No. 25-3727

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

————————————

GAVIN NEWSOM, *in his official capacity as Governor of the State of California*; STATE OF CALIFORNIA,
*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, *in his official capacity as President of the United States*; PETE HEGSETH, *in his official capacity as Secretary of the Department of Defense*; DEPARTMENT OF DEFENSE,
*Defendants-Appellants.*

————————————

On Appeal from the United States District Court
for the Northern District of California

————————————

## EMERGENCY MOTION UNDER CIRCUIT RULE 27-3
## FOR STAY PENDING APPEAL

————————————

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
ANNA O. MOHAN
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7517*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-2689*

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................1

STATEMENT ......................................................................................................3

    A.    Legal Background.................................................................... 3

    B.    Factual Background................................................................. 5

    C.    Prior Proceedings .................................................................. 9

ARGUMENT ..................................................................................................... 10

    A.    This Court has appellate jurisdiction........................................ 10

    B.    The federal government is likely to prevail on the merits. ....................... 11

    C.    The other stay factors strongly favor the government. ........................... 20

CONCLUSION .................................................................................................. 23

CERTIFICATE OF COMPLIANCE

# INTRODUCTION

The district court has entered an unprecedented order enjoining the President from deploying National Guardsmen to protect federal officers from ongoing violent protests and attacks, and to protect federal property from further damage. That order is an extraordinary intrusion on the President's constitutional authority as Commander in Chief to call forth the National Guard as necessary to protect federal officials, as well as his statutory authority under 10 U.S.C. § 12406 to mobilize state National Guards into federal service. This Court should immediately stay the order pending appeal.

The President is specifically authorized by statute to deploy the National Guard when "there is a rebellion or danger of a rebellion against the authority of the Government of the United States" or "the President is unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(2)-(3). Both prongs apply here: the violent actions taken by large numbers of protestors, whom local law-enforcement officials have been unable effectively to control, constitute a rebellion against federal authority, and have impeded the ability of Immigration Customs and Enforcement (ICE) and other federal officials to enforce federal law. The President accordingly mobilized the National Guard "to temporarily protect ICE and other United States Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at

locations where protests against these functions are occurring or are likely to occur based on current threat assessments and planned operations."

The district court concluded that the statutory conditions were not satisfied. But that sort of second-guessing of the Commander in Chief's military judgments is a gross violation of the separation of powers. Nearly 200 years ago, the Supreme Court made clear that these judgment calls are for the President to make—not a Governor, and certainly not a federal court. *See Martin v. Mott*, 25 U.S. 19 (12 Wheat.) 19 (1827). In any case, even if reviewable, the President had more than ample grounds to determine that the riots rose to the level of a "danger" of rebellion, and that state and local law enforcement were "unable" to sufficiently protect federal personnel and property.

The district court also found that the President's memorandum was not issued "through" the Governor of California within the meaning of 10 U.S.C. § 12406, but that too was mistaken. The President's memorandum directed the Secretary of Defense to effectuate the federalization of National Guard troops, and the Secretary issued memoranda to the Adjutant General of the California National Guard, who acts for the Governor for these purposes, to transfer authority over the Guard from the state to the federal government. Nothing in the statute requires the Governor's *consent* to mobilization—a legal theory that would have empowered the Governor of Arkansas to block President Eisenhower from deploying the National Guard to desegregate Arkansas' public school. In any event, any failure to issue an order

"through" the Governor—who indisputably had contemporaneous notice of the order, and no legal authority to block it—would not support this extraordinary injunction entered by the district court.

The district court's order improperly impinges on the Commander in Chief's supervision of military operations, countermands a military directive to officers in the field, and puts federal officers (and others) in harm's way. The balancing of harms thus weighs strongly in favor of interim relief pending appeal and/or mandamus, and this Court should also grant an immediate administrative stay pending consideration of this motion. Defendants-appellants respectfully request that this Court act on the motion no later than 9:00 pm PST today, June 12, 2025, to permit the Solicitor General to seek immediate relief in the Supreme Court, if necessary, before the expiration of the temporary stay issued by the district court at noon tomorrow, June 13.

## STATEMENT

### A.    Legal Background

**1.** The Constitution authorizes Congress both to raise and support a national Army and to organize "the Militia." *See* U.S. Const. art. I, § 8 (granting Congress the power to "call[] forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions"). Exercising that authority, Congress has "created the National Guard of the United States, a federal organization comprised of state national guard units and their members." *Perpich v. Department of Def.*, 496 U.S. 334,

338 (1990) (quotation and citation omitted).  The National Guard is composed of both the State National Guard, under the command of the several States, and the National Guard of the United States, a federal entity under the federal chain of command, *see* 10 U.S.C. § 10101.

"Since 1933 all persons who have enlisted in a State National Guard unit have simultaneously enlisted in the National Guard of the United States."  *Perpich*, 496 U.S. at 345.  Once ordered into federal service, "members of the National Guard . . . lose their status as members of the state militia during their period of active duty," *id.* at 347, become federal soldiers, 10 U.S.C. § 10106, and serve under the President as Commander in Chief, *see* U.S. Const., art. II, § 2, cl. 1.

**2.**  Congress has granted the President several authorities under which he may call forth the National Guard, including 10 U.S.C. § 12406, the statutory authority under which the President acted here.

Section 12406's historic lineage dates to the First Militia Act of 1792, which was used by George Washington to respond to the Whiskey Rebellion.  *See* Cong. Research Serv., *The Posse Comitatus Act and Related Matters: The Use of the Military to Execute Civilian Law*, R42659, at 8 (Nov. 6, 2018).  Today, in its entirety, Section 12406 provides:

Whenever—

(1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation;

(2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or

(3) the President is unable with the regular forces to execute the laws of the United States;

the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws. Orders for these purposes shall be issued through the governors of the States or, in the case of the District of Columbia, through the commanding general of the National Guard of the District of Columbia.

**B.      Factual Background**

**1.** On Friday, June 6, 2025, officers from ICE Enforcement and Removal Operations (ERO) conducted federally authorized immigration enforcement operations in Los Angeles, California. *See* Decl. of Ernesto Santacruz Jr., A238 ¶ 7.[1] A group of protestors gathered and tried to prevent ICE officials from operating by throwing objects at ICE vehicles. *Id.* Several individuals were arrested and brought to ERO's federal facility in downtown Los Angeles. *Id.*

Around 5:00 pm that evening, a crowd began to gather at the ERO facility. Santacruz Decl., A238 ¶ 9. The crowd quickly turned violent, and the protests spread across downtown, threatening several Federal facilities and other public buildings. *Id.* ¶¶ 9, 10. Protestors threw "bottles, concrete chunks, and other objects" at Federal Protective Service officers attempting to prevent the mob from breaching federal property. *Id.* ¶ 11. The officers were "pinned down in a defensive position by

---

[1] Citations to "A" are to the addendum accompanying this motion.

protesters and severely outnumbered," while rioters attempted "to use large rolling commercial dumpsters as a battering ram" to violently "break open the garage gate and break into the federal building." *Id.*

Officers feared for their safety. Santacruz Decl., A238 ¶ 13. ICE and Homeland Security Investigations officers responded to support the Federal Protective Service officers under siege, and attempted to use non-lethal force to disperse the crowd. *Id.* The federal officers managed to prevent a breach of the facility, but it took Los Angeles Police Department (LAPD) officers nearly an hour and a half to arrive and assist the federal officers in pushing the crowd back from the parking garage gate. *Id.* Meanwhile, the protests turned extremely violent; news reports show demonstrators using chairs, dumpsters, and other weapons. *Id.* ¶ 14. Once on scene, LAPD declared an "unlawful assembly" and ordered protesters to disperse, but many protestors instead began attacking LAPD officers, and the scene was not cleared for several hours, leaving extensive damage to multiple federal buildings. *Id.* ¶¶ 16, 17.

That night, President Trump spoke with Governor Newsom, informing the Governor of the dangers to federal personnel and property and directing him to take action to stop the violence.[2] The next day, the violence only intensified. On Saturday

---

[2] Emma Colton & John Roberts, *Trump Brings Receipts He Called Newsom Amid LA Riots as California Gov Claims There Wasn't 'Even a Voicemail',* Fox News (June 10, 2025 4:15pm EDT), https://perma.cc/Z25U-GD5X; *see also* Governor Gavin

*Continued on next page.*

morning, large crowds congregated around a Homeland Security Investigations office in the Los Angeles area as officers prepared for another enforcement operation. Santacruz Decl., A238 ¶ 18. The crowd blocked traffic and began to attack ERO and Customs and Border Patrol (CBP) officers, causing hours of non-stop fighting between federal officials and protesters. *Id.* ¶ 20. The crowd surrounded an ERO officer's vehicle, shaking and pounding on the car and pummeling it with stones. *Id.* Protestors boxed in federal officers, launching mortar-style fireworks with multiple explosions at them and throwing objects of all nature, shattering the wrist of a CBP officer. *Id.* The perimeter fence of the federal building was breached, and several vehicles were damaged. *Id.* ¶ 21.

Protests continued in the following days. Santacruz Decl., A238 ¶ 24. Protesters blocked the 101 Freeway. *Id.* ¶ 25. Protesters set dumpsters on fire and launched commercial-grade fireworks at federal officers. *Id.* ¶ 26. Federal and state buildings have been damaged, and the federal building security checkpoint has been in ruins. *Id.* ¶¶ 26-27. Officers have been injured. *Id.* ¶ 27. And the federal complex in downtown Los Angeles, which has been closed due to the unrest, *id.* ¶ 29, has been severely damaged and vandalized, *id.* ¶¶ 26-27.

**2.** In response to the violence, the President signed a memorandum on June 7 calling into federal service at least 2,000 members of the California National Guard to

---

Newsom, *Watch: Governor Newsom Discusses "Donald Trump's Mess" in Los Angeles* (June 9, 2025), https://perma.cc/6W95-2DZQ.

protect federal personnel and property. Memorandum from President Donald J. Trump to the Sec'y of Def., Attorney Gen., and Sec'y of Homeland Sec, *Department of Security for the Protection of Department of Homeland Security Functions*, (June 7, 2025), A250-51 (Presidential Memo). The President found that "[n]umerous incidents of violence and disorder have recently occurred and threaten to continue" in response to ICE and other government officials' enforcement of federal law. Presidential Memo, A250. "In addition, violent protests threaten the security of and significant damage to Federal immigration detention facilities and other Federal property." *Id.* The President determined that protests and acts of violence that "directly inhibit the execution of the laws . . . constitute a form of rebellion against the authority of the Government of the United States." *Id.* "In light of these incidents and credible threats of continued violence," the President invoked Section 12406 to mobilize the National Guard "to temporarily protect ICE and other United States Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property[.]" *Id.* The President directed the Secretary of Defense "to coordinate with the Governors of the States and the National Guard Bureau in identifying and ordering into Federal service the appropriate members and units of the National Guard under this authority." *Id.* The Secretary was also authorized to deploy members of the regular Armed Forces "to augment and support the protection of Federal functions and property." A251.

The Secretary of Defense subsequently directed the California Adjutant General to effectuate the call into federal service of the National Guard. *See* Memorandum from the Sec'y of Def. to Adjutant Gen. of the Cal. Nat'l Guard, *Calling Members of the California National Guard into Federal Service* (June 7, 2025), A249-51. The Secretary subsequently requested additional federalized National Guards, Memorandum from the Sec'y of Def. to the Adjutant Gen. of the Cal. Nat'l Guard, *Calling Additional Members of the California National Guard into Federal Service* (June 9, 2025), A253-56, and also ordered the mobilization of 700 active-duty marines. *See* Decl. of Paul S. Eck, A189 ¶ 18.

Since those calls to federal action, National Guardsmen have been "protecting federal personnel performing official functions as well as property at designated locations through security patrols, observation posts, and outer cordon security perimeter of buildings." *See* Decl. of Major Gen. Niave F. Knell, A259 ¶ 7. This includes National Guardsmen providing protection activities at several federal sites throughout the Los Angeles area, as well as to federal agents conducting their duties, including ICE agents enforcing federal immigration laws.

### C. Prior Proceedings

**1.** Plaintiffs, the State of California and Governor Gavin Newsom, filed suit alleging that the defendants' actions were *ultra vires* under the Constitution and 10 U.S.C. § 12406, violated the Tenth Amendment, and were arbitrary and capricious under the Administrative Procedure Act. A1-22. Plaintiffs then moved for a

temporary restraining order enjoining the Department of Defense from deploying federal troops in aid of federal agents carrying out their duties to enforce federal law in the field. A201.

**2.** The district court held a hearing on the motion on June 12, 2025 and granted the motion that same day. The district court issued an order enjoining defendants "from deploying members of the California National Guard in Los Angeles," and directing defendants "to return control of the California National Guard to Governor Newsom." A295. Defendants appealed.[3]

## ARGUMENT

The government is entitled to a stay because it is likely to succeed on the merits, it will suffer irreparable harm absent a stay, and the balance of the equities and public interest favor a stay. *See Nken v. Holder*, 556 U.S. 418, 426 (2009).

### A.      This Court has appellate jurisdiction.

This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1). "[W]here an order has the 'practical effect' of granting or denying an injunction, it should be treated as such for purposes of appellate jurisdiction." *Abbott v. Perez*, 585 U.S. 579, 594 (2018). Here, "several factors counsel in favor of construing the District Court's order as an appealable preliminary injunction." *Department of Education v. California*, 145 S. Ct. 966, 968 (2025) (per curiam). The court issued a comprehensive, 36-page order,

---

[3] The district court stayed its order until noon on June 13, 2025. A295.

"an adversary hearing has been held, and the court's basis for issuing the order is strongly challenged." *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 762 (9th Cir. 2018) (cleaned up). The order also threatens to inflict irreparable harm by exposing federal property and officials once again to a grave threat of lawless mob violence, and lawful federal immigration enforcement efforts again to the likelihood of active interference and obstruction," thus warranting immediate review. *Abbott*, 585 U.S. at 594-595.

In the alternative, this Court may exercise mandamus jurisdiction to review the district court's extraordinary order. *See Special Invs., Inc. v. Aero Air, Inc.*, 360 F.3d 989, 993 (9th Cir. 2004). The order imposes irreparable harm by impinging on the ability of the President and the Secretary of Defense to utilize the National Guard to protect federal officials enforcing federal law from harm or interference, leaving the federal government with "no other adequate means to attain the relief." *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 380 (2004) (quotation marks omitted). And mandamus is "appropriate under the circumstances" because the district court has claimed authority to superintend the Executive Branch's control over the military. *Id.* at 381.

**B.    The federal government is likely to prevail on the merits.**

**1.** The Constitution obligates the President to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. The President is also the Commander in Chief of the Armed Forces including "the Militia of the several States, when called into the actual Service of the United States[.]" *Id.* § 2, cl. 1. The President has

inherent constitutional authority to use federal troops, including federalized National Guard members, to protect the federal government, its functions, and its property. *See In re Neagle*, 135 U.S. 1, 65 (1890); *In re Debs*, 158 U.S. 564 (1895).

Congress also has explicitly authorized the President to "call into Federal service" members of the National Guard "[w]henever," *inter alia*, "there is a rebellion or danger of a rebellion against the authority of the Government of the United States" or "the President is unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(2)-(3).

The President properly invoked those authorities when he federalized California National Guard members in response to the dangerous and uncontrolled security environment in Los Angeles. "[I]ncidents of violence and disorder" were occurring "in response to the enforcement of Federal law by [ICE] and other United States Government personnel . . . performing Federal functions and supporting the faithful execution of Federal immigration laws." Presidential Memo, A250. Those incidents "threaten[ed] the security of and significant damage to Federal immigration detention facilities and other Federal property." *Id.* The President concluded that the protests and acts of violence—to the extent they "directly inhibit[ed] the execution of the laws"—constituted "a form of rebellion against the authority of the Government of the United States." *Id.* And he federalized National Guard members "to temporarily protect ICE and other United States Government personnel who are performing Federal functions, including the enforcement of Federal law, and to

protect Federal property, at locations where protests against these functions are occurring or are likely to occur." *Id.*

**2.** The district court rejected the President's substantive determination under Section 12406, concluding that the protests do not rise to the level of "rebellion" and that the federal government has not been "unable" to execute its laws.

The term "rebellion" however, is not limited to "an organized attempt to change the government or leader of a country," as plaintiffs claimed in district court. *See* A39. Congress enacted Section 12406's predecessor in response to the Whiskey Rebellion—a protest against the government's taxes, not an effort to change the country's leader. Even California's cited definition of "rebellion" includes "[o]pen resistance or opposition to an authority or tradition" and "[d]isobedience of a legal command or summons." *Rebellion*, Black's Law Dictionary (12th ed. 2024). That is precisely what occurred here—protests and acts of violence "constitute a form of rebellion against the authority of the Government of the United States" to the extent they "directly inhibit the execution of the laws." Presidential Memo, A250.

The basis for the President's conclusions regarding the violence in Los Angeles cannot reasonably be questioned. Plaintiffs' own declarant described protesters "engage[d] in dangerous behavior such as throwing rocks and other objects, including a Molotov Cocktail at deputies damaging vehicles, burning a vehicle, looting a gas station, and vandalizing property." Decl. of Brian Olmstead, A183-84 ¶ 9. Plaintiffs' exhibits depicted images of burning or burnt cars, *see, e.g.,* A97, A143, A152, A171,

A173, of demonstrators "blocking traffic on [a] busy thoroughfare," A172, and of a "massive crowd" pushing to a wall barrier, A170. One article documented a crowd of demonstrators "mov[ing] through the city despite the area-wide dispersal order, again lighting fireworks and throwing projectiles at police vehicles driving by." A171.

The record also plainly supports the President's determination that he was "unable with the regular forces to execute the laws of the United States," 10 U.S.C. § 12406(3). The Santacruz declaration details the substantial threats that federal law enforcement personnel experienced as they attempted to enforce—*i.e.*, "execute"—federal immigration laws. *See* A239-245. Plaintiffs' submissions show the same. One article describes how demonstrators "blocked entrances and exits to [a Federal Building in downtown Los Angeles]" and "attempted to physically stop ICE vehicles." A104. Another reports that "ICE requested assistance from LAPD multiple times over the course of Friday night" but that it "took LAPD 55 minutes to respond." A173.

The district court was incorrect in suggesting that ICE's limited success in arresting some individuals means that Section 12406(3) cannot apply. That argument ignores the fact that ICE would have been able to carry out additional federal enforcement activities absent violent protests. It also ignores that federal personnel were physically injured while effectuating the arrests they were able to make in these perilous circumstances. Section 12406(3) cannot plausibly be read to mean that so long as some amount of execution of the laws remains possible, the statute cannot be

14

invoked, regardless of how much execution of the laws remains thwarted or how much personal danger federal personnel face during operations.

Finally, to the extent plaintiffs challenge the President's assessment of the magnitude of the threat or the number of National Guard members it was appropriate to deploy, those are not subjects for judicial second-guessing. Decisions related to the control and deployment of militias are firmly entrusted to the political branches. *See* U.S. Const. art. I, § 8, cl. 15 (granting Congress the "Power . . . To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions" (ellipsis in original)); U.S. Const. art. II, § 2, cl. 1 ("The President shall be Commander in Chief . . . of the Militia of the several States, when called into the actual Service of the United States."). The statute at issue—Section 12406—also specifies that the President may call into service members of the National Guard "in such numbers as he considers necessary" to quell the rebellion or execute the laws. 10 U.S.C. § 12406. When, as here, a statute "commits decisionmaking to the discretion of the President, judicial review of the President's decision is not available." *Dalton v. Specter*, 511 U.S. 462, 477 (1994); *see also Martin v. Mott*, 25 U.S. 19 (12 Wheat.) 19 (1827) (holding that a challenge to the legality of the President's decision to call out the militia under a similar statute was beyond judicial scrutiny). The deployment decision here also implicates immigration and national-security matters into which courts will intrude only with the greatest reluctance. *See Mathews v. Diaz*, 426 U.S. 67,

81 (1976) (immigration); *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 842 (D.C. Cir. 2010) (en banc) (national security).

**3.** The district court similarly erred in concluding that the President failed to comply with Section 12406's procedures. Section 12406 specifies that the President's orders calling National Guard members into service "shall be issued through the governors of the States." 10 U.S.C. § 12406. That procedural mechanism reflects the dual control of the Guard and ensures that responsibility for the soldiers is clearly transferred from state to federal control. *See supra* pp. 3-4.

The President and the Secretary of Defense satisfied this procedural requirement. The President spoke with Governor Newsom about the situation in Los Angeles on June 6. *See supra* n.2. The next day, the President signed the memorandum federalizing National Guardsmen. *See* Presidential Memo, A250-51 The Secretary of Defense then sent a memorandum to California's Adjutant General, a state cabinet-level official who is required under California law to perform "duties consistent with the regulations and customs of the United States Army, United States Air Force, and the United States Navy[,]" including "issu[ing] all orders *in the name of the Governor.*" Cal. Mil. & Vet. Code § 163 (emphasis added). The memorandum bore the label "THROUGH: THE GOVERNOR OF CALIFORNIA." A249; *see also* A253 (second memorandum bearing same label). Contrary to the district court's conclusion, the transmission of the order through the official who issues orders on behalf of Governor was sufficient to satisfy Section 12406's requirement.

Nothing in the statute supports plaintiffs' contention that the Governor needed to issue the mobilization order himself. Section 12406 states that orders are issued "through," not "by," governors. 10 U.S.C. § 12406. There is a fundamental difference between orders being issued "by" a person (making them the decisionmaker) and orders being issued "through" that person (providing notice of and making them a conduit for a decision already made). The latter structure better aligns with the purpose of the procedural requirement—to effectuate the handover of command and control of the National Guard members from the state military commander to the federal military commander, thereby avoiding command confusion during an emergency.

Plaintiffs are likewise incorrect to suggest that the President needed to obtain the Governor's consent prior to federalizing National Guard members. When Congress wants to require gubernatorial consent in National Guard matters, it says so explicitly. *See, e.g.*, 10 U.S.C. § 12301(d) (members "may not be ordered to active duty . . . without the *consent* of the governor or other appropriate authority of the State concerned" (emphasis added)). Nor was the President required to consult with the Governor about the prudence and specifics of the order. When a commander issues an order "through" a subordinate, that is not an invitation for the subordinate to debate whether the order should have been issued in the first place. And in any event, the President did discuss the federalization with Governor Newsom. *See supra* n.2.

**4.**  The President's order is also consistent with the Tenth Amendment and the Posse Comitatus Act.  The President federalized National Guard members for the express purpose of "temporarily protect[ing] ICE and other United States Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where protests against these functions are occurring or are likely to occur."  Presidential Memo, A250.  He did not authorize the National Guard members to prevent future protests or to exercise "police power."  Accordingly, federalized California National Guard members have been protecting federal personnel, property, and functions at designated locations by providing security patrols, observation posts, and outer cordon security perimeter of buildings. A259-60 ¶¶ 6-8.

Plaintiffs' Tenth Amendment and Posse Comitatus Act arguments thus fail. The President indisputably has the authority to call forth the militia to protect federal property, personnel, and prerogatives.  *See supra* p. 11.  The federal government does not invade areas of state sovereignty simply because it exercises its authority in a manner that impacts a state's police power. *See Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 291 (1981).

It is similarly well established that when the President lawfully federalizes National Guard members pursuant to statutory authority designed to authorize the use of the militia to restore order, the Posse Comitatus Act does not apply.  Although the Act generally prohibits the use "of the Army, the Navy, the Marine Corps, the Air

Force, or the Space Force as a posse comitatus or otherwise to execute the laws," that prohibition does not apply in "cases and under circumstances expressly authorized by the Constitution or Act of Congress." 18 U.S.C. § 1385. The Insurrection Act, which was not invoked here, is one such exception. *See President's Power to Use Federal Troops to Suppress Resistance to Enforcement of Federal Court Orders—Little Rock, Arkansas*, 41 Op. Att'y Gen. 313 (Nov. 7, 1957). So too is the similarly worded Section 12406, which the President invoked in issuing the challenged memorandum. The National Guard may lawfully be used to suppress invasions and rebellions, and to protect the execution of the laws where regular forces have failed to do so, without engaging in activities the Posse Comitatus Act would otherwise prohibit.

The President's constitutional authority to protect federal personnel and property is likewise unaffected by the Posse Comitatus Act. The Act "does not impair the President's inherent authority to use troops for the protection of federal property and federal functions." William Rehnquist, *Authority to Use Troops to Prevent Interference With Federal Employees by Mayday Demonstrations and Consequent Impairment of Government Functions*, 1 Op. O.L.C. Supp. 343, 343 (1971). Nor does it "prevent the use of troops to protect the functioning of the government by assuring the availability of federal employees to carry out their assigned duties." *Id.*; *see In re Neagle*, 135 U.S. at 65; *In re Debs*, 158 U.S. at 582.

## C. The other stay factors strongly favor the government.

**1.** The district court's injunction imposes significant harms on the federal government and the public at large. It exposes federal employees to violence at the hands of rioting mobs in Los Angeles and interferes with those employees' ability to enforce federal law. As noted, National Guard members were deployed following mob violence directed at federal officers and property, in which protestors threw bottles, concrete chunks, and other objects at federal protective service officers attempting to prevent a mob from breaching federal property; attacked federal officers preparing for an immigration enforcement operation with rocks and explosives and fought them for hours; trapped a federal enforcement officer in her vehicle, which a mob pounded, shook, and violently pummeled with stones; injured numerous federal officers and agents by throwing projectiles; set multiple vehicles on fire; and caused extensive damage to federal property. *See supra* pp. 5-7. And it reaches even beyond the injunction sought by the plaintiffs, by enjoining National Guard members from protecting federal properties from damage. The federal government clearly has a compelling interest in preventing these extraordinary acts of violence causing both personal injury and property damage—which local law-enforcement and federal officials were unsuccessful in preventing. *See Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 838 (9th Cir. 2020).

The government also suffers irreparable harm when its federal immigration officials are prevented from safely and successfully enforcing the law by mobs of protestors.

On the other side of the ledger, plaintiffs have not established irreparable injury warranting extraordinary relief. Plaintiffs complain that the mobilization order was not issued by the Governor or following consultation with him. But the federal government's overriding interest in protecting national security far outweighs plaintiffs' interest in vindicating asserted procedural rights. That follows directly from *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008), where the plaintiffs claimed that the Navy failed to conduct studies before deploying an antisubmarine force, but the Court held that the plaintiffs' interests were "plainly outweigh[ed]" by the harm to the government in "jeopardiz[ing] the safety of the fleet." *Id.* at 26.

Plaintiffs also claim there is a "very high risk of substantial civil unrest" due to the "deployment of the military in a large, civilian population center." A46. That theory of injury is inherently suspect, as it presumes that the widespread violence occurring prior to the President's memorandum was caused by immigration enforcement, but that going forward, it will be caused instead by the National Guard's protection of federal employees in their enforcement of federal law. Nor does that theory make sense given plaintiffs' concession that their desired injunction need not bar the National Guard from "protecting federal immigration detention facilities and

other federal buildings" or "defending federal officials or employees from threatened physical harm at such buildings or real property." A201

**2.** Even if some form of injunctive relief had been warranted, it should have been "tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018). As explained, plaintiffs' proposed injunction restricted only how National Guard members could be deployed, limiting them to protecting federal property, and federal personnel on such property, but not federal personnel outside federal property. The district court, however, issued a broader injunction directing defendants "to return control of the California National Guard to Governor Newsom" and enjoining defendants from deploying National Guard members in Los Angeles. A295.

Beyond those flaws, plaintiffs' claimed harm is from the deployment of the National Guard to protect federal officers enforcing federal immigration law in Los Angeles during the ongoing crisis, but the district court granted an injunction that bars the Secretary of Defense and the Department of Defense "from deploying members of the California National Guard in Los Angeles," A295, with no limitation to the identity of the federal agency they are assisting or the nature of agency operations. At a minimum, the injunction should be stayed insofar as it applies to National Guard protection of federal agencies enforcing laws other than the immigration laws.

**CONCLUSION**

The Court should stay the district court's order pending appeal, and should grant an immediate administrative stay pending consideration of the motion.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. McARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE

*/s/ Anna O. Mohan*
ANNA O. MOHAN
*Attorneys, Appellate Staff*
*Civil Division, Room 7517*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 353-2689*
*Sharon.swingle@usdoj.gov*

June 2025

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) and Local Rules 27-1(d) and 32-3 because it contains 5,392 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Anna O. Mohan*
ANNA O. MOHAN

# ADDENDUM

# TABLE OF CONTENTS

Complaint, Dkt. 1 (June 9, 2025)............................................................................ A1

Motion for Temporary Restraining Order, Dkt. 8 (June 10, 2025)............................. A23

Declaration of Nicholas Espiritu in Support of Motion for Temporary
Restraining Order, Dkt. 8-1 (June 10, 2025) ...................................................... A51

Declaration of Brian Olmstead, Dkt. 8-2 (June 10, 2025)......................................... A180

Declaration of Paul S. Eck, Dkt. 8-3 (June 10, 2025) .................................................. A186

[Proposed] Order Granting Temporary Restraining Order, Dkt. 8-4 (June 10,
2025) ........................................................................................................... A197

Defendants' Corrected Opposition to Motion for Temporary Restraining
Order, Dkt. 25 (June 11, 2025)........................................................................ A203

Declaration of Ernesto Santacruz, Jr., Dkt. 25-1 (June 11, 2025) ............................ A235

June 7 Memorandum for Adjutant General of the California National Guard
from the Secretary of Defense and June 7 Memorandum for the
Secretary of Defense from the President, Dkt. 25-2 (June 11, 2025)............ A249

June 9 Memorandum for Adjutant General of the California National Guard
Through: The Governor of California and June 7 Memorandum for the
Secretary of Defense from the President, Dkt. 25-3 (June 11, 2025).............. A53

Declaration of Major General Niave F. Knell, Dkt. 25-4 (June 11, 2025)............... A257

Order Granting Temporary Restraining Order, Dkt. 64 (June 12, 2025) ............... A261

**ROB BONTA**
Attorney General of California
MARISSA MALOUFF
JAMES E. STANLEY
Supervising Deputy Attorneys General
NICHOLAS ESPÍRITU
LUKE FREEDMAN
ROBIN GOLDFADEN
BRENDAN M. HAMME
LORRAINE LOPEZ
KENDAL MICKLETHWAITE
MEGAN RICHARDS
Deputy Attorneys General
LAURA L. FAER
Acting Senior Assistant Attorney General
  1515 Clay St.
  Oakland, CA  94612
  Telephone: (510) 879-3304
  E-mail:  Laura.Faer@doj.ca.gov
*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **GAVIN NEWSOM, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF CALIFORNIA; STATE OF CALIFORNIA,** | **NO.** |
| Plaintiffs, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| **v.** | Date:<br>Time: |
| **DONALD TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; PETE HEGSETH, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF DEFENSE; U.S. DEPARTMENT OF DEFENSE,** | Courtroom:<br>Judge:<br>Trial Date:<br>Action Filed: |
| Defendants. | |

**A1**

**INTRODUCTION**

1.    The Governor of the State of California and the State of California bring this action to protect the State against the illegal actions of the President, Secretary of Defense, and Department of Defense to deploy members of the California National Guard, without lawful authority, and in violation of the Constitution.

2.    One of the cornerstones of our Nation and our democracy is that our people are governed by civil, not military, rule. The Founders enshrined these principles in our Constitution— that a government should be accountable to its people, guided by the rule of law, and one of civil authority, not military rule.

3.    President Trump has repeatedly invoked emergency powers to exceed the bounds of lawful executive authority. On Saturday, June 7, he used a protest that local authorities had under control to make another unprecedented power grab, this time at the cost of the sovereignty of the State of California and in disregard of the authority and role of the Governor as commander-in-chief of the State's National Guard.

4.    The vehicle the President has sought to invoke for this unprecedented usurpation of state authority and resources is a statute, 10 U.S.C. § 12406, that has been invoked on its own only once before and for highly unusual circumstances not presented here. Invoking this statute, the President issued a Memorandum on June 7, 2025 (Trump Memo), "call[ing] into Federal service members and units of the National Guard." Secretary of Defense Hegseth, in turn, issued a Memorandum (DOD Order) that same day to the Adjutant General of California, ordering 2,000 California National Guard members into federal service. And on June 9, 2025, Secretary Hegseth issued another Memorandum (June 9 DOD Order) ordering an additional 2,000 California National Guard members into federal service.

5.    These orders were issued despite the text of section 12406, which, among other things, requires that when the President calls members of a State National Guard into federal service pursuant to that statute, those orders "shall be issued through the governors of the States." 10 U.S.C. § 12406. Instead, Secretary Hegseth unlawfully bypassed the Governor of California, issuing an order that by statute must go through him.

**A2**

6.  As a result, the National Guard has been deployed to Los Angeles. And now, on top of the National Guard, Defendants are reportedly also deploying Marines to the area.

7.  The President's federalization and deployment of the National Guard for reasons not authorized by law and without input from or consent of the Governor contravenes core statutory and constitutional restrictions. Use of the regular armed forces is similarly unlawful here.

8.  The Constitution reserves to the States power over their respective state militias— now the National Guard— unless the State requests or consents to federal control. Only under the most exigent of circumstances can the President, over the objections of a State, call the National Guard into federal service. The balance the Framers struck between the State's power to control its own militia and the very narrow circumstances in which the federal government may take command and control of the militia serves as a vital check against federal overreach. Section 12406 does not provide the authority Defendants have claimed and cannot be the vehicle for their actions.

9.  The Constitution grants the States—not the federal Executive—the authority to conduct ordinary law enforcement activities and to determine how their own state laws should be enforced.

10.  Reflecting the Founders' distrust of military rule, the U.S. Constitution and the laws of our Nation strictly limit the domestic use of the military, including the federalized National Guard. The Posse Comitatus Act codifies these strict rules, prohibiting the military from engaging in civil law enforcement unless explicitly authorized by law. The authority to use the military domestically for civil law enforcement is reserved for dire, narrow circumstances, none of which is present here. Defendants have overstepped the bounds of law and are intent on going as far as they can to use the military in unprecedented, unlawful ways.

11.  It appears that the Trump Administration intends to treat section 12406 as a mechanism to evade these time-honored constitutional limits. But the statute provides no such authority. This Court should reject the unlawful attempt by Defendants to wrest away the State's control of its own National Guard for improper and unjustified ends.

**A3**

**JURISDICTION AND VENUE**

12.  The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, and 2201(a).

13.  Venue is proper in this judicial district under 28 U.S.C. § 1391(e) because the California Attorney General and the State of California have offices at 455 Golden Gate Avenue, San Francisco, California and at 1515 Clay Street, Oakland, California, and therefore reside in this district, and no real property is involved in this action. This is a civil action in which Defendants are agencies of the United States or officers of such an agency.

14.  Assignment to the San Francisco Division of this District is proper pursuant to Civil Local Rule 3-2(c)-(d) and 3-5(b) because Plaintiffs maintain offices in the District of San Francisco.

**PARTIES**

15.  Plaintiff Gavin Newsom is the Governor of the State of California. In his capacity as Governor, Governor Newsom is the Commander-in-Chief of the California National Guard. Cal. Const., art. V, § 7.

16.  Attorney General Rob Bonta is the chief law officer of the State of California and head of the California Department of Justice. He has the authority to file civil actions to protect California's rights and interests and the resources of this State. Cal. Const., art. V, § 13; Cal. Gov't Code §§ 12510-11, 12600-12; see *Pierce v. Superior Court*, 1 Cal. 2d 759, 761-62 (1934) (The Attorney General "has the power to file any civil action or proceeding directly involving the rights and interests of the state . . . and the protection of public rights and interests.").

17.  Defendant Donald Trump is the President of the United States. In his official capacity as such, he issued a Memorandum on June 7, 2025, directing the federalization of the National Guard. He is the Commander-in-Chief of the United States' armed forces, including the National Guard when under federal control. He is sued in his official capacity.

18.  Defendant Peter Hegseth is the Secretary of Defense and head of the Department of Defense. On June 7 and June 9, 2025, Secretary Hegseth issued Memoranda ordering California National Guard members into federal service. He is sued in his official capacity.

**A4**

19.  Defendant U.S. Department of Defense (DOD) is a department of the executive branch of the United States government, responsible for coordinating the activities of the United States' armed forces, including the National Guard when under federal control.

20.  Defendant U.S. Department of Defense and Defendant Hegseth shall collectively be referred to as the "DOD Defendants."

## FACTS

### A.    Immigration Raids Give Rise to Protests

21.  On Friday, June 6, 2025, Immigration and Customs Enforcement (ICE) officers carried out enforcement actions at multiple locations within Los Angeles County and the City of Los Angeles. According to news reports that rely on statements from the Department of Homeland Security, ICE officers were executing search warrants at various locations, including outside Ambiance Apparel, a clothing wholesaler. ICE reportedly also carried out enforcement activities that included detentions and arrests at a doughnut shop in the Fashion District of downtown Los Angeles and two Home Depot stores in the Westlake District in Los Angeles.

22.  Prior to the ICE operations, federal officials did not provide the leadership of the Los Angeles Sheriff's Department (LASD) or Los Angeles Police Department (LAPD) with any notice as to the planned operations or otherwise attempt to coordinate activities to protect the safety of the public.

23.  During the course of these operations, ICE and its agents reportedly took actions that inflamed tensions and provoked protest. On information and belief, agents engaged in military-style operations while conducting these detentions and arrests that sparked panic in the community. For example, in some instances, ICE agents were reportedly observed sealing off entire streets around targeted buildings and using unmarked armored vehicles equipped with paramilitary gear.

24.  In all, the Department of Homeland Security reported that its enforcement activities on Friday, June 6, resulted in the arrest of approximately 44 individuals and 70-80 people detained in total.

**A5**

25.  That same day, members of the public gathered in protest at the Edward R. Roybal Federal Building and U.S. Courthouse. This building, located at 255 E. Temple St., Los Angeles, CA 90012, includes a detention facility known as "B-18." On information and belief, protestors gathered at this location based on reports that individuals who were detained during the ICE operations were being held there. Protesters also gathered at other locations where ICE operations were reportedly happening, including in the City of Paramount, a city in Los Angeles County.

26.  While not unified in their views or tactics, most protesters seem to have gathered to express their opposition to the manner in which the Trump Administration has executed its immigration agenda and to express solidarity with and concern for the individuals and families most directly impacted by the enforcement actions taking place in their community.

27.  During the protests, Service Employees International Union California leader David Huerta was injured in the midst of interactions with federal agents. He was arrested, treated at a nearby hospital, and then detained. Federal authorities have alleged that Mr. Huerta was obstructing federal agents' access to a worksite where they were executing a warrant, while in contrast, Union representatives have reported that Mr. Huerta was detained while exercising his First Amendment right to observe and document law enforcement activity. The arrest of Mr. Huerta, who remains detained as of the date of filing, led to further upset in the community.

28.  Protests continued on June 7, and June 8, 2025.

29.  Most of those involved in protesting have been exercising their rights under the First Amendment in a peaceful, non-violent, and legally compliant manner. There have no doubt been exceptions. News reports have shown some individuals in the midst of these protests breaking the law and acting violently, for example by throwing objects at law enforcement officers and damaging property, including by setting fires. State and local law enforcement agencies have responded to such actions, and Governor Newsom and other state and local officials have unequivocally condemned such conduct and called for the prosecution of such law breaking.

30.  At no point in the past three days has there been a rebellion or an insurrection. Nor have these protests risen to the level of protests or riots that Los Angeles and other major cities

have seen at points in the past, including in recent years. The protests and unrest of the past three days pale in comparison to a host of examples, including the time when the National Guard was last federalized for riot control – in 1992, at the then-Governor's request, during the "Rodney King riots." That unrest involved thousands of people across Los Angeles County, resulting in multiple shootouts, over sixty deaths, thousands of people injured, and more than 12,000 arrests.

**B.     Local Authorities Quickly Respond and Are Able to Control and Manage Conditions**

31.   Both the Los Angeles Police Department (LAPD) and Los Angeles Sheriff Department (LASD) have substantial training and experience responding to protests and large-scale riots. The last instance in which it was determined there was need or want for the intervention of federal authorities occurred in 1992, in the above-described circumstances that stand in sharp contrast to the events that commenced on June 6.

32.   LAPD and LASD have been responding promptly, professionally, and effectively to the events unfolding in the City and County. Officers from both Departments have been on the ground, actively enforcing the law, issuing and enforcing orders to disperse, and protecting public safety and property as well as federal personnel.

33.   In the afternoon of June 6, 2025, some time after protesters had gathered near the Roybal Federal Building and its "B-18" detention facility, federal agents sent a request to LAPD for assistance. Within an hour, assistance from LAPD arrived on the scene and began coordinating their officers to address the situation with the protesters.

34.   LAPD would have responded sooner had federal officials coordinated with LAPD prior to engaging in the enforcement actions. Federal officials did not, and as a result LAPD was unable to proactively plan for the potential incidents, for example by pre-positioning resources, and it was not positioned to immediately deploy appropriate staffing and equipment.

35.   Around 7:50 p.m., LAPD declared an unlawful assembly in the area of the protest site, at the intersection of Alameda and Temple Streets, and it issued an order for the protesters to disperse or be arrested.

36.   By approximately 8:00 p.m., the crowd started to disperse, with LAPD officers blocking their path back to the B-18 detention center.

37.  A few hours later, LAPD received a report that another crowd had gathered outside of a parking lot in Chinatown. The group dispersed as federal agents established a perimeter.

38.  ICE immigration enforcement activity continued the next day, Saturday, June 7.

39.  Protests continued in the City of Los Angeles that were by all accounts peaceful.

40.  The LAPD issued a statement that night that "demonstrations across the City of Los Angeles remained peaceful," and commended those who exercised their First Amendment rights responsibly.

41.  Earlier in the day, outside the City, but within the County of Los Angeles, there were other protests. At approximately 10:15 a.m., personnel from LASD responded to the 6400 Block of Paramount Boulevard in Paramount, CA, following reports of a large crowd gathering in the area and obstructing traffic.

42.  Upon arrival, LASD deputies observed the presence of federal law enforcement officers and a significant number of individuals gathering to protest. Federal officials did not give LASD any forewarning of any of the planned operations in that area, or otherwise attempt to coordinate activities.

43.  LASD positioned its officers around the intersection of Alondra Boulevard and Atlantic Avenue, and deployed less-lethal weapons.

44.  At approximately 4:00 p.m., LASD declared an unlawful assembly and instructed individuals to leave the area or be arrested. Officers shot tear gas canisters into the crowd and protesters retreated.

45.  By 7:00 p.m., approximately 100 protesters had gathered on the other side of the 710 Freeway near Atlantic Avenue and Alondra Boulevard.

46.  At about 9:30 p.m. a line of LASD deputies and vehicles began moving toward the crowd, forcing them back, and by midnight, most of demonstrators began to leave.

47.  LASD's standard practice is to call in assistance from other local agencies, such as sheriff's departments from neighboring counties, and then for direct aid from state agencies when LASD determines that it cannot handle a situation. These two steps would be done before a

**A8**

request for federal assistance would be made. But LASD did not need and did not request the assistance of other agencies to gain control of the protests.

48.  Governor Newsom has also taken steps to ensure that the State itself is actively providing support, in close coordination with the City and County, and there are no unmet needs from local law enforcement. Local law enforcement agencies have not requested any assistance, but if they were to do so, the State is more than prepared to meet any needs that may arise. As an example, on June 6 and June 7, the State deployed additional California Highway Patrol personnel to maintain safety and order on Los Angeles highways.

49.  ICE continues to carry out immigration enforcement, including in Los Angeles County.

**C.   Without Consent or Even Official Notice to the Governor, the President Federalizes the National Guard**

50.  Early on Saturday, June 7, Border Czar Tom Homan stated "Mayor [Karen] Bass should be thanking us. She says they are going to mobilize—guess what? We are already mobilizing. We are going to bring the National Guard in tonight."

51.  Over the course of the day, the Department of Defense (DOD) did not communicate directly with the Governor's Office regarding any planned activation and deployment of California National Guard members.

52.  At no time prior to issuing the memorandum to federalize the California National Guard troops did the DOD seek approval from Governor Newsom to utilize California's National Guard to protect federal agents and federal property, or otherwise notify or seek concurrence from the Governor or his office regarding the planned mobilization of the National Guard.

///

**A9**

53.  At 5:13 p.m. on June 7, the Governor communicated unequivocally and publicly on social media that he disapproved of the federal government's plans, which were unnecessary because "there is currently no unmet need," and which would be counterproductive because it would "only escalate tensions" and "erode public trust":



**Governor Gavin Newsom** ✔
@CAgovernor

The federal government is moving to take over the California National Guard and deploy 2,000 soldiers. That move is purposefully inflammatory and will only escalate tensions.

LA authorities are able to access law enforcement assistance at a moment's notice. We are in close coordination with the city and county, and there is currently no unmet need.

The Guard has been admirably serving LA throughout recovery.

This is the wrong mission and will erode public trust.

5:13 PM · Jun 7, 2025 · **7.4M** Views

54.  On the evening of June 7, President Trump issued a memorandum entitled "Department of Defense Security for the Protection of Department of Homeland Security Functions" (the Trump Memo). The Trump Memo does not identify the Los Angeles protests, the State, or any specific geographic region by name, but instead refers to "[n]umerous incidents of violence and disorder" that "have recently occurred and threaten to continue in response" to ICE enforcement of federal immigration laws and to threats to the security of federal immigration detention facilities and other federal property. The Trump Memo also states that "[t]o the extent that protests or acts of violence directly inhibit the execution of the laws, they constitute a form of rebellion against the authority of the Government of the United States."

55.  The Trump Memo states: "In light of these incidents and credible threats of continued violence, by the authority vested in me as President by the Constitution and the laws of the United

**A10**

States of America, I hereby call into Federal service members and units of the National Guard under 10 U.S.C. 12406 to temporarily protect ICE and other United States Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where protests against these functions are occurring or are likely to occur based on current threat assessments and planned operations."

56.  The Trump Memo further directs the Secretary of Defense "to coordinate with the Governors of the States and the National Guard Bureau in identifying and ordering into Federal service the appropriate members and units of the National Guard under this authority." The Trump Memo specifies that the members and units called into federal services "shall be at least 2,000 National Guard personnel and the duration of duty shall be for 60 days or at the discretion of the Secretary of Defense." Finally, the Trump Memo authorizes personnel to "perform those military protective activities that the Secretary of Defense determines are reasonably necessary to ensure the protection and safety of Federal personnel and property."

57.  The provision cited by President Trump for his authority to take this step—section 12406—states that:

> Whenever—
>
> (1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation;
>
> (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or
>
> (3) the President is unable with the regular forces to execute the laws of the United States;
>
> The President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws. Orders for these purposes shall be issued through the governors of the States or, in the case of the District of Columbia, through the commanding general of the National Guard of the District of Columbia.

**A11**

10 U.S.C. § 12406.

58.   This is only the second time in our nation's history that a President has relied on the exclusive authority of this provision to federalize the National Guard. The first was President Richard Nixon when he called upon the National Guard to deliver the mail during the 1970 Postal Service Strike. This is also the first time since 1965—when President Johnson sent troops to Alabama to protect civil rights demonstrators, under different federal authority—that a president has activated a State's National Guard without a request from the State's Governor.

59.   Later in evening of June 7, Secretary Hegseth sent a memorandum (the "DOD Order") to the Adjutant General of California, who leads the California National Guard but also holds a federal commission as a reserve of the United States Army. Secretary Hegseth attached the Trump Memo and called into federal service 2,000 members of the California National Guard for a period of 60 days.

60.   The Adjutant General subsequently shared the DOD Order with the Governor's Office; however, at no time did the Governor or his Office provide consent to the mobilization or issue orders through the Governor mobilizing the Guard members.

61.   Shortly thereafter on the same evening, the Adjutant General relinquished command of the 79th Infantry Brigade Combat Team to General Gregory M. Guillot, commander of U.S. Northern Command (USNORTHCOM). Since that time, all orders issued to this unit have come from USNORTHCOM.

62.   The service members of the 79th Infantry Brigade Combat Team come from across California. Many members are based in San Diego, but other members have individual residences throughout the State, and the 79th has subordinate units based in various parts of the state, including Richmond, California.

63.   When the 300 deployed California National Guard troops and armored vehicles began arriving in Los Angeles on Sunday morning, the city was quiet. The local police and sheriff's departments had addressed any disturbances up to that point.

64.   On June 8, the Governor's Office sent a letter to Secretary Hegseth objecting to the federalization and deployment of California National Guard troops to Los Angeles and requesting

**A12**

that DOD rescind its order. The letter also reiterated that local law enforcement is more than capable of responding to the situation in Los Angeles and had taken robust action to protect federal facilities and maintain order.

65.   On June 9, 2025, Secretary Hegseth issued a second memorandum (June 9 DOD Order) ordering the federalization of 2,000 additional California National Guard members. Once again, this order was not issued through the Governor and did not provide any opportunity for the Governor to review or consent.

66.   While the face of the Defendants' orders purport to direct the deployment of the federalized National Guard members to protect federal property and federal personnel carrying out their functions, these directives are phrased in an ambiguous manner and suggest potential misuse of the federalized National Guard. It is unclear what actions Secretary Hegseth will deem as "reasonably necessary to ensure the protection and safety of Federal personnel and property." Among other concerns, the lengthy duration of the deployment (60 days) and location (not just where protests are occurring, but where they are "likely" to occur) indicate that the National Guard may be compelled to accompany immigration enforcement on its missions in any location with potentially dissenting residents.

67.   Defendants have already made clear their intention to expand the use of these National Guard members to effectuate interior civil immigration enforcement activities normally conducted by civil immigration law enforcement officers. For example, on the evening of June 8, President Trump issued a statement on social media purporting to direct DOD and other federal agencies to "take all action necessary to liberate Los Angeles from the Migrant Invasion[.]" And he informed the media: "We're going to have troops everywhere."

68.   Already, fear and terror are spreading in communities across California as a result of Defendants' actions. And, as predicted by Governor Newsom and other state and local leaders, the deployment of the National Guard seems to have only heightened tensions with protesters and residents in Los Angeles.

**D.    Defendants' Mobilization of California's National Guard Members Usurps the Authority of the Governor and Harms the State of California**

69.    Defendants' actions unlawfully activating 4,000 California National Guard members into federal service directly infringes on Governor Newsom's proper role of Commander-in-Chief of the California National Guard. Cal. Const. art. V, § 7; U.S. Const. art. I, §§ 8, cls. 15-16; amend. X.    Except when the State's militia has been lawfully called into federal service, the Governor maintains command and control of the militia.

70.    As Commander-in-Chief, the Governor of California calls members of the California National Guard into active duty to serve the needs of California. The California National Guard is vital for various State functions including emergency and natural disaster response and drug interdiction. The California National Guard acts to protect people and property in many ways, and the State relies on the National Guard to be ready to intervene in emergent situations to help protect Californians. As a general matter, it is the Governor, in conjunction with local law enforcement, who is best situated to determine the resources needed in times of emergency.

71.    By unlawfully diverting 4,000 service members from their state responsibilities for at least 60 days, Defendants' action impairs the Governor's ability as Commander-in-Chief of the California National Guard to call upon the State's National Guard for emergencies and to carry out other critical functions.

72.    The California National Guard, composed of the California Army National Guard and the California Air National Guard, has approximately 18,733 service members, with 12,212 available for deployment. Most of the California National Guard members serve as reserve forces, meaning that their role in the California National Guard is part-time, and they are generally employed in civilian roles separate from their work as service members. Many of these service members receive specialized training to perform specific duties, and all play a critical role in protecting the State.

73.    As a recent example of the National Guard's important work, in January 2025, the Guard was called upon to assist in fighting one of the most destructive fires in the State's history in Los Angeles County. Between January 7, 2025, when the fires started, and January 11, 2025,

Governor Newsom activated 2,500 service members to support firefighting efforts. Many of the National Guard members were dispatched the same day as the fire began. In addition to firefighting support, the National Guard's provision of resources was critical to assisting local authorities and ensuring the safety of the surrounding community, firefighting brigades, and pilots.

74.   This deployment comes when California is in the midst of peak wildfire season for both Northern and Southern California and may need to rely on their crucial support, as the State did during the Los Angeles fires earlier this year.

75.   When the State faces simultaneous emergencies, the National Guard's resources can be stretched thin. For example, in 2020, the California National Guard was required to respond to COVID-19, multiple wildfires at once, and civil unrest, significantly burdening the National Guard's military policing resources and making it difficult to fulfill emergent needs across the State. Such overlapping emergencies cannot be predicted.

76.   All 4,000 of the federally deployed National Guard members are now unavailable if a natural disaster or other state-emergency erupts. These National Guard members, coming from the 79th Infantry Brigade Combat Team, include a large number of guard members who serve in Taskforce Rattlesnake, the State's specialized fire combat unit. These service members have specialized training in wildland fire mitigation and prevention and direct fire suppression, and would be highly difficult for the State to replace.

77.   The 79th Infantry Brigade also contains Counterdrug Taskforce members that specialize in providing support to stop the trafficking of fentanyl at the U.S.-Mexico Border.

78.   Because these National Guard members have been federalized for 60 days— unlawfully, as detailed below—the State of California is deprived of resources to protect itself and its citizens, and of critical responders in the event of a State emergency.

**CLAIMS**

**FIRST CAUSE OF ACTION**
**Ultra Vires**
**(All Defendants)**

79.  Plaintiffs reallege and incorporate by reference the foregoing allegations as fully set forth herein.

80.  Neither the President nor an agency can take any action that exceeds the scope of their constitutional or statutory authority.

81.  Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015). Indeed, the Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

82.  Section 12406 requires that orders pursuant to that section be "issued through the governors of the States or, in the case of the District of Columbia, through the commanding general of the National Guard of the District of Columbia." 10 U.S.C. § 12406.

83.  Section 12406 originated as part of the Militia Act of 1903. Publ. L. No. 57-33, 32 Stat. 775 (1903). The original section did not include this provision, but the statute was subsequently amended to include the requirement that orders be issued through the governor. Militia Act of 1908, ch. 204, 35 Stat. 399 (1908).

84.  "'A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.'" *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (quoting Singer, Statutes and Statutory Construction § 46.06, pp. 181–186 (rev. 6th ed. 2000)). "'[A] significant change in language is presumed to entail a change in meaning' even when legislative history is silent as to Congress's intent." *In re Saldana*, 122 F.4th 333, 341 (9th Cir. 2024) (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 256–60 (2012)).

85. As discussed *supra*, Defendants did not notify Governor Newsom of the orders or attempt to obtain his consent. Nor did they issue their orders through the Governor as the statute directs. This circumvention deprived the Governor of the opportunity that compliance with the terms of the statute would have afforded him—at a minimum, consultation with the President or other federal officials not only as to whether the California National Guard should be called into federal service at all, but if so, which service members and in what number should be called, and for what purposes and what period of time.

86. President Trump's Memo purporting to call into federal service members of the California National Guard under 10 U.S.C. § 12406 without issuing this order through Governor Newsom is contrary to law and outside of the authority granted to the President under that statute.

87. Secretary Hegseth's orders purporting to federalize 4,000 members of the California National Guard without issuing these orders through Governor Newsom are contrary to law and outside of Secretary Hegseth's authority.

88. Defendants' actions are *ultra vires* for reasons beyond their failure to follow the procedural requirements of section 12406. Conditions in California did not fall under any of the situations set forth in section 12406 that would allow its invocation at the time it was invoked, nor do they now, nor is it reasonable to expect them to for the next 60 days. The statute authorizes the federalization of the National Guard to (1) repel invasion of the United States by a foreign nation, (2) suppress a rebellion or danger of rebellion against the authority of the Government of the United States; or (3) execute federal laws when the President is unable to do so with the regular forces. 10 U.S.C. § 12406(1)-(3).

89. The Trump Memo does not (and cannot) assert that California is being invaded or is in danger of invasion by a foreign power. Nor has the Trump Administration identified a "rebellion," which is generally understood to connote "an organized attempt to change the government or leader of a country, [usually] through violence," something much beyond mere protest or sporadic acts of disobedience and violence. *Rebellion, Black's Law Dictionary* (12th ed. 2024). The Trump Memo asserts that "[t]o the extent that protests or acts of violence directly inhibit the execution of the laws, they constitute a form of rebellion against the authority of the

**A17**

Government of the United States," but primarily peaceful protests with some acts of violence or civil disobedience do not rise to the level of a rebellion. Indeed, nothing about the scale of the protests or acts of violence set these events apart from other recent periods of significant social unrest.

90.   Defendants have also not shown that any of the protests have rendered the President "unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(3). Indeed, Governor Newsom and Mayor Karen Bass both reported on June 7, 2025, that they had sufficient resources to respond to any potential unrest or threats to safety or property. A June 8 letter from the Office of Governor Newsom to Secretary Hegseth notes that as "demonstrated by the robust law enforcement response yesterday evening to protect federal facilities, local law enforcement resources are sufficient to maintain order." And on both June 6 and 7, ICE officials were able to act on warrants and make arrests.

91.   Violation of the Posse Comitatus Act is imminent, if not already underway.

92.   Accordingly, Plaintiffs are entitled to a declaration that any action taken pursuant to the June 7, 2025 Presidential Memorandum is invalid, and an injunction prohibiting DOD Defendants from implementing the Memorandum.

## SECOND CAUSE OF ACTION
### Tenth Amendment of the U.S. Constitution; Article I, § 8, cls. 15-16; Title 32
### (All Defendants)

93.   Plaintiffs reallege and incorporate by reference the foregoing allegations as fully set forth herein.

94.   The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

95.   The President's unlawful order calling up "at least 2,000 National Guard personnel" infringes on Governor Newsom's role as Commander-in-Chief of the California National Guard and violates the State's sovereign right to control and have available its National Guard in the absence of a lawful invocation of federal power.

**A18**

96.   Under our system of federalism, policing and crime control remain one of the most basic rights reserved to the states. "Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 618 (2000). "[T]he power to establish the ordinary regulations of police has been left with the individual States, and cannot be assumed by the national government." *Patterson v. State of Kentucky*, 97 U.S. 501, 503 (1878).

97.   Local control of law enforcement is also essential to the protection of liberty and government accountability. "Because the police power is controlled by 50 different States instead of one national sovereign, the facets of governing that touch on citizens' daily lives are normally administered by smaller governments closer to the governed. The Framers thus ensured that powers which "in the ordinary course of affairs, concern the lives, liberties, and properties of the people" were held by governments more local and more accountable than a distant federal bureaucracy. The Federalist No. 45, at 293 (J. Madison)." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012).

98.   Deploying over 4,000 federalized military forces to quell a protest or prevent future protests despite the lack of evidence that local law enforcement was incapable of asserting control and ensuring public safety during such protests represents the exact type of intrusion on State Power that is at the heart of the Tenth Amendment. State officials in conjunction with local officials, such as the Los Angeles Police Department and the Los Angeles Sheriff's Department are in the best position to determine what resources are necessary to preserve public safety amid protest activity, and to intervene to enforce public safety and criminal laws when warranted.

99.   Further, here the federal government is not merely intruding on the province of the State, but doing so by taking command of the State's own resources, the California National Guard, which remains under State control unless properly federalized. Proper federalization has not happened here.

100. Because the January 7, 2025 Presidential Memoranda and resulting DOD Order and June 9 DOD Order purport to federalize the National Guard for an unconstitutional and illegal

**A19**

purpose, Plaintiffs respectfully ask the Court to find that the Orders are void, and that the National Guard should be transferred back to the rightful command and control of the State of California through Governor Newsom.

101. Plaintiffs are also entitled to a declaration that any action taken pursuant to the June 7, 2025 Presidential Memorandum is invalid, and an injunction prohibiting DOD Defendants from implementing the Memorandum.

**THIRD CAUSE OF ACTION**
**Violation of the Administrative Procedure Act**
**(Against DOD Defendants)**

102. Plaintiffs reallege and incorporate by reference the foregoing allegations as fully set forth herein.

103. Under the Administrative Procedure Act, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," that is "contrary to constitutional right [or] power," or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C).

104. An agency may not take any action that exceeds the scope of its constitutional or statutory authority.

105. The DOD Defendants lack authority to federalize members of the California National Guard without issuing such orders through Governor Newsom, who has not consented to their actions or been afforded the opportunity to consult on any deployment. Such agency actions are unauthorized, unprecedented, and not entitled to deference by this Court.

106. Accordingly, Plaintiffs are entitled to a declaration that Secretary Hegseth's June 7 and June 9 Orders are invalid, and an injunction prohibiting DOD Defendants from implementing the June 7, 2025 Presidential Memorandum.

**A20**

**PRAYER FOR RELIEF**

107. Wherefore, Plaintiffs request that the Court enter a judgment against Defendants and award the following relief:

    a.  A declaration that the June 7, 2025 Presidential Memorandum calling into Federal service members and units of the National Guard under 10 U.S.C. § 12406 and Secretary Hegseth's June 7 and June 9 Orders (and any future orders) calling the California National Guard into service under the stated authority of the President's use of 10 U.S.C. § 12406 are unauthorized by and contrary to the laws of the United States;

    b.  Injunctive relief prohibiting the DOD Defendants from federalizing and deploying the California National Guard and military without meeting the requirements of 10 U.S.C. § 12406, which include that issuance shall be "through the Governor" and only for the reasons set forth in 10 U.S.C. § 12406 (1-3) and not to conduct domestic law enforcement activities;

    c.  Award the State of California its costs and reasonable attorneys' fees; and

    d.  Such additional relief as the court deems proper and the interests of justice may require.

**A21**

Dated:  June 9, 2025                    Respectfully submitted,

                                        ROB BONTA
                                        Attorney General of California
                                        MARISSA MALOUFF
                                        JAMES E. STANLEY*
                                        Supervising Deputy Attorneys General
                                        NICHOLAS ESPÍRITU
                                        LUKE FREEDMAN
                                        ROBIN GOLDFADEN
                                        BRENDAN M. HAMME
                                        LORRAINE LOPEZ*
                                        KENDAL MICKLETHWAITE
                                        MEGAN RICHARDS
                                        Deputy Attorneys General

                                        /s/ Laura L. Faer
                                        LAURA L. FAER
                                        Acting Senior Assistant Attorney General
                                          1515 Clay St.
                                          Oakland, CA  94612
                                          Telephone: (510) 879-3304
                                          E-mail:  Laura.Faer@doj.ca.gov

                                        *Attorneys for Plaintiffs*

                                        * Admission Pending

**A22**

**ROB BONTA**
Attorney General of California
LAURA L. FAER
Acting Senior Assistant Attorney General
MARISSA MALOUFF
JAMES E. STANLEY
Supervising Deputy Attorneys General
LUKE FREEDMAN
ROBIN GOLDFADEN
BRENDAN M. HAMME
LORRAINE LOPEZ
KENDAL MICKLETHWAITE
MEGAN RICHARDS
NICHOLAS ESPÍRITU
Deputy Attorneys General
 1515 Clay St.
 Oakland, CA  94612
 Telephone: (510) 879-3908
 E-mail:  Nicholas.Espiritu@doj.ca.gov
*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **GAVIN NEWSOM, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF CALIFORNIA; STATE OF CALIFORNIA,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**DONALD TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; PETE HEGSETH, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF DEFENSE; U.S. DEPARTMENT OF DEFENSE,**<br><br>Defendants. | **NO. 3:25-cv-04870-CRB**<br><br>**PLAINTIFFS' EX PARTE MOTION FOR A TEMPORARY RESTRAINING ORDER**<br><br>Date:<br>Time:<br>Courtroom:<br>Judge:    Charles R. Breyer<br>Trial Date:<br>Action Filed: 6/9/2025 |

**A23**

**PLAINTIFFS' EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER**

PLEASE TAKE NOTICE that Plaintiffs GAVIN NEWSOM, in his official capacity as Governor of the State of California and the STATE OF CALIFORNIA (collectively, Plaintiffs) hereby move the Court pursuant to Federal Rule of Civil Procedure 65 for a temporary restraining order (TRO) and order to show cause why a preliminary injunction should not issue against Defendants PETE HEGSETH, in his official capacity as Secretary of the Department of Defense, and the United States Department of Defense (collectively, DOD Defendants), and their officers, agents, servants, employees, and any other persons who are in active concert or participation with them.

Plaintiffs respectfully move the Court to enter a temporary restraining order and preliminary injunction prohibiting DOD Defendants from taking any of the actions described in Plaintiffs' contemporaneously-filed Proposed Order and Order to Show Cause.

This motion is based on this Ex Parte Motion, the Complaint for Declaratory and Injunctive Relief (Doc. 1), the accompanying Memorandum of Points and Authorities, the accompanying proposed Temporary Restraining Order, the accompanying supporting declarations, as well as the papers, evidence, and records on file in this action, and any other written or oral evidence or argument presented at or before the time this motion is heard by the Court.

As set forth in the accompanying Memorandum of Points and Authorities, a TRO is necessary by 1:00 p.m. on June 10, 2025, to prevent immediate and irreparable harm to Plaintiffs. Absent immediate injunctive relief, Defendants' use of the military and the federalized National Guard to patrol communities or otherwise engage in general law enforcement activities creates imminent harm to State Sovereignty, deprives the State of vital resources, escalates tensions and promotes (rather than quells) civil unrest. Accordingly, the Plaintiffs seek a TRO and preliminary injunction to preserve the status quo.

Plaintiffs respectfully request leave to file excess pages pursuant to the Court's standing order. Good cause exists for leave; this case present complex and novel issues related to the proper use of the military for domestic law enforcement and comes to the Court on an emergency

**A24**

basis.

Notice of this Ex Parte Motion has been and will be provided to Defendants as set forth in the accompanying Certificate Regarding Notice to Defendants of Ex Parte Motion.  Defendants stated in response: "Defendants oppose any ex parte proceedings in this matter and request no less than 24 hours from the time that Plaintiffs file their motion for a temporary restraining order to file a response brief.  Should the Court desire to rule on the temporary restraining order in the absence of Defendants' written response, Defendants seek to be heard at a hearing and are available at any time."

Dated:  June 10, 2025                              Respectfully submitted,

ROB BONTA
Attorney General of California
LAURA L. FAER
Acting Senior Assistant Attorney General
MARISSA MALOUFF
JAMES E. STANLEY*
Supervising Deputy Attorneys General
NICHOLAS ESPÍRITU
LUKE FREEDMAN
ROBIN GOLDFADEN
BRENDAN M. HAMME
LORRAINE LOPEZ*
KENDAL MICKLETHWAITE
MEGAN RICHARDS
Deputy Attorneys General

*/s/ Nicholas Espíritu*
NICHOLAS ESPÍRITU
Deputy Attorney General
  1515 Clay St.
  Oakland, CA  94612
  Telephone: (510) 879-3908
  E-mail:  Nicholas.Espiritu@doj.ca.gov

*Attorneys for Plaintiffs*

* Admission Pending

**A25**

Introduction ................................................................................................................. 1

Statement of Facts ....................................................................................................... 3

    I.     Federal Immigration Enforcement Actions In Los Angeles ................................. 3

    II.    Local Authorities Respond and Manage Conditions. ............................................. 4

    III.   The President, Without the Governor's Consent, Federalizes 4,000 California National Guard Troops And Mobilizes Additional U.S. Marines. ........ 4

    IV.   Current Status of Protests and National Guard Deployment. ................................ 6

Legal Standard ............................................................................................................ 7

Argument ..................................................................................................................... 7

    I.     Plaintiffs Are Likely To Succeed on the Merits, And At A Minimum, Plaintiffs Present Serious Questions Going to the Merits ..................................... 7

        A.    The Section 12406 Federalization Orders are Unlawful ............................ 7

            1.    There were no conditions in California that would allow invocation of Section 12406 ........................................... 9

            2.    The Governor did not issue the federalization order .................... 10

        B.    The Orders are a substantial intrusion into the State of California's police powers. ................................................... 11

        C.    The Military's Threatened Law Enforcement Activities Will Violate the Posse Comitatus Act ............................................ 12

            1.    The federalized National Guard and the Marines Corps are subject to the Posse Comitatus Act ............................... 12

            2.    There is a substantial likelihood that the National Guard and Marines will engage in activities that "amount to direct active involvement in the execution of the laws" ........................ 14

    II.    There is a Grave Risk of Imminent, Irreparable harm ......................................... 16

    III.   The Public Interest and Balance of Equities Tip Sharply in Favor of A TRO ...... 18

**A26**

CASES

*A Woman's Friend Pregnancy Res. Clinic v. Becerra*
   901 F.3d 1166 (9th Cir. 2018)............................................................................ 7

*Abbott v. Biden*
   70 F.4th 817 (5th Cir. 2023)............................................................................ 13

*Ariz. Dream Act. Coal. v. Brewer*
   757 F.3d 1053 (9th Cir. 2014).......................................................................... 18

*Black Lives Matter D.C. v. Trump*
   544 F. Supp. 3d 15 (D.D.C. 2021) ................................................................. 14

*California v. Trump*
   963 F.3d 926 (9th Cir. 2020)........................................................................... 15

*City and County of San Francisco v. U.S. Citizenship and Immigration Services*
   408 F.Supp.3d 1057 (N.D. Cal. 2019) ........................................................... 16

*City of Los Angeles v. Barr*
   941 F.3d 931 (9th Cir. 2019)............................................................................. 8

*Clark v. United States*
   322 F.3d 1358 (Fed. Cir. 2003)....................................................................... 13

*District of Columbia v. Heller*
   554 U.S. 570 (2008)......................................................................................... 13

*Drakes Bay Oyster Co. v. Jewell*
   747 F.3d 1073 (9th Cir. 2014).......................................................................... 18

*E. Bay Sanctuary Covenant v. Biden*
   993 F.3d 640 (9th Cir. 2021)............................................................................. 7

*Hibbs v. Winn*
   542 U.S. 88 (2004)........................................................................................... 11

*In re Saldana*
   122 F.4th 333 (9th Cir. 2024).......................................................................... 11

*in United States v. Hartley*
   796 F.2d 112 (5th Cir. 1986)........................................................................... 15

*Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*
   4 F.3d 819 (9th Cir. 1993)............................................................................... 18

*Laird v. Tatum*
    408 U.S. 1 (1972) ............................................................................................ 12

*M.R. v. Dreyfus*
    697 F3d 706 (9th Cir. 2015) ......................................................................... 16

*Michigan v. United States Army Corps of Engineers*
    667 F3d 765 (7th Cir. 2011) ......................................................................... 16

*Mueller v. City of Joliet*
    943 F.3d 834 (7th Cir. 2019) ........................................................................ 14

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*
    886 F.3d 803 (9th Cir. 2018) ........................................................................ 16

*Nken v. Holder*
    556 U.S. 418 (2009) .................................................................................. 7, 18

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*
    572 U.S. 545 (2014) ........................................................................................ 8

*Patterson v. State of Kentucky*
    97 U.S. 501 (1878) ....................................................................................... 12

*Perfect 10, Inc. v. Google, Inc.*
    653 F.3d 976 (9th Cir. 2015) ........................................................................ 16

*R.I.L-R v. Johnson*
    80 F. Supp. 3d 164 (D.D.C. 2015) ............................................................... 18

*Rodriguez v. Robbins*
    715 F.3d 1127 (9th Cir. 2013) ...................................................................... 19

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*
    240 F.3d 832 (9th Cir. 2001) .......................................................................... 7

*Trump v. Int'l Refugee Assistance Project*
    582 U.S. 571 (2017) .................................................................................. 7, 18

*United States v. Chon*
    210 F.3d 990 (9th Cir. 2000) .................................................................. 12, 13

*United States v. Dreyer*
    804 F.3d 1266 (9th Cir. 2015) ................................................................ 12, 13

**A28**

*United States v. Hernandez-Garcia*
    44 F.4th 1157 (9th Cir. 2022) ............................................................... 15

*United States v. McArthur*
    419 F. Supp. 186 (D.N.D.1975) ........................................................... 15

*United States v. Morrison*
    529 U.S. 598 (2000) ............................................................................. 11

*United States v. Red Feather*
    392 F. Supp. 916 (D.S.D. 1975) ........................................................... 15

*United States v. Rios-Montano*
    438 F. Supp. 3d 1149 (S.D. Cal. 2020) ............................................... 12

*Winter v. Nat. Res. Def. Council, Inc.*
    555 U.S. 7 (2008) .................................................................... 7, 16, 18

**STATUTES**

United States Code, Title 10
    § 248 ...................................................................................................... 15
    § 271 ...................................................................................................... 15
    § 272 ...................................................................................................... 15
    § 274 ...................................................................................................... 15
    § 284 ...................................................................................................... 15
    § 375 ...................................................................................................... 12
    § 12405 .................................................................................................. 13
    § 12406 ............................................................................................. *passim*

United States Code, Title 18
    § 1385 .................................................................................................... 12

Act of June 18, 1878, Chapter 263, 20 Stat. 152 (1878) ............................... 12

Militia Act of 1903. Publ. l. No. 57-33, 32 Stat. 775 (1903) ...................... 11

Militia Act of 1908, Chapter 204, 35 Stat. 399 (1908) ................................ 11

**CONSTITUTIONAL PROVISIONS**

United States Constituion
    First Amendment .................................................................................... 9
    Tenth Amendment ................................................................................. 12

**OTHER AUTHORITIES**

Code of Federal Regulations, Title 32
    § 182.6(a)(1)(iii) (2013) ...................................................................... 13
    § 213.10(a)(3) (1982) ........................................................................ 12

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

In the United States, the police—and not the military—enforce the law. This bedrock principle flows from the Founding, finds expression in Acts of Congress, and lives at the core of our civil society. Ours is a Nation of laws, enforced through even-handed justice, and not ruled by military decree. But Defendants, including President Trump and Secretary of Defense Hegseth have sought to bring military personnel and a "warrior culture" to the streets of cities and towns where Americans work, go to school, and raise their families. Now, they have turned their sights on California with devastating consequences, setting a roadmap to follow across the country.

Through a June 7 Presidential Memorandum and subsequent implementing orders, Defendants have seized control of 4,000 members of the California National Guard over the express objection of California's Governor and deployed them to Los Angeles, the largest county and second largest city in the country. Unsatisfied with this excessive and unnecessary show of force, Defendants have sent another 700 active-duty Marines into Los Angeles.

All of this was unlawful. The President purported to federalize the California National Guard under 10 U.S.C. § 12406, which authorizes him to call the Guard into federal service in only very narrow circumstances, none of which is present. To put it bluntly, there is no invasion or rebellion in Los Angeles; there is civil unrest that is no different from episodes that regularly occur in communities throughout the country, and that is capable of being contained by state and local authorities working together. And nothing is stopping the President from enforcing the laws through use of ordinary, civilian mechanisms available to federal officers. True enough, many Californians—and many Angelenos—oppose the Administration's immigration enforcement policies. They have expressed that view through largely peaceful protest. In the isolated instances of more significant disturbance, Los Angeles-area law enforcement has quickly and professionally responded, with support from the California Highway Patrol and with additional resources available through the State's well-established law enforcement mutual aid system. What is more, even in circumstances where the statutory predicates are present, Section 12406

**A31**

requires orders to federalize the National Guard to be "issued through the governors of the States," and here the Governor never issued such an order or gave consent.

The Marine Corps' deployment for law enforcement purposes is likewise unlawful. For more than a century, the Posse Comitatus Act has expressly prohibited the use of the active duty armed forces and federalized national guard for civilian law enforcement. And the President and Secretary Hegseth have made clear—publicly and privately—that the Marines are not in Los Angeles to stand outside a federal building.

Instead, as established in the attached declarations, Defendants intend to use unlawfully federalized National Guard troops and Marines to accompany federal immigration enforcement officers on raids throughout Los Angeles. They will work in active concert with law enforcement, in support of a law enforcement mission, and will physically interact with or detain civilians. These unlawful deployments have already proven to be a deeply inflammatory and unnecessary provocation, anathema to our laws limiting the use federal forces for law enforcement, rather than a means of restoring calm. Federal antagonization, through the presence of soldiers in the streets, has already caused real and irreparable damage to the City of Los Angeles, the people who live there, and the State of California. They must be stopped, immediately.

To preserve the peace, Plaintiffs respectfully urge the Court to grant the circumscribed emergency relief requested through this motion for a temporary restraining order, which will prevent the use of federalized National Guard and active duty Marines for law enforcement purposes on the streets of a civilian city. This motion does not seek to prevent any of those forces from protecting the safety of federal buildings or other real property owned or leased by the federal government, or federal personnel on such property. It instead seeks narrow relief tailored to avoid irreparable harm to our communities and the rule of law that is likely to result if Defendants are allowed to proceed with their plans to use Marines and federalized National Guard to enforce immigration laws and other civil laws on the streets of our cities.

### STATEMENT OF FACTS

I.   FEDERAL IMMIGRATION ENFORCEMENT ACTIONS IN LOS ANGELES

On Friday, June 6, 2025, Immigration and Customs Enforcement (ICE) officers carried out enforcement actions at multiple locations within Los Angeles County and the City of Los Angeles. Declaration of Brian Olmstead ("Olmstead Dec.") ¶ 6. ICE officers were executing search warrants at various locations around Los Angeles. Declaration of Nicholas Espíritu ("Espíritu Dec."), Ex. F. ICE reportedly also carried out enforcement activities that included detentions and arrests at a doughnut shop in Los Angeles and several Home Depot parking lots in the Westlake District in Los Angeles. *Id.*

During the course of these operations in places where members of immigrant communities work and go about daily business, ICE and its agents reportedly took actions that inflamed tensions and provoked protest. Agents engaged in military-style operations while conducting these detentions and arrests that sparked panic in the community. *See id.* at 1 (Los Angeles Mayor Karen Bass stating "the [ICE] activity was meant to 'sow terror' in the nation's second-largest city"). For example, in some instances, ICE agents were reportedly observed conducting "military-style" operations. Espíritu Dec., Ex. G. In all, the Department of Homeland Security reported that its enforcement activities on Friday, June 6, resulted in the arrest of approximately 44 individuals and 70-80 people detained. Espíritu Dec., Ex. H. (noting 44 individuals were detained); Espíritu Dec, Ex. G (noting that "between 70 and 80 people had been detained").

That same day, members of the public gathered at the Edward R. Roybal Federal Building and U.S. Courthouse in Los Angeles to protest the escalation in force and scope of immigration enforcement activities. Espíritu Dec., Ex. I. Protestors gathered at this location based on reports that individuals who were detained during the ICE operations were being held there. *Id.* Protesters also gathered at other locations where ICE operations were reportedly happening, including in the cities of Paramount and Compton. Olmstead Dec. ¶ 7.

The Los Angeles protests continued into Saturday June 7, and Sunday, June 8, 2025. Olmstead Dec. ¶¶ 6-14. While some protestors began to engage in unlawful behavior, the majority did not, and state and local law enforcement agencies contained the situation. *See id.*

**A33**

¶¶ 9, 10. Governor Newsom and other state and local officials have unequivocally condemned all violence and other conduct that damages or threatens people and property. *See, e.g.*, Espíritu Dec., Ex. Q (statement from Governor Newsom on June 7, 2025: "Never use violence. Speak out peacefully"); Espíritu Dec., Ex. N at 6 (statement from LAPD Chief Jim McDonnell on June 9, 2025: "There is no tolerance for criminal activity under the guise of protest"); Espíritu Dec., Ex. L (Mayor Karen Bass (@MayorofLA) posted on X, on June, 7, 2025 at 6:06 pm: "Everyone has the right to peacefully protest, but let me be clear: violence and destruction are unacceptable, and those responsible will be held accountable").

## II.  LOCAL AUTHORITIES RESPOND AND MANAGE CONDITIONS.

Consistent with their extensive training and experience responding to both large-scale peaceful protests and civil disturbances, the Los Angeles Police Department (LAPD) and Los Angeles Sheriff Department (LASD) responded promptly and effectively to the events in Los Angeles. Olmstead Dec. ¶¶ 6-9, 11-12, 14. For instance, LAPD responded to protests at Los Angeles' Metropolitan Detention Center and LASD responded to protests in the cities of Paramount and Compton. *Id.* ¶¶ 6-7, 9-10, 12. And even though both LAPD and LASD are able to request aid from nearby California law enforcement agencies under the state's Mutual Aid System during civil disturbances, *id.* ¶¶ 2-5, neither needed to take even that step at first. *Id.* ¶¶ 6-11. That is because the unlawful aspects of the disturbances were not different in scale or kind than that which occurs periodically throughout the country and is eventually brought under control by civilian authorities.

## III.  THE PRESIDENT, WITHOUT THE GOVERNOR'S CONSENT, FEDERALIZES 4,000 CALIFORNIA NATIONAL GUARD TROOPS AND MOBILIZES ADDITIONAL U.S. MARINES.

That evening, the President issued a memorandum ("June 7 Trump Memo"), which, without naming any particular locale, declared that "[n]umerous incidents of violence and disorder" had "recently occurred and threaten to continue in response" to enforcement of federal immigration laws. Espíritu Dec., Ex. E. Asserting "credible threats of continued violence," the June 7 Trump Memo purported to "call into Federal service members and units of the National Guard under 10 U.S.C. 12406" to "temporarily protect" federal government personnel and federal

**A34**

property. *Id*. The June 7 Trump Memo then directed the Secretary of Defense "to coordinate with the Governors of the States and the National Guard Bureau in identifying and ordering into Federal service the appropriate members and units of the National Guard under this authority" which "shall," regardless, "be at least 2,000 National Guard personnel and the duration of duty shall be for 60 days or at the discretion of the Secretary of Defense." *Id*. It further instructed the Secretary of Defense to take measures "reasonably necessary to ensure the protection and safety of Federal personnel and property" where protests were occurring or "likely" to occur. *Id*.

At no time prior to issuing the June 7 Trump Memo to federalize the California National Guard did DOD notify or seek approval from Governor Newsom to utilize or "mobilize" California's National Guard. Espíritu Dec., Ex. K at 2 (June 8, 2025 letter from the Governor's office to the U.S. Secretary of Defense, informing the Secretary that "the Department of Defense did not transmit this directive to the Office of the Governor, nor was it approved or ordered by the Governor of California").

Later in the evening of June 7, Secretary Hegseth sent an order ("First DOD Order") to the Adjutant General of California, who serves in dual roles as the leader of the California National Guard and as a reserve of the U.S. Army. Espíritu Dec., Ex. O. The First DOD Order attached the June 7 Trump Memo and called into federal service 2,000 members of the California National Guard for a period of 60 days. *Id*. Neither the Governor nor his office ever consented to the mobilization of the National Guard nor were presented with an opportunity to provide input on the mobilization; the Governor only learned of the First DOD Order from the Adjutant General after it was received from DOD. *See* Espíritu Dec., Ex. K at 1-2 (June 8, 2025 letter from the Governor's office to the U.S. Secretary of Defense noting that the Adjutant General of California, but not the Governor of California, received the First DOD Order). Nevertheless, the Adjutant General relinquished command of the 79th Infantry Brigade Combat Team to General Guillot, commander of U.S. Northern Command, which has issued all orders to the National Guard Unit since that time. *See* Espíritu Dec., Ex. J (June 8, 2025 Press Release from USNORTHCOM noting its command over California National Guard units deployed in the greater Los Angeles area). Commenting on the situation on June 8, the President stated over media channels that DOD

and other federal agencies must "take all action necessary to liberate Los Angeles from the Migrant Invasion" and that "[w]e're going to have troops everywhere." Espíritu Dec., Ex. M.

On June 9, 2024 at 3:24 p.m., Secretary Hegseth posted on X that "approximately 700 active-duty U.S. Marines from Camp Pendleton are being deployed to Los Angeles to restore order" and "to defend federal law enforcement officers." Declaration of Paul S. Eck ("Eck. Dec.") ¶ 18. The same day, Secretary Hegseth issued a second memorandum ("Second DOD Order," and collectively with the First DOD Order, the "DOD Orders") ordering the federalization of 2,000 additional California National Guard members, again without providing any opportunity for Governor Newsom to review or consent to that mobilization. Espíritu Dec., Ex. S at 1 (June 10, 2025 letter from the Governor's office to the U.S. Secretary of Defense noting that "[T]he Governor of California was given no opportunity to provide or withhold his consent, nor, at a minimum, to consult with the President or [the Secretary of Defense] as to which service members and in what number should be called, and for what purposes and what period of time.").

## IV.   CURRENT STATUS OF PROTESTS AND NATIONAL GUARD DEPLOYMENT.

Only about 325 California National Guard troops and armored vehicles were initially deployed, with the remaining 1700 under federal command but not deployed. When the California National Guard troops first arrived in Los Angeles on the morning of June 8, the city was quiet. *See* Espíritu Dec., Ex. R ("The situation appeared calm to start on Sunday, with CBS News Los Angeles reporters at the scene reporting no signs of conflict until about 3 p.m., when a large group of demonstrators marched from the steps of L.A. City Hall to the federal building, where the detention center is located."). Protests remain largely peaceful and civilian law enforcement has ably responded to isolated disturbances. *Id.* Accordingly, Governor Newsom's office sent a letter to Secretary Hegseth objecting to the federalization and deployment of California National Guard troops to Los Angeles and requesting that DOD rescind the First DOD Order. Espíritu Dec., Ex. K.

Instead, the State became aware on June 9, 2025 that mobilized federalized California National Guard units would be providing support for counter-immigration operations and not only at federal buildings. Eck Dec. ¶ 19. Specifically, these activities—scheduled to begin today,

June 10, 2025—will include "holding a secure perimeter in communities around areas where immigration enforcement activities would take place, and securing routes over public streets where immigration enforcement officers would travel." *Id.*

## LEGAL STANDARD

The purpose of interim injunctive relief is "not to conclusively determine the rights of the parties," but instead to balance the equities as litigation moves forward." *Trump v. Int'l Refugee Assistance Project,* 582 U.S. 571, 579, 137 S.Ct. 2080 (2017). The standard for a temporary restraining order is generally the same as for a preliminary injunction. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). "A plaintiff seeking a preliminary injunction must establish that he [or she] is likely to succeed on the merits, that he [or she] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his [or her] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In the Ninth Circuit, a plaintiff may also obtain a preliminary injunction under a "sliding scale" approach by raising "serious questions" going to the merits of plaintiff's claims and showing that the balance of hardships tips "sharply" in plaintiff's favor. *A Woman's Friend Pregnancy Res. Clinic v. Becerra*, 901 F.3d 1166, 1167 (9th Cir. 2018); *see also E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 668 (9th Cir. 2021). When the government is a party, the last two *Winter* factors (the equities and public interest) merge. *E. Bay Sanctuary Covenant,* 993 F.3d at 668 (citing *Nken v. Holder,* 556 U.S. 418, 435 (2009)).

## ARGUMENT

**I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS, AND AT A MINIMUM, PLAINTIFFS PRESENT SERIOUS QUESTIONS GOING TO THE MERITS**

### A.    The Section 12406 Federalization Orders are Unlawful

Both the Constitution and federal law strictly limit the domestic use of the National Guard. Article I, § 8, Cls. 15-16 ("the Militia Clauses") of the Constitution give *Congress* the power "to provide for calling forth the militia to execute the laws of the union, suppress insurrections, and repel invasions," as well as the power "to provide for organizing, arming, and disciplining, the

**A37**

militia, and for governing [the militia when] employed in the Service of the United States."

However, Congress has delegated its power to deploy the National Guard domestically to the

President in certain specific circumstances, set forth in statute. One of these instances is 10 U.S.C.

§ 12406, which provides that:

> Whenever—
>
> (1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation;
>
> (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or
>
> (3) the President is unable with the regular forces to execute the laws of the United States;
>
> the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws. Orders for these purposes shall be issued through the governors of the States or, in the case of the District of Columbia, through the commanding general of the National Guard of the District of Columbia.

10 U.S.C. § 12406. The President's June 7 memorandum that purports to federalize California's

National Guard relies on Section 12406 for its authority.

Section 12406 means what it says: it is applicable only when **both** the requisite conditions

exist **and** the federalization order is "issued through the" Governor. *See Octane Fitness, LLC v.*

*ICON Health & Fitness, Inc.*, 572 U.S. 545, 553 (2014) ("As in all contested questions of

statutory interpretation, "[o]ur analysis begins and ends with the text."); *see also City of Los*

*Angeles v. Barr*, 941 F.3d 931, 940 (9th Cir. 2019) ("We give Congress's words their ordinary

and everyday meaning, and may consult dictionary definitions to ensure a plain interpretation.").

If either condition is not satisfied, the President may not use this statute to call members of the

National Guard into federal service. Here, neither condition was met at the time the California

National Guard was purportedly federalized and, as a consequence, Plaintiffs have a high

likelihood of prevailing on their claims.

**A38**

1.    **There were no conditions in California that would allow invocation of Section 12406.**

The Trump Memo does not (and cannot) assert that California is being invaded or is in danger of invasion by a foreign power, so that ground in inapposite. 10 U.S.C. § 12406(1). There is also plainly no "rebellion" under 10 U.S.C. § 12406(2).  "Rebellion" means "an organized attempt to change the government or leader of a country, [usually] through violence," something far beyond anything that has occurred or is likely to occur in Los Angeles. *Rebellion, Black's Law Dictionary* (12th ed. 2024). The Trump Memo asserts that "[t]o the extent that protests or acts of violence directly inhibit the execution of the laws, they constitute a form of rebellion against the authority of the Government of the United States," but simply saying so doesn't make it true. Primarily peaceful protests that include some level of civil disturbance do not rise to the level of a rebellion. Indeed, nothing about the scale of the protests or acts of violence set these events apart from other recent periods of significant social unrest.

On June 7 and June 8, members of the public gathered to protest immigration enforcement activities in their communities, to express their opposition to the manner in which the Trump Administration has executed its immigration agenda, and to stand in solidarity with the individuals and families most directly impacted by the actions. Most protesters have exercised their First Amendment rights in a peaceful, non-violent, and legally compliant manner. While incidents of unrest and violence have been reported, those incidents are the exception. And when protests have crossed the line from peaceful to destructive or violent, Governor Newsom and other state and local officials have unequivocally condemned that conduct and called for prosecution. And state and local law enforcement agencies have quickly and effectively responded to these limited incidents, including by making dozens of arrests. Indeed, Los Angeles Police Department (LAPD) and Los Angeles Sheriff Department (LASD) have substantial training and experience responding to protests and riots on even larger scales than what Los Angeles has experienced in recent days.

These resources and training have proved sufficient to address the issue. Governor Newsom and Mayor Karen Bass both reported on June 7, 2025, that they had sufficient resources

**A39**

to respond to any potential unrest or threats to safety or property. In a June 8 letter to Secretary Hegseth, Governor Newsom's Office affirmed that the "robust law enforcement response [] to protect federal facilities" demonstrated "local law enforcement resources are sufficient to maintain order." At no time have these serious but limited incidents of violence, let alone the peaceful protests, overwhelmed local law enforcement or come close to an event that could be considered "an organized attempt to change the government or leader of a country." Indeed, these protests have not even risen to the level of protests or riots that Los Angeles and other major cities have seen in recent years—and dealt with entirely without federalization of National Guard troops.

Finally, Defendants have not shown that any of the protests have rendered the President "unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(3). According to news reports that rely on statements from the Department of Homeland Security, on Friday, June 6, 2025 and Saturday, June 7, 2025, Immigration and Customs Enforcement (ICE) officers carried out enforcement actions at multiple locations within Los Angeles County and the City of Los Angeles.  In all, the Department of Homeland Security reported that its enforcement activities on Friday, June 6, resulted in the arrest of approximately 44 individuals and 70-80 people detained in total. This ability to carry out enforcement activities with regular Department of Homeland Security officers does not amount to an inability to execute federal laws. *See* 10 U.S.C. § 12406(3)*.* And it is a far cry from the only other time in our nation's history that a President has relied on the exclusive authority of Section 12406 to federalize the National Guard. There, President Richard Nixon called upon the National Guard to deliver the mail during the 1970 Postal Service Strike, which involved over 210,000 postal workers and over 670 locations throughout the country, virtually crippling the distribution of mail in the country. Here, DHS officials were able to engage in enforcement activities, and continue to be able to do so throughout the country including in Los Angeles.

## 2.    The Governor did not issue the federalization order.

Section 12406 requires that orders pursuant to that section be "issued through the governors of the States." 10 U.S.C. § 12406. The Governor did not do so, and that is an

independent, free-standing reason for the Court to conclude that the federalization orders are unlawful.

Section 12406 originated as part of the Militia Act of 1903. Publ. L. No. 57-33, 32 Stat. 775 (1903). The original section did not include this provision, but the statute was subsequently amended to include the requirement that orders be issued through the governor. Militia Act of 1908, ch. 204, 35 Stat. 399 (1908). "'A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.'" *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (quoting Singer, STATUTES AND STATUTORY CONSTRUCTION § 46.06, pp. 181-86 (rev. 6th ed. 2000)). "'[A] significant change in language is presumed to entail a change in meaning' even when legislative history is silent as to Congress's intent." *In re Saldana*, 122 F.4th 333, 341 (9th Cir. 2024) (quoting Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 256-60 (2012)). Here, Congress chose to include language that affirmatively required orders under § 12406 be issued by the Governor, who is in the best position to understand the public safety and other needs of the communities in that state. Any order not issued in compliance with that requirements is unlawful.

As discussed *supra*, the DOD Defendants did not issue their orders through the Governor as the statute directs. This violates both the letter of the law and its spirit by depriving the Governor of the opportunity to consult with the President or other federal officials. Given the chance, the Governor could have discussed with the President not only whether the California National Guard should be called into federal service at all, but if so, which and how many service members should be called, and for what purposes and time period.

Defendants' failure to issue the orders through Governor Newsom, as required by § 12406, renders the orders ultra vires to the statute.

### B.    The Orders are a substantial intrusion into the State of California's police powers.

Under our system of federalism, policing and crime control remain one of the most basic rights reserved to the states. *United States v. Morrison*, 529 U.S. 598, 618 (2000) ("Indeed, we can think of no better example of the police power, which the Founders denied the National

**A41**

Government and reposed in the States, than the suppression of violent crime and vindication of its victims"); *Patterson v. State of Kentucky*, 97 U.S. 501, 503 (1878) ("[T]he power to establish the ordinary regulations of police has been left with the individual States, and cannot be assumed by the national government"). Deploying over 4,000 federalized military personnel absent proper invocation Section 12406 to quell a protest or prevent future protests despite the lack of evidence that local law enforcement was incapable of asserting control and ensuring public safety during such protests represents the exact type of intrusion on State Power that is at the heart of the Tenth Amendment. For this reason, Plaintiffs are substantially likely to prevail on their Tenth Amendment claim as well.

### C. The Military's Threatened Law Enforcement Activities Will Violate the Posse Comitatus Act

#### 1. The federalized National Guard and the Marines Corps are subject to the Posse Comitatus Act

"Posse comitatus (literally 'power of the county) was defined at common law [for those] upon whom a sheriff could call for assistance in preventing any type of civil disorder." *United States v. Dreyer*, 804 F.3d 1266, 1272 (9th Cir. 2015) (citations omitted). The general prohibition against the use of the military in civilian law enforcement activities have been codified under the Posse Comitatus Act ("PCA") since 1878. *Id.* (citing Act of June 18, 1878, ch. 263, 20 Stat. 152 (1878)). The current version, codified under 18 U.S.C. § 1385, forbids the willful use of "any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws." *United States v. Chon*, 210 F.3d 990, 993 (9th Cir. 2000). The prohibition has been extended to include the Marine Corps. *Id.*, *cited in Dreyer*, 804 F.3d at 1272; *United States v. Rios-Montano*, 438 F. Supp. 3d 1149, 1151 (S.D. Cal. 2020) (citing *Laird v. Tatum*, 408 U.S. 1, 15 (1972)).

Further, the Secretary of Defense, pursuant to 10 U.S.C. § 375, issued regulations that prohibited the use of military personnel "as a posse comitatus or otherwise to execute the laws." 32 C.F.R. § 213.10(a)(3) (1982), *cited in Dreyer*, 804 F.3d at 1272-73. The prohibited actions include search or seizure, arrest, stop and frisk, or "surveillance of pursuit of individuals." *Id.* The Department of Defense issued a near-identical policy in 1986, explicitly applicable to the Marine

Corps. *Id*. at 1273. Although the regulations were removed in 1993, substantively similar regulations were reissued in 2013. *See* 32 C.F.R. § 182.6(a)(1)(iii) (2013).

The restrictions apply equally to National Guard members in Federal Service. *See Chon*, 210 F.3d at 993 (recognizing the naval policies exempt National Guard members "when not" in Federal Service), *cited in Dreyer*, 804 F.3d at 1273; *see also Clark v. United States*, 322 F.3d 1358, 1357 (Fed. Cir. 2003) (holding National Guard members can only be used for civilian law enforcement when they are not in federal service). Section 12406 is *not* a statutory exception to the Posse Comitatus Act. *See, e.g.*, 10 U.S.C. § 12405; Department of Defense Instruction, Defense Support of Civilian Law Enforcement Agencies 3025.21, Enclosure 3 ¶ 1.b.(5) (Feb. 27, 2013) (Incorporating Change 1, Effective Feb. 8, 2019) (regulations implementing Posse Comitatus Act); Center for Law and Military Operations, Domestic Operational Law: 2024 Handbook for Legal Personnel 96-97 (2024) (listing, without inclusion of 10 U.S.C. § 12406, the statutes and authorities that allow for direct DOD participation in civil law enforcement in defined circumstances).

Restricting the military and National Guard – the modern-day militia – from enforcing civilian law domestically, has been an essential principle since this Nation's founding and should undergird its application here. The Founding Fathers supported militias but feared "that professional soldiers would imperil the promises of a free government." *Abbott v. Biden*, 70 F.4th 817, 840 (5th Cir. 2023) (citing Akhil R. Amar, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION 53-56 (1998)) (addressing National Guard in Title 32 status). Tyrants, including from within the federal government, could eliminate a militia "simply by taking away the people's arms, enabling a *select militia* or standing army to suppress political opponents." *District of Columbia v. Heller*, 554 U.S. 570, 598 (2008) (citations omitted) (emphasis added). The Anti-Federalists feared that the United States might "cow the militia, destroy it, or convert it into a tool of oppression." *Abbott*, 70 F.4th at 840. Most poignantly, John Marshall noted at Virginia's ratification debate, "[u]nited we are strong, divided we fall. Will you prevent the general government from drawing the militia of one state to another, when the consequence would be, that every state must depend on itself?" 3 Debates in the Several State Conventions on

**A43**

the Adoption of the Federal Constitution 425 (Jonathan Elliot ed., 1836)) at 420 (emphasis added).

While the PCA does not create a private civil cause of action for damages, *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 40 (D.D.C. 2021), *aff'd sub nom. Buchanan v. Barr*, 71 F. 4th 1003 (D.C. Cir. 2023), a plaintiff may nonetheless present an ultra vires claim where there is a showing an agency "has disregarded a specific and unambiguous statutory directive, or when the agency has violated some specific command of a statute," *id*. at 41.

In *Black Lives Matter D.C.*, the plaintiffs alleged members of the District of Columbia National Guard contributed to "unprovoked violence" as they were clearing peaceful protesters from Lafayette Park in June 2020. 544 F. Supp. 3d 26-27. Among their arguments was an ultra vires claim that the D.C. National Guard violated the PCA. *See id.* at 41. Plaintiffs claimed the National Guard unit from D.C. was inherently a federal entity and should have been considered perpetually in federal service, "such that the Posse Comitatus Act would apply to it at all times." *Id*. The Government argued, and the court agreed, that the PCA only applies to members of the D.C. National Guard "when they have been ordered to active duty pursuant to Title 10." *Id*. (citing *Mueller v. City of Joliet*, 943 F.3d 834, 837 (7th Cir. 2019)).

By contrast, there is no dispute that the National Guard members in the present matter have purportedly been ordered to active duty pursuant to Title 10. An ultra vires claim is therefore viable upon a showing that National Guard members – or other active-duty military – have "disregarded" a specific and unambiguous directive of the PCA or "violated some specific command" of the PCA. *Id.* at 41.

> **2.    There is a substantial likelihood that the National Guard and Marines will engage in activities that "amount to direct active involvement in the execution of the laws"**

The evidence strongly indicates that the federalized National Guard and active duty Marines deployed in Los Angeles will engage in quintessential law enforcement activity in violation of the PCA. The State became aware on June 9, 2025 that mobilized federalized California National Guard united would be providing support for counter-immigration operations and not only at federal buildings. Eck Dec. ¶ 19. Specifically, these activities—scheduled to begin

**A44**

today, June 10, 2025—will include "holding a secure perimeter in communities around areas where immigration enforcement activities would take place, and securing routes over public streets where immigration enforcement officers would travel." *Id.* Indeed, the military, including National Guard members, have already been deployed with federal law enforcement agents conducting law enforcement activity. On June 8, National Guard members arrived to work with the LAPD and LASD. Olmstead Dec. ¶ 11. The National Guard members were there to respond to protestors, but it was not clear what role they were to play or what equipment or training necessary they had. *Id*. National Guard members were also present at the Metropolitan Detention Center on June 8. *Id*. at ¶ 12.

The apparent mission of the troops at issue here is very different from the types of indirect support that Congress contemplates federal military assets may provide to state and local agencies. 10 U.S.C. § 248(b), for example, provides a list of supportive activities the active military can provide to other agencies, including maintenance and repair, transportation, training facilities, counterdrug and counter-transnational organized crime training, and surveillance support. *See* 10 U.S.C. § 284(b); *United States v. Hernandez-Garcia*, 44 F.4th 1157, 1163-64 (9th Cir. 2022); *California v. Trump*, 963 F.3d 926, 946 (9th Cir. 2020). The military may also share information and equipment with civilian law enforcement officials in certain instances. *See* 10 U.S.C. §§ 271, 272, *cited in United States v. Hartley*, 796 F.2d 112, 114 (5th Cir. 1986). Relatedly, military personnel may use civilian equipment to "monitor[ ] and communicate[ ] the movement of air and sea traffic." 10 U.S.C. §§ 271, 272, 274(a), (b). Courts have previously confirmed that such activities do not constitute direct military involvement that would be violate the PCA. *United States v. Red Feather*, 392 F. Supp. 916, 925 (D.S.D. 1975); *see also United States v. McArthur*, 419 F. Supp. 186, 194 (D.N.D.1975), *aff'd sub nom., United States v. Casper*, 541 F.2d 1275 (8th Cir. 1976).

But here, the evidence indicates that Defendants plan to use soldiers to directly support law enforcement activity—immigration enforcement raids by ICE. *See* Eck Dec. ¶ 19. By ordering Marines and National Guard soldiers to accompany ICE on immigration enforcement raids in the community and engaging in supportive activities such as cordoning off populated

areas, Defendants will create a substantial likelihood that the military will physically confront, detain, or search civilians whom they perceive are posing a security threat, thereby actively executing civil laws. Accompanying law enforcement officers will place soldiers in situations that have already resulted in tense interactions with civilians. For example, on June 7, federal officers pushed protesters away from the Metropolitan Detention Center. Olmstead Dec. ¶ 9. The crowd at the Metropolitan Detention Center doubled in size on June 8 and included protestors apparently angry that the National Guard had been federalized. *Id*. ¶ 12. The National Guard's presence "seemed to only inflame the protestors further." *Id*.

These activities are strong evidence that the federalized National Guard and active duty Marines in Los Angeles will engage in law enforcement activity in direct violation of the PCA. Plaintiffs have therefore demonstrated—at a minimum—substantial questions going to the merits of their ultra vires claim on this basis as well. *See* Compl., ECF No. 1 at 6, 91.

## II.    THERE IS A GRAVE RISK OF IMMINENT, IRREPARABLE HARM

Plaintiffs will suffer irreparable injury in the absence of an injunction. *Winter,* 555 US at 20. Defendants' conduct need not be the exclusive cause of Plaintiffs' injury. *M.R. v. Dreyfus*, 697 F3d 706, 728-729 (9th Cir. 2015). Nor must the alleged harm be certain to occur before a court can grant a preliminary injunction. *Michigan v. United States Army Corps of Engineers* 667 F3d 765, 788 (7th Cir. 2011). Plaintiffs show a "sufficient causal connection" between Defendants' conduct and Plaintiffs' injury that can only be addressed by an immediate injunction. *City and County of San Francisco v. U.S. Citizenship and Immigration Services,* 408 F.Supp.3d 1057, 1121 (N.D. Cal. 2019) (citing, *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv*., 886 F.3d 803, 819 (9th Cir. 2018); *Perfect 10, Inc. v. Google, Inc.* 653 F.3d 976, 745 (9th Cir. 2015)).

Plaintiffs are likely to suffer several types of irreparable harm in the absence of temporary relief, but one stands out among the rest: the very high risk of substantial civil unrest as a direct result of Defendants' inflammatory and confrontational deployment of the military in a large, civilian population center. Indeed, the presence of soldiers on the streets of Los Angeles, including their actual or perceived support and aid in the execution of ICE duties, has *already* created significant civil unrest and is likely to result in increased civil unrest in the future. This

**A46**

week, the presence of National Guard soldiers deployed to Los Angeles became the focus of protests and led to civil unrest, requiring intervention by state and local law enforcement to protect the National Guard soldiers. In the absence of immediate injunctive relief, there is a real risk of significant and widespread civil disturbance.

Put simply, soldiers patrolling the streets of Los Angeles have not made anyone safer; indeed, the opposite is true. Defendants' confrontational decision to deploy the military in a civilian city serves only to spread fear and heighten tensions in Los Angeles. If anything, the presence of the military threatens to further *de*-stabilize the community and escalate a situation that calls for cool heads and steady hands. *See* Olmstead Dec. ¶ 12 ("The presence of the National Guard seemed to only inflame the protesters further."). What is more, federalization of the National Guard and the deployment of active duty Marines aims to solve a problem that does not exist: since Fiscal Year 2024, ICE operated in the Los Angeles Area of Responsibility, making 4,741 arrests, and has continued to operate unimpeded, arresting approximately 44 individuals and detaining 70-80 people in total since Friday, June 6. Espíritu Dec., Exs. B, G.

Moreover, Defendants' unlawful federalization of 4,000 California National Guard members, over the repeated objections of Governor Newsom, diverts necessary state resources. *See* Eck Dec. ¶ 32 (noting the California Military Department has "has identified and committed 4,600 service members to achieve state specific missions, which is 38% of the available strength"); *id.* ¶ 33 ("In 2025, there have already been 3,332 services members activated for 89,061 duty days, indicating the state will need every available service member to meet the State's operational needs."). Most members of the California National Guard serve in a reserve capacity, meaning they work in civilian roles when not serving as part-time militia forces, often in specialized positions. Eck Dec. ¶¶ 21, 37. As one pertinent example, 2,500 California National Guard members were activated in response to some of the most destructive fires in Los Angeles County that occurred in early January 2025. Eck Dec. ¶¶ 35-36. Likewise, the federalized force includes elements of the 79th Infantry Brigade Combat Team that serve in Taskforce Rattlesnake, the State's specialized fire combat unit. Eck Dec. ¶¶ 14, 39-40. The 79th Infantry Brigade Combat Team also includes Counterdrug Taskforce members that specialize in providing support

to stop the trafficking of fentanyl at the U.S.-Mexico Border. *Id.* ¶¶ 15, 42-43. Members of the California National Guard also serve key roles in a variety of functions, from defending the state from cyber threats to conducting emergency traffic control. *Id.* ¶¶ 44-46. In short, Defendants' federalization of the California National Guard jeopardizes vital resources on which the State depends to protect itself from emergencies, including the 79th Infantry Brigade Combat Team's specialized fire suppression and drug interdiction teams. *Id.* ¶¶ 47-50.

In short, Defendants' unlawful federalization of a significant subset of the California National Guard for 60 days at the expense of state resources jeopardizes the safety and welfare of the state's citizens on two fronts: ***first***, it removes these servicemembers from their vital roles combating drug trafficking in California's border zones and fighting wildfires and ***second***, their deployment risks inflaming an unstable and dangerous situation of Defendants' own making, putting property and countless lives at unnecessary risk. *See id.* ¶¶ 13-16.

### III. THE PUBLIC INTEREST AND BALANCE OF EQUITIES TIP SHARPLY IN FAVOR OF A TRO

Lastly, a preliminary injunction is appropriate where: (1) the balance of equities tips in favor of the applicants; and (2) an injunction is in the public interest. *Winter*, 555. U.S. at 20. When the federal government is a party, these last two factors merge. *Nken*, 556 U.S. at 435; *Drakes Bay Oyster Co. v. Jewell,* 747 F.3d 1073, 1092 (9th Cir. 2014). When evaluating the balance of hardships, "a court must consider the impact granting or denying a motion for a preliminary injunction will have on the respective enterprises." *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 827 (9th Cir. 1993). Among other things, "by establishing a likelihood of success on the merits," a plaintiff "establish[es] that both the public interest and the balance of the equities favor a preliminary injunction." *Ariz. Dream Act. Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014). The purpose of such interim equitable relief is not to conclusively determine the rights of the parties but to balance the equities as the litigation moves forward. *Trump v. Int'l Refugee Assistance Project*, 582 U.S. at 580. Moreover, the federal government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015)

(quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)).

Here, the balance of equities tips sharply in Plaintiffs' favor. Plaintiffs seek to preserve (in part) the status quo by temporarily enjoining Defendants from ordering or deploying the active-duty members of the military and federalized National Guard soldiers to patrol communities or otherwise engage in general law enforcement activities beyond the immediate vicinity of federal buildings or other federal real property. As outlined above, Defendants' use of the military and the federalized National Guard deprives the State of vital resources, escalates tensions and promotes (rather than quells) civil unrest. By contrast, the public interest is served if the Court enjoins Defendants from further militarizing California's communities to allow State and local law enforcement to fulfill their duties to enforce State law. Moreover, a preliminary injunction will not harm Defendants: the Department of Homeland Security can continue to enforce immigration law and the DOD Defendants will merely be ordered to comply with the PCA and statutes governing the federalization of the National Guard.

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully urge the Court to help the State keep the peace in Los Angeles and enter a temporary restraining order that prevents federal troops from enforcing the laws in a civilian city.

**A49**

Dated:  June 10, 2025                         Respectfully submitted,

                                              ROB BONTA
                                              Attorney General of California
                                              LAURA L. FAER
                                              Acting Senior Assistant Attorney General
                                              MARISSA MALOUFF
                                              JAMES E. STANLEY*
                                              Supervising Deputy Attorneys General
                                              LUKE FREEDMAN
                                              ROBIN GOLDFADEN
                                              BRENDAN M. HAMME
                                              LORRAINE LOPEZ*
                                              KENDAL MICKLETHWAITE
                                              MEGAN RICHARDS
                                              Deputy Attorneys General

                                              _/s/ Nicholas Espíritu_

                                              NICHOLAS ESPÍRITU
                                              Deputy Attorney General
                                                1515 Clay St.
                                                Oakland, CA  94612
                                                Telephone: (510) 879-3908
                                                E-mail:  Nicholas.Espiritu@doj.ca.gov

                                              _Attorneys for Plaintiffs_

                                              * Admission Pending

**A50**

**ROB BONTA**
Attorney General of California
LAURA L. FAER
Acting Senior Assistant Attorney General
MARISSA MALOUFF
JAMES E. STANLEY
Supervising Deputy Attorneys General
LUKE FREEDMAN
ROBIN GOLDFADEN
BRENDAN M. HAMME
LORRAINE LOPEZ
KENDAL MICKLETHWAITE
MEGAN RICHARDS
NICHOLAS ESPÍRITU
Deputy Attorneys General
  1515 Clay St.
  Oakland, CA  94612
  Telephone: (510) 879-3908
  E-mail:  nicholas.espiritu@doj.ca.gov
 *Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **GAVIN NEWSOM, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF CALIFORNIA; STATE OF CALIFORNIA,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**DONALD TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; PETE HEGSETH, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF DEFENSE; U.S. DEPARTMENT OF DEFENSE,**<br><br>Defendants. | **NO.   3:25-cv-04870-CRB**<br><br>**DECLARATION OF NICHOLAS ESPIRITU IN SUPPORT OF PLAINTIFFS' EX PARTE MOTION FOR A TEMPORARY RESTRAINING ORDER**<br><br>Judge:       Hon. Charles R. Breyer<br>Trial Date:   None Set<br>Action Filed: June 9, 2025 |

**A51**

I, Nicholas Espíritu, declare under penalty of perjury that the following is true and correct:

1.      I am an attorney licensed to practice law in the State of California, admitted to the bar of this Court, and a Deputy Attorney General in the Office of the Attorney General, California Department of Justice. The Attorney General is counsel to Plaintiffs Governor Gavin Newsom and the State of California. I make this declaration in support of Plaintiffs' motion for a temporary restraining order.

2.      I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

3.      Attached hereto as **Exhibit A** is a true and correct copy of the Service Employees International Union's ("SEIU") June 9, 2025 Press Release following the release of David Huerta, entitled *STATEMENT: SEIU President April Verrett on David Huerta's Release from Federal Custody* and available on SEIU's official website at https://www.seiu.org/2025/06/statement-seiu-president-april-verrett-on-david-huertas-release-from-federal-custody.

4.      Attached hereto as **Exhibit B** is a true and correct copy of is a true and correct copy of U.S. Immigration and Customs Enforcement's ("ICE") Enforcement and Removal Operation Statistics, available on ICE's official website at https://www.ice.gov/statistics, last accessed on June 10, 2025.

5.      Attached hereto as **Exhibit C** is a true and correct copy of an October 2, 2024 article written by Joseph Nunn and published by the Brennan Center for Justice, entitled *Limiting the Military's Role in Law Enforcement*, and available on the Brennan Center for Justice's official website at https://www.brennancenter.org/our-work/policy-solutions/limiting-militarys-role-law-enforcement.

6.      Attached hereto as **Exhibit D** is a true and correct copy of a June 6, 2025 article published by ABC 7 News Los Angeles, entitled *Crowds clash with federal agents after dozens detained in ICE raids across LA*, and available on ABC 7 News's official website at

**A52**

https://abc7.com/post/multiple-people-detained-ice-homeland-security-agents-conduct-2-separate-investigations-la/16678559/.

7.    Attached hereto as **Exhibit E** is a true and correct copy of the June 7, 2025 Memorandum from President Trump to the Secretary of Defense, Attorney General, and Secretary of Homeland Security, regarding "Department of Defense Security for the Protection of Department of Homeland Security Functions."

8.    Attached hereto as **Exhibit F** is a true and correct copy of a June 7, 2025 article written by Damian Dovarganes and Olga R. Rodriguez and published by the Associated Press, entitled *Federal authorities arrest dozens for immigration violations across Los Angeles*, and available on the Associated Press's official website at https://apnews.com/article/immigration-raids-los-angeles-f8c4160e32be0ff77c5d4bf0ccef98cc.

9.    Attached hereto as **Exhibit G** is a true and correct copy of a June 7, 2025 article published by Al Jazeera, entitled *ICE launches 'military-style' raids in Los Angeles: What we know*, and available on Al Jazeera's official website at

https://www.aljazeera.com/news/2025/6/7/ice-launches-military-style-raids-in-los-angeles-what-we-know.

10.    Attached hereto as **Exhibit H** is a true and correct copy of a June 7, 2025 article written by Melanie Mason and published by Politico, entitled *Newsom blasts deployment of National Guard to LA as 'purposefully inflammatory'*, and available on Politico's official website at https://www.politico.com/news/2025/06/07/newsom-national-guard-los-angeles-00393526.

11.    Attached hereto as **Exhibit I** is a true and correct copy of a June 6, 2025 article published by Fox 11 Los Angeles News, entitled *LA immigrant families reportedly detained by ICE at routine check-ins sparks human rights concerns*, and available on Fox 11 News's official website at https://www.foxla.com/news/ice-la-immigration-routine-check-ins-human-rights-concerns.

12.    Attached hereto as **Exhibit J** is a true and correct copy of a June 8, 2025 Press Release from U.S. Northern Command (USNORTHCOM), entitled *USNORTHCOM statement regarding protection of federal property and personnel in the Los Angeles Area*, and available on

USNORTHCOM's official website at https://www.northcom.mil/Newsroom/Press-Releases/Article/4209228/usnorthcom-statement-regarding-protection-of-federal-property-and-personnel-in/.

13.    Attached hereto as **Exhibit K** is a true and correct copy of a June 8, 2025 letter sent from the California Office of the Governor to Secretary of Defense Pete Hegseth, regarding Federalization of the California National Guard, via e-mail delivery.

14.    Attached hereto as **Exhibit L** is a true and correct copy of a June 7, 2025 post on the social media website X by Mayor of Los Angeles Karen Bass, available on X's website at https://x.com/MayorOfLA/status/1931518214414172656?.

15.    Attached hereto as **Exhibit M** is a true and correct copy of a June 8, 2025 article written by Tyler Pager and published by the New York Times, entitled *Trump Jumps at the Chance for a Confrontation in California Over Immigration*, and available on the New York Times's official website at https://www.nytimes.com/2025/06/08/us/politics/trump-california-immigration.html.

16.    Attached hereto as **Exhibit N** is a true and correct copy of ongoing news coverage last updated on June 9, 2025 at 10:33 p.m. PT and published by NBC News, entitled *700 Marines will deploy as immigration protests continue*, and available on NBC News's official website at https://www.politico.com/news/2025/06/07/newsom-national-guard-los-angeles-00393526

17.    Attached hereto as **Exhibit O** is a true and correct copy of the June 7, 2025 Memorandum for Adjutant General of the California National Guard Through: The Governor of California, with the subject line "Calling Members of the California National Guard into Federal Service."

18.    Attached hereto as **Exhibit P** is a true and correct copy of a June 9, 2025 Memorandum for Adjutant General of the California National Guard Through: The Governor of California, with the subject line "Calling Additional Members of  the California National Guard into Federal Service."

19.    Attached hereto as **Exhibit Q** is a true and correct copy of a June 7, 2025 press release from California Governor Gavin Newsom, entitled *Governor Gavin Newsom on speaking*

*out peacefully*, and available on the Governor's official website at

https://www.gov.ca.gov/2025/06/07/governor-gavin-newsom-on-speaking-out-peacefully/.

20.     Attached hereto as **Exhibit R** is a true and correct copy of a June 9, 2025 article

written by Austin Turner, Dean Fioresi, and Camilo Montoya-Galvez and published by CBS

KCAL News, entitled *Los Angeles immigration enforcement operations set to continue after*

*weekend of protests, National Guard deployment*, and available on CBS News's official website

at https://www.cbsnews.com/losangeles/news/national-guard-troops-los-angeles-immigration-

protests/.

21.     Attached hereto as **Exhibit S** is a true and correct copy of a June 10, 2025 letter

sent from the California Office of the Governor to Secretary of Defense Pete Hegseth, regarding

Federalization of the California National Guard, via e-mail delivery.

22.     Pursuant to N.D. Cal. L.R. 65-1 and Fed. R. Civ. P. 65, counsel from my office

emailed notice of the instant application to counsel for the Defendants, the United States

Department of Justice at Garry.Hartlieb2@usdoj.gov; Eric.Hamilton@usdoj.gov;

Alex.Haas@usdoj.gov; Christopher.Edelman@usdoj.gov; and Ben.Kurland@usdoj.gov. The

United States Department of Justice stated to our office "Defendants oppose any ex parte

proceedings in this matter and request no less than 24 hours from the time that Plaintiffs file their

motion for a temporary restraining order to file a response brief.  Should the Court desire to rule

on the temporary restraining order in the absence of Defendants' written response, Defendants

seek to be heard at a hearing and are available at any time."


     I declare under penalty of perjury under the laws of the United States that the foregoing is

true and correct.

Executed on June 10, 2025, at Oakland, California.

                                                                /s/ Nicholas Espíritu
                                                       _____

                                                                Nicholas Espíritu

**A55**

**EXHIBIT I**

# LA immigrant families reportedly detained by ICE a routine check-ins sparks human rights concerns

By FOX 11 Digital Team  |  Published  June 6, 2025 8:48am PDT  |  Immigration  |  FOX 11  |

**LA ICE raids conducted at multiple locations; community speaks out**

Several protests were held Friday in response to immigration raids at various locations in Los Angeles.

---

**The Brief**

- Immigrant families, including children, are reportedly being detained by ICE at the Los Angeles federal building during routine check-ins.

- Advocates and a U.S. Representative describe conditions as inhumane, with overcrowding, lack of food and water, and families held overnight.

- No official statement from ICE or DHS on these specific detentions is currently availabl but investigations are being demanded.

---

A57

**LOS ANGELES** - Alarming reports from the Edward R. Roybal Federal Building i downtown Los Angeles indicate that immigrant families, including asylum seeke and children, are being detained by Immigration and Customs Enforcement (IC during what were previously considered routine check-ins.

This concerning shift in practice has sparked immediate human rights concern and demands for an investigation from prominent officials and advocacy grou who describe conditions for those held as inhumane.

## Inhumane conditions reported at federal building

What we know: Immigrants, many asylum seekers with children, were reported detained by ICE after arriving for scheduled check-ins at the Roybal Federal Building. Eyewitness accounts and attorney reports detail overcrowded conditions, with individuals held in the building's basement, conference rooms, and even outdoor tents due to lack of space. People are being processed and moved to facilities out of state that have room as there is none left in the local facilities.

Detainees have reportedly been deprived of food and water for 12 to 24 hours more, with some families, including young children, forced to endure these conditions overnight. Additionally, lights in the building reportedly shut off at 5 p.m., leaving families in complete darkness.

One attorney reported a client was being held without food or water from 2 p.r until the next day, while his wife and two children waited over 12 hours. There also reports of a 20-year-old woman being held alone, separated from her mother, despite having legally checked in with ICE for years and being days fro court date for an asylum process.

Attorneys inside said this began Tuesday, with more than a hundred people in custody. Local immigration groups protesting outside the federal building and

Metropolitan Holding Facility say people are being denied due process and tha
the federal building basement is not a fitting location to hold people.

**LA ICE Raids: Protesters rally in downtown**

Hundreds gathered in downtown LA Friday to protest immigration raids that w
being conducted throughout the city.

What they're saying: Representative Jimmy Gomez (CA-34), whose district inclu
the Roybal Federal Building, condemned the detentions.

"These are very disturbing reports from L.A.'s Roybal Federal Building," said
Gomez. "Law-abiding asylum seekers — many with kids — are being detained
after showing up for routine ICE check-ins. No food. No water. Locked in holdir
rooms for over 12 to 24 hours. These are not criminals. These are families who
followed the rules. Filed the paperwork. Showed up on time. Instead, they're
being treated like they broke the law just for seeking asylum."

Gomez further added, "This isn't 'just how the system works.' This is a system breaking people. Bureaucracy weaponized against those who complied. DHS—demand to go in to get answers. We need to know why law-abiding asylum seekers are being detained, separated, and treated like criminals."

The League of United Latin American Citizens (LULAC) also issued a national ale and demanded an immediate federal investigation. Roman Palomares, LULAC National President and Chairman of the Board, stated, "This is beyond unacceptable — it is unconscionable. The notion that our federal courthouse – place that symbolizes the pursuit of justice — is now being used as a de facto detention facility under ICE authority, is an affront to every value our nation is supposed to uphold. We are demanding answers: Who is being held, who is holding them, and under what legal justification? We must not allow the courthouse to become a cage."

Palomares continued, "It is inconceivable that in the United States of America, a nation that claims to value the rule of law, we are seeing such blatant disregard for due process, civil rights, and human dignity. These are individuals whose las hope rests with the U.S. judicial system. Instead, they are being detained in the very place they came to for justice. This violates our own constitution and international human rights standards."

The other side: While no specific statement from ICE or the Department of Homeland Security (DHS) regarding these particular allegations the Roybal Federal Building is currently available, ICE operates under a broad mandate to enforce U.S. immigration laws.

According to attorneys on site, ICE claims it can detain people indefinitely even they have a "legal stay," which is generally a temporary suspension of a deportation order.

**A60**

From ICE's general operational perspective, the presence of a legal stay does n
always preclude detention, as individuals may still be deemed ultimately
removable under immigration statutes or present other factors that, in ICE's vie
warrant continued custody. Enforcement actions, including arrests at check-ins
are part of ICE's stated mission to apprehend individuals violating immigration
laws.

## Nationwide arrests

Big picture view: These reported detentions in LA align with a broader federal
effort to significantly escalate immigration arrests nationwide.
Internal government data shows ICE arrests during President
Donald Trump's second term have already surpassed 100,000 this week,
including over 2,000 arrests on both Tuesday and Wednesday. This marks a
dramatic increase from the daily average of approximately 660 arrests during t
first 100 days of the Trump administration.

These numbers reportedly move closer to the stated goal of top administration
officials, such as White House deputy chief of staff Stephen Miller, who has
pushed for ICE to conduct "a minimum" of 3,000 arrests each day.

**A61**

**ICE raid at alleged underground nightclub in LA**

Agents with homeland security and ICE raided an alleged underground nightclu
in Los Angeles. HSI Los Angeles said more than 30 people with ties to China an
Taiwan were arrested in the raid.

---

This aggressive expansion, which includes arresting migrants and asylum-seeke
at court hearings or check-in appointments, is seen by critics as deterring
individuals from complying with the legal process and creating a dangerous
situation for immigrant communities.

What's next: LULAC is urgently calling for a full and immediate investigation by
Department of Justice and the Office of the Inspector General. The
also demand an accounting from ICE and federal court officials
regarding the legal basis and circumstances of these detentions, a halt to any
deportation actions until due process is fully afforded to every individual in
custody, and oversight by members of Congress, particularly the Congressiona
Hispanic Caucus and the House and Senate Judiciary Committees.

**A62**

Representative Gomez has also demanded access to the facility. As the son of immigrants, Gomez has been a strong advocate for immigrant families, previou filing an amicus brief urging the court to uphold the 14th amendment's guaran of citizenship and supporting the Dream and Promise Act of 2025.

He has also called on the IRS and DHS to halt the misuse of confidential taxpay data for immigration enforcement and is leading efforts to reinstate the Citizenship and Assimilation (C&A) Grant Program.

**The Source:** This article's information comes directly from official statement and reports by Representative Jimmy Gomez and the League of United Latin American Citizens (LULAC). Context for the broader immigration enforcemer trends was sourced from a Fox News report based on internal government data.

**Immigration**      **Los Angeles**      **Instastories**      **Downtown LA**

This material may not be published, broadcast, rewritten, or redistributed. ©2025 FOX Television Stations

**A63**

**EXHIBIT A**



**Contact:**
SEIU National Media, media@seiu.org

Issued June 09, 2025

# STATEMENT: SEIU President April Verrett on David Huerta's Release from Federal Custody

*Following the release of SEIU California and SEIU-USWW President David Huerta from federal custody, SEIU International President April Verrett released the following statement.*

"David Huerta was arrested while standing up for immigrants' rights. Today, a judge set him free after federal authorities attacked, injured, and unjustly detained him since Friday. We are relieved that David is free and reunited with his family and we are deeply grateful to the hundreds of elected officials, civil rights leaders, labor partners and allies from across the nation who stood in solidarity and demanded David's release.

"But this struggle is about much more than just one man. Thousands of workers remain unjustly detained and separated from their families. At this very moment, immigrant communities are being terrorized by heavily militarized armed forces. The Trump regime calling in the National Guard is a dangerous escalation to target people who disagree with them. It is a threat to our democracy. The federal government should never be used as a weapon against people who disagree with them.

"SEIU will always stand up to protect the rights and dignity of hard working people, and the safety of workers in the workplace. Imagine what it feels like for thousands of workers around the country to be attacked by masked men with weapons, or to bear witness to their co-workers getting dragged away, knowing their kids may not see them again.

"It is shameful and wrong that this administration is attempting to tear apart our families, communities and disrupt the lives of peaceful, hardworking people. It is yet another attempt to use people's race and

**A65**

country of origin to divide us as Americans. It won't work. And these cruel ICE raids are economically destructive, hurting all working people by targeting the essential immigrant workers who are the backbone of our economy.

"America is a nation of immigrants. Immigrant workers are essential to our society: feeding our nation, caring for our elders, cleaning our workplaces, and building our homes. Immigrants are scientists, they are teachers and professors. They are our co-workers, neighbors and family members. They deserve our respect and they need their constitutional rights respected.

"We demand the release of all people unjustly detained, and an end to the raids. We demand that all immigration proceedings uphold the principles of due process, and that all detainees have access to the legal representation and rights promised by the constitution."

###

###

About    Blog    Members    Careers    Press

      

Privacy    Contact    Search    Join Us

© 2025 Service Employees International Union

1800 Massachusetts Ave NW
Washington, DC 20036

**A66**

Paid for by SEIU COPE and United We Can, seiu.org. Not authorized by any candidate or candidate's committee.



**A67**

**EXHIBIT** B

An official website of the United States government



**Official websites use .gov**
A **.gov** website belongs to an official government organization in the United States.



**Secure .gov websites use HTTPS**
A **lock** ( 🔒 ) or **https://** means you've safely connected to the .gov website. Share sensitive information only on official, secure websites.

En Español    🗔 Contact Us    🔗 Quick Links

## U.S. Immigration and Customs Enforcement

Search

Call 1-866-DHS-2-ICE          Report Crime

ICE

## ICE Enforcement and Removal Operations Statistics

U.S. Immigration and Customs Enforcement's Enforcement and Removal Operations (ERO) officers enforce immigration laws within the interior to preserve national security and public safety.

ERO manages all aspects of the immigration enforcement process, including the identification, arrest, detention and removal of aliens who are subject to removal or are unlawfully present in the United States.

Like all law enforcement agencies, ERO officers prioritize their enforcement actions based on agency and department priorities, funding and capacity. ERO operations are flexible enough to allow its officers to respond to events such as spikes in border crossings, modifications to U.S. laws, pandemics, and natural disasters at home and abroad.

**The following dashboards present for the first time information and trends in arrests, detentions, removals and alternatives to detention as of December 31, 2024.**

The dashboards will be updated quarterly.



ERO enforces laws by arresting immigration violators in the interior of the United States. It relies on statutory law enforcement authority to identify and arrest aliens who may present threats to national security or public safety, or who otherwise undermine the integrity of U.S. immigration laws. ERO uses targeted, intelligence-driven operations to prioritize its enforcement actions in ways that help protect communities nationwide. While ERO primarily conducts administrative arrests of aliens it has probable cause to believe are removable from the United States, it also has the authority to execute criminal arrest warrants and initiate prosecutions for criminal activity, including immigration-related crimes. ERO officers assigned to task forces also help target and apprehend foreign fugitives in the United States who are wanted for crimes here and abroad by working with domestic and international partners.

- **Arrests by country of citizenship and criminal history:** ERO arrests are broken down by country of citizenship and categories of criminal history that include people with:

○ U.S. criminal convictions.
○ Pending criminal charges in the United States.
○ No convictions or pending charges but who have broken U.S. immigration laws including visa overstays and Visa Waiver Program violators.*

*This category includes those who have repeatedly violated U.S. law by reentering after deportation, immigration fugitives with an executable final order of removal, and international fugitives wanted for crimes committed abroad.
○ For fiscal years 2021 and 2022, this category also includes individuals apprehended while attempting to unlawfully enter the United States after January 1, 2021.
• **ERO arrests over time:** Historically, ERO most commonly arrests immigration violators with convictions involving DUI, drug possession, assault and criminal (non-civil) traffic offenses such as hit-and-run or leaving the scene of an accident.
• **Arrests by Area of Responsibility (AOR):** ERO has 25 field offices, which are geographic areas of responsibility, around the country, each headed by a field office director.

ARRESTS



ICE provides the above Arrests, Removal, Detention and Alternatives to Detention statistics for public use. ICE confirms the integrity of the data as published on this site and cannot attest to subsequent transmissions. Data fluctuate until "locked" at the conclusion of the fiscal year. These statistics are published with data one quarter in arrears. Future quarter-end and year-end reporting may include corrections and other updates and will supersede previous quarter's data.

*The Harlingen AOR was added from parts of San Antonio and Houston in FY2022.

A70

# DETENTION

ERO oversees the civil immigration detention of one of the most diverse and rapidly changing detained populations in the world. The ERO Headquarters Custody Management and ICE Health Service Corps divisions help officers in the field manage the detained population and ensure detained aliens' health and safety, ensure compliance with ICE's detention standards, and provide medical care — including mental health care — to detained individuals.

ICE detains individuals as necessary, including to secure their presence for immigration proceedings and removal from the United States. ICE also detains those who are subject to mandatory detention under U.S. immigration law and those a supervisor has determined are public safety or flight risks.

After ICE arrests and processes individuals for administrative immigration violations or CBP and other state, local and federal law enforcement partners turn them over to ICE, officials may detain them while their immigration cases are pending or release them under a form of supervision. Both ICE and the Department of Justice's Executive Office for Immigration Review — the office that oversees the immigration court system — can impact custody status at various points during a alien's immigration proceedings.

Officials make custody determinations on an individual basis, taking into account all facets of a person's situation, including their immigration history and criminal records. Authorities also consider family ties, humanitarian issues and whether a person may be a flight risk.

Whenever possible, ICE seeks to house detained individuals within the geographical areas of their arrests to minimize their time in ICE custody and keep them close to family, friends and legal representatives.

Most detained individuals are transfers from CBP following arrests at the border. ICE is legally obligated to detain some of these people, including those with certain criminal histories.

If an alien or their representative believes they should not be subject to enforcement, detention or removal, they should contact their local ERO field office to request a case review or initiate the ICE Case Review process. People who want to contact ICE about their cases should first notify their local ERO field office via email with supporting documentation for an initial review.

- **Detention by country of citizenship and criminal history:** Detained individuals are categorized in the following ways:
  - Individuals with criminal convictions.
  - Individuals with pending criminal charges.
  - Those with no convictions or pending charges but who have broken U.S. immigration laws.*

    *The third category includes individuals without any known criminal convictions or pending charges who have repeatedly violated U.S. law by reentering after deportation; immigration fugitives with a final order of removal by an immigration judge; and foreign fugitives wanted for crimes committed abroad.

- **Detention over time:** Most detained individuals are transfers from CBP following arrests made at the border. Higher numbers of border crossings are typically associated with higher detention numbers.

DETENTION

A71



ICE provides the above Arrests, Removal, Detention and Alternatives to Detention statistics for public use. ICE confirms the integrity of the data as published on this site and cannot attest to subsequent transmissions. Data fluctuate until "locked" at the conclusion of the fiscal year. These statistics are published with data one quarter in arrears. Future quarter-end and year-end reporting may include corrections and other updates and will supersede previous quarter's data.

*The Harlingen AOR was added from parts of San Antonio and Houston in FY2022.



ICE's authority to remove aliens exists under the Immigration and Nationality Act pursuant to Title 8 of the U.S. Code, sometimes called "Title 8 authority."

Between March 2020 and May 2023, the Department of Homeland Security quickly expelled irregular border crossers from the United States under a public health order the Centers for Disease Control and Prevention issued March 21, 2020, sometimes called "Title 42 authority."

**Title 8:** ICE principally removes aliens from the United States after they have received a final order of removal. These removal operations require complex coordination, management and facilitation efforts to successfully remove and return aliens from the United States. ERO accomplishes this mission through charter flights and on commercial airlines for escorted and unescorted removals, in addition to ground transportation missions on the northern and southern borders and at ports of entry.

ERO's highest-profile removals generally comprise fugitives wanted for serious crimes in other countries, such as homicide, gang-related offenses, corruption and fraud. Often, these individuals come to ERO's attention because of Interpol notices. Other high-profile removals include known or suspected terrorists, those involved in counterproliferation crimes, and those on the terrorist watch list and no-fly list. War criminals and others convicted or suspected of committing human rights abuses — including torture, ethnic cleansing and genocide — are also in this category. Authorities escort high-profile removals out of the country via commercial flights, regularly scheduled ICE charter flights and special high-risk charters. In many cases, the individuals are turned over to law enforcement authorities in their home country to face charges or sentencing.

**Title 42:** Title 42 is a public health authority guided by the CDC and is not an immigration authority. On March 21, 2020, The U.S. Department of Health and Human Services transferred Title 42 Public Health Authority to CBP. Under Title 42, CBP prohibited the entry of certain people who potentially posed a health risk by being subject to previously announced travel restrictions or having unlawfully entered the country to bypass health screening measures. Under Title 42 authority, DHS rapidly expelled irregular border crossers to their country of last transit — Canada or Mexico — or, when such an expulsion was not possible, interagency partners engaged foreign government officials to secure aliens' expulsion to their countries of origin.

**REMOVALS**

**A73**



ICE provides the above Arrests, Removal, Detention and Alternatives to Detention statistics for public use. ICE confirms the integrity of the data as published on this site and cannot attest to subsequent transmissions. Data fluctuate until "locked" at the conclusion of the fiscal year. These statistics are published with data one quarter in arrears. Future quarter-end and year-end reporting may include corrections and other updates and will supersede previous quarter's data.

*The Harlingen AOR was added from parts of San Antonio and Houston in FY2022.

ICE served a role in transporting aliens expelled under Title 42 via ICE charter flights.

The data in the chart below represents only Title 42 expulsions conducted by ICE via ICE charter flights. Effective May 11, 2023, President Joe Biden declared the end of the COVID-19 national emergency.

Comprehensive data related to Title 42 expulsions for the United States is available through CBP. For additional information, please visit CBP's Title 42 statistical report.

EXPULSIONS

A74



Individual T42 Expulsion flights may stop at multiple locations. ICE confirms the integrity of the data as published on this site and cannot attest to subsequent transmissions. Data fluctuates until "locked" at the conclusion of the fiscal year. These statistics are published with data one quarter in arrears. Future quarter-end and year-end reporting may include corrections and other updates and will supersede previous quarter's data.



The Alternatives to Detention (ATD) program's Intensive Supervision Appearance Program is an alien compliance tool overseen by ERO.

ATD uses technology and case management to more closely monitor cases assigned to the non-detained docket where detention is not necessary or appropriate. The level of supervision and technology participants are assigned is based on their current immigration status, criminal history, compliance history, community or family ties, caregiver or provider status, and other humanitarian or medical conditions. Officials may enroll aliens in ATD following a border apprehension by CBP or an ICE interior administrative arrest, or at a later stage in removal proceedings.

In fiscal year 2023, ICE's ATD program deployed the following types of monitoring:

- **Facial matching technology:** Facial matching technology allows participants to report compliance via an app installed on an alien's own smartphone or a dedicated government-issued device.
- **GPS monitoring:** Satellites track participants' location to ensure compliance with conditions of release.
- **Telephonic reporting (telephonic check-in):** Phone calls are compared against a voiceprint obtained during enrollment.
- **Wrist worn device:** Provides GPS monitoring, facial matching, and virtual case management functionality, including virtual check-ins and reminders. ICE is conducting a limited deployment of 50 wrist worn devices in the Denver AOR.

ALTERNATIVES TO DETENTION

A76



ICE provides the above Arrests, Removal, Detention and Alternatives to Detention statistics for public use. ICE confirms the integrity of the data as published on this site and cannot attest to subsequent transmissions. Data fluctuate until "locked" at the conclusion of the fiscal year. These statistics are published with data one quarter in arrears. Future quarter-end and year-end reporting may include corrections and other updates and will supersede previous quarter's data.

*The Harlingen AOR was added from parts of San Antonio and Houston in FY2022.

*Unknown Legal Stage: Legal stage data was unavailable when the record was produced. Data is extracted under a point-in-time scenario.

## Additional Resources

- ICE Fiscal Year 2024 Annual Report
- ICE Fiscal Year 2023 Annual Report
- ICE Fiscal Year 2022 Annual Report
- ICE Fiscal Year 2021 Annual Report

A77

- ICE Annual Report Fiscal Year 2020
- Fiscal Year 2020 Enforcement and Removal Operations Report | Local Statistics 2020
- Fiscal Year 2020 Homeland Security Investigations
- Fiscal Year 2019 Enforcement and Removal Operations | Local Statistics 2019
- Fiscal Year 2019 Homeland Security Investigations
- Fiscal Year 2018 Enforcement and Removal Operations | Local Statistics 2018
- Fiscal Year 2018 Homeland Security Investigations
- Fiscal Year 2017 Enforcement and Removal Operations | Local Statistics 2017
- Fiscal Year 2017 Homeland Security Investigations
- Fiscal Year 2016 Enforcement and Removal Operations | Local Statistics 2013-2016
- Fiscal Year 2016 Homeland Security Investigations
- Fiscal Year 2015 Enforcement and Removal Operations
- Fiscal Year 2014 Enforcement and Removal Operations
- Fiscal Year 2013 ICE Immigration Removals

# Definitions

| Term | Definition |
|------|------------|
| Aliens | People without U.S. citizenship or nationality, which may include stateless people. |
| AOR | AOR refers to the area of responsibility that ICE has identified as a geographic region for an action taken. |
| Arresting Agency | Arresting agency is either CBP or ICE. Border patrol and inspections by air, land or sea are the program areas included within the CBP data. |
| Arrests | ICE administrative arrests occur when an ICE officer physically apprehends an alien for a non-criminal civil infraction. The immigration courts hear these cases. ICE civil immigration enforcement arrests do not always lead to detention. |
| ATD | ATD refers to ICE's Alternatives to Detention program. ATD is a flight-mitigation tool that uses technology and case management to ensure alien compliance with release conditions, court hearings and final orders of removal while allowing them to remain in their communities as they move through the immigration process or prepare for departure from the United States. |
| CBP | U.S. Customs and Border Protection. |
| Citizenship Country | Country of citizenship of the alien . Country of Citizenship is derived from the ICE system of record as it is input by the officer at the time of processing. An "Unknown" Country indicates the alien failed or refused to identify a country of citizenship or the officer lacked documentation to do so at the time. Country of Birth or Citizenship can be updated at anytime during the Immigration Lifecycle by an Officer. These aliens can include those that were born in Palestine, West Bank, or the Gaza strip and considered Stateless. |
| Criminality | Criminality encompasses three categories: individuals with criminal convictions, people with pending criminal charges, and other immigration violators. Those with convictions are immigration violators who have a criminal conviction in ICE's system of record at the time of the enforcement action. Pending criminal charges refers to an immigration violator with pending criminal charges in ICE's system of record at the time of the enforcement action. Other immigration violators are individuals without any known criminal convictions or pending charges in ICE's system of record at the time of the enforcement action. |
| Detentions | The detention data presented counts the number of initial book-ins into ICE facilities and does not include juveniles who are transferred to Office of Refugee Resettlement custody or housed in an ORR facility. U.S. Marshals Service prisoners are also excluded. Transfers between ICE facilities are not counted as new detention events, and aliens may be booked into ICE facilities more than once without triggering a new detention event. |
| Expulsions | The term 'Expulsion' refers to the removal of an alien pursuant to the United States Code other than Title 8 such as Title 42 or Title 50. |
| Facial Monitoring | Facial monitoring technology is a form of monitoring for ATD participants. It is a smartphone application that uses facial recognition technology to verify the user's identity and physical location. This application also provides video conferencing, community referrals, messaging between the alien and an officer, document capturing, appointment reminders and a calendar. |
| GPS Ankle Monitor | A GPS ankle monitor is a low-profile ankle bracelet that uses GPS to provide detailed information about an ATD participant's movement. |
| ICE | U.S. Immigration and Customs Enforcement. |
| Removals | ICE removal data includes returns. Returns include:<br><br>• Voluntary returns: Discretionary relief granted by an ICE officer at the border by permitting an alien to depart the United States without a removal order and related immigration consequences.<br>• Voluntary departures: Discretionary relief granted in removal proceedings or by an ICE officer in lieu of removal proceedings permitting an alien to depart the United States voluntarily without a removal order and related immigration consequences. |

| Term | Definition |
|------|------------|
| | • Withdrawals under docket control: Discretionary relief granted by an ICE officer or immigration judge to an alien encountered at a port of entry that permits the alien to voluntarily withdraw an application for admission to the United States and depart the United States without a removal order and related immigration consequences. |
| | ICE Removals include aliens processed for Expedited Removal (ER) or Voluntary Return (VR) that are turned over to ERO for detention. As of May 12, 2023, aliens processed for ER that were turned over from Border Patrol to ICE for removal via ICE Air are also included. Aliens processed for ER and not detained by ERO or VR after June 1, 2013, and not detained by ERO are primarily processed by Border Patrol. Those statistics are not included in this dashboard and are maintained by CBP. This does not include Title 42 expulsions. |
| Staging sites or S-sites | Staging sites, also known as S-Sites, are locations mostly along the Southwest Border that enroll participants being released from CBP or ICE custody. These participants are generally given fewer than 30 days to report to an ERO office in their final destination AOR. After a participant arrives in their AOR, local ATD officers determine their continued suitability in the ATD program and possible transition to other sites. |
| Telephonic Check-in | Telephonic check-in is a form of monitoring in the ATD program and is a multilingual telephonic voice recognition system. Telephonic check-in automatically calls ATD program participants in one of 36 languages and validates participants' voices against a master template resulting in pass or failure. |
| Unmapped AOR Records | An 'Unmapped AOR' indicates that the location of a given enforcement action is not mapped to a specific AOR in the database. |
| Wrist worn device | Provides GPS monitoring, facial matching, and virtual case management functionality, including virtual check-ins and reminders. |

# Access and Export Congressionally Mandated ICE Data

- [ICE Detention Statistics](#)

# Access and Export ICE Data

To download the underlying ICE data from all the dashboards as an Excel spreadsheet, click [here](#).

*Applied filters will not be captured in the data download.*
*Records with less than 10 aliens are excluded for privacy reasons.*

# Tips for Using the ICE Dashboards

This page is best viewed on a desktop computer. If you are using Internet Explorer, you may have issues viewing the charts on this page. Please use another browser, such as Chrome, Safari, Firefox or Edge to view. When using a mobile device, the charts are best displayed in landscape mode. If the charts are not loading or appear overlapping, refresh your browser or press Ctrl+F5 on a PC or Cmd+R on a Mac.
Dashboards are best viewed in "Full Screen." To enter "Full Screen" click the "Full Screen" button next to "Share" at the bottom-right corner of each dashboard.



**A79**

# Tips for Exporting ICE Dashboards as Images

To download the underlying data as an Image, PDF, or PowerPoint spreadsheet, click the "Download" button next to "Full Screen" at the bottom-right corner of each dashboard.
*Records with less than 10 aliens are excluded for privacy reasons.*



Updated: 05/30/2025

ADDRESS

500 12th St SW
Washington, DC 20536

Report Crimes: Call 1-866-DHS-2-ICE

RELATED INFORMATION

Mission
Who We Are
ICE Leadership
Career Opportunities
News Releases and Statements

CONTACT US

General Information
ICE Field Offices
HSI International Offices
Media Inquiries
Small Business

**About Us**                    **Immigration Enforcement**

**Combating Transnational Crime**          **Newsroom**



**ICE Contact Center**

Report suspicious activity: 1-866-DHS-2-ICE

 ICE.gov
**An official website of the U.S. Department of Homeland Security**

About ICE              Archive              The White House
Accessibility          No FEAR Act Data     DHS Components
FOIA Requests          Site Links           USA.gov
Privacy Policy         Performance Reports
DHS.gov                Inspector General



National
Terrorism
Advisory
System

EXHIBIT C



**POLICY SOLUTION**

# Limiting the Military's Role in Law Enforcement

The Posse Comitatus Act bars the armed forces from serving as civilian police, but loopholes and exceptions undermine its effectiveness.



**Joseph Nunn**

**PUBLISHED:** October 2, 2024

In May 1992, seven U.S. Marines joined two local police officers as they responded to a domestic violence call in the waning days of the Los Angeles riots. Deployed to the city alongside several thousand other federal troops after President George H. W. Bush invoked the Insurrection Act, these Marines now found themselves playing a role for which they had little training: that of civilian law enforcement officer.

At the scene, as the police officers prepared to enter the home, someone inside fired a shotgun through the door. One of the officers shouted to the Marines, "Cover me" — a request, in law enforcement parlance, that they raise their weapons and be ready to fire if necessary. But the Marines, in accordance with their own training, took it as a request for suppressing fire. They riddled the home with more than 200 bullets. Miraculously, no one was killed. [1]

In the United States, federal military participation in civilian law enforcement like this has been rare, particularly over the past half century. The idea of tanks rolling down the streets of American towns and soldiers dressed in camouflage appre-

hending Americans is anathema to modern sensibilities. Some Americans might even assume that these actions are prohibited by the U.S. Constitution. Indeed, the use of federal troops as a domestic police force is in tension with both constitutional principles and long-standing American traditions, which were informed by the British government's heavy-handed use of the military to police the colonies in the years leading up to the American Revolution. Events like the Boston Massacre illustrated to the founding generation the dangers of domestic deployment of the military. But while the Constitution limits military involvement in civilian affairs in various ways, it does not entirely bar the federal armed forces from conducting law enforcement activities. A partial prohibition comes instead from a law passed by Congress in 1878: the Posse Comitatus Act.

The Posse Comitatus Act rests at the center of a web of laws, regulations, and policies that govern what the U.S. military can and cannot do domestically. It is a crucial safeguard for the preservation of both American democracy and constitutional liberties. At the same time, it is riddled with exceptions, loopholes, and ambiguities that leave it surprisingly weak. The most dangerous exception by far is the Insurrection Act, which gives the president virtually limitless discretion to use the military as a domestic police force. But there are also other ways in which the Posse Comitatus Act fails to provide robust protection against the use of federal troops for law enforcement purposes.

In reality, the principle enshrined in the Posse Comitatus Act is protected more by norms and historical practice than by the text of the law itself. Those norms and practices are significant, to be sure, and efforts to reform the law should embrace and codify them. But in an era in which we can no longer rely on tradition to constrain executive action, the Posse Comitatus Act's flimsiness poses serious risks. Rather than wait for those risks to materialize, Congress should act now to shore up the law's protections.

This report proceeds in three parts. Part I discusses the dangers of using the military for domestic law enforcement, a concern that has been prominent in American legal thinking since the nation's founding. It also explains how the Constitution approaches domestic deployment of the military, including the central role accorded to Congress. Part II lays out the array of problems that undermine the Posse Comitatus Act, from its many statutory exceptions to its lack of meaningful enforcement mechanisms. Finally, part III lays out a legislative proposal for fixing each of these shortcomings.

**Brennan Center for Justice at New York University School of Law**

[link-1]

DOWNLOAD PDF

---

## Endnotes

**1** See Kyle Daly, "1992: Rioting in Los Angeles," *Leatherneck*, October 2020, 30, 34, https://www.mca-marines.org/wp-content/uploads/1992-Riots-in-Los-Angeles.pdf. See also Paul J. Scheips, *The Role of Federal Military Forces in Domestic Disorders, 1945–1992* (Washington, DC: Center of Military History, United States Army, 2012), 448, https://www.govinfo.gov/content/pkg/GOVPUB-D114-PURL-gpo82975/pdf/GOVPUB-D114-PURL-gpo82975.pdf.

---

## Links

link-1: Download PDF  /media/13317/download

**Brennan Center for Justice at New York University School of Law**

**A84**

**EXHIBIT D**

SOCIETY

## Crowds clash with federal agents after dozens detained in ICE raids across LA


Friday, June 6, 2025 9:40PM

Este artículo se ofrece en Español →



Immigration enforcement agents carried out raids in Los Angeles, prompting gatherings of protesters who at one point clashed with authorities.

WESTLAKE, LOS ANGELES (KABC) -- Immigration enforcement agents carried out raids in Los Angeles Friday, prompting gatherings of protesters who at one point clashed with authorities.

At one scene in downtown Los Angeles, a crowd of people tried to prevent authorities from leaving in vans after multiple people were detained.



Immigration enforcement agents carried out raids in Los Angeles Friday, prompting gatherings of protesters who at one point clashed with authorities.

Protesters could be seen throwing objects at the vehicles, while others tried to block the vans from leaving. One person was nearly run over when they fell to the ground after getting in front of one of the vehicles.

Friday evening, protesters marched in downtown L.A. condemning Friday's immigration raids.

Immigration enforcement agents were spotted at two separate locations in the morning, including a Home Depot store in the Westlake District.





Haven't claimed their scholarship yet?
Get up to $1,500 for their college journey.

Claim now!


Read More

00:01                                                                                02:00

Video posted to the Citizen app showed Department of Homeland Security agents escorting men in handcuffs outside the store on Wilshire Boulevard.

A witness who spoke with Eyewitness News outside the store said several people, including men and women, some of whom are street food vendors, were detained.

"We're a little scared," said the witness in Spanish.

 24/7 Live                                                                      62°

"Frankly, I'm just outraged because what happened is that went ICE went in they just took people away. And we just can't have this in our city, and it happened at multiple places in the city," Bass said. "It sows a sense of terror throughout the community...ICE was literally chasing people down the street."

"I've been really worried about this from the beginning, and as far as I know, this is the first time this has happened in our city like this. We know ICE has been here, but it's been for targeted arrests; this was just mass chaos," Bass added. "It sows a sense of chaos in our city, and a sense of terror, and it's just unacceptable."



Mayor Karen Bass spoke with Eyewitness News Friday afternoon regarding the ICE raids that occurred across the city, and said that neither she nor LAPD had any idea these raids were going to happen.

The mayor also said that SEIU-USWW President David Huerta was injured and hospitalized after federal agents got on top of him to detain him. The mayor said Huerta was just an observer and a witness as part of a rapid response network to the community when events like these occur.

ABC7 spoke with members of the SEIU who said the union leader wanted to protect his members working at the Ambiance Apparel location at 15th Street and Santa Fe Avenue. At some point, there was a scuffle involving federal agents and it appeared Huerta was pushed down and hit his head. One video shows a federal agent pushing Huerta while he has his hands at his hips, after which, he falls to the ground.

Friday evening, Angélica Salas, Executive Director of CHRLA, said Huerta had been released from the hospital but was still being detained by federal authorities.

Meanwhile, FBI agents were also spotted outside the Ambiance Apparel store near 9th Street and Towne Avenue in the Fashion District. Dozens of people were seen gathered outside the store.

**A88**



Read More

01:49                                                                                          02:00

At around 10 p.m. Friday, federal agents were seen gathering at a parking lot in the on the 700 block of north Hill Street in Chinatown. It was unclear whether they were carrying out an operation or not.

Their presence sparked a confrontation between the agents and a large crowd of residents. Video from AIR7 showed several unmarked vehicles and federal agents trying to clear out the crowd.



Several federal agents staged in a parking lot on the 700 block of north Hill Street in Chinatown Friday evening, prompting a large crowd of residents.

A senior DHS spokesperson sent ABC7 a statement Friday, but did not directly address the investigations at both locations.

The statement said in part, "ICE is now following the law and placing these illegal aliens in expedited removal, as they always should have been."

"If they have a valid credible fear claim, they will continue in immigration proceedings, but if no valid claim is found, aliens will be subject to a swift deportation."

Eyewitness News is working to get more information.

Aerial video from AIR7 showed federal agents using a parking lot for their operations near a California Highway Patrol office. According to CHP, the FBI requested to use the lot but did not disclose it would be used as part of immigration enforcement.

"The CHP was informed by the FBI that the request to use the public parking lot was for a federal operation not related to immigration enforcement. Based on that representation, CHP granted access to the parking lot strictly for staging purposes and did not participate in the operation itself," said CHP in a statement. "CHP was not made aware of any involvement by immigration enforcement agencies at the time of the request. If the nature or scope of the operation changed or was broader than initially communicated, that information was not disclosed to CHP prior to the approval."

Friday's raids come as the advocacy group League of United Latin American Citizens calls for an investigation after reports surfaced of U.S. Immigration and Customs Enforcement holding families in detention at a federal building in downtown L.A.

Images shared by LULAC showed several people being detained by authorities.

**Swift condemnation from local leaders**

California Gov. Gavin Newsom joined the many condemning Friday's immigration raids saying:

"Continued chaotic federal sweeps, across California, to meet an arbitrary arrest quota are as reckless as they are cruel. Donald Trump's chaos is eroding trust, tearing families apart, and undermining the workers and industries that power America's economy."

U.S. Senator Alex Padilla (D-Calif.) echoed the governor's sentiments, calling the raids "extreme" and "cruel." He issued the following statement:

"The ICE raids across Los Angeles today are a continuation of a disturbing pattern of extreme and cruel immigration enforcement operations across the country. These indiscriminate raids prove once again that the Trump administration cares about nothing but instilling harm and fear in our communities to drive immigrants into the shadows. It will not work. This fearmongering is not going to change the fact that immigrants are valued members of our communities who contribute to our society and economy, and my office will demand accountability for today's actions."

L.A. County Supervisor Janice Hahn said:

"The ICE raids across Los Angeles today are chilling. They aren't targeting violent criminals - they are sweeping up hardworking people in our communities just trying to provide for their families. These agents are armed to the teeth and it is clear their goal is to make people afraid and it's working. I understand that during this morning's raids, SEIU California President David Huerta was injured by federal agents and wrongfully detained. I am calling for his immediate release. This is a democracy. People have a right to peacefully protest, to observe law enforcement activity, and to speak out against injustice."

Los Angeles County Supervisor Lindsey P. Horvath shared the following:

"Today's ICE raids were acts of cruelty and bigotry, targeting our immigrant neighbors and tearing families apart. These actions are designed to instill fear in communities of color-but we will not be intimidated, and we will not be silent. I'm in direct communication with County, State, & community leaders to ensure that all available protections from LA County are activated immediately. We must remain vigilant. We must protect one another. And above all, we will stand together."

Los Angeles County Chair Pro Tem and First District Supervisor Hilda L. Solis issued the following statement:

"Today's immigration sweeps across the First District in downtown Los Angeles, Westlake, and Cypress Park are deeply disturbing. The individuals detained are hardworking Angelenos who contribute to our local economy and labor force every day. It is also horrifying that ICE targeted Skid Row to intimidate some of our most vulnerable residents. Trump said he would go after criminals, not innocent hardworking people contributing to our economy and supporting their families.

These are difficult times that have our communities fearful and concerned by these federal immigration actions. As we continue to hear from community organizers exercising their rights to speak out, it is vital we all remain safe and calm in assessing the needs of those impacted. Los Angeles County remains committed to standing with our immigrant communities, providing support through our Office of Immigrant Affairs and our network of nonprofit partners."

L.A. City Councilmembers Eunisses Hernandez, Adrin Nazarian, Bob Blumenfield, Nithya Raman, Katy Yaroslavsky, Imelda Padilla, Marqueece Harris-Dawson, Heather Hutt, Hugo Soto-Martínez, Ysabel Jurado, and Tim McOsker released the following statement in response to the raids:

"Today, Los Angeles witnessed an egregious escalation from federal immigration agencies as reports of ICE raids and activity occurred throughout the City. This indiscriminate targeting of children and families not only harms the individuals who are directly impacted, but destroys our communities' sense of trust and safety in their own homes.

We condemn this in no uncertain terms: Los Angeles was built by immigrants and it thrives because of immigrants. We will not abide by fear tactics to support extreme political agendas that aim to stoke fear and spread discord in our city. To every immigrant living in our city: we see you, we stand with you, and we will fight for you. Los Angeles will continue to be a place that values and dignifies every human being, no matter who they are or where they come from."

Los Angeles Unified School District Superintendent Alberto Carvalho said:

"I am dismayed by recent immigration enforcement activity occurring near our schools. These actions are causing unnecessary fear, confusion, and trauma for our students and families - many of whom are simply trying to get to and from school and work, and to live with dignity. Our schools must remain safe havens - places where every child can learn, grow, and thrive without fear of being separated from their loved ones. The presence of federal immigration activity near campuses threatens that fundamental right. Children deserve support, not surveillance.

Los Angeles Unified stands with our immigrant families. We will continue to provide resources, support, and information to protect our students and their families - and we will use every tool at our disposal to advocate for their safety and well-being.

We are working with school leaders, safety teams, and community partners to ensure that impacted schools remain a safe, welcoming, and protected environment for all students and families. We are advising families to closely monitor communication from their schools. If any parent or guardian sees immigration activity, please contact your school, utilize the LASAR app, and/or call the Family Hotline at 213-443-1300."

Los Angeles County Sheriff Robert Luna also issued a statement reminding the public that the department does not participate in any immigration enforcement activities, and urged everyone to remain calm:

"This afternoon, we received several reports of federal immigration enforcement actions across Los Angeles County. The Los Angeles County Sheriff's Department wants to emphasize that we do not participate in any civil immigration enforcement activities or mass deportation sweeps. Immigration enforcement is the responsibility of federal law enforcement agencies not the Sheriff's Department. The Sheriff's Department does not enforce civil immigration laws, nor do we ask about an individual's immigration status when responding to calls for service. Our focus and priority remain on enforcing state and local laws to ensure the safety and well-being of our diverse communities throughout Los Angeles County.

We deeply value diversity, inclusion and public trust within our communities and we want our residents to know that when they call for help, the Los Angeles County Sheriff's Department will respond, investigate, and protect everyone-regardless of a person's legal status. We recognize that these reports have caused fear, anxiety, and concern within our communities. We urge everyone to remain calm and peaceful as we continue to place your safety and well-being at the forefront of our efforts."

**Get ABC7's top stories in your inbox every day with one click**

Sign up for our daily newsletter

Email Address*

Name@emaildotcom

Yes! I would like to receive the Daily News Headlines Newsletter. By creating an account, you agree to our **Terms of Use** and acknowledge that you have read our **Privacy Policy** and **US State Privacy Rights Notice**.

Sign Up

*Required Fields

Report a correction or typo

Copyright © 2025 KABC Television, LLC. All rights reserved.

**Related Topics**

SOCIETY    WESTLAKE    LOS ANGELES    IMMIGRATION    LOS ANGELES    ICE    INVESTIGATION    INVESTIGATIONS    FBI

A stress-relief game that everyone around me is playing
Sponsored / Elvenar - Play on Browser

Learn More

Seniors Born 1939-1969 Receive 11 Benefits This Month If They Ask
Sponsored / Super Saving Online

After 35 Years, Her Jewelry Is Nearly Gone
Sponsored / The Heritage Journal

Read More

Chuck Norris Begs Seniors: Avoid These 3 Foods Like The Plague
Sponsored / Roundhouse Provisions

Learn More

Don't Play This Game If You Are Under 30

Sponsored / RAID

**Restaurants In Culver City With Good Senior Discounts**

Sponsored / TheWalletGuru

Play Now

**People in Los Angeles are Loving Martha Stewart's Meal Kit**

Sponsored / Marley Spoon

**Costco Shoppers Say This $7 Generic Cialis Is Actually Worth It**

Sponsored / FridayPlans

Learn more

**Perfect for casual daily play**

Sponsored / Elvenar - Play on Browser

Learn More

**Topics**

Home

Weather

Traffic

U.S. & World

Politics

Consumer

**Regions**

Los Angeles

Orange County

Inland Empire

Ventura County

California

**More**

Live Video

Apps

ABC7 En Español

Investigations

Shop

**Company**

Submit News Tips

TV Listings

About ABC7

Meet the News Team

Jobs/Internships

ABC7 Merchandise

 

Privacy Policy    Do Not Sell or Share My Personal Information    Children's Privacy Policy    Your US State Privacy Rights    Terms of Use    Interest-Based Ads    Public Inspection File    FCC Applications    Copyright © 2025 KABC Television, LLC. All Rights Reserved.

**EXHIBIT E**

PRESIDENTIAL ACTIONS

Department of Defense Security for the Protection of Department of Homeland Security Functions

Presidential Memoranda

June 7, 2025

MEMORANDUM FOR THE SECRETARY OF DEFENSE
       THE ATTORNEY GENERAL
       THE SECRETARY OF HOMELAND SECURITY

SUBJECT:    Department of Defense Security for the Protection of Department of Homeland Security Functions

Numerous incidents of violence and disorder have recently occurred and threaten to continue in response to the enforcement of Federal law by U.S. Immigration and Customs Enforcement (ICE) and other United States Government personnel who are performing Federal functions and supporting the faithful execution of Federal immigration laws.  In addition, violent protests threaten the security of and significant damage to Federal immigration detention facilities and other Federal property.  To the extent that protests or acts of violence directly inhibit the execution of the laws, they constitute a form of rebellion

*The* WHITE HOUSE

in me as President by the Constitution and the laws of the United States of America, I hereby call into Federal service members and units of the National Guard under 10 U.S.C. 12406 to temporarily protect ICE and other United States Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where protests against these functions are occurring or are likely to occur based on current threat assessments and planned operations.  Further, I direct and delegate actions as necessary for the Secretary of Defense to coordinate with the Governors of the States and the National Guard Bureau in identifying and ordering into Federal service the appropriate members and units of the National Guard under this authority.  The members and units of the National Guard called into Federal service shall be at least 2,000 National Guard personnel and the duration of duty shall be for 60 days or at the discretion of the Secretary of Defense.  In addition, the Secretary of Defense may employ any other members of the regular Armed Forces as necessary to augment and support the protection of Federal functions and property in any number determined appropriate in his discretion.

To carry out this mission, the deployed military personnel may perform those military protective activities that the Secretary of Defense determines are reasonably necessary to ensure the protection and safety of Federal personnel and property  The Secretary of Defense shall consult with the Attorney General and the Secretary of Homeland Security prior to withdrawing any personnel from any location to which they are sent.  The Secretaries of Defense and Homeland Security may delegate to subordinate officials of their respective Departments any of the authorities conferred upon them by this memorandum.

     DONALD J. TRUMP

NEWS

ADMINISTRATION

ISSUES

CONTACT

EOP

VISIT

GALLERY

VIDEO LIBRARY

A94

AMERICA 250

FOUNDING FATHERS



Subscribe to The White House newsletter

Your email                                              SIGN UP

Text POTUS to 45470 to receive updates

THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

Privacy

A95

**EXHIBIT F**

ADVERTISEMENT

U.S. NEWS

## Federal authorities arrest dozens for immigration violations across Los Angeles

BY DAMIAN DOVARGANES AND OLGA R. RODRIGUEZ
Updated 9:21 AM PDT, June 7, 2025

LOS ANGELES (AP) — After federal immigration authorities arrested more than 40 people Friday across Los Angeles, protesters gathered outside a federal detention center demanding their release before police in riot gear tossed tear gas canisters to disperse the crowd.

Immigration and Customs Enforcement officers executed search warrants at multiple locations, including outside a clothing warehouse where a tense scene unfolded as a crowd tried to block agents from driving away. Sirens blared as protesters surrounded black SUVs and tactical vehicles. Officers threw flash bangs into the street to disperse people as they shouted and filmed the scene with their cell phones. One demonstrator tried to physically stop a vehicle from leaving.

LA protests     Sly Stone dies     Apple at WWDC     Greta Thunberg     BET Awards

labor union, was arrested and charged for impeding a federal agent while protesting, the U.S. Attorney's office said.

Los Angeles Mayor Karen Bass said the activity was meant to "sow terror" in the nation's second-largest city.

**RELATED STORIES**



Trump sending National Guard troops to LA-area protests against ICE



Los Angeles' image is scuffed since ICE raids and protests

A97



**Marines deployed to LA to respond to immigration protests**

Federal immigration authorities have been ramping up arrests across the country to fulfill President Donald Trump's promise of mass deportations. Todd Lyons, the head of U.S. Immigration and Customs Enforcement, defended his tactics earlier this week against criticism that authorities are being too heavy-handed. He has said ICE is averaging about 1,600 arrests per day and that the agency has arrested "dangerous criminals."

Protests recently broke out after an immigration action at a restaurant in San Diego and in Minneapolis, when federal officials in tactical gear showed up in a Latino neighborhood for an operation they said was about a criminal case, not immigration.

## Protesters chant 'set them free'

In Los Angeles, federal agents executed search warrants at three locations, O'Keefe said. But Angelica Salas, executive director for the Coalition of Humane Immigrant Rights, or CHIRLA, said advocates were aware of activity at seven locations, including several Home Depot parking lots and a doughnut shop.

At the warehouse in the fashion district, agents had a search warrant after they and a judge found there was probable cause the employer was using fictitious documents for some of its workers, U.S. Attorney's Office spokesperson Ciaran McEvoy confirmed.

Dozens of protesters gathered Friday evening outside a federal detention center in Los Angeles where lawyers said those arrested had been taken, chanting "set them free, let them stay!"

Other protesters held signs that said "ICE out of LA!" while others led chants and shouted from megaphones. Some scrawled graffiti on the building facade.

Officers holding protective shields stood shoulder to shoulder to block an entrance. Some tossed tear gas canisters to disperse the crowd. Officers wearing helmets and holding batons then forced the protesters away from the building by forming a line and walking slowly down the street.

"Our community is under attack and is being terrorized. These are workers, these are fathers, these are mothers, and this has to stop. Immigration enforcement that is terrorizing our families throughout this country and picking up our people that we love must stop now," Salas, of CHIRLA, said at an earlier press conference while surrounded by a crowd holding signs protesting Immigration and Customs Enforcement.

## One detainee sent to Mexico

Yliana Johansen-Mendez, chief program officer for the Immigrant Defenders Law Center, said her organization was aware of one man who was already deported back to Mexico after being picked up at a Home Depot on Friday morning. The man's family contacted her organization and one of their attorneys was waiting for hours to speak to him inside the detention center, she said. Authorities later said he had already been removed, and the man later contacted his family to say he was back in Mexico.

Videos from bystanders and television news crews captured people being walked across a Home Depot parking lot by federal agents as well as clashes that broke out at other detention sites. Outside the warehouse, KTLA aired aerial footage of agents leading detainees out of a building and toward two large white vans waiting in a parking lot.

The hands of the detained people were tied behind their backs. The agents patted them down before loading them into the vans. The agents wore vests with the agency acronyms FBI, ICE and HSI. Armed agents used yellow police tape to keep crowds on the street and sidewalk away from the operations.

Immigrant-rights advocates used megaphones to speak to the workers, reminding them of their constitutional rights and instructing them not to sign anything or say anything to federal agents, the Los Angeles Times reported.

Katia Garcia, 18, left school when she learned her father, 37-year-old Marco Garcia, may have been targeted.

Katia Garcia, a U.S. citizen, said her father is undocumented and has been in the U.S. for 20 years. "We never thought this would happen to us," she told the Los Angeles Times.

———

Rodriguez reported from San Francisco and McAvoy from Honolulu. Associated Press journalists Jae Hong and Eugene Garcia in Los Angeles, Amy Taxin in Orange County, California, and Kathleen Ronayne in Sacramento, California, contributed.

**A98**

**MOST READ**



1   Live updates on the LA protests: Trump authorizes the deployment of additional 2,000 National Guard members

2   Barbara weakens to a tropical storm as it heads to cooler waters off the coast of Mexico

3   Trump authorizes additional 2,000 National Guard members to Los Angeles, US officials say

4   Gaza-bound aid boat with Greta Thunberg on board arrives in Israel after its seizure

5   Southern Baptists target porn, sports betting, same-sex marriage and 'willful childlessness'

**SUGGESTED FOR YOU** 

**EXHIBIT G**

 ALJAZEERA

● LIVE    ✕

**EXPLAINER**

News | Police

### ICE launches 'military-style' raids in Los Angeles: What we know

*More than 40 people have been arrested by immigration officials in what has been described as an 'oppressive and vile paramilitary operation'.*



Los Angeles Police Department officers move to disperse a protest after federal immigration authorities conducted an operation on Friday, June 6, 2025 [Jae C Hong/AP]

By **Al Jazeera Staff**
7 Jun 2025

  

Los Angeles witnessed a series of [coordinated immigration raids](#) by United States law enforcement officials on Friday, resulting in the arrest of dozens and igniting widespread protests.

The raids, which were carried out in a military-style operation, have intensified concerns about the force used by federal immigration officials and the rights of undocumented individuals.

---

RECOMMENDED STORIES

US economy adds 139,000 jobs as growth slows

Why does Donald Trump seem to be fixated on foreign nationals?

What has Musk accused Trump of in relation to the Epstein files?

---

Here is what we know about the raids and the latest on the ground.

### What happened in LA?

Federal agents from US Immigration and Customs Enforcement (ICE), the Department of Homeland Security (DHS), the Federal Bureau of Investigation (FBI) and the Drug Enforcement Administration (DEA) conducted a series of "immigration enforcement operations" across Los Angeles on Friday morning.

Individuals suspected of "immigration violations and the use of fraudulent documents" were arrested. The arrests were carried out without judicial warrants, according to multiple legal observers and confirmed by the American Civil Liberties Union (ACLU).

You rely on Al Jazeera for true-on-the-ground reporting from the Middle East and beyond. Please consider supporting our work.

We use cookies and other tracking technologies to deliver and personalize content and ads, enable features, measure site performance, and enable social media sharing. You can choose to adjust your preferences. **Learn more about our Cookie Policy.**

**Allow all**    Do not sell my personal information

Advertisement

## A101

The Los Angeles Police Department (LAPD), which did not take part in the raids, was called in to quell ensuing protests.

The raids were part of a broader initiative under the Trump administration's intensified immigration policies.

Sign up for Al Jazeera
## Americas Coverage Newsletter

US politics, Canada's multiculturalism, South America's geopolitical rise—we bring you the stories that matter.

E-mail address

Subscribe

By signing up, you agree to our **Privacy Policy**

protected by reCAPTCHA

## Which areas were raided?

The raids focused on several locations in downtown LA and its immediate surroundings. These spots are known to have significant migrant populations and labour-intensive industries.

Angelica Salas, executive director of the Coalition of Humane Immigrant Rights (CHIRLA), which covers California – home to the US's largest population of undocumented people – said advocates had recorded enforcement activity at seven sites. This included two Home Depot stores in the Westlake District of Los Angeles, a doughnut shop and the clothing wholesaler, Ambiance Apparel in the Fashion District of downtown Los Angeles.

Other locations in which raids were carried out included day labour centres and one other Ambiance facility near 15th Street and Santa Fe Avenue in south Los Angeles.

## How many people have been arrested?

ICE and Homeland Security Investigations (HSI) reported the "administrative arrest" of 44 individuals for immigration-related offences.

An administrative arrest, unlike a criminal arrest, refers to detention for civil immigration violations such as overstaying a visa or lacking legal status, and does not require criminal charges. These arrests can result in detention, deportation, temporary re-entry bans and denial of future immigration requests.

Advertisement

You rely on Al Jazeera for truth and transparency

We use cookies and other tracking technologies to deliver and personalize content and ads, enable features, measure site performance, and enable social media sharing. You can choose to customize your preferences. **Learn more about our Cookie Policy.**

Advocates believe the number of arrests made was higher, however. Caleb Soto, of the National Day Laborer Organizing Network, told Al Jazeera that between 70 and 80 people had been detained, but only three lawyers have been allowed access to the detention centre where they were being held to provide legal advice.

Soto added that members of the community had effectively been "kidnapped" as officials, wearing masks had not shown warrants or any form of documentation when carrying out arrests.

Additionally, David Huerta, president of the Service Employees International Union (SEIU) California, was arrested for allegedly obstructing federal agents during the raids. Huerta was reportedly injured during the arrest and received medical treatment at Los Angeles General Medical Center before being taken into custody.



A protester attempts to evade a Department of Homeland Security officer [Jae C Hong/AP Photo]

**What kinds of raids were these?**

What sets these raids apart from typical civil enforcement actions was their military-style execution, experts say.

According to witnesses, legal observers and advocacy groups, federal agents involved in the operations were heavily armed and dressed in tactical gear, with some wearing camouflage and carrying rifles.

Agents arrived in unmarked black SUVs and armoured vehicles and, at certain points, sealed off entire streets around targeted buildings. Drones were reportedly used for surveillance in some areas and access to sites was blocked off with yellow tape, similar to measures which would be taken during a high-threat counterterrorism or drug bust operation.

You rely on Al Jazeera for truth and transparency

We use cookies and other tracking technologies to improve your browsing experience on our website, to show you personalized content and targeted ads, to analyze our website traffic, and to understand where our visitors are coming from. By browsing our website, you consent to our use of cookies and other tracking technologies. Learn more about our Cookie Policy.

Donald Trump    Live updates    What's behind the Trump-Musk feud?    Can Trump deploy the National Guard?    Photos: Protests intensify in LA

The [ACLU described](#) the show of force as an "oppressive and vile paramilitary operation". Civil liberties groups said the tactics used had created panic in local communities and may have violated protocols for civil immigration enforcement.

1:17

### How did protests break out?

As news of the raids spread via social media and through immigrant advocacy networks, hundreds of protesters gathered outside the Edward R Roybal Federal Building in downtown Los Angeles, where detainees were being processed.

Demonstrators blocked entrances and exits to the building, chanted slogans and demanded the release of those arrested. Some spray-painted anti-ICE slogans on the building's exterior walls. Several protesters attempted to physically stop ICE vehicles, leading to confrontations with law enforcement.

LAPD officers issued dispersal orders and warned protesters that they would be subject to arrest if they remained in the area. To enforce the order, officers in riot gear deployed tear gas, pepper spray and "less-lethal munitions", including firing rubber bullets to disperse the crowd. A citywide tactical alert was also issued, requiring all LAPD officers to remain on duty.

### What's happening now?

Shortly after 7pm on Friday [02:00 GMT Saturday], the LAPD declared the protests to be an "unlawful assembly", meaning that those who failed to leave the area could be subject to arrest. The declaration appeared to remain in effect until the crowd dispersed later that evening, though no formal end time was publicly announced.

Advertisement

You rely on Al Jazeera for truth and transparency

We use cookies and other tracking technologies to deliver and personalize content and ads, enable features, measure site performance, and enable social media sharing. You can choose to customize your preferences. **Learn more about our Cookie Policy.**

A104

US media outlets and rights groups reported that hundreds of detainees, including children, were held overnight in the basement of the federal building without access to beds, blankets or adequate food and water.

However, an ICE spokesperson told CBS News that the agency "categorically refutes the assertions made by immigration activists in Los Angeles", stating that it takes its mandate to care for people in custody "seriously".

The status of all individuals detained remains unclear. While some have been released, others continue to be held and details about their current locations or conditions have not been fully disclosed.

**What are the reactions to the raids?**

Local and state officials condemned the raids and the manner in which they were conducted.

In a statement shared on X on Friday, Los Angeles Mayor Karen Bass said such operations "sow terror in our communities and disrupt basic principles of safety in our city".



California Governor Gavin Newsom issued a statement describing the operations as "cruel" and "chaotic", adding that they are an attempt "to meet an arbitrary arrest quota".

All 15 members of the Los Angeles City Council issued a joint statement denouncing the raids.

Some Trump administration officials, on the other hand, defended the actions and criticised local leaders for pushing back. White House Deputy Chief of Staff Stephen Miller, for instance, suggested that Mayor Karen Bass was undermining federal law.

You rely on Al Jazeera for truth and transparency

We use cookies and other tracking technologies to deliver and personalize content and ads, enable features, measure site performance, and enable social media sharing. You can choose to customize your preferences. **Learn more about our Cookie Policy.**

A105



SOURCE: AL JAZEERA AND NEWS AGENCIES

Advertisement

**You rely on Al Jazeera for truth and transparency**

We use cookies and other tracking technologies to deliver and personalize content and ads, enable features, measure site performance, and enable social media sharing. You can choose to customize your preferences.    **Learn more about our Cookie Policy.**

**A106**

ADVERTISEMENT

Dianomi ▷

This content is created and paid for by advertisers and does not involve Al Jazeera journalists.



Leverage TradeStation's platform designed for self-directed traders.
TradeStation



Seniors Born 1941-1979 Receive 55 Benefits This Month if They Ask
WalletJump



Tom Lee's top stock picks for May - see what's on the list.
FS Insight



Leverage TradeStation's platform designed for self-directed traders.
TradeStation

LISTEN TO THESE PODCASTS

From: The Take
**Why is Donald Trump fixated on South Africa?**
The administration of US President Donald Trump has granted refugee status to 49 white Afrikaners, echoing a debunked cons...

From: The Inside Story Podcast
**What will Trump's movie tariffs mean for the global film industry?**
Donald Trump says Hollywood is 'dying fast'. The US President blames foreign countries for the crisis. And he has ordered ...

From: The Take
**How to become a bike-friendly city? Lessons from a Paris revolution**
Smog once choked Paris streets. Now, cleaner air, grassroots pressure and a bold city agenda are reshaping how the city br...

RELATED

US police, protesters clash in Los Angeles following immigration raids
Protesters gathered after immigration agents took dozens of people into custody during raids across Los Angeles.
7 Jun 2025

From: NewsFeed
Kilmar Abrego Garcia back in the US, facing charges
Kilmar Abrego Garcia, the man mistakenly deported from the US to El Salvador, has been returned to the US.
6 Jun 2025

You rely on Al Jazeera for truth and transparency
We use cookies and other technologies to deliver and personalize content and ads, enable features, measure site performance, and enable social media sharing. You can choose to customize your preferences.    Learn more about our Cookie Policy.

US Supreme Court grants DOGE access to sensitive Social Security data

The ruling was one of two victories the US's highest court handed the Trump administration in cases about data privacy.

6 Jun 2025



## MORE FROM NEWS

Several people killed, injured in Austria school shooting



Photos: Trump sends Marines and more National Guard members to Los Angeles



Several people killed in school shooting in Austria's Graz



Ukraine urges 'action' from allies as Russian attacks mount



## MOST POPULAR

Updates: Israel kills 60 in Gaza; Madleen crew being deported



Two killed in Odesa after 315 Russian drones, 7 missiles target Ukraine



You rely on Al Jazeera for truth and transparency

We use cookies and other tracking technologies to deliver and personalize content and ads, enable features, measure site performance, and enable social media sharing. You can choose to customize your preferences. **Learn more about our Cookie Policy.**

Israel strikes Yemen's Hodeidah port, threatens blockade



Trump sends 700 Marines to LA, doubles number of National Guard



About ⌄

Connect ⌄

Our Channels ⌄

Our Network ⌄

Follow Al Jazeera English:





© 2025 Al Jazeera Media Network

You rely on Al Jazeera for truth and transparency

We use cookies and other tracking technologies to deliver and personalize content and ads, enable features, measure site performance, and enable social media sharing. You can choose to customize your preferences. **Learn more about our Cookie Policy.**

**EXHIBIT H**




PROPOSED MEDI-CAL CUTS ARE EVEN **WORSE**
THAN TRUMP'S "BIG BEAUTIFUL BILL."
MEDICAID MATTERS *to me*

**Newsom blasts deployment of National Guard to LA as 'purposefully inflammatory'**

The federal government is deploying 2,000 soldiers amid unrest over immigration sweeps in Los Angeles.



A man helps an injured woman during a protest in the Paramount section of Los Angeles, Saturday, June 7, 2025, after federal immigration authorities conducted operations. | Eric Thayer/AP

By **MELANIE MASON**
06/07/2025 09:00 PM EDT
Updated: 06/07/2025 09:28 PM EDT



LOS ANGELES — California Gov. Gavin Newsom on Saturday denounced President Donald Trump's plan to deploy thousands of National Guard troops to quell pro-immigrant demonstrators in the Los Angeles area, calling the action "purposefully inflammatory."

The Democrat's remarks came after Tom Homan, Trump's border czar, told Fox News that the administration planned to send National Guard troops to the area. The White House said Trump signed a presidential memorandum deploying 2,000 troops "to address the lawlessness that has been allowed to fester."

Advertisement


MEDICAID MATTERS *to me*
**PROPOSED
MEDI-CAL CUTS ARE
EVEN WORSE THAN
TRUMP'S "BIG
BEAUTIFUL BILL."**
PAID FOR BY HEALTH JUSTICE ACTION FUND

A111

In a statement, Newsom said Trump was moving to take over the California National Guard and deploy 2,000 soldiers, which the governor said would "only escalate tensions" after protesters confronted immigration agents making raids on local businesses. Trump's move came without Newsom's signature, presumably by invoking Title 10, the legal basis for activating and mobilizing the Guard.

In a social media post, Trump said, "If Governor Gavin Newscum, of California, and Mayor Karen Bass, of Los Angeles, can't do their jobs, which everyone knows they can't, then the Federal Government will step in and solve the problem, RIOTS & LOOTERS, the way it should be solved!!!"

The standoff in Paramount, a small city in southeast Los Angeles County, marks the second consecutive day of clashes in the region over high-profile immigration raids. At least 44 people were arrested on Friday on suspicion of immigration violations.

Among those arrested was the president of the labor union SEIU California, David Huerta, whose injuries during his detainment required brief hospitalization and set off a wave of condemnation from California Democratic officials, including Newsom. A video of Huerta's arrest showed officers knocking the labor union leader to the ground.

In Paramount, federal agents in riot gears squared off against protestors, using tear gas and flash-bang grenades to disperse the crowds.

Karoline Leavitt, the White House press secretary, said in a statement that "violent mobs have attacked ICE Officers and Federal Law Enforcement Agents carrying out basic deportation operations" and that "California's feckless Democrat leaders have completely abdicated their responsibility to protect their citizens."

Homan told Fox News that while people had a First Amendment right to protest, there would be consequences for "crossing the line" and impeding ICE's operations.

"We're already ahead of the game. We're already mobilizing. We're going to bring in the National Guard tonight," he said. "We're going to continue doing our job. We're going to push back on these people and we're going to enforce the law."

Newsom, in his statement, said such federal intervention was unnecessary.

"LA authorities are able to access law enforcement assistance at a moment's notice. We are in close coordination with the city and county, and there is currently no unmet need," Newsom said. "The Guard has been admirably serving LA throughout recovery. This is the wrong mission and will erode public trust."

FILED UNDER: NATIONAL GUARD, IMMIGRATION & CUSTOMS ENFORCEMENT, DONALD TRUMP



SPONSORED CONTENT



**Why did Donald Trump buckle?**

Financial Times



**Summer in Punta Cana**

This Summer leave Culver City behind and book your hotel from $107 USD

Barceló Hotel Group



**Why Gen X is the real loser generation**

The Economist



**GOP's Private Luncheon Rocked by Trump's Tariff Twist**

Puck



**Tired of Urinating Frequently at Night? This Might Be What You Need**

Discover The Results

Mens Health



**If you own a mouse you have to try this game. No Install. Play for free.**

RAID: Shadow Legends

About Us

Advertising

Breaking News Alerts

Careers

Credit Card Payments

Digital Edition

FAQ

Feedback

Headlines

Photos

Press

Print Subscriptions

Request A Correction

Write For Us

RSS

Site Map

Terms of Service

Privacy Policy

Do Not Sell or Share My Personal Information and Opt Out of Targeted Advertising

© 2025 POLITICO LLC

A113

**EXHIBIT J**

An official website of the United States government  Here's how you know

☰   🦅 U.S. NORTHERN COMMAND                                                          🔍

HOME > NEWSROOM > PRESS RELEASES

---

**PRESS RELEASE** | June 8, 2025

# USNORTHCOM statement regarding protection of federal property and personnel in the Los Angeles Area

**PETERSON SPACE FORCE BASE, Colo.** – By direction of Secretary of Defense and in coordination with U.S. Northern Command (USNORTHCOM), approximately 2,000 California Army National Guard soldiers have been placed under federal command and control in a Title 10 status to support the protection of federal personnel and federal property in the greater Los Angeles area.

As USNORTHCOM's land component command, U.S. Army North stood up Task Force 51, with a two-star general, as the ground command and control element over the Title 10 forces. At this time, there are approximately 300 members of the California Army National Guard's 79th Infantry Brigade Combat Team deployed at the following locations in the greater Los Angeles area: Los Angeles, Paramount, and Compton, California.

Additionally, approximately 500 Marines from 2nd Battalion, 7th Marines at Twentynine Palms, California, are in a prepared to deploy status should they be necessary to augment and support the DoD's protection of federal property and personnel efforts.

USNORTHCOM will provide more information as units are identified and deployed.

–30–

NOTE TO EDITORS: For further information, please contact U.S. Northern Command Public Affairs at (719) 554-6889 or email us at n-ncpa.omb@mail.mil.

Follow us on Facebook and X at www.facebook.com/USNORTHCOM and www.x.com/USNorthernCmd.

---

      

SHARE          PRINT

🏷 Southern Border

**A115**

**EXHIBIT K**



# OFFICE OF THE GOVERNOR

June 8, 2025

Hon. Pete Hegseth
Secretary of Defense
Washington, DC 20301

<u>Via email only</u>

Re:    Federalization of the California National Guard

Dear Secretary Hegseth:

On June 7, 2025, President Trump issued a memorandum to your office entitled "Department of Defense Security for the Protection of Department of Homeland Security Functions." The memorandum purports to invoke 10 U.S.C. § 12406 to "call into Federal service members and units of the National Guard . . . to temporarily protect ICE and other United States Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property." The memorandum further directs "actions as necessary for the Secretary of Defense to coordinate with the Governors of the States and the National Guard Bureau in identifying and ordering into Federal service the appropriate members and units of the National Guard under this authority."

Section 12406 states that "the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary" to (1) repel an invasion of the United States by a foreign nation; (2) suppress a rebellion against the authority of the Government of the United States; or (3) execute the laws of the United States when the President is unable to do so with regular forces. Section 12406 further states that "[o]rders for these purposes shall be issued through the governors of the States."

Last night, the Adjutant General of California received a memorandum from your office with the subject line "Calling Members of the California National

Guard into Federal Service," which states that "[t]wo thousand members of the California National Guard will be called into Federal service effective immediately for a period of 60 days." Notably, this directive did not issue "through the governor[] of the State[]" as required by section 12406; the Department of Defense did not transmit this directive to the Office of the Governor, nor was it approved or ordered by the Governor of California. This directive is also inconsistent with the President's memorandum, which anticipates "coordinat[ion] with the Governors of the States" in identifying and ordering units of the National Guard into federal service.

At present, law enforcement authorities from the City and County of Los Angeles are safeguarding public safety, and, as demonstrated by the robust law enforcement response yesterday evening to protect federal facilities, local law enforcement resources are sufficient to maintain order.  In dynamic and fluid situations such as the one in Los Angeles, State and local authorities are the most appropriate ones to evaluate the need for resources to safeguard life and property.  Indeed, the decision to deploy the National Guard, without appropriate training or orders, risks seriously escalating the situation.

There is currently no need for the National Guard to be deployed in Los Angeles, and to do so in this unlawful manner and for such a lengthy period is a serious breach of state sovereignty that seems intentionally designed to inflame the situation, while simultaneously depriving the State from deploying these personnel and resources where they are truly required. Accordingly, we ask that you immediately rescind your order and return the National Guard to its rightful control by the State of California, to be deployed as appropriate when necessary.

Sincerely,

David Sapp
Legal Affairs Secretary
Office of Governor Gavin Newsom

cc.    California Attorney General Rob Bonta (via email only)

2

**A118**

**EXHIBIT Q**

🔴 **Los Angeles fires:** Go to CA.gov/LAfires for latest information and resources

**News**

**Jun 7, 2025**

# Governor Gavin Newsom on speaking out peacefully

**Los Angeles, California** – Governor Gavin Newsom today issued the following statement in response to speaking out peacefully on the federal government's immigration actions:

> The federal government is taking over the California National Guard and deploying 2,000 soldiers in Los Angeles — not because there is a shortage of law enforcement, but because they want a spectacle.
>
> Don't give them one.
>
> Never use violence. Speak out peacefully.
>
> Governor Gavin Newsom

Categories: **Press releases, Public safety, Recent news, Top story**



**EXHIBIT L**



← Post

**Mayor Karen Bass** ✔
@MayorOfLA

This is a difficult time for our city. As we recover from an unprecedented natural disaster, many in our community are feeling fear following recent federal immigration enforcement actions across Los Angeles County.

Reports of unrest outside the city, including in Paramount, are deeply concerning. We've been in direct contact with officials in Washington, D.C., and are working closely with law enforcement to find the best path forward.

Everyone has the right to peacefully protest, but let me be clear: violence and destruction are unacceptable, and those responsible will be held accountable.

6:06 PM · Jun 7, 2025 · **1.6M** Views

💬 10K    🔁 1.7K    ♡ 4.6K    🔖 485    ⬆

💬 Read 10.7K replies



**New to X?**

Sign up now to get your own personalized timeline!

G  Sign up with Google

  Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service | Privacy Policy | Cookie Policy |
More ···    © 2025 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in    Sign up

A122

**EXHIBIT M**

NEWS ANALYSIS

# *Trump Jumps at the Chance for a Confrontation in California Over Immigration*

The situation has all the elements that the president seeks: a showdown with a top political rival in a deep blue state over an issue core to his agenda.

---

 ▶ **Listen to this article · 7:30 min**   Learn more



**By Tyler Pager**
Reporting from Washington

June 8, 2025

It is the fight President Trump had been waiting for, a showdown with a top political rival in a deep blue state over an issue core to his political agenda.

In bypassing the authority of Gov. Gavin Newsom of California, a Democrat, to call in the National Guard to quell protests in the Los Angeles area over his administration's efforts to deport more migrants, Mr. Trump is now pushing the boundaries of presidential authority and stoking criticism that he is inflaming the situation for political gain.

Local and state authorities had not sought help in dealing with the scattered protests that erupted after an immigration raid on Friday in the garment district. But Mr. Trump and his top aides leaned into the confrontation with California leaders on Sunday, portraying the demonstrations as an existential threat to the country — setting in motion an aggressive federal response that in turn sparked new protests across the city.

A124

As more demonstrators took to the streets, the president wrote on social media that Los Angeles was being "invaded and occupied" by "violent, insurrectionist mobs," and directed three of his top cabinet officials to take any actions necessary to "liberate Los Angeles from the Migrant Invasion."

"Nobody's going to spit on our police officers. Nobody's going to spit on our military," Mr. Trump told reporters as he headed to Camp David on Sunday, although it was unclear whether any such incidents had occurred. "That happens, they get hit very hard."

The president declined to say whether he planned to invoke the 1807 Insurrection Act, which allows for the use of federal troops on domestic soil to quell a rebellion. But either way, he added, "we're going to have troops everywhere."

Stephen Miller, the White House deputy chief of staff, posted on social media that "this is a fight to save civilization."

Mr. Trump's decision to deploy at least 2,000 members of the California National Guard is the latest example of his willingness and, at times, an eagerness to shatter norms to pursue his political goals and bypass limits on presidential power. The last president to send in the National Guard for a domestic operation without a request from the state's governor, Lyndon B. Johnson, did so in 1965, to protect civil rights demonstrators in Alabama.



President Trump in New Jersey on Sunday. On social media, he, his aides and allies have sought to frame the demonstrations against immigration officials on their own terms. Haiyun Jiang for The New York Times

But aides and allies of the president say the events unfolding in Los Angeles provide an almost perfect distillation of why Mr. Trump was elected in November.

"It could not be clearer," said Newt Gingrich, the former Republican House speaker and ally of the president who noted that Mr. Trump had been focused on immigration enforcement since 2015. "One side is for enforcing the law and protecting Americans, and the other side is for defending illegals and being on the side of the people who break the law."

Sporadic protests have occurred across the country in recent days as federal agents have descended on Los Angeles and other cities searching workplaces for undocumented immigrants, part of an expanded effort by the administration to ramp up the number of daily deportations.

**A126**

6/10/25, 4:52 AM
Case 3:25-cv-04870-CRB   Document 10   Filed 06/10/25   Page 77 of 129
Trump Targets the California Protests as a Flash Point in Fight over U.S. Immigration - The New York Times

On social media, Mr. Trump, his aides and allies have sought to frame the demonstrations against immigration officials on their own terms. They have shared images and videos of the most violent episodes — focusing particularly on examples of protesters lashing out at federal agents — even as many remained peaceful. Officials also zeroed in on demonstrators waving flags of other countries, including Mexico and El Salvador, as evidence of a foreign invasion.

"Illegal criminal aliens and violent mobs have been committing arson, throwing rocks at vehicles, and attacking federal law enforcement for days," wrote Karoline Leavitt, the White House press secretary.

Mr. Newsom, whom the president refers to as "Newscum," has long been a foil for Mr. Trump, who has repeatedly targeted California and its leader as emblematic of failures of the Democratic Party.

"We expected this, we prepared for this," Mr. Newsom said in a statement to The New York Times. "This is not surprising — for them to succeed, California must fail, and so they're going to try everything in their tired playbook despite the evidence against them."

On Sunday, the governor sent a letter to Defense Secretary Pete Hegseth formally requesting that Mr. Trump rescind the call-up of the National Guard, saying federal actions were inflaming the situation. And on Monday, Mr. Newsom said California would file a lawsuit challenging the president's order to federalize the state's National Guard.

He was echoed by other Democratic officials, who said the mounting demonstrations were the result of Mr. Trump's own actions.

The president and his aides "are masters of misinformation and disinformation," Senator Alex Padilla of California, a Democrat, said in an interview. "They create a crisis of their own making and come in with all the theatrics and cruelty of immigration enforcement. They should not be surprised in a community like Los Angeles they will be met by demonstrators who are very passionate about standing up for fundamental rights and due process."

A127

Republicans defended Mr. Trump's moves, saying he was rightfully exercising his power to protect public safety.

"The president is extremely concerned about the safety of federal officials in L.A. right now who have been subject to acts of violence and harassment and obstruction," Representative Kevin Kiley, Republican of California, said in an interview.

He added: "We are in this moment because of a series of reckless decisions by California's political leaders, the aiding and abetting the open-border policies of President Biden."

Trump officials said on Sunday that they were ready to escalate their response even more, if necessary. Tom Homan, the president's border czar, suggested in an interview with NBC News that the administration would arrest anyone, including public officials, who interfered with immigration enforcement activities, which he said would continue in California and across the country.



Protesters in Pasadena, Calif., on Sunday.    Alex Welsh for The New York Times

Mr. Trump appears to be deploying against California a similar playbook that he has used to punish universities, law firms and other institutions and individuals that he views as political adversaries.

Last month, he threatened to strip "large scale" federal funding from California "maybe permanently" over the inclusion of transgender athletes in women's sports. And in recent days, his administration said it would pull roughly $4 billion in federal funding for California's high-speed train, which would further delay a project that has long been plagued by delays and funding shortages.

"Everything he's done to attack California or anybody he fears isn't supportive of him is going to continue to be an obsession of his," Mr. Padilla said. "He may think it plays smart for his base, but it's actually been bad for the country."

Trump Jumps at the Chance to Confront an Emotional Immigration Issue - The New York Times

White House officials said there was a different common denominator that explains Mr. Trump's actions both against institutions like Harvard and immigration protests in Los Angeles.

"For years Democrat-run cities and institutions have failed the American people, by both choice and incompetence," Abigail Jackson, a White House spokeswoman, said in a statement.

"In each instance," she added, "the president took necessary action to protect Americans when Democrats refused."

**Tyler Pager** is a White House correspondent for The Times, covering President Trump and his administration.

---

A version of this article appears in print on , Section A, Page 1 of the New York edition with the headline: Trump Leaps at Chance For Clash in California

**A130**

**EXHIBIT N**

EVENT ENDED    Last updated June 9, 2025, 10:33 PM PDT

## 700 Marines will deploy as immigration protests continue

The state of California has sued the Trump administration for its activation of the state's National Guard.



Updated June 9, 2025, 10:33 PM PDT

**By NBC News**

*This liveblog has now ended.*

- **TROOPS IN L.A.:** About 700 Marines from the Marine Corps base in Twentynine Palms, California, will deploy to Los Angeles to support the roughly 300 National Guard members already in the city to control protests against federal immigration raids, Defense Secretary Pete Hegseth said. President Donald Trump had earlier ordered the deployment of 2,000 troops in a move California Gov. Gavin Newsom criticized as inflammatory.

- **HOW WE GOT HERE:** Protests erupted after Immigration Customs Enforcement officers carried out raids Friday in three locations across Los Angeles, where dozens of people were taken into custody. Newsom called the raids "chaotic federal sweeps" that aimed to fill an "arbitrary arrest quota."

- **TRUMP VS. NEWSOM:** "Border czar" Tom Homan threatened Newsom and Mayor Karen Bass with arrest if they impede troop deployment efforts. Newsom responded by saying: "Tom, arrest me. Let's go." Trump backed Homan's threat, and Newsom called it "an unmistakable step toward authoritarianism."

- **CALIFORNIA SUES:** Newsom and California Attorney General Rob Bonta sued Trump and Hegseth over the activation of the state's National Guard, asking a court to declare the order unlawful.

- **ARRESTS:** At least 56 people were arrested this weekend as protesters were ordered to leave downtown and law enforcement shot "less-lethal" rounds. Demonstrators spilled out onto the 101 Freeway, while others set fire to Waymo driverless cars.

---

6h ago / 10:33 PM PDT

### 'There was a kind of a stampede of people,' says man in L.A. protest

 Alicia Victoria Lozano

⌖ Reporting from Los Angeles

Pau Castro said he was in a crowd of people in downtown Los Angeles' Little Tokyo when, during what he characterized as a peaceful protest, "there was a bit of an exchange" with police.

"And all of a sudden, very quickly, there was a kind of stampede of people, and we were tear-gassed," Castro, 27, said in the lobby of the building where he and others took shelter.

"And with the stampede of people, we were able to find a safe place in this lobby of an apartment building," the Los Angeles resident said. "And immediately afterwards the police began charging forward and shooting against the protesters."

A132

Castro said the protest was peaceful but that a few people tried to escalate it, and others in the crowd tried to stop them.

He said water balloons were thrown, and then fireworks were set off, "and then it kind of all happened quickly."

"I've been to many protests, and it kind of always happens like this, you know?" Castro said. "It's like everything is kind of contained, and then there's this one spark, or the police decide, 'OK, enough is enough. We're charging forward.'"

---

7h ago / 10:04 PM PDT

### Police push in line from Little Tokyo intersection, video shows

 Phil Helsel

News helicopter video from NBC Los Angeles showed a line of police advancing from 2nd and San Pedro streets as some protesters fled ahead of them.

Police are wearing riot helmets and other equipment. A very large number of police vehicles with lights flashing are stationed behind the officers, not moving, video showed.

Police have used a chemical irritant and flash-bang devices.

---

7h ago / 9:49 PM PDT

### Police use tear gas and flash-bangs after declaring unlawful assembly

 Alicia Victoria Lozano

⊙ Reporting from Los Angeles

An NBC News reporter was trapped in a building with other journalists after police declared an unlawful assembly in the Little Tokyo section of downtown and then used flash-bang devices and tear gas on protesters.

Some demonstrators lingered amid the gas, while others screamed and ran. One woman tried to retrieve a water bottle from the street, and police shot a less-lethal round at her.

A news photographer with a different agency was also hit with tear gas, and water was used to flush his eyes.

Video from a helicopter showed a line of police in riot gear at an intersection and a small group of people farther down the street, dispersed between cars and on the sides of buildings.

---

8h ago / 9:27 PM PDT

### Australian PM says he raised issue of injured journalist with U.S.

 Phil Helsel

Australian Prime Minister Anthony Albanese said he was "horrified" by video of Channel Nine journalist Lauren Tomasi being struck by a less-lethal round fired by police during protests in Los Angeles.

Tomasi is clearly identified as a journalist and is clearly speaking into a microphone toward a camera when, video shows, an officer raises his weapon and fires from behind her. Tomasi then yells in pain.

"In L.A., it is not unreasonable to think that she would not have been targeted with a rubber bullet," Albanese said at the National Press Club of Australia, shown on Australia television. "It is not unreasonable to think that she could go about her coverage, clearly, as people could see the footage, clearly identified as media."

"And so we have already raised these issues with the U.S. administration. We don't find it acceptable that it occurred," he said. "And we think that the role of the media is particularly important."

Albanese said Tomasi is doing well, "but that footage was horrific."

---

8h ago / 9:07 PM PDT

### In L.A.'s downtown, a resident hopes for peace amid protest chaos around him

 Dennis Romero

For a fourth straight night, protesters have descended on downtown Los Angeles and clashed with authorities on the otherwise empty streets of a community known for its commuter life.

But the urban center of Los Angeles is home to an estimated 90,000 residents in historic lofts, converted single-room occupancy apartments and newer high-rise penthouses. Many are trying to endure the daily action on the street.

Last night, protesters were on the street below Derek Mazzeo's residence in a roughly 100-year-old building that was redeveloped in the 2000s. Despite what he said was a solid job bringing the old

[ SHOW MORE ]

---

8h ago / 8:52 PM PDT

### Police fire flash-bang grenades at crowd of around 1,000

 Alicia Victoria Lozano

⊙ Reporting from Los Angeles

Officers fired flash-bang grenades at a crowd of around 1,000 protesters in downtown Los Angeles.

People in the crowd flew Mexican flags and at least two U.S. flags turned upside-down, a signal of distress.

Police continued to work to push the crowd back down the street after they advanced on protesters in the city's Little Tokyo section.

---

9h ago / 8:29 PM PDT

### Police fire pepper balls at crowd in downtown L.A.'s Little Tokyo

 Alicia Victoria Lozano

◎ Reporting from Los Angeles

Officers were seen firing pepper balls into a crowd that had roughly tripled in size at 2nd and San Pedro streets in Los Angeles.

The crowd was observed yelling, "Peaceful protest!" It was not immediately clear what prompted officers to fire. An irritant hung heavy in the air after the incident at around 8:15 p.m.

The intersection is in the Little Tokyo area of downtown Los Angeles, the cultural and historic hub of the city's Japanese community.

---

9h ago / 8:11 PM PDT

### Authorities attacked reporters 27 times during L.A. protests, journalist groups say

 Dennis Romero

Authorities deployed to protests in Los Angeles since Friday have attacked journalists 27 times, the organization PEN America said, citing the Los Angeles Press Club and Reporters Without Borders.

PEN America joined 24 other organizations to decry the attacks, reported from Friday to Sunday, in a letter to Homeland Security Secretary Kristi Noem.

The letter focused on attacks by federal officers, who it said may have violated journalists' First Amendment rights, as well as federal case law that held that reporters have the right to record their actions and may remain nearby even as dispersal orders are directed at protesters.

SHOW MORE

---

9h ago / 7:38 PM PDT

### Around 1,700 National Guard troops in greater Los Angeles, military says

 Courtney Kube

About 1,700 National Guard troops are on site in the greater Los Angeles area, and 700 Marines were activated to join them in their mission in Los Angeles, the military said in a statement.

The military task force is "protecting federal personnel and federal property in the greater Los Angeles area," said U.S. Northern Command, known as NORTHCOM.

Overall, there are 2,100 National Guard soldiers with the task force, called Task Force 51, along with the 700 Marines, the military said.

The city's Democratic mayor and other officials, as well as Newsom, have condemned the deployment to Los Angeles.

---

9h ago / 7:31 PM PDT

### 'Border czar' says Newsom hasn't done anything to warrant arrest, after Trump says he should be arrested

🌈 Zoë Richards

Trump's "border czar," Tom Homan, said he did not believe Newsom has done anything to warrant arrest after Trump suggested today that he should have Newsom arrested.

Asked in a CNN interview that aired tonight about Trump's comments and whether Newsom should face arrest, Homan responded: "Not at this time, absolutely not."

Newsom had dared Homan to arrest him. Responding to Newsom's challenge, Trump told reporters earlier today, "I would do it if I were Tom."

Homan also defended Trump's move to activate the National Guard, telling CNN host Kaitlan Collins that he thinks Trump "did exactly the right thing" and that Trump had not acted unlawfully.

"I certainly think the president is acting within the confines of the law," Homan said when he was asked about Trump's deploying the National Guard without Newsom's request.

---

10h ago / 7:02 PM PDT

🌈 Gadi Schwartz

◎ Reporting from Los Angeles

Reporter falls back with dispersed L.A. protesters amid flash-bangs, tear gas

04:58



Officials tried to disperse a crowd at anti-ICE protests downtown by firing tear gas and flash-bang devices.

---

10h ago / 6:57 PM PDT

## Democratic Sen. Fetterman condemns protests, calling them 'anarchy and true chaos'

 Raquel Coronell Uribe

Sen. John Fetterman, D-Pa., called the protests in Los Angeles "anarchy and true chaos," slamming his party for what he characterized as a refusal to condemn violent acts.

"I unapologetically stand for free speech, peaceful demonstrations, and immigration – but this is not that," Fetterman wrote on X.

"My party loses the moral high ground when we refuse to condemn setting cars on fire, destroying buildings, and assaulting law enforcement," he added.

The protests have been largely peaceful, and there have not been widespread reports of damage.

Fetterman's response is in contrast to statements by other Democratic lawmakers. Senate Minority Leader Chuck Schumer, D-N.Y., condemned the Trump administration's response, in which Trump ordered the National Guard to the city, calling it "unnecessary, inflammatory, and provocative" in a statement today.

---

10h ago / 6:30 PM PDT

## 'Stop the raids,' L.A. mayor pleads with feds

 Phil Helsel

Bass ended a news conference this evening by asking the federal government to stop conducting immigration raids in the city, saying they are creating chaos and are unnecessary.

Bass said that in some cases families are showing up for their scheduled appointments with ICE as they are supposed to and then being detained and that day laborers are being targeted.

Bass said there have been five raids in the LA region, but she did not know all the details.

"I am hopeful that the federal government will hear our plea: Stop the raids," Bass said. "This is creating fear and chaos in our city, and it is unnecessary."

"And I hope that we will be heard, because our city is trying to move forward," she continued. "And I believe that the federal government should be supportive of us moving forward."

The protests erupted after federal raids Friday.

---

11h ago / 6:23 PM PDT

## Authorities fire less-lethal weapons from rooftop

 Alicia Victoria Lozano and Dennis Romero

The situation grew tense in downtown Los Angeles this evening as less-lethal rounds were launched from the rooftop of the Edward R. Roybal Federal Building and police moved in to secure the area.

Authorities in fatigues were seen firing from the rooftop. It wasn't clear which agency opened fire, but the Los Angeles Police Department's Central Division noted that officers in the area were authorized to use less-lethal weapons.

The division, which patrols downtown, said on X that troublemakers were throwing objects at officers at Los Angeles and Temple streets, adjacent to the federal building.

The situation seemed to darken as more law enforcement agents and officers moved into the area, agitating some protesters.

Police formed a line blocking the steps of City Hall nearby.

Some protesters were trapped on Los Angeles Street near the Los Angeles Mall as police shut down movement from the area. They also closed Temple Street, which runs east-west past the federal building.

---

11h ago / 6:18 PM PDT

### L.A. mayor warns fed heavy-handedness may be 'test case' by Trump

 Phil Helsel

Bass said tonight that the immigration raids last week that set off the protests in the city were unnecessary and that they targeted people like day laborers at a Home Depot, not the criminals the Trump administration claimed would be prioritized.

"Nothing warranted the raids," Bass said. "If you remember at the beginning of this administration, we were told that raids would be to look for violent criminals, people who have warrants."

"But I don't know how you go from a drug dealer to a Home Depot, to people's workplaces where they're just trying to make a living," she said.

L.A. mayor suggests city may be a 'test case' for increased federal authority
02 : 33



Bass said the Trump administration could be using Los Angeles to see how far federal agents can go.

"These are not the people that we were told were going to be detained," she said. "And it makes me feel like our city is actually a test case – a test case for what happens when the federal government moves in and takes the authority away from the state or away from local government."

---

11h ago / 6:14 PM PDT

### LAPD chief 'very concerned' about reporter struck by less-lethal round

 Dennis Romero

Police Chief McDonnell said today that he's "very concerned" after an officer fired a less-lethal round that struck a journalist during protests downtown last night.

Lauren Tomasi, a correspondent with Australia's Channel Nine, was broadcasting live when she was struck in the leg by what the LAPD described as a foam projectile fired from a 40 mm launcher.

In video of the use of force, a police officer is seen turning toward Tomasi and firing a round in her direction. Tomasi yells and stumbles to reach for her leg. She later told Nine News Australia that she was "safe."

Police are trained to aim at the belt line of anyone targeted with less-lethal arounds, including the foam projectiles and bean bag rounds. However, the department has agreed in the past – including after the 2007 "Mayday melee," in which officers injured multiple reporters and protesters at a pro-immigrant rally – not to target journalists who are working and covering action from a reasonable distance.

McDonnell said the department is looking into the incident.

---

11h ago / 6:00 PM PDT

### There will be 'many more' arrests in coming days, LAPD chief says

 Phil Helsel

Police Chief Jim McDonnell warned tonight that anyone committing violence or vandalism during protests will be arrested and said investigators will make more arrests connected to past incidents.

"There is no tolerance for criminal activity under the guise of protest," McDonnell said at a news conference.

Around 60 people were arrested in the unrest over the weekend, officials said. McDonnell said he "wouldn't argue" that relatively few people have been arrested thus far, but he said numbers are expected to grow as investigations continue.

"There will be many more subsequent arrests," he said.

McDonnell also said the Trump administration's deployment of federal troops without direct coordination causes logistical problems "and risks confusion during critical incidents."

He said that the LAPD has decades of experience with large-scale protests and that he is confident the police department can respond to the current demonstrations professionally and effectively.

---

11h ago / 5:43 PM PDT

### Police fire less-lethal rounds in faceoff with protesters in center of L.A.

 Sossy Dombourian and Dennis Romero

Protesters in the middle of an intersection faced off with law enforcement officers who used less-lethal rounds in an attempt to disperse the crowd today.

The sound of small explosions and popping from officers' less-lethal launchers could be heard as protesters began to retreat from the intersection of Los Angeles and Temple streets near the Edward R. Roybal Federal Building. A handful had been observed throwing objects at officers.

Some protesters ran, while others put up their hands, some holding up two fingers in a seeming sign of peace.

Police declared an unlawful assembly in the area, meaning anyone who remains can be arrested. Officers were seen lined up, pushing the crowd back.

---

11h ago / 5:30 PM PDT

### National Guard deployment is illegal and could hinder wildfire prevention, California AG says

 Raquel Coronell Uribe

California Attorney General Rob Bonta said that the state's position is clear and that state officials believe Trump's decision to federalize the National Guard was unlawful.

"The California National Guard is a joint operation, and the commander-in-chief, most of the time, is the governor of California," Bonta said on MSNBC, adding that only in cases of "rare and infrequent" conditions like rebellions or invasions can the president deploy the National Guard.

"The president can do many lawful things, but he cannot do unlawful things, and what he has tried to do here is exercise authority he doesn't have," Bonta said.

He added that Trump federalized the guard as wildfire season in California is in full swing and that the state's troops, who are trained to combat wildfires, are pulled away from that mission.

"What the Trump administration has done here is unnecessary. It's not constructive. It's harmful. It has only led to inflame tensions and provoke, as opposed to calm and create peace. And most importantly, it's unlawful," Bonta said.

---

12h ago / 5:20 PM PDT

### Burning electric vehicles hard to extinguish during protests, fire department says

 Phil Helsel

Electric vehicles were left to burn in the Los Angeles unrest in some cases because their batteries are hard to reach with water and take a lot of it, a spokesperson for the fire department said today.

The fire department responded to "multiple vehicle fires" during this weekend's unrest, Public Information Officer Erik Scott said in a video on X. Among the vehicles that were torched were Waymo autonomous electric vehicles, video showed.

"Due to the design of EV battery systems, it's often difficult to apply the water directly to the burning cells, especially in a chaotic environment, and in some cases, allowing the fire to burn is the safest tactic," Scott said.

It also requires a large amount of water, Scott said, and the runoff must be managed.

The lithium-ion batteries in electric vehicles become dangerous when they are burned, he said, including releasing highly toxic hydrogen fluoride gas – dangerous to the lungs when it is breathed in and able to be absorbed through the skin.

It can cause "serious internal harm," Scott said.

---

12h ago / 4:58 PM PDT

### ACLU says Marines aren't trained to police protests

 Phil Helsel

**A137**

The American Civil Liberties Union today called the deployment of active-duty troops an unnecessary escalation and a move by the Trump administration that raises serious constitutional concerns.

"Every move President Trump has made since Saturday night has been escalatory and inflammatory," Hina Shamsi, director of the National Security Project at the ACLU, said in a statement.

"The idea that these Marines have anywhere near the kind of training required to police protests while respecting people's constitutional rights would be laughable if the situation weren't so alarming," Shamsi said.

"From the get-go, the Trump administration's deployment of troops into the streets of California, over the governor's objection, has raised serious constitutional concerns," Shamsi said. "This latest move only increases legal and ethical jeopardy for troops, and further endangers the rights of the people of Los Angeles."

---

### LAPD got no formal notice Marines would be deployed, chief says

 Andrew Blankstein

Police Chief Jim McDonnell said today his agency has not received any formal notice that Marines would be deployed in Los Angeles, but he said the police force has the experience when it comes to large protests.

"The LAPD has not received any formal notification that the Marines will be arriving in Los Angeles. However, the possible arrival of federal military forces in Los Angeles absent clear coordination presents a significant logistical and operational challenge for those of us charged with safeguarding this city," McDonnell said in a statement.

"The Los Angeles Police Department, alongside our mutual aid partners, have decades of experience managing large-scale public demonstrations, and we remain confident in our ability to do so professionally and effectively," he said.

McDonnell said his agency's priority is public and officer safety, and he urged "open and continuous lines of communication between all agencies to prevent confusion, avoid escalation, and ensure a coordinated, lawful, and orderly response during this critical time."

---

12h ago / 4:39 PM PDT

### Hegseth makes it official: Marines deploying to L.A.

 Mosheh Gains and Dennis Romero

Hegseth made the deployment of Marines to Los Angeles official, saying on X that the 700 Marines mobilized to Camp Pendleton will be sent to defend federal resources.

"Due to increased threats to federal law enforcement officers and federal buildings, approximately 700 active-duty U.S. Marines from Camp Pendleton are being deployed to Los Angeles to restore order," he said.

U.S. Northern Command said in an earlier statement that the Marines would come from the Marine Corps Air Ground Combat Center and were being sent to Camp Pendleton in San Diego County before probable deployment.

Twentynine Palms, in the California desert, is about 140 miles east of downtown Los Angeles. Camp Pendleton, which has its main address in Oceanside, is about 90 miles south of downtown L.A.

Two Defense Department sources said the process of mobilizing – moving troops from Twentynine Palms to Oceanside, a distance of about 147 miles – would begin tonight.

Hegseth said the troops will defend federal agents amid protests in Los Angeles over immigration raids.

"We have an obligation to defend federal law enforcement officers – even if Gavin Newsom will not," he said.

---

12h ago / 4:36 PM PDT

### California suit against use of troops: 'People are governed by civil, not military, rule'

 Phil Helsel

California's attorney general has filed a promised lawsuit challenging the Trump administration's deployment of military troops in Los Angeles following protests and unrest.

The suit says that Trump exceeded his lawful authority and that he "used a protest that local authorities had under control to make another unprecedented power grab."

Newsom is the legal commander-in-chief of the state's National Guard, the suit argues, and he did not request their use. In fact, Newsom has criticized Trump's ordered of troops as an attempt to "manufacture a crisis."

The lawsuit says that under the legal statute, "when the President calls members of a State National Guard into federal service pursuant to that statute, those orders 'shall be issued through the governors of the States.'"

"Instead, Secretary Hegseth unlawfully bypassed the Governor of California, issuing an order that by statute must go through him," Bonta wrote in the suit.

Bonta also argued that Trump's action "contravenes core statutory and constitutional restrictions."

"One of the cornerstones of our Nation and our democracy is that our people are governed by civil, not military, rule. The Founders enshrined these principles in our Constitution," Bonta wrote.

---

13h ago / 4:25 PM PDT

### Newsom says Trump is deploying another 2,000 National Guard troops to L.A.

 Phil Helsel

Newsom said this afternoon that Trump is deploying 2,000 more National Guard troops to Los Angeles, on top of an initial 2,000.

"I was just informed Trump is deploying another 2,000 Guard troops to L.A.," he said on X.

"The first 2,000? Given no food or water. Only approx. 300 are deployed – the rest are sitting, unused, in federal buildings without orders," Newsom wrote.

"This isn't about public safety. It's about stroking a dangerous President's ego," he continued. "This is Reckless. Pointless. And Disrespectful to our troops."

California's attorney general today filed a lawsuit challenging Trump's deployment of National Guard troops to Los Angeles, calling it an unprecedented power grab that exceeds his authority.

Newsom has accused Trump of using the National Guard "to manufacture a crisis."

---

13h ago / 4:11 PM PDT                                                                                  

### One voice in the crowd urges protesters not to 'give Donald Trump what he wants'

 Alicia Victoria Lozano

Amid the protesters outside the Edward R. Roybal Federal Building in downtown Los Angeles today was a voice calling for peace.

Najee Gow, 27, is a Los Angeles resident from Portland, Oregon, who was at that city's raucous 2020 protests that emerged from the police murder of George Floyd in Minneapolis this spring.

Using a handheld loudspeaker, Gow urged fellow protesters today to remain peaceful and not "give Donald Trump what he wants."

Gow said protesters who turn to violence and vandalism feed Trump's strategy to paint Los Angeles as a city of crime while bolstering his use of the National Guard and, possibly, Marines to protect federal assets in the region.

Gow noted that Trump administration officials have threatened to arrest Newsom.

"I don't know what will happen if Marines set foot in L.A.," Gow said. "You know, like, if you arrest the governor, if you arrest the mayor, that is a decline of democracy, that is a dictatorship."

---

13h ago / 3:58 PM PDT                                                                                  

### Hakeem Jeffries: Trump and Republicans have 'zero credibility' on law and order

 Phil Helsel

House Minority Leader Hakeem Jeffries said today that Trump and the current Republican Party have "zero credibility" on law-and-order issues and are "intentionally trying to inflame" the situation.

.

[ SHOW MORE ]

---

13h ago / 3:55 PM PDT                                                                                  

### All 'uniformed officers' to stay on duty as LAPD declares 'tactical alert'

 Phil Helsel

The LAPD's Central Division, which covers downtown, declared a tactical alert shortly after 3 p.m.

"The City of Los Angeles has declared a Tactical Alert. All uniformed personnel are to remain on duty," is said on X.

A tactical alert allows supervisors to keep officers past their shifts and maintain high levels of staffing in the event of emergencies or large incidents.

---

13h ago / 3:48 PM PDT                                                                                  

### 'Not on our watch': L.A. public schools plan to protect undocumented families at graduations

Helen Jeong, NBC Los Angeles

Ahead of the roughly 100 graduation ceremonies today and tomorrow, the Los Angeles Unified School District is carrying out plans to protect its estimated 7,500 undocumented students and their families amid ongoing federal immigration raids in Los Angeles and beyond, according to United Teachers Los Angeles, an LAUSD teachers' union.

Superintendent Alberto Carvalho said that security perimeters will be set up at every graduation site and that buses and bus sites are included in security plans.

"Every single graduation site is a protected site," Carvalho said. "Any federal agency [that] may want to take action during these joyous times that we call graduation – not on our watch."

United Teachers Los Angeles, the teachers union for the second-largest public school district in the country, says about 1 in 4 of the district's 30,000 immigrant students are undocumented.

*Read the full story here.*

---

13h ago / 3:41 PM PDT

### Gov. Newsom says using military in L.A. is 'dictatorial'

 Dennis Romero

Newsom continued a bitter back-and-forth with Trump today after U.S. Marines were mobilized in anticipation of duty in Los Angeles amid the region's ongoing protests.

Newsom said using Marines amid free speech displays by Americans on U.S. soil is "un-American."

"U.S. Marines have served honorably across multiple wars in defense of democracy," Newsom said. "They are heroes."

The mission in Los Angeles, should Marines be deployed, would be to protect federal personnel and resources, two Defense Department sources said. Under federal law, they would be prohibited from making arrests.

Still, using U.S. forces for a domestic situation is rare.

"They shouldn't be deployed on American soil facing their own countrymen to fulfill the deranged fantasy of a dictatorial President," Newsom said on X this afternoon.

"This is un-American," he said.

---

13h ago / 3:30 PM PDT

### 'My message to ICE is: Leave us alone,' pastor says at L.A. march

 Liz Kreutz

◎ Reporting from Los Angeles

Marching with protesters in Los Angeles today, Pastor Lucia Chappelle at Founders Metropolitan Community Church in Los Angeles said her message was a simple one.

"My message to ICE is: Leave us alone," she said, using a walker to join the crowd.

"I mean, you're talking about family people, you're talking about my neighbors, you're talking about people who have not hurt anyone – not hurt anyone," she said.

Chappelle also said the reality of Los Angeles, which has many immigrants, does not match the rhetoric of an "invasion" that is being spread.

"You can see we're not a mass of invading, marauding immigrants tearing up the city," she said. "We're people building this city – all of us are."

---

14h ago / 3:10 PM PDT

### Marines mobilize to Camp Pendleton in anticipation of L.A. deployment

 Courtney Kube and Dennis Romero

An estimated 700 Marines are being mobilized, moving from Marine Corps Air Ground Combat Center in Twentynine Palms, about 140 miles east of Los Angeles, to Camp Pendleton in San Diego County, defense sources said.

The mobilization will put the troops closer to Los Angeles, where they could be deployed alongside National Guard troops to protect federal resources and personnel, two Defense Department sources

SHOW MORE

---

14h ago / 3:05 PM PDT

### Protesters gather at historic site where L.A. was founded

 Dennis Romero

A few hundred peaceful protesters gathered today at Olvera Street, part of El Pueblo de Los Angeles Historical Monument, commemorated as the site where Los Angeles was founded.

The location emits a symbolism, no doubt, in the minds of some protesters, attaching history to contemporary demographics that have Los Angeles County roughly one-half Latino and three-fourths people of color.

The city's Latino roots reach to Olvera Street, where in 1769 Gaspar de Portola led a Spanish expedition north from San Diego and found an ideal place for a settlement.

SHOW MORE

---

14h ago / 2:56 PM PDT

### Labor leader David Huerta released on $50K bond

 Tyler Kingkade

◎ Reporting from Los Angeles

David Huerta, president of the California chapter of the Service Employees International Union, was released from federal custody on a $50,000 bond this afternoon after his first court appearance.

Huerta faces a federal charge of conspiracy to impede an officer, a felony, stemming from Friday's immigration raids.

The charges were not discussed during the hearing, and the court did not ask him to enter a plea.

A criminal complaint alleges that Huerta arrived on the scene of an immigration enforcement operation and, according to an undercover officer in the crowd, directed people to picket to prevent law enforcement vehicles from entering the property of a clothing warehouse.

SHOW MORE

---

14h ago / 2:44 PM PDT

**Newark Mayor Ras Baraka slams Trump's National Guard decision as 'dangerous'**

 +2  Julie Tsirkin, Olympia Sonnier and Bridget Bowman

⊙ Reporting from Newark, N.J.

Newark, New Jersey, Mayor Ras Baraka said today that Trump's decision to federalize California's National Guard troops is "really dangerous."

Baraka, who is running for governor of New Jersey, said he agreed with Newsom's objection to activating the state's National Guard to respond to protests in Los Angeles.

"They are putting troops on the ground in these cities, and this is something that you don't do, right?" Baraka told NBC News on the eve of the state's gubernatorial primary, in which he is one of six candidates for the Democratic nomination.

SHOW MORE

14h ago / 2:33 PM PDT

**Newsom's office criticizes mobilization of Marines**

 Dennis Romero

Newsom's press office called the mobilization of U.S. Marines, an estimated 700 of whom are being moved to L.A. to support National Guard troops, "completely unwarranted."

"The level of escalation is completely unwarranted, uncalled for, and unprecedented," the office said on X.

The governor's office characterized the move as "mobilizing the best in class branch of the U.S. military against its own citizens."

It made a distinction between mobilizing the troops and deploying them, saying Marines are not being deployed but will be moved to L.A., where raucous protests over immigration enforcement have been ongoing since the weekend.

Deployment would be a final step in putting troops on the streets, as two sources in the U.S. Department of Defense said, to protect federal personnel and resources amid the protests.

14h ago / 2:29 PM PDT

**Rabbi at Los Angeles protest calls ICE raids 'dehumanizing'**

 NBC News

15h ago / 2:27 PM PDT

**Los Angeles protester: 'Families are being torn apart'**

 Morgan Chesky and Daniella Silva

A protester at a pro-union rally for immigrants said he showed up to send the message that families should not be "torn apart" by the ICE raids in Los Angeles and that "workers can go to work every day and not fear that they're not gonna be able to see their families at the end of the day."

"I think it improves us all to come out here today, to come out tomorrow and the next day to show a peaceful front, and to make sure that the right story that's out there is that these families are being torn apart, and that this should stop, that ICE needs to leave, that the National Guard should stand down, and that we need to be able to supporting our immigrant families and those communities," Victor Sanchez, the executive director of the Los Angeles Alliance for a New Economy, told NBC News.

Sanchez, who is a native of Los Angeles and comes from an immigrant family, said watching the events of the last 72 hours in his city has been "heart-wrenching."

"I think this is probably the start of a groundswell of activism and mobilization on behalf of the community and the moral imperative is here. I think people are standing up and are saying, 'enough is enough,'" he said. "We have to continue to show up, not just for the larger context in terms of what we're suffering with this administration, but for these families that are being locked up and deported without due process."

15h ago / 2:06 PM PDT

**Immigration arrests are way up and ICE detention facilities are full**

 Laura Strickler and Dennis Romero

New data from U.S. Immigration and Customs Enforcement shows immigration enforcement efforts, including arrests of those believed to be in the United States illegally, are up significantly.

ICE detention facilities are at capacity, even as the number of detainees is expected to grow. The U.S. Department of Homeland Security says ICE arrested more than 2,000 people each day for much of last week.

The number of people in detention is now at 51,302, which is 30% higher than it was at the beginning of President Donald Trump's administration. ICE is funded to hold 41,500 detainees.

In May, there were 28,797 people booked into ICE facilities, the highest number since the second Trump Administration began. During the last two weeks of May, a total of 15,020 were held at ICE facilities. This figure represents people who were arrested by ICE or U.S. Customs and Border Protection.

ICE is using 44% more detention facilities, 155 in all, since the last days of President Joe Biden's term.

Of those in ICE detention, 56%, or 28,864, have criminal backgrounds, meaning they have either been convicted of a crime or have pending criminal charges, according to the data. The remaining 22,438 do not have criminal histories.

**A141**

The Adelanto ICE Processing Center is the main ICE facility for the Los Angeles area and currently has 140 detainees, the data show. At the start of the Trump administration, it had just three detainees.

---

15h ago / 1:52 PM PDT 

### U.S. Marines tasked with defense of federal property

 Courtney Kube and Mosheh Gains

U.S. Marine Corps troops mobilized in Los Angeles will be tasked with defending federal property and personnel, two U.S. Department of Defense officials said.

An estimated 700 Marines from the U.S. Marine Corps Air Ground Combat Center in Twentynine Palms have been mobilized to assist National Guard troops and law enforcement in Los Angeles amid ongoing protests.

Twentynine Palms is in the desert, about 140 miles east of L.A.

According to the officials, the Marines will operate under three rules of force: self defense, defense of federal property and defense of federal personnel.

Those are the same rules of force for National Guard troops deployed under Trump's executive order in Los Angeles, where raucous protests have been ongoing.

---

16h ago / 1:25 PM PDT 

### 700 U.S. Marines mobilized to support National Guard

 Courtney Kube and Dennis Romero

Approximately 700 U.S. Marines have been mobilized to support the National Guard in protecting federal personnel and property in Los Angeles, according to two Department of Defense officials.

The troops are from the U.S. Marine Corps Air Ground Combat Center Twentynine Palms, which is in the desert about 140 miles east of Los Angeles.

The mobilization is temporary until more California National Guard troops arrive to L.A., the officials said.

Mobilization is separate from full deployment, so it's not clear if the Marine Corps troops will hit the streets of L.A. immediately or remain on standby.

President Donald Trump authorized the deployment of California National Guard troops to protect federal law enforcement as protesters angry over immigration raids hit the streets over the weekend.

---

16h ago / 1:03 PM PDT 

### JD Vance tells Newsom to 'do your job'

NBC News

---

16h ago / 12:44 PM PDT

### Crane removes charred Waymo vehicle

Matt Nighswander

---



— Frederic J. Brown / AFP - Getty Images

A work crew removes a charred driverless Waymo vehicle today that was burned during last night's protests. Waymo began offering robotaxi rides across 80-plus square miles of Los Angeles County last year.

---

17h ago / 12:21 PM PDT                                                                              co

### L.A. mayor says Trump created a crisis

 NBC News

---

17h ago / 12:19 PM PDT                                                                              co

### Trump calls ICE raid protesters 'insurrectionists'

 Marlene Lenthang

Trump wrote on Truth Social today, "If they spit, we will hit" while addressing ICE protests in Los Angeles and called the protesters "insurrectionists."

"The Insurrectionists have a tendency to spit in the face of the National Guardsmen/women, and others. These Patriots are told to accept this, it's just the way life runs. But not in the Trump Administration," he wrote. "IF THEY SPIT, WE WILL HIT, and I promise you they will be hit harder than they have ever been hit before. Such disrespect will not be tolerated!"

---

17h ago / 12:13 PM PDT                                                                              co

### Families describe emotional toll of detainments outside clothing warehouse

 Tyler Kingkade

⊙ Reporting from Los Angeles

At a rally outside the Ambiance clothing warehouse in L.A., around two dozen family members of people who were detained there Friday held signs with photos of their loved ones. One sign read, "Dad, Come Back Home :("

Several described the toll the arrests have taken on their families.

A person who identified himself as Gabriel said his brother, Paco Vasquez, was detained in the raid. Because Vasquez was his household's sole breadwinner, his family doesn't know how it will cover expenses, such as rent and bills.

A woman named Julian said her father, Mario Romero, was arrested, but her family has avoided telling her 4-year-old brother, who has autism and struggles to communicate.

"He's asked about his father," she said, "in which we have responded that he's working."

At least four people said they had not received updates from immigration authorities or been able to communicate with their detained loved ones.

Jerónimo Martínez, 39, said in an interview, through an interpreter, that he is worried about his nephew, Lázaro Maldonado, because the family hasn't had any communication with him since Friday.



—  An unidentified woman speaks outside Ambiance Apparel in Los Angeles today.  **Tyler Kingkade / NBC News**

"We don't know if they're OK," Martínez said. "We don't know where they are."

---

17h ago / 11:45 AM PDT

## California AG says Trump has no grounds to arrest Newsom

Marlene Lenthang

When asked whether the Trump administration can legally arrest Gov. Gavin Newsom if the federal government sees him as impeding ICE efforts, California Attorney General Rob Bonta said, "It's just more talk, more bluff, more bluster, more threats."

"States have rights. States could do lawful things," Bonta told reporters today in announcing the state's lawsuit against the Trump administration. "It is the president and the Trump administration that is consistently and frequently blatantly and brazenly violating the law, not Gov. Newsom."

Earlier today, Trump said Newsom should perhaps be arrested after the governor dared Trump's border czar Tom Homan to do so.

---

18h ago / 11:26 AM PDT

## Police in Portland, Oregon, make some arrests during weekend ICE protests

Daniella Silva

Los Angeles isn't the only U.S. city where anti-ICE protests have been taking place. The Portland Police Bureau in Oregon said in a statement today that officers responded to "safety concerns and protest activity" around the ICE facility there Saturday and yesterday.

Some of the protests were peaceful and others included arrests, the bureau said.

Police responded yesterday to the area following a report of people on private property next to the ICE building. The crowd cooperated, moving to a nearby sidewalk and no arrests were made

SHOW MORE

---

18h ago / 11:14 AM PDT

## California to sue Trump administration

+2  Jacob Soboroff, Gary Grumbach and Marlene Lenthang

California Attorney General Rob Bonta and Gov. Gavin Newsom said they will file a lawsuit today against Trump and Defense Secretary Pete Hegseth over the activation of the state's National Guard.

The Defense Department, under Trump's orders, redirected hundreds of National Guard troops from San Diego to Los Angeles without the governor's authorization and against the wishes of local law enforcement, the attorney general's office said in a news release.

The lawsuit will ask the court to declare the order unlawful because it "exceeds the federal government's authorities under the law and violates the Tenth Amendment."

The move came as ICE had conducted multiple immigration raids in downtown Los Angeles the two days prior that were met with multiple protests. The release said by the time the National Guard

SHOW MORE

---

18h ago / 11:08 AM PDT

## When have other presidents federalized the National Guard?

Megan Lebowitz

A president ordering the National Guard under federal command over objections from a state's governor is historically rare.

"It's highly, highly unusual and really outside our constitutional norms and traditions," said Laura Dickinson, a law professor at George Washington University.

Other presidents have federalized the National Guard during civil unrest.

President George H.W. Bush used the Insurrection Act to mobilize troops in Los Angeles during the 1992 riots when police officers accused of beating Rodney King were found not guilty.

SHOW MORE

---

19h ago / 10:16 AM PDT

## 'Unmistakable step toward authoritarianism': Newsom responds to Trump saying he should be arrested

A146

 Rebecca Shabad

Newsom responded in a post on X to Trump saying the Democratic governor should be arrested after Newsom dared border czar Tom Homan to do it.

"The President of the United States just called for the arrest of a sitting Governor," Newsom wrote.

"This is a day I hoped I would never see in America," he continued. "I don't care if you're a Democrat or a Republican this is a line we cannot cross as a nation – this is an unmistakable step toward authoritarianism."

19h ago / 10:01 AM PDT

### Trump says Homan should have Newsom arrested

 Rebecca Shabad

Trump said in brief remarks to reporters today that maybe Gavin Newsom should be arrested after the Democratic governor dared Trump's border czar Tom Homan to do so.

"I would do it if I were Tom," Trump said after landing back at the White House when asked about Newsom's dare. "I like Gavin Newsom ... he's a nice guy, but he's grossly incompetent."

Asked to describe the people protesting in L.A., Trump said the people who are causing the problems are "professional agitators" and "insurrectionists."

19h ago / 9:55 AM PDT

### SEIU president David Huerta charged

 Lindsay Good and Marlene Lenthang

David Huerta, president of the Service Employees International Union California, who was arrested during ICE protests in Los Angeles on Friday, has been federally charged with felony conspiracy to impede an officer.

The felony charge carries a statutory maximum sentence of six years in federal prison. He's currently in federal custody at the Metropolitan Detention Center in Los Angeles.

His initial appearance is set for today at 1:20 p.m. PT.

The SEIU said that Huerta, an American citizen and Los Angeles native, was injured and detained Friday as he was peacefully observing an ICE raid.

He was hospitalized for his injury and taken into custody. Mayor Karen Bass told NBC Los Angeles that Huerta was pepper-sprayed.



 David Huerta, president of SEIU California. *Ringo Chiu / AP file*

---

19h ago / 9:48 AM PDT

### Schumer calls on Trump to 'revoke his command' for the National Guard

 Frank Thorp V and Megan Lebowitz

Senate Minority Leader Chuck Schumer, D-N.Y., slammed Trump's order to deploy the National Guard as "unnecessary, inflammatory, and provocative."

"Trump should immediately revoke his command to use the National Guard, and leave the law enforcement to the governor and the mayor, who are more than capable of handling the situation," Schumer said in a statement. "Americans do not need or deserve this unnecessary and provocative chaos."

Democrats have repeatedly criticized Trump's response to the protests along similar lines as Schumer, framing the White House as trying to escalate the situation.

---

19h ago / 9:47 AM PDT

### Trump frames National Guard decision as 'a great decision'

 Megan Lebowitz

Trump said in a post on Truth Social that "we made a great decision in sending the National Guard" to respond to the protests in Los Angeles, claiming that the city would have otherwise "been completely obliterated."

He criticized Newsom and Bass, saying that they should have been telling the president that "you are so wonderful" and "we would be nothing without you."

Democrats have consistently criticized Trump ordering the National Guard to deploy, arguing that it escalated the situation. Newsom had objected to Trump sending the National Guard.

---

19h ago / 9:33 AM PDT

### Protesters plan more demonstrations today

 Daniella Silva

Immigration protests were planned today after dozens of people were arrested over the weekend.

Here are some of the demonstrations planned today, all Pacific time:

9 a.m. — Families demand release of their loved ones arrested in weekend raids. Ambiance Warehouse, 2415 E. 15th St., Los Angeles.

11 a.m. — L.A. student walkout and protest against National Guard deployment. After walking out of school, high school students will convene at the Federal Building downtown at 1 p.m.

Noon – National civil rights leaders to rally with hundreds to demand an end to the immigration raids. They will be joined by workers, elected officials and supporters to demand the release of David Huerta from federal detention and the end of ICE raids in the community, according to organizers.

---

20h ago / 9:08 AM PDT

### 42 Mexicans detained in L.A. raids, Mexican officials say

 Nicole Duarte and Marlene Lenthang

Forty-two Mexicans were detained in the ICE raids in Los Angeles, Mexico's foreign minister, Juan Ramón de la Fuente, said at a news conference today.

Of those, 37 are men and five are women, and all were identified and assisted by consular authorities.

Four people have been deported, two by previous removal orders and two voluntarily.

---

21h ago / 7:50 AM PDT

### What can Trump legally do to disperse L.A. immigration protests?

President Donald Trump ordered the deployment of 2,000 National Guard troops to Los Angeles to disperse immigration protests and California Gov. Gavin Newsom has questioned the legality of this move. NBC News legal analyst Danny Cevallos breaks down what Trump's legal options are for using federal troops.

---

21h ago / 7:45 AM PDT

### Border czar Tom Homan: Newsom and Bass 'haven't crossed the line, but they're not above the law either'

 Megan Lebowitz and Sarah Dean

President Donald Trump's "border czar" Tom Homan responded to California Gov. Gavin Newsom telling Homan to "arrest me" after the border czar threatened to arrest anyone obstructing immigration enforcement.

"I was clear, they haven't crossed the line, but they're not above the law either," Homan said in an interview on MSNBC's "Morning Joe," referring to Newsom and L.A. Mayor Karen Bass. "If they commit a crime, then certainly we'd ask for prosecution. That's what was happening. I never threatened to arrest Governor Newsom, so I'm not biting off of that."

Separately, when asked whether everyone arrested by ICE has a criminal record, Homan said, "Absolutely not."

"If ICE is there to arrest that bad guy and other aliens are there, we're going to arrest them," Homan said. "That's what sanctuary cities get."

Homan also criticized rhetoric about the protesters, pointing to incidents of violence.

"It's a matter of time before someone loses their life," he said. He added that throwing a Molotov cocktail at an officer "can certainly be met with deadly force."

---

22h ago / 6:29 AM PDT

### Newsom slams use of National Guard on ICE protesters in L.A.

 Liz Kreutz

California Gov. Gavin Newsom is criticizing President Donald Trump's use of the National Guard to crack down on demonstrators in Los Angeles who are protesting immigration raids by federal agents, saying it only inflames the situation. Meanwhile, border czar Tom Homan said officials who stand in the way of law enforcement operations could be arrested.

---

23h ago / 6:02 AM PDT

### Australian TV news reporter struck by rubber bullet while broadcasting

 Astha Rajvanshi

Lauren Tomasi, a news correspondent with Australia's Channel Nine, was broadcasting live from the protests on Sunday evening when she was struck in the leg by what appeared to be a nonlethal rubber bullet fired by law enforcement.

In the video, a police officer was seen turning toward Tomasi and her crew before firing a round in their direction. Tomasi appeared to yell in pain as she stumbled to reach for her injured leg while the camera swiveled in the other direction.

Tomasi later told Nine News Australia that she was "safe," adding that it had been "a really volatile day on the streets of L.A."

LAPD did not respond to a request for comment.

---

23h ago / 6:01 AM PDT

### Chicago congressman to speak out against Trump's deployment of National Guard troops

 Astha Rajvanshi

Rep. Jesús "Chuy" García, a Democrat from Chicago, will join immigrant rights leaders in the city later today to speak out against Trump's move to deploy hundreds of National Guard troops in Los Angeles, as widespread protests persist for a fourth day.

A press release for the news conference, scheduled for 10 a.m. ET, stated that "the deportations, forced disappearances, travel ban 2.0, attacks on welcoming jurisdictions, and the jailing of labor leaders, highlight the cruelty with which Trump and his administration are focused on harming communities and families."

In Chicago, protestors on Sunday held a rally in Pilsen to oppose the detention of at least 10 immigrants by ICE agents last week near a warehouse in the South Loop. Those arrested had "executable final orders of removal by an immigration judge, and had not complied with that order," ICE said in a statement.

---

1d ago / 5:05 AM PDT

### Rallies and protests planned for today

 Marlene Lenthang

The ACLU will lead a peaceful rally and protest in downtown Los Angeles today at noon PT to demand the end of ICE raids, as anger toward government immigration politics simmers.

SHOW MORE

---

1d ago / 4:35 AM PDT

### Miami-Dade Commission to vote on a proposal calling for police-ICE collaboration

Astha Rajvanshi

The Miami-Dade Commission is set to vote on a proposal Monday 9 a.m. ET that could block the county from releasing public records about the people detained within its jails.

The commission will hold a hearing at the Stephen P. Clark Government Center, where the proposal, if passed, would effectively disappear those detained into the system without public accountability for their whereabouts.

In exchange, the proposed contract will pay the county $25 per day for every person detained.

The proposal is part of an agreement with Immigration and Customs Enforcement under its 287(g) program to cooperate in apprehending and detaining those believed to be in the country illegally.

Each of Florida's 67 county jails has signed the agreement, with 590,000 of the country's nearly 11 million undocumented immigrants living in Florida, according to the latest Homeland Security Department estimates.

On Friday, Miami-Dade Commissioner Roberto Gonzalez said he would back the proposal in a post on X, adding that "Miami-Dade is not and will not be a sanctuary county."

---

1d ago / 4:19 AM PDT

**A149**

**The Trump admin says it ordered the deployment of 2,000 National Guard troops in L.A. to stop 'violent protests'**

Astha Rajvanshi

Around 300 National Guard members are stationed in downtown Los Angeles after President Donald Trump ordered the deployment of 2,000 troops for 60 days – a move condemned by California Gov. Gavin Newsom, who called it inflammatory. About 500 Marines are ready to deploy to respond to the protests.

SHOW MORE

---

1d ago / 3:40 AM PDT

**What sparked the L.A. protests?**

Astha Rajvanshi

Widespread protests in Los Angeles County erupted after Immigration Customs Enforcement (ICE) officers on Friday carried out raids in three locations across the city, where dozens of people were taken into custody.

California Gov. Gavin Newsom condemned the raids, calling them "chaotic federal sweeps" that aimed to fill an "arbitrary arrest quota."

But as L.A.'s sizable pro-immigrant organizations and labor groups continued to demonstrate Saturday, L.A. County Sheriff Robert Luna said federal law enforcement operations were "proceeding as planned" across the county.

Law enforcement used less-than-lethal munitions, as well as what appeared to be tear gas, to disperse crowds while multiple people were detained throughout the day.

The unrest also prompted President Donald Trump to deploy 2,000 National Guard troops to L.A. – a move that was condemned by Newsom and Mayor Karen Bass, who said at a news conference that the raids didn't increase peace and decrease crime but that they did push a wave of fear through a county where 1 in 3 are foreign-born.

"What we're seeing in Los Angeles is chaos that is provoked by the administration," Bass said, referring to Trump.

The protests continued for a third day on Sunday, with 56 people arrested so far, according to the police.

---

1d ago / 3:09 AM PDT

**British photographer says he was shot by police while covering L.A. protests**

Astha Rajvanshi

**A150**



 Protesters help photographer Nick Stern on Saturday.   Ethan Swope / AP

British photographer Nick Stern said he was hit with a 14mm high-velocity "sponge bullet" in his thigh while he was covering a stand-off between protestors and law enforcement in Los Angeles on

SHOW MORE

---

1d ago / 2:40 AM PDT

**Los Angeles Mayor Bass calls on protesters to demonstrate 'peacefully'**

 NBC News

Los Angeles Mayor Karen Bass said that ICE raids have created fear and unrest in the city and called on protesters to express their anger "peacefully."

---

1d ago / 2:21 AM PDT

**Chinese Consulate in L.A. urges Chinese citizens in the area to stay vigilant**

Astha Rajvanshi

The Chinese Consulate General in Los Angeles urged Chinese citizens in the region to follow safety protocol as law enforcement operations continue in the area in an official statement issued Monday.

Chinese citizens "stay vigilant, enhance personal safety precautions, avoid gatherings, crowded areas, or places with poor public security, and refrain from going out alone or at night," it added.

---

1d ago / 2:09 AM PDT

**Almost 60 arrested in L.A. so far, police say**

Astha Rajvanshi

At least 56 people were arrested in Los Angeles over the weekend, police said.

Capt. Raul Jovel from the LAPD's Central Division said that the California Highway Patrol had made 17 arrests while patrolling the 101 Freeway.

A151

Those arrested include a person who allegedly threw a Molotov cocktail at an officer and another who was accused of ramming a motorcycle into a line of officers, injuring one.



 Waymo cars burn during protests in Los Angeles on Sunday.   Mario Tama / Getty Images

Another driver was arrested after protesters chased a van near Union Station in downtown Los Angeles Sunday because, they said, it aimed at them. The van appeared to veer toward protesters gathered near the Edward R. Roybal Federal Building multiple times as it drove in circles, with what sounded like gunfire being heard from the van.

1d ago / 1:57 AM PDT                                                                                                       

## "BRING IN THE TROOPS!!!" says Trump

 Astha Rajvanshi

President Donald Trump on Sunday continued his harsh rhetoric against protestors in LA in a series of posts on Truth Social. Referring to reports from Los Angeles Police Chief Jim McDonnell that protestors in LA were "getting very much more aggressive," Trump once again called on troops from the National Guard to be deployed in the area.

"Looking really bad in L.A. BRING IN THE TROOPS!!!" he said in a post on Truth Social, adding, "ARREST THE PEOPLE IN FACE MASKS, NOW!" in a separate post.

About 300 National Guardsmen have been deployed on the ground in LA after being called to protect federal personnel and property for the first time by an American president.

1d ago / 1:40 AM PDT

## Clashes continue through the night in Los Angeles

Max Butterworth

Protesters wave Mexican flags last night following two days of clashes with law enforcement, sparked by a series of immigration raids in Los Angeles.

**A152**



——— Ringo Chiu / AFP - Getty Images

A153



—    Spencer Platt / Getty Images

---

1d ago / 1:26 AM PDT                                                                                                          CC

### Downtown L.A. declared an "unlawful assembly" area by the LAPD

 Astha Rajvanshi

The LAPD has declared the Civic Center area in downtown Los Angeles an "unlawful assembly," according to a post on X, adding that it had sent an alert to all cell phones in the area.

---

1d ago / 1:26 AM PDT                                                                                                          CC

### Stores in downtown L.A. are being looted, LAPD says

 Astha Rajvanshi

Local business owners reported that stores in the area of 6th Street and Broadway were being looted, Los Angeles police said in a post on X, adding that its officers were en route to the location to investigate.

In a separate post on X, the LAPD's Central Division requested all DTLA businesses or residents to photograph all vandalism, damage or looting so that "it can be documented by an official police report."

---

1d ago / 1:06 AM PDT                                                                                                          CC

### Trump's travel ban takes effect amid immigration tensions

 Jennifer Jett

Trump's new ban on travel to the U.S. by nationals from 12 mostly African and Middle Eastern countries took effect at 12:01 a.m. ET as protesters in Los Angeles clashed with law enforcement over immigration enforcement raids.

A proclamation Trump signed last week bars entry to nationals of Afghanistan, Myanmar, Chad, the Republic of Congo, Equatorial Guinea, Eritrea, Haiti, Iran, Libya, Somalia, Sudan and Yemen. Seven other countries – Burundi, Cuba, Laos, Sierra Leone, Togo, Turkmenistan and Venezuela – face heightened restrictions.

Trump said that nationals from the affected countries might pose risks related to terrorism and public safety and that many of the countries had high rates of people overstaying their visas.

The ban has been strongly condemned as discriminatory by groups that provide aid and resettlement to refugees, who say it will prevent many people from reuniting with family and jeopardize the safety of those fleeing conflict and persecution in countries such as Afghanistan.

---

1d ago / 1:06 AM PDT

### 'Tom, arrest me. Let's go.': Gov. Gavin Newsom responds to Newsom from Trump 'border czar'

 Jacob Soboroff

⊙ Reporting from LOS ANGELES

In an exclusive interview, Newsom said Trump "has created the conditions" surrounding the Los Angeles protests.

Newsom went on to call Trump's decision to deploy the National Guard "a manufactured crisis," then addressed White House "border czar" Tom Homan's threats of arrest.

"Tom, arrest me. Let's go," he said. The governor also plans to sue the Trump administration over its deployment of the National Guard.

---

1d ago / 1:06 AM PDT

### Waymo cars go up in flames during Los Angeles anti-ICE protests

 NBC News

At least five Waymo cars went up in flames as crowds protested after federal immigration raids. The driverless rides have been suspended in downtown Los Angeles.

---

NBC News

Phil Helsel, Dennis Romero and Marlene Lenthang contributed.

---

**A155**

**EXHIBIT O**



**SECRETARY OF DEFENSE**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

**JUN 0 7 2025**

MEMORANDUM FOR ADJUTANT GENERAL OF THE CALIFORNIA NATIONAL GUARD
THROUGH: THE GOVERNOR OF CALIFORNIA

SUBJECT: Calling Members of the California National Guard into Federal Service

   The President of the United States has called forth at least 2000 National Guard personnel into Federal service pursuant to section 12406 of title 10, U.S. Code, to temporarily protect U.S. Immigration and Customs Enforcement and other U.S. Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where protests against these functions are occurring or are likely to occur based on current threat assessments and planned operations. The President signed a copy of the attached memorandum today to effectuate the calling forth of these Service members.

   This memorandum implements the President's direction. Two thousand members of the California National Guard will be called into Federal service effective immediately for a period of 60 days. The Chief of the National Guard Bureau will immediately coordinate the details of the mobilization with the Adjutant General of the California National Guard, in coordination with the Chairman of the Joint Chiefs of Staff and Commander, U.S. Northern Command. The mobilized Service members will be under the command and control of the Commander, U.S. Northern Command.

Attachment:
As stated

cc:
Chairman of the Joint Chiefs of Staff
Chief, National Guard Bureau
Commander, U.S. Northern Command
Under Secretary of Defense for Policy

**A157**

June 7, 2025


MEMORANDUM FOR THE SECRETARY OF DEFENSE
                THE ATTORNEY GENERAL
                THE SECRETARY OF HOMELAND SECURITY

SUBJECT:        Department of Defense Security for the Protection
                of Department of Homeland Security Functions


Numerous incidents of violence and disorder have recently
occurred and threaten to continue in response to the enforcement
of Federal law by U.S. Immigration and Customs Enforcement (ICE)
and other United States Government personnel who are performing
Federal functions and supporting the faithful execution of
Federal immigration laws.  In addition, violent protests
threaten the security of and significant damage to Federal
immigration detention facilities and other Federal property.  To
the extent that protests or acts of violence directly inhibit
the execution of the laws, they constitute a form of rebellion
against the authority of the Government of the United States.

In light of these incidents and credible threats of continued
violence, by the authority vested in me as President by the
Constitution and the laws of the United States of America, I
hereby call into Federal service members and units of the
National Guard under 10 U.S.C. 12406 to temporarily protect ICE
and other United States Government personnel who are performing
Federal functions, including the enforcement of Federal law, and
to protect Federal property, at locations where protests against
these functions are occurring or are likely to occur based on
current threat assessments and planned operations.  Further, I
direct and delegate actions as necessary for the Secretary of
Defense to coordinate with the Governors of the States and the
National Guard Bureau in identifying and ordering into Federal
service the appropriate members and units of the National Guard
under this authority.  The members and units of the National
Guard called into Federal service shall be at least 2,000
National Guard personnel and the duration of duty shall be for
60 days or at the discretion of the Secretary of Defense.  In
addition, the Secretary of Defense may employ any other members

**A158**

2

of the regular Armed Forces as necessary to augment and support
the protection of Federal functions and property in any number
determined appropriate in his discretion.

To carry out this mission, the deployed military personnel may
perform those military protective activities that the Secretary
of Defense determines are reasonably necessary to ensure the
protection and safety of Federal personnel and property  The
Secretary of Defense shall consult with the Attorney General and
the Secretary of Homeland Security prior to withdrawing any
personnel from any location to which they are sent.  The
Secretaries of Defense and Homeland Security may delegate to
subordinate officials of their respective Departments any of the
authorities conferred upon them by this memorandum.

                    DONALD J. TRUMP

**EXHIBIT P**



**SECRETARY OF DEFENSE**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

JUN - 9 2025

MEMORANDUM FOR ADJUTANT GENERAL OF THE CALIFORNIA NATIONAL GUARD
THROUGH: THE GOVERNOR OF CALIFORNIA

SUBJECT: Calling Additional Members of the California National Guard into Federal Service

On June 7, 2025, the President of the United States called forth at least 2,000 National Guard personnel into Federal service pursuant to section 12406 of title 10, U.S. Code, to temporarily protect U.S. Immigration and Customs Enforcement and other U.S. Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where protests against these functions are occurring or are likely to occur based on current threat assessments and planned operations. The President signed a copy of the attached memorandum to effectuate the calling forth of these Service members. Also on June 7, 2025, I implemented that order by directing 2,000 members of the California National Guard be called into Federal Service for a period of 60 days (see attached memorandum).

This memorandum further implements the President's direction. An additional 2,000 members of the California National Guard will be called into Federal service effective immediately for a period of 60 days. The Chief of the National Guard Bureau will immediately coordinate the details of the mobilization with the Adjutant General of the California National Guard, in coordination with the Chairman of the Joint Chiefs of Staff and Commander, U.S. Northern Command. The mobilized Service members will be under the command and control of the Commander, U.S. Northern Command.

Attachments:
As stated

cc:
Chairman of the Joint Chiefs of Staff
Chief, National Guard Bureau
Commander, U.S. Northern Command
Under Secretary of Defense for Policy
Under Secretary of Defense for Personnel and Readiness

**A161**

June 7, 2025


MEMORANDUM FOR THE SECRETARY OF DEFENSE
                THE ATTORNEY GENERAL
                THE SECRETARY OF HOMELAND SECURITY

SUBJECT:        Department of Defense Security for the Protection
                of Department of Homeland Security Functions


Numerous incidents of violence and disorder have recently
occurred and threaten to continue in response to the enforcement
of Federal law by U.S. Immigration and Customs Enforcement (ICE)
and other United States Government personnel who are performing
Federal functions and supporting the faithful execution of
Federal immigration laws.  In addition, violent protests
threaten the security of and significant damage to Federal
immigration detention facilities and other Federal property.  To
the extent that protests or acts of violence directly inhibit
the execution of the laws, they constitute a form of rebellion
against the authority of the Government of the United States.

In light of these incidents and credible threats of continued
violence, by the authority vested in me as President by the
Constitution and the laws of the United States of America, I
hereby call into Federal service members and units of the
National Guard under 10 U.S.C. 12406 to temporarily protect ICE
and other United States Government personnel who are performing
Federal functions, including the enforcement of Federal law, and
to protect Federal property, at locations where protests against
these functions are occurring or are likely to occur based on
current threat assessments and planned operations.  Further, I
direct and delegate actions as necessary for the Secretary of
Defense to coordinate with the Governors of the States and the
National Guard Bureau in identifying and ordering into Federal
service the appropriate members and units of the National Guard
under this authority.  The members and units of the National
Guard called into Federal service shall be at least 2,000
National Guard personnel and the duration of duty shall be for
60 days or at the discretion of the Secretary of Defense.  In
addition, the Secretary of Defense may employ any other members

**A162**

2

of the regular Armed Forces as necessary to augment and support
the protection of Federal functions and property in any number
determined appropriate in his discretion.

To carry out this mission, the deployed military personnel may
perform those military protective activities that the Secretary
of Defense determines are reasonably necessary to ensure the
protection and safety of Federal personnel and property  The
Secretary of Defense shall consult with the Attorney General and
the Secretary of Homeland Security prior to withdrawing any
personnel from any location to which they are sent.  The
Secretaries of Defense and Homeland Security may delegate to
subordinate officials of their respective Departments any of the
authorities conferred upon them by this memorandum.


                         DONALD J. TRUMP



**SECRETARY OF DEFENSE**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

**JUN 0 7 2025**

MEMORANDUM FOR ADJUTANT GENERAL OF THE CALIFORNIA NATIONAL GUARD
THROUGH: THE GOVERNOR OF CALIFORNIA

SUBJECT: Calling Members of the California National Guard into Federal Service

The President of the United States has called forth at least 2000 National Guard personnel into Federal service pursuant to section 12406 of title 10, U.S. Code, to temporarily protect U.S. Immigration and Customs Enforcement and other U.S. Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where protests against these functions are occurring or are likely to occur based on current threat assessments and planned operations. The President signed a copy of the attached memorandum today to effectuate the calling forth of these Service members.

This memorandum implements the President's direction. Two thousand members of the California National Guard will be called into Federal service effective immediately for a period of 60 days. The Chief of the National Guard Bureau will immediately coordinate the details of the mobilization with the Adjutant General of the California National Guard, in coordination with the Chairman of the Joint Chiefs of Staff and Commander, U.S. Northern Command. The mobilized Service members will be under the command and control of the Commander, U.S. Northern Command.

Attachment:
As stated

cc:
Chairman of the Joint Chiefs of Staff
Chief, National Guard Bureau
Commander, U.S. Northern Command
Under Secretary of Defense for Policy

**A164**

**EXHIBIT R**



Los Angeles | News    Weather    Sports    Videos    KCAL News Shows                    62°

LOCAL NEWS

**Los Angeles immigration enforcement operations set to continue after weekend of protests, National Guard deployment**


Sean Fioresi, Camilo Montoya-Galvez
2025 / 11:38 PM PDT / KCAL News

National Guard troops arrived in downtown Los Angeles on Sunday after being ordered into the city by President Trump in response to a weekend of violent clashes between law enforcement officers and protesters triggered by immigration enforcement operations in the area on Friday.

Protesters clashed with soldiers throughout the afternoon and evening hours of Sunday after a crowd gathered near the Metropolitan Detention Center downtown. Images captured by CBS News Los Angeles showed members of the National Guard using what appeared to be tear gas and firing non-lethal rounds toward some groups of demonstrators.

... County including in the Westlake District, downtown L.A. and Paramount, and have escalated to violence on ... by Immigration and Customs Enforcement on Friday. A federal law enforcement official told CBS News that multiple ... ng confrontations with protesters on Friday and Saturday.

... Chief Jim McDonnell said 39 people had been arrested in total – 29 on Saturday and 10 on Sunday. McDonnell also ... was slow to respond to the unrest.


**Be the first to know**
Get browser notifications for breaking news, live events, and exclusive reporting.

**A166**

"We can't participate in any way in civil immigration enforcement," McDonnell said, noting that the department must comply with the California Values Act, also known as SB 54, which prohibits local and state law enforcement agencies from assisting federal immigration enforcement actions.



See More

00:00                                                                                                                    02:00

"Federal partners have been reticent to provide information to us before something happens because of that reason," McDonnell said.

The Trump administration has made it clear that immigration enforcement will continue despite the ensuing violence. Democratic U.S. Rep. Nanette Barragán, who represents parts of L.A.'s South Bay, told CBS News that ICE enforcement and removal operations are expected daily for the next 30 days in L.A. County.

Mr. Trump announced Saturday night that he'd deploy the guard in response to the protests. In a post to his Truth Social late Saturday night local time, Mr. Trump called the events in L.A. "two days of violence, clashes and unrest."

He posted again on Sunday, saying that California Gov. Gavin Newsom and L.A. Mayor Karen Bass should "apologize to the people of Los Angeles for the absolutely horrible job that they have done, and this now includes the ongoing L.A. riots."

"These are not protesters, they are troublemakers and insurrectionists," the post said. "Remember, NO MASKS!"

**Be the first to know**

Get browser notifications for breaking news, live events, and exclusive reporting.

**A167**



Members of the National Guard stand guard outside the Metropolitan Detention Center in downtown Los Angeles, California on June 8, 2025.
FREDERIC J. BROWN/AFP VIA GETTY IMAGES

A Presidential Memoranda issued Saturday stated that at least 2,000 National Guard troops were going to be deployed. The majority of the soldiers are from the California National Guard, a Defense Department official told CBS News.

The U.S. military's Northern Command also confirmed to CBS News that 300 National Guard troops were in the Los Angeles area on Sunday, specifically in Paramount, Compton and the downtown area. They also said that 500 active-duty U.S. Marines based at Twentynine Palms were in "prepared to deploy" status and were ready to augment the National Guard if ordered to do so.

Newsom on Saturday criticized Mr. Trump's military deployment, calling it "purposefully inflammatory" in a post to X. In another post he said Mr. Trump was "escalating the situation."

"The federal government is taking over the California National Guard and deploying 2,000 soldiers in Los Angeles – not because there is a shortage of law enforcement, but because they want a spectacle," he said in another post. "Don't give them one."

He formally requested that Mr. Trump rescind the deployment of troops to L.A. in a letter addressed to Defense Secretary Pete Hegseth, saying there was "no need" for the National Guard.

"State and local authorities are the most appropriate ones to evaluate the need for resources to safeguard life and property," Newsom's letter said. "Indeed, the decision to deploy the National Guard, without appropriate training or orders, risks seriously escalating the situation."

On Sunday afternoon, Newsom's office confirmed that he was in Los Angeles. He met with Los Angeles Police Chief Jim McDonell and L.A. County Sheriff Robert Luna, shown in a picture posted to his X account.

"We're here to keep the peace – not play into Trump's political games," the post said.

On Monday morning, Newsom confirmed plans to sue the Trump administration and accused the president of illegally activating the National Guard.



**Be the first to know**
Get browser notifications for breaking news, live events, and exclusive reporting.

**A168**



Watch CBS News

A protester carries a Mexican flag as L.A. County Sheriff deputies form a law enforcement line to keep demonstrators from advancing after ICE raids at a nearby Home Depot and the Garment District brought out resistance from Los Angeles residents on June 7, 2025 in Compton, California.

GINA FERAZZI/LOS ANGELES TIMES VIA GETTY IMAGES

Bass called the deployment of the National Guard a "chaotic escalation" of the situation in a post to X.

"The fear people are feeling in our city right now is very real - it's felt in our communities and within our families and it puts our neighborhoods at risk," she said in part. "This is the last thing that our city needs, and I urge protestors to remain peaceful."

Former Vice President Kamala Harris took to X to share a statement on Sunday afternoon.

"Los Angeles is my home. And like so many Americans, I am appalled at what we are witnessing on the streets of our city. Deploying the National Guard is a dangerous escalation meant to provoke chaos," her statement said.

Standing outside the Metropolitan Detention Center before violent clashes began on Sunday, Rep. Maxine Waters, who represents parts of South L.A., called Mr. Trump's deployment of the National Guard a "disruption."

"People have to stand up for what is right," she said.

In a statement to CBS News, an ICE spokesperson said immigration enforcement operations have resulted in the arrest of a "domestic abuser" and a "child rapist."

"Irresponsible politicians continue to push dangerous and misleading rhetoric that puts communities and law enforcement at risk," the statement reads. "Even the Los Angeles Police Departments referred to violent riots yesterday as 'peaceful protests.' Americans can look at the videos and images and see with their own eyes that they are dangerous not 'peaceful.'"

## Protesters clash with law enforcement again

For the third straight day, some protesters and activists gathered in downtown L.A. to protest the ongoing operations and presence of federal authorities in the city.

The situation appeared calm to start on Sunday, with CBS News Los Angeles reporters at the scene reporting no signs of conflict until about 3 p.m., when a large group of demonstrators marched from the steps of L.A. City Hall to the federal building, where the detention center is located.



**Be the first to know**

Get browser notifications for breaking news, live events, and exclusive reporting.

**A169**



A massive crowd of protesters in downtown Los Angeles on June 8, 2025, as demonstrations against immigration operations continued for third straight day.

KCAL NEWS

They began to clash with the large group of federal agents located outside of the building, including some who looked to be members of the National Guard. In response to the escalation, which police said involved people throwing projectiles and concrete in their direction, the LAPD issued a Tactical Alert for the entire city.

"An UNLAWFUL ASSEMBLY has been declared for the area of Alameda between 2nd St and Aliso St. A DISPERSAL ORDER has been issued. Arrests are being made. To our media partners, please keep a safe distance from active operations," said a post on X by LAPD's Central Division.

Two officers were injured when two motorcyclists tried to breach the LAPD skirmish line in front of the detention center, police said. Both of those people were detained.

Several blocks away, CBS News Los Angeles reporters saw a smaller crowd of people vandalizing as many as six Waymo driverless vehicles in the area. They were seen spray painting the cars, throwing objects and jumping on the windshields.

A short time later, all six of those vehicles were set on fire as the large crowd looked on. Plumes of smoke billowed over the downtown landscape.



**Be the first to know**

Get browser notifications for breaking news, live events, and exclusive reporting.



A Waymo vehicle on fire in the midst of protests in downtown Los Angeles.

KCAL NEWS

The flames from the vehicles continued to burn for some time and there were several small explosions seen in footage filmed from CBS News Los Angeles' helicopter.

While the demonstrations continued, some people used chairs, garbage bins and street signs to block the road at Temple and Main Street. A few blocks away a Metro bus was stopped by demonstrators. Some were seen spray painting the sides with anti-ICE messages from helicopter footage.

The crowd moved into the city's Civic Center at around 5 p.m. Some demonstrators were seen setting fireworks from the CBS News Los Angeles helicopter as LAPD officers on horseback attempted to push the crowd back.

A little before 9 p.m., LAPD's Central Division said on X that "Downtown Los Angeles has been declared as an UNLAWFUL ASSEMBLY. You are to leave the Downtown Area immediately."

The crowd of demonstrators began to move into the LA Live area, near Crypto.com Arena, at 9:30 p.m., LAPD officers said. They were blocking traffic on Figueroa Street and 11th Street.

They moved through the city despite the area-wide dispersal order, again lighting fireworks and throwing projectiles at police vehicles driving by. Several fires were set in dumpsters and trash bins and at least one store had windows shattered by alleged looters. Dozens of buildings were tagged with graffiti, including the LAPD Headquarters, the U.S. Courthouse and the old Los Angeles Times building.

Footage from the CBS News Los Angeles helicopter showed that multiple windows of the police headquarters had been shattered as well.

As the events continued, both LAPD and LASD personnel could be seen working to quell the situation. Sheriff Luna said that more than 100 deputies were deployed to assist both LAPD and CHP at around 6 p.m., and that mutual assistance was also requested from the California Office of Emergency Services.

Separately, San Francisco police reported 60 arrests Sunday night. Police said people were taking part in "First Amendment activities" but then began committing crimes "ranging from assault to felony vandalism and causing property damage." An unlawful assembly was declared but several people kept "engaging in illegal activity," police said. Two officers were hurt, though the injuries weren't life threatening. Police said the demonstrators then vandalized buildings, a police cruiser and other property, and officers began arresting people who didn't comply with the dispersal order.



**Be the first to know**

Get browser notifications for breaking news, live events, and exclusive reporting.

**A171**



Demonstrators flood the 101 Freeway as immigration operation protests continue for third day in Los Angeles.

KCAL NEWS

### Crowd swarms L.A.'s 101 Freeway

Just before 4 p.m., demonstrators moved onto the 101 Freeway, blocking traffic on the busy thoroughfare. They blocked the Aliso Street offramp and several lanes while hundreds of others watched from the Main Street overpass.

In response, the California Highway Patrol closed the entire stretch of freeway that runs through the downtown area. Dozens of CHP officers were seen as they also entered the freeway, stopping under the overpass in a line. They completely overtook southbound lanes, moving protesters back, though the majority of the crowd remained on the other side of the freeway.

Several people were seen being taken into custody from the CBS helicopter's aerial view. Officers deployed multiple smoke-filled canisters at the feet of the crowd. Some people attempted to kick the canisters back in the direction of law enforcement.

The crowd was completely moved from the road by 5 p.m.

With multiple CHP patrol vehicles still parked on the freeway, people began to throw objects over the side of the overpass. They were seen throwing street signs, fireworks, e-scooters and pieces of concrete with the CBS News Los Angeles helicopter overhead.

Some of the cars sustained visible damage before officers began deploying non-lethal canisters of smoke towards the crowd. Though they briefly dispersed, they returned to the area and continued to throw items, one of which caught a CHP vehicle on fire.

As some officers tried to get into their vehicles, some of the people were seen throwing cement in their direction.

Because of the debris and damaged cars now in the road, the southbound 101 Freeway was expected to remain closed until further notice, LAPD said. It's unclear when the cleanup process would begin.

In nearby Pasadena, a small gathering began Sunday afternoon after federal officers were spotted at a local hotel, a city spokesperson confirmed.

Pasadena Mayor Victor M. Gordo said in a statement that no enforcement activity was confirmed.

"We understand the anxiety and fear that these reports can create for many in our community," he said. "I urge our community to remain calm, united, and peaceful, _____ ___ ____ __ _____ight to peacefully assemble and express ourselves is a fundamental part of who we are–not just as Pasadenans, but as



**Be the first to know**

Get browser notifications for breaking news, live events, and exclusive reporting.

_____ns were conducted across L.A., primarily in the Westlake District, downtown and South L.A., ICE officials confirmed.

_____ ____ _e arrest of 44 unauthorized immigrants, ICE told CBS News on Sunday. An additional 77 were arrested around the

The exact charges of those arrests were not yet clear as of Sunday afternoon.

ICE confirmed to CBS News Los Angeles that four federal search warrants were served at three locations in L.A. on Friday night. As news of those warrants spread, protests broke out. The most notable of which was Friday night, and took place outside the Federal Building in downtown L.A. after demonstrators learned that detainees were allegedly being held inside.

As tensions escalated and some protesters threw objects toward law enforcement, the Los Angeles Police Department eventually issued an unlawful assembly declaration and a dispersal order. Dozens of officers sporting riot gear and shields formed a skirmish line.

A federal law enforcement official with knowledge of the operations told CBS News that ICE requested assistance from LAPD multiple times over the course of Friday night. That same official said it took local authorities more than two hours to honor that request, although a senior city official in L.A. told CBS News that it took LAPD 55 minutes to respond, not two hours.



A car burns during a protest in Compton, Calif., Saturday, June 7, 2025, after federal immigration authorities conducted operations.
ERIC THAYER/AP

On Saturday, protests centered in on the city of Paramount after ICE and other federal law enforcement officers were spotted. Tricia McLaughlin, a spokesperson for the Department of Homeland Security, said in a statement that there was no ICE "raid" on Saturday in Paramount, but instead the agents were staging at an office.

The protests in Paramount eventually spilled over into Compton, where hundreds of demonstrators gathered around a car that was set on fire in the middle of the intersection of Alondra Boulevard and Atlantic Avenue, near Dale's Donuts.

Images captured at the scene by CBS News Los Angeles showed law enforcement deploying what appeared to be tear gas to disperse crowds and shooting non-lethal munitions at some protesters.

A federal law enforcement official told CBS News that deputies with LA County Sheriff's Office are now assisting ICE officials with perimeter protection, although they will not be assisting with any immigration enforcement efforts.

contributed to this report.

 **Be the first to know**
Get browser notifications for breaking news, live events, and exclusive reporting.

on of child porn

2 including toddler found dead, Minneapolis police suspect murder-suicide

**A173**

 Two injured in shooting in St. Paul Friday night

In: **Los Angeles**    **Immigration**    **U.S. Immigration and Customs Enforcement**

**Austin Turner**
Austin Turner is a web producer at CBS Los Angeles. An Inland Empire native, Austin earned a degree in journalism from San Jose State University in 2020. Before joining CBS in 2025, he worked at KTLA, the San Jose Mercury News, the Sedona Red Rock News and various freelance outlets as a sports reporter.

© 2025 CBS Broadcasting Inc. All Rights Reserved.

### The Business Sneaker Loved by CEOs and NFL Stars
Premium full-grain leather and marathon running shoe technology providing first class comfort all day long. Loved and worn by NFL athletes and coaches. Shoes much more comfortable than traditional dress shoes.
PAID   WOLF & SHEPHERD   Shop Now

### Medical Mystery Solved: Dementia and Memory Loss Has Been Linked To This Common Thing.
Here's What You Need to Know
PAID   VITALGETHEALTH   Click Here

### Costco Shoppers Say This Wrinkle Cream Is "Actually Worth It"
PAID   THE SKINCARE MAGAZINE

### Seniors Born 1941-1979 Receive 55 Benefits This Month if They Ask
Ridiculous benefits seniors are entitled to in 2025, but often forget to claim.
PAID   WALLETJUMP   Learn More

### After 35 Years, Her Jewelry Is Nearly Gone
For over 35 years, Lana Green spent her days crafting delicate, one-of-a-kind jewelry in her cozy workshop. Each piece was made by hand, infused with care, and gifted to close friends and family
PAID   THE HERITAGE JOURNAL   Read More

### New Hope for Neuropathy Sufferers
Learn how this simple series of steps helped regain a life from neuropathy. Improve your mobility today.
PAID   NEUROPATHYGUIDE   Click Here

### A stress-relief game that everyone around me is playing
If you need to kill time on your computer, this popular strategy game is a must-try.
PAID   ELVENAR - PLAY ON BROWSER   Learn More

### Swollen Prostate? Do This Every Morning And Feel The Change In Just Days!
Avoid Frequent Bathroom Trips at Night
PAID   HEALTH BENEFITS

### Social Security Recipients Under $2,384/Mo Now Entitled To 12 "Kickbacks" (Tap for List)
Senior Benefits And Discounts Are One Of The Few Truly Great Perks That Come With Getting Older
PAID   HEALTHYWALLET   Learn More

### Chuck Norris Begs Seniors: Avoid These 3 Foods Like The Plague
This is a must watch for anyone over 60
PAID   ROUNDHOUSE PROVISIONS   Learn More

### Memory Getting Worse? Top Neuroscientist Points to This Common Behavior
Here's What You Need to Know
PAID   VITALGETHEALTH   Click Here

### Top Picks: The $25 "Makeup Stick" Seniors Swear By
This Miracle Complexion Concealer Is Made For Your 50's, 60's, 70's, And Beyond…
PAID   BRUNCHESNCRUNCHES   Learn More

### We Tested 17 Anti-Aging Creams - Only 1 Delivered Jaw Dropping Results
Beat the Rush: The $42 Serum Costco Shoppers Swear By
PAID   BEST OF BEAUTY   Learn More

### Shoe CEO Drops Business Sneakers Taking The NFL By Storm
Finally, A Comfortable Shoe Thats Fit For The Office. With Comfort, Luxury, & Versatility Engineered Into Every Step, Wolf & Shepherd Shoes Are Specifically Designed For Those Who Want To Lead The Pack.
PAID   WOLF & SHEPHERD   Shop Now

### Large Prostate Has Nothing To Do With Age: Just Stop Doing This One Common Habit
Discover The Results
PAID   MENS HEALTH   Learn More

### 5 This, Choosing for Seniors on Social Security in 2025
... That Come With Getting Older
PAID   HEALTHYWALLET   Learn More

### ... Wreath Decoration is Taking Los Angeles By Storm
PAID   SOLYMALL   Shop Now

### ... At Costco (Find Out Why)
PAID   THE SKINCARE MAGAZINE


**Be the first to know**
Get browser notifications for breaking news, live events, and exclusive reporting.

Watch CBS News

**Study Shows Surprising Link Between Aging & your Pillowcase**

PAID  BLISSY  Learn More

**Chuck Norris: After 60, I Avoided These 3 Foods Like The Plague**

PAID  ROUNDHOUSE PROVISIONS  Learn More

**Side Sleepers With Neck Pain: Try This "Pillow Trick" Tonight**

PAID  SLEEP DIGEST PUBLICATION  Learn More

**Cardiologists: How to Quickly Lose a Hanging Tummy**

Discover how a simple purple peel trick helps reduce stubborn belly fat effectively.

PAID  HEALTH WELLNESS JOURNAL  Watch More

**Low-Cost Senior Apartments in Los Angeles (Take a Look)**

PAID  PAQARENA | SENIOR HOUSING | SEARCH ADS  Learn More

**Neurologists Amazed: These Barefoot Shoes Help Seniors Lose Weight and Live a Life with Less Pain**

Barefoot Shoes are the Ultimate Weight Loss Tool for 2025.

PAID  BAREFOOT VITALITY  Learn More

**Doctor Sued for Leaking the Egg Ritual That Causes Rapid Weight Loss**

PAID  TOLIFETV25.COM

**Eat 1 Teaspoon Every Night, See What Happens A Week Later [Video]**

Forget Strict Diets, Use This 7 Second Trick To Burn Belly Fat Faster!

PAID  HEALTH BENEFITS

**Featured**

Tony Award Winners

Los Angeles Protests

NBA Playoffs Schedule

2025 NHL Playoff Schedule

**Follow Us On**

YouTube

Facebook

Instagram

TikTok

X

**CBS News Los Angeles**

Meet the Team

Program Guide

Contests & Promotions

Advertise With Us

Sitemap

**Regulation**

Public File for KCBS-TV

Public File for KCAL-TV

Public Inspection File Help

FCC Applications

EEO Report

**Be the first to know**

Get browser notifications for breaking news, live events, and exclusive reporting.

A175

Company
Watch CBS News
About Paramount
Advertise With Paramount
Join Our Talent Community
Help
Feedback

©2025 CBS Broadcasting Inc. All Rights Reserved.

**EXHIBIT S**



# OFFICE OF THE GOVERNOR

June 10, 2025

Hon. Pete Hegseth
Secretary of Defense
Washington, DC 20301

<u>Via email only</u>

Re:     Federalization of the California National Guard

Dear Secretary Hegseth:

        Yesterday, you issued a memorandum calling an additional 2,000 members of the California National Guard into federal service. This was done without going **"through the governor[]"** as is statutorily required under section 12406 of title 10 of the United States Code, and without **"coordinat[ion] with the Governor[] of the State[]"** as instructed in the President's June 7 memorandum.

        Although you notified this office of the action once it was taken, the Governor of California was given no opportunity to provide or withhold his consent, nor, at a minimum, to consult with the President or you as to which service members and in what number should be called, and for what purposes and what period of time. And to be clear, the Governor does not consent to this unlawful usurpation of his authority or to this unnecessary and counterproductive deployment of service members in our communities. Together with the California Attorney General, the Governor filed a lawsuit to stop these unlawful abuses of authority.

        The Governor wishes to reiterate that Los Angeles has a robust presence of State and local law enforcement responding swiftly to the small number of protestors who are acting violently and breaking the law. These agencies are regularly entrusted to police and enforce the law in a region of over 9 million people and are fully capable of responding to these recent sporadic acts of civil disobedience and violence, which are no different in kind from instances of

civil unrest that impact communities throughout the United States from time to time.

This latest usurpation **of the Governor's authority is even more egregious** given that you have not even committed at least 1600 of the 2000 service members you unlawfully federalized only two days earlier. As has been widely **reported, the federal government's organizatio**nal failure has meant that service members who were deployed arrived with no federal funding for food, water, fuel or lodging.

There is no need for the National Guard to be deployed on the streets of Los Angeles. Allow state and local authorities to do their work of restoring order and deescalating, without the added burden of military forces whose mere presence fans the flames. Rescind your orders and return the National Guard to its rightful control by the State of California.

Sincerely,

David Sapp
Legal Affairs Secretary
Office of Governor Gavin Newsom

cc.    California Attorney General Rob Bonta (via email only)

2

**A179**

1   ROB BONTA
    Attorney General of California
2   MARISSA MALOUFF
    JAMES E. STANLEY
3   Supervising Deputy Attorneys General
    NICHOLAS ESPÍRITU
4   LUKE FREEDMAN
    ROBIN GOLDFADEN
5   BRENDAN M. HAMME
    LORRAINE LOPEZ
6   KENDAL MICKLETHWAITE
    MEGAN RICHARDS
7   Deputy Attorneys General
    LAURA L. FAER
8   Acting Senior Assistant Attorney General
    1515 Clay St.
9   Oakland, CA 94612
    Telephone: (510) 879-3304
10  E-mail: Laura.Faer@doj.ca.gov
    *Attorneys for Plaintiffs*

11

12                  IN THE UNITED STATES DISTRICT COURT

13                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

14

15

16  **GAVIN NEWSOM, IN HIS OFFICIAL**
    **CAPACITY AS GOVERNOR OF THE**
17  **STATE OF CALIFORNIA; STATE OF**          **DECLARATION OF BRIAN**
    **CALIFORNIA,**                            **OLMSTEAD**
18
                              Plaintiffs,       Date:
19                                              Time:
                                                Courtroom:
20          v.                                  Judge: Charles R. Breyer
                                                Trial Date:
21  **DONALD TRUMP, IN HIS OFFICIAL**          Action Filed: 6/9/2025
    **CAPACITY AS PRESIDENT OF THE**
22  **UNITED STATES; PETE HEGSETH, IN**
    **HIS OFFICIAL CAPACITY AS SECRETARY**
23  **OF THE DEPARTMENT OF DEFENSE;**
    **U.S. DEPARTMENT OF DEFENSE,**
24
25  Defendants.

26

27

28
                                    1

**A180**

# DECLARATION OF BRIAN OLMSTEAD

I, Brian Olmstead, declare as follows:

1.    I am over the age of 18 years and a U.S. citizen. I know the following facts based on my own personal knowledge and on my review of information and records gathered by California Governor's Office of Emergency Services (Cal OES) staff in the ordinary course of business, and if called as a witness, I could and would testify competently to the matters set forth below.

2.    I currently serve as an Assistant Chief in the Law Enforcement Branch (LEB) of the California Governor's Office of Emergency Services (Cal OES). As an Assistant Chief, my duties include, but are not limited to: implementing and coordinating California's Law Enforcement Mutual Aid System (Mutual Aid System) in case of a natural or war-caused disaster, civil disturbance, mass casualty event, or homeland security incident; consulting with and advising local law enforcement organizations in the utilizing California's Mutual Aid System; assisting in the coordination of emergency law enforcement activities during the time of a natural or war-caused disaster or civil disturbance; and providing planning and training guidance for law enforcement and homeland security programs.

3.    California's Law Enforcement Mutual Aid System was established in 1961 and has been used to restore order during emergencies, including civil unrest, and to provide assistance to local agencies during other unusual events or catastrophic disasters. As a component of the Standardized Emergency Management System (SEMS), the Mutual Aid System is based on four organizational levels: cities, counties, regions, and the State. The state is divided into seven Law Enforcement Mutual Aid Regions. Cal OES Law Enforcement Branch has Assistant Chiefs assigned to each of the seven regions for direct coordination with law enforcement chiefs and sheriffs within each region. I am the

2

Declaration of Brian Olmstead

1    Assistant Chief assigned to Region 1, which is comprised of Los Angeles and

2    Orange Counties.

3        4.    The County Sheriff serves as the "Operational Area Mutual Aid

4    Coordinator." In each of the seven regions, one Sheriff, elected by his or her peers,

5    serves as the Regional Mutual Aid Coordinator (RMAC). The Los Angeles County

6    Sheriff is the Regional Mutual Aid Coordinator for Region 1.

7        5.    Under the Mutual Aid System, within an operational area, adjacent or

8    neighboring law enforcement agencies will assist one another. Should an event

9    require assistance from outside the county, the region will provide requested

10   assistance to the impacted county. If the combined resources of the region are

11   insufficient to cope with the incident, the Regional Coordinator contacts the Cal

12   OES Law Enforcement Branch for coordination of resources.

13       6.    As Assistant Chief, on June 6, 2025, I began monitoring the protests

14   occurring in the city of Los Angeles at the Metropolitan Detention Center that

15   began that day, involving individuals protesting immigration enforcement activities

16   being carried out by U.S. Immigration and Customs Enforcement (ICE). I was in

17   regular communication with representatives of the Los Angeles Police Department

18   (LAPD) and the Los Angeles County Sheriff's Department (LASD) regarding the

19   situation. On June 6, 2025, Both LAPD and LASD informed me that they were not

20   in need of any additional resources, whether additional personnel or equipment. I

21   understand that LAPD had reassigned about 150 additional officers to the area

22   around Metropolitan Detention Center. Based on my observations and experience,

23   which includes serving 32 years as a peace officer with the Santa Barbara County

24   Sheriff's Department, local law enforcement was effectively managing the

25   situation.

26       7.    I continued to monitor activities occurring in the city and county of Los

27   Angeles on June 7, 2025, as it appeared that federal immigration enforcement

28   activities were continuing and, thus, protests would continue. Protests did continue

3

**A182**

1  at the Metropolitan Detention Center, as well as in the cities of Paramount and

2  Compton. Nonetheless, I did not receive any requests for mutual aid, which is an

3  indication that local law enforcement agencies felt they were capable of controlling

4  the situation. I understand that LASD provided at least 200 deputies to respond to

5  the protests in Paramount and Compton. I further understand that part of the

6  assistance provided by LASD included their Sheriff's Response Team – a team

7  with specialized training in handling civil unrest – as well as Mobile Field Force.

8      8.      As I was traveling to the Los Angeles County Sheriff's Department

9  Operations Center, at about 5:15 PM on June 7, I was contacted by representatives

10  of both LAPD and LASD asking me if the National Guard was being deployed and

11  who was deploying them. Typically, during fires or other disasters, agencies that

12  exhaust their local resources and need assistance will submit a request through the

13  Mutual Aid System requesting the assistance of the National Guard to provide

14  assistance in conducting activities like staffing traffic control points to enable

15  officers/deputies to focus on other law enforcement activities. As neither LAPD nor

16  LASD had made such a request, it was unclear to them how the National Guard was

17  being activated.

18      9.      During the evening of June 7, I observed the protest activities and law

19  enforcement response from the LASD Department Operations Center. Based on my

20  observations and conversations with LAPD, the protest activities at the

21  Metropolitan Detention Center were fairly in control with some incidents with

22  protesters targeting the Metropolitan Detention Center. After federal officers

23  pushed protesters away from the detention center, LAPD moved in front of the

24  federal officers' skirmish line and declared an unlawful assembly. By 2:15 a.m.,

25  most of the protestors had left the area. Most activity that evening was focused in

26  the cities of Paramount and Compton, where the LASD deployed additional

27  resources to assist with crowd movement and control, as federal officers moved

28  protesters away from federal property and onto the streets, which are within the

4

Declaration of Brian Olmstead

**A183**

1   jurisdiction of local law enforcement. At that time, some protesters unfortunately

2   began to engage in dangerous behavior such as throwing rocks and other objects,

3   including a Molotov Cocktail at deputies damaging vehicles, burning a vehicle,

4   looting a gas station, and vandalizing property. Two deputies were injured during

5   the incident. Local law enforcement was able to bring the situation under control

6   and it is my understanding that by 4:00 a.m. on the morning of June 8, the LASD

7   demobilized its teams, after it de-escalated the situation.

8       10.   In my estimation, there were approximately 300 to 400 protesters present

9   on the evening of June 7 in the cities of Paramount and Compton, and that at least

10  11 individuals were arrested for engaging in unlawful behavior that evening related

11  to the protests in Los Angeles, Paramount, and Compton.

12      11.   On the morning of Sunday, June 8, I was contacted by individuals with

13  the LAPD and LASD asking if the National Guard had arrived. I subsequently

14  learned that they had arrived in the area, but it was not clear what role they were to

15  play or what orders they were provided. In addition, there were concerns that

16  having been deployed so quickly, the National Guard members did not have the

17  equipment or training necessary to handle the situation. Without such equipment

18  and training, and without any police powers, the National Guard members would be

19  limited in how they could respond to protesters when equipped only with a rifle, a

20  baton, and a shield.

21      12.   As the day progressed, there was a significant increase in the number of

22  protesters in the area, and in particular at the Metropolitan Detention Center, where

23  the National Guard were deployed. It appeared that the crowd at the Metropolitan

24  Detention Center had increased significantly from the prior days' protest. LAPD

25  estimated over 3,500 protesters. In addition, many of the protesters appeared angry

26  that the National Guard had been federalized and was now present in their city. The

27  presence of the National Guard seemed to only inflame the protesters further.

28

**A184**

Declaration of Brian Olmstead

1    13.   In addition to LAPD and LASD, the California Highway Patrol also

2  deployed to the protest area as protestors had blocked Highway 101 after moving

3  away from the Metropolitan Detention Center. Additionally, law enforcement

4  mutual aid resources were requested from several law enforcement agencies both

5  inside and outside of Los Angeles County to assist with controlling and addressing

6  the civil unrest.

7    14.   I understand that at least 42 individuals were arrested related to their

8  conduct during protests on June 8, with at least 19 of those individuals having been

9  arrested by the CHP.

10    15.   Given that the number of protesters has increased since the arrival of the

11  National Guard, LAPD is now seeking the assistance of additional officers and

12  these needs are being met by local law enforcement through California's Law

13  Enforcement Mutual Aid System.

14

15    I declare under penalty of perjury under the laws of the United States that the

16  foregoing is true and correct.

17    Executed on June 10, 2025, at Los Angeles, California.

18

19                              Brian Olmstead

20

21

22

23

24

25

26

27

28

**A185**

1   ROB BONTA
    Attorney General of California
2   MARISSA MALOUFF
    JAMES E. STANLEY
3   Supervising Deputy Attorneys General
    NICHOLAS ESPÍRITU
4   LUKE FREEDMAN
    ROBIN GOLDFADEN
5   BRENDAN M. HAMME
    LORRAINE LOPEZ
6   KENDAL MICKLETHWAITE
    MEGAN RICHARDS
7   Deputy Attorneys General
    LAURA L. FAER
8   Acting Senior Assistant Attorney General
    1515 Clay St.
9   Oakland, CA 94612
    Telephone: (510) 879-3304
10  E-mail: Laura.Faer@doj.ca.gov
    *Attorneys for Plaintiffs*

11

        IN THE UNITED STATES DISTRICT COURT

12

        FOR THE NORTHERN DISTRICT OF CALIFORNIA

13

14

15

16  **GAVIN NEWSOM, IN HIS OFFICIAL
    CAPACITY AS GOVERNOR OF THE**
17  **STATE OF CALIFORNIA; STATE OF        DECLARATION OF PAUL S. ECK
    CALIFORNIA,**
18                                          Date:
                            Plaintiffs,     Time:
19                                          Courtroom:
                     **v.**                 Judge: Charles R. Breyer
20                                          Trial Date:
                                            Action Filed: 6/9/2025
21  **DONALD TRUMP, IN HIS OFFICIAL
    CAPACITY AS PRESIDENT OF THE**
22  **UNITED STATES; PETE HEGSETH, IN
    HIS OFFICIAL CAPACITY AS SECRETARY**
23  **OF THE DEPARTMENT OF DEFENSE;
    U.S. DEPARTMENT OF DEFENSE,**
24

25  Defendants.

26

27

28

                            1

                         **A186**                    Declaration of Paul S. Eck

# DECLARATION OF PAUL S. ECK

I, Paul S. Eck, declare under penalty of perjury that the following is true and correct:

1.    I am a resident of the State of California. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

1.   I am a Deputy General Counsel in the California Military Department (CMD). I have served in this role since August 2018.

2.   As Deputy General Counsel for the California Military Department, I lead a blended team of California and National Guard attorneys. I provide direct legal support to the Executive Staff and other senior leaders on complex matters at the intersection of military operations, state governance, and national security. I am regularly consulted on the operational needs, objectives, movements, and orders impacting the CMD.

3.   I began my service career as a Sergeant in the United States Marine Corps. I served in the United States Marine Corps. from 1980 to 1984 before being honorably discharged.

4.   I completed college and law school following my service in the United States Marine Corps. and worked in private practice from 1991 to 2012.

5.   From 2008 to 2012, I also worked for the San Diego Sheriff's Department as a Search and Rescue Reserve. In this capacity I provided communications and logistical support to San Diego Sheriff's Department during search and rescue operations for missing and lost persons, evidence recovery, emergency and disaster operations, and mutual aid events among other duties.

Declaration of Paul S. Eck

6. From 2010 to 2022, I served as a Colonel (CA) and Judge Advocate in the CMD, advising a wide array of units including the 40th Infantry Division, 3-140th Aviation Regiment, 49th Military Police Brigade, and Joint Forces Headquarters. In this capacity, I advised on both administrative law and critical operational legal support.

7. From 2012 to 2014, I worked as an attorney III for the California Department of Forestry and Fire Protection (Cal Fire).

8. From 2014 to 2018, I served as a Peace Officer with Cal Fire, ultimately rising to Chief of Investigations. In this role, I led critical investigative and law enforcement operations supporting both Cal Fire and the Office of the State Fire Marshal. I concurrently served as Bomb Squad Commander and Terrorism Liaison Officer.

9. I am certified by POST at the Basic, Intermediate, Supervisor, and Instructor levels and also hold specialized credentials, including a Post-Blast Explosives Investigator Certificate from the FBI and the FBI Certified Explosives Investigator designation.

10. I have been a National Guard Bureau Intelligence Oversight Monitor for the State of California since I joined CMD in 2018, maintaining annual certifications and ensuring strict compliance with intelligence oversight standards.

11. I have also been a Domestic Operational Law Legal Advisor since 2018, activated to support major domestic missions such as the Oroville Dam crisis and the Camp Fire response. I am trained in State Disaster Management, Advanced ICS Command, Military Resources in Emergency Management, USSOCOM OPSEC, and Army Counterintelligence.

**June 7, 2025**

12. I am aware of and have reviewed the Memorandum issued by President Trump on June 7, 2025 (Trump Memo) calling into federal service members and units of the National Guard.

3

Declaration of Paul S. Eck

13. I am also aware and have reviewed the June 7, 2025, Memorandum from Secretary of Defense Peter Hegseth (DOD June 7 Order) to the Adjutant General of California, ordering 2,000 California National Guard members into federal service.

14. I am aware that all 2,000 of the National Guard members deployed as a result of the DOD June 7 Order are members of the 79th Infantry Brigade Combat Team, which include a large number of guard members who serve in Taskforce Rattlesnake, the State's specialized fire combat unit. These service members have specialized training in wildland fire mitigation and prevention and direct fire suppression, and would be highly difficult for the State to replace.

15. The 79th Infantry Brigade also contains Counterdrug Taskforce members that specialize in providing support to stop the trafficking of fentanyl at the U.S.-Mexico Border.

16. As further described below, these deployments will impair the California National Guard's ability to perform critical functions for the State of California, including providing urgent responses to natural disasters and wildfires and drug interdiction, among other imperative missions.

**June 9, 2025**

17. I have reviewed the June 9, 2025, Memorandum from Secretary Hegseth order federalizing an additional 2,000 California National Guard members into federal service (DOD June 9 Order).

18. I have also reviewed a post by Secretary Hegseth on the X social media platform, posted at 3:24 p.m. Pacific time on June 9, 2025, stating that "approximately 700 active-duty U.S. Marines from Camp Pendleton are being deployed to Los Angeles to restore order" and "to defend federal law enforcement officers." (https://x.com/SecDef/status/1932202105361612994.)

19. Consistent with those public statements by Secretary Hegseth, on June 9 and 10, 2025, I became aware that CMD was informed of DOD's plans to issue change orders to the DOD June 7 Order and DOD June 9 Order (collectively, DOD

4

Declaration of Paul S. Eck

1  Orders). CMD was informed that those change orders would advise that beginning

2  June 10, mobilized federalized California National Guard units would be providing

3  support for counter-immigration operations across Los Angeles, in communities

4  during immigration enforcement operations and not only at federal buildings.

5  CMD was informed that such support activities would include holding a secure

6  perimeter in communities around areas where immigration enforcement activities

7  would take place, and securing routes over public streets where immigration

8  enforcement officers would travel.

9  **California's National Guard**

10  20. The California Army National Guard and the California Air National

11  Guard are part of the organized militia of the State of California and are federally

12  recognized units and organizations of the reserve components of the United States

13  military. For the purposes of this declaration, I will refer to the California Army

14  National Guard and the California Air National Guard together as the "California

15  National Guard."

16  21. Soldiers and airmen of the California National Guard serve important

17  functions for California under the authority of the Governor of California while

18  simultaneously training to perform their federal missions.

19  22. The California National Guard's purpose is to organize, train, equip,

20  deploy, and employ California's Airmen, Soldiers, and Sailors, to deliver integrated

21  staff, enhanced federal readiness, civil support, and historical contribution

22  capabilities to the California Military Department, interagency partners, and the

23  Governor.

24  23. The California National Guard is part of the CMD, a state agency that

25  includes the California State Guard, which cannot be federalized and remains at the

26  command and control of the Governor. CMD works under the Executive authority

27  of the Governor of California and performs numerous functions to effectively

28

**A190**

1    operate the California National Guard, including planning and organizing

2    deployments, and trainings.

3        24. There are three duty status categories for the National Guard: State

4    Active Duty, Title 10, or Title 32 status. In general, these statuses determine who

5    funds an operation and whether they are under the command and control of the

6    Governor or the President in their respective capacities as Commander-in-Chief.

7        25. In State Active Duty, the California National Guard is fully paid for by

8    the California budget and federal funds are not obligated for any personnel or units.

9    Service members in State Active Duty serve under the command and control of the

10    Governor of California.

11        26. California National Guard members may serve in Title 32 status. In this

12    hybrid status, they are under the command and control of the Governor, but the

13    mission is paid for by federal funds. The federal government may request the

14    Governor provide the California National Guard's assistance under Title 32 for

15    federal missions. As an example, the California National Guard is in Title 32 status

16    when it is deployed at the southern border to provide operational support to federal

17    law enforcement for drug interdiction.

18        27. The National Guard may be called into federal service under Title 10 of

19    the United States Code. When members of the California National Guard are called

20    to federal service under Title 10, they become components of the Army and federal

21    National Guard. In Title 10 status, the National Guard is paid for by the federal

22    government and under the command and control of the President.

23        28. There are approximately 18,733 members of the California National

24    Guard. Most of the California National Guard members serve as reserve forces,

25    meaning that their role in the California National Guard is part-time, and they are

26    generally employed in civilian roles separate from their work as service members.

27    There are currently approximately 12,212 available members of the California

28    National Guard.

6

**A191**

29. There are approximately 717 California National Guard servicemembers who work full time on State Active Duty. There are 1,109 Army National Guard and 1,170 Air National Guard members who are in a full time Title 32 status and support the readiness of their guard units. These individuals serve full time for fixed terms, which are often renewed.

30. As the largest National Guard in the country, the California National Guard provides mission ready forces for the State and the Nation, supporting missions all over the world. Each service member plays a critical role, and many have years of specialized training. Pulling those members away from these assignments may imperil the State's ability to protect its residents.

**Use of the National Guard in Service of the State**

31. As Commander-in-Chief of the State's militia, the Governor of California calls members of the California National Guard into active duty to serve the needs of California. The California National Guard is vital for various State functions including emergency and natural disaster response, cybersecurity, and drug interdiction. The California National Guard acts to protect people and property in many ways and the State relies on the National Guard to be ready to intervene in emergent situations to help protect Californians.

32. On average, in the years 2020 through 2025, 3,937 servicemembers were activated for Emergency State Active-Duty each year. CMD has identified and committed 4,600 service members to achieve state specific missions, which is 38% of the available strength.

33. The needs of the State are variable depending on emergent circumstances. For example, in 2020, 12,601 services members were deployed for 488,051 duty days, representing nearly three times more than the assigned strength for the State. In 2025, there have already been 3,332 services members activated for 89,061 duty days, indicating the state will need every available service member to meet the State's operational needs. These numbers exclude specialized taskforces

7

Declaration of Paul S. Eck

1  such as Operation Rattlesnake and the State Counterdrug teams, discussed further

2  below, which contribute collectivity over 600 additional personnel dedicated to

3  state missions.

4      34. Presently only 6.15% of the assigned strength of CMD is not subject to

5  Title 10 activation, meaning if there is a large federal activation the State will fall

6  far short of the anticipated annual state requirements, even without considering

7  specialized skills and capabilities to accomplish those missions.

8      35. The January 2025 Los Angeles Fires are a recent example of one of these

9  state missions. On January 7, 2025, a devastating wildfire broke out in Los Angeles

10  County. Governor Newsom immediately proclaimed a state of emergency and

11  deployed the California National Guard to manage the emergency. Over the course

12  of 24 days 2,500 service members were deployed to assist with the firefighting and

13  emergency response efforts sprawling across 37,000 acres of fire-impacted land.

14      36. The California National Guard's support included firefighting brigades,

15  aerial firefighters who provided critical fire suppression assistance, military police

16  forces stationed at traffic control points to ensure the safety of the surrounding

17  community and those with specialized skills in removing hazardous waste.

18      37. There are also a number of specialized units and missions.

19      38. For example, the California National Guard operates FireGuard, a

20  wildfire satellite detection mission. During the last 18 months, FireGuard activated

21  at least five Emergency State Active-Duty Force Packages, consisting of 360

22  personnel total, in support of the Bridge Fire, Line Fire, and Park Fire in California.

23  One hundred-forty additional Emergency State Active-Duty Military Police

24  Soldiers were also activated to operate and augment Traffic Control Points at the

25  Line Fire and Bridge Fire.

26      39. The California National Guard also operates Joint Task Force

27  Rattlesnake, a joint taskforce with CalFire to mitigate and prevent wildland fires

28  through fuels mitigation projects and direct fire suppression. Task Force

Declaration of Paul S. Eck

Rattlesnake provides 14 full-time, year-round Type I Hand Crews to reduce fuels and respond to fire incidents and other emergencies across the State. Each Task Force Rattlesnake crewmember is trained to Firefighter 1C standards, which require at least 540 hours of training. Each of California's 14 Crews are staffed with a minimum of 22 California National Guard personnel and maintain a minimum of 22 Firefighter 1C trained crewmembers (308 personnel in total).

40. Over the past 18 months, Task Force Rattlesnake responded to at least 738 wildland firefighting response missions, covering 10,243 acres of land.

41. The California National Guard also participates in drug interdiction activities in conjunction with local and federal law enforcement agencies. The CMD Counterdrug Task Force includes both state funded and Title 32 servicemembers operating year-round and includes specialized training for analysts and reconnaissance personnel.

42. The State Counterdrug Task Force is funded by the State's General Fund, and currently includes 118 service members assigned as analysts in drug demand reduction at the southern border. California has invested over $60 million over four years to expand California National Guard's work to prevent drug trafficking.

43. California National Guard servicemembers who perform this crucial work are criminal analysts, reconnaissance support personnel, and drug demand reduction outreach specialists—all positions that entail specialized training. State funding for fiscal year 2025 and beyond enables the Counterdrug Task Force to maintain and enhance support to federal, state and local partners in the ability to assist in seizures of firearms, currency, and cryptocurrency from drug trafficking organizations.

44. CMD also has 700 soldiers and 100 Air Guardsmen who are in Military Police companies. These units receive training in apprehensions, detentions, less lethal weapons options, and de-escalation, and they have unique capabilities in crowd control and management. They provide critical site security to "high value

9

Declaration of Paul S. Eck

1  areas" such as residence buildings or state assets. Units can provide area security as

2  well as conducting traffic control points in an emergency. California relies on these

3  units as a part of its "Quick Reaction Force" (NGRF), which is used to rapidly

4  respond and support the needs of Californians in an emergency.

5      45. The California National Guard also provides critical cybersecurity

6  support for the State, including providing staffing to CalOES's operation of the Cal

7  CSIC (Cyber Security Integration Center). Cal CSIC aids in identifying and

8  tracking cyber-attacks and coordinating response efforts to combat those attacks.

9      46. The California National Guard operates the Cyber Network Defense

10 Team (CND-T), which supports cyber vulnerability inspections of state agencies,

11 state schools, and, by request, local education agencies and city and county

12 governments. These state agency vulnerability assessments are mandated by

13 California Government Code section 11549.3, which also authorizes CND-T to

14 conduct vulnerability assessments, known as Independent Security Assessments

15 (ISAs) of state agencies and state schools as coordinated through the California

16 Department of Technology.

17    **Impact of Federalization**

18    47. As recounted above, the DOD June 7 Order federalized 2,000 members

19 of the 79th Infantry Brigade Combat Team, which included a large number of guard

20 members who serve in CMD's Taskforce Rattlesnake and Counterdrug Taskforce.

21    48. This deployment is pulling California National Guard members away

22 from their critical drug interdiction work. This will undermine the State's critical

23 investment in this area.

24    49. This deployment is also pulling away highly trained fire mitigation and

25 prevention and direct fire suppression CMD specialists at the start of California's

26 wildfire season.

27    50. Most critically, diverting members of the National Guard impairs the

28 Governor's ability to respond to emergencies. As set forth above, California

10

1   National Guard resources are limited, and the State does not have an excess of

2   National Guard servicemembers to carry out emergency functions, even without

3   taking into account specialized training.

4       I declare under penalty of perjury under the laws of the United States that the

5   foregoing is true and correct.

6       Executed on June 10, 2025, at Sacramento, California.

7

8   _____

9       Declaration of Paul S. Eck

**A196**

Declaration of Paul S. Eck

ROB BONTA
Attorney General of California
LAURA L. FAER
Acting Senior Assistant Attorney General
MARISSA MALOUFF
JAMES E. STANLEY
Supervising Deputy Attorneys General
LUKE FREEDMAN
ROBIN GOLDFADEN
BRENDAN M. HAMME
LORRAINE LOPEZ
KENDAL MICKLETHWAITE
MEGAN RICHARDS
NICHOLAS ESPÍRITU
Deputy Attorneys General
  1515 Clay St.
  Oakland, CA  94612
  Telephone: (510) 879-3908
  E-mail:  nicholas.espiritu@doj.ca.gov
*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GAVIN NEWSOM, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF CALIFORNIA; STATE OF CALIFORNIA,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; PETE HEGSETH, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF DEFENSE; U.S. DEPARTMENT OF DEFENSE,<br><br>Defendants. | NO. 3:25-cv-04870-CRB<br><br>**[PROPOSED] ORDER GRANTING TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE** |

A197

## [PROPOSED] ORDER

Plaintiffs' application for a temporary restraining order ("TRO") and order to show cause came before this Court for consideration on June 10, 2025. Upon consideration, and for good cause shown, **IT IS HEREBY ORDERED** that the TRO is **GRANTED.**

## TEMPORARY RESTRAINING ORDER

The Court finds that Plaintiffs have demonstrated a likelihood of success on the merits of their claims, a likelihood of irreparable harm in the absence of temporary relief, that the balance of equities tips in their favor, and that a temporary restraining order is in the public interest. In support of this Order, the Court makes the following findings:

1.      Since Fiscal Year 2024, U.S. Immigration and Customs Enforcement (ICE) has made 4,741 arrests in the Los Angeles Area of Responsibility. Mass episodes of civil unrest related to those arrests in 2024 were nominal. On June 6, 2025, ICE conducted enforcement actions within the Los Angeles Area of Responsibility, including the execution of search warrants at various locations. During these operations, ICE and its agents reportedly took actions that inflamed tensions and provoked protest. In all, the Department of Homeland Security reported that its enforcement activities on Friday, June 6, resulted in the arrest of approximately 44 individuals and 70–80 people detained in total, further showing ICE could execute its functions.

2.      On June 7, 2025, President Donald Trump issued a memorandum "call[ing] into Federal service members and units of the National Guard."

3.      On June 7, 2025, Secretary of Defense Pete Hegseth issued a memorandum to the Adjutant General of California ordering 2,000 California National Guard soldiers into federal service.

4.      On June 9, 2025, Secretary Hegseth issued another memorandum ordering an additional 2,000 California National Guard members into federal service.

5.      Defendants' orders were issued over the express objection of the Governor of the State of California, despite 10 U.S.C. § 12406's requirement that all orders made pursuant to that provision "shall be issued through the governors of the States."

**A198**

6.      As a result, 2,000 California National Guard soldiers have been moved to federal command, and an additional 2,000 will be moved imminently, for a total of 4,000 federalized National Guard soldiers available to be deployed by the federal government in the Los Angeles area.

7.      Also on June 9, 2025, Secretary Hegseth mobilized 700 active-duty members of the United States Marine Corps from Camp Pendleton and deployed them to the Los Angeles area. Together with the 4,000 federalized National Guard soldiers, these constitute the "Title 10 Force" for purposes of this Order.

8.      To date, Secretary Hegseth has deployed only approximately 325 of the 2,000 National Guard soldiers initially mobilized under federal authority, with a mission limited to protecting federal real property and a presence on or immediately adjacent to federal real property.

9.      Plaintiffs are likely to prevail on their claims that Defendants' actions are *ultra vires*, including because they violate 10 U.S.C. § 12406 and the Posse Comitatus Act. Under section 12406, the President lacks the authority to use California's National Guard soldiers to aid federal agents with enforcing federal law. Section 12406 permits the President to call a state's National Guard soldiers into service in only three circumstances: (1) the United States is invaded or is in danger of invasion by a foreign nation; (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or (3) the President is unable to execute the laws of the United States with regular forces.  None of these three circumstances exists here.  In his June 7 memorandum, the President purported to invoke the second and third circumstance, stating that "[t]o the extent protests or acts of violence directly inhibit the execution of the laws, they constitute a form of rebellion against the authority of the Government of the United States."  However, Plaintiffs have shown that the protests in Los Angeles fall far short of a rebellion, which is generally understood to connote "an organized attempt to change the government or leader of a country, [usually] through violence," something much beyond mere protest or sporadic acts of disobedience and violence. *Rebellion, Black's Law Dictionary* (12th ed. 2024). Nor do these protests prevent the President or ICE from executing the laws of the

**A199**

United States.  Plaintiffs' evidence shows that ICE has continued to execute its duties and that National Guard soldiers are unnecessary to aid with the enforcement of federal law.

10.    Plaintiffs are also likely to prevail on their claims because section 12406 mandates that "[o]rders for these purposes shall be issued through the governors of the States."  The President's order was not issued through the Governor of the State of California.

11.    Plaintiffs are also likely to prevail on their claim that the use of the Title 10 Force is likely to result in violations of the Posse Comitatus Act, 18 U.S.C. § 1385, because these forces are likely to engage in activity that will 'amount to direct active involvement in the execution of the laws[.]" *United States v. Dreyer*, 804 F.3d 1266, 1275 (9th Cir. 2015).

12.    Plaintiffs are also likely to prevail on their claim that the use of the Title 10 Force violates the Tenth Amendment because it intrudes on the State of California's sovereign powers, including by taking command of the State's own resources and depriving the State of its right to control and have available its National Guard.

13.    Plaintiffs are likely to suffer irreparable harm in the absence of temporary relief. First, violations of state sovereignty are irreparable harms.  Second, federalization of the California National Guard's soldiers impairs the Guard's ability to perform critical functions of the State of California, such as responding to natural disasters and wildfires when California is in peak wildfire season.  And third, Plaintiffs have shown that the presence of the Title 10 Force on the streets of Los Angeles, including their actual or perceived support and aid in the execution of ICE duties has created significant civil unrest and is likely to result in increased civil unrest in the future. Specifically, after National Guard soldiers were deployed to Los Angeles, their presence became the focus of protests and led to civil unrest, requiring intervention by state and local law enforcement to protect the National Guard soldiers. Further escalation of military force will create a significant and imminent risk of harm to Los Angeles by escalating tensions and increasing the risk of potential hostilities that may lead to further violence against Californians or any violence against the Title 10 Force or federal agents.

14.    The balance of equities and public interest favor injunctive relief, particularly considering the imminent risk of violence in Los Angeles if the Title 10 Force is deployed in excess of the law.

Accordingly, it is hereby:

**ORDERED** that Defendants Secretary of Defense Pete Hegseth and the United States Department of Defense ("DOD Defendants") are temporarily enjoined from ordering or deploying the Title 10 Force to enforce or aid federal agents in enforcing federal law or to take any action beyond those that are required to ensure the protection and safety of federal buildings and other real property owned or leased by the federal government and federal personnel on such property;

**ORDERED** that DOD Defendants are temporarily enjoined from ordering or permitting the Title 10 Force to execute or assist in the execution of any federal agent or officer's enforcement of federal law, including but not limited to all law-enforcement functions such as execution of warrants, arrests, searches, checkpoints, or cordons;

**ORDERED** that DOD Defendants are temporarily enjoined from ordering or permitting the Title 10 Force to patrol communities or otherwise engage in general law enforcement activities beyond the immediate vicinity of federal buildings or other real property owned or leased by the federal government.

This Order does not prohibit any of the Title 10 Force at issue from providing indirect assistance to federal officials by protecting federal immigration detention facilities and other federal buildings or real property owned or leased by the federal government, or by defending federal officials or employees from threatened physical harm at such buildings or real property.

Because Defendants have not shown they are likely to suffer harm as a result of this temporary restraining order, and because this case implicates constitutional rights and the public interest, the Court finds that only a nominal bond is necessary and orders Plaintiffs to post $100 within seven (7) days of this order.  *See Taylor-Failor v. Cnty. of Haw.*, 90 F. Supp. 3d 1095, 1102-03 (D. Haw. 2015) (citing *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005)).

**A201**

**ORDER TO SHOW CAUSE**

Defendants are ordered to show cause before this Court why a preliminary injunction should not issue enjoining the Title 10 Force from enforcing or aiding in the enforcement of federal law outside of federal property or the areas immediately surrounding federal property, including raids, arrests, searches, or any other activity, or conducting patrols beyond federal property.  The hearing on the order to show cause will be held on _____ at _____.  Plaintiffs' moving papers shall be filed no later than _____. Defendants' opposition papers shall be filed and served on or before _____.  Plaintiffs' may file a reply no later than _____.

**IT IS SO ORDERED.**

Dated:

_____
HON. CHARLES R. BREYER
United States District Judge

**A202**

BRETT A. SHUMATE
Assistant Attorney General
ERIC J. HAMILTON (CA Bar No. 296283)
Deputy Assistant Attorney General
ALEXANDER K. HAAS (CA Bar No. 220932)
Branch Director
CHRISTOPHER EDELMAN (DC Bar No. 1033486)
Senior Counsel
GARRY D. HARTLIEB (IL Bar No. 6322571)
BENJAMIN S. KURLAND (DC Bar No. 1617521)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Telephone: (202) 353-8659
christopher.edelman@usdoj.gov
*Attorneys for Defendants*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| GAVIN NEWSOM, in his official capacity as Governor of the State of California, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States of America, et al., <br><br> *Defendants*. | Case No. 3:25-cv-04870-CRB <br><br> **DEFENDANTS' CORRECTED OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER**[1] |

---

[1] Consistent with the Court's order, Defendants filed this brief within 24 hours of Plaintiffs' brief. Defendants encountered technical difficulties while finalizing their brief that prevented them from generating tables and adding the formatting required by Local Rules. This Opposition is corrected only as follows: (1) updated formatting to conform to the Court's Rules, *see* Loc. Civ. R. 3-4(c); (2) inclusion of a table of contents; and (3) inclusion of a table of authorities. No changes have been made in the substance of Defendants' Opposition. Defendants have conferred with counsel for Plaintiffs regarding these corrections and Plaintiffs have no objection to the filing of this Corrected Opposition.

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................................1

BACKGROUND.................................................................................................................3

I.      The National Guard System...............................................................................3

II.     10 U.S.C. § 12406..............................................................................................3

III.    The Riots and Violence in Los Angeles.............................................................4

IV.     President Trump Deploys the California National Guard...................................6

PROCEDURAL HISTORY ...............................................................................................7

LEGAL STANDARD .........................................................................................................8

ARGUMENT ......................................................................................................................8

I.      PLAINTIFFS' CLAIMS ARE LEGALLY AND FACTUALLY MERITLESS. ............8

        A.      The President Lawfully Federalized the National Guard.....................9

                1.      The Court cannot second-guess the President's determinations that
                        the necessary conditions existed.............................................9

                2.      The necessary conditions existed for the President's order.....................12

                3.      Section 12406 does not require a governor's consent or input...............15

        B.      The Federalization of Guardsmen Does Not Intrude on State Police
                Powers.....................................................................................................17

        C.      Defendants Have Not Violated the Posse Comitatus Act...................18

II.     THE BALANCE OF EQUITIES CUTS AGAINST ANY INJUNCTION. ...................21

III.    ANY INJUNCTIVE RELIEF SHOULD BE STAYED PENDING APPEAL AND
        ACCOMPANY A BOND.................................................................................25

CONCLUSION.................................................................................................................26

**A204**

## TABLE OF AUTHORITIES

### Cases

*Baker v. Carr*,
  369 U.S. 186 (1962) .................................................................................................. 11, 12

*California v. United States*,
  104 F.3d 1086 (9th Cir. 1997) ................................................................................. 12

*Caribbean Marine Servs. Co. v. Baldrige*,
  844 F.2d 668 (9th Cir. 1988) .................................................................................. 24

*City of L.A. v. Barr*,
  929 F.3d 1163 (9th Cir. 2019) ................................................................................ 23

*Dakota Cent. Tel. Co. v. S.D. ex rel. Payne*,
  250 U.S. 163 (1919) .................................................................................................. 11

*Dalton v. Spector*,
  511 U.S. 462 (1994) ............................................................................................. 9, 11

*Doran v. Salem Inn, Inc.*,
  422 U.S. 922 (1975) .................................................................................................. 24

*El-Shifa Pharm. Indus. Co. v. United States*,
  607 F.3d 836 (D.C. Cir. 2010) ................................................................................ 12

*In re Debs*,
  158 U.S. 564 (1895) .................................................................................................. 20

*In re Neagle*,
  135 U.S. 1 (1890) ................................................................................................ 19, 20

*Index Newspapers LLC v. U.S. Marshals Serv.*,
  977 F.3d 817 (9th Cir. 2020) ............................................................................ 22, 23

*Luther v. Borden*,
  48 U.S. (7 How.) 1 (1849) ....................................................................................... 11

*Marbury v. Madison*,
  5 U.S. (1 Cranch) 137 (1803) ................................................................................. 11

*Martin v. Mott*,
  25 U.S. (12 Wheat.) 19 (1827) .......................................................................... 10, 11

*Nken v. Holden*,
  556 U.S. 418 (2009) .................................................................................................. 25

**A205**

*Perpich v. Dep't of Def.*,
    496 U.S. 334 (1990).................................................................................3

*Perpich v. U.S. Dep't of Def.*,
    666 F. Supp. 1319 (D. Minn. 1987).........................................................3

*Stuhlbarg Int'l Sales Co. Inc. v. John D. Brush & Co.*,
    240 F.3d 832 (9th Cir. 2001)...................................................................8

*Titaness Light Shop, LLC v. Sunlight Supply, Inc.*,
    585 F. App'x 390 (9th Cir. 2014)...........................................................24

*Trump v. Int'l Refugee Assistance Proj.*,
    582 U.S. 571 (2017).................................................................................8

*Trump v. Wilcox*,
    145 S. Ct. 1415 (2025)............................................................................8

*Washington v. Trump*,
    847 F.3d 1151 (9th Cir. 2017).................................................................8

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982)..........................................................................8, 22

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008).......................................................................8, 21, 24

**Federal Statutes**

5 U.S.C. § 706.................................................................................................7

10 U.S.C. § 246.............................................................................................3

10 U.S.C. § 12301.......................................................................................16

10 U.S.C. § 12304a.........................................................................16, 17, 18

10 U.S.C. § 12406.................................................................................*passim*

18 U.S.C. § 1385....................................................................................18, 19

**State Statutes**

Cal. Mil & Vet Code § 163.........................................................................16

**The Constitution**

U.S. Const. art. I, § 8..............................................................................3, 18

U.S. Const. art. II, § 2 ................................................................................ 3, 9, 12

**Legislative Materials**

Act of Feb. 28, 1795, ch. 36, 1 Stat. 424 .............................................. 10

**Rules**

Fed. R. Civ. P. 65 ....................................................................................... 8, 25

**Other Authorities**

*Emergency Power and the Militia Acts*, Stephen I. Vladeck,
    114 Yale L.J. 149 (2004) .................................................................... 4

Rebellion, *Black's Law Dictionary* (12th ed. 2024) ........................... 12, 13

**A207**

## INTRODUCTION

In a crass political stunt endangering American lives, the Governor of California seeks to use this Court to stop the President of the United States from exercising his lawful statutory and constitutional power to ensure that federal personnel and facilities are protected. But, under the Constitution, the President is the Commander in Chief of the armed forces, and the President is responsible for ensuring the protection of federal personnel and federal facilities. Over the past several days, violent rioters who object to enforcement of federal immigration laws have targeted and damaged federal buildings, injured federal personnel, and impeded federal functions. The L.A. Police Department ("LAPD") and other local and state law enforcement have been unable to bring order to the city. Indeed, in a press conference, the LAPD Chief of Police lamented that "things have gotten out of control" and warned that "somebody could easily be killed."[2] Evaluating the unrest and threats to the enforcement of federal law that local and state authorities were unable or unwilling to control, the President responded by using the authority vested in him by statute and the Constitution to federalize and deploy the California National Guard to protect federal personnel and property, quell the mobs, and restore order. When the situation escalated further, the Secretary of Defense deployed a group of U.S. Marines to further assist.

There is no rioters' veto to enforcement of federal law. And the President has every right under the Constitution and by statute to call forth the National Guard and Marines to quell lawless violence directed against enforcement of federal law. Yet instead of working to bring order to Los Angeles, California and its Governor filed a lawsuit in San Francisco seeking a court order limiting the federal government's ability to protect its property and officials. The extraordinary relief Plaintiffs request would judicially countermand the Commander in Chief's military directives—and would do so in the posture of a temporary restraining order, no less. That would be unprecedented. It would be constitutionally anathema. And it would be dangerous.

---

[2] Michele McPhee, "LAPD Chief Jim McDonnell Says, 'Violence I Have Seen is Disgusting,' Recounting Attacks on Cops" (June 8, 2025), *Los Angeles Magazine*, https://lamag.com/news/lapd-chief-jim-mcdonnell-says-violence-i-have-seen-is-disgusting-recounting-attacks-on-cops.

On the merits, Plaintiffs' claims are baseless. The President properly invoked his statutory authority to federalize the California National Guard under 10 U.S.C. § 12406. Plaintiffs admit that Los Angeles has experienced "unrest," but ask this Court to second-guess the President's judgment that federal reinforcements were necessary. That is precisely the type of sensitive judgment that is committed to the President's discretion by law, and to which courts owe the highest deference. The statute empowers *the President* to determine what forces "*he* considers necessary" to "suppress" a "rebellion" or to "execute" federal "laws"—not the Governor, and not a federal court. Plaintiffs also object that the President did not consult with, or obtain the consent of, the Governor, but the statute imposes no such requirement. It merely directs, as a procedural matter, that the *President's* orders be conveyed "through" the Governor. They were.

Plaintiffs' objection based on the Posse Comitatus Act is equally misdirected. Neither the National Guard nor the Marines are engaged in law enforcement. Rather, they are *protecting* law enforcement, consistent with longstanding practice and the inherent protective power to provide for the safety of federal property and personnel. Plaintiffs offer no contrary evidence, only a speculative assertion that the National Guard and Marines will be used for unlawful purposes in the future. That speculation cannot justify the extraordinary remedy they seek.

The balance of equities likewise cuts decisively against any judicial intervention in the President's military judgments and deployments. Particularly in the realms of law enforcement and national security, the separation of powers counsels against such interference. And, if the Court were to grant the relief that Plaintiffs seek, that could cripple the federal government's law enforcement operations and, as the local Police Chief explained, even lead to a loss of life.

Courts did not interfere when President Eisenhower deployed the military to protect school desegregation. Courts did not interfere when President Nixon deployed the military to deliver the mail in the midst of a postal strike. And courts should not interfere here either.

**A209**

## BACKGROUND

### I.     The National Guard System

The Constitution authorizes Congress both to raise and support a national Army and to organize "the Militia." *See* U.S. Const. art. I, § 8, cl. 15 (granting Congress the power to "call[] forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions"). The "Militia" of old is now the modern-day National Guard.[3] The National Guard consists of "two overlapping, but legally distinct, organizations. Congress, under its constitutional authority to 'raise and support armies' has created the National Guard of the United States, a federal organization comprised of state national guard units and their members." *Perpich v. Dep't of Def.*, 496 U.S. 334, 338 (1990) (quoting *Perpich v. U.S. Dep't of Def.*, 666 F. Supp. 1319, 1320 (D. Minn. 1987)). It is composed of both the State National Guard, under the command of the several States, and the National Guard of the United States, a federal entity enmeshed in the federal chain of command.

The Guard wears two hats: "Since 1933 all persons who have enlisted in a State National Guard unit have simultaneously enlisted in the National Guard of the United States. In the latter capacity they became a part of the Enlisted Reserve Corps of the Army, but unless and until ordered to active duty in the Army, they retain[] their status as members of a separate State Guard unit." *Perpich*, 496 U.S. at 345. While ordered into federal service, "members of the National Guard . . . lose their status as members of the state militia," *id.* at 347, and become federal soldiers with the President as the Commander in Chief of those forces. *See* U.S. Const. art. II § 2.

### II.     10 U.S.C. § 12406

Congress has granted the President several authorities under which he may call forth the National Guard, including the Insurrection Act (which is not at issue in this case), as well as other

---

[3] The composition and classes of the militia are defined in 10 U.S.C. § 246, which provides that the National Guard is part of the "organized militia."

authorities such as 10 U.S.C. § 12406 (which the President invoked here).

The statutory lineage of Section 12406 begins with the First Militia Act of 1792, which, among other things, was used by George Washington to respond to the Whiskey Rebellion.[4]  *See Note: Emergency Power and the Militia Acts*, Stephen I. Vladeck, 114 Yale L.J. 149 at 160 (2004). Today, in its entirety, Section 12406 provides:

> Whenever-
>
> (1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation;
> (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or
> (3) the President is unable with the regular forces to execute the laws of the United States;
> the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws. Orders for these purposes shall be issued through the governors of the States or, in the case of the District of Columbia, through the commanding general of the National Guard of the District of Columbia.

10 U.S.C. § 12406.

### III.    The Riots and Violence in Los Angeles

On Friday, June 6, 2025, officers from the Department of Homeland Security's Immigration and Customs Enforcement ("ICE") Enforcement and Removal Operations ("ERO") conducted federally authorized operations in Los Angeles, California.  *See* Decl. of Ernesto Santacruz Jr., ¶ 7 ("Santacruz Decl."), Ex. 1.  A crowd gathered at an enforcement site and tried to prevent ICE officials from operating by throwing objects at ICE vehicles.  *Id.*  Several individuals were arrested in the operation and brought to ERO's federal facility in downtown Los Angeles.  *Id.*

Around 5:00 pm PT that night, a crowd began to gather at the ERO facility.  *Id.* ¶ 9.  The protests quickly turned violent.  *Id.*  They spread across the downtown area, threatening federal facilities and other public buildings.  *Id.* ¶ 10.  Protesters pinned down Federal Protective Services ("FPS") officers who were left severely outnumbered while trying to defend a parking garage

---

[4] The Act was amended by the Militia Act of 1795, which was invoked by President Madison, as discussed below.

connected to several federal buildings. *Id.* ¶ 11. Protesters threw concrete chunks, bottles of liquid, and other objects at the officers. *Id.* Protesters also attempted to use a large rolling commercial dumpster as a battering ram to breach the parking garage, causing damage to federal property. *Id.*

Officers feared for their safety. *Id.* ¶ 13. ICE and Homeland Security Investigations ("HSI") officers responded to support the FPS officers under siege and attempted to use non-lethal force to disperse the crowd. *Id.* The federal officers managed to prevent a breach of the facility, but it took Los Angeles Police Department ("LAPD") officers nearly an hour and a half to arrive and assist the federal officers in pushing the crowd back from the parking garage gate. *Id.* Meanwhile, the protests turned extremely violent, with news reports showing demonstrators using chairs, dumpsters, and other weapons. *Id.* ¶ 14. Once on scene, LAPD declared an "unlawful assembly" around 7:00 pm and ordered protesters to disperse. *Id.* ¶ 16. Many did not and instead began attacking LAPD officers. *Id.* The scene was not clear until around 11:00 p.m., leaving extensive damage to multiple federal buildings. *Id.* ¶ 17.

At approximately 10:23pm PT that night, President Trump called Governor Newsom. The President informed Governor Newsom of the dangers that federal personnel and property were being subjected to and directed him to take action to stop the violence.[5] But the violence only intensified the next day. On Saturday morning, large crowds congregated around an HSI office in the Paramount neighborhood of LA as federal officers prepared for another enforcement operation. *Id.* ¶ 18. The crowd blocked traffic and began to attack ERO and Customs and Border Patrol ("CBP") officers. *Id.* ¶ 20. Seven hours of non-stop fighting between federal officials and protesters ensued. *Id.* The crowd boxed in federal officers, surrounded an ERO officer's vehicle that they pummeled with stones, launched mortar-style fireworks, set at least one vehicle on fire, and threw objects of all nature, which caused a CBP officer to suffer a shattered wrist. *Id.* The perimeter fence of the federal building was breached, vehicles were damaged, and mortar-style

---

[5] https://www.foxnews.com/politics/trump-brings-receipts-he-called-newsom-amid-la-riots-california-gov-claims-wasnt-even-voicemail.amp; *see also* https://www.gov.ca.gov/2025/06/09/watch-governor-newsom-discusses-donald-trumps-mess-in-los-angeles/ (Governor Newsom concurring that the call took place)

fireworks with multiple explosions were thrown at the federal officers.  *Id.* ¶ 21.  Leaders in both political parties have described the violence in the strongest terms.  Democrat Senator John Fetterman called it "anarchy and true chaos."[6]

Protests continued Sunday and through the moment.  *Id.* ¶ 24.  Protesters have blocked the 101 Freeway.  *Id.* ¶ 25.  Dumpsters have been lit on fire and commercial-grade fireworks were set off toward federal officers.  *Id.* ¶ 26.  Federal and state buildings have been damaged, and the federal building security checkpoint has been in ruins. *Id.* ¶¶ 26-27.  Officers have been injured. *Id.* ¶ 27.  The federal complex in Downtown LA has been closed due to the unrest, *id.* ¶ 29, and has been severely damaged and vandalized, *id.* ¶¶ 26-27.

## IV.    President Trump Deploys the California National Guard

In response to these events, on June 7, the President signed a memorandum calling into federal service at least 2,000 members of the California National Guard to protect federal personnel and property.  The White House, *Dep't of Defense Security for the Protection of Dep't of Homeland Security Functions*, (Jun. 7, 2025) ("Presidential Memo"), ECF No. 8-1 at 44–45.  Specifically, the President invoked Section 12406 to "temporarily protect ICE and other United State Government personnel who are performing [f]ederal functions, including the enforcement of Federal law, and to protect [f]ederal property[.]" *Id.* at 44.  That same night, Governor Newsom issued a statement acknowledging that "[t]he federal government is moving to take over the California National Guard and deploy 2,000 soldiers" while criticizing the decision as "the wrong mission."[7]

Later that evening, based on the President's invocation of Section 12406, the Secretary of Defense issued directed the California Adjutant General to effectuate the call into federal service of the National Guard.  Sec'y of Def., *Calling Members of the Cal. Nat'l Guard into Federal Service* (Jun. 7, 2025) ("June 7 DoD Memo"), Ex. 2.  By the early morning of June 8, the Adjutant General had responded that his orders had been received and acknowledged that his forces were

---

[6] https://x.com/SenFettermanPA/status/1932234335425323417
[7] Governor Gavin Newsom (@CAgovernor), X (Jun. 7, 2025 8:13 PM), https://x.com/CAgovernor/status/1931504803487879617

mobilized.  On June 9, the Secretary of Defense issued a second memorandum to the Adjutant General requesting an additional 2,000 federalized National Guards.  Sec'y of Def., *Calling Additional Members of the Cal. Nat'l Guard into Federal Service* (Jun. 9, 2025) ("June 9 DoD Memo"), Ex. 3.  The Secretary also ordered the mobilization of 700 active-duty marines from Camp Pendleton to Los Angeles.  *See* Declaration of Paul S. Eck, ECF No. 8-3 ¶ 18.

Since those calls to federal action, Guardsmen have been charged with conducting safety and protection of Federal personnel, property, and functions at designated locations by providing security patrols, observation posts, and outer cordon security perimeter of buildings.  This includes National Guardsmen providing protection activities at several federal sites throughout the Los Angeles area, as well as to federal agents conducting their duties.

## PROCEDURAL HISTORY

Plaintiffs, the State of California and Governor Gavin Newsom, filed their Complaint on June 9, 2024.  Compl. ECF No. 1 ("Compl.").  Plaintiffs principally allege that Defendants took *ultra vires* action—that is, official acts exceeding their statutory bounds.  Compl. ¶¶ 79–92 ("Count I").  Plaintiffs also allege Defendants violated the Tenth Amendment by "unlawful[ly]" mobilizing the California National Guard and thereby depriving the Governor of command and availability of those mobilized units.  *Id.* ¶¶ 93–101 (Count II).  The second count is thus derivative of the first.  Finally, though they do not raise it as a basis for the pending motion, Plaintiffs allege Secretary Hegseth and the DoD have taken agency action in excess of statutory authority in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.  Compl. ¶¶ 102–06 (Count III).

On June 10, 2025, Plaintiffs filed their Motion for a Temporary Restraining Order.  Pls.' Mot. for a TRO, ECF No. 8 ("TRO Mot.").  Through their TRO Motion, Plaintiffs seek a court order enjoining the DoD from deploying federal troops in aid of federal agents carrying out their duties to enforce federal law in the field.  Proposed Order, ECF No. 8-4 at 5.

**LEGAL STANDARD**

Rule 65 of the Federal Rules of Civil Procedure empowers district courts to issue TROs. *See* Fed. R. Civ. P. 65(b). Like a preliminary injunction, a TRO is "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see also Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017) (standards applicable to TROs and preliminary injunctions "substantially identical" (quoting *Stuhlbarg Int'l Sales Co. Inc. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001))). "The purpose of . . . interim equitable relief is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward." *Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025) (quoting *Trump v. Int'l Refugee Assistance Proj.*, 582 U.S. 571, 580 (2017)). Thus, a court should not "mechanically" grant an injunction for every violation of law. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982).

Instead, plaintiffs must establish that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *Winter*, 555 U.S. at 20. A court may convert a TRO motion into a preliminary injunction motion, Fed. R. Civ. P. 65, and doing so may be appropriate in order to ensure that consequential rulings are subject to immediate appeal.

**ARGUMENT**

**I.    PLAINTIFFS' CLAIMS ARE LEGALLY AND FACTUALLY MERITLESS.**

The thrust of Plaintiffs' motion is that the President lacks authority to federalize the State National Guard and to deploy those forces, along with U.S. Marines, to protect federal assets in Los Angeles. That is flatly wrong. Section 12406 expressly empowers the President to call the California National Guard into federal service when he considers it necessary either to quell a "rebellion against the authority of the Government of the United States" or when he determines that "regular forces" are "unable" to execute federal law. The President reasonably made both of those determinations here, and they are not subject to judicial second-guessing under foundational

precedent dating back nearly two centuries.  Nor does the President need the consent (or even the input) of the State Governor to give these orders; Plaintiffs blatantly mischaracterize the statute in suggesting otherwise.  Finally, Plaintiffs offer no evidentiary support for their claim that military forces are engaged in ordinary law-enforcement activities.  The President and Secretary of Defense have directed those forces to protect federal property and federal officials, including to ensure the safety and security of federal law-enforcement operations—but the military itself is not executing federal law.  Plaintiffs' objection under the Posse Comitatus Act is therefore meritless too.

### A.    The President Lawfully Federalized the National Guard.

The President is the Commander in Chief of the armed forces including "the Militia of the several States, when called into the actual Service of the United States[.]"  U.S. Const. art. II, § 2. And Congress has authorized the President to call the National Guard into federal service.  10 U.S.C. § 12406.  Plaintiffs challenge the federalization of the National Guard on two grounds. First, they dispute that the necessary conditions were present when the President issued his Saturday memorandum.  Second, they object to the process through which Guardsmen were activated.  Both arguments lack merit, especially in light of the President's inherent authority to protect federal personnel and property.

### 1.    The Court cannot second-guess the President's determinations that the necessary conditions existed.

Most fundamentally, Plaintiffs' challenge to the conditions in California at the time of the presidential memorandum is unreviewable because it is a statutorily authorized discretionary judgment of the President.  When courts are confronted with a claim alleging that the President has "violated the terms of" a statute, "longstanding authority holds that such review is not available when the statute in question commits the decision to the discretion of the President."  *Dalton v. Spector*, 511 U.S. 462, 474 (1994).  Section 12406 commits the decision of whether the conditions are ripe to call forth the National Guard to the President's discretion.  The statute authorizes "the President" to activate Guardsmen "in such numbers *as he considers necessary* to repel the invasion, suppress the rebellion, or execute those laws."  10 U.S.C. § 12406 (emphasis added).

There is no textual basis in the statute for either the Court or Plaintiffs to second-guess the President's determination that the conditions to call forth the Guard are met.

Indeed, nearly two centuries ago, the Supreme Court squarely rejected Plaintiffs' position that courts had authority to decide whether a sufficient exigency supported the President's decision. In *Martin v Mott*, the Supreme Court held that a challenge to the legality of President Madison's decision to call out the militia in response to a national emergency was beyond judicial scrutiny and second-guessing. *See* 25 U.S. (12 Wheat.) 19 (1827). As noted in the background, today's Section 12406 vests the President with statutory authority to call forth the National Guard "as he considers necessary to repel the invasion, suppress the rebellion, or execute [the] laws" of the United States. 10 U.S.C. § 12406. Much like that statute, the law at issue in *Martin* provided "that whenever the United States shall be invaded, or be in imminent danger of invasion … it shall be lawful for the President of the United States to call forth such number of the militia of the State or States most convenient to the place of danger, or scene of action, as he may judge necessary to repel such invasion, and to issue his order for that purpose to such officer or officers of the militia as he shall think proper." *Martin*, 25 U.S. at 29 (quoting Act of Feb. 28, 1795, ch. 36, 1 Stat. 424) (concerning the first calling out statute that was invoked in the Whiskey Rebellion and by President Madison in the War of 1812 and the predecessor to Section 12406).

The Court explained that "the authority to decide whether the exigency has arisen, belongs exclusively to the President, and that his decision is conclusive upon all other persons." *Id.* at 30. Such authority "necessarily results from the nature of the power itself, and from the manifest object contemplated by the act of Congress." *Id.* This was so because "[w]henever a statute gives a discretionary power to any person, to be exercised by him upon his own opinion of certain facts, … the statute constitutes him the sole and exclusive judge of the existence of those facts." *Id.* at 31–32. Exercise of such authority is nonreviewable because "[t]he remedy for this, as well as for all other official misconduct" resided in "the frequency of elections, and the watchfulness of the

representatives of the nation, [which] carry with them all the checks which can be useful to guard against usurpation or wanton tyranny." *Id.* at 32.

Modern precedent points in the same direction. Under *Dalton*, where claims "concern[] not a want of Presidential power, but a mere excess or abuse of discretion in exerting a power given," they are not subject to judicial review. 511 U.S. at 474 (quoting *Dakota Cent. Tel. Co. v. S.D. ex rel. Payne*, 250 U.S. 163, 184 (1919)).[8] When a statute "commits decisionmaking to the discretion of the President, judicial review of the President's decision is not available." *Id.* at 477. That principle forecloses Plaintiffs' claims here. They do not dispute that the President has the power to federalize the National Guard—only that he exceeded that authority because the conditions were not satisfied. But Congress vested such matters in the President's discretion. "How the President chooses to exercise the discretion Congress has granted him is not a matter for [judicial] review." *Id.* at 476.

While a court should "always be ready to meet any question confided to it by the Constitution, it is equally its duty not to pass beyond its appropriate sphere of action." *Luther v. Borden*, 48 U.S. (7 How.) 1, 47 (1849). Certain "[q]uestions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803). Thus, if the act of an official is one in which the "executive possesses a constitutional or legal discretion, nothing can be more perfectly clear . . . that their acts are only politically examinable." *Id.* at 166; *see also Baker v. Carr*, 369 U.S. 186, 217 (1962) (setting forth the test for political question doctrine).

That is the case here. The statutory conditions (determination of an invasion, rebellion, or inability to execute the laws of the United States) are "of a kind clearly for nonjudicial discretion." *Baker*, 369 U.S. at 217. They operate against a backdrop of constitutional powers, including that "[t]he President shall be Commander in Chief of the Army and Navy of the United States, and

---

[8] In *Dakota Central Telephone Co.*, the Supreme Court rejected the same type of claim that the State asserts here, namely that the President "exceeded the authority given him" pursuant to a statute by taking action when "there was nothing in the conditions at the time the power was exercised which justified the calling into play of the authority." 250 U.S. at 184.

of the Militia of the several States, when called into the actual Service of the United States." U.S. Const. art. II, § 2, cl. 1. They implicate national security, a subject that is broadly committed to the discretion of the political branches. *See El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 842 (D.C. Cir. 2010). And there are no "judicially discoverable and manageable standards for resolving" whether riots rise to the level of rebellion, or whether the regular forces are adequate to execute federal law. *Cf. California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997) (collecting cases for proposition that determination of an "invasion," the first of the Section 12406 conditions, presents a political question).

In short, while Plaintiffs repeatedly acknowledge the unchecked violence in Los Angeles, they ask the Court to supersede the President's judgment that the violence has risen to a level sufficient to trigger the statute—even though the statute empowers the President to mobilize the National Guard in "such numbers as *he* considers necessary." 10 U.S.C. § 12406 (emphasis added). Indulging that request would fail to display "the respect due coordinate branches of government." *Baker*, 369 U.S. at 217.

### 2.    The necessary conditions existed for the President's order.

Even if some form of deferential judicial review were permissible, the President had more than ample grounds for invoking Section 12406. As his memorandum explained, it arose out of "[n]umerous incidents of violence and disorder" that threaten federal property and federal officials who are supporting the faithful execution of federal laws. Presidential Memo at 1. Indeed, the dangerous conditions in Los Angeles doubly satisfied Section 12406.

*First*, "there [was] a rebellion or danger of a rebellion against the authority of the Government of the United States." 10 U.S.C. § 12406(2). Plaintiffs cite one legal authority— Black's Law Dictionary—in their rebellion argument, and quote selectively from it. TRO Mot. at 9. Black's Law Dictionary's definition of the term "rebellion" provides three definitions of the term, each embracing something less than "an organized attempt to change the government or leader of a country." TRO Mot. at 9 (quoting Rebellion, *Black's Law Dictionary* (12th ed. 2024)). "Rebellion" means:

> 1. Open, organized, and armed resistance to an established government or ruler, esp., an organized attempt to change the government or leader of a country, usu. through violence. Cf. civil war under war (1). 2. Open resistance or opposition to an authority or tradition. 3. Hist. Disobedience of a legal command or summons.

Rebellion, *Black's Law Dictionary* (12th ed. 2024). Consistent with this understanding of the term, the presidential memorandum notes that "[n]umerous incidents of violence and disorder have recently occurred and threaten to continue in response to the enforcement of Federal law by U.S. Immigration and Customs Enforcement (ICE) and other United States Government personnel who are performing Federal functions and supporting the faithful execution of Federal immigration laws." Presidential Memo. Presidential Memo at 1. It concludes that "[t]o the extent that protests or acts of violence directly inhibit the execution of the laws, they constitute a form of rebellion against the authority of the Government of the United States." *Id.*

Plaintiffs do not dispute that substantial violence had occurred in Los Angeles by the time the presidential memorandum was signed and that it has continued through the weekend (and to this day), or that the violence was in opposition to federal immigration enforcement. While characterizing the protest activity as "[p]rimarily peaceful," Plaintiffs admit that Los Angeles witnessed "some level of civil disturbance" and that the situation required local authorities to "mak[e] dozens of arrests." TRO Mot. at 9. That is a severe understatement. Their own submission to the Court substantiates the President's judgment many times over. One of Plaintiffs' declarants highlights the severity of the situation: "[S]ome protesters unfortunately began to engage in dangerous behavior such as throwing rocks and other objects, including a Molotov Cocktail at deputies damaging vehicles, burning a vehicle, looting a gas station, and vandalizing property." Declaration of Brian Olmstead ¶ 9, ECF No. 8-2. "Two deputies were injured during the incident." *Id.*

The articles submitted by Plaintiffs also describe the dangerous conditions in Los Angeles, with mobs resisting federal authority in a manner that rises to the level of rebellion. Plaintiffs' submission to the Court contains five images of burning or burnt cars. ECF No. 8-1, at 47, 93, 102, 121, 123. It contains a sixth image of an unidentified burning object. ECF No. 8-1, at 104.

And they have also submitted images of (in their sources' words) demonstrators "blocking traffic on [a] busy thoroughfare" and a "massive crowd" pushing to a wall barrier. ECF No. 8-1, at 120, 122. Plaintiffs' articles say that "[d]emonstrators blocked entrances and exits to [the Federal Building in downtown Los Angeles]." ECF No. 8-1 at 54. They also "spray-painted anti-ICE slogans on [a] building's exterior walls" and "attempted to physically stop ICE vehicles." *Id.* "Dozens of buildings were tagged with graffiti, including the LAPD Headquarters, the U.S. Courthouse and the old Los Angeles Times building." ECF No. 8-1, at 121.

Plaintiffs' submission also reflects the crowd's refusal to comply with local authorities' orders. "The crowd of demonstrators . . . moved through the city despite the area-wide dispersal order, again lighting fireworks and throwing projectiles at police vehicles driving by." ECF No. 8-1 at 121. "Several fires were set in dumpsters and trash bins and at least one store had windows shattered by alleged looters." *Id.* It also reflects local authorities' inability to adequately respond. An article submitted by Plaintiffs reports that "[a] federal law enforcement official with knowledge of the operations told CBS News that ICE requested assistance from LAPD multiple times over the course of Friday night." ECF No. 8-1, at 123. "[A] senior city official in L.A. told CBS News that it took LAPD 55 minutes to respond." *Id.*

At minimum, on Plaintiffs' own record, the conditions in Los Angeles qualify as a "*danger* of a rebellion" against federal authority. 10 U.S.C. § 12406(2) (emphasis added). Plaintiffs argue that a rebellion was not present, but they never contend that there was no *danger* of a rebellion. Section 12406's "danger of a rebellion" language appears nowhere in their brief outside their block quotation of the statute. That alone is sufficient grounds to invoke the statute—and thus to deny Plaintiffs' motion.

*Second*, "the President [was] unable with the regular forces to execute the laws of the United States," *id.* § 12406(3), an independently sufficient basis for federalizing the Guard. The same record establishes this. Mr. Santacruz's declaration details the substantial threats to the safety of federal law enforcement personnel in the field and at federal buildings. Demonstrators began to organize on Friday at sites where ICE ERO was enforcing alien removal laws, i.e., "execut[ing]

the laws of the United States." 10 U.S.C. § 12406(3). And local authorities were unable to allow that activity to occur safely. Plaintiffs' short argument on this prong of the statute contends that because ICE ERO succeeded in arresting 44 individuals on Friday, the President was able to execute the laws of the United States. TRO Mot. at 10. But that limited success came with the risk of danger—risk that the President could reasonably have determined was intolerable. Plus, Plaintiffs' argument ignores that ICE ERO would have been able to carry out additional execution-of-the-laws activity in the absence of a riot. And absent the use of additional law enforcement resources to protect ICE agents from the violent assaults of protestors, it would be perilous for ICE officials to carry out further immigration-enforcement operations.

Plaintiffs also argue this prong is inapplicable because President Nixon used the same authority to respond to a nationwide crisis while last weekend's crisis centered only on the Nation's second largest city. They never connect that argument to the statute's text, however, and nothing in Section 12406 supports the distinction.

On this prong, Plaintiffs' argument amounts to a request to second-guess the President's judgment about the adequacy of state and local law enforcement to protect federal property and federal personnel. That is inappropriate. The President cannot be hamstrung by the Governor's insistence that state and local authorities are up to the task, particularly when the evidence on the ground shows otherwise. And, respectfully, the Court is not positioned to countermand this judgment either, particularly in a highly expedited proceeding with a limited record.

### 3.    Section 12406 does not require a governor's consent or input.

Defendants also acted lawfully in the processes they used to federalize Guardsmen. Section 12406's first sentence establishes the President's unilateral authority to federalize Guardsmen. Again, it reads: "[T]he President may call into Federal service members and units of the National Guard of any State . . . ." The next sentence adds that "[o]rders for these purposes shall be issued through the governors of the States." 10 U.S.C. § 12406. The statute is thus clear that the orders are issued *by* the President, and they are conveyed *through* State officials. Nothing in the statute entitles a Governor to veto or impede a valid presidential order.

The President complied with this procedural provision. Secretary Hegseth's memorandum was issued to California's Adjutant General, a state cabinet-level official who is required under California law to perform "duties consistent with the regulations and customs of the United States Army, United States Air Force, and the United States Navy[,]" including "issu[ing] all orders *in the name of the Governor*." Cal. Mil & Vet Code § 163 (emphasis added). The memorandum bore the label "THROUGH: THE GOVERNOR OF CALIFORNIA." ECF No. 8-1, at 107. And Secretary Hegseth sent a second memorandum federalizing an additional 2,000 Guardsmen on Monday with the same label. ECF No. 8-1, at 111. There is no dispute that the Governor had actual and contemporaneous knowledge of the order—indeed, he acknowledged that it was forthcoming before it even issued. This procedural objection is thus meritless, and certainly not a basis to issue an unprecedented injunction against the deployment of military forces.

Plaintiffs, however, interpret the statute to "require[] orders under § 12406 be issued *by* the Governor." TRO Mot. at 11 (emphasis added). But Section 12406 does not use the word "by." And there is a fundamental difference between orders issued "by" a person (making them the decisionmaker) and orders issued "through" that person (making them a mere conduit for a decision already made). The latter better aligns with the purpose of this procedural requirement, as the federalization of the California National Guard requires a careful handover of command and control from the State Commander in Chief (the Adjutant General) to the Federal Commander-in-Chief. Orders going "through" the Governor, in particular the Governor's Adjutant General, provides proper notice and avoids command confusion which is critical in an emergency.

Meanwhile, when Congress has wanted to give the Governor veto power, it has done so expressly. For example, the Secretary of Defense may "order a member of a reserve component under his jurisdiction to active duty" except that members "may not be ordered to active duty . . . without the *consent* of the governor or other appropriate authority of the State concerned." 10 U.S.C. § 12301(d) (emphasis added). Likewise, the Secretary may order a member of the Army, Navy, Marine, or Air Force Reserves to active duty to provide assistance in response to a major disaster or emergency, but only after receiving a request from a Governor. 10 U.S.C. § 12304a(a).

Yet Section 12406 omits any language even hinting that Governor could withhold his consent.

In short, Section 12406 affords no veto to Governor Newsom over the President's decision to call forth the guard, just as it afforded no veto to Governor Faubus when President Eisenhower last invoked the predecessor to Section 12406 to ensure that the enforcement of federal law was not obstructed.

Plaintiffs also suggest that the statute imposes a gubernatorial consultation requirement. TRO Mot. at 11. They complain that Defendants "violate[d] the letter of the law" by "depriving the Governor of the opportunity to consult with the President." *Id.* That too is wrong both legally and factually. Nothing in the statute requires consultation. Anyway, as explained, President Trump spoke with Governor Newsom about the situation in Los Angeles the day before he federalized guardsmen. In that discussion, the President directed the Governor to take control of riots in Los Angeles. *Id.* Lines of communication between the President and Governor Newsom were open. The next day, the President signed a memorandum that directed to the Secretary of Defense to federalize the Guardsmen. ECF No. 8-1, Ex. E. Governor Newsom acknowledged that act in a public statement. *See supra*.

Finally, even if Plaintiffs' interpretation of the statute were correct, the only party acting unlawfully would be Governor Newsom—not President Trump or Secretary Hegseth. Section 12406 uses the mandatory "shall," depriving the Governor of any possible discretion in whether to issue an order. So if the order was not issued "through" the Governor via the Adjutant General who acts in his name, then the Governor should have issued the order himself, rather than drafting a press release objecting to the presidential memorandum. His failure to comply with President Trump's lawful order to federalize California's guardsmen cannot somehow support an injunction against the federal government.

### B.    The Federalization of Guardsmen Does Not Intrude on State Police Powers.

Plaintiffs press a four-sentence argument suggesting a Tenth Amendment defect in the President's memorandum federalizing Guardsmen. They make the conclusory assertion that Defendants acted unlawfully in activating the National Guard "to quell a protest or prevent future

protests despite the lack of evidence that local law enforcement was incapable of asserting control." TRO Mot. at 12. As explained, Plaintiffs' own record submissions show that local law enforcement was unable to bring rioters under control last weekend. But more importantly, Plaintiffs' argument misstates the mission for Guardsmen in Los Angeles: They have been deployed to protect federal personnel and facilities and not to "prevent future protests." *Id.*

In all events, Plaintiffs' Tenth Amendment claim is wholly derivative of their statutory claim that the presidential memorandum itself did not comply with Section 12406. The Constitution authorizes Congress "[t]o provide for calling for the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions." U.S. Const. art. I, § 8. Congress is also empowered to "provide for organizing, arming, and discipling, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the militia according to the discipline prescribed by Congress." *Id.* Congress acted under this authority in enacting Section 12406, which the President validity invoked. This claim therefore adds nothing.

### C.    Defendants Have Not Violated the Posse Comitatus Act

The presidential memorandum, Secretary Hegseth's memoranda, and the military personnel's protection of federal property and employees are consistent with the Posse Comitatus Act. That Act states in full: "Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both." 18 U.S.C. § 1385. The Act "was originally enacted in 1878 for the purpose of preventing United States Marshals, on their own initiative, from calling upon troops to assist them in performing their duties." Mem. Op., *Authority to Use Troops to Prevent Interference With Federal Employees by Mayday Demonstrations and Consequent Impairment of Government Functions*, U.S. Dep't of Justice, Off. of Legal Counsel, at 344 (April 29, 1971), https://www.justice.gov/file/147726/dl. "The Act was designed to prevent use of troops in direct law enforcement under command of minor

civilian officials." *Id.*

It is well established, however, that when the President lawfully federalizes the national guard pursuant to statutory authority designed to authorize the use of the militia to restore order, the Posse Comitatus Act does not apply.  One such exception is contained in the Insurrection Act. *See* Office of Att'y Gen., *President's Power to Use Federal Troops to Suppress Resistance to Enforcement of Federal Court Orders* (Nov. 7, 1957).  But 10 U.S.C. § 12406, which is worded quite similarly to the Insurrection Act, represents another.  After all, national guard could properly be used to suppress invasions and rebellions, and execute the laws where the regular forces have failed to do so, without engaging in activities the Posse Comitatus Act would otherwise prohibit. The Constitution, in addition, obligates the President to "take care that the laws be faithfully executed." U.S. Const. art. III, § 3.  The President thus has an inherent constitutional authority to protect the federal government, and the Posse Comitatus Act does not change that.

As William Rehnquist concluded as the head of the Department of Justice's Office of Legal Counsel, "the Posse Comitatus Act does not impair the President's inherent authority to use troops for the protection of federal property and federal functions." Mem. Op., *Authority to Use Troops to Prevent Interference With Federal Employees by Mayday Demonstrations and Consequent Impairment of Government Functions*, U.S. Dep't of Justice, Off. of Legal Counsel, at 343 (April 29, 1971), https://www.justice.gov/file/147726/dl.  Nor does it "prevent the use of troops to protect the functioning of the government by assuring the availability of federal employees to carry out their assigned duties." *Id.*  Thus, in 1971, Mr. Rehnquist held that the President could use troops to respond to demonstrators who threatened to "prevent[] federal employees from reaching their agencies." *Id.*  Likewise, the Supreme Court recognized in *In re Neagle*, 135 U.S. 1, 65 (1890), that troops could be used to prevent an obstruction to the U.S. mail:

> if the president or the postmaster general is advised that the mails of the United States, possibly carrying treasure, are liable to be robbed, and the mail carriers assaulted and murdered, in any particular region of country, who can doubt the authority of the president, or of one of the executive departments under him, to make an order for the protection of the mail, and of the persons and lives of its carriers, by doing exactly what was done in the case of Mr. Justice FIELD, namely, providing a sufficient guard, whether it be by soldiers of the army or by marshals

of the United States, with a posse comitatus properly armed and equipped, to secure the safe performance of the duty of carrying the mail wherever it may be intended to go?

*Id.*  Earlier, in *In re Debs*, 158 U.S. 564, 582 (1895), the Supreme Court upheld President Cleveland's order to troops to protect federal property and to remove obstructions to the U.S. mail. "The strong arm of the national government may be put forth to brush away all obstructions to the freedom of interstate commerce or the transportation of the mails." *Id.*  "If the emergency arises, the army of the Nation, and all its militia, are at the service of the Nation to compel obedience to its laws." *Id.*

As with that order, President Trump's order to military personnel to protect federal employees and buildings is a lawful exercise of his inherent protective power.  By its terms, the presidential memorandum "call[s] into Federal service members and units of the National Guard . . . to temporarily protect ICE and other United States Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property." Presidential Memo.  The National Guard has been acting within the scope of that mission. Federalized California National Guard personnel have been conducting safety and protection of Federal personnel, property, and functions at designated locations by providing security patrols, observation posts, and outer cordon security perimeter of buildings.

Plaintiffs have not provided any factual basis to conclude that Defendants have or will violate the Posse Comitatus Act.  The most they muster is the shaky assertion that "[t]he evidence strongly indicates that the federalized National Guard and active-duty Marines deployed in Los Angeles will engage in quintessential law enforcement activity in violation of the PCA." TRO Mot. at 14.  That allegation does not rise to the level needed to obtain a temporary restraining order affecting the President's command of military forces in the face of riotous and rebellious conditions.  Plaintiffs suggest it would be unlawful for Defendants to "hold[] a secure perimeter in communities around areas where immigration enforcement activities would take place, and securing routes over public streets where immigration enforcement officers would travel." TRO

Mot. at 15. Those actions plainly describe conduct to protect ICE ERO employees enforcing the laws that Congress has provided they must carry out. Military service members' protection of those federal employees while they perform their work is distinct from the military members' own engagement in ordinary law enforcement. The former is entirely lawful, and that is all that the record supports.

*      *      *

The groundless nature of Plaintiffs' claims is further exposed by the mismatch between those claims and the relief they seek. They argue that the President improperly federalized the California National Guard—but their proposed injunction restricts only how those Guardsmen may be *deployed*. Specifically, they ask for an order that restricts the Guardsmen to protecting federal property, and federal personnel on such property, but not federal personnel outside federal property. There is no reading of Section 12406 that could justify *that* relief. Nor does that relief make any sense in view of the Posse Comitatus Act—if military forces may permissibly be used to protect federal officials and to ensure their safety (as they can), it should not matter whether those federal officials are inside a federal building or on a street a few blocks away.

Plaintiffs' proposed order reveals the true aim of their motion. It is not to return National Guardsmen to California's control, or to vindicate the (misguided) rights they claim, but instead to prevent the federal government from protecting federal officers who are carrying out law-enforcement operations in Los Angeles. That interference is impermissible and groundless, and further underscores why the Court should deny their motion.

## II.    THE BALANCE OF EQUITIES CUTS AGAINST ANY INJUNCTION.

The balance of equities and the public interest cut squarely against the extraordinary remedy of a temporary restraining order or preliminary injunction. The Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the

A228

extraordinary remedy of injunction." *Id.* (quoting *Weinberger,* 456 U.S. at 312).

Here, an injunction would not only hinder federal law enforcement but also expose federal employees and property to violence and vandalism by the rioters in Los Angeles. The federal government has an "uncontested interest in protecting federal agents and property." *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 838 (9th Cir. 2020). The President and Secretary of Defense's memorandum calling up the National Guard expressly invoked this interest. *See* Ex. 2 ("to temporarily protect U.S. Immigration and Customs Enforcement and other U.S. Government personnel… and to protect Federal property."). These are indisputably "very important public interest[s]." *Index Newspapers LLC*, 977 F.3d at 838.

The President's reference to these interests was not mere words on a piece of paper. The Order arose from documented instances of violence against federal officials that were happening at the time of the Order and which continue today. On Friday June 6, 2025, protestors threw "bottles, concrete chunks, and other objects at the FPS officers," and attempt[ed] to use large rolling commercial dumpsters as a battering ram to breach the parking garage gate" of a federal building complex. Santacruz Dec. ¶ 11. All available federal officers were called to defend the complex, needing to resort to resort to riot control devices to prevent the breach of federal property, all while it took more than one- and one-half hours for the LAPD to arrive. *Id.* ¶ 13. While California chalks this up as a peaceful protest, Compl. ¶ 29, the rioters were "using chairs, pepper balls, and other items as weapons" to "heavily vandalize" a federal building and clash with law enforcement. Santacruz Decl. ¶¶ 14–15, 17. The next day, the crowd once again became violent and attacked ERO and CBP officers, for seven continuous hours. *Id.* ¶ 20. Once officer was trapped inside her law enforcement vehicle, which the crowd surrounded and violently pummeled with stones, and the DHS office perimeter fence was cut, vehicles were damaged, and incendiary devices were thrown at federal officers. *Id.* ¶¶ 21–22. By the next day, despite LAPD declaring the downtown area an unlawful assembly, protestors set off fireworks, threw objects at law enforcement, lit fires in dumpsters and trans bins, looted stores, and vandalized the Federal Courthouse and even LAPD's own headquarters. *Id.* ¶ 26. At end of the day, the Federal building's

security checkpoint was in ruins. *Id.* ¶ 27.

The vandalization of a Federal Courthouse hardly fits the description of "civil unrest that is no different from episodes that regularly occur in communities throughout the country." TRO Mot. at 1. Nor were these conditions where California's local authorities "have been responding promptly, professionally, and effectively." Compl. ¶ 32; *see also* TRO Mot. at 1. In cases of violent uprising, as Plaintiffs allege, the National Guard is "vital" in acting "to protect people and property" and the "State relies on the National Guard to be ready to intervene in emergent situations to help." Compl. ¶ 70. That is exactly what the President ordered the National Guard to do when the events in opposition to ICE's operation in Los Angeles occurred. Given Plaintiff's acknowledgement of the National Guard playing such an important role in protecting people and property, there should be no opposition to the National Guard providing help during the events at issue in this case.

Further, the Federal government would suffer more widespread irreparable harm were an injunction to issue. The City of Los Angeles "has made a longstanding decision" not "participat[e] in federal civil immigration enforcement." *City of L.A. v. Barr*, 929 F.3d 1163, 1173 (9th Cir. 2019). Federal ICE personnel are attempting to enforce federal civil immigration laws in the City of Los Angeles, but have suffered violence in response to carrying out lawful alien removal operations. Local and state law enforcement were not able to prevent that violence, and their responses to exigent circumstances were delayed. State and local inaction has already resulted in threats to federal personnel, which has hindered the federal government's ability to safely carry out its mandates. If an injunction is entered and the National Guard cannot accompany and protect ICE personnel, the federal government will continue to be hindered in its ability to safely carry out its mandates. Consequently, the government has shown exactly what it needs to prevail on the third and fourth injunction factors: an uncontested interest in protecting federal agents and property, combined with active threats against both. *Cf. Index Newspapers LLC*, 977 F.3d at 838.

Against all this, the State claims only speculative harms and unsubstantiated harms. First, it cites a risk of civil unrest caused by demonstrators' opposition to the federalization of

guardsmen.  But as Plaintiffs' brief concedes and Defendants' brief has explained, *see supra* §
Background III, the significant civil unrest began days *before* the National Guard was mobilized.
The civil unrest stemmed from rioters' violent uprising.  The National Guard's presence, by
contrast, ensured that the rioters were not successful in completely overrunning federal property
and harming those ICE officers.  Regardless, Plaintiff's invocation of the hypothetical or possible
"risk of" harms is not enough and does not meet the "stringent" standard set forth by the Supreme
Court. *E.g., Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975); *Caribbean Marine Servs. Co. v.
Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("Speculative injury does not constitute irreparable
injury . . . ."); *Titaness Light Shop, LLC v. Sunlight Supply, Inc.*, 585 F. App'x 390, 391 (9th Cir.
2014).

Plaintiffs also complain that the federalization of Guardsmen subtracts from resources
available to the California National Guard.  But Plaintiffs do not identify any type of exigency that
they would direct these resources that approaches the seriousness of the situation in Los Angeles.
Plaintiffs worry that the activation of Guardsmen "jeopardizes vital resources on which the State
depends to protect itself from emergencies"—while ignoring that these resources have been
deployed to deal with a present emergency in the State.  TRO Mot. at 18.

An injunction is particularly inappropriate inasmuch as Plaintiffs largely invoke *procedural*
harm: namely, that the Order to mobilize the National Guard was not issued by the Governor or
that the Governor was not consulted. In *Winter*, the Supreme Court found an injunction was not
appropriate in the context of Plaintiff's claim that the Navy violated the National Environmental
Policy Act of 1969 and other federal laws when it failed to undertake statutorily required studies.
*Winter*, 555 U.S. at 12, 26.  The Court held that "forcing the Navy to deploy an inadequately trained
antisubmarine force jeopardizes the safety of the fleet," which was an interest that "plainly
outweigh[ed]" the plaintiffs' downstream interest in watching marine mammals.  *Id.* at 26.  An
injunction should be denied here for similar reasons.  Like *Winter*, this suit involves an allegation
that the military failed to comply with a procedural directive. Further, like *Winter*, the federal
government has articulated an immediate and direct harm if an injunction were to issue, but

Plaintiffs have only communicated a second-hand and speculative harm.

In balancing the equities and the public's interest, California's desire to keep the National Guard at bay must give way to the undisputed immediate threats to the life of federal officers and the security of federal property that the President is responsible for protecting.

## III.    ANY INJUNCTIVE RELIEF SHOULD BE STAYED PENDING APPEAL AND ACCOMPANY A BOND.

To the extent the Court issues any injunctive relief, Defendants respectfully request that such relief be stayed pending the disposition of any appeal that is authorized, or at a minimum, administratively stayed for a period of seven days to allow the United States to seek an emergency, expedited stay from the Court of Appeals or Supreme Court if an appeal is authorized.   For the reasons explained above, Defendants have, at a minimum, satisfied the requirements for a stay of any injunction pending appeal.  *See Nken v. Holden*, 556 U.S. 418, 434 (2009) (describing the standard for obtaining such a stay and noting the "substantial overlap" between that standard and "the factors governing preliminary injunctions").

The Defendants also respectfully request that any injunctive relief be accompanied by a bond under Fed. R. Civ. P. 65(c), which provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."

**CONCLUSION**

For these reasons, this Court should deny Plaintiffs' motion for a temporary restraining order or preliminary injunction.

Respectfully submitted,
BRETT A. SHUMATE
Assistant Attorney General
Civil Division

**A232**

ERIC J. HAMILTON
Deputy Assistant Attorney General
Federal Programs Branch
(CA Bar No. 296283)

ALEXANDER K. HAAS
(CA Bar No. 220932)
Director
Federal Programs Branch

*/s/ Christopher D. Edelman*
CHRISTOPHER EDELMAN
(DC Bar No. 1033486)
Senior Counsel
GARRY D. HARTLIEB
(IL Bar No. 6322571)
BENJAMIN S. KURLAND
(DC Bar No. 1617521)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel.: 202-305-8659
Email: christopher.edelman@usdoj.gov

*Attorneys for Defendants*

**A233**

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GAVIN NEWSOM, IN HIS OFFICIAL CAPACITY AS THE GOVERNOR OF THE STATE OF CALIFORNIA; STATE OF CALIFORNIA, | Case No. 3:25-cv-04870 |
| | **DECLARATION OF ERNESTO SANTACRUZ, JR.** |
| Plaintiffs, | |
| v. | Hon. Charles R. Breyer |
| DONALD TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; PETE HEGSETH, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF DEFENSE; U.S. DEPARTMENT OF DEFENSE, | United States District Judge |
| Defendants. | |

## <u>DECLARATION OF ERNESTO SANTACRUZ, JR.</u>

I, Ernesto Santacruz, Jr., hereby declare:

1.     I am employed by the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) as the Field Office Director (FOD) of the Los Angeles Field Office (ERO Los Angeles). I have held this position since April 6, 2025.

2.     I have been employed by ICE, or its predecessor Immigration and Naturalization Service (INS), since May 2002. Prior to my position as FOD, I served as the ERO Los Angeles Deputy Field Office Director, Acting Assistant Field Office

1

**A235**

Director, and Assistant Field Office Director. I have also served ERO as a Supervisory Detention and Deportation Officer, Deportation Officer, and Immigration Enforcement Agent. Prior to the creation of ICE, I served as a Detention Enforcement Officer with INS.

3.      As the FOD for ERO Los Angeles, I direct and oversee ICE's enforcement of federal immigration laws within the Central District of California, which has the same geographic boundaries as the ERO Los Angeles Field Office. The ERO Los Angeles Field Office currently consists of over 290 officers in six offices who are responsible for enforcing federal immigration laws in seven California counties with a combined population of over 20 million people. ICE is the largest investigative branch of DHS and is charged with the enforcement of more than 400 federal statutes. The agency was created after the September 11, 2001 terrorist attacks, by combining components of the former INS and the former U.S. Customs Service, to more effectively enforce federal immigration and customs laws and to protect the United States against terrorist attacks. The mission of ICE is to protect the United States from the cross-border crime and illegal immigration that threaten national security and public safety. To carry out that mission, ICE focuses on enforcing immigration laws, preventing terrorism, and combating transnational criminal threats. ICE consists of three core operational directorates: (1) ERO, which consists of 25 field offices led by FODs; (2) Homeland Security Investigations (HSI), which

2

**A236**

consists of 30 field offices led by Special Agents-in-Charge; and (3) the Office of the Principal Legal Advisor, which includes 25 field locations led by Chief Counsel.

4.      ERO deportation officers are immigration officers under 8 U.S.C. § 1357 and have been delegated limited customs officer authority under 19 U.S.C. § 1589a. It is the mission of ERO to identify, arrest, and remove aliens who present a danger to national security or are a risk to public safety, as well as those who enter the United States illegally—including those who cross the border illegally, which is a federal misdemeanor, 8 U.S.C. § 1325, and those who illegally reenter after having been removed, which is a federal felony, 8 U.S.C. § 1326—or otherwise undermine the integrity of our immigration laws and our border control efforts.

5.      The majority of ERO's immigration enforcement operations take place in the interior of the country. ERO manages all logistical aspects of the removal process by identifying, apprehending, and, when appropriate, detaining removable aliens during the course of immigration proceedings and pending physical removal from the United States. This includes locating and taking into custody fugitive aliens and at-large criminal aliens, as well as identifying aliens in federal, state, and local prisons and jails and working with those authorities to transfer them to ICE custody without releasing them into the community. When aliens are ordered removed, ERO is responsible for safely repatriating them, or otherwise overseeing their departure from the United States.

3

6.      ERO Los Angeles officers are authorized to execute civil immigration arrest warrants for aliens ordered removed by immigration judges, aliens subject to expedited removal orders, and aliens for whom ERO officers have probable cause of their removability. *See* 8 U.S.C. §§ 1225, 1226, 1231, 1357; *see also* 8 C.F.R. §§ 235.3(b), 236.1(b), 241.2, 287.5(e), 287.8(c).

7.      On Friday, June 6, 2025, ICE conducted immigration enforcement operations in several locations in the Los Angeles area. A crowd of people gathered at the site of an ICE law enforcement operation in the Garment District, tried to prevent ICE authorities from leaving in their official vehicles, and threw objects at the vehicles. Members of the crowd walked and ran alongside the vehicles creating dangerous conditions for both the officers and crowd. One protestor attempted to stop a law enforcement van's progression by standing directly in front of the van and placing his hand on the vehicle's hood. The man also backpedaled in front of a departing SUV, then tripped and fell in front of the vehicle. Fortunately, the driver of the SUV was able to reverse and drive around him without harming him. Individuals arrested during the immigration enforcement operation were taken to the ERO facility in the federal building at 300 N. Los Angeles Street for processing.

8.      At 3:23 p.m. on June 6, Mayor Karen Bass posted on X: "This morning, we received reports of federal immigration enforcement actions in multiple locations in Los Angeles. As Mayor of a proud city of immigrants, who contribute to our city in

4

**A238**

so many ways, I am deeply angered by what has taken place. These tactics sow terror in our communities and disrupt basic principles of safety in our city. My Office is in close coordination with immigrant rights community organizations. We will not stand for this."

9.      At about 5:00 p.m., I personally observed protesters pass by the front of the 300 North Los Angeles Street building heading northwest on Los Angeles Street. However, the situation turned violent and riotous as the marchers turned right and headed southeast down East Aliso Street, and then headed south on North Alameda Street.

10.      Around this time, the number of demonstrators swelled to approximately 500 at 300 North Los Angeles Street, in downtown Los Angeles, and an additional 300 at an underground parking garage gate off of North Alameda Street. This gate leads to a multilevel parking structure under all of the federal buildings in this complex, including a Veterans Affairs (VA) medical facility, the Roybal Courthouse, the 300 North Los Angeles Street Federal building, and the Metropolitan Detention Center.

11.      I observed that approximately five Federal Protective Service (FPS) inspectors, who use security expertise to protect federal facilities and protect employees, were pinned down in a defensive position by protesters and severely outnumbered while trying to defend the damaged back Alameda Street gate. The

5

**A239**

protestors were throwing concrete chunks, bottles of liquid, and other objects at the

FPS officers, as well as attempting to use large rolling commercial dumpsters as a

battering ram to breach the parking garage gate and damaged federal property. The

FPS officers defended the parking garage entrance against the protesters who were

violently trying to break open the garage gate and break into the federal building

complex.

12.     At that time, just inside the federal building, approximately 130 aliens

arrested by ICE earlier in the day were being processed by federal immigration

officers.

13.     I feared for the safety of all the office workers, federal employees, and

lawfully detained aliens in the building. This being late on a Friday afternoon, I had

to call all available officers in the building to report to the back Alameda Street gate

to prevent FPS from being overrun, which would have resulted in a breach of the

entire federal complex. All available ERO officers and HSI agents reported to the

location. The ICE officers formed a line of protection in front of the garage entrance

and held the line by using pepper balls and other alternatives to lethal force, aiming

to minimize harm and de-escalate situations. The combination of FPS, ERO, and

HSI law enforcement officers successfully prevented a breach and held the line

from approximately 5:15 p.m. to 10:30 p.m., including about an hour and a half

before the Los Angeles Police Department (LAPD), having been called by FPS,

arrived on scene to push the crowd to Temple Avenue.

14.     During this time, I observed that the demonstrators continued to be violent, using chairs, dumpsters, and other items as weapons against federal law enforcement officers.

15.     Thereafter, LAPD responded to the request from FPS for assistance and according to media reports, indicate that their response was delayed due to "significant traffic congestion, the presence of demonstrators, and…the fact that federal agents had deployed irritants into the crowd before LAPD's arrival."

16.     At approximately 7:00 p.m., approximately two hours after the protesters congregated in the area, LAPD declared an "unlawful assembly," ordered protestors to leave, and gave them 5 minutes to comply. The crowd did not comply. By 8:00 p.m., LAPD blocked the crowd's path to the Metropolitan Detention Center. Protestors threw large chunks of concrete at those officers. The LAPD fired non-lethal foam projectiles and bean bag rounds in response. The federal building was heavily vandalized.

17.     The demonstrators had all departed by 11:00 p.m., with the LAPD officers following them away from the property. However, there was damage to both the Federal Building at 300 North Los Angeles Street and the Edward R. Roybal Federal Building and United States Courthouse at 255 East Temple Street, which is next door. Both locations were heavily vandalized, the window to the guard shack

7

**A241**

was broken, there was evidence of tampering on the retractable anti-vehicle barriers, and the roll up entrance gate was working sporadically. Federal law enforcement officers secured the entrance gate throughout Friday night.

18.    On the next morning of Saturday, June 7, 2025, while federal officers prepared for an immigration enforcement operation at a Department of Homeland Security office in Paramount, California, a large crowd gathered. A large contingent of approximately 110 Customs and Border Protection (CBP) officers had arrived from the San Diego area to assist with immigration enforcement operations and as a precautionary measure in the aftermath of Friday night's violence. Prior to the start of the immigration enforcement action, these CBP officers stood in uniform in an industrial park in advance of discussing the day's upcoming operations.

19.    Coincidently, a Home Depot retail store – which was not the target of any intended operation – was located just across the street from the DHS office parking lot being used for staging.

20.    A large crowd gathered and blocked traffic in the area. The crowd became violent and attacked the ERO and CBP officers. This led to about seven hours of non-stop fighting, from about 9:30 a.m. to approximately 5:00 or 6:00 p.m. The violent crowd boxed in ERO and CBP officers throwing mortar-style fireworks with multiple explosions, rocks and mangos at them, and used shopping carts to

barricade the street, prompting our officers to try clear a path so federal vehicles could enter and exit. One ERO officer was trapped inside her law enforcement vehicle when the crowd surrounded it, pounding it, shaking it, and violently pummeling it with stones, necessitating a rescue from other officers on scene. A protester shattered the wrist of a CBP officer with a thrown object. The violent and riotous crowd set at least one vehicle on fire and possibly also set a propane tank on fire, which exploded and thankfully did not injure anyone.

21.    HSI reports that the perimeter fence of the DHS office in Paramount was cut in two places, three government vehicles were damaged, the business park sign was vandalized, and mortar-style fireworks with multiple explosions were thrown at the federal officers. In addition, at approximately 4:00 p.m., the Los Angeles Sheriff's Department (LASD) declared an "unlawful assembly" in Paramount, and the protest spread to the neighboring Compton area.

22.    Later that Saturday night, another protest formed in the vicinity of the Federal complex at 300 N. Los Angeles Street, near the location of the previous night's riot, at North Alameda Avenue and East Temple Street. According to media reports, the LAPD eventually declared this to be an unlawful assembly.

23.    I was informed by Homeland Security Investigations on the morning of Sunday, June 8, National Guard troops arrived in downtown Los Angeles. Specifically, 300 National Guard troops deployed to Paramount, Compton, and

9

**A243**

downtown Los Angeles.

24.     On Sunday afternoon, at around 3:00 p.m., a large crowd of people marched from the steps of Los Angeles City Hall to the 300 N. Los Angeles Street federal complex. Protestors confronted a line of federal agents stationed outside. LAPD issued a citywide Tactical Alert. Shortly thereafter, the LAPD issued a dispersal order and made additional arrests.

25.     Then, protestors entered the 101 Freeway in downtown Los Angeles, blocking the Aliso Street off-ramp. California Highway Patrol (CHP) officers dispersed the crowd by 5 p.m. and moved them to the Civic Center.

26.     At approximately 9:00 p.m., LAPD declared the downtown protest to be an unlawful assembly and ordered protestors to leave. The protesters did not leave. They continued to move through downtown, setting off commercial-grade fireworks toward federal officers and throwing objects at passing law enforcement vehicles. The protestors lit fires in dumpsters and trash bins and looted at least one store. Protestors vandalized dozens of buildings with graffiti, including the Federal Courthouse and LAPD Headquarters.

27.     By the end of the weekend, the Federal building at 300 N. Los Angeles Street was vandalized in numerous locations, pieces of the bollards used for building security were broken, and the security checkpoint was in ruins. Numerous federal officers and agents have been injured by projectiles thrown at them such as

**A244**

rocks, water bottles, and bricks.

28.     Many law enforcement personnel, including the five FPS officers who initially held the North Alameda Street gate while severely outnumbered.  On Monday, June 9, at approximately 5:00 p.m. additional protests are formed at the 300 North Los Angeles Street federal complex, as well as at the Federal Building in Santa, Ana, Orange County, California. Based on federal agency reports, a crowd of 1,000 demonstrators gathered near the Roybal Federal Building. At this time a demonstrator drove by the building and fired paintballs at the FPS inspectors, hitting at least one in the head and neck. At the Santa Ana Federal Building, violent protestors attacked a 13-passenger federal van carrying multiple aliens and officers, rocking the vehicle, and smashing the windows. The violent protestors also damaged multiple vehicles in the surrounding parking lot.

29.     This federal complex was largely closed today Monday will again be closed Tuesday, due to the civil unrest. This is a disruption for the many federal agencies working in this building, as well as the co-located federal courthouse, VA medical facility, and Federal Bureau of Prisons facility.

30.     From what I understand, the LAPD reported they are on tactical alert and declared a partial mobilization of 400 additional officers.

31.     The aggressive horde at the Roybal Building moved downtown to Little Tokyo and City Hall later in the evening, where they clashed with LAPD officers,

**A245**

injuring five, and also injured five LAPD horses. LAPD deployed less-lethal munitions and made multiple arrests.

32.     LAPD declared an unlawful assembly for the area of the Civic Center part of Los Angeles and had to shut down Route 101 in central Los Angeles in response to demonstrators throwing objects onto the freeway and damaging multiple police vehicles.

33.     Even with the LAPD, LASD, and CHP all engaged in the ensuing law enforcement activities, I believe the safety of local federal facilities and safety of those conducting immigration enforcement operations in this area of responsibility requires additional manpower and resources. Aside from the horrendous actions of the violent demonstrators at the various federal protected locations, I am also aware that there were significant instances of demonstrators posting the location, images, and family information of federal law enforcement employees online in an attempt to dox, threaten, and obstruct federal law enforcement personnel and their families and impede lawful federal activity. Demonstrators have also been posting the locations of federal law enforcement employees conducting immigration enforcement operations to threaten and obstruct their work.

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best

of my information, knowledge, and belief.

Executed on this 11th day of June 2025.

ERNESTO M
SANTACRUZ
JR

Digitally signed by
ERNESTO M
SANTACRUZ JR
Date: 2025.06.11
08:16:31 -07'00'

Ernesto Santacruz, Jr.
Field Office Director
DHS ICE ERO Los Angeles

13

**A247**

# EXHIBIT 2



**SECRETARY OF DEFENSE**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

JUN 0 7 2025

MEMORANDUM FOR ADJUTANT GENERAL OF THE CALIFORNIA NATIONAL GUARD
THROUGH: THE GOVERNOR OF CALIFORNIA

SUBJECT: Calling Members of the California National Guard into Federal Service

    The President of the United States has called forth at least 2000 National Guard personnel into Federal service pursuant to section 12406 of title 10, U.S. Code, to temporarily protect U.S. Immigration and Customs Enforcement and other U.S. Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where protests against these functions are occurring or are likely to occur based on current threat assessments and planned operations. The President signed a copy of the attached memorandum today to effectuate the calling forth of these Service members.

    This memorandum implements the President's direction. Two thousand members of the California National Guard will be called into Federal service effective immediately for a period of 60 days. The Chief of the National Guard Bureau will immediately coordinate the details of the mobilization with the Adjutant General of the California National Guard, in coordination with the Chairman of the Joint Chiefs of Staff and Commander, U.S. Northern Command. The mobilized Service members will be under the command and control of the Commander, U.S. Northern Command.

Attachment:
As stated

cc:
Chairman of the Joint Chiefs of Staff
Chief, National Guard Bureau
Commander, U.S. Northern Command
Under Secretary of Defense for Policy

**A249**

June 7, 2025


MEMORANDUM FOR THE SECRETARY OF DEFENSE
                THE ATTORNEY GENERAL
                THE SECRETARY OF HOMELAND SECURITY

SUBJECT:          Department of Defense Security for the Protection
                  of Department of Homeland Security Functions


Numerous incidents of violence and disorder have recently
occurred and threaten to continue in response to the enforcement
of Federal law by U.S. Immigration and Customs Enforcement (ICE)
and other United States Government personnel who are performing
Federal functions and supporting the faithful execution of
Federal immigration laws.  In addition, violent protests
threaten the security of and significant damage to Federal
immigration detention facilities and other Federal property.  To
the extent that protests or acts of violence directly inhibit
the execution of the laws, they constitute a form of rebellion
against the authority of the Government of the United States.

In light of these incidents and credible threats of continued
violence, by the authority vested in me as President by the
Constitution and the laws of the United States of America, I
hereby call into Federal service members and units of the
National Guard under 10 U.S.C. 12406 to temporarily protect ICE
and other United States Government personnel who are performing
Federal functions, including the enforcement of Federal law, and
to protect Federal property, at locations where protests against
these functions are occurring or are likely to occur based on
current threat assessments and planned operations.  Further, I
direct and delegate actions as necessary for the Secretary of
Defense to coordinate with the Governors of the States and the
National Guard Bureau in identifying and ordering into Federal
service the appropriate members and units of the National Guard
under this authority.  The members and units of the National
Guard called into Federal service shall be at least 2,000
National Guard personnel and the duration of duty shall be for
60 days or at the discretion of the Secretary of Defense.  In
addition, the Secretary of Defense may employ any other members

**A250**

2

of the regular Armed Forces as necessary to augment and support
the protection of Federal functions and property in any number
determined appropriate in his discretion.

To carry out this mission, the deployed military personnel may
perform those military protective activities that the Secretary
of Defense determines are reasonably necessary to ensure the
protection and safety of Federal personnel and property  The
Secretary of Defense shall consult with the Attorney General and
the Secretary of Homeland Security prior to withdrawing any
personnel from any location to which they are sent.  The
Secretaries of Defense and Homeland Security may delegate to
subordinate officials of their respective Departments any of the
authorities conferred upon them by this memorandum.


                         DONALD J. TRUMP

# EXHIBIT 3



**SECRETARY OF DEFENSE**
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

JUN - 9 2025

MEMORANDUM FOR ADJUTANT GENERAL OF THE CALIFORNIA NATIONAL GUARD
THROUGH: THE GOVERNOR OF CALIFORNIA

SUBJECT: Calling Additional Members of the California National Guard into Federal Service

On June 7, 2025, the President of the United States called forth at least 2,000 National Guard personnel into Federal service pursuant to section 12406 of title 10, U.S. Code, to temporarily protect U.S. Immigration and Customs Enforcement and other U.S. Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where protests against these functions are occurring or are likely to occur based on current threat assessments and planned operations. The President signed a copy of the attached memorandum to effectuate the calling forth of these Service members. Also on June 7, 2025, I implemented that order by directing 2,000 members of the California National Guard be called into Federal Service for a period of 60 days (see attached memorandum).

This memorandum further implements the President's direction. An additional 2,000 members of the California National Guard will be called into Federal service effective immediately for a period of 60 days. The Chief of the National Guard Bureau will immediately coordinate the details of the mobilization with the Adjutant General of the California National Guard, in coordination with the Chairman of the Joint Chiefs of Staff and Commander, U.S. Northern Command. The mobilized Service members will be under the command and control of the Commander, U.S. Northern Command.

Attachments:
As stated

cc:
Chairman of the Joint Chiefs of Staff
Chief, National Guard Bureau
Commander, U.S. Northern Command
Under Secretary of Defense for Policy
Under Secretary of Defense for Personnel and Readiness

**A253**

June 7, 2025


MEMORANDUM FOR THE SECRETARY OF DEFENSE
                THE ATTORNEY GENERAL
                THE SECRETARY OF HOMELAND SECURITY

SUBJECT:          Department of Defense Security for the Protection
                  of Department of Homeland Security Functions


Numerous incidents of violence and disorder have recently
occurred and threaten to continue in response to the enforcement
of Federal law by U.S. Immigration and Customs Enforcement (ICE)
and other United States Government personnel who are performing
Federal functions and supporting the faithful execution of
Federal immigration laws.  In addition, violent protests
threaten the security of and significant damage to Federal
immigration detention facilities and other Federal property.  To
the extent that protests or acts of violence directly inhibit
the execution of the laws, they constitute a form of rebellion
against the authority of the Government of the United States.

In light of these incidents and credible threats of continued
violence, by the authority vested in me as President by the
Constitution and the laws of the United States of America, I
hereby call into Federal service members and units of the
National Guard under 10 U.S.C. 12406 to temporarily protect ICE
and other United States Government personnel who are performing
Federal functions, including the enforcement of Federal law, and
to protect Federal property, at locations where protests against
these functions are occurring or are likely to occur based on
current threat assessments and planned operations.  Further, I
direct and delegate actions as necessary for the Secretary of
Defense to coordinate with the Governors of the States and the
National Guard Bureau in identifying and ordering into Federal
service the appropriate members and units of the National Guard
under this authority.  The members and units of the National
Guard called into Federal service shall be at least 2,000
National Guard personnel and the duration of duty shall be for
60 days or at the discretion of the Secretary of Defense.  In
addition, the Secretary of Defense may employ any other members

2

of the regular Armed Forces as necessary to augment and support
the protection of Federal functions and property in any number
determined appropriate in his discretion.

To carry out this mission, the deployed military personnel may
perform those military protective activities that the Secretary
of Defense determines are reasonably necessary to ensure the
protection and safety of Federal personnel and property  The
Secretary of Defense shall consult with the Attorney General and
the Secretary of Homeland Security prior to withdrawing any
personnel from any location to which they are sent.  The
Secretaries of Defense and Homeland Security may delegate to
subordinate officials of their respective Departments any of the
authorities conferred upon them by this memorandum.


                              DONALD J. TRUMP



**SECRETARY OF DEFENSE**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

JUN 0 7 2025

MEMORANDUM FOR ADJUTANT GENERAL OF THE CALIFORNIA NATIONAL GUARD
THROUGH: THE GOVERNOR OF CALIFORNIA

SUBJECT: Calling Members of the California National Guard into Federal Service

      The President of the United States has called forth at least 2000 National Guard personnel into Federal service pursuant to section 12406 of title 10, U.S. Code, to temporarily protect U.S. Immigration and Customs Enforcement and other U.S. Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where protests against these functions are occurring or are likely to occur based on current threat assessments and planned operations. The President signed a copy of the attached memorandum today to effectuate the calling forth of these Service members.

      This memorandum implements the President's direction. Two thousand members of the California National Guard will be called into Federal service effective immediately for a period of 60 days. The Chief of the National Guard Bureau will immediately coordinate the details of the mobilization with the Adjutant General of the California National Guard, in coordination with the Chairman of the Joint Chiefs of Staff and Commander, U.S. Northern Command. The mobilized Service members will be under the command and control of the Commander, U.S. Northern Command.

Attachment:
As stated

cc:
Chairman of the Joint Chiefs of Staff
Chief, National Guard Bureau
Commander, U.S. Northern Command
Under Secretary of Defense for Policy

**A256**

## IN THE UNITED STATES COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

GAVIN NEWSOM, et al.     )
             )
 *Plaintiffs,*       )
             )  No. 3:25-cv-4870
 v.          )
             )
DONALD TRUMP, et al.     )
             )
 *Defendant*       )

---

## DECLARATION OF MAJOR GENERAL NIAVE F. KNELL

I, Major General Niave F. Knell, hereby state and declare as follows:

1. I am currently employed by the United States Army as the Deputy Commanding General for the United States Army North Command (ARNORTH), which is a component of the United States Northern Command (USNORTHCOM). I have held this position since August 24, 2024. I have served as a commissioned Army Officer for more than 33 years. My current responsibilities include overseeing the daily operations of ARNORTH as well as ensuring the training, discipline, and readiness of the units under ARNORTH's command. I have reviewed the Complaint in the matter of *Newsom v. Trump*, No. 3:25-cv-4870 (N.D. Cal.). This declaration is based on my personal knowledge as well as information made available to me during the routine execution of my official duties.

2. On June 7, 2025, the President of the United States issued a memorandum with the subject "Department of Defense (DoD) Security for the Protection of Department of Homeland Security (DHS) Functions." The memorandum noted: "Numerous incidents of violence and disorder have recently occurred and threaten to continue in response to the enforcement of Federal law by U.S. Immigration and Customs Enforcement (ICE) and other United States

Government personnel who are performing Federal functions and supporting the faithful execution of Federal immigration laws. Aditionally, violent protests threaten the security of, and significant damage to, Federal immigration detention facilities and other Federal property." The memorandum thus directed members of the National Guard into federal service "to temporarily protect ICE and other United States Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property." It further directed the Secretary of Defense to call *at least* 2,000 National Guard personnel into service for 60 days subject to change at his discretion. It also further delegated to the Secretary of Defense the authority to utilize the regular forces to assist with this mission. The Secretary of Defense issued guidance accordingly that same day. The following day, the Secretary authorized the activation of the 2nd Battalion, 7th Marine Regiment, 1st Marine Division.

3.      The Chief of the National Guard Bureau transmitted the Secretary of Defense's orders on Saturday, June 7 to the Adjutant General of the California National Guard. At 10:17 Pacific Standard Time, the California Adjutant General responded, "consider our forces mobilized."

4.      USNORTHCOM is one of DoD's eleven unified combatant commands. Its mission is to provide command and control of DoD homeland defense efforts and to coordinate defense support of civil authorities. ARNORTH supports USNORTHCOM in this mission.

5.      When federalized, members of a State National Guard serve pursuant to Title 10 of the U.S. Code under the command of the President and the Secretary of Defense. In this case, the Secretary of Defense authorized USNORTHCOM to execute command and control of federalized members of the California National Guard as well as the 2nd Battalion, 7th Marine Regiment, 1st Marine Division (2/7 USMC). USNORTHCOM further delegated operational control of federalized National Guard forces and tactical control of Marine forces to ARNORTH.

6.     Following the President's June 7, 2025 memorandum, ARNORTH published Operational Order (OPORD) 01-23 and Fragmentary Order (FRAGORD) 25-501.000 to direct federalized members of California National Guard and members of the 2/7 USMC to temporarily protect federal property, as well as ICE and other U.S. Government personnel who are performing federal functions, where protests are occurring in Los Angeles County, California.

7.     Since Saturday, June 7, federalized California National Guard personnel have conducted operations in Los Angeles strictly consistent with the directions of the President's June 7 memorandum and FRAGORD 25-501.000.  They are protecting federal personnel performing official functions as well as property at designated locations through security patrols, observation posts, and outer cordon security perimeter of buildings.  Federalized California National Guard personnel activities are limited to those protection operations.  They are not performing law enforcement or any other functions.

8.     So far, 2,112 members and 256 vehicles of the 79th Infantry Brigade Combat Team have conducted or are currently conducting the following protection operations:

    A.  146 federalized guardsmen protected an ICE facility located at 6319 Alondra Boulevard, Paramount, California.

    B.  108 federalized guardsmen are conducting patrols of a federal building located at 110 Wilshire Boulevard, Los Angeles, California.

    C.  94 federalized guardsmen are protecting federal facilities and federal personnel performing official functions in downtown Los Angeles.

    D.  107 federalized guardsmen are providing protection to Homeland Security Investigations (HSI) warrant servicing agents performing official functions at a Los Angeles airport cargo terminal.

E.  95 federalized guardsmen provided protection at a federal building located at 535 Alameda Street, Los Angeles, California.

F.  300 federalized guardsmen protected federal employees and property at a federal building located at 11099 S. La Cienega Boulevard, Los Angeles, California.

G.  32 federalized guardsmen provided protection for a federal building located at 34 Civic Center Plaza, San Ana, California.

H.  35 federalized guardsmen performed protection activities for the Glenn M. Anderson federal building located at 501 W. Ocean Boulevard, Long Beach, California.

I.  Federalized guardsmen continue to provide protection for ICE Officers, Customs and Border Protection Officers, and Federal Bureau of Investigations Special Agents performing official functions so that such federal personnel may carry out their assigned duties.

9.  ARNORTH has been allocated tactical control of 721 members of the 2/7 USMC.  These Marines are currently training in preparation to conduct similar protection operations.


MAJOR GENERAL NIAVE F. KNELL

DEPUTY COMMANDING GENERAL
U.S. Army North


**A260**

1
2
3
4
5               IN THE UNITED STATES DISTRICT COURT
6             FOR THE NORTHERN DISTRICT OF CALIFORNIA
7

8    GAVIN NEWSOM, et al.,              Case No.  25-cv-04870-CRB
9                Plaintiffs,
                                         **ORDER GRANTING PLAINTIFFS'**
10        v.                             **APPLICATION FOR TEMPORARY**
                                         **RESTRAINING ORDER**
11   DONALD J. TRUMP, et al.,
12               Defendants.

13          On June 6, 2025, the federal government initiated immigration raids across the City

14   of Los Angeles.  Protests swiftly followed, and some individuals involved in those protests

15   were unruly and even violent.  State and local law enforcement responded.  The following

16   day, President Trump ordered that members of the California National Guard be

17   federalized, and thereupon assumed control of those forces.

18          At this early stage of the proceedings, the Court must determine whether the

19   President followed the congressionally mandated procedure for his actions.  He did not.

20   His actions were illegal—both exceeding the scope of his statutory authority and violating

21   the Tenth Amendment to the United States Constitution.  He must therefore return control

22   of the California National Guard to the Governor of the State of California forthwith.

23   I.     **BACKGROUND**

24          A.     **California National Guard**

25          The California Army National Guard and the California Air National Guard

26   (together, the California National Guard) are part of the organized militia of the State of

27   California and federally recognized units of the reserve components of the U.S. military.

28   Eck Decl. (dkt. 8-3) ¶ 20.  Governor Newsom is the commander-in-chief of the California

United States District Court
Northern District of California

1   National Guard when it is under state control.  Id. ¶ 31; Cal. Const., art. V, § 7.  President

2   Trump is the commander-in-chief of the U.S. Armed Forces, including the National Guard

3   when it is under federal control.  U.S. Const. art. II § 2, cl. 1.  A president can call the

4   National Guard into federal service under Title 10 of the United States Code.  Id. ¶ 27.

5   That is what happened here.

6       California has the largest National Guard in the country, with 18,733 members,

7   12,212 of whom are currently available.  Eck Decl. ¶¶ 28, 30.  The California National

8   Guard is "vital" in carrying out state functions such as "emergency and natural disaster

9   response, cybersecurity, and drug interdiction."  Id. ¶ 31.  For instance, 2,500 California

10  National Guard members were activated in response to the destructive fires in Los Angeles

11  County in January 2025.  Id. ¶¶ 35–36.  Some serve on Taskforce Rattlesnake, the state's

12  specialized fire combat unit.  Id. ¶¶ 14, 39–40.  Others serve on the Counterdrug

13  Taskforce, which specializes in stopping fentanyl trafficking at the U.S.-Mexico border.

14  Id. ¶¶ 15, 42–43.

15      **B.    ICE Actions and Public Protest**

16          On June 6, 2025, Immigration and Customs Enforcement began carrying out

17  immigration raids in Los Angeles. Olmstead Decl. (dkt. 8-2) ¶ 6.  The Associated Press

18  reported that ICE executed search warrants at multiple locations across Los Angeles.

19  Espíritu Decl. (dkt. 8-1) Ex. F ("Federal immigration authorities have been ramping up

20  arrests across the country to fulfill President Donald Trump's promise of mass

21  deportations.").  Los Angeles Police Chief Jim McDonnell stated that "federal officials did

22  not brief his department, which made it difficult to respond to the mobs of people who

23  began to protest."  See McPhee, LAPD Chief Jim McDonnell Says, 'Violence I Have Seen

24  Is Disgusting,' Recounting Attacks on Cops, L.A. Mag. (June 8, 2025),

25  https://perma.cc/G24N-PZHE.  ICE reportedly targeted "several locations in downtown

26  L.A. and its immediate surroundings" that are "known to have significant migrant

27  populations and labour-intensive industries."  Espíritu Decl. Ex. G.  These included two

28  Home Depot stores, a donut store, and a clothing wholesaler.  Id.  Ultimately, between 70

United States District Court
Northern District of California

and 80 people were detained, and 44 arrested.  Espíritu Decl. Exs. G, H.

State and city leaders expressed concern and disapproval.  Governor Newsom reportedly stated that the "[c]ontinued chaotic federal sweeps … to meet an arbitrary arrest quota are as reckless as they are cruel."  Espíritu Decl. Ex. D.  Mayor Karen Bass told reporters that she received no notice that the raids were to be conducted, and that the raids "sow[] a sense of chaos in our city, and a sense of terror."  Id.  And Los Angeles County Supervisor Janice Hahn reportedly said: "They aren't targeting violent criminals—they are sweeping up hardworking people in our communities just trying to provide for their families.  These agents are armed to the teeth and it is clear their goal is to make people afraid and it's working."  Id.

Some members of the public gathered in protest.  A group of people assembled at the site of an ICE operation in Los Angeles's Garment District and tried to prevent ICE from leaving.  Santacruz Decl. (dkt. 22-1) ¶ 7; Espíritu Decl. Ex. D.  Another one of the primary protests on June 6 took place at the Metropolitan Detention Center.  Olmstead Decl. ¶ 6.  The protests were explicitly about the immigration raids.  See Espíritu Decl. Ex. D ("Friday evening, protesters marched in downtown L.A. condemning Friday's immigration raids.").  The Governor's Office of Emergency Services, which was monitoring the protests, was in regular communication with representatives of the Los Angeles Police Department and the Los Angeles County Sheriff's Department.  Olmstead Decl. ¶ 6.  Both stated that they did not need additional resources, and LAPD reassigned additional officers to the area.  Id.

That evening, protesters reportedly marched in downtown Los Angeles.  Espíritu Decl. Ex. D.  There were about 800 protesters at two sites.  Santacruz Decl. ¶¶ 9, 10.  Some protesters threw "concrete chunks, bottles of liquid, and other objects at Federal Protective Service officers guarding a parking lot gate; some protesters attempted "to use large rolling commercial dumpsters as a battering ram."  Id. ¶ 11.  Officers protected the gate entrance with pepper balls and other nonlethal force, until LAPD arrived and pushed the crowd away.  Id. ¶ 13.  Some of the protesters used "chairs, dumpsters, and other items

United States District Court
Northern District of California

1  as weapons." Id. ¶ 14.  LAPD declared an "unlawful assembly," and while some

2  individuals resisted, the protesters departed by 11:00 p.m.  Id. ¶¶ 16, 17.  Two federal

3  buildings were vandalized and sustained minor damage.  Id. ¶ 17.

4        On June 7, both the ICE operations and responsive protests continued.  Olmstead

5  Decl. ¶ 7.  In addition to the protest at the Metropolitan Detention Center, protests also

6  emerged in Paramount and Compton.  Id.  LASD provided 200 deputies to respond to the

7  Paramount and Compton protests, including a team with specialized training in handling

8  civil unrest.  Id.  Customs and Border Protection officers arrived from San Diego to assist

9  with immigration enforcement operations.  Santacruz Decl. ¶ 18.

10        During the evening hours of June 7, the protest at the Metropolitan Detention

11  Center was "fairly in control," with some protesters targeting the building.  Olmstead Decl.

12  ¶ 9.  Federal officers pushed protesters away while LAPD officers moved in front and

13  declared an unlawful assembly; by 2:15 a.m., "most of the protestors had left the area." Id.

14  In Paramount and Compton, there were about 300 to 400 protesters present.  Id. ¶ 10.

15  Some protesters threw rocks and other objects (including a Molotov cocktail), burned a

16  vehicle, looted a gas station, and vandalized property.  Id. ¶ 9.  There was an extended

17  clash between some protesters and officers, with a crowd boxing in the officers and

18  throwing fireworks, rocks, and mangos at them, and "using shopping carts to barricade the

19  street."  Santacruz Decl. ¶ 20.  One officer was briefly trapped inside her law enforcement

20  vehicle when a crowd surrounded it, shook it, and threw stones at it.  Id.  A DHS fence was

21  damaged, and three government vehicles were damaged.  Id. ¶ 21.  Local law enforcement

22  brought the situation under control by 4:00 a.m. and LASD was able to demobilize its

23  teams.  Olmstead Decl. ¶ 9.  About 11 people were arrested for engaging in unlawful

24  behavior at the protests that night.  Id. ¶ 10.

25      **C.**    **Federalizing of National Guard and Continued Protest**

26        President Trump intervened in the response to the protests on the evening of June 7,

27  issuing a memorandum to the Secretary of Defense, Attorney General, and Secretary of

28  Homeland Security.  See June 7 Memo (Espíritu Decl. Ex. O at 108–09).  Although it did

not name California, Los Angeles, or any other geographic area, the memo asserted that "[n]umerous incidents of violence and disorder have recently occurred and threaten to continue in response to the enforcement of Federal law by [ICE] and other United States Government personnel." Id. It continued: "To the extent that protests or acts of violence directly inhibit the execution of the laws, they constitute a form of rebellion against the authority of the Government of the United States." Id. (emphasis added). The memo explained that due to "these incidents and credible threats of continued violence," President Trump was calling

> into Federal service members and units of the National Guard under 10 U.S.C. [§] 12406 to temporarily protect ICE and other United States Government personnel who are performing Federal functions, including enforcement of Federal law, and to protect Federal property, at locations where protests against these functions are occurring or are likely to occur based on current threat assessments and planned operations.

Id. President Trump further directed Secretary Hegseth "to coordinate with the Governors of the States and the National Guard Bureau in identifying and ordering into Federal service the appropriate members and units of the National Guard under this authority," calling for "at least 2,000" National Guard personnel to be on duty "for 60 days or at the discretion of" Secretary Hegseth. Id. (emphasis added). Finally, the memo provided that Secretary Hegseth could "employ any other members of the regular Armed Forces as necessary." Id.

Secretary Hegseth issued an order that same night, attaching the June 7 Memo, and announcing that 2,000 members of the California National Guard were being "called into Federal service effective immediately for a period of 60 days." See June 7 DOD Order (Espíritu Decl. Ex. P at 111). The top of the order read:

**MEMORANDUM FOR ADJUTANT GENERAL OF THE
CALIFORNIA NATIONAL GUARD
THROUGH: THE GOVERNOR OF CALIFORNIA**

Id. The order further stated that the Commander of U.S. Northern Command would control the 2,000 National Guard members. Id.

Defendants did not notify Governor Newsom of their intent to federalize the

United States District Court
Northern District of California

1    California National Guard prior to issuing the June 7 Memo or the June 7 DOD Order.

2    Espíritu Decl. Ex. K (June 8 letter from Sapp to Secretary Hegseth).[1]  Governor Newsom

3    only learned of the June 7 DOD Order from the Adjutant General after the Adjutant

4    General received it.  Id.  The Adjutant General relinquished command to the commander

5    of U.S. Northern Command, and thereafter the commander of U.S. Northern Command,

6    not the Governor, has issued all orders to the federalized National Guard.  Espíritu Decl.

7    Ex. J.  Responding to these events, Governor Newsom issued a statement that "[t]he

8    federal government is taking over the California National Guard and deploying 2,000

9    soldiers in Los Angeles—not because there is a shortage of law enforcement, but because

10   they want a spectacle."  Espíritu Decl. Ex. Q.  On June 8, the New York Times reported

11   that President Trump wrote on social media that he had directed his cabinet officials to

12   "take any actions necessary to 'liberate Los Angeles from the Migrant Invasion,'" and

13   said, "we're going to have troops everywhere."  Espíritu Decl. Ex. M.

14         The National Guard troops arrived in Los Angeles on June 8, but "it was not clear

15   what role they were to play or what orders they were provided," and "there were concerns"

16   that they "did not have the equipment or training necessary to handle the situation."

17   Espíritu Decl. Ex. R; Olmstead Decl. ¶ 11.  Initially that morning, the city was quiet.

18   Espíritu Decl. Ex. R.  That afternoon, protesters increased to about 3,500, particularly near

19   the Metropolitan Detention Center, where the National Guard was deployed.  Olmstead

20   Decl. ¶ 12.  "[M]any of the protestors appeared angry that the National Guard had been

21   federalized and was now present in their city."  Id.; Espíritu Decl. Ex. M (New York Times

22   stating that "aggressive federal response … in turn sparked new protests across the city.").

23   "The presence of the National Guard seemed to only inflame the protesters further."

24   Olmstead Decl. ¶ 12.[2]

25

26   [1] President Trump called Governor Newsom at some point and purportedly "directed him
     to take action to stop the violence."  Opp. at 5 & n.4 (citing Colton & Roberts, Trump
27   brings receipts, Fox News (June 10, 2025), https://perma.cc/EX6D-V8Y5).  No one
     suggests that President Trump mentioned the National Guard.
28   [2] The LAPD Chief whom Defendants quote as stating that "things have gotten out of
     control," see Opp. (dkt. 25) at 1, n.2, made that comment on the night of June 8.

1    LAPD, LASD, and the California Highway Patrol deployed to the protest area as
2    protesters, blocked Highway 101.  Id. ¶ 13.  Several blocks away, individuals reportedly
3    vandalized Waymo driverless vehicles.  Espíritu Decl. Ex. R.  Some people "moved
4    through downtown, setting off commercial-grade fireworks toward federal officers and
5    throwing objects at passing law enforcement vehicles."  Santacruz Decl. ¶ 26.  Individuals
6    "lit fires in dumpsters and trash bins[,] looted at least one store," and vandalized buildings.
7    Id.  At least 42 people were arrested in connection with their conduct during the June 8
8    protests.  Olmstead Decl. ¶ 14.

9    That same day, Governor Newsom's office wrote to Secretary Hegseth, stating that
10   the June 7 DOD Order did not comply with the law or even with President Trump's June 7
11   Memo.  Espíritu Decl. Ex. K.  The letter argued that "local law enforcement resources are
12   sufficient to maintain order" and that deploying the National Guard without adequate
13   training or orders "risks seriously escalating the situation."  Id.  Asserting that the
14   deployment represented "a serious breach of state sovereignty that seems intentionally
15   designed to inflame the situation," the letter asked Secretary Hegseth to rescind the June 7
16   DOD Order.  Id.

17   Instead, on June 9, Secretary Hegseth posted on social media that "approximately
18   700 active-duty U.S. Marines from Camp Pendleton are being deployed to Los Angeles to
19   restore order" and "defend federal law enforcement officers."  Eck Decl. ¶ 18.  Secretary
20   Hegseth then issued a second order federalizing another 2,000 National Guard members
21   for 60 days.  June 9 DOD Order (Espíritu Decl. Ex. P at 114).  Defendants did not consult
22   with Governor Newsom in advance of the June 9 DOD Order.  Espíritu Decl. Ex. S.  On
23   June 9, a thousand demonstrators gathered, and one person drove by firing paintballs at the
24   FPS inspectors.  Santacruz Decl. ¶ 28.  The crowd clashed with LAPD officers, injuring
25   five.  Id. ¶ 31.

26   Over the course of the protests, state and local law enforcement arrests increased by
27   the day, with over 400 individuals ultimately being arrested in total.  Olmstead Supp. Decl.

28

(dkt. 39-3) ¶ 14.[3]  The parties have not introduced any evidence of any protesters carrying firearms, and there is no evidence of any organized (as opposed to sporadic) violence.

### D.    Procedural History

Plaintiffs Newsom and the State of California bring suit against Defendants Trump, Hegseth, and the DOD, arguing that Defendants' actions exceeded the scope of their authority.  See Compl. (dkt. 1).  The complaint includes causes of action for: (1) ultra vires, against all Defendants; (2) violation of the Tenth Amendment of the U.S. Constitution, against all Defendants; and (3) violation of the Administrative Procedures Act, against Secretary Hegseth and the Department of Defense.  Id.  Plaintiffs seek declaratory and injunctive relief.  Id. ¶ 107.  On June 10, Plaintiffs filed a Motion for a TRO, asking the Court to rein in the President's use of military force in Los Angeles.  Mot. (dkt. 8); Reply (dkt. 39).  Defendants have opposed the motion, see Opp., and the Court held a hearing on June 12.

## II.    LEGAL STANDARD

A party seeking a temporary restraining order must establish (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest.  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008); Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., 240 F.3d 832, 839 n.7 (9th Cir. 2001) (standard for temporary restraining order the same as for preliminary injunction).  Alternatively, if the party demonstrates that "the balance of hardships tips sharply in [its] favor," it need only show that "serious questions going to the merits were raised" and that the other two Winter elements are satisfied.  All. for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1134–35 (9th Cir. 2011) (citation omitted).  Either way, success on the merits "is the most important Winter factor."  Disney Enters., Inc. v. VidAngel, Inc., 869 F.3d 848, 856 (9th Cir. 2017) (citation omitted).  And when the government is a party, the last two Winter factors—the

---

[3] LAPD made 29 arrests on June 7.  Id.  LAPD, LASD, and CHP made at least 41 arrests on June 8, 135 arrests on June 9, and 297 arrests on June 10.  Id.

United States District Court
Northern District of California

equities and the public interest—merge.  E. Bay Sanctuary Covenant v. Biden, 993 F.3d 640, 668 (9th Cir. 2021).

## III.    DISCUSSION

The Court begins with the likelihood of success on the merits and, concluding that Plaintiffs are likely to succeed on at least some of their claims, then proceeds to the remaining Winter factors.

### A.    Likelihood of Success on the Merits

Plaintiffs bring three claims—an ultra vires claim, a Tenth Amendment claim, and an APA claim—but rely only on the first two for purposes of their motion for a temporary restraining order.  Mot. at 7–11, 12–15 (ultra vires), 11–12 (Tenth Amendment).  As part of their ultra vires claim, Plaintiffs contend that President Trump exceeded his lawful authority in three ways:  First, although he cited 10 U.S.C. § 12406, which permits the President to federalize the National Guard, none of the three statutory conditions for invoking that statute were met.  Second, he failed to comply with § 12406's procedural requirement that any order issued under that statute "shall be issued through the governors of the States."  Third, he federalized the National Guard for an unlawful purpose in violation of the Posse Comitatus Act, 18 U.S.C. § 1385.  The Court addresses these three arguments before turning to Plaintiffs' Tenth Amendment claim.

### 1.    Section 12406's Conditions for Federalization

Through the Militia Act of 1903, Congress authorized the President to "call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary," but only if

> (1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation;
>
> (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or
>
> (3) the President is unable with the regular forces to execute the laws of the United States.

Pub. L. No. 57-33, § 4, 32 Stat. 775, 776 (codified at 10 U.S.C. § 12406).  Neither

1    President Trump nor Secretary Hegseth specified by a citation to the statute which of these

2    conditions justified federalizing the National Guard, though President Trump's

3    memorandum suggests that he relied on the second, the third, or both.  June 7 Memo ( "To

4    the extent that the protests or acts of violence directly inhibit the execution of the laws,

5    they constitute a form of rebellion against the authority of the Government of the United

6    States.").  Defendants confirm in their opposition brief and at the June 12 hearing that they

7    rely on the second and third conditions.[4]  Opp. at 13–16.

8         Defendants also challenge whether the Court can even properly evaluate whether

9    these conditions were met, asserting that § 12406 reserved this determination to the

10   President's discretion alone.  Id. at 10–13.  This presents a preliminary question for the

11   Court to resolve before addressing the merits of the § 12406 conditions for federalizing the

12   National Guard.

13                              a.    **Justiciability**

14        "It is emphatically the province and duty of the judicial department to say what the

15   law is."  Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803).  Thus, federal courts

16   have "no more right to decline the exercise of jurisdiction which is given, than to usurp

17   that which is not given."  Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 404 (1821).  The

18   Supreme Court has recognized only limited exceptions to this general rule—one of which

19   is known as the "political question" doctrine.  Zivotofsky ex rel. Zivotofsky v. Clinton, 566

20   U.S. 189, 195 (2012).  This doctrine recognizes that certain "[q]uestions, in their nature

21   political, or which are, by the constitution and laws, submitted to the executive, can never

22   be made in this court."  Marbury, 5 U.S. at 170.  The political question doctrine is,

23   however, a "narrow exception" to the general rule that "the Judiciary has a responsibility

24   to decide cases properly before it, even those it 'would gladly avoid.'"  Zivotofsky, 566

25   U.S. at 195 (quoting Cohens, 19 U.S. at 404).

26

27   _____

28   [4] To be sure, nothing in the June 7 Memo, the June 7 DOD Order, or the June 9 DOD
     Order remotely suggested that the United States or California had been "invaded or [was]
     in danger of invasion by a foreign nation."  10 U.S.C. § 12406 (emphasis added).

United States District Court
Northern District of California

**A270**    10

United States District Court
Northern District of California

Baker v. Carr is the canonical case examining this doctrine.  369 U.S. 186 (1962).
In Baker, the Court proposed six ways in which a case might present a political question
and thus be unfit for judicial review: (1) if there is "a textually demonstrable constitutional
commitment of the issue to a coordinate political department," (2) if there is "a lack of
judicially discoverable and manageable standards for resolving it," (3) if it would be
impossible to decide the issue "without an initial policy determination of a kind clearly for
nonjudicial discretion," (4) if it would be impossible for a court to "undertak[e]
independent resolution without expressing lack of the respect due coordinate branches of
government," (5) if there is "an unusual need for unquestioning adherence to a political
decision already made," or (6) if there is "potentiality of embarrassment from multifarious
pronouncements by various departments on one question." Id. at 217.  "Unless one of
these formulations is inextricable from the case at bar, there should be no dismissal for
non-justiciability on the ground of a political question's presence." Id.

Defendants contend that the third Baker formulation—the existence of a policy
question "clearly for nonjudicial discretion"—applies here to render nonjusticiable the
question whether § 12406's conditions for federalization of the National Guard were met.
Opp. at 12–13.  They rely on the language of § 12406 itself, stating that the statute gives
sole and exclusive discretion to the President to determine whether "there is a rebellion or
danger of a rebellion against the authority of the Government of the United States" or
whether he "is unable with the regular forces to execute the laws of the United States." Id.
at 10–13.  Indeed, at the hearing Defendants contended that the President could invoke
§ 12406 on no evidence whatsoever and remain immune from judicial review.  And to be
sure, when the "executive possesses a constitutional or legal discretion, … their acts are
only politically examinable." Marbury, 5 U.S. at 166; see also Dalton v. Specter, 511 U.S.
462, 477 (1994) ("Where a statute … commits decisionmaking to the discretion of the
President, judicial review of the President's decision is not available.").

Defendants misconstrue the plain language of § 12406, however.  The statute
permits the President to federalize the National Guard "[w]henever" one of the three

enumerated conditions are met, not whenever <u>he determines that</u> one of them is met. 10 U.S.C. § 12406. Defendants point to the language providing that "the President may call into Federal service members and units of the National Guard of any state in such numbers <u>as he considers necessary</u> to repel the invasion, suppress the rebellion, or execute those laws." <u>Id.</u> (emphasis added). But their argument puts the cart before the horse. For the President to exercise his discretion (as to how many National Guard members or units to federalize), there must first be an invasion, rebellion, or inability to execute the laws. Consider, as an analogy, 5 U.S.C. § 3345, which applies "[i]f an officer of an Executive agency … whose appointment to office is required to be made by the President … dies, resigns, or is unable to perform the functions and duties of the office." <u>Id.</u> § 3345(a). The President's discretion in what to do next, <u>see id.</u> § 3345(a)(2)–(3), does not mean that the President can unilaterally and without judicial review declare that a vacancy exists in order to fill it. That is classic <u>ipse dixit</u>.

Defendants assert that, despite the plain language of the statute, the Supreme Court's 1827 <u>Martin v. Mott</u> decision compels a different outcome. 25 U.S. (12 Wheat.) 19 (1827). <u>Martin</u> arose from a militiaman's refusal to enter federal service to fight in the War of 1812 after President Madison had ordered the New York militia into federal service pursuant to a predecessor statute to the Militia Act of 1903. <u>See id.</u> at 28. That statute provided that "whenever the United States shall be invaded, or be in imminent danger of invasion from any foreign nation or Indian tribe, it shall be lawful for the President of the United States to call forth such number of the militia of the state, or states, most convenient to the place of danger, or scene of action, as he may judge necessary to repel such invasion." Act of Feb. 28, 1795, ch. 36, 1 Stat. 424, 424. <u>Martin</u> thus presented the question: "Is the President the sole and exclusive judge whether the exigency has arisen, or is it to be considered as an open question, upon which every officer to whom the orders of the President are addressed, may decide for himself, and equally open to be contested by every militia-man who shall refuse to obey the orders of the President?" 25 U.S. at 29–30. The Supreme Court held "that the authority to decide whether the exigency has arisen,

1
2
3
4
5
6
7

belongs exclusively to the President, and that his decision is conclusive upon all other persons." Id. at 30.  It stated that the President "is necessarily constituted the judge of the existence of the exigency in the first instance, and is bound to act according to his belief of the facts." Id. at 31.  And so the Court concluded that "[w]henever a statute gives a discretionary power to any person, to be exercised by him upon his own opinion of certain facts, it is a sound rule of construction, that the statute constitutes him the sole and exclusive judge of the existence of those facts." Id. at 31–32.

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

In J.A.V. v. Trump, a challenge to President Trump's actions under the Alien Enemies Act, the federal government relied on Martin to make a similar argument to the one they make here.  --- F. Supp. 3d ----, 2025 WL 1257450 (S.D. Tex. May 1, 2025).  The plaintiffs in that case were Venezuelan citizens who alleged that President Trump's removal of Venezuelan citizens had exceeded the terms of the AEA, which allows the President, in his discretion, to remove certain noncitizens when "any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government." Id. at *2, 5; 50 U.S.C. § 21; see also Ludecke v. Watkins, 335 U.S. 160, 164 (1948) (the AEA "confers on the president very great discretionary powers").  President Trump argued there, as he does here, that the political question doctrine shielded his attempt to remove Venezuelan citizens from the United States because "whether the AEA's preconditions are satisfied is a political question committed to the President's discretion." J.A.V., 2025 WL 1257450, at *7.  And he cited Martin for the same proposition as he does here.  See Opp. to Mot. for Prelim. Inj. at 12, J.A.V., No. 25-cv-72 (filed Apr. 23, 2025), ECF No. 45.

23
24
25
26
27
28

Judge Rodriguez rejected President Trump's attempt to preclude judicial review. He emphasized that "'questions of interpretation' fall within the Judiciary's responsibility" and that this can involve "analyzing whether a government official has impermissibly crossed statutory boundaries" by "determining the meaning of statutory terms and gauging the government's actions against those determined parameters." J.A.V., 2025 WL 1257450, at *9.  Accordingly, he went on to define "invasion" and "predatory incursion"

United States District Court
Northern District of California

1    before concluding that President Trump had not adequately established the existence of

2    either.  J.A.V., 2025 WL 1257450, at *14–18.

3        The Court agrees with Judge Rodriguez's thoughtful reasoning in J.A.V. and finds

4    it applicable here.  To start, J.A.V. is in line with other recent decisions rebuffing efforts

5    from Defendants to skirt judicial review of their alleged statutory violations.  See, e.g.,

6    J.G.G. v. Trump, --- F. Supp. 3d ----, 2025 WL 890401, at *9 (D.D.C. 2025) ("Simply

7    because a legal claim implicates foreign affairs or national security, however, does not

8    mean that the political-question doctrine places it 'beyond judicial cognizance.'" (citation

9    omitted)).  It is also consistent with a long line of precedent recognizing the judiciary's

10   role in interpreting statutory text.  See, e.g., Zivotofsky, 566 U.S. at 196 (determining

11   whether federal officials' "interpretation of [a] statute is correct" is "a familiar judicial

12   exercise"); Japan Whaling Ass'n v. Am. Cetacean Soc'y, 478 U.S. 221, 230 (1986)

13   ("[O]ne of the Judiciary's characteristic roles is to interpret statutes, and we cannot shirk

14   this responsibility merely because our decision may have significant political overtones.");

15   El-Shifa Pharm. Indus. Co. v. United States, 607 F.3d 836, 842 (D.C. Cir. 2010) ("[T]hat a

16   case may involve the conduct of the nation's foreign affairs does not necessarily prevent a

17   court from determining whether the Executive has exceeded the scope of prescribed

18   statutory authority or failed to obey the prohibition of a statute or treaty."); Stark v.

19   Wickard, 321 U.S. 288, 310 (1944) ("The responsibility of determining the limits of

20   statutory grants of authority … is a judicial function entrusted to the courts by Congress by

21   the statutes establishing courts and marking their jurisdiction.").  Finally, even though the

22   AEA and § 12406 are different statutes, they both grant the President discretion in some

23   respects while still containing important statutory conditions that must be met for that

24   discretion to be exercised.  See Ludecke, 335 U.S. at 164, 171.  Accordingly, the Court

25   concludes that § 12406 does not preclude judicial review of whether a rebellion has

26   occurred or is in danger of occurring, or whether the President is unable to execute federal

27   law.

28       To be sure, based on longstanding deference to the President on matters of national

United States District Court
Northern District of California

1    security and foreign policy, courts cannot second-guess a President's <u>factual</u>

2    determinations in support of a proclamation under the AEA that an invasion or predatory

3    incursion had occurred or was threatened.  <u>J.A.V.</u>, 2025 WL 1257450, at *10 (citing

4    <u>Holder v. Humanitarian L. Project</u>, 561 U.S. 1, 34 (2010), <u>Chi. & S. Air Lines v.</u>

5    <u>Waterman S. S. Corp.</u>, 333 U.S. 103, 111 (1948), and <u>Martin</u>, 25 U.S. at 31[5]); <u>see also</u>

6    <u>Trump v. Hawaii</u>, 585 U.S. 667, 708 (2018) ("[T]he Executive's evaluation of the

7    underlying facts is entitled to appropriate weight, particularly in the context of litigation

8    involving 'sensitive and weighty interests of national security and foreign affairs.'"

9    (quoting <u>Humanitarian L. Project</u>, 561 U.S. at 33–34)).  As discussed below, the Court

10    here—like Judge Rodriguez in <u>J.A.V.</u>—does not question Defendants' factual assertions.

11    The Court considers only whether those factual assertions, if true, constitute a rebellion or

12    make the President unable to execute federal law.

13          That said, the Court points out that this case is not one involving the kind of foreign

14    policy or national security questions that traditionally are left to the President.  It instead

15    implicates the President's <u>domestic</u> use of military force, a matter on which the courts can

16    certainly weigh in.  As the Supreme Court stated over fifty years ago:

> The concerns of the Executive and Legislative Branches in
> response to disclosure of the Army surveillance activities …
> reflect a traditional and strong resistance of Americans to any
> military intrusion into civilian affairs.  That tradition has deep
> roots in our history and found early expression, for example, in
> the Third Amendment's explicit prohibition against quartering
> soldiers in private homes without consent and in the
> constitutional provisions for civilian control of the military.
> Those prohibitions are not directly presented by this case, but
> their philosophical underpinnings explain our traditional
> insistence on limitations on military operations in peacetime.
> <u>Indeed, when presented with claims of judicially cognizable</u>

---

[5] <u>Martin</u>, like other cases that Defendants cite (for example, <u>California v. United States</u>),
involved issues of foreign policy and national security not presented in this case.  <u>See</u>
<u>Martin</u>, 25 U.S. at 31 ("[T]he evidence upon which the President might decide that there is
imminent danger of invasion, might be of a nature not constituting strict technical proof, or
the disclosure of the evidence might reveal important secrets of state, which the public
interest, and even safety, might imperiously demand to be kept in concealment.");
<u>California v. United States</u>, 104 F.3d 1086, 1091 (9th Cir. 1997) ("In this case, the issue of
protection of the States from invasion implicates foreign policy concerns which have been
constitutionally committed to the political branches.").

United States District Court
Northern District of California

> injury resulting from military intrusion into the civilian sector, federal courts are fully empowered to consider claims of those asserting such injury; there is nothing in our Nation's history or in this Court's decided cases, including our holding today, that can properly be seen as giving any indication that actual or threatened injury by reason of unlawful activities of the military would go unnoticed or unremedied.

Laird v. Tatum, 408 U.S. 1, 15–16 (1972) (emphasis added).[6]  Between the unique concerns raised by federal military intrusion into civilian affairs and the fact that federal officials are not uniquely positioned to ascertain what is happening on the ground (as compared to, say, state and local officials), the Court is not convinced that the judiciary cannot question presidential assertions about domestic activities leading to military action. See Myers v. United States, 272 U.S. 52, 177 (Holmes, J., dissenting) ("The duty of the President to see that the laws be executed is a duty that does not go beyond the laws or require him to achieve more than Congress sees fit to leave within his power.").

At bottom, § 12406 does not reserve to sole presidential discretion the determination of whether a rebellion has or is in danger of occurring or whether the President is unable to execute federal law.  Accordingly, the Court now turns to the questions whether (1) "there [was] a rebellion or danger of a rebellion against the authority of the Government of the United States" or (2) "the President [was] unable with the regular forces to execute the laws of the United States."

### b.    Rebellion

Section 12406 does not define the term "rebellion," so the Court must interpret the term "consistent with [its] 'ordinary meaning at the time Congress enacted the statute.'" Wis. Cent. Ltd. v. United States, 585 U.S. 274, 277 (2018) (cleaned up) (citation omitted). In this endeavor, the Court may turn to contemporary dictionary definitions for insight. See, e.g., id. (relying on dictionary definitions of "money"); Lackey v. Stinnie, 145 S. Ct.

---

[6] In Laird, the plaintiffs challenged federal military action taken pursuant to the Insurrection Act, which grants certain presidential discretion.  Id. at 3 & n.2.  The Court did not reject the lawsuit on justiciability grounds, though, but for lack of any injury to the plaintiffs.  Id. at 13.  Indeed, as quoted above, the Court strongly insisted that judicial review remained available for any claim "of judicially cognizable injury."  Id. at 16.

659, 667 (2025) (relying on dictionary definitions of "prevailing party"); City of Los Angeles v. Barr, 941 F.3d 931, 940 (9th Cir. 2019) ("We give Congress's words their ordinary and everyday meaning, and may consult dictionary definitions to ensure a plain interpretation.").  And where there are multiple dictionary definitions, the Court must apply "the contextually appropriate ordinary meaning, unless there is reason to think otherwise."  Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 70 (2012).  Part of understanding context involves recognizing that statutes "should be construed so that effect is given to all [their] provisions, so that no part will be inoperative or superfluous, void or insignificant."  Hibbs v. Winn, 542 U.S. 88, 101 (2004) (citation omitted).

Both parties quote the definition of "rebellion" from the current edition of Black's Law Dictionary, which is:

> 1. Open, organized, and armed resistance to an established government or ruler; esp., an organized attempt to change the government or leader of a country, usu. through violence.
>
> 2. Open resistance or opposition to an authority or tradition.
>
> 3. Hist. Disobedience of a legal command or summons.

Rebellion, Black's Law Dictionary (12th ed. 2024).  The Court's own research has turned up the following definitions from the late 1800s and early 1900s—the relevant time period for understanding what Congress meant when they passed the Militia Act of 1903:

> Deliberate, organized resistance, by force and arms, to the laws and operations of the government, committed by a subject.

Rebellion, Black's Law Dictionary (1st ed. 1891).

> 1. An open and avowed renunciation of the authority of the government to which one owes allegiance; or the taking of arms traitorously to resist the authority of lawful government; revolt. Rebellion differs from insurrection and from mutiny. Insurrection may be a rising in opposition to a particular act or law, without a design to renounce wholly all subjection to the government.  Insurrection may be, but is not necessarily, rebellion. Mutiny is an insurrection of soldiers or seamen against the authority of their officers.
>
> 2. Open resistance to lawful authority.

United States District Court
Northern District of California

A277    17

1    Rebellion, American Dictionary of the English Language (1900).

2
3              The taking up of arms traitorously against the government; the
               forcible opposition and resistance to the laws and process
4              lawfully installed.  If the rebellion amounts to treason, it is
               punished by the laws of the United States with death.  If it be a
5              mere resistance of process, it is generally punished by fine and
               imprisonment.

6    Rebellion, The Cyclopedic Dictionary of Law (1901).

7              1. The act of rebelling; open and avowed renunciation of the
8              authority of the government to which one owes obedience, and
               resistance to its officers and laws, either by levying war, or by
9              aiding others to so; an organized uprising of subjects for the
               purpose of coercing or overthrowing their lawful rule or
10             government by force; revolt; insurrection.

11             2. Open resistance to, or defiance of, lawful authority.

12   Rebellion, Webster's International Dictionary of the English Language (1903)

13         Where dictionaries list multiple definitions of "rebellion," the first definition is the

14   one demanded by context here.  The first definition of "rebellion" in each dictionary is

15   political in nature, as opposed to the more open-ended concept of "rebellion" that some

16   dictionaries provide as a secondary definition.  Indeed, dictionaries' examples of the

17   secondary usage of the term never apply in the political arena.  See, e.g., Rebellion, Oxford

18   English Dictionary (rev. 2009).[7]  And if there were any room for doubt, the language of

19   § 12406 (requiring that the rebellion be "against the authority of the Government of the

20   United States") resolves the question in favor of the political definition of "rebellion."

21         From there, the Court observes that the dictionary definitions from the turn of the

22   century share several key characteristics.  First, a rebellion must not only be violent but

23

24   _____

     [7] The Oxford English Dictionary's secondary definition of "rebellion" is "[o]pen or
25   determined defiance of or resistance to any authority, controlling power, or convention; an
     instance of this."  Examples of this usage include spiritual rebellion ("The event of this
26   evening has reconciled me to God and humanity!  I had risen in angry rebellion against
     providence." (quoting Brontë, Wuthering Heights, 87 (New York, Harper & Bros. 1858)
27   (1847))) and familial rebellion ("He had forgotten that he had it, but told me when he saw
     it that he remembered it as the first thing that made him begin to rise against his father in a
28   rebellion which he recognized as righteous." (quoting Butler, The Way of All Flesh, 178
     (New York, E.P. Dutton & Co. 1917) (1903))).

1   also be <u>armed</u>.  <u>Second</u>, a rebellion must be organized.  <u>Third</u>, a rebellion must be open
2   and avowed.  <u>Fourth</u>, a rebellion must be against the government as a whole—often with
3   an aim of overthrowing the government—rather than in opposition to a single law or issue.

4          The protests in Los Angeles fall far short of "rebellion."  Defendants refer
5   repeatedly to "violent rioters," and "mobs," <u>see, e.g.</u>, Opp. at 1, and so the Court pauses to
6   state that there can be no debate that most protesters demonstrated peacefully.
7   Nonetheless, it is also beyond debate that some individuals used the protests as an excuse
8   for violence and destruction.  Some bad actors on June 6 threw "concrete chunks, bottles
9   of liquid, and other objects at … officers," Santacruz Decl. ¶ 11, and used "chairs,
10  dumpsters, and other items as weapons," <u>id.</u> ¶ 14.  Others threw rocks and other objects,
11  including a Molotov cocktail, on June 7.  Olmstead Decl. ¶ 9.  A  "violent crowd" boxed in
12  officers, threw fireworks, rocks, and mangos, and trapped one officer in her car,
13  surrounding it, shaking it, and throwing stones at it.  Santacruz Decl. Ex. 20.  Some people
14  on June 8 set off fireworks toward officers and threw objects at their vehicles.  Santacruz
15  Decl. ¶ 26.  Someone on June 9 fired paintballs, <u>id.</u> ¶ 28, and a crowd injured five LAPD
16  officers, <u>id.</u> ¶ 31.

17         Violence is necessary for a rebellion, but it is not sufficient.  Even accepting the
18  questionable premise that people armed with fireworks, rocks, mangoes, concrete, chairs,
19  or bottles of liquid are "armed" in a 1903 sense—the Court is aware of no evidence in the
20  record of actual firearms—there is little evidence of whether the violent protesters' actions
21  were "open or avowed."  Some presumably engaged violently with officers at close
22  quarters in the daylight, while many others threw items under cover of darkness, protected
23  by a crowd, identities concealed.  Certainly, the <u>peaceful</u> protesters were "organized" to
24  some degree, in that people knew generally knew where to go to participate in protests,
25  <u>see, e.g.</u>, Espíritu Decl. Ex. F ("Dozens of protesters gathered Friday evening outside a
26  federal detention center in Los Angeles where lawyers said those arrested had been taken,
27  chanting 'set them free, let them stay!'"), but there is no evidence of organized, as apart
28

United States District Court
Northern District of California

from sporadic or impromptu, violence.[8]  Nor is there evidence that any of the violent protesters were attempting to overthrow the government as a whole; the evidence is overwhelming that protesters gathered to protest a single issue—the immigration raids. See, e.g., Espíritu Decl. Ex. D ("Friday evening, protesters marched in downtown L.A. condemning Friday's immigration raids.").  While Defendants have pointed to several instances of violence, they have not identified a violent, armed, organized, open and avowed uprising against the government as a whole.  The definition of rebellion is unmet.

Moreover, the Court is troubled by the implication inherent in Defendants' argument that protest against the federal government, a core civil liberty protected by the First Amendment, can justify a finding of rebellion.  The U.S. Reports are chock-full of language explaining the importance of individuals' right to speak out against the government—even when doing so is uncomfortable, even when doing so is provocative, even when doing so causes inconvenience.  See, e.g., Cohen v. California, 403 U.S. 15, 24–25 (1972) ("To many, the immediate consequence of this freedom may often appear to be only verbal tumult, discord, and even offensive utterance.  …  That the air may at times seem filled with verbal cacophony is, in this sense not a sign of weakness but of strength."); Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 508 ("But, in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression.  Any departure from absolute regimentation may cause trouble.  …  Any word spoken … that deviates from the views of another person may start an argument or cause a disturbance.  But our Constitution says we must take this risk."); Cox v. Louisiana, 379 U.S. 536, 550–51 (rejecting the argument that a conviction for breach of the peace "should be sustained because of fear expressed by some [onlookers] that 'violence was about to erupt' because of the demonstration" and explaining "that constitutional rights may not be denied simply because of hostility to their assertion or

---

[8] To the contrary, the record suggests that the violent individuals might not have been bona fide protesters.  See McPhee, supra ("McDonnell said of the most violent protestors … 'many come in from other places just to hurt people and cause havoc.'").

United States District Court
Northern District of California

1    exercise" (quoting <u>Watson v. City of Memphis</u>, 373 U.S. 526, 535 (1963))); <u>Texas v.</u>

2    <u>Johnson</u>, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First

3    Amendment, it is that the government may not prohibit the expression of an idea simply

4    because society finds the idea itself offensive or disagreeable."); <u>Hurley v. Irish-Am. Gay,</u>

5    <u>Lesbian & Bisexual Grp. of Boston, Inc.</u>, 515 U.S. 557, 574 (1995) ("[T]he point of all

6    speech protection [] is to shield just those choices of content that in someone's eyes are

7    misguided, or even hurtful.").

8          Applying these principles, courts have repeatedly reaffirmed that peaceful protest

9    does not lose its protection merely because some isolated individuals act violently outside

10   the protections of the First Amendment:

11           Moreover, although defendants make much of the fact that some
       demonstrators had allegedly violated the law, transforming the

12           peaceful demonstration into a potentially disruptive one, the
       Supreme Court has expressly held that "the right to associate

13           does not lose all constitutional protection merely because some
       members of the group may have participated in conduct or

14           advocated doctrine that itself is not protected."

15   <u>Jones v. Parmley</u>, 465 F.3d 46, 57 (2d Cir. 2006) (cleaned up) (quoting <u>NAACP v.</u>

16   <u>Claiborne Hardware Co.</u>, 458 U.S. 886, 908 (1982)); <u>see also</u> <u>Black Lives Matter Seattle-</u>

17   <u>King Cnty. v. City of Seattle</u>, 466 F. Supp. 3d 1206, 1213 (W.D. Wash. 2020) (finding that

18   instances of protesters "launch[ing] objects at the police, ranging from rocks, bottles,

19   fireworks, traffic cones, traffic flares, and more," warranted only "ensur[ing] an adequate

20   police presence" and "arrest[ing] those who engage in such conduct" rather than

21   "suppress[ing] legitimate First Amendment conduct as a prophylactic measure" (quoting

22   <u>Collins v. Jordan</u>, 110 F.3d 1363, 1372 (9th Cir. 1996))); <u>Index Newspapers LLC v. City</u>

23   <u>of Portland</u>, 480 F. Supp. 3d 1120, 1143 (D. Or. 2020) ("The fact that there are some

24   violent offenders [] does not give the Federal Defendants carte blanche to attack journalists

25   and legal observers and infringe their First Amendment rights."). In short, individuals'

26   right to protest the government is one of the fundamental rights protected by the First

27   Amendment, and just because some stray bad actors go too far does not wipe out that right

28   for everyone. The idea that protesters can so quickly cross the line between protected

United States District Court
Northern District of California

1    conduct and "rebellion against the authority of the Government of the United States" is

2    untenable and dangerous.

3        In a short paragraph, Defendants suggest that even if there was no rebellion that

4    would justify federalizing the National Guard, there was still a "danger of a rebellion,"

5    which would satisfy § 12406.  Opp. at 16.  This argument cannot withstand scrutiny.  For

6    starters, President Trump and Secretary Hegseth did not rely on a "danger of a rebellion"

7    when issuing the memorandum and orders that federalized the National Guard under s

8    12406.  See June 7 Memo; June 7 Order; June 9 Order.[9]  It is concerning, to say the least,

9    to imagine that the federal executive could unilaterally exercise military force in a

10   domestic context and then be allowed to backfill justifications for doing so, especially

11   considering how wary courts are of after-the-fact justifications even where the stakes are

12   lower.  Cf. Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S.

13   29, 50 (1983) ("[C]ourts may not accept appellate counsel's post hoc rationalizations for

14   agency action.").  But in any event, Defendants do not even explain how the Court should

15   determine whether there is a "danger of a rebellion."  "Rebellion" remains the operative

16   word, and so any difference between a "rebellion" and a "danger of a rebellion" must be a

17   difference of degree, not one of kind, with respect to the conduct of the alleged rebellion.

18   With that in mind, Defendants have still not established a factual basis—again, even

19   assuming their factual assertions to be correct—from which this Court can conclude that

20   there is a danger of an organized, violent, armed uprising with the goal of overthrowing the

21   lawful government of the United States.

22       Accordingly, Defendants do not satisfy the "rebellion" condition.

23            c.    Execution of the Laws

24       The third condition justifying the federalization of the National Guard, and the

25   second advanced by Defendants, is that "the President [was] unable with the regular forces

26   _____

27   [9] At the hearing, Defendants contended that President Trump's use of the phrase "[t]o the
     extent" in the June 7 Memo means that he relied on the "danger of a rebellion" clause.  But
28   the June 7 Memo states: "To the extent that protests or acts of violence directly inhibit the
     execution of the laws, they constitute a form of rebellion," not a danger of rebellion.

to execute the laws of the United States." 10 U.S.C. § 12406; Opp. at 16–17. Defendants argue that they satisfy this condition because the Los Angeles protests threatened the safety of federal law enforcement personnel and interfered with the sites where ICE agents were enforcing alien removal laws. Opp. at 16. Defendants concede that ICE succeeded in arresting 44 people on June 6, but insist that "that limited success came with the risk of danger," and that, had the protests not interfered with their operations, ICE "would have been able to carry out additional execution-of-the-laws activity." Id.

Whether ICE could have detained more people in the absence of the protests is mere conjecture—Defendants provide no support for that assertion. Even assuming that Defendants are correct, however, the statute does not allow for the federalizing of the National Guard when the President faces obstacles that cause him to underperform in executing the laws. Nor does the statute allow for the federalizing of the National Guard when the President faces some risk in executing the laws, though of course federal employees should never have to fear danger when performing their jobs. The statute requires that the President be "unable" to execute the laws of the United States. That did not happen here. See Espíritu Decl. Exs. G, H (between 70 and 80 people were detained, and 44 arrested by ICE).

A classic example of a president being "unable with the regular forces to execute the laws"—indeed, the only other time in this Country's history that a president has exclusively relied on § 12406 to federalize the National Guard—is the 1970 Postal Service Strike. See Opp. at 3 (drawing parallel to Postal Service Strike). Frustrated by low pay and poor working conditions, letter carriers voted on March 17, 1970 to strike, "threaten[ing] to bring the nation to a standstill." Pope, Operation Graphic Hand, Smithsonian Nat'l Postal Museum (Mar. 23, 2017), https://postalmuseum.si.edu/operation -graphic-hand. By March 19, 1970, the mail service was "paralyzed," the areas affected by the strike were growing, and "[b]ills, dividend checks, income-tax returns, advertising brochures, credit cards, bank statements, sales flyers and personal mail lay uncollected in thousands of mail drops." Bigart, Mail Service Here is Paralyzed by Postal System's First

Strike; Business Beginning to Feel Pinch, N.Y. Times (March 19, 1970),

https://perma.cc/8VYB-CT32.  On March 23, 1970, President Nixon declared a state of

national emergency, ordering 25,000 personnel from the National Guard and other military

branches into New York City "to get some mail moving."  Pope, supra; see also Bigart,

Troops Welcomed as Mail Carriers, N.Y. Times (March 26, 1970), https://perma.cc/9A9N-

PLHD; Exec. Order No. 11,519, 35 Fed. Reg. 5003 (Mar. 23, 1970).  In that case, the mail

system was incapacitated—the "regular forces" of letter carriers were on strike, and there

was no other way to deliver the mail.  In this case, the regular forces were and are still very

much on duty.  While ICE was not able to detain as many people as Defendants believe it

could have, ICE was nonetheless able to execute the federal immigration laws.  Indeed,

ICE continues to carry out enforcement actions, executing those laws.  See Espíritu Supp.

Decl. (dkt. 39-1).

Accordingly, Defendants do not satisfy the "execution of the laws" condition.

### 2.    Section 12406's Procedural Requirements

Shortly after enacting the Militia Act of 1903, Congress amended the Act to require

that any orders issued under § 12406 be issued "through the governor of the respective

State … from which State … such troops may be called."  Militia Act of 1908, Pub. L.

No. 60-145, § 3, 35 Stat. 399, 400.  Section 12406 maintains this requirement: "Orders for

these purposes shall be issued through the governors of the States … ."

Plaintiffs assert that President Trump failed to comply with this procedural

requirement.  They explain that Governor Newsom first learned that President Trump had

called 2,000 of California's National Guard members into federal service when

California's adjutant general forwarded him the June 7 DOD Order.  See Espíritu Decl.

Ex. K.  From that point on, the commander of U.S. Northern Command, not the Governor,

has issued all orders to the federalized National Guard.  See Espíritu Decl. Ex. J.

Similarly, Secretary Hegseth—not Governor Newsom—issued the June 9 order calling

another 2,000 National Guard members into federal service.  See Espíritu Decl. Ex. S.

Defendants assert that they complied with § 12406 because written at the top of the

June 7 and June 9 DOD Orders was the label "THROUGH: THE GOVERNOR OF CALIFORNIA." Opp. at 17. True enough. But an interpretation of § 12406 that permits the President to federalize a state's National Guard by typing the phrase "Through the Governor of [insert state here]" at the top of a document that the President <u>never sends to the governor</u> strains credibility, especially given that Congress specifically amended the statute to add the requirement that orders "shall be issued through the governors." <u>See</u> Militia Act of 1908 § 3.

Defendants also argue that they complied with this requirement by sending the order to California's adjutant general, who is tasked with issuing orders "in the name of the Governor." Opp. at 17 (citing Cal. Mil. & Vet. Code § 163). But § 12406 specifically requires that orders federalizing the National Guard be issued "through <u>the governor</u> of the respective State," not through a different state official (even one who can issue orders in the governor's name). Indeed, when Congress has wanted to accommodate other state officials, it has done so expressly. For example, the Secretary of Defense may "order a member of a reserve component under his jurisdiction to active duty" except that members "may not be ordered to active duty … without the consent of the governor <u>or other appropriate authority of the State concerned</u>." 10 U.S.C. § 12301(d) (emphasis added). And, in fact, § 12406 specifically provides for, "in the case of the District of Columbia," orders to issue "through the commanding general of the National Guard of the District of Columbia."

As a final point, Plaintiffs emphasize that Defendants did not provide Governor Newsom "an opportunity to provide or withhold his consent" or even "to consult … as to which service members and in what number should be called, and for what purposes and what period of time." Mot. at 6. Defendants respond that § 12406 says nothing about obtaining a governor's <u>consent</u> as a prerequisite for federalizing the National Guard. They are correct: section 12406 does not expressly require consent or approval of a governor to federalize that state's National Guard, unlike similar statutes. <u>Cf.</u> 10 U.S.C. § 12301(d) (allowing the Secretary of Defense to "order a member of a reserve component under his

jurisdiction to active duty" only with "the consent of the governor or other appropriate authority of the State concerned" (emphasis added)).  That said, the June 7 Memo specifically ordered Secretary Hegseth to "coordinate with the Governors of the States" in the process of calling National Guard members to federal service, and Defendants do not claim to have done so.  And in any case, the instant motion does not require the Court to determine whether or how § 12406 would operate if Secretary Hegseth had attempted to issue his orders through Governor Newsom and he had refused, as the President and Secretary circumvented the Governor (and thus, the procedure mandated by statute) from the outset.[10]

Regardless of whether Defendants gave Governor Newsom an opportunity to consult with them or consent to the federalization of California's National Guard, they did not issue their orders through him, and thus failed to comply with § 12406.

### 3.    The Posse Comitatus Act

Plaintiffs' third argument for why President Trump's federalization of the National Guard exceeds his legal authority rests not on § 12406 but a different statute—the Posse Comitatus Act.  First enacted in 1878, the Act prohibits military personnel from acting as a "posse comitatus," or those "upon whom a sheriff could call for assistance in preventing any type of civil disorder."  United States v. Dreyer, 804 F.3d 1266, 1272 (9th Cir. 2015) (en banc) (citation omitted); Act of June 18, 1878, ch. 263, § 14, 20 Stat. 145, 152.  The current version of the Act provides:

> Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both.

---

[10] Where Presidents have federalized the National Guard against a state governor's wishes, they have used other statutes to do so.  See Exec. Order No. 11,207, 30 Fed. Reg. 3743 (Mar. 23, 1965) (relying on the Insurrection Act, then codified at 10 U.S.C. §§ 332–334, and now codified at 10 U.S.C. §§ 252–254).  It seems that this would be the proper course if a governor refused to issue an order, as forcing a governor to do so would raise serious anti-commandeering problems.  See Printz v. United States, 521 U.S. 898, 935 (1997).

18 U.S.C. § 1385.  The Act reflects "'a traditional and strong resistance of Americans to any military intrusion into civilian affairs' that 'has deep roots in our history and found early expression, for example, in the Third Amendment's explicit prohibition against quartering soldiers in private homes without consent and in the constitutional provisions for civilian control of the military.'"  Dreyer, 804 F.3d at 1272 (quoting Laird, 408 U.S. at 15).

The Posse Comitatus Act does not provide a private cause of action for damages.  Black Lives Matter D.C. v. Trump, 544 F. Supp. 3d 15, 40 (D.D.C. 2021), aff'd sub nom. Buchanan v. Barr, 71 F.4th 1003 (D.C. Cir. 2023).  But a plaintiff can still bring an ultra vires claim where, as Plaintiffs assert is the case here, an "agency has disregarded a specific and unambiguous statutory directive" or "has violated some specific command of a statute."  Id. at 41 (quoting Griffith v. FLRA, 842 F.2d 487, 493 (D.C. Cir. 1988)).  So if Plaintiffs are correct that President Trump and Secretary Hegseth's federalization of the National Guard requires National Guard members to violate the Posse Comitatus Act, such a violation may provide a basis for their ultra vires claim.

At present, Plaintiffs contend that that the federalized National Guard troops and the Marines are "likely" to engage in "active involvement in the execution of the laws" in violation of the Posse Comitatus Act.  See Mot. at 14; see also United States v. Khan, 35 F.3d 426, 431 (9th Cir. 1994) (quoting United States v. Yunis, 924 F.2d 1086, 1094 (D.C. Cir. 1991)).  They concede that there are a number of "supportive activities" in which the military can engage without running afoul of the Act, such as "maintenance and repair, transportation, training facilities, counterdrug and counter-transactional organized crime training, and surveillance support."  Mot. at 15.  But Plaintiffs note that the federalized National Guard members will soon provide support during immigration enforcement operations and not only at federal buildings.  Id. at 14 (citing Eck Decl. ¶ 19).  And they suspect that such support will lead to the military "physically confront[ing], detain[ing], or search[ing] civilians," which would constitute "executing civil laws."  Id. at 15–16.  By the time they filed a reply brief, Plaintiffs asserted that "that threat has already become a

reality," because heavily armed National Guard members have been photographed standing near ICE agents during arrests.  Reply (dkt. 38) at 11 (citing Espíritu Reply Decl. Exs. 2, 3).  While the sight of an armed National Guard member no doubt has the potential to intimidate, Plaintiffs do <u>not</u> contend that National Guard members have in fact participated in any arrests.

        Defendants respond that they have not violated the Act, and will not, as the June 7 Trump Memo and the June 7 and June 9 DOD Orders do not direct the federalized National Guard members to undertake activities that would violate the Act.  <u>See</u> Opp. at 20–23; <u>see also</u> Knell Decl. (dkt. 22-4) ¶ 7 ("Since Saturday, June 7, federalized California National Guard personnel have conducted operations in Los Angeles strictly consistent with the directions of the President's June 7 memorandum ... .  They are protecting federal personnel performing official functions as well as property at designated locations.").  Of course, federal officials do not only act through official documents.  President Trump reportedly wrote on social media that he had directed his cabinet officials to "take any actions necessary to 'liberate Los Angeles from the Migrant Invasion,'" and said, "we're going to have troops everywhere," which certainly differs from the circumscribed role professed in the opposition brief.  <u>See</u> Espíritu Decl. Ex. M; <u>see also</u> <u>id.</u> ("Tom Homan, the president's border czar, suggested in an interview with NBC News that the administration would arrest anyone, including public officials, who interfered with immigration enforcement activities, which he said would continue in California and across the country."); Fortinsky, <u>Bondi Says California at 'Good Point': 'We're Not Scared to Go Further'</u>, The Hill (June 11, 2025), https://perma.cc/G6HR-Q5M8 (quoting Attorney General Bondi: "We're not scared to go further. We're not frightened to do something else if we need to."); Bowden, <u>Noem Asks Hegseth to Exceed Trump's Order and Force the Military to Arrest LA Citizens to Protect ICE Agents</u>, The Independent (June 11, 2025) ("DHS chief Kristi Noem wants the US military directly involved in detaining and arresting protesters in Los Angeles, according to a letter sent to Defense Secretary Pete Hegseth."), https://perma.cc/XG9F-EQF9.

The Court has already concluded that Defendants exceeded their lawful authority by violating 10 U.S.C. § 12406.  The Court therefore need not reach this additional basis for Plaintiffs' ultra vires claim at this early moment in the litigation.  When the Court has before it Plaintiffs' motion for a preliminary injunction, the record will be more complete as to any and all military activities, and whether, as Plaintiffs contend, the presence of troops near ICE agents during raids "in dense, urban communities" indeed results in "military forces [being] drawn into a variety of law enforcement activities, such as confronting, interrogating, detaining, or searching civilians perceived as security threats." See Reply at 12.  At that point—just a week from now—the parties will be free to make whatever arguments they wish in connection with the Posse Comitatus Act.

As of now, the Court only has counsel's speculation of what might happen.

### 4.    Tenth Amendment

Plaintiffs' second claim in their complaint is that President Trump's federalization of the National Guard "infringes on Governor Newsom's role as Commander-in-Chief of the California National Guard and violates the State's sovereign right to control and have available its National Guard in the absence of a lawful invocation of federal power." Compl. ¶ 95.  Plaintiffs' argument rests in part on their assertion that President Trump acted ultra vires when he federalized the National Guard, see id. ¶ 100, and in part on their allegation that using National Guard members to "quell" or "prevent" protests is an exercise of police power, which is traditionally reserved to the states, see id. ¶¶ 96–98.

Focusing on the first piece of Plaintiffs' argument, Defendants argue that the Tenth Amendment issue "is wholly derivative" of whether President Trump lawfully invoked § 12406.  Opp. at 20.  And because Defendants assert that they did not violate § 12406, they contend that there is no Tenth Amendment problem.  Id.

Yet the Court has concluded that Defendants did violate § 12406, so their argument against Plaintiffs' Tenth Amendment claim starts from a flawed premise.  And even if that were not the case, Defendants fail to grapple with the second part of Plaintiffs' Tenth Amendment claim—that their use of the National Guard and the Marines comes into

United States District Court
Northern District of California

1   conflict with California's police power.  It is well-established that the police power is one

2   of the quintessential powers reserved to the states by the Tenth Amendment.  E.g., United

3   States v. Morrison, 529 U.S. 598, 618–19 (2000) (the reservation of police powers to the

4   states is "one of the few principles that has been consistent since the [Constitution] was

5   adopted"); Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 203–04 (1824) ("No direct general

6   power over these objects is granted to Congress; and, consequently, they remain subject to

7   State legislation.").

8        Although Defendants identify some stray violent incidents relating to the protests

9   against ICE raids in Los Angeles, and from there boldly claim that state and local officials

10   were "unable to bring rioters under control," Opp. at 19–20, it is not the federal

11   government's place in our constitutional system to take over a state's police power

12   whenever it is dissatisfied with how vigorously or quickly the state is enforcing its own

13   laws.  Quite the contrary, the Founders reserved that power, and others, to the states in the

14   Tenth Amendment.  See Patterson v. Kentucky, 97 U.S. 501, 504 (1878) ("Whether the

15   policy thus pursued by the State is wise or unwise, it is not the province of the national

16   authorities to determine.  That belongs to each State, under its own sense of duty, and in

17   view of the provisions of its own Constitution.").

18        Of course, federal authority extends to protecting legitimate federal interests, such

19   as protecting federal personnel and facilities.  Plaintiffs do not contest this.  See Mot. at 2.

20   As discussed above, the parties vigorously dispute whether the National Guard and the

21   Marines were deployed to Los Angeles merely to protect federal personnel and facilities or

22   to engage in more routine law enforcement, and the Court does not at this point reach any

23   conclusion on this issue.  But with respect to the Tenth Amendment claim, that is not the

24   only consideration at play; there is also the fact that the federalization of 4,000 members of

25   California's National Guard necessarily prevents Governor Newsom, as the commander-

26   in-chief of his state's National Guard, from deploying them as needed.  Had Defendants

27   complied with the substantive and procedural requirements of § 12406, the federal

28   interests reflected by that statute may well override Governor Newsom's interest in

1    retaining his National Guard members.  But they did not.  So whether or not the National

2    Guard is exercising <u>illegitimate</u> federal police power in Los Angeles, the unlawful

3    federalization of those members has interfered with the state's <u>legitimate</u> police power, and

4    thus it violates the Tenth Amendment.

5        For the above reasons, the Court concludes that Plaintiffs are likely to succeed on

6    their Tenth Amendment claim.

7        **B.    Likelihood of Irreparable Harm**

8        A party seeking preliminary injunctive relief must "demonstrate that irreparable

9    injury is <u>likely</u> in the absence of an injunction."  <u>Winter</u>, 555 U.S. at 22 (emphasis in

10   original); <u>see also</u> <u>Michigan v. U.S. Army Corps of Eng'rs</u>, 667 F.3d 765, 788 (7th Cir.

11   2011) (harm need not be certain to occur for injunctive relief to issue).  The party must

12   show a "sufficient causal connection" between the defendant's conduct and their

13   anticipated injury.  "Irreparable harm is traditionally defined as harm for which there is no

14   adequate legal remedy, such as an award of damages."  <u>Ariz. Dream Act Coal. v. Brewer</u>,

15   757 F.3d 1053, 1068 (9th Cir. 2014).

16       Plaintiffs identify two types of harm that they claim to be likely to suffer in the

17   absence of a temporary restraining order.  <u>First</u>, they assert that there is a "very high risk of

18   substantial civil unrest as a direct result of Defendants' inflammatory and confrontational

19   deployment of the military in a large, civilian population center."  Mot. at 16.  <u>Second</u>,

20   they contend that "Defendants' unlawful federalization of 4,000 California National Guard

21   members … diverts necessary state resources" from addressing serious problems facing

22   California, such as wildfires and drug trafficking.  <u>Id.</u> at 17–18.  Defendants respond that

23   these harms are "speculative" and "unsubstantiated."  Opp. at 26.

24       As for Plaintiffs' first asserted harm, they have established that the continued

25   presence of National Guard members and Marines in Los Angeles risks worsening, not

26   improving, tensions on the ground.  "The presence of the National Guard seemed only to

27   inflame the protesters further."  Olmstead Decl. ¶ 12.  Indeed, local law enforcement

28   arrests jumped after the National Guard was deployed.  Olmstead Supp. Decl. ¶ 14 (29

United States District Court
Northern District of California

1    arrests on June 7, 41 arrests on June 8, 135 arrests on June 9, and 297 arrests on June 10).

2    Defendants reiterate that civil unrest began before President Trump nationalized the

3    National Guard, Opp. at 26, but that does not address Plaintiffs' point that military

4    presence in a civilian population center will worsen—and has worsened—the situation.

5    And contrary to Defendants' assertion, Plaintiffs have provided evidence backing up their

6    concern, so it is not merely "hypothetical or possible." Id. (citing Doran v. Salem Inn,

7    Inc., 422 U.S. 922, 931 (1975)).

8        In fact, it is common sense that President Trump and Secretary Hegseth's unilateral

9    exercise of federal power risks doing more harm than good. That is the very point that

10   Justice Jackson made in his renowned concurrence in Youngstown Sheet & Tube Co. v.

11   Sawyer:

> The appeal, however, that we declare the existence of inherent
> powers [out of necessity] to meet an emergency asks us to do
> what many think would be wise, although it is something the
> forefathers omitted. They knew what emergencies were, knew
> the pressures they engender for authoritative action, knew, too,
> how they afford a ready pretext for usurpation. We may also
> suspect that they suspected that emergency powers would tend
> to kindle emergencies.

17   343 U.S. 579, 649–50 (1952) (Jackson, J., concurring) (emphasis added). Indeed, as

18   Justice Jackson explained using examples from Weimar Germany, the French Republic,

19   and World War II–era Great Britain, "emergency powers are consistent with free

20   government only when their control is lodged elsewhere than in the Executive who

21   exercises them." Id. at 651–62. The issue presented in Youngstown (whether the

22   President had implied constitutional authority to seize steel production plants during

23   wartime) is admittedly different than that presented here (whether the President can

24   federalize the National Guard over the objection of a state governor and without evidence

25   of a rebellion). But Justice Jackson's lesson remains poignant: federal overreach risks

26   instigating the very behavior that the federal government fears. To put a finer point on it,

27   the federal government cannot be permitted to exceed its bounds and in doing so create the

28   very emergency conditions that it then relies on to justify federal intervention.

1     Turning now to Plaintiffs' second asserted harm, Plaintiffs explain that California's

2  National Guard provides important state services, including by fighting wildfires, see Eck

3  Decl. ¶¶ 35–36, 39–40, and drug trafficking enforcement, id. ¶¶ 42–43.  Plaintiffs have

4  also shown that National Guard members are often relied upon to their fullest capacity and,

5  indeed, are likely to be so relied upon in 2025.  Id. ¶¶ 32–33.  Defendants respond that

6  "Plaintiffs do not identify any type of exigency that they would direct these resources [to]

7  that approaches the seriousness of the situation in Los Angeles."  Opp. at 27.  But this

8  overstates the violence in Los Angeles, which even by Defendants' own account is limited

9  to isolated actors and is primarily damage to property, and vastly understates the risks to

10  property and human life caused by wildfires and trafficked drugs like fentanyl.[11]  Perhaps

11  Defendants simply mean that there is not an immediate (as in today) need for California's

12  National Guard to be deployed, but even that is untrue.  As Plaintiffs point out, as of June

13  11 there were 13 fires over 10 acres, including one that has consumed over 4,200 acres,

14  burning in California.  Eck Suppl. Decl. (dkt. 39-2) ¶ 10.  And in any case, Defendants'

15  myopic focus on whether there is currently an exigency misunderstands the nature of

16  emergencies, which are inherently unplanned for.

17     The Court finds that Plaintiffs have established that they are likely to suffer at least

18  these two forms of harm in the absence of immediate injunctive relief.

19        **C.    Balance of Equities and Public Interest**

20     A party seeking injunctive relief must also demonstrate that the balance of equities

21  tips in its favor, and that an injunction is in the public interest.  See Winter, 555 U.S. at 20.

22  "'In exercising their sound discretion, courts of equity should pay particular regard for the

23  public consequences in employing the extraordinary remedy of injunction.'"  Id. (quoting

24  Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982)).  Because the government is a

25  _____

26  [11] Indeed, President Trump has officially recognized that fentanyl trafficking is a "national emergency" and a "public health crisis," Fact Sheet: President Donald J. Trump Proceeds

27  with Tariffs on Imports from Canada and Mexico, White House (Mar. 3, 2025), and called the January 2025 Los Angeles wildfires a "tragedy [that] affects the entire Nation,"

28  Emergency Measures to Provide Water Resources in California and Improve Disaster Response in Certain Areas, White House (Jan. 24, 2025).

United States District Court
Northern District of California

1  party, the last two <u>Winter</u> factors merge.  <u>E. Bay Sanctuary Covenant</u>, 993 F.3d at 668.

2      The Court begins by observing that significant harm has already occurred.

3  President Trump's June 7 Memo marks the first time that a President has invoked § 12406,

4  lawfully or not, against the wishes of a state governor.  Regardless of the outcome of this

5  case or any other, that alone threatens serious injury to the constitutional balance of power

6  between the federal and state governments, and it sets a dangerous precedent for future

7  domestic military activity.[12]  There is a reason that § 12406 and other similar statutes, such

8  as the Insurrection Act, apply only in the narrowest and most extreme of circumstances—

9  they jeopardize the delicate federalism that forms the basis of our very system of

10  government.  <u>See</u> <u>Youngstown</u>, 343 U.S. at 638 (Jackson, J., concurring) ("Presidential

11  claim to a power at once so conclusive and preclusive must be scrutinized with caution, for

12  what is at stake is the equilibrium established by our constitutional system.").  The

13  continued deployment of federal troops in Los Angeles[13] for 60 days would further

14  entrench this harm.

15      Moreover, Plaintiffs have shown a likelihood of prevailing in their argument

16  President Trump's invocation of § 12406 was in fact <u>not lawful</u>, both exceeding the scope

17  of his authority and violating the Tenth Amendment.  When Plaintiffs establish "a

18  likelihood that Defendants' policy violates the U.S. Constitution, Plaintiffs have also

19  established that both the public interest and the balance of the equities favor [injunctive

20  relief]."  <u>See</u> <u>Arizona Dream Act Coalition</u>, 757 F.3d at 1069.  Defendants are not harmed

21  by "an injunction that merely ends an unlawful practice or reads a statute as required to

22

23  [12] Defendants argue that the separation of powers cuts against judicial intervention, <u>see</u>
24  Opp. at 2, but they focus exclusively on the separation between the Executive and the
    Judiciary, missing entirely the important balance between federal and state power.
25  [13] And potentially nationwide, as the June 7 Memo invoking 10 U.S.C. § 12406 <u>does not
    name Los Angeles</u> or California or any other geographical area and purports to apply to
26  "the Governors of the States," not just California.  Indeed, amici from Washington,
    Delaware, Arizona, Colorado, Connecticut, Hawai'i, Illinois, Maine, Maryland,
27  Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York,
    North Carolina, Oregon, Vermont, Wisconsin, Rhode Island, and the Office of the
    Governor of Kansas contend that they "are implicated by the unlimited scope of" the June
28  7 Memo.  <u>See</u> States Amici (dkt. 30-1) at 2.  Whether the memo adequately satisfies any of
    the conditions of § 12406 as to jurisdictions beyond Los Angeles is not before this Court.

United States District Court
Northern District of California

1  avoid constitutional concerns." See R.I.L.-R v. Johnson, 80 F. Supp. 3d 164, 191 (D.D.C.

2  2015).  They may continue to enforce the immigration law, even without the assistance of

3  the National Guard.

4       Defendants no doubt have an "interest in protecting federal agents and property."

5  See Index Newspapers LLC v. U.S. Marshals Serv., 977 F.3d 817, 831 (9th Cir. 2020).

6  But they have no legitimate interest in doing so beyond the bounds of their authority.  See

7  R.I.L-R, 80 F. Supp. 3d at 191.  Federal agents and property may actually well be served

8  by de-militarization and a concurring de-escalation of the situation.  Regardless, Plaintiffs

9  and the citizens of Los Angeles face a greater harm from the continued unlawful

10  militarization of their city, which not only inflames tensions with protesters, threatening

11  increased hostilities and loss of life, but deprives the state for two months of its own use of

12  thousands of National Guard members to fight fires, combat the fentanyl trade, and

13  perform other critical functions.  As discussed above, Defendants' actions also threaten to

14  chill legitimate First Amendment expression.

15       Accordingly, the Court concludes that Plaintiffs have demonstrated that the balance

16  of equities tips in their favor and that an injunction restraining the President's use of

17  military force in Los Angeles is in the public interest.

18  **IV.  CONCLUSION**

19       For the foregoing reasons, the Court GRANTS Plaintiffs' motion for a temporary

20  restraining order.

21      •  Defendants are temporarily ENJOINED from deploying members of the

22         California National Guard in Los Angeles.

23      •  Defendants are DIRECTED to return control of the California National Guard to

24         Governor Newsom.

25      •  The Court further STAYS this order until noon on June 13, 2025.

26      •  Plaintiffs are ORDERED to post a nominal bond of $100 within 24 hours.  The

27         bond shall be filed in the Clerk's Office and be deposited into the registry of the

28         Court.  If said bond is not posted by the aforementioned date and time, this

1    Order shall be dissolved.

2    • Defendants are further ORDERED TO SHOW CAUSE why a preliminary

3    injunction should not issue.  A hearing on this order to show cause will be held

4    on **June 20, 2025 at 10 a.m.**  Plaintiffs' moving papers shall be filed no later

5    than **June 16, 2025**; Defendants' opposition shall be due no later than **June 18,**

6    **2025**, and Plaintiffs' reply shall be due on **June 19, 2025**.

7    **IT IS SO ORDERED.**

8    Dated: June 12, 2025



9    CHARLES R. BREYER
     United States District Judge

10

11

United States District Court
Northern District of California

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**A296** 36