No. 25-3727

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

―――――――――――

GAVIN NEWSOM, *et al.*,
*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, *et al.*,
*Defendants-Appellants.*

―――――――――――

## On Appeal from the United States District Court
## for the Northern District of California
No. 3:25-cv-04870
The Honorable Charles R. Breyer

―――――――――――

## OPPOSITION TO MOTION FOR STAY PENDING APPEAL

―――――――――――

ROB BONTA
*Attorney General of California*
MICHAEL J. MONGAN
*Solicitor General*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*
SAMUEL T. HARBOURT*
JOSHUA PATASHNIK
CHRISTOPHER D. HU
*Deputy Solicitors General*
ANYA BINSACCA
JOHN D. ECHEVERIA
MARISSA MALOUFF
JAMES E. STANLEY
*Supervising Deputy*
  *Attorneys General*

NICHOLAS ESPIRÍTU
NICHOLAS GREEN
JANE REILLEY
MEGAN RICHARDS
MEGHAN H. STRONG
*Deputy Attorneys General*
HALEY AMSTER
CARA NEWLON
*Associate Deputy*
  *Solicitors General*

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3919
Samuel.Harbourt@doj.ca.gov
*Attorneys for Plaintiffs-Appellees*

June 15, 2025

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................ 1

Statement ................................................................................... 3

Argument ................................................................................... 7

I.    Defendants are not likely to succeed on the merits ............................ 8

    A.    Defendants exceeded their lawful authority in federalizing 4,000 soldiers of the California National Guard ...................... 9

        1.    None of the factual predicates in Section 12406 exists ............................................................................ 10

        2.    The orders were not issued "through the governor[]" .. 15

    B.    This case presents a justiciable controversy ........................... 17

II.    The equitable factors do not support issuance of a stay pending appeal ...................................................................................... 21

Conclusion ................................................................................ 25

# TABLE OF AUTHORITIES

**Page**

CASES

*Chamber of Com. of U.S. v. Reich*
74 F.3d 1322 (D.C. Cir. 1996)....................................................19

*Dalton v. Specter*
511 U.S. 462 (1994).....................................................................19

*Deakins v. Monaghan*
484 U.S. 193 (1988).....................................................................17

*Dep't of Educ. v. California*
145 S. Ct. 966 (2025)....................................................................9

*E. Bay Sanctuary Covenant v. Trump*
932 F.3d 742 (9th Cir. 2018) ........................................................9

*Hibbs v. Winn*
542 U.S. 88 (2004).......................................................................16

*In re Saldana*
122 F.4th 333 (9th Cir. 2024) .....................................................15

*J.A.V. v. Trump*
___ F. Supp. 3d ____, 2025 WL 1257450
(S.D. Tex. May 1, 2025) .............................................................18

*J.G.G. v. Trump*
2025 WL 914682 (D.C. Cir. Mar. 26, 2025) ..............................18

*Laird v. Tatum*
408 U.S. 1 (1972)....................................................................2, 24

*Marbury v. Madison*
5 U.S. (1 Cranch) 137 (1803) .....................................................18

*Martin v. Mott*
25 U.S. (12 Wheat.) 19 (1827) ..............................................19, 20

# TABLE OF AUTHORITIES
## (continued)

Page

*Murphy Co. v. Biden*
65 F.4th 1122, 1130 (9th Cir. 2023) ........................................... 18

*Nken v. Holder*
556 U.S. 418 (2009) ...................................................... 7, 8, 21

*Printz v. United States*
521 U.S. 898 (1997) ............................................................. 16

*Sebelius v. Cloer*
569 U.S. 369 (2013) ............................................................. 11

*Trump v. J.G.G.*
145 S. Ct. 1003 (2025) .......................................................... 18

*Youngstown Sheet & Tube Co. v. Sawyer*
343 U.S. 579 (1952) ......................................................... 10, 18

*Zivotofsky ex rel. Zivotofsky v. Clinton*
566 U.S. 189 (2012) ............................................................. 18

**STATUTES**

10 U.S.C. §§ 332-334 ............................................................. 17

10 U.S.C. § 12406 ........................................................... *passim*

18 U.S.C. § 1385 .................................................................. 4

35 Stat. 399 (1908) ............................................................. 15

Cal. Mil. & Vet. Code § 163 ...................................................... 17

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. X .............................................................. 10

U.S. Const. art. I, § 8, cl. 15 ............................................... 2, 4, 9

## TABLE OF AUTHORITIES
### (continued)

Page

U.S. Const. art. I, § 9, cl. 2.................................................................11

U.S. Const. art. II, § 2, cl. 1 ...............................................................4

Cal. Const. art. V, § 7..........................................................................3

OTHER AUTHORITIES

Exec. Order No. 10730, 22 Fed. Reg. 7628 (Sept. 25, 1957)...................16, 17

Exec. Order No. 11519, 35 Fed. Reg. 5003 (Mar. 24, 1970) .........................14

Associated Press, *LIVE: Kristi Noem holds a press conference in
 Los Angeles*, YouTube (June 12, 2025),
 https://tinyurl.com/ymx7cm2v.......................................................6

*Rebellion*, Black's Law Dictionary (12th ed. 2024) ........................................11

Scalia & Garner, Reading Law (2012) ............................................................15

The Examination of Doctor Benjamin Franklin, Before an August
 Assembly, Relating to the Repeal of the Stamp-Act (Feb. 13,
 1766), *available at* https://tinyurl.com/577emuzh ....................................22

*The Great Postal Strike*, 133 The Postal Record 14 (2020),
 https://tinyurl.com/29a8dw38 ....................................................14

*Watch: Governor Newsom discusses 'Donald Trump's mess' in
 Los Angeles*, Governor Gavin Newsom (June 9, 2025),
 https://tinyurl.com/577p5rh9 ....................................................16

# INTRODUCTION

On June 7, for the first time in our Nation's history, the President invoked 10 U.S.C. § 12406 to federalize a State's National Guard units over the objection of its Governor. That unprecedented action was in response to local protests and civil disobedience no different from what communities nationwide have experienced dozens of times since the enactment of Section 12406. Four thousand California National Guard members are now under federal command (joined recently in Los Angeles by hundreds of active-duty Marines). And those federalized troops are not merely protecting federal facilities; on defendants' orders, they are actively assisting ICE officers in the day-to-day enforcement of civil immigration laws on the streets of America's second-largest city.

The district court acted properly in temporarily restoring the pre-June 7 status quo as to California's National Guard while the parties expeditiously brief a preliminary injunction motion that will be heard this Friday, June 20. To be clear, the civil unrest in Los Angeles is a serious matter; violence against government officers and property is unacceptable and is not tolerated by the State of California. That is why thousands of local and state law enforcement officers are currently on the ground in Los Angeles, working to maintain order and arresting individuals who engage in violence. Those circumstances—a period of protest and civil unrest in an urban center actively managed by state and local law enforcement—are not

uncommon. As the district court found based on the record evidence, the circumstances here do not remotely amount to a "rebellion or danger of a rebellion" or a situation that renders the President "unable with the regular forces to execute the laws of the United States" under 10 U.S.C. § 12406(2) and (3), the two factual predicates that defendants purportedly relied on as a basis for their federalization orders. And those orders are unlawful for the additional reason that they were never "issued through the governor[] of the State[]," the process Congress required when it exercised its Article I power to define the scope of the President's authority. *Id.* § 12406.

Defendants accuse the district court of committing a "gross violation of the separation of powers" (Mot. 2) and "an extraordinary intrusion on the President's constitutional authority" (Mot. 1). In truth, it is defendants who have departed from our constitutional traditions by intruding on the authority of the Legislative Branch—to which the Framers granted the power to "provide for calling forth the Militia," U.S. Const. art. I, § 8, cl. 15—and of the States, whose sovereignty Congress respected by demanding a role for "the governor" in Section 12406. Defendants have unilaterally seized control of state National Guard units without any statutory or constitutional authorization. They have undermined our Nation's longstanding tradition against "military intrusion into civilian affairs." *Laird v. Tatum*, 408 U.S. 1, 15-16 (1972). They are asking this Court to treat their actions

as unreviewable despite the robust tradition of judicial review of executive actions—and the profound consequences for our democracy of denying that review. They urge the Court to allow them to continue their unprecedented actions without any genuine showing that the situation in Los Angeles is unprecedented or that the temporary restraining order injures them. And they are doing so in the face of evidence that those actions deprive the State of its own Guard members for critical functions like firefighting; escalate tensions and exacerbate the risk of further violence; and disregard the proper balance of power between the Executive, Congress, and sovereign States. The Court should deny the motion for a stay pending appeal.

## STATEMENT

The California National Guard is part of the organized militia of the State of California and is a federally recognized unit and organization of the reserve component of the U.S. military. A190.[1] It is "vital" in carrying out state functions such as "emergency and natural disaster response, cybersecurity, and drug interdiction." A192. Governor Newsom is the commander-in-chief of the California National Guard when it is under state control. *Id.*; Cal. Const. art. V, § 7. President Trump is the commander-in-chief of the U.S. Armed Forces, which

---

[1] This citation and subsequent "A" citations are to the addendum to defendants' motion for a stay pending appeal.

includes the National Guard only when validly "called into the actual Service of the United States" under an act of Congress. U.S. Const. art. II § 2, cl. 1; *see id.* art. I § 8, cl. 15. "The United States military is not primarily a law enforcement organization and is prohibited by law from acting as a domestic police force[.]" Br. of Former U.S. Army & Navy Secretaries & Retired Four-Star Admirals & Generals, Dkt. 31-1 at 4 (citing 18 U.S.C. § 1385).[2]

In recent days, many residents of Los Angeles have joined protests of federal immigration policies and enforcement actions. A262-268. "[T]here can be no debate that most protesters [have] demonstrated peacefully." A279. "Nonetheless, it is also beyond debate that some individuals [have] used the protests as an excuse for violence and destruction." *Id.* State and local leaders have unequivocally condemned those acts of violence and illegality. *See, e.g.*, A120, A122. And state and local law enforcement agencies—including the Los Angeles Police Department (LAPD), one of the world's largest law enforcement agencies—have moved promptly to arrest lawbreakers, quell unrest, and restore order, consistent with their expertise in "controlling and (when necessary) dispersing crowds, managing protests, apprehending those who break the law, and keeping people safe." Br. of City of Los Angeles, Dkt. 51-1 at 2; *see also* A263-264, A267-268.

---

[2] "Dkt." refers to the district court docket.

On June 7, 2025, one day after the protests began, President Trump issued a memorandum authorizing Defense Secretary Hegseth to "call[] into Federal service . . . at least 2,000 National Guard personnel . . . for 60 days." A158. The only legal authority identified in the memorandum was 10 U.S.C. § 12406, which allows the President to federalize state National Guard units when "there is a rebellion or danger of a rebellion" or when "the President is unable with the regular forces to execute the laws of the United States." In President Trump's view, any "protests or acts of violence [that] directly inhibit the execution of the laws . . . constitute a form of rebellion." A158. President Trump has also stated that "we're going to have troops everywhere" to "liberate Los Angeles from the Migrant Invasion." A266.

On the same day that President Trump issued the memorandum, Secretary Hegseth federalized 2,000 members of the California National Guard, A249, and deployed those troops to Los Angeles, A265-266. Two days later, on June 9, Secretary Hegseth federalized an additional 2,000 members of the State's National Guard. A253. They too were deployed to Los Angeles, as were 700 active-duty members of the U.S. Marine Corps. *See* A267. According to Secretary Hegseth, the mission of these troops is to protect "personnel who are performing Federal functions" at "locations where protests against these functions are occurring or are likely to occur." A253.

Since their deployment, military forces have joined federal immigration agents in the field, "providing security patrols, observation posts, and outer cordon security perimeter of buildings." Mot. 18. ICE has released photos showing armed federalized guardsmen accompanying ICE agents during arrests. *See, e.g.*, Dkt. 39-1. Federal officials have repeatedly stated that military forces can detain—and even arrest—civilians. *See, e.g.*, A288 (describing statements by the DHS Secretary and acting ICE director). Attorney General Bondi has announced that "[w]e're not scared to go further." *Id.* And the Secretary of Homeland Security stated that the operation, including the "military," will continue until they have "liberate[d]" Los Angeles from the leadership of the democratically elected Governor and Mayor. Associated Press, *LIVE: Kristi Noem holds a press conference in Los Angeles*, YouTube, at 5:03 (June 12, 2025), https://tinyurl.com/ymx7cm2v.

To prevent irreparable harm from this unprecedented deployment, Governor Newsom and the State of California sued and moved for a temporary restraining order. A268. In support of that motion, plaintiffs submitted evidence showing that state and local law enforcement agencies were containing and suppressing incidents of violence and unrest as they arose, consistent with similar past episodes of public protest. *See, e.g.*, A181-185. Plaintiffs also showed that nearly 33% of the members of California's National Guard have now been federalized and

6

transferred to federal command, depleting the Guard's personnel available "to combat wildfires, conduct drug interdiction, and provide services for Californians." Dkt. 39-2 ¶ 3.

After reviewing plaintiffs' evidence and defendants' response, A268, the district court concluded that defendants likely acted without legal authority in federalizing the California National Guard, A269-286, A289-291, and that California would suffer immediate and irreparable harm without a temporary restraining order pending completion of an expedited briefing schedule and hearing on Plaintiffs' request for a preliminary injunction. A295-296. That hearing is set to take place on June 20.

## ARGUMENT

A party seeking a stay pending appeal must show that it is likely to succeed on the merits of its appeal, that it will be irreparably injured absent a stay, and that the balance of the equities and the public interest favor a stay. *See Nken v. Holder*, 556 U.S. 418, 434 (2009). Defendants cannot satisfy those requirements. The district court properly granted a temporary restraining order responding to defendants' unprecedented decision to federalize 4,000 California National Guard members and deploy them into service (including civil immigration enforcement) on the streets of Los Angeles. That action exceeded multiple requirements set by

Congress in 10 U.S.C. § 12406—the sole authority that defendants invoked—and impermissibly intruded on California's sovereign powers.

Defendants' assertion that Section 12406 confers unreviewable and nearly unlimited authority on the President to federalize state National Guard units contravenes the statutory text and is at odds with foundational constitutional principles. And the equitable factors all weigh against a stay pending appeal. Defendants will not be harmed by temporarily restoring the Guard to state control and restoring the status quo from before their unlawful actions, because civilian law enforcement at the local, state, and federal level is already available in great numbers to preserve order and enforce the laws, as they have during similar periods of civil unrest for decades. In contrast, preventing the district court's order from taking effect would work irreparable injury: depriving the State of the services of the California National Guard at a time of great need, exacerbating tensions on the ground in Los Angeles, and altering the balance of powers carefully struck by the Framers.

## I.   DEFENDANTS ARE NOT LIKELY TO SUCCEED ON THE MERITS

Defendants cannot make a "strong showing" of likelihood of success. *Nken*, 556 U.S. at 434. To begin with, there are serious questions as to appellate jurisdiction (and defendants do not even address the demanding standard governing their alternative request for mandamus relief, *see* Mot. 11). "Ordinarily,

8

a TRO is not an appealable order." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 762 (9th Cir. 2018). Courts sometimes deviate from that general rule when a TRO "carries . . . the hallmarks of a preliminary injunction." *E.g.*, *Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (per curiam). But the order here is plainly a temporary precursor to an actual preliminary injunction: The district court ordered the parties to show cause why a preliminary injunction should not be issued and set a highly expedited briefing schedule on that question, with a preliminary injunction hearing just eight days later, on June 20. A296. And even if the district court's temporary order were appealable, defendants are not likely to obtain reversal. Indeed, defendants barely respond to the district court's persuasive rejection of their arguments.

### A. Defendants Exceeded Their Lawful Authority in Federalizing 4,000 Soldiers of the California National Guard

Defendants acknowledge that the Constitution "grant[s] *Congress* the power to call[] forth the militia to execute the laws of the union, suppress Insurrections, and repel Invasions." Mot. 3 (quoting U.S. Const. art. I, § 8, cl. 15). Congress has enacted statutes that authorize the President to deploy the National Guard domestically in only limited circumstances. "That authority has been used sparingly throughout this country's history, and rightfully so in a democracy governed by civilians elected by the American people." Br. of Former U.S. Army & Navy Secretaries & Retired Four-Star Admirals & Generals, Dkt. 31-1 at 4. The

central question in this appeal is whether the President exceeded the authority Congress gave him in 10 U.S.C. § 12406—the sole statute he invoked when federalizing members of the California National Guard. A249-255; *see generally Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring in the judgment) (the President's "power is at its lowest ebb" when he takes actions incompatible with the express terms of a statute).

Congress imposed two requirements that must be satisfied for the President to lawfully federalize units or members of a state National Guard under Section 12406. First, one or more of the three predicate conditions in subsections (1) through (3) must exist. Second, the order must be "issued through the governor[.]" *Id.* Defendants failed to satisfy either of those requirements here, rendering their actions *ultra vires* and inconsistent with the Constitution's reservation of powers to the States. *See, e.g.*, U.S. Const. amend. X.

### 1. None of the factual predicates in Section 12406 exists

Defendants concede (A270) that the events in Los Angeles in recent days do not constitute an invasion or "danger of invasion." 10 U.S.C. § 12406(1). They instead assert that the predicates in subsections (2) and (3) are satisfied because the violence and misconduct of some individuals in Los Angeles "constitute[d] a rebellion against federal authority, and . . . impeded the ability of Immigration and Customs Enforcement (ICE) and other federal officials to enforce federal law."

Mot. 1. But statutory terms must be "interpreted in accordance with their ordinary meaning," *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013), and defendants' expansive reading of subsections (2) and (3) cannot be squared with the ordinary meaning of the words Congress enacted.

*"Rebellion or danger of a rebellion."* Defendants cannot show that the record establishes "a rebellion or danger of a rebellion against the authority of the Government of the United States." 10 U.S.C. § 12406(2). The ordinary meaning of "rebellion"—today and when Congress enacted the Militia Act of 1903—is "[o]pen, organized, and armed resistance to an established government or ruler" or "an organized attempt to change the government or leader of a country, usu[ally] through violence." *Rebellion*, Black's Law Dictionary (12th ed. 2024); *see id.* ("Cf. civil war"); A277-279 (collecting historic dictionary definitions supporting the view that a "rebellion" describes a violent, organized, open, and armed attempt to change the government as a whole). That is why the term "rebellion" is often used alongside the related term "invasion," as in Section 12406 itself. *See, e.g.*, U.S. Const. art. I, § 9, cl. 2 (specifying that the writ of habeas corpus "shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it"). "Rebellion" is not a synonym for civil unrest or riots.

The facts here do not rise to the level of a "rebellion" or "danger of a rebellion." Defendants cite examples of individuals "blocking traffic," "throwing

rocks," and "vandalizing property." Mot. 13-14 (quoting A172, A183-184). The Governor, the state Attorney General, and local elected officials have repeatedly and unequivocally condemned these episodes of violence and illegality. *Supra* p. 4. And state and local law enforcement responded effectively to them, as they are trained to do, including by making hundreds of arrests. Dkt. 39-3 ¶ 14. These episodes are not categorically different from others that have occurred during periods of unrest in recent years and throughout our Nation's history. Defendants cite no legal authority (*see* Mot. 13-15) supporting their argument that this type of misconduct, amidst a series of primarily peaceful protests, qualifies as "rebellion" or creates a "danger of rebellion." Nor do they offer any response to the district court's careful application of the statutory text to the record here. A279-282.

Instead, defendants invoke the secondary and tertiary dictionary definitions of the term "rebellion" as "'[o]pen resistance or opposition to an authority or tradition'" or "'[d]isobedience of a legal command or summons.'" Mot. 13 (quoting Black's). But it is not remotely plausible that Congress intended Section 12406 to authorize the federalization of state National Guard units whenever civilians express open opposition to federal actions or disobey a legal command. *See* A278 ("[T]he first definition is the one demanded by context here."). The First Amendment protects the right to openly oppose federal authority through assemblies and protests, and it is not uncommon for those protected activities to be

accompanied by some measure of civil disobedience.  *See* A280-282.  By defendants' logic, every modern President has seen dozens of "rebellions" come and go during his time in office—all while failing to deploy the National Guard to "suppress the rebellion."  10 U.S.C. § 12406.

*"Unable with the regular forces to execute the laws."*  Nor can Defendants establish that the recent events in Los Angeles have rendered President Trump "unable with the regular forces to execute the laws of the United States."  10 U.S.C. § 12406(3).  As defendants read that language, the predicate exists anytime federal law enforcement personnel face "substantial threats," are "physically injured," or are hindered in their ability "to carry out additional federal enforcement activities."  Mot. 14.  But those circumstances, while regrettable, are regular occurrences in our Nation.  They do not render the President "*unable*" to execute federal law—or justify the President commandeering state National Guard units.

At a minimum, for the President to be "unable" to "execute the laws of the United States," the threats must be of such a magnitude that ordinary measures using "regular forces" are insufficient to enable the enforcement of federal law.  10 U.S.C. § 12406(3).  The evidence here establishes nothing of the sort.  "[T]he regular forces were and are still very much on duty."  A284.  From the day the protests began, ICE has continued to conduct enforcement actions and make arrests

13

in the Los Angeles area. *See, e.g.*, Dkt. 39-1 at 2, 4. And while the protests presented operational difficulties for ICE, there is no indication that ICE would have been unable to overcome these difficulties with ordinary security measures and the assistance of other federal officers or local law enforcement.

Indeed, defendants' own declarant asserts that the crowd of protestors outside the federal building on June 6 that prompted the initial federalization order (*see* Mot. 5-6) had fully dispersed within about four hours of LAPD's arrival, "with the LAPD officers following them away from the property." A241. In the ensuing days, "thousands of officers from LAPD, LASD, CHP, and local law enforcement agencies from Los Angeles and neighboring counties have responded to the incidents," making hundreds of arrests. Dkt. 39-3 ¶¶ 8, 14. That is a far cry from the only other time in our Nation's history that a President relied on the exclusive authority of Section 12406 to federalize the National Guard: When President Nixon called the National Guard into service to deliver the mail in 1970, it was in response to a postal strike involving over 200,000 postal workers nationwide. *The Great Postal Strike*, 133 The Postal Record 14, 19 (2020), https://tinyurl.com/29a8dw38; *see also* Exec. Order No. 11519, 35 Fed. Reg. 5003 (Mar. 24, 1970) (invoking Section 12406's predecessor). In other words, hundreds of thousands of personnel who otherwise executed the relevant function were

14

unavailable due to being on strike.  Here, those personnel are available and on the job.

### 2.    The orders were not issued "through the governor[]"

Defendants also cannot establish that the federalization orders on June 7 and June 9 were "issued through the governor[]" of California, as Congress required. 10 U.S.C. § 12406; *see* A284-286.  As originally enacted, Section 12406 did not contain those words.  Congress amended the statute to add them in 1908, *see* Militia Act of 1908, ch. 204, 35 Stat. 399, 400, and that "significant change in language" must be "presumed to entail a change in meaning," *In re Saldana*, 122 F.4th 333, 341 (9th Cir. 2024) (quoting Scalia & Garner, Reading Law 256-60 (2012)).  At a minimum, the text contemplates a procedure by which a governor is consulted about an order, receives it, and then issues the order to the relevant guard units.  That did not happen here.  A117-118, A178-179.

Defendants contend that the federalization orders here satisfied the "issued through the governor" requirement because the "President spoke with Governor Newsom about the situation in Los Angeles on June 6," and the June 7 and 9 memoranda "bore the label 'THROUGH: THE GOVERNOR OF CALIFORNIA.'"  Mot. 16 (citing A249, A253).  But defendants cite only a news article, not record evidence, for the assertion that the June 6 conversation addressed the possible federalization of state National Guard units, and the

Governor himself has refuted that assertion.[3]  And it "strains credibility" for defendants to contend that merely stamping those words "at the top of a document that the President never sends to the governor" satisfies the process demanded by Congress.  A285 (emphasis omitted).

That interpretation would contravene multiple canons of statutory construction.  It would render the "issued through the governor" requirement "inoperative[,] superfluous, void [and] insignificant." *Hibbs v. Winn*, 542 U.S. 88, 101 (2004).  And it would needlessly present constitutional concerns:  to allow the President to federalize a State's National Guard in a public document that was never received by the Governor but purports to be issued "through" the Governor, and to treat the Governor as a "subordinate" whose only role is ministerial (Mot. 17), would "diminish the accountability of state [and] federal officials." *Printz v. United States*, 521 U.S. 898, 930 (1997).

Contrary to defendants' assertion, the district court's understanding of "through the governor[]" would not have "empowered the Governor of Arkansas to block President Eisenhower from deploying the National Guard to desegregate Arkansas' public school[s]."  Mot. 2.  President Eisenhower relied on a different statute—the Insurrection Act—to order that deployment.  *See* Exec. Order No.

---

[3] *Watch:  Governor Newsom discusses 'Donald Trump's mess' in Los Angeles*, Governor Gavin Newsom (June 9, 2025), https://tinyurl.com/577p5rh9.

10730, 22 Fed. Reg. 7628 (Sept. 25, 1957).  Unlike Section 12406, the Insurrection Act does not require that orders be issued "through the governor[]."  *See* 10 U.S.C. §§ 332-334.

Defendants also argue that Section 12406 is satisfied because California's Adjutant General, who is authorized by state law to issue orders in the name of the Governor, served as the "conduit for [the] decision."  Mot. 17; *see id.* at 16 (citing Cal. Mil. & Vet. Code § 163); *see also id.* at 9.  That argument runs headlong into the text of Section 12406, which allows orders to be issued through a general of the National Guard *only* with respect to the District of Columbia.  10 U.S.C. § 12406 ("Orders for these purposes shall be issued through the governors of the States *or, in the case of the District of Columbia*, through the *commanding general* of the National Guard of the District of Columbia." (emphasis added)).  Section 12406 only authorizes the President to federalize the National Guard of a sovereign State where a proper order is issued "through the governor[.]"  *Id.*

### B.  This case presents a justiciable controversy

Defendants briefly argue (Mot. 15) that courts may not review whether any of Section 12406's factual predicates is present.  But they offer no response to the six pages of analysis in the district court's order explaining why that argument fails.  *See* A270-276.  Federal courts have a "virtually unflagging obligation" to exercise the jurisdiction given them, *e.g.*, *Deakins v. Monaghan*, 484 U.S. 193, 204 (1988),

17

and to "say what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). And this Court has taken "an expansive view" of the reviewability of claims that the President and other executive officials have acted *ultra vires*. *Murphy Co. v. Biden*, 65 F.4th 1122, 1130 (9th Cir. 2023); *see id.* at 1128-1131; *see also Youngstown*, 343 U.S. at 585-588.

The political-question doctrine provides only "a narrow exception" to the rule that "the Judiciary has a responsibility to decide cases properly before it." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194-195 (2012). The modern trend has been to treat cases as justiciable even where they implicate questions of foreign affairs or national security. *See, e.g.*, *id.* at 201. In recent months, for example, courts have repeatedly rejected the President's request to treat questions under the Alien Enemies Act—in particular, whether there has been an "invasion"—as non-justiciable. *See, e.g.*, *J.A.V. v. Trump*, ___ F. Supp. 3d ____, 2025 WL 1257450, at *7-11 (S.D. Tex. May 1, 2025); *J.G.G. v. Trump*, 2025 WL 914682, at *5-7 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring); *cf. Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (2025).

Defendants identify no persuasive reason for the Court to take a different course here. They characterize Section 12406 as entirely discretionary because it "authorizes 'the President' to activate Guardsmen 'in such numbers *as he considers necessary* to repel the invasion, suppress the rebellion, or execute those

18

laws.'" A216; *see* Mot. 15. But the phrase "as he considers necessary" is a textual commitment of discretion with respect to the President's decision about the "numbers" called into service *after* the statutory predicates have been satisfied. 10 U.S.C. § 12406. Congress did not include that discretionary language when describing the predicate conditions that must be satisfied *before* the President federalizes members of a State's National Guard.

Turning to precedent, defendants assert that *Dalton v. Specter*, 511 U.S. 462, 477 (1994), forecloses review. Mot. 15. But *Dalton* "merely stands for the proposition that when a statute entrusts a discrete specific decision to the President and contains no limitations on the President's exercise of that authority, judicial review of an abuse of discretion claim is not available." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1331 (D.C. Cir. 1996) (emphasis added). Section 12406 contains clear and explicit limitations on the President's authority. Finally, defendants contend that *Martin v. Mott*, 25 U.S. (12 Wheat.) 19 (1827), "made clear" that judicial review is unavailable here. Mot. 2. It does not. *Martin* long predates the modern political-question doctrine. It concerned a question that directly implicated foreign policy—unlike this case, which "implicates the President's domestic use of military force." A275 (emphasis omitted). And the facts were not remotely comparable: the plaintiff was a militiaman who faced a

court-martial for refusing President Madison's order to federal service during the War of 1812. *See Martin*, 25 U.S. at 20-22.

\* \* \*

Considered individually, defendants' legal arguments are meritless. Considered in the aggregate, they are terrifying. Defendants' interpretation of Section 12406 would empower the President to commandeer a State's National Guard based merely on evidence that some civilians opposed his authority, disobeyed his commands, or presented operational difficulties for civil law-enforcement officials—and without any input from (or even notice to) the Governor. *See* Mot. 14-17. Courts would be powerless to enforce the limits Congress imposed on the President's exercise of that authority. *See id.* at 2, 15. And, as defendants see things, the Posse Comitatus Act would "not apply" to any of the troops federalized via the President's unreviewable exercise of his Section 12406 authority, *id.* at 18, a position no court has ever endorsed. That unchecked power could be deployed in any context—not just where civilians are protesting immigration enforcement, but also where they are protesting other policies of a federal administration, or protesting in advance of a hotly contested federal election. Collectively, defendants' arguments would sideline the Judiciary, ignore Congress's limitations, and trample over the States' sovereign interest in their own militias. The district court correctly rejected those arguments.

## II. THE EQUITABLE FACTORS DO NOT SUPPORT ISSUANCE OF A STAY PENDING APPEAL

Nor have defendants established that the remaining factors support a stay pending appeal. *See Nken*, 556 U.S. at 434. As to irreparable injury, defendants contend that the district court's order "exposes federal employees to violence at the hands of rioting mobs in Los Angeles and interferes with those employees' ability to enforce federal law." Mot. 20. But the evidence in the record does not support that proposition. Defendants' declarant described certain episodes of unlawful conduct characteristic of the kind of civil unrest that occurs periodically in this country—such as vandalism, individuals throwing objects, and a vehicle being set on fire. A239-245. But the evidence shows that state and local law enforcement have responded effectively to that misconduct—and remain on the scene in substantial numbers today to enforce the law and prevent further violence. *See, e.g.*, A240 (federal security agents "held the line" at the federal building until LAPD arrived on scene to control the crowd); A241 (LAPD dispersed the crowd within four hours); A244 ("LAPD issued a dispersal order and made multiple arrests"); A182-185 (describing operations on June 6-8); Dkt. 39-3 ¶¶ 7-15 (describing work of thousands of state and local officers, including hundreds of arrests).

In contrast, as the district court recognized (A291-293), the State and the public will be significantly harmed if the federalization of thousands of members

21

of California's National Guard over the objection of the Governor goes on any longer. It impairs the Guard's ability to perform critical functions for the State, including responding to natural disasters and interdicting drugs. A189. Most concerning, as California enters peak wildfire season, the Guard's wildfire-fighting Task Force Rattlesnake has been depleted by *more than half* because defendants deployed its members to Los Angeles. *Id.* ¶¶ 6-10. Defendants do not respond to this pressing concern. *See* Mot. 21-22.[4]

The "continued presence of National Guard members" as federal forces in Los Angeles also "risks worsening, not improving, tensions on the ground." A291. Arrests made by local law enforcement rose more than tenfold *after* the Guard was deployed, from 29 arrests on June 7 to 297 arrests on June 9. A291-292; Dkt. 39-3 ¶ 14. Defendants contend that this "theory of injury is inherently suspect," Mot. 21, but it is hardly surprising that the unnecessary and provocative deployment of military forces into the second-largest city in the Nation—against the wishes of state and local elected officials—would further inflame tensions. *Cf.* The Examination of Doctor Benjamin Franklin, Before an August Assembly, Relating to the Repeal of the Stamp-Act (Feb. 13, 1766) ("Suppose a military force

---

[4] Nor do defendants respond to the other harms discussed by the district court, such as depleting the National Guard's Counterdrug Task Force, "which specializes in stopping fentanyl trafficking at the U.S.-Mexico border." A262. That Task Force has now "lost 139 out of 446 service members to the federalization"—a 31% reduction in strength. Dkt. 39-2 ¶ 11.

sent into America . . . . They will not find a rebellion; they may indeed make one."), *available at* https://tinyurl.com/577emuzh.

Defendants contend that the district court's order is broader than necessary to address the State's harms because the court "direct[ed] defendants 'to return control of the California National Guard to Governor Newsom'" and temporarily enjoined the deployment of the Guard members in question in Los Angeles, while plaintiffs' requested relief "restricted only how National Guard members could be deployed." Mot. 22. That represented an effort by plaintiffs to focus their initial ex parte motion exclusively on the most immediate and exigent harms—*i.e.*, those presented by armed troops actively participating in civil law enforcement on the streets of Los Angeles. But the ultimate relief plaintiffs seek in this litigation is to enjoin the unlawful federalization of the California National Guard altogether, *see* A21, and plaintiffs intend to seek that broader form of relief at the preliminary injunction and summary judgment stage. Given the substantial harms that the unlawful federalization of these 4,000 Guard members is currently causing the State, *see supra* pp. 21-22, after receiving briefing and argument from both sides, the district court reasonably determined that an order temporarily returning control

of the Guard to the Governor was necessary to protect the State from further harm.[5]

The broader public interest also supports the district court's order. The "traditional and strong resistance of Americans to any military intrusion into civilian affairs . . . has deep roots in our history" and our Constitution. *Laird v. Tatum*, 408 U.S. 1, 15 (1972). "President Trump's June 7 Memo marks the first time that a President has invoked § 12406 . . . against the wishes of a state governor," which "alone threatens serious injury to the constitutional balance of power between the federal and state governments" while "set[ting] a dangerous precedent for future domestic military activity." A294. It also marks the first time that a President has invoked Section 12406 to order troops to patrol the streets of a major American city in support of routine civil law enforcement activities—while civil law enforcement officials at the local, state, and federal level all remain available and are doing that work. And defendants' nearly limitless conception of Section 12406 (*supra* pp. 10-17) would give the President discretion to repeat this experiment in response to ordinary, nonviolent acts of civil disobedience across our Nation. The public interest is served by a judicial order preserving the rule of

---

[5] At a minimum, this Court should allow the TRO to take effect insofar as it enjoins defendants from using Guard forces to patrol the streets of Los Angeles or engage in ordinary law-enforcement activities beyond the protection of federal buildings and personnel at those facilities. *See* A201.

law in the face of unprecedented and unlawful Executive action that threatens

grave and irreparable damage to our State and the Nation.

## CONCLUSION

The motion for a stay pending appeal should be denied.

Dated:  June 15, 2025                    Respectfully submitted,

                                         *s/ Samuel T. Harbourt*
_____

ROB BONTA
  *Attorney General of California*
MICHAEL J. MONGAN
  *Solicitor General*
THOMAS S. PATTERSON
  *Senior Assistant Attorney General*
SAMUEL T. HARBOURT
JOSHUA PATASHNIK
CHRISTOPHER D. HU
  *Deputy Solicitors General*
ANYA BINSACCA
JOHN D. ECHEVERRIA
MARISSA MALOUFF
JAMES E. STANLEY
  *Supervising Deputy Attorneys General*
NICHOLAS ESPIRÍTU
NICHOLAS GREEN
STEVE KERNS
JANE REILLEY
MEGAN RICHARDS
MEGHAN H. STRONG
  *Deputy Attorneys General*
HALEY AMSTER
CARA NEWLON
  *Associate Deputy Solicitor General*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) and Local Rules 27-1(d) and 32-3 because it contains 5,600 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word in Times New Roman 14-point font.