No. 25-3727

IN THE UNITED STATES COURT OF APPEALS FOR
THE NINTH CIRCUIT

GAVIN NEWSOM, in his official capacity as
Governor of the State of California; STATE OF
CALIFORNIA,

*Plaintiffs-Appellants*.

DONALD TRUMP, in his official capacity as
President of the United States; PETE HEGSETH, in
his official capacity as Secretary of the Department
of Defense; DEPARTMENT OF DEFENSE,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the District of California
No. 3:25-cv-04870-CRB
Hon. Charles R. Breyer

**BRIEF OF THE CITY OF LOS ANGELES
AS *AMICUS CURIAE* IN OPPOSITION TO EMERGENCY MOTION
UNDER CIRCUIT RULE 27-3 FOR STAY PENDING APPEAL**

Hydee Feldstein Soto
Valerie L. Flores
Michael Dundas
Shaun Dabby Jacobs
200 North Main Street, City Hall East Rm 800
Los Angeles, California 90012
Hydee.feldsteinsoto@lacity.org
Valerie.flores@lascity.org
Mike.dundas@lacity.org
shaun.jacobs@lacity.org
Telephone: (213) 978-8100
*Attorneys* for Amicus Curiae
City of Los Angeles

Norman L. Eisen
Stephen A. Jonas
Joshua G. Kolb
Diamond Brown
**DEMOCRACY DEFENDERS FUND**
600 Pennsylvania Avenue SE Suite 15180
Washington, DC 20003
Telephone: (202) 594-9958
Norman@statedemocracydefenders.org
Steve@statedemocracydefenders.org
Joshua@statedemocracydefenders.org
Diamond@statedemocracydefenders.org
*Attorneys for the City of Los Angeles*

# Table of Contents

*IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT* ...................................................................................................5

*INTRODUCTION AND STATEMENT OF INTEREST* .......................................3

*ARGUMENT* ..........................................................................................................5

    I.    The Deployment of the Military Impedes the City's Ability to Carry out its Traditional Police Powers. ...................................................................5

       A.   The City—not the military—has expertise in domestic law enforcement. Error! Bookmark not defined.

       B.   There are no factual circumstances that exist that authorized or warranted the unprecedented deployment of military forces without the consent of local authorities. ................................................................7

    II.   This Court May and Should Determine that There Is No "Rebellion" in Los Angeles. ................................................................................................10

    III.  The TRO Should Be Permitted to Take Effect and the Stay Dissolved. 13

       A.   California Should Prevail on the Merits. ....................................................13

*CONCLUSION* ....................................................................................................14

## Table of Authorities

**CASES**

*A.A.R.P. v. Trump* ...................................................................................................12

*J.A.V. v. Trump* .......................................................................................................12

*J.G.G. v. Trump* ......................................................................................................13

*Martin v. Mott* ........................................................................................................11

*NFIB v. Sebelius* .......................................................................................................5

**STATUTES**

10 U.S.C. § 12406(2) ...............................................................................................11

**OTHER AUTHORITIES**

Alien Enemies Act ...................................................................................................12

Federalist No. 39 .......................................................................................................5

LAPD News Release (June 9, 2025) .......................................................................10

Mark Nevitt, *The Military, the Mexican Border, and Posse Comitatus*, Just
  Security (Nov. 6, 2018) .........................................................................................8

Noah Goldberg et al., *Bass Enacts Curfew in Downtown L.A. to Stem Chaotic
  Protests*, L.A. Times (June 10, 2025)..................................................................10

Steve Vladeck, *Five Questions About Domestic Use of the Military*, One First
  (Apr. 14, 2025) ......................................................................................................8

## INTRODUCTION AND STATEMENT OF INTEREST

As a matter of both constitutional principle and practical expertise, states and local municipalities, rather than the federal government, hold the primary responsibility for addressing public safety and crime within their jurisdictions, including responding to any civil unrest, disorder, and criminal activity connected with public protests.[1]

Until yesterday morning,[2] the recent protests in the City of Los Angeles ("City"), a charter city that covers 469 square miles and is home to nearly four million people, occurred within one square mile of the downtown area of the City and involved, at most, a few thousand and, most often, a few hundred protestors at any given time. The federal Government's (the "Government") response to this geographically contained and size-limited series of protests was to activate or deploy, without the request or even consent of the local and state authorities, 4,000 federalized National Guard and 700 United States Marines. To give the scale of this deployment some context, the number of troops deployed by the Government exceeds the size of all but five police departments in the country.

---

[1] No party or party's counsel authored this brief in whole or in part. No party or party's counsel contributed money to fund preparation or submission of this brief.
[2] On Saturday, June 14, 2025, tens of thousands of demonstrators participated in peaceful protests at more than a dozen locations across the City in the so-called "No Kings Day" protests.

3

The deployment of armed military personnel, skilled in warfare against external enemies, on domestic soil without the training and perspective of the Los Angeles Police Department ("LAPD" or "the Department") and other local law enforcement agencies traditionally charged with protecting civilian populations, unnecessarily provoked fear in the City, escalated tensions, and contributed to the episodes of violence and lawlessness in the downtown area.

The City is critically interested in public safety within its boundaries and in preserving the constitutional rights of its residents to peacefully assemble and speak freely. It has worked tirelessly to preserve both principles by quelling violent and destructive outbursts while maintaining a space for the peaceful exercise of First Amendment rights. The Government's military presence undermines those principles and has sown chaos in Los Angeles, creating serious and irreparable harm.

This Court should not allow the military's dangerous and unprecedented deployment in downtown Los Angeles to stand. The City urges the Court to reject the Government's motion for stay pending appeal, allow the TRO to go into effect, and let the City to focus on fulfilling its duties to protect its residents and preserve their freedoms.

4

# ARGUMENT

I. **The Deployment of the Military Impedes the City's Ability to Carry out its Traditional Police Powers.**

   A. **The City—not the military—has expertise in domestic law enforcement.**

Our federalist form of government leaves local policing to local governments—not to the federal government and certainly not to the military. *See* Federalist No. 39 at 245 ("[T]he local or municipal authorities form distinct and independent portions of the supremacy, no more subject, within their respective spheres, to the general authority, than the general authority is subject to them, within its own sphere."). Under the Tenth Amendment, state and local governments retain their sovereign authority to "perform many of the vital functions of modern government—punishing street crime, running public schools, and zoning property for development, to name but a few." *NFIB v. Sebelius*, 567 U.S. 519, 535–36 (2012).

Consistent with the unbroken tradition of allowing local governments to police their jurisdictions, Los Angeles and the LAPD developed an expertise in the nuances of local policing—controlling and (when necessary) dispersing crowds, managing protests, apprehending those who break the law, and keeping people safe. The LAPD's policies are rooted in a commitment to constitutional policing

5

and recognize that the City's communities are safer when officers maintain a relationship of trust, respect, and cooperation with the City's residents.

The City's police force is a highly trained and professional department, accustomed to protests, adept at crowd control, well versed in managing public safety and protests, with long established protocols for requesting, receiving, and providing mutual aid and assistance from other law enforcement agencies when the need arises. The LAPD regularly trains to handle situations that require balancing individual rights of speech, expression, and assembly with the need to protect public safety, residents, and property.

LAPD has great familiarity with handling large-scale pre-planned and unpermitted demonstrations, protests, and events, which occur regularly and with great frequency City-wide. The history of peaceful protests and demonstrations in the City has allowed the Department to form strong relationships with frequent protest organizers in order to facilitate peaceful demonstrations. But even the most peaceful planned events bring out those who seek to commit violence.

The 2024 Los Angeles Dodgers World Series Championship parade, which saw more than 200,000 fans in the same one square mile where the events that are the subject of this litigation are occurring, is instructive. That day, a handful of violent and hostile crowds burned a city bus, looted stores, and threw dangerous objects at LAPD. Notwithstanding the violence, it would be untenable to suggest

6

that those actions of a few among so many peaceful fans constituted a "rebellion" against the City.

The Department also has dealt with spontaneous, unpermitted protests, such as the large George Floyd protests that occurred in Los Angeles in 2020. The City learned many lessons from those events—and has since further trained its personnel on updated crowd management and control techniques; de-escalation of tense, hostile, and even violent situations; protection of peaceful protestors; and apprehending those who use the protests as cover for committing crimes.

The military, in contrast, is trained in combat and warfare. Mark Nevitt, *The Military, the Mexican Border, and Posse Comitatus*, Just Security (Nov. 6, 2018). And the "domestic use of the military can . . . be corrosive—to the morale of the troops involved, all of a sudden, in policing their own; to the relationship between local/state governments and the federal government; and to the broader relationship between the military and civil society." Steve Vladeck, *Five Questions About Domestic Use of the Military*, One First (Apr. 14, 2025), https://www.stevevladeck.com/p/142-five-questions-about-domestic.

**B. There are no factual circumstances that exist that authorized or warranted the unprecedented deployment of military forces without the consent of local authorities.**

7

Starting on June 6, 2025, the Government launched a series of intense immigration raids in Los Angeles without providing any notice to the LAPD or local officials. The Government chose not to notify the Department of even the possible need to prepare for protests that predictably resulted from its escalating raids.

On June 7, the President issued a memorandum authorizing the deployment of the California National Guard—over the objections of the Governor (and without any initial notice to the Governor). The President declared that "[t]o the extent that protests or acts of violence directly inhibit the execution of the laws, they constitute a form of rebellion against the authority of the Government of the United States." Memorandum from President Donald J. Trump to the Sec'y of Def., Attorney Gen., and Sec'y of Homeland Sec, *Department of Security for the Protection of Department of Homeland Security Functions*, (Jun. 7, 2025), A250-51 (Presidential Memo) https://www.whitehouse.gov/presidential-actions/2025/06/department-of-defense-security-for-the-protection-of-department-of-homeland-security-functions/.

Unsurprisingly, following the Government's militarization in downtown Los Angeles, tensions between demonstrators and law enforcement rose dramatically. The National Guard stepped off the federal property it was guarding onto a City street to push protesters back; at the same time, federal agents deployed tear gas, pepper spray, and other similar munitions into the crowd. The presence of

8

armed forces stationed outside federal buildings and on the streets and sidewalks of the City continue to precipitate skirmishes between law enforcement and demonstrators.

Over the course of these protests, LAPD deployed thousands of officers to the one-square mile area for crowd control and crime suppression. Even at the peak of the unrest, in the early evening of June 8, the consistent efforts of the Department, with those of the California Highway Patrol and the Los Angeles County Sheriff, put an end to the day's unlawful assemblies, looting, vandalism, and other violence, all without any intervention by the federal troops.

Nevertheless, on the morning of June 9, the President posted on social media that his administration "made a great decision in sending the National Guard to deal with the violent, instigated riots in California." He claimed that if the Government "had not done so, Los Angeles would have been completely obliterated." But contrary to the President's assertions, the National Guard did not provide *any* operational support to LAPD with respect to the June 8 demonstrations.

Adding insult to injury, the Government—again without providing any notice to the City or apparently even to the State—posted on social media that it would deploy 700 Marines and an additional 2,000 members of the National Guard to Los Angeles. After learning about the possible deployment through news sources and social media, the LAPD issued a press statement stating that "the possible arrival of

9

federal military forces in Los Angeles—absent clear coordination—presents a significant logistical and operational challenge for those of us charged with safeguarding the city." LAPD News Release (June 9, 2025), https://t.ly/_U7vP. The Department also explained that, unlike the military, the LAPD and its local law enforcement partners "have decades of experience managing large-scale public demonstrations." *Id.* The lack of "open and continuous lines of communication" only added to the confusion and escalation of the situation. *Id.*

The City and the LAPD have continued to use effective policing tools to prevent protests from escalating any further, including on June 10, a City-imposed curfew between 8 PM and 6 AM in the downtown area. That curfew has been largely successful, quelling protests and calming tempers inflamed by the Government's arrival. *See* Noah Goldberg et al., *Bass Enacts Curfew in Downtown L.A. to Stem Chaotic Protests*, L.A. Times (June 10, 2025), https://www.nytimes.com/2025/06/10/us/la-curfew-protests-karen-bass-curfew.html.

## II. This Court May and Should Determine that There Is No "Rebellion" in Los Angeles.

The Government has claimed its authority for the large-scale troop mobilization was authorized by violent acts that amounted to a "rebellion against the authority of the Government," which made the Government "unable to execute

10

the laws" of the United States with its "regular forces." But the vast majority of the violence that occurred was targeted at private property and local law enforcement, not the Government or its property. Most fundamentally, these incidents—widespread graffiti and other defacement of property, setting cars on fire, scattered looting, even were they directed at federal property—would not legally constitute a "rebellion" under 10 U.S.C. § 12406(2), the Government's purported statutory authorization for its actions.

The President's use of Section 12406, and the Government's contention in this Court and in the District Court that no court can evaluate its invocation or whether its conditions were even met, poses a direct threat to the careful, constitutionally-established, federalist separation of powers. The Government's interpretation of Section 12406 tramples on the allocation of police power to the states and localities by erroneously arrogating to the President the authority to deploy National Guard troops in his unreviewable discretion.

The Government raises *Martin v. Mott*, a United States Supreme Court decision from 1827, arguing that courts should defer to a President's determinations in this area. 25 U.S. (12 Wheat.) 19 (1827). *Martin* concerned the president's authority under the Militia Act to call state militias into federal service to fight in a war—the War of 1812—an exercise of the president's authority as commander-in-chief that implicated the core of his *foreign* affairs powers. As the District Court

11

properly found, President Trump's attempt to use the military to address purely ***domestic*** affairs and ordinary criminal conduct simply did not implicate those powers. *Newsom*, 3:25-cv-04870, ECF No. 64, at *15–16.  As did the District Court found, this Court should find that it may review whether the predicate conditions set forth in the statute the President invoked were met. Judicial review is especially critical to preserve the federalist separation of powers when courts are confronted with the extraordinary and dangerous action of engaging the military on domestic soil and for domestic issues under Section 12406.

Recent jurisprudence surrounding President Trump's use of the Alien Enemies Act ("AEA") is instructive.  In a spate of cases challenging the President's invocation of the AEA, courts—including the Supreme Court—have acknowledged the necessity of judicial review, and in particular scrutinizing the predicate terms, including "invasion" or "predatory incursion," that trigger the statute. *See, e.g., A.A.R.P. v. Trump*, 145 S. Ct. 1364 (2025); *J.A.V. v. Trump,* No. 1:25-CV-072, at *10 (S.D. Tex. 2025).  As the Court of Appeals for the D.C. Circuit noted, "conditional questions—the legal meaning of war, invasion and predatory incursion—are well within courts' bailiwick." *J.G.G. v. Trump*, No. 25-5068, at 13 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring).

Here, the courts face a straightforward question: Has the President met the specific requirements necessary to invoke Section 12406?  The answer is clearly no.

12

## III. The TRO Should Be Permitted to Take Effect and the Stay Dissolved.
### A. California Should Prevail on the Merits.

Using standard tools of statutory interpretation—including textual analysis, historical context, and common usage at the time of drafting—it is plain that the President's memorandum does not establish the predicates required to deploy the National Guard. As the District Court properly found, a "rebellion" must be: (1) not merely violent but also "armed"; (2) organized; (3) "open and avowed"; and (4) "against the government as a whole—often with an aim of overthrowing the government—rather than in opposition to a single law or issue." *Newsom*, 3:25-cv-04870, ECF No. 64, at 18–19. The President's memorandum says nothing about an armed, organized, avowed action taken against the United States as a whole, let alone an attempt to overthrow the Government. The reason is simple. Nothing remotely resembling such an action took place.

In addition, the District Court correctly found that the Government could not properly invoke clause (3) of Section 12406, the "execute the laws" condition. 10 U.S.C. § 12406(3). No facts alleged indicate that "regular forces" (in this case, ICE agents) could not execute federal immigration law, as demonstrated by ICE's uninterrupted raids and arrests of alleged undocumented immigrants throughout the week.

13

Before the National Guard arrived in Los Angeles, LAPD had brought the protests against those raids and arrests under control—addressing the violence while respecting the First Amendment rights of peaceful protesters and deploying officers in response to a request for assistance from the ICE agents on the ground. Thus, the National Guard was not needed. Moreover, even if the protests hampered ICE attempts to apprehend or arrest some persons, that would not rise to the level of "regular forces" being "unable to execute" federal law. If the law were otherwise, any impediment at all to federal law enforcement would trigger the President's powers to federalize the state National Guard and that is clearly wrong.

## CONCLUSION

For the reasons stated herein, the City of Los Angeles urges this Court to affirm the District Court's ruling and allow the Temporary Restraining Order to go into effect.

Dated: June 15, 2025

Respectfully submitted,

                        */s/.*  MICHAEL J. DUNDAS

Hydee Feldstein Soto
Valerie L. Flores
Michael Dundas
200 North Main Street, City Hall
East Rm 800
Los Angeles, California 90012
Hydee.feldsteinsoto@lacity.org
Valerie.flores@lascity.org
Mike.dundas@lacity.org
Telephone: (213) 978-8100
Facismile: (213) 978-8312

*Attorneys for* Amicus Curiae
City of Los Angeles

Norman L. Eisen
Stephen A. Jonas
Joshua G. Kolb
Diamond Brown
**DEMOCRACY DEFENDERS FUND**
600 Pennsylvania Avenue SE
Suite 15180
Washington, DC 20003
Telephone: (202) 594-9958
Norman@statedemocracydefenders.org
Steve@statedemocracydefenders.org
Joshua@statedemocracydefenders.org
Diamond@statedemocracydefenders.org

*Attorneys for the City of Los Angeles as* Amicus Curiae

15

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

Form 8. Certificate of Compliance for Briefs

9th Cir. Case Number:

I am the attorney or self-represented party.

**This brief contains 2527 words,** including

_____ words manually counted in any

visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

☐ complies with the word limit of Cir. R. 32-1.

☐ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

☒ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

☐ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

☐ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  ☐ it is a joint brief submitted by separately represented parties.
  ☐ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

☐ complies with the length limit designated by court order dated

☐ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

Signature /s/ Michael J. Dundas                              Date June 15, 2025

16

## CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2025, an electronic copy of the foregoing brief *amicus curiae* was filed with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit using the CM/ECF filing system and that service upon counsel for the parties will be accomplished using the CM/ECF system.

>  */s/*   Michael J. Dundas
>       MICHAEL J. DUNDAS