NO. 25-3727

---

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

GAVIN NEWSOM, in his official capacity as
Governor of the State of California, et al.,

*Plaintiffs–Appellees,*

v.

DONALD J. TRUMP, in his official capacity
as President of the United States, et al.,

*Defendants–Appellants.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
No. 3:25-cv-04870-CRB
The Honorable Charles R. Breyer

---

**BRIEF FOR THE STATES OF WASHINGTON, DELAWARE, ARIZONA, COLORADO, CONNECTICUT, HAWAIʻI, ILLINOIS, MAINE, MARYLAND, MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, NEW YORK, NORTH CAROLINA, OREGON, RHODE ISLAND, VERMONT, WISCONSIN, AND THE OFFICE OF THE GOVERNOR OF KANSAS AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS-APPELLEES' OPPOSITION TO DEFENDANTS-APPELLANTS' EMERGENCY MOTION FOR STAY**

---

NICHOLAS W. BROWN
Attorney General of Washington

PATRICIO MARQUEZ
EMILY NELSON
ANDREW HUGHES

KATHLEEN JENNINGS
Attorney General of Delaware

IAN R. LISTON
Director of Impact Litigation

ALEXIA DIORIO
Assistant Attorneys General
Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744
Patricio.Marquez@atg.wa.gov
Emily.Nelson@atg.wa.gov
Andrew.Hughes@atg.wa.gov
Alexia.Diorio@atg.wa.gov

ROSE E. GIBSON
Assistant Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
Ian.Liston@deaware.gov

*(Additional Amici on Signature Page)*

## **<u>TABLE OF CONTENTS</u>**

I.    INTRODUCTION ...................................................................1

II.   IDENTITY AND INTERESTS OF AMICI ....................................1

III.  ARGUMENT .......................................................................1

    A.  Fear of Military Rule Compelled the Framers to Embed State
         Control of the Militias in the Constitution ..................................1

        1.  Our Founders Sought to Prohibit Military Rule .................................2

        2.  The Constitution Enshrines a Deliberate Balance of State and
             Federal Military Control .....................................................3

    B.  Presidents Have Carefully Avoided Domestic Deployment of the
         Militias Unless Absolutely Necessary .......................................6

IV.  CONCLUSION ...............................................................12

i

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Bissonette v. Haig*,
  776 F.2d 1384 (8th Cir. 1985)................................................................1

*Duncan v. Kahanamoku*,
  327 U.S. 304 (1946) ....................................................................2, 3

*Houston v. Moore*,
  18 U.S. 1 (1820) ............................................................................4

*Laird v. Tatum*,
  408 U.S. 1 (1972) ..........................................................................2

*Perpich v. Dep't of Def.*,
  496 U.S. 335 (1990) .......................................................................8

*Reid v. Covert*,
  354 U.S. 1 (1957) ..........................................................................2

### <u>Constitutional Provisions</u>

Articles of Confederation of 1781, art. VI, para. 4.........................................3

U.S. Const., art. I, § 8, cls. 12-14...............................................................4

U.S. Const., art. I, § 8, cls. 15-16...............................................................4

U.S. Const., art. II, § 2 ..........................................................................4

U.S. Const., art. II, § 2, cl. 1 ..................................................................4

### <u>Statutes</u>

10 U.S.C. § 12406................................................................................8

18 U.S.C. § 1385................................................................................7

An Act Making Appropriations for the Support of the Army for the Fiscal
    Year Ending June Thirtieth, Eighteen Hundred and Seventy-Nine, and for
    Other Purposes,
    ch. 263, § 15, 20 Stat. 145, 152 (1878). ................................................................7

The Calling Forth Act,
    ch. 28, 1 Stat. 264 (1792) ......................................................................5

The Dick Act,
    ch. 196, 32 Stat. 775, § 4 (1903) ............................................................8

The Insurrection Act of 1807,
    2 Stat. 443 (1807) ................................................................................5

Pub. L. No. 60-145, § 3, 35 Stat. 400 (1908)............................................9

Pub. L. No. 84-1028, 70A Stat. 199 (1956)..............................................9

## Executive Orders

Exec. Order No. 11519,
    35 Fed. Reg. 5003 (March 23, 1970) ....................................................10

Ulysses S. Grant, Proclamation (May 3, 1871),
    https://millercenter.org/the-presidency/presidential-speeches/may-3-1871-
    message-regarding-fourteenth-amendment. ..........................................7

Ulysses S. Grant, Proclamation 3972 (March 23, 1970),
    https://www.lawandfreedom.com/site/executive/execorders/Nixon.pdf.............11

## Other Authorities

1908 Cong. Rec. 6942 (Statement of Rep. Parker of NJ),
    https://www.congress.gov/bound-congressionalrecord/1908/05/25/42/house
    -section/article/6893-6949?q=%7B%22search%22%3A%221908+Cong.+R
    ec.+6942%22%7D&s=1&r=1. .................................................................9

Alexander F. Barnes, *On the Border: The Nat'l Guard mobilizes for war in
1916*, U.S. Army (Feb. 26, 2016),
    https://www.army.mil/article/162413/on_the_border_the_national_guard_m
    obilizes_for_war_in_1916. ....................................................................10

Frederick Bernays Wiener, *The Militia Clause of the Constitution*,
54 Harv. L. Rev. 181, n.74 (Dec. 1940) ...................................................8

H.R. Rep. No. 1094,
57th Cong., 1st Sess. (1902).........................................................................8

Homer Bigart, *Mil. in Post Offs., Begins Handling the Mail*, NY Times
(March 24, 1970),
https://www.nytimes.com/1970/03/24/archives/military-in-post-offices-
begins-handling-the-mail-military-in-post.html.................................................11

Joseph Nunn & Elizabeth Goitein, *Guide to Invocations of the Insurrection
Act*, Brennan Ctr. for Just. (Apr. 25, 2022),
https://www.brennancenter.org/our-work/research-reports/guide-
invocations-insurrection-act. ....................................................................6

Memorandum from Deputy Assistant Att'y Gen. Mary C. Lawton to Assistant
Att'y Gen. Antonin Scalia, *Laws Relating to Civil Disturbances*
(Jan. 6, 1975),
https://www.justice.gov/d9/pages/attachments/2022/09/02/la_19750106_la
w_relating_to_civil_disturbances_0.pdf. ..............................................6

Off. of the Judge Advoc. Gen., *Fed. Aid in Domestic Disturbances
1903-1922*, S. Doc. No. 263, at 10, 67th Cong., 2d Sess. (1922),
https://babel.hathitrust.org/cgi/pt?id=pst.000057379777&seq=7........................3

Today in Hist. – March 5, *The Boston Massacre: A Hist. with Documents*,
Libr. of Congress,
https://www.loc.gov/item/today-in-history/march-05/ (last visited
6/14/2025)..................................................................................................2

Ulysses S. Grant to the House of Reps. (Jan. 22, 1877), *quoted in* G. Norman
Lieber, *Use of the Army in Aid of the Civil Power*, at 8 (1898),
https://archive.org/details/useofarmyinaidof00liebrich/page/n3/mode/2up. .........7

## I.     INTRODUCTION

President Trump's deployment of California's National Guard, without the consent of California's Governor and in violation of the statute on which the President relies, is unlawful, unconstitutional, and undemocratic. It is inconsistent with one of our Nation's founding principles that freedom depends on the subordination of the military to civilian authority. By calling forth troops when there is no invasion to repel, no rebellion to suppress, and when state and local law enforcement is fully able to execute the laws, the President flouts the vision of our Founders, undermines the rule of law, and sets a chilling precedent that puts the constitutional rights of all Americans at risk.

## II.     IDENTITY AND INTERESTS OF AMICI

The identity and interests of the Amici States are detailed in their contemporaneously filed Motion for Leave to file this brief.

## III.     ARGUMENT

### A.     Fear of Military Rule Compelled the Framers to Embed State Control of the Militias in the Constitution

"Civilian rule is basic to our system of government." *Bissonette v. Haig*, 776 F.2d 1384, 1387 (8th Cir. 1985), *on reh'g*, 800 F.2d 812 (8th Cir. 1986), *aff'd*, 485 U.S. 264 (1988). Civilian authority is necessary to uphold our liberties, because the "use of military forces to seize civilians can expose civilian government to the threat of military rule and the suspension of constitutional liberties." *Id*. Military

1

force threatens "vital Fourth and Fifth Amendment rights," "chill[s] the exercise" of the rights to "speak freely and to vote," and can "create the atmosphere of fear and hostility which exists in territories occupied by enemy forces." *Id.* Accordingly, "a traditional and strong resistance of Americans to any military intrusion into civilian affairs . . . has deep roots in our history." *Laird v. Tatum*, 408 U.S. 1, 15 (1972). President Trump's unconstitutional deployment of the National Guard threatens this tradition and the freedoms it protects.

### 1.    Our Founders Sought to Prohibit Military Rule

One of the Founders' "well-established purpose[s]" was to keep the military subordinate to civil authority. *Reid v. Covert*, 354 U.S. 1, 30 (1957); *see also Duncan v. Kahanamoku*, 327 U.S. 304, 320 (1946). Indeed, King George III's deployment of British soldiers in the colonies galvanized a revolution. Starting in 1768, the King quartered British troops in Boston "to intimidate the local populace." *Reid*, 354 U.S. at 27. In 1770, Redcoats deployed to enforce unpopular tax acts murdered five protestors in the Boston Massacre, sparking our Revolution.[1]

The Founders thus embraced a commitment to civilian control, even as they faced down a war. In drafting the Articles of Confederation, the Continental Congress placed primary reliance on state militias to provide security in

---

[1] *See* Today in Hist. – March 5, *The Boston Massacre: A Hist. with Documents*, Libr. of Congress, https://www.loc.gov/item/today-in-history/march-05/ (last visited 6/14/2025).

2

emergencies, while eschewing the role of federal troops.[2] They further provided that each state's militia was limited to those functions needed for the "defense" of the state.

Under the Articles, "[t]he executive and military officials who . . . found it necessary to utilize the armed forces to keep order in a young and turbulent nation, did not lose sight . . . that existing civilian government . . . [was] not to be interfered with by the exercise of military power." *Kahanamoku*, 327 U.S. at 320. For example, in 1786, when insurrectionists armed themselves to attack federal facilities in what became known as Shays' Rebellion, Massachusetts' governor deployed the militia to assist civil law enforcement. But the governor decreed the militia was "to consider [themselves] in all [their] military offensive operations constantly as under the direction of the civil officer[.]"[3]

## 2. The Constitution Enshrines a Deliberate Balance of State and Federal Military Control

When the Framers met to craft a new Constitution in 1787, the document they created reflected their concerns about military subversion of civilian rule, while acknowledging that some national military might be necessary to supplement the state militias. The result was a compromise: the Framers cautiously embraced a

---

[2] Articles of Confederation of 1781, art. VI, para. 4.

[3] Off. of the Judge Advoc. Gen., *Fed. Aid in Domestic Disturbances 1903-1922*, S. Doc. No. 263, at 10, 67th Cong., 2d Sess. (1922), https://babel.hathitrust.org/cgi/pt?id=pst.000057379777&seq=7.

3

standing army under the command of a civilian Commander-in-Chief, and gave Congress, not the President, authority to raise, support, and regulate the armed forces. U.S. Const., art. II, § 2, cl. 1; art. I, § 8, cls. 12-14. Meanwhile, the Framers preserved a primary role for "the Militia of the several States." *Id.*, art. II, § 2. Congress was empowered "[t]o provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions" and "[t]o provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress[.]" *Id.*, art. I, § 8, cls. 15-16. The President was assigned the role of "Commander in Chief of . . . the Militia of the several States" only "when called into the actual Service of the United States[.]" *Id.*, art. II, § 2.

Thus, Congress was given the power to provide for calling state militias into national service—but only in cases of invasion, insurrection, or breakdown in federal law. And when called forth, the President would exercise authority as Commander-in-Chief. Otherwise, state militias remained entirely within the states' control. *See Houston v. Moore*, 18 U.S. 1, 50 (1820) (Story, J., concurring) ("[T]he power here given to Congress over the militia[] is of a limited nature, and confined to the objects

4

specified in these clauses; . . . in all other respects, and for all other purposes, the militia are subject to the control and government of the State authorities.").

In this vein, Congress passed the Calling Forth Act in 1792, 1 Stat. 264, § 1 (1792), which authorized the President to deploy state militias "whenever the United States shall be invaded, or be in imminent danger of invasion from any foreign nation or Indian tribe . . . to repel such invasion." *Id*. In the event of "insurrection," the President was empowered to federalize state militias only "on application of the legislature" of the state facing the insurrection, "or of the executive (when the legislature cannot be convened)." *Id.*, § 2. The Act also authorized the President to deploy militias without a state's request, but only if "the laws of the United States shall be opposed, or the execution thereof obstructed . . . by combinations too powerful to be suppressed by the ordinary course of judicial proceedings, or by the powers vested in the [federal] marshals." *Id.* In 1807, Congress passed the Insurrection Act, permitting the President to deploy regular military forces in the same circumstances as state militias. 2 Stat. 443 (1807).

With this, the balance of state and federal authority was set, and has since remained essentially unchanged, with the President's authority to deploy militias for domestic law enforcement carefully conscribed.

**B.      Presidents Have Carefully Avoided Domestic Deployment of the Militias Unless Absolutely Necessary**

Since 1792, the President has only used militia in domestic law enforcement as "a last resort," when a state requested help to quell an insurrection, when necessary to enforce a federal court order, or when state and local law enforcement are unable to enforce the law.[4] Between 1792 and June 2025, Presidents relied on the Calling Forth and Insurrection Acts approximately thirty times to engage National Guards in domestic law enforcement.[5] Presidents have called the National Guard forth to respond to armed uprisings like the Whiskey Rebellion in 1794 and the Brooks-Baxter War in 1874; riots like the Colfax Massacre in 1873 and the Los Angeles Riots in 1992; the Civil War and post-war reign of terror by the Ku Klux Klan; crippling labor strife like the Colorado Coalfield War of 1914 and the Battle of Blair Mountain in 1921; and states' refusals to comply with desegregation orders and protect civil rights protestors in Little Rock in 1957 and Selma in 1965.[6]

Meanwhile, Congress periodically adjusted the guardrails to ensure the President's ability to respond to emergencies, while protecting the delicate

---

[4] Memorandum from Antonin Scalia to the Deputy Att'y Gen., *Laws Relating to Civil Disturbances* (Jan. 6, 1975), https://www.justice.gov/d9/pages/attachments/2022/09/02/la_19750106_law_relating_to_civil_disturbances_0.pdf.

[5] *See generally* Joseph Nunn & Elizabeth Goitein, *Guide to Invocations of the Insurrection Act*, Brennan Ctr. for Just. (Apr. 25, 2022), https://www.brennancenter.org/our-work/research-reports/guide-invocations-insurrection-act.

[6] Nunn & Goitein, *supra* note 5.

6

state-federal balance. During Reconstruction, President Grant deployed armed forces on multiple occasions to support fragile Reconstruction governments and address the threats of the Ku Klux Klan and other terrorist groups.[7] In this unique epoch, extensive military involvement was indispensable in reconstructing a shattered nation and protecting the rights of newly freed slaves.[8]

In 1876, however, Republican Rutherford B. Hayes lost the popular vote, but won the electoral vote only after promising to withdraw federal troops from the former Confederacy. Shortly thereafter, Congress passed the Posse Comitatus Act to restrict any further use of the armed forces for domestic law enforcement.[9] As presently codified, the Act provides:

> Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws shall be fined . . . or imprisoned[.]

18 U.S.C. § 1385. After the experience of Reconstruction, the Posse Comitatus Act reestablished the antebellum balance. It sharply limited military involvement in

---

[7] *Id.*; *see also* Ulysses S. Grant, Proclamation (May 3, 1871), https://millercenter.org/the-presidency/presidential-speeches/may-3-1871-message-regarding-fourteenth-amendment.

[8] Ulysses S. Grant to the House of Reps. (Jan. 22, 1877), *quoted in* G. Norman Lieber, *Use of the Army in Aid of the Civil Power*, at 8 (1898), https://archive.org/details/useofarmyinaidof00liebrich/page/n3/mode/2up.

[9] An Act Making Appropriations for the Support of the Army for the Fiscal Year Ending June Thirtieth, Eighteen Hundred and Seventy-Nine, and for Other Purposes, ch. 263, § 15, 20 Stat. 145, 152 (1878).

civilian affairs, while preserving some flexibility for the President to use armed forces in extraordinary circumstances.

Congress next spoke in 1903. Following the Spanish-American War, Congress passed the Militia Act of 1903—known as the Dick Act—to improve the readiness and training of the state militias.[10] The Dick Act created the modern National Guard and set forth the circumstances under which they may be federalized. *See Perpich v. Dep't of Def.*, 496 U.S. 335, 342 (1990). As Representative Charles Dick, then-Chairman of the Committee on Militia explained, the President could not call up the National Guard at "his arbitrary pleasure" but only in specific enumerated circumstances.[11] He noted, "[i]t was the hereditary fear of standing armies, as a menace to liberty in time of peace, which lead the framers of the Constitution to provide that the militia should always remain a militia of the States."[12]

Consistent with this unbroken tradition of restricting the President's authority to call up the National Guard, Section 4 of the Dick Act included the provision that would later become 10 U.S.C. § 12406. As initially passed, it provided:

> That whenever the United States is invaded, or in danger of invasion from any foreign nation, or of rebellion against the authority of the Government of the United States, or the President is unable, with the

---

[10] The Dick Act, ch. 196, 32 Stat. 775, § 4 (1903).

[11] Frederick Bernays Wiener, *The Militia Clause of the Constitution*, 54 Harv. L. Rev. 181, n.74 (Dec. 1940) (citing H.R. Rep. No. 1094, 57th Cong., 1st Sess., at 22-23 (1902)).

[12] *Id.*

other forces at his command, to execute the laws of the Union in any part thereof, it shall be lawful for the President to call forth, for a period not exceeding nine months, such number of the militia of the State or of the States or Territories or of the District of Columbia as he may deem necessary to repel such invasion, suppress such rebellion, or to enable him to execute such laws, and to issue his orders for that purpose to such officers of the militia as he may think proper.

Perhaps in response to the experience of the Civil War during which some pro-slavery Union states declined to send forth their militias,[13] this early version of the statute did not include any role for state governors. But just five years later, before Section 4 was ever invoked, Congress amended the statute to add the requirement that when the President has need to nationalize the Guard in the face of invasion, rebellion, or inability to enforce the laws, he must "issue his orders for that purpose, through the governor of the respective State or Territory, or through the commanding general of the militia of the District of Columbia, from which State, Territory, or District such troops may be called."[14] In 1956, when the Dick Act was recodified into Title 10, the statute was amended into its current form[15]:

Whenever-

(1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation;

---

[13] *See* 1908 Cong. Rec. 6942 (Statement of Rep. Parker of NJ), https://www.congress.gov/bound-congressional-record/1908/05/25/42/house-section/article/6893-6949?q=%7B%22search%22%3A%221908+Cong.+Rec.+6942%22%7D&s=1&r=1.

[14] Pub. L. No. 60-145, § 3, 35 Stat. 400 (1908).

[15] Pub. L. No. 84-1028, 70A Stat. 199 (1956).

(2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or

(3) the President is unable with the regular forces to execute the laws of the United States;

the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws. Orders for these purposes shall be issued through the governors of the States or, in the case of the District of Columbia, through the commanding general of the National Guard of the District of Columbia.

In the hundred-plus years Section 12406 has been on the books, it has only been invoked twice. In 1916, after Pancho Villa attacked the United States in an ongoing border dispute, U.S. Army forces chased him into Mexico. With the Army drawn away, other Mexican forces attacked undefended towns in Texas, leading President Wilson to call up National Guard units to defend against any further incursions.[16]

Section 12406 was next invoked 54 years later, when President Nixon called upon the Guard to deliver mail during a Postal Service Strike. Exec. Order No. 11519, 35 Fed. Reg. 5003 (March 23, 1970). The strike had stopped mail delivery entirely in New York, despite federal law "requir[ing] that the business of the Post Office Department, including the expeditious processing and delivery of the mail, be regularly carried on." *Id.* Because he was "unable solely with the regular forces"

---

[16] Alexander F. Barnes, *On the Border: The Nat'l Guard mobilizes for war in 1916*, U.S. Army (Feb. 26, 2016), https://www.army.mil/article/162413/on_the_border_the_national_guard_mobilizes_for_war_in_1916.

to carry out these laws, President Nixon declared a national emergency, *see* Proclamation 3972, and federalized the Guard to deliver mail.[17]

In the 55 years since, Section 12406 has lain dormant.

As this history makes clear, President Trump's invocation of Section 12406 to deploy armed National Guard soldiers and entangle them in protests that local law enforcement is able to manage—over the objection of California's Governor—is unprecedented in our history. It runs contrary to our nation's unbroken tradition of restraint in using the armed forces to conduct law enforcement. It undermines the historical and constitutionally enshrined balance between state and local authority. And it threatens the civil liberties of all Americans. While our leaders have long recognized that the armed forces might sometimes be necessary to respond to emergencies, they have only been used as a last resort, and always with an eye toward respecting the primacy of civil law enforcement and state control of the militias.

For good reason. Under Appellants' theory, a president could make unfounded claims of voter fraud and then send federalized National Guard troops to seize voting machines based on his determination that state election officers are unable to enforce federal election law. Or a president could determine states were

---

[17] Homer Bigart, *Mil. in Post Offs., Begins Handling the Mail*, NY Times (March 24, 1970), https://www.nytimes.com/1970/03/24/archives/military-in-post-offices-begins-handling-the-mail-military-in-post.html (digitized version).

insufficiently enforcing gun safety laws and send the National Guard house-to-house to inspect Americans' weapons and seize any that could arguably be used in a rebellion. This cannot be, and the Court should make clear that President Trump's invocation of Section 12406 undermines one of our Nation's founding principles: that freedom depends on the subordination of the military to civilian authority.

## IV.    CONCLUSION

This Court should deny Appellants' request for a Stay.

DATED this 15th day of June 2025.

Respectfully submitted,

NICHOLAS W. BROWN
Attorney General of Washington

*s/ Patricio Marquez*
PATRICIO MARQUEZ
EMILY NELSON
ANDREW HUGHES
ALEXIA DIORIO
Assistant Attorneys General
Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744
Patricio.Marquez@atg.wa.gov
Emily.Nelson@atg.wa.gov
Andrew.Hughes@atg.wa.gov
Alexia.Diorio@atg.wa.gov

KATHLEEN JENNINGS
Attorney General of Delaware

*s/ Ian R. Liston*
IAN R. LISTON
Director of Impact Litigation
ROSE E. GIBSON
Assistant Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
Ian.Liston@delaware.gov

KRISTIN K. MAYES
Attorney General of Arizona
2005 N. Central Ave.
Phoenix, AZ 85004

PHILIP J. WEISER
Attorney General of Colorado
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203

12

WILLIAM TONG
Attorney General of Connecticut
165 Capitol Avenue
Hartford, CT 06106

KWAME RAOUL
Attorney General of Illinois
115 S. LaSalle St.
Chicago, IL 60603

ANTHONY G. BROWN
Attorney General of Maryland
200 Saint Paul Place
Baltimore, MD 21202

KEITH ELLISON
Attorney General
State of Minnesota
102 State Capitol
75 Rev. Dr. Martin Luther King Jr.
Blvd.
St. Paul, MN 55155

MATTHEW J. PLATKIN
Attorney General
State of New Jersey
25 Market Street
Trenton, NJ 08625

JEFF JACKSON
Attorney General of North Carolina
PO Box 629
Raleigh, NC 27602

PETER F. NERONHA
Attorney General
State of Rhode Island
150 South Main Street
Providence, RI 02903

JOSHUA L. KAUL
Attorney General of Wisconsin
17 W. Main Street
Madison, WI 53703

ANNE E. LOPEZ
Attorney General of Hawai'i
Department of the Attorney General
425 Queen Street
Honolulu, HI 96813

AARON M. FREY
Attorney General of Maine
6 State House Station
Augusta, ME 04333-0006

DANA NESSEL
Michigan Attorney General
P.O. Box 30212
Lansing, MI 48909

AARON D. FORD
Attorney General
State of Nevada
100 North Carson Street
Carson City, NV 89701

LETITIA JAMES
Attorney General
State of New York
28 Liberty Street
New York, NY 10005

DAN RAYFIELD
Attorney General of Oregon
1162 Court Street NE
Salem, OR 97301

CHARITY R. CLARK
Vermont Attorney General
109 State Street
Montpelier, VT 05609

JUSTIN WHITTEN
Attorney for Governor Kelly
Office of the Governor of Kansas
300 SW 10th Ave., Suite 541-E
Topeka, KS 66612

**CERTIFICATE OF COMPLIANCE**

This brief complies with Federal Rule of Appellate Procedure 29(a)(5), because it is 2,793 words, less than half of the length of a principal brief authorized by Federal Rule of Appellate Procedure 27(d)(2)(A) and Circuit Rule 32-2-(b). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(4)-(6) because it was prepared in 8 1/2 by 11 inch paper, double-spaced, at least one inch margins on all four sides, headings and footnotes single-spaced, quotations more than two lines are indented, and 14-point Times New Roman font, a proportionally spaced typeface.

DATED this 15th day of June 2025.

*s/ Patricio Marquez*
PATRICIO MARQUEZ

## CERTIFICATE OF SERVICE

I certify that on June 25, 2025, I electronically filed the foregoing document with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system. I further certify that all participants in this case are registered ACMS users and service will be accomplished by the appellate system.

DATED this 15th day of June 2025.

*s/ Patricio Marquez*
PATRICIO MARQUEZ