No. 25-3727

_____

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

NEWSOM, et al.,

*Plaintiffs-Appellees*,

v.

TRUMP, et al.,

*Defendants-Appellants*

_____

On Appeal from the United States District Court
for the Northern District of California, No. 3:25-cv-04807-CRB

_____

**BRIEF OF *AMICUS CURIAE* CALIFORNIA CONSTITUTION SCHOLARS
IN SUPPORT OF APPELLEES AND AFFIRMANCE**

_____

David A. Carrillo (carrillo@law.berkeley.edu)
Brandon V. Stracener (bvstrac@gmail.com)
University of California, Berkeley School of Law
#7200
Berkeley, CA 94720-7200
(510) 664-4953

*Amicus Curiae California Constitution Scholars*

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS.......................................................................i

TABLE OF AUTHORITIES ..............................................................ii

INTEREST OF AMICUS CURIAE ....................................................7

SUMMARY OF ARGUMENT ..........................................................7

BACKGROUND ...............................................................................8

    I.     The National Guard has a unique, dual status...................8

    II.    The California National Guard is the domestic state militia...........10

ARGUMENT ...................................................................................11

    I.     Federal courts can review the presidential order here.....................11

    II.    Federal constitutional power over the militia is not exclusive. .......15

    III.    Only Congress can define conditions for federalizing the militia.........16

    IV.    The order does not satisfy the statutory conditions for federalizing California's militia. .......19

    V.    The order violates the Tenth Amendment's anti-commandeering doctrine. ................20

    VI.    The order violates the Tenth Amendment's reservation of police powers to the states.........22

    VII.    Lacking congressional authority, the president's power is at its lowest ebb. ................26

CONCLUSION ................................................................................29

CERTIFICATE OF COMPLIANCE...................................................31

CERTIFICATE OF SERVICE ..........................................................32

# TABLE OF AUTHORITIES

**Cases**

*A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935) ........... 12, 14

*Alden v. Maine*, 527 U.S. 706 (1999) ....................................................... 25

*Am. Nat'l Red Cross v. S. G.*, 505 U.S. 247 (1992) .................................... 17

*Am. Power & Light Co. v. Sec. & Exch. Comm'n*, 325 U.S. 385 (1945) ............... 12

*Blatchford v. Native Village of Noatak*, 501 U.S. 775 (1991) ................................ 15

*Bond v. United States*, 564 U.S. 211 (2011) ................................................ 15

*Bond v. United States*, 572 U.S. 844 (2014) ................................................ 15, 27

*Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644 (2020) .................................... 17

*Brecht v. Abrahamson*, 507 U.S. 619 (1993) .............................................. 24

*Charles v. Rice*, 28 F.3d 1312 (1st Cir. 1994) ............................................. 9

*Chastleton Corp. v. Sinclair*, 264 U.S. 543 (1924) ...................................... 12-13

*Cipollone v. Liggett Group, Inc.*, 505 U.S. 504 (1992) .................................. 24

*Cohens v. Virginia*, 19 U.S. (6 Wheat.) (1821) ............................................ 11

*Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157 (2004) ........................... 18

*Coyle v. Smith*, 221 U.S. 559 (1911) ....................................................... 15, 23

*Dalton v. Specter*, 511 U.S. 462 (1994) .................................................... 12

*Davis v. United States*, 495 U.S. 472 (1990) .............................................. 18

*Dolan v. Postal Serv.*, 546 U.S. 481 (2006) ............................................... 18

*Gilbert v. Minnesota*, 254 U.S. 325 (1920) ................................................ 19

*Gonzales v. Oregon*, 546 U.S. 243 (2006) ................................................. 24

*Gregory v. Ashcroft*, 501 U.S. 452 (1991) ................................................. 24

*Haaland v. Brackeen*, 599 U.S. 255 (2023) ................................................ 24

*Hillsborough County v. Automated Medical Laboratories, Inc.*, 471 U.S. 707 (1985) ................................................................................ 24

*Hirabayashi v. United States,* 320 U.S. 81 (1943) ........................................ 13

## TABLE OF AUTHORITIES
### (Continued)

*Holmes v. California Nat. Guard*, 90 Cal.App.4th 297 (2001) ...........................8, 10

*Holmes v. Jennison*, 39 U.S. 540 (1840) ...................................................25

*Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919 (1983)...........................12

*In re Sealed Case*, 551 F.3d 1047 (D.C. Cir. 2009) ...................................20

*Knutson v. Wisconsin Air Nat. Guard*, 995 F.2d 765 (7th Cir. 1993) ......................8

*Korematsu v. United States*, 323 U.S. 214 (1944)........................................ 13, 14

*Laird v. Tatum*, 408 U.S. 1 (1972)....................................................25

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) ...............................14

*Marbury v. Madison*, 1 Cranch 137 (1803) ...................................... 11, 22

*Medellin v. Texas*, 552 U.S. 491 (2008) .................................................12

*Miller v. Schoene*, 276 U.S. 272 (1928)................................................13

*Murphy v. National Collegiate Athletic Association*, 584 U.S. 453 (2018) ...........21

*Nevada v. Hall*, 440 U.S. 410 (1979)................................................. 15, 27

*New York v. United States*, 505 U.S. 144 (1992)........................................21

*Oklahoma v. Castro-Huerta*, 597 U.S. 629 (2022)........................................ 23, 27

*Penn Dairies, Inc. v. Milk Control Comm'n of Pa.*, 318 U.S. 261 (1943) ..............18

*People v. Markham*, 49 Cal.3d 63 (1989)................................................23

*Perpich v. Department of Defense*, 496 U.S. 334 (1990) ............................ 8, 16, 19

*Roche v. Evaporated Milk Ass'n*, 319 U.S. 21 (1943)....................................12

*Shelby County, Ala. v. Holder*, 570 U.S. 529 (2013)....................................15

*Skiriotes v. Florida*, 313 U.S. 69 (1941)..............................................23

*Spear v. Reeves*, 148 Cal. 501 (1906) ................................................28

*Stirling v. Brown*, 18 Cal.App.5th 1144 (2018)..........................................8

*Susman v. City of Los Angeles*, 269 Cal.App.2d 803 (1969)..............................27

*Torres v. Lynch*, 578 U.S. 452 (2016) .................................................15

# TABLE OF AUTHORITIES
### (Continued)

*Torres v. Tex. Dep't of Pub. Safety*, 597 U.S. 580, 590 (2022)..............................25

*Trump v. United States*, 603 U.S. 593 (2024).........................................................29

*Trump v. Vance*, 591 U.S. 786, 799 (2020) ...................................................... 15, 27

*United States v. California*, 921 F.3d 865 (9th Cir. 2019) ....................................21

*United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304 (1936).........................25

*United States v. Lanza*, 260 U.S. 377 (1922).........................................................23

*United States v. Lopez*, 514 U.S. 549 (1995)............................................. 15, 22, 27

*United States v. Wheeler*, 435 U.S. 313 (1978).....................................................23

*Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302 (2014) ............................................17

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952)..................... 13, 26

*Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189 (2012).......................... 11, 12

## Constitutional Provisions

U.S. Const., art. I, § 8...............................................................................................22

U.S. Const., art. I, § 8, cl. 15...................................................................................16

U.S. Const., art. I, § 8, cl. 16............................................................................. 10, 16

U.S. Const., art. I, § 10, cl. 3...................................................................................10

U.S. Const., art. II, §1..............................................................................................16

U.S. Const., art. II, § 2, cl. 1 .....................................................................................9

U.S. Const., Amdt. 10 ........................................................................................ 15, 22

Cal. Const. art. V, § 1...............................................................................................25

Cal. Const. art. V, § 13.............................................................................................25

Cal. Const. art. V, § 7....................................................................................... 11, 27, 29

## Statutes

10 U.S.C. § 12406 ....................................................................................................17

18 U.S.C. § 1385 ......................................................................................................25

# TABLE OF AUTHORITIES
### (Continued)

32 U.S.C. § 109 ................................................................10

32 U.S.C. § 110 ............................................................9, 11

Cal. Gov't Code § 8571 ..................................................29

Cal. Gov't Code § 8572 ..................................................29

Cal. Gov't Code § 8574 ..................................................29

Cal. Gov't Code § 8629 ..................................................14

Cal. Gov't Code § 8645 ..................................................29

Cal. Mil. & Vet. Code § 120 ...........................................10

Cal. Mil. & Vet. Code § 121 ...........................................10

Cal. Mil. & Vet. Code § 140 .................................8, 11, 28

Cal. Mil. & Vet. Code § 142 ...........................................11

Cal. Mil. & Vet. Code § 146 .....................................11, 28

Cal. Mil. & Vet. Code § 550 ...........................................11

**Regulations**

Nat. Guard Reg. (NGR) 500-5 § 4-1 ..................................8

NGR No. 500-5 .................................................................9

NGR No. 500-5, § 10-2 ................................................9, 11

NGR No. 500-5, § 10-3 ..................................................10

NGR No. 500-5, § 10-4 ....................................................9

NGR No 502 ...................................................................11

NGR No. 903–04 ............................................................11

**Other Authorities**

11 Op.Cal.Atty.Gen. 253 ...............................................19

Joseph R. Grodin, Darien Shanske, and Michael B. Salerno, THE CALIFORNIA STATE CONSTITUTION (Oxford University Press 2016) .......................................23

# TABLE OF AUTHORITIES
### (Continued)

Margaret Hu, *Reverse-Commandeering*, 46 U.C. DAVIS L. REV. 535 (2012).........20

Michael R. Moore, *I Ran the L.A.P.D. I Know What Happens When Troops Are Sent to American Cities*, THE NEW YORK TIMES, Jun. 13, 2025.........................29

Susan B. Glasser and Michael Grunwald, *The Steady Buildup to a City's Chaos*, THE WASHINGTON POST, Sept. 11, 2005 ............................................................28

## INTEREST OF AMICUS CURIAE

Amicus are California constitution and state constitutional law scholars who seek to aid this Court in resolving the issues of state sovereignty and federalism presented here. We are academics affiliated with the California Constitution Center (David A. Carrillo is executive director and Brandon V. Stracener is a senior research fellow), a nonpartisan academic research center at the University of California, Berkeley, School of Law. The University of California is not party to this brief, and our academic titles are for identification only.

This brief, filed on leave of court, will assist the Court by addressing the core issue: federalizing a state militia is lawful only when conditions set by Congress are met, and a president exceeds his powers in attempting to federalize a state militia over a governor's objection without meeting those conditions.

Consistent with Federal Rule of Appellate Procedure 29(a)(4)(E), Amicus certifies that no party or counsel for any party has authored the Brief, participated in its drafting, or made any monetary contributions intended to fund preparation or submission of the Brief. A motion for leave to file accompanies this brief.

## SUMMARY OF ARGUMENT

Federal courts have jurisdiction to review presidential emergency declarations in general, and militia callouts like those here in particular. Such executive actions are no different from any other: whether or not they are authorized by constitutional or statutory law is a matter of interpretation and resolving factual disputes. Both matters are squarely within the judicial power to decide controversies and declare the law. Here, state militias can only be federalized under express statutory conditions. Because those conditions are unmet, California's militia was unlawfully federalized. Even if those statutory conditions existed, the authorizing statutes are unconstitutional to that extent because they violate the Tenth Amendment's anti-commandeering principle, which

forbids seizing state assets to enforce a federal policy. And even if federal statutory law can be so used, using a state militia for domestic law enforcement violates the Posse Comitatus Act. Thus, if the militia is being used for keeping the peace, that usurps state police power and violates state sovereignty. And if the militia is being used for federal law enforcement, that violates Posse Comitatus. The result is that no scenario exists here where the militia callup is lawful. This Court should affirm the lower court's decision that the president's order (the "order") federalizing California's militia is unlawful.

**BACKGROUND**

## I.    The National Guard has a unique, dual status.

In its modern form the National Guard is a special entity because it has a dual role as both the militias of the 50 states, the District of Columbia and the territories, and as the reserve force for the regular United States military.[1] The Guard may serve a state in times of local civil strife, or it may be federalized during national emergencies. In each state the Guard is under state authority and control as the militia. State governors are the commanders in chief of their militias.[2] All persons enlisting in a state militia simultaneously enlist in the U.S. National Guard.[3] But unless and until ordered to active Army duty, they retain their status as state militia members.[4]

---

[1] This description of the National Guard's legal status is drawn from *Knutson v. Wisconsin Air Nat. Guard*, 995 F.2d 765, 767 (7th Cir. 1993) (cert. den. (1993) 510 U.S. 933) and *Stirling v. Brown*, 18 Cal.App.5th 1144, 1151–53 (2018), Nat. Guard Reg. (NGR) 500-5 § 4-1, and *Perpich v. Department of Defense*, 496 U.S. 334, 340–46 (1990).

[2] See, e.g., Cal. Mil. & Vet. Code § 140.

[3] *Perpich*, 496 U.S. at 345.

[4] *Ibid.* See also *Holmes v. California Nat. Guard*, 90 Cal.App.4th 297, 317 (2001).

Yet federal law accounts for much of the Guard's composition and function. The federal military prescribes regulations and issues orders to organize, discipline, and govern the National Guard.[5] The president is the commander in chief of the Guard when under active federal duty status.[6] The Guard's dual function and dual enlistment means a service member may serve in any one of three statuses: state active duty status, Title 10 (active federal duty) status, or Title 32 (hybrid) status.

Under state active duty status, a state is free to employ its militia under state control for state purposes and at state expense as provided in the state's constitution and statutes. When serving in a state active duty status militia members are under the command and control of the governor and the state or territorial government.[7]

Title 10 status means the state militia member has been called into active federal duty under the president's command. This federal service is performed under Title 10 U.S. Code, with command and control resting solely with the president.[8] When employed at home or abroad in Title 10 duty status, Guard forces are relieved of duties as a member of their state militia, released from state control, and become elements of the Reserve Component of the federal military force.[9]

Title 32 status is a hybrid in that a Guard member operates under state active duty and under state control but in the service of the federal government. While under Title 32 status, the Guard service member is on state active duty funded by the federal government but authorized, organized, implemented, and administered

---

[5] 32 U.S.C. § 110; see *Charles v. Rice*, 28 F.3d 1312, 1315 (1st Cir. 1994).
[6] U.S. Const., art. II, § 2, cl. 1.
[7] National Guard Regulation ("NGR") No. 500-5, § 10-2(a) & (b).
[8] NGR 500-5.
[9] NGR 500-5, § 10-4(a).

by the state.[10] When conducting domestic law enforcement support operations under Title 32, Guard members are under the command and control of the state and thus in a state status, but paid with federal funds. Under Title 32, the governor maintains command and control of Guard forces even though those forces are employed "in the service of the United States" for a primarily federal purpose.[11]

## II. The California National Guard is the domestic state militia.

The National Guard's hybrid nature is a product of the federal constitutional design. The federal constitution prohibits states from keeping troops without the consent of Congress.[12] It reserves to Congress the power "To provide for organizing, arming, and disciplining the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress."[13] Congress, in turn, has authorized states to keep both federally recognized militias (the National Guard) and non-federally recognized militias (known as state defense forces).[14]

The California National Guard is part of the active militia of this state.[15] The state militia consists of the National Guard, State Guard and the Naval Militia, and the unorganized militia.[16] "The unorganized militia consists of all persons liable to service in the militia, but who are not members of the National Guard, the State Guard, or the Naval Militia."[17] operates under the governor's command and control

---

[10] *Holmes*, 90 Cal.App.4th at 317.
[11] NGR 500-5, § 10-3(a).
[12] U.S. Const., art. I, § 10, cl. 3.
[13] U.S. Const., art. I, § 8, cl. 16.
[14] See 32 U.S.C. § 109.
[15] Cal. Mil. & Vet. Code § 120.
[16] Cal. Mil. & Vet. Code § 120.
[17] Cal. Mil. & Vet. Code § 121.

unless it is lawfully federalized, when it operates under the president's command and control.[18]

California's governor commands the state's militia as "the commander in chief of a militia that shall be provided by statute" and "may call it forth to execute the law."[19] The governor may order the militia to perform military duty of every description.[20] The governor may call into active service the active and the unorganized militia in case of (among others) tumult, riot, breach of the peace, or resistance to the laws of California or the United States.[21]

The governor has exclusive authority over National Guard members in state active duty status.[22] Although the Posse Comitatus Act generally bars the president from using federalized National Guard members within the United States for law enforcement and other purposes, there is no similar bar against a governor's use of the militia within a state for law enforcement purposes or to assist in emergency relief.

## ARGUMENT

### I.    Federal courts can review the presidential order here.

Whether the order here satisfies constitutional and statutory requirements is a judicial question. In such cases federal courts are empowered and obligated to interpret and declare the law.[23] The narrow "political question" doctrine does not

---

[18] See Cal. Mil. & Vet. Code § 550; 32 U.S.C. §§ 110, 502(a) 502(f), 903–04.
[19] Cal. Const. art. V, § 7; see also Cal. Mil. & Vet. Code § 140.
[20] Cal. Mil. & Vet. Code § 142.
[21] Cal. Mil. & Vet. Code § 146.
[22] See NGR 500-5 § 10-2(a).
[23] *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803); *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821) (federal courts can neither decline their given jurisdiction nor usurp any other); *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S.

apply here.[24] That exception applies when a law gives the executive policy discretion that is only changeable through the political process.[25] Yet here the relevant federal constitutional and statutory provisions set conditions for the president acting on the militia. That is a matter of interpretation squarely within the judicial function: the power to declare the law necessarily includes a power to declare when the conditions set by constitution or statute are met.[26] As always, the president's authority to act here "must stem either from an act of Congress or from the Constitution itself."[27] Because presidential emergency declarations, or decisions to call up the militia, are governed by constitutional and statutory provisions, federal courts can (and must) determine whether a president's decision to invoke emergency powers or summon the militia are lawful.

Indeed, the high court has long done so. For example, in *Chastleton Corp.* the court held that it could inquire whether facts supported a supposed emergency, that an emergency ceases to exist when the facts change, and a court "is not at

---

189, 195 (2012) (court is responsible for deciding cases properly before it, even those it "would gladly avoid").

[24] *Zivotofsky*, 566 U.S. at 195.

[25] *Dalton v. Specter*, 511 U.S. 462, 477 (1994) (presidential decisions made under statutes granting discretion are not judicially reviewable). Yet there are limits to the discretion Congress may grant. *A.L.A. Schechter Poultry Corporation v. United States*, 295 U.S. 495, 537–538 (1935) (Congress cannot delegate "unfettered discretion" to the president).

[26] *Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919, 952–53 n.16 (1983) (executive action is always subject to check by the authorizing statute's terms, and if that authority is exceeded it is open to judicial review); *Am. Power & Light Co. v. Sec. & Exch. Comm'n*, 325 U.S. 385, 389–390 (1945) (when Congress formulates conditions by statute courts will review whether the statute's terms are met); *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 30 (1943) (courts cannot expand conditions set by Congress).

[27] *Medellin v. Texas*, 552 U.S. 491, 524 (2008).

liberty to shut its eyes to an obvious mistake, when the validity of the law depends upon the truth of what is declared."[28] Three other clear examples of the judicial power to review executive action even during gravest peril are all from World War II:

- In *Hirabayashi* the court reviewed whether restrictions imposed by a military commander on persons in a military area, as authorized by presidential order in a declared war, were an unconstitutional delegation by Congress of its legislative power, and whether the restrictions violated rights held by citizens of Japanese ancestry.[29]

- The court did so again in *Korematsu*, where it reviewed a military order issued under presidential executive order authority granted by congressional statute. The question was whether it was beyond the war power of Congress and the executive to exclude those of Japanese ancestry from the West Coast war area.[30]

- And in *Youngstown* the court reviewed whether the president acted within his constitutional power when he issued an order based on findings "that his action was necessary to avert a national catastrophe" and that in meeting this "grave emergency" the president acted within his constitutional executive powers as commander-in-chief.[31]

---

[28] *Chastleton Corp. v. Sinclair*, 264 U.S. 543, 547–48 (1924); see also *Miller v. Schoene*, 276 U.S. 272, 281 (1928) (official's discretion to decide whether or not conditions are met is subject to judicial review).

[29] *Hirabayashi v. United States,* 320 U.S. 81 (1943).

[30] *Korematsu v. United States*, 323 U.S. 214, 225 (1944) abrogated by 585 U.S. 667.

[31] *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582 (1952).

Thus, even in a declared all-out war with foreign powers the courts still may review questions of constitutional and statutory interpretation, and judge factual assertions. Mere invocations of "commander-in-chief" status and similar talismans are inadequate to escape judicial review of whether the power is properly exercised or exists at all. Otherwise, bare declarations of "danger!" would leave executive power unchecked.[32] The federal constitution was not so designed.[33]

Instead, courts should accord executive conclusions "respect" — which means the executive's views inform but do not supersede judicial review.[34] Otherwise the courts would not be independent at all, and the executive would be unbound. Concerned with kingly despots, the constitution's drafters were not so unwise. By contrast in California, the Emergency Services Act provides a legislative emergency brake for ending gubernatorial declarations that federal executive powers lack.[35] Failing to provide for any check on presidential emergency powers is either a grave oversight in a document full of interbranch checks on every other power, or it means that the courts are meant to review exercises of federal executive power in emergencies. Thus, the court below correctly assumed jurisdiction over the questions presented here.

---

[32] Cf. *Korematsu*, 323 U.S. at, 232 n.8 (Roberts, J., dissenting) ("No pronouncement of the commanding officer can, in my view, preclude judicial inquiry and determination whether an emergency ever existed . . . ." (abrogated by 585 U.S. 667).

[33] *A.L.A. Schechter Poultry Corporation v. United States*, 295 U.S. 495, 528–529 (1935) (even extraordinary conditions cannot create or enlarge constitutional power; the Tenth Amendment precludes such assertions of extraconstitutional authority).

[34] *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 385–86 (2024).

[35] California's legislature can terminate a governor's emergency powers by concurrent resolution. Cal. Gov't Code § 8629.

## II.    Federal constitutional power over the militia is not exclusive.

States have all powers not barred to them by the federal constitution because the same document creates a federal government of only certain enumerated powers.[36] The states are sovereign political entities that retained residual sovereignty on joining the Union.[37] Thus, when a federal power is not explicitly granted, the Tenth Amendment vests those powers in the states.[38] For example, in exercising their plenary police powers, state legislatures are not limited to Congress's enumerated powers.[39] This reservation of all things not expressly granted gives states free rein to act wherever the federal government's power ends: absent a constitutional provision barring a power from the states, powers that are not delegated to the federal government are state powers.[40] The purpose of this federalist structure is to secure citizen liberty by diffusing sovereign power.[41] And this allocation of reserved powers in our federal system preserves the integrity, dignity, and residual sovereignty of the states.[42]

---

[36] The federal constitution "provides that all powers not specifically granted to the Federal Government are reserved to the States or citizens." *Shelby County, Ala. v. Holder*, 570 U.S. 529, 543 (2013); *United States v. Lopez*, 514 U.S. 549, 552 (1995); *Bond v. United States*, 572 U.S. 844, 863 (2014).

[37] U.S. Const., Amdt. 10; *Printz v. United States*, 521 U.S. 898, 918–19 (1997); *Coyle v. Smith*, 221 U.S. 559, 567 (1911); *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 779 (1991) (states entered the Union "with their sovereignty intact").

[38] *Nevada v. Hall*, 440 U.S. 410, 425 (1979), overruled in other respect by *Franchise Tax Bd. of California v. Hyatt*, 587 U.S. 230 (2019).

[39] *Torres v. Lynch*, 578 U.S. 452, 457–58 (2016).

[40] *Trump v. Vance*, 591 U.S. 786, 799 (2020).

[41] *Shelby County* , 570 U.S. at 543; *Bond v. United States*, 564 U.S. 211, 220–21 (2011) (explaining that "the people, from whom all governmental powers are derived" have their freedom enhanced by the creation of two governments).

[42] *Bond*, 564 U.S. at 221.

State militias are an example of this reserved state power. The state militias predate the nation itself. As with all other sovereign state powers, states ceded control over their militias to the Union only by the federal constitution's terms. The federal constitution provides that organizing the militia is a shared state and federal responsibility.[43] As discussed next, it also provides that Congress has exclusive power to define that relationship's terms by statute, and the presidential order here does not meet those mandatory conditions.

## III.     Only Congress can define conditions for federalizing the militia.

The federal constitution grants Congress power to "provide for calling forth the militia to execute the laws of the union, suppress insurrections and repel invasions."[44] That is an exclusive power of Congress to define by statute when the militia may be federalized. Congress is also granted the power to provide for "organizing" the militia, "and for governing such part of them as may be employed in the service of the United States."[45] That also is an exclusive power to provide by statute how and when the militia may be federalized. Together, "the Militia Clauses are — as the constitutional text plainly indicates — additional grants of power to Congress."[46]

Granting this power to the federal legislative branch necessarily denies it to the federal executive, making it exclusive to Congress. Thus, the federal constitution makes the president commander in chief of the militia only "when called into the actual service of the United States."[47] Because Congress defines the exclusive conditions for when that may occur, the president can only call a state

---

[43] U.S. Const. art. I, section 8, cl. 16.
[44] U.S. Const., art. I, § 8, cl. 15.
[45] U.S. Const., art. I, § 8, cl. 16.
[46] *Perpich*, 496 U.S. at 349.
[47] U.S. Const., art. II, §1.

militia into federal service on conditions set by statute, and can command a state militia only when it is in active federal service, as defined in statute. A president may not ignore these statutory requirements when they are inconvenient.[48]

Congress has exercised its power to set statutory conditions with 10 U.S.C. § 12406 and the Insurrection Act. Of the two, only section 12406 is implicated here. Section 12406 originated in the 1903 Dick Act, the first in a series of congressional enactments that transformed the state militias into what is now the National Guard. At first, the 1903 text ignored the state governors and granted the president unilateral authority. But Title 10 was recodified in 1956, and the statute's second sentence was amended to its current phrasing, which requires federalizing orders to be issued through state governors: "Orders for these purposes shall be issued through the governors of the States."[49] Courts must read a change in statutory language, if possible, to have some effect.[50] Adding the requirement to issue orders through state governors must mean something more than merely telling state governors that "this is happening whether you like it or not."

The context of Congress' 1956 amendment is significant: adding governors to the statute at their request shows that Congress intended to involve governors in militia call-ups.[51] It suggests greater involvement than the perfunctory pass-through argued by the government, which would render part of the statute

---

[48] *Util. Air Regul. Grp. v. E.P.A*., 573 U.S. 302, 327 (2014) (no presidential power to revise clear statutory terms that turn out not to work in practice).

[49] 10 U.S.C. § 12406.

[50] *Am. Nat'l Red Cross v. S. G*., 505 U.S. 247, 263 (1992).

[51] *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 655 (2020) (interpretation should accord with ordinary public meaning of terms at time of its enactment, courts should orient themselves "to the time of the statute's adoption").

superfluous — something courts "are loath to do."[52] If a governor has no substantive role in a militia call-up, then Congress need not have included them. There is no reason Congress would bother to specify conditions for federalizing the militia only to allow federalization absent those conditions. Instead, reading *through the governors of the States* to give those governors some say is consistent with a congressional purpose to respond to state concerns about unilateral federalization.[53]

By contrast, sections 252 and 253 of the Insurrection Act are unilateral and designed for a state defying federal authority. On those rare occasions when presidents have wrested control of a militia away from a governor, it has always been done through the Insurrection Act, not through section 12406. This counters arguments that the lower court here abrogated necessary unilateral presidential militia call-up authority — which still exists under the Insurrection Act should that act's conditions be met.

Even with congressional power to define militia call-up conditions, the domestic military is not truly an exclusive federal power. States have significant residual police powers that overlap with Congress's power over the military. On that basis, the Supreme Court previously dismissed a claim that "all power of legislation regarding" military matters "is conferred upon Congress and withheld from the States," upholding state legislation on enlistment in the U.S. Army and

---

[52] *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 166 (2004).

[53] *Davis v. United States*, 495 U.S. 472, 480 (1990) (court used fact that Congress was responding to stakeholder concerns to adopt interpretation consistent with this goal); see also *Dolan v. Postal Serv.*, 546 U.S. 481, 486 (2006) (statutory interpretation includes "considering the purpose and context of the statute"); *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997) (court's interpretation based partly on the statute's "primary purpose").

Navy.[54] The high court rejected the idea "that a State has no interest or concern in the United States or its armies or power of protecting them from public enemies," eschewing "[c]old and technical reasoning" that "insist[s] on a separation of the sovereignties" in the army-raising context.[55] Similarly, the court held that "there is no clause of the Constitution which purports, unaided by Congressional enactment, to prohibit" states from exercising their police powers in ways that arguably burden congressional power to raise and support armies.[56] Thus, from both a federal constitutional perspective and a state sovereignty view, declaring that the president is commander in chief is not sufficient. Instead, the president must show that his order meets statutory requirements. As discussed next, it fails that test.

## IV.  The order does not satisfy the statutory conditions for federalizing California's militia.

The court below correctly found that the statutory terms for federalizing California's militia here are unmet. (We will not retread that discussion.) Absent that statutory and constitutional authority, the president exceeds his power in seizing command of the militia. Unless lawfully called into federal service, a California militia member remains under the state governor's command.[57] This state affiliation may be suspended in favor of a federal affiliation only during the period of active duty.[58] What changes when the militia passes in and out of active federal duty is the chain of command. When called into federal service under section 12406, the California militia operates under the direct command of the Secretary of the Army; otherwise, the state militia operates as reserves of the

---

[54] *Gilbert v. Minnesota*, 254 U.S. 325, 327–28 (1920).
[55] *Id.* at 328–29.
[56] *Penn Dairies, Inc. v. Milk Control Comm'n of Pa.*, 318 U.S. 261, 269 (1943).
[57] 11 Op.Cal.Atty.Gen. 253 (National Guard officer when not in federal service belongs to a state force under command of governor).
[58] *Perpich*, 496 U.S. at 349.

Army.[59] And when not federally activated as reserves of the Army under section 12301, guardsmen have state status and report directly to the governor. [60] Without a valid statutory basis for transferring command over a state militia, the president lacks constitutional power to order California militia units into federal service.

The remainder of this discussion assumes that this Court agrees that the order does not comply with section 12406. Because the order operates outside that authority, it violates the Tenth Amendment's anti-commandeering principle by seizing state assets to enforce a federal policy — here, immigration laws.

## V.    The order violates the Tenth Amendment's anti-commandeering doctrine.

The order here is invalid because it violates the anti-commandeering doctrine. That rule bars the federal government from conscripting states to implement federal policy.[61] Rooted in the Tenth Amendment, this federalism doctrine protects state sovereignty by policing "the vertical separation of powers between the state and federal governments."[62] The anti-commandeering doctrine bars the federal government from forcing state assets to implement federal immigration policy. Thus, federalizing California's militia to assist federal immigration enforcement is precisely the commandeering that the Tenth Amendment forbids.

---

[59] *In re Sealed Case*, 551 F.3d 1047, 1050–51 (D.C. Cir. 2009) (citing 10 U.S.C. § 10107).
[60] *Ibid.*
[61] See *Printz*, 521 U.S. at 935 ("Congress cannot compel the States to enact or enforce a federal regulatory program.").
[62] Margaret Hu, *Reverse-Commandeering*, 46 U.C. DAVIS L. REV. 535, 548–49 (2012).

The anti-commandeering doctrine preserves the constitutional design "to withhold from Congress the power to issue orders directly to the States."[63] As a body with only enumerated powers, Congress lacking enumerated power to directly order the states means that it lacks that power.[64] The doctrine also flows from the Tenth Amendment principle that states are sovereign and cannot be forced to execute federal laws. Anti-commandeering applies to all state assets — law enforcement and (barring lawful federalization) the militia alike. This remains true for federal control over the militia because that control exists only in statutory conditions unmet here. Thus, the order violates the Tenth Amendment.

The anti-commandeering principle dictates that "Congress cannot issue direct orders to state legislatures," and states can refuse to adopt federal policies.[65] Federal statutes cannot force states to participate "in the actual administration of a federal program" or policy.[66] States may "refrain from assisting with federal efforts."[67] The doctrine applies even when the federal executive has clear federal power to execute a federal policy — states cannot be compelled to execute federal policy.

Thus, even had the president complied with statutory requirements here, federalizing the militia in this instance would be unconstitutional because it commandeers the militia to enforce federal law. The president's order justifies the action "to temporarily protect ICE" and other federal agents in "the enforcement of Federal law." And other presidential statements listed in California's complaint

---

[63] *Murphy v. National Collegiate Athletic Association*, 584 U.S. 453, 470 (2018).
[64] *Ibid.*
[65] *Murphy,* 584 U.S. at 475. See *New York v. United States*, 505 U.S. 144, 161–62 (1992).
[66] *Printz,* 521 U.S. at 917–18.
[67] *United States v. California*, 921 F.3d 865, 891 (9th Cir. 2019).

show an intent to use the militia for federal law enforcement, specifically civil immigration. All that may in theory match with section 12406 authority to use the militia to execute federal laws (if that section actually applied here). But anticommandeering forbids this use of state resources to enforce federal policy. Thus, even if the order met the statutory requirements, the statute's substance is unconstitutional to the extent it permits use of California's militia to support federal immigration enforcement.

## VI. The order violates the Tenth Amendment's reservation of police powers to the states.

Federalizing a state militia for intra-state law enforcement violates the Tenth Amendment by usurping the exclusive state police powers. The federal government lacks a general police power to enact and enforce laws for community welfare and order; it instead possesses only limited authority to prohibit and punish crimes. "The Constitution creates a Federal Government of enumerated powers."[68] As with its powers generally, Congress has only limited authority over crime. "The Constitution," in short, "withhold[s] from Congress a plenary police power."[69]

Those matters are instead exclusive state subjects. The federal government therefore exceeds its power to federalize a state militia by trying to enforce state laws, such as the crowd control and public order laws implicated here. Keeping the peace (even during civil unrest) is a state responsibility, as is the decision to deploy the militia to supplement local law enforcement. Absent a showing that the president is unable with the regular forces to execute the laws of the United States,

---

[68] *Lopez*, 514 U.S. at 552; see U.S. Const., art. I, § 8; *Marbury v. Madison*, 1 Cranch 137, 176 (1803) ("The powers of the legislature are defined, and limited; and that those limits may not be mistaken, or forgotten, the constitution is written").

[69] *Lopez*, 514 U.S. at 566; see U.S. Const., art. I, § 8; Amdt. 10.

isolated incidents of civil unrest are inadequate to withdraw militia command from the governor.

By contrast, state legislatures are vested with plenary lawmaking power. Unlike Congress, which only holds the specific powers delegated to it by the federal constitution, the California legislature has plenary legislative authority, except as limited by the California constitution.[70] The police power, a state's "broad authority to enact legislation for the public good," is constrained only by the limits of the state's own constitution or the federal charter.[71] States retaining their sovereignty when they joined the Union means that states are the repositories of traditional police powers.[72]

Keeping the local peace is California's power and responsibility. California's plenary power to regulate civil unrest derives from the separate and independent sources of power and authority that originally belonged to the states before admission to the Union, which were preserved to them by the Tenth Amendment.[73] Every state is "competent to exert that residuum of sovereignty not delegated to the United States by the Constitution itself."[74] Thus, California "has the power, inherent in any sovereign, independently to determine what shall be an offense against its authority and to punish such offenses."[75] Breach of the peace is just such an offense.

---

[70] Joseph R. Grodin, Darien Shanske, and Michael B. Salerno, THE CALIFORNIA STATE CONSTITUTION (Oxford University Press 2016) at 139.

[71] *Bond*, 572 at 854 (the federal government has no analogue to states' broad authority to enact legislation for the public good); *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 636 (2022) (a state is generally "entitled to the sovereignty and jurisdiction over all the territory within her limits").

[72] *People v. Markham*, 49 Cal.3d 63, 72 (1989) (citing The Federalist, No. 45).

[73] *United States v. Lanza*, 260 U.S. 377, 382 (1922).

[74] *Coyle v. Smith*, 221 U.S. at 567; *Skiriotes v. Florida*, 313 U.S. 69, 77 (1941).

[75] *United States v. Wheeler*, 435 U.S. 313, 320 (1978).

Preemption does not apply here. The high court assumes that the historic state police powers are not superseded by federal law unless Congress expresses a clear and manifest purpose to do so.[76] Under the background principles of our federal system, the areas traditionally left to state control using their police power are too numerous to list.[77] To encroach on those areas, Congress must "make its intention clear and manifest [that] it intends to pre-empt the historic powers of the States."[78] Even a statement of intent to preempt may be inadequate if Congress infringes on areas of traditional state control. Here, the broad state police power is not limited by the mere existence of federal powers over the militia because "Article I gives Congress a series of enumerated powers, not a series of blank checks."[79] Other than perhaps section 12406 (which does not apply here), no federal statute would supply the preemptive intent necessary to override California's historic police powers over public order.

To the extent that the president relies here on a federal statute for authority to use state assets for general policing purposes, that exceeds the federal legislative power. If these statutes are so read, then Congress has encroached on states' traditional police powers to define the criminal law and to protect the public order.[80] Congress cannot by statute enlist state government assets for general *federal* policing purposes (unconnected to any specific federal crime) such as crowd control purposes here. In doing so Congress would be using its incidental

---

[76] *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992).
[77] See *Gonzales v. Oregon*, 546 U.S. 243, 274 (2006).
[78] *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991) (internal quotation marks and citation omitted).
[79] *Haaland v. Brackeen*, 599 U.S. 255, 276 (2023).
[80] *Brecht v. Abrahamson*, 507 U.S. 619, 635 (1993); *Hillsborough County v. Automated Medical Laboratories, Inc*., 471 U.S. 707, 719 (1985).

authority to subvert basic principles of federalism and dual sovereignty, which it cannot do.[81]

Today's facts are local law enforcement within the jurisdiction of California's governor and attorney general, not an invasion or insurrection.[82] Were this a declared war, a sudden military invasion, or an organized domestic rebellion, the president's power would be undisputed.[83] Yet those conditions are absent here, and in the ordinary course the notion that states may call out the militia to respond to genuine exigencies is uncontroversial. Because the events at hand are at most ordinary civil unrest within local capabilities, no federal statute could constitutionally encroach on state power here.

Even if the president dodges these impediments, his order is made unlawful by the Posse Comitatus Act.[84] Since 1878, Congress has by statute forbidden the use of federal military personnel to enforce domestic policies within any of the

---

[81] *Printz*, 521 U.S. at 923–24; *Alden v. Maine*, 527 U.S. 706, 732–33 (1999).

[82] Cal. Const. art. V, § 1 (supreme state executive power is vested in the governor, who "shall see that the law is faithfully executed"), and art. V, § 13 (attorney general is state's chief law enforcement officer with a duty "to see that the laws of the State are uniformly and adequately enforced").

[83] The federal constitution divests the states of war powers and "[t]he States ultimately ratified the Constitution knowing that their sovereignty would give way to national military policy." *Torres v. Tex. Dep't of Pub. Safety*, 597 U.S. 580, 590 (2022); *Holmes v. Jennison*, 39 U.S. 540, 551 (1840) ("The powers of war and peace, and of making treaties, are conferred upon the general government; and at the same time, expressly prohibited to the states."); *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 318 (1936).

[84] 18 U.S.C. § 1385 ("Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both."); *Laird v. Tatum*, 408 U.S. 1, 32 (1972) (Reconstruction Era statute forbids the use of military troops as a posse comitatus).

states. Even if California's militia were lawfully federalized, they are now federal military troops. As such, their use for the domestic law enforcement task of quelling civil unrest is barred by the Posse Comitatus Act.

## VII. Lacking congressional authority, the president's power is at its lowest ebb.

With congressional permission absent, the president can only apply his inherent powers against those of California and its governor. To resolve that conflict, Justice Jackson's concurrence in *Youngstown* for resolving conflicts between Congress and the president applies equally well here.[85] *Youngstown* discussed horizontal separation of powers — yet the same framework describes vertical federalism conflicts between the federal executive and the states. Most state–federal conflicts have seen Congress attempting to impose its legislative power on the states. By contrast, there is scant authority on the federalism implications of states opposing federal executive power. *Youngstown* best suits that scenario.

Through that lens, the president's power here is at its lowest ebb. He acts without congressional authority, so he may rely only on his own powers. But the president lacks any direct power to federalize the militia, with the federal constitution assigning that authority exclusively to Congress. Thus, the president's power here is dependent on congressional authorization, and lacking that the president can rely only on his own inherent powers. Those are inadequate against California's sovereign power as a state.

States have maximum power in this scenario, where the federal executive lacks an express or necessarily implied constitutional power. In such cases the police power, a state's "broad authority to enact legislation for the public good," is

---

[85] *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).

constrained only by the limits of the state's own constitution or the federal charter.[86] By contrast, the federal constitution creates a federal government of only certain enumerated powers.[87] Thus, when a federal power is not explicitly granted, the Tenth Amendment vests those powers in the states.[88] Absent a constitutional provision barring a power from the states, powers that are not delegated to the federal government are state powers.[89] That makes it California's decision to call up the militia, not the president's.

Here, California's governor has explicit state constitutional power to command the state's militia.[90] It is a discretionary state executive power: "When and under what circumstances the National Guard should be called into action to preserve the peace and to protect property is a matter within the discretion of the Governor . . . ."[91] Because the state constitution vests the supreme executive power in the governor and imposes on that officer a duty to see that the laws are faithfully executed, that duty also applies to constitutional provisions — such as

---

[86] *Bond*, 572 U.S. at 854 (federal government has no analogue to broad state authority to enact legislation for the public good and instead "can exercise only the powers granted to it"); *Oklahoma*, 597 U.S. at 636 (a state is generally "entitled to the sovereignty and jurisdiction over all the territory within her limits").

[87] *Lopez,* 514 U.S. at 552; *Bond*, 572 U.S. at 863 (citations omitted).

[88] *Nevada*, 440 U.S. at 425 (given Tenth Amendment's reminder that powers not delegated to the federal government nor prohibited to the states are reserved to the states or to the people, courts should not assume that unstated limitations on state power were intended by the Framers), overruled in other respect by *Franchise Tax Bd. of California v. Hyatt*, 587 U.S. 230 (2019).

[89] *Trump*, 591 U.S. at 799.

[90] Cal. Const. art. V., § 7 ("The Governor is commander in chief of a militia that shall be provided by statute. The Governor may call it forth to execute the law.").

[91] *Susman v. City of Los Angeles*, 269 Cal.App.2d 803, 818–19 (1969).

commanding the militia.[92] California's governor also has explicit statutory powers over the militia.[93]

With the state governor as commander in chief of the state's militia, a presidential order federalizing the state militia under section 12406 requires orders issued through the state governor. California law mirrors this requirement, permitting the militia to respond upon "call or requisition of the President of the United States."[94] Absent that authority, the state governor retains command.

Indeed, Congress arguably has already negated any argument that a president has unilateral authority to override a state governor in calling up the militia. President George W. Bush once declined to activate Florida's militia over the state governor's objection, uncertain about the legality of doing so.[95] Congress attempted to resolve that ambiguity by expanding presidential authority to mobilize the National Guard in the National Defense Authorization Act of 2007 — which allowed the president to federalize the Guard without state governor consent. But after all 50 governors objected, Congress repealed it the following year, reverting the law to its original text. Thus, section 12406 still mandates that federalizing orders be issued through the governors. Nor does 10 U.S.C. § 12301 (which arguably permits militia federalization over a governor's objection) apply here — it covers only "active duty outside the United States, its territories, and its possessions." Let's stipulate that California is *inside* the United States.

Finally, there is no argument that lack of state power requires federal

---

[92] *Spear v. Reeves*, 148 Cal. 501, 504 (1906).
[93] Cal. Mil. & Vet. Code § 140 ("The Governor of the State, by virtue of his office, is the Commander in Chief of the Militia of the State.").
[94] Cal. Mil. & Vet. Code § 146(b).
[95] See Susan B. Glasser and Michael Grunwald, *The Steady Buildup to a City's Chaos*, THE WASHINGTON POST, Sept. 11, 2005.

intervention. California's governor has constitutional and statutory authority to muster the militia and order it to "execute the law."[96] Beyond that, California's governor has power to declare a state of emergency under the Emergency Services Act (ESA).[97] The ESA grants broad gubernatorial powers in the event of a declared emergency.[98] With that, California's governor is well-armed against any catastrophe; more so against the transient local events here. This is at most a local policing matter, and "federal troops should always be a last resort, used only in cases of widespread collapse of civil authority and only at the explicit request of local leaders."[99] That is not the case here.

## CONCLUSION

Since the Civil War, power has shifted from the states to the federal government, and from Congress to the president. The past may well have required such changes. Today calls for ensuring the balance has not tipped too far away from the constitutional order, for recognizing state powers, and for refusing claims of exclusive executive power inconsistent with the Constitution. Failing to do so ensures greater concentration of power and warping of the constitutional structure. The lesson of recognizing overly expansive executive power is that doing so encourages abuse of power.[100] This Court should not add unreviewable domestic military force to that arsenal. A reasoned result here holds that judicial review applies, that state power never ceded to the federal government remains, and that

---

[96] Cal. Const. art. V, § 7.

[97] Cal. Gov't Code § 8574.

[98] Cal. Gov't Code §§ 8571–72, 8645.

[99] See Michael R. Moore, *I Ran the L.A.P.D. I Know What Happens When Troops Are Sent to American Cities*, THE NEW YORK TIMES, Jun. 13, 2025.

[100] *Trump v. United States*, 603 U.S. 593, 609 (2024) (president is entitled to absolute immunity from criminal prosecution for actions within his conclusive and preclusive constitutional authority).

the president may not impose domestic military force on civilians at will. This
Court should affirm the lower court.

DATED: June 16, 2025          Respectfully submitted,


  */s/ Brandon V. Stracener*

David A. Carrillo (State Bar # 177856)
Brandon V. Stracener (State Bar # 314032)
Amicus California Constitution Scholars

## CERTIFICATE OF COMPLIANCE

**This brief contains 6,996 words**, excluding the items exempted by FED. R. APP. P. 32(f), and therefore complies with the word limit of FED. R. APP. 29(a)(5) in light of Circuit Rule 32-1(a).

This brief's type size and typeface comply with FED. R. APP. P. 32(a)(5) and (6) because this brief has been prepared in proportionally spaced typeface using size-14, Times New Roman font in Microsoft Word.

DATED:  June 16, 2025

By:  _/s/ Brandon V. Stracener_

David A. Carrillo (State Bar # 177856)
Brandon V. Stracener (State Bar # 314032)
Amicus California Constitution Scholars

## CERTIFICATE OF SERVICE

I, Brandon V. Stracener, hereby certify under Ninth Circuit Rule 25-5(f)-(g) that I electronically filed the foregoing brief on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing System. Participants in the case are registered users of the electronic filing system, and service will be accomplished by this system.

DATED: June 16, 2025

By: _/s/ Brandon V. Stracener_

David A. Carrillo (State Bar # 177856)
Brandon V. Stracener (State Bar # 314032)
Amicus California Constitution Scholars