No. 25-3727

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

————————————

GAVIN NEWSOM, *in his official capacity as Governor of the State of California*; STATE OF CALIFORNIA,
*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, *in his official capacity as President of the United States*; PETE HEGSETH, *in his official capacity as Secretary of the Department of Defense*; DEPARTMENT OF DEFENSE,
*Defendants-Appellants.*

————————————

On Appeal from the United States District Court
for the Northern District of California

————————————

## REPLY IN SUPPORT OF EMERGENCY MOTION UNDER CIRCUIT
## RULE 27-3 FOR STAY PENDING APPEAL
————————————

BRETT A. SHUMATE
   *Assistant Attorney General*

ERIC D. McARTHUR
   *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
ANNA O. MOHAN
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7517*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 353-2689*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

ARGUMENT ..................................................................................................... 3

    A.    The federal government is likely to prevail on the merits. ........................ 3

    B.    The remaining factors support a stay. ......................................... 10

CONCLUSION ................................................................................................ 12

CERTIFICATE OF COMPLIANCE

# INTRODUCTION

A stay is urgently needed to preserve the federal government's ability to protect federal personnel and property from violent attacks, to safeguard federal officers' ability to effectively enforce civil and criminal laws, and to prevent unprecedented judicial interference with a military order issued by the President as Commander in Chief.

The President mobilized the National Guard in the face of violence specifically targeted at federal officials attempting to enforce our immigration laws. That mob violence seriously injured federal officers, caused extensive damage to federal property, and forced the closure of federal buildings. State and local police were unable or unwilling to effectively quell the violence, and federal agents on site were unable to do so without assistance. In these circumstances, the President properly determined that there was "a rebellion or danger of a rebellion against the authority of the Government of the United States" and that "the President is unable with the regular forces to execute the laws of the United States," warranting mobilization of the National Guard. 10 U.S.C. § 12406(2)-(3).

A stay is warranted because the defendants are likely to prevail on the merits. Plaintiffs argue that the criteria for mobilization were not satisfied, but under plaintiffs' and the district court's atextual interpretation of Section 12406(2), the President would be unable to call up the Guard to respond to a violent uprising no matter how widespread and dangerous, unless the mob was dedicated to the

"overthrow[]" of "the government as a whole." A278, 280; Opp.11. Similarly, so long as any quantum of federal law enforcement could be accomplished in the face of mob violence specifically aimed at blocking such enforcement, Section 12406(3) would not apply regardless of the "obstacles" posed to federal law enforcement and the "risk" of personal injury to federal law-enforcement officials and harm to federal property. A283. Neither statutory text nor history supports that extraordinary result.

Plaintiffs also erroneously suggest that the statutory instruction to issue a mobilization order "through" a governor compels the President to "consult[]" with the California Governor and await his "issu[ance of] the order to the relevant guard units." Opp.15. That implausible understanding of "through" would effectively turn a procedure intended to ensure orderly transfer of command authority into a gubernatorial veto, contrary to Congress' vesting of the mobilization decision here—unlike other provisions—in the President without regard to the Governor's consent. The district court also faulted defendants for transmitting the order through the Adjutant General, but California law authorizes the Adjutant General to act for the Governor in commanding the National Guard, and regardless, any technical flaw in transmitting the order would not justify the extraordinary injunction issued by the district court.

Finally, the balancing of harms weighs overwhelmingly in favor of a stay pending appeal. Deployment of the National Guard has been critical to the protection of federal property and personnel, including officials enforcing civil and

criminal immigration laws and laws protecting federal property and personnel, in the face of ongoing rioting and violence in the Los Angeles area. As the government's supplemental declarations make clear, violent riots designed to interfere with federal immigration operations continue.

## ARGUMENT

### A.  The federal government is likely to prevail on the merits.

The Constitution and Congress have vested in the President the decision to call up the National Guard to protect federal personnel and federal property. Here, the President exercised his authority consistent with those authorities.[1] And contrary to plaintiffs' half-hearted suggestion otherwise, Opp.8-9, this Court has appellate jurisdiction to review the district court's order. Mot.10-11.

**1.** The President complied with the substantive requirements of Section 12406. First, the President reasonably determined that, "[t]o the extent that protests or acts of violence directly inhibit the execution of the laws, they constitute a form of rebellion against the authority of the Government of the United States." A250. Violent riots targeted at stopping enforcement of federal immigration law constitute "[o]pen resistance or opposition to an authority or tradition" and "[d]isobedience of a legal command or summons." *Rebellion*, Black's Law Dictionary (12th ed. 2024). At a minimum, the violence creates a "danger" of such a rebellion, which is all that Section

---

[1] The district court did not reach plaintiffs' Posse Comitatus Act argument, A289, plaintiffs do not renew it here, and in any event it fails. Mot.18-19.

12406(2) requires. Plaintiffs' and the district court's narrower construction of "rebellion"—under which nothing short of an "uprising against the government as a whole," *i.e.*, a national revolution, would suffice, A280; Opp.11—is ahistorical and would disable the President from suppressing violent opposition to federal law enforcement.

Congress plainly used "rebellion" in its broader sense when it enacted the statutory antecedent to Section 12406 during the early-20th-century reforms that created the National Guard. *See* Act of Jan. 21, 1903, ch. 196, § 4, 32 Stat. 776 (authorizing the President to call forth state militias in response to "rebellion against the authority of the Government of the United States"). Otherwise, the statute would not encompass numerous instances in which the President has called up the militia to address open defiance of federal authority in situations that fell short of efforts to overthrow the entire government.

Most famously, President Washington called up the militia to assist in suppressing the Whiskey Rebellion—a violent protest against the collection of a federal excise tax. See, *e.g.*, Cong. Research Serv., *The Posse Comitatus Act and Related Matters: The Use of the Military to Execute Civilian Law*, R42659, at 8 (Nov. 6, 2018). And there are countless other civil disorders that members of the militia and other federal military forces have been called up to address, including use of the activated National Guard in the 1960s in the face of resistance to enforcement of federal civil rights laws. *See id.* at 9-23, 34-42. Neither the district court nor the plaintiffs square their cramped

4

interpretation of "rebellion" with this 200-year history of using militia and National Guard forces to quell domestic upheavals.

Second, the President's action under Section 12406 was independently warranted under Section 12406(3), which authorizes the President to call up the Guard when he is "unable with the regular forces to execute the laws of the United States."  Again, the district court and plaintiffs offer an implausibly narrow reading of statutory text, under which the statute does not apply so long as some amount of execution of the laws remains possible, no matter how impaired that execution may be and how much danger is faced by regular law-enforcement officials.  Plaintiffs and the district court point to the 1970 Postal Service strike, A283; Opp.14, but that recent event does not establish the statute's outer boundaries.  Moreover, it is not clear that that strike would even satisfy plaintiffs' excessively narrow interpretation:  it was initially localized, some postal employees continued to work, and some mail service continued.  *See* "The Strike That Stunned the Country," *TIME* (Mar. 30, 1970), https://apwu.org/sites/apwu/files/resource-files/update09-2007-031907-iretdoc.pdf.

Section 12406(3) is better read to authorize the President to call up the National Guard when he is unable to ensure to his satisfaction the faithful execution of federal laws by the federal officers who regularly enforce them, without undue harm or risk to officers.  The previous instances in which Presidents have called up the militia support the common-sense conclusion that an inability to maintain law and order in the ordinary course as federal agents try to do their jobs represents a

breakdown in the "execution of the laws." *See supra* pp. 4-5. At a minimum, the statute applies where the impediments to execution of federal law are as substantial as they clearly are.

Contrary to plaintiffs' suggestion (Opp.12-14), the situation in Los Angeles is far from ordinary civil unrest being adequately addressed by local law enforcement. Federal officials have been specifically targeted and subjected to periods of sustained violence aimed at preventing them from executing federal immigration laws. For more than a week, violent mobs have besieged federal facilities, assaulted and "pinned down" federal officers, thrown "concrete chunks" and other dangerous objects at them, used "commercial dumpsters" as "battering ram[s]" to breach federal buildings, engaged in "seven hours of non-stop fighting" with federal officials, repeatedly fired potentially lethal "commercial-grade" and "mortar-style" fireworks at officers, set fire to vehicles and propane tanks, and injured "[n]umerous federal officers and agents" including shattering the wrist of a CBP officer. A238-45 ¶¶ 7-28. And local law enforcement has been incapable of addressing the threat. *See* A241-46 ¶¶ 16, 21, 26, 33.

In all events, Congress vested the decision whether to mobilize the Guard in the President, not the courts, as the Supreme Court recognized 200 years ago in *Martin v. Mott*, 25 U.S. (12 Wheat.) 19 (1827). There, the Court refused to second-guess President Madison's assessment of a threat that in his view warranted activating the state militia into federal service, explaining that "the authority to decide whether

6

the exigency has arisen[] belongs exclusively to the President." *Id.* at 30. Neither plaintiffs nor the district court succeed in distinguishing *Martin*. It cannot be that a statute's conferral of discretion in the President depends on the identity of the plaintiff, or the nature of the circumstances in which it is invoked. *Contra* A275 n.5; Opp.19-20. Nor does the existence of statutory criteria for activating the National Guard—present also in *Martin*—empower a court to second-guess the President's determination. Finally, the Supreme Court has repeatedly reaffirmed the central premise of *Martin*. *See Dalton v. Specter*, 511 U.S. 462, 476 (1994) ("How the President chooses to exercise the discretion Congress has granted him is not a matter for [judicial] review.").

**2.** The President also acted lawfully in the processes used to federalize the California National Guard. Section 12406 first establishes the President's unilateral authority to "call into Federal service members and units of the National Guard of any State . . . ." It then states that "[o]rders for these purposes shall be issued through the governors of the States." Orders are thus issued *by* the President, and conveyed *through* Governors. Defendants complied with that provision when the Secretary of Defense transmitted the President's order to the California Adjutant General, the chief of staff to the Governor and commander of state military forces. *See* Cal. Mil. & Vet. Code § 160. The Adjutant General, in turn, relinquished command of the requested National Guard units to the federal commander. *See* A12 ¶ 61.

Plaintiffs do not dispute that the Governor knew about the order. *See* A120

7

(statement about June 7 mobilization); A178 (acknowledging Governor's office was notified of June 9 order). Instead, plaintiffs protest that the President did not consult with the Governor. Opp.15-16; *cf.* A285-86. But nothing in Section 12406 imposes a consultation requirement. When a military commander issues an order "through" a third party, that is not an invitation for the third party to debate the merits of the order with the commander.

This plain-text, common-sense interpretation does not render Section 12406's procedural requirement "inoperative" or "superfluous." Opp.16. Rather, it reflects the dual control of the Guard and ensures that command and control is properly transferred. Mot.3-4, 16. Section 12406's procedure guarantees that the state commander in chief has notice of the federalization order and eliminates any command confusion.

Plaintiffs are likewise incorrect that the Governor himself—and not the Adjutant General—needed to transmit the order to the Guard units. The Adjutant General is the commander of all state military forces and is authorized to "issue all orders in the name of the Governor." Cal. Mil. & Vet. Code §§ 160, 163. California law thus delegates the Governor's authority over the National Guard to the Adjutant General, who then issues orders on the Governor's behalf. And nothing in Section 12406 suggests that Congress required the President to ignore that state-law delegation, contrary to the longstanding presumption that "as far as delegation to subordinates is concerned, express statutory authority for delegation is not required."

8

*Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. U.S. Dep't of Homeland Sec.*, 107 F.4th 1064, 1076 (9th Cir. 2024) (cleaned up).[2]

Finally, even if transmission to the Adjutant General were insufficient under Section 12406, the district court's order would still be unsound. The duty to issue the order is mandatory, not discretionary. Plaintiffs' suggestion that the order is not legally effective unless issued directly by the Governor, Opp.15 (and their implicit suggestion that the Governor was not required to do so), would effectively give the Governor a veto, contrary to Section 12406's text and in contradistinction to other statutes that expressly require gubernatorial consent. Mot.17. It is undisputed that the Governor became aware of the order; even if it reached him only indirectly, he was obligated to comply and to mobilize the National Guard. And any procedural shortcoming of this sort cannot justify an injunction given defendants' overriding interest in protecting federal personnel and property. *See* Mot.21.

**3.** The call-up orders are also consistent with the Tenth Amendment. The district court correctly acknowledged that plaintiffs' Tenth Amendment claim is derivative of their procedural claim to the extent it asserts that the President failed to

---

[2] Section's 12406's reference to the "commanding general of the National Guard of the District of Columbia" is irrelevant. It simply accounts for the fact that the District of Columbia has no governor and the District of Columbia National Guard, unlike state national guards, is always under federal command even acting as a militia. *See* D.C. Code 49-409.

comply with Section 12406. A289. That claim accordingly fails for the same reasons. *See supra* pp. 3-9.

Plaintiffs do not defend the district court's conclusion that the orders "conflict with California's police power" even if properly issued under Section 12406. A289-90. Nor can they. Contrary to plaintiffs' suggestion (Opp.1, 23), the federalized National Guardsmen are not enforcing civil immigration laws. They are "protect[ing] ICE and other United States Government personnel who are performing Federal functions, including the enforcement of Federal law," and "protect[ing] Federal property, at locations where protests against these functions are occurring or are likely to occur." Presidential Memo, A250; *see also* Knell Decl., A259 ¶ 7; Decl. of Major Gen. Scott M. Sherman, SA10-11, ¶¶ 7-8.[3] And the district court properly acknowledged that "federal authority extends to protecting legitimate federal interests, such as protecting federal personnel and facilities." A290; *see* Mot.12. The unavailability of the federalized Guardsmen for state duties necessarily results from the statute's operation. Mot.18-19.

### B. The remaining factors support a stay.

The balancing of harms overwhelmingly favors a stay. The federal government detailed the significant violence targeted at federal officials carrying out immigration enforcement operations, as well as federal property. As explained in the supplemental

---

[3] "SA" refers to the supplemental addendum accompanying this reply.

declaration from Ernesto Santacruz, SA1-7, those violent protests at federal facilities have continued. On June 14, over 1,000 people gathered outside 300 North Los Angeles Federal Building and Edward R. Roybal Federal Building and U.S. Courthouse, and members of the crowd assaulted federal law enforcement officers with rocks, bricks, bottles, and commercial-grade fireworks. Protestors blocked an exit from the parking garage, preventing ICE transport vehicles from exiting with approximately 130 federal detainees. "The National Guard cleared a path for several unmarked vans to remove the detainees in small groups" and was "key to maintaining operations." SA4 ¶ 8.

More generally, the National Guard has been instrumental in "acting as a security element" during immigration enforcement operations, "accompanying federal officers and agents during operations to ensure safety of all involved." SA4 ¶ 7. Additionally, "[t]he National Guard has been protecting the entire perimeter of the federal complex all week, as protestors are gathered throughout the area continuously." SA4 ¶ 8. Enjoining the National Guard deployment, and pulling Guardsmen from the area, would pose a substantial risk to federal personnel and property, as well as to federal officials' ability to enforce federal law.

The district court posited that "[f]ederal agents and property may actually well be served by de-militarization and a concurring de-escalation of the situation." A295. But the district court cannot second-guess the President's judgment about how best to quell the violent opposition to federal enforcement of immigration laws, which was

11

clearly the impetus for the deployment of the National Guard and not vice versa. The district court also cited the harm to the Governor's control over the National Guard, A294, but that assumes erroneously that the Governor must consent to deployment. And the district court noted that mobilized California National Guard members would not be available to carry out other important functions, A293, but the plaintiffs provided no record evidence—and the district court did not cite any—of concrete adverse impacts to active state operations.

## CONCLUSION

The Court should stay the district court's order pending appeal.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE

*/s/ Anna O. Mohan*
ANNA O. MOHAN
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7517*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-2689*
  *Sharon.swingle@usdoj.gov*

June 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) and Local Rules 27-1(d) and 32-3 because it contains 2,769 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Anna O. Mohan*
ANNA O. MOHAN

**SUPPLEMENTAL ADDENDUM**

## TABLE OF CONTENTS

Declaration of Ernesto Santacruz, Jr. (June 15, 2025) ..................................................SA1

Declaration of Major General Scott M. Sherman (June 15, 2025) .............................SA8

## IN THE NINTH CIRCUIT COURT OF APPEALS

| | |
|---|---|
| GAVIN NEWSOM, IN HIS OFFICIAL CAPACITY AS THE GOVERNOR OF THE STATE OF CALIFORNIA; STATE OF CALIFORNIA, | Appeal No. 25-3727 |
| | **DECLARATION OF ERNESTO SANTACRUZ, JR.** |
| Plaintiffs, | |
| v. | |
| DONALD TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; PETE HEGSETH, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF DEFENSE; U.S. DEPARTMENT OF DEFENSE, | |
| Defendants. | |

## DECLARATION OF ERNESTO SANTACRUZ, JR.

I, Ernesto Santacruz, Jr., hereby declare:

1.     I am employed by the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) as the Field Office Director (FOD) of the Los Angeles Field Office (ERO Los Angeles). I have held this position since April 6, 2025.

2.     The purpose of this declaration is to provide an update on the current conditions on the ground in the Los Angeles Area of Responsibility (AOR) with respect to immigration enforcement operations and the security of federal property and personnel. This declaration supplements the information in my June 11, 2025

declaration filed with the Defendants' Opposition to Plaintiffs' Motion for a
Temporary Restraining Order. *See Newsom v. Trump*, No. 25-4870 (N.D. Cal. filed
June 11, 2025), Dkt. 22-1.

3.      It is my understanding that, at this time, approximately 3,000 Department of
Defense personnel, which includes approximately 2,000 members of the California
National Guard, are in the Los Angeles area providing protection of federal
personnel, property, and functions.

4.      The 300 North Los Angeles Street Federal Building in downtown Los
Angeles, California continues to be the site of daily protests, and it has been closed
to the public since June 9, 2025. While the facility is largely non-operational,
members of the National Guard have been essential to protect the building, the
Edward R. Roybal Federal Building and U.S. Courthouse, and the Federal Bureau
of Prisons Metropolitan Detention Center - all located in the same city block - from
further damage or attempts at incursion and provide security to those federal
employees working inside, like myself.

5.      Prior to the National Guard's deployment, rioters and protestors assaulted
federal, state, and local law enforcement officers with rocks, fireworks, and other
objects. They also damaged federal property by spray painting death threats to
federal law enforcement officers. Photos and videos for those assaults and
threatening graffiti can be found here: https://www.dhs.gov/news/2025/06/10/dhs-

sets-record-straight-la-riots-condemns-violence-against-law-enforcement (last

visited June 15, 2025). Several suspects have been arrested for possessing Molotov

cocktails and assaulting federal officers during recent civil unrests in downtown

Los Angeles, Paramount, and Santa Ana. *See*

https://www.nbclosangeles.com/news/local/molotov-cocktail-attacks-la-

paramount-protests/3721306/ (last visited on June 15, 2025).

6.      It is my understanding that federal facilities in Westwood, Santa Ana, Long

Beach, and other locations in California have been the site of continuing violent

protests during the last week. For example, on June 14, 2025, the Los Angeles

Police Department declared an unlawful assembly outside 300 North Los Angeles

Federal Building and Edward R. Roybal Federal Building and U.S. Courthouse

after violent opportunists in the crowd of over 1,000 people began assaulting law

enforcement officers with rocks, bricks, bottles, fireworks, and other objects.

"Officers Deploy Tear Gas, Rubber Bullets to Clear Protestors in Downtown Los

Angeles", available at:https://ktla.com/news/local-news/no-kings-protestors-

ordered-to-disperse-tear-gassed-in-downtown-los-angeles/ (last visited June 15,

2025). One suspect was taken into custody after spitting on a Federal Protective

Service (FPS) officer and National Guard members. Protestors also threw red paint

on FPS and National Guard members.

7.     The National Guard has been absolutely helpful this week by protecting federal property and personnel during immigration enforcement operations. Through their protective efforts, the guards have assisted on most operations that ICE and its federal partners conducted this week. The guards are acting as a security element, accompanying federal officers and agents during operations to ensure safety of all involved.

8.     On Saturday, June 14th, the protests at the 300 N. Los Angeles Federal Building continued throughout the day. The National Guard has been protecting the entire perimeter of the federal complex all week, as protestors are gathered throughout the area continuously. Protestors blocked the parking garage exits on Alameda Street, preventing ICE transport vehicles from exiting with approximately 130 immigration detainees. As the protests grew, ICE was forced to not utilize the U.S. Marshall's transport bus as originally intended. The National Guard cleared a path for several unmarked vans to remove the detainees in small groups. The National Guard's assistance was key to protecting ICE officials' ability to continue these immigration enforcement operations.

9.     Having the National Guard at our fingertips as a Quick Reaction Force is key to maintaining officer safety and continuing our immigration enforcement operations. The resources that they bring to protect federal immigration officials from interference in their enforcement efforts and their presence at federal facilities

4

**SA4**

is the key to continuing operations and enforcing federal law in the Los Angeles area.

10.    The guard's presence prevented other incidents like the one in Paramount last Saturday, discussed in my prior declaration. There, an unruly mob attacked ERO and U.S. Customs and Border Protection (CBP) officers, engaging them in an hours-long fight while the local law enforcement did not intervene for several hours. I believe that the guard's presence since their deployment to Los Angeles has prevented this from reoccurring during our subsequent immigration enforcement operations and has been critical to maintaining the safety of all law enforcement officers involved.

11.    The National Guard has a Quick Reaction Force that is now a critical resource available to us, should something like June 6th incident at the federal building in downtown Los Angeles, or the incident in Paramount, take place in the future.

12.    The presence of the National Guard and other Department of Defense personnel has enabled ICE to continue to carry out its congressionally mandated duties in the Los Angeles area. It is the additional manpower and resources provided by these guards – indeed, their mere presence – that has ensured the safety of local federal facilities and the safety of those enforcing federal laws here this week.

13.     If these resources were not at my disposal, our immigration enforcement mission would be greatly impacted.  The safety of our continued operations would be in doubt, placing both federal employees and the general public at an unnecessarily greater risk.

14.     The National Guard, with approximately 900 troops assigned to protect federal buildings, has also been instrumental in enhancing the ability to protect federal property from damage or breach attempts.

15.     Our local law enforcement colleagues, including the Los Angeles Police Department (LAPD), Los Angeles County Sheriff's Department (LASD), and California Highway Patrol (CHP), have all engaged in taxing law enforcement activities throughout the week, with the assistance of their mutual aid network. But the National Guard provides resources and protective capabilities that are unparalleled.

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed on this 15th day of June 2025.

ERNESTO M SANTACRUZ JR
Digitally signed by ERNESTO M SANTACRUZ JR
Date: 2025.06.15 17:32:06 -07'00'

Ernesto Santacruz, Jr.
Field Office Director
DHS ICE ERO Los Angeles

**IN THE UNITED STATES COURT**
**OF APPEALS FOR THE NINTH CIRCUIT**

GAVIN NEWSOM, et al.           )
                                    )
      *Plaintiffs-Appellees,*    )
                                    )     No. 25-3727
      v.                    )
                                    )
DONALD TRUMP, et al.          )
                                    )
      *Defendant-Appellants*    )

_____

DECLARATION OF MAJOR GENERAL SCOTT M. SHERMAN

I, Major General Scott M. Sherman, hereby state and declare as follows:

1.      I am currently employed by the United States Army as the Commanding General of Task Force 51 and the Deputy Commanding General for the United States Army North Command (ARNORTH). ARNORTH is a component of the United States Army Northern Command (USNORTHCOM). I have held the position of Deputy Commanding General of ARNORTH since August 2023 and serve as the Commanding General of Task Force 51 since that time when the Task Force forms as a command. I have served as a commissioned Army Officer for more than 33 years. My current responsibilities include serving as a principal deputy commander and overseeing the logistical, administrative, and sustainment operations of ARNORTH as well as ensuring the training, discipline, and readiness of the units under ARNORTH's command. I have reviewed the Complaint in the matter of *Gavin Newsom, et al. v. Donald Trump, et al.*, Case No. 3:25-CV-04870 (N.D. Cal.). This declaration is based on my personal knowledge, as well as information made available to me during the routine execution of my official duties.

2.      On June 7, 2025, the President of the United States issued a memorandum with the subject "Department of Defense (DoD) Security for the Protection of Department of Homeland

Security (DHS) Functions." The memorandum noted that "[n]umerous incidents of violence and disorder have recently occurred and threaten to continue in response to the enforcement of Federal law by U.S. Immigration and Customs Enforcement (ICE) and other United States Government personnel who are performing Federal functions and supporting the faithful execution of Federal immigration laws. In addition, violent protests threaten the security of and significant damage to Federal immigration detention facilities and other Federal property." The memorandum directed members of the National Guard into federal service "to temporarily protect ICE and other United States Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property." It further directed the Secretary of Defense to call *at least* 2,000 National Guard personnel into service for 60 days, subject to change at his discretion. It also further delegated to the Secretary of Defense the authority to utilize the regular forces to assist with this mission. The Secretary of Defense issued guidance accordingly that same day. The following day, the Secretary authorized the activation of the 2nd Battalion, 7th Marine Regiment, 1st Marine Division (2/7 USMC).

3.      The Chief of the National Guard Bureau transmitted the Secretary of Defense's orders on Saturday, June 7, to the Adjutant General of the California National Guard. At 10:17am Pacific Standard Time, the California Adjutant General responded, "consider our forces mobilized."

4.      USNORTHCOM is one of DoD's eleven unified combatant commands. Its mission is to provide command and control of the DoD homeland defense efforts and to coordinate defense support of civil authorities. ARNORTH supports USNORTHCOM in its mission.

5.      When federalized, members of the State National Guard serve pursuant to Title 10 of the United States Code under the command of the President and the Secretary of Defense. In this case, the Secretary of Defense authorized USNORTHCOM to execute command and control of

mobilized and federalized members of the California National Guard as well as 2/7 USMC. On June 8, 2025, USNORTHCOM further delegated operational control of the federalized National Guard forces and on June 11, 2025, tactical control of Marine forces to ARNORTH. These command and control authorities were further delegated to Task Force 51 on June 12, 2025. On June 11, 2025, I assumed command of Task Force 51, ARNORTH's Contingency Command Post, which provides a rapidly deployable capacity to partner with civilian authorities and DoD entities in response to Homeland Defense and Homeland Security Operations. Task Force 51 oversees the assignments and tasking for the federalized members of the National Guard as well as the 2/7 USMC. On June 14, 2025, Task Force 51 was delegated operational control of the federalized National Guard 49th Military Police Brigade.

6. Following the President's June 7, 2025 directive, ARNORTH published Operational Order (OPORD) 01-23 and Fragmentary Order (FRAGORD) 25-501.000 to direct federalized members of California National Guard and members of the 2/7 USMC to temporarily protect federal property, as well as Immigration and Customs Enforcement (ICE) Officers and other U.S. Government personnel who are performing federal functions, where protests are occurring in Los Angeles County, California.

7. Since Saturday, June 7, federalized California National Guard personnel have conducted operations in Los Angeles consistent with the directions of the President's June 7 memorandum and FRAGORD 25-501.000. Task Force 51 receives requests for assistance from Federal Government agents and agencies related to protection of federal personnel performing official functions, as well as requests for protection duties such as fixed observation posts, perimeter security of federal property, and escorts for Government personnel conducting federal law enforcement duties. Task Force 51 reviews the requests for compliance with the President's

June 7 memorandum and directives from higher headquarters. Upon approval, Task Force 51 assigns trained personnel in accordance with those directives. All Title 10 personnel activities are limited to protective functions. Title 10 personnel are not performing law enforcement or any other functions.

8.      As of June 14, 2025, TF-51 is composed of 4155 California National Guard members in a Title 10 status, 821 Active-Duty United States Marines, and approximately 382 vehicles. Members of the 79th Infantry Brigade Combat Team and the 2/7 USMC have conducted or are currently conducting the following protection operations (members of the 49thMilitary Police Brigade have joined the task force but are not yet conducting any missions):

A.  Federalized National Guard members are providing installation protection by establishing outside perimeters, observation posts, and presence patrols for federal property at locations targeted by protests, including the Edward R. Royball Federal Building and Courthouse (Royball Complex), the Wilshire Federal Building; an ICE facility in the city of Paramount; Santa Ana Civic Center, and other locations where the Federal Government has a presence and carries out its Federal functions.

B.  Federalized National Guard members are providing personnel protection for ICE Officers, Customs and Border Protection (CBP) Officers, Homeland Security Investigation (HSI) Special Agents, and Federal Bureau of Investigation (FBI) Special Agents, who are conducting operations throughout the Los Angeles County area. Protection is provided to enable Federal Law Enforcement officers to conduct their Federal functions safely and with minimal interference from bystanders.

C.  On June 13, 2025, after completing non-lethal training and Federal Protection Mission training, members of the 2/7 USMC assumed protection duties for the federal building located on Wilshire Boulevard (Royball Complex).

D.  Federalized members of the National Guard have not detained any individuals, though one individual was detained by an active-duty United States Marine when the individual attempted to enter a restricted area multiple times. The individual was advised to get off the federal property and was temporarily detained after he attempted to enter the property despite being warned to stop. The individual was placed in flexi-cuffs and turned over to the Los Angeles Police Department as soon as they arrived a few minutes later.

E.  There has been one reported injury to a service member when a protester grabbed and pulled on the protective shield the Soldier was holding. When the Soldier pulled on the shield and the protester let go, the shield struck the Soldier in the mouth chipping one of his teeth. The Soldier was taken to the dentist for urgent care and was otherwise unharmed.

MAJOR GENERAL SCOTT M. SHERMAN
COMMANDING GENERAL
JOINT TASK FORCE 51