No. 25-3727

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

GAVIN NEWSOM, *in his official capacity as Governor of the State of California*;
STATE OF CALIFORNIA,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, *in his official capacity as President of the United States*;
PETER HEGSETH, *in his official capacity as Secretary of the Department of Defense*;
UNITED STATES DEPARTMENT OF DEFENSE,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of California

### GOVERNMENT'S RESPONSE TO COURT'S ORDER OF JULY 11, 2025

BRETT A. SHUMATE
   *Assistant Attorney General*

ERIC D. McARTHUR
   *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
ANNA O. MOHAN
STEVEN A. MYERS
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7232*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 305-8648*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................1

STATEMENT .....................................................................................................3

ARGUMENT .................................................................................................... 10

CONCLUSION ................................................................................................. 18

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Atonio v. Wards Cove Packing Co.,*
    810 F.2d 1477 (9th Cir. 1987) ...................................................................... 2, 10

*Castro v. United States,*
    540 U.S. 375 (2003) ................................................................................................ 2

*Martin v. Mott,*
    25 U.S. (12 Wheat) 19 (1827) ................................................................... 8, 11

*Parker Drilling Mgmt. Servs., Ltd. v. Newton,*
    587 U.S. 601 (2019) ............................................................................................ 13

*Perpich v. Department of Def.,*
    496 U.S. 334 (1990) .............................................................................................. 3

*Service Emps. Int'l Union v. National Union of Healthcare Workers,*
    598 F.3d 1061 (9th Cir. 2010) ........................................................................... 8

*United States v. Sineneng-Smith,*
    590 U.S. 371 (2020) ....................................................................................... 2, 17

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ................................................................................................ 16

**U.S. Constitution:**

Art. I, § 8 .................................................................................................................... 3

Art. II, § 2, cl. 1 ....................................................................................................... 3

**Statutes:**

10 U.S.C. § 10106 .................................................................................................... 3

10 U.S.C. § 12301(d) ............................................................................................. 15

10 U.S.C. § 12406 ....................................................................................... 3, 11, 14

10 U.S.C. § 12406(2)-(3) ......................................................................................... 3

10 U.S.C. § 12406(3) ....................................................................................... 1, 11

Cal. Mil. & Vet. Code § 160 ................................................................... 9, 14

Cal. Mil. & Vet. Code § 163 ................................................................... 9, 14

**Rule:**

Fed. R. App. P. 40(a) .............................................................................. 10

**Other Authorities:**

Emma Colton & John Roberts, *Trump Brings Receipts He Called Newsom
    Amid LA Riots as California Gov Claims There Wasn't 'Even a Voicemail'*,
    Fox News (June 10, 2025, at 16:15 ET), https://perma.cc/Z25U-GD5X ...............5

Josh DuBose, *'That Can Kill You': L.A. Police Attacked with Fireworks,
    Rocks, Molotov Cocktails*, KTLA (June 8, 2025, at 22:49 PT),
    https://ktla.com/news/local-news/that-can-kill-you-l-a-police-
    attacked-with-fireworks-rocks-molotov-cocktails/ ........................................6

Jennifer K. Elsea, Cong. Rsch. Serv., R42659, *The Posse Comitatus Act and
    Related Matters: The Use of the Military to Execute Civilian Law* (2018) ............14

Governor Gavin Newsom, *Watch: Governor Newsom Discusses 'Donald Trump's
    Mess' in Los Angeles* (June 9, 2025), https://perma.cc/6W95-2DZQ............5

Shawn Hubler, *Trump Releases About Half of the National Guard Troops in
    Los Angeles*, N.Y. Times, July 15, 2025, https://www.nytimes.com/
    2025/07/15/us/national-guard-los-angeles-trump.html ............................11

Michele McPhee, *LAPD Chief Jim McDonnell Says, 'Violence I Have Seen
    Is Disgusting,' Recounting Attacks on Cops*, L.A. Magazine (June 8, 2025),
    https://lamag.com/news/lapd-chief-jim-mcdonnell-says-violence-i-
    have-seen-is-disgusting-recounting-attacks-on-cops ......................................6

## INTRODUCTION

This case is a challenge by the State of California to the President's order federalizing several thousand members of the California National Guard to protect federal personnel and property from violent mobs. Among other things, those mobs attacked federal officers with Molotov cocktails and commercial-grade fireworks, threw concrete chunks at federal officers, and used dumpsters to create a makeshift battering ram to breach a federal building—all in an attempt to interfere with federal agents' execution of federal law. After the district court entered an injunction requiring control of the guardsmen to be returned to state authorities, a unanimous panel of this Court (Bennett, Miller, Sung, JJ.) issued a lengthy and considered order staying the injunction pending appeal. *See* Order, June 19, 2025 (Stay.Order). California did not seek rehearing en banc, and the Court entered a briefing schedule pursuant to which the government will file its opening brief on Tuesday. *See* Order, June 24, 2025.

More than three weeks after the panel stayed the injunction, the Court sua sponte directed the parties to submit supplemental briefs "setting forth their respective positions on whether this case should be reheard en banc." Order, July 11, 2025. As set out below, there is no basis for rehearing. As the unanimous stay decision confirms, federal law permits the President to deploy the National Guard "[w]henever … the President is unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(3). The panel correctly concluded that violent

mobs' obstruction of federal officials likely justified the President's invocation of this statute, particularly given the appropriately deferential standard of review. The panel was also correct that the President likely complied with Section 12406's requirement that deployment orders be issued "through the governor[]" because the President's order was transmitted to the California Adjutant General, and in any event any harmless procedural error would not limit the President's authority to call up the Guard or justify the district court's extraordinary injunctive relief. Finally, the panel correctly held that the equities favored the government because the concrete injuries to federal personnel and property outweighed plaintiffs' speculative fears of inflamed tensions or diversion of state resources.

Were there any doubt that rehearing is unwarranted, it is resolved by California's failure to request it in the weeks since the panel's stay ruling. En banc review is "extraordinary," *Atonio v. Wards Cove Packing Co.*, 810 F.2d 1477, 1479 (9th Cir. 1987) (en banc) (quotation omitted), and en banc review of interlocutory stay decisions is even more unusual. "[O]ur system 'is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief.'" *United States v. Sineneng-Smith*, 590 U.S. 371, 375-76 (2020) (quoting *Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in the judgment)). California's own litigation decisions confirm that rehearing en banc is unwarranted.

2

## STATEMENT

1.     The Constitution authorizes Congress both to raise and support a national Army and to organize "the Militia."  *See* U.S. Const. art. I, § 8.  Exercising that authority, Congress has "created the National Guard of the United States, a federal organization comprised of state national guard units and their members." *Perpich v. Department of Def.*, 496 U.S. 334, 338 (1990) (quotation omitted).  Once ordered into federal service, "members of the National Guard … lose their status as members of the state militia during their period of active duty," *id.* at 347, become federal soldiers, 10 U.S.C. § 10106, and serve under the President as Commander in Chief, *see* U.S. Const. art. II, § 2, cl. 1.

Congress has granted the President several authorities under which he may call the National Guard into federal service, including 10 U.S.C. § 12406.  That statute provides, in relevant part, that "[w]henever" "there is a rebellion or danger of a rebellion against the authority of the Government of the United States"; or "the President is unable with the regular forces to execute the laws of the United States; the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to … suppress the rebellion, or execute those laws."  10 U.S.C. § 12406(2)-(3).  Section 12406 also requires, as relevant here, that "[o]rders for these purposes shall be issued through the governors of the States."  *Id.* § 12406.

3

**2.** On Friday, June 6, 2025, officers from Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) conducted federal immigration enforcement operations in Los Angeles. *See* A238 ¶ 7.[1] A group of protestors sought to obstruct ICE officials by throwing objects at ICE vehicles, and several individuals were arrested and brought to ERO's federal facility in downtown Los Angeles. *Id.*

Around 5:00 pm that evening, a crowd began to gather at the ERO facility. A239 ¶ 9. The crowd turned violent and protests spread, threatening several federal facilities and other public buildings. A239 ¶¶ 9-10. Protestors threw "concrete chunks, bottles of liquid, and other objects" at Federal Protective Service officers. A240 ¶ 11. The officers were "pinned down in a defensive position by protesters and severely outnumbered," while rioters attempted "to use large rolling commercial dumpsters as a battering ram" to violently "break open the garage gate and break into the federal building." A239-40 ¶ 11.

ICE and Homeland Security Investigations officers responded to support the officers and attempted to use non-lethal force to disperse the crowd. A240 ¶ 13. The federal officers managed to prevent a breach of the facility, but it took Los Angeles Police Department (LAPD) officers nearly an hour and a half to arrive and assist the federal officers. *Id.* Meanwhile, the protests turned extremely violent; demonstrators

---

[1] Citations to "A" are to the addendum accompanying the federal government's stay motion.

"us[ed] chairs, dumpsters, and other items as weapons against federal law enforcement officers."  A241 ¶ 14.  Once on scene, LAPD declared an "unlawful assembly" and ordered protesters to disperse, but many protestors began attacking LAPD officers, and the scene was not cleared for several hours, leaving extensive damage to multiple federal buildings.  A241 ¶¶ 16-17 (quotation omitted).

That night, President Trump spoke with Governor Newsom to inform the Governor of the dangers to federal personnel and property and urge him to take action to stop the violence.[2]  The next day, violence intensified.  On Saturday morning, large crowds congregated around a Homeland Security Investigations office as officers prepared for another enforcement operation.  A242 ¶ 18.  The crowd blocked traffic and began to attack ERO and Customs and Border Protection (CBP) officers, causing hours of fighting between federal officials and protesters.  A242 ¶ 20. The crowd surrounded an ERO officer's vehicle, pounding on the car and pummeling it with stones.  A243 ¶ 20.  Protestors boxed in federal officers, launching mortar-style fireworks with multiple explosions and throwing various objects, shattering the wrist of a CBP officer.  A242-43 ¶ 20.  The perimeter fence of the federal building was breached, and several vehicles were damaged.  A243 ¶ 21.

_____

[2] Emma Colton & John Roberts, *Trump Brings Receipts He Called Newsom Amid LA Riots as California Gov Claims There Wasn't 'Even a Voicemail'*, Fox News (June 10, 2025, at 16:15 ET), https://perma.cc/Z25U-GD5X; *see also* Governor Gavin Newsom, *Watch: Governor Newsom Discusses 'Donald Trump's Mess' in Los Angeles* (June 9, 2025), https://perma.cc/6W95-2DZQ.

Protests continued in the following days. *See* A244 ¶ 24. Protesters burned dumpsters and launched commercial-grade fireworks at federal officers. A244 ¶ 26. Federal and state buildings were damaged, and the federal building security checkpoint was left in ruins. A244 ¶¶ 26-27. Officers were injured. A244 ¶ 27. At a press conference, LAPD Chief Jim McDonnell admitted that the LAPD had been "overwhelmed," lamented that "things have gotten out of control," and added that "somebody could easily be killed."[3]

**3.** On June 7, the President signed a memorandum calling into federal service at least 2,000 members of the California National Guard to protect federal personnel and property. A250-51. The President found that "[n]umerous incidents of violence and disorder have recently occurred and threaten to continue" in response to ICE and other government officials' enforcement of federal law. A250. "In addition, violent protests threaten the security of and significant damage to Federal immigration detention facilities and other Federal property." A250. The President determined that protests and acts of violence that "directly inhibit the execution of the laws … constitute a form of rebellion against the authority of the Government of

_____

[3] Josh DuBose, *'That Can Kill You': L.A. Police Attacked with Fireworks, Rocks, Molotov Cocktails*, KTLA (June 8, 2025, at 22:49 PT), https://ktla.com/news/local-news/that-can-kill-you-l-a-police-attacked-with-fireworks-rocks-molotov-cocktails/; Michele McPhee, *LAPD Chief Jim McDonnell Says, 'Violence I Have Seen Is Disgusting,' Recounting Attacks on Cops*, L.A. Magazine (June 8, 2025), https://lamag.com/news/lapd-chief-jim-mcdonnell-says-violence-i-have-seen-is-disgusting-recounting-attacks-on-cops (quotation omitted).

the United States." A250. "In light of these incidents and credible threats of continued violence," the President invoked his statutory authority to mobilize the National Guard "to temporarily protect ICE and other United States Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property." A250.

The Secretary of Defense directed the California Adjutant General to effectuate the call into federal service of the National Guard. *See* A249-51. The Secretary later requested additional federalized National Guards. *See* A253-56. Since that time, National Guardsmen have been "protecting federal personnel performing official functions as well as property at designated locations through security patrols, observation posts, and outer cordon security perimeter of buildings." *See* A259 ¶ 7. "Plaintiffs presented no evidence that National Guard members were engaged in any other activities." Stay.Order 8.

**4.** The State of California and Governor Newsom filed suit and sought a temporary restraining order. After full briefing from the parties and a hearing at which both parties presented argument, the district court enjoined defendants "from deploying members of the California National Guard in Los Angeles," requiring defendants "to return control of the California National Guard to Governor Newsom." A295. Defendants appealed and sought a stay, and a panel of this Court heard oral argument before unanimously granting the government's motion on June 19. *See generally* Stay.Order.

7

The panel first found that it had appellate jurisdiction. The panel explained that the temporary restraining order "possesses the qualities of a preliminary injunction," Stay.Order 11 (quoting *Service Emps. Int'l Union v. National Union of Healthcare Workers*, 598 F.3d 1061, 1067 (9th Cir. 2010)), because "[d]efendants challenged the basis for the order" and the order "does not automatically expire," *id.* The panel further explained that the temporary restraining order "has the practical effect of a preliminary injunction" because it enjoined "[d]efendants from deploying members of the National Guard in Los Angeles and directed return of control of the National Guard to [p]laintiffs." Stay.Order 12.

On the merits, the panel held that defendants "made the required strong showing that they are likely to succeed." Stay.Order 3. The panel emphasized "[t]he history of Congress's statutory delegations of its calling forth power," and explained that cases such as *Martin v. Mott*, 25 U.S. (12 Wheat) 19 (1827), "strongly suggest that … review of the President's determinations in this context is especially deferential." Stay.Order 19; *see also* Stay.Order 22 (explaining that *Martin* requires "a great level of deference to the President's determination that a predicate condition exists"). Applying this "highly deferential standard of review," the panel held that "the President had a colorable basis for invoking [Section] 12406(3)." Stay.Order 29. The panel rejected the district court's suggestion that Section 12406(3) "requir[es] total or near total interference" with the federal government's ability to enforce the law. Stay.Order 28. And the panel noted that the federal government put forth ample

8

evidence of "protesters' interference with the ability of federal officers to execute the laws." Stay.Order 29-30.[4]

The panel also concluded that the government likely complied with Section 12406's procedural requirements. Stay.Order 30-35. "Under California law," the panel observed, "the Adjutant General 'is chief of staff to the Governor, . . . [and] the commander of all state military forces,'" Stay.Order 31 (quoting Cal. Mil. & Vet. Code § 160), and issues "all orders in the name of the Governor," *id.* (quoting Cal. Mil. & Vet. Code § 163). And it is undisputed that "California's Adjutant General received the memoranda from the Secretary of Defense, relinquished command to the federal military accordingly, and forwarded the memoranda to Governor Newsom." *Id.* In any event, any procedural violation would warrant only "injunctive relief tailored to [d]efendants' failure to issue the order through the Governor—not an injunction prohibiting the President from exercising his lawful authority to call up the National Guard." Stay.Order 34. "At most, such tailored relief would be an injunction directing the President to send the relevant memoranda directly to the Governor." *Id.*

On the remaining factors, the panel concluded that "[b]oth irreparable harm and the public interest weigh in favor of [d]efendants." Stay.Order 35. The panel

---

[4] Because Section 12406(3) was sufficient to allow the panel to conclude the federal government was likely to prevail, the panel did not reach the arguments under Section 12406(2). Stay.Order 28.

9

recognized that the federal government has "an uncontested interest in the protection of federal agents and property and the faithful execution of law," as well as a "significant interest[]" in preventing the violent attacks that had occurred before the deployment of the National Guard. Stay.Order 35, 36. Those interests outweighed any "speculative" concerns California has "about escalation and interference with local law enforcement." Stay.Order 38.

California did not seek rehearing en banc, and five days after granting the government's stay motion, the Court entered a briefing schedule pursuant to which the government will file its opening brief on Tuesday, July 22, 2025. *See* Order, June 24, 2025. Several weeks later, the Court issued an order noting that "[a] judge of this court has called for a vote to determine whether this case should be reheard en banc" and directing the parties to "file simultaneous briefs setting forth their respective positions on whether this case should be reheard en banc." Order, July 11, 2025.

## ARGUMENT

Rehearing en banc is "extraordinary," *Atonio v. Wards Cove Packing Co.*, 810 F.2d 1477, 1479 (9th Cir. 1987) (en banc) (quotation omitted), and "not favored," Fed. R. App. P. 40(a); rehearing of an interlocutory stay decision is even more unusual. The criteria governing rehearing are plainly not satisfied here: the stay decision does not

conflict with a decision of other courts in any pertinent respect,[5] and an interlocutory decision simply preserving the President's control over the armed forces hardly presents a question of exceptional importance. Beyond that, California did not seek rehearing, and merits briefing is already underway. There is accordingly no basis for rehearing en banc.[6]

**A.1.** The panel correctly concluded that the President likely did not exceed his authority in deploying the National Guard to protect federal property and personnel, and its conclusion in that regard does not conflict with the decision of any other court. Under 10 U.S.C. § 12406, Congress authorized the President to call forth members of the National Guard "[w]henever … the President is unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(3). While the panel did not accept the government's contention that the President's invocation of this statute is entirely unreviewable, at an absolute minimum *Martin* requires that

---

[5] Although the Court applied a highly deferential standard of review to the President's invocation of 10 U.S.C. § 12406(3), the government's position is that such decisions are entirely unreviewable under Supreme Court precedent. *Compare* Stay.Order 26 (rejecting argument that the President's federalization decisions are entirely unreviewable), *with Martin*, 25 U.S. (12 Wheat) at 30 (President's decision is "conclusive"). Any conflict between the Stay Order and the Supreme Court's decision in *Martin* is not a basis for further review because accepting the government's reading would only further support the stay panel's order.

[6] The Court may also take judicial notice of the fact that the Secretary recently ordered the release of nearly 2,000 members of the California National Guard. *See* Shawn Hubler, *Trump Releases About Half of the National Guard Troops in Los Angeles*, N.Y. Times, July 15, 2025, https://www.nytimes.com/2025/07/15/us/national-guard-los-angeles-trump.html.

courts "give a great level of deference to the President's determination that a predicate condition exists." Stay.Order 22; *see also, e.g.*, Stay.Order 24 (explaining that this "view of *Martin* has remained the settled understanding of the Supreme Court and among legal scholars").

The stay panel correctly concluded that the President "had a colorable basis" for determining that he was unable to execute the laws of the United States under Section 12406(3), especially given the appropriately deferential standard of review. Stay.Order 29. The President explained that "[n]umerous incidents of violence and disorder" were occurring in Los Angeles. A250. That violence was specifically targeted at federal "personnel . . . performing Federal functions and supporting the faithful execution of Federal immigration laws" and "threaten[ed] the security of and significant damage to Federal immigration detention facilities and other Federal property." A250.

As the stay panel recognized, those judgments were sufficient to invoke Section 12406(3), and they were fully supported by record evidence. A lengthy declaration submitted by the government detailed the substantial threats that federal law enforcement personnel experienced as they attempted to enforce—*i.e.*, "execute"— federal immigration laws. *See* A239-45. Beyond that, California's own declarant described protesters "engage[d] in dangerous behavior such as throwing rocks and other objects, including a Molotov Cocktail[,] at deputies[,] damaging vehicles, burning a vehicle, looting a gas station, and vandalizing property." A183-84 ¶ 9. Its

exhibits depicted images of burning or burnt cars, *see, e.g.*, A97, A143, A152, A171, A173, of demonstrators "blocking traffic on [a] busy thoroughfare," A172, and of a "massive crowd" pushing towards a barrier, A170. One article documented a crowd "mov[ing] through the city despite the area-wide dispersal order, again lighting fireworks and throwing projectiles at police vehicles driving by." A171. Another article describes how demonstrators "blocked entrances and exits to [a federal building in downtown Los Angeles]" and "attempted to physically stop ICE vehicles." A104. And a third reports that "ICE requested assistance from LAPD multiple times over the course of Friday night" but that it "took LAPD 55 minutes to respond." A173. Federal immigration authorities' ability to engage in vigorous enforcement of existing laws is plainly impeded if they must do so amid violent anarchy.

The stay panel rightly rejected the district court's suggestion that Section 12406(3) does not apply so long as any amount of execution of the laws remains possible. Section 12406(3) "does not have as a prerequisite that the President be completely precluded from executing the relevant laws of the United States in order to call members of the National Guard into federal service, nor does it suggest that activation is inappropriate so long as any continued execution of the laws is feasible." Stay.Order 28-29. To suggest otherwise would render Section 12406(3) a virtual nullity, in contravention of the "'cardinal principle' of interpretation that courts 'must give effect, if possible, to every clause and word of a statute.'" *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. 601, 611 (2019) (quotation omitted).

13

The district court's reading is also inconsistent with the history of Presidents deploying the National Guard to address violence that significantly impeded, but did not completely foreclose, the enforcement of federal law. Throughout the early years of the republic, Presidents routinely called out the National Guard to suppress opposition to federal revenue laws. Jennifer K. Elsea, Cong. Rsch. Serv., R42659, *The Posse Comitatus Act and Related Matters: The Use of the Military to Execute Civilian Law* 9-10 (2018). In the late 1800s and early 1900s, states frequently requested assistance from federal troops to address violence stemming from labor disputes. *See id.* at 13-14, 35-37. And Presidents Eisenhower and Johnson used the federalized National Guard to ensure the enforcement of federal civil rights laws and to protect civil rights advocates in the 1950s and 1960s. *See id.* at 37-38.

**2.** The stay panel also correctly held that the President likely complied with Section 12406's requirement that federalization orders "be issued through the governors of the States." 10 U.S.C. § 12406. Section 12406 "requires that the President's order be issued *through* the Governor, not *directly by* the Governor." Stay.Order 31. And here "the federalization order was issued through an agent of the Governor in the Governor's name." *Id.* Specifically, the order was transmitted through the Adjutant General, who, under California law, "is chief of staff to the Governor, . . . is the commander of all state military forces," *id.* (quoting Cal. Mil. & Vet. Code § 160), and issues "all orders in the name of the Governor," *id.* (quoting Cal. Mil. & Vet. Code § 163). State law thus empowers the Adjutant General to act

14

on behalf of the Governor for purposes of issuing the President's order. "Nothing in [Section] 12406 prevents the State from delegating to a subordinate, such as the Adjutant General, the Governor's authority to issue such orders." Stay.Order 31-32.

As the stay panel explained, *see* Stay.Order 31, the President need not obtain the Governor's consent to federalize National Guard members. When Congress wants to require gubernatorial consent in National Guard matters, it does so explicitly. *See, e.g.*, 10 U.S.C. § 12301(d) (members "may not be ordered to active duty … without the consent of the governor or other appropriate authority of the State concerned"). But the text of Section 12406 omits any such requirement.

Nor does the language of Section 12406 support California's contention that the President needed to consult the Governor personally about the order. The requirement to issue orders "through the governor[]" "does not grant the governor any 'consulting' role'"; "[i]t simply delineates the procedural mechanisms through which the President's orders are issued." Stay.Order 33 (first alteration in original) (quotation omitted). After all, when a military commander issues an order "through" a third party, that is not an invitation for the third party to debate the merits of the order with the commander.

Finally, the stay panel explained why even if the President failed to comply with Section 12406's procedural requirements, the district court's injunction was still unsound. "[T]he proper remedy" for non-compliance with the procedural requirement "would be injunctive relief tailored to [d]efendants' failure to issue the

15

order through the Governor"—*i.e.*, at most "an injunction directing the President to send the relevant memoranda directly to the Governor." Stay.Order 34. That conclusion follows from *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), where the Supreme Court held that the Navy's failure to conduct certain environmental studies before deploying an antisubmarine force could not justify an injunction barring that deployment and "jeopardizing national security." *Id.* at 32-33.

    **3.** The panel correctly determined that the equities favored the federal government, which has "an uncontested interest in the protection of federal agents and property and the faithful execution of law." Stay.Order 35. The district court's order seriously threatened that interest by exposing federal employees to violence at the hands of violent mobs and by interfering with those employees' enforcement of federal law. Enjoining the National Guard deployment would leave federal personnel essentially on their own in the performance of their duties, requiring federal officers to choose between their safety and enforcement of federal law.

    The federal government's "significant" interest in preventing these extraordinary acts of violence and threats to federal personnel outweighs plaintiffs' "speculative" harms. Stay.Order 36, 38. California and the district court suggested that the presence of the Guard risked worsening tensions in Los Angeles. But neither California nor the district court may second-guess the President's judgment about how best to quell violent opposition to federal law enforcement. They also noted that mobilized California National Guard members would not be available to carry out

other important functions, A293, but they provided no record evidence of concrete adverse impacts to state operations. And as the stay panel observed, "we do not know what emergencies may occur in California" in the future. Stay.Order 38. Nor do we know what, if any, effect the deployment of limited numbers of National Guard members to temporarily protect federal personnel in Los Angeles will have on the state's ability to address any such emergency.

**B.** Were there any doubt that en banc rehearing is unwarranted, it is confirmed by California's failure to request it in the three weeks following the panel's stay ruling. En banc review of an interlocutory stay decision is extremely unusual, and granting such review without a request, while the parties are simultaneously briefing the merits, would be unprecedented. The American adversarial system relies on the parties to seek the relief to which they believe they are entitled, *Sineneng-Smith*, 590 U.S. at 375-76, and California did not seek en banc review here. Second-guessing that choice now, while the parties are already briefing the merits of the appeal, could lead to a series of conflicting decisions—and it would inevitably prompt the government to seek emergency relief in the Supreme Court to ensure the President's uninterrupted ability to enforce federal law. The far better approach is to permit this appeal to be resolved in the ordinary, orderly course.

## CONCLUSION

The Court should decline to review the panel's decision en banc.

Respectfully submitted,

BRETT A. SHUMATE
   *Assistant Attorney General*

ERIC D. McARTHUR
   *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
ANNA O. MOHAN

 *s/ Steven A. Myers*
STEVEN A. MYERS
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7232*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 305-8648*
   *Steven.A.Myers@usdoj.gov*

July 2025

## CERTIFICATE OF COMPLIANCE

I certify that this response complies with the type-volume limitation of this Court's July 11, 2025, order because it contains 4198 words. It was prepared using Microsoft Word in Garamond, 14-point font, a proportionally spaced typeface.

*s/ Steven A. Myers*
Steven A. Myers