No. 25-3727

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————

GAVIN NEWSOM, *et al.*,
*Plaintiffs-Appellees*,

V.

DONALD J. TRUMP, *et al.*,
*Defendants-Appellants*.

———————————

**On Appeal from the United States District Court
for the Northern District of California**
No. 3:25-cv-04870
The Honorable Charles R. Breyer

———————————

## PLAINTIFFS-APPELLEES' BRIEF
## IN SUPPORT OF EN BANC REHEARING

———————————

ROB BONTA
*Attorney General of California*
MICHAEL J. MONGAN
*Solicitor General*
THOMAS S. PATTERSON
MICHAEL L. NEWMAN
*Senior Assistant Attorneys General*
ANYA BINSACCA
MARISSA MALOUFF
JAMES E. STANLEY
*Supervising Deputy
  Attorneys General*

SAMUEL T. HARBOURT*
CHRISTOPHER D. HU
*Deputy Solicitors General*
MEGHAN H. STRONG
*Deputy Attorney General*
HALEY AMSTER
*Associate Deputy
  Solicitor General*

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3919
Samuel.Harbourt@doj.ca.gov
*Attorneys for Plaintiffs-Appellees*

July 18, 2025

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................ 1

Statement ................................................................................................... 3

Argument ................................................................................................... 5

I.      This case presents issues of exceptional importance ........................... 6

II.     The panel misunderstood the relevant statutory text, history, and
        precedent ................................................................................... 9

Conclusion ................................................................................................ 19

i

# TABLE OF AUTHORITIES

**Page**

C ASES

*Baker v. Carr*
    369 U.S. 186 (1962)................................................................13, 15

*Boumediene v. Bush*
    553 U.S. 723 (2008)......................................................................13

*I.N.S. v. Cardoza-Fonseca*
    480 U.S. 421 (1987)......................................................................12

*J.A.V. v. Trump*
    2025 WL 1257450 (S.D. Tex. May 1, 2025)..................................14

*J.G.G. v. Trump*
    2025 WL 914682 (D.C. Cir. Mar. 26, 2025)..................................13

*Laird v. Tatum*
    408 U.S. 1 (1972).......................................................................1, 7

*Luftig v. McNamara*
    373 F.2d 664 (D.C. Cir. 1967).....................................................14

*Luther v. Borden*
    48 U.S. (7 How.) 1 (1849) .......................................................14, 15

*Martin v. Mott*
    25 U.S. (12 Wheat.) 19 (1827) ....................................12, 13, 14, 15

*Nken v. Holder*
    556 U.S. 418 (2009)......................................................................16

*Orlando v. Laird*
    443 F.2d 1039 (2d Cir. 1971) ......................................................14

*Pomares v. Dep't of Veterans Affs.*
    113 F.4th 870 (9th Cir. 2024) ......................................................16

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Printz v. United States*
   521 U.S. 898 (1997)................................................................16

*Sterling v. Constantin*
   287 U.S. 378 (1932)....................................................14, 15, 16

*Trump v. J.G.G.*
   145 S. Ct. 1003 (2025)............................................................13

*United States v. Nixon*
   418 U.S. 683 (1974)................................................................13

*Widakuswara v. Lake*
   2025 WL 1521355 (D.C. Cir. May 28, 2025) (en banc) ....................2

*Youngstown Sheet & Tube Co. v. Sawyer*
   343 U.S. 579 (1952)................................................................13

*Zivotofsky ex rel. Zivotofsky v. Clinton*
   566 U.S. 189 (2012)................................................................13

**STATUTES**

10 U.S.C. § 12406 ......................................................................*passim*

12 Stat. 281 (1861)......................................................................11

32 Stat. 775 (1903)......................................................................12

35 Stat. 399 (1908)......................................................................12

108 Stat. 2663 (1994)..................................................................12

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I, § 8, cls. 15-16................................................7

U.S. Const. art. II, § 2, cl. 1 ......................................................7

# TABLE OF AUTHORITIES
## (continued)

**Page**

### COURT RULES

Fed. R. App. P. 40(b)(2)(D) ........................................................................2, 5

Fed. R. App. P. 40(d)(1) ................................................................................1

### OTHER AUTHORITIES

Cal. Dep't of Forestry & Fire Protection, *2025 Fire Season Outlook*,
https://www.fire.ca.gov/incidents/2025 ..............................................17

Coakley, *The Role of Federal Military Forces in Domestic Disorders,
1789-1878* (1988), https://tinyurl.com/566cb2cm ..................................7

Harter, *National Guard Troops Deployed to L.A. Were Sent to
Riverside County Marijuana Farm Raid*, L.A. Times (June 24,
2025), https://tinyurl.com/7r9xtb7c .......................................................4

Hubler, *Trump's National Guard Troops Are Questioning Their
Mission in L.A.*, N.Y. Times (July 16, 2025),
https://tinyurl.com/bd7v8ree ..................................................................5

Kastenberg, *The Limits of Executive Power in Crisis in the Early
Republic*, 82 La. L. Rev. 161 (2021) ...................................................14

Leider, *The Modern Militia*, 2023 Mich. St. L. Rev. 893 (2023) ............7

Mackey, *Federal Agents Use Force During Immigration Raid at Two
California Farms*, Guardian (July 10, 2025),
https://tinyurl.com/4u8w9zw9 .................................................................4

Watson & Weber, *What to Know About the Troops and Federal
Agents in LA's MacArthur Park*, Associated Press (July 7, 2025),
https://tinyurl.com/mvsjm34m ................................................................4

Webster's New Int'l Dictionary (2d ed. 1936) .......................................10

iv

## INTRODUCTION

Last month, defendants President Trump and Defense Secretary Hegseth invoked 10 U.S.C. § 12406 to federalize 4,000 members of the California National Guard and deploy them to Los Angeles to assist in federal immigration enforcement.  The district court held that defendants' unprecedented action likely exceeded the statutory authority granted by Congress and that the equities weighed in favor of a temporary restraining order.  A week later, on a highly expedited briefing and argument schedule, a three-judge panel of this Court issued a published order staying the TRO pending defendants' appeal.  As a result, National Guard troops remain under federal command—many accompanying ICE agents on immigration raids in Los Angeles and beyond—and unavailable to perform critical state functions like fighting wildfires and responding to other disasters.

In the normal course, a petition for rehearing en banc would have been due on August 4, 2025.  *See* Fed. R. App. P. 40(d)(1).  On July 11, ahead of that deadline, the Court sensibly ordered the parties to file briefs addressing whether the panel's stay order should be reheard en banc.  It should.  Defendants' unprecedented actions upset our Nation's longstanding tradition against "military intrusion into civilian affairs," *Laird v. Tatum*, 408 U.S. 1, 15 (1972), and threaten to alter the proper balance of power between Congress, the President, and the sovereign States.  The panel rightly rejected some of defendants' most extreme legal theories,

1

like their contention that the federalization order is entirely unreviewable. But the panel's precedential opinion adopts an expansive interpretation of Section 12406(3) that sorely misunderstands the relevant text, history, and precedent.

The issues addressed by the panel's order would present "questions of exceptional importance" (Fed. R. App. P. 40(b)(2)(D)) even if this case were limited to the current situation in Los Angeles. But the presidential order challenged in this litigation is not limited to Los Angeles, or even to California—it purports to authorize the federalization of state National Guard units anywhere that protests "are occurring or are likely to occur" against *any* "United States Government personnel who are performing Federal functions." A158. And the panel's decision to publish its order means that its flawed analysis of Section 12406 will apply anywhere in the Ninth Circuit where defendants decide to repeat this dangerous experiment.

To avoid that extraordinary result, the Court should grant rehearing en banc and vacate the panel's order on the motion for a stay pending appeal. *Cf. Widakuswara v. Lake*, 2025 WL 1521355, at *1 (D.C. Cir. May 28, 2025) (en banc) (granting similar relief). Once the Court vacates the stay and allows the district court's order to take effect, the State is prepared to immediately reassume control of all federalized Guard units.

## STATEMENT

The California National Guard carries out "vital" state functions when it is under state control.  A262.[1]  Those functions include "emergency and natural disaster response, cybersecurity, and drug interdiction."  *Id.*  Over a two-day period beginning on June 6, many residents of Los Angeles joined protests related to federal immigration enforcement.  A262-268.  The vast majority demonstrated peacefully, but some engaged in acts of violence and destruction at and around federal buildings.  *See* A279-A280.  State and local leaders unequivocally condemned those acts.  *See, e.g.*, A120, A122.  And state and local law enforcement moved promptly to arrest lawbreakers, protect federal buildings and officials, and restore order.  *See, e.g.*, D.Ct. Dkt. 77-3.

In response to those events, President Trump issued a memorandum on June 7 authorizing Defense Secretary Hegseth to "call[] into Federal service . . . at least 2,000 National Guard personnel . . . for 60 days" or longer.  A158.  The sole authority that the President invoked was 10 U.S.C. § 12406.  *Id.*  Later that evening, Secretary Hegseth federalized 2,000 members of the California National Guard, and deployed those troops to Los Angeles.  A265-266.  On June 9, he

---

[1] "A" citations are to the addendum to defendants' motion for a stay (C.A. Dkt. 5.1).  "SA" citations are to the supplemental addendum attached to defendants' reply in support of their motion (C.A. Dkt. 26.1).

federalized another 2,000 members of the State's Guard.  A267.  They too were deployed to Los Angeles, along with 700 active-duty Marines.  *Id.*

Since their deployment, these military forces have routinely accompanied federal immigration agents in the field.  *See, e.g.*, C.A. Dkt. 25.1 at 11; SA4, 11. For example, on July 7, defendants deployed "[a]bout 90 National Guard troops," "dozens of federal officers," and "17 Humvees [and] four tactical vehicles" to a Los Angeles park in "a densely populated immigrant neighborhood."  Watson & Weber, *What to Know About the Troops and Federal Agents in LA's MacArthur Park*, Associated Press (July 7, 2025), https://tinyurl.com/mvsjm34m.  Federalized guard units have also been "sent more than 100 miles away [from Los Angeles]" to assist the DEA in enforcement actions "on suspected illegal marijuana farms." Harter, *National Guard Troops Deployed to L.A. Were Sent to Riverside County Marijuana Farm Raid*, L.A. Times (June 24, 2025), https://tinyurl.com/7r9xtb7c.[2]

Governor Newsom and the State sued President Trump and Secretary Hegseth on June 9 and sought a temporary restraining order the following day.  A268.  The district court concluded that defendants likely acted unlawfully in federalizing the

---

[2] *See also* Mackey, *Federal Agents Use Force During Immigration Raid at Two California Farms*, Guardian (July 10, 2025), https://tinyurl.com/4u8w9zw9 ("[ICE] agents accompanied by national guard troops" were deployed to Santa Barbara County, "about 90 miles [away from] Los Angeles," and Ventura County, "about 50 miles from LA").

Guard, and that the State would suffer irreparable harm.  A269-295.  The court

temporarily barred defendants from deploying Guard troops in Los Angeles and

directed them to return control of the Guard to the State.  A295-296.

Defendants appealed and sought an emergency stay.  Opn. 15-16.  A panel of

this Court heard oral argument five days later.  Opn. 1, 15-16.  Two days after

argument, it issued a published order granting defendants' stay motion.  *Id.* at 1.

Briefing in the appeal is ongoing, with defendants' opening brief due July 22.

C.A. Dkt. 39.1.  Meanwhile, litigation continues in the district court on issues not

subject to the pending appeal, including plaintiffs' allegations that defendants are

violating the Posse Comitatus Act.  D.Ct. Dkt. 101.  On July 15, defendants

returned about 2,000 members of the Guard to state control.  Approximately 1,900

troops remain federalized.  Hubler, *Trump's National Guard Troops Are

Questioning Their Mission in L.A.*, N.Y. Times (July 16, 2025),

https://tinyurl.com/bd7v8ree.

## ARGUMENT

This case raises "questions of exceptional importance" to our Nation and our

democratic traditions.  Fed. R. App. P. 40(b)(2)(D).  In ruling on the emergency

motion for a stay pending appeal, the panel had little time to analyze those

questions.  And while its published order correctly rejected some of defendants'

most extreme contentions, its principal holding about 10 U.S.C. § 12406

misunderstands the statutory text, its history, and the relevant Supreme Court precedent. Because that holding threatens substantial harms to California and the Nation at large, including through the deployment of military troops to the streets of communities across the country, it should be reconsidered by an en banc panel.

## I.   THIS CASE PRESENTS ISSUES OF EXCEPTIONAL IMPORTANCE

For the first time in American history, a President has invoked Section 12406 based on a temporary period of unrest to federalize thousands of National Guard troops over the opposition of the State's Governor. A294. Those troops are currently engaged in immigration enforcement throughout Los Angeles and other counties in California—to say nothing of enforcement activities entirely disconnected from the President's original justification for federalizing the Guard. *Supra* p. 4 & n.2. The "highly deferential standard of review" for presidential invocations of Section 12406 that the panel adopted in its published order (Opn. 33) will invite President Trump and future presidents to repeat this experiment throughout the Ninth Circuit and beyond.

The questions of how to interpret Section 12406—and how courts should review invocations of that authority—have important consequences for our democracy. It is a "bedrock principle of American democracy" that "our military is apolitical." Br. of Former U.S. Army & Navy Secretaries & Retired Four-Star Admirals & Generals, C.A. Dkt. 17.1 at 12. By unilaterally seizing control of state

6

National Guard units in service of the President's efforts to ramp up federal immigration enforcement, defendants risk "politicization of the military, which inevitably erodes public trust, impacts recruitment, and undermines troop morale." *Id.* at 7. And every day that military troops patrol the streets of American communities, our Nation's longstanding norm against "military intrusion into civilian affairs" is further eroded. *Laird*, 408 U.S. at 15; *see also* Coakley, *The Role of Federal Military Forces in Domestic Disorders, 1789-1878*, at 3 (1988), https://tinyurl.com/566cb2cm ("Opposition to the use of military force in the enforcement of civil law is deeply embedded in American tradition.").

This case also implicates the proper balance of power between the President, Congress, and the States. The Militia Clauses of the Constitution vest authority to call forth the militia—in modern terms, the National Guard—"in the Congress, not the president." Coakley, *supra*, at 14. And the Militia Clauses and the Tenth Amendment reflect the Framers' intent to preserve state authority over the militia. *See, e.g.*, Leider, *The Modern Militia*, 2023 Mich. St. L. Rev. 893, 915-916 (2023). James Madison "advocated for full national control of the militia." *Id.* at 916. "Other delegates, however, fought Madison by stressing the importance" of state control. *Id.* at 917. Under the prevailing compromise, States retain control absent a valid federalization pursuant to a statute enacted by Congress. *See* U.S. Const. art. I, § 8, cls. 15-16; *see also id.* art. II, § 2, cl. 1.

7

That compromise continues to serve important purposes today. The National Guard performs vital state functions, including disaster response and drug interdiction. *See, e.g.*, A190-195, A262. When the President federalizes the Guard in ways that exceed the limited authority granted to him by Congress—and when courts do not appropriately police the boundaries of executive authority—it intrudes on Congress's Article I prerogatives and on the State's sovereign right to deploy its Guard. This case vividly illustrates those consequences: Until earlier this week, nearly one third of the State's 12,212 Guard troops had been federalized. D.Ct. Dkt. 39-2 at 2. As a result, over 55% of the Guard's elite fire suppression unit was diverted away from wildfire prevention and relief efforts during peak wildfire season. *See id.* at 2-3. And over 30% of the Guard's Counterdrug Task Force was directed away from important drug interdiction efforts, including stopping the flow of fentanyl across the U.S.-Mexico border. *Id.* at 3. Nearly 2,000 Guard troops remain federalized. *Supra* p. 5.

Other troubling consequences are likely to flow from defendants' expansive understanding of their legal authority and the panel's decision to accord extraordinary deference in this area. Defendants appear to think that "mere dissatisfaction" with the effectiveness of federal law enforcement would suffice to allow the President to federalize the Guard under Section 12406. Oral Argument Recording, 13:45-14:05, https://tinyurl.com/ysdx5xm4; *see* C.A. Dkt. 5.1 at 13-15.

On that view, defendants could use Guard troops to augment federal law
enforcement resources without having to go through the trouble of seeking a
congressional appropriation.  And according to the panel, sporadic acts of unrest
and violence directed at federal buildings and officers can suffice to authorize
federalization.  *See* Opn. 33-34.  Giving the President authority to federalize the
Guard in those circumstances would make it all too easy to deploy thousands of
military troops to American communities—not just where civilians are protesting
immigration enforcement, but also where they are protesting other policies, or
protesting in advance of a federal election.  En banc review is warranted to prevent
that "untenable and dangerous" scenario (A282) from materializing.

## II.  THE PANEL MISUNDERSTOOD THE RELEVANT STATUTORY TEXT, HISTORY, AND PRECEDENT

The panel appropriately rejected or ignored some of defendants' most
extreme legal theories.  Most notably, it rejected their argument that the challenged
actions are immune from *any* form of judicial review.  Opn. 19-23.  And it
declined to reach (Opn. 32) defendants' remarkable assertion that protests and
instances of illegal activity over two days in Los Angeles constitute a "rebellion
. . . against the authority of the Government of the United States."  10 U.S.C.
§ 12406(2).  But the balance of the panel's published stay order, including its
exceedingly deferential approach to Section 12406(3), misapprehends the relevant
text, history, and precedent.  The panel's order also unpersuasively downplays the

9

tremendous harm to California—and our Nation's democratic traditions—of allowing defendants' unlawful federalization to remain in place.

1. The central merits question in this appeal is whether defendants exceeded their authority under 10 U.S.C. § 12406—the sole statute that they invoked when federalizing 4,000 members of California's Guard. Section 12406(3) allows federalization in only limited circumstances. It requires a showing that "the President is unable with the regular forces to execute the laws of the United States." Before the district court, defendants took the position that "regular forces" means "everything other than the State National Guard." Tr. 24, Hearing of June 12, 2025. "[I]t could be local police, it could be federal marshals"; "[i]t could be the Marines." *Id.* In light of the vast number of personnel encompassed within that definition, it is implausible to think that those forces would be "unable" to execute the laws. "Unable" means "incapable," "impotent," or "helpless." Webster's New Int'l Dictionary (2d ed. 1936).

Before this Court, defendants switched gears and asserted that "regular forces" means "the federal officers who regularly enforce" the laws in question— here, immigration agents. C.A. Dkt. 25.1 at 5. But even under that definition (which defendants have not supported with any arguments based on the text or history of the statute), defendants have not made a credible showing. Defendants have never attempted to demonstrate that the President was unable to redirect

immigration agents from nearby regions to assist the 290 agents currently assigned to ICE's Los Angeles Field Office. A236. Nor have defendants persuasively explained why those 290 officers were "unable" to execute the immigration laws without assistance from 4,000 federalized National Guard troops. From the day the protests began, ICE has continued to conduct enforcement actions in Los Angeles. *See, e.g.*, D.Ct. Dkt. 39-1 at 2, 4. And state and local law enforcement agencies have responded promptly and forcefully to restore order and protect federal officers and buildings. *See, e.g.*, A263-264, A267. As of June 17, for example, state and local law enforcement agencies had deployed thousands of officers and made numerous arrests. D.Ct. Dkt. 77-3 at 3, 5; *see* C.A. Dkt. 30.1.

The panel nonetheless held that defendants had a "colorable basis for invoking § 12406(3)"—a basis sufficient under a "highly deferential standard of review." Opn. 33. But that standard finds no support in Section 12406's text or history. When Congress adopted the relevant text as part of its 1903 reforms to the Militia Act, it omitted deference-according language that might have supported the panel's approach. Before 1903, the Militia Act had authorized the President to federalize the militia "whenever . . . it shall become impracticable, in the judgment of the President . . . to enforce . . . the laws of the United States." 12 Stat. 281, 281 (1861). In 1903, however, Congress imposed a higher bar on the President's authority: it used the term "unable," rather than "impracticable," and chose not to

11

repeat "in the judgment of the President of the United States." 32 Stat. 775, 776.

Since then, Congress has continued to omit that language from its revisions to

Section 12406. *See, e.g.*, 108 Stat. 2663, 2994 (1994); 35 Stat. 399, 400 (1908).

"'Few principles of statutory construction are more compelling than the

proposition that Congress does not intend *sub silentio* to enact statutory language

that it has earlier discarded.'" *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 442-443

(1987). And the panel's extraordinary form of deference would be especially

inappropriate in light of the Framers' decision to give *Congress*, not the Executive,

authority to determine when federalization of the militia is proper. *Supra* p. 7.

Nor does Supreme Court precedent support the panel's "highly deferential

standard of review." Opn. 33. The panel thought it was bound by *Martin v. Mott*,

25 U.S. (12 Wheat.) 19 (1827). *See, e.g.*, Opn. 26-30. But *Martin* was a case

about justiciability, not deference—and it involved circumstances that bear little

resemblance to those at issue here. *Martin* addressed a challenge by a low-ranking

militiaman to the President's determination that the War of 1812 qualified as an

"invasion" under the 1795 Militia Act. 25 U.S. at 28-29. The Court held that the

President was the "sole and exclusive judge" of whether an invasion had occurred.

*Id.* at 32. The Court saw no need for judicial review because of "the high qualities

which the Executive must be presumed to possess, of public virtue, and honest

devotion to the public interests." *Id.* In the Court's view, those qualities,

considered alongside "the frequency of elections, and the watchfulness of the representatives of the nation," provided sufficient checks "to guard against usurpation or wanton tyranny." *Id.*

Whatever the merit of that view at the time *Martin* was decided, the Supreme Court has long since abandoned it. At least since *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), the Court has recognized the importance of judicial checks on presidential power—even in wartime, and even when the President acts in the realm of foreign affairs. *See, e.g.*, *Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (2025); *Boumediene v. Bush*, 553 U.S. 723, 797-798 (2008); *United States v. Nixon*, 418 U.S. 683, 692-697 (1974); *see also Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 201 (2012); *J.G.G. v. Trump*, 2025 WL 914682, at *5-7 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring). It is the duty of the judiciary "to be last, not first, to give . . . up" our constitutional system of checks and balances. *Youngstown*, 343 U.S. at 655 (Jackson, J., concurring in the judgment). Indeed, the panel correctly held that defendants' actions are reviewable under modern justiciability principles. *See* Opn. 19-21.

To the extent *Martin* has any continuing viability, its scope is exceedingly narrow. In *Baker v. Carr*, 369 U.S. 186, 213 (1962), the principal modern authority on justiciability under the political question doctrine, the Court understood *Martin* to establish the limited proposition that courts will "refus[e] to

13

review the political departments' determination of when or whether a war has ended."  And far from there being any "settled understanding . . . among legal scholars" that *Martin* should be construed more expansively, Opn. 28, a comprehensive academic assessment of *Martin* understands it to merely "reinforce" the settled principle that "officers, as well as the commander in chief, [may] issue orders" to subordinate members of the military "free from judicial interference."  Kastenberg, *The Limits of Executive Power in Crisis in the Early Republic*, 82 La. L. Rev. 161, 226 (2021).[3]

In light of these narrow, sensible understandings of *Martin*, the Court need not "overrul[e]" it to affirm the district court.  Opn. 30.  It need only refrain from *expanding* the decision well beyond the contours of any reasonable view of modern justiciability doctrine.  Other courts have recently done just that, rejecting the federal government's expansive reading of *Martin* in challenges arising under the Alien Enemies Act.  *See, e.g.*, *J.A.V. v. Trump*, 2025 WL 1257450, at *7-11 (S.D. Tex. May 1, 2025).  As the panel acknowledged, its published order here is "in some tension" (Opn. 30) with this line of cases.

Beyond *Martin*, the panel also invoked *Luther v. Borden*, 48 U.S. (7 How.) 1 (1849), and *Sterling v. Constantin*, 287 U.S. 378 (1932).  But like *Martin*, *Luther*

---

[3] *See, e.g.*, *Orlando v. Laird*, 443 F.2d 1039, 1043-1044 (2d Cir. 1971); *Luftig v. McNamara*, 373 F.2d 664, 665-666 (D.C. Cir. 1967).

was a case about justiciability. *See, e.g.*, *Baker*, 369 U.S. at 218-226. Its principal holding—that claims under the federal Guarantee Clause are nonjusticiable—has no relevance here. *See id.* And though the decision also briefly addressed the justiciability of challenges under the 1795 Militia Act, *see* 48 U.S. at 43-45, its analysis is just as out of step with modern justiciability principles as *Martin*'s reasoning. *Supra* pp. 12-13. *Luther*'s analysis was also limited to the section of the 1795 Act authorizing the President "to suppress an insurrection against a State government." 48 U.S. at 44-45. Because that language does not appear in Section 12406, there is no basis for treating *Luther* as controlling here. Nor is there any textual basis for concluding that Congress intended to "import" (Opn. 27) *Luther*'s outmoded approach into Section 12406.

To the extent *Sterling* has any relevance here, it strengthens *plaintiffs'* arguments, not defendants'. *Sterling* addressed a federal due process challenge to an order of the Governor of Texas directing the State's National Guard to restrict the production of oil. 287 U.S. at 386-387. Although the decision contains passing statements about the need to presume officials act in "good faith" with "honest judgment," *id.* at 399-400, the Court's core holding was that executive actions may *not* be "conclusively supported by mere executive fiat," *id.* at 400. After carefully reviewing the basis for the Governor's actions, the Court held that "[t]here was no exigency which justified [them]." *Id.* at 404. A comparable

15

approach to judicial review here would support the same conclusion with respect to defendants' federalization order. *See id.* at 403 ("it cannot be said that the judicial power is fettered because the [plaintiffs'] injury is attributable to a military order").

An alternative basis for overturning the federalization order is that defendants failed to issue it "through the governor[]" of California. 10 U.S.C. § 12406; *see* A284-286. The panel wrongly held that defendants are likely to succeed in showing otherwise. Without consulting the Governor or even notifying him of the order, defendants unilaterally issued it with the words "Through: The Governor of California" stamped across the top of the page. A265. Treating that approach as sufficient would render the statute's through-the-governor requirement "meaningless surplusage." *Pomares v. Dep't of Veterans Affs.*, 113 F.4th 870, 880 (9th Cir. 2024). It would also raise serious constitutional questions by forcing the Governor to "tak[e] the blame" and bear partial responsibility for the order, thereby "diminish[ing] the accountability of . . . federal officials." *Printz v. United States*, 521 U.S. 898, 930 (1997).

2. The panel further erred in concluding that the remaining equitable factors, *see Nken v. Holder*, 556 U.S. 418, 434 (2009), support a stay pending appeal. As the district court recognized, *see* A291-293, the State and the public will be substantially and irreparably harmed if the unlawful federalization of California's National Guard continues. Until earlier this week, defendants had federalized

16

nearly one in three members of the State's Guard. *Supra* p. 8. Almost 2,000 troops remain federalized. *Supra* p. 5. That diversion of personnel has "significantly undermine[d] the State's ability to respond to . . . emergencies, including wildfires," "combat drug trafficking," and "provide many . . . other support services," D.Ct. Dkt. 39-2 at 4, such as programs that "support youth development, leadership skills, and civic engagement," *id.* at 3. The effect on the Guard's ability to respond to wildfires and other emergencies is especially concerning. "Wildfire activity is already trending above normal," and "[f]ire potential across California is expected to increase steadily through summer." Cal. Dep't of Forestry & Fire Protection, 2025 Fire Season Outlook, https://www.fire.ca.gov/incidents/2025.

The panel gave short shrift to that serious threat. It stated that "we do not know what emergencies may occur in California while the National Guard is deployed." Opn. 41. As the district court recognized, however, a "focus on whether there is currently an exigency misunderstands the nature of emergencies, which are inherently unplanned for." A293. The Guard must be ready to respond at a moment's notice to wildfires and other disasters—just as thousands of Guard troops did in response to the devastating fires that struck the Los Angeles region earlier this year. A193.

17

In contrast, defendants' assertions of injury are overstated. Defendants have described certain episodes of unlawful conduct and violence over a short period in early June. A239-245. But the record before the district court—including a declaration from defendants' principal declarant, the ICE field director in Los Angeles—shows that state and local law enforcement agencies have responded promptly and effectively to those instances of misconduct. *See, e.g.*, A240-244; D.Ct. Dkt. 77-3 at 2-5. And they have continued to do so when faced with isolated instances of illegality in the intervening weeks. In any event, defendants have never shown that there was a need to federalize thousands of National Guard troops to address any risks to federal officers. *Supra* pp. 10-11.

Nor does the public interest weigh in favor of defendants. Every day that the federal deployment of California's Guard remains in place, important democratic norms are weakened or cast aside. As civilians continue to witness military troops patrolling their neighborhoods, local parks, and businesses, *see, e.g.*, *supra* p. 4, there is a grave danger that the public will become accustomed to this unprecedented intrusion of the military into civilian life. As a result, important First Amendment freedoms will be chilled. The States' sovereign authority over their militias will be compromised. And the federal executive will amass authority that our Framers never contemplated.

## CONCLUSION

The published order granting a stay should be reheard en banc.

Dated:  July 18, 2025                    Respectfully submitted,

<u>   *s/ Samuel T. Harbourt*               </u>

ROB BONTA
  *Attorney General of California*
MICHAEL J. MONGAN
  *Solicitor General*
THOMAS S. PATTERSON
MICHAEL L. NEWMAN
  *Senior Assistant Attorneys General*
SAMUEL T. HARBOURT
CHRISTOPHER D. HU
  *Deputy Solicitors General*
ANYA BINSACCA
MARISSA MALOUFF
JAMES E. STANLEY
  *Supervising Deputy Attorneys General*
MEGHAN STRONG
  *Deputy Attorney General*
HALEY AMSTER
  *Associate Deputy Solicitor General*

19

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of this Court's order on July 11, 2025 because it contains 4,196 words.  This brief was prepared using Microsoft Word in Times New Roman 14-point font.