# Case No. 25-3727

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GAVIN NEWSOM,
in his official capacity as Governor of the State of California;
STATE OF CALIFORNIA,
*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP,
in his official capacity as President of the United States;
PETER HEGSETH, in his official capacity as Secretary of the Department of Defense; UNITED
STATES DEPARTMENT OF DEFENSE,
*Defendants-Appellants.*

*On Appeal from the United States District Court for the Northern District of California (San Francisco),
Case No. 3:25-cv-04870-CRB • The Honorable Charles R. Breyer, District Judge*

## BRIEF OF BIPARTISAN FORMER GOVERNORS AS *AMICI CURIAE*
## IN SUPPORT OF REHEARING EN BANC

JULIA SPIEGEL
GOVERNORS ACTION ALLIANCE
2300 North Street, NW, Suite 501A
Washington, D.C. 20037
Telephone: (301) 450-3151

CHARANYA KRISHNASWAMI
GOVERNORS SAFEGUARDING
DEMOCRACY
2300 North Street, NW, Suite 501A
Washington, D.C. 20037
Telephone: (213) 933-2126

CAREY R. DUNNE
KEVIN TROWEL
ZACK GOLDBERG
MARTHA REISER
FREE AND FAIR LITIGATION
GROUP, INC.
266 West 37th Street, 20th Floor
New York, NY 10018
Telephone: (646) 434-8604

JOSEPH T. BAIO*
JOSEPH T. BAIO LLC
240 Centre Street
New York, NY 10013
Telephone: (914) 523-2255

*Application for admission pending*

*Counsel for Amici Curiae Bipartisan Former Governors*

 

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................1

INTERESTS OF AMICI CURIAE.............................................................5

ARGUMENT .............................................................................................7

    I.    Federalism is enshrined in the Constitution and entrusts the states—
        not the federal government—with general police powers. ...................7

    II.    The National Guard plays a critical role in assisting governors in
        protecting the public............................................................................9

    III.    Only in the most exceptional circumstances has the National Guard
        been federalized or active-duty forces deployed in a state absent
        consultation with state authorities. .....................................................12

    IV.    The Administration's interpretation of 10 U.S.C. § 12406 conflicts
        with this history and tradition of federal-state coordination..............14

    V.    The Administration's interpretation of 10 U.S.C. § 12406 threatens
        public safety.......................................................................................15

    VI.    The courts play a critical role in protecting this balance of state-
        federal authority.................................................................................17

CONCLUSION ........................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alden v. Maine,*
527 U.S. 706 (1999) ...................................................................... 11

*Bond v. United States,*
572 U.S. 844 (2014) ......................................................................2, 8

*Gonzales v. Oregon,*
546 U.S. 243 (2006) .......................................................................17

*Gregory v. Ashcroft,*
501 U.S. 452 (1991) ............................................................... 1, 8, 14

*Laird v. Tatum,*
408 U.S. 1 (1972) ...........................................................................18

*Marbury v. Madison,*
5 U.S. (1 Cranch) 137 (1803) .........................................................17

*New York v. United States,*
505 U.S. 144 (1992) ............................................................ 1-2, 8, 17

*Perpich v. Dep't of Def.,*
496 U.S. 334 (1990) ......................................................................9, 14

*Printz v. United States,*
521 U.S. 898 (1997) ................................................................ 1, 7, 8

*Stark v. Wickard,*
321 U.S. 288 (1944) .......................................................................17

*Trump v. Hawaii,*
585 U.S. 667 (2018) .......................................................................18

*United States v. Lopez,*
514 U.S. 549 (1995) .........................................................................8

*United States v. Morrison,*
529 U.S. 598 (2000) ......................................................................8-9

*Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens,*
529 U.S. 765 (2000) .......................................................................14

*Webster v. Doe*,
  486 U.S. 592 (1988) ........................................................................18

**Statutes**

8 U.S.C. § 1182(f) .............................................................................18

10 U.S.C. § 12301(b) ........................................................................19

10 U.S.C. § 12406 ..................................................................... *passim*

Md. Code Ann., State Gov't § 3-303(a) ...............................................9

Mont. Code Ann. § 10-3-305(1) ........................................................10

N.Y. Mil. L. § 3 ..................................................................................9

**Constitutional Amendments**

U.S. Const., amend. X .....................................................................7, 8

**Rules**

Fed. R. App. P. 40(b)(2)(D) .................................................................3

**Other Authorities**

About the Guard | How We Began, National Guard Bureau .....................9

Annabelle Timsit, Kyle Melnick, Alex Horton, *When Have Presidents
  Called in the National Guard to Quell Domestic Unrest?*, Wash. Post
  (June 9, 2025) ...............................................................................12

Bill Chappell, *What Happened When Lyndon Johnson Federalized the
  National Guard*, NPR (June 9, 2025) ..............................................13

Elaine S. Povich, *Same Mission, Different Pay for National Guard*,
  Stateline (June 18, 2020) ...............................................................10

The Federalist No. 39 (James Madison) (Clinton Rossiter ed., 1961) ......7

Joint Chiefs of Staff, Joint Publication 3-28, Defense Support of Civil
  Authorities at II-11 (Oct. 29, 2018) ................................................11

Paul J. Scheips, *The Role of Federal Military Force in Domestic
  Disorders, 1945-1992*, Army Hist. Series, CMH Pub. 30-20-1 (2012) .............13

Presidential Memoranda, Department of Defense Security for the
  Protection of Department of Homeland Security Functions
  (June 7, 2025) ..............................................................................4, 5

Robert Leider, *Federalism and the Military Power of the United States*,
73 Vand. L. Rev. 989 (2020)....................................................................16

Shawn Hubler, *Trump's National Guard Troops Are Questioning Their
Mission in L.A.*, N.Y. Times (July 16, 2025) ........................................16

Solcyre Burga, *Why Trump Sending the National Guard to L.A. Is
Different From Its Deployment There in 1992*, Time Magazine
(June 9, 2025) ...........................................................................................12

Spc. Thomas Lamb, *Maryland National Guard Remembers 9/11*,
National Guard Bureau (Sept. 13, 2021)................................................10

Tech Sgt. John Orrell, *Hurricane Katrina, Eight Years Later: Former
Guard Chief Reflects on the Guard's "Finest Hour,"* National Guard
Bureau (August 29, 2013) .......................................................................10

U.S. Department of Defense, *Profile of the Military Community:
2023 Demographics* (Dec. 16, 2024) ........................................................9

U.S. Department of the Army, Civil Support Operations, Field Manual
3-28 (2010) ...........................................................................9, 10, 11, 15

# INTRODUCTION

Our constitutional order depends on the dispersion and careful balance of authority among the federal government and the states. The contours of that balance were established at the Founding and are embodied in the United States Constitution. "[T]he Framers rejected the concept of a central government that would act upon and through the States, and instead designed a system in which the State and Federal Governments would exercise concurrent authority over the people." *Printz v. United States*, 521 U.S. 898, 919–20 (1997). "In the tension between federal and state power lies the promise of liberty." *Gregory v. Ashcroft*, 501 U.S. 452, 459 (1991).

Amici curiae are acutely familiar with the tension between federal and state power that is at the core of our constitutional democracy. As a bipartisan group of former governors who collectively governed states—both large and small—through natural disasters, episodes of civil unrest, and public health emergencies, amici have substantial experience exercising command over their states' National Guard while managing the sensitive and often complex interplay between state and federal authority in times of heightened need or domestic crisis.

To be sure, the maintenance of this delicate balance has presented challenges throughout our nation's history. Where such challenges have arisen, federal courts have intervened to protect it. *See New York v. United States*, 505 U.S. 144, 155

1

(1992) ("At least as far back as *Martin v. Hunter's Lessee*, . . . the Court has resolved questions of 'great importance and delicacy' in determining whether particular sovereign powers have been granted by the Constitution to the Federal Government or have been retained by the States.").  Those interventions reflect the essential premise that, "[i]n our federal system, the National Government possesses only limited powers; the States and the people retain the remainder." *Bond v. United States*, 572 U.S. 844, 854 (2014).  The broad reservoir of authority retained by the states includes what the courts have called "'police power.'  The Federal Government, by contrast, has no such authority and can exercise only the powers granted to it" by the Constitution.  *Id.* (internal quotations and citations omitted).

Throughout our history, and notwithstanding our nation's political, social, and geographic diversity, the federal government has rarely and only under the most extraordinary circumstances imposed military authority on the citizens of a state against the wishes of the state's executive.  The structure of our federalist system, and the language of the relevant statutory provisions at issue in this case, impose legal constraints on the president's authority to take such extreme measures.  Indeed, over the course of our nearly 250-year history, the president has attempted such military imposition only a handful of times, and only in times of significant exigency.  Our political structure also incentivizes the federal and state governments to work together cooperatively to address issues of local and national

importance, including but not limited to civil unrest. Historically, state and federal authorities have negotiated—in public and in private—the balance of their respective authorities, and never, to amici's knowledge, have those negotiations resulted in the unilateral deployment of federal troops to address the kind of protests and civil unrest present in Los Angeles in June.

Accordingly, this case presents issues of "exceptional importance" concerning our nation's federalist structure, the preservation of state sovereignty, the domestic use of military force for civilian law enforcement, and the judiciary's historic role in checking federal overreach. Fed. R. App. P. 40(b)(2)(D). In amici's experience, local law enforcement agencies are best equipped to respond to local protests, including those in which a minority of protestors have broken the law, while safeguarding the constitutional rights of others who wish to—and do— exercise those rights peacefully. If anything, the hasty federalization of the California National Guard without consultation and cooperation from state authorities, and without sufficient opportunity for local law enforcement to do their job in restoring peace and order, likely exacerbated tensions in Los Angeles and thereby increased the risk to civilians and law enforcement officers alike.

Indeed, the upending of the normal federal-state balance has predictably created a range of practical harms. Not only was the decision to deploy federal forces undertaken without cooperation; the deployment itself is taking place

without adequate coordination to ensure that local law enforcement and federal forces are working safely and effectively together.  History teaches that there is significant potential for confusion and error under these circumstances.  In addition, the California National Guard members who have been pulled away from their regular state duties include significant portions of the Guard task forces created to respond to wildfires and to interdict narcotics trafficking at the border. Governors rely on Guard forces to perform such life-saving tasks on a daily basis; the risk to the health and safety of Californians because of this diversion cannot be overstated.

The president's order federalizing the National Guard with no geographic or temporal limit and the deployment of National Guard to Los Angeles absent consultation with California's governor stand in stark contrast to our nation's history and tradition of federal-state cooperation.[1]  The Court need not identify the outer limit of the president's authority to federalize and deploy the National Guard under Section 12406 (or other provisions) to conclude that the present deployment of military resources, based on an assertion of nearly unfettered federal authority, is unlawful.  The president's assertion of authority to deploy military resources on

---

[1] Presidential Memoranda, Department of Defense Security for the Protection of Department of Homeland Security Functions (June 7, 2025), https://www.whitehouse.gov/ presidential-actions/2025/06/department-of-defense-security-for-the-protection-of-department-of-homeland-security-functions/.

domestic soil to any place where mere "protests" against administration policy "are occurring or are likely to occur," without the cooperation and coordination of state authorities, threatens to upset the delicate balance of state and federal authority that underlies our constitutional order.[2]

For these reasons, amici respectfully submit that the Court should grant rehearing en banc.

## INTERESTS OF AMICI CURIAE

Amici curiae are a bipartisan group of former governors who served as their states' chief executives and civilian commanders of their respective National Guards.[3]  In that role, they exercised the police powers reserved to the states to ensure the public's health, safety, and welfare—often in coordination with federal authorities across party lines.  They bring firsthand experience activating the National Guard in response to natural disasters, public health emergencies, and civil unrest.

The former governors represent diverse political affiliations, geographies, and tenures, yet are unified in their support for Appellees' request for relief in this exceptionally important case.  As described herein, federal authorities' decision to

---

[2] *Id.*

[3] No party or party's counsel authored this brief in whole or in part.  No party or party's counsel contributed money intended to fund preparation or submission of this brief.  All parties have given consent to file this Brief of *Amici Curiae*.

federalize the California National Guard without consultation with California's governor disturbs the constitutional balance of state and federal authority, weakens state executives' authority to maintain intrastate law and order, deprives states of vital emergency response tools, and breaks with a long tradition of cooperation between the federal government and the states on issues of public safety. The former governor amici in support of this brief are:

- Jerry Brown, Governor of California from 1975 to 1983 and 2011 to 2019.

- Steve Bullock, Governor of Montana from 2013 to 2021.

- Arne Carlson, Governor of Minnesota from 1991 to 1999.

- Mark Dayton, Governor of Minnesota from 2011 to 2019.

- Jim Doyle, Governor of Wisconsin from 2003 to 2011.

- Parris Glendening, Governor of Maryland from 1995 to 2003.

- Jennifer Granholm, Governor of Michigan from 2003 to 2011.

- Bill Graves, Governor of Kansas from 1995 to 2003.

- Christine Gregoire, Governor of Washington from 2005 to 2013.

- Tony Knowles, Governor of Alaska from 1994 to 2002.

- Gary Locke, Governor of Washington from 1997 to 2005.

- Terry McAuliffe, Governor of Virginia from 2014 to 2018.

- Janet Napolitano, Governor of Arizona from 2003 to 2009.

- Martin O'Malley, Governor of Maryland from 2007 to 2015.

- Deval Patrick, Governor of Massachusetts from 2007 to 2015.

- Marc Racicot, Governor of Montana from 1993 to 2001.

- Bill Ritter Jr., Governor of Colorado from 2007 to 2011.

- Kathleen Sebelius, Governor of Kansas from 2003 to 2009.

- Steve Sisolak, Governor of Nevada from 2019 to 2023.

- Eliot Spitzer, Governor of New York from 2007 to 2008.

- Ted Strickland, Governor of Ohio from 2007 to 2011.

- Tom Vilsack, Governor of Iowa from 1999 to 2007.

- Bill Weld, Governor of Massachusetts from 1991 to 1997.

- Christine Todd Whitman, Governor of New Jersey from 1994 to 2001.

- Tom Wolf, Governor of Pennsylvania from 2015 to 2023.

## ARGUMENT

## I. Federalism is enshrined in the Constitution and entrusts the states—not the federal government—with general police powers.

"It is incontestible that the Constitution established a system of 'dual sovereignty,'" in which the states "retained 'a residuary and inviolable sovereignty.'" *Printz*, 521 U.S. at 918–19 (quoting The Federalist No. 39, at 245 (James Madison) (Clinton Rossiter ed., 1961)). This division of authority is evidenced throughout the Constitution, which grants Congress only "discrete, enumerated" powers. *Printz*, 521 U.S. at 919. The Tenth Amendment makes that

division explicit by reserving all other powers "to the States respectively, or to the people." *Id.* at 919 (quoting U.S. Const. amend. X); *see also New York*, 505 U.S. at 156 ("[I]f a power is an attribute of state sovereignty reserved by the Tenth Amendment, it is necessarily a power the Constitution has not conferred on Congress.").

This federalist structure safeguards liberty. "[A] healthy balance of power between the States and the Federal Government . . . reduce[s] the risk of tyranny and abuse from either front." *Gregory*, 501 U.S. at 458; *see also* The Federalist No. 51, at 323 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ("a double security arises to the rights of the people") (quoted in *Printz*, 521 U.S. at 922).

Within this framework, states retain broad "police powers" to protect public health and safety—authority the federal government lacks. *See Bond*, 572 U.S. at 854 (noting that "[t]he States have broad authority to enact legislation for the public good—what we have often called a 'police power,'" but the "Federal Government, by contrast, has no such authority"); *United States v. Lopez*, 514 U.S. 549, 584–85 (1995) (Thomas, J., concurring) ("The Federal Government has nothing approaching a police power."). Although the federal government may override this authority with a clear directive from Congress, the presumption remains that states—not the federal government—bear primary responsibility for maintaining civil order within their borders. *See United States v. Morrison*, 529

U.S. 598, 618 (2000) ("Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims.").

## II. The National Guard plays a critical role in assisting governors in protecting the public.

State National Guard units have safeguarded our communities since before the nation's founding.[4]  In the early 20th century, the National Guard was transformed and professionalized through various acts of Congress.  *See generally Perpich v. Dep't of Def.*, 496 U.S. 334, 342–44 (1990).  Today, the Army and Air National Guards comprise some 430,000 members across all states and territories.[5]

Over this long history, the National Guard has played a critical role in ensuring public safety under the leadership of governors, in their capacities as commanders-in-chief, and in coordination with federal authorities.[6]  For example,

---

[4] About the Guard | How We Began, National Guard Bureau, https://www.nationalguard.mil/About-the-Guard/How-We-Began/ (last visited July 18, 2025).

[5] *See* U.S. Department of Defense, *Profile of the Military Community: 2023 Demographics* 86 (Dec. 16, 2024), https://www.militaryonesource.mil/data-research-and-statistics/military-community-demographics/; *see also* U.S. Department of the Army, Civil Support Operations, Field Manual 3-28 at 1–6 (2010) ("Army Field Manual") ("Each state, each territory, and the District of Columbia have National Guard forces, for a total of 54 state and territorial Army National Guard elements.").

[6] *See, e.g.*, N.Y. Mil. L. § 3 ("The governor of the state shall be the commander-in-chief of the militia of the state."); Md. Code Ann., State Gov't § 3-303(a) ("The Governor is the commander-in-chief of the land and naval militia of the State,

National Guard members were deployed in response to the September 11 terrorist attacks, including Governor Glendening's Maryland Air National Guardsmen who quickly joined first responders on the ground at the Pentagon.[7]  In 2005, more than 50,000 National Guard troops—including units deployed by amici Governors Vilsack, Sebelius, Gregoire, Granholm, and Doyle—responded to the Hurricane Katrina disaster in Florida, Louisiana, and Mississippi, following emergency declarations by the governors of those affected states.[8]  And in 2020, more than 84,000 National Guard troops were deployed domestically to assist with civil unrest and the COVID-19 pandemic, again, under the direction of governors.[9]

---

except for any part of the militia that is in the active military service of the United States."); Mont. Code Ann. § 10-3-305(1) ("During an incident and during a state of emergency or disaster, the governor is commander-in-chief of the militia and of all other forces available for incident, emergency, or disaster duty."); *see also* Army Field Manual at viii ("The governor of each respective state has overall command responsibility for the National Guard in that state and is their Commander in Chief.").

[7] *See* Spc. Thomas Lamb, *Maryland National Guard Remembers 9/11*, National Guard Bureau (Sept. 13, 2021), https://www.nationalguard.mil/News/Article-View/Article/2772083/maryland-national-guard-remembers-911/.

[8] *See* Tech. Sgt. John Orrell, *Hurricane Katrina, Eight Years Later: Former Guard Chief Reflects on the Guard's "Finest Hour"*, National Guard Bureau (August 29, 2013), https://www.nationalguard.mil/News/Article-View/Article/574826/hurricane-katrina-eight-years-later-former-guard-chief-reflects-on-the-guards-f/.

[9] Elaine S. Povich, *Same Mission, Different Pay for National Guard*, Stateline (June 18, 2020), https://stateline.org/2020/06/18/same-mission-different-pay-for-national-guard/.

In amici's experience, state officials calling upon state resources are best equipped to lead the response to all but the most extraordinary disasters and emergencies. State and local leaders, directing local resources, are best positioned to know where and what kind of help is needed in an emergency, and how to most efficiently provide it to the affected population. Military guidance reflects this consensus: incidents should be "managed at the lowest level possible,"[10] and "[t]he primary responsibility for responding to domestic disasters and emergencies . . . rests with the lowest level of government able to manage the response."[11] In amici's collective experience, incidents requiring a federal military response are nearly unprecedented—state and federal officials have worked together in good faith to avoid the use of federal forces in situations normally handled by state and local law enforcement.

Indeed, in amici's experience, such cooperation is essential, and successful federal-state partnership arises from a deeper principle that underlies the very structure of our system of government: states retain not only sovereign authority but also "the dignity and essential attributes inhering in that status." *Alden v. Maine*, 527 U.S. 706, 714 (1999). Successful emergency response depends on

---

[10] Joint Chiefs of Staff, Joint Publication 3-28, Defense Support of Civil Authorities at II-11 (Oct. 29, 2018) ("Joint Chiefs Publication").

[11] Army Field Manual at 3-2.

respect for state sovereignty, communication, and shared accountability—

principles historically embraced by both state and federal officials.

### III. Only in the most exceptional circumstances has the National Guard been federalized or active-duty forces deployed in a state absent consultation with state authorities.

Presidents have historically recognized the importance of consulting with

state officials before federalizing National Guard units—a reflection of the states'

primary responsibility for maintaining civil order. In rare cases, that consultation

has led past administrations and governors, working together, to federalize Guard

forces. In 1992, for example, President George H.W. Bush responded to a request

from California Governor Pete Wilson and Los Angeles Mayor Tom Bradley by

federalizing the California National Guard and deploying active-duty troops during

the Los Angeles riots.[12] In other instances, federal consultation with state

authorities has led the president to reach the opposite conclusion, such as in 2006

when Louisiana Governor Kathleen Blanco retained control over the Guard and

opposed federalization in response to Hurricane Katrina.[13]

---

[12] Solcyre Burga, *Why Trump Sending the National Guard to L.A. Is Different From Its Deployment There in 1992*, Time Magazine (June 9, 2025), https://time.com/7292493/trump-national-guard-la-1992-riots/.

[13] Annabelle Timsit, Kyle Melnick, Alex Horton, *When Have Presidents Called in the National Guard to Quell Domestic Unrest?*, Wash. Post (June 9, 2025), https://www.washingtonpost.com/history/2025/06/09/national-guard-president-deployments/.

Federalization without gubernatorial consent has occurred only in exceptional circumstances where, for example, governors openly defied federal law.  For instance, in 1957, President Eisenhower federalized the Arkansas National Guard and deployed active-duty troops only after Arkansas Governor Orval Faubus openly refused to comply with a federal court order to integrate Little Rock Central High School.[14]  Similarly, in 1965, President Johnson federalized Alabama's Guard, but only after Governor George Wallace refused to follow a court order requiring that state officials protect civil rights marchers in Selma.[15]  In neither instance, it should be noted, did the president rely on 10 U.S.C. § 12406 to federalize the state's National Guard.

California's governor and state authorities, by contrast, have not defied any federal law and instead have actively worked to quell unrest since it first arose.  Yet unlike past presidents who sought consultation with state officials, President Trump federalized California's Guard without consent, coordination, or timely

---

[14] Bill Chappell, *What Happened When Lyndon Johnson Federalized the National Guard,* NPR (June 9, 2025), https://www.npr.org/2025/06/09/nx-s1-5428352/johnson-national-guard-history-eisenhower-alabama-civil-rights-trump-newsom.

[15] Paul J. Scheips, *The Role of Federal Military Force in Domestic Disorders, 1945–1992*, Army Hist. Series, CMH Pub. 30-20-1, at 162–63 (2012), https://www.govinfo.gov/content/pkg/GOVPUB-D114-PURL-gpo82975/pdf/GOVPUB-D114-PURL-gpo82975.pdf.

notice. That decision breaks sharply with longstanding constitutional practice and undermines the spirit of cooperative federalism.

## IV. The Administration's interpretation of 10 U.S.C. § 12406 conflicts with this history and tradition of federal-state coordination.

The administration's reading of 10 U.S.C. § 12406 departs from the long tradition of federal-state cooperation in managing the National Guard. The Guard's dual-control structure reflects core federalist principles. *See Perpich*, 496 U.S. at 345 (explaining dual-role structure of National Guard). That structure depends on good-faith collaboration—especially during domestic deployments.

To understand Section 12406 as authorizing the president to override a governor's judgment in the absence of the most extraordinary circumstances is to distort the constitutional balance among the federal government and the states. It is implausible that Congress intended to grant the president sweeping authority to federalize the Guard without geographic or temporal limits even when a state is already managing local unrest through civilian means. *See, e.g.*, *Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 787 (2000) (noting "the ordinary rule of statutory construction that if Congress intends to alter the usual constitutional balance between States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute") (internal quotations omitted); *Gregory*, 501 U.S. at 461 ("[T]he States retain substantial sovereign powers under our constitutional scheme, powers with which Congress

14

does not readily interfere."). Section 12406 provides *conditional* authority—triggered only by rebellion, invasion, or the inability to enforce federal law using regular forces—that limits federalization through a fact-based inquiry, and it instructs that federal authorities work with, rather than around, "the governors of the States." *See* 10 U.S.C. § 12406.

The administration's expansive view of Section 12406 carries dangerous consequences. In amici's view, it poses a serious and unprecedented threat to the constitutional balance, raising exceptionally important questions about unchecked federal military intervention on state soil.

## V. The Administration's interpretation of 10 U.S.C. § 12406 threatens public safety.

The administration's understanding of Section 12406 not only undermines state sovereignty but also deprives governors of a critical public safety tool. If federalization of the National Guard is unreviewable, a president motivated by ill will or competing policy priorities could divert Guard resources away from critical state needs, including wildfires, floods, or public health crises.

Uncoordinated deployments of federalized Guard members—often untrained in civilian law enforcement—exacerbate confusion on the ground, strain resources, and undermine public confidence in both state and federal law enforcement. Poorly planned call-ups also reduce troop morale and readiness. *See* Army Field Manual at B-2 ("The pace of work in a disaster response and other incidents is

15

demanding.  Leaders monitor their Soldiers to avoid physical exhaustion.  Rotating personnel between more demanding tasks and less demanding tasks mitigates the accumulation of fatigue. Leaders need to establish and enforce viable sleep plans.").[16]

In short, when the federal government federalizes and deploys the National Guard in a state without consent and coordination with state executives, it risks creating precisely the kind of constitutional tension and practical harms that the dual-role structure of the Guard was designed to prevent.  *See* Robert Leider, *Federalism and the Military Power of the United States*, 73 Vand. L. Rev. 989, 996 (2020) (asserting that separation of the professional military and the state-federal militia system was intended to "limit federal military power and to provide checks against the use of illegitimate force by private parties, state actors, and federal officials").  The Guard exists to serve as a flexible, state-controlled force that may augment federal capacity *in coordination with*—not *in defiance of*—state and local leadership.  Disregarding that balance threatens constitutional norms and impairs emergency response nationwide.

---

[16] Interviews with Guard members currently deployed in Los Angeles indicate "low morale and deep concern that the deployment may hurt recruitment for the state-based military force for years to come."  Shawn Hubler, *Trump's National Guard Troops Are Questioning Their Mission in L.A.*, N.Y. Times (July 16, 2025), https://www.nytimes.com/2025/07/16/us/trump-national-guard-california.html.

## VI. The courts play a critical role in protecting this balance of federal-state authority.

The president claims unreviewable authority under 10 U.S.C. § 12406 to federalize the California National Guard. That assertion conflicts with the Constitution, the judiciary's role in upholding our federalist structure, and long-standing principles of state sovereignty. Judicial review is especially critical where one sovereign encroaches on another's authority to police domestic unrest.

"It is emphatically the province and duty of the judicial department to say what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803), including "determining the limits of statutory grants of authority." *Stark v. Wickard*, 321 U.S. 288, 310 (1944). Courts routinely resolve questions "of great importance and delicacy in determining whether particular sovereign powers have been granted by the Constitution to the Federal Government or have been retained by the States." *New York*, 505 U.S. at 155 (internal quotation omitted).

Federal courts also interpret statutes with sensitivity to state sovereignty. *See Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) (warning against broad readings of federal statutes that intrude into areas traditionally regulated by the states). Section 12406 contains no language suggesting that Congress committed to the president the unfettered discretion to displace state authority over the Guard without any judicial oversight. Rather, the statute provides conditional authority tied to defined emergencies—rebellion, invasion, or inability to execute federal law

17

with regular forces—and contains no grant of unchecked discretion. *See Laird v. Tatum*, 408 U.S. 1, 15–16 (1972) ("Indeed, when presented with claims of judicially cognizable injury resulting from military intrusion into the civilian sector, federal courts are fully empowered to consider claims of those asserting such injury."). Nothing in Section 12406 purports to grant the president unreviewable authority to deploy the Guard anywhere, anytime, based on whatever facts that the president, in his sole discretion, deems sufficient, and without consultation with the state's chief executive. Yet that is precisely the type of unchecked power the president seeks to establish here.

When Congress intends to grant the president (or others) unreviewable decision-making authority, it does so with unmistakable language. In *Trump v. Hawaii*, for example, the Court held that 8 U.S.C. § 1182(f) "exudes deference to the President in every clause" and "entrusts to the President the decisions whether and when" to exercise the authority granted by the statute. 585 U.S. 667, 684 (2018). The Court reached a similar conclusion in *Webster v. Doe*, where the statute under review "exude[d] deference to the Director, and . . . foreclose[d] the application of any meaningful judicial standard of review." 486 U.S. 592, 600 (1988).

Section 12406 contains no such sweeping language. And unlike in the immigration or foreign policy context—where executive power is at its apex—the

18

Constitution contemplates a shared structure of authority over state militias. *See, e.g.*, 10 U.S.C. § 12301(b) (requiring gubernatorial consent to activate National Guard in certain circumstances).

This Court need not define the outer limits of presidential authority to conclude that the action here—federalizing California's Guard without clear statutory justification or state consent—is subject to review and incompatible with federalist principles.

## CONCLUSION

For the reasons set forth above, amici curiae respectfully request that the Court grant rehearing en banc.

DATED: July 18, 2025

Julia Spiegel
GOVERNORS ACTION ALLIANCE
2300 N. St., NW, Suite 501A
Washington, D.C. 20037

Charanya Krishnaswami
GOVERNORS SAFEGUARDING
DEMOCRACY
2300 N. St., NW, Suite 501A
Washington, D.C. 20037

*/s/ Carey R. Dunne*
Carey R. Dunne
     *Counsel of Record*
Kevin Trowel
Zack Goldberg
Martha Reiser
FREE AND FAIR LITIGATION GROUP, INC.
266 W. 37th St., 20th Floor
New York, NY 10018

Joseph T. Baio*
JOSEPH T. BAIO LLC
240 Centre Street
New York, NY 10013

*Application for admission pending*

*Counsel for Bipartisan Former Governors*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 25-3727

I am the attorney or self-represented party.

**This brief contains** 4,074 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

⦿ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____ .

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Carey R. Dunne **Date** July 18, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                     20                                                     *Rev. 12/01/22*