Court of Appeals No. 25-3727

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

GAVIN NEWSOM, etc., et al.,
*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, etc., et al.,
*Defendants-Appellants.*

_____

On Appeal from the United States District Court
for the Northern District of California, No. 3:25-cv-04870-CRB,
The Honorable Charles R. Breyer, Presiding
_____

**UNOPPOSED BRIEF AMICUS CURIAE OF
THE LEGISLATURE OF THE STATE OF CALIFORNIA
IN SUPPORT OF REHEARING EN BANC**

_____

Robin B. Johansen, State Bar No. 79084
Margaret R. Prinzing, State Bar No. 209482
OLSON REMCHO, LLP
1901 Harrison Street, Suite 1550
Oakland, CA  94612
Phone:  (510) 346-6200
Fax:  (510) 574-7061
Email:  rjohansen@olsonremcho.com
          mprinzing@olsonremcho.com
Attorneys for Amicus Curiae
Legislature of the State of California

# **TABLE OF CONTENTS**

**Page(s)**

TABLE OF AUTHORITIES ........................................................... ii

IDENTITY AND INTEREST OF AMICUS CURIAE ..................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................2

ARGUMENT ..........................................................................4

I.      THE COURT SHOULD GIVE GREATER
        CONSIDERATION TO THE HARMS SUFFERED
        BY THE STATE AS A RESULT OF THE UNILATERAL
        FEDERALIZATION OF THE CALIFORNIA NATIONAL
        GUARD ........................................................................4

        A.      Defendants' Own Evidence Demonstrates That
                Irreparable Harm And The Public Interest Weigh
                In Favor Of The Governor ......................................6

                1.      The evidence demonstrates that the National Guard
                        was not necessary to enforce federal law .......................8

                2.      The evidence demonstrates that local enforcement
                        successfully helped to quell the violence .................... 10

        B.      The State's Interests Have Been Severely Harmed ................ 12

                1.      Harms to the State's Interest in the California
                        National Guard ............................................. 12

                2.      Harms to National Guard Servicemembers .................. 19

CONCLUSION ...................................................................... 20

CERTIFICATE OF COMPLIANCE ........................................ 21

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES:

*National Federation of Independent Businesses v. Sebelius*, ........................1
    567 U.S. 519 (2012)

*New York v. United States*, ..............................................................5
    505 U.S. 144 (1992)

*Printz v. United States*, ..................................................................4
    521 U.S. 898 (1997)

*United States v. California*, ............................................................3
    921 F.3d 865 (9th Cir. 2019)

*United States v. Morrison*, ..............................................................3
    529 U.S. 598 (2000)

## U.S. CONSTITUTION:

Amend. X ......................................................................................1

Article IV
    § 4 ..........................................................................................1

## CALIFORNIA CONSITUTION:

Article V
    § 7 ...................................................................................... 13

## STATUTES:

California Government Code
    § 26602 ............................................................................ 3, 4
    § 41601 ............................................................................ 3, 4

California Military and Veterans Code
    § 146(d) .......................................................................... 3, 12

## TABLE OF AUTHORITIES:
### (Continued)

**Page(s)**

California Penal Code
§§ 403-420.1 ........................................................ 3, 4

10 U.S.C. § 12406 ................................................. passim

**MISCELLANEOUS:**

ABC News, *President Trump officially classifies fentanyl as Schedule 1 narcotic, signs 'Halt Fentanyl Act'*, YouTube (July 16, 2025), https://youtu.be/9hEOGSXr0vs?si= 09qzi1cN6SneqmUa ..................................................... 14

Bora Erden et al., *Maps and Timeline of the L.A. Immigration Protests and the Federal Response*, New York Times (June 8, 2025), https://www.nytimes.com/interactive/2025/06/08/us/la-immigration-protests-photos-map.html ...................................... 10, 11

Shawn Hubler, *Trump's National Guard Troops Are Questioning Their Mission In L.A.*, New York Times (July 16, 2025), https://www.nytimes.com/2025/07/16/us/trump-national-guard-california.html ........................................................... 15

Shawn Hubler & Laurel Rosenhall, *Trump Pulls Back 150 Guard Troops From Federal Duties in California*, New York Times (July 1, 2025), https://www.nytimes.com/2025/07/01/us/california-national-guard-trump.html ................................................ 13

The Federalist No. 39 (James Madison) ................................4

The Federalist No. 45 (James Madison) ................................1

Grace Toohey, *Trump Officials To Send Home Half Of The 4,000 National Guard Troops In L.A.*, Los Angeles Times (July 15, 2025), https://www.latimes.com/california/story/2025-07-15/trump-admin-to-send-home-half-of-the-4-000-national-guard-troops-still-deployed-in-l-a ................................................................. 13

## <u>TABLE OF AUTHORITIES</u>:
### (Continued)

<u>**Page(s)**</u>

*Troops And Federal Agents Briefly Descend On L.A.'s Macarthur
Park In Largely Immigrant Neighborhood*, Associated Press (via NBC
News) (July 8, 2025), https://www.nbcnews.com/news/us-news/troops-
federal-agents-briefly-descend-ls-macarthur-park-largely-immigr-
rcna217405 ................................................................................................ 17

## <u>IDENTITY AND INTEREST OF AMICUS CURIAE</u>

The Legislature of the State of California's interest in this appeal is deeply rooted in the principles of federalism and comity upon which this country was founded. When the State of California was admitted to the United States in 1850, it was not merely understood but *constitutionally guaranteed* that "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. One such power reserved to the states and foreclosed to the Federal Government is the "general power of governing," known as the police power. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012). The Framers deliberately crafted the Federal Constitution to ensure that "powers which 'in the ordinary course of affairs, concern the lives, liberties, and properties of the people' were held by governments more local and more accountable than a distant federal bureaucracy." *Id.* (quoting The Federalist No. 45 (James Madison)). Toward that end, article IV, section 4 expressly provides that "*on Application of the Legislature,* or of the Executive (when the Legislature cannot be convened)," the federal government shall protect each state against domestic violence. U.S. Const. art. IV, § 4 (emphasis added).

1

At the heart of the Legislature's role in California government is its members' responsibility to represent and serve their constituents. As described below, Defendants' decision to mobilize the California National Guard has severely compromised the Legislature's ability to do that. Members have received anguished calls from constituents about the damage caused by the military presence in their communities and have had to cancel events and services in their districts because constituents are afraid to attend. In short, the federalization of the National Guard has disrupted state governance, damaged community relationships, and obstructed the equitable delivery of vital public services.

Thus, the Legislature, the elected body tasked with representing the people of California, has a significant interest in ensuring that the Court gives proper weight and consideration to the Federal Government's intrusion upon the State's sovereignty and relationship to the people it serves.[1]

### INTRODUCTION AND SUMMARY OF ARGUMENT

Consistent with the powers conferred upon it by the federal and state Constitutions, the Legislature has enacted laws to maintain public order

---

[1] No party or party's counsel authored this brief in whole or in part. No party or party's counsel contributed money intended to fund preparation or submission of this brief. All parties have given consent to file this Brief of *Amicus Curiae*.

2

and has delegated responsibility for local law enforcement to county sheriffs and city police. *See*, *e.g.*, Cal. Penal Code §§ 403-405 (making it a misdemeanor to participate in an unlawful assembly or riot); Cal. Gov't Code §§ 26602, 41601. Thus, the expectation in California, and the Legislature's expectation in passing such legislation, is that these local officials will be capable of maintaining the peace. If they feel that they are not, then they may ask the Governor to call up the California National Guard to assist them. *See*, *e.g.*, Cal. Mil. & Vet. Code § 146(d).

The Legislature enacted this legislation pursuant to California's inherent police power, which is reserved to it under the Tenth Amendment. *United States v. California*, 921 F.3d 865, 887 n.11 (9th Cir. 2019) ("A state's ability to regulate its internal law enforcement activities is a quintessential police power.") (citing *United States v. Morrison*, 529 U.S. 598, 618 (2000)). The facts of this particular case demonstrate that California law enforcement authorities were, and continue to be, fully capable of controlling crowd behavior during the protests, and that activation of the National Guard has severely harmed state interests. Under these circumstances, en banc review should be granted in order to adequately weigh the equities and harms to the interests of the State of California and its people.

# ARGUMENT

## I.

## THE COURT SHOULD GIVE GREATER CONSIDERATION TO THE HARMS SUFFERED BY THE STATE AS A RESULT OF THE UNILATERAL FEDERALIZATION OF THE CALIFORNIA NATIONAL GUARD

Our federalist system of government assumes that the State of California "retain[s] 'a residuary and inviolable sovereignty' . . . [which] is reflected throughout the Constitution's text[.]"  *Printz v. United States*, 521 U.S. 898, 919 (1997) (quoting The Federalist No. 39 (James Madison)). In this case, however, California's right to govern itself according to its laws, particularly on matters close to home, has been ignored.  *See id.* at 928 ("It is an essential attribute of the States' retained sovereignty that they remain independent and autonomous within their proper sphere of authority.").  The Legislature of the State of California – whose constitutional duty is to make the laws of the State – saw the various laws it enacted to protect public peace subordinated to the President's unnecessary invocation of 10 U.S.C. § 12406 ("section 12406").  *See*, *e.g.*, Cal. Penal Code §§ 403-420.1 (crimes against public peace); Cal. Gov't Code §§ 26602, 41601 (delegating law enforcement authority to sheriffs and chiefs of police).

4

The gravest harm, however, is the effect that federalizing the National Guard has had on Californians themselves. These are the people that the Legislature was elected to represent and to whom the Legislature is accountable. As demonstrated below, ever since the National Guard was deployed in Los Angeles, members of the Legislature have seen fear spread throughout their communities due to the continued military presence and repeated shows of force. This has severely restricted the Legislature's ability to serve its residents, with many constituents afraid to seek out public services, attend community events, or even visit public parks. It has also meant that the State cannot depend on the National Guard for its fire prevention and drug trafficking interdiction services regardless of the need for such services.

As the Supreme Court said in *New York v. United States*, 505 U.S. 144, 181 (1992), "[t]he Constitution does not protect the sovereignty of States for the benefit of the States or state governments as abstract political entities, or even for the benefit of the public officials governing the States. To the contrary, the Constitution divides authority between federal and state governments for the protection of individuals." The President upset this balance of power when he unilaterally federalized the California National Guard. The result is not just an affront to the

5

California Legislature as an institution – it is a direct attack on the

democratic self-governance guaranteed to all Californians by the United

States Constitution.

## A. Defendants' Own Evidence Demonstrates That Irreparable Harm And The Public Interest Weigh In Favor Of The Governor

The panel found that irreparable harm and the public interest

weigh in favor of Defendants.  Dkt. 32 at 35 (June 19, 2025 Order).  It

recognized that the State has "significant interests . . . implicated here," but

largely declined to consider them based on its conclusion that Congress

had effectively set those interests aside whenever the President invokes

section 12406.  *Id.* at 36-37.  In this way, the panel declined to balance the

federal interests with the interests of the State of California and its people.

Rather, because it determined that the President had not clearly exceeded the

scope of his statutory authority, it focused almost exclusively on federal

interests.

Because the panel's refusal to consider California's interests

turned on its conclusion that the President had not "clearly exceeded the

scope of [his] statutory authority" (Dkt. 32 at 36), the Legislature begins

with the federal interests that the panel identified when evaluating the stay

factors.  The panel concluded that the President has "an uncontested interest

in the protection of federal agents and property and the faithful execution of law." *Id*. at 35.

The California Legislature does not disagree. Yet, in the context of this case, those interests acquire or lose weight to the extent that the evidence shows that they were sufficiently threatened to render the President "unable with the regular forces to execute the laws of the United States" within the meaning of section 12406(3). To the extent such evidence only weakly supports that showing – as is the case here – those interests become less compelling when balanced against the State's interests.

A central question here is whether the facts supporting the President's June 7 Memorandum meet the standard Congress established in section 12406(3). They do not. Even the President's Memorandum does not state that he is unable to execute the laws of the United States. To the contrary, he states that he is calling the National Guard to service "to temporarily protect" Immigration and Customs Enforcement ("ICE") and "other United States Government personnel *who are performing Federal functions, including the enforcement of Federal law*, and to protect Federal property . . . ." ECF 25-2 at 3 [A250] (emphasis added).[2]

---

[2] Citations to "A" are to the addendum accompanying Defendants' stay motion, at Docket Entry 5.

**1.    The evidence demonstrates that the National Guard was not necessary to enforce federal law**

Instead of considering whether the statutory predicates had been met, the panel focused on evidence of "violence and disorder" and the serious hurdles that violence created for federal personnel.  ECF 25-2 at 3 [A250]; Dkt. 32 at 30.  Such evidence indisputably exists:  individual protesters committed reprehensible acts of violence in response to ICE raids in Los Angeles.  As the panel recites, protesters "threw objects at ICE vehicles trying to complete a law enforcement operation" and "'pinned down' several [Federal Protective Service] officers defending federal property" while also trying "to breach the parking garage of a federal building."  Dkt. 32 at 30.

What neither the President nor the panel describes, however, and what does not appear to exist in the record, is evidence that this violence and disorder rendered federal government personnel unable to execute the law.  In fact, Defendants' own evidence is to the contrary.  The panel drew its information about protesters throwing objects at ICE vehicles from paragraph 7 of Defendants' Declaration of Ernesto Santacruz, Jr., the Los Angeles Field Office Director for ICE.  ECF 25-1 at 5 [A238].  But Mr. Santacruz testifies in the same paragraph that, despite these disruptions, individuals "were arrested during [that] immigration enforcement

operation." *Id.* Similarly, the panel drew its information about protesters pinning down Federal Protective Service inspectors and trying to breach a parking garage from paragraph 11 of Mr. Santacruz's declaration. *Id.* at 6-7 [A239-40]. But again, Mr. Santacruz explains that while these protests were taking place outside the federal building, "approximately 130 [undocumented individuals] arrested by ICE earlier in the day were being processed by federal immigration officials." *Id.* at 7 [A240]. In short, Mr. Santacruz establishes that ICE was able to continue executing these laws throughout the protests, and neither he nor any of Defendants' other declarants testify that the protests prevented any arrests, enforcement operations, or the execution of any law.

Defendants' evidence also establishes that "the regular forces" were able to quell the protests without the National Guard. Mr. Santacruz explains that the protest which led to federal inspectors becoming "pinned down" began around 5:00 p.m. on June 6. ECF 25-1 at 6 [A239]. He immediately called all available ICE officers in the building, and by 5:15 p.m. – just *fifteen minutes* after the protest began – those additional federal officials "successfully prevented a breach and held the line" until 10:30 p.m. *Id.* at 7 [A240].

9

### 2. The evidence demonstrates that local law enforcement successfully helped to quell the violence

Within approximately an hour after the violence began, at least 150 officers from the Los Angeles Police Department ("LAPD") arrived on the scene, and by 11:00 p.m., all demonstrators had departed. ECF 25-1 at 8 [A241]; ECF 8-2 at 3 [A183].

More regular forces responded the next day, June 7. When ICE commenced immigration operations in Paramount that morning, they were joined by "[a] large contingent of approximately 110 Customs and Border Protection (CBP) officers" from San Diego. ECF 25-1 at 9 [A242]. When protesters convened, including violent protesters, the LAPD and the Los Angeles Sheriff's Department ("LASD") responded. *Id.* LASD alone provided at least 200 deputies, including a team with specialized training in civil unrest, to respond to an estimated 300 to 400 protesters in Paramount and Compton. ECF 8-2 at 4, 5 [A183-84]. Meanwhile, the LAPD and California Highway Patrol ("CHP") responded to unrest downtown. *Id.* at 4, 6 [A183, A185]. By the evening of June 7 – when the President issued his Memorandum[3] – LAPD was "fairly in control" of the protests, and by

---

[3] Press reports indicate the President issued the Memorandum at approximately 6:00 p.m. on June 7. *See, e.g.*, Bora Erden et al., *Maps and Timeline of the L.A. Immigration Protests and the Federal Response*, New

(Continued . . .)

2:15 a.m., protesters had largely dispersed.  *Id.* at 4 [A183].  Again, neither

Mr. Santacruz nor any of Defendants' other declarants state that the protests

prevented any arrests, enforcement operations, or the execution of any

federal law.  Instead, Mr. Santacruz said only that, without the National

Guard, "our immigration enforcement mission would be greatly impacted,"

and that "we would not be able to carry out as many immigration

enforcement operations as we have been able to with the Guards'

assistance."  ECF 84-1 at 7.  In other words, Mr. Santacruz makes the

unremarkable observation that an infusion of state resources expanded

federal capacity.

        Mr. Santacruz also stated that he believes that the safety of local

federal facilities and of those conducting immigration enforcement

operations "requires additional manpower and resources" beyond the LAPD,

LASD, and CHP.  ECF 25-1 at 13 [A246].  But additional manpower and

resources *are* available through State and local law enforcement agencies,

without resorting to the military.  California's Law Enforcement Mutual Aid

System was standing by on and after June 6 to send law enforcement to

Los Angeles from other nearby jurisdictions if they were needed.  ECF 8-2

---

York Times (June 8, 2025), https://www.nytimes.com/interactive/2025/
06/08/us/la-immigration-protests-photos-map.html.

at 3-4 [A182-83]; ECF 39-3 at 5. None of the federal declarants indicate any awareness of the availability of these resources. Furthermore, if further resources were needed, the California Governor could summon the National Guard. Cal. Mil. & Vet. Code § 146(d).

In short, while the evidence unquestionably establishes that individual protesters *threatened* the faithful execution of the law, it does not clearly establish that the President was unable to execute the laws of the United States with the regular federal forces or that state and local peacekeeping forces were inadequate. Since it is therefore far from clear that this federalization of the California National Guard meets the standard Congress set under section 12406(3), it also far from clear that Defendants are acting in accordance with the constitutional federal-state balance. *See* Dkt. 32 at 36 (June 19, 2025 Order). The Legislature urges the Ninth Circuit to grant en banc review to properly balance the federal and state interests.

**B.    The State's Interests Have Been Severely Harmed**

**1.    Harms to the State's Interest in the California National Guard**

The District Court found that the State was likely to suffer harm because the federalization of the National Guard would divert state resources "from addressing serious problems facing California, such as wildfires and drug trafficking." ECF 64 at 31, 33 [A291, A293]. This was based on

12

evidence that the California National Guard performs vital state functions, "including emergency and natural disaster response, cybersecurity, and drug interdiction." ECF 8-3 at 7 [A192]. Of critical importance during the state's dry summers, National Guard units like Taskforce Rattlesnake, which is trained in wildland fire mitigation and direct fire suppression, are needed to respond to wildfires. *Id.* at 8-9 [A193-94]. Members of the National Guard also serve on the State's Counterdrug Taskforce, a unit with specialized training in preventing fentanyl trafficking at the border. *Id.* at 9 [A194]. At the peak of federalization, when 4,000 service members were placed under federal command,[4] the California National Guard was reduced by nearly 33 percent, against the will of the Governor who is their Commander-in-Chief under state law. ECF 39-2 at 2; Cal. Const. art. V, § 7. This included more than 55 percent of Taskforce Rattlesnake, at a time when 13 wildfires were already burning in the state, and 31 percent of the Counterdrug Task Force, at a time when fentanyl has led to what the President recently called

---

[4] By July 15, the President's administration had reduced that number to about 2,000. Shawn Hubler & Laurel Rosenhall, *Trump Pulls Back 150 Guard Troops From Federal Duties in California*, New York Times (July 1, 2025), https://www.nytimes.com/2025/07/01/us/california-national-guard-trump.html; Grace Toohey, *Trump Officials To Send Home Half Of The 4,000 National Guard Troops In L.A.*, Los Angeles Times (July 15, 2025), https://www.latimes.com/california/story/2025-07-15/trump-admin-to-send-home-half-of-the-4-000-national-guard-troops-still-deployed-in-l-a

"the worst drug crisis in American history."[5]  ECF 39-2 at 2-3.  This diversion is, in a word, dangerous.  Taking the National Guard away from their state duties endangers the lives and property of Californians who are and will be threatened by wildfires this summer, and endangers the life of any American who encounters the fentanyl that the National Guard will now be unable to intercept.

The panel found these concerns to be "counterbalanced by the undisputed fact that federal property has been damaged and federal employees have been injured."[6]  Dkt. 32 at 37.  But this ignores the fact that the federal government had other "regular forces" available to protect federal property and employees – a fact that is relevant in determining whether this deployment was lawful under section 12406 – while California does not have replacements for its National Guard.

The federalization also threatens to harm the Guard by undermining retention and recruitment, which was already trending down.

---

[5] The President made this statement during a recent speech addressing fentanyl use.  ABC News, *President Trump officially classifies fentanyl as Schedule 1 narcotic, signs 'Halt Fentanyl Act'*, YouTube (July 16, 2025), https://youtu.be/9hEOGSXr0vs?si=09qzi1cN6SneqmUa.

[6] This apparently refers to the officer whose wrist was broken on June 7.  ECF 25-1 at 10 [A243].  The Legislature is unaware of any other injuries to federal employees prior to the time of the President's Memorandum.

Press reports indicate that retention rates for servicemembers whose enlistment is set to expire during this federalized deployment might be only 21 percent, which is sharply lower than the Guard's typical 60 percent rate.[7]

Furthermore, the federalization has inflicted searing reputational harms on the Guard because California's National Guard has now become inextricably linked with the forces that have been sowing terror in the daily lives of Californians ever since ICE raids began last month in Los Angeles. Simply put, the ICE raids have devastated families and communities across Southern California. While these harms would be beyond the scope of this lawsuit *if they involved ICE officers alone*, the Department of Defense chose to deploy the National Guard to support ICE raids, rather than just protecting federal property. ECF 8-3 at 4-5 [A189-90]. Consequently, many Californians now consider the National Guard to be indistinguishable from ICE.

This truth has been communicated to California State legislators on a daily basis as their offices are deluged with calls from

---

[7] Shawn Hubler, *Trump's National Guard Troops Are Questioning Their Mission In L.A.*, New York Times (July 16, 2025), https://www.nytimes.com/2025/07/16/us/trump-national-guard-california.html.

constituents who are desperate for help, and who have come to see both ICE
and the National Guard as the cause of their desperation.  For example:

1.   One constituent has seen immigration enforcement agents on
     the streets of Los Angeles using brute force to treat Latinos and
     immigrants "like animals who do not deserve respect or
     dignity."  She has a 5-year-old daughter and an 11-year-old son
     who are now too afraid to attend their summer programs.  She
     herself is afraid to leave the house for fear of being arrested and
     taken away from her family.

2.   Another constituent reports that her mother witnessed masked
     men grab three of her clients, hit them, and shove them into
     their unmarked vehicles.

3.   Another constituent was walking in her neighborhood with her
     two teenaged sons when immigration enforcement agents
     confronted and detained her, taking her away from her sons.

4.   Another constituent was brutalized by immigration enforcement
     agents and left handcuffed and covered in vomit for over eight
     hours without proper medical care.

5.   Two constituents were at a bus stop waiting to go to summer
     school along with four Latino men.  They were approached by
     immigration enforcement agents, made to line up, and present
     identification.  The students were let go, but saw the agents take
     the men away.  The family of one of the students is now
     seeking alternatives to in-person learning.

6.   Many constituents report that they are afraid for their lives and
     afraid of being torn from their families after seeing and hearing
     about acts like those described above.  These constituents say
     that they feel anxious and stressed, and that they suffer from
     symptoms ranging from headaches to panic attacks.

7.   Many constituents report that they are afraid to leave their
     homes, which means they cannot work to earn money for food
     or rent, and cannot receive medical care, attend classes, buy
     groceries, or go to church.

8.     Legislators have seen stark evidence of this fear.  Summer events such as fireworks and community concerts have been cancelled.  Civic events have also been cancelled, or have proceeded with sharply reduced participation.  For example, one state senator felt compelled to cancel her annual back-to-school event, which her low-income constituents rely upon for free school supplies and information about nutrition and after-school programs.  A budget town hall that drew 250 attendees last year drew 40 people this year.  Participation at a weekly food distribution event has plummeted by 50 percent, meaning 350 fewer families and individuals are receiving the food they need.  Alcoholics Anonymous meetings have been cancelled.  In other words, community life has been decimated.

9.     Many constituents report damage to local businesses because so many people are afraid to work and shop.  For example, one constituent has felt unable to run her cleaning business, while another had to shut down her food truck because her customers stopped coming.

This terror and confusion is greatly amplified by the federal government's use of the Guard.  In one of the most notorious examples, on July 7, federal officers and approximately 90 members of the California National Guard stormed through MacArthur Park on foot, horseback, and in armored military vehicles.  The park was mostly empty at the time and the troops did not make any reported arrests.[8]  Many of the Legislature's constituents have therefore concluded that the National Guard has entered

---

[8] *Troops And Federal Agents Briefly Descend On L.A.'s Macarthur Park In Largely Immigrant Neighborhood*, Associated Press (via NBC News) (July 8, 2025), https://www.nbcnews.com/news/us-news/troops-federal-agents-briefly-descend-ls-macarthur-park-largely-immigr-rcna217405.

their communities, not to keep the peace or enforce the law, but to target them and to intentionally stoke fear.

A constituent who witnessed this operation reports that he felt as if his entire neighborhood was under a military occupation and had become a war zone. That morning, a summer camp at the park was welcoming school-aged children when the military descended. It was a terrifying scene, and chaotic, because the soldiers did not appear to have any clear direction. The operation blocked traffic, which confined people to an area that seemed to be under military siege. Street vendors disappeared and small businesses surrounding the park closed. The park had also been hosting several agencies that offer community services, but the individuals who had been standing in line fled the park without receiving the help they needed. This constituent said that he did know how to describe how harmful this event was to his community and to his own sense of safety within that community.

The members of the California Legislature must now not only seek to heal their communities, but also to grapple with the fact that their constituents may never trust the California National Guard again. The full implications are impossible to predict, but it has become clear that this

federal deployment has inflicted lasting psychological harm on Californians and fractured the trust essential to civic life.

## 2.    Harms to National Guard Servicemembers

Although military orders bar National Guard servicemembers from publicly discussing this federalization, the New York Times recently interviewed six members of the Guard on condition of anonymity.[9]  These members spoke of "low morale and deep concern that the deployment may hurt recruitment for . . . years to come."  Five members expressed reservations about the deployment, including because they did not want to be involved in immigration crackdowns.  They described a Latino soldier who told his officers that he so strongly objected to having to participate in an immigration raid that "he offered to be arrested rather than take part in the operation."  *Id.*

Guard figures reportedly show that Guard members are underutilized.  The are "mostly . . . loung[ing] in warehouse-sized tents, listening to music and playing games on their cell phones.  Only about 400 of the 3,882 deployed Guard members had actually been sent on assignments away from the base."  It is therefore not surprising that some

---

[9] Hubler, *supra* n.7.

19

servicemembers have voiced their belief that "the Trump administration had

put them on the streets for what they described as a "fake mission." *Id.*

## CONCLUSION

This case presents grave issues involving the constitutional

balance between presidential authority and state sovereignty. The

Legislature respectfully requests that it be reviewed en banc.

Dated: July 19, 2025                    Respectfully submitted,

                                        OLSON REMCHO, LLP

                                        By: *s/Margaret R. Prinzing*
                                            Margaret R. Prinzing

                                        Attorneys for Amicus Curiae
                                        Legislature of the State of California

## <u>CERTIFICATE OF COMPLIANCE</u>

This Unopposed Amicus Brief in Support of Rehearing En Banc complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionately-spaced typeface using Microsoft Word 365, in 14-point font, Times New Roman.

This Unopposed Amicus Brief in Support of Rehearing En Banc also complies with the 4,200-word limit contained in the Court's July 11, 2025, order directing the parties to file simultaneous briefing briefs setting forth their positions on whether the case should be reheard en banc because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 4,190 words.

Dated:  July 19, 2025

By:  *s/Margaret R. Prinzing*
     Margaret R. Prinzing

(2,101,559)

21