No. 25-3727

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————

GAVIN NEWSOM, *in his official capacity as Governor of the State of California*; STATE OF CALIFORNIA,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, *in his official capacity as President of the United States*; PETER HEGSETH, *in his official capacity as Secretary of the Department of Defense*; UNITED STATES DEPARTMENT OF DEFENSE,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the Northern District of California

———————————

## BRIEF FOR APPELLANTS

———————————

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
ANNA O. MOHAN
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7517*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-2689*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................1

STATEMENT OF JURISDICTION ......................................................4

STATEMENT OF THE ISSUES............................................................5

PERTINENT STATUTES AND REGULATIONS ...............................5

STATEMENT OF THE CASE...............................................................5

      A.    Legal Background ........................................................5

      B.    Factual Background ......................................................7

      C.    Prior Proceedings.......................................................11

SUMMARY OF ARGUMENT............................................................ 18

STANDARD OF REVIEW ................................................................ 21

ARGUMENT ..................................................................................... 21

I.    The President Lawfully Federalized the National Guard to Protect
    Federal Personnel and Property from Mob Violence in Los Angeles .............. 21

      A.    The President Reasonably Determined that Section 12406's
            Conditions Are Satisfied and that Decision Is Conclusive.......................21

      B.    The President Acted Lawfully in the Process Used to Call Up the
            National Guard.......................................................................35

      C.    The President's Order Is Consistent with the Tenth Amendment..........39

II.    Plaintiffs Did Not Establish the Equitable Factors for Injunctive Relief ......... 41

CONCLUSION ................................................................................. 44

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                                          **Page(s)**

*Abbott v. Perez,*
   585 U.S. 579 (2018) ............................................................................................ 4

*Baker v. Carr,*
   369 U.S. 186 (1962) ........................................................................................... 33

*Columbia Pictures Indus., Inc. v. Fung,*
   710 F. 3d 1020 (9th Cir. 2013) ......................................................................... 21

*Dalton v. Specter,*
   511 U.S. 462 (1994) ........................................................................................... 33

*Excel Innovations, Inc., In re,*
   502 F.3d 1086 (9th Cir. 2007) .......................................................................... 42

*Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. U.S. Dep't of Homeland Sec.,*
   107 F.4th 1064 (9th Cir. 2024) .........................................................................37

*Herb Reed Enters., LLC v. Florida Ent. Mgmt., Inc.,*
   736 F.3d 1239 (9th Cir. 2013) .......................................................................... 43

*Hodel v. Virginia Surface Mining & Reclamation Ass'n,*
   452 U.S. 264 (1981) ........................................................................................... 40

*Index Newspapers LLC v. U.S. Marshals Serv.,*
   977 F.3d 817 (9th Cir. 2020) .............................................................................41

*Loughrin v. United States,*
   573 U.S. 351 (2014) ...........................................................................................24

*Luther v. Borden,*
   48 U.S. (7 How.) 1 (1849) ...................................................................... 31, 32, 33

*Martin v. Mott,*
   25 U.S. (12 Wheat.) 19 (1827) ........................ 2, 12, 20, 22, 30, 31, 32, 33, 34

*Monsanto Co. v. Geertson Seed Farms,*
   561 U.S. 139 (2010) ........................................................................................... 41

*Newsom v. Trump,*
   141 F.4th 1032 (9th Cir. 2025) ..................................... 4, 14, 15, 16, 17, 18, 22, 24, 32,
                                         33, 35, 36, 37, 38, 39, 41, 42, 43

iii

*New York v. United States,*
    505 U.S. 144 (1992) ............................................................40

*Parker Drilling Mgmt. Servs., Ltd. v. Newton,*
    587 U.S. 601 (2019) .......................................................... 24

*Perpich v. Department of Def.,*
    496 U.S. 334 (1990) ......................................................... 5, 6

*Service Emps. Int'l Union v. National Union of Healthcare Workers,*
    598 F.3d 1061 (9th Cir. 2010) ..............................................4

*Sterling v. Constantin,*
    287 U.S. 378 (1932) ...............................................15, 33, 34

*United States v. Comstock,*
    560 U.S. 126 (2010) .......................................................... 40

*United States v. Hatch,*
    722 F.3d 1193 (10th Cir. 2013) .......................................... 40

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) .............................................................. 39

**U.S. Constitution:**

Art. I, § 8, cl. 15 .................................................... 5, 22, 40

Art. II, § 2, cl. 1 ....................................................... 6, 40

Art. II, § 3 ................................................................. 40

**Statutes:**

Act of May 2, 1792, ch. 28, §§ 1-2, 1 Stat. 264, 264 ......................27

Act of Jan. 21, 1903, ch. 196, § 4, 32 Stat. 775, 776 ......................26

10 U.S.C. § 10101 ...................................................... 5, 37

10 U.S.C. § 10106 ......................................................... 6

10 U.S.C. § 12301(d) ...................................................... 37

10 U.S.C. § 12304a(a) ..................................................... 38

10 U.S.C. § 12406 ............................................... 1, 5, 6, 11, 18, 20, 22, 32, 35, 38, 40

10 U.S.C. § 12406(2) ............................................................................................ 19, 26

10 U.S.C. § 12406(2)-(3) ...................................................................................... 1, 18, 22

10 U.S.C. § 12406(3) ...................................................................................................... 22

18 U.S.C. § 111 ............................................................................................................... 25

18 U.S.C. § 1361 ............................................................................................................. 25

18 U.S.C. § 1752 ............................................................................................................. 25

28 U.S.C. § 1292(a)(1) ..................................................................................................... 4

28 U.S.C. § 1331 ............................................................................................................... 4

28 U.S.C. § 1346 ............................................................................................................... 4

28 U.S.C. § 2201(a) ......................................................................................................... 4

Cal. Mil. & Vet. Code § 160 .................................................................................... 16, 36

Cal. Mil. & Vet. Code § 163 .................................................................................... 16, 36

D.C. Code § 49-409 ........................................................................................................ 37

**Rule:**

Fed. R. App. P. 4(a)(1)(B) ............................................................................................... 4

**Other Authorities:**

Emma Colton & John Roberts, *Trump Brings Receipts He Called Newsom Amid LA Riots as California Gov Claims There Wasn't 'Even a Voicemail'*, Fox News (June 10, 2025, at 16:15 ET), https://perma.cc/Z25U-GD5X ....................................................8

Josh DuBose, *'That Can Kill You': L.A. Police Attacked with Fireworks, Rocks, Molotov Cocktails*, KTLA (June 8, 2025, at 22:49 PT), https://ktla.com/news/local-news/that-can-kill-you-l-a-police-attacked-with-fireworks-rocks-molotov-cocktails/ ....................................................................9

v

Jennifer K. Elsea, Cong. Rsch. Serv., R42659, *The Posse Comitatus Act and Related Matters: The Use of the Military to Execute Civilian Law* (2018) ........................................................................................6, 27, 28

Michele McPhee, *LAPD Chief Jim McDonnell Says, 'Violence I Have Seen Is Disgusting,' Recounting Attacks on Cops*, L.A. Magazine (June 8, 2025), https://perma.cc/9848-BJES ................................................9

Governor Gavin Newsom, *Watch: Governor Newsom Discusses 'Donald Trump's Mess' in Los Angeles* (June 9, 2025), https://perma.cc/6W95-2DZQ........................................................................8

Press Release, U.S. Dep't of Homeland Sec., *DHS Sets the Record Straight on LA Riots, Condemns Violence Against Law Enforcement, Destruction of Property and Threats to ICE Agents* (June 10, 2025), https://perma.cc/6WSM-3UEG ........................................29

*Rebellion*:
 An American Dictionary of the English Language (1900) ...........................26
 Black's Law Dictionary (1st ed. 1891) ......................................................26
 Black's Law Dictionary (12th ed. 2024) ...................................................26
 The Cyclopedic Dictionary of Law (1901) ...........................................26-27
 Webster's International Dictionary of the English Language (1903) ........27

*The Strike That Stunned the Country*, TIME (Mar. 30, 1970), https://perma.cc/X5E6-QN9Y ...................................................................25

## INTRODUCTION

On June 6, 2025, a violent mob, protesting the enforcement of federal immigration law, pinned down federal personnel outside a federal building in Los Angeles. The mob attacked the officers with concrete chunks, chairs, and other objects and used dumpsters as battering rams to breach the perimeter of the building. The next day, the violence intensified and spread. Large crowds assaulted a group of federal officers for seven hours, launching commercial-grade fireworks and rocks at the officers, trapping one officer in her vehicle while violently pummeling it with stones, shattering the wrist of another officer, and damaging federal buildings. The violence continued in the days that followed: More officers were injured, and federal buildings were seriously damaged.

In response to these attacks, which local law enforcement were unable effectively to address, the President activated the National Guard to protect federal personnel and property. Under 10 U.S.C. § 12406, the President is authorized to call up members of the National Guard into federal service when "there is a rebellion or danger of a rebellion against the authority of the Government of the United States" or "the President is unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(2)-(3). Both conditions apply here: The violent actions by large numbers of protestors, directed at enforcement of federal immigration laws, constitute a rebellion against federal authority, and have impeded the ability of

Immigration Customs and Enforcement (ICE) and other federal officials to enforce federal law.

The district court disagreed, entering an extraordinary order enjoining the President's activation of the National Guard and directing him to relinquish command of the federalized troops back to the Governor of California, who had not even requested such a sweeping injunction. The Governor and the State (collectively, plaintiffs) had instead sought only to restrain where the federal troops would be allowed to perform their protective mission while deployed in Los Angeles. The district court had no sound basis for inserting itself into the military chain of command. Its order was flawed in multiple respects, as a panel of this Court recognized in granting the federal government's request for a stay pending appeal.

First, the district court erred in second-guessing the President's judgment that Section 12406's statutory conditions were satisfied. Nearly 200 years ago, the Supreme Court made clear that these judgment calls are for the President to make and that his determinations are conclusive upon all persons, including federal courts. *See Martin v. Mott*, 25 U.S. (12 Wheat.) 19 (1827). Even if the President's decision were reviewable, the stay panel correctly held that the President had an adequate basis for concluding that he was "unable" to sufficiently execute federal laws and protect federal personnel and property. The President also had ample grounds to determine that the violent riots—specifically directed at enforcement of federal immigration

laws—rose to the level of a "rebellion," or at minimum, a "danger of a rebellion" against federal authority.

Second, the district court erred in finding that the President's order was not issued "through" the Governor of California as required by Section 12406, but, as the stay panel explained, that too was mistaken. The President's order was transmitted to the California Adjutant General, the commander of state military forces, who then shared the order with the Governor and transferred authority over the Guard members to the federal commander. The stay panel rightly concluded that this process satisfied Section 12406's requirement and rejected plaintiffs' contention that the President needed to obtain the Governor's consent or to consult with the Governor prior to mobilization.

Third, the district court erred in weighing the equities. The court's order improperly impinges on the Commander in Chief's supervision of military operations, countermands a military directive to officers in the field, and puts federal officers (and others) in harm's way. The stay panel already held that these concrete harms far outweigh plaintiffs' speculation about inflamed tensions and the diversion of state resources. Accordingly, plaintiffs cannot carry their burden of demonstrating that the equitable factors favor injunctive relief. This Court should vacate the district court's order.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. §§ 1331, 1346, and 2201(a).  ER-215.  On June 12, 2025, the district court entered a temporary restraining order without any expiration date.  The government timely appealed on June 12, 2025.  ER-37-38; *see* Fed. R. App. P. 4(a)(1)(B).

This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).  As the stay panel explained, a temporary restraining order "is reviewable under 28 U.S.C. § 1292(a)(1)" when it "possesses the qualities of a preliminary injunction," *Newsom v. Trump*, 141 F.4th 1032, 1043 (9th Cir. 2025) (per curiam) (quoting *Service Emps. Int'l Union v. National Union of Healthcare Workers*, 598 F.3d 1061, 1067 (9th Cir. 2010)), and has the "'practical effect' of granting or denying an injunction," *id.* at 1044 (quoting *Abbott v. Perez*, 585 U.S. 579, 594 (2018)).

The panel correctly concluded that the order here "is effectively a preliminary injunction."  *Newsom*, 141 F.4th at 1044.  The district court issued the order, along with a comprehensive opinion, "after an adversarial hearing" and "extensive" briefing through which the federal government strongly "challenged the basis for the order." *Id.*  The order did not have an expiration date and threatened to inflict irreparable harm by exposing federal property and officials to a grave threat of lawless mob violence, and lawful federal immigration enforcement efforts to the likelihood of active interference and obstruction, thus warranting immediate review.  *See infra* p. 41-42.

## STATEMENT OF THE ISSUES

1. Whether the President's decision to call forth members of the National Guard to protect federal personnel and property from violent mob attacks in Los Angeles is reviewable, and if so, whether it was a lawful exercise of the President's authority under 10 U.S.C. § 12406.

2. Whether plaintiffs failed to establish the equitable requirements for injunctive relief.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.     Legal Background

**1.** The Constitution authorizes Congress both to raise and support a national Army and to organize "the Militia." *See* U.S. Const. art. I, § 8, cl. 15 (granting Congress the power to "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions"). Exercising that authority, Congress has "created the National Guard of the United States, a federal organization comprised of state national guard units and their members." *Perpich v. Department of Def.*, 496 U.S. 334, 338 (1990) (quotation omitted). The National Guard is composed of both the State National Guard, under the command of the several States, and the National Guard of the United States, a federal entity under the federal chain of command, *see* 10 U.S.C. § 10101.

5

"Since 1933 all persons who have enlisted in a State National Guard unit have simultaneously enlisted in the National Guard of the United States." *Perpich*, 496 U.S. at 345. Once ordered into federal service, "members of the National Guard . . . lose their status as members of the state militia during their period of active duty," *id.* at 347, become federal soldiers, 10 U.S.C. § 10106, and serve under the President as Commander in Chief, *see* U.S. Const. art. II, § 2, cl. 1.

**2.** Congress has granted the President several authorities under which he may call forth the National Guard, including 10 U.S.C. § 12406, the statutory authority under which the President acted here.

Section 12406's historic lineage dates to the First Militia Act of 1792, which was used by George Washington to respond to the Whiskey Rebellion. *See* Jennifer K. Elsea, Cong. Rsch. Serv., R42659, *The Posse Comitatus Act and Related Matters: The Use of the Military to Execute Civilian Law* 8 (2018) (CRS Report). Today, in its entirety, Section 12406 provides:

> Whenever—
>
> (1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation;
>
> (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or
>
> (3) the President is unable with the regular forces to execute the laws of the United States;
>
> the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws.

6

> Orders for these purposes shall be issued through the governors of the States or, in the case of the District of Columbia, through the commanding general of the National Guard of the District of Columbia.

## B. Factual Background

**1.** On Friday, June 6, 2025, officers from ICE Enforcement and Removal Operations (ERO) conducted federally authorized immigration enforcement operations in Los Angeles, California. *See* ER-56. A group of protestors gathered and tried to prevent ICE officials from operating by throwing objects at ICE vehicles. ER-56. Several individuals were arrested and brought to ERO's federal facility in downtown Los Angeles. ER-56.

Around 5:00pm that evening, a crowd began to gather at the ERO facility. ER-57. The crowd quickly turned violent, and the protests spread across downtown, threatening several federal facilities and other public buildings. ER-57. Protestors threw "concrete chunks, bottles of liquid, and other objects" at Federal Protective Service officers attempting to prevent the mob from breaching federal property. ER-57-58. The officers were "pinned down in a defensive position by protesters and severely outnumbered," while rioters attempted "to use large rolling commercial dumpsters as a battering ram" to violently "break open the garage gate and break into the federal building." ER-57-58.

Officers feared for their safety. ER-58. ICE and Homeland Security Investigations officers responded to support the Federal Protective Service officers under siege, and attempted to use non-lethal force to disperse the crowd. ER-58.

7

The federal officers managed to prevent a breach of the facility, but it took Los Angeles Police Department (LAPD) officers nearly an hour and a half to arrive and assist the federal officers in pushing the crowd back from the parking garage gate. ER-58-59. Meanwhile, the violence continued, with demonstrators using chairs, dumpsters, and other items as weapons against federal law enforcement officers. ER-59. Once on scene, LAPD declared an "unlawful assembly" and ordered protesters to disperse, but many protestors instead began attacking LAPD officers, and the scene was not cleared for several hours, leaving extensive damage to multiple federal buildings. ER-59-60 (quotation omitted).

That night, President Trump spoke with Governor Newsom, informing the Governor of the dangers to federal personnel and property and urging him to take action to stop the violence.[1] The next day, the violence only intensified. On Saturday morning, large crowds congregated around a Homeland Security Investigations office in the Los Angeles area as officers prepared for another immigration enforcement operation. ER-60. The crowd blocked traffic and began to attack ERO and Customs and Border Protection (CBP) officers, leading to seven hours of fighting between federal officials and protesters. ER-60-61. The crowd surrounded an ERO officer's

---

[1] Emma Colton & John Roberts, *Trump Brings Receipts He Called Newsom Amid LA Riots as California Gov Claims There Wasn't 'Even a Voicemail',* Fox News (June 10, 2025, at 16:15 ET), https://perma.cc/Z25U-GD5X; *see also* Governor Gavin Newsom, *Watch: Governor Newsom Discusses 'Donald Trump's Mess' in Los Angeles* (June 9, 2025), https://perma.cc/6W95-2DZQ.

vehicle, pounding on the car and pummeling it with stones. ER-60-61. Protestors boxed in federal officers, launching mortar-style fireworks with multiple explosions at them and throwing objects of all nature, shattering the wrist of a CBP officer. ER-60-61. The perimeter fence of the federal building was breached, and several vehicles were damaged. ER-61.

Protests continued in the following days. ER-62. Protesters blocked the 101 Freeway. ER-62. Protesters set dumpsters on fire and launched commercial-grade fireworks at federal officers. ER-62. Federal and state buildings were damaged, and the federal building security checkpoint was left in ruins. ER-62-63. Officers were injured. ER-62-63. And the federal complex in downtown Los Angeles, which was closed due to the unrest, ER-63, was severely damaged and vandalized, ER-62-63. At a press conference, LAPD Chief Jim McDonnell admitted that the LAPD had been "overwhelmed," lamented that "things have gotten out of control," and added that "somebody could easily be killed."[2]

**2.** In response to the violence, the President signed a memorandum on June 7 calling into federal service at least 2,000 members of the California National Guard to protect federal personnel and property. Memorandum from President Donald J.

---

[2] Josh DuBose, *'That Can Kill You': L.A. Police Attacked with Fireworks, Rocks, Molotov Cocktails*, KTLA (June 8, 2025, at 22:49 PT), https://ktla.com/news/local-news/that-can-kill-you-l-a-police-attacked-with-fireworks-rocks-molotov-cocktails/; Michele McPhee, *LAPD Chief Jim McDonnell Says, 'Violence I Have Seen Is Disgusting,' Recounting Attacks on Cops*, L.A. Magazine (June 8, 2025), https://perma.cc/9848-BJES.

Trump to Sec'y of Def., Att'y Gen., and Sec'y of Homeland Sec. (June 7, 2025), ER-50-51. The President found that "[n]umerous incidents of violence and disorder have recently occurred and threaten to continue" in response to ICE and other government officials' enforcement of federal law. ER-50. "In addition, violent protests threaten the security of and significant damage to Federal immigration detention facilities and other Federal property." ER-50. The President determined that protests and acts of violence that "directly inhibit the execution of the laws . . . constitute a form of rebellion against the authority of the Government of the United States." ER-50. "In light of these incidents and credible threats of continued violence," the President invoked Section 12406 to mobilize the National Guard "to temporarily protect ICE and other United States Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property." ER-50. The President directed the Secretary of Defense "to coordinate with the Governors of the States and the National Guard Bureau in identifying and ordering into Federal service the appropriate members and units of the National Guard under this authority." ER-50. The Secretary was also authorized to deploy members of the Armed Forces "to augment and support the protection of Federal functions and property." ER-51.

The Secretary of Defense subsequently transmitted orders to the California Adjutant General to effectuate the call into federal service of the National Guard. *See*

10

Memorandum from Sec'y of Def., U.S. Dep't of Def. to Adjutant Gen. of the Cal. Nat'l Guard (June 7, 2025), ER-49. The Adjutant General, in turn, relinquished command of the requested National Guard units to the federal commander. *See* ER-223. The Secretary later sent orders to federalize additional National Guard members, Memorandum from Sec'y of Def., U.S. Dep't of Def. to Adjutant Gen. of the Cal. Nat'l Guard (June 9, 2025), ER-44, and also ordered the mobilization of a complement of active-duty marines. *See* ER-69.

Once mobilized, National Guard members began "protecting federal personnel performing official functions as well as property at designated locations through security patrols, observation posts, and outer cordon security perimeter of buildings." ER-41. This includes National Guard members providing protection activities at several federal sites throughout the Los Angeles area, as well as to federal agents conducting their duties, including ICE agents enforcing federal immigration laws.

### C.    Prior Proceedings

**1.** Plaintiffs, the State of California and Governor Gavin Newsom, filed suit alleging that defendants' actions exceeded the President's authority under 10 U.S.C. § 12406, violated the Tenth Amendment, and were arbitrary and capricious under the Administrative Procedure Act. ER-212-233. Plaintiffs moved for a temporary restraining order based only on their Section 12406 and Tenth Amendment claims.

**2.** The district court held a hearing on the motion on June 12, 2025 and issued a temporary restraining order without an expiration date that same day. The court

first rejected defendants' argument that Section 12406 vests exclusive, unreviewable discretion in the President to determine whether the conditions exist to justify federalizing the National Guard.  ER-18.  The court acknowledged that the Supreme Court in *Martin v. Mott* analyzed a similarly worded statute and held "that the authority to decide whether the exigency has arisen[] belongs exclusively to the President, and that his decision is conclusive upon all other persons."  ER-14-15 (quoting 25 U.S. (12 Wheat.) 19, 30 (1827)).  The district court nevertheless concluded that it could review the President's decision here because *Martin* "involved issues of foreign policy and national security not presented in this case."  ER-17 & n.5.

Turning to the merits, the district court held that Section 12406's substantive conditions were not satisfied.  First, the court determined that there was no "rebellion" within the meaning of Section 12406(2).  According to the court, a rebellion must be "armed," "organized," "open and avowed," and "against the government as a whole—often with an aim of overthrowing the government—rather than in opposition to a single law or issue."  ER-21 (emphasis omitted).  The court concluded that the conditions in Los Angeles did not satisfy those requirements because many rioters "threw items under cover of darkness . . . identities concealed"; there was "no evidence of organized, as apart from sporadic or impromptu, violence"; and the "protesters gathered to protest a single issue—the immigration raids" instead of "attempting to overthrow the government as a whole."  ER-21-22.

12

The district court similarly determined that the President was not justified in federalizing the National Guard under Section 12406(3).  The court acknowledged that "federal employees should never have to fear danger when performing their jobs."  ER-25.  The court nonetheless insisted that the President was not unable to execute the laws within the meaning of Section 12406(3) because ICE succeeded in arresting 44 people and detaining others on June 6 and had been able to carry out some enforcement actions since then.  ER-25-26.

The court further concluded that the President violated the procedural requirements of Section 12406.  The court acknowledged that the call-up orders were sent to the California Adjutant General, that the Governor received them, and that the commander of the U.S. Northern Command assumed control of the Guard units.  ER-26.  But that was insufficient in the court's view because Section 12406 "requires that orders federalizing the National Guard be issued 'through *the governor* of the respective State,' not through a different state official (even one who can issue orders in the governor's name)."  ER-27.

Because the court concluded that the President did not lawfully invoke Section 12406, the court also held that plaintiffs were likely to succeed on their Tenth Amendment claim.  *See* ER-31-33.  The court further suggested that even if the President lawfully federalized the Guard members under Section 12406, his order might violate the Tenth Amendment insofar as the federalization interfered with the state's police power.  *See* ER-31-33.

13

Finally, the court determined that the remaining equitable factors weighed in favor of an injunction. The court found that plaintiffs had established "that the continued presence of National Guard members and Marines in Los Angeles risks worsening, not improving, tensions on the ground," citing a declaration reporting that local law-enforcement arrests increased after the National Guard was deployed. ER-33-34. The court also concluded that the Los Angeles deployment would divert National Guard resources from addressing potential emergencies like forest fires or drug trafficking. ER-35. And the court stated that the invocation of Section 12406, against the wishes of a state governor, "threaten[ed] serious injury to the constitutional balance of power between the federal and state governments." ER-36.

Having found that the requirements for injunctive relief were satisfied, the district court granted plaintiffs' motion. Plaintiffs had requested a limited order prohibiting defendants from using the National Guard members outside of federal property. *See* D. Ct. Dkt. 8-4, at 5. The district court, however, issued a broader order, enjoining defendants "from deploying members of the California National Guard in Los Angeles," and directing defendants "to return control of the California National Guard to Governor Newsom." ER-37. Defendants appealed. ER-235.

**3.** In a published opinion issued after oral argument, a unanimous panel of this Court granted a stay pending appeal. *Newsom v. Trump*, 141 F.4th 1032, 1040-41 (9th Cir. 2025) (per curiam). After finding that it possessed appellate jurisdiction, the panel concluded that each of the stay factors favored defendants.

14

On the merits, the panel held that defendants "made the required strong showing that they are likely to succeed." *Newsom*, 141 F.4th at 1040. The panel began by emphasizing "[t]he history of Congress's statutory delegations of its calling forth power" and explaining that cases such as *Martin* "strongly suggest that . . . review of the President's determinations in this context is especially deferential." *Id.* at 1047; *see also id.* at 1048 (explaining that *Martin* requires "a great level of deference to the President's determination [under Section 12406] that a predicate condition exists"). The panel rejected plaintiffs' and the district court's efforts to distinguish *Martin*, explaining that *Martin*'s reasoning was equally applicable regardless of a case's facts, that Congress could have amended the statute had it wanted to provide for greater judicial review, and that the Supreme Court itself understood *Martin* to apply broadly—in the domestic, as in the foreign, sphere. *Id.* at 1048-51. At the same time, however, the panel concluded that Section 12406 did not preclude all judicial review of the President's decision to federalize the Guard: "Consistent with *Martin*, courts may at least review the President's determination to ensure that it reflects a colorable assessment of the facts and law within a 'range of honest judgment.'" *Id.* at 1051 (quoting *Sterling v. Constantin*, 287 U.S. 378, 399 (1932)).

Applying this "highly deferential standard of review" to the President's determination here, the panel held that "the President had a colorable basis for invoking [Section] 12406(3)." *Newsom*, 141 F.4th at 1052. The panel rejected the district court's suggestion that Section 12406(3) "requir[es] total or near total

15

interference" with the federal government's ability to enforce the law. *Id.* at 1051.

"Section 12406 does not have as a prerequisite that the President be completely precluded from executing the relevant laws of the United States in order to call members of the National Guard into federal service, nor does it suggest that activation is inappropriate so long as any continued execution of the laws is feasible." *Id.* And the panel noted that the federal government put forth ample evidence of "protesters' interference with the ability of federal officers to execute the laws, leading up to the President's federalization of the National Guard on June 7." *Id.* at 1052.[3]

The panel also concluded that defendants' actions likely satisfied Section 12406's procedural requirements. *See Newsom*, 141 F.4th at 1052. "Under California law," the panel observed, "the Adjutant General 'is chief of staff to the Governor, . . . the commander of all state military forces,'" *id.* (quoting Cal. Mil. & Vet. Code § 160), and issues "all orders in the name of the Governor," *id.* (quoting Cal. Mil. & Vet. Code § 163). And it is undisputed that "California's Adjutant General received the memoranda from the Secretary of Defense, relinquished command to the federal military accordingly, and forwarded the memoranda to Governor Newsom." *Id.* at 1052-53. It did not matter that Governor Newsom did not issue the order himself because Section 12406 "requires that the President's order be issued *through*

---

[3] Because Section 12406(3) was sufficient to allow the panel to conclude that the federal government was likely to prevail, the panel did not reach the arguments under Section 12406(2). *Newsom*, 141 F.4th at 1051-52.

16

the Governor, not *directly by* the Governor," and nothing in the statute "prevents the State from delegating [that authority] to a subordinate." *Id.* at 1053. In any event, the President's failure to go directly through the Governor—even if a violation of the statute's procedural requirements—would "not limit his otherwise lawful authority to call up the National Guard" because Section 12406 gives governors neither "veto power" nor a "'consulting' role." *Id.* Any alleged procedural violation would warrant only "injunctive relief tailored to [d]efendants' failure to issue the order through the Governor—not an injunction prohibiting the President from exercising his lawful authority to call up the National Guard." *Id.* at 1054.

The panel then briefly addressed plaintiffs' Tenth Amendment claim, observing that the district court's holding "rested, at least in part," on its conclusion that the President violated Section 12406 and that plaintiffs had not pressed any alternative Tenth Amendment arguments. *Newsom*, 141 F.4th at 1054 n.5. Because the panel concluded that defendants likely complied with Section 12406, the panel rejected plaintiffs' Tenth Amendment claims. *Id.*

On the remaining stay factors, the panel concluded that "[b]oth irreparable harm and the public interest weigh in favor of [d]efendants." *Newsom*, 141 F.4th at 1054. The panel recognized that the federal government has "an uncontested interest in the protection of federal agents and property and the faithful execution of law," as well as a "significant interest[]" in preventing the violent attacks that had occurred before the deployment of the National Guard. *Id.* at 1054-55. And the panel held

17

that those interests outweighed any "speculative" concerns plaintiffs may have "about escalation and interference with local law enforcement." *Id.* at 1055.

## SUMMARY OF ARGUMENT

In the face of violent protests targeted at preventing enforcement of federal immigration laws, the President called up members of the California National Guard to protect federal personnel and property. That order was consistent with the President's statutory authority under 10 U.S.C. § 12406 and with the Tenth Amendment. And where, as here, federal agents experienced serious violence while seeking to do their jobs, the equities strongly favor the federal government. The district court's order should be vacated.

**I.A.** Section 12406 authorizes the President to call forth National Guard members "in such numbers as he considers necessary" whenever "there is a rebellion or danger of a rebellion against the authority of the Government of the United States" or "the President is unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(2)-(3). The President reasonably concluded that those conditions were satisfied here. In the days preceding the President's order, violent mobs attacked ICE agents and other federal personnel attempting to enforce immigration laws with commercial-grade fireworks, concrete chunks, bricks, and rocks. The mobs engaged federal officers in hours of fighting, leaving officers injured and fearing for their safety. The mobs breached the perimeter of federal buildings, destroying checkpoints and spray-painting death threats on the walls.

18

These facts, as the stay panel recognized, support the President's judgment that he was unable to execute the laws of the United States under Section 12406(3). Federal officials need not be completely incapable of performing their jobs to satisfy the statute. It is sufficient that federal officials were targeted by frequent and prolonged violent attacks specifically aimed at obstructing their enforcement of federal laws.

The facts on the ground also justify the President's invocation of Section 12406(2) based on "a rebellion or danger of a rebellion against the authority of the Government of the United States." 10 U.S.C. § 12406(2). The district court disagreed, reasoning that the situation in Los Angeles did not amount to a rebellion because the mobs were not attempting to overthrow the government as a whole. But the plain meaning of "rebellion" encompasses a situation short of national revolution, as the dictionaries cited by plaintiffs and the district court confirm. And that interpretation, unlike the district court's, is consistent with Section 12406's statutory lineage, which makes clear that Congress intended to capture incidents where violent mobs target federal personnel and property based on their objection to federal laws. Even if the facts on the ground did not show a "rebellion," they certainly demonstrated a "danger of a rebellion."

In any event, Section 12406 does not authorize the district court to second-guess the President's decision to federalize the National Guard. Long ago, the Supreme Court examined one of Section 12406's predecessors and held that the

19

statute vests sole and exclusive authority in the President to determine whether an exigency has arisen that justifies calling forth the National Guard.  *See Martin v. Mott*, 25 U.S. (12 Wheat.) 19 (1827).  And it is well-established that where a valid statute commits a decision to the discretion of the President, the President's exercise of that discretion is not subject to judicial review.

**B.**  The President also complied with the procedural requirement in Section 12406 that orders to activate the National Guard be issued "through the governor[]." 10 U.S.C. § 12406.  As the stay panel explained, the relevant orders were transmitted to the Adjutant General, the commander of the state military forces who issue orders for those purposes on behalf of the Governor.  The Adjutant General sent the orders to the Governor and relinquished command of the relevant National Guard units.

The stay panel correctly rejected the district court's assertion that Section 12406 required the President to send the orders directly to the Governor.  Orders under Section 12406 are issued "through"—not "by"—the Governor, and nothing in the statute prevents the delegation of that role to a subordinate under state law.  The Governor also lacks any authority under Section 12406 to second-guess the President's order or to insist upon additional consultation, so even if there were some technical flaw in the process here, it would not justify the district court's injunction.

**C.**  The President's order is also consistent with the Tenth Amendment.  The stay panel properly found that plaintiffs' Tenth Amendment claim is derivative of their Section 12406 claim, and so it fails for the same reasons.  The district court erred

20

to the extent it suggested that the President's order—even if fully consistent with Section 12406—might still infringe on state sovereignty. It is settled that where, as here, the President properly exercises statutory authority, his actions do not run afoul of the Tenth Amendment even if they affect state police power.

**II.** The equitable factors also strongly favor the federal government, and the district court erred in concluding otherwise. As the stay panel explained, plaintiffs' concerns about inflaming tensions and diverting state resources are purely speculative. Such speculation cannot support a finding of irreparable harm and is far outweighed by the very real violence that ICE agents and other federal personnel faced in seeking to do their jobs.

## STANDARD OF REVIEW

This Court reviews the district court's grant of an injunction for abuse of discretion, but questions of law are reviewed de novo. *See Columbia Pictures Indus., Inc. v. Fung*, 710 F. 3d 1020, 1030 (9th Cir. 2013).

## ARGUMENT

### I. The President Lawfully Federalized the National Guard to Protect Federal Personnel and Property from Mob Violence in Los Angeles

#### A. The President Reasonably Determined that Section 12406's Conditions Are Satisfied and that Decision Is Conclusive

The Constitution grants Congress the power to "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions."

21

U.S. Const. art. I, § 8, cl. 15.  In 10 U.S.C. § 12406, Congress explicitly authorized the President to "call into Federal service" members of the National Guard "[w]henever," *inter alia*, "there is a rebellion or danger of a rebellion against the authority of the Government of the United States" or "the President is unable with the regular forces to execute the laws of the United States."  10 U.S.C. § 12406(2)-(3).  The President reasonably determined that each of those conditions was satisfied when he federalized members of the California National Guard in response to mob violence in Los Angeles.  His decision on that score was "conclusive upon all other persons," including the district court.  *Martin v. Mott*, 25 U.S. (12 Wheat.) 19, 30 (1827).

**1.**  First, as the stay panel already held, the President "had a colorable basis for invoking [Section] 12406(3)."  *Newsom v. Trump*, 141 F.4th 1032, 1052 (9th Cir. 2025) (per curiam).  Section 12406(3) authorizes the President to call forth the National Guard when he is "unable with the regular forces to execute the laws of the United States."  10 U.S.C. § 12406(3).  In this case, the President explained that "[n]umerous incidents of violence and disorder" were occurring in Los Angeles.  ER-50.  That violence was specifically targeted at "[ICE] and other United States Government personnel . . . performing Federal functions and supporting the faithful execution of Federal immigration laws" and "threaten[ed] the security of and significant damage to Federal immigration detention facilities and other Federal property."  ER-50.

Those judgments were sufficient to invoke Section 12406(3), and they were fully supported by the facts on the ground.  A lengthy declaration from a federal

22

official describes the substantial threats that federal law enforcement personnel experienced as they attempted to enforce—*i.e.*, "execute"—federal immigration laws. *See* ER-56-64. Plaintiffs' submissions show the same. Plaintiffs' own declarant described protesters "engage[d] in dangerous behavior such as throwing rocks and other objects, including a Molotov Cocktail at deputies[,] damaging vehicles, burning a vehicle, looting a gas station, and vandalizing property." ER-80-81. Plaintiffs' exhibits depicted images of burning or burnt cars, *see, e.g.*, ER-129, ER-175, ER-184, ER-203, ER-205, of demonstrators "blocking traffic on [a] busy thoroughfare," ER-204, and of a "massive crowd" pushing to a wall barrier, ER-202. One article documented a crowd of demonstrators "mov[ing] through the city despite the area-wide dispersal order, again lighting fireworks and throwing projectiles at police vehicles driving by." ER-203. Another article described how demonstrators "blocked entrances and exits to [a federal building in downtown Los Angeles]" and "attempted to physically stop ICE vehicles." ER-136; *see also* ER-118-19. And a third reported that "ICE requested assistance from LAPD multiple times over the course of Friday night" but that it "took LAPD 55 minutes to respond." ER-205. Federal immigration authorities' ability to engage in vigorous enforcement of existing laws is plainly impeded if they must do so in a climate of violent anarchy.

The district court did not dispute these facts and acknowledged that "federal employees should never have to fear danger when performing their jobs." ER-25. The court nonetheless concluded that Section 12406(3) was not satisfied, adopting an

23

implausibly narrow reading of the text, under which Section 12406(3) cannot apply so long as some amount of execution of the laws remains possible, no matter how impaired that execution may be and how much danger is faced by regular law-enforcement officials.

The stay panel correctly rejected that reading. The panel explained that Section 12406(3) "does not have as a prerequisite that the President be completely precluded from executing the relevant laws of the United States in order to call members of the National Guard into federal service, nor does it suggest that activation is inappropriate so long as any continued execution of the laws is feasible." *Newsom*, 141 F.4th at 1051. To suggest otherwise, the panel reasoned, would mean that "so long as any quantum of federal law enforcement could be accomplished in the face of mob violence," "the President would be unable to call up the Guard to respond." *Id.* (quotation omitted). And it would render Section 12406(3) a virtual nullity, in contravention of the "'cardinal principle' of interpretation that courts 'must give effect, if possible, to every clause and word of a statute.'" *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. 601, 611 (2019) (quoting *Loughrin v. United States*, 573 U.S. 351, 358 (2014)). Section 12406(3) is better read to authorize the President to call up the National Guard when he is unable to ensure to his satisfaction the faithful execution of federal laws by the federal officers who regularly enforce them, without undue harm or risk to officers.

24

To support its strained reading, the district court pointed to the Postal Strike of 1970 during which President Nixon federalized the National Guard to deliver the mail in several cities. ER-25-26. That recent event, however, does not establish the statute's outer boundaries. And it is not clear that that strike would even satisfy the district court's excessively narrow interpretation: The postal strike was initially localized, some postal employees continued to work, and some mail service continued. *See The Strike That Stunned the Country*, TIME (Mar. 30, 1970), https://perma.cc/X5E6-QN9Y.

The district court further erred in focusing exclusively on the ability of regular immigration authorities to detain and remove illegal aliens. *See* ER-25-26. Other federal laws are relevant as well, including the laws forbidding interference with federal functions or assaults on federal officers and property. *See, e.g.*, 18 U.S.C. § 111 (assaults on specified federal officers and employees); *id.* § 1361 (destruction of government property); *id.* § 1752 (trespass onto restricted federal grounds or buildings). The President was entitled to conclude that activation of the National Guard was necessary to ensure adequate federal resources to fully and faithfully execute those laws as well. And the previous instances in which Presidents have called up the militia support the common-sense conclusion that an inability to maintain law and order in the ordinary course as federal agents try to do their jobs represents a breakdown in the "execution of the laws." *See infra* p. 27-28.

25

**2.**  The President's action under Section 12406 was independently warranted under the provision authorizing him to call the National Guard into federal service whenever "there is a rebellion or danger of a rebellion against the authority of the Government of the United States."  10 U.S.C. § 12406(2).  The President reasonably determined that "[t]o the extent that protests or acts of violence directly inhibit the execution of the laws, they constitute a form of rebellion against the authority of the Government of the United States."  ER-50.

The term "rebellion" encompasses the violent resistance to lawful enforcement of federal immigration law occurring in Los Angeles.  Black's Law Dictionary defines rebellion to include "[o]pen resistance or opposition to an authority or tradition" and "[d]isobedience of a legal command or summons."  *See Rebellion*, Black's Law Dictionary (12th ed. 2024).  The same understanding prevailed in 1903, when Congress first enacted what is now Section 12406.  *See* Act of Jan. 21, 1903, ch. 196, § 4, 32 Stat. 775, 776 (authorizing the President to call forth the state militias into active federal service in the case of, among other things, "rebellion against the authority of the Government of the United States").  Dictionaries from the 1890s and 1900s define "rebellion" to focus on deliberate resistance to the government's laws and authority.  *See Rebellion*, Black's Law Dictionary (1st ed. 1891) ("Deliberate, organized resistance, by force and arms, to the laws or operations of the government, committed by a subject.");  *Rebellion*, An American Dictionary of the English Language (1900) ("Open resistance to lawful authority.");  *Rebellion*, The Cyclopedic Dictionary

26

of Law (1901) ("[T]he forcible opposition and resistance to the laws and process lawfully issued"); *Rebellion*, Webster's International Dictionary of the English Language (1903) ("Open resistance to, or defiance of, lawful authority.").

The district court and plaintiffs favor a narrower definition of rebellion limited to open, armed, and organized resistance to "the government as a whole—often with an aim of overthrowing the government—rather than . . . to a single law or issue." ER-20-21.  Congress, however, plainly used "rebellion" in its broader sense here. Otherwise, Section 12406 would fail to encompass numerous instances, both before and after its initial enactment in 1903, in which the President has called the militia into federal service to address open defiance of federal authority in situations that fell short of organized efforts to overthrow the government.

Most famously, President Washington called up the militia to assist in suppressing the Whiskey Rebellion—a violent protest in western Pennsylvania targeted at tax assessors attempting to collect a federal excise tax on distilled whiskey. *See* CRS Report 8.  President Washington took that action under a 1792 statute that did not by its terms refer to "rebellion."  *See* CRS Report 7-8; *see also* Act of May 2, 1792, ch. 28, §§ 1-2, 1 Stat. 264, 264.  But when Congress later enacted statutes referring to a "rebellion," those statutes plainly extended to cover this original historical precedent of violent opposition limited to a particular federal law—precisely what occurred in Los Angeles, and what the district court and plaintiffs' flawed reading would not cover.

27

The Whiskey Rebellion, moreover, is only one example of a range of civil disorders that members of the militia and other federal military forces have long been called upon to address. Throughout the early years of the republic, Presidents routinely called out troops to suppress opposition to other federal revenue laws. *See* CRS Report 9-12. In the late 1800s and early 1900s, states frequently requested assistance from federal troops to address violence stemming from labor disputes and miners' strikes. *See* CRS Report 13-14, 35-37. And Presidents Eisenhower and Johnson used the federalized National Guard to ensure the enforcement of federal civil rights laws and to protect civil rights advocates in the 1950s and 1960s. *See* CRS Report 37-38.

The situation in Los Angeles exhibited many of the same features as these historical precedents. In response to lawful immigration enforcement efforts, violent rioters specifically targeted federal personnel and buildings. They assaulted and pinned down federal officials with, among other things, commercial-grade, mortar-style fireworks, Molotov cocktails, large chunks of concrete, chairs, bricks, rocks, and paintballs. *See* ER-57-63; ER-80-81. The mobs besieged federal facilities, using "commercial dumpsters" as "battering ram[s]" to breach a federal building, ER-58, and "heavily vandaliz[ing]" federal properties, ER-59; ER-62-63, including by spray

painting messages like "Kill ICE" and "Death to ICE."[4]  Demonstrators organized
themselves through social media, "posting the locations of federal law enforcement
employees conducting immigration enforcement operations," as well as "images[] and
family information of federal law enforcement employees."  ER-64.

Contrary to the district court's suggestion (ER-21), the presence of non-violent
protestors in Los Angeles does not detract from the threat posed by these violent
mobs.  Nor is the nature of the rebellion transformed because some of the violent
rioters may have thrown "items under cover of darkness, protected by a crowd,
identities concealed."  ER-21.  It is unsurprising that many if not most violent rioters
would seek to avoid detection and apprehension for their crimes, and it would be
perverse to read Section 12406(2) to prevent the President from protecting federal
personnel and property from all attacks except those where the perpetrators expect to
be identified and caught.

At a minimum, these conditions created a "danger of a rebellion."  Congress
sensibly did not require the President to await an actual rebellion before federalizing
Guard members where a significant threat of rebellion exists.  And here, violent
rioters used weapons to injure several federal officials; painted death threats aimed at
federal employees on federal buildings; and publicly disseminated the location, images,

---

[4] *See* Press Release, U.S. Dep't of Homeland Sec., *DHS Sets the Record Straight on
LA Riots, Condemns Violence Against Law Enforcement, Destruction of Property and Threats to
ICE Agents* (June 10, 2025), https://perma.cc/6WSM-3UEG.

and family information of federal employees in an attempt to threaten them. Creating life-threatening dangers for federal officers enforcing federal law (as well as bystanders) and targeting federal employees for their work performing federal functions surely amounts to a dangerous risk of rebellion.[5]

**3.** In all events, Congress vested the decision whether to call up the National Guard in the President, not the courts, as the Supreme Court observed nearly 200 years ago in *Martin*, 25 U.S. (12 Wheat.) 19. There, a member of the New York militia challenged the penalties imposed on him by a court martial after he refused to comply with orders to report for federal service as part of the War of 1812. *See id.* at 20-23. President Madison had activated the state militia into federal service pursuant to a 1795 law providing "that whenever the United States shall be invaded, or be in imminent danger of invasion from any foreign nation or Indian tribe, it shall be lawful for the President of the United States to call forth such number of the militia of the State or States most convenient to the place of danger, or scene of action, as he may judge necessary to repel such invasion." *Id.* at 29 (quotation omitted). The Supreme Court refused to entertain the militia member's contention that the President had misjudged the danger of such an invasion, explaining that "the authority to decide

---

[5] Contrary to the district court's suggestion (ER-24), nothing in Section 12406 requires the President to refer explicitly to a "danger of a rebellion" in his order federalizing the National Guard. Even were there such a requirement, the President satisfied it here by explaining that "[t]o the extent that protests or acts of violence directly inhibit the execution of the laws, they constitute a form of rebellion." ER-50.

30

whether the exigency has arisen[] belongs exclusively to the President," whose decision "is conclusive upon all other persons." *Id.* at 30.

That conclusion, the Court explained, "necessarily results from the nature of the power itself," which is "to be exercised upon sudden emergencies, upon great occasions of state, and under circumstances which may be vital to the existence of the Union." *Martin*, 25 U.S. (12 Wheat.) at 30. To be effective, the President's authority to activate the militia must command "unhesitating obedience" from his military subordinates, consistent with "command of a military nature." *Id.* The Court also emphasized that the 1795 law "confided" the power to call up the militia "to the Executive of the Union," as Commander in Chief, and thus "necessarily constituted" the President himself as "the judge of the existence of the exigency in the first instance." *Id.* at 31; *cf. Luther v. Borden*, 48 U.S. (7 How.) 1, 43 (1849) (asking rhetorically whether, "[a]fter the President has acted and called out the militia, is a Circuit Court of the United States authorized to inquire whether his decision was right" and observing that extending the judicial power so far would be "a guarantee of anarchy").

Those same principles apply here. At bottom, plaintiffs seek to use this suit to second-guess the President's judgment that the waves of mob violence roiling Los Angeles warranted activating the National Guard—both because the violence rose to the level of rebellion or a danger of rebellion against the federal government's authority to enforce the immigration laws and because the violence left the President

sufficiently unable to ensure faithful execution of federal law.  But like the 1795 law at issue in *Martin*, Section 12406 makes clear that Congress has granted "the authority to decide whether" those statutory prerequisites are satisfied "exclusively to the President," whose decision must be treated as "conclusive."  *Martin*, 25 U.S. (12 Wheat.) at 30.

The stay panel was correct to dismiss the district court's and plaintiffs' efforts to distinguish *Martin* on the ground that that case involved an invasion by a foreign government, as opposed to a domestic dispute.  *See* ER-17-18, ER-17 & n.5.  The panel observed that Section 12406 "is not limited to the domestic use of military force"; the first prong of the statute, using almost exactly the same language as the 1795 law at issue in *Martin*, authorizes the President to call forth the militia when the United States "is invaded or is in danger of invasion by a foreign nation."  *Newsom*, 141 F.4th at 1050 (quoting 10 U.S.C. § 12406).  And the panel found "no reason" to believe "that Congress would have intended for the President to receive significant deference when he invokes the first precondition in [Section] 12406, but not when he invokes the other two."  *Id.*  The panel further explained that the Supreme Court relied heavily on *Martin* in *Luther v. Borden*—a case involving a "purely domestic dispute" between two factions each purporting to constitute the legitimate government of Rhode Island.  *Id.* (citing *Luther*, 48 U.S. (7 How.) at 44-45).

Nor, as the stay panel explained, is the President's decision binding only as to military subordinates.  To the contrary, the Court in *Martin* emphasized that the

32

President's decision was "conclusive upon all other persons." 25 U.S. (12 Wheat.) at 28. And in *Luther*, the Court explained that even courts could not second-guess President Tyler's decision to call out the militia to support one side in the Rhode Island dispute. 48 U.S. (7 How.) at 44-45. Similarly, the stay panel correctly recognized that *Martin*'s continuing viability is not for lower courts to decide. *Newsom*, 141 F.4th at 1050-51. And in any event, the Supreme Court has repeatedly reiterated that when a valid statute "commits [a] decision to the discretion of the President," the President's exercise of discretion is not subject to judicial review. *Dalton v. Specter*, 511 U.S. 462, 474 (1994); *cf. Baker v. Carr*, 369 U.S. 186, 213 (1962) (citing *Martin* for the proposition that an emergency demands "[a] prompt and unhesitating obedience").

The stay panel erred, however, in concluding that *Martin* and its progeny preserve some degree of judicial review—albeit highly deferential—of the President's decision to call forth the Guard. To reach that conclusion, the panel relied on *Sterling v. Constantin*, 287 U.S. 378 (1932), a case involving a challenge by oil producers to various military orders issued by the Governor of Texas and Texas National Guard officials. *See id.* at 388-89. That case began when the Railroad Commission of Texas ordered the producers to limit production during an oil rush. *See id.* at 387-88. The oil producers challenged the Commission's orders and obtained a temporary restraining order enjoining their enforcement. *See id.* at 387. Instead of complying with the court's order, the Governor of Texas proclaimed that the oil and gas

33

producers were "in a state of insurrection" and ordered the militia to enforce the limits on production. *Id.* at 387-88 (quotation omitted).

When the case reached the Supreme Court, the Court made clear that the question before it was "not of the power of the Governor to proclaim that a state of insurrection . . . exists, and that it is necessary to call military force to the aid of the civil power." *Sterling*, 287 U.S. at 401. Rather, "[t]he question . . . is simply with respect to the Governor's attempt to regulate by executive order the lawful use of complainants' properties in the production." *Id.* at 401-02. Accordingly, the Court "assumed that the Governor was entitled to declare a state of insurrection and to bring military force to the aid of civil authority" but emphasized that "the proper use of that power in this instance was to maintain the federal court in the exercise of its jurisdiction, and not to attempt to override it." *Id.* at 404. In other words, *Sterling* involved judicial review of the conduct of the militia once deployed, not of the Governor's determination that deployment of the militia was warranted in the first instance. *See id.* at 401 ("What are the allowable limits of military discretion, and whether or not they have been overstepped in a particular case, are judicial questions."). The case thus says nothing about the core teaching of *Martin*—that under statutes such as Section 12406, the President is vested with the discretion to determine whether an exigency requiring military aid has arisen and "his decision is conclusive upon all other persons." 25 U.S. (12 Wheat.) at 30; *see also Sterling*, 287 U.S. at 399.

34

Even if some judicial review of the President's decision were permitted, that review would be highly deferential. The longstanding precedent interpreting statutory delegations of the calling-forth power requires, at a minimum, that courts "give a great level of deference to the President's determination that [one of Section 12406's] predicate condition[s] exists." *Newsom*, 141 F.4th at 1048; *see also id.* at 1047 (observing that review of the President's decision in this context is "especially deferential"). And even the district court recognized that "courts cannot second-guess a President's factual determinations" underlying a call-up order under Section 12406. ER-17. Plaintiffs do not come close to showing the clear abuse of discretion or absence of any justification that would be necessary to demonstrate that the calling up of the National Guard was unlawful under any deferential judicial review that could apply.

### B. The President Acted Lawfully in the Process Used to Call Up the National Guard

The President also complied with Section 12406's procedural requirement when he federalized the California National Guard. Section 12406 first establishes the President's unilateral authority to "call into Federal service members and units of the National Guard of any State." 10 U.S.C. § 12406. It then states that "[o]rders for these purposes shall be issued through the governors of the States." *Id.* Orders are thus issued by the President and conveyed through Governors. This procedural mechanism reflects the dual control of the National Guard and ensures that

35

responsibility for the members is clearly transferred from state to federal control. *See supra* p. 5-6.

The President and the Secretary of Defense satisfied this procedural requirement. The President spoke with Governor Newsom about the situation in Los Angeles on June 6. *See supra* p. 8. The next day, the President signed the order federalizing members of the California National Guard. *See* ER-50-51. The Secretary of Defense then sent a memorandum to California's Adjutant General, who forwarded the memorandum to the Governor, ER-149-50, and transferred operational command of the relevant National Guard units to the federal commander. *See* ER-223.

The stay panel correctly rejected the district court's suggestion that the Governor himself—and not the Adjutant General—needed to transmit the order to the Guard units. *See Newsom*, 141 F.4th at 1052-54. As the panel explained, Section 12406 "requires that the President's order be issued *through* the Governor, not *directly by* the Governor." *Id.* at 1053. And here "the federalization order was issued through an agent of the Governor in the Governor's name." *Id.* at 1052. Specifically, the order was transmitted through the Adjutant General, who, under California law, "is chief of staff to the Governor, . . . is the commander of all state military forces," *id.* (quoting Cal. Mil. & Vet. Code § 160), and issues "all orders in the name of the Governor," *id.* (quoting Cal. Mil. & Vet. Code § 163). State law thus empowers the Adjutant General to act on behalf of the Governor for purposes of issuing the

36

President's order through the Governor.  "Nothing in [Section] 12406 prevents the State from delegating to a subordinate, such as the Adjutant General, the Governor's authority to issue such orders."  *Id.* at 1053 (citing *Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. U.S. Dep't of Homeland Sec.*, 107 F.4th 1064, 1075-76 (9th Cir. 2024)).[6]

The stay panel was similarly correct to conclude that the President need not obtain the Governor's consent to federalize National Guard members.  "[T]he text of [Section] 12406 does not give governors any veto power over the President's federalization decision," the panel reasoned.  *Newsom*, 141 F.4th at 1053.  Several other related provisions of the Code explicitly require a Governor to concur before the activation of federal troops.  For example, the Secretary of Defense may "order a member of a reserve component under his jurisdiction to active duty," except that members of the National Guard "may not be ordered to active duty . . . without the *consent* of the governor or other appropriate authority of the State concerned."  10 U.S.C. § 12301(d) (emphasis added); *see id.* § 10101 (defining the "reserve components" to include the National Guard).  Likewise, the Secretary may order a member of the Army, Navy, Marine, or Air Force Reserves to active duty to provide assistance in response to a major disaster or emergency but only after receiving a

---

[6] Section's 12406's reference to the "commanding general of the National Guard of the District of Columbia" is irrelevant.  It simply accounts for the fact that the District of Columbia has no governor and the District of Columbia National Guard, unlike state national guards, is always under federal command even acting as a militia. *See* D.C. Code § 49-409.

37

request from a Governor. *Id.* § 12304a(a). Section 12406, in contrast, conspicuously omits a consent requirement.

Nor does the language of Section 12406 support plaintiffs' contention that the President needed to consult the Governor about the order. As the stay panel noted, "the decision to activate the National Guard under [Section] 12406 is textually committed to the President alone." *Newsom*, 141 F.4th at 1053; *see* 10 U.S.C. § 12406 ("[T]he *President* may call into Federal service members and units of the National Guard . . . ." (emphasis added)). The requirement to issue orders "'through the governor[]'" "does not grant the governor any 'consulting' role"; "[i]t simply delineates the procedural mechanisms through which the President's orders are issued." *Newsom*, 141 F.4th, at 1053 (first alteration in original). After all, when a military commander issues an order "through" a third party, that is not an invitation for the third party to debate the merits of the order with the commander.

This plain-text, common-sense interpretation does not render Section 12406's procedural requirement inoperative or superfluous. Rather, it reflects the dual control of the Guard and ensures that command and control is properly transferred. Section 12406's procedure guarantees that the state commander in chief has notice of the federalization order and eliminates any command confusion that might otherwise result.

Finally, the stay panel explained why even if the President failed to comply with Section 12406's procedural requirement, the district court's order was still unsound.

38

"[T]he proper remedy" for non-compliance with the procedural requirement "would be injunctive relief tailored to [d]efendants' failure to issue the order through the Governor[, ]not an injunction prohibiting the President from exercising his lawful authority to call up the National Guard." *Newsom*, 141 F.4th at 1054. That conclusion follows from *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), where the Supreme Court held that the Navy's failure to conduct certain environmental studies before deploying an antisubmarine force could not justify an injunction barring that deployment and "jeopardizing national security." *Id.* at 32-33. "At most," relief tailored to a procedural violation of Section 12406 "would be an injunction directing the President to send the relevant memoranda directly to the Governor." *Newsom*, 141 F.4th at 1054.

## C.   The President's Order Is Consistent with the Tenth Amendment

The President's order is also consistent with the Tenth Amendment. The district court rightly recognized that plaintiffs' Tenth Amendment claim is derivative of their other claims to the extent it asserts that the President failed to comply with Section 12406. ER-31. That claim accordingly fails for the same reasons. *See supra* p. 21-39.

The district court erred, however, in further suggesting that the order might "conflict with California's police power" even if properly issued under Section 12406. ER-31-32. As an initial matter, the President called up the National Guard members

39

to protect undisputedly federal interests—specifically, to "temporarily protect ICE and other United States Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where protests against these functions are occurring or are likely to occur." ER-50. The President did not authorize the National Guard members to prevent future protests or to exercise general state police power.

The fact that the federalized Guardsmen cannot now be used for state duties does not change this analysis. The Supreme Court "long ago rejected the suggestion" that the federal government "invades areas reserved to the States by the Tenth Amendment simply because it exercises its authority . . . in a manner that displaces the States' exercise of their police powers." *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 291 (1981). As long as the federal action is authorized by the Constitution, "the Tenth Amendment gives way." *United States v. Hatch*, 722 F.3d 1193, 1202 (10th Cir. 2013); *see United States v. Comstock*, 560 U.S. 126, 144 (2010) ("If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States . . . ." (alteration in original) (quoting *New York v. United States*, 505 U.S. 144, 156 (1992)). And here the President was acting both pursuant to a valid federal statute enacted by Congress and his own inherent Article II authority, including as Commander in Chief. *See* U.S. Const. art. I, § 8, cl. 15; *id.* art. II, § 2, cl. 1; *id.* art. II, § 3; *see also* 10 U.S.C. § 12406.

40

## II.    Plaintiffs Did Not Establish the Equitable Factors for Injunctive Relief

The district court's order should be vacated for the independent reason that plaintiffs did not show that the remaining factors warrant the "extraordinary relief of an injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010).

**1.** The stay panel appropriately recognized that the district court's injunction imposed significant harms on the federal government and the public at large. The federal government has "an uncontested interest in the protection of federal agents and property and the faithful execution of law." *Newsom*, 141 F.4th at 1054 (citing *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 838 (9th Cir. 2020)). And the district court's order seriously threatened that interest by exposing federal employees to violence at the hands of rioting mobs in Los Angeles and interfering with those employees' ability to enforce federal law. As noted, National Guard members were called up to protect federal personnel and property following mob violence, in which protestors threw bottles, concrete chunks, and other objects at federal protective service officers attempting to prevent a mob from breaching federal property; attacked federal officers preparing for an immigration enforcement operation with potentially lethal incendiary devices and fought them for hours; trapped a federal enforcement officer in her vehicle, which a mob pounded, shook, and violently pummeled with stones; injured numerous federal officers and agents by

throwing projectiles; set multiple vehicles on fire; and caused extensive damage to federal property. *See supra* p. 7-9.

Enjoining the National Guard deployment, and pulling National Guard members from the area, would have posed a substantial risk to federal personnel and property, as well as to federal officials' ability to enforce federal law. ICE agents (and other federal personnel) would have been essentially left on their own in the performance of their duties, bereft of the protection of the activated National Guard or the Marines that have deployed to assist the Guard. As a result, federal officers would have either had to face the very real risk of ongoing violence that the President found to be unacceptable, or they would have been compelled to curtail their enforcement of federal law in some instances to avoid the threat of violence.

**2.** The stay panel was also correct to hold that the federal government's "significant" interest in preventing these extraordinary acts of violence and threats to federal personnel outweighed the "speculative" harms that plaintiffs put forward. *See Newsom*, 141 F.4th at 1055. The speculative nature of plaintiffs' harms likewise makes clear that they did not establish irreparable injury warranting extraordinary relief. *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007) ("Speculative injury cannot be the basis for a finding of irreparable harm.").

Plaintiffs posited that the "continued presence of National Guard members and Marines in Los Angeles risks worsening, not improving, tensions." ER-33. But plaintiffs cannot second-guess the President's judgment about how best to quell the

42

violent opposition to federal enforcement of immigration laws, which was clearly the impetus for the deployment of the National Guard and not vice versa. And plaintiffs did not adduce any evidence to support their conclusory assertion that the National Guard members would worsen the situation on the ground. The district court cited the increased number of local law enforcement arrests in Los Angeles following the National Guard deployment, ER-33-34, but there is no basis for concluding that those arrests were the result of inflamed tensions. Rather, they might simply reflect the fact that National Guard members were available to protect federal personnel, freeing local law enforcement to focus on apprehending violent rioters. Plaintiffs' speculation about inflamed tensions is thus not "grounded in . . . evidence" and cannot establish that plaintiffs will suffer irreparable harm absent the district court's injunction. *Herb Reed Enters., LLC v. Florida Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013).

Similarly speculative are plaintiffs' fears that National Guard members will be unable to carry out other important state functions during the Los Angeles deployment. Plaintiffs provided no record evidence—and the district court did not cite any—of concrete adverse impacts to existing state operations. And as the stay panel observed, "we do not know what emergencies may occur in California" in the future. *Newsom*, 141 F.4th at 1055. Nor do we know what, if any, effect the deployment of limited numbers of National Guard members to temporarily protect federal personnel in Los Angeles will have on the state's ability to address any such emergency. Plaintiffs have never explained how such hypothetical, speculative

43

concerns could outweigh the concrete, already-demonstrated risk of unlawful violent conduct in the absence of the National Guard.[7]

## CONCLUSION

For the foregoing reasons, the district court's temporary restraining order should be vacated.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE

  *s/ Anna O. Mohan*
ANNA O. MOHAN
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7517*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-2689*
  *sswingle@usdoj.gov*

July 2025

---

[7] The district court also erred in concluding that the President's invocation of Section 12406, "against the wishes of a state governor . . . threatens serious injury to the constitutional balance of power." ER-36. That argument simply repackages plaintiffs' merits arguments, all of which fail for the reasons explained. *See supra* p. 21-39.

44

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, appellants state that they know of no related case pending in this Court.

*s/ Anna O. Mohan*
Anna O. Mohan

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,814 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Anna O. Mohan*
Anna O. Mohan

ADDENDUM

# TABLE OF CONTENTS

10 U.S.C. § 12406 ...................................................................................................A1

**10 U.S.C. § 12406**

**§ 12406. National Guard in Federal service: call**

Whenever—

(1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation;

(2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or

(3) the President is unable with the regular forces to execute the laws of the United States;

the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws. Orders for these purposes shall be issued through the governors of the States or, in the case of the District of Columbia, through the commanding general of the National Guard of the District of Columbia.