No. 25-3727

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE NINTH CIRCUIT

GAVIN NEWSOM, *et al.*,
*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, *et al.*,
*Defendants-Appellants*.

**On Appeal from the United States District Court
for the Northern District of California**
No. 3:25-cv-04870
The Honorable Charles R. Breyer

### ANSWERING BRIEF OF PLAINTIFFS-APPELLEES

ROB BONTA
*Attorney General of California*
HELEN H. HONG
*Acting Solicitor General*
THOMAS S. PATTERSON
MICHAEL L. NEWMAN
*Senior Assistant Attorneys General*
ANYA BINSACCA
MARISSA MALOUFF
JAMES E. STANLEY
*Supervising Deputy
  Attorneys General*

SAMUEL T. HARBOURT*
CHRISTOPHER D. HU
*Deputy Solicitors General*
MEGHAN H. STRONG
JANE REILLEY
*Deputy Attorneys General*
HALEY AMSTER
*Associate Deputy
  Solicitor General*

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3919
Samuel.Harbourt@doj.ca.gov
*Attorneys for Plaintiffs-Appellees*

September 2, 2025

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................ 1

Jurisdiction ........................................................................ 3

Statement ........................................................................... 3

    A.    Legal background ....................................................... 3

    B.    Factual background & procedural history ................................ 7

Summary of argument ............................................................. 13

Argument ............................................................................ 16

I.    The Court should affirm the district court's injunction .................... 16

    A.    Plaintiffs have shown a likelihood of success on the merits ... 16

        1.    There is no "rebellion" or other basis for federalizing the National Guard under Section 12406 .............................................................. 16

            a.    The predicates for invoking Section 12406 are not satisfied ............................................ 17

            b.    Principles of deference do not provide a basis for upholding defendants' federalization ............ 28

            c.    Courts may review whether the executive branch has complied with Section 12406 .......... 35

        2.    Defendants failed to issue their federalization orders "through the Governor" ................................ 40

    B.    The remaining equitable factors strongly support upholding the district court's order ........................................ 48

II.    Alternatively, the Court may wish to vacate the district court's injunction—and its own prior stay order—in light of changed circumstances .................................................................. 53

Conclusion ........................................................................ 59

# TABLE OF AUTHORITIES

Page

**CASES**

*Baker v. Carr*
369 U.S. 186 (1962)................................................................32, 37

*Biden v. Nebraska*
600 U.S. 477 (2023)......................................................................27

*Biden v. Texas*
597 U.S. 785 (2022)......................................................................18

*Bond v. United States*
572 U.S. 844 (2014)................................................................19, 26

*Boumediene v. Bush*
553 U.S. 723 (2008)......................................................................39

*Bragdon v. Abbott*
524 U.S. 624 (1998)......................................................................33

*Chamber of Com. of U.S. v. Reich*
74 F.3d 1322 (D.C. Cir. 1996)....................................................36

*City of Los Angeles v. Adams*
556 F.2d 40 (D.C. Cir. 1977)......................................................46

*Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*
603 U.S. 799 (2024)......................................................................47

*Dalton v. Specter*
511 U.S. 462 (1994)................................................................36, 39

*Deakins v. Monaghan*
484 U.S. 193 (1988)......................................................................35

*Degelmann v. Advanced Med. Optics Inc.*
699 F.3d 1103 (9th Cir. 2012) ....................................................55

## TABLE OF AUTHORITIES
### (continued)

Page

*E. Bay Sanctuary Covenant v. Biden*
 993 F.3d 640 (9th Cir. 2021) .............................................. 16, 56

*EPA v. EME Homer City Generation, L.P.*
 572 U.S. 489 (2014) ................................................................ 44

*Gen. Dynamics Corp. v. United States*
 563 U.S. 478 (2011) ................................................................ 32

*Gregory v. Ashcroft*
 501 U.S. 452 (1991) ................................................................ 21

*Gustafson v. Alloyd Co.*
 513 U.S. 561 (1995) ................................................................ 23

*Health Freedom Def. Fund, Inc. v. Carvalho*
 __ F.4th __, 2025 WL 2167401 (9th Cir. July 31, 2025) (en banc) ........... 53

*INS v. Cardoza-Fonseca*
 480 U.S. 421 (1987) ................................................................ 30

*J.A.V. v. Trump*
 781 F. Supp. 3d 535 (S.D. Tex. 2025) ....................................... 35

*J.G.G. v. Trump*
 2025 WL 914682 (D.C. Cir. Mar. 26, 2025) ............................. 35

*Johnson v. Couturier*
 572 F.3d 1067 (9th Cir. 2009) .................................................. 48

*Laird v. Tatum*
 408 U.S. 1 (1972) ............................................................ 2, 10, 26

*Loper Bright Enter. v. Raimondo*
 603 U.S. 369 (2024) ............................................................ 28-30

*Lopez-Angel v. Barr*
 952 F.3d 1045 (9th Cir. 2019) .................................................. 30

## TABLE OF AUTHORITIES
### (continued)

Page

*Luftig v. McNamara*
    373 F.2d 664 (D.C. Cir. 1967)................................................................38

*Luther v. Borden*
    48 U.S. (7 How.) 1 (1849) ........................................... 31-32, 39-40

*Marbury v. Madison*
    5 U.S. (1 Cranch) 137 (1803) ...............................................35

*Martin v. Mott*
    25 U.S. (12 Wheat.) 19 (1827) ...................................... 31-33, 37-40

*Mayorkas v. Innovation L. Lab*
    141 S. Ct. 2842 (2021).....................................................55

*Ex parte Milligan*
    71 U.S. (1 Wall.) 2 (1866) ................................................34

*Murphy Co. v. Biden*
    65 F.4th 1122 (9th Cir. 2023) ............................................36

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*
    422 F.3d 782 (9th Cir. 2005) ...........................................48, 50

*Nisbet v. Bridger*
    124 F.4th 577 (9th Cir. 2024) ............................................50

*Nixon v. Missouri Mun. League*
    541 U.S. 125 (2004)........................................................26

*Orlando v. Laird*
    443 F.2d 1039 (2d Cir. 1971) ............................................38

*Paulsen v. Daniels*
    413 F.3d 999 (9th Cir. 2005) .............................................47

*Pomares v. Dep't of Veterans Affs.*
    113 F.4th 870 (9th Cir. 2024) ...........................................20

iv

## TABLE OF AUTHORITIES
### (continued)

Page

*Printz v. United States*
    521 U.S. 898 (1997)....................................................................44

*Redd v. Guerrero*
    122 F.4th 1203 (9th Cir. 2024) ..................................................55

*Riverbend Farms, Inc. v. Madigan*
    958 F.2d 1479 (9th Cir. 1992) ....................................................47

*Roman v. Wolf*
    977 F.3d 935 (9th Cir. 2020) ................................................53, 54

*Russello v. United States*
    464 U.S. 16 (1983)......................................................................36

*Sierra Club v. Bosworth*
    510 F.3d 1016 (9th Cir. 2007) ....................................................46

*Stanley v. City of Sanford, Fla.*
    145 S. Ct. 2058 (2025)................................................................41

*State Bd. of Educ. v. Levit*
    52 Cal. 2d 441 (1959) .................................................................45

*Sterling v. Constantin*
    287 U.S. 378 (1932)....................................................................34

*Sw. Voter Registration Educ. Project v. Shelley*
    344 F.3d 914 (9th Cir. 2003) (en banc) .....................................16

*Taggart v. Lorenzen*
    587 U.S. 554 (2019)....................................................................33

*Tandon v. Newsom*
    593 U.S. 61 (2021)......................................................................53

*Trump v. J.G.G.*
    145 S. Ct. 1003 (2025)..........................................................35, 39

v

# TABLE OF AUTHORITIES
## (continued)

Page

*U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*
    513 U.S. 18 (1994).........................................................................56

*United States v. Munsingwear, Inc.*
    340 U.S. 36 (1950).........................................................................55

*United States v. Nixon*
    418 U.S. 683 (1974).......................................................................39

*Util. Air Regul. Grp. v. EPA*
    573 U.S. 302 (2014).......................................................................26

*Valentine v. Collier*
    960 F.3d 707 (5th Cir. 2020) ........................................................54

*V.O.S. Selections, Inc. v. Trump*
    __ F.4th __, 2025 WL 2490634 (Fed. Cir. Aug. 29, 2025) (en banc)........27

*Washington v. Trump*
    858 F.3d 1168 (9th Cir. 2017) ......................................................55

*Wisc. Dep't of Health & Fam. Servs. v. Blumer*
    534 U.S. 473 (2002).......................................................................44

*Wolford v. Lopez*
    116 F.4th 959 (9th Cir. 2024) ................................................16, 48

*Youngstown Sheet & Tube Co. v. Sawyer*
    343 U.S. 579 (1952)............................................................32, 39, 52

*Zivotofsky ex rel. Zivotofsky v. Clinton*
    566 U.S. 189 (2012).......................................................................35

STATUTES

10 U.S.C. §§ 251-255..................................................................4, 41

10 U.S.C. § 12406..................................................................*passim*

## TABLE OF AUTHORITIES
### (continued)

Page

Cal. Mil. & Vet. Code § 160 ................................................................45

Cal. Mil. & Vet. Code § 163 ................................................................45

1 Stat. 264 (1792) ..................................................................................5

1 Stat. 424 (1795) .............................................................................5, 38

12 Stat. 281 (1861) .....................................................................5, 22, 30

14 Stat. 485 (1867) .........................................................................42-43

32 Stat. 775 (1903) .........................................................................5, 30

35 Stat. 399 (1908) ....................................................................6, 30, 40

108 Stat. 2663 (1994) ...........................................................................30

CONSTITUTIONAL PROVISIONS

Cal. Const. art. V, § 7...........................................................................45

U.S. Const. art. I, § 8, cls. 15-16.....................................................4, 16

U.S. Const. art. I, § 9, cl. 7..................................................................26

U.S. Const. art. II, § 2, cl. 1 ................................................................31

OTHER AUTHORITIES

42 Cong. Rec. 6870 (1908) ..................................................................42

46 Cong. Rec. 3638 (1911) ..................................................................42

35 Fed. Reg. 5001 (Mar. 24, 1970)........................................................6

Black's Law Dictionary (12th ed. 2024) ..............................................18

# TABLE OF AUTHORITIES
### (continued)

Page

Bradley & Goldsmith, *Foreign Affairs, Nondelegation, and the Major Questions Doctrine*, 172 U. Pa. L. Rev. 1743 (2024) ......................31

Branson-Potts & Do, *Veterans' Advocates Warn of Low Morale Amid L.A. Deployment*, L.A. Times (June 24, 2025), https://tinyurl.com/yc8ymxse .......................................................................57

Cal. Sec'y of State, *2025 Statewide Special Election*, https://tinyurl.com/38n3jpn2........................................................................12

Coakley, *The Role of Federal Military Forces in Domestic Disorders, 1789-1878* (1988) ................................................................4, 24

Exec. Order 10730, 22 Fed. Reg. 7628 (Sept. 24, 1957)................................46

Exec. Order 11519, 35 Fed. Reg. 5003 (Mar. 24, 1970) ..................................6

Exec. Order 14339, 90 Fed. Reg. 42121 (Aug. 25, 2025).....................2, 13, 58

Fairman, *Martial Rule in the Light of* Sterling v. Constantin, 19 Cornell L.Q. 20 (1933) .................................................................................34

Harter, *National Guard Troops Deployed to L.A. Were Sent to Riverside County Marijuana Farm Raid*, L.A. Times (June 24, 2025), https://tinyurl.com/7r9xtb7c ............................................................9

Hubler, *Trump's National Guard Troops Are Questioning Their Mission in L.A.*, N.Y. Times (July 16, 2025), https://tinyurl.com/bd7v8ree........................................................................57

Kastenberg, *The Limits of Executive Power in Crisis in the Early Republic*, 82 La. L. Rev. 161 (2021) .....................................................37-38

Lamothe, *Pentagon Plans Military Deployment in Chicago as Trump Eyes Crackdown*, Wash. Post (Aug. 23, 2025), https://tinyurl.com/5drb5fr9.................................................................13, 58

Leider, *The Modern Militia*, 2023 Mich. St. L. Rev. 893 (2023).......................3

## TABLE OF AUTHORITIES
### (continued)

Page

Mackey, *Federal Agents Use Force During Immigration Raid at Two California Farms*, Guardian (July 10, 2025), https://tinyurl.com/4u8w9zw9 .................................................. 9

Manheim & Watts, *Reviewing Presidential Orders*, 86 U. Chi. L. Rev. 1743 (2019) ................................................................ 29

Mayson & Stevenson, *Misdemeanors by the Numbers*, 61 B.C. L. Rev. 971 (2020) ....................................................................... 19

Mirasola, *Sovereignty, Article II, and the Military During Domestic Unrest*, 15 Harv. Nat'l Sec. J. 199 (2023) .................. 31

Mokam & Cooper, *National Guard Patrols Begin to Carry Weapons in D.C.*, N.Y. Times (Aug. 24, 2025), https://tinyurl.com/2mmvhe87 ................................................. 13

Note, *The Presumption of Regularity in Judicial Review of the Executive Branch*, 131 Harv. L. Rev. 2431 (2018) ................... 32

Pope, *Operation Graphic Hand*, Smithsonian Nat'l Postal Museum (Mar. 23, 2017), https://tinyurl.com/3tdvv5v2 ........... 6

Protest to House of Representatives (Mar. 2, 1867), https://tinyurl.com/pjrvs8pa ................................................ 43

Rubio, *Undelivered: From the Great Postal Strike of 1970 to the Manufactured Crisis of the U.S. Postal Service* (2020) ............. 6

Scalia & Garner, *Reading Law* (2012) ............................................. 33

Sharp, *Trial in National Guard Lawsuit Tests Whether Trump Will Let Courts Limit Authority*, L.A. Times (Aug. 12, 2025), https://tinyurl.com/2k3jv5c9 ................................................. 57

Slaughter, *The Whiskey Rebellion: Frontier Epilogue to the American Revolution* (1986) ......................................................... 21

## TABLE OF AUTHORITIES
### (continued)

**Page**

Stelloh, *Pete Hegseth Orders the Removal of 2,000 National Guard Troops From Los Angeles*, NBC News (July 15, 2025), https://tinyurl.com/4m883yks ..................................................................... 11

Tyler, *The Forgotten Core Meaning of the Suspension Clause*, 125 Harv. L. Rev. 901 (2012) ....................................................... 34

U.S. Dep't of Just., Agencies: Law Enforcement, https://tinyurl.com/39yae7hf ........................................................ 24

U.S. Dep't of Just., Archives, Crim. Res. Manual, https://tinyurl.com/3zacwe2y ....................................................... 25

Vladeck, Note, *Emergency Power and the Militia Acts*, 114 Yale L.J. 149 (2004) ........................................................................ 4

Watson & Weber, *What to Know About the Troops and Federal Agents in LA's MacArthur Park*, Associated Press (July 7, 2025), https://tinyurl.com/mvsjm34m ...................................... 9

Webster's Int'l Dictionary of the English Language (1903) .......................... 17

Webster's New Int'l Dictionary (2d ed. 1936) ......................................... 22, 40

White House, *President Trump Participates in a Cabinet Meeting*, YouTube (Aug. 26, 2025), https://tinyurl.com/3knxk2vw ....................................................... 2

Wiener, *The Militia Clause of the Constitution*, 54 Harv. L. Rev. 181 (1940) ............................................................................ 5

## INTRODUCTION

On June 7, for the first time in our Nation's history, the President invoked 10 U.S.C. § 12406 to federalize a State's National Guard over the objections of the State's Governor. President Trump and Defense Secretary Hegseth transferred 4,000 members of California's National Guard—one in three of the Guard's total active members—to federal control to serve in a civilian law enforcement role on the streets of Los Angeles and other communities in Southern California. After the State and Governor Newsom brought suit to challenge that unprecedented action, the district court temporarily ordered the return of federalized troops to the State. The district court held that defendants' actions were likely unlawful and threatened to cause irreparable injury to both California and our Nation's democratic traditions. This Court, however, administratively stayed the district court's order and one week later issued a stay pending appeal.

Since that time, it has become clear that defendants' actions in Southern California earlier this summer were just the opening salvo in an effort to transform the role of the military in American society. President Trump and Secretary Hegseth have deployed thousands of soldiers to streets of Washington, D.C. for the purpose of civilian crime control. Plans are underway to do the same thing in Chicago. President Trump has also threatened to target New York, Oakland, and San Francisco with similar deployments. And a recent executive order directs

Secretary Hegseth to ensure that National Guard troops in all 50 States are ready to be deployed for civilian law enforcement purposes. Indeed, the order requires the Secretary to establish a new "standing National Guard quick reaction force" for "rapid nationwide deployment." Exec. Order 14339, 90 Fed. Reg. 42121-42122 (Aug. 25, 2025). At no prior point in our history has the President used the military this way: as his own personal police force, to be deployed for whatever law enforcement missions he deems appropriate. Addressing questions about the legality of this effort, the President recently stated: "I'm the President of the United States"; "I have the right to do anything I want to do." White House, *President Trump Participates in a Cabinet Meeting*, YouTube, at 3:12:21-3:12:31 (Aug. 26, 2025), https://tinyurl.com/3knxk2vw.

In the face of that extraordinary threat, this Court should revisit the reasoning in its prior stay order. That order adopted a "highly deferential standard of review" (Stay Order 33) that will make it difficult for courts to meaningfully limit defendants' future reliance on Section 12406. The district court, by contrast, applied a more demanding standard—a standard consistent with the statute's text and history, as well as the serious threat posed by defendants' actions to our system of federalism, the separation of powers, and longstanding norms against "military intrusion into civilian affairs." *Laird v. Tatum*, 408 U.S. 1, 15 (1972). Because

defendants have never provided an adequate justification under that standard, the district court's temporary restraining order should be affirmed.

Alternatively, the Court may wish to consider vacating and remanding the district court's order without reaching the merits. The Court has discretion to do so where, as here, the relevant factual circumstances have evolved in significant ways during the pendency of an appeal. If the Court takes that approach, it should also vacate its published stay order. Defendants should not be given the opportunity to invoke that order in support of their unlawful and increasingly extreme departures from longstanding limits on the military's role in our democracy.

## JURISDICTION

The Court previously concluded that it has appellate jurisdiction. *See* Stay Order 16-18. In light of that determination, plaintiffs do not contest the jurisdictional statement in defendants' opening brief. *See* 9th Cir. R. 28-2.2.

## STATEMENT

### A.   Legal Background

At the Constitutional Convention, "[t]he Framers heavily debated . . . whether the entire military power should be transferred to the national government." Leider, *The Modern Militia*, 2023 Mich. St. L. Rev. 893, 916 (2023). James Madison "advocated for full national control of the militia." *Id.* "Other delegates, however, fought Madison by stressing the importance" of state control. *Id.* at 917. Under the prevailing compromise, embodied in the Constitution's Militia Clauses,

3

the States retain control of the militia absent a valid federalization pursuant to a statute enacted by Congress. *See* U.S. Const. art. I, § 8, cls. 15-16.

By vesting federalization authority "in the Congress, not the president," the Framers ensured that the President would not have unfettered power to call forth state militias for service at the federal level. Coakley, *The Role of Federal Military Forces in Domestic Disorders, 1789-1878*, at 14 (1988). "Most everyone at the Convention dreaded a powerful standing army, and nearly as many feared a central, dominant Chief Executive." Vladeck, Note, *Emergency Power and the Militia Acts*, 114 Yale L.J. 149, 157 (2004). "The consensus thus clearly favored vesting the primary responsibility for responding to threats in the militias of the several states." *Id.* And "the federal government—through Congress, not the President—would exercise ultimate control." *Id.*

Today, the States retain primary responsibility over the militia—in modern terms, the National Guard. *See, e.g.*, Br. of Bipartisan Former Governors as Amici Curiae, C.A. Dkt. 49.1 at 9-12. But Congress has delegated limited statutory authority to the President to call the Guard into federal service. Section 12406 is one such statute.[1] Its earliest predecessor is the 1792 Militia Act. Under the 1792 Act, the President could call forth the militia in response to invasion or

---

[1] A separate set of laws—known collectively as the Insurrection Act—also authorizes federalization in specified circumstances. *See* 10 U.S.C. §§ 251-255.

4

insurrection, or whenever "the laws of the United States shall be opposed, or the execution thereof obstructed, in any state, by combinations too powerful to be suppressed by the ordinary course of judicial proceedings." 1 Stat. 264, 264. Congress amended the Militia Act in 1795 but left the quoted language in place. 1 Stat. 424, 424. Shortly after the Civil War began, Congress again amended the Act to authorize the President to federalize the militia when "rebellion" or other "unlawful obstructions, combinations, or assemblages of persons" make it "impracticable, in the judgment of the President . . . to enforce . . . the laws of the United States." 12 Stat. 281, 281 (1861).

In 1903, Congress comprehensively overhauled the Militia Act, including by enacting a new calling-forth provision that ultimately became Section 12406. *See* 32 Stat. 775, 776; Wiener, *The Militia Clause of the Constitution*, 54 Harv. L. Rev. 181, 193-196 (1940). As relevant here, the 1903 Act gave the President authority to federalize the National Guard in cases of invasion, rebellion, or when "the President is unable, with the other forces at his command, to execute the laws of the Union in any part thereof." 32 Stat. at 776. In crafting that provision, Congress departed from the language in the 1861 statute: it used the term "unable," rather than "impracticable," and did not repeat "in the judgment of the President of the United States." *Id.* In 1908, Congress replaced the term "other

forces" with "regular forces" and made clear that federalization orders are to be issued "through the governor of the respective State." 35 Stat. 399, 400.

Before June of this year, no President had ever used Section 12406 to federalize the National Guard over a governor's objections. The statute was last employed in 1970, when President Nixon mobilized the National Guard along with active-duty troops to process mail during a nationwide postal strike. *See* Rubio, *Undelivered: From the Great Postal Strike of 1970 to the Manufactured Crisis of the U.S. Postal Service* 97-99 (2020). Although the strike began in New York, it quickly spread across the country and affected an estimated 671 post offices, including in many of the Nation's largest cities. *Id.* at 60, 115, 117. Roughly 200,000 postal workers, "between one-quarter and one-third of all postal employees," joined the strike, *id.* at 118, and it "threatened to bring the nation to a standstill," Pope, *Operation Graphic Hand*, Smithsonian Nat'l Postal Museum (Mar. 23, 2017), https://tinyurl.com/3tdvv5v2. The Nixon Administration negotiated with union leaders, but rank-and-file workers refused to settle. Rubio, *supra*, at 76-77, 87. After exhausting those efforts, the President declared a national emergency, 35 Fed. Reg. 5001 (Mar. 24, 1970), and federalized the National Guard, Exec. Order 11519, 35 Fed. Reg. 5003 (Mar. 24, 1970). In the President's view, he was unable "to execute the Postal laws of the United States" with "the regular forces." *Id.*

6

### B.   Factual Background & Procedural History

1.   The California National Guard currently has about 12,000 active members. ER-4.  The Guard has three duty status categories:  state active duty, in which the State pays for and controls the Guard; hybrid or Title 32 status, in which the State retains control but a particular mission is federally funded; and federal service under Title 10 of the United States Code, in which command shifts from the Governor to the President.  ER-71.  The Guard carries out "vital" state functions when it is under state control, including "emergency and natural disaster response, cybersecurity, and drug interdiction."  ER-72.

Over a two-day period beginning on June 6, many residents of Los Angeles joined protests related to federal immigration enforcement.  ER-4-9.  The vast majority demonstrated peacefully, but some engaged in acts of violence at and around federal buildings.  *See* ER-21-22.  State and local leaders unequivocally condemned those unlawful acts.  *See, e.g.*, ER-152; ER-154.  And state and local law enforcement moved promptly to arrest lawbreakers, protect federal buildings and officials, and restore order.  *See, e.g.*, ER-9-10; ER 79-82; *see also* SER-5-8.[2]

---

[2] Plaintiffs have generally included documents in the Supplemental Excerpts of Record only if they were before the district court at the time that it issued the temporary restraining order under review.  The only exception is D.Ct. Dkt. 77-3, which was filed after the district court's order but before this Court ruled on the motion for a stay.  *See* C.A. Dkt. 30.1.

Following those events, President Trump issued a memorandum on June 7 authorizing Defense Secretary Hegseth to "call[] into Federal service . . . at least 2,000 National Guard personnel . . . for 60 days" or longer. ER-190. The sole authority that the President invoked was 10 U.S.C. § 12406. ER-190-191. The President's memorandum referred to "incidents of violence and disorder" that had recently taken place in response to the "execution of Federal immigration law." ER-190. The President asserted that, to "the extent that protests or acts of violence directly inhibit the execution of the laws, they constitute a form of rebellion against the authority of the Government of the United States." *Id.* The memorandum authorized the deployment of federalized troops to protect, not just immigration agents, but any "United States Government personnel who are performing Federal functions, including the enforcement of Federal law . . . at locations where protests against these functions are occurring or are likely to occur[.]" ER-190. And the memorandum did not limit the deployment of troops to the areas in Los Angeles experiencing protest activity, or even to the Los Angeles region. ER-190-191.

On the evening of June 7, Secretary Hegseth federalized 2,000 members of the California National Guard and deployed those troops to Los Angeles. ER-7; ER-49. On June 9, he federalized another 2,000 members of the State's Guard. ER-9; ER-44. They too were deployed to Los Angeles, along with 700 active-duty Marines. ER-9. Since their deployment, these military forces have routinely

accompanied federal immigration agents in the field. *See, e.g.*, C.A. Dkt. 25.1 at 11. For example, on July 7, defendants deployed "[a]bout 90 National Guard troops," "dozens of federal officers," and "17 Humvees [and] four tactical vehicles" to a Los Angeles park in a densely populated neighborhood. Watson & Weber, *What to Know About the Troops and Federal Agents in LA's MacArthur Park*, Associated Press (July 7, 2025), https://tinyurl.com/mvsjm34m. Federalized guard units were also "sent more than 100 miles away" from Los Angeles to assist the DEA in enforcement actions "on suspected illegal marijuana farms." Harter, *National Guard Troops Deployed to L.A. Were Sent to Riverside County Marijuana Farm Raid*, L.A. Times (June 24, 2025), https://tinyurl.com/7r9xtb7c.[3]

2. Governor Newsom and the State sued President Trump and Secretary Hegseth on June 9 and sought a temporary restraining order. *See* ER-10. The district court held that defendants likely acted unlawfully in federalizing the Guard, and that the State would suffer irreparable harm. ER-18-37. As the district court explained, "California's National Guard provides important state services." ER-35. And defendants' actions "set[] a dangerous precedent for future domestic military activity." ER-36. "There is a reason," the court explained, that Section

---

[3] *See also* D.Ct. Trial Tr. 80:4-81:15 (Aug. 11, 2025); Mackey, *Federal Agents Use Force During Immigration Raid at Two California Farms*, Guardian (July 10, 2025), https://tinyurl.com/4u8w9zw9.

12406 "appl[ies] only in the narrowest and most extreme of circumstances." *Id.*
Federalization threatens to "jeopardize the delicate federalism that forms the basis
of our very system of government." *Id.* Consistent with those concerns, the court
temporarily barred defendants from deploying Guard troops in Los Angeles and
directed them to return control of the Guard to the State. ER-37-38.

Defendants appealed and sought a stay. Stay Order 15-16. This Court
ordered expedited briefing and scheduled oral argument. *See id.* Two days after
argument, the Court issued a published order granting a stay pending appeal. *Id.* at
10. The Court applied a "highly deferential standard of review" and concluded
that defendants were likely to succeed in showing that they had "a colorable basis
for invoking" Section 12406. *Id.* at 33. The Court also held that the other stay
factors weighed in defendants' favor. *Id.* at 11, 38-41.

Following the Court's decision, a judge made a sua sponte call for an en banc
vote, and the Court directed the parties to file briefs in response. C.A. Dkt. 43.1.
Defendants opposed en banc review. C.A. Dkt. 46.1. Plaintiffs argued that en
banc review is warranted because the reasoning in the panel's published stay order
is contrary to our Nation's longstanding tradition against "military intrusion into
civilian affairs," *Laird*, 408 U.S. at 15, and threatens to alter the proper balance of
power between Congress, the President, and the sovereign States. C.A. Dkt. 48.1
at 1-2. Plaintiffs also argued that the "highly deferential standard of review"

10

adopted in the Court's stay order (Stay Order 33) would invite President Trump and future presidents to deploy troops in other communities throughout the Ninth Circuit and beyond. *Id.* at 6. The en banc call remains pending.

Since the Court's stay order, litigation has continued before the district court. Following a bench trial on plaintiffs' allegations that defendants have violated the Posse Comitatus Act, the court concluded that "[t]he record is replete with evidence" that defendants "executed domestic law" in violation of the Act. D.Ct. Dkt. 176 at 42. Consistent with that finding, the court enjoined Secretary Hegseth and the Defense Department from directing troops to "engag[e] in arrests, apprehensions, searches, seizures, security patrols," and other civilian law enforcement activities barred by the Act. *Id.* at 52.

The circumstances on the ground in the Los Angeles region have also evolved. On July 15, a spokesman for the Defense Department expressed the view that "the lawlessness in Los Angeles is subsiding."[4] And the record before the district court confirms that immigration agents in the region no longer face the type of security risk that, in defendants' view, originally warranted assistance from the National Guard: for example, the head of ICE's field office in Los Angeles

---

[4] Stelloh, *Pete Hegseth Orders the Removal of 2,000 National Guard Troops From Los Angeles*, NBC News (July 15, 2025), https://tinyurl.com/4m883yks.

recently testified that the National Guard is currently assisting on "zero" ICE field operations. D.Ct. Trial Tr. 198:5-10 (Aug. 11, 2025).

Despite that change in circumstances, defendants issued a new order extending the federalization of Guard troops for 90 additional days. D.Ct. Dkt. 140-2. Under that order, 300 troops will remain deployed through early November, *id.*, well beyond the beginning of early voting and through Election Day.[5] Defendants have not offered a timeline for returning those troops to state control. Nor have they imposed any limits on the activities of those troops beyond those briefly mentioned in the President's June 7 order. *Supra* p. 8.

In response, plaintiffs have asked the district court to preliminarily enjoin defendants' new federalization order. D.Ct. Dkt. 183. In plaintiffs' view, there is no longer any legitimate basis—if there ever was—for federalizing the Guard. *See, e.g.*, *id.* at 9-13. And as voting gets underway ahead of this fall's election, the deployment of military troops as a police force on city streets poses an increasingly grave threat to our democracy. *See id.* at 16-17.

Meanwhile, defendants have greatly expanded their efforts to use the military for civilian law enforcement purposes. They have deployed thousands of National

---

[5] Cal. Sec'y of State, 2025 Statewide Special Election, https://tinyurl.com/38n3jpn2.

Guard troops to the streets of Washington, D.C.[6]  Defendants are also "planning a military deployment to Chicago as President Donald Trump says he wants to crack down on crime, homelessness and undocumented immigration, in a model that could later be used in other major cities."[7]  And just last week, the White House issued an executive order requiring the Secretary of Defense to ensure that the National Guard in "each State[]" is "available to assist" the federal government in civilian law enforcement missions, including "quelling civil disturbances and ensuring the public safety and order."  Exec. Order 14339, 90 Fed. Reg. 42121-42122 (Aug. 25, 2025).  "In addition, the Secretary of Defense shall ensure the availability of a standing National Guard quick reaction force that shall be resourced, trained, and available for rapid nationwide deployment."  *Id.* at 42122.

## SUMMARY OF ARGUMENT

The Court should affirm the district court's order enjoining defendants from federalizing thousands of members of California's National Guard.  The district court correctly held that plaintiffs were likely to succeed under 10 U.S.C. § 12406.  There was no "rebellion or danger of a rebellion" in Los Angeles on June 6-7.  And defendants have not persuasively explained why the President was "unable with

---

[6] Mokam & Cooper, *National Guard Patrols Begin to Carry Weapons in D.C.*, N.Y. Times (Aug. 24, 2025), https://tinyurl.com/2mmvhe87.

[7] Lamothe, *Pentagon Plans Military Deployment in Chicago as Trump Eyes Crackdown*, Wash. Post (Aug. 23, 2025), https://tinyurl.com/5drb5fr9.

the regular forces to execute the laws." Given the considerable personnel and resources of federal civilian law enforcement agencies, it is implausible to think that "regular forces" were unavailable. Defendants have certainly not shown otherwise. Nor have defendants demonstrated that any obstacles to the execution of federal law on June 6-7 were substantial enough to justify the extraordinary step of deploying the military for civilian law enforcement purposes. Due respect for our system of federalism—and our longstanding tradition against intrusion of the military into civilian affairs—counsels strongly against adopting defendants' expansive construction of Section 12406.

In issuing a stay pending appeal, this Court applied a "highly deferential standard of review" and held that defendants likely had a "colorable basis" for invoking Section 12406. Stay Order 33. The Court should revisit that determination. Although interpretations of statutes offered by federal agencies and officials are sometimes entitled to an appropriate measure of deference from the judiciary, the federal government must at least make reasonable efforts to ground its interpretation in statutory text or history. Defendants have not done so. Their arguments about Section 12406 boil down to the assertion that some immigration agents in Los Angeles faced practical impediments to enforcing federal law on June 6-7. But Section 12406 requires far more: that the President is "unable with the regular forces" to execute the laws. Defendants have not made that showing.

14

Nor have defendants shown that the district court erred in applying the remaining equitable factors. Defendants' federalization of 4,000 members of California's National Guard—one in three of the Guard's active troops—depleted the State's forces of personnel assigned to wildfire response, disaster relief, drug interdiction, and other critical responsibilities. Defendants' actions also threatened to exacerbate the risk of civil disorder in Los Angeles, erode public trust in the military, compromise troop morale, and undermine the democratic traditions that have guided our Nation since the Founding.

If, however, the Court is not prepared to affirm the district court's injunction, it may instead wish to consider vacating and remanding without reaching the merits. Although that approach would be atypical, the Court has discretion to vacate and remand an injunction when circumstances change in material ways during the pendency of an appeal. If the Court takes that approach, it should also vacate its prior published stay order. The reasoning in that order threatens to limit the judiciary's ability to serve as a meaningful check on future abuses of Section 12406. And such abuses are already underway: defendants have made clear in recent weeks that they intend to deploy the military across the country as a civilian police force. The Court should not give defendants the opportunity to enlist this Court's published stay order in support of that unprecedented effort.

## ARGUMENT

### I. THE COURT SHOULD AFFIRM THE DISTRICT COURT'S INJUNCTION

The district court correctly held that a temporary restraining order was necessary to block defendants from unlawfully federalizing thousands of members of California's National Guard. In its order staying that ruling, this Court held that "the district court's order is effectively a preliminary injunction." Stay Order 18. Preliminary injunctions are reviewed on appeal for abuse of discretion. *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc). The factors guiding that discretion are the plaintiffs' "likelihood of success," "irreparable harm," a "favorable balance of the equities," and the "public interest." *Wolford v. Lopez*, 116 F.4th 959, 976 (9th Cir. 2024). Although this Court evaluated those factors on a provisional basis earlier this summer, *see* Stay Order 18-41, the Court's stay order "is not binding here," *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 660 (9th Cir. 2021). The Court should now revisit the reasoning of its prior order and affirm the district court.

### A. Plaintiffs Have Shown a Likelihood of Success on the Merits

#### 1. There is no "rebellion" or other basis for federalizing the National Guard under Section 12406

Exercising its power under the Militia Clauses, *see* U.S. Const. art. I, § 8, cls. 15-16, Congress has delegated limited authority to the President to federalize members of the National Guard. The only statute invoked by defendants here—

16

Section 12406—requires a showing that "(1) the United States [has been] . . . invaded or is in danger of invasion by a foreign nation"; "(2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States"; or "(3) the President is unable with the regular forces to execute the laws of the United States." Defendants do not rely on the first predicate and have not shown that either the second or third is satisfied. And neither deference nor nonjusticiability principles support reversal of the district court's injunction.

### a. The predicates for invoking Section 12406 are not satisfied

*Rebellion or danger of a rebellion.* Defendants attempt to defend the President's assertion in his June 7 Order that there was a "rebellion against the authority of the Government of the United States" in the Los Angeles region on June 6 and 7. ER-194; *see* Opening Br. 26-30. But "definitions from the late 1800s and early 1900s—the relevant time period for understanding what Congress meant" when it enacted the language now in Section 12406—show that the term "rebellion" refers to "violent," "armed," "organized," "open and avowed" resistance to the lawful authority of the government, "often with an aim of overthrowing the government." ER-19-21 (citing, *e.g.*, Webster's Int'l Dictionary of the English Language (1903)). That understanding closely tracks the statute's history: Congress first added "rebellion" to the Militia Act in 1861. *Supra* p. 5. It is not difficult to imagine what lawmakers had in mind when using that term

17

shortly after the Confederacy declared independence and the first shots were fired at Fort Sumter.  *See generally Biden v. Texas*, 597 U.S. 785, 804 (2022) ("historical context" can "confirm[] the plain import of [a statute's] text").

Under that definition, there was no rebellion or danger of rebellion when protests against federal immigration policies arose in the Los Angeles region on June 6 and 7.  As the district court's factual findings show, "most protesters demonstrated peacefully."  ER-21.  Although "some individuals used the protests as an excuse for violence and destruction," *id.*, there was "no evidence of organized, as apart from sporadic or impromptu, violence," ER-21-22; *see also* ER-4-10.  Because defendants make no effort to challenge those factual determinations, they are conclusive for purposes of this appeal.

Defendants argue, however, that the district court misconstrued the term "rebellion."  *See, e.g.*, Opening Br. 26-27.  Relying on secondary and tertiary dictionary definitions of the term, defendants assert that "rebellion" means any form of "[o]pen resistance or opposition to an authority or tradition" or "[d]isobedience of a legal command or summons."  *Id.* at 26 (citing, *e.g.*, Black's Law Dictionary (12th ed. 2024)).  But it is not remotely plausible to think that Congress intended to adopt those expansive definitions.  As the district court explained, those definitions generally refer to rebellions of a "spiritual" or "familial" nature, ER-20 n.7—for example, when a parent says "my teenage son is

going through a 'rebellion' or a 'rebellious' phase." It would not make sense to use "rebellion" that way in the context of a statute describing rebellion "against the authority of the Government of the United States." 10 U.S.C. § 12406. Congress plainly had in mind rebellions that are "political in nature." ER-20.

The far-reaching consequences of defendants' definition also make it an implausible understanding of congressional intent. *Cf. Bond v. United States*, 572 U.S. 844, 860 (2014) (refusing to adopt "boundless reading" of a statute in light of its "deeply serious consequences"). Construing "rebellion" to mean "open resistance or opposition to an authority or tradition" would threaten to make it trivially easy for the President to federalize National Guard troops. The First Amendment protects the right to openly oppose federal authority through assemblies and protests. ER-22-23. And it is not uncommon for those protected activities to be accompanied by some measure of civil disobedience. *See, e.g. id.* By defendants' logic, every modern President has seen dozens of "rebellions" come and go. "[R]esistance or opposition to an authority" (Opening Br. 26)—in both lawful and unlawful forms—is conduct that occurs on a daily basis across our Nation. *See, e.g.*, Mayson & Stevenson, *Misdemeanors by the Numbers*, 61 B.C. L. Rev. 971, 999-1000 (2020) ("resisting arrest" is a "common misdemeanor").

Congress would not have set the bar so low for federalizing the National Guard. Construing "rebellion" so expansively would effectively render the

remainder of Section 12406 superfluous. No President would ever have any reason to resort to Section 12406(1) or 12406(3) if any form of "open resistance or opposition to an authority or tradition" sufficed to authorize federalization. *See generally Pomares v. Dep't of Veterans Affs.*, 113 F.4th 870, 880 (9th Cir. 2024) (discussing the "canon against surplusage"). And by making it so easy for the President to federalize National Guard troops, defendants' understanding of "rebellion" would undermine a "bedrock principle of American democracy": that "our military is apolitical." Br. of Former U.S. Army & Navy Secretaries & Retired Four-Star Admirals & Generals, C.A. Dkt. 17.1 at 12. Defendants' interpretation would enable the President to use military personnel and resources to advance his own domestic policy agenda, including in "politically charged situation[s]." *Id.* That threatens "politicization of the military, which inevitably erodes public trust, impacts recruitment, and undermines troop morale." *Id.* at 7.

Defendants' interpretation also raises profound constitutional concerns. The Framers entrusted Congress—not the President—with authority to determine when federalization is appropriate. *Supra* pp. 3-4. And they deliberately left control with the States in circumstances where Congress has not authorized federalization. *Id.* That Founding Era decision continues to serve important purposes today. The National Guard performs vital state functions, including disaster response and drug interdiction. *See, e.g.*, ER-70-76; *see also* Br. of Bipartisan Former Governors as

Amici Curiae, C.A. Dkt. 49.1 at 9-12.  When the President federalizes the Guard in ways that Congress has not contemplated, it intrudes on Congress's Article I prerogatives and on the State's sovereign interest in deploying its Guard.  The Court should construe Section 12406 to avoid that result.  *See generally Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) ("'it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides'" the "constitutional balance of federal and state powers").

In support of their sweeping view of Section 12406(2), defendants point to the Whiskey Rebellion and other historical episodes "in which the President has called the militia into federal service."  Opening Br. 27.  But the Whiskey Rebellion is a perfect illustration of the *district court's* definition of "rebellion":  it involved armed, open, organized, prolonged resistance to the federal government's authority.[8]  And there is no reason to think that Congress viewed 19th century "labor disputes and miners' strikes"—or any of the other examples mentioned in

---

[8] The Whiskey Rebellion was a "serious military encounter" that posed a major threat to the stability of our early republic.  Slaughter, *The Whiskey Rebellion: Frontier Epilogue to the American Revolution* 180 (1986).  Although it began as "something less than [a] treasonous 'rebellion,'" *id.*, it ultimately grew into "[t]he single largest example of armed resistance to a law of the United States between the ratification of the Constitution and the Civil War," *id.* at 5.  "Before it was over, some 7,000 western Pennsylvanians advanced against the town of Pittsburgh, threatened its residents, [and] feigned an attack on Fort Pitt and the federal arsenal there[.]"  *Id.* at 3; *see also id.* at 188 ("Independence seemed the goal of these 7,000 rebels in arms.").

defendants' briefing, *see* Opening Br. 28—as a form of "rebellion."  After all, other types of exigencies have historically allowed for federalization.  *See, e.g.*, 12 Stat. at 281 (authorizing federalization in response to certain "unlawful obstructions, combinations, or assemblages").

Defendants' understanding of "rebellion" is also contrary to the reasoning in this Court's stay order.  Although the Court did not squarely address defendants' interpretation of the term, *see* Stay Order 32, the Court did recognize that a "rebellion" is an "unusual and extreme exigenc[y] . . . threaten[ing] the normal operations of civil government," *id.* at 33.  Defendants' capacious understanding of the term, by contrast, would not require anything unusual or extreme.  It has no basis in the text or history of Section 12406 and should be rejected.

### Unable with the regular forces to execute the laws of the United States.

Defendants next invoke Section 12406(3), which authorizes the President to federalize members of the National Guard when he is "unable with the regular forces to execute the laws of the United States."  That is a demanding standard.  "[A]ny minimal interference with the execution of laws" is not "enough to justify invoking § 12406(3)."  Stay Order 33.  "Unable" means "incapable," "impotent," or "helpless."  Webster's New Int'l Dictionary (2d ed. 1936).  And the President must exhaust adequate alternative measures before federalizing the Guard: specifically, if "regular forces" are able to execute the laws, then Section 12406(3)

does not allow the National Guard to be called in.  Section 12406(3) also requires the President to identify an "unusual," "extreme" exigency similar in kind to the "invasion[s]" or "rebellion[s]" mentioned in "[s]ubsections one and two of the statute."  Stay Order 33; *see generally Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995) (statutory terms are "known by the company [they] keep[]").

Defendants have not satisfied those requirements here.  Before the district court, defendants took the position that "regular forces" means "everything other than the State National Guard."  Hearing Tr. 24 (June 12, 2025).  "[I]t could be local police, it could be federal marshals"; "[i]t could be the Marines."  *Id.*  In light of the vast number of personnel encompassed within that definition, it is implausible to think that those forces would have been "unable" to execute the laws in early June when defendants invoked Section 12406.  Defendants have made no attempt to show otherwise.  *Cf.* Opening Br. 22-25.

Before this Court, defendants switch gears and assert that "regular forces" means "the federal officers who regularly enforce" the laws in question—here, immigration agents.  *E.g.*, Opening Br. 24.  But defendants have not supported that interpretation with any arguments based on statutory text or history.  Nor have defendants provided any sensible reason why Congress would have intended to adopt that view.  If the President is able to execute the laws with the federal civilian officers that Congress has appropriated funds to support—for example,

officers from one or more of the federal government's many law enforcement arms, *see, e.g.*, U.S. Dep't of Just., Agencies: Law Enforcement, https://tinyurl.com/39yae7hf—there is no reason to think that Congress would have wanted to license the President to take the extreme step of federalizing National Guard troops. Our Nation's longstanding tradition of "[o]pposition to the use of military force in the enforcement of civil law," Coakley, *supra*, at 3, presupposes the opposite: that Congress would have wanted the President to treat federalization as "a last resort," Br. of Former U.S. Army & Navy Secretaries & Retired Four-Star Admirals & Generals, C.A. Dkt. 17.1 at 13.

But even if "regular forces" could plausibly be understood to mean "the federal officers who regularly enforce" the laws in question, defendants still have not satisfied Section 12406(3). Defendants have never attempted to show that the President was unable to redirect immigration agents from nearby regions to assist the 290 agents currently assigned to ICE's Los Angeles Field Office. ER-54. Nor have defendants persuasively explained why those 290 officers were "unable" to execute federal law without assistance from 4,000 federalized Guard troops. As Judge Miller noted at oral argument, "in the normal course, the level of resistance encountered by federal law enforcement officers"—such as immigration agents— "is not zero." Argument Recording, 07:22-07:53, https://tinyurl.com/ysdx5xm4. And here, the record demonstrates that the risk of harm to federal officers and

property was limited and on the decline: state and local law enforcement agencies responded promptly and forcefully to restore order and protect federal officers and buildings. *See, e.g.*, ER-4-6; ER-9-10; ER-53-64. There was certainly no "unusual" or "extreme" "exigenc[y]," similar in kind to an "invasion" or "rebellion." Stay Order 33. Indeed, the events of June 6-7 in Los Angeles stand in stark contrast to the postal strike that precipitated President Nixon's reliance on Section 12406 in 1970. As discussed above, *supra*, p. 6, the postal strike threatened to bring mail delivery across the country to a standstill.

Defendants assert that federalization was necessary to ensure adequate enforcement of, not just immigration laws, but "[o]ther federal laws . . . as well," including federal criminal laws "forbidding interference with federal functions or assaults on federal officers and property." Opening Br. 25. But defendants make no attempt to show that "regular forces"—however that term is defined—were unavailable to execute those laws. The FBI, Federal Protective Service, and other federal law enforcement agencies are generally responsible for enforcing those laws. *See, e.g.*, U.S. Dep't of Just., Archives, Crim. Res. Manual § 1563, https://tinyurl.com/3zacwe2y. Defendants have not explained why enforcement by those agencies would have been infeasible.

If the Court has any remaining doubt about Section 12406(3), it should construe the statute narrowly to avoid the far-reaching consequences of

defendants' interpretation. An overly expansive construction of Section 12406(3) would effectively allow defendants to use the National Guard to augment federal law enforcement resources without having to go through the trouble of seeking a congressional appropriation. That would not only license an end-run around the Constitution's Appropriations Clause, *see* U.S. Const. art. I, § 9, cl. 7, but also threaten to upset the constitutional balance of power between the President, Congress, and the States, *supra* pp. 3-4, 20-21, and undermine longstanding norms against military intrusion into civilian affairs, *see, e.g.*, *Laird*, 408 U.S. at 15. The Court should not lightly conclude that Congress intended those consequences. *Cf. Bond*, 572 U.S. at 862-863; *Nixon v. Missouri Mun. League*, 541 U.S. 125, 140-141 (2004). Nor should the Court view those consequences as hypothetical or remote in light of defendants' recent efforts to deploy troops for law enforcement purposes in a growing number of cities across the country. *Supra* pp. 1-2, 12-13.

Another way of thinking about the problem with defendants' understanding of Section 12406 is that it would violate the major-questions doctrine. *See, e.g.*, *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014). Defendants have purported to "discover in a long-extant statute an unheralded power" (*id.*): the power to commandeer and deploy thousands of members of a State's National Guard in response to sporadic episodes of violence that state and local law enforcement agencies are forcefully and capably addressing. *Supra* pp. 7, 18, 25. Defendants

believe they can invoke that power without any showing that civilian personnel are unavailable. No President has ever invoked Section 12406 in that way. *Supra* p. 6. And the sheer "breadth of the authority" asserted by defendants provides "reason to hesitate before concluding that Congress meant to confer [it]," *Biden v. Nebraska*, 600 U.S. 477, 501 (2023) (internal quotation marks omitted), especially given that defendants' position, if adopted, would erode Congress' powers under the Militia and Appropriations Clauses, *see supra* pp. 3-4, 26; *see also V.O.S. Selections, Inc. v. Trump*, __ F.4th __, 2025 WL 2490634, at *15 (Fed. Cir. Aug. 29, 2025) (en banc) (applying major-questions doctrine to deny President expansive authority in area of "core Congressional power"); *id.* at *14 & n.17.

Rather than grappling with the consequences of their far-reaching position, defendants focus on responding to a straw man: that "Section 12406(3) cannot apply so long as *some amount* of execution of the laws remains possible." Opening Br. 24 (emphasis added). That is not and has never been plaintiffs' position regarding the scope of Section 12406(3). Instead, plaintiffs' position is that defendants must provide a reasoned basis for concluding that regular forces are unable to execute the laws due to an exigency akin to an invasion or rebellion. *Supra* pp. 22-23. Defendants are not "entitled to conclude" that "activation of the National Guard was necessary" (Opening Br. 25) simply because they say so. Defendants have made no attempt—none—to demonstrate that the alternative

27

personnel and resources discussed above were unavailable.  *See* ER-24-26.

Section 12406(3) requires more than ipse dixit.

### b. Principles of deference do not provide a basis for upholding defendants' federalization

In provisionally upholding defendants' federalization, the Court concluded that defendants likely had a "colorable basis for invoking § 12406(3)."  Stay Order 33.  In the Court's view, a "colorable basis" was sufficient under a "highly deferential standard of review."  *Id.*  But the Court provided no sensible basis for adopting that extraordinary form of deference.  If the Court reaches the merits in resolving this appeal, it should revisit that standard.

Today, the starting point for evaluating interpretive deference to the executive branch is *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024).  In *Loper*, the Court held that courts should accord—at most—"due respect" to the executive's interpretation of a statute, *id.* at 385, to the extent that it is "based upon specialized experience . . . and informed judgment," *id.* at 388 (internal quotation marks and alterations omitted).  Although *Loper* addressed a pure question of law, *see id.* at 382-383, its approach appears to apply to mixed questions of law and fact as well, *see id.* at 388-390.  Accordingly, *Loper* supplies the standard for evaluating pure questions of statutory interpretation—for example, the meaning of "regular forces," *supra* pp. 23-25—as well as defendants' application of the statute to the facts—for example, whether the President was "unable with the regular

28

forces to execute the laws of the United States," *see id.* Alternatively, if the Court concludes that a more deferential standard is appropriate for mixed questions, *cf. Loper*, 603 U.S. at 469 (Kagan, J., dissenting), the relevant question would be whether defendants' position reflects "'a sensible exercise of judgment,'" *id.* at 388 (majority) (quoting *Gray v. Powell*, 314 U.S. 402, 412-413 (1941)).[9]

Either way, defendants' positions here are unconvincing. As discussed above, *supra* pp. 16-28, defendants offer no persuasive support in the text or history of Section 12406 for their interpretations of the terms "rebellion" and "regular forces." And in applying Section 12406(3) to the relevant facts, defendants provide no reasoning worthy of deference. Defendants simply assert, without any explanation or evidence, that deployment of the National Guard was necessary "to ensure adequate federal resources to fully and faithfully execute [the] laws." Opening Br. 25. Under any plausible construction of "regular forces," however, there were alternative forces available. *Supra* pp. 23-25. Defendants have certainly failed to show otherwise. And when the federal government provides "no

---

[9] *Loper* addressed an executive agency's interpretation, *see* 603 U.S. at 382, whereas this case involves statutory interpretation by the President and the Secretary of Defense. But that distinction provides no basis for according greater deference here. *Cf.* Manheim & Watts, *Reviewing Presidential Orders*, 86 U. Chi. L. Rev. 1743, 1813-1814 (2019).

reasoning of any substance," *e.g.*, *Lopez-Angel v. Barr*, 952 F.3d 1045, 1047 (9th Cir. 2019), there is nothing for this Court to defer to.

To be sure, Congress can instruct courts to depart from ordinary deference principles. *See Loper*, 603 U.S. at 404. But nothing in the text or history of Section 12406 supports any such departure. When Congress adopted the text now in Section 12406, it *omitted* deference-according language that might have supported the standard applied in this Court's stay order. Before 1903, the Militia Act authorized the President to federalize the militia whenever "it shall become impracticable, *in the judgment of the President* . . . to enforce . . . the laws of the United States." 12 Stat. at 281 (emphasis added). In 1903, however, Congress chose not to repeat "in the judgment of the President." 32 Stat. at 776. Since then, Congress has repeatedly omitted that language from its revisions to Section 12406. *See, e.g.*, 108 Stat. 2663, 2994 (1994); 35 Stat. at 400. And "'[f]ew principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded.'" *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-443 (1987).

Nor does the Constitution support any departure from ordinary principles of deference. Scholars have suggested that heightened deference—greater than the degree of deference under *Loper*—may apply to executive interpretations in the realm of foreign affairs and other areas in which the Constitution grants unilateral

power to the President. *See, e.g.*, Bradley & Goldsmith, *Foreign Affairs, Nondelegation, and the Major Questions Doctrine*, 172 U. Pa. L. Rev. 1743, 1795 n.265 (2024). As discussed above, however, the Militia Clauses entrust *Congress*, not the President, with authority to determine when federalization of the Guard is warranted. *Supra* pp. 3-4, 20. And though the Commander-in-Chief Clause gives the President certain unilateral powers over the regular Armed Forces, it empowers him to command "the Militia of the several States" only "when called into the actual Service" pursuant to an act of Congress. U.S. Const. art. II, § 2, cl. 1.[10]

This Court derived its "highly deferential standard of review" (Stay Order 33) from several U.S. Supreme Court decisions—in particular, *Martin v. Mott*, 25 U.S. (12 Wheat.) 19 (1827), and *Luther v. Borden*, 48 U.S. (7 How.) 1 (1849). *See* Stay Order 23-31. But *Martin* and *Luther* were cases about justiciability, not deference: In *Martin*, the Court held that the President was the "sole and exclusive judge" of whether an invasion had occurred under the 1795 Militia Act. 25 U.S. at 32. In *Luther*, the Court extended *Martin* to the President's determination under the 1795 Militia Act that there was "an insurrection against a State government." 48 U.S. at

---

[10] At times, defendants have referred to an inherent theory of executive "protective power." *See, e.g.*, SER-43-44. But for good reason, defendants do not invoke that theory in their opening brief here. The judiciary has never squarely endorsed its existence, and there are serious questions about its validity. *See, e.g.*, Mirasola, *Sovereignty, Article II, and the Military During Domestic Unrest*, 15 Harv. Nat'l Sec. J. 199, 207-208, 219-223 (2023).

44-45.  In light of developments in justiciability doctrine since *Martin* and *Luther* were decided—developments that afford far more room for judicial review of presidential action, *see, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952)—the Supreme Court has understood those cases quite narrowly.  *See, e.g.*, *Baker v. Carr*, 369 U.S. 186, 213, 218-226 (1962).[11]  Indeed, this Court correctly held in its stay order that modern justiciability principles do not render plaintiffs' challenge here unreviewable.  *See* Stay Order 19-21.

This Court appeared to derive its extraordinary form of deference from *Martin*'s statement that a "public officer is presumed to act in obedience to his duty, until the contrary is shown."  25 U.S. at 33; *see* Stay Order 31.  But that statement merely describes the well-established presumption of regularity—a doctrine presuming that executive officials follow proper procedures in making decisions.  *See generally* Note, *The Presumption of Regularity in Judicial Review of the Executive Branch*, 131 Harv. L. Rev. 2431 (2018).  Read in context, the statement quoted by this Court merely shows that *Martin* viewed the presumption of regularity as a reason to treat certain types of presidential decisions under the 1795 Militia Act as nonjusticiable—that is, dependent on the President's "own

---

[11] *See also Gen. Dynamics Corp. v. United States*, 563 U.S. 478, 484 (2011) (invoking *Martin* for the narrow principle that there is a "[g]overnment privilege against court-ordered disclosure of state and military secrets").

judgment of the facts." 25 U.S. at 33. For reasons detailed below, that justiciability holding has no bearing here. *Infra* pp. 35-40.

At a minimum, the Court's analysis in *Martin* is far too unclear to support an inference that Congress intended to "import" a novel form of judicial deference into Section 12406. Stay Order 27. Courts presume that Congress intends to "carry forward [an] interpretation" from one statute to another—as relevant here, the 1795 Militia Act to the 1903 Militia Act—only if the earlier statute has received a clear, "authoritative[] interpret[ation]." Scalia & Garner, *Reading Law* 322 (2012) (citing, *e.g.*, *Bragdon v. Abbott*, 524 U.S. 624, 645 (1998)). Courts also infer that Congress intends to "bring[] the old soil" into a new statute only when Congress "*obviously* transplant[s]" a statutory term from an older law to a new one. *Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019) (internal quotation marks omitted and emphasis added). The most notable aspect of the 1903 Act for present purposes is that Congress omitted the deference-according language enacted by the 1861 Militia Act amendments. *Supra* pp. 5, 30. In light of that history, it is far from "obvious[]," *Taggart*, 587 U.S. at 560, that Congress intended to carry forward any deference-related principles from *Martin*.

Another problem with assuming that Congress intended to incorporate a pre-1903 approach to deference into Section 12406 is that the Supreme Court did not have a consistent approach to deference before 1903. For example, in *Ex parte*

*Milligan*, 71 U.S. (1 Wall.) 2 (1866), the Court gave very little (if any) deference to the President in determining whether exigent circumstances justified trying a citizen by military tribunal. *See, e.g.*, *id.* at 121-122, 127; *see also* Tyler, *The Forgotten Core Meaning of the Suspension Clause*, 125 Harv. L. Rev. 901, 995 n.608 (2012). In light of *Milligan*, members of Congress would not have assumed when drafting the 1903 Act that courts would accord extraordinary deference to presidential exigency-related determinations. If Congress had intended to adopt that form of deference, it could have (and surely would have) said so more clearly.

Finally, this Court invoked *Sterling v. Constantin*, 287 U.S. 378 (1932). *See* Stay Order 31. Far from applying any "highly deferential" standard, however, the Court in *Sterling* carefully reviewed the determination by the Governor of Texas that exigent circumstances required the state militia to restrict the production of oil. 287 U.S. at 386-387, 400-404; *see also* Fairman, *Martial Rule in the Light of Sterling v. Constantin*, 19 Cornell L.Q. 20, 20-22 (1933). And the Court's ultimate conclusion was that "no exigency . . . justified the Governor['s]" actions. 287 U.S. at 404. Invoking *Milligan*, 71 U.S. at 124, the Court emphasized that "it cannot be said that the judicial power is fettered because the injury is attributable to a military order." 287 U.S. at 402-403. Applying a similar approach here, the Court should hold that no exigency justified defendants' extraordinary decision to

federalize and deploy National Guard troops to the streets of Los Angeles and other communities in Southern California.

### c. Courts may review whether the executive branch has complied with Section 12406

Defendants also take the extreme position (*see* Opening Br. 30-34) that Section 12406's factual predicates are entirely unreviewable by the judiciary. But federal courts have a "virtually unflagging obligation" to exercise the jurisdiction given them, *Deakins v. Monaghan*, 484 U.S. 193, 204 (1988), and to "say what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). The political question doctrine provides only "a narrow exception" to that rule. *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194 (2012). The modern trend has been to treat cases as justiciable even where they implicate questions of foreign affairs or national security. *See, e.g.*, *id.* at 201. In recent months, for example, courts have repeatedly rejected the President's request to treat questions under the Alien Enemies Act as nonjusticiable.[12] And this Court correctly held in its stay order that "the political question doctrine does not bar judicial review" here. Stay Order 21.

Defendants identify no persuasive reason for the Court to take a different course now. In their stay papers, defendants characterized Section 12406 as

---

[12] *See, e.g.*, *J.A.V. v. Trump*, 781 F. Supp. 3d 535, 547-554 (S.D. Tex. 2025); *J.G.G. v. Trump*, 2025 WL 914682, at *5-7 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring); *see also Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (2025).

35

entirely discretionary because it "specifies that the President may call into service members of the National Guard 'in such numbers *as he considers necessary*' to quell rebellion or execute the laws." C.A. Dkt. 5.1 at 15 (emphasis added). For good reason, however, defendants have abandoned that argument. *Cf.* Opening Br. 30-34. The phrase "as he considers necessary" is a textual commitment of discretion with respect to the President's decision about the "numbers" called into service *after* the statutory predicates have been satisfied. 10 U.S.C. § 12406. Congress did not include that language when describing the predicate conditions that must be satisfied *before* the President federalizes a State's National Guard. And the fact that Congress included that language in one portion of the statute— but not the portion relevant here—shows that Congress knows how to grant broad discretion to the President when it wishes to do so. *See generally Russello v. United States*, 464 U.S. 16, 23 (1983).

Turning to precedent, defendants assert that *Dalton v. Specter*, 511 U.S. 462, 474 (1994), forecloses review. Opening Br. 33. But *Dalton* "merely stands for the proposition that when a statute entrusts a discrete specific decision to the President and contains *no limitations* on the President's exercise of that authority, judicial review of an abuse of discretion claim is not available." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1331 (D.C. Cir. 1996) (emphasis added); *see also Murphy Co. v. Biden*, 65 F.4th 1122, 1130-1131 (9th Cir. 2023). "Unlike in *Dalton*," the

36

text of Section 12406 "does not make the President the sole judge of whether one or more of the statutory preconditions exist." Stay Order 23.

Defendants also contend that *Martin*, 25 U.S. at 19, dictates that judicial review is unavailable here. Opening Br. 30-32. It does not. *Martin* long predates the modern political question doctrine. It arose under a different statute, the 1795 Militia Act. It concerned a question that directly implicated foreign policy—unlike this case, which "implicates the President's domestic use of military force." ER-17 (emphasis omitted). And the facts were not remotely comparable: the plaintiff was a militiaman who faced a court-martial for refusing President Madison's order to federal service during the War of 1812. *See Martin*, 25 U.S. at 20-22.

Both courts and scholars have construed *Martin* quite narrowly. In *Baker*, 369 U.S. at 213, the principal modern authority on justiciability under the political question doctrine, the Court understood *Martin* to establish the limited rule that courts will "refus[e] to review the political departments' determination of when or whether a war has ended." And far from there being any "settled understanding . . . among legal scholars" that *Martin* should be construed more expansively, Stay Order 28, a comprehensive academic assessment of *Martin* understands it to merely "reinforce" the settled principle that "officers, as well as the commander in chief, [may] issue orders" to subordinate members of the military "free from judicial interference." Kastenberg, *The Limits of Executive Power in Crisis in the*

37

*Early Republic*, 82 La. L. Rev. 161, 226 (2021).[13]  In light of these narrow, sensible understandings of *Martin*, the Court need not "overrul[e]" it to affirm the district court.  Stay Order 30.  It need only refrain from *expanding* the decision well beyond the contours of any reasonable view of modern justiciability doctrine.

The nature of *Martin*'s reasoning confirms that it has little, if any, modern precedential force.  As discussed above, *supra* p. 31, *Martin* addressed the scope of judicial review under the 1795 Militia Act, which provided in relevant part that "whenever the United States shall be invaded, or be in imminent danger of invasion from any foreign nation or Indian tribe, it shall be lawful for the President of the United States to call forth . . . the militia of [a] state."  1 Stat. at 424.  In treating the President as "the sole and exclusive judge" of whether that statutory predicate existed, 25 U.S. at 32, the Court pointed to several considerations, including the "delicate nature" of foreign affairs determinations, *id.* at 29, and the need for "prompt and unhesitating obedience" by lower-ranking members to "command[s] of a military nature," *id.* at 30.

The Court also offered two additional rationales:  first, that "the language of the act of 1795" gave the President complete, unreviewable discretion merely because it authorized him to act when "certain facts" existed, *Martin*, 25 U.S. at

---

[13] *See, e.g.*, *Orlando v. Laird*, 443 F.2d 1039, 1043-1044 (2d Cir. 1971); *Luftig v. McNamara*, 373 F.2d 664, 665-666 (D.C. Cir. 1967).

31-32; and second, that there was no need for judicial review because of "the high qualities which the Executive must be presumed to possess, of public virtue, and honest devotion to the public interests," *id.* at 32.  In the Court's view, those qualities, considered alongside "the frequency of elections, and the watchfulness of the representatives of the nation," provided sufficient checks "to guard against usurpation or wanton tyranny."  *Id.*

Neither of those rationales has support in modern precedent.  The first is contrary to the standard articulated in *Dalton*, 511 U.S. at 474, for determining when a statute "commits [a] decision to the discretion of the President."  *See supra* pp. 36-37.  The second is fundamentally inconsistent with modern decisions recognizing the importance of judicial checks on presidential power.  *See, e.g.*, *Trump*, 145 S. Ct. at 1006; *Boumediene v. Bush*, 553 U.S. 723, 797-798 (2008); *United States v. Nixon*, 418 U.S. 683, 692-697 (1974).  It is the judiciary's duty "to be last, not first, to give . . . up" our Constitution's system of checks and balances.  *Youngstown*, 343 U.S. at 655 (Jackson, J., concurring).

The decision in *Luther*, 48 U.S. at 44-45, does not alter the justiciability analysis.  *Luther* simply repeated the same outmoded "rule of construction" applied in *Martin* for determining when a statute confers unreviewable discretion on the President.  48 U.S. at 45; *see id.* ("The same principle [applied in *Martin*] applies to the case now before the court.").  In light of the developments in

39

justiciability doctrine discussed above, *supra* pp. 35-39, there is no basis to apply *Luther* today when addressing the President's authority under a statute different from the one before the Court in *Martin* and *Luther*. Nor is there is any sensible reason to conclude that Congress intended to incorporate the approach of *Martin* or *Luther* into Section 12406. *See supra* pp. 33-34. The Court should apply the statute's plain terms and hold that defendants violated the law.

### 2. Defendants failed to issue their federalization orders "through the Governor"

Defendants also violated Section 12406 because they failed to issue their federalization orders "through the governor[]." 10 U.S.C. § 12406; *see* ER-26-28. Without consulting with the Governor or even notifying him of the federalization, defendants unilaterally issued two federalization orders with the words "THROUGH: THE GOVERNOR OF CALIFORNIA" stamped across the top of the page. ER-189; ER-193; *see also* ER-7-9. That approach makes a mockery of the statutory text—and the respect for federalism evinced by Congress when adding that language to the statute in 1908. *See* 35 Stat. at 400. "Through" means "[i]nto, for subjection to some treatment, and then out of" or "[b]y way of . . . indicating either a channel or course for passage, or an intervening stage." Webster's New Int'l Dictionary (2d ed. 1936). At a minimum, then, a requirement that an order be issued "through the governor[]" means that the Governor must be notified of the order and given an opportunity to convey it to the State's Guard—

an opportunity that naturally affords the Governor a chance to discuss the order with the President. Nothing of the sort occurred here.

Defendants argue that they complied with Section 12406 because they sent a memorandum describing the federalization orders "*to* California's Adjutant General, who forwarded the memorandum *to* the Governor." Opening Br. 36 (emphases added). In defendants' view, the limited purpose of the statute's "through the governor[]" requirement is to prevent "command confusion" in the event of federalization and ensure that "the state commander in chief has notice of the federalization order." *Id.* at 38. But that would render "through the governor[]" meaningless surplusage. *Any* statute authorizing federalization of National Guard troops necessarily requires that the State's commander in chief be informed of the federalization. For example, the Insurrection Act authorizes the President to federalize the National Guard in specified circumstances. *See* 10 U.S.C. §§ 251-255. When the President exercises that authority, the State's governor obviously must be told that members of the Guard have been transferred to federal control. Yet the Insurrection Act contains no "through the governor[]" requirement. Congress must have had more in mind when it added that language to Section 12406. *See generally Stanley v. City of Sanford, Fla.*, 145 S. Ct. 2058, 2064 (2025) ("[t]hat Congress used different language in these two provisions strongly suggests that it meant for them to work differently").

41

The statute's legislative history confirms what the plain text establishes:  that "through the governor[]"operates as a meaningful limitation on the President's authority.  In 1908, after the Senate amended the legislation to add "through the governor[]," a member of Congress explained that "[t]he old law of 1795 gave the President direct authority over every citizen of this land," while the proposed amendment "provide[d] that he may issue his orders for that purpose through the governor of the respective State."  42 Cong. Rec. 6870, 6942 (1908).  He suggested that the "through the governor[]" requirement could seriously limit the President's authority if "governors did not desire to have the militia called out[.]"  *Id.*

In 1911, shortly after Congress added the requirement, Major General Leonard Wood, the Army Chief of Staff, expressed a similar understanding.  He asserted in a memorandum to Congress that the "modern existing" Militia Act had "intensified" what he viewed as one of the Act's "principal defects":  "[d]ivided responsibility between the Federal Government and the States."  46 Cong. Rec. 3638, 3701 (1911).  General Wood explained that "[t]he old law did not require the President to consult the governors with reference to turning out the militia[,] . . . [b]ut now it is required by law."  *Id.* [14]

---

[14] Another historical example provides support for reading "through the governor[]" as a meaningful limitation on presidential power.  In 1867, Congress passed a law requiring "all orders and instructions relating to military operations issued by the President" to "be issued through the General of the army."  14 Stat.

(continued…)

That understanding of "through the governor[]" makes good sense. It promotes our system of federalism by giving a State's commander in chief an opportunity to play a meaningful role in federalization decisions. As relevant here, for example, if President Trump had contacted Governor Newsom to inform him of the order and request that he issue it, the Governor could have told President Trump that federalizing one-third of California's Guard troops in the middle of wildfire season would pose an extreme risk to the health and safety of Californians. *See* ER-35. Governor Newsom could have also informed President Trump about the critical work performed by the Guard in combatting the flow of fentanyl across the U.S.-Mexico border, *see id.*; the ways in which federalization would jeopardize that work and other important projects; and the effective response of state and local law enforcement agencies to the limited instances of violence and disorder in Los Angeles, *see supra* p. 7. Governor Newsom could have also asked President Trump to reconsider his order or at least reduce the number of federalized troops. Or if it were really true that "regular forces" were inadequate or unavailable, *but see supra* pp. 23-28, the Governor could have offered to provide assistance from state-status National Guard troops, *see supra* p. 7.

---

485, 486-487 (1867). President Johnson objected that the "through the General" requirement "in certain cases virtually deprives the President of his constitutional functions as Commander in Chief of the Army." Protest to House of Representatives (Mar. 2, 1867), https://tinyurl.com/pjrvs8pa.

The Court should confirm that Section 12406 provides state leaders with that opportunity. Where, as here, Congress enacts a statute "designed to advance" cooperation between the States and the federal government, courts are careful to honor that intent. *E.g.*, *Wisc. Dep't of Health & Fam. Servs. v. Blumer*, 534 U.S. 473, 495 (2002). Defendants' construction, by contrast, would undermine principles of state sovereignty and pose serious concerns under the Tenth Amendment. In defendants' view, Section 12406 licenses them to stamp "through the governor" on the top of a federalization order that the governor never reviewed or even received. *Supra* p. 40. That forces the Governor to "tak[e] the blame" and bear partial responsibility, thereby "diminish[ing] the accountability of . . . federal officials." *Printz v. United States*, 521 U.S. 898, 930 (1997).[15]

The Court concluded in its stay order that defendants likely satisfied the "through the governor[]" requirement because the federalization order "was issued

---

[15] This Court previously observed that "the language of § 12406" does not "grant the governor any 'consulting' role." Stay Order 36. But plaintiffs' argument is not that the statutory text refers to "consultation." It is that the process of issuing an order "through" an official naturally gives that official a chance to discuss the order with the individual that seeks its issuance. Because that opportunity would advance principles of "cooperative federalism," *Wisc. Dep't of Health*, 534 U.S. at 495, it would be anomalous for the Court to torture the plain meaning of the text to deny that opportunity here. *Cf. EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 537 (2014) (Scalia, J., dissenting) (courts should avoid "transforming [a statute] . . . based on cooperative federalism to one of centralized federal control").

through an agent of the Governor," the California Adjutant General. Stay Order 35. But California law in no way "delegat[es] . . . the Governor's authority to issue such orders" to the Adjutant General. *Id.* The provision of the California Military and Veterans Code invoked by the Court merely acknowledges that the Adjutant General "shall issue all [of his] orders in the name of the Governor." Cal. Mil. & Vet. Code § 163. It does not give the Adjutant General power to issue orders *that the Governor has not approved*. The Adjutant General is "subordinate . . . to the Governor," *id.* § 160, who serves as commander in chief of the National Guard under California's Constitution, *see* Cal. Const. art. V, § 7. And it has long been a settled principle of California law that the Legislature may not delegate the Governor's constitutional powers to "any other officer or authority" without his consent. *E.g.*, *State Bd. of Educ. v. Levit*, 52 Cal. 2d 441, 461 (1959).

The Court need not "give governors . . . veto power over the President's federalization decision" (Stay Order 36) to hold that defendants violated Section 12406. The statutory text contemplates cooperation between the President and governors; it is silent on what should occur in the event of an impasse or disagreement. One possible understanding is that governors have a veto in those circumstances. The President could then consider an alternative source of federalization authority, such as the Insurrection Act, which does not contain a

"through the governor[]" requirement. *Supra* p. 41.[16]  Alternatively, the Court

could construe the statute to require no more than a serious attempt at full

compliance.  On that understanding, if the President notifies a governor of

federalization, asks him to issue the order, and hears out the governor on any

concerns or objections—and the governor refuses to proceed—then the President

would be able to bypass the governor. *Cf. City of Los Angeles v. Adams*, 556 F.2d

40, 50 (D.C. Cir. 1977) (when full compliance with a statute becomes impossible,

federal officials must "effectuate the . . . statutory scheme as much as possible").

Because defendants made no effort of any kind to comply with the "through

the governor[]" requirement here, the proper remedy is to vacate the challenged

federalization orders.  That is the typical remedy for noncompliance with

procedural requirements imposed by law.  For example, courts routinely vacate

agency actions for failure to satisfy the procedural mandates of the APA.  *See, e.g.*,

*Sierra Club v. Bosworth*, 510 F.3d 1016, 1023 (9th Cir. 2007) ("when an agency

has taken action without observance of the procedure required by law, that action

will be set aside").  Defendants provide no reason to depart from that practice in

the context of an action like this one. *Cf.* Opening Br. 38-39.  The APA's vacatur

---

[16] President Eisenhower invoked the Insurrection Act over a governor's
objection when deploying the National Guard to desegregate Arkansas' public
schools in the 1950s.  Exec. Order 10730, 22 Fed. Reg. 7628 (Sept. 24, 1957).

standard, after all, merely builds on a preexisting legal tradition. *See, e.g.*, *Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 603 U.S. 799, 840 (2024) (Kavanaugh, J., concurring).

Defendants argue that vacatur of the federalization orders would be an overbroad remedy. Opening Br. 38-39. Their theory appears to be that any noncompliance with the "through the governor[]" requirement was harmless. *See id.* But there is no basis in the record for the Court to make that assumption. Ordinarily, courts presume that statutory procedures exist for good reason: to ensure that decisionmakers receive the information needed to render accurate, informed decisions. *See, e.g.*, *Paulsen v. Daniels*, 413 F.3d 999, 1005-1008 (9th Cir. 2005); *Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1487 (9th Cir. 1992). Here, for example, it is not at all clear that President Trump and Secretary Hegseth were informed about the serious effects of federalization on the State. *Supra* p. 43. Nor is it clear that they would have insisted on federalizing one out of every three members of California's Guard if they had known what the consequences would be for the State's disaster relief and prevention efforts, drug interdiction programs, and many other activities performed by the Guard when not federalized. *See* ER-35 & n.11; ER-72-76; SER-17-19. "To avoid gutting" the "through the governor[]" requirement, *Riverbend Farms*, 958 F.3d at 1487, the

Court should apply its plain text and reject defendants' unsubstantiated suggestion that any violation was harmless.

### B. The Remaining Equitable Factors Strongly Support Upholding the District Court's Order

The remaining equitable factors—irreparable harm and the public interest, *see Wolford*, 116 F.4th at 976—also weigh in favor of the district court's order. The district court made multiple findings of fact in support of its determination that the State had shown irreparable harm. *See* ER-33-35. None of those findings is "clearly erroneous." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 795 (9th Cir. 2005). Nor did the district court abuse its discretion in holding that "an injunction restraining the President's use of military force in Los Angeles is in the public interest." ER-37; *see generally Johnson v. Couturier*, 572 F.3d 1067, 1079 (9th Cir. 2009) ("as long as the district court got the law right [in issuing a preliminary injunction], it will not be reversed simply because the appellate court would have arrived at a different result if it had applied the law to the facts of the case") (internal quotation marks and brackets omitted).

1. In holding that plaintiffs had demonstrated irreparable harm, the district court focused on two principal injuries: first, the ways in which California would be deprived of forces to perform "important state services," ER-35, and second, the "risk of substantial civil unrest as a direct result of Defendants' inflammatory and confrontational deployment of the military in a large, civilian population center,"

48

ER-33 (internal quotation marks omitted). As to the first, the district court found that federalization would "deprive[] the state . . . of its own use of thousands of National Guard members to fight fires, combat the fentanyl trade, and perform other critical functions." ER-37; *see* ER-35. Evidence before the district court showed that one of every three members of California's active National Guard units had been federalized. SER-17. That included *more than half* of the Guard's elite wildfire-fighting unit, Task Force Rattlesnake. *Id*. And the Guard's Counterdrug Task Force, "which specializes in stopping fentanyl trafficking at the U.S.-Mexico border," ER-4, had "lost 139 out of 446 service members to the federalization"—a 31% reduction in strength, SER-18.

When staying the district court's order pending appeal, this Court downplayed the threat of depleting California's emergency response resources and personnel. The Court stated that "we do not know what emergencies may occur in California while the National Guard is deployed." Stay Order 41. As the district court recognized, however, a "focus on whether there is currently an exigency misunderstands the nature of emergencies, which are inherently unplanned for." ER-35. The Guard must be ready to respond at a moment's notice to wildfires and other disasters—just as thousands of Guard troops did in response to the devastating fires that struck the Los Angeles region earlier this year. ER-4.

The district court also found that "the continued presence of National Guard members and Marines in Los Angeles risks worsening, not improving, tensions on the ground." ER-33. Defendants provide no basis to overturn that finding on appeal. *See Nat'l Wildlife*, 422 F.3d at 795. The evidentiary record showed that arrests by state and local law enforcement steadily increased after the Guard was deployed. *See* ER-82; SER-14. The overall number of protests also increased, and there was evidence that "many of the protesters appeared angry that the National Guard had been federalized and was now present in their city," which "seemed to only inflame the protesters further." ER-81-82.

Defendants do not dispute that a spike in arrests coincided with the Guard's deployment. Instead, they speculate that the increase "might simply reflect the fact that National Guard members were available to protect federal personnel," freeing up local law enforcement to make arrests. Opening Br. 43. But the mere possibility that the district court *could* have drawn a different inference from the evidence does not suffice to demonstrate clear error. "The clear-error standard of review, by definition, admits the possibility that more than one inference can be drawn from any given record; when that occurs, a trial court's choice between these permissible inferences cannot be clearly erroneous." *Nisbet v. Bridger*, 124 F.4th 577, 589 (9th Cir. 2024).

2. The district court also properly held that defendants furnished limited evidence of harm and that the overall public interest weighed heavily in favor of injunctive relief. While the district court acknowledged that defendants have a general interest "in protecting federal agents and property," it concluded that defendants lack any "legitimate interest in [providing such protection] beyond the bounds of their authority." ER-37 (internal quotation marks omitted). Put differently, defendants failed to show that there was any need for federalization and deployment of *California's National Guard* to provide protective services. So long as "regular forces" were available to protect federal personnel and property, there was no need for the National Guard to be called in. Defendants have offered no persuasive reason to think that federal civilian resources and personnel were inadequate, especially in light of the considerable support offered by state and local law enforcement agencies. *Supra* pp. 23-28. Defendants have also overstated the risk level faced by federal officers in Los Angeles. Although "some individuals used the protests as an excuse for violence and destruction," ER-21, state and local law enforcement agencies responded forcefully to quell unrest and restore order, *see, e.g.*, ER-9-10; ER-79-82; *see also* SER-5-8.

With respect to the public interest, the district court rightly emphasized that "significant harm has already occurred." ER-36. Defendants' decision to federalize thousands of National Guard troops for a civilian law enforcement

51

mission upended "the important balance between federal and state power" and "set[] a dangerous precedent for future domestic military activity."  ER-36 & n.12. Every day that the federal deployment of California's National Guard remains in place, important democratic norms are weakened or cast aside.  As civilians continue to witness military troops patrolling their neighborhoods, local parks, and businesses, *see, e.g.*, *supra* pp. 9, 12-13, there is a grave danger that the public will become accustomed to this unprecedented intrusion of the military into civilian life.  There is also a risk that our military will be politicized, *see* Br. of Former U.S. Army & Navy Secretaries & Retired Four-Star Admirals & Generals, C.A. Dkt. 17.1 at 12; that our troops' morale will suffer, *see id.* at 7; that our First Amendment freedoms will be chilled, *see* ER-22-23; and that defendants' mission will steadily expand, step by step, until military involvement in civilian affairs becomes a new normal, *cf. Youngstown*, 343 U.S. at 650-651 (Jackson, J., concurring) (discussing the dangers of "emergency powers").  The district court acted appropriately to prevent those harms before it becomes too late to salvage the traditions that have guided our democracy for almost 250 years.

## II. ALTERNATIVELY, THE COURT MAY WISH TO VACATE THE DISTRICT COURT'S INJUNCTION—AND ITS OWN PRIOR STAY ORDER—IN LIGHT OF CHANGED CIRCUMSTANCES

Ordinarily, appellate courts proceed to the merits so long as a change in circumstances does not render a case moot. *See, e.g.*, *Tandon v. Newsom*, 593 U.S. 61, 63 (2021). And given that 300 members of California's National Guard remain federalized, *supra* p. 12, this case is certainly not moot. *See generally Health Freedom Def. Fund, Inc. v. Carvalho*, __ F.4th __, 2025 WL 2167401, at *4-5 (9th Cir. July 31, 2025) (en banc). Accordingly, plaintiffs believe the most appropriate resolution to this appeal would be an order reaching the merits and affirming the district court's injunction. *See supra* pp. 16-52.

Plaintiffs acknowledge, however, that appellate courts occasionally avoid reaching the merits in appeals from interim relief issued at the district court level. For example, in *Roman v. Wolf*, 977 F.3d 935 (9th Cir. 2020), this Court addressed a challenge to conditions at an immigration detention facility that allegedly placed detainees "at unconstitutional risk of contracting COVID-19." *Id.* at 938. The district court had entered a preliminary injunction, but during the pendency of appeal, "conditions at [the facility] . . . evolv[ed] rapidly." *Id.* at 945. A majority of the Court reached aspects of the district court's merits analysis, *see id.* at 943-944, but deemed it unnecessary to address "the provisions of the injunction ordering specific reductions in the detainee population," *id.* at 945. In light of

53

changed circumstances, the majority "vacate[d] . . . and remand[ed]" the district court's injunction. *Id.* (citing *Valentine v. Collier*, 960 F.3d 707 (5th Cir. 2020)).

Concurring in the judgment, Judge Miller argued that it was inappropriate to reach any aspects of the district court's merits analysis. *Roman*, 977 F.3d at 947 (Miller, J., concurring in part and concurring in the judgment). As he explained, "[t]he situation . . . ha[d] changed considerably" in the months since the district court had entered its injunction. *Id.* "Perhaps the plaintiffs were likely to establish a constitutional violation on that record, or perhaps not," Judge Miller reasoned, "but at this point the question is academic." *Id.* In his view, the sensible course was "to remand [to] allow the district court to determine, based on a new record, whether the government's response has fallen short of constitutional standards." *Id.* Although the Court did not adopt that proposed approach, *see id.* at 943-944 (majority), it did not squarely foreclose it either.

If the Court agrees with the approach proposed by Judge Miller, it could vacate and remand the district court's order without reaching the merits. The circumstances on the ground in Los Angeles and surrounding communities have certainly evolved since the events of June 6-7. The forms of sporadic violence and civil unrest that took place in the Los Angeles region earlier this year have not reoccurred. *See* D.Ct. Dkt. 183 at 10. And at this point, the question whether the original federalization was lawful is no longer the most pressing concern in this

litigation. Today, the most relevant questions under Section 12406 are whether there is any valid justification for deploying hundreds of National Guard troops through November—and whether defendants have any valid basis to make good on their recent threats to expand the deployment to other cities across California and beyond. Because proceedings are already underway before the district court to determine whether a new preliminary injunction is warranted, *supra* p. 12, there would be a limited cost to the district court and the parties of vacating the original injunction and remanding for further proceedings.

If the Court takes that route, it should also vacate its prior published stay order.[17] When a case becomes moot because of a change in circumstances, thereby preventing the completion of appellate review, it is often appropriate to vacate the order in question. *See, e.g.*, *Mayorkas v. Innovation L. Lab*, 141 S. Ct. 2842 (2021); *see generally United States v. Munsingwear, Inc.*, 340 U.S. 36, 39 (1950). Although this case is not moot, *see supra* p. 53, similar considerations would support vacatur here. A decision to avoid reaching the merits would deny this

---

[17] Either a three-judge panel or an en banc panel would have authority to grant that relief. *See, e.g.*, *Degelmann v. Advanced Med. Optics Inc.*, 699 F.3d 1103, 1104 (9th Cir. 2012) (three-judge panel vacating published opinion issued by the same panel); *Washington v. Trump*, 858 F.3d 1168, 1177 & n.5 (9th Cir. 2017) (Bybee, J., dissenting from denial of rehearing en banc) (discussing authority to grant en banc rehearing for limited purpose of vacatur); *Redd v. Guerrero*, 122 F.4th 1203, 1205 & n.1 (9th Cir. 2024) (Berzon, J., respecting the denial of rehearing en banc) (similar); *id.* at 1222-1223 & n.20 (Bennett, J., dissenting from denial of rehearing en banc) (similar).

Court the opportunity to revisit—and clarify or adjust—the reasoning in its prior published stay order. *See E. Bay Sanctuary*, 993 F.3d at 660-662.

Other considerations support vacatur here as well. The parties briefed and argued, and the Court resolved, the stay on a highly expedited basis: it was issued just two days after argument and only a week after the district court issued its temporary restraining order. *See, e.g.*, Stay Order 14-16. When parties and courts move so quickly, the risk of error is heightened. And plaintiffs have—at the very least—raised serious questions about the reasoning in the Court's stay order. *See supra* pp. 16-52; C.A. Dkt. 48.1 at 9-18; *see generally U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 29 (1994) (recognizing that "exceptional circumstances" may warrant vacatur).

If left in place as published precedent, the Court's stay order threatens to make it all too easy for defendants to federalize and deploy National Guard troops in communities through this Circuit—and the Nation more broadly. *See, e.g.*, C.A. Dkt. 48.1 at 6-9. The flawed form of extraordinary deference adopted in the Court's stay order, *see supra* pp. 28-35, is especially worrisome. That standard will make it difficult for the judiciary to act as a meaningful check on decisions by the President to use troops across the country for civilian law enforcement missions. So long as the President can muster a "colorable basis" (Stay Order 33) for invoking Section 12406, he can deploy troops anywhere he desires, in any

56

number he deems appropriate—no matter the harm to troop morale, our democratic traditions, and our constitutional structure.

That is no mere hypothetical threat. Since early June, defendants have expanded the military's mission in Southern California from protecting immigration agents in Los Angeles to accompanying DEA agents on operations more than 100 miles away. *Supra* p. 9. Troop morale has also predictably suffered, as members of the military have been ordered to do what they have long been trained to view as unacceptable: act as a police force on the streets of their own communities.[18] And defendants have used the same playbook deployed in Los Angeles to support a mobilization of the National Guard in Washington, D.C. Indeed, Secretary Hegseth has bragged that the federal administration aims to do "the 'same thing'" in the District of Colombia that it did "in Los Angeles." D.Ct. Dkt. 176 at 15. And when asked if the federal government would deploy troops to other cities, President Trump stated, "We're going to look at New York," "[a]nd if we need to, we're going to do the same thing in Chicago." Sharp, *Trial in National Guard Lawsuit Tests Whether Trump Will Let Courts Limit Authority*, L.A. Times (Aug. 12, 2025), https://tinyurl.com/2k3jv5c9. "Hopefully, L.A. is watching," he

---

[18] *See, e.g.*, Branson-Potts & Do, *Veterans' Advocates Warn of Low Morale Amid L.A. Deployment*, L.A. Times (June 24, 2025), https://tinyurl.com/yc8ymxse; Hubler, *Trump's National Guard Troops Are Questioning Their Mission in L.A.*, N.Y. Times (July 16, 2025), https://tinyurl.com/bd7v8ree.

added.  *Id.*  President Trump has also threatened to deploy troops to Oakland, San Francisco, and other cities.  *See, e.g.*, D.Ct. Dkt. 176 at 15.

These threats are not merely rhetorical.  "The Pentagon has for weeks been planning a military deployment to Chicago[.]"  Lamothe, *Pentagon Plans Military Deployment in Chicago as Trump Eyes Crackdown*, Wash. Post (Aug. 23, 2025), https://tinyurl.com/5drb5fr9.  And the White House recently issued an executive order requiring the Secretary of Defense to ensure that the National Guard in "*each State[]*" is "available to assist" the federal government in "ensuring the public safety and order" in cities across the country.  Exec. Order 14339, 90 Fed. Reg. 42121-42122 (Aug. 25, 2025) (emphasis added).  The order also directs the Secretary to "ensure the availability of a standing National Guard quick reaction force that shall be . . . available for rapid nationwide deployment."  *Id.* at 42122.  Nothing of the kind has ever been witnessed in our history:  a standing army drawn from state-level militias and deployed on a nationwide basis by the President for civilian law enforcement purposes.  The Court should not run the risk that the analysis in its published stay order will facilitate this unprecedented departure from our cherished democratic and constitutional traditions.

## CONCLUSION

The district court's temporary restraining order should be affirmed.
Alternatively, the Court should vacate that order, as well as this Court's published
stay order, and remand for further proceedings.

Dated:  September 2, 2025

Respectfully submitted,

_s/ Samuel T. Harbourt_

ROB BONTA
  *Attorney General of California*
HELEN H. HONG
  *Acting Solicitor General*
THOMAS S. PATTERSON
MICHAEL L. NEWMAN
  *Senior Assistant Attorneys General*
SAMUEL T. HARBOURT
CHRISTOPHER D. HU
  *Deputy Solicitors General*
ANYA BINSACCA
MARISSA MALOUFF
JAMES E. STANLEY
  *Supervising Deputy Attorneys General*
MEGHAN STRONG
JANE REILLEY
  *Deputy Attorneys General*
HALEY AMSTER
  *Associate Deputy Solicitor General*

59

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 25-3727

I am the attorney or self-represented party.

**This brief contains** <u>13,995 words</u>**,** including <u>0</u> words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[**X** ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** <u>s/Samuel T. Harbourt</u>    **Date** <u>9/2/2025</u>
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**    *Rev. 12/01/22*