No. 25-3727

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————

GAVIN NEWSOM, *et al.*,
*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, *et al.*,
*Defendants-Appellants.*

———————————

## On Appeal from the United States District Court
## for the Northern District of California
No. 3:25-cv-04870
The Honorable Charles R. Breyer

———————————

## SUPPLEMENTAL EXCERPTS OF RECORD

———————————

ROB BONTA
*Attorney General of California*
HELEN H. HONG
*Acting Solicitor General*
THOMAS S. PATTERSON
MICHAEL L. NEWMAN
*Senior Assistant Attorneys General*
ANYA BINSACCA
MARISSA MALOUFF
JAMES E. STANLEY
*Supervising Deputy*
*Attorneys General*

SAMUEL T. HARBOURT*
CHRISTOPHER D. HU
*Deputy Solicitors General*
MEGHAN H. STRONG
JANE REILLEY
*Deputy Attorneys General*
HALEY AMSTER
*Associate Deputy*
 *Solicitor General*

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3919
Samuel.Harbourt@doj.ca.gov
*Attorneys for Plaintiffs-Appellees*

September 2, 2025

## SUPPLEMENTAL EXCERPTS OF RECORD INDEX

| No. | Document | Date | ECF No. | SER No. |
| --- | --- | --- | --- | --- |
| 1 | Declaration of Joseph Zizi | 06/16/25 | 77-3 | 3-9 |
| 2 | Supplemental Declaration of Brian Olmstead | 06/12/25 | 39-3 | 10-15 |
| 3 | Supplemental Declaration of Paul S. Eck | 06/12/25 | 39-2 | 16-19 |
| 4 | Defendants' Corrected Opposition to Plaintiffs' Motion for a Temporary Restraining Order | 06/11/25 | 25 | 20-50 |

i

Docusign Envelope ID: 8F5221B7-3248-4BB5-95B7-B0B89FBEEDA8

Case 3:25-cv-04870-CRB     Document 77-3     Filed 06/16/25     Page 1 of 7

1   **ROB BONTA**
    Attorney General of California
2   THOMAS S. PATTERSON
    Senior Assistant Attorney General
3   ANYA BINSACCA
    JOHN D. ECHEVERRIA
4   MARISSA MALOUFF
    JAMES E. STANLEY
5   Supervising Deputy Attorneys General
    NICHOLAS ESPÍRITU
6   STEVEN KERNS
    JANE REILLEY
7   MEGAN RICHARDS
    MEGHAN H. STRONG
8    Deputy Attorneys General
      455 Golden Gate Avenue
9     San Francisco, CA 94102
      Telephone: (415) 510-3877
10     E-mail: Meghan.Strong@doj.ca.gov
    *Attorneys for Plaintiffs*

11

12              IN THE UNITED STATES DISTRICT COURT

13            FOR THE NORTHERN DISTRICT OF CALIFORNIA

14

15

16

17  **GAVIN NEWSOM, IN HIS OFFICIAL**          Case No: 3:25-cv-04870-CRB
    **CAPACITY AS GOVERNOR OF THE**
    **STATE OF CALIFORNIA; STATE OF**
18  **CALIFORNIA,**

19                            Plaintiffs,

20          v.                               **DECLARATION OF JOSEPH ZIZI**

21  **DONALD TRUMP, IN HIS OFFICIAL**
22  **CAPACITY AS PRESIDENT OF THE**
    **UNITED STATES; PETE HEGSETH, IN**
23  **HIS OFFICIAL CAPACITY AS SECRETARY**
    **OF THE DEPARTMENT OF DEFENSE;**
24  **U.S. DEPARTMENT OF DEFENSE,**

25

26                          Defendants.

27              **DECLARATION OF JOSEPH ZIZI**

28
                                1

I, JOSEPH ZIZI, declare as follows:

1.  I am over the age of 18 years and a U.S. citizen. I know the following facts based on my own personal knowledge and on my review of information and records gathered by California Highway Patrol (CHP) staff in the ordinary course of business. If called as a witness, I could and would testify competently to the matters set forth below.

2.  I am employed by the CHP as a law enforcement officer. I graduated from the CHP Academy in August of 2000 and have been continuously employed since that time as a member of the CHP. I have been assigned to the CHP Southern Division for my entire career and have held the rank of officer, sergeant, lieutenant and captain. I currently hold the rank of Assistant Chief in the Southern Division of the CHP. As part of my duties, I have been trained in CHP's Incident Command System (ICS).

3.  In my capacity as Assistant Chief, I am currently assigned as Commander of CHP's representatives participating in the multi-agency Unified Command for the protests in Los Angeles (hereafter, the "Los Angeles Protest Incidents"). I have been assigned to this post since Sunday, June 8, 2025. My regular shift is 6:00 a.m. to 6:00 p.m., although based on circumstances my shifts are typically much longer and hours may vary. In this capacity I manage CHP liaison officers also assigned to the Unified Command, including a Special Response Team Captain, staff officers responsible for Command logistics, and a Public Information Officer. My duties also include the movement of people and resources, as well as ensuring adequate staffing, supplies, relief, back up, and protection of CHP officers assigned to the Los Angeles Protest Incidents.

4.  The Unified Command consists of five agencies including CHP, the Los Angeles Police Department (LAPD), the Los Angeles County Sheriff's Department (LASD), the Los Angeles Fire Department (LAFD), and the Los Angeles County

2

Docusign Envelope ID: 8F5221B7-3248-4BB5-B5B7-80B005BEEDA8

Case 3:25-cv-04870-CRB     Document 77-3     Filed 06/16/25     Page 3 of 7

1   Fire Department (LACFD). The Unified Command is housed at the Los Angeles
2   Police Academy in the City of Los Angeles. Each agency designates its own
3   representatives to the Unified Command. Incident Commanders designated from
4   each agency are of similar rank and collaborate on management objectives, goals
5   and operational plans.

6        5.   Since the protests in Los Angeles began on June 6, thousands of officers
7   from LAPD, LASD, CHP and local law enforcement agencies from Los Angeles
8   and neighboring counties have responded to the incidents. Each agency's
9   deployment has fluctuated over the course of the incident. Based on a report I have
10  received, LAPD's maximum deployment to date has been 3,316 officers deployed
11  over a 24-hour period on June 14, and LASD's maximum deployment to date was
12  581 deputies deployed on the same day. Neighboring law enforcement agencies
13  have also continued to provide additional support in response to requests made
14  through California's Law Enforcement Mutual Aid System, managed by the
15  Governor's Office of Emergency Services. As of 0709 on Sunday, June 15, there
16  were 117 officers from neighboring agencies deployed to assist the Los Angeles
17  Sheriff's Department through the Mutual Aid System.

18       6.   Since the beginning of the protests, CHP officers have also played an
19  important role in responding to the developing situation in Los Angeles, ensuring
20  public safety by keeping protestors off major freeways, providing support for crowd
21  control, and making arrests as necessary.

22       7.   CHP, as of June 15, had approximately 800 uniformed personnel
23  assigned specifically to manage these protest incidents each day. This includes
24  approximately 250 uniformed personnel working a day shift from 0600 to 1830
25  each day, and a night shift of approximately 150 uniformed personnel working from
26  1800 to 0630 each day, as well as approximately 400 personnel from Special
27  Response Teams, described below, assigned each day. In addition to the
28  approximately 800 personnel assigned specifically to manage these protest

3

1  incidents, CHP has approximately 240 additional uniformed personnel working at

2  stations in the area and on standby to respond to emergency situations as needed.

3      8.  From June 7 through June 14, 2025, CHP's tactical alert expenditures in

4  connection with the Los Angeles Protest Incidents (costs over and above normal

5  operating expenses) are estimated to have totaled approximately $7 million, with

6  the largest expenditures coming on June 9, 10, and 11. These cost figures are

7  preliminary and subject to adjustment as CHP collects and reviews additional

8  reports and information.

9      9.  The Special Response Teams assigned to Los Angeles were drawn from

10  five different CHP Divisions around the state.  The Special Response Teams are

11  specially equipped and trained in crowd control techniques and have been

12  responsible for CHP's response to unlawful protest.  In addition to the annual

13  training on managing civil disturbances that all CHP officers receive, all Special

14  Response Team members are required to complete an initial Commission on Peace

15  Officer Standards and Training certified 24-hour course.  Each Division's Special

16  Response Team also completes quarterly training on relevant topics.  Further,

17  Special Response Team members annually complete an additional 12-hour

18  recertification course, which includes practical scenarios based on current events.

19  Additionally, the Special Response Teams have Logistics Units that are responsible

20  for booking arrestees, furnishing necessary supplies, and transport of arrestees.

21  During the Los Angeles Protest Incidents, these Special Response Teams have been

22  used as a rapid reaction force mobilizing quickly to hot spots as needed.

23      10. In addition to these Special Response Teams, CHP has deployed

24  numerous other specialized units to Los Angeles to help manage these incidents.

25  These include commercial enforcement units providing logistics and supplies;

26  canine units; air operations units, including airplanes and helicopters, that monitor

27  and track crowd movements, and have the capability to track particular vehicles

28  believed to have been involved in criminal activity; mounted units on horseback

4

1   specially trained in crowd control techniques; and a detective unit that specializes in

2   the investigation of felonious criminal activity, including identification and

3   investigation of individuals who assault law enforcement officers.

4       11. Finally, CHP uniformed officers also provide security and traffic control

5   on major freeways in the area, including US-101 and on/offramps. In particular,

6   they are focused on preventing freeway incursions by protestors and other

7   pedestrians. CHP also maintains a Mobile Field Force ready to respond to incidents

8   on freeways in and around Los Angeles.

9       12. Over the course of these protests and related incidents, state and local law

10  enforcement agencies have arrested numerous individuals. LAPD made 29 arrests

11  on Saturday, June 7. The number of arrests made increased following deployment

12  of the National Guard on June 8. In Los Angeles, between LAPD, LASD, and

13  CHP, there were 43 arrests on Sunday, June 8; 135 arrests on Monday, June 9; 295

14  arrests on Tuesday, June 10; 85 arrests on Wednesday, June 11; 52 arrests on

15  Thursday, June 12; 35 arrests on Friday, June 13; 56 arrests on Saturday, June 14;

16  and 2 arrests on Sunday, June 15. These numbers are preliminary and may change

17  as more data is collected and reviewed. Although there have been some arrests for

18  acts of violence and property destruction, based on information and belief the

19  majority of the arrests made to date have been for failure to disperse after law

20  enforcement declare an unlawful assembly.

21      13. Since June 8, violent incidents at federal facilities have been concentrated

22  in the immediate vicinity of the Edward R. Roybal Federal Building and U.S.

23  Courthouse in downtown Los Angeles, as well as the federal building in Santa Ana

24  and facility in Paramount. Other than incidents at those locations, I have not

25  received reports of violence at other federal facilities in and around Los Angeles,

26  including those in Westwood and Long Beach.

27      14. Law enforcement officers experienced significant violent assaults on the

28  weekend of June 7 and 8. On these days, law enforcement officers in downtown

5

Declaration of Joseph Zizi (3:25-cv-04870-CRB)

1 Los Angeles, Paramount, and Compton were the target of assaults, including from

2 thrown projectiles such as rocks, bottles, fireworks, and other objects. At least one

3 incident involved a Molotov Cocktail thrown at officers.  These incidents led to

4 some state and local law enforcement officers sustaining injuries, mostly minor.

5  15. As a result of these incidents, state and local law enforcement agencies

6 significantly increased their presence at the Los Angeles Protest Incidents in the

7 following days.  CHP deployed the Special Response Teams described above and

8 other law enforcement agencies also increased staffing.  California's Law

9 Enforcement Mutual Aid System was also utilized to obtain support from

10 neighboring law enforcement agencies.  Maximum law enforcement deployments

11 were on Saturday, June 14, in anticipation of large protests planned for that day.

12 Although there were significant violent incidents on the evening of June 14, state

13 and local law enforcement agencies were able to respond to those events with the

14 increased staffing available.

15  16. Civil unrest in Los Angeles County is typically managed effectively by

16 state and local law enforcement without the intervention of the National Guard or

17 active-duty Marines.  CHP and our allied local law enforcement agencies continue

18 to monitor the evolving situation and are taking steps to prepare for any future civil

19 unrest.

20

21  I declare under penalty of perjury under the laws of the United States that the

22 foregoing is true and correct.

23  Executed on June 16, 2025, at Los Angeles, California.

24

25

26 

27 Joseph Zizi

28

6

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

7

Declaration of Joseph Zizi (3:25-cv-04870-CRB)

1  ROB BONTA
   Attorney General of California
2  LAURA L. FAER
   Acting Senior Assistant Attorney General
3  MARISSA MALOUFF
   JAMES E. STANLEY
4  Supervising Deputy Attorneys General
   NORMA FRANKLIN
5  ROBIN GOLDFADEN
   NICHOLAS GREEN
6  BRENDAN M. HAMME
   STEVEN KERNS
7  LORRAINE LOPEZ
   KENDAL MICKLETHWAITE
8  MEGAN RICHARDS
   MEGHAN STRONG
9  CHRISTOPHER TENORIO
   NICHOLAS ESPÍRITU
10 Deputy Attorneys General
   1515 Clay St.
11 Oakland, CA 94612
   Telephone: (510) 879-3304
12 E-mail: Laura.Faer@doj.ca.gov
   *Attorneys for Plaintiffs*
13

14             IN THE UNITED STATES DISTRICT COURT

15           FOR THE NORTHERN DISTRICT OF CALIFORNIA

16

17

| 18 | **GAVIN NEWSOM, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF CALIFORNIA; STATE OF CALIFORNIA,** | Case No: 3:25-cv-04870-CRB |
|---|---|---|
| 19 | | |
| 20 | | **SUPPLEMENTAL** |
| 21 | Plaintiffs, | **DECLARATION OF BRIAN OLMSTEAD** |
| 22 | v. | |
| 23 | **DONALD TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; PETE HEGSETH, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF DEFENSE; U.S. DEPARTMENT OF DEFENSE,** | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | Defendants. | |
| 28 | | |

1

## SUPPLEMENTAL DECLARATION OF BRIAN OLMSTEAD

I, Brian Olmstead, declare as follows:

1.    I am over the age of 18 years and a U.S. citizen. I know the following facts based on my own personal knowledge and on my review of information and records gathered by California Governor's Office of Emergency Services (Cal OES) staff in the ordinary course of business, and if called as a witness, I could and would testify competently to the matters set forth below.

2.    I currently serve as an Assistant Chief in the Law Enforcement Branch (LEB) of the California Governor's Office of Emergency Services (Cal OES). As an Assistant Chief, my duties include, but are not limited to: implementing and coordinating California's Law Enforcement Mutual Aid System (Mutual Aid System) in case of a natural or war-caused disaster, civil disturbance, mass casualty event, or homeland security incident; consulting with and advising local law enforcement organizations in the utilizing California's Mutual Aid System; assisting in the coordination of emergency law enforcement activities during the time of a natural or war-caused disaster or civil disturbance; and providing planning and training guidance for law enforcement and homeland security programs.

3.    I am currently deployed to the Los Angeles County Sheriff's Department Operations Center.

4.    As the Assistant Chief for LEB Region 1 in Los Angeles and Orange Counties, I work directly with representatives of state and local law enforcement agencies, including the Los Angeles Police Department (LAPD), the Los Angeles County Sheriff's Department (LASD), and the California Highway Patrol (CHP), including to coordinate and respond to resource requests for both personnel and equipment, as part of California's Law Enforcement Mutual Aid System (Mutual Aid System).

2

5.     A local law enforcement agency can submit a mutual aid request to Cal OES request through the Mutual Aid System when the combined resources of the region where the local law enforcement agency is located are insufficient to cope with an incident. A summary of the Mutual Aid System was provided in paragraphs 3 to 5 of my prior declaration filed in this matter.

6.     The first request for mutual aid Cal OES received related to the protests occurring in the Los Angeles area was submitted on June 8, after the deployment of the National Guard. Neither LAPD nor LASD submitted mutual aid requests prior to the National Guard's deployment. LAPD and LASD have both made use of the Mutual Aid System when necessary during prior incidents and my understanding is that when local law enforcement agencies do not request mutual aid it is generally because they are able to manage events on their own without outside assistance.

7.     On June 8, LASD, as the Region Mutual Aid Coordinator, requested four platoons of officers to assist LAPD. As a result, officers from the Orange County Sheriff's Office, Long Beach Police Department, Ventura County Sheriff's Office, and the Santa Barbara County Sheriff's Office were quickly deployed to assist LAPD. Cal OES has since received additional mutual aid requests from LASD, all of which have been fulfilled, with officers being provided from neighboring local law enforcement agencies. Cal OES has not received any mutual aid requests for June 11.

8.     Since the protests began on June 6, thousands of officers from LAPD, LASD, CHP, and local law enforcement agencies from Los Angeles and neighboring counties have responded to the incidents. Each agency's deployment has fluctuated over the course of the incident. LAPD's maximum deployment to date has been 1,199 officers deployed in response to these protests on June 10. LASD's maximum deployment to date has been 248 officers on June 11. Maximum daily deployments from neighboring law enforcement agencies that have also provided officers include 80 officers from the Orange County Sheriff's

3

Suppl. Declaration of Brian Olmstead (3:25-cv-04870-CRB)

SER-012

Docusign Envelope ID: 9BECBC0A-855B-477B-B9FB-A8989A0200AF

Case 3:25-cv-04870-CRB    Document 39-3    Filed 06/12/25    Page 4 of 6

1   Department, 28 officers from the San Bernardino Sheriff's Department, 35 officers

2   from the Riverside County Sheriff's Office, 32 officers from the Santa Barbara

3   County Sheriff's Office, as well as 150 officers cumulatively from 22 local law

4   enforcement agencies in Los Angeles County, and 55 officers cumulatively from

5   Ventura County law enforcement agencies (Ventura County Sheriff's Office, Simi

6   Valley Police Department, Ventura Police Department, and Santa Paula Police

7   Department).

8       9.    Since the beginning of the protests, CHP officers have also played an

9   important role in responding to the developing situation in Los Angeles, ensuring

10  public safety by keeping protestors off major freeways, providing support for crowd

11  control, and making arrests as necessary.

12      10.   CHP currently has approximately 800 uniformed personnel assigned

13  specifically to these protest incidents each day. This includes 189 uniformed

14  personnel working a day shift from 0600 to 1830 each day, and a night shift of 129

15  uniformed personnel working from 1800 to 0630 each day, as well as 488 personnel

16  from Special Response Teams, described below, assigned each day. In addition to

17  the approximately 800 personnel assigned specifically to these protest incidents,

18  CHP has approximately 240 additional uniformed personnel working at stations in

19  the area and on standby to respond to emergency situations as needed.

20      11.   The Special Response Teams currently assigned to Los Angeles are

21  drawn from five different CHP Divisions around the state. They are specially

22  equipped and trained in crowd control techniques and have been responsible for

23  CHP's response to unlawful protest. Additionally, the Special Response Teams

24  have Logistics Units that are responsible for booking arrestees, furnishing necessary

25  supplies, and transport of arrestees.

26      12.   In addition to these Special Response Teams, CHP has deployed

27  numerous other specialized units to Los Angeles to help manage these incidents.

28  These include commercial enforcement units providing logistics and supplies;

4

Suppl. Declaration of Brian Olmstead (3:25-cv-04870-CRB)

SER-013

1   canine units; air operations units, including airplanes and helicopters, that monitor

2   and track crowd movements, and have the capability to track particular vehicles

3   believed to have been involved in criminal activity; mounted units on horseback

4   specially trained in crowd control techniques; and a detective unit that specializes in

5   the investigation of felonious criminal activity, including identification and

6   investigation of agitators who assault law enforcement officers.

7       13.    Finally, CHP uniformed officers also provide security and traffic control

8   on major freeways in the area, including US-101 and on/offramps. In particular,

9   they are focused on preventing freeway incursions by protestors and other

10  pedestrians.  CHP also maintains a Mobile Field Force ready to respond to incidents

11  on freeways in and around Los Angeles.

12      14.    Over the course of these protests and related incidents, state and local law

13  enforcement agencies have arrested numerous individuals for unlawful conduct.

14  LAPD made 29 arrests on Saturday, June 7. After deployment of the National

15  Guard on June 8 the number of arrests increased day-by-day.  Between LAPD,

16  LASD, and CHP, there were at least 41 arrests on Sunday, June 8; 135 arrests on

17  Monday, June 9; and 297 arrests on Tuesday, June 10.  These numbers are

18  preliminary and may grow as more data is collected from participating law

19  enforcement agencies and reviewed.

20      15.    I have confidence in California's Law Enforcement Mutual Aid System

21  and the ability of state and local law enforcement agencies in California to manage

22  the type of civil unrest we have seen over the past several days in Los Angeles.

23  Cal OES continues to monitor the situation and stands prepared to respond to public

24  safety needs as they may emerge.

25

26

27

28

5

Suppl. Declaration of Brian Olmstead (3:25-cv-04870-CRB)

SER-014

1

2     I declare under penalty of perjury under the laws of the United States that the

3     foregoing is true and correct.

4          Executed on June 12, 2025, at Los Angeles, California.

5

6     _____

7     Brian Olmstead

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Suppl. Declaration of Brian Olmstead (3:25-cv-04870-CRB)

1   **ROB BONTA**
    ATTORNEY GENERAL OF CALIFORNIA
2   LAURA L. FAER
    ACTING SENIOR ASSISTANT ATTORNEY
3   GENERAL
    MARISSA MALOUFF
4   JAMES E. STANLEY
    SUPERVISING DEPUTY ATTORNEYS GENERAL
5   NORMA FRANKLIN
    ROBIN GOLDFADEN
6   NICHOLAS GREEN
    BRENDAN M. HAMME
7   STEVEN KERNS
    LORRAINE LOPEZ
8   KENDAL MICKLETHWAITE
    MEGAN RICHARDS
9   MEGHAN STRONG
    CHRISTOPHER TENORIO
10  NICHOLAS ESPÍRITU
      DEPUTY ATTORNEYS GENERAL
11  1515 CLAY ST.
    OAKLAND, CA 94612
12  TELEPHONE: (510) 879-3908
    E-MAIL: NICHOLAS.ESPIRITU@DOJ.CA.GOV
13  *ATTORNEYS FOR PLAINTIFFS*

14              IN THE UNITED STATES DISTRICT COURT

15          FOR THE NORTHERN DISTRICT OF CALIFORNIA

16

17

18

19  **GAVIN NEWSOM, IN HIS OFFICIAL**
    **CAPACITY AS GOVERNOR OF THE**
20  **STATE OF CALIFORNIA; STATE OF**          **SUPPLEMENTAL**
    **CALIFORNIA,**                            **DECLARATION OF PAUL S. ECK**
21
                              Plaintiffs,      Date:
22                                             Time:
                 v.                            Courtroom:
23                                             Judge:
                                               Trial Date:
24  **DONALD TRUMP, IN HIS OFFICIAL**          Action Filed:
    **CAPACITY AS PRESIDENT OF THE**
25  **UNITED STATES; PETE HEGSETH, IN**
    **HIS OFFICIAL CAPACITY AS SECRETARY**
26  **OF THE DEPARTMENT OF DEFENSE;**
    **U.S. DEPARTMENT OF DEFENSE,**
27
28  Defendants.

                                    1

Case 3:25-cv-04870-CRB    Document 39-2    Filed 06/12/25    Page 2 of 4

# DECLARATION OF PAUL S. ECK

I, Paul S. Eck, declare under penalty of perjury that the following is true and correct:

1.    I am a resident of the State of California. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

1.    I am the Deputy General Counsel in the California Military Department (CMD). I have served in this role since August 2018.

2.    On June 10, 2025, I submitted a declaration in support of the State's request for a temporary restraining order. *See* ECF 8, Ex. 3.

## Increasing Impacts on the California National Guard

3.    The federalization of 4,000 California National Guard service members has already resulted in a significant impact to California's ability to combat wildfires, conduct drug interdiction, and provide services for Californians.

4.    The federalization of 4,000 service members amounts to a reduced strength of 32.75% of the California National Guards approximate total 12, 212 available members.

5.    Federalization has especially impacted the CMD's specialized units.

6.    Task Force Rattlesnake, California's highly trained fire mitigation and prevention and direct fire suppression unit, lost 190 out of its total 340 members to the Title 10 federal activation. A reduction of 55.88% of California National Guard's fire prevention and fighting force.

7.    The negative impacts of the reduction in force to Task Force Rattlesnake are imminent.

2

Case 3:25-cv-04870-CRB    Document 39-2    Filed 06/12/25    Page 3 of 4

1        8.   Prior to the Title 10 Federal activation of California National Guard

2    forces, Task Force Rattlesnake (Rattlesnake) maintained Fourteen (14) Type 1

3    Wildfire Handcrews. Post the mobilization, Rattlesnake has been whittled down to

4    Nine (9) Type 1 crews.

5        9.   The reduction in the number of Rattlesnake Type 1 crews has limited the

6    CMD's, and consequently Cal Fire's, ability to conduct ground fuels reduction

7    missions, and more importantly, it has negatively impacted CMD's ability to

8    respond to wildfires.

9        10. The consequences may be felt soon. As of June 11 there are 13 fires over

10    10 acres burning in California, including the Ranch Fire in San Bernardino which

11    has consumed over 4,200 acres. If it continues to grow at its current rate of spread,

12    it would necessitate the use of Rattlesnake.

13        11. The CMD Counterdrug Task Force lost 139 out of 446 service members

14    to the federalization. That is a 31% reduction in strength that will negatively impact

15    the State's critical drug interdiction work and investment in this area.

16        12. The CMD also operates many youth programs, administered through its

17    Youth and Community Programs Task Force (YCP). These programs support youth

18    development, leadership skills, and civic engagement. They include, among others,

19    the Grizzly Youth Academy, a program offering a structured environment for

20    students at risk of dropping out; the California Cadet Corps, which focuses on

21    school-based leadership and education; and the Star Base, a STEM based program

22    for 5th graders in the cities of Sacramento and Los Alamitos.

23        13. The CMD lost 58 out of its total 280 military academy instructors to the

24    Title 10 federalization. That is a strength reduction of 20% of instructors, which

25    will curtail or negatively impact the State's ability to serve California's youth.

26        14. This reduction in YCP's number of instructors has the greater

27    ramification of potentially causing CMD to breach its agreements with multiple

28    school districts that host YCP programs. CMD's military academy agreements

3

require CMD to maintain a 25:1 student to teacher ratio. The current Federalization of 58 instructors has caused CMD to breach its agreement regarding the Sunburst Youth Academy and may cause the same regarding the Discovery Challenge Academy.

15. The negative impact of the 60-day federalization of over 30% of the California National Guard will significantly undermine the State's ability to respond to State emergencies, including wildfires, combat drug trafficking, serve our youth, and provide many of the other support services to our city, county, and other state department partners.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on June 11, 2025, at Sacramento, California.

Declaration of Paul S. Eck

1  BRETT A. SHUMATE
   Assistant Attorney General
2  ERIC J. HAMILTON (CA Bar No. 296283)
   Deputy Assistant Attorney General
3  ALEXANDER K. HAAS (CA Bar No. 220932)
   Branch Director
4  CHRISTOPHER EDELMAN (DC Bar No. 1033486)
   Senior Counsel
5  GARRY D. HARTLIEB (IL Bar No. 6322571)
6  BENJAMIN S. KURLAND (DC Bar No. 1617521)
   Trial Attorneys
7  U.S. Department of Justice
8  Civil Division, Federal Programs Branch
   1100 L Street, NW
9  Washington, DC 20005
   Telephone: (202) 353-8659
10 christopher.edelman@usdoj.gov
11 *Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

14

15 | GAVIN NEWSOM, in his official capacity as    Case No. 3:25-cv-04870-CRB
16 | Governor of the State of California, et al.,

17 |                          *Plaintiffs*,    **DEFENDANTS' CORRECTED**
                                              **OPPOSITION TO PLAINTIFFS' MOTION**
18 |          v.                              **FOR A TEMPORARY RESTRAINING**
                                              **ORDER**[1]
19 | DONALD J. TRUMP, in his official capacity as
20 | President of the United States of America, et al.,

21

22 |                          *Defendants*.

23

24 ―――――――――――――――――

25 [1] Consistent with the Court's order, Defendants filed this brief within 24 hours of Plaintiffs' brief.
   Defendants encountered technical difficulties while finalizing their brief that prevented them from
26 generating tables and adding the formatting required by Local Rules. This Opposition is corrected
   only as follows: (1) updated formatting to conform to the Court's Rules, *see* Loc. Civ. R. 3-4(c);
27 (2) inclusion of a table of contents; and (3) inclusion of a table of authorities. No changes have
   been made in the substance of Defendants' Opposition. Defendants have conferred with counsel
28 for Plaintiffs regarding these corrections and Plaintiffs have no objection to the filing of this
   Corrected Opposition.

**TABLE OF CONTENTS**

INTRODUCTION..................................................................................................1

BACKGROUND....................................................................................................3

I.    The National Guard System......................................................................3

II.   10 U.S.C. § 12406.....................................................................................3

III.  The Riots and Violence in Los Angeles...................................................4

IV.   President Trump Deploys the California National Guard..........................6

PROCEDURAL HISTORY ...................................................................................7

LEGAL STANDARD ............................................................................................8

ARGUMENT .........................................................................................................8

I.    PLAINTIFFS' CLAIMS ARE LEGALLY AND FACTUALLY MERITLESS. ............8

      A.    The President Lawfully Federalized the National Guard......................9

            1.    The Court cannot second-guess the President's determinations that
                  the necessary conditions existed...................................................9

            2.    The necessary conditions existed for the President's order.....................12

            3.    Section 12406 does not require a governor's consent or input...............15

      B.    The Federalization of Guardsmen Does Not Intrude on State Police
            Powers.....................................................................................17

      C.    Defendants Have Not Violated the Posse Comitatus Act...................18

II.   THE BALANCE OF EQUITIES CUTS AGAINST ANY INJUNCTION. ...................21

III.  ANY INJUNCTIVE RELIEF SHOULD BE STAYED PENDING APPEAL AND
      ACCOMPANY A BOND.........................................................................25

CONCLUSION.....................................................................................26

ii

# TABLE OF AUTHORITIES

## Cases

*Baker v. Carr,*
    369 U.S. 186 (1962)................................................................................11, 12

*California v. United States,*
    104 F.3d 1086 (9th Cir. 1997)..........................................................................12

*Caribbean Marine Servs. Co. v. Baldrige,*
    844 F.2d 668 (9th Cir. 1988)............................................................................24

*City of L.A. v. Barr,*
    929 F.3d 1163 (9th Cir. 2019)..........................................................................23

*Dakota Cent. Tel. Co. v. S.D. ex rel. Payne,*
    250 U.S. 163 (1919)........................................................................................11

*Dalton v. Spector,*
    511 U.S. 462 (1994)......................................................................................9, 11

*Doran v. Salem Inn, Inc.,*
    422 U.S. 922 (1975)........................................................................................24

*El-Shifa Pharm. Indus. Co. v. United States,*
    607 F.3d 836 (D.C. Cir. 2010)..........................................................................12

*In re Debs,*
    158 U.S. 564 (1895)........................................................................................20

*In re Neagle,*
    135 U.S. 1 (1890)......................................................................................19, 20

*Index Newspapers LLC v. U.S. Marshals Serv.,*
    977 F.3d 817 (9th Cir. 2020)......................................................................22, 23

*Luther v. Borden,*
    48 U.S. (7 How.) 1 (1849)................................................................................11

*Marbury v. Madison,*
    5 U.S. (1 Cranch) 137 (1803) ..........................................................................11

*Martin v. Mott,*
    25 U.S. (12 Wheat.) 19 (1827)....................................................................10, 11

*Nken v. Holden,*
    556 U.S. 418 (2009)........................................................................................25

iii

*Perpich v. Dep't of Def.*,
   496 U.S. 334 (1990).................................................................................3

*Perpich v. U.S. Dep't of Def.*,
   666 F. Supp. 1319 (D. Minn. 1987).......................................................3

*Stuhlbarg Int'l Sales Co. Inc. v. John D. Brush & Co.*,
   240 F.3d 832 (9th Cir. 2001)..................................................................8

*Titaness Light Shop, LLC v. Sunlight Supply, Inc.*,
   585 F. App'x 390 (9th Cir. 2014).........................................................24

*Trump v. Int'l Refugee Assistance Proj.*,
   582 U.S. 571 (2017).................................................................................8

*Trump v. Wilcox*,
   145 S. Ct. 1415 (2025)............................................................................8

*Washington v. Trump*,
   847 F.3d 1151 (9th Cir. 2017)................................................................8

*Weinberger v. Romero-Barcelo*,
   456 U.S. 305 (1982)..........................................................................8, 22

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)......................................................................8, 21, 24

**Federal Statutes**

5 U.S.C. § 706.............................................................................................7

10 U.S.C. § 246...........................................................................................3

10 U.S.C. § 12301.....................................................................................16

10 U.S.C. § 12304a.......................................................................16, 17, 18

10 U.S.C. § 12406............................................................................*passim*

18 U.S.C. § 1385..............................................................................18, 19

**State Statutes**

Cal. Mil & Vet Code § 163......................................................................16

**The Constitution**

U.S. Const. art. I, § 8..........................................................................3, 18

iv

U.S. Const. art. II, § 2 ..................................................................... 3, 9, 12

    **Legislative Materials**

Act of Feb. 28, 1795, ch. 36, 1 Stat. 424 ........................................... 10

    **Rules**

Fed. R. Civ. P. 65 ........................................................................... 8, 25

    **Other Authorities**

*Emergency Power and the Militia Acts*, Stephen I. Vladeck,
    114 Yale L.J. 149 (2004) ............................................................. 4

Rebellion, *Black's Law Dictionary* (12th ed. 2024) ..................... 12, 13

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

**INTRODUCTION**

In a crass political stunt endangering American lives, the Governor of California seeks to use this Court to stop the President of the United States from exercising his lawful statutory and constitutional power to ensure that federal personnel and facilities are protected. But, under the Constitution, the President is the Commander in Chief of the armed forces, and the President is responsible for ensuring the protection of federal personnel and federal facilities. Over the past several days, violent rioters who object to enforcement of federal immigration laws have targeted and damaged federal buildings, injured federal personnel, and impeded federal functions. The L.A. Police Department ("LAPD") and other local and state law enforcement have been unable to bring order to the city. Indeed, in a press conference, the LAPD Chief of Police lamented that "things have gotten out of control" and warned that "somebody could easily be killed."[2] Evaluating the unrest and threats to the enforcement of federal law that local and state authorities were unable or unwilling to control, the President responded by using the authority vested in him by statute and the Constitution to federalize and deploy the California National Guard to protect federal personnel and property, quell the mobs, and restore order. When the situation escalated further, the Secretary of Defense deployed a group of U.S. Marines to further assist.

There is no rioters' veto to enforcement of federal law. And the President has every right under the Constitution and by statute to call forth the National Guard and Marines to quell lawless violence directed against enforcement of federal law. Yet instead of working to bring order to Los Angeles, California and its Governor filed a lawsuit in San Francisco seeking a court order limiting the federal government's ability to protect its property and officials. The extraordinary relief Plaintiffs request would judicially countermand the Commander in Chief's military directives— and would do so in the posture of a temporary restraining order, no less. That would be unprecedented. It would be constitutionally anathema. And it would be dangerous.

---

[2] Michele McPhee, "LAPD Chief Jim McDonnell Says, 'Violence I Have Seen is Disgusting,' Recounting Attacks on Cops" (June 8, 2025), *Los Angeles Magazine*, https://lamag.com/news/lapd-chief-jim-mcdonnell-says-violence-i-have-seen-is-disgusting-recounting-attacks-on-cops.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

On the merits, Plaintiffs' claims are baseless. The President properly invoked his statutory authority to federalize the California National Guard under 10 U.S.C. § 12406. Plaintiffs admit that Los Angeles has experienced "unrest," but ask this Court to second-guess the President's judgment that federal reinforcements were necessary. That is precisely the type of sensitive judgment that is committed to the President's discretion by law, and to which courts owe the highest deference. The statute empowers *the President* to determine what forces "*he* considers necessary" to "suppress" a "rebellion" or to "execute" federal "laws"—not the Governor, and not a federal court. Plaintiffs also object that the President did not consult with, or obtain the consent of, the Governor, but the statute imposes no such requirement. It merely directs, as a procedural matter, that the *President's* orders be conveyed "through" the Governor. They were.

Plaintiffs' objection based on the Posse Comitatus Act is equally misdirected. Neither the National Guard nor the Marines are engaged in law enforcement. Rather, they are *protecting* law enforcement, consistent with longstanding practice and the inherent protective power to provide for the safety of federal property and personnel. Plaintiffs offer no contrary evidence, only a speculative assertion that the National Guard and Marines will be used for unlawful purposes in the future. That speculation cannot justify the extraordinary remedy they seek.

The balance of equities likewise cuts decisively against any judicial intervention in the President's military judgments and deployments. Particularly in the realms of law enforcement and national security, the separation of powers counsels against such interference. And, if the Court were to grant the relief that Plaintiffs seek, that could cripple the federal government's law enforcement operations and, as the local Police Chief explained, even lead to a loss of life.

Courts did not interfere when President Eisenhower deployed the military to protect school desegregation. Courts did not interfere when President Nixon deployed the military to deliver the mail in the midst of a postal strike. And courts should not interfere here either.

## BACKGROUND

### I.    The National Guard System

The Constitution authorizes Congress both to raise and support a national Army and to organize "the Militia." *See* U.S. Const. art. I, § 8, cl. 15 (granting Congress the power to "call[] forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions"). The "Militia" of old is now the modern-day National Guard.[3] The National Guard consists of "two overlapping, but legally distinct, organizations. Congress, under its constitutional authority to 'raise and support armies' has created the National Guard of the United States, a federal organization comprised of state national guard units and their members." *Perpich v. Dep't of Def.*, 496 U.S. 334, 338 (1990) (quoting *Perpich v. U.S. Dep't of Def.*, 666 F. Supp. 1319, 1320 (D. Minn. 1987)). It is composed of both the State National Guard, under the command of the several States, and the National Guard of the United States, a federal entity enmeshed in the federal chain of command.

The Guard wears two hats: "Since 1933 all persons who have enlisted in a State National Guard unit have simultaneously enlisted in the National Guard of the United States. In the latter capacity they became a part of the Enlisted Reserve Corps of the Army, but unless and until ordered to active duty in the Army, they retain[] their status as members of a separate State Guard unit." *Perpich*, 496 U.S. at 345. While ordered into federal service, "members of the National Guard . . . lose their status as members of the state militia," *id.* at 347, and become federal soldiers with the President as the Commander in Chief of those forces. *See* U.S. Const. art. II § 2.

### II.    10 U.S.C. § 12406

Congress has granted the President several authorities under which he may call forth the National Guard, including the Insurrection Act (which is not at issue in this case), as well as other

---

[3] The composition and classes of the militia are defined in 10 U.S.C. § 246, which provides that the National Guard is part of the "organized militia."

3

authorities such as 10 U.S.C. § 12406 (which the President invoked here).

The statutory lineage of Section 12406 begins with the First Militia Act of 1792, which, among other things, was used by George Washington to respond to the Whiskey Rebellion.[4] *See Note: Emergency Power and the Militia Acts*, Stephen I. Vladeck, 114 Yale L.J. 149 at 160 (2004). Today, in its entirety, Section 12406 provides:

> Whenever-
>
> (1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation;
> (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or
> (3) the President is unable with the regular forces to execute the laws of the United States;
> the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws. Orders for these purposes shall be issued through the governors of the States or, in the case of the District of Columbia, through the commanding general of the National Guard of the District of Columbia.

10 U.S.C. § 12406.

### III.    The Riots and Violence in Los Angeles

On Friday, June 6, 2025, officers from the Department of Homeland Security's Immigration and Customs Enforcement ("ICE") Enforcement and Removal Operations ("ERO") conducted federally authorized operations in Los Angeles, California.  *See* Decl. of Ernesto Santacruz Jr., ¶ 7 ("Santacruz Decl."), Ex. 1.  A crowd gathered at an enforcement site and tried to prevent ICE officials from operating by throwing objects at ICE vehicles.  *Id.*  Several individuals were arrested in the operation and brought to ERO's federal facility in downtown Los Angeles.  *Id.*

Around 5:00 pm PT that night, a crowd began to gather at the ERO facility.  *Id.* ¶ 9.  The protests quickly turned violent.  *Id.*  They spread across the downtown area, threatening federal facilities and other public buildings.  *Id.* ¶ 10.  Protesters pinned down Federal Protective Services ("FPS") officers who were left severely outnumbered while trying to defend a parking garage

---

[4] The Act was amended by the Militia Act of 1795, which was invoked by President Madison, as discussed below.

4

connected to several federal buildings. *Id.* ¶ 11. Protesters threw concrete chunks, bottles of liquid, and other objects at the officers. *Id.* Protesters also attempted to use a large rolling commercial dumpster as a battering ram to breach the parking garage, causing damage to federal property. *Id.*

Officers feared for their safety. *Id.* ¶ 13. ICE and Homeland Security Investigations ("HSI") officers responded to support the FPS officers under siege and attempted to use non-lethal force to disperse the crowd. *Id.* The federal officers managed to prevent a breach of the facility, but it took Los Angeles Police Department ("LAPD") officers nearly an hour and a half to arrive and assist the federal officers in pushing the crowd back from the parking garage gate. *Id.* Meanwhile, the protests turned extremely violent, with news reports showing demonstrators using chairs, dumpsters, and other weapons. *Id.* ¶ 14. Once on scene, LAPD declared an "unlawful assembly" around 7:00 pm and ordered protesters to disperse. *Id.* ¶ 16. Many did not and instead began attacking LAPD officers. *Id.* The scene was not clear until around 11:00 p.m., leaving extensive damage to multiple federal buildings. *Id.* ¶ 17.

At approximately 10:23pm PT that night, President Trump called Governor Newsom. The President informed Governor Newsom of the dangers that federal personnel and property were being subjected to and directed him to take action to stop the violence.[5] But the violence only intensified the next day. On Saturday morning, large crowds congregated around an HSI office in the Paramount neighborhood of LA as federal officers prepared for another enforcement operation. *Id.* ¶ 18. The crowd blocked traffic and began to attack ERO and Customs and Border Patrol ("CBP") officers. *Id.* ¶ 20. Seven hours of non-stop fighting between federal officials and protesters ensued. *Id.* The crowd boxed in federal officers, surrounded an ERO officer's vehicle that they pummeled with stones, launched mortar-style fireworks, set at least one vehicle on fire, and threw objects of all nature, which caused a CBP officer to suffer a shattered wrist. *Id.* The perimeter fence of the federal building was breached, vehicles were damaged, and mortar-style

---

[5] https://www.foxnews.com/politics/trump-brings-receipts-he-called-newsom-amid-la-riots-california-gov-claims-wasnt-even-voicemail.amp; *see also* https://www.gov.ca.gov/2025/06/09/watch-governor-newsom-discusses-donald-trumps-mess-in-los-angeles/ (Governor Newsom concurring that the call took place)

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

1  fireworks with multiple explosions were thrown at the federal officers. *Id.* ¶ 21. Leaders in both

2  political parties have described the violence in the strongest terms. Democrat Senator John

3  Fetterman called it "anarchy and true chaos."[6]

4        Protests continued Sunday and through the moment. *Id.* ¶ 24. Protesters have blocked the

5  101 Freeway. *Id.* ¶ 25. Dumpsters have been lit on fire and commercial-grade fireworks were set

6  off toward federal officers. *Id.* ¶ 26. Federal and state buildings have been damaged, and the

7  federal building security checkpoint has been in ruins. *Id.* ¶¶ 26-27. Officers have been injured.

8  *Id.* ¶ 27. The federal complex in Downtown LA has been closed due to the unrest, *id.* ¶ 29, and

9  has been severely damaged and vandalized, *id.* ¶¶ 26-27.

10  **IV.    President Trump Deploys the California National Guard**

11

12        In response to these events, on June 7, the President signed a memorandum calling into

13  federal service at least 2,000 members of the California National Guard to protect federal personnel

14  and property. The White House, *Dep't of Defense Security for the Protection of Dep't of Homeland*

15  *Security Functions*, (Jun. 7, 2025) ("Presidential Memo"), ECF No. 8-1 at 44–45. Specifically, the

16  President invoked Section 12406 to "temporarily protect ICE and other United State Government

17  personnel who are performing [f]ederal functions, including the enforcement of Federal law, and

18  to protect [f]ederal property[.]" *Id.* at 44. That same night, Governor Newsom issued a statement

19  acknowledging that "[t]he federal government is moving to take over the California National

20  Guard and deploy 2,000 soldiers" while criticizing the decision as "the wrong mission."[7]

21

22        Later that evening, based on the President's invocation of Section 12406, the Secretary of

23  Defense issued directed the California Adjutant General to effectuate the call into federal service

24  of the National Guard. Sec'y of Def., *Calling Members of the Cal. Nat'l Guard into Federal*

25  *Service* (Jun. 7, 2025) ("June 7 DoD Memo"), Ex. 2. By the early morning of June 8, the Adjutant

26  General had responded that his orders had been received and acknowledged that his forces were

27  ---
[6] https://x.com/SenFettermanPA/status/1932234335425323417
28  [7] Governor Gavin Newsom (@CAgovernor), X (Jun. 7, 2025 8:13 PM),
https://x.com/CAgovernor/status/1931504803487879617

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

mobilized.  On June 9, the Secretary of Defense issued a second memorandum to the Adjutant General requesting an additional 2,000 federalized National Guards.  Sec'y of Def., *Calling Additional Members of the Cal. Nat'l Guard into Federal Service* (Jun. 9, 2025) ("June 9 DoD Memo"), Ex. 3.  The Secretary also ordered the mobilization of 700 active-duty marines from Camp Pendleton to Los Angeles.  *See* Declaration of Paul S. Eck, ECF No. 8-3 ¶ 18.

Since those calls to federal action, Guardsmen have been charged with conducting safety and protection of Federal personnel, property, and functions at designated locations by providing security patrols, observation posts, and outer cordon security perimeter of buildings.  This includes National Guardsmen providing protection activities at several federal sites throughout the Los Angeles area, as well as to federal agents conducting their duties.

## PROCEDURAL HISTORY

Plaintiffs, the State of California and Governor Gavin Newsom, filed their Complaint on June 9, 2024.  Compl. ECF No. 1 ("Compl.").  Plaintiffs principally allege that Defendants took *ultra vires* action—that is, official acts exceeding their statutory bounds. Compl. ¶¶ 79–92 ("Count I").  Plaintiffs also allege Defendants violated the Tenth Amendment by "unlawful[ly]" mobilizing the California National Guard and thereby depriving the Governor of command and availability of those mobilized units.  *Id.* ¶¶ 93–101 (Count II).  The second count is thus derivative of the first. Finally, though they do not raise it as a basis for the pending motion, Plaintiffs allege Secretary Hegseth and the DoD have taken agency action in excess of statutory authority in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.  Compl. ¶¶ 102–06 (Count III).

On June 10, 2025, Plaintiffs filed their Motion for a Temporary Restraining Order.  Pls.' Mot. for a TRO, ECF No. 8 ("TRO Mot.").  Through their TRO Motion, Plaintiffs seek a court order enjoining the DoD from deploying federal troops in aid of federal agents carrying out their duties to enforce federal law in the field.  Proposed Order, ECF No. 8-4 at 5.

7

**LEGAL STANDARD**

Rule 65 of the Federal Rules of Civil Procedure empowers district courts to issue TROs. *See* Fed. R. Civ. P. 65(b). Like a preliminary injunction, a TRO is "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see also Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017) (standards applicable to TROs and preliminary injunctions "substantially identical" (quoting *Stuhlbarg Int'l Sales Co. Inc. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001))). "The purpose of . . . interim equitable relief is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward." *Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025) (quoting *Trump v. Int'l Refugee Assistance Proj.*, 582 U.S. 571, 580 (2017)). Thus, a court should not "mechanically" grant an injunction for every violation of law. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982).

Instead, plaintiffs must establish that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *Winter*, 555 U.S. at 20. A court may convert a TRO motion into a preliminary injunction motion, Fed. R. Civ. P. 65, and doing so may be appropriate in order to ensure that consequential rulings are subject to immediate appeal.

**ARGUMENT**

**I.     PLAINTIFFS' CLAIMS ARE LEGALLY AND FACTUALLY MERITLESS.**

The thrust of Plaintiffs' motion is that the President lacks authority to federalize the State National Guard and to deploy those forces, along with U.S. Marines, to protect federal assets in Los Angeles. That is flatly wrong. Section 12406 expressly empowers the President to call the California National Guard into federal service when he considers it necessary either to quell a "rebellion against the authority of the Government of the United States" or when he determines that "regular forces" are "unable" to execute federal law. The President reasonably made both of those determinations here, and they are not subject to judicial second-guessing under foundational

8

precedent dating back nearly two centuries. Nor does the President need the consent (or even the input) of the State Governor to give these orders; Plaintiffs blatantly mischaracterize the statute in suggesting otherwise. Finally, Plaintiffs offer no evidentiary support for their claim that military forces are engaged in ordinary law-enforcement activities. The President and Secretary of Defense have directed those forces to protect federal property and federal officials, including to ensure the safety and security of federal law-enforcement operations—but the military itself is not executing federal law. Plaintiffs' objection under the Posse Comitatus Act is therefore meritless too.

### A.   The President Lawfully Federalized the National Guard.

The President is the Commander in Chief of the armed forces including "the Militia of the several States, when called into the actual Service of the United States[.]" U.S. Const. art. II, § 2. And Congress has authorized the President to call the National Guard into federal service. 10 U.S.C. § 12406. Plaintiffs challenge the federalization of the National Guard on two grounds. First, they dispute that the necessary conditions were present when the President issued his Saturday memorandum. Second, they object to the process through which Guardsmen were activated. Both arguments lack merit, especially in light of the President's inherent authority to protect federal personnel and property.

### 1.   The Court cannot second-guess the President's determinations that the necessary conditions existed.

Most fundamentally, Plaintiffs' challenge to the conditions in California at the time of the presidential memorandum is unreviewable because it is a statutorily authorized discretionary judgment of the President. When courts are confronted with a claim alleging that the President has "violated the terms of" a statute, "longstanding authority holds that such review is not available when the statute in question commits the decision to the discretion of the President." *Dalton v. Spector*, 511 U.S. 462, 474 (1994). Section 12406 commits the decision of whether the conditions are ripe to call forth the National Guard to the President's discretion. The statute authorizes "the President" to activate Guardsmen "in such numbers *as he considers necessary* to repel the invasion, suppress the rebellion, or execute those laws." 10 U.S.C. § 12406 (emphasis added).

9

There is no textual basis in the statute for either the Court or Plaintiffs to second-guess the President's determination that the conditions to call forth the Guard are met.

Indeed, nearly two centuries ago, the Supreme Court squarely rejected Plaintiffs' position that courts had authority to decide whether a sufficient exigency supported the President's decision. In *Martin v Mott*, the Supreme Court held that a challenge to the legality of President Madison's decision to call out the militia in response to a national emergency was beyond judicial scrutiny and second-guessing. *See* 25 U.S. (12 Wheat.) 19 (1827). As noted in the background, today's Section 12406 vests the President with statutory authority to call forth the National Guard "as he considers necessary to repel the invasion, suppress the rebellion, or execute [the] laws" of the United States. 10 U.S.C. § 12406. Much like that statute, the law at issue in *Martin* provided "that whenever the United States shall be invaded, or be in imminent danger of invasion … it shall be lawful for the President of the United States to call forth such number of the militia of the State or States most convenient to the place of danger, or scene of action, as he may judge necessary to repel such invasion, and to issue his order for that purpose to such officer or officers of the militia as he shall think proper." *Martin*, 25 U.S. at 29 (quoting Act of Feb. 28, 1795, ch. 36, 1 Stat. 424) (concerning the first calling out statute that was invoked in the Whiskey Rebellion and by President Madison in the War of 1812 and the predecessor to Section 12406).

The Court explained that "the authority to decide whether the exigency has arisen, belongs exclusively to the President, and that his decision is conclusive upon all other persons." *Id.* at 30. Such authority "necessarily results from the nature of the power itself, and from the manifest object contemplated by the act of Congress." *Id.* This was so because "[w]henever a statute gives a discretionary power to any person, to be exercised by him upon his own opinion of certain facts, … the statute constitutes him the sole and exclusive judge of the existence of those facts." *Id.* at 31–32. Exercise of such authority is nonreviewable because "[t]he remedy for this, as well as for all other official misconduct" resided in "the frequency of elections, and the watchfulness of the

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

1  representatives of the nation, [which] carry with them all the checks which can be useful to guard

2  against usurpation or wanton tyranny." *Id.* at 32.

3      Modern precedent points in the same direction. Under *Dalton*, where claims "concern[]

4  not a want of Presidential power, but a mere excess or abuse of discretion in exerting a power

5  given," they are not subject to judicial review. 511 U.S. at 474 (quoting *Dakota Cent. Tel. Co. v.

6  *S.D. ex rel. Payne*, 250 U.S. 163, 184 (1919)).[8] When a statute "commits decisionmaking to the

7  discretion of the President, judicial review of the President's decision is not available." *Id.* at 477.

8  That principle forecloses Plaintiffs' claims here. They do not dispute that the President has the

9  power to federalize the National Guard—only that he exceeded that authority because the

10 conditions were not satisfied. But Congress vested such matters in the President's discretion.

11 "How the President chooses to exercise the discretion Congress has granted him is not a matter for

12 [judicial] review." *Id.* at 476.

13     While a court should "always be ready to meet any question confided to it by the

14 Constitution, it is equally its duty not to pass beyond its appropriate sphere of action." *Luther v.*

15 *Borden*, 48 U.S. (7 How.) 1, 47 (1849). Certain "[q]uestions, in their nature political, or which

16 are, by the constitution and laws, submitted to the executive, can never be made in this court."

17 *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803). Thus, if the act of an official is one in

18 which the "executive possesses a constitutional or legal discretion, nothing can be more perfectly

19 clear . . . that their acts are only politically examinable." *Id.* at 166; *see also Baker v. Carr*, 369

20 U.S. 186, 217 (1962) (setting forth the test for political question doctrine).

21     That is the case here. The statutory conditions (determination of an invasion, rebellion, or

22 inability to execute the laws of the United States) are "of a kind clearly for nonjudicial discretion."

23 *Baker*, 369 U.S. at 217. They operate against a backdrop of constitutional powers, including

24 that "[t]he President shall be Commander in Chief of the Army and Navy of the United States, and

---

[8] In *Dakota Central Telephone Co.*, the Supreme Court rejected the same type of claim that the State asserts here, namely that the President "exceeded the authority given him" pursuant to a statute by taking action when "there was nothing in the conditions at the time the power was exercised which justified the calling into play of the authority." 250 U.S. at 184.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

of the Militia of the several States, when called into the actual Service of the United States." U.S. Const. art. II, § 2, cl. 1. They implicate national security, a subject that is broadly committed to the discretion of the political branches. *See El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 842 (D.C. Cir. 2010). And there are no "judicially discoverable and manageable standards for resolving" whether riots rise to the level of rebellion, or whether the regular forces are adequate to execute federal law. *Cf. California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997) (collecting cases for proposition that determination of an "invasion," the first of the Section 12406 conditions, presents a political question).

In short, while Plaintiffs repeatedly acknowledge the unchecked violence in Los Angeles, they ask the Court to supersede the President's judgment that the violence has risen to a level sufficient to trigger the statute—even though the statute empowers the President to mobilize the National Guard in "such numbers as *he* considers necessary." 10 U.S.C. § 12406 (emphasis added). Indulging that request would fail to display "the respect due coordinate branches of government." *Baker*, 369 U.S. at 217.

### 2. The necessary conditions existed for the President's order.

Even if some form of deferential judicial review were permissible, the President had more than ample grounds for invoking Section 12406. As his memorandum explained, it arose out of "[n]umerous incidents of violence and disorder" that threaten federal property and federal officials who are supporting the faithful execution of federal laws. Presidential Memo at 1. Indeed, the dangerous conditions in Los Angeles doubly satisfied Section 12406.

*First*, "there [was] a rebellion or danger of a rebellion against the authority of the Government of the United States." 10 U.S.C. § 12406(2). Plaintiffs cite one legal authority— Black's Law Dictionary—in their rebellion argument, and quote selectively from it. TRO Mot. at 9. Black's Law Dictionary's definition of the term "rebellion" provides three definitions of the term, each embracing something less than "an organized attempt to change the government or leader of a country." TRO Mot. at 9 (quoting Rebellion, *Black's Law Dictionary* (12th ed. 2024)). "Rebellion" means:

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

1. Open, organized, and armed resistance to an established government or ruler, esp., an organized attempt to change the government or leader of a country, usu. through violence. Cf. civil war under war (1). 2. Open resistance or opposition to an authority or tradition. 3. Hist. Disobedience of a legal command or summons.

Rebellion, *Black's Law Dictionary* (12th ed. 2024). Consistent with this understanding of the term, the presidential memorandum notes that "[n]umerous incidents of violence and disorder have recently occurred and threaten to continue in response to the enforcement of Federal law by U.S. Immigration and Customs Enforcement (ICE) and other United States Government personnel who are performing Federal functions and supporting the faithful execution of Federal immigration laws." Presidential Memo. Presidential Memo at 1. It concludes that "[t]o the extent that protests or acts of violence directly inhibit the execution of the laws, they constitute a form of rebellion against the authority of the Government of the United States." *Id.*

Plaintiffs do not dispute that substantial violence had occurred in Los Angeles by the time the presidential memorandum was signed and that it has continued through the weekend (and to this day), or that the violence was in opposition to federal immigration enforcement. While characterizing the protest activity as "[p]rimarily peaceful," Plaintiffs admit that Los Angeles witnessed "some level of civil disturbance" and that the situation required local authorities to "mak[e] dozens of arrests." TRO Mot. at 9. That is a severe understatement. Their own submission to the Court substantiates the President's judgment many times over. One of Plaintiffs' declarants highlights the severity of the situation: "[S]ome protesters unfortunately began to engage in dangerous behavior such as throwing rocks and other objects, including a Molotov Cocktail at deputies damaging vehicles, burning a vehicle, looting a gas station, and vandalizing property." Declaration of Brian Olmstead ¶ 9, ECF No. 8-2. "Two deputies were injured during the incident." *Id.*

The articles submitted by Plaintiffs also describe the dangerous conditions in Los Angeles, with mobs resisting federal authority in a manner that rises to the level of rebellion. Plaintiffs' submission to the Court contains five images of burning or burnt cars. ECF No. 8-1, at 47, 93, 102, 121, 123. It contains a sixth image of an unidentified burning object. ECF No. 8-1, at 104.

13

1   And they have also submitted images of (in their sources' words) demonstrators "blocking traffic

2   on [a] busy thoroughfare" and a "massive crowd" pushing to a wall barrier. ECF No. 8-1, at 120,

3   122. Plaintiffs' articles say that "[d]emonstrators blocked entrances and exits to [the Federal

4   Building in downtown Los Angeles]." ECF No. 8-1 at 54. They also "spray-painted anti-ICE

5   slogans on [a] building's exterior walls" and "attempted to physically stop ICE vehicles." *Id.*

6   "Dozens of buildings were tagged with graffiti, including the LAPD Headquarters, the U.S.

7   Courthouse and the old Los Angeles Times building." ECF No. 8-1, at 121.

8          Plaintiffs' submission also reflects the crowd's refusal to comply with local authorities'

9   orders. "The crowd of demonstrators . . . moved through the city despite the area-wide dispersal

10  order, again lighting fireworks and throwing projectiles at police vehicles driving by." ECF No.

11  8-1 at 121. "Several fires were set in dumpsters and trash bins and at least one store had windows

12  shattered by alleged looters." *Id.* It also reflects local authorities' inability to adequately respond.

13  An article submitted by Plaintiffs reports that "[a] federal law enforcement official with knowledge

14  of the operations told CBS News that ICE requested assistance from LAPD multiple times over

15  the course of Friday night." ECF No. 8-1, at 123. "[A] senior city official in L.A. told CBS News

16  that it took LAPD 55 minutes to respond." *Id.*

17

18         At minimum, on Plaintiffs' own record, the conditions in Los Angeles qualify as a "*danger

19  of a rebellion*" against federal authority. 10 U.S.C. § 12406(2) (emphasis added). Plaintiffs argue

20  that a rebellion was not present, but they never contend that there was no *danger* of a rebellion.

21  Section 12406's "danger of a rebellion" language appears nowhere in their brief outside their block

22  quotation of the statute. That alone is sufficient grounds to invoke the statute—and thus to deny

23  Plaintiffs' motion.

24         *Second*, "the President [was] unable with the regular forces to execute the laws of the

25  United States," *id.* § 12406(3), an independently sufficient basis for federalizing the Guard. The

26  same record establishes this. Mr. Santacruz's declaration details the substantial threats to the safety

27  of federal law enforcement personnel in the field and at federal buildings. Demonstrators began

28  to organize on Friday at sites where ICE ERO was enforcing alien removal laws, i.e., "execut[ing]

14

the laws of the United States." 10 U.S.C. § 12406(3). And local authorities were unable to allow that activity to occur safely. Plaintiffs' short argument on this prong of the statute contends that because ICE ERO succeeded in arresting 44 individuals on Friday, the President was able to execute the laws of the United States. TRO Mot. at 10. But that limited success came with the risk of danger—risk that the President could reasonably have determined was intolerable. Plus, Plaintiffs' argument ignores that ICE ERO would have been able to carry out additional execution-of-the-laws activity in the absence of a riot. And absent the use of additional law enforcement resources to protect ICE agents from the violent assaults of protestors, it would be perilous for ICE officials to carry out further immigration-enforcement operations.

Plaintiffs also argue this prong is inapplicable because President Nixon used the same authority to respond to a nationwide crisis while last weekend's crisis centered only on the Nation's second largest city. They never connect that argument to the statute's text, however, and nothing in Section 12406 supports the distinction.

On this prong, Plaintiffs' argument amounts to a request to second-guess the President's judgment about the adequacy of state and local law enforcement to protect federal property and federal personnel. That is inappropriate. The President cannot be hamstrung by the Governor's insistence that state and local authorities are up to the task, particularly when the evidence on the ground shows otherwise. And, respectfully, the Court is not positioned to countermand this judgment either, particularly in a highly expedited proceeding with a limited record.

### 3. Section 12406 does not require a governor's consent or input.

Defendants also acted lawfully in the processes they used to federalize Guardsmen. Section 12406's first sentence establishes the President's unilateral authority to federalize Guardsmen. Again, it reads: "[T]he President may call into Federal service members and units of the National Guard of any State . . . ." The next sentence adds that "[o]rders for these purposes shall be issued through the governors of the States." 10 U.S.C. § 12406. The statute is thus clear that the orders are issued *by* the President, and they are conveyed *through* State officials. Nothing in the statute entitles a Governor to veto or impede a valid presidential order.

15

1    The President complied with this procedural provision. Secretary Hegseth's

2 memorandum was issued to California's Adjutant General, a state cabinet-level official who is

3 required under California law to perform "duties consistent with the regulations and customs of

4 the United States Army, United States Air Force, and the United States Navy[,]" including

5 "issu[ing] all orders *in the name of the Governor*." Cal. Mil & Vet Code § 163 (emphasis added).

6 The memorandum bore the label "THROUGH: THE GOVERNOR OF CALIFORNIA." ECF No.

7 8-1, at 107. And Secretary Hegseth sent a second memorandum federalizing an additional 2,000

8 Guardsmen on Monday with the same label. ECF No. 8-1, at 111. There is no dispute that the

9 Governor had actual and contemporaneous knowledge of the order—indeed, he acknowledged that

10 it was forthcoming before it even issued. This procedural objection is thus meritless, and certainly

11 not a basis to issue an unprecedented injunction against the deployment of military forces.

12    Plaintiffs, however, interpret the statute to "require[] orders under § 12406 be issued *by*

13 the Governor." TRO Mot. at 11 (emphasis added). But Section 12406 does not use the word "by."

14 And there is a fundamental difference between orders issued "by" a person (making them the

15 decisionmaker) and orders issued "through" that person (making them a mere conduit for a

16 decision already made). The latter better aligns with the purpose of this procedural requirement,

17 as the federalization of the California National Guard requires a careful handover of command and

18 control from the State Commander in Chief (the Adjutant General) to the Federal Commander-in-

19 Chief. Orders going "through" the Governor, in particular the Governor's Adjutant General,

20 provides proper notice and avoids command confusion which is critical in an emergency.

21    Meanwhile, when Congress has wanted to give the Governor veto power, it has done so

22 expressly. For example, the Secretary of Defense may "order a member of a reserve component

23 under his jurisdiction to active duty" except that members "may not be ordered to active duty . . .

24 without the *consent* of the governor or other appropriate authority of the State concerned." 10

25 U.S.C. § 12301(d) (emphasis added). Likewise, the Secretary may order a member of the Army,

26 Navy, Marine, or Air Force Reserves to active duty to provide assistance in response to a major

27 disaster or emergency, but only after receiving a request from a Governor. 10 U.S.C. § 12304a(a).

28

16

1  Yet Section 12406 omits any language even hinting that Governor could withhold his consent.

2  In short, Section 12406 affords no veto to Governor Newsom over the President's decision

3  to call forth the guard, just as it afforded no veto to Governor Faubus when President Eisenhower

4  last invoked the predecessor to Section 12406 to ensure that the enforcement of federal law was

5  not obstructed.

6  Plaintiffs also suggest that the statute imposes a gubernatorial consultation requirement.

7  TRO Mot. at 11.  They complain that Defendants "violate[d] the letter of the law" by "depriving

8  the Governor of the opportunity to consult with the President." *Id.*  That too is wrong both legally

9  and factually.  Nothing in the statute requires consultation.  Anyway, as explained, President Trump

10  spoke with Governor Newsom about the situation in Los Angeles the day before he federalized

11  guardsmen.  In that discussion, the President directed the Governor to take control of riots in Los

12  Angeles. *Id.*  Lines of communication between the President and Governor Newsom were open.

13  The next day, the President signed a memorandum that directed to the Secretary of Defense to

14  federalize the Guardsmen.  ECF No. 8-1, Ex. E.  Governor Newsom acknowledged that act in a

15  public statement. *See supra.*

16  Finally, even if Plaintiffs' interpretation of the statute were correct, the only party acting

17  unlawfully would be Governor Newsom—not President Trump or Secretary Hegseth.  Section

18  12406 uses the mandatory "shall," depriving the Governor of any possible discretion in whether

19  to issue an order.  So if the order was not issued "through" the Governor via the Adjutant General

20  who acts in his name, then the Governor should have issued the order himself, rather than drafting

21  a press release objecting to the presidential memorandum.  His failure to comply with President

22  Trump's lawful order to federalize California's guardsmen cannot somehow support an injunction

23  against the federal government.

24  **B.      The Federalization of Guardsmen Does Not Intrude on State Police Powers.**

25  Plaintiffs press a four-sentence argument suggesting a Tenth Amendment defect in the

26  President's memorandum federalizing Guardsmen.  They make the conclusory assertion that

27  Defendants acted unlawfully in activating the National Guard "to quell a protest or prevent future

28  

17

protests despite the lack of evidence that local law enforcement was incapable of asserting control." TRO Mot. at 12. As explained, Plaintiffs' own record submissions show that local law enforcement was unable to bring rioters under control last weekend. But more importantly, Plaintiffs' argument misstates the mission for Guardsmen in Los Angeles: They have been deployed to protect federal personnel and facilities and not to "prevent future protests." *Id.*

In all events, Plaintiffs' Tenth Amendment claim is wholly derivative of their statutory claim that the presidential memorandum itself did not comply with Section 12406. The Constitution authorizes Congress "[t]o provide for calling for the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions." U.S. Const. art. I, § 8. Congress is also empowered to "provide for organizing, arming, and discipling, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the militia according to the discipline prescribed by Congress." *Id.* Congress acted under this authority in enacting Section 12406, which the President validity invoked. This claim therefore adds nothing.

### C.    Defendants Have Not Violated the Posse Comitatus Act

The presidential memorandum, Secretary Hegseth's memoranda, and the military personnel's protection of federal property and employees are consistent with the Posse Comitatus Act. That Act states in full: "Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both." 18 U.S.C. § 1385. The Act "was originally enacted in 1878 for the purpose of preventing United States Marshals, on their own initiative, from calling upon troops to assist them in performing their duties." Mem. Op., *Authority to Use Troops to Prevent Interference With Federal Employees by Mayday Demonstrations and Consequent Impairment of Government Functions*, U.S. Dep't of Justice, Off. of Legal Counsel, at 344 (April 29, 1971), https://www.justice.gov/file/147726/dl. "The Act was designed to prevent use of troops in direct law enforcement under command of minor

18

1  civilian officials." *Id.*

2      It is well established, however, that when the President lawfully federalizes the national

3  guard pursuant to statutory authority designed to authorize the use of the militia to restore order,

4  the Posse Comitatus Act does not apply.  One such exception is contained in the Insurrection Act.

5  *See* Office of Att'y Gen., *President's Power to Use Federal Troops to Suppress Resistance to*

6  *Enforcement of Federal Court Orders* (Nov. 7, 1957).  But 10 U.S.C. § 12406, which is worded

7  quite similarly to the Insurrection Act, represents another.  After all, national guard could properly

8  be used to suppress invasions and rebellions, and execute the laws where the regular forces have

9  failed to do so, without engaging in activities the Posse Comitatus Act would otherwise prohibit.

10  The Constitution, in addition, obligates the President to "take care that the laws be faithfully

11  executed." U.S. Const. art. III, § 3.  The President thus has an inherent constitutional authority to

12  protect the federal government, and the Posse Comitatus Act does not change that.

13      As William Rehnquist concluded as the head of the Department of Justice's Office of Legal

14  Counsel, "the Posse Comitatus Act does not impair the President's inherent authority to use troops

15  for the protection of federal property and federal functions."  Mem. Op., *Authority to Use Troops*

16  *to Prevent Interference With Federal Employees by Mayday Demonstrations and Consequent*

17  *Impairment of Government Functions*, U.S. Dep't of Justice, Off. of Legal Counsel, at 343 (April

18  29, 1971), https://www.justice.gov/file/147726/dl.  Nor does it "prevent the use of troops to protect

19  the functioning of the government by assuring the availability of federal employees to carry out

20  their assigned duties." *Id.*  Thus, in 1971, Mr. Rehnquist held that the President could use troops

21  to respond to demonstrators who threatened to "prevent[] federal employees from reaching their

22  agencies." *Id.*  Likewise, the Supreme Court recognized in *In re Neagle*, 135 U.S. 1, 65 (1890),

23  that troops could be used to prevent an obstruction to the U.S. mail:

24
25          if the president or the postmaster general is advised that the mails of the United
            States, possibly carrying treasure, are liable to be robbed, and the mail carriers
26          assaulted and murdered, in any particular region of country, who can doubt the
            authority of the president, or of one of the executive departments under him, to
27          make an order for the protection of the mail, and of the persons and lives of its
            carriers, by doing exactly what was done in the case of Mr. Justice FIELD, namely,
28          providing a sufficient guard, whether it be by soldiers of the army or by marshals

                                          19

of the United States, with a posse comitatus properly armed and equipped, to secure
the safe performance of the duty of carrying the mail wherever it may be intended
to go?

*Id.*  Earlier, in *In re Debs*, 158 U.S. 564, 582 (1895), the Supreme Court upheld President

Cleveland's order to troops to protect federal property and to remove obstructions to the U.S. mail.

"The strong arm of the national government may be put forth to brush away all obstructions to the

freedom of interstate commerce or the transportation of the mails." *Id.*  "If the emergency arises,

the army of the Nation, and all its militia, are at the service of the Nation to compel obedience to

its laws." *Id.*

As with that order, President Trump's order to military personnel to protect federal

employees and buildings is a lawful exercise of his inherent protective power.  By its terms, the

presidential memorandum "call[s] into Federal service members and units of the National Guard .

. . to temporarily protect ICE and other United States Government personnel who are performing

Federal functions, including the enforcement of Federal law, and to protect Federal property."

Presidential Memo.  The National Guard has been acting within the scope of that mission.

Federalized California National Guard personnel have been conducting safety and protection of

Federal personnel, property, and functions at designated locations by providing security patrols,

observation posts, and outer cordon security perimeter of buildings.

Plaintiffs have not provided any factual basis to conclude that Defendants have or will

violate the Posse Comitatus Act.  The most they muster is the shaky assertion that "[t]he evidence

strongly indicates that the federalized National Guard and active-duty Marines deployed in Los

Angeles will engage in quintessential law enforcement activity in violation of the PCA." TRO

Mot. at 14.  That allegation does not rise to the level needed to obtain a temporary restraining order

affecting the President's command of military forces in the face of riotous and rebellious

conditions.  Plaintiffs suggest it would be unlawful for Defendants to "hold[] a secure perimeter

in communities around areas where immigration enforcement activities would take place, and

securing routes over public streets where immigration enforcement officers would travel." TRO

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

Mot. at 15. Those actions plainly describe conduct to protect ICE ERO employees enforcing the laws that Congress has provided they must carry out. Military service members' protection of those federal employees while they perform their work is distinct from the military members' own engagement in ordinary law enforcement. The former is entirely lawful, and that is all that the record supports.

*     *     *

The groundless nature of Plaintiffs' claims is further exposed by the mismatch between those claims and the relief they seek. They argue that the President improperly federalized the California National Guard—but their proposed injunction restricts only how those Guardsmen may be *deployed*. Specifically, they ask for an order that restricts the Guardsmen to protecting federal property, and federal personnel on such property, but not federal personnel outside federal property. There is no reading of Section 12406 that could justify *that* relief. Nor does that relief make any sense in view of the Posse Comitatus Act—if military forces may permissibly be used to protect federal officials and to ensure their safety (as they can), it should not matter whether those federal officials are inside a federal building or on a street a few blocks away.

Plaintiffs' proposed order reveals the true aim of their motion. It is not to return National Guardsmen to California's control, or to vindicate the (misguided) rights they claim, but instead to prevent the federal government from protecting federal officers who are carrying out law-enforcement operations in Los Angeles. That interference is impermissible and groundless, and further underscores why the Court should deny their motion.

## II.     THE BALANCE OF EQUITIES CUTS AGAINST ANY INJUNCTION.

The balance of equities and the public interest cut squarely against the extraordinary remedy of a temporary restraining order or preliminary injunction. The Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the

21

extraordinary remedy of injunction." *Id.* (quoting *Weinberger,* 456 U.S. at 312).

Here, an injunction would not only hinder federal law enforcement but also expose federal employees and property to violence and vandalism by the rioters in Los Angeles. The federal government has an "uncontested interest in protecting federal agents and property." *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 838 (9th Cir. 2020). The President and Secretary of Defense's memorandum calling up the National Guard expressly invoked this interest. *See* Ex. 2 ("to temporarily protect U.S. Immigration and Customs Enforcement and other U.S. Government personnel… and to protect Federal property."). These are indisputably "very important public interest[s]." *Index Newspapers LLC*, 977 F.3d at 838.

The President's reference to these interests was not mere words on a piece of paper. The Order arose from documented instances of violence against federal officials that were happening at the time of the Order and which continue today. On Friday June 6, 2025, protestors threw "bottles, concrete chunks, and other objects at the FPS officers," and attempt[ed] to use large rolling commercial dumpsters as a battering ram to breach the parking garage gate" of a federal building complex. Santacruz Dec. ¶ 11. All available federal officers were called to defend the complex, needing to resort to resort to riot control devices to prevent the breach of federal property, all while it took more than one- and one-half hours for the LAPD to arrive. *Id.* ¶ 13. While California chalks this up as a peaceful protest, Compl. ¶ 29, the rioters were "using chairs, pepper balls, and other items as weapons" to "heavily vandalize" a federal building and clash with law enforcement. Santacruz Decl. ¶¶ 14–15, 17. The next day, the crowd once again became violent and attacked ERO and CBP officers, for seven continuous hours. *Id.* ¶ 20. Once officer was trapped inside her law enforcement vehicle, which the crowd surrounded and violently pummeled with stones, and the DHS office perimeter fence was cut, vehicles were damaged, and incendiary devices were thrown at federal officers. *Id.* ¶¶ 21–22. By the next day, despite LAPD declaring the downtown area an unlawful assembly, protestors set off fireworks, threw objects at law enforcement, lit fires in dumpsters and trans bins, looted stores, and vandalized the Federal Courthouse and even LAPD's own headquarters. *Id.* ¶ 26. At end of the day, the Federal building's

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

1    security checkpoint was in ruins. *Id.* ¶ 27.

2         The vandalization of a Federal Courthouse hardly fits the description of "civil unrest that

3    is no different from episodes that regularly occur in communities throughout the country." TRO

4    Mot. at 1. Nor were these conditions where California's local authorities "have been responding

5    promptly, professionally, and effectively." Compl. ¶ 32; *see also* TRO Mot. at 1. In cases of

6    violent uprising, as Plaintiffs allege, the National Guard is "vital" in acting "to protect people and

7    property" and the "State relies on the National Guard to be ready to intervene in emergent

8    situations to help." Compl. ¶ 70. That is exactly what the President ordered the National Guard

9    to do when the events in opposition to ICE's operation in Los Angeles occurred. Given Plaintiff's

10   acknowledgement of the National Guard playing such an important role in protecting people and

11   property, there should be no opposition to the National Guard providing help during the events at

12   issue in this case.

13        Further, the Federal government would suffer more widespread irreparable harm were an

14   injunction to issue. The City of Los Angeles "has made a longstanding decision" not "participat[e]

15   in federal civil immigration enforcement." *City of L.A. v. Barr*, 929 F.3d 1163, 1173 (9th Cir.

16   2019). Federal ICE personnel are attempting to enforce federal civil immigration laws in the City

17   of Los Angeles, but have suffered violence in response to carrying out lawful alien removal

18   operations. Local and state law enforcement were not able to prevent that violence, and their

19   responses to exigent circumstances were delayed. State and local inaction has already resulted in

20   threats to federal personnel, which has hindered the federal government's ability to safely carry

21   out its mandates. If an injunction is entered and the National Guard cannot accompany and protect

22   ICE personnel, the federal government will continue to be hindered in its ability to safely carry out

23   its mandates. Consequently, the government has shown exactly what it needs to prevail on the

24   third and fourth injunction factors: an uncontested interest in protecting federal agents and

25   property, combined with active threats against both. *Cf. Index Newspapers LLC*, 977 F.3d at 838.

26        Against all this, the State claims only speculative harms and unsubstantiated harms. First,

27   it cites a risk of civil unrest caused by demonstrators' opposition to the federalization of

28

                                           23

guardsmen. But as Plaintiffs' brief concedes and Defendants' brief has explained, *see supra* §
Background III, the significant civil unrest began days *before* the National Guard was mobilized.
The civil unrest stemmed from rioters' violent uprising. The National Guard's presence, by
contrast, ensured that the rioters were not successful in completely overrunning federal property
and harming those ICE officers. Regardless, Plaintiff's invocation of the hypothetical or possible
"risk of" harms is not enough and does not meet the "stringent" standard set forth by the Supreme
Court. *E.g.*, *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975); *Caribbean Marine Servs. Co. v.
Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("Speculative injury does not constitute irreparable
injury . . . ."); *Titaness Light Shop, LLC v. Sunlight Supply, Inc.*, 585 F. App'x 390, 391 (9th Cir.
2014).

Plaintiffs also complain that the federalization of Guardsmen subtracts from resources
available to the California National Guard. But Plaintiffs do not identify any type of exigency that
they would direct these resources that approaches the seriousness of the situation in Los Angeles.
Plaintiffs worry that the activation of Guardsmen "jeopardizes vital resources on which the State
depends to protect itself from emergencies"—while ignoring that these resources have been
deployed to deal with a present emergency in the State. TRO Mot. at 18.

An injunction is particularly inappropriate inasmuch as Plaintiffs largely invoke *procedural*
harm: namely, that the Order to mobilize the National Guard was not issued by the Governor or
that the Governor was not consulted. In *Winter*, the Supreme Court found an injunction was not
appropriate in the context of Plaintiff's claim that the Navy violated the National Environmental
Policy Act of 1969 and other federal laws when it failed to undertake statutorily required studies.
*Winter*, 555 U.S. at 12, 26. The Court held that "forcing the Navy to deploy an inadequately trained
antisubmarine force jeopardizes the safety of the fleet," which was an interest that "plainly
outweigh[ed]" the plaintiffs' downstream interest in watching marine mammals. *Id.* at 26. An
injunction should be denied here for similar reasons. Like *Winter*, this suit involves an allegation
that the military failed to comply with a procedural directive. Further, like *Winter*, the federal
government has articulated an immediate and direct harm if an injunction were to issue, but

24

Plaintiffs have only communicated a second-hand and speculative harm.

In balancing the equities and the public's interest, California's desire to keep the National Guard at bay must give way to the undisputed immediate threats to the life of federal officers and the security of federal property that the President is responsible for protecting.

## III.    ANY INJUNCTIVE RELIEF SHOULD BE STAYED PENDING APPEAL AND ACCOMPANY A BOND.

To the extent the Court issues any injunctive relief, Defendants respectfully request that such relief be stayed pending the disposition of any appeal that is authorized, or at a minimum, administratively stayed for a period of seven days to allow the United States to seek an emergency, expedited stay from the Court of Appeals or Supreme Court if an appeal is authorized.   For the reasons explained above, Defendants have, at a minimum, satisfied the requirements for a stay of any injunction pending appeal.  *See Nken v. Holden*, 556 U.S. 418, 434 (2009) (describing the standard for obtaining such a stay and noting the "substantial overlap" between that standard and "the factors governing preliminary injunctions").

The Defendants also respectfully request that any injunctive relief be accompanied by a bond under Fed. R. Civ. P. 65(c), which provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."

### CONCLUSION

For these reasons, this Court should deny Plaintiffs' motion for a temporary restraining order or preliminary injunction.

Respectfully submitted,
BRETT A. SHUMATE
Assistant Attorney General
Civil Division

25

1   ERIC J. HAMILTON
2   Deputy Assistant Attorney General
    Federal Programs Branch
3   (CA Bar No. 296283)

4   ALEXANDER K. HAAS
5   (CA Bar No. 220932)
    Director
6   Federal Programs Branch

7   */s/ Christopher D. Edelman*
    CHRISTOPHER EDELMAN
8   (DC Bar No. 1033486)
    Senior Counsel
9   GARRY D. HARTLIEB
10  (IL Bar No. 6322571)
    BENJAMIN S. KURLAND
11  (DC Bar No. 1617521)
    Trial Attorneys
12  U.S. Department of Justice
    Civil Division, Federal Programs Branch
13  1100 L Street, N.W.
    Washington, DC 20005
14  Tel.: 202-305-8659
15  Email: christopher.edelman@usdoj.gov

16  *Attorneys for Defendants*

17
18
19
20
21
22
23
24
25
26
27
28

26

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

**SER-050**