No. 25-3727

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GAVIN NEWSOM, ET AL.,
*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, ET AL.,
*Defendants-Appellants.*

On Appeal from the United States District Court for the
Northern District of California
No. 3:25-cv-04870
Hon. Charles R. Breyer

## BRIEF OF AMICI CURIAE THE CALIFORNIA UNITY BAR AND THE FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY IN SUPPORT OF PLAINTIFFS-APPELLEES

Robert S. Chang
Shaleen Shanbhag
FRED T. KOREMATSU CENTER
FOR LAW AND EQUALITY
UC IRVINE SCHOOL OF LAW
401 E. Peltason Drive
Irvine, CA 92697
(949) 824-3034
rchang@law.uci.edu

Sarvenaz Bahar
BAHAR LAW OFFICE, P.C.
2934 ½ Beverly Glen Circle, # 517
Los Angeles, CA 90077
(310) 246-0567
sb@baharlaw.com

*Counsel for Amici Curiae*

September 9, 2025

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A),

amici curiae state that no amicus has a parent corporation and that no publicly held

corporation owns 10% or more of the stock of any amicus.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ I

TABLE OF CONTENTS ................................................................................... II

TABLE OF AUTHORITIES ........................................................................... IV

IDENTITY AND INTEREST OF AMICI CURIAE ............................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................... 3

ARGUMENT ................................................................................................ 6

I.   This Court Should Scrutinize the President's Stated Purpose for Deploying the National Guard in Los Angeles to Determine if He Was Acting in Bad Faith ............................................................... 6

    A.   The Court's check on executive power is an essential function of our constitutional democracy ................................................. 6

    B.   *Korematsu* offers a cautionary tale of the harm that results when courts fail to consider the broader context and facts that refute a government's stated justifications ........................................... 7

II.   Facts Relating to Deployment of Federalized Guardsmen in Los Angeles And Other Majority-Democratic Cities Establish That the President's Proffered Reasons are Pretextual ............................... 11

    A.   The President and a high-level official use the deployment to attack Democratic leaders and the "Democratic Power Center"—as reflected in their own words ................................................. 11

    B.   The Trump Administration has used National Guard forces for political purposes in Los Angeles, wholly unrelated to their purported protective mission ......................................................... 13

    C.   The Trump Administration used public protests against its extreme actions as a pretext for deployment—as confirmed by newly established facts ......................................................... 16

D. The Trump Administration's stated purpose for deploying Federal Guardsmen and the geographic scope of the deployment have expanded exponentially since the start of this appeal ............................ 20

III. Facts Relating to Other Actions by the Trump Administration Also Establish That the President's Proffered Reasons are Pretextual ................ 24

A. The Trump Administration is engaged in an unprecedented unlawful attack on an independent judiciary ........................................................... 25

B. The Trump Administration is engaged in an unprecedented unlawful attack on an independent legal profession ............................................... 27

C. The Trump Administration is invoking emergency powers with unprecedented frequency to justify unilateral action and bypass Congress unlawfully .................................................................................... 29

CONCLUSION ........................................................................................................ 31

CERTIFICATE OF COMPLIANCE ....................................................................... 32

CERTIFICATE OF SERVICE ................................................................................ 33

# TABLE OF AUTHORITIES

## CASES

*Abrego Garcia v. Noem*, No. 25-1345, 2025 WL 1021113 (4th Cir. Apr. 7, 2025) ........................................................................26

*Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993) ....................7

*Dep't of Commerce v. New York*, 588 U.S. 752 (2019)............................................6

*Jenner & Block LLP v. U.S. Department of Justice*, No. 25-916, 2025 WL 1482021 (D.D.C, May 23, 2025)..................................................28

*Korematsu v. United States*, 323 U.S. 214 (1944)........................................ passim

*Korematsu v. United States*, 584 F. Supp. 1406 (N.D. Cal. 1984) ........................10

*Marbury v. Madison*, 5 U.S. 137 (1803)..................................................................3

*McCreary Cnty. v. American Civil Liberties Union of Ky.*, 545 U.S. 844 (2005)...................................................................................................7

*Newsom v. Trump*, 141 F.4th 1032 (9th Cir. 2025) ................................................6

*Newsom v. Trump*, No. 25-cv-04870-CRB, 2025 WL 2501619 (N.D. Cal. Sept. 2, 2025) ...................................................................... passim

*Perkins Coie L.L.P. v. U.S. Department of Justice*, No. 25-716, 2025 WL 1276857 (D.D.C. May 2, 2025)..............................................27, 28

*Susman Godfrey LLP v. Executive Office of the President et al.*, No. 25-1107, 2025 WL 1779830 (D.D.C., June 27, 2025) ...........................28

*Trump v. Hawaii,* 585 U.S. 667 (2018) ...................................................................7

*United States v. Russell*, No. 1:25-cv-02029, 2025 WL 2448955 (D. Md. Aug. 26, 2025) ...................................................................25, 26

*V.O.S. Selections, Inc. v. Donald J. Trump*, Nos. 2025-1812, 2025-1813, 2025 WL 2490634 (Fed. Cir. Aug. 29, 2025) ........................................30

*Vasquez Perdomo v. Noem*, No. 2:25-cv-05605-MEMF-SP, 2025 WL 1915964 (C.D. Cal. July 11, 2025)..................................................18, 19

*Vasquez Perdomo v. Noem*, No. 25-4312, 2025 WL 2181709 (9th Cir.), *rev'd,* 606 U.S. ___ (2025)........................................................18, 19

*W.M.M. et al. v. Donald J. Trump et al.*, No. 25-10534, 2025 WL 2508869 (5th Cir. Sept. 2, 2025) .......................................................30

*Wilmer Cutler Pickering Hale and Dorr LLP v. Executive Office of the President*, No. 25-917, 2025 WL 1502329 (D.D.C., May 27, 2025) ......................................................................................................28

## OTHER AUTHORITIES

Anna Commander, *Border Patrol Chief Issues Stark Warning to L.A. on Immigration Raids*, Newsweek (July 7, 2025), https://perma.cc/5NVD-F79N ...................................................................15

Casey Tolan & Isabelle Chapman, *ICE Uses Starkly Different Tactics to Arrest Immigrants in Red and Blue States*, *Data Shows*, CNN

(Aug. 5, 2025, at 06:00 ET), https://perma.cc/HBJ3-MNCL ............................17

Chris Cameron et al., *Trump Administration Authorizes Deployment of National Guard at ICE Facilities*, N.Y. Times (July 30, 2025), https://perma.cc/X6MC-VWSK ....................................................................23

Complaint filed with the United States District Court of Appeals, https://perma.cc/3J6P-CAZ2 ........................................................................27

C-SPAN, *President Trump Holds Cabinet Meeting* at 3:12:29-40 (Aug. 26, 2025), available at https://tinyurl.com/bb6sa5bp ...........................22

Donald J. Trump (@realDonaldTrump), Truth Social (June 15, 2025), https://truthsocial.com/@realDonaldTrump/posts/114690267066155731............................................................................................................12

Donald J. Trump @realDonaldTrump, Truth Social (June 11, 2025, 6:53 a.m.), https://perma.cc/2DZG-XGQL .................................................11

Elizabeth Goitein, *How the President is Misusing Emergency Powers to Impose Worldwide Tariffs*, Brennan Center (May 13, 2025), https://perma.cc/499C-FRS9 ........................................................................30

Ed White & Christopher Keller, *Trump Suggests More U.S. Cities Need National Guard But Crime Stats Tell a Different Story*, Los Angeles Times (Aug. 29, 2025, at 08:47 ET), https://perma.cc/2KN5-2FPH ....................................................................21

Executive Order, Additional Measures to address the Crime Emergency in the District of Columbia (Aug. 25, 2025), https://perma.cc/F2ER-WBJW ....................................................................21

George Chidi, *Trump Claims Chicago is 'World's Most Dangerous City.' The Four Most Violent Ones Are All in Red States*, The Guardian (Sept. 6, 2025), https://perma.cc/TH56-GPT2 ........................23

Harold Meyerson, *The GOP States with Guards Deployed to D.C. Have Urban Murder Rates Way Higher than D.C.'s*, The American Prospect (Aug. 19, 2025), https://perma.cc/WMG7-4YYR ...........................23

Helen Jeong, *Kristi Noem Blames Democratic Officials for Making ICE Raids in LA Harder*, NBC LA (June 12, 2025), https://perma.cc/8JZN-DV4B ......................................................................12

Executive Order re Jenner Block, https://perma.cc/3U5S-ZJAB .........................27

Executive Order re Wilmer Cutler, https://perma.cc/935Q-93V3 .........................27

Executive Order re Susman Godfrey, https://perma.cc/NB39-NKB7....................27

Executive Order re Perkins Coie, https://perma.cc/Z9A9-SV2E ...........................27

Justin Kaufman, *Trump Threatens Chicago with "Department of War" Ahead of Planned Crackdown*, AXIOS (Sept. 6, 2025), https://perma.cc/NR8L-F6BQ ....................................................................22

Karuba Ioffee, *Meet the UC Berkeley Data Team who Proved Trump isn't Deporting just "Worst of the Worst,"* Berkeleyside (Aug. 19, 2025, at 07:00 ET) https://perma.cc/D4GC-DB57 .........................................17

*MacArthur Park Los Angeles, CA 90057, Neighborhood Profile*, NeighborhoodScout.com (last visited on Sept. 8, 2025), https://perma.cc/9PTP-HGBF ......................................................................15

*MacArthur Park: An Oasis Transformed into an Immigration Crossroads in Los Angeles*, SimpleAboutThings.com (July 8, 2025), https://perma.cc/88N2-SCHY ..................................................15

Myah Ward, *Trump Admin Plans Immigration Enforcement Surge in Boston,* Politico (Aug. 29, 2025, at 13:52 PM), https://perma.cc/GB9C-KKX9 ..........................................................21

Robert McCoy, *Hegseth's Rant on D.C. Takeover Turned into Evidence Against Trump*, The New Republic (August 11, 2025, at 17:18 ET), https://perma.cc/WKY3-DU2B...............................21

Sara DiNatale, *Trump adds San Francisco to List of Cities Where He Wants to Send Troops*, S.F. Chronicle (Aug. 22, 2025, at 13:34 PM), https://perma.cc/6Z8A-R2QH ......................................21

Sara Dorn, *Trump Says Some Americans Would 'Like a Dictator,'* Forbes (Aug. 25, 2025, at 13:12 ET), https://perma.cc/PD2T-J2XT ...............22

Soo Rin Kim, *Chief Justice John Roberts Makes Rare Public Appearance, Defends Judicial Independence*, ABC News (May 7, 2025, at 19:13 ET), https://perma.cc/7F7B-G5XL............................................26

Tara Copp & Christopher Weber, *Troops and Federal Agents Briefly Descend on Los Angeles' Macarthur Park in Largely Immigrant Neighhorhood*, PBS (July 7, 2025), https://perma.cc/LV2P-6ZH2..................15

UP FIRST FROM NPR: *Governors and the National Guard, Europe and Ukraine, Texas Redistricting* (Website, Aug. 20, 2025), https://perma.cc/E7TY-C6ZP ..........................................................23

Visa Verge, *ICE Arrest Tactics Differ Sharply Between Red and Blue States, Data Shows*, VisaVerge.com (Aug, 5, 2025, at 11:17 ET), https://perma.cc/2452-NJT7 ............................................................17

Yoshinori H. Himel, *Americans' Misuse of "Internment,"* 14 Seattle J. Soc. Just. 797 (2016), https://perma.cc/8MZC-Q6JD.......................................8

Zachary Basu, *Trump's United States of Emergency*, Axios (Apr. 7, 2025), https://perma.cc/ATH6-759Q.................................................29

## IDENTITY AND INTEREST OF AMICI CURIAE[1]

The California Unity Bar is an unincorporated organization of local bar associations across 16 counties throughout the state.[2] The California Unity Bar is committed to fostering a legal community that reflects the diverse communities being served, and it seeks to unify bar associations throughout California in their pursuit of a more equitable and inclusive judicial system. It has a unique interest in upholding the ideals of justice for all because it serves communities with a deep understanding of historical injustices.

The Korematsu Center is a non-profit organization based at the University of California, Irvine School of Law. Inspired by the legacy of Fred Korematsu, who defied military orders during World War II that ultimately led to the unlawful incarceration of over 120,000 Japanese Americans, the Korematsu Center works to advance social justice for all. In addition to having a deep commitment to the rule of law, the Korematsu Center has a special interest in ensuring that executive

---

[1] Amici certify that no party's counsel authored this brief in whole or in part; no party or a party's counsel contributed money that was intended to fund the preparation or submission of this brief; and no person other than amici curiae and their counsel contributed money intended to fund the preparation or submission of this brief. The parties have consented to the filing of this brief.

[2] The California Unity Bar's affiliated associations can be seen here: <https://www.calunitybar.org/about>. The California Unity Bar does not, in this brief or otherwise, represent the official views of these independent organizations.

1

action remains bounded by the U.S. Constitution. The Korematsu Center does not, in this brief or otherwise, represent the official views of the University of California, Irvine School of Law.

The California Unity Bar and the Korematsu Center (collectively "Amici") have a special interest in this case because of their commitment to the values and principles set forth in the U.S. Constitution, and their deep understanding of historical injustices that have occurred when the government departed from and violated constitutional protections through wrongful detention, arrest, incarceration, and/or deportation without due process of law of various targeted groups throughout California's and our nation's history. Amici also are mindful of the key role played by the judiciary in U.S. history in either checking or facilitating these governmental excesses.

Amici are interested in preserving our constitutional democracy which includes an independent judiciary and the rule of law, and a commitment to the separation of powers doctrine. Amici perceive unchecked executive power—such as the actions at issue in this case—as a threat to our democracy.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Fidelity to the rule of law is a bedrock principle of our constitutional democracy. Chief Justice John Marshall established judicial review as a critical component in ensuring that we remain a government of laws, not of men.[3] Meaningful judicial review requires that courts not turn a blind eye when reasons advanced to justify governmental conduct are not in accord with the facts.

Amici urge the Court to scrutinize the motives behind the decision of President Donald Trump ("President") to deploy federalized Guardsmen in Los Angeles by considering all relevant facts established by reliable and openly available evidence. This includes examining this case in the broader context within which this specific decision was made. Amici note that this kind of broader examination was precisely what the dissenting justices in *Korematsu v. United States*, 323 U.S. 214 (1944), called for when, as discussed *infra*, they criticized the majority for its too narrow focus on the exclusion order without placing it into the broader context of the government's scheme of mass incarceration and for turning a blind eye to readily available evidence that undercut the purported national security rationale.

---

[3] *Marbury v. Madison*, 5 U.S. 137, 163 (1803).

In particular, Amici contend that this examination establishes that the President's stated reason for the deployment under 10 U.S.C. § 12406—protecting federal property and personnel during immigration enforcement activities—is pretextual. Specifically, Amici draw the Court's attention to the fact that, since the deployment, both its purpose and geographic scope have expanded exponentially. During the trial before Judge Charles Breyer, Defendants—the President, Secretary of Defense Pete Hegseth, and the Department of Defense—changed their position regarding the purpose of the deployment and now contend that federalized Guardsmen could be deployed any time federal personnel are present for any purpose (even if the purpose is not related to enforcement of any federal law), and as a purely preventive measure (even if there is no actual or even potential threat). In addition, the President recently deployed National Guard forces in Washington, D.C., and has discussed possible deployments in numerous cities governed by Democrats to reduce crime. He also issued an executive order setting up "specialized" National Guard units to facilitate these deployments. This selective deployment, putatively to reduce crime, must be viewed against the fact that homicide and other crime rates are highest in cities and states governed by Republicans where Defendants' interventions have been vastly more limited and restrained. This evidence is sufficient to rebut the presumption of regularity and establishes that the President is acting in bad faith.

Amici also draw the Court's attention to actions taken by the Trump Administration nationwide which further erode the presumption of regularity and establish that the President's proffered reasons are pretextual. The President's decision to deploy federalized Guardsmen to Los Angeles should not be viewed in a vacuum but rather with eyes open to the realities of our time. While the President is militarizing majority-Democratic cities, he is also waging a war on multiple fronts against the judiciary, Congress, and even the legal profession to expand and consolidate executive power unlawfully, suppress opposition, and undermine the rule of law—all in the name of public interest and national security. It is no coincidence that Defendants' positions in this litigation echo the same themes that underlie the Administration's nationwide actions. Viewed against this backdrop, the President's decision at issue here is part and parcel of this bigger plan and shares the same purpose.

Indeed, consistent with the Administration's nationwide attacks on the judiciary, Defendants make the breathtaking claim in this litigation that the President's actions are judicially unreviewable. This usurps judicial power and violates the separation of powers doctrine enshrined in the U.S. Constitution.

Because the Executive is not acting in good faith, this Court should affirm the district court's grant of a preliminary injunction.

## ARGUMENT

I. **This Court Should Scrutinize the President's Stated Purpose for Deploying the National Guard in Los Angeles to Determine if He Was Acting in Bad Faith.**

A. **The Court's check on executive power is an essential function of our constitutional democracy.**

This Court has recognized both its role as a check on the President's exercise of statutory power and its authority to scrutinize his motives—rejecting Defendants' claim that the President's decision to deploy Guardsmen in Los Angeles is not subject to judicial review. *Newsom v. Trump*, 141 F.4th 1032, 1050–51 (9th Cir. 2025). The Court held that, while the President is entitled to a presumption that he acted in good faith, this presumption can be overcome by evidence showing otherwise. *Id*. The Court confirmed that it should be able "to review a decision that was obviously absurd or made in bad faith," *id*. at 1050, and that "courts may at least review the President's determination to ensure that it reflects a colorable assessment of the facts and law within a 'range of honest judgment.'" *Id*. at 1051 (quoting *Sterling v. Constantin*, 287 U.S. 378, 399 (1932)). *Cf. Dep't of Commerce v. New York*, 588 U.S. 752, 783 (2019) (refusing to accept federal agency's explanation for an action because "[s]everal points, considered together, reveal a significant mismatch between the decision the Secretary made and the rationale he provided").

The Supreme Court has recognized that extrinsic evidence may be considered by courts to assess the motive or intent of a president when those subjects are relevant. *See Trump v. Hawaii,* 585 U.S. 667, 701–02, 704 (2018); *see also id.* at 727-37 (Sotomayor, J., dissenting). Such evidence can include "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and … contemporaneous statements made by by [the decisionmaker]." *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 540 (1993). Courts may also consider other "comparable official act[s]," *McCreary Cnty. v. American Civil Liberties Union of Ky.*, 545 U.S. 844, 862 (2005), which necessarily includes evidence that no or materially different action was taken in response to comparable circumstances.

**B.      *Korematsu* offers a cautionary tale of the harm that results when courts fail to consider the broader context and facts that refute a government's stated justifications.**

The issue before the Supreme Court in *Korematsu* was whether Fred Korematsu's conviction for refusing to comply with an exclusion order, requiring that he leave a designated military area, was lawful. The majority took a narrow view of the case and considered only the constitutionality of the exclusion order, stating that "[t]o do more would be to go beyond the issues raised, and to decide momentous questions not contained within the framework of the pleadings or the evidence in this case." 323 U.S. at 222. It relied on the government's evidence and

claim of military necessity and held that the exclusion order and Fred's criminal conviction were valid. *Id.* at 218–20.

Three dissenting justices strongly rejected the majority's narrow framing of the case. They argued that the Court should have viewed the exclusion order within its broader context which included other related and contemporaneous executive orders and government actions against Japanese Americans which ultimately resulted in their forced relocation and indefinite incarceration[4] in "so-called Relocation Center[s]." *Id.* at 230 (Roberts, J., dissenting). Viewed in the context of this broader evidence, the exclusionary order—according to the dissenting judges—constituted government sanctioned unlawful discrimination based on race. *Id.* at 226 (Roberts, J., dissenting); *id.* at 233 (Murphy, J., dissenting); *id.* at 246 (Jackson, J., dissenting).

The recent express repudiation and abrogation of *Korematsu* in *Trump v. Hawaii*, 585 U.S. at 710, urges then that courts heed the cautionary words of the dissenting justices. Dissenting Justice Robert Jackson characterized the majority's view "wholly delusive" because it ignored that the exclusion of Japanese Americans was just a first step toward their imprisonment in a concentration camp.

---

[4] The term "incarceration" is used in this brief rather than the commonly-misused term "internment" that applies to non-citizen aliens in the Alien Enemies Act. *See* Yoshinori H. Himel, *Americans' Misuse of "Internment,"* 14 Seattle J. Soc. Just. 797 (2016), https://perma.cc/8MZC-Q6JD.

*Korematsu*, 323 U.S. at 243, 248. Dissenting Justice Frank Murphy stated that, while the military's determination was owed due deference, "the military claim must subject itself to the judicial process of having its reasonableness determined and its conflicts with other interests reconciled." *Id.* at 234.

Dissenting Justice Owen Roberts was emphatic in his urgent plea to the majority:

> **We cannot shut our eyes to the fact** that had the petitioner attempted to violate Proclamation No. 4 and leave the military area in which he lived he would have been arrested and tried and convicted for violation of Proclamation No. 4. The two conflicting orders, one which commanded him to stay and the other which commanded him to go, were nothing but a cleverly devised trap **to accomplish the real purpose of the military authority, which was to lock him up in a concentration camp.** The only course by which the petitioner could avoid arrest and prosecution was to go to that camp according to instructions to be given him when he reported at a Civil Court Center. **We know that is the fact**.

*Id.* at 232 (emphasis added). He pointedly asked, "Why should we set up a figmentary and artificial situation instead of addressing ourselves to the actualities of the case?" *Id.*

*Korematsu* is viewed today as a prime example of the judiciary failing to fulfill its constitutionally mandated role to check the exercise of power by the two other co-equal branches of government.[5] In 2018, ruling on the legality of

---

[5] Further highlighting the danger of a judiciary's unquestioning deference to the government, forty years after *Korematsu*, a federal district court overturned Fred Korematsu's wartime conviction, finding that the government "knowingly

(Footnote continues on next page.)

President Trump's visa ban for mostly Muslim countries during his first term, Chief Justice John Roberts took "the opportunity to make express what is already obvious: *Korematsu* was gravely wrong the day it was decided, has been overruled in the court of history, and—to be clear—'has no place in law under the Constitution.'" *Hawaii*, 585 U.S. at 710 (quoting *Korematsu*, 323 U.S. at 248 (Jackson, J., dissenting)).

Perhaps the most compelling lesson from *Korematsu* for the purposes of this appeal is that a court's decision on a seemingly isolated act or incident involving the Executive, without regard to context, can be dangerous. In his dissent, Justice Jackson warned that the majority's opinion was "dangerous" because "[t]he principle [recognized by the court] then lies about like a loaded weapon ready for the hand of any authority that can bring forward a plausible claim of an urgent need. Every repetition imbeds that principle more deeply in our law and thinking and expands it to new purposes." *Id.* at 246. The principle "has a generative power of its own, and all that it creates will be in its own image." *Id.*

For reasons discussed below, even if the presence of the federalized Guardsmen in Los Angeles ends today, any holding by this Court that the

---

withheld information from the courts when they were considering the critical question of military necessity in this case." *Korematsu v. United States*, 584 F. Supp. 1406, 1417 (N.D. Cal. 1984).

President's decision to deploy these forces was lawful is sure to outlive the instant circumstances and be used by the Executive to justify far broader use of these forces nationwide for political purposes and in violation of the Constitution.

## II.    Facts Relating to Deployment of Federalized Guardsmen in Los Angeles And Other Majority-Democratic Cities Establish That the President's Proffered Reasons are Pretextual.

Defendants' contention that the President deployed the National Guard to Los Angeles to protect federal personnel and property cannot be reconciled with the following facts.

### A.    The President and a high-level official use the deployment to attack Democratic leaders and the "Democratic Power Center"— as reflected in their own words.

The President and other high-level officials repeatedly have used the deployment to attack and criticize California's elected Democratic leaders. For example:

(1) On June 11, 2025, in a Truth Social post, President Trump stated:

**The INCOMPETENT Governor of California** was unable to provide protection in a timely manner when our Ice Officers, GREAT Patriots they are, were attacked by an out of control mob of agitators, troublemakers, and/or insurrectionists. MAKE AMERICA GREAT AGAIN![6]

---

[6] Donald J. Trump @realDonaldTrump, Truth Social (June 11, 2025, 6:53 a.m.), https://perma.cc/2DZG-XGQL (emphasis added).

(2)     On June 12, 2025, referring to the presence of federalized

National Guard in Los Angeles, Department of Homeland Security Secretary

Kristi Noem stated:

> We are not going away. **We are staying here to liberate this city from the socialist and burdensome leadership that this Governor Newsom and this mayor placed on this country and what they have tried to insert into this city**.[7]

(3)     On June 15, 2025, in a Truth Social post, President Trump attacked

"America's largest Cities, such as Los Angeles, Chicago, and New York" as the

"**core of the Democrat Power Center** where they use Illegal Aliens to expand

their Voter Base, cheat in Elections, and grow the Welfare State …."[8]   He

continued: "These Radical Left Democrats are sick of mind, hate our Country, and

actually want to destroy our Inner Cities. … And that is why I want ICE, Border

Patrol, and our Great and Patriotic Law Enforcement Officers, to FOCUS on …

those places where Sanctuary Cities play such a big role. You don't hear about

Sanctuary Cities in our Heartland!"[9]

---

[7] Helen Jeong, *Kristi Noem Blames Democratic Officials for Making ICE Raids in LA Harder*, NBC LA (June 12, 2025), https://perma.cc/8JZN-DV4B, (emphasis added).

[8] Donald J. Trump (@realDonaldTrump), Truth Social (June 15, 2025), https://truthsocial.com/@realDonaldTrump/posts/114690267066155731, (emphasis added).

[9] *Id.*

These are but three examples that demonstrate the partisan political reasons for the deployment that belie Defendants' claims in this litigation.

**B.     The Trump Administration has used National Guard forces for political purposes in Los Angeles, wholly unrelated to their purported protective mission.**

The federalized National Guard troops were deployed in MacArthur Park in Los Angeles on July 7, 2025, for a political purpose, unrelated to their protective mission. Based on evidence presented at a three-day trial, Judge Breyer found that approximately 80 "Task Force 51" troops (which consisted of the federalized National Guard and the U.S. Marines) participated in a DHS operation at the park, titled "Operation Excalibur." *Newsom v. Trump*, No. 25-cv-04870-CRB, 2025 WL 2501619, at *1, *7 (N.D. Cal. Sept. 2, 2025) (hereinafter "*Newsom/District Court Ruling*"). Secretary Hegseth approved this massive display of military force after an initial request was rejected by Major General Sherman, the Army deputy commanding Task Force 51.[10] *Id.* In assessing whether to conduct this operation, DHS noted that there was "a lack of high-value targets or threats to federal functions" at the park and that the only risk of *not* performing the operation at all

---

[10] Initially, the operation was planned to take place at the park on Father's Day. Major General Sherman did not approve the involvement of the Task Force in this operation, citing in part to the large number of people who would be in the park on that day and the possibility of the operation "attract[ing] large crowds in opposition to the operation." *Newsom/District Court Ruling,* 2025 WL 2501619, at *7.

was "the hypothetical concern that 'it would weaken the public's perception of federal responsiveness and reduce deterrence in other areas if the federal presence seems limited or absent.'" *Id.*

During this operation, "federal law enforcement officials march[ed] across MacArthur Park while Task Force 51 remained stationed on the outside of the park in military vehicles—Humvees and tactical vehicles—at two traffic control points to prevent vehicular traffic along a stretch of Wilshire Boulevard." *Id.* "DHS's mission in executing Operation Excalibur was 'to demonstrate, through a show of presence, the capacity and freedom of maneuver of federal law enforcement within the Los Angeles Joint Operations Area." *Id.*

Judge Breyer concluded that, during the MacArthur Park operation, the National Guard did not serve any role related to "federal <u>enforcement</u>" of any law or a "protective function" of any kind. *Id.* at *7, 24, n.24 (underlining in original). Instead, he concluded, the sole purpose of this operation was a show of military force and presence in an exercise of "compulsory power on the surrounding public." *Id.* at *24-25.

MacArthur Park—where this show of force occurred—is densely populated with low-income residents who largely identify their ancestry as Mexican or

Asian.[11] Significantly, it serves as a vital cultural, social and economic hub for minority communities.[12] The operation had its intended effect; it instilled fear in the residents and turned usually vibrant public spaces into ghost towns.[13]

In response to widespread criticism after this operation, Gregory Bovino, Customs and Border Protection chief in Southern California, doubled down, stating: "Better get used to us now, cause [sic] this is going to be normal very soon. We will go anywhere, anytime we want in Los Angeles."[14]

Absent a definitive ruling from this Court, nothing prevents the Defendants from ordering National Guard forces to accompany federal law enforcement in similar operations anywhere in the state for the sole purpose of making a show of force and intimidating the public.

---

[11] *MacArthur Park Los Angeles, CA 90057, Neighborhood Profile*, NeighborhoodScout.com (last visited on Sept. 8, 2025), https://perma.cc/9PTP-HGBF.

[12] *MacArthur Park: An Oasis Transformed into an Immigration Crossroads in Los Angeles*, SimpleAboutThings.com (July 8, 2025), https://perma.cc/88N2-SCHY; Tara Copp & Christopher Weber, *Troops and Federal Agents Briefly Descend on Los Angeles' Macarthur Park in Largely Immigrant Neighhorhood*, PBS (July 7, 2025), https://perma.cc/LV2P-6ZH2.

[13] *Id.*

[14] Anna Commander, *Border Patrol Chief Issues Stark Warning to L.A. on Immigration Raids*, Newsweek (July 7, 2025), https://perma.cc/5NVD-F79N.

**C.** **The Trump Administration used public protests against its extreme actions as a pretext for deployment—as confirmed by newly established facts.**

Defendants rely on isolated violent acts that occurred on June 6, 2025, and in the days that followed during protests to the Trump Administration's immigration enforcement activities in Los Angeles to justify the President's decision to deploy federalized Guardsmen under Section 12406. Defs.' Br. 1, 7–10, 21–24. Due to two district court rulings and multiple investigative reports, much more is known now about the events that led to and followed the deployment. These newly revealed facts demonstrate that the Administration's own extreme actions led to the protests and, even though local law enforcement was fully capable of addressing these protests, the Administration used a need to respond as a pretext for its military takeover of an American city.

To begin, multiple investigations of ICE enforcement data collected by Deportation Data Project (University of California, Berkeley) have reached the same conclusion: The Trump administration has used starkly different tactics to arrest immigrants in majority-Republican versus majority-Democratic states. In red states, 59% of ICE arrests happened inside prisons and jails and involved people with criminal records. In contrast, in majority-Democratic states, 70% of arrests took place in the community, such as workplaces, on the streets or during large

scale sweeps, and largely involved people who have no criminal record.[15] Indeed, "[i]n Los Angeles, most people arrested had no criminal record whatsoever."[16]

Consistent with this conclusion, Judge Breyer found after trial that the President's decision to deploy the National Guard followed a series of ICE enforcement operations which targeted several locations in downtown Los Angeles that are "known to have significant migrant populations and labour-intensive industries." *Newsom/District Court Ruling*, 2025 WL 2501619, at *2. These operations resulted in the detention of between seventy and eighty people and the arrest of forty-four. *Id.* "Public protests quickly followed," the court noted, which included some isolated acts of violence. *Id.* Judge Breyer concluded that these protests did not necessitate deployment of the National Guard because the "Los Angeles Police Department and Los Angeles Sheriff's Department responded to the[ ] protests and maintained control of the situation" and that, even before the protests, LAPD had reassigned additional officers to downtown. *Id.* He further

---

[15] *See* Casey Tolan & Isabelle Chapman, *ICE Uses Starkly Different Tactics to Arrest Immigrants in Red and Blue States*, *Data Shows*, CNN (Aug. 5, 2025, at 06:00 ET), https://perma.cc/HBJ3-MNCL; Visa Verge, *ICE Arrest Tactics Differ Sharply Between Red and Blue States, Data Shows*, VisaVerge.com (Aug, 5, 2025, at 11:17 ET), https://perma.cc/2452-NJT7.

[16] Karuba Ioffee, *Meet the UC Berkeley Data Team who Proved Trump isn't Deporting just "Worst of the Worst,"* Berkeleyside (Aug. 19, 2025, at 07:00 ET) https://perma.cc/D4GC-DB57.

noted that "[l]ocal law enforcement is no stranger to such protests" as it has handled numerous similar protests in Los Angeles in the past. *Id.* at *23, n.21.

The context behind these protests is discussed in *Vasquez Perdomo v. Noem*, No. 2:25-cv-05605-MEMF-SP, 2025 WL 1915964 (C.D. Cal. July 11, 2025) (hereinafter "*Vasquez Perdomo/District Court*") which challenges the tactics utilized by federal immigration enforcement agents during a series of immigration raids in Los Angeles. On June 6, 2025, and the days that followed, federal officials engaged in raids which they described as "the largest Mass Deportation Operation" in history in a broad range of public places (including bus stops, car washes, farms, Home Depot, and swap meets). *Id.* at *1, 3. On May 28, 2025, White House Deputy Chief of Staff Stephen Miller stated that they were "looking to set a goal of a minimum of 3,000 arrests for ICE every day." *Vasquez Perdomo v. Noem*, No. 25-4312, 2025 WL 2181709 at *2, n.2 (9th Cir.), *rev'd,* 606 U.S. ___ (2025) (hereinafter "*Vasquez Perdomo/Ninth Circuit*").

The district court made findings regarding the coercive and heavy-handed tactics used by the immigration agents during the raids which were highly disruptive to the community. Witnesses described how agents—masked and heavily armed, without visible badges or name tags, travelling in groups in unmarked cars with tinted windows—suddenly pulled up and grabbed, interrogated, verbally threatened, handcuffed and/or shackled them without

identifying themselves or providing a reason or warrant for their actions. *Vasquez Perdomo/District Court,* 2025 WL 1915964, at \*21–24. The witnesses stated that they believed they were being kidnapped and feared for their lives. *Id.* The court found that, due to these tactics, members of minority communities regardless of immigration status and even some members of the broader public feared leaving their homes because they feared being swept up in enforcement actions. *Id.* at \*26.

When the government appealed the *Vasquez Perdomo* decision to the Ninth Circuit and requested a stay, they notably did *not* dispute any of the court's findings or plaintiffs' allegations that the government's tactics targeted minorities, in particular Hispanics. *Vasquez Perdomo/Ninth Circuit,* 2025 WL 2181709, at \*2–3. This Court recognized that the government's actions put nearly half the population in the affected communities at risk. The population of the seven counties at issue—Los Angeles, Riverside, San Bernardino, Orange, Ventura, Santa Barbara, and San Luis Obispo—is over nineteen million, approximately nine million of which, or 47%, identify as Hispanic or Latino. *Id.* at \*2.

The Administration's extraordinary and extreme actions predictably fueled tension and protest in numerous California communities. Even then, the evidence

shows that local law enforcement was capable of handling these protests and no military deployment was necessary.

### D. The Trump Administration's stated purpose for deploying Federal Guardsmen and the geographic scope of the deployment have expanded exponentially since the start of this appeal.

What began as an isolated deployment to protect federal property and personnel in Los Angeles during protests has since morphed into a broad-scale plan to militarize majority-Democratic cities nationwide for the purported purpose of fighting crime or simply as a preventive measure.

While in this appeal Defendants contend that the federalized Guardsmen were deployed to protect federal personnel and property in response to immigration protests, this is *not* what they argued during the recent trial before Judge Breyer. The significance and consequences of Defendants' changed position were not lost on Judge Breyer. He noted that Defendants no longer contend that the federalized Guardsmen will be deployed only where there is an actual or even a potential threat to "federal property, personnel, or functions." *Newsom/District Court Ruling*, 2025 WL 2501619, at *5. Instead, he noted, Defendants now take the position that "the mere possibility that federal law enforcement agents might not be able to do their job could justify deployment of Task Force 51 as 'a preventive measure.'" *Id.*

20

Contemporaneous with this momentous shift, the Trump Administration has reveated its plan to use National Guard forces in majority-Democratic cities nationwide. Citing Los Angeles as a template,[17] the Trump Administration has deployed armed National Guard forces in Washington D.C. and has announced plans to deploy them to a long list of majority-Democratic cities (e.g., Chicago, Oakland, New York, Seattle, Baltimore, Portland, San Francisco, New Orleans and Boston)—all for the purported reason of fighting runaway crime.[18] Indeed, on August 25, 2025, the President signed an executive order establishing "specialized" National Guard units to address crime.[19] The President rejected

---

[17] Robert McCoy, *Hegseth's Rant on D.C. Takeover Turned into Evidence Against Trump*, The New Republic (August 11, 2025, at 17:18 ET), https://perma.cc/WKY3-DU2B.

[18] Ed White & Christopher Keller, *Trump Suggests More U.S. Cities Need National Guard But Crime Stats Tell a Different Story*, Los Angeles Times (Aug. 29, 2025, at 08:47 ET), https://perma.cc/2KN5-2FPH [hereinafter E. White, *Crime Stats*]; Myah Ward, *Trump Admin Plans Immigration Enforcement Surge in Boston,* Politico (Aug. 29, 2025, at 13:52 PM), https://perma.cc/GB9C-KKX9; Sara DiNatale, *Trump adds San Francisco to List of Cities Where He Wants to Send Troops*, S.F. Chronicle (Aug. 22, 2025, at 13:34 PM), https://perma.cc/6Z8A-R2QH.

[19] Executive Order, Additional Measures to Address the Crime Emergency in the District of Columbia (Aug. 25, 2025), https://perma.cc/F2ER-WBJW.

criticism that, with these actions, he was acting like a dictator but stated "a lot of people are saying that 'maybe we'd like a dictator.'"[20]

On September 6, 2025, in a notable escalation that seemed to suggest waging war on an American city, the President threatened to unleash "the Department of WAR" on Chicago.[21] Asked about the Chicago deployment, the President stated:

> I have the right to do anything I want to do. I'm the President of the United States. If I think our country is in danger, and it is in danger in these cities, I can do it.[22]

Notably, these plans are not tied in any way to *federal* crime or illegal immigration, merely to crime in general, which of course is the traditional responsibility of state government. Regardless, the reason cited for the future deployments (like the Los Angeles deployment) is pretextual. Numerous reports establish that the majority-Democratic cities cited by the President, including Washington D.C., have been experiencing steadily declining crime rates in recent years and the lowest crime rates in decades. Indeed, the four cities with the highest

---

[20] Sara Dorn, *Trump Says Some Americans Would 'Like a Dictator,'* Forbes (Aug. 25, 2025, at 13:12 ET), https://perma.cc/PD2T-J2XT.

[21] Justin Kaufman, *Trump Threatens Chicago with "Department of War" Ahead of Planned Crackdown*, AXIOS (Sept. 6, 2025), https://perma.cc/NR8L-F6BQ.

[22] C-SPAN, *President Trump Holds Cabinet Meeting* at 3:12:29-40 (Aug. 26, 2025), available at https://tinyurl.com/bb6sa5bp.

murder rates in 2024 were all in Republican-led states: Jackson (Mississippi),

Birmingham (Alabama), St. Louis (Missouri) and Memphis (Tennessee).[23]

     As further evidence of the political and partisan purpose of these

deployments, the governors of six majority-Republican states (West Virginia,

South Carolina, Mississippi, Louisiana, Ohio and Tennessee) have sent National

Guard troops to D.C. for the purported purpose of reducing crime. Ironically, many

of these states have cities with substantially higher crime rates than the Capital. For

example, in 2024, in Jackson (Mississippi) the murder rate was more than four

times higher than that of Washington D.C.; in Memphis (Tennessee), it was nearly

triple; and in North Charleston (South Carolina), it was one and a half times

higher.[24] The Trump Administration has deployed the National Guard to

Republican-led cities only to assist with administrative and clerical duties in ICE

facilities.[25]

---

[23] George Chidi, *Trump Claims Chicago is 'World's Most Dangerous City.' The Four Most Violent Ones Are All in Red States*, The Guardian (Sept. 6, 2025), https://perma.cc/TH56-GPT2; E. White, *Crime Stats*, *supra* note 18.

[24] *See* UP FIRST FROM NPR: *Governors and the National Guard, Europe and Ukraine, Texas Redistricting* (Website, Aug. 20, 2025), https://perma.cc/E7TY-C6ZP; Harold Meyerson, *The GOP States with Guards Deployed to D.C. Have Urban Murder Rates Way Higher than D.C.'s*, The American Prospect (Aug. 19, 2025), https://perma.cc/WMG7-4YYR.

[25] Chris Cameron et al., *Trump Administration Authorizes Deployment of National Guard at ICE Facilities*, N.Y. Times (July 30, 2025), https://perma.cc/X6MC-VWSK.

Recognizing that Los Angeles was the first city where National Guard troops were deployed "but not the last," Judge Breyer warned that the Trump Administration is "creating a national police force with the President as its chief." *Newsom/District Court Ruling*, 2025 WL 2501619, at *1, 9.

## III. Facts Relating to Other Actions by the Trump Administration Also Establish That the President's Proffered Reasons are Pretextual.

As courts have recognized, these are *not* normal times. As such, drawing from Justice Roberts's warning in *Korematsu*, it is dangerous for the Court to conduct an overly narrow review of the President's decision to deploy federalized Guardsmen in Los Angeles by "shut[ting] [its] eyes" to the "actualities." *Korematsu*, 323 U.S. at 232 (Roberts, J., dissenting). Mindful of this warning, the Court should not shut its eyes to the fact that the President who made the decision at issue here is contemporaneously taking actions nationwide to unlawfully and exponentially expand and consolidate his executive powers and stifle opposition to his policies—all in the name of national security and the public good. The Court should determine the purpose behind the President's decision to deploy Guardsmen to Los Angeles in light of his broader plans which are playing out in various arenas across the country. It is no coincidence that Defendants' positions in this litigation echo the Trump Administration's actions nationwide to stifle any limit on or criticism of the President.

For the Court's consideration, below is a list of notable—but by no means complete—actions by the Trump Administration which courts have held are unlawful expansions of the executive power and violations of the doctrine of separation of powers.

### A. The Trump Administration is engaged in an unprecedented unlawful attack on an independent judiciary.

The President and high-ranking members of his administration routinely attack judges who have ruled against his policies. In a recent opinion, a federal district court summarized these unprecedented attacks as follows:

> [O]ver the past several months, principal officers of the Executive (and their spokespersons) have described federal district judges across the country as "left-wing," "liberal," "activists," "radical," "politically minded," "rogue," "unhinged," "outrageous, overzealous, [and] unconstitutional," "[c]rooked," and worse. Although some tension between the coordinate branches of government is a hallmark of our constitutional system, this concerted effort by the Executive to smear and impugn individual judges who rule against it is both unprecedented and unfortunate.

*United States v. Russell*, No. 1:25-cv-02029, 2025 WL 2448955, at *2, n.2 (D. Md. Aug. 26, 2025 [hereinafter "*Chief Judge Russell*"].

The attacks are not only verbal. Notably, on June 24, 2025, the DHS took the unprecedented step of filing a lawsuit against all fifteen federal judges in the District Court of Maryland, seeking declaratory and injunctive relief against a standing order issued by Chief Judge George Russell in immigration cases. Dismissing that lawsuit, a federal district court was clear about the Executive's

disregard for a co-equal judicial branch. The court stressed that the correct approach for handling the Executive's concern was to file an appeal in an individual case in which the standing order was applied. It added, "[A]s events over the past several months have revealed, **these are not normal times**—at least regarding the interplay between the Executive and this coordinate branch of government. It's no surprise that the Executive chose a different, and more confrontational, path entirely." *Id*. at *2 (emphasis added); *see also Abrego Garcia v. Noem*, No. 25-1345, 2025 WL 1021113, at *8 (4th Cir. Apr. 7, 2025) (Wilkinson, J., concurring) (noting that "reciprocal respect for the roles of the Executive and the Judiciary" is lacking in current atmosphere).

The Trump Administration also has sought to impeach or remove judges that do not rule in its favor. In a rare public statement, on May 7, 2025, Chief Justice Roberts spoke out against calls by many in the executive branch to impeach judges who have ruled against his administration, notably U.S. District Judge James Boasberg who presides over a high-profile deportation case.[26] Notwithstanding this plea, on July 28, 2025, the U.S. Justice Department filed a formal complaint with

---

[26] Soo Rin Kim, *Chief Justice John Roberts Makes Rare Public Appearance, Defends Judicial Independence*, ABC News (May 7, 2025, at 19:13 ET), https://perma.cc/7F7B-G5XL.

the D.C. Circuit seeking to reprimand Judge Boasberg and remove him from the case purportedly for comments he had made at a judicial conference.[27]

Defendants show a similar disregard for the role of the judiciary in this case. They contend that the President's decision is not subject to any judicial review, even a "highly deferential" review to determine if the President was acting in bad faith. Defs.' Br. 2, 19–20, 30–33. They argue that the President's decision is both "exclusive" and "conclusive." *Id.* at 30–32, 34.

### B. The Trump Administration is engaged in an unprecedented unlawful attack on an independent legal profession.

The Trump Administration has also been engaged in a full scale and unprecedented attack on the independence of law firms/lawyers. This has included punitive executive orders against four law firms which he claims are necessitated by public interest and national security.[28] Four district courts have held that these executive orders constituted unlawful exercise of executive power and violation of the separation of powers. *See Perkins Coie L.L.P. v. U.S. Department of Justice*, No. 25-716, 2025 WL 1276857 (D.D.C. May 2, 2025); *Jenner & Block LLP v. U.S.*

---

[27] Complaint filed with the United States Court of Appeals for the District of Columbia Circuit, https://perma.cc/3J6P-CAZ2.

[28] All four executive orders expressly refer to public safety and national security/interest as justification. *See* https://perma.cc/3U5S-ZJAB (Jenner Block); https://perma.cc/NB39-NKB7 (Susman Godfrey); https://perma.cc/Z9A9-SV2E (Perkins Coie); and https://perma.cc/935Q-93V3 (Wilmer Hale)

*Department of Justice*, No. 25-916, 2025 WL 1482021 (D.D.C, May 23, 2025);

*Wilmer Cutler Pickering Hale and Dorr LLP v. Executive Office of the President*,

No. 25-917, 2025 WL 1502329 (D.D.C., May 27, 2025); *Susman Godfrey LLP v.*

*Executive Office of the President et al.*, No. 25-1107, 2025 WL 1779830 (D.D.C.,

June 27, 2025.[29]

    These courts further found that the President targeted these law firms

because of their representation of the President's political opponents and for

bringing lawsuits against the policies of his Administration. Three of these courts

rejected the government's purported national security rationale for these attacks,

citing in part to the government's settlement with Paul Weiss as proof that there

was no legitimate national security concern at issue. The President's settlement

with Paul Weiss made no reference to national security concerns even though the

executive order targeting the firm was based on the need to protect such interests.

*See Perkins Coie*, 2025 WL 1276857, at *33; *Jenner & Block*, 2025 WL 1482021

at, *12; *Susman Godfrey*, 2025 WL 1779830, at *15. As the *Wilmer* court

exclaimed, "the [Executive] Order's unsupported assertion of national security will

not save it!" *Wilmer*, 2025 WL 1502329, at *19.

---

[29] The Trump Administration has appealed all four decisions.

Defendants have used a similar approach here. They contend that the deployment of the National Guard is justified by public interest and to address opposition and violent protests against the Administration's immigration policy. Defs.' Br. 1, 7–10, 21–24, 39–40. This assertion of public interest is as unsupported here as it was in the four cases against the law firms. As discussed, Judge Breyer found that local authorities had the situation under control, and no deployment of federal National Guard forces was necessary.

### C. The Trump Administration is invoking emergency powers with unprecedented frequency to justify unilateral action and bypass Congress unlawfully.

Based on data collected by the Brennan Center for Justice, the President has declared more national emergencies in the first 100 days of his term than any other president during the same time period in modern American history.[30] He has invoked this extraordinary power broadly, ranging from deporting Venezuelan migrants to imposing tariffs.[31] While emergency powers are traditionally used for rare moments of unforeseen crisis to allow for swift action by the Executive, the

---

[30] Zachary Basu, *Trump's United States of Emergency*, Axios (Apr. 7, 2025), https://perma.cc/ATH6-759Q.

[31] *Id.*

President is regularly invoking emergency powers to address everyday issues, bypass Congress, and unilaterally expand his executive power.[32]

Some of these efforts have been blocked by the courts. *See, e.g.*, *V.O.S. Selections, Inc. v. Donald J. Trump*, Nos. 2025-1812, 2025-1813, 2025 WL 2490634 (Fed. Cir. Aug. 29, 2025) (holding that the President unlawfully invoked emergency powers to impose tariffs); *W.M.M. et al. v. Donald J. Trump et al.*, No. 25-10534, 2025 WL 2508869 (5th Cir. Sept. 2, 2025) (holding that the President unlawfully invoked the Alien Enemies Act to deport Venezuelans alleged to be gang members).

Consistent with this broader pattern, Defendants have invoked emergency powers in this case, arguing that the isolated violent acts that took place in Los Angeles on and around June 6, 2025, constitute a "rebellion" against the authority of the Government of the United States under Section 12406. Defs.' Brief 26–30, 33. Judge Breyer held after trial that this claim is unfounded, finding that while "[t]here were indeed protests in Los Angeles, and some people engaged in violence," "there was no rebellion, nor was civilian law enforcement unable to

---

[32] *Id.*; see also Elizabeth Goitein, *How the President is Misusing Emergency Powers to Impose Worldwide Tariffs*, Brennan Center for Justice (last updated May 13, 2025), https://perma.cc/499C-FRS9.

respond to the protests and enforce the law." *Newsom/District Court Ruling*, 2025 WL 2501619, at *1.

## CONCLUSION

For the foregoing reasons, Amici urge the Court to affirm the district court's grant of preliminary injunction.

DATED: September 9, 2025  BAHAR LAW OFFICE. P.C.

By:    */s/ Sarvenaz Bahar*
    Sarvenaz Bahar

Robert S. Chang
Shaleen Shanbhag
FRED T. KOREMATSU CENTER
FOR LAW AND EQUALITY
401 E. Peltason Dr.
Irvine, CA 92697
(949) 824-3034
rchang@law.uci.edu

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

I certify pursuant to Federal Rules of Appellate Procedure 32(a)(7)(C) that the attached brief is proportionately spaced, has a typeface of 14 points, and, according to the word count feature of the word processing system used to prepare the brief, contains 6743 words.

DATED: September 9, 2025          By: _____ */s/ Sarvenaz Bahar* _____
                                                      Sarvenaz Bahar

## CERTIFICATE OF SERVICE

I certify that on September 9, 2025, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the appellate CM/ECF system.

DATED: September 9, 2025　　　　By: _____*/s/ Sarvenaz Bahar*_____
　　　　　　　　　　　　　　　　　　　Sarvenaz Bahar