## Case No. 25-3727

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

————◆————

GAVIN NEWSOM,
in his official capacity as Governor of the State of
California; STATE OF CALIFORNIA,
*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP,
in his official capacity as President of the United States;
PETER HEGSETH, in his official capacity as Secretary of the Department of Defense; UNITED
STATES DEPARTMENT OF DEFENSE,
*Defendants-Appellants.*

_____

*On Appeal from the United States District Court for the Northern District of California (San Francisco), Case No. 3:25-cv-04870-CRB • The Honorable Charles R. Breyer, District Judge*

## BRIEF OF BIPARTISAN FORMER GOVERNORS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES

JULIA SPIEGEL
GOVERNORS ACTION ALLIANCE
2300 North Street, NW, Suite 501A
Washington, D.C. 20037
Telephone: (301) 450-3151

CHARANYA KRISHNASWAMI
GOVERNORS SAFEGUARDING
DEMOCRACY
2300 North Street, NW, Suite 501A
Washington, D.C. 20037
Telephone: (213) 933-2126

CAREY R. DUNNE
KEVIN TROWEL
ZACK GOLDBERG
MARTHA REISER
FREE AND FAIR LITIGATION
GROUP, INC.
266 West 37th Street, 20th Floor
New York, NY 10018
Telephone: (646) 434-8604

JOSEPH T. BAIO
JOSEPH T. BAIO LLC
240 Centre Street
New York, NY 10013
Telephone: (914) 523-2255

*Counsel for Amici Curiae Bipartisan Former Governors*

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

INTERESTS OF AMICI CURIAE ........................................................................5

ARGUMENT .........................................................................................................8

   I. Federalism is enshrined in the Constitution and entrusts the
      states—not the federal government—with general police powers ................8

   II. The National Guard plays a critical role in assisting governors
       in protecting the public. ...............................................................................10

   III. Only in the most exceptional circumstances has the National
        Guard been federalized or active-duty forces deployed in a
        state absent consultation with state authorities ............................................13

   IV. The administration's interpretation of 10 U.S.C. § 12406 conflicts
        with this history and tradition of federal-state coordination ........................16

   V. The administration's interpretation of 10 U.S.C. § 12406 threatens
       public safety ................................................................................................18

   VI. The courts play a critical role in protecting this balance of federal
        -state authority.............................................................................................22

CONCLUSION ....................................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Alden v. Maine*,
  527 U.S. 706 (1999)...................................................................................13

*Arizona v. United States*,
  567 U.S. 387 (2012)....................................................................................9

*Bond v. United States*,
  572 U.S. 844 (2014)................................................................................2, 9

*Gonzales v. Oregon*,
  546 U.S. 243 (2006)...................................................................................23

*Gregory v. Ashcroft*,
  501 U.S. 452 (1991)..........................................................................1, 8, 17

*Laird v. Tatum*,
  408 U.S. 1 (1972)......................................................................................24

*Luther v. Borden*,
  48 U.S. (7 How.) 1 (1849)........................................................................23

*Marbury v. Madison*,
  5 U.S. (1 Cranch) 137 (1803)...................................................................22

*Martin v. Mott*,
  25 U.S. 19 (1827)......................................................................................23

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
  584 U.S. 453 (2018)...................................................................................23

*New York v. United States*,
  505 U.S. 144 (1992).............................................................................*passim*

*Perpich v. Dep't of Def.*,
  496 U.S. 334 (1990)............................................................................10, 16

*Printz v. United States*,
  521 U.S. 898 (1997).........................................................................1, 8, 9, 23

*Stark v. Wickard*,
  321 U.S. 288 (1944)...................................................................................22

*Trump v. Hawaii,*
   585 U.S. 667 (2018)......................................................................24, 25

*United States v. Curtiss-Wright Export Corp.,*
   299 U.S. 304 (1936).............................................................................26

*United States v. Lopez,*
   514 U.S. 549 (1995)..........................................................................9, 23

*United States v. Morrison,*
   529 U.S. 598 (2000)..............................................................................9

*Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens,*
   529 U.S. 765 (2000).............................................................................16

*Webster v. Doe,*
   486 U.S. 592 (1988).............................................................................25

**Court Documents:**

Addendum to Motion to Stay Lower Court Order, *Newsom v. Trump*, No.
   25-3727 (9th Cir. June 12, 2025), ECF No. 5.....................................18

**U.S. Constitutional Provisions:**

U.S. Const. art. IV, § 4..............................................................................12

U.S. Const. amend. X .................................................................................8

**Statutes:**

8 U.S.C. § 1182(f) ....................................................................................12

10 U.S.C. § 12301(b) ..........................................................................12, 26

10 U.S.C. § 12301(d) ...............................................................................12

10 U.S.C. § 12406 .............................................................................*passim*

Md. Code Ann., State Gov't § 3-303(a) ...................................................10

Mont. Code Ann. § 10-3-305(1)................................................................10

N.Y. Mil. L. § 3 ........................................................................................10

**Other Authorities:**

About the Guard | How We Began, National Guard Bureau....................10

Solcyre Burga, *Why Trump Sending the National Guard to L.A. Is Different From Its Deployment There in 1992*, Time Magazine (June 9, 2025)..................................................................................14

Bill Chappell, *What Happened When Lyndon Johnson Federalized the National Guard,* NPR (June 9, 2025) ....................................................15

*Colo. and Minn. National Guard Assist in Fire Battles*, National Guard (Aug. 24, 2018)............................................................................20

Will Conybeare, *More Than 500 Arrests Made Over 8 Days of Protests in Los Angeles,* KTLA (June 15, 2025)........................................................15

The Federalist No. 51 (Alexander Hamilton)..............................................9

Shawn Hubler, *Trump's National Guard Troops Are Questioning Their Mission in L.A.*, N.Y. Times (July 16, 2025)........................................20

Hannah Hudnall, *Illinois Sends Search and Rescue Team to Texas for Flood Relief*, Journal Star (July 15, 2025)..........................................21

Macy Jenkins & Jonathan Lloyd, *Tourists share heir impressions of Los Angeles during a week of protests*, NBC Los Angeles (June 13, 2025) ...............3

Joint Chiefs of Staff, Joint Publication 3-28, Defense Support of Civil Authorities (Oct. 29, 2018)................................................................12, 13

Spc. Thomas Lamb, *Maryland National Guard Remembers 9/11*, National Guard Bureau (Sept. 13, 2021) ..............................................................11

Robert Leider, *Federalism and the Military Power of the United States*, 73 Vand. L. Rev. 989 (2020)..................................................................21

Michel R. Moore, *I Ran the L.A.P.D. I Know What Happens When Troops Are Sent to American Cities*, N.Y. Times (June 13, 2025) ....................................4

*Nevada Guard Commits Record 800 Members to COVID-19 Fight*, National Guard (Apr. 15, 2020)..................................................................20

Tech. Sgt. John Orrell, *Hurricane Katrina, Eight Years Later: Former Guard Chief Reflects on the Guard's "Finest Hour"*, National Guard Bureau (Aug. 29, 2013) ......................................................................11

*Pennsylvania National Guard Helping Shovel Out Erie County*, National Guard (Dec. 28, 2017) ......................................................................19

Elaine S. Povich, *Same Mission, Different Pay for National Guard*,
Stateline (June 18, 2020)....................................................................11

Presidential Memoranda, Department of Defense Security for the
Protection of Department of Homeland Security Functions
(June 7, 2025)......................................................................................5

Susan Saulny & Jim Rutenberg, *Kansas Tornado Renews Debate on
Guard at War*, N.Y. Times (May 9, 2007)..........................................19

Paul J. Scheips, *The Role of Federal Military Force in Domestic
Disorders, 1945–1992*, Army Hist. Series, CMH Pub. 30-20-1 (2012) ........15, 16

Jon Soucy, *National Guard Members Continue LA Wildfire
Response*, National Guard (Jan. 21, 2025)..........................................18

*Three Republican-Led States to Send Hundreds of National Guard Troops
to Washingto*n, NPR (Aug. 17, 2025) ..................................................21

Annabelle Timsit, Kyle Melnick, Alex Horton, *When Have Presidents
Called in the National Guard to Quell Domestic Unrest?*, Wash. Post
(June 9, 2025)....................................................................................14

*Up to 1,000 Guard Members Respond to Mass. Tornadoes*, National Guard
(June 2, 2011)....................................................................................19

U.S. Department of Defense, *Profile of the Military Community: 2023
Demographics* (Dec. 16, 2024)...........................................................10

U.S. Department of the Army, *Civil Support Operations*,
Field Manual 3-28 (2010) ...................................................10, 12, 20

**INTRODUCTION**

Our constitutional order depends on the dispersion and careful balance of authority among the federal government and the states. The contours of that balance were established at the Founding and are embodied in the United States Constitution. "[T]he Framers rejected the concept of a central government that would act upon and through the States, and instead designed a system in which the State and Federal Governments would exercise concurrent authority over the people." *Printz v. United States*, 521 U.S. 898, 919–20 (1997). "In the tension between federal and state power lies the promise of liberty." *Gregory v. Ashcroft*, 501 U.S. 452, 459 (1991).

Amici curiae are acutely familiar with the tension between federal and state power that is at the core of our constitutional democracy. As a bipartisan group of former governors who collectively governed states—both large and small— through natural disasters, episodes of civil unrest, and public health emergencies, amici have substantial experience exercising command over their states' National Guard while managing the sensitive and often complex interplay between state and federal authority in times of heightened need or domestic crisis.

To be sure, the maintenance of this delicate balance has presented challenges throughout our nation's history. Where such challenges have arisen, federal courts have intervened to protect it. *See New York v. United States*, 505 U.S. 144, 155

1

(1992) ("At least as far back as *Martin v. Hunter's Lessee*, . . . the Court has resolved questions of 'great importance and delicacy' in determining whether particular sovereign powers have been granted by the Constitution to the Federal Government or have been retained by the States."). Those interventions reflect the essential premise that, "[i]n our federal system, the National Government possesses only limited powers; the States and the people retain the remainder." *Bond v. United States*, 572 U.S. 844, 854 (2014). The broad reservoir of authority retained by the states includes what the courts have called "'police power.' The Federal Government, by contrast, has no such authority and can exercise only the powers granted to it" by the Constitution. *Id.* (internal quotations and citations omitted).

Throughout our history, and notwithstanding our nation's political, social, and geographic diversity, the federal government has rarely and only under the most extraordinary circumstances imposed military authority on the citizens of a state against the wishes of the state's executive. The structure of our federalist system, and the language of the relevant statutory provisions at issue in this case, impose legal constraints on the president's authority to take such extreme measures. Indeed, over the course of our nearly 250-year history, the president has attempted such military imposition only a handful of times, and only in times of significant exigency. Our political structure also incentivizes the federal and state governments to work together cooperatively to address issues of local and national

importance, including but not limited to civil unrest. Historically, state and federal authorities have negotiated—in public and in private—the balance of their respective authorities, and never, to amici's knowledge, have those negotiations resulted in the unilateral deployment of federal troops to address the kind of protests and civil unrest present in Los Angeles in June.

Amici—drawing on 178 years of combined experience serving as chief executives of their state and commanders-in-chief of their state's National Guard—respectfully submit that the factual predicates necessary to justify federalizing the National Guard have not been met and, in their experience, local law enforcement is fully capable of managing the protests in Los Angeles without federal interference.[1] In amici's experience, local law enforcement agencies are best equipped to respond to local protests, including those in which a minority of protestors have broken the law, while safeguarding the constitutional rights of others who wish to—and do—exercise those rights peacefully. If anything, the hasty federalization of the California National Guard without consultation and

---

[1] Local press reports indicate that the unrest has been limited to approximately one square mile within Los Angeles. *See, e.g.*, Macy Jenkins & Jonathan Lloyd, *Tourists share their impressions of Los Angeles during a week of protests*, NBC Los Angeles (June 13, 2025), https://www.nbclosangeles.com/news/local/tourism-los-angeles-protests-location/3723920/.

cooperation from state authorities likely exacerbated tensions in Los Angeles and thereby increased the risk to civilians and law enforcement officers alike.[2]

Indeed, the upending of the normal federal-state balance has predictably created a range of practical harms. Not only was the decision to deploy federal forces undertaken without cooperation; the deployment itself is taking place without adequate coordination to ensure that local law enforcement and federal forces are working safely and effectively together. History teaches that there is significant potential for confusion and error under these circumstances. In addition, the California National Guard members who have been pulled away from their regular state duties include significant portions of the Guard task forces created to respond to wildfires and to interdict narcotics trafficking at the border. Governors rely on Guard forces to perform such life-saving tasks on a daily basis; the risk to the health and safety of Californians because of this diversion cannot be overstated.

The president's order federalizing the National Guard with no geographic or temporal limit and the deployment of National Guard to Los Angeles absent

---

[2] *See, e.g.*, Michel R. Moore, *I Ran the L.A.P.D. I Know What Happens When Troops Are Sent to American Cities*, N.Y. Times (June 13, 2025), https://www.nytimes.com/2025/06/13/opinion/lapd-troops-la-protests.html ("The roles of the military and law enforcement are fundamentally distinct. . . . Military training, equipment and tactics are optimized for warfare—not for safeguarding civil liberties or managing peaceful protest.").

consultation with California's governor stand in stark contrast to our nation's history and tradition of federal-state cooperation.[3] The Court need not identify the outer limit of the president's authority to federalize and deploy the National Guard under 10 U.S.C. § 12406 (or other provisions) to conclude that the present deployment of military resources, based on an assertion of nearly unfettered federal authority, is unlawful. The president's assertion of authority to deploy military resources on domestic soil to any place where mere "protests" against administration policy "are occurring or are likely to occur," without the cooperation and coordination of state authorities, threatens to upset the delicate balance of state and federal authority that underlies our constitutional order.[4]

For these reasons, amici respectfully submit that the Court affirm the district court's temporary restraining order enjoining the federalization of the California National Guard in Los Angeles.

### INTERESTS OF AMICI CURIAE

Amici curiae are a bipartisan group of former governors who served as their states' chief executives and civilian commanders of their respective National

---

[3] Presidential Memoranda, Department of Defense Security for the Protection of Department of Homeland Security Functions (June 7, 2025), https://www.whitehouse.gov/ presidential-actions/2025/06/department-of-defense-security-for-the-protection-of-department-of-homeland-security-functions/.

[4] *Id.*

Guards.[5]  In that role, they exercised the police powers reserved to the states to ensure the public's health, safety, and welfare—often in coordination with federal authorities across party lines.  They bring firsthand experience activating the National Guard in response to natural disasters, public health emergencies, and civil unrest.

The former governors represent diverse political affiliations, geographies, and tenures, yet are unified in their support for Appellees' request for relief in this case.  As described herein, federal authorities' decision to federalize the California National Guard without consultation with California's governor disturbs the constitutional balance of state and federal authority, weakens state executives' authority to maintain intrastate law and order, deprives states of vital emergency response tools, and breaks with a long tradition of cooperation between the federal government and the states on issues of public safety.  The former governor amici in support of this brief are:

- Jerry Brown, Governor of California from 1975 to 1983 and 2011 to 2019.

- Steve Bullock, Governor of Montana from 2013 to 2021.

- Arne Carlson, Governor of Minnesota from 1991 to 1999.

---

[5] No party or party's counsel authored this brief in whole or in part.  No party or party's counsel contributed money intended to fund preparation or submission of this brief.  All parties consented to the filing of this Amicus Brief.

- Mark Dayton, Governor of Minnesota from 2011 to 2019.

- Jim Doyle, Governor of Wisconsin from 2003 to 2011.

- Parris Glendening, Governor of Maryland from 1995 to 2003.

- Jennifer Granholm, Governor of Michigan from 2003 to 2011.

- Bill Graves, Governor of Kansas from 1995 to 2003.

- Christine Gregoire, Governor of Washington from 2005 to 2013.

- Tony Knowles, Governor of Alaska from 1994 to 2002.

- Gary Locke, Governor of Washington from 1997 to 2005.

- Terry McAuliffe, Governor of Virginia from 2014 to 2018.

- Janet Napolitano, Governor of Arizona from 2003 to 2009.

- Martin O'Malley, Governor of Maryland from 2007 to 2015.

- Deval Patrick, Governor of Massachusetts from 2007 to 2015.

- Marc Racicot, Governor of Montana from 1993 to 2001.

- Bill Ritter Jr., Governor of Colorado from 2007 to 2011.

- Kathleen Sebelius, Governor of Kansas from 2003 to 2009.

- Steve Sisolak, Governor of Nevada from 2019 to 2023.

- Eliot Spitzer, Governor of New York from 2007 to 2008.

- Ted Strickland, Governor of Ohio from 2007 to 2011.

- Tom Vilsack, Governor of Iowa from 1999 to 2007.

- Bill Weld, Governor of Massachusetts from 1991 to 1997.

- Christine Todd Whitman, Governor of New Jersey from 1994 to 2001.

- Tom Wolf, Governor of Pennsylvania from 2015 to 2023.

## ARGUMENT

**I.     Federalism is enshrined in the Constitution and entrusts the states—not the federal government—with general police powers.**

"It is incontestible that the Constitution established a system of 'dual sovereignty,'" in which the states "retained 'a residuary and inviolable sovereignty.'" *Printz*, 521 U.S. at 918–19 (quoting The Federalist No. 39 (James Madison)). This division of authority is evidenced throughout the Constitution, which grants Congress only "discrete, enumerated" powers. *Printz*, 521 U.S. at 919. The Tenth Amendment makes that division explicit by reserving all other powers "to the States respectively, or to the people." *Id.* at 919 (quoting U.S. Const. amend. X); *see also New York*, 505 U.S. at 156 ("[I]f a power is an attribute of state sovereignty reserved by the Tenth Amendment, it is necessarily a power the Constitution has not conferred on Congress.").

This federalist structure safeguards liberty. "[A] healthy balance of power between the States and the Federal Government . . . reduce[s] the risk of tyranny and abuse from either front." *Gregory*, 501 U.S. at 458. From this constitutional dispersion of authority "a double security arises to the rights of the people. The different governments will control each other, at the same time that each will be

controlled by itself." The Federalist No. 51 (Alexander Hamilton) (quoted in *Printz*, 521 U.S. at 922).

Within this framework, states possess broad "police powers" to protect public health and safety—authority the federal government lacks. *See Bond*, 572 U.S. at 854 (noting that "[t]he States have broad authority to enact legislation for the public good—what we have often called a 'police power,'" but the "Federal Government, by contrast, has no such authority"); *United States v. Lopez*, 514 U.S. 549, 584–85 (1995) (Thomas, J., concurring) ("The Federal Government has nothing approaching a police power."). The Supreme Court has cautioned that the federal government may not displace state authority over core matters of public safety absent "a clear and manifest purpose" from Congress to do so. *See Arizona v. United States*, 567 U.S. 387, 400 (2012) (discussing federal preemption of states' police powers). Thus, in our federal system the presumption remains that states— not the federal government—bear primary responsibility for maintaining civil order within their borders. *See United States v. Morrison*, 529 U.S. 598, 618 (2000) ("Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims.").

II.     **The National Guard plays a critical role in assisting governors in protecting the public.**

State National Guard units have safeguarded our communities since before the nation's founding.[6]  In the early 20th century, the National Guard was transformed and professionalized through various acts of Congress.  *See generally Perpich v. Dep't of Def.*, 496 U.S. 334, 342–44 (1990).  Today, the Army and Air National Guards comprise some 430,000 members across all states and territories.[7]

Over this long history, the National Guard has played a critical role in ensuring public safety under the leadership of governors, in their capacities as commanders-in-chief, and in coordination with federal authorities.[8]  For example,

---

[6] About the Guard | How We Began, National Guard Bureau, https://www.nationalguard.mil/About-the-Guard/How-We-Began/ (last visited July 18, 2025).

[7] *See* U.S. Department of Defense, *Profile of the Military Community: 2023 Demographics* 86 (Dec. 16, 2024), https://www.militaryonesource.mil/data-research-and-statistics/military-community-demographics/; *see also* U.S. Department of the Army, Civil Support Operations, Field Manual 3-28 at 1–6 (2010) ("Army Field Manual") ("Each state, each territory, and the District of Columbia have National Guard forces, for a total of 54 state and territorial Army National Guard elements.").

[8] *See, e.g.*, N.Y. Mil. L. § 3 ("The governor of the state shall be the commander-in-chief of the militia of the state."); Md. Code Ann., State Gov't § 3-303(a) ("The Governor is the commander-in-chief of the land and naval militia of the State, except for any part of the militia that is in the active military service of the United States."); Mont. Code Ann. § 10-3-305(1) ("During an incident and during a state of emergency or disaster, the governor is commander-in-chief of the militia and of all other forces available for incident, emergency, or disaster duty."); *see also* Army Field Manual at viii ("The governor of each respective state has overall command

National Guard members were deployed in response to the September 11 terrorist attacks, including Governor Glendening's Maryland Air National Guardsmen who quickly joined first responders on the ground at the Pentagon.[9]  In 2005, more than 50,000 National Guard troops—including units deployed by amici Governors Vilsack, Sebelius, Gregoire, Granholm, and Doyle—responded to the Hurricane Katrina disaster in Florida, Louisiana, and Mississippi, following emergency declarations by the governors of those affected states.[10]  And in 2020, more than 84,000 National Guard troops were deployed domestically to assist with civil unrest and the COVID-19 pandemic, again, under the direction of governors.[11]

In amici's experience, state officials calling upon state resources are best equipped to lead the response to all but the most extraordinary disasters and emergencies.  State and local leaders, directing local resources, are best positioned

---

responsibility for the National Guard in that state and is their Commander in Chief.").

[9] *See* Spc. Thomas Lamb, *Maryland National Guard Remembers 9/11*, National Guard Bureau (Sept. 13, 2021), https://www.nationalguard.mil/News/Article-View/Article/2772083/maryland-national-guard-remembers-911/.

[10] *See* Tech. Sgt. John Orrell, *Hurricane Katrina, Eight Years Later: Former Guard Chief Reflects on the Guard's "Finest Hour"*, National Guard Bureau (Aug. 29, 2013), https://www.nationalguard.mil/News/Article-View/Article/574826/hurricane-katrina-eight-years-later-former-guard-chief-reflects-on-the-guards-f/.

[11] Elaine S. Povich, *Same Mission, Different Pay for National Guard*, Stateline (June 18, 2020), https://stateline.org/2020/06/18/same-mission-different-pay-for-national-guard/.

to know where and what kind of help is needed in an emergency, and how to most efficiently provide it to the affected population. Military guidance reflects this consensus: incidents should be "managed at the lowest level possible,"[12] and "[t]he primary responsibility for responding to domestic disasters and emergencies . . . rests with the lowest level of government able to manage the response."[13] The Army estimates that more than 90% of declared emergencies do not require a federal military response.[14] In amici's collective experience, incidents requiring a federal military response are nearly unprecedented—state and federal officials have worked together in good faith to avoid the use of federal forces in situations normally handled by state and local law enforcement.

Indeed, in amici's experience, federal-state cooperation is critical to the success of any emergency response. Cooperation is often required by law, *see, e.g.*, U.S. Const. art. IV § 4 ("on Application of the Legislature, or of the Executive"); 10 U.S.C. § 12301(b) ("without the consent of the governor"); 10 U.S.C. § 12301(d) (same), but *successful* federal-state cooperation depends on constitutional principles inherent in our federalist structure—particularly respect for state sovereignty. The Constitution reserves to the states not only a "substantial

---

[12] Joint Chiefs of Staff, Joint Publication 3-28, Defense Support of Civil Authorities at II-11 (Oct. 29, 2018) ("Joint Chiefs Publication").

[13] Army Field Manual at 3-2.

[14] *Id.*

portion of the Nation's primary sovereignty," but also "the dignity and essential attributes inhering in that status." *Alden v. Maine*, 527 U.S. 706, 714 (1999).

This constitutional guarantee extends beyond "the formal structure of federalism." *Id*. at 758.  In our system of dual sovereignty, federal action must afford states "the esteem due to them as joint participants in a federal system, one beginning with the premise of sovereignty in *both* the central Government and the separate States." *Id.* (emphasis added).  Consistent with this constitutional requirement, federal authorities have historically recognized that cooperation premised on mutual respect, transparency, shared authority, and accountability are essential to the success of any emergency response.[15]

III.  **Only in the most exceptional circumstances has the National Guard been federalized or active-duty forces deployed in a state absent consultation with state authorities.**

Presidents have historically recognized the importance of consulting with state officials before federalizing National Guard units—a reflection of the states'

---

[15] Joint Chiefs Publication at I-7 ("State and local officials are responsible for preparing for and coordinating the provision of assistance to their populace for domestic emergencies and disasters. Governors have the authority to deploy and employ NG forces under their control in response to domestic incidents."), V-11 ("The public's perception of the response depends to a great extent on traditional and social media reporting.  This perception also influences the level of cooperation and coordination between military and civilian leaders.  Positive public support facilitates mission accomplishment.  Lack of public support, on the other hand, can seriously impede the effectiveness of military forces during the execution of DSCA operations.").

primary responsibility for maintaining civil order.  In rare cases, that consultation

has led past administrations and governors, working together, to federalize Guard

forces.  In 1992, for example, President George H.W. Bush responded to a request

from California Governor Pete Wilson and Los Angeles Mayor Tom Bradley by

federalizing the California National Guard and deploying active-duty troops during

the Los Angeles riots.[16]  In other instances, federal consultation with state

authorities has led the president to reach the opposite conclusion, such as in 2006

when Louisiana Governor Kathleen Blanco retained control over the Guard and

opposed federalization in response to Hurricane Katrina.[17]

Federalization without gubernatorial consent has occurred only in

exceptional circumstances where, for example, governors openly defied federal

law.  For instance, in 1957, President Eisenhower federalized the Arkansas

National Guard and deployed active-duty troops only after Arkansas Governor

Orval Faubus openly refused to comply with a federal court order to integrate

---

[16] Solcyre Burga, *Why Trump Sending the National Guard to L.A. Is Different From Its Deployment There in 1992*, Time Magazine (June 9, 2025), https://time.com/7292493/trump-national-guard-la-1992-riots/.

[17] Annabelle Timsit, Kyle Melnick, Alex Horton, *When Have Presidents Called in the National Guard to Quell Domestic Unrest?*, Wash. Post (June 9, 2025), https://www.washingtonpost.com/history/2025/06/09/national-guard-president-deployments/.

Little Rock Central High School.[18]  Similarly, in 1965, President Johnson

federalized Alabama's Guard, but only after Governor George Wallace refused to

follow a court order requiring that state officials protect civil rights marchers in

Selma.[19]  In neither instance, it should be noted, did the president rely on 10 U.S.C.

§ 12406 to federalize the state's National Guard.

     California presents no such exceptional circumstances. California's governor

and state authorities have not defied any federal law, but instead have actively

worked to quell unrest since it first arose.[20]  Moreover, these historical examples

highlight an additional constitutional norm that President Trump violated: the

practice of consultation before federalization of the National Guard.  Even in the

exceptional situations described above—where governors openly defied court

orders during one of the most contentious periods in the nation's history—

Presidents Eisenhower and Johnson first met in person with Governors Faubus and

---

[18] Bill Chappell, *What Happened When Lyndon Johnson Federalized the National Guard,* NPR (June 9, 2025), https://www.npr.org/2025/06/09/nx-s1-5428352/johnson-national-guard-history-eisenhower-alabama-civil-rights-trump-newsom.

[19] Paul J. Scheips, *The Role of Federal Military Force in Domestic Disorders, 1945–1992*, Army Hist. Series, CMH Pub. 30-20-1, at 162–63 (2012), https://www.govinfo.gov/content/pkg/GOVPUB-D114-PURL-gpo82975/pdf/GOVPUB-D114-PURL-gpo82975.pdf.

[20] *See, e.g.,* Will Conybeare, *More Than 500 Arrests Made Over 8 Days of Protests in Los Angeles,* KTLA (June 15, 2025), https://ktla.com/news/local-news/more-than-500-arrests-made-over-8-days-of-protests-in-los-angeles/ (noting that LAPD made over 500 arrests during one week of protests).

Wallace, respectively, to seek resolution without federal intervention.[21]  President

Trump, by contrast, abandoned this historically important practice of consultation

between state and federal authorities when he federalized California's Guard

without consent or coordination with California's governor.  This unprecedented

and extraordinary decision breaks sharply with longstanding constitutional practice

and undermines the spirit of cooperative federalism.

**IV.     The administration's interpretation of 10 U.S.C. § 12406 conflicts with
          this history and tradition of federal-state coordination.**

The administration's reading of 10 U.S.C. § 12406 departs from the long

tradition of federal-state cooperation in managing the National Guard.  The

Guard's dual-control structure reflects core federalist principles.  *See Perpich*, 496

U.S. at 345 (explaining dual-role structure of National Guard).  That structure

depends on good-faith collaboration—especially during domestic deployments.

To understand Section 12406 as authorizing the president to override a

governor's judgment in the absence of the most extraordinary circumstances is to

distort the constitutional balance among the federal government and the states.  It

is implausible that Congress intended to grant the president sweeping authority to

federalize the Guard without geographic or temporal limits even when a state is

already managing local unrest through civilian means.  *See, e.g.*, *Vermont Agency*

---

[21] Scheips, *supra* note 19, at 36, 162.

*of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 787 (2000) (noting "the ordinary rule of statutory construction that if Congress intends to alter the usual constitutional balance between States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute") (internal quotations omitted); *Gregory*, 501 U.S. at 461 ("[T]he States retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere."). Section 12406 provides *conditional* authority— triggered only by rebellion, invasion, or the inability to enforce federal law using regular forces—that limits federalization through a fact-based inquiry, and it instructs that federal authorities work with, rather than around, "the governors of the States." *See* 10 U.S.C. § 12406. The statute must, in other words, be understood against the background principle that "the preservation of the States, and the maintenance of their governments, are as much within the design and care of the Constitution as the preservation of the Union and the maintenance of the National Government." *New York*, 505 U.S. at 162 (internal quotation omitted).

The administration's expansive view of Section 12406 carries dangerous consequences. The domestic deployment of military forces in Los Angeles is, in amici's view, a novel and unwelcome challenge to the delicate constitutional balance that officials at all levels of government have for so long sought to maintain. Officials across the political spectrum recognize the challenges such

17

unilateral deployment poses, both immediate and precedential, to our constitutional order.

## V. The administration's interpretation of 10 U.S.C. § 12406 threatens public safety.

The administration's understanding of Section 12406 not only undermines state sovereignty but also deprives governors of a critical public safety tool. If federalization of the National Guard is unreviewable, a president motivated by ill will or competing policy priorities could divert Guard resources away from critical state needs, including wildfires, floods, or public health crises. Already, President Trump's federalization of the California National Guard has depleted its wildfire fighting taskforce by more than half during peak wildfire season,[22] and federalization has redirected Guard members away from California's counterdrug taskforce, which would normally be providing support to stop the trafficking of fentanyl at the Southern Border.[23]

When state National Guards are federalized, governors lose their most immediate and flexible resource for responding to large-scale emergencies. In

---

[22] Earlier this year, over 2,700 National Guard members were deployed by the governor to assist with the Los Angeles wildfire response. *See, e.g.*, Jon Soucy, *National Guard Members Continue LA Wildfire Response*, National Guard (Jan. 21, 2025), https://www.nationalguard.mil/News/Article-View/Article/4034416/national-guard-members-continue-la-wildfire-response/.

[23] *See* Addendum to Motion to Stay Lower Court Order, at A189, *Newsom v. Trump*, No. 25-3727 (9th Cir. June 12, 2025), ECF No. 5.

2007, the federalization and deployment of state National Guard personnel and equipment to Iraq and Afghanistan undermined the ability of governors to deploy the Guard in response to local disasters, such as when a tornado devasted Greensburg, Kansas during Governor Sebelius's tenure.[24] This is because governors rely on their state's National Guard members to act as first responders during domestic emergencies, particularly natural disasters. In 2011, Governor Patrick deployed up to 1,000 Massachusetts National Guard Members to respond to a tornado that left more than 30 miles of Western Massachusetts in ruin.[25] In 2017, Governor Wolf activated members of the Pennsylvania National Guard to provide safety and wellness checks in response to a winter storm that dumped over five feet of snow on Erie County.[26] In 2018 Governor Dayton called on the Minnesota National Guard to help firefighters combat a 500-acre wildfire in

---

[24] Susan Saulny & Jim Rutenberg, *Kansas Tornado Renews Debate on Guard at War*, N.Y. Times (May 9, 2007), https://www.nytimes.com/2007/05/09/us/09guard.html.

[25] *Up to 1,000 Guard Members Respond to Mass. Tornadoes*, National Guard (June 2, 2011) https://www.nationalguard.mil/News/Article-View/Article/608722/up-to-1000-guard-members-respond-to-mass-tornadoes/.

[26] *Pennsylvania National Guard Helping Shovel Out Erie County*, National Guard (Dec. 28, 2017), https://www.nationalguard.mil/News/Article-View/Article/1405023/pennsylvania-national-guard-helping-shovel-out-erie-county/.

Beltrami County.[27]  More recently, Governor Sisolak activated a record number of Nevada National Guard Soldiers and Airmen to support COVID-19 response efforts, including by providing medical support, setting up alternate care facilities, and managing supply distribution operations.[28]

By contrast, uncoordinated deployments of federalized Guard members—often untrained in civilian law enforcement—exacerbate confusion on the ground, strain resources, and undermine public confidence in both state and federal law enforcement.  Poorly planned call-ups also reduce troop morale and readiness and hurt Guard recruitment efforts.  *See* Army Field Manual at B-2 ("The pace of work in a disaster response and other incidents is demanding.  Leaders monitor their Soldiers to avoid physical exhaustion.  Rotating personnel between more demanding tasks and less demanding tasks mitigates the accumulation of fatigue. Leaders need to establish and enforce viable sleep plans.").[29]

---

[27] *Colo. and Minn. National Guard Assist in Fire Battles*, National Guard (Aug. 24, 2018), https://www.nationalguard.mil/News/Article-View/Article/1611406/colo-and-minn-national-guard-troops-assist-in-fire-battles/.

[28] *Nevada Guard Commits Record 800 Members to COVID-19 Fight*, National Guard (Apr. 15, 2020), https://www.nationalguard.mil/News/Article-View/Article/2150429/nevada-guard-commits-record-800-members-to-covid-19-fight/.

[29] Interviews with Guard members currently deployed in Los Angeles indicate "low morale and deep concern that the deployment may hurt recruitment for the state-based military force for years to come."  Shawn Hubler, *Trump's National Guard Troops Are Questioning Their Mission in L.A.*, N.Y. Times (July 16, 2025),

In short, when the federal government federalizes and deploys the National

Guard in a state without consent and coordination with state executives, it risks

creating precisely the kind of constitutional tension and practical harms that the

dual-role structure of the Guard was designed to prevent. *See* Robert

Leider, *Federalism and the Military Power of the United States*,

73 Vand. L. Rev. 989, 996 (2020) (asserting that separation of the professional

military and the state-federal militia system was intended to "limit federal military

power and to provide checks against the use of illegitimate force by private parties,

state actors, and federal officials"). It also raises the alarming possibility that a

president could ask politically allied governors to deploy Guard troops from one

state into another without the latter state's consent,[30] creating the very kind of

interstate friction and erosion of local control that the Guard's dual federal–state

structure was designed to avoid while also undermining the type of altruistic

cooperation between states that is often necessary during natural catastrophes.[31]

---

https://www.nytimes.com/2025/07/16/us/trump-national-guard-california.html.

[30] *See, e.g.*, *Three Republican-Led States to Send Hundreds of National Guard Troops to Washington*, NPR (Aug. 17, 2025), https://www.npr.org/2025/08/17/nx-s1-5505271/three-republican-led-states-to-send-hundreds-of-national-guard-troops-to-washington.

[31] *See, e.g.,* Hannah Hudnall, *Illinois Sends Search and Rescue Team to Texas for Flood Relief*, Journal Star (July 15, 2025), https://www.pjstar.com/story/news/2025/07/15/texas-flood-relief-illinois-

The Guard exists to serve as a responsive, state-controlled force that may augment federal capacity *in coordination with*—not *in defiance of*—state and local leadership.  Disregarding that balance threatens constitutional norms and impairs emergency response nationwide.

## VI.    The courts play a critical role in protecting this balance of federal-state authority.

The President's assertion of unreviewable authority under 10 U.S.C. § 12406 to federalize the California National Guard conflicts with the Constitution, undermines the judiciary's duty to uphold our federalist structure, and contravenes long-standing principles of state sovereignty. Judicial review is especially critical where one sovereign encroaches on another's authority to police domestic unrest.

"It is emphatically the province and duty of the judicial department to say what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803), including "determining the limits of statutory grants of authority."  *Stark v. Wickard*, 321 U.S. 288, 310 (1944).  Courts routinely resolve questions "of great importance and delicacy in determining whether particular sovereign powers have been granted by the Constitution to the Federal Government or have been retained by the States."  *New York*, 505 U.S. at 155 (internal quotation omitted).  "Although it is the obligation of all officers of the Government to respect the constitutional

----

sends-search-and-rescue-team-pritzker-emergency-management/85206476007/.

design, the federal balance is too essential a part of our constitutional structure and plays too vital a role in securing freedom for [the Court] to admit inability to intervene when one or the other level of Government has tipped the scales too far." *Lopez*, 514 U.S. at 578 (Kennedy, J., concurring) (internal citations omitted). Time and again, the Supreme Court has affirmed the critical role the judiciary fills in resolving disputes involving state sovereigns challenging overreaching federal action. *See, e.g.*, *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 473–74 (2018); *Printz*, 521 U.S. at 919; *New York*, 505 U.S. at 155.[32]

Federal courts also interpret statutes with sensitivity to state sovereignty. *See Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) (warning against broad readings of federal statutes that intrude into areas traditionally regulated by the states). This presumption applies with particular force where courts are asked to determine if the federal government is intruding on a state's police powers. *See Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947) ("[W]e start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.").

---

[32] In this case, the Plaintiff is the Governor of California, the chief executive of a sovereign entity afforded the protections of the Tenth Amendment and recognized in the Guarantee Clause of the U.S. Constitution. Unlike the individual litigants in *Martin v Mott*, 25 U.S. 19 (1827) and *Luther v. Borden*, 48 U.S. (7 How.) 1 (1849), therefore, the Governor, suing as the chief executive of a sovereign state, is entitled to an adjudication by an Article III court.

Section 12406 contains no language suggesting that Congress committed to the president the unfettered discretion to displace state authority over the Guard without any judicial oversight. Rather, the statute provides conditional authority tied to defined emergencies—rebellion, invasion, or inability to execute federal law with regular forces—and contains no grant of unchecked discretion. *See Laird v. Tatum*, 408 U.S. 1, 15–16 (1972) ("Indeed, when presented with claims of judicially cognizable injury resulting from military intrusion into the civilian sector, federal courts are fully empowered to consider claims of those asserting such injury."). Nothing in Section 12406 purports to grant the president unreviewable authority to deploy the Guard anywhere, anytime, based on whatever facts that the president, in his sole discretion, deems sufficient, and without consultation with the state's chief executive. Yet that is precisely the type of unchecked power the president seeks to establish here.

When Congress intends to grant the president (or others) unreviewable decision-making authority, it does so with unmistakable language. In *Trump v. Hawaii*, for example, the Supreme Court held that 8 U.S.C. § 1182(f) "exudes deference to the President in every clause" and "entrusts to the President the decisions whether and when" to exercise the authority granted by the statute. 585 U.S. 667, 684 (2018). The Court catalogued the statute's repeated use of "shall

deem" and "may deem" to conclude that Congress intended to grant the president unreviewable discretion over immigration restrictions. *Id*.

Likewise, in *Webster v. Doe*, the Supreme Court reached the same conclusion with respect to Section 102(c) of the National Security Act of 1947. 486 U.S. 592 (1988). The Court emphasized that Section 102(c) allows termination of an Agency employee whenever the Director "'shall *deem* such termination necessary or advisable in the interests of the United States' (emphasis added), not simply when the dismissal *is* necessary or advisable to those interests." *Id*. at 600. Moreover, Section 102(c) explicitly grants the Director authority to act "in his discretion"—deferential language that reinforces Congress's intent to limit judicial review. *See id*. at 594. As in *Trump v. Hawaii,* the Court concluded that the language "fairly exudes deference to the Director, and appears to us to foreclose the application of any meaningful judicial standard of review." *Id*. at 600.

Section 12406, by contrast, lacks the sweeping language of the INA or NSA, and limits the exercise of the president's authority by reference to the existence of a listed predicate. *Compare* 10 U.S.C. § 12406 (stating that "whenever" certain factual predicates are met the president may federalize the National Guard of any state), *with* 8 U.S.C. § 1182(f) (stating that "whenever the President finds" that certain factual predicates are met the president may restrict entry of certain foreign

nationals). These textual differences reflect the variable scope of presidential authority: the president's power is at its zenith in matters concerning immigration and foreign affairs, *see, e.g.*, *United States v. Curtiss-Wright Export Corp*., 299 U.S. 304, 320 (1936) (noting the "plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations"), but the president's power over state militias is non-plenary and remains more circumscribed, *see, e.g.,* 10 U.S.C. § 12301(b) (requiring gubernatorial consent to activate National Guard in certain circumstances). It is precisely where presidential authority is non-plenary and constrained by statutory predicates that judicial oversight becomes necessary to enforce constitutional and statutory boundaries.

This Court need not define the outer limits of presidential authority to conclude that the action here—federalizing California's Guard without clear statutory justification or state consent—is subject to review and incompatible with federalist principles.

## CONCLUSION

For the reasons set forth above, amici curiae respectfully request that the Court affirm the district court's temporary restraining order enjoining the federalization of the California National Guard in Los Angeles.

DATED: September 9, 2025

Julia Spiegel
GOVERNORS ACTION ALLIANCE
2300 N. St., NW, Suite 501A
Washington, D.C. 20037

Charanya Krishnaswami
GOVERNORS SAFEGUARDING
DEMOCRACY
2300 N. St., NW, Suite 501A
Washington, D.C. 20037

*/s/ Carey R. Dunne*
Carey R. Dunne
   *Counsel of Record*
Kevin Trowel
Zack Goldberg
Martha Reiser
FREE AND FAIR LITIGATION GROUP, INC.
266 W. 37th St., 20th Floor
New York, NY 10018

Joseph T. Baio
JOSEPH T. BAIO LLC
240 Centre Street
New York, NY 10013

*Counsel for Bipartisan Former
Governors*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 25-3727

I am the attorney or self-represented party.

**This brief contains** | 6,726 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [          ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Carey R. Dunne | **Date** | September 9, 2025
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*