No. 25-3727

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

GAVIN NEWSOM, *et al.*,

*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, *et al.*,

*Defendants-Appellants*

**On Appeal from the United States District Court
for the Northern District of California**
No. 3:25-cv-04870
The Honorable Charles R. Breyer

---

**BRIEF OF *AMICI CURIAE* VET VOICE FOUNDATION AND RETIRED
SENIOR MILITARY OFFICERS IN SUPPORT OF PLAINTIFFS-
APPELLEES AND AFFIRMANCE**

---

Christine P. Sun
STATES UNITED DEMOCRACY CENTER
506 S Spring St, #13308
Los Angeles, CA 90013
(202) 999-9305


*Attorneys for* Amici Curiae *Vet
Voice Foundation and Retired
Senior Military Officers*

J. Andrew Boyle
   *Counsel of Record*
Maithreyi Ratakonda
STATES UNITED DEMOCRACY CENTER
45 Main Street, Suite 320
Brooklyn, NY 11201
(202) 999-9305

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................... ii

IDENTITY AND INTEREST OF AMICUS CURIAE ............................................1

SUMMARY OF ARGUMENT .............................................................10

ARGUMENT ...............................................................................10

    I.    There is—and Must be—a High Bar for Military Deployment to Respond to Civilian Disturbances .......................................................10

    II.    Domestic Deployment of the Military Can Lead to Harmful Consequences .....................................................................12

        A.    The U.S. Military Must Remain a Nonpartisan Institution ......12

        B.    The Military is Being Deployed Here in a Deeply Political Context .......................................................................15

        C.    This Deployment Will Harm the Military's Reputation and Morale .......................................................................18

    III.    Courts Have an Essential Role to Play in Ensuring that the Military Operates within the Law .....................................................23

CONCLUSION ...............................................................................25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Greer v. Spock*, 424 U.S. 828 (1976) ........................................................13

*Laird v. Tatum*, 408 U.S. 1 (1972) ............................................................10

*Marbury v. Madiso*n, 5 U.S. 137, 177 (1803) ...........................................23

**Statutes**

10 U.S.C. § 12406 ................................................................................ 11, 24

10 U.S.C. § 275 ..........................................................................................11

18 U.S.C. § 1385 ........................................................................................11

**Other Materials**

Amb. Douglas A. Silliman et al., *The Strength of America's Apolitical Military*, Just Security (June 15, 2020) ..........................................................15

Andrew Gumbel, *Troops and marines deeply troubled by LA deployment: 'Morale is not great'*, The Guardian (June 12, 2025) ......................................... 18, 23

Colonel Charles, J. Dunlap, Jr., *The Police-ization of the Military*, 27 J. Polit. Mil. Sociol. 217 (1999) ........................................................................22

*Confidence in Institutions*, Gallup (last visited Aug. 25, 2025) ..............................19

Donald J. Trump, President of the United States, Address at the 250th Anniversary of the Army at Fort Liberty (June 10, 2025) ......................................... 16, 21

Ed Pilkington, *Trump LA protest response risks turning US military into political force, veterans warn*, The Guardian (June 9, 2025) ............................... 18, 24

Exec. Order No. 14288, 90 Fed. Reg. 18765 (April 28, 2025) ...............................21

General George Marshall, Speech at Trinity College (June 15, 1941), *in* Papers of George Catlett Marshall, 1941 .......................................................21

Jeremy S. Weber*, Political Speech, the Military, and the Age of Viral Communication*, 69 A.F.L. Rev. 91 (2013) ...................................................14

Jim Garamone, *Active-Duty Personnel Must Remian Apolitical, Nonpartisan, Dunford Says*, U.S. Dep't of Def. News (Aug. 1, 2016) ..............................15

Joey Garrison, *President Trump says other US cities could be next as he deploys National Guard to DC*, USA Today (Aug. 11, 2025) ...................................24

Kathleen J. McInnis, Cong. Rsch. Serv., IF 11566, *Congress, Civilian Control of the Military, and Nonpartisanship* (June 10, 2020) ......................................13

Ken Klippenstein, *Video: Troops Question Los Angeles Deployment*, Substack (Jul 22, 2025) .................................................................................................23

Konstantin Toropin & Steve Beynon, *Bragg Soldiers Who Cheered Trump's Political Attacks While in Uniform Were Checked for Allegiance, Appearance*, Military.com (June 11, 2025)............................................ 17, 18

Lindsay P. Cohn, *Domestic Policing Deployment and Public Trust in the Military*, Lawfare (Oct. 10, 2024) .................................................................................22

Memorandum on Department of Defense Security for the Protection of Department of Homeland Security Functions, 2025 Daily Comp. Pres. Doc. 672 (June 7, 2025) ...................................................................................................24

National Guard Bureau Historical Services, *Federalizations of the Guard for Domestic Missions through 2025* (June 9, 2025) ..........................................12

Proclamation No. 3972, 35 Fed. Reg. 5001 (Mar. 23, 1970) ...................................12

Ret. Army Gen. Joseph Votel, *An Apolitical Military is Essential to Maintaining Balance Among American Institutions*, Army Times (June 8, 2020)............15

Shawn Hubler, *Trump's National Guard Troops Are Questioning Their Mission in L.A.*, The New York Times (Jul. 16, 2025) ...................................... 19, 22, 23

Stephen Groves, *Trump suggests he'll use the military on 'the enemy from within' the U.S. if he's reelected*, PBS News (Oct. 13, 2024) ...................................21

The Lawfare Podcast, *Lawfare Daily: Civil Military Relations in the Trump Administration*, Lawfare (Jul. 2, 2025) ........................................................20

U.S. Dep't of Air Force, Instr. 51-902, Political Activities By Members of the U.S. Air Force (27 Aug. 2014) .................................................................................14

U.S. Dep't of Army, *The Army: A Primer to Our Profession of Arms* (May 1, 2025)...................................................................................................14

U.S. Dep't of Navy, Sec'y of Navy Instr. 5720.44C, Department of the Navy Public Affairs Policy and Navy Regulations (21 Feb. 2012) .......................14

U.S. Dep't of Veterans Affairs, Veterans Health Admin., Heath Systems Research,
*Moral Injury and Mental Heath Among US Military Service Members and
Veterans* (2024) ......................................................................................22

## IDENTITY AND INTEREST OF AMICI CURIAE[1]

*Amicus curiae*, Vet Voice Foundation ("VVF"), is a veteran-led, non-profit, non-partisan organization representing almost two million veterans, military family members, and their supporters. VVF represents veterans and military families across the political spectrum and across the country. It strives to support them and their interests, including by championing policies and actions that protect our country's freedoms and advance our national security.

*Amici curiae* retired senior military officers have extensive experience in leadership roles in the U.S. military, expertise in the factors that contribute to a strong and motivated military force, and demonstrated devotion to the strength of the U.S. military as well as to the United States. Abbreviated biographies for these individuals are included here to give a sense of the well-informed perspectives they bring to this case:

**Lieutenant General (Ret.) Karen Gibson, U.S. Army** was appointed Sergeant at Arms of the U.S. Senate in March 2021, becoming the Senate's chief law enforcement and protocol officer, responsible for Capitol security, emergency preparedness, continuity of government, cybersecurity, technology, and a wide

---

[1] As required by Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* provide this statement: no counsel for a party authored this brief in whole or in part. No person other than amici or their counsel made a monetary contribution to this brief's preparation or submission.

range of support services. A retired U.S. Army Lieutenant General with 33 years of service, she held senior intelligence and cyberspace roles including Deputy Director of National Intelligence for National Security Partnerships, Director of Intelligence for U.S. Central Command, Director of Intelligence for Operation Inherent Resolve, and Deputy Commanding General of U.S. Army Cyber Command. A seasoned combat veteran with leadership experience in Iraq, Afghanistan, Korea, and East Africa, she has been awarded the National Intelligence Distinguished Service Medal and the Distinguished Superior Service Medal with combat device.

**Lieutenant General (Ret.) Claudia Kennedy, U.S. Army** was commissioned as a Second Lieutenant in the U.S. Army in 1969 and went on to become the first woman in the Army to attain the rank of three-star general in 1997. Over her 32-year career, she specialized in intelligence and cryptology, serving in Germany, South Korea, and a range of leadership roles across the Army, including commanding the 3d Operations Battalion in Augsburg, the San Antonio Recruiting Battalion, and the 703d Military Intelligence Brigade in Hawaii. She also served as Deputy Commander of the U.S. Army Intelligence Center and Assistant Commandant of the Army Intelligence School. A member of the Military Intelligence Hall of Fame, her honors include multiple Legions of Merit, the Defense Meritorious Service Medal, and the Meritorious Service Medal.

**Major General (Ret.) Paul D. Eaton, U.S. Army** served in the U.S. Army for 33 years. General Eaton's military career includes command of Infantry units from company to brigade levels, as well as serving as Commanding General of the Infantry Center at Fort Benning and Chief of Infantry. From 2003 to 2004, he led the effort to build the Iraqi Security Forces as Commanding General of the training command in Iraq—establishing the structure and infrastructure for both the Iraqi Armed Forces and Interior Ministry forces. His other operational deployments include Somalia, Bosnia, and Albania. Additional key assignments included service on the Joint Staff, Deputy Commanding General for Transformation and Stryker Unit Development, and as Assistant Professor and head of the French Department at West Point.

**Major General (Ret.) Randy Manner, U.S. Army** served over three decades in the U.S. Army, culminating in senior leadership roles at the Pentagon and overseas. He was Deputy Commanding General of the U.S. 3rd Army in Kuwait, Acting Vice Chief of the National Guard Bureau, and Acting and Deputy Director of the Defense Threat Reduction Agency. His career included facilitating the 2010 withdrawal of U.S. forces from Iraq, supporting efforts to neutralize Russian chemical weapons, overseeing investments in biological defense research on pathogens like Ebola, coordinating military disaster response for U.S. states, and leading red-team assessments of critical Department of Defense systems

3

against cyber and physical threats. His service and leadership were recognized with numerous awards, including the Distinguished Service Medal with Bronze Oak Leaf Cluster, Defense Superior Service Medal with Bronze Oak Leaf Cluster, Legion of Merit, Bronze Star Medal, and the Meritorious Service Medal with seven Oak Leaf Clusters.

**Major General (Ret.) Trish Rose, U.S. Air Force** served more than three decades in the U.S. Air Force, where she held key leadership roles in logistics, engineering, and security across the Air Force and joint commands. Commissioned in 1984, she began her career as an aircraft maintenance officer and went on to command the 36th Aerial Port Squadron at McChord Air Force Base. She later directed joint logistics in Southwest Asia in support of Operations Iraqi Freedom and Enduring Freedom and served as a senior logistics leader for U.S. Pacific Command and Air Force Materiel Command. Rising to the rank of Major General in 2013, her career was marked by extensive operational experience, global deployments, and contributions to sustainment, readiness, and force protection. She is the recipient of numerous awards, including the Defense Superior Service Medal and the Legion of Merit.

**Major General (Ret.) Linda Singh, Army National Guard** was the first African American and first woman to serve as Maryland's Adjutant General, has dedicated more than 30 years to military service in both enlisted and officer ranks.

4

Commissioned through Officer Candidate School in 1991, she has held staff and command positions at every level, including as commander of the Maryland Army National Guard and director of the Joint Staff, Maryland National Guard. Singh deployed to Kosovo and completed a combat tour in Afghanistan in support of Operation Enduring Freedom. In 2015, she was appointed the state's top military officer, responsible for leading the Maryland Military Department, overseeing the readiness, training, and administration of more than 6,700 service members and managing a budget of over $314 million. Her numerous decorations include the Distinguished Service Medal, Legion of Merit, Bronze Star Medal, Meritorious Service Medal, Army Commendation Medal, Afghanistan Campaign Medal, Kosovo Campaign Medal, NATO Medal, Maryland Distinguished Service Cross.

**Major General (Ret.) Tammy Smith, U.S. Army** served 35 years in the United States Army, culminating her career at the Pentagon as Military Advisor to the Assistant Secretary of the Army (Manpower and Reserve Affairs), where she oversaw quality-of-life programs for more than one million soldiers and families across the Active, Guard, and Reserve force. A logistics officer by training, she held command and staff positions worldwide, including deployments in Panama, Costa Rica, Afghanistan, and South Korea, and served as Deputy Commanding General of the Eighth Army. In 2012 she became the military's first openly LGBT general officer, using her platform to advance inclusion and diversity across the

5

force, earning the Secretary of the Army Diversity in Leadership Award. A decorated combat veteran, her honors include the Distinguished Service Medal, Bronze Star Medal, Legion of Merit, and Combat Action Badge, and she was inducted into the Army ROTC Hall of Fame in 2016.

**Brigadier General (Ret.) Steven M. Anderson, U.S. Army** served a 31-year career in the U.S. Army, specializing in logistics across key command and staff assignments in Korea, Iraq, Kuwait, Afghanistan, Germany, Hawaii, and the Pentagon. His most significant role was as Deputy Chief of Staff for Logistics to General David H. Petraeus during the Multi-National Force in Iraq from 2006 to 2007, where he oversaw critical sustainment operations during the height of the conflict. Anderson retired in 2010 and was recognized with numerous awards, including the Distinguished Service Medal with Oak Leaf Cluster and the Bronze Star.

**Brigadier General (Ret.) Paul G. Smith, U.S. Army** is a retired Massachusetts National Guard officer whose more than three-decade career included command at the company, battalion, and brigade levels, culminating as Assistant Adjutant General – Army. He also served as Commander of the Land Component Command and as a Dual-Status Commander, where he led Army force development initiatives in suicide prevention, drug abuse reduction, sexual assault prevention, resiliency, and diversity. General Smith directed the State Partnership

6

Program with the Republic of Paraguay, supporting the development of United Nations peacekeeping forces, and represented Massachusetts on the Military Interstate Children's Compact Commission as well as the National Guard Bureau Joint Diversity Executive Council. As Commander of Joint Task Force – Massachusetts, he oversaw emergency responses to the Western Massachusetts tornado, Hurricanes Irene and Sandy, severe winter storms, and the Boston Marathon Bombings. His service is recognized with numerous awards, including the Meritorious Service Medal with four oak leaf clusters and the Army Commendation Medal with four oak leaf clusters.

**Brigadier General (Ret.) Robin B. Umberg, U.S. Army** began her Army career at 18 and was commissioned in 1977 after earning a nursing scholarship at Walter Reed. Over 36 years of active and reserve service, she held command and staff roles across the U.S. and overseas, including deployments during Operations Desert Shield and Desert Storm, and earned high honors such as the Legion of Merit and the Civilian Humanitarian Service Medal. As Chief of Professional Services for the 3rd Medical Command, she advised on readiness and career management for more than 27,000 medical personnel, and in 2006 was inducted into the Military Order of Medical Merit. Following her military retirement in 2010, she continued serving veterans as Undersecretary of California Department of Veteran Affairs, where she modernized long-term care for aging, disabled, and

7

homeless veterans. Appointed to the board of visitors at West Point, Umberg has dedicated her career to service, leadership, and advocacy for veterans. She earned the Lifetime Achievement Award for her service to veterans.

**Rear Admiral (LH) (Ret.) Michael S. Baker, M.D., F.A.C.S.** is a retired general and trauma surgeon and Rear Admiral, U.S. Navy (Ret.), with a distinguished dual career in medicine and military service. Board certified in General Surgery with fellowship training in cardiovascular surgery, he served as a surgery department chair for more than 20 years and was on the clinical faculty at two medical schools. He has published over 100 peer-reviewed articles, lectured widely at national and international conferences, and taught at U.S. military bases around the world. Dr. Baker has completed 5 tours in Ukraine during the current war to teach Advanced Trauma Life Support to doctors and nurses with the International Medical Corps. In the Navy, he specialized in combat casualty care, triage, trauma, operational medicine, and disaster response, retiring after 30 years with three Legions of Merit, the Marine Corps Combat Action Ribbon, and the Combat Craft River Warfare pin.

*Amici* have a strong interest in this case because federalizing the National Guard on the premise of either "rebellion" or inability to enforce federal law, and the deployment of federal troops (comprised of both Marines and the federalized National Guard) within the United States to address civilian disturbances should

8

occur only in extreme and rare circumstances, as prescribed by law. Deployment of these forces domestically where their assistance is not justified can result in a raft of deleterious short and long-term consequences, including damaging civilian trust in the military and undermining the integrity of the military itself. In particular, domestic deployment for civilian disturbances in circumstances that have been politicized deeply affects morale within the military community and erodes the view of the military as a politically neutral force whose mission is to protect and serve the country and the people in it. The deployment that is the subject of this case is of grave concern to *amici*.

*Amici* submit this brief to ensure that the perspective of veterans, military families, and former high-ranking military leaders—based on their knowledge of, and service in, the military and their strong interest in the integrity and reputation of the military—is represented before this Court.

## SUMMARY OF ARGUMENT

The federalization of the California National Guard and deployment of federal forces to Los Angeles against the will of state and local authorities should give any supporter of the military and military members pause. Due to strong legal and moral constraints, such actions have occurred rarely in the history of this country, and that must continue to remain the case. It is the role of the judiciary—a vital check on executive authority—to ensure that any orders that federalize the National Guard and deploy the military in the context of domestic disturbances are properly cabined within one of the circumscribed legal provisions that Congress, pursuant to its Article I powers, has permitted. Deferring too greatly to the executive in these matters risks the morale of military troops and the trust of military communities. Furthermore, it gravely undermines the reputation and integrity of the military as an institution, all of which can harm the military's effectiveness. While the President is the commander-in-chief, all branches of government have a role in ensuring the proper use of the military domestically.

## ARGUMENT

## I.      There is—and Must be—a High Bar for Military Deployment to Respond to Civilian Disturbances

As the Supreme Court has correctly recognized, "a traditional and strong resistance of Americans to any military intrusion into civilian affairs . . . has deep roots in our history." *Laird v. Tatum*, 408 U.S. 1, 15 (1972). The laws of our nation

10

reflect this by, for example, setting a default of prohibiting use of the military for domestic law enforcement except as "expressly authorized by the Constitution or Act of Congress." 18 U.S.C. § 1385; *see also* 10 U.S.C. § 275.

The law that President Trump has invoked here, 10 U.S.C. § 12406, allows for federalization of the National Guard when at least one of three circumstances exist: 1) when the country has been invaded or is in danger of being invaded by a foreign country; 2) when there is a rebellion against the government, or a danger of such rebellion; or 3) when "the President is unable with the regular forces to execute the laws of the United States." The predicates on which the law rests—invasion, rebellion, an inability to execute federal law with the vast power of the federal government's "regular forces"—speak to the high bar that must be met before the threshold of employing the military in the civilian context is utilized.

Recognizing that the United States military is not a domestic law enforcement organization, prior presidents have only rarely—particularly since the advent of modern federal law enforcement capabilities—called upon the military to be deployed within the country's borders in response to civilian disturbances. Rarer still is to do so over the objection of states' governors, who have their own authority over law enforcement and the National Guard. As to the specific federal authority invoked here, the National Guard Bureau Historical Services identifies a single instance when a President relied solely on 10 U.S.C. § 12406; that was over

fifty years ago, when the Guard was federalized in 1970 during a "wildcat" strike of the United States Postal Service employees in order to deliver mail. Proclamation No. 3972, 35 Fed. Reg. 5001 (Mar. 23, 1970). There are many reasons that such domestic deployments concerning civilian disturbances are rare, not the least of which is the harm to the military and its community.[2]

## II.    Domestic Deployment of the Military Can Lead to Harmful Consequences

The laws restricting use of the military in regards to domestic civilian disturbances and prior administrations' rare use of the legal exceptions make clear that troops should only be federalized or deployed in situations where there is a clear and urgent need that cannot be satisfied by local and state law enforcement, and where the deployment squarely fits within a permissible basis granted by Congress. This is for good reason, as deployment of the military within our country's borders to be used against its population is not only contrary to core American values, but can also be harmful to the reputation, integrity, and morale of the military itself.

### A.    The U.S. Military Must Remain a Nonpartisan Institution

---

[2] National Guard Bureau Historical Services, *Federalizations of the Guard for Domestic Missions through 2025* (June 9, 2025), https://www.nationalguard.mil/Portals/31/Documents/FEDERALIZATION-OF-GUARD-UP-TO-2025.pdf.

A foundational precept of the U.S. military is that it is apolitical. Indeed, "the widely held view is that a military that is nonpartisan is able to serve the sovereign American people regardless of party and to defend all Americans regardless of their affiliation. This, in turn, protects and enables the process of American democracy to occur without fear of military intervention to shape or mandate a particular political outcome."[3] The U.S. Supreme Court has observed that the

> military as such is insulated from both the reality and appearance of acting as a handmaiden for partisan political causes or candidates. Such a policy is wholly consistent with the American constitutional tradition of a politically neutral military establishment under civilian control. It is a policy that has been reflected in numerous laws and military regulations throughout our history.

> *Greer v. Spock*, 424 U.S. 828, 839 (1976).

Military institutions and experts have repeatedly emphasized that the military must stand as a nonpartisan institution within American society. Each service branch has policies and directives explaining the importance of political nonpartisanship. For example, an Army primer states: "Nonpartisanship assures the public that our Army will always serve the Constitution and our people loyally and

---

[3] Kathleen J. McInnis, Cong. Rsch. Serv., IF 11566, *Congress, Civilian Control of the Military, and Nonpartisanship* (June 10, 2020), https://www.congress.gov/crs_external_products/IF/PDF/IF11566/IF11566.1.pdf.

13

responsively."[4] The Air Force instructs that "members are prohibited from engaging in certain political activities . . . in order to maintain good order and discipline."[5] And the Navy's policy states: "U.S. Armed Forces must refrain from any activity or association that could be interpreted as linking the Services with political causes, candidates, or organizations."[6]

Respected and high-ranking military leaders agree. In 2008, the Chairman of the Joint Chiefs of Staff wrote a letter to all service members stating: "A professional armed force that stays out of the politics that drive the policies it is sworn to enforce is vital to the preservation of the union and to our way of life."[7] Marine Corps General Joe Dunford, when he was chairman of the Joint Chiefs of Staff, stated that the American people need to see the military "as an apolitical organization that swears an oath to the Constitution of the United States—not an individual, not a party, not a branch of government—the Constitution of the United States."[8] And in 2020, 612 former officials including from diplomatic and military

---

[4] U.S. Dep't of Army, *The Army: A Primer to Our Profession of Arms* at 12 (May 1, 2025), https://armypubs.army.mil/ProductMaps/PubForm/Details.aspx?PUB_ID=103102.
[5] U.S. Dep't of Air Force, Instr. 51-902, Political Activities By Members of the U.S. Air Force sec. 1 (27 Aug. 2014).
[6] U.S. Dep't of Navy, Sec'y of Navy Instr. 5720.44C, Department of the Navy Public Affairs Policy and Navy Regulations § 0103(1) (21 Feb. 2012).
[7] Jeremy S. Weber*, Political Speech, the Military, and the Age of Viral Communication*, 69 A.F.L. Rev. 91, 102 (2013).
[8] Jim Garamone, *Active-Duty Personnel Must Remian Apolitical, Nonpartisan, Dunford Says*, U.S. Dep't of Def. News (Aug. 1, 2016),

14

backgrounds wrote: "Misuse of the military for political purposes would weaken the fabric of our democracy, denigrate those who serve in uniform to protect and defend the Constitution, and undermine our nation's strength abroad."[9]

Moreover, military leaders have recognized that an apolitical military is especially important when it comes to domestic deployments such as this one: "[The] employment of military personnel in support of civilian law enforcement is an extremely delicate matter and one fraught with tremendous peril. When not done thoughtfully, it endangers the apolitical reputation of the military."[10]

### B.    The Military is Being Deployed Here in a Deeply Political Context

Unfortunately, the context of the current deployment has been deeply politicized, placing the military in an untenable position. President Trump himself has repeatedly charged the situation with political invective, by levying partisan attacks against California's state and local officials. He has even gone further and

---

https://www.defense.gov/News/News-Stories/Article/Article/881624/active-duty-personnel-must-remain-apolitical-nonpartisan-dunford-says/#:~:text=%E2%80%9CImportantly%2C%20as%20an%20institution%2C,it%20in%20a%20recent%20session.

[9] Amb. Douglas A. Silliman et al., *The Strength of America's Apolitical Military*, Just Security (June 15, 2020), https://www.justsecurity.org/70608/the-strength-of-americas-apolitical-military/.

[10] Ret. Army Gen. Joseph Votel, *An Apolitical Military is Essential to Maintaining Balance Among American Institutions*, Army Times (June 8, 2020), https://www.armytimes.com/opinion/commentary/2020/06/08/an-apolitical-military-is-essential-to-maintaining-balance-among-american-institutions/.

explicitly tied the deployment of troops to these political attacks.[11] In speeches in front of military members and in social media posts, he has castigated state and local officials claiming that they have "paid troublemakers" and are "Radical Democratic Politicians."[12] And he has branded state and local leaders, as well as

---

[11] *See, e.g.*, Donald Trump (@realDonaldTrump), Truth Social (June 7, 2025, 11:41 PM), https://truthsocial.com/@realDonaldTrump/posts/114646378582957392 (Great job by the National Guard in Los Angeles after two days of violence, clashes and unrest. We have an incompetent Governor (Newscum) and Mayor (Bass) . . . .These Radical Left protests, by instigators and often paid troublemakers, will NOT BE TOLERATED . . . . Again, thank you to the National Guard for a job well done!"); Donald Trump (@realDonaldTrump), Truth Social (June 9, 2025, 9:10 AM), https://truthsocial.com/@realDonaldTrump/posts/114654277401980803 ("We made a great decision in sending the National Guard to deal with the violent, instigated riots in California. If we had not done so, Los Angeles would have been completely obliterated. The very incompetent 'Governor,' Gavin Newscum, and 'Mayor,' Karen Bass . . . . choose to lie to the People of California and America by saying that we weren't needed."); Donald Trump (@realDonaldTrump), Truth Social (June 12, 2025, 4:10 AM), https://truthsocial.com/@realDonaldTrump/posts/114670085083632579 ("[W]ithout the Military, Los Angeles would be a crime scene like we haven't seen in years. Governor Gaven NewScum had totally lost control of the situation. He should be saying THANK YOU for saving his ass, instead of trying to justify his mistakes and incompetence!!!").

[12] *See, e.g.*, Donald J. Trump, President of the United States, Address at the 250th Anniversary of the Army at Fort Liberty (June 10, 2025) (transcript available here: https://rollcall.com/factbase/trump/transcript/donald-trump-speech-250th-anniversary-army-fort-liberty-north-carolina-june-10-2025/) (hereinafter Address at Fort Liberty) ("In Los Angeles, the governor of California, the mayor of Los Angeles, they're incompetent and they paid troublemakers, agitators and insurrectionists. They're engaged in this willful attempt to nullify federal law and aid the occupation of the city by criminal invaders. That's what it is. They're invaders, no different."); Donald Trump (@realDonaldTrump), Truth Social (June 15, 2025, 5:43 PM), https://truthsocial.com/@realDonaldTrump/posts/114690267066155731 ("Every

16

other Democrats as enemies who "are sick of mind, hate our Country, and actually want to destroy our Inner Cities."[13]

In one particularly disturbing example, on June 10th the President gave a highly partisan speech in front of the military at Fort Bragg, North Carolina, that included remarks regarding the deployment in Los Angeles. He attacked California's Democratic leaders, "goading jeers from a crowd of soldiers positioned behind his podium—blurring the long-standing and sacrosanct line between the military and partisan politics."[14] The soldiers selected to be behind the President and therefore visible to cameras were reportedly chosen based on, *inter alia*, political leanings.[15] One military commander called the situation "shameful," and stated, "This has been a bad week for the Army for anyone who cares about us

---

[13] day, the Brave Men and Women of ICE are subjected to violence, harassment, and even threats from Radical Democrat Politicians.").

[13] Donald Trump (@realDonaldTrump), Truth Social (June 15, 2025, 5:43 PM), https://truthsocial.com/@realDonaldTrump/posts/114690267066155731("These, and other such Cities, are the core of the Democrat Power Center, where they use Illegal Aliens to expand their Voter Base, cheat in Elections, and grow the Welfare State, robbing good paying Jobs and Benefits from Hardworking American Citizens. These Radical Left Democrats are sick of mind, hate our Country, and actually want to destroy our Inner Cities.").

[14] Konstantin Toropin & Steve Beynon, *Bragg Soldiers Who Cheered Trump's Political Attacks While in Uniform Were Checked for Allegiance, Appearance*, Military.com (June 11, 2025), https://www.military.com/daily-news/2025/06/11/bragg-soldiers-who-cheered-trumps-political-attacks-while-uniform-were-checked-allegiance-appearance.html.

[15] *Id.*

17

being a neutral institution."[16] Retired Lieutenant General Russel Honoré agreed: "@POTUS Speech at #FortBragg was inappropriate, criticizing previous administration, and Generals while speaking to troops, I never witnessed that S..t like this in 37 years in Uniform."[17]

The baldly politicized context of the current deployment has been recognized by other military veterans as well. *Amicus* Major General Paul Eaton (Ret.) has observed that the deployment to California "is a politicization of the armed forces."[18] And as Janessa Goldbeck, CEO of *amicus* VVF and a Marine Corps veteran, has stated: "Among all that I spoke with, the feeling was that the Marines are being used as political pawns, and it strains the perception that Marines are apolitical."[19]

### C.  This Deployment Will Harm the Military's Reputation and Morale

---

[16] *Id*.

[17] Russel L. Honoré (@ltgrusselhonore), X (June 10, 2025, 1:49 PM), https://x.com/ltgrusselhonore/status/1932540559085678729.

[18] Ed Pilkington, *Trump LA protest response risks turning US military into political force, veterans warn*, The Guardian (June 9, 2025), https://www.theguardian.com/us-news/2025/jun/09/veterans-trump-national-guard-la-protests.

[19] Andrew Gumbel, *Troops and Marines deeply troubled by LA deployment: 'Morale is not great'*, The Guardian (June 12, 2025), https://www.theguardian.com/us-news/2025/jun/12/los-angeles-national-guard-troops-marines-morale.

The decidedly political context of the current deployment, as described above, can cause significant harm to the military's cohesiveness and reputation, as well as to the morale of the soldiers being deployed. Indeed, these harms have already been occurring.

Gallup polling shows that the U.S. Military is the most trusted out of an array of American institutions.[20] But a military that is thrust into aggressive interactions with civilians in a politicized context will, over time, inevitably lose the respect and trust that it currently has among the American people. Reports show this is already occurring in Los Angeles, when comparing public reaction to Guard deployment to fight the California wildfires earlier in the year and Guard deployment in this context.[21] This disapproval from fellow Americans can only exacerbate feelings of isolation and low morale for the military deployed.

A politicized military will also struggle to recruit and retain the best talent, regardless of political views. Potential recruits will feel that they may be forced into actions for political motivations, or that their own political views could be a hindrance to their professional success in the military. One professor of civil-

---

[20] *Confidence in Institutions*, Gallup (last visited Aug. 25, 2025), https://news.gallup.com/poll/1597/confidence-institutions.aspx.
[21] Shawn Hubler, *Trump's National Guard Troops Are Questioning Their Mission in L.A.*, The New York Times (Jul. 16, 2025), https://www.nytimes.com/2025/07/16/us/trump-national-guard-california.html?rsrc=ss&unlocked_article_code=1.XE8.PvSQ.KrjqFXwRbQWx&smid=nytcore-ios-share&referringSource=articleShare.

military relations observed when discussing the recent deployment of troops in California: "I also worry about a self-perpetuating cycle of some groups worrying that they are not welcome in the military . . . and that in turn causing the military to become less representative and more and more homogenous."[22] She went on to explain that such homogeneity is harmful to both our democracy and to the military as an institution. First, "democracy is a system in which any party can lose an election . . . what you want is a military that belongs to the whole society and not to a specific group in society."[23] Additionally, "we know from all kinds of research on group decision making that homogeneity may be good for, sort of, shallow social cohesion purposes, but it's really not good for producing, sort of, creative, adaptive problem solving."[24]

　　　As an organization that supports military members and families, and former senior military leaders, *amici* recognize that those who choose to join the National Guard or regular military are primarily driven out of a desire to serve America and their fellow citizens, not to be turned inwards against them. Having to do so harms military morale, which is an essential part of the effectiveness of any military. As

---

[22] The Lawfare Podcast, *Lawfare Daily: Civil Military Relations in the Trump Administration*, Lawfare, at 39:00 to 41:30 (Jul. 2, 2025) (conversation with Lindsay P. Cohn), https://www.lawfaremedia.org/article/lawfare-daily--civil-military-relations-in-the-trump-administration-july-2.
[23] *Id.*
[24] *Id.*

General George Marshall once said, "It is not enough to fight. It is the spirit which we bring to the fight that decides the issue. It is morale that wins the victory."[25]

Here, the President has not just taken aim at state and local officials from another political party; he has also taken aim at the civilians with whom the military may come into contact when domestically deployed. While running for reelection, President Trump first floated using the military against what he called "the enemy within."[26] He tasked his subordinates with considering how "military and national security assets" can be used against ordinary crime.[27] And in the specific context of this deployment, the President labeled the civilians the military may engage with as "invaders," and boasted about aggressive military tactics to be used against them.[28]

The likely resulting harm to military morale is not only intuitive, but confirmed by experts. One political scientist observed that a "factor contributing to the reluctance of military commanders to become involved in law enforcement

---

[25] General George Marshall, Speech at Trinity College (June 15, 1941), *in* Papers of George Catlett Marshall, 1941.

[26] Stephen Groves, *Trump suggests he'll use the military on 'the enemy from within' the U.S. if he's reelected*, PBS News (Oct. 13, 2024), https://www.pbs.org/newshour/politics/trump-suggests-hell-use-the-military-on-the-enemy-from-within-the-u-s-if-hes-reelected ("We have some very bad people. We have some sick people, radical left lunatics. And I think they're the big — and it should be very easily handled by, if necessary, by National Guard, or if really necessary, by the military, because they can't let that happen.").

[27] Exec. Order No. 14288, 90 Fed. Reg. 18765 (April 28, 2025).

[28] Address at Fort Liberty, *supra* note 12.

activities is the potential damage to morale and discipline that may result."[29] Another has stated: "Service members are likely to feel significantly more internal conflict about such a role than about a foreign deployment, increasing their risk of moral injury."[30] And a recent study conducted by the Department of Veterans Affairs found that moral injury—harm from being forced to act against one's moral beliefs—resulted in increased severity of negative outcomes experienced by military members, such as PTSD, depression, and anxiety.[31]

Deployed troops themselves have expressed confusion and low morale over their assignments in this deployment. In a recent report, six members of the National Guard "including infantrymen, officers and two officials in leadership roles — spoke of low morale and deep concern that the deployment may hurt recruitment for the state-based military force for years to come."[32] Other reports have described the same. "I think we all feel a little bit anxious about what, why,

---

[29] Colonel Charles, J. Dunlap, Jr., *The Police-ization of the Military*, 27 J. Polit. Mil. Sociol. 217, 224 (1999).
[30] Lindsay P. Cohn, *Domestic Policing Deployment and Public Trust in the Military*, Lawfare (Oct. 10, 2024), https://www.lawfaremedia.org/article/domestic-policing-deployment-and-public-trust-in-the-military.
[31] U.S. Dep't of Veterans Affairs, Veterans Health Admin., Health Systems Research, *Moral Injury and Mental Heath Among US Military Service Members and Veterans* (2024), https://www.hsrd.research.va.gov/publications/esp/moral-injury.pdf.
[32] Hubler, *supra* note 21.

why we're here," said Private First Class Andrew Oliveira.[33] A National Guard member deployed in California recently also touched upon the idea of moral injury: "The moral injuries of this operation, I think, will be enduring . . . This is not what the military of our country was designed to do, at all."[34] Another National Guard member simply and bluntly described the assignment as "shitty."[35]

## III. Courts Have an Essential Role to Play in Ensuring that the Military Operates within the Law

Congress has limited the circumstances in which the military can be deployed in the domestic setting, and it is "emphatically the province and duty" of the courts to determine whether the congressional requirements have been met. *See Marbury v. Madison*, 5 U.S. 137, 177 (1803). Here, President Trump has stated he has authority to federalize the California Guard under 10 U.S.C. § 12406(2) and (3) and it is the duty of this Court to determine whether the requirements of those provisions have been met in these circumstances.

This is especially so where the circumstances of this deployment are exceptionally troubling. In addition to the politicized context surrounding the deployment as described above, President Trump has claimed authority to

---

[33] Ken Klippenstein, *Video: Troops Question Los Angeles Deployment*, Substack (Jul 22, 2025), https://www.kenklippenstein.com/p/video-troops-question-los-angeles.
[34] Hubler, *supra* note 21.
[35] Gumbel, *supra* note 19.

23

federalize the National Guard without geographical restriction and delegated to the Secretary of Defense the authority to determine when and where to deploy the military domestically in relation to other possible civilian disturbances.[36] Indeed, President Trump has stated: "We're gonna have troops everywhere."[37] And, now months after the military was first deployed to Los Angeles, there remain federalized National Guard troops in the city with no explanation as to why the purported authority to deploy the troops in the first place—there being a "rebellion or danger of a rebellion against the authority of the Government of the United States," or the President being "unable with the regular forces to execute the laws of the United States"—remains the case. 10 U.S.C. § 12406. Defense Secretary Peter Hegseth recently extended the federalization of the California Guard for an additional three months, and President Trump has deployed National Guard in Washington, D.C. with threats to do so in other cities including New York City, Baltimore, Oakland, New Orleans, and Chicago.[38]

---

[36] Memorandum on Department of Defense Security for the Protection of Department of Homeland Security Functions, 2025 Daily Comp. Pres. Doc. 672 (June 7, 2025), https://www.govinfo.gov/app/details/DCPD-202500672.

[37] Pilkington, *supra* note 18.

[38] *See* Joey Garrison, *President Trump says other US cities could be next as he deploys National Guard to DC*, USA Today (Aug. 11, 2025), https://www.usatoday.com/story/news/politics/2025/08/11/trump-national-guard-deployment-us-cities-dc/85610923007/; Reuters, *Trump says he may send US troops to New Orleans, Louisiana to fight crime,* Sept. 3, 2025, https://www.reuters.com/world/us/trump-says-he-may-send-us-troops-new-orleans-louisiana-fight-crime-2025-09-03/.

To deploy the military in response to a largely peaceful protest in a major American city against the wishes of local officials is an escalation with myriad harms, not least to our military members and families, and such executive action requires careful judicial review. In a nation of laws, not military rule, setting a precedent that allows the executive to deploy the military to any protest across the country will severely harm the military as a trusted and nonpartisan institution. It is vital for the Court to step in now.

## CONCLUSION

*Amici* VVF and retired senior military officers ask this Court to consider the factors described above in adjudicating this case, and to affirm the District Court's decision to enjoin the federalization of the California National Guard under 10 U.S.C. § 12406 in this instance.

Dated: September 9, 2025                     Respectfully submitted,

Christine P. Sun                          */s/ J. Andrew Boyle*
STATES UNITED DEMOCRACY CENTER            J. Andrew Boyle
506 S Spring St, #13308                       *Counsel of Record*
Los Angeles, CA 90013                     Maithreyi Ratakonda
christine@statesunited.org                STATES UNITED DEMOCRACY CENTER
                                          45 Main Street, Suite 320
                                          Brooklyn, NY 11201
                                          Tel.: (202) 999-9305
                                          andrew@statesunited.org
                                          mai@statesunited.org

*Attorneys for* Amici Curiae *Vet Voice Foundation*
*and Retired Senior Military Officers*

25

## CERTIFICATE OF SERVICE

I, J. Andrew Boyle, hereby certify that on September 9, 2025, I electronically filed the foregoing Brief of *Amici Curiae* Vet Voice Foundation and Retired Senior Military Officers, with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. A true and correct copy of this brief has been served via the Court's CM/ECF system on all counsel of record.

Dated: September 9, 2025                    */s/ J. Andrew Boyle*
                                            J. Andrew Boyle
                                            *Attorney for Amici Curiae Vet
                                            Voice Foundation and Retired
                                            Senior Military Officers*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** __25-3727_____

I am the attorney or self-represented party.

**This brief contains _____5684_____ words,** including _____0____ words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _____s/J. Andrew Boyle_____ **Date** __September 9, 2025___
*(use "s/[typed name]" to sign electronically-filed documents)*