# No. 25-3727

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

GAVIN NEWSOM, in his official capacity as Governor of the State of
California; STATE OF CALIFORNIA,

*Plaintiffs-Appellees*,

*v.*

DONALD J. TRUMP, in his official capacity as President of the United
States; PETER HEGSETH, in his official capacity
as Secretary of the Department of Defense;
UNITED STATES DEPARTMENT OF DEFENSE,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of California
The Honorable Charles R. Breyer, District Judge
Case No. 3:25-cv-04870-CRB

## BRIEF FOR THE CHAMBERLAIN NETWORK
## AND MILITARY VETERANS AS AMICI CURIAE
## IN SUPPORT OF APPELLEES

Brian A. Sutherland
Jocelyn Sperling
COMPLEX APPELLATE
LITIGATION GROUP LLP
96 Jessie Street
San Francisco, CA 94105
Telephone: (415) 649-6700

*Attorneys for Amici Curiae*
*The Chamberlain Network and Military Veterans*

# TABLE OF CONTENTS

**Page**

INTERESTS OF AMICI CURIAE ............................................................ 1

SUMMARY OF ARGUMENT ................................................................ 8

ARGUMENT ........................................................................................ 11

I.     Under § 12406, the President should deploy military force only when necessary to protect the United States. ...................... 12

II.    Unnecessary military deployments for domestic law enforcement harm servicemembers, the military, and national security .............................................................................. 16

        A.    Deploying servicemembers to confront their fellow Americans absent a threat to the nation harms their morale and threatens recruitment and retention. .............. 17

        B.    Deploying military force to serve domestic law enforcement priorities is politically polarizing and harms the military. .............................................................. 20

        C.    Unnecessary deployments of the military impose a substantial burden on servicemembers and affect military readiness. .............................................................. 24

CONCLUSION ...................................................................................... 27

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## *Cases*

*Ex parte Milligan*,
   71 U.S. (4 Wall.) 2 (1866) ...................................................... 13

*Feliciano v. Dep't of Transp.*,
   145 S. Ct. 1284 (2025) .......................................................... 14

*King v. Burwell*,
   576 U.S. 473 (2015) .............................................................. 13

*Newsom v. Trump*,
   141 F.4th 1032 (9th Cir. 2025) ........................................ 13, 15

*TRW Inc. v. Andrews*,
   534 U.S. 19 (2001) ................................................................ 14

## *Statutes*

10 U.S.C. § 12406.......................... 8, 9, 11, 12, 13, 14, 15, 20, 27

## *Other Authorities*

Zoltan Barany, *Armies and Autocrats: Why Putin's Military
   Failed*, 34 J. Democracy 80 (Jan. 2023) ............................... 22

Alastair Bland, *Fact Check: Why Is Trump Blaming the LA
   Fires on Newsom's Water Policies?*, CalMatters (Jan. 8, 2025)........... 20

Patty-Jane Geller, *Within Ranks, Trust in Our Military Declines
   Amid Politicization of National Defense*, Heritage Foundation
   (Feb. 8, 2023) ....................................................................... 23

Amanda Holpuch, *California Officials Criticize President's
   National Guard Deployment*, N.Y. Times (June 8, 2025) ................... 21

Samuel P. Huntington, *The Soldier and the State: The Theory
   and Politics of Civil Military Relations* (Belknap Press 1957) .......... 23

# TABLE OF AUTHORITIES
## (*continued*)

**Page**

Ken Klippenstein, *Exclusive: The US Military Is Monitoring Protests in 7 States*, Nation (May 30, 2020) .........................................19

Victoria Mayo, Belfer Ctr. for Sci. & Int'l Affs., Harvard Kennedy Sch., *Preserving a Nonpartisan Military* (Natalia Angel ed., Apr. 22, 2022) ........................................................23

Oren Oppenheim, *Trump Said It Would Be 'Great' to Arrest Newsom*, ABCNews (June 9, 2025) ......................................................20

Charlsy Panzino, *Some Soldiers May Not Be Able to Handle New Pace of Training, Guard Chief Says*, Army Times (Mar. 13, 2018) ...........................................................................25

Sgt. Darron Salzer, *Post 9/11: This Isn't Your Father's National Guard*, Nat'l Guard Bureau (Sept. 9, 2010).........................................25

Ceclia Smith-Schoenwalder, *Trump Has a New Target: Inside His Battle with Gavin Newsom*, U.S. News & World Rep. (June 11, 2025) .............................................................................21

*Testimony of Retired Major General Randy Manner Before the Senate Judiciary Committee* (Dec. 10, 2024) ...................................18, 26

Donald J. Trump (@realDonaldTrump), Truth Social (June 9, 2025, at 14:47).........................................................................20

USAFacts, *Where Are US Troops Stationed?* (June 23, 2025)................25

## INTERESTS OF AMICI CURIAE[1]

Amicus Curiae The Chamberlain Network's nonpartisan mission is to mobilize and empower veterans to protect democracy through organizing, education, and community engagement. The Chamberlain Network is a network of thousands of veterans dedicated to combating polarization of the military. Individual amici are military veterans who are part of the network and served in the National Guard or Marine Corps or both.

Amici are concerned about the implications of a decision that would permit domestic deployments of military force that are unnecessary to protect the United States and Americans. Such deployments are contrary to their values, training, understanding of our traditions, and desire to maintain a strong and nonpartisan military. With this brief, amici aim to assist the Court by explaining the consequences of the Court's decision. The individual amici are:

---

[1] All parties have consented to the filing of this brief. No party or party's counsel authored this brief in whole or in part, and no person, other than amici curiae and their counsel, contributed funds intended to fund the preparing or submitting of this brief.

**Chris Purdy**

Mr. Purdy is an Army National Guard veteran. He grew up in Rochester, New York. His father served in the Air Force. His grandfather served in the Army. After the terrorist attacks of 9/11 and the beginning of the war in Iraq, while he was in college, Mr. Purdy began to ask himself how he could give back. In 2004, he enlisted with the National Guard, a reserve component of the U.S. Army.

After his training, Mr. Purdy began the dual-hat life of the citizen-soldier, working as a special education teacher and as a member of the National Guard. When the governor called him into state service, he often responded to snow-related emergencies. In 2011, he deployed to Iraq, where he led a gun truck to escort convoys from southern to central Iraq. He was honorably discharged in 2012.

After returning from Iraq, Mr. Purdy began working with veterans to support international human rights. At home, he saw rising and alarming distrust in government and other institutions across the political spectrum. He wanted to preserve public trust in the military and founded the nonpartisan Chamberlain Network to organize veterans against politicization of the military. Mr. Purdy and his colleagues at The Chamberlain Network have spoken with thousands of

veterans about their values and deep commitment to maintaining a nonpartisan and trusted military.

**Marc Jaruzel**

Mr. Jaruzel is a National Guard and Marine Corps Reserve veteran. He grew up on a farm in a small rural community in Michigan. While attending community college, he joined the Marine Corps Reserve. He was a field radio operator, assigned to an engineering unit that built bridges. After transferring to a university, he transferred his service to the Michigan National Guard. He then trained as a paralegal and in disaster relief, and mobilized for one year to assist with the COVID-19 response. Mr. Jaruzel thereafter transferred to the D.C. National Guard. He spent ten years of combined service in the Reserve and the National Guard. He was honorably discharged in 2022.

Mr. Jaruzel was disturbed to hear about the Los Angeles deployment. He enlisted in the military to serve our country and protect it from foreign enemies. He imagined himself in the shoes of those who were deployed: while preparing to protect our country from enemies, they were suddenly placed on American streets with war-fighting weapons. He would be horrified to be ordered to confront fellow Americans with weapons instead of helping or defending them.

3

**Phil Klay**

Mr. Klay is a Marine Corps veteran. He grew up in New York. While he was in college, the United States went to war in Iraq. His religion and upbringing commended service to country, especially when at war, so he served. After college, he became a public affairs officer.

Mr. Klay served his country in Iraq from January 2007 to February 2008. During his deployment, Mr. Klay saw that our country's mission to root out Al Qaeda and other enemies in Iraq could not succeed without working with the local communities and local leaders. Building a sustainable connection with local leaders enabled the military to bring a measure of stability to the region. After returning home, he was honorably discharged in 2009.

Mr. Klay is concerned that the President sent troops to an American city over the objections and against the wishes of state and local leaders. He saw in Los Angeles the imposition of military force upon a population that did not want it. He is concerned that the Los Angeles deployment puts servicemembers in an unbearably difficult situation, casting them as partisan actors in a dispute between a governor and president of opposing parties.

**Alex McCoy**

Mr. McCoy is a Marine Corps veteran. He grew up in a military family. His father served his career in the Navy. His grandfather and great-grandfather also served in the armed forces. He enlisted shortly after high school.

After training to provide embassy security, Mr. McCoy served his country for three years overseas, protecting embassy compounds in Saudi Arabia, Honduras, and Germany. During that time, his leaders emphasized that embassy security must calibrate the use of force carefully because a mistake could cause a diplomatic incident, with adverse consequences for U.S. foreign policy interests. Accordingly, he observed strict rules of engagement when interacting with foreign civilians around federal facilities. He was honorably discharged in 2013.

Based on his extensive training and experience, Mr. McCoy is concerned that servicemembers are not well positioned to protect federal facilities from civil threats if they lack sufficient and specific training for that mission. He is concerned that in a volatile situation, servicemembers may fall back on their combat training and mindset, with devastating consequences.

**Isaac Tait**

Mr. Tait is a Marine Corps veteran. He grew up in Forest Falls, California, a small mountain town east of Los Angeles. His father and grandparents on both sides of his family served in the armed forces. He enlisted in the Marine Corps Reserve when he was seventeen years old, and became a light armored vehicle crewman.

Mr. Tait served our country in Iraq, starting in 2003, during the earliest ground incursions of that war. He suffered a traumatic head injury in Iraq and returned to the United States for medical care. After recovering from his serious injury, he deployed to Afghanistan in 2009. He was honorably discharged in 2010.

Mr. Tait never would have imagined that servicemembers might one day bear assault rifles in an American city. If he had received an order to face down his fellow Americans with a service-issued weapon, he would have been brokenhearted. He is concerned about how the deployment in Los Angeles will affect the next generation of recruits, who must be thinking: What will I be asked to do?

**Mia Leigh Renna**

Ms. Renna is a National Guard and active-duty Army veteran. She grew up in New Jersey, and, after graduating from high school in 2010, she enlisted in the National Guard. She attended college while also serving in an engineering battalion in the National Guard. After graduating with a degree in civil engineering in 2014, she served as an active-duty engineering officer in the Army for four years. She was honorably discharged in 2019.

As a veteran of both the National Guard and active-duty components of the Army, Ms. Renna has seen firsthand how the chain-of-command structure for the National Guard is distinct and serves state interests domestically. She is concerned that when a president unnecessarily overrides the command structure and federalizes the National Guard to support federal officers in carrying out law enforcement activities, servicemembers may view the operation as a matter of partisan politics, not military necessity.

**Keegan Evans**

Mr. Evans is a Marine Corps veteran. His father and grandfathers were military officers. His family's service and military values of honor and service motivated him to become a pilot. After college, in 2002, he

7

attended officer training in Quantico. He learned to fly helicopters and deployed three times to Iraq, where he flew casualty evacuation missions. After eight years of active-duty service, he served five years in the Marine Corps Reserve. He was honorably discharged in 2016.

Mr. Evans is concerned that deploying uniformed personnel in American cities will harm those who serve and the military itself. He emphasizes that combat training involves identifying and destroying enemies of the United States. He is concerned that deploying servicemembers against Americans sends a wrong message to the country—that the President has identified enemies within and is sending troops to combat them.

## SUMMARY OF ARGUMENT

The question presented is whether 10 U.S.C. § 12406 conferred authority on the President to call the National Guard into federal service when American protesters threw objects at federal officers, attempted to block their path, and vandalized federal property. The Court should answer "no" because these acts are not an invasion, rebellion, or other comparable interference with national government that leaves the President unable to execute the laws.

Congress did not authorize the President to summon military force to maintain the efficacy and performance of federal law enforcement. Rather, as the language of § 12406(3) and other provisions of the law make clear, it reserved the use of military force for instances when the nation itself was threatened. The statute thus reflects the longstanding tradition and understanding that the military serves the nation, not domestic law enforcement priorities. It should be invoked for law enforcement purposes only where the United States is unable to function as a government of laws without military assistance. Under any standard of review, the criminal acts in Los Angeles fell far short of that line.

The Court's contrary conclusion, if not corrected, will result in a range of harms to servicemembers, the military, and national security. As amici explain, servicemembers join the military to serve their fellow Americans, not to police them. When called to military service as part of the federal armed forces, they expect to face an enemy of the United States, not to confront Americans who do not threaten the nation or constitutional order. Absent a crisis on the same level as a foreign invasion or a rebellion against the United States, ordering servicemembers to confront their fellow Americans as enemies puts them in an intolerable situation and creates the potential for tragic

consequences. Many servicemembers may choose to leave the service, and other Americans may decide not to serve at all, rather than face being placed in that position.

In addition, an unnecessary military deployment to support the President's law enforcement priorities creates the impression that the military serves him and not the country, violating the military's bedrock commitment to nonpartisanship. A departure from that commitment could result in a shift of the composition of the military toward those who support the President's political agenda, driving out those who do not share the agenda or who do not believe the military should be used to advance it. That could create barriers to military effectiveness in situations where the military is called upon to answer the commands of a president or governor of the opposite political party. It would also weaken the military more broadly, as one of its core strengths is its ability to draw on the full range of the nation's population to serve a common national purpose.

Finally, unnecessary federalization and domestic deployment of the military works significant hardship on servicemembers and their families. Members of the National Guard and active-duty armed forces enlist to serve their country and their communities. They are proud and

10

honored to do this work, no matter the sacrifice it may require. At the same time, however, the U.S. military is currently stretched thin. That is particularly the case for National Guard members, who have increasingly been deployed overseas while also serving disaster-response roles at home and acting as vital members of their communities when not called into service. Creating an additional, unnecessary burden on servicemembers compounds the readiness and morale problems that result from being asked to police fellow Americans to serve a particular president's domestic policy priorities.

## ARGUMENT

Section 12406 authorizes the President to call the military into federal service only under extreme circumstances that threaten the nation. Under the Court's stay order, however, the President has virtually limitless discretion to use the military for domestic law enforcement purposes. Being forced to deploy against fellow Americans to serve the President's domestic policy agenda risks demoralizing servicemembers, which can harm recruitment and retention; results in the politicization of the military; and places significant burdens on servicemembers; all with potentially grave consequences for military readiness and national security.

I.     **Under § 12406, the President should deploy military force only when necessary to protect the United States.**

As common sense and amici's experience instruct, the purpose of federal deployment of the military is to protect the nation. The statute at issue reflects that longstanding purpose and should be construed accordingly. If courts instead defer to the President's assessment of what the statute means and whether its conditions are met, he will have virtually unlimited discretion to deploy troops for domestic law enforcement purposes. Congress did not give the President that discretionary power.

Under § 12406, the President may call the National Guard into federal service when the United States "is invaded or is in danger of invasion by a foreign nation." 10 U.S.C. § 12406(1). Invasion of domestic territory by a foreign power poses an obvious and potentially existential threat to the United States. Our military exists to defend against such invasions. The potential harm to the nation is so great, even a "danger of invasion" may justify the use of military force under the statute.

Section 12406 also authorizes the President to call the National Guard into federal service when "there is a rebellion or danger of a rebellion against the authority of the Government of the United States." 10 U.S.C. § 12406(2). A rebellion is an organized effort to replace the

governing authority with a new one or to change laws by force, rather than by legal processes. Like an invasion, a rebellion presents an existential threat to the nation. The civil war was a rebellion. In some States, "the national authority was overturned and the courts driven out." *Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 127 (1866). The President need not wait until a rebellion overthrows federal authority; he or she may call the National Guard into service to combat "danger of a rebellion." 10 U.S.C. § 12406(2).

Lastly, § 12406 authorizes the President to call the National Guard into federal service when he or she "is unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(3). As the Court's stay decision recognized, this language must be construed in light of the statute's other two conditions. *Newsom v. Trump*, 141 F.4th 1032, 1051-52 (9th Cir. 2025); *see also King v. Burwell*, 576 U.S. 473, 492 (2015) (terms that are ambiguous when read in isolation may be "clarified by the remainder of the statutory scheme"). The other two conditions (invasion and rebellion) are cataclysmic, history-book-level events that threaten to destroy or transform the United States by organized force. To construe the third condition as applying to comparatively small-scale incidents like brick-throwing and vandalism would be highly anomalous and render

13

conditions one and two superfluous (given that condition three would almost always be available), which is a good reason to reject that construction. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001). Rather, condition three should be construed to apply only when the rule of law itself is under threat. That interpretation is consistent with the other statutory conditions, as well as an ordinary understanding of when use of military force on American soil is appropriate. *See Feliciano v. Dep't of Transp.*, 145 S. Ct. 1284, 1291 (2025) ("Just ask yourself how an ordinary American might approach the law's terms.").

The language of § 12406 underscores this reading. Congress authorized federalizing the National Guard only when the President is unable to execute the "laws of the United States." The phrase "laws of the United States" capaciously refers to the entirety of federal law. Congress could have authorized federalization when the President is unable to enforce "any" federal law, but it did not, again confirming that Congress intended to condition federalization on interference with the executive branch's enforcement power more generally.

The Court reached an erroneous conclusion in its stay order in part by avoiding a determination of how the statute should be interpreted. The order states, on the one hand, that "any minimal

14

interference with the execution of laws" would not justify invoking § 12406, and on the other hand, that the President need not be "completely precluded from executing the relevant laws of the United States in order to call members of the National Guard into federal service." *Newsom*, 141 F.4th at 1051. But the Court declined to specify how much interference would be necessary to render the President "unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(3). Instead, the Court concluded that it was bound to apply a deferential standard of review and that the government's allegations were sufficient under this standard. 141 F.4th at 1052. With the benefit of more time for close inspection of the statutory language, the Court should specify the level of interference required under § 12406 and make clear that the provision requires a threat to the functioning of the nation commensurate with the threat posed by an invasion or rebellion.

When § 12406(3) is thus understood, it becomes clear that the President's federalization of California National Guard members would not pass legal muster even if his application of the law to facts were entitled to significant deference. Under any standard of review, the President has no basis for invoking the law in response to isolated, small-scale acts of violence that occur in a localized area over a short

15

period of time. On the undisputed facts of this litigation, the situation in Los Angeles came nowhere close to meeting the statutory precondition for federalizing the National Guard: a disturbance so great that the United States was unable to exercise its authority and law was silent.

The reality on the ground is this: Under the stay order, the President may federalize and deploy troops in American cities any time protests against the actions of federal officers involve any modicum of violence directed at those officers. That comes perilously close to being a blank check. This Court should reconsider; if it does not, this President and others who follow may be all too willing to use their newfound discretion, with dire consequences for servicemembers, the military, and national security.

## II. Unnecessary military deployments for domestic law enforcement harm servicemembers, the military, and national security.

If not corrected, the consequences of granting the President virtually unlimited discretion to use the military for domestic purposes will be profound. Domestic deployments to support law enforcement priorities pit soldiers against fellow Americans; are naturally associated with the leader who ordered them and his or her political party, not a

national project to protect the United States; and impose a significant burden on servicemembers. Such deployments harm servicemembers, the military, and national security.

### A.    Deploying servicemembers to confront their fellow Americans absent a threat to the nation harms their morale and threatens recruitment and retention.

One of the bedrock commitments of the military is nonpartisanship. The commitment begins with a motivation to serve the country and a common national identity. That commitment grows more resolute during training, which demands apolitical duty and inculcates the value of a nonpartisan military, and during service itself. The military trained amici that regardless of racial, political, or other differences between them and others, they were all brothers and sisters serving the country together. As one amicus related, it was through service that he met America. Working alongside people with radically different perspectives from every geography, they were bound together by common purpose.

Servicemembers have faith that elected leaders will use servicemembers' lives well, in the service of their country. When a political leader takes servicemembers who signed up for public service and unnecessarily forces them into a project that pits them against

17

fellow Americans, he or she violates that faith and undermines the core premise of national service. Servicemembers should not be asked to participate in domestic conflicts except in the most extreme circumstances.

If asked to deploy, though, the military's command structure and training requires servicemembers to obey. Thus, if a commander orders servicemembers to deploy to an American city, they would be trained to believe that the reason is to fight an enemy. At the same time, servicemembers are motivated and trained to protect Americans. Deploying them against Americans creates a traumatic dissonance for those trained both to follow orders and serve their country.

Adding to that traumatic dissonance is the potential for violent confrontations with fellow citizens. National Guard members receive little training in quelling civil disturbances, and active-duty troops generally receive none.[2] Faced with violence by some protesters, a servicemember making split-second decisions may naturally fall back on his or her combat training. If servicemembers wield military force that is better suited to a battlefield than a city block, the bad outcomes

---

[2] *Testimony of Retired Major General Randy Manner Before the Senate Judiciary Committee* 3-4 (Dec. 10, 2024), https://www.judiciary.senate.gov/imo/media/doc/2024-12-10_-_testimony_-_manner.pdf.

are obvious, as the Kent State shootings of student protesters of fifty years ago reflect. The possibility that an interaction with civilians could take a tragic turn is a nightmare for servicemembers.[3]

In amici's experience, servicemembers did not sign up for military service to turn their training as fighters against other Americans, and such deployments could profoundly affect their morale. Some may decide not to reenlist at the end of their service. There is a risk that members will choose to separate rather than continue under leadership that puts them at odds with their oath to serve the people and Constitution first, and not any political party or leader. Those considering joining the service may be dissuaded from doing so for the same reason. Using active-duty military and National Guard members unnecessarily for domestic law enforcement purposes thus threatens to diminish the number of people who are willing to serve, which would hamper combat readiness and undermine national security.

---

[3] As one National Guard member told a reporter when faced with being deployed to suppress protests over the police killing of George Floyd, "We're a combat unit not trained for riot control or safely handling civilians in this context. Soldiers up and down the ranks are scared about hurting someone, and leaders are worried about soldiers' suffering liability." Ken Klippenstein, *Exclusive: The US Military Is Monitoring Protests in 7 States*, Nation (May 30, 2020), www.thenation.com/article/society/national-guard-defense-department-protests.

**B.    Deploying military force to serve domestic law enforcement priorities is politically polarizing and harms the military.**

As Congress was no doubt aware when it enacted 10 U.S.C. § 12406, unless an exigency has rendered the United States unable to execute its laws, deploying federalized troops on American soil to support law enforcement is dangerous and destabilizing. Among other risks, a domestic deployment at the pleasure of the President associates the military with his and his party's partisan objectives and may result in political polarization of the military, with multiple attendant harms.

Any domestic deployment to pursue a president's law enforcement priorities rather than to protect the nation runs this risk. But it is especially acute when, as here, the President has attacked opposition-party leaders for their alleged failure to govern Los Angeles in the time leading up to the deployment.[4] In this case, the President sent troops to

---

[4] *See, e.g.*, Oren Oppenheim, *Trump Said It Would Be 'Great' to Arrest Newsom*, ABCNews (June 9, 2025), https://abcnews.go.com/Politics/ trump-great-arrest-newsom-stormy-relationship-politics-play/story? id= 122655967; Donald J. Trump (@realDonaldTrump), Truth Social (June 9, 2025, at 14:47), https://truthsocial.com/@realDonaldTrump/posts/ 114654893116531233 [https://perma.cc/GV3Q-D3FL] ("Gavin Newscum [sic] inspired Riots going on in Los Angeles"); Alastair Bland, *Fact Check: Why Is Trump Blaming the LA Fires on Newsom's Water Policies?*, CalMatters (Jan. 8, 2025), https://calmatters.org/environment/ wildfires/2025/01/la-fires-donald-trump-fact-check (blaming California governor for fires and calling him "Gavin Newscum").

an American city over the objections and against the wishes of state and local leaders of the other party, who were not acting in opposition to the United States, but were actively working to restore order and prevent violence.[5] Overriding state and local leaders with military force under those circumstances transformed troops into something much closer to a hostile occupying force than American troops ever should be on American soil. It also created the appearance, if not the reality, of a politically motivated deployment.

The President's order to federalize and deploy National Guard troops thus conscripted a nonpartisan institution into what was widely perceived to be a partisan fight between the President, on the one hand, and the Governor and local officials, on the other.[6] Servicemembers must obey orders unless they are patently unlawful and cannot extricate themselves from this conflict, so they are forced into a

---

[5] *See, e.g.*, Amanda Holpuch, *California Officials Criticize President's National Guard Deployment*, N.Y. Times (June 8, 2025), https://www.nytimes.com/2025/06/08/us/california-trump-national-guard-protests.html.

[6] *See, e.g.*, Ceclia Smith-Schoenwalder, *Trump Has a New Target: Inside His Battle with Gavin Newsom*, U.S. News & World Rep. (June 11, 2025), www.usnews.com/news/national-news/articles/2025-06-11/trumps-latest-target-california-governor-gavin-newsom (tracing deployment to longstanding partisan dispute between President Trump and Governor Newsom).

21

partisan conflict against their will. If this is permitted to continue or recur, the result could be a politicized military that drives out those with opposing views and leads to monolithic thinking, ultimately hampering military effectiveness.[7]

Here, for example, if National Guard members deployed to Los Angeles view themselves as part of the President's political agenda, those who disagree with that agenda—or with the idea of the military being used to serve any political agenda—may leave the service. Those who agree with the President's agenda and his use of the military to implement it may stay. The remaining unit may have difficulty carrying out the orders of a commander-in-chief of a *different* political party, whether he or she is the California governor (in cases where the California National Guard is called into State Active Duty status) or a successor president. This is why servicemembers take an oath to uphold the Constitution and defend the nation, and do not pledge loyalty to a party or president.

---

[7] In Russia, for example, Vladimir Putin drove out independent voices in the military, creating blind spots, limiting the flow of information, and discouraging individual initiative. *See* Zoltan Barany, *Armies and Autocrats: Why Putin's Military Failed*, 34 J. Democracy 80 (Jan. 2023), https://www.journalofdemocracy.org/articles/armies-and-autocrats-why-putins-military-failed.

More broadly, a military that is affiliated with one political party or leader and their objectives is inherently weaker than a nonpartisan military that unifies all Americans based on shared national interest. A military that is viewed as partisan attracts mainly partisans and mercenaries, whereas a nonpartisan military can appeal to and inspire all citizens of this nation.[8] This is why maintaining a nonpartisan military has traditionally been a great source of strength for the United States, as compared with countries in which the military does not reflect or represent all the people.[9]

---

[8] Tellingly, one survey found that sixty-eight percent of active-duty personnel surveyed said that "increasing politicization of the military would influence whether they encourage their children to join." Patty-Jane Geller, *Within Ranks, Trust in Our Military Declines Amid Politicization of National Defense*, Heritage Foundation (Feb. 8, 2023), https://www.heritage.org/defense/commentary/within-ranks-trust-our-military-declines-amid-politicization-national-defense.

[9] *See, e.g.*, Victoria Mayo, Belfer Ctr. for Sci. & Int'l Affs., Harvard Kennedy Sch., *Preserving a Nonpartisan Military* 2 (Natalia Angel ed., Apr. 22, 2022), www.belfercenter.org/publication/preserving-nonpartisan-military (quoting General George C. Marshall: "We [the Armed Forces] have a great asset and that is that our people, our countrymen, do not distrust us and do not fear us . . . ."); *see also* Samuel P. Huntington, *The Soldier and the State: The Theory and Politics of Civil Military Relations* 258-59 (Belknap Press 1957), https://archive.org/details/samuelp.huntingtonthesoldierandthestatethe theoryandpoliticsofcivilmilitaryrelationsbelknappress1957.

The stakes are high. Deployment in American cities risks normalization of deviance, which occurs when someone makes a decision that is outside the previously acceptable range of conduct. If the deviance is not corrected, the standard of acceptable behavior could shift to include what was previously unacceptable: deploying armed forces against Americans. That normalization could happen here unless the deviation is stopped. What has been a sacred and foundational value—that our military is never used for partisan political purposes—could crumble.

### C. Unnecessary deployments of the military impose a substantial burden on servicemembers and affect military readiness.

Servicemembers enlist in the National Guard and active-duty armed forces with the expectation that they will be required to make sacrifices to serve their country. They know that they may be asked to give their lives to keep their nation safe. They make these sacrifices willingly and with pride, knowing that their fellow Americans depend on them.

Notwithstanding this fact—indeed, precisely because of these sacrifices—it is wrong and dangerous to place unnecessary burdens on servicemembers that may harm their morale and readiness. Requiring

24

servicemembers to engage in lengthy deployments to serve the President's law enforcement priorities creates such a burden.

Our nation's military is stretched thin. Troops are currently stationed or deployed in more than 150 countries around the world, pursuing the military's core mission of protecting the United States against threats posed by hostile foreign powers.[10] National Guard servicemembers are particularly taxed. In their civilian lives, they perform vital roles in their communities as firefighters, paramedics, teachers, healthcare providers, and more. They spend a minimum of 39 days a year in military training,[11] and they are regularly deployed within their states to respond to emergencies such as hurricanes and fires. Increasingly since 9/11, they have also been deployed alongside active-duty troops for overseas missions.[12] As the former Vice Chief of

---

[10] USAFacts, *Where Are US Troops Stationed?* (June 23, 2025), https://usafacts.org/articles/where-are-us-military-members-stationed-and-why.

[11] Charlsy Panzino, *Some Soldiers May Not Be Able to Handle New Pace of Training, Guard Chief Says*, Army Times (Mar. 13, 2018), https://www.armytimes.com/news/your-army/2018/03/13/some-soldiers-may-not-be-able-to-handle-new-pace-of-training-guard-chief-says.

[12] Sgt. Darron Salzer, *Post 9/11: This Isn't Your Father's National Guard*, Nat'l Guard Bureau (Sept. 9, 2010), https://www.nationalguard.mil/News/Article-View/Article/576443/post-911-this-isnt-your-fathers-national-guard.

the National Guard Bureau testified in December 2024, National Guard units "have virtually no time for additional missions or training."[13]

Nonetheless, in this case, more than 4,000 National Guard members and 700 U.S. Marines were deployed to Los Angeles for a period of several weeks; 300 National Guard members remain in federal service to this day, fully three months after they were deployed. This lengthy and demoralizing deployment placed and continues to place a significant burden on servicemembers and their families. Adding this burden, on top of the obligations soldiers face in the normal course of their service, threatens to exhaust troops who are already stretched thin and to deplete the most important resource the military has: the readiness of its servicemembers.

---

[13] *Testimony of Retired Major General Randy Manner*, *supra* n.2, at 2.

## CONCLUSION

The Court should affirm the district court's order preliminarily enjoining the President's order calling the California National Guard into federal service under 10 U.S.C. § 12406.

September 9, 2025

Respectfully submitted,

By: <u>s/ Brian A. Sutherland</u>
Brian A. Sutherland
Jocelyn Sperling
COMPLEX APPELLATE
LITIGATION GROUP LLP
96 Jessie Street
San Francisco, CA 94105
Telephone: (415) 649-6700

*Attorneys for Amici Curiae*
*The Chamberlain Network and Military Veterans*

27

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 25-3727

I am the attorney or self-represented party.

**This brief contains** | 5,188 | **words,** including | | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

● is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  □ it is a joint brief submitted by separately represented parties.
  □ a party or parties are filing a single brief in response to multiple briefs.
  □ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated | | .

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Brian A. Sutherland | **Date** | September 9, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**      *Rev. 12/01/22*