No. 25-3727

# In the United States Court of Appeals for the Ninth Circuit

GAVIN NEWSOM, in his official capacity as
Governor of the State of California, *et al.*,

*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, in his official capacity
as President of the United States, *et al.*,

*Defendants-Appellants*.

*On Appeal from the United States District Court
for the Northern District of California*

**BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER
AS *AMICUS CURIAE* IN SUPPORT OF APPELLEES AND AFFIRMANCE**

Elizabeth B. Wydra
Brianne J. Gorod
Brian R. Frazelle
CONSTITUTIONAL
   ACCOUNTABILITY CENTER
1730 Rhode Island Ave. NW, Suite 1200
Washington, D.C. 20036
(202) 296-6889
brian@theusconstitution.org

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... ii

INTEREST OF *AMICUS CURIAE* ..................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT .............................. 1

ARGUMENT ................................................................................... 7

I.     *Martin v. Mott* Does Not Foreclose Judicial Review of a President's Decision to Federalize the National Guard............................................. 7

      A.     *Mott*'s Historical Context ............................................. 7

      B.     *Mott*'s Procedural Context........................................... 9

      C.     *Mott*'s Holding and Reasoning .................................... 12

II.    Subsequent Decisions Citing *Mott* Do Not Foreclose Judicial Review ..................................................................... 18

III.   History Demonstrates that Courts Can Evaluate Whether the Conditions for Federalizing the National Guard Are Met.................... 21

CONCLUSION ............................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*Alexander v. Sandoval*,
    532 U.S. 275 (2001)................................................................ 4

*Carroll v. Carroll's Lessee*,
    57 U.S. 275 (1853).................................................................. 4

*Chappell v. Wallace*,
    462 U.S. 296 (1983)................................................................ 5

*Cohens v. Virginia*,
    19 U.S. 264 (1821).................................................................. 4

*Dakota Cent. Tel. Co. v. South Dakota*,
    250 U.S. 163 (1919)................................................................ 20

*Dalton v. Specter*,
    511 U.S. 462 (1994)................................................................ 20

*Dames & Moore v. Regan*,
    453 U.S. 654 (1981)................................................................ 28

*Decatur v. Paulding*,
    39 U.S. 497 (1840).................................................................. 6

*Dynes v. Hoover*,
    61 U.S. 65 (1857).................................................................... 12

*Hirabayashi v. United States*,
    320 U.S. 81 (1943).................................................................. 18

*Little v. Barreme*,
    6 U.S. 170 (1804).................................................................... 12

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024)................................................................ 6

*Luther v. Borden*,
    48 U.S. 1 (1849)............................................................. 5, 18-20

*Mallory v. Norfolk S. Ry. Co.*,
    600 U.S. 122 (2023)................................................................ 5

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Marbury v. Madison,*
    5 U.S. 137 (1803)....................................................................... 6, 28

*Martin v. Mott,*
    25 U.S. 19 (1827)................................................................. 1, 3, 10-18

*Nixon v. Fitzgerald,*
    457 U.S. 731 (1982).......................................................................... 4

*Opinion of the Justices,*
    8 Mass. 548 (1812)............................................................................ 8

*Sterling v. Constantin,*
    287 U.S. 378 (1932)......................................................................... 21

*Tracy v. Swartwout,*
    35 U.S. 80 (1836)............................................................................ 12

*United States v. George S. Bush & Co.,*
    310 U.S. 371 (1940)......................................................................... 20

*United States v. Speed,*
    75 U.S. 77 (1868)........................................................................ 20, 21

*Vanderheyden v. Young,*
    11 Johns. 150 (N.Y. 1814)............................................................... 13

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952)...................................................................... 5, 28

*Ziglar v. Abbasi,*
    582 U.S. 120 (2017).......................................................................... 5

*Zivotofsky v. Clinton,*
    566 U.S. 189 (2012).......................................................................... 1

Constitutional Provisions, Statutes, and Legislative Materials

Act of May 2, 1792, ch. 28, 1 Stat. 264 .................................... 22, 23, 26

Act of Feb. 28, 1795, ch. 36, 1 Stat. 424 ....................................... 10, 26

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

3 Annals of Cong. (1792).............................................................. 23, 24

*A Proclamation*, 4 Annals of Cong. (1794)................................. 25, 26

H. Journal, 2d Congress, 1st Sess. 575 (1792) ............................ 23

10 U.S.C. § 12406........................................................................ 1, 22

U.S. Const. art. I, § 8, cl. 15........................................................ 1, 22


Books, Articles, and Other Materials

William Blackstone, *Commentaries on the Laws of England* (1766) ........ 11

Marcus Cunliffe, *Soldiers and Civilians: The Martial Spirit in America* (1968) .................................................................................. 7

David E. Engdahl, *Soldiers, Riots, and Revolution: The Law and History of Military Troops in Civil Disorders*, 57 Iowa L. Rev. 1 (1971) .......... 23-26

James Kent, *Commentaries on American Law* (1840) .............................. 7, 9

Richard H. Kohn, *The Washington Administration's Decision to Crush the Whiskey Rebellion*, 59 J. Am. Hist. 567 (1972)................................ 25, 26

Bennett M. Rich, *Washington and the Whiskey Insurrection*, 65 Pa. Mag. Hist. & Bio. 334 (1941) ......................................................... 25-27

Joseph Story, *Commentaries on the Constitution of the United States* (1833) .................................................................................. 9, 17

Emory Upton, *The Military Policy of the United States* (1917)................. 7, 8

Frederick Bernays Wiener, *The Militia Clause of the Constitution*, 54 Harv. L. Rev. 181 (1940) ......................................................... 7

## INTEREST OF *AMICUS CURIAE*[1]

Constitutional Accountability Center is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history. CAC works in our courts, through our government, and with legal scholars to improve understanding of the Constitution and to protect the rights, freedoms, and structural safeguards that our nation's charter guarantees. Accordingly, CAC has an interest in this case.

## INTRODUCTION AND
## SUMMARY OF ARGUMENT

Exercising its exclusive authority to "provide for calling forth the Militia," U.S. Const. art. I, § 8, cl. 15, Congress set forth specific criteria for when presidents may call the National Guard into federal service. *See* 10 U.S.C. § 12406. Interpreting statutes like this "is what courts do," *Zivotofsky v. Clinton*, 566 U.S. 189, 201 (2012), and nothing in *Martin v. Mott*, 25 U.S. 19 (1827), is to the contrary. As history demonstrates, judges are just as capable of construing and applying this statute as any other.

That is why the stay panel in this case was correct to hold that President Trump's decision to federalize members of the California National Guard is

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amicus* or its counsel made a monetary contribution to its preparation or submission. All parties have consented to the filing of this brief.

judicially reviewable. Where the panel went astray, however, was in reading *Martin v. Mott* to require an extreme level of deference that permits federalization whenever there is a merely "colorable" basis for it. Stay Op. 29. *Mott* does not support that overly lenient standard, which would allow presidents to deploy armed soldiers in America's neighborhoods based on flimsy pretexts, exploiting the Guard's military power for political theater or partisan reprisal. Still less does *Mott* support the President's dangerous claim to immunity from all judicial check on his deployment of the Guard.

*Mott* held that a militia member could not relitigate the outcome of his court-martial by challenging, in a common law suit, the validity of an order he concededly disobeyed. The Supreme Court's opinion focused entirely on preserving the military chain of command. This required ensuring that subordinates followed orders under the militia act and foreclosing civil liability for officers who obeyed such orders—as the defendant Martin did when he seized Mott's property to effectuate the result of Mott's court-martial. Even if a presidential order calling up the militia took a mistaken view of the law or the facts, *Mott* reasoned, it did not follow that officers subject to this order could flout it based on their own judgments.

Thus, *Mott* resolved only a narrow question: may a servicemember escape punishment for defying a presidential order by suing the officers tasked with

2

carrying out that punishment—and requiring them to prove the factual and legal soundness of the President's order?  In answering no, *Mott* settled the question of who decides "in the first instance," 25 U.S. at 31, whether the conditions of statutes like § 12406 are satisfied.  The Court reached that answer because of the untenable breakdown in the chain of command that would follow if "every officer" and "every militia-man" could "refuse to obey the orders of the President" based on their own views about "whether the exigency has arisen." *Id.* at 29-30.

What *Mott* spoke to, therefore, was whether any officers besides the President had the right to decide for themselves if the statutory conditions for calling up the militia were met.  That question was hotly debated during the War of 1812, when Jacob Mott failed to render military service.  During that unpopular conflict, individual states had frustrated the war effort by claiming that their own state militia commanders, not the President, were the arbiters of whether an "invasion" had occurred within the meaning of the contemporary militia statute. *Mott* was understood as definitively resolving *that* dispute.  Indeed, this is how *Mott*'s own author, Justice Joseph Story, characterized the decision in his celebrated *Commentaries* published a few years later.  *Mott* established that disagreement with the President's assessment did not justify dereliction or defiance by lower-level militia officers, and that, conversely, officers who implemented presidential orders could not be held personally liable for doing so.

3

*Mott*'s procedural posture and concerns about the chain of command thus represent more than a difference in "factual circumstances," as the stay panel wrongly thought. Stay Op. 21. They are the crux of the decision. Indeed, all of *Mott*'s broad-sounding passages, when read in context, are focused entirely on these considerations. As the Supreme Court has cautioned, "general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used." *Cohens v. Virginia*, 19 U.S. 264, 399 (1821). If these expressions "go beyond the case," they do not "control the judgment in a subsequent suit when the very point is presented for decision." *Id.* The judiciary "has never held itself bound by any part of an opinion, in any case, which was not needful to the ascertainment of the right or title in question between the parties." *Carroll v. Carroll's Lessee*, 57 U.S. 275, 287 (1853); *see Alexander v. Sandoval*, 532 U.S. 275, 282 (2001) ("this Court is bound by holdings, not language").

Given its distinctive posture, *Mott* had no need to—and did not—establish a broad rule that judicial relief of every kind is foreclosed whenever presidents employ conditional laws like the militia statute. The *judiciary's* responsibility to evaluate the legality of a President's action, in a proper case, was not presented in *Mott*. After all, a plaintiff's inability to pursue civil liability for an officer's conduct, as in *Mott*, does not mean that courts are powerless to grant prospective relief from that conduct. *Compare Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982)

(no damages liability for a President's official actions), *with Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 583 (1952) (courts may enjoin implementation of illegal presidential orders).  Whether "monetary and other liabilities should be imposed upon individual officers" raises different questions than whether "equitable remedies" are warranted, and the answer "requires an assessment of [the] impact on governmental operations systemwide."  *Ziglar v. Abbasi*, 582 U.S. 120, 134, 136 (2017); *e.g.*, *Chappell v. Wallace*, 462 U.S. 296, 300 (1983) (declining to permit damages suits against military officers for violating subordinates' rights, based on "[t]he need for special regulations in relation to military discipline, and the consequent need and justification for a special and exclusive system of military justice").

Nothing in Supreme Court precedent since *Mott* has transformed its meaning or expanded the decision into a wholesale barrier against judicial review whenever statutes give conditional authority to presidents.  Over the past two centuries, *Mott*'s analysis has generated little more than a handful of peripheral citations. And the few opinions that address it in any depth, such as *Luther v. Borden*, 48 U.S. 1 (1849), are just as inapplicable here as *Mott* itself.

In sum, while federal courts are bound by precedent that "directly controls," *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023), even if its reasoning has eroded or been supplanted, *Mott* does not directly control here.  California and its

5

leaders have not disobeyed President Trump's orders. They do not argue that they, rather than the President, are entitled to decide in the first instance whether § 12406's conditions are satisfied. They are not seeking to hold anyone civilly liable. Rather, while complying with the President's orders (to their own detriment), they are asking the judiciary to do what it normally does: "interpret the act of Congress, in order to ascertain the rights of the parties," *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385 (2024) (quoting *Decatur v. Paulding*, 39 U.S. 497, 515 (1840)), and "say what the law is," *id.* (quoting *Marbury v. Madison*, 5 U.S. 137, 177 (1803)).

Judges are eminently qualified to conduct that analysis. Recognizing as much, the Founding generation made *prior* judicial review a prerequisite to presidential action under the original militia statute. Adhering to that process, President Washington obtained judicial certification that federal law could not be enforced before he called up the militia to combat the Whiskey Rebellion. More recently, the proceedings in this very case demonstrate that courts can construe statutes like § 12406 and issue timely decisions evaluating whether the statute's requirements are satisfied—without impeding the National Guard's efforts in the meantime, and without causing the disruption to military effectiveness that motivated the result in *Mott*. This Court should uphold the district court's decision.

## ARGUMENT

I. ***Martin v. Mott*** **Does Not Foreclose Judicial Review of a President's Decision to Federalize the National Guard.**

### A. *Mott*'s Historical Context

During the War of 1812, "a large section of the country was in virtual revolt against the general government." Frederick Bernays Wiener, *The Militia Clause of the Constitution*, 54 Harv. L. Rev. 181, 188 (1940). In particular, "the authority of the president of the United States over the militia became a subject of doubt and difficulty, and of a collision of opinion between the general government and the governments of some of the states." 1 James Kent, *Commentaries on American Law* 262 (1840). In defiance of President Madison, "[t]he governors of Massachusetts and Connecticut refused to call out their militia in the federal service." Marcus Cunliffe, *Soldiers and Civilians: The Martial Spirit in America* 185 (1968); *see* Kent, *supra*, at 263 (the states "refused to furnish detachments of militia for the maritime frontier"). Meanwhile, New York's militia refused to enter Canada to battle the British, believing such measures went beyond repelling "invasions." Wiener, *supra*, at 189. Rhode Island would not allow its militia to leave the state. These actions were "able to paralyze for the time being the military power of their respective States, and defeat the plans of the General Government." Emory Upton, *The Military Policy of the United States* 96 (1917).

To justify such noncompliance, the governor of Massachusetts obtained judicial support for his view that state military leaders could decide for themselves whether an "invasion" had occurred that triggered presidential authority to call up the militia. The governor submitted to the state's highest court the question of "whether the commanders in chief of the militia of the several states have a right to determine whether any of the exigencies aforesaid exist, so as to require them to place the militia . . . in the service of the United States, at the request of the president." *Opinion of the Justices*, 8 Mass. 548, 549 (1812).

The court concluded that "this right is vested in the commanders in chief of the militia of the several states," and it was "the duty of *these commanders* to execute this important trust," in conformity with "the laws of their several states" but "*without reference to the . . . officers of the United States*." *Id.* (emphasis added). "They must, therefore, determine when either of the special cases exist, obliging them . . . to render themselves and the militia subject to the command of the president." *Id.* Addressing Congress, President Madison denied that "the authority of the United States to call into service and command the militia for the public defense can be thus frustrated even in a state of declared war." Upton, *supra*, at 97.

"These embarrassing questions . . . remained unsettled by the proper and final decision of the tribunal that is competent to put them to rest, until the case of

*Martin v. Mott*." Kent, *supra*, at 265. As Joseph Story—*Mott*'s author—explained a few years after the decision, the war provoked disagreement about whether "the governors of the states, to whom orders were addressed by the president to call forth the militia on account of danger of invasion, were entitled to judge for themselves, whether the exigency had arisen; and were not bound by the opinion or orders of the president." 3 Joseph Story, *Commentaries on the Constitution of the United States* 90 (1833). "*This question* was much agitated during the late war with Great Britain," and "[a]t a very recent period, the question came before the Supreme Court," which "determined, that the authority to decide, whether the exigency has arisen, belongs exclusively to the president." *Id.* (emphasis added).

### B.    *Mott*'s Procedural Context

While the *Mott* opinion was solicitous of presidential prerogatives, its scope and contours were shaped by the common law form of action in which it arose. *Mott* confronted the specific question of whether servicemembers could use common law suits to escape the consequences of military dereliction. The Court answered no, recognizing the serious consequences for military discipline and the national defense that would otherwise follow. *Mott* contains no sweeping announcement that courts may never, under any circumstances, evaluate the legality of presidential decisions under the militia statute. Statements in the

opinion that sound broad in isolation all take on a narrower meaning in the context of the opinion as a whole.

*Mott*'s focus is on who the militia statute empowers, "in the first instance," 25 U.S. at 31, to decide whether the conditions for calling forth the militia are satisfied. Even if a President errs in making that decision, it does not follow that officers in the chain of command may disobey the President's order and later escape liability by challenging the order's factual or legal sufficiency in a common law suit. The decision reaches no further. That is why, at the time, the question *Mott* was understood to resolve was whether the President or state militia officers had the power to decide if the statute's conditions were satisfied.

Amidst "public and open war" with Britain, *id.* at 20, President Madison requisitioned state militia troops under the distant precursor to 10 U.S.C. § 12406, which permitted calling up these troops "whenever the United States shall be invaded, or be in imminent danger of invasion from any foreign nation," Act of Feb. 28, 1795, ch. 36, § 1, 1 Stat. 424, 424. New York's governor, the commander-in-chief of the state militia, implemented Madison's requisition by ordering his state militia members into federal service. *Mott*, 25 U.S. at 20. But Jacob Mott, a private in the militia, failed to appear and render service as ordered. *Id.* at 21.

10

Mott was far from the only delinquent, and a federal court-martial was established to prosecute those in the district who failed to serve. *Id.* Mott was convicted and fined. *Id.* at 22. When he did not pay, a federal marshal was ordered to seize his property to satisfy the fine. *Id.*

To recover his property, Mott brought a replevin action against the officer in New York court. Replevin enabled plaintiffs to secure the return of personal property wrongly taken and also to obtain damages. *See* 3 William Blackstone, *Commentaries on the Laws of England* 149-50 (1766). Martin, the defendant officer, responded by filing an "avowry," a pleading setting forth a justification for the seizure. *See id.*; *Mott*, 25 U.S. at 21. Mott, in turn, demurred—challenging the sufficiency of the allegations in Martin's avowry on several legal grounds. 25 U.S. at 23-27. After Mott prevailed in state court, the case was brought to the Supreme Court. The Court's opinion is structured around examining and rejecting the various arguments in Mott's demurrer. *See id.* at 28 ("it will be our business to discuss the most material of these objections").

Mott's main contention was that defendant Martin's avowry failed to allege that the preconditions of the militia statute were satisfied—that "any of the exigencies had occurred, in which the President is empowered to call out the militia." *Id.* at 23. According to Mott, it was "necessary [for Martin] to aver the

11

facts which bring the exercise [of the President's power] within the purview of the statute." *Id.* at 32. The Court disagreed.

### C. *Mott*'s Holding and Reasoning

Rejecting Mott's contentions, the Supreme Court held that Martin's avowal did not need to prove the accuracy of President Madison's determination that the militia statute's conditions were satisfied. If the factual basis for the President's order could be contested in a common law suit, that fact dispute would be sent to a jury, "and thus the legality of the orders of the President would depend, not on his own judgment of the facts, but upon the finding of those facts upon the proofs submitted to a jury." *Id.* at 33. The Court found it functionally and pragmatically untenable to have state court juries reevaluating the factual bases of presidential decisions under the militia statute. *Id.* at 29-33.

Significantly, there was no immunity from damages in this era for officers who implemented unlawful presidential orders. *See Little v. Barreme*, 6 U.S. 170, 170-71 (1804); *Tracy v. Swartwout*, 35 U.S. 80, 98-99 (1836); *see also Dynes v. Hoover*, 61 U.S. 65, 78-80, 83-84 (1857) (federal marshals who executed court-martial sentences did so under the President's orders pursuant to his military authority). So if juries could second-guess the President's assessment that an invasion was threatened—invalidating his orders calling up the militia—then "any act done by any person in furtherance of such orders would subject him to

responsibility in a civil suit, in which his defence must finally rest upon his ability to establish the facts by competent proofs." *Mott*, 25 U.S. at 30. That is precisely the burden Mott attempted to place on defendant Martin. "Such a course would be subversive of all discipline, and expose the best disposed officers to the chances of ruinous litigation." *Id.* at 30-31.

The Court underscored the centrality of this factor by repeatedly citing and endorsing a New York decision addressing similar facts, which took "precisely the same" view of a claim like Mott's. *Id.* at 33. In *Vanderheyden v. Young*, 11 Johns. 150 (N.Y. 1814), the New York Supreme Court rejected a trespass and false arrest suit against a court-martial official by a militia member who was ordered detained after his conviction for desertion. *Id.* at 151-52. As in *Mott*, the plaintiff demurred to the defendant officer's avowal because it did not allege "that the United States were invaded, or in imminent danger of invasion." *Id.* at 154.

Just as in *Mott*, the court ruled that such an allegation was not required. If it were, then "every subordinate officer, who should be called into service, would be put to the necessity, when he was sued for any act of discipline upon the privates, to prove to a jury that the president had acted correctly in making his requisitions; and if he failed in this proof, it would subject him to damages for an act otherwise lawful." *Id.* at 158. This result would be "monstrous," the court wrote: "No man would dare to obey the orders, either of the president, or of his superior officer,

lest, peradventure, the president had either abused his authority, or misjudged, in relation to the occurrence of the fact, which authorized him to call forth the militia." *Id.* For officers like the defendant, who carried out presidential orders, "it is not their duty or business to investigate the facts thus referred to their superior, and to rejudge his determination. In a military point of view, the contrary doctrine would be subversive of all discipline," and would have "deplorable and fatal" consequences for national security. *Id.*

*Mott* endorsed this decision as resolving the case "with entire legal correctness." *Mott*, 25 U.S. at 33. Explicitly adopting the same reasoning, *Mott* foreclosed civil liability for officers who carried out presidential orders under the militia statute because entertaining those suits would critically undermine military discipline and the national defense. Every subordinate officer would be licensed to disobey presidential orders in favor of their own judgment of the facts, and to submit those disputes to juries if later punished for disobedience. And no officers would be safe carrying out military orders, because a President's misjudgment of the law or the facts would leave them exposed to "ruinous litigation." *Id.* at 31.

This is why, in Mott's replevin action, the President's judgment was "conclusive as to the existence of the exigency, and may be given in evidence as conclusive proof thereof." *Id.* at 32. Mott could not relitigate his count-martial and sentence by questioning the legality of the order he was convicted of

14

disobeying.  The Supreme Court had no need to—and did not—endorse the much broader proposition that the legality of presidential orders under the militia statute could never be tested in any context or be the subject of any form of judicial relief. Nor did it declare that presidential discretion under the statute was absolute. Indeed, the Court noted that the authority given to the President "is, in its terms, a limited power, confined to cases of actual invasion, or of imminent danger of invasion." *Id.* at 29.

Although the stay panel acknowledged *Mott*'s "concerns about militiamen disobeying orders," the panel thought that "much of the Court's reasoning . . . appears equally applicable regardless of the case's particular facts."  Stay Op. 22. On the contrary, *Mott*'s concern about the chain of command—and the harms that would follow if common law actions could be used to disrupt the chain of command—is central to the entire decision.  All of *Mott*'s broad-sounding passages, when read in context, are plainly focused on this concern.

Take, for instance, *Mott*'s statement that "the authority to decide whether the exigency has arisen, belongs exclusively to the President," and that "his decision is conclusive upon all other persons."  25 U.S. at 30.  Defendants claim that "all other persons" here included the courts.  Appellants Br. 22.  Not so.  The full passage reveals what the Supreme Court meant:

> If [the power conferred by the militia statute] be a limited power, the
> question arises, by whom is the exigency to be judged of and

decided?  Is the President the sole and exclusive judge whether the exigency has arisen, *or is it to be considered as an open question, upon which every officer to whom the orders of the President are addressed, may decide for himself, and equally open to be contested by every militia-man who shall refuse to obey the orders of the President*?  We are all of opinion, that the authority to decide whether the exigency has arisen, belongs exclusively to the President, and that his decision is conclusive upon all other persons.

*Mott*, 25 U.S. at 29-30 (emphasis added).  The "other persons" for whom presidential orders were deemed "conclusive" here were not federal judges.  Rather, the Court was referring to the military bureaucracy: federal military officers and state militia members.  A similar reference to "any other person" confirms this.  Discussing why officers who implement orders under the militia statute cannot later be found liable for doing so, the Court explained:

[The President] is necessarily constituted the judge of the existence of the exigency in the first instance, and is bound to act according to his belief of the facts.  If he does so act, and decides to call forth the militia, his orders for this purpose are in strict conformity with the provisions of the law; *and it would seem to follow as a necessary consequence, that every act done by a subordinate officer, in obedience to such orders, is equally justifiable*.  The law contemplates that, under such circumstances, orders shall be given to carry the power into effect; and *it cannot therefore be a correct inference that any other person has a just right to disobey them*.

*Id.* at 31 (emphasis added).

Elsewhere, the Court further confirmed that ensuring an effective chain of command was the motivating force behind its decision.  The President's power to call up the militia "is to be exercised upon sudden emergencies . . . under

circumstances which may be vital to the existence of the Union," and therefore a "prompt and unhesitating obedience to orders is indispensable to the complete attainment of the object." *Id.* at 30. The Court then underscored its pragmatic reasoning about the effectiveness of the militia:

> The service is a military service, and the command of a military nature; and in such cases, every delay, and every obstacle to an efficient and immediate compliance, necessarily tend to jeopard[ize] the public interests. *While subordinate officers or soldiers are pausing to consider whether they ought to obey, or are scrupulously weighing the evidence of the facts upon which the commander in chief exercises the right to demand their services*, the hostile enterprise may be accomplished without the means of resistance.

*Id*. (emphasis added). Once again, the focus was on deciding if the President, or the "subordinate officers" in the state militias, were the arbiters of whether the conditions for calling up the militia were satisfied. The *judiciary's* power vis-à-vis the President was not at issue and was not discussed.

In short, *Mott* addressed only the President's tug-of-war with lower-level militia figures in the states over the interpretation of the militia statute. It put to rest the "embarrassing questions," Kent, *supra*, at 265, that were "much agitated" during the War of 1812, Story, *supra*, at 90, about whether the lawfulness of calling up the militia was "an open question, which every officer, to whom the orders of the president are addressed, may decide for himself," *id.* at 89-90. It did so by preventing officers who obeyed federal orders from facing civil liability in suits by officers who disobeyed federal orders.

17

This is the context in which the Court held that the President's discretion under the statute to exercise "his own opinion of certain facts" made him "the sole and exclusive judge of the existence of those facts." *Mott*, 25 U.S. at 31-32. But Plaintiffs here seek a different form of judicial relief in a very different procedural posture that raises different questions. *Mott* does not control this case.

## II. Subsequent Decisions Citing *Mott* Do Not Foreclose Judicial Review.

*Mott* was not the font of a robust doctrine. In 200 years, its analysis has generated little more than a smattering of mostly peripheral citations. *E.g.*, *Hirabayashi v. United States*, 320 U.S. 81, 93 (1943) (citing *Mott* while upholding discriminatory curfew on American citizens of Japanese ancestry). Only a few decisions citing the case bear discussion. None supports a bar on judicial review in this case, or the extreme deference the stay panel applied.

*Luther v. Borden*, 48 U.S. 1 (1849), was "very similar" to *Mott*, and is similarly inapplicable here. *Id.* at 44. Like *Mott*, it involved an effort to impose civil liability on officers who followed orders to the plaintiff's detriment. As in *Mott*, the plaintiff asked the courts to reevaluate a decision made by another entity that had authorized the officers' conduct. And just as in *Mott*, the Supreme Court held that allowing such reevaluation in a common law suit would have intolerable effects on the public interest—for reasons that do not apply here.

18

The backdrop to the case was an unusual armed conflict between two competing state legislatures in Rhode Island. *Id.* at 34-35. In a trespass suit against state officers who entered his home to arrest him, Luther asked the court to rule that the government which these officers served was illegitimate. There were many reasons to reject Luther's request. Deciding which of two governments was legitimate had always been considered a political, not judicial, task. *Id.* at 39. The Rhode Island courts had sided with the legislature the officers served, and federal courts were bound to follow that ruling on state law. *Id.* at 40. No judicial standards existed for resolving the question anyway. *Id.* at 41. And the dispute was ultimately a factual disagreement, which in a common law suit could be resolved differently by different juries, leaving the validity of the rival governments unsettled. *Id.* at 41-42.

Finally—and here the opinion relies on *Mott*—if one of the two legislatures requested federal military support under the militia act, "the President must, of necessity, decide which is the government, and which party is unlawfully arrayed against it." *Id.* at 43. Could a federal court, "while the parties were actually contending in arms," reevaluate that decision, "call witnesses before it and inquire which party represented a majority of the people?" *Id.* If so, and if the court ruled against the original government, then all of its laws "were nullities; its taxes wrongfully collected; its salaries and compensation to its officers illegally paid; its

19

public accounts improperly settled; and the judgments and sentences of its courts in civil and criminal cases null and void, and the officers who carried their decisions into operation answerable as trespassers, if not in some cases as criminals." *Id.* at 38-39.

None of those considerations apply here, for the same reason that *Mott*'s analysis does not. Accepting Luther's claim would have made the Constitution "a guarantee of anarchy." *Id.* at 43. Not so here.

*United States v. Speed*, 75 U.S. 77 (1868), involved a statute that, unlike 10 U.S.C. § 12406, contained no standards limiting the relevant officer's exercise of discretion. *Id.* at 78, 83 & n.4. For obvious reasons, the Supreme Court has consistently held that standardless grants of discretion like this are not amenable to judicial review. *See Dalton v. Specter*, 511 U.S. 462, 476 (1994); *Dakota Cent. Tel. Co. v. South Dakota*, 250 U.S. 163, 181 (1919).

*United States v. George S. Bush & Co.*, 310 U.S. 371 (1940), which addressed tariffs on "canned clams imported from Japan," was similar. *Id.* at 375. The statute there authorized the President to adopt tariff rate adjustments recommended by a commission "*if in his judgment* such rates of duty and changes are shown by such investigation of the commission to be necessary to equalize [certain] differences in costs of production." *Id.* at 376-77 (quoting statute) (emphasis added). A lower court invalidated the President's action because it

20

believed the commission used the wrong method when it "computed the Japanese cost of production." *Id.* at 377. But as the Supreme Court explained, "[t]here [was] no express provision in the Act" requiring the method of computation the lower court dictated. "The matter was left at large," and so "[t]he President's method of solving the problem was open to scrutiny neither by the [lower court] nor by us." *Id.* at 378-79. As in *Dalton* and similar cases, but unlike here, the statute provided no standards limiting the President's discretion, and hence nothing for a court to enforce.

*Sterling v. Constantin*, 287 U.S. 378 (1932), unlike this case, dealt exclusively with a governor's *constitutional* power to identify exigencies requiring military aid. *Id.* at 399. The decision grapples with the nature of that vaguely defined, implied constitutional authority "to maintain peace." *Id.* at 400. It does not support unbridled presidential license to wield statutory powers when the specific conditions Congress prescribed for invoking those powers are absent.

In sum, nothing in the sparse precedent citing *Mott* over the past two centuries transformed that decision into a sweeping barrier against judicial review whenever statutes grant authority to presidents under specified conditions.

## III. History Demonstrates that Courts Can Evaluate Whether the Conditions for Federalizing the National Guard Are Met.

Defendants argue that courts may not "second-guess the President's judgment" that the conditions for activating the National Guard are satisfied.

21

Appellants Br. 31.  But judges are fully capable of examining the evidence submitted to them and determining whether the executive branch is unable to "execute the laws of the United States."  10 U.S.C. § 12406(3).  The Founding generation recognized as much, making *prior* judicial review a prerequisite to presidential action under the original militia statute.  Adhering to that process, President Washington obtained judicial certification before mobilizing the militia to combat the Whiskey Rebellion—a truly existential threat to the enforcement of federal law.  As demonstrated by that history, and by the proceedings in this very case, courts can use the same methods they always use to construe statutes like § 12406 and evaluate whether the facts justify their invocation.

Congress passed the first militia statute in 1792, implementing its authority to "provide for calling forth the Militia."  U.S. Const. art. I, § 8, cl. 15.  Not unlike § 12406, this statute authorized presidents to call the state militias into federal service under three conditions: (1) invasion or imminent danger of invasion, (2) insurrection against a state government, or (3) inability to execute the laws of the United States.  *See* Act of May 2, 1792, ch. 28, §§ 1, 2, 1 Stat. 264, 264.

There was an important difference, however.  The original militia statute distinguished invasion and insurrection (addressed in section one) from an inability to execute the laws (addressed in section two).  Before the latter power could be employed, Congress required a Supreme Court Justice or the local district judge to

certify to the President that federal law was being "opposed, or the execution thereof obstructed, . . . by combinations too powerful to be suppressed by the ordinary course of judicial proceedings, or by the powers vested in the [federal] marshals." *Id.* § 2, 1 Stat. at 264; *see also id.* § 9, 1 Stat. at 265 (allowing federal marshals to execute federal law using the same powers possessed by local law enforcement).

Requiring judicial certification was a considered choice, driven by concerns about the potential for overreaction if military force could be used to execute federal law. Initial proposals for the bill placed much greater discretion in the President to deploy the militia, simply providing that he was "authorized to call out the Militia, or such part thereof, *as the exigence may, in his opinion, require,* to execute the laws of the Union, suppress insurrections, and repel invasions." H. Journal, 2d Congress, 1st Sess. 575 (1792) (emphasis added). "Representatives were not troubled over the use of the militia in circumstances so grave as invasion or outright insurrection; but they were deeply concerned over the prospect of troops being used in common civilian situations 'to execute the laws of the Union.'" David E. Engdahl, *Soldiers, Riots, and Revolution: The Law and History of Military Troops in Civil Disorders*, 57 Iowa L. Rev. 1, 44 (1971).

One representative, for instance, invoked the prospect of federal statutes being "enforced by martial law." 3 Annals of Cong. 574 (1792) (Rep. Page).

Another "objected to the general terms used in this section," and thought "the sources from whence complaints should issue should be pointed out." *Id.* (Rep. Livermore). Still another acknowledged "the necessity of providing for an energetic execution of the laws" but stressed "the importance of having the power defined and guarded as much as possible," to ensure that "the military is never called in but in the last extremity." *Id.* at 575 (Rep. Murray). Referencing the newly enacted and already unpopular whiskey tax, one representative objected that the bill would allow the President "to call forth the military in case of any opposition to the excise law; so that if an old woman was to strike an excise officer with a broomstick, forsooth the military is to be called out to suppress an insurrection." *Id.* (Rep. Clark). On similar grounds, another declared that this power "could not with safety be intrusted to the President." *Id.* at 576 (Rep. Giles).

In response to these concerns about presidential overreach, a motion was made to require that, before the militia was employed, information that federal law could not be executed must first "be communicated to the President of the United States by one of the Associate Justices, or the District Judge." *Id.* at 577 (Rep. Baldwin). This motion was adopted, and the bill soon passed. *Id.* at 580. Congress thus "assign[ed] to the courts the judgment of whether the necessary contingency had occurred," Engdahl, *supra*, at 48, preventing presidents from

taking *any* responsive action with the militia without first obtaining judicial authorization.

Two years later, President Washington complied with this process when combatting the Whiskey Rebellion—an organized, armed, and sustained resistance to enforcement of the federal excise tax in Pennsylvania. *See* Richard H. Kohn, *The Washington Administration's Decision to Crush the Whiskey Rebellion*, 59 J. Am. Hist. 567, 569-70 (1972) (recounting how local leaders resolved to "obstruct the operation of the Law" and called for "intimidation of anyone who favored or obeyed the law"). Among other incidents in that conflict, hundreds of "armed insurgents . . . besieged the home of the revenue collector, wounding some of the inhabitants," and "fired upon, and later seized the federal marshal, releasing him only on his agreement to renounce any future service of process." Engdahl, *supra*, at 49 n.237. The rebels "caused both the revenue collector and the marshal to flee," and "[t]he federal district court in the insurgent district was unable to sit." *Id.*; *see* Kohn, *supra*, at 570 (the revenue collector reported that "the law was now unenforceable"). President Washington characterized the rebels as "levying war against the United States." *A Proclamation*, 4 Annals of Cong. 1412 (1794).

In response to the calamity, Washington "turned over to Associate Justice James Wilson the evidence which had been collected showing resistance to the laws." Bennett M. Rich, *Washington and the Whiskey Insurrection*, 65 Pa. Mag.

Hist. & Bio. 334, 340 (1941); *see* Kohn, *supra*, at 572 n.23 (noting that this evidence included deposition testimony from a military officer). Three days later, Justice Wilson provided the certification required by the statute. *See A Proclamation*, 4 Annals of Cong. 1413 (1794) (relating that Justice Wilson "did, from evidence which had been laid before him, notify to me that 'in the counties of Washington and Allegany, in Pennsylvania, laws of the United States are opposed, and the execution thereof obstructed by combinations too powerful to be suppressed by the ordinary course of judicial proceedings, or by the powers vested in the marshal of that district'"). Upon the arrival of the militia in Pennsylvania, resistance to the laws ceased. Rich, *supra*, at 347.

Washington's handling of the Whiskey Rebellion confirmed the truth of what Congress recognized when passing the militia statute: even during a national crisis, judges are capable of examining facts presented to them and deciding whether the legal conditions for activating the militia are satisfied.

The original militia statute expired after two years. *See* Act of May 2, 1792, § 10, 1 Stat. 264 at 265. When Congress enacted a new version in 1795, it omitted the requirement for judicial precertification, *see* Act of Feb. 28, 1795, § 2, 1 Stat. at 424, although "no reasons for the deletion appear in the legislative history," Engdahl, *supra*, at 48 n.229. Lawmakers may have been reassured by their President's measured and restrained conduct during the Whiskey Rebellion, which

gave "abundant evidence of Washington's scrupulous regard for the law." Rich, *supra*, at 350; *see id.* at 351-52 (highlighting President Washington's "patience over a considerable period of law violation, his attempts at conciliation and peaceful settlement, his efforts to enlist the co-operation of state officials, and his especial concern for the protection of the civil rights of the citizenry"). Congress also may have decided that requiring prior authorization through an unusual warrant-like procedure—paralyzing any responsive action in the meantime—could prove a hindrance when emergencies required especially prompt action.

Whatever the reason, Congress's new policy choice on this matter did not negate what the original statute helped demonstrate: the capacity of judges to interpret statutes like § 12406 and resolve whether their conditions are satisfied.

The proceedings in this case demonstrate the same thing. After President Trump federalized members of the Guard, Plaintiffs complied with Defendants' directives but promptly sought judicial review of their legality. The district court granted preliminary relief soon after, but temporarily stayed that relief, and this Court, at Defendants' request, granted an administrative stay the same day. A week later, this Court granted Defendants' motion for a stay pending appeal. Although the district court and this Court's stay panel disagreed about whether § 12406(3)'s requirements were met, both issued reasoned opinions on short

27

deadlines that attended carefully to the facts.  Defendants' use of the Guard was unimpeded in the meantime.

Resolving concrete disputes about the legality of presidential action is a key part of what federal courts do.  *E.g.*, *Dames & Moore v. Regan*, 453 U.S. 654, 667 (1981); *Youngstown*, 343 U.S. at 588-89; *Marbury*, 5 U.S. at 177.  The Founding generation, mindful of the gravity of assigning domestic military power to the President, entrusted judges with making the same type of determinations required in this case.  And as discussed above, nothing in the holding or reasoning of *Martin v. Mott* prevents judges from resolving those questions or requires them to give undue deference to the President in the process.

## CONCLUSION

For the foregoing reasons, this Court should affirm the District Court's order.

Respectfully submitted,

*/s/ Brian R. Frazelle*
Elizabeth B. Wydra
Brianne J. Gorod
Brian R. Frazelle
CONSTITUTIONAL ACCOUNTABILITY CENTER
1730 Rhode Island Ave. NW, Suite 1200
Washington, D.C. 20036
(202) 296-6889
brian@theusconstitution.org

*Counsel for Amicus Curiae*

Dated: September 9, 2025

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:*
http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**: 25-3727

I am the attorney or self-represented party.

**This brief contains 6,775 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[  ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ x ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [  ] it is a joint brief submitted by separately represented parties.

    [  ] a party or parties are filing a single brief in response to multiple briefs.

    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Brian R. Frazelle        **Date** September 9, 2025

*(use "*s/[typed name]*" to sign electronically-filed documents)*

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of September, 2025, I electronically filed the foregoing document using the Court's Appellate Case Management System, causing a notice of filing to be served upon all counsel of record.

Dated: September 9, 2025

*/s/ Brian R. Frazelle*
Brian R. Frazelle