No. 25-3727

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

GAVIN NEWSOM, in his official capacity as Governor of the State
of California, et al.,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, in his official capacity as President of the
United States, et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of California
No. 3:25-cv-04870-CRB
Hon. Charles R. Breyer

_____

**BRIEF OF AMICUS CURIAE INTERFAITH ALLIANCE FOUNDATION
IN SUPPORT OF APPELLEES AND AFFIRMANCE**

_____

Simon C. Brewer
Brian D. Netter
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
202-448-9090
sbrewer@democracyforward.org

*Counsel for Amicus Curiae*
*Interfaith Alliance Foundation*

## DISCLOSURE STATEMENT

Interfaith Alliance Foundation is a non-profit organization with its principal place of business in Washington, D.C. It does not have either a parent corporation or a publicly held corporation that owns 10 percent or more of its stock.

Date:  September 9, 2025

*/s/ Simon C. Brewer*
Simon C. Brewer

# TABLE OF CONTENTS

Page

DISCLOSURE STATEMENT ................................................................i

TABLE OF AUTHORITIES ............................................................. iii

INTRODUCTION AND INTEREST OF AMICUS CURIAE...............................1

SUMMARY OF THE ARGUMENT......................................................2

ARGUMENT .................................................................................3

I.      Protest is a vital part of the faith community's free expression and
        free exercise of religion...................................................................3

        A.      Protest is a vital expression of faith in many traditions.......................3

        B.      Historically, faith communities have played an important role in
                protest movements .................................................................6

        C.      The First Amendment provides an essential safeguard for protest as
                religious expression ...........................................................12

II.     The preliminary injunction protects First Amendment rights.......................14

CONCLUSION .................................................................................21

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021) ....................................17

*Bissonette v. Haig*, 485 U.S. 264 (1988) ..................................................................17

*Bissonette v. Haig*, 776 F.2d 1384 (8th Cir. 1985)...................................................17

*Bissonette v. Haig*, 800 F.2d 812 (8th Cir. 1986)....................................................17

*Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603 (2020) .......................18

*Capitol Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753 (1995)...................13

*Citizens United v. FEC*, 558 U.S. 310 (2010) ..........................................................17

*Collins v. Jordan*, 110 F.3d 1363 (9th Cir. 1996) ...................................................20

*Doe v. Harris*, 772 F.3d 563 (9th Cir. 2014)...........................................................15

*Edwards v. City of Coeur d'Alene*, 262 F.3d 856 (9th Cir. 2001)..........................19

*Fellowship of Christian Athletes v. S.J. Unified Sch. Dist. Bd. of Educ.*,
   82 F.4th 664 (9th Cir. 2023) .........................................................................15

*Green v. City of St. Louis*, 52 F.4th 734 (8th Cir. 2022) .........................................16

*Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022)...................................12, 13

*Laird v. Tatum*, 408 U.S. 1 (1972) ..........................................................................20

*Mahmoud v. Taylor*, 145 S. Ct. 2332 (2025)...........................................................18

*Meinecke v. City of Seattle*, 99 F.4th 514 (9th Cir. 2024) ......................................13

*Menotti v. City of Seattle*, 409 F.3d 1113 (9th Cir. 2005) ......................................14

*Newsom v. Trump,* 141 F.4th 1032 (9th Cir. 2025)..................................................14

*Ovadal v. City of Madison*, 416 F.3d 531 (7th Cir. 2005) ......................................12

*Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14 (2020) ..................15, 18

*Schenk v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357 (1997) ...........................12

*Snyder v. Phelps*, 562 U.S. 443 (2011) ...................................................13

*United States v. Alvarez*, 567 U.S. 709 (2012)..........................................18

*United States v. Hansen*, 599 U.S. 762 (2023)...........................................15

## STATUTES AND RULES

10 U.S.C. § 12406 ........................................................................14

Fed. R. App. P. 29 ........................................................................1

## OTHER AUTHORITIES

Claire Wang, *'To Not Speak Out is to be Complicit': LA Faith Leaders
    Mobilize Amid ICE Raids*, The Guardian (June 18, 2025),
    https://perma.cc/32UG-BSUZ.................................................7

Desmond Tutu, Nobel Prize lecture (Dec. 11, 1984),
    https://perma.cc/U6ZM-GU4G ................................................10

*How Mass Deportations Will Separate American Families, Harm Our
    Armed Forces, and Devastate Our Economy: Hearing Before the
    Comm. on the Judiciary*, 118th Cong. (2024) (statement of Ret.
    Maj. Gen. Randy Manner), https://perma.cc/7P4K-4H34 ...........................16

James F. Findlay, *Religion and Politics in the Sixties: The Churches and
    the Civil Rights Act of 1964*, 77 J. Am. Hist. 66 (1990). ..............................9

James Queally, *A Curfew—and Faith Leaders' Calls—Quiet the Night*,
    L.A. Times (June 10, 2025), https://perma.cc/4CRN-7X76..........................7

Letter from Rev. Dr. Martin Luther King Jr., *Letter from a Birmingham
    Jail* (Apr. 16, 1963), https://perma.cc/4HMV-GZ63 .....................................8

Letter from Sihk Coalition to Assistant Att'y Gen. for Civ. Rts. Nominee
    Harmeet Kaur Dhillon (Dec. 19, 2024), https://perma.cc/YXQ7-
    Y94T ...................................................................................4

Melissa Gomez, *Faith Leaders Come Together to Defend Immigrant
    Communities Among Federal Raids*, L.A. Times (June 19, 2025),
    https://perma.cc/DHH7-C9RT ...................................................7

iv

Michael Parks, *S. Africa Clerics, Marchers Pray for Detainees' Release*, L.A. Times (Apr. 18, 1987), https://perma.cc/W3VD-YPWJ .....................10

Nina Darnton, *The Subtle Power of the Polish Church*, N.Y. Times (June 6, 1982), https://perma.cc/D377-F85F .........................................11

Press Release, Montgomery Improvement Association, *Bus Protesters Call Southern Negro Leaders Conference on Transportation and Nonviolent Integration* (Jan. 7, 1957), https://perma.cc/8845-MP7D ......................................................................................8

Robert F. Kennedy Hum. Rts. Ctr., *Father Jerzy Popieluszko*, https://perma.cc/WFE4-Q3JL .......................................................12

S. Baptist Church, *Resolution On The Freedom Of Choice Act, Hyde Amendment* (June 1, 1993), https://perma.cc/9MDX-TCX2 .........................6

Tristan Anne Borer, Church Leadership, State Repression, and the 'Spiral of Involvement' in the South African Anti-Apartheid Movement, in *Disruptive Religion: The Force Of Faith In Social Movement Activism* (1st ed. 1996)......................................................................10

*Truth and Reconciliation Commission of South Africa Report* (Oct. 29, 1998), https://perma.cc/7TQK-ZCZH............................................9

U.S. Conf. of Catholic Bishops, *The Harvest of Justice Is Sown in Peace* (Nov. 17, 1993), https://perma.cc/NL68-FFAT ...............................5

United Methodist Church, *Social Principles: The Political Community*, https://perma.cc/3QLJ-RJ38 (last visited Sept. 9, 2025) ..............................6

Voice of Am., *Popular Hero and Activist Priest Beatified in Poland* (June 6, 2010), https://perma.cc/R24J-N7S4 ...............................12

Wendell Bird, *Religious Speech and the Quest for Freedoms in the Anglo-American World* (2023)......................................................7

Wladyslaw Sila-Nowick, *The Role of the Catholic Church in Polish Independence*, 6 N.Y. L. Sch. J. Int'l & Comp. L. 703 (1986).....................11

Zdzislawa Walaszek, *An Open Issue of Legitimacy: The State and the Church in Poland*, 483 Annals of the Am. Acad. of Pol. & Soc. Sci. 118, 133 (1986)......................................................................11

## SACRED TEXTS

Deuteronomy 16:20 ...................................................................................3

Mark 12:30-31 ......................................................................................5

Matthew 5:10 ........................................................................................5

Matthew 21:12 ......................................................................................5

Matthew 25 ...........................................................................................5

Micah 6:8 ..............................................................................................4

Qur'an 4:135 .........................................................................................4

Qur'an 16:90 .........................................................................................4

## INTRODUCTION AND INTEREST OF AMICUS CURIAE[1]

Amicus curiae Interfaith Alliance Foundation is a network of people of diverse faiths and beliefs from across the country working together to build a resilient democracy and fulfill America's promise of religious freedom and civil rights not just for some, but for all. Since its founding in 1994, Interfaith Alliance has worked tirelessly to defend the values that define this nation—values of inclusion, dignity, and the protection of each individual's right to believe as they choose. It strives to build a resilient, inclusive democracy, which respects the inherent dignity of all people, affords each person the freedoms of belief and religious practice, and guarantees that all have the opportunity to thrive.

Interfaith Alliance has an important interest in the outcome of this case because it implicates the First Amendment rights of the organization's members and others belonging to diverse faith communities in the United States. The order at issue in this appeal prohibiting the illegal deployment of the National Guard in Los Angeles honors the First Amendment by safeguarding the right to engage in public protest. That right is particularly vital for members of faith communities, many of whom regard protesting injustice as an expression of their faith.

---

[1] All parties consent to the filing of this brief. No party's counsel authored this brief in whole or in part, and no money intended to fund preparing or submitting this brief was contributed by a party or party's counsel or anyone other than amici, their members, or their counsel. *See* Fed. R. App. P. 29(a).

## SUMMARY OF THE ARGUMENT

I.    For many Americans, publicly protesting injustice is an essential expression of their faith. Religious teachings from various traditions urge believers to seek justice and to speak out when they perceive injustice. As a result, faith leaders and religious organizations often have played important roles in movements around the world protesting injustice, such as the U.S. civil rights movement, the South African anti-apartheid movement, and the Polish resistance to Soviet rule. The Constitution provides multiple mutually reinforcing protections for such protests as an expression of faith. The First Amendment's Free Expression, Free Exercise, and Assembly Clauses work in tandem to protect and promote religiously motivated protests.

II.    The preliminary injunction entered by the district court advances First Amendment values. The deployment of armed National Guardsmen in Los Angeles threatens to escalate an already volatile situation and, given soldiers' combat training and lack of training in civilian policing, raises the specter of violent military-civilian confrontations that would undoubtedly discourage peaceful protesters. Even if no such incidents occur, the mere presence of soldiers at a protest predictably chills the exercise of the First Amendment rights to free expression, free exercise of religion, and peaceable assembly. Those core constitutional guarantees deserve judicial protection when the government broadly

2

claims that emergency conditions justify highly unusual measures, as it has done here. Because the district court acted appropriately to safeguard constitutional rights, the injunction it entered should be affirmed.

## ARGUMENT

### I. Protest is a vital part of the faith community's free expression and free exercise of religion.

#### A. Protest is a vital expression of faith in many traditions.

Americans of many faith traditions are called to protest, among other First Amendment activities, as an expression of their religious commitments to rectify injustice and pursue righteousness. That principle holds true broadly across many faith traditions practiced in the United States.

Jewish tradition emphasizes the obligation to pursue "tzedek," the concept of righteousness or justice. For instance, the Book of Deuteronomy commands believers: "Justice, justice shall you pursue . . . ." Deuteronomy 16:20. The Hebrew term "tikkun olam" ("repairing the world") is widely used in the United States to refer to the Jewish social responsibility to engage in promote more just public policy. The Hebrew Prophets protested injustice in their own times, and American Jews follow that example through prophetic advocacy today, often through Jewish institutions. The Prophet Micah's words have echoed throughout the millennia: "He has shown you, O mortal, what is good. And what does the Lord require of

you? To act justly and to love mercy, and to walk humbly with your God." Micah 6:8.

Dharmic traditions such as Hinduism, Buddhism, and Sikhism underscore the concept of dharma, engaging in a right way of living, that has sometimes been translated as "justice" or "righteousness." That concept includes a moral responsibility to engage in these efforts in society at large. These traditions promote the practice of seva, or selfless actions toward others. For example, the Sikh Coalition has recently explained: "the Sikh faith tradition has a long and proud history of standing against injustice . . . . This tradition runs in lockstep with the central nature of the rights to free speech and protest in the American story and democratic experiment." Letter from Sihk Coalition to Assistant Att'y Gen. for Civ. Rts. Nominee Harmeet Kaur Dhillon (Dec. 19, 2024), https://perma.cc/YXQ7-Y94T.

For Muslims, the Qur'an teaches that "God commands justice, the doing of good." Qur'an 16:90. Believers are admonished to "stand out firmly for justice as witnesses to God." Qur'an 4:135. Indeed, the command to enjoin what is good and forbid what is evil is repeated throughout the Islamic texts of the Qur'an and hadith; it can therefore be considered an act of worship for Muslims to call their fellow Americans toward justice, including through public protest.

For Christians, Jesus protested the injustice he witnessed in the temple when he cleared moneychangers and turned over tables. Matthew 21:12. He also taught his followers "Blessed are those who are persecuted because of justice" (Matthew 5:10), and told them that the greatest commandment is to love God and love your neighbor as yourself (Mark 12:30-31). In Matthew 25, Jesus teaches that nations will be judged for how they treated the most vulnerable. These teachings have led many Christians throughout history to challenge unjust rulers who act against the common good. For example, the United States Conference of Catholic Bishops set forth "a commitment to resist manifest injustice and public evil with means other than force. These include dialogue, negotiations, protests, strikes, boycotts, civil disobedience and civilian resistance." U.S. Conf. of Catholic Bishops, *The Harvest of Justice Is Sown in Peace* (Nov. 17, 1993), https://perma.cc/NL68-FFAT. The Bishops cited examples of effective protests by Catholics "in places as diverse as the Philippines and Eastern Europe" to "demonstrate the power of nonviolent action, even against dictatorial and totalitarian regimes." *Id.*

For Protestants in particular, protest is in the name of the tradition itself. The Protestant Reformation gave us one of the greatest examples in human history of the essential nature of protesting as an act of faith. The United Methodist Church, the nation's largest mainline Protestant denomination, states in its Social Principles its "support [for] those who, acting under the constraints of moral conscience or

5

religious conviction and having exhausted all other legal avenues, feel compelled

to disobey or protest unjust or immoral laws. We urge those who engage in civil

disobedience to do so nonviolently and with respect for the dignity and worth of all

concerned." United Methodist Church, *Social Principles: The Political*

*Community*, https://perma.cc/3QLJ-RJ38 (last visited Sept. 9, 2025). The Southern

Baptist Convention, the nation's largest evangelical Protestant denomination,

endorsed a resolution in 1993 opposing "the passage of any legislation which

would have the effect of denying First Amendment freedom of speech rights,

especially as a means of responsible, non-violent protest at abortion clinics." S.

Baptist Church, *Resolution On The Freedom Of Choice Act, Hyde Amendment*

(June 1, 1993), https://perma.cc/9MDX-TCX2.

## B. Historically, faith communities have played an important role in protest movements.

In light of these broadly shared principles, it comes as no surprise that faith

communities and leaders have taken a centerstage role in protesting and resisting

injustice both domestically and internationally. Although countless historical

examples could be catalogued, a few examples amply demonstrate the point.

1. *Recent Los Angeles Protests Regarding Immigration Enforcement.*
Particularly relevant here are recent faith-led protests in Los Angeles regarding

immigration enforcement. In June, "an array of faith leaders" joined the mayor to

promote nonviolent protest against immigration enforcement actions based on their

religious convictions. James Queally, *A Curfew—and Faith Leaders' Calls—Quiet the Night*, L.A. Times (June 10, 2025), https://perma.cc/4CRN-7X76. A few days later, "[m]ore than a dozen religious leaders from an array of faiths marched to the steps of the Federal Building in downtown Los Angeles . . . flowers in hand, calling for an end to the federal immigration raids they say have torn families apart and resulted in racial profiling." Melissa Gomez, *Faith Leaders Come Together to Defend Immigrant Communities Among Federal Raids*, L.A. Times (June 19, 2025), https://perma.cc/DHH7-C9RT. One pastor leading the protest explained that principles shared among "[a]ll of our faith traditions"—including "Jewish, Sikh, Muslim and Catholic traditions"—motivated their protests. *Id.*

Los Angeles churches have a deep history of this type of activism. *See* Claire Wang, *'To Not Speak Out is to be Complicit': LA Faith Leaders Mobilize Amid ICE Raids*, The Guardian (June 18, 2025), https://perma.cc/32UG-BSUZ ("LA churches have long functioned both as refuge and protest spaces, particularly against anti-immigrant policies."). Religious leaders have long regarded this kind of speech as "their faith . . . being put into action." *Id.*

2. *The Civil Rights Movement*. The Civil Rights Movement provides another prime example of the central role played by faith communities in protesting injustice. *See, e.g.*, Wendell Bird, *Religious Speech and the Quest for Freedoms in the Anglo-American World* 296 (2023) ("The modern civil rights movement of the

1950s and 1960s was primarily led by black ministers and primarily supported by black churches.").

Religious faith inspired many of the movement's leaders. Consider, for example, Reverand Dr. Martin Luther King Jr.'s *Letter from a Birmingham Jail*, which analogized his own exercise of "the First-Amendment privilege of peaceful assembly and protest" to "the refusal of Shadrach, Meshach and Abednego to obey the laws of Nebuchadnezzar" and to "the early Christians, who were willing to face hungry lions and the excruciating pain of chopping blocks rather than submit to certain unjust laws of the Roman Empire." Rev. Dr. Martin Luther King Jr., *Letter from a Birmingham Jail* (Apr. 16, 1963), https://perma.cc/4HMV-GZ63. Similarly, in forming the Southern Christian Leadership Conference, Dr. King and fellow ministers Reverand C.K. Steele and Reverand Fred Shuttlesworth wrote that they "ha[d] no moral choice, before God, but to delve deeper into the struggle—and to do so with greater reliance on non-violence and with greater unity, coordination, sharing and Christian understanding." Press Release, Montgomery Improvement Association, *Bus Protesters Call Southern Negro Leaders Conference on Transportation and Nonviolent Integration* (Jan. 7, 1957), https://perma.cc/8845-MP7D.

Against that backdrop, religious speech occupied a prominent role "in each of the major campaigns of the modern civil rights movement that Dr. King led: the

8

Montgomery bus boycott, the Birmingham marches to city hall, the March on Washington, the Selma march to the state capital, and the Memphis sanitation workers' strike." Bird, *supra*, at 316. And Congress reacted to the faith community's moral leadership on civil rights issues. Senator Hubert Humphrey, "the floor manager of the [Civil Rights Act of 1964] in the Senate, ultimately felt that the churches were 'the most important force at work'" supporting the passage of the law. James F. Findlay, *Religion and Politics in the Sixties: The Churches and the Civil Rights Act of 1964*, 77 J. Am. Hist. 66, 66 (1990). The passage of that law followed in no small part from "[m]assive demonstrations in southern cities, often orchestrated by black religious leaders" and other First Amendment activities undertaken by a broad coalition of church leaders and members. *Id.* at 71; *see also, e.g.*, *id.* at 80 (noting the "round-the-clock vigil" held by "by Catholic, Protestant, and Jewish seminary students from all over the country" near the Lincoln Memorial leading up to the passage of the Civil Rights Act).

3. *The South African Anti-Apartheid Movement.* Faith communities and religious leaders also played an integral role in opposing the South African apartheid. "Churches, mosques, synagogues and temples . . . spawned many of apartheid's strongest foes, motivated by values and norms coming from their particular faith traditions." 4 *Truth and Reconciliation Commission of South Africa Report* ch. 3, ¶ 2 (Oct. 29, 1998), https://perma.cc/7TQK-ZCZH. In his Nobel Prize

acceptance speech, Bishop Desmond Tutu explained the moral imperative underlying his protest of the apartheid regimes injustice: "God's Shalom, peace, involves inevitably righteousness, justice, wholeness, fullness of life, participation in decision-making, goodness, laughter, joy, compassion, sharing and reconciliation." Desmond Tutu, *Nobel Prize Lecture* (Dec. 11, 1984), https://perma.cc/U6ZM-GU4G.

Many other faith leaders and community members shared those sentiments. By the end of the 1980s, "mobilized Christians were in the forefront of the Anti-apartheid struggle." Tristan Anne Borer, *Church Leadership, State Repression, and the 'Spiral of Involvement' in the South African Anti-Apartheid Movement* 126, *in Disruptive Religion: The Force of Faith in Social-Movement Activism* (1st ed. 1996). The South African Council of Churches and the Southern African Catholic Bishops Conference, for example, treated political activity—including "leading protest marches" against apartheid—"as an integral part of their Christian mission." *Id.* And in another illustrative example, clergy from the Anglican, Catholic, Methodist, and Lutheran churches led a Good Friday protest seeking the release of political prisoners in 1987. Michael Parks, *S. Africa Clerics, Marchers Pray for Detainees' Release*, L.A. Times (Apr. 18, 1987), https://perma.cc/W3VD-YPWJ. Religiously motivated protest thus played a central role in the resistance to the apartheid regime.

4. *The Polish Resistance to Soviet Rule.* The Catholic Church provided a locus of resistance to the repressive Communist rule in Poland following World War II. The Catholic Church consistently "supported freedom movements in Poland. For example, the Church supported the student movement in 1968 and the coast workers in 1970." Wladyslaw Sila-Nowick, *The Role of the Catholic Church in Polish Independence*, 6 N.Y. L. Sch. J. Int'l & Comp. L. 703, 706 (1986). Later, when the Soviet Union imposed increasingly restrictive martial law on Poland during the 1980s, "people looked more and more to the church hierarchy to speak for them, to give voice to their frustration and outrage." Nina Darnton, *The Subtle Power of the Polish Church*, N.Y. Times (June 6, 1982), https://perma.cc/D377-F85F. The Catholic Church became the focal point of "organized resistance to martial law" and "the forum within which people gathered, manifested their opposition, [and] exchanged information." Zdzislawa Walaszek, *An Open Issue of Legitimacy: The State and the Church in Poland*, 483 Annals of the Am. Acad. of Pol. & Soc. Sci. 118, 133 (1986).

The Church's opposition to Soviet injustices was not costless. Father Jerzy Popieluszko "often preach[ed] about the intersection of moral duty and political activism in sermons sharply critical of the Polish Communist government and the political violence visited on communities by the notorious Polish Security Service." Robert F. Kennedy Hum. Rts. Ctr., *Father Jerzy Popieluszko,*

11

https://perma.cc/WFE4-Q3JL. After failing to intimidate or silence him, agents of the Polish Security Service murdered him in 1984. *Id.* For many Polish Catholics, Father Popieluszko "became a symbol of resistance - a symbol that became even more powerful when he was kidnapped, beaten and killed" for his faithful resistance to the abuses of the Soviet government. Voice of Am., *Popular Hero and Activist Priest Beatified in Poland* (June 6, 2010), https://perma.cc/R24J-N7S4.

### C. The First Amendment provides an essential safeguard for protest as religious expression.

Fortunately, the U.S. Constitution's First Amendment contains multiple, mutually reinforcing protections for protest as religious expression. Religiously motivated political protests "lie at the heart of the First Amendment." *Schenk v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 377 (1997); *see also, e.g.*, *Ovadal v. City of Madison*, 416 F.3d 531, 536 (7th Cir. 2005) (observing that the "use of signs and banners to express a religious viewpoint" constituted core First Amendment activity).

The First Amendment's Free Exercise, Free Speech, and Assembly Clauses are all implicated when government actors suppress religiously motivated protest. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 523 (2022) ("Where the Free Exercise Clause protects religious exercises, whether communicative or not, the Free Speech Clause provides overlapping protection for expressive religious

activities."). As the Supreme Court has explained, the multiple protections for "religious speech is no accident. It is a natural outgrowth of the framers' distrust of government attempts to regulate religion and suppress dissent." *Id.* at 523-24. The historical record illustrates that "government suppression of speech has so commonly been directed precisely at religious speech that a free-speech clause without religion would be Hamlet without the prince." *Capitol Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995).

Federal courts are frequently called upon to protect those interlocking rights in moments of public controversy. In *Snyder v. Phelps*, for example, the Supreme Court upheld the Westboro Baptist Church's members' right to protest at a military funeral. 562 U.S. 443, 448 (2011). The Court recognized that Westboro's message—its belief that "God is killing American soldiers as punishment for the Nation's sinful policies," *id.* at 455—was controversial and upsetting to many Americans. *See id.* at 460. The Court nonetheless held that the church's protest deserved full First Amendment protection as an expression of "its 'honestly believed' views on public issues." *Id.* at 455 (citation omitted). Countless other decisions from federal courts at all levels embody the same principle across a wide array of factual contexts. *See, e.g.*, *Meinecke v. City of Seattle*, 99 F.4th 514, 518, 521 (9th Cir. 2024) ("Matthew Meinecke is a devout Christian who seeks to spread the message of the gospel at well-attended public events. . . . The parties agree that

the First Amendment protects religious speech like Meinecke's."). The First Amendment right to peacefully protest based on deeply held religious and moral values is beyond cavil.

## II.    The preliminary injunction protects First Amendment rights.

The First Amendment interests at stake support the district court's preliminary injunction in two principal respects. Because the panel did not consider these issues when granting a stay, *see generally Newsom v. Trump,* 141 F.4th 1032 (9th Cir. 2025), Interfaith Alliance urges the Court to take account of the First Amendment interests at stake and affirm the district court.[2]

First, the government's extraordinarily broad reading of 10 U.S.C. § 12406 raises serious constitutional concerns. That is true not only with respect to the federalism issues highlighted by California (Answering Br. 20-21), but also with respect to the freedom of expression. Of course, the First Amendment does not prohibit the government from taking action to restore public order in genuine emergencies. *Cf. Menotti v. City of Seattle*, 409 F.3d 1113, 1140 (9th Cir. 2005). But the level of deference the government claims in invoking Section 12406 here "threaten[s] to chill legitimate First Amendment expression" in situations far

---

[2] Because the stay panel construed the temporary restraining order entered by the district court as an appealable preliminary injunction, *Newsom,* 141 F.4th at 1044, this brief refers to the order as a preliminary injunction. Interfaith Alliance expresses no opinion on whether the stay panel's conclusion on this point was correct.

beyond what the Constitution tolerates. ER-37; *see also* ER-21 (discussing the First Amendment interests in public protests in concluding that "[t]he protests in Los Angeles fall far short of 'rebellion'"). The doctrine of constitutional avoidance thus counsels a narrower interpretation limiting Section 12406 to situations involving grave threats of uncontrolled violence that broadly prevent the enforcement of federal law—conditions that the evidence simply does not substantiate. *See, e.g.*, *United States v. Hansen*, 599 U.S. 762, 781 (2023) ("When legislation and the Constitution brush up against each other, our task is to seek harmony . . . .").

Second, injunctions safeguarding the First Amendment are always in the public interest. *See, e.g.*, *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014) (concluding that "the public interest favors the exercise of First Amendment rights"); *see also Fellowship of Christian Athletes v. S.J. Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 695 (9th Cir. 2023) (en banc) (explaining that merely raising "serious First Amendment questions" alone "compels a finding that the balance of hardships tips sharply" toward protecting free exercise and free expression (internal quotation marks omitted)). The loss of First Amendment freedoms, even for minimal periods of time, works irreparable harm on the members of the public who would otherwise exercise those rights. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020).

The National Guard's deployment inevitably creates a chilling effect on First Amendment rights. As the district court aptly observed, the deployment of armed National Guardsmen in Los Angeles "no doubt has the potential to intimidate," and it escalates the risk of violent confrontations with protesters. ER-30. The court's factual findings amply support that common-sense conclusion. As the court found, "the continued presence of National Guard members and Marines in Los Angeles risks worsening, not improving, tensions on the ground." ER-33; *see also* ER-37 (finding that the National Guard's presence "inflames tensions with protesters, threatening increased hostilities and loss of life"); *cf. Green v. City of St. Louis*, 52 F.4th 734, 739 (8th Cir. 2022) (holding that it is well established that the "intimidating use of" an armored police vehicle and the use of tear gas "would chill a person of ordinary firmness" in exercising their First Amendment right to protest).

The increased potential for violence, and resulting chilling effect, stems in part from the fact that soldiers are trained for combat; they are not trained to police civilian populations or deescalate conflict in a domestic context. *See, e.g.*, *How Mass Deportations Will Separate American Families, Harm Our Armed Forces, and Devastate Our Economy: Hearing Before the Comm. on the Judiciary*, 118th Cong. 3 (2024) (statement of Ret. Maj. Gen. Randy Manner), https://perma.cc/7P4K-4H34 ("[T]he vast majority of National Guard and virtually

16

all active duty units are not trained for situations where they may be engaged in domestic law enforcement activities."). No matter how the soldiers conduct themselves, however, the mere presence of military forces, who are naturally associated in Americans' minds with combat, is likely to intimidate many and discourage them from engaging in constitutionally protected protest activity. *See Bissonette v. Haig*, 776 F.2d 1384, 1387 (8th Cir. 1985) ("Military enforcement of the civil law . . . may also chill the exercise of fundamental rights, such as the rights to speak freely and to vote, and create the atmosphere of fear and hostility which exists in territories occupied by enemy forces."), *aff'd en banc*, 800 F.2d 812 (8th Cir. 1986), *aff'd as if by an equally divided court for want of a quorum*, 485 U.S. 264 (1988).

It is immaterial whether the intimidation of and increased risk of violence directed at protesters is an intentional or incidental effect of the National Guard's deployment. *Cf. Citizens United v. FEC*, 558 U.S. 310, 340 (2010) ("[P]olitical speech must prevail against laws that would suppress it, whether by design or inadvertence."). After all, "the protections of the First Amendment are triggered not only by actual restrictions on an individual's ability to join with others to further shared goals"—the "risk of a chilling effect on association" suffices "because First Amendment freedoms need breathing space to survive." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 618-19 (2021) (internal quotation marks

17

and brackets omitted). Here, even the "mere potential" for a military-civilian confrontation "casts a chill" on protected activity that "the First Amendment cannot permit if free speech, thought, and discourse are to remain a foundation of our freedom." *United States v. Alvarez*, 567 U.S. 709, 723 (2012) (plurality opinion). The district court thus acted responsibly in entering its injunction quickly. *Cf. Mahmoud v. Taylor*, 145 S. Ct. 2332, 2358 (2025) ("[W]hen a deprivation of First Amendment rights is at stake, a plaintiff need not wait for the damage to occur before filing suit.").

Nor did the district court err in entering a preliminary injunction even though the government invokes amorphous "emergency conditions" as the basis for its action. ER-34. While a true emergency could justify the invocation of Section 12406, this Court should narrowly construe the statute given the substantial First Amendment concerns at play. *See, e.g.*, *Roman Cath. Diocese of Brooklyn*, 592 U.S. at 21 (Gorsuch, J., concurring) ("Government is not free to disregard the First Amendment in times of crisis."); *Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603, 2615 (2020) (Kavanaugh, J., dissenting) ("This Court's history is littered with unfortunate examples of overly broad judicial deference to the government when the government has invoked emergency powers and asserted crisis circumstances to override . . . free-speech principles. The court of history has rejected those jurisprudential mistakes and cautions us against an unduly

deferential judicial approach . . . .”). To avoid a conflict between the statute and the Constitution, the Court should require the government to demonstrate a level of incapacitation of federal law enforcement that far exceeds anything that can be inferred from the record’s description of isolated violent acts.

The government likewise errs in suggesting (Opening Br. 41) that the public interest weighs against the preliminary injunction because the government has a valid interest in protecting federal agents and property. That interest is certainly legitimate, but it was incumbent on the government to show that the deployment of military forces, along with its attendant chilling effect on First Amendment freedoms, was necessary. Governmental assertions of an interest “in safeguarding its citizens against violence” must find support in “tangible evidence that speech-restrictive regulations are necessary to advance the proffered interest in public safety.” *Edwards v. City of Coeur d’Alene*, 262 F.3d 856, 863 (9th Cir. 2001). The government failed to carry that burden here. “[T]here can be no debate that most protesters demonstrated peacefully,” ER-21, and although “some isolated individuals act[ed] violently outside the protections of the First Amendment,” ER-23, the government’s disproportionate and heavy-handed response chills protected speech. The fact that protests in early June involved some incidents of violence cannot justify the ongoing National Guard deployment three months later, with no end in sight, in a manner that chills future free expression indiscriminately. *Cf.*

*Collins v. Jordan*, 110 F.3d 1363, 1372 (9th Cir. 1996) ("The law is clear that First Amendment activity may not be banned simply because prior similar activity led to or involved instances of violence. . . . The courts have held that the proper response to potential and actual violence is for the government . . . to arrest those who actually engage in such conduct, rather than to suppress legitimate First Amendment conduct as a prophylactic measure.").

Protecting First Amendment rights is particularly critical when the government seeks to deploy the military inside our country. Americans have a "traditional and strong resistance . . . to any military intrusion into civilian affairs" that makes it necessary for the judiciary to protect civil liberties against any "unlawful activities of the military." *Laird v. Tatum*, 408 U.S. 1, 16 (1972). That is all the more so when the unlawful deployment of the military interferes with many Americans' deeply held religious convictions that require them to speak publicly about injustice they see in the world today. First Amendment principles strongly support the district court's preliminary injunction against the unjustified domestic deployment of the military, and this Court should uphold those values in deciding the appeal.

## CONCLUSION

The Court should affirm the preliminary injunction entered by the district court.

Respectfully submitted,

*/s/ Simon C. Brewer*
Simon C. Brewer*
Brian D. Netter
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
202-448-9090
sbrewer@democracyforward.org

*Attorneys for Amicus Curiae*
*Interfaith Alliance Foundation*

* Not admitted in the District of Columbia;
practicing under the supervision of
Democracy Forward lawyers who are
members of the D.C. Bar.

September 9, 2025

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify that the foregoing brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 4569 words, according to the count of Microsoft Word. I further certify that it complies with Federal Rule of Appellate Procedure 32(a)(5) and (6) because it is set in 14-point Times New Roman, a proportionally spaced typeface.

*/s/ Simon C. Brewer*
Simon C. Brewer