Court of Appeals No. 25-3727

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

GAVIN NEWSOM, etc., et al.,
*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, etc., et al.,
*Defendants-Appellants.*

_____

On Appeal from the United States District Court
for the Northern District of California, No. 3:25-cv-04870-CRB,
The Honorable Charles R. Breyer, Presiding

_____

**UNOPPOSED AMICUS CURIAE BRIEF OF
THE LEGISLATURE OF THE STATE OF CALIFORNIA
IN SUPPORT OF PLAINTIFFS-APPELLEES**

_____

*Margaret R. Prinzing, State Bar No. 209482
Robin B. Johansen, State Bar No. 79084
OLSON REMCHO, LLP
1901 Harrison Street, Suite 1550
Oakland, CA 94612
Phone: (510) 346-6200
Fax:     (510) 574-7061
Email:
mprinzing@olsonremcho.com
rjohansen@olsonremcho.com

Cara L. Jenkins, State Bar No. 271432
Legislative Counsel
Kathryn Londenberg, State Bar No. 278390
Chief Deputy Legislative Counsel
OFFICE OF LEGISLATIVE COUNSEL
925 L Street, Suite 900
Sacramento, CA 95814
Phone: (916) 341-8000
Email:
Cara.Jenkins@LegislativeCounsel.ca.gov
Kathryn.Londenberg@LegislativeCounsel.ca.gov

Attorneys for *Amicus Curiae* Legislature of the State of California

# TABLE OF CONTENTS

**Page(s)**

INTEREST OF AMICUS CURIAE ............................................................... 1

SUMMARY OF ARGUMENT ..................................................................... 4

ARGUMENT ................................................................................................ 7

I.      CONSTITUTIONAL CONSIDERATIONS REQUIRE LESS DEFERENCE TO THE PRESIDENT'S DECISION TO MOBILIZE THE NATIONAL GUARD ......... 7

     A.    Federalism And Comity Require Courts To Take State Interests Into Account When Ruling On Matters Involving Federal Authority Over Domestic Affairs ............................................................... 7

     B.    The Founders Were Keenly Aware Of The Need To Balance State And Federal Authority And Limit Federal Interference In Domestic Affairs ........... 11

     C.    Congress Has Restricted The President's Use Of The Military In Civilian Affairs .................................... 15

II.     THE EVIDENCE DEMONSTRATES THE PRESIDENT DID NOT MEET THE REQUIREMENTS OF § 12406(3) .......................................................................... 17

     A.    The President Was Not Significantly Impeded In His Ability To Enforce Federal Law ............................ 20

     B.    The "Regular Forces" Were Willing And Able To Protect Federal Property And Personnel ...................... 22

III.    BY INVOKING § 12406(3) UNDER THESE CIRCUMSTANCES, THE PRESIDENT UPSET THE CONSTITUTIONAL BALANCE BETWEEN THE FEDERAL AND STATE GOVERNMENTS ........................ 26

     A.    Section 12406(3)'s Reference To "Regular Forces" Is Essential For State Sovereignty ................................. 26

     B.    Defendants' Decision To Disregard The "Regular Forces" Requirement Harmed The State ........................ 29

CONCLUSION ........................................................................................... 33

CERTIFICATE OF COMPLIANCE............................................................ 34

i

# <u>TABLE OF AUTHORITIES</u>

<u>**Page(s)**</u>

**Cases**

*A.L.A. Schechter Poultry Corp. v. United States*,
    295 U.S. 495 (1935) ................................................................. 11

*Berger v. N.C. State Conf. of the NAACP*,
    597 U.S. 179 (2022) ............................................................ 4, 10

*Bond v. United States*,
    572 U.S. 844 (2014) ................................................................. 8

*California v. ARC Am. Corp.*,
    490 U.S. 93 (1989) .................................................................. 9

*Gregory v. Ashcroft*,
    501 U.S. 452 (1991) ............................................................ 9, 10

*Laird v. Tatum*,
    408 U.S. 1 (1972) .................................................................. 17

*Luther v. Borden*,
    48 U.S. (7 How.) 1 (1849) ..................................................... 17

*Martin v. Mott*,
    25 U.S. (12 Wheat.) 19 (1827) ...................................... 4, 17, 22

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012) ........................................................ passim

*New York v. United States*,
    505 U.S. 144 (1992) ......................................................... 7, 9, 11

*Newsom v. Trump*,
    141 F.4th 1032 (9th Cir. 2025) ........................................ passim

*Newsom v. Trump*,
    No. 25-cv-04870-CRB, 2025 U.S. Dist. LEXIS 170747
    (N.D. Cal. Sept. 2, 2025) ........................................... 22, 26, 27

*Printz v. United States*,
    521 U.S. 898 (1997) ............................................................ 8, 10

*United States v. California*,
    921 F.3d 865, 887 n.11 ............................................................ 3

*United States v. Chae Won Chon*,
    210 F.3d 990 (9th Cir. 2000) ................................................. 16

**TABLE OF AUTHORITIES**: (Continued)                    Page(s)

**Cases (cont'd)**

*United States v. Darby,*
  312 U.S. 100 (1941) ................................................................... 9

*United States v. Dreyer,*
  804 F.3d 1266 (9th Cir. 2015) ............................................... 16

*United States v. Morrison,*
  529 U.S. 598 (2000) ................................................................. 3

*Youngstown Sheet & Tube Co. v. Sawyer,*
  343 U.S. 579 (1952) .......................................................... 16, 17

**United States Constitution**

U.S. Const. art. I, § 8, cl. 15 ..................................................... 8

U.S. Const. art. IV, § 4 ................................................... passim

U.S. Const. amend. X ................................................................ 1

**California Constitution**

Cal. Const. art. IV, § 1 .............................................................. 2

Cal. Const. art. V, § 7 ............................................................... 2

**United States Statutes**

6 U.S.C. § 466 ......................................................................... 17

10 U.S.C. § 275 ....................................................................... 15

10 U.S.C. § 12406 ......................................................... passim

18 U.S.C. § 1385 ............................................................... 15, 16

42 U.S.C. § 5170b ................................................................... 15

42 U.S.C. § 5191 ..................................................................... 15

**California Statutes**

Military and Veterans Code

  § 100 *et seq.* ........................................................................ 2

  § 101 ..................................................................................... 2

**TABLE OF AUTHORITIES**: (Continued)                    **Page(s)**

**California Statutes (cont'd)**

§ 146 ................................................................................ 3

Government Code

§ 26602 ........................................................................... 3

§ 41601 ........................................................................... 3

Penal Code §§ 403-405 .......................................................... 3

**Rules**

Circuit Rule 29-3 .................................................................. 4

Federal Rules of Appellate Procedure, rule 29(a)(4)(E)................................4

**Other Authorities**

3 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 441 (1891) .................................. 13

ABC News, *President Trump officially classifies fentanyl as Schedule 1 narcotic, signs 'Halt Fentanyl Act'*, YouTube (July 16, 2025) ........................................................ 30

Bora Erden et al., *Maps and Timeline of the L.A. Immigration Protests and the Federal Response*, N.Y. Times (June 12, 2025)........................ 18

Cal. Governor's Off., *Trump's Unlawful CalGuard Power Grab Results in 57% Decrease in Fentanyl Pounds Seized* (July 31, 2025).................... 31

Deborah Jones Merritt, *The Guarantee Clause and State Autonomy*, 88 Colum. L. Rev. 1 (1988)...................................................... 13

Jay Bybee, *Insuring Domestic Tranquility: Lopez, Federalization of Crime, and the Forgotten Role of the Domestic Violence Clause*, 66 Geo. Wash. L. Rev. 1, 79 (1997)......................................... 13

James Balcius & Bryan A. Liang, *Public Health Law & Military Medical Assets: Legal Issues in Federalizing National Guard Personnel*, 18 Ann. Health L. 35, 41 (2009).............................................. 16

Major Cities Chiefs Ass'n, *Report on the 2020 Protests and Civil Unrest* 7-12 (2020), ..................................................................... 24

Proclamation No. 6427, 57 Fed. Reg. 19359 (May 1, 1992). .................... 28

**TABLE OF AUTHORITIES: (Continued)**          **Page(s)**

**Other Authorities (cont'd)**

Robert W. Coakley, *The Role of Federal Military Forces in Domestic Disorders, 1789-1878*, at 4-7 (1988) ................................................ 16

Shawn Hubler, *Trump's National Guard Troops Are Questioning Their Mission In L.A.*, N.Y. Times (July 16, 2025), ........................................ 31

Solcyré Burga, *Why Trump Sending the National Guard to L.A. Is Different From Its Deployment There in 1992* (June 9, 2025) ........... 28

The Federalist No. 39 (James Madison) ......................................................... 9

The Federalist No. 45 (James Madison) ................................................. 1, 12

The Federalist No. 51 (James Madison) .............................................. 10, 12

*Troops And Federal Agents Briefly Descend On L.A.'s Macarthur Park In Largely Immigrant Neighborhood*, Associated Press (via NBC News) (July 8, 2025) ............................................................. 32

v

## INTEREST OF AMICUS CURIAE

The Legislature of the State of California's interest in this appeal is rooted in the principles of federalism and comity upon which this country was founded. When the State of California was admitted to the Union, it was constitutionally guaranteed that the "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. One such power reserved to the states is the "general power of governing," known as the police power. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012) (*NFIB*). The Framers deliberately crafted the federal Constitution to ensure that "powers which 'in the ordinary course of affairs, concern the lives, liberties, and properties of the people' were held by governments more local and more accountable than a distant federal bureaucracy." *Id.* (quoting The Federalist No. 45 (James Madison)). Toward that end, Article IV, Section 4 expressly provides that "*on Application of the Legislature*, or of the Executive (when the Legislature cannot be convened)," the federal government shall protect each State "against domestic Violence." U.S. Const. art. IV, § 4 (emphasis added). In light of that, the California Legislature has a distinct interest in this appeal to

ensure that any federalization of the California National Guard involving incidents of domestic violence is constitutionally permissible.

California's Constitution establishes the Legislature as one of three coequal branches of government and provides that the "legislative power of this State is vested in the California Legislature[.]" Cal. Const. art. IV, § 1. The California Constitution further provides that the Governor "is commander in chief of a militia that shall be provided by statute." *Id.* art. V, § 7. The Legislature has fulfilled that responsibility by enacting California Military and Veterans Code section 100 *et seq.*, which provides for the organization and responsibilities of the state militia. Included in this scheme is California Military and Veterans Code section 101, which adopts federal law regarding the National Guard "*so far as the same are not inconsistent with the rights reserved to this State and guaranteed under the Constitution of this State*[.]" *Id.* (emphasis added).

The President's federalization of California's National Guard on June 7, 2025, was not requested by, and in fact was against the will of, the Legislature and Governor, in violation of the rights reserved to California under the federal Constitution. One of the State's quintessential police powers reserved to it under the Tenth Amendment is its "ability to regulate its internal law enforcement activities[.]" *United States v.*

*California*, 921 F.3d 865, 887 n.11 (9th Cir. 2019) (citing *United States v. Morrison*, 529 U.S. 598, 618 (2000)). Consistent with its inherent police power, the Legislature has enacted laws to maintain public order (*see*, *e.g.*, Cal. Penal Code §§ 403-405) and has delegated responsibility for local law enforcement to county sheriffs and city police. Cal. Gov't Code §§ 26602, 41601. Decades of experience in California demonstrate that local officials are fully capable of maintaining the peace in their communities. If they feel they are unable able to do so, they may ask the Governor to call up the California National Guard. *See*, *e.g.*, Cal. Mil. & Vet. Code § 146(d). If the Governor decides additional assistance is necessary, the Governor may ask the Legislature to request federal assistance under Article IV, Section 4.

That is not the process that unfolded in Los Angeles, however. The National Guard and federal troops were called in without request and against the will of state and local officials in response to incidents of domestic violence, despite the fact that local regular forces were fully capable of restoring order, and even though activation of the National Guard severely harmed state interests. The President's decision to federalize the State's National Guard and employ Marines in Los Angeles not only unnecessarily impairs California's ability to govern itself, but also violates the State's rights under the United States Constitution. "No one questions

3

that States possess 'a legitimate interest in the continued enforcement of their own statutes.'" *Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179, 191 (2022) (cleaned up, citation omitted). Accordingly, as the lawmaking authority of the State, and as the state authority empowered to request federal assistance in instances of domestic violence, the California Legislature's interests are gravely affected by the outcome of this case.

Pursuant to Circuit Rule 29-3, the California Legislature obtained the consent of all parties to the filing of this brief.[1]

## SUMMARY OF ARGUMENT

In its earlier opinion in this appeal, this Court held that *Martin v. Mott*, 25 U.S. (12 Wheat.) 19 (1827) requires a highly deferential standard for review of the President's decision to mobilize the National Guard under 10 U.S.C. § 12406. *Newsom v. Trump*, 141 F.4th 1032, 1047 (9th Cir. 2025). Ultimately, the Court said that it should review the President's decision "to ensure that it reflects a colorable assessment of the facts and law within a 'range of honest judgment'" and that at that stage of the litigation, "we need not further specify the precise standard that governs

---

[1] Consistent with the Federal Rules of Appellate Procedure, rule 29(a)(4)(E), *amicus* certifies that no party or counsel for any party has authored this brief, participated in its drafting, or made any monetary contributions intended to fund its preparation or submission.

our review." *Id.* at 1051 (citation omitted). In applying that standard to determine whether the President had been "unable with the regular forces to execute the laws of the United States" within the meaning of § 12406(3), the Court relied almost exclusively on Defendants' evidence concerning violent protesters, without reference to evidence that federal officials continued executing federal law throughout the protests and that regular forces effectively quelled the violence. Moreover, when urged by the Governor to safeguard the constitutional balance of power between the federal and California governments, the Court indicated that it was up to Congress to consider the State's interests when enacting § 12406, so that the Court need only consider whether the President exceeded the scope of his statutory authority. *Id.* at 1055.

The Legislature respectfully suggests that such a deferential standard is not required in this appeal, while greater consideration of the State's interests is. As discussed below, federal courts have long acknowledged their duty, based on principles of federalism and comity, to give commensurate consideration to a State's interests when deciding whether the federal government has encroached on areas traditionally regulated by the States. The Framers and Congress acknowledged that states' interests are perhaps at their zenith in matters involving their police

5

powers, and they sought to shield them from undue federal intrusion. Because the President's invocation of § 12406(3) squarely infringes on California's constitutionally protected authority over domestic law enforcement matters, review of that decision requires serious consideration of the State's interests under Article IV, Section 4 as well as principles of federalism and comity.

Even under a highly deferential standard of review, Defendants have failed to demonstrate that the President was "unable with the regular forces to execute the laws of the United States," as required by § 12406(3). The District Court's order was stayed based *solely* on evidence of violence that took place prior to federalization. But, as discussed in sections II and III below, the remaining evidence before this Court establishes both that Defendants continued executing the laws throughout the protests and that the regular forces restored order when the protests turned violent. Accordingly, this federalization does not satisfy § 12406(3), and there is no justification for the severe harms that California has suffered as a consequence.

# ARGUMENT

## I.

## CONSTITUTIONAL CONSIDERATIONS REQUIRE LESS DEFERENCE TO THE PRESIDENT'S DECISION TO MOBILIZE THE NATIONAL GUARD

### A. Federalism And Comity Require Courts To Take State Interests Into Account When Ruling On Matters Involving Federal Authority Over Domestic Affairs

Since this country's founding, courts have been asked to "resolve[] questions 'of great importance and delicacy' in determining whether particular sovereign powers have been granted by the Constitution to the Federal Government or have been retained by the States." *New York v. United States*, 505 U.S. 144, 155 (1992). Whether the question is framed as "one of ascertaining the limits of the power delegated to the Federal Government under the affirmative provisions of the Constitution or one of discerning the core of sovereignty retained by the States under the Tenth Amendment," this Court's task remains the same: it must evaluate whether the President's use of § 12406 to federalize California's National Guard in these circumstances "oversteps the boundary between federal and state authority." *Id.* at 159.

As a threshold matter, "the Federal Government 'can exercise only the powers granted to it.'" *NFIB*, 567 U.S. at 534-35 (citation omitted). With regard to the federal government's use of a State's National Guard, the

7

Constitution expressly authorizes Congress "[t]o provide for calling forth the militia to execute the laws of the union, suppress insurrections and repel invasions." U.S. Const. art. I, § 8, cl. 15. In turn, Congress enacted § 12406, authorizing the President to exercise the calling forth authority under limited circumstances. Importantly, however, the President may exercise this enumerated calling forth power only to the extent authorized in § 12406 and in a manner that does not impermissibly intrude on a State's constitutionally guaranteed authority to govern its domestic affairs.

In grappling with the proper allocation of power between the federal and state governments, care must be taken to "avoid creating a general federal authority akin to the police power." *NFIB*, 567 U.S. at 536. The Framers were keenly aware that "the facets of governing that touch on citizens' daily lives" were better suited for local, rather than national, government. *Id.* Notably, the Framers chose to deny the federal government this "general power of governing." *Id.*; *see also Bond v. United States*, 572 U.S. 844, 854 (2014) ("The States have broad authority to enact legislation for the public good — what we have often called a 'police power.'"). The States' authority over domestic affairs was therefore baked into the very text of the United States Constitution. *Printz v. United States*, 521 U.S. 898, 918-19 (1997) (providing a non-exhaustive list of constitutional provisions

that reflect the States' "residuary and inviolable sovereignty") (quoting The Federalist No. 39 (James Madison)). "It is in this sense that the Tenth Amendment 'states but a truism that all is retained which has not been surrendered.'" *New York*, 505 U.S. at 156 (quoting *United States v. Darby*, 312 U.S. 100, 124 (1941)).

Using the plenary power reserved to them under the United States Constitution, states "perform many of the vital functions of modern government," including "punishing street crime, running public schools, and zoning property for development[.]" *NFIB*, 567 U.S. at 535. Courts are justifiably skeptical when the federal government tries to intrude on these functions, and they repeatedly turn to principles of federalism and comity to aid their analysis. *See, e.g.*, *Gregory v. Ashcroft*, 501 U.S. 452, 457-63 (1991) (reviewing the origins of the federalist system and cases implicating the States' sovereignty).

This is why, when Congress legislates in a field traditionally occupied by the States, courts apply a "presumption against finding preemption of state law[.]" *California v. ARC Am. Corp.*, 490 U.S. 93, 101 (1989). It is also why courts view federal interference with the way a State has structured its government as "upset[ting] the usual constitutional balance of federal and state powers[.]" *Gregory*, 501 U.S. at 460; *see also Berger*,

9

597 U.S. at 191-92 (stating that respecting the states' "chosen means of diffusing its sovereign powers" serves "important national interests"). The Supreme Court has even said that when the federal government tries to "direct the functioning of the state executive," balancing does not sufficiently protect the dual sovereign system, for such an act offends "the very *principle* of separate state sovereignty . . . and no comparative assessment of the various interests can overcome that fundamental defect." *Printz*, 521 U.S. at 932.

These cases demonstrate that when the federal government has encroached on areas "traditionally regulated by the States" or intruded upon "decision[s] of the most fundamental sort for a sovereign entity," principles of federalism and comity require the courts to give commensurate consideration to the State's interests. *Gregory*, 501 U.S. at 460. The same must be true here. For the "double security" of our federalist system to be effective, "there must be a proper balance between the States and the Federal Government." *Id.* at 459 (quoting The Federalist No. 51 (James Madison)). Accordingly, § 12406 must be construed to uphold that balance, and deference shown to the President must yield at the point that the President has "overstep[ped] the boundary between federal and state authority,"

10

especially when that overstep occurs in instances involving domestic violence.  *New York*, 505 U.S. at 155.

**B.  The Founders Were Keenly Aware Of The Need To Balance State And Federal Authority And Limit Federal Interference In Domestic Affairs**

In this case, history requires that the degree of deference shown to the President be measured by the Founders' insistence on limiting the federal government's authority to interfere with a state's domestic affairs. As the Supreme Court said in *National Federation of Independent Businesses v. Sebelius,* 567 U.S. at 535, the Tenth Amendment "made express what the enumeration of powers necessarily implied: "'The powers not delegated to the United States by the Constitution . . . are reserved to the States respectively, or to the people.'"  As the Court said earlier with respect to the Enumeration Clause:

> Those who act under these grants are not at liberty to transcend the imposed limits because they believe that more or different power is necessary. Such assertions of extra-constitutional authority were anticipated and precluded by the explicit terms of the Tenth Amendment.
>
> *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 528-29 (1935).[2]

---

[2] *Accord New York*, 505 U.S. at 157 ("the Tenth Amendment confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States").

Prior to adoption of the Tenth Amendment, the debates over ratification of the new Constitution focused heavily on respect for state sovereignty.  For example, the Federalist Papers sought to reassure the people that the Constitution would protect them from federal overreaching:

> In the compound republic of America, the power surrendered by the people is first divided between two distinct governments . . . .  Hence a double security arises to the rights of the people. The different governments will control each other, at the same time that each will be controlled by itself.[3]

In The Federalist No. 45, at 292-293, James Madison wrote that federal governmental power "will be exercised principally on external objects, as war, peace, negotiation, and foreign commerce," whereas "[t]he powers reserved to the several States will extend to all the objects which, in the ordinary course of affairs, concern the lives, liberties, and properties of the people, and the internal order, improvement, and prosperity of the State."

These assurances were grounded not just in the enumeration clause but also in Article IV, Section 4, which reads:

> The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive

---

[3] The Federalist No. 51, at 323 (James Madison).

12

(when the Legislature cannot be convened) against domestic Violence.

This section, containing the Guarantee Clause and the Domestic Violence Clause, not only protects the States from foreign interference, but from *federal* interference as well.[4]  For example, Edmund Pendleton, president of the Virginia ratifying convention, described Article IV, Section 4 as "a restraint on the general government not to interpose" in the event of domestic violence, saying "[t]he state is in full possession of the power of using its own militia to protect itself against domestic violence" and the federal government cannot interpose "without the application of the state itself."[5]  Thus, as Judge Bybee wrote in a 1997 article, the Domestic Violence Clause "was seen as a bill of rights for the states, ensuring that the United States would not abuse its authority over the militia to displace state power over domestic disturbances."[6]  Judge Bybee went on:

---

[4] For a thorough discussion of the way in which the Guarantee Clause protects state government from federal intervention, *see* Deborah Jones Merritt, *The Guarantee Clause and State Autonomy*, 88 Colum. L. Rev. 1 (1988).

[5] 3 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 441 (1891).

[6] Jay Bybee, *Insuring Domestic Tranquility: Lopez, Federalization of Crime, and the Forgotten Role of the Domestic Violence Clause*, 66 Geo. Wash. L. Rev. 1, 79 (1997).

Domestic violence is by its nature local; it refers to the internal affairs of a state. ***Although a state might believe itself overwhelmed by insurrection, riots, or even more ordinary crime, the decision whether assistance is needed, like decisions about defining and punishing crime itself, belongs to the state***. Such a reading of the clause is confirmed by the requirement that state legislatures, rather than the state executive, make the request, which gives the states an additional measure of security by avoiding a precipitous request by the governor.

*Id.* at 79 (emphasis added).

Article IV, Section 4 is the only place in the Constitution in which the phrase "domestic violence" is used, and it requires a request from the state legislature before the federal government may intervene to suppress domestic violence. Thus, as the Court grapples with the appropriate construction of the phrase "unable with the regular forces to execute the laws of the United States" in order to define the authority delegated to the President under § 12406, the role that the Constitution reserves for the State in cases of "domestic violence" should serve as an important constitutionally based guardrail. Read together, the federal government may not call forth the militia to the extent doing so would impinge on the State's authority under Article IV, Section 4.

14

**C.     Congress Has Restricted The President's Use Of The Military In Civilian Affairs**

Finally, § 12406 should be construed in the context of the limits Congress has imposed on the President's use of the military in domestic law enforcement activities.  This Court previously relied on the "history of Congress's statutory delegations of its calling forth power" and the relevant case law to determine the standard of deference it should afford the President under § 12406.  *Newsom v. Trump*, 141 F.4th at 1047-51.  But these general delegation statutes and cases do not fully address the circumstances in this case.  Congress has also regulated the use of military power in domestic contexts primarily under State control.

A key example of such a limit is the Posse Comitatus Act ("PCA"), enacted by Congress in 1878.[7]  The PCA forbids use of the military to execute general laws, except when expressly authorized by the Constitution or by statute.  18 U.S.C. § 1385.  As a result, the PCA prohibits

---

[7]  Other examples include domestic disaster relief and limited resource-sharing among military and civilian agencies.  *See* 42 U.S.C. §§ 5191 (requests for emergency presidential declaration must be made through Governor, unless emergency involves "Federal primary responsibility"), 5170b(c)(1) (authorizing temporary use of Department of Defense "resources" for domestic disaster relief on request of the Governor); 10 U.S.C. § 275 (where Congress has authorized the military to share resources with civilian law enforcement agencies, Secretary of Defense must "ensure" resource-sharing does not allow "direct participation" in law enforcement by servicemembers).

"military personnel from participating in civilian law enforcement activities" as a general rule. *United States v. Dreyer*, 804 F.3d 1266, 1272 (9th Cir. 2015) (quoting *United States v. Chae Won Chon*, 210 F.3d 990, 993 (9th Cir. 2000)). As Justice Jackson observed, when Congress passed the PCA, it exercised its powers under the Militia Clauses to limit Presidential military authority. "Congress has forbidden him to use the army for the purpose of executing general laws except when *expressly* authorized by the Constitution or by Act of Congress." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 644-45 (1952) (*Youngstown*) (Jackson, J., concurring).

As relevant here, the PCA is more than a limit on federal power in civilian affairs. By restricting the federal use of the military, including federalized militias, except as "expressly authorized" (18 U.S.C. § 1385), Congress has also reserved general law enforcement authority for the States. Enacted as a compromise of federalism in the wake of the Civil War, the law was designed to prevent the federal military from being the Government's primary enforcement tool for the Reconstruction Amendments, permitting the States to resume exercise of their police powers.[8] Its ethos has been

---

[8] James Balcius & Bryan A. Liang, *Public Health Law & Military Medical Assets: Legal Issues in Federalizing National Guard Personnel*, 18 Ann. Health L. 35, 41 (2009) (citing Robert W. Coakley, *The Role of Federal Military Forces in Domestic Disorders, 1789-1878*, at 4-7 (1988)).

traced to our country's founding, and its continued importance recognized by Congress. *See, e.g.*, *Laird v. Tatum*, 408 U.S. 1, 15 (1972) (describing "a traditional and strong resistance of Americans to any military intrusion into civilian affairs" with "deep roots in our history"); 6 U.S.C. § 466 (Homeland Security Act of 2002, finding "the Posse Comitatus Act has served the Nation well in limiting the use of the Armed Forces to enforce the law").

The PCA also highlights the danger of relying primarily on caselaw, like *Martin v. Mott*, 25 U.S. (12 Wheat.) 19 (1827) and *Luther v. Borden*, 48 U.S. (7 How.) 1 (1849), which preceded the PCA. Simply put, reliance on case law decided before Congress limited the President's use of the military in civilian affairs risks granting the President greater military powers than Congress intended. Contravening the "expressed or implied will of Congress" brings Executive power to its "lowest ebb." *Youngstown*, 343 U. S. at 637-38 (Jackson, J., concurring). In such a case, the executive action "must be scrutinized with caution[.]" *Id.*

## II.

### THE EVIDENCE DEMONSTRATES THE PRESIDENT DID NOT MEET THE REQUIREMENTS OF § 12406(3)

In the mere days that this panel had to consider its earlier decision, based on only a truncated evidentiary record, the panel concluded "that the President had a colorable basis for invoking § 12406(3)." *Newsom*

*v. Trump*, 141 F.4th at 1052.  This conclusion rested almost entirely on Defendants' evidence of the violence that erupted during the protests on June 6 and 7, prior to the President issuing his Memorandum the evening of June 7,[9] and on the panel's extreme deference to Defendants' argument that such violence necessarily interfered with federal enforcement activities.  The State's evidence received almost no attention, except to note that the State also described violence.  *Id.*  There is *no* mention of the State's extensive evidence demonstrating that the State was effectively managing the protests without the National Guard.

The Legislature respectfully submits that the evidence before this Court mandates a different outcome, even under the highly deferential standard articulated in the prior ruling in this appeal.  Not even Defendants' evidence – let alone the State's evidence – supports the conclusion that the President acted within the authority conferred under § 12406.  This is true for at least two reasons under § 12406(3), which provides that federalization is authorized "[w]henever . . . the President is ***unable with the regular forces*** to execute the laws of the United States."  *Id.* (emphasis added).

---

[9] *See*, *e.g.*, Bora Erden et al., *Maps and Timeline of the L.A. Immigration Protests and the Federal Response*, N.Y. Times (June 12, 2025), https://www.nytimes.com/interactive/2025/06/08/us/la-immigration-protests-photos-map.html.

The first problem is with the conclusion that this federalization satisfied § 12406 because, "*[a]ccording to the declarations submitted by Defendants*," the violence "significantly impeded the ability of federal officers to execute the laws." *Newsom v. Trump*, 141 F.4th at 1052 (emphasis added). Yet that conclusion – reached by the panel under extreme time pressure – goes much further than the evidence. While Defendants' declarations attest to violence that slowed and complicated the work of federal agents, those declarations confirm that those agents continued to enforce the law throughout the protests.

The second problem is that the conclusion that the violence impeded federal officials ended the panel's inquiry, even though § 12406 requires more. Congress did not authorize federalization based solely on an inability to execute federal law. Rather, the President must be unable to execute federal law "*with the regular forces*." 10 U.S.C. § 12406(3) (emphasis added). Defendants have rightly defined the "regular forces" to mean "everything other than the State National Guard." ECF 77 at 21-22 [TRO Hr'g Tr. 24:2-5]. Here, the evidence established both that State and local law enforcement agencies *did* restore order, and that many additional regular forces were available if matters escalated, but the President nevertheless chose to federalize his own force. That is not what Congress

19

authorized, and no amount of deference can overcome Defendants' failure to satisfy a requirement expressly embedded in the text of § 12406.

## A. The President Was Not Significantly Impeded In His Ability To Enforce Federal Law

The Legislature does not dispute that the violence that occurred during the protests created real dangers for federal personnel. ECF 25-2 at 3 [A250]; *Newsom v. Trump*, 141 F.4th at 1052. As the panel recites, protesters "threw objects at ICE vehicles" and "'pinned down' several [Federal Protective Service] officers defending federal property" while also trying "to breach" a federal parking garage. *Newsom v. Trump*, 141 F.4th at 1052. The Legislature emphatically condemns that violence.

But § 12406(3) is not triggered by violence or danger alone. To satisfy § 12406(3), that violence would have to render the federal government unable to execute the law. Yet Defendants' evidence is to the contrary. The information about protesters throwing objects at vehicles comes from Ernesto Santacruz, Jr., the Los Angeles Field Office Director for Immigration and Customs Enforcement ("ICE"). ECF 25-1 at 5 [A238]. Yet Mr. Santacruz also testified that, despite these disruptions, individuals "[were] arrested during [that] immigration enforcement operation[.]" *Id.* Similarly, the information about protesters pinning down federal officers comes from the same declaration. *Id.* at 6-7 [A239-40]. But again,

Mr. Santacruz explained that while these protests were taking place outside the federal building, "approximately 130 [undocumented individuals] . . . were being processed" by federal officials. *Id.* at 7 [A240].

Furthermore, the panel states that Defendants' declarations indicate that violent protesters "significantly impeded the ability of federal officers to execute the laws." *Newsom v. Trump*, 141 F.4th at 1052. But while the declarations describe harrowing circumstances that complicated law enforcement efforts, those circumstances did not prevent the law from being executed. For example, Mr. Santacruz described protesters "preventing ICE transport vehicles from exiting" a parking garage with detainees, but he also explained that the agents were able to instead use "several unmarked vans to remove the detainees." ECF 84-1 at 5. Indeed, none of the declarants claimed that the violence prevented even a single arrest, enforcement operation, or the execution of any law.

Defendants confirm this evidentiary hole in their brief on appeal by relying solely on argument to assert that the violence "plainly

impeded" the enforcement of federal law. Appellants' Opening Br. ("AOB"), Dkt. 56 at 30.[10]

This panel acknowledged that "*Martin* [*v. Mott*, 25 U.S. (12 Wheat.) 19 (1827)] does not compel us to accept the federal government's position that the President could federalize the National Guard based on no evidence whatsoever . . . ." *Newsom v. Trump*, 141 F.4th at 1050. Accordingly, this panel need not defer to Defendants' arguments in the absence of evidence of any inability to execute the law.

## B. The "Regular Forces" Were Willing And Able To Protect Federal Property And Personnel

There is a reason why the federal government was able to continue executing the law amidst the protests: the "regular forces" (local law enforcement) effectively quelled the domestic violence.

Again, that is clear from Defendants' own evidence. Mr. Santacruz explains that the protest which "pinned down" federal inspectors began around 5:00 p.m. on June 6. ECF 25-1 at 6 [A239]. He immediately called all available ICE officers in the building, and by

---

[10] This brief focuses exclusively on the record evidence for this appeal. It is nevertheless important to note that, following trial on the Posse Comitatus Act, the District Court found that ICE continued to arrest and detain individuals throughout the protests. *Newsom v. Trump*, No. 25-cv-04870-CRB, 2025 U.S. Dist. LEXIS 170747, at *8-9 (N.D. Cal. Sept. 2, 2025).

5:15 p.m. – just *fifteen minutes* after the protest began – those additional federal officials "successfully prevented a breach and held the line" until 10:30 p.m. *Id.* at 7 [A240]. Approximately an hour and a half after the violence began, at least 150 officers from the Los Angeles Police Department ("LAPD") arrived on the scene, and by 11:00 p.m., all demonstrators had departed. *Id.* at 8 [A241]; ECF 8-2 at 3 [A182].

More regular forces responded the next day, June 7. When ICE commenced immigration operations in Paramount that morning, they were joined by "approximately 110 Customs and Border Protection (CBP) officers" from San Diego. ECF 25-1 at 9 [A242]. When protesters convened, the LAPD and the Los Angeles Sheriff's Department ("LASD") responded. *Id.* at 10 [A243]. Meanwhile, the LAPD and California Highway Patrol ("CHP") responded to unrest downtown. ECF 8-2 at 4, 6 [A183, A185]. By that evening – when the President issued his Memorandum – LAPD was "fairly in control" of the protests, and by 2:15 a.m., protesters had largely dispersed. *Id.* at 4 [A183]. According to Assistant Chief Brian Olmstead from the Law Enforcement Branch of the California Governor's Office of Emergency Services, "local law enforcement was effectively managing the situation" *before* the National Guard arrived. *Id.* ¶¶ 2, 6, 9 [A181-83].

23

The regular forces were able to manage this unrest because, unlike the National Guard, they are accustomed to doing so. Simply put, violent protests amounting to domestic violence are relatively common. A study by the Major Cities Chiefs Association, which represents large police agencies, revealed that 574 of the 8,700 protests that took place in 68 large American and Canadian cities during the summer of 2020 involved violence that resembles the violence here.[11] Accordingly, while the violence that occurred in Los Angeles in June may be shocking to the public, today's law enforcement agencies are accustomed to it, and prepared to respond effectively. Most notably, there was no need to federalize the National Guard in these situations.

It is therefore not surprising that Sean Duryee, the Commissioner of the CHP who was present at the protests from June 8 through June 11, testified that the protests "were not unlike other protests I have experienced" and that "[l]ocal and State law enforcement resources were sufficient to restore order." ECF 87-3 ¶ 4. Joseph Zizi, the CHP's Commander on the multi-agency Unified Command for the protests, agreed.

---

[11] Major Cities Chiefs Ass'n, *Report on the 2020 Protests and Civil Unrest* 7-12 (2020), https://majorcitieschiefs.com/wp-content/uploads/2021/01/MCCA-Report-on-the-2020-Protest-and-Civil-Unrest.pdf.

"Civil unrest in Los Angeles County," he declared, "is typically managed effectively by state and local law enforcement without the intervention of the National Guard." ECF 77-3 ¶¶ 3, 16.

Despite this, Mr. Santacruz declared on June 11, 2025, that he believed circumstances "require[d] additional manpower and resources" beyond the LAPD, LASD, and CHP. ECF 25-1 at 13 [A246]. But Mr. Santacruz, who has no local law enforcement experience, appears unaware that additional State and local forces *were* available. Commander Zizi and Assistant Chief Duryee testified that the numbers of LAPD, LASD, and CHP officers fluctuated with evolving security needs, peaking on June 14 – proving that local law enforcement was able to provide the additional "manpower" Mr. Santacruz wanted. ECF 77-3 ¶ 15; ECF 87-3 at 3. Even then, local law enforcement agencies had not exhausted their ranks. The CHP alone had hundreds of "additional uniformed personnel . . . on standby" and additional special response teams. ECF 87-3 at 4. Moreover, even if LAPD, LASD, and CHP had exhausted their ranks – which they had not – Assistant Chief Olmstead testified that California's Law Enforcement Mutual Aid System was prepared to send law enforcement from other jurisdictions to Los Angeles as needed. ECF 8-2 at 3-4 [A182-83]; ECF 39-3 at 5.

25

In short, the evidence shows that the regular forces were willing and able to safeguard the federal government's ability to execute federal law.[12]  When the President chose instead to make the California National Guard into his own federalized force, he did so under circumstances that Congress did not authorize.

### III.

### BY INVOKING § 12406(3) UNDER THESE CIRCUMSTANCES, THE PRESIDENT UPSET THE CONSTITUTIONAL BALANCE BETWEEN THE FEDERAL AND STATE GOVERNMENTS

### A.    Section 12406(3)'s Reference To "Regular Forces" Is Essential For State Sovereignty

Defendants' decision to disregard the "regular forces" requirement in § 12406(3) is no mere technical violation.  It is tantamount to disregarding a sovereign state's ability to govern its own internal affairs.

After all, when § 12406(3) is invoked against the will of the State's leadership, the "regular forces" requirement is the only element of that statute that expressly requires that the State's interests will be balanced with the federal government's interests.  By including that requirement, and

---

[12] Again, although the Legislature's argument relies solely on the record in this appeal, it notes that the District Court concluded after trial that "there was no rebellion, nor was civilian law enforcement unable to respond to the protests and enforce the law."  *Newsom v. Trump*, 2025 U.S. Dist. LEXIS 170747, at *4, 8-9.

by not making § 12406 an exception to the PCA,[13] Congress ensured that a President could federalize a State's National Guard only in extraordinary circumstances that do not include the relatively typical domestic disturbance at issue here. If this Court relieves the President of that requirement, a President could arguably federalize the National Guard whenever the President decides that circumstances more than minimally impede federal execution of the law, *even if the State's regular forces are willing and able to safeguard that ability*. In this way, federalization would become less a critical tool to safeguard the rule of law, and more a means for a President to use state resources to advance federal policy goals at the expense of sovereign states.

After all, the list of circumstances that can slow or complicate the work of federal officials is vast: anything from a labor shortage to bad weather to a large protest. Without the "regular forces" requirement, it would not matter whether the federal government could address the problem with regular federal forces, perhaps by calling in reinforcements or shifting work to other offices. It would not matter whether regular state and local police forces were willing and able to address the problem. All that would

---

[13] *See Newsom v. Trump*, 2025 U.S. Dist. LEXIS 170747, at *54.

matter is that the President merely characterized a desire for state resources, regardless of whether doing so would deprive a sovereign State of the necessary use of its own National Guard, and even when doing so undermines the State's authority to regulate its own domestic law enforcement activities.

That is not what Congress authorized, and it is not how past Presidents and Governors have construed § 12406.  When President George H.W. Bush nationalized the California National Guard in 1992 in response to violence that erupted after acquittal of the police officers charged with assaulting Rodney King, he did so at the request of the California Governor and Los Angeles Mayor.[14]  President Bush's proclamation expressly noted that the Governor and Mayor had informed him "that the available law enforcement resources, including the National Guard, are unable to suppress such acts of violence and to restore law and order."[15]  Accordingly, the "regular forces" requirement was met and President Bush's federalization did not undermine State rights.

---

[14] Solcyré Burga, *Why Trump Sending the National Guard to L.A. Is Different From Its Deployment There in 1992* (June 9, 2025), https://time.com/7292493/trump-national-guard-la-1992-riots/.

[15] Proclamation No. 6427, 57 Fed. Reg. 19359 (May 1, 1992).

Furthermore, the circumstances that led to the 1992 federalization illustrate the kinds of circumstances that can overwhelm the regular forces. In 1992, Los Angeles was reeling from widespread rioting that in a matter of days left more than 60 people dead, another 2,000 injured, and approximately $1 billion in property damage, including the defacement of more than 1,000 buildings.[16] The violence in L.A. on June 6 and 7, by contrast, was confined to a few locations. ECF 25-1 at 5, 7 [A238, A240]. No one was killed. One federal officer was injured. *Id.* at 10 [A243].[17] Two federal buildings and an unidentified number of federal vehicles were damaged. *Id.* at 5, 7 [A238, A240].

## B. Defendants' Decision To Disregard The "Regular Forces" Requirement Harmed The State

It is hardly surprising that a federalization made in blatant disregard of the State's interests and sovereignty inflicted great harm on this State. The California National Guard performs vital state functions,

---

[16] *See* Burga, *supra* note 14.

[17] Defendants conflate events occurring before the federalization with events occurring after the federalization, making the circumstances leading to federalization seem more dangerous. AOB, Dkt. 56 at 14-16. For example, Defendants describe multiple injuries to officers, even though all but one injury occurred *after* the federalization, when the violence intensified because of anger over the federalization. ECF 25-1 at 10, 12 [A243, A245]; ECF 8-2 at 5 [A184].

"including emergency and natural disaster response, cybersecurity, and drug interdiction." ECF 8-3 at 7 [A192]. Of critical importance during the State's dry summers, National Guard units like Taskforce Rattlesnake are needed to prevent and respond to wildfires. *Id.* at 8-9 [A193-94]. Members of the National Guard also serve on the State's Counterdrug Taskforce tasked with preventing fentanyl trafficking at the border. *Id.* at 9 [A194]. At the peak of federalization, the California National Guard was reduced by nearly 33 percent. ECF 39-2 ¶ 4. This included more than 55 percent of Taskforce Rattlesnake, at a time when 13 wildfires were already burning in the state, and 31 percent of the Counterdrug Task Force.[18] *Id.* ¶¶ 10-11.

The panel previously characterized these injuries as mere "concerns" while referring to the federal government's injuries as "facts." *Newsom v. Trump*, 141 F.4th at 1055-56. But there is nothing speculative about the State's injuries. When members of Taskforce Rattlesnake are unavailable to mitigate fire risk, wildfires become more likely to break out, and are more dangerous when they do. When members of the State's Counterdrug Taskforce are unavailable at the border, more fentanyl crosses

---

[18] The President made this statement during a recent speech addressing fentanyl use. ABC News, *President Trump officially classifies fentanyl as Schedule 1 narcotic, signs 'Halt Fentanyl Act'*, YouTube (July 16, 2025), https://youtu.be/9hEOGSXr0vs?si=09qzi1cN6SneqmUa.

the border.  Indeed, since federalization, there has been a reported 57 percent decrease in fentanyl seized by CalGuard's Counterdrug Task Force along the border.[19]

There is also evidence that federalization is harming the Guard. Press reports indicate that retention rates for servicemembers whose enlistment was set to expire during this federalized deployment might be only 21 percent, which is sharply lower than the Guard's typical 60 percent rate.[20]

Furthermore, the federalization has inflicted searing reputational harms on the Guard because it has now become inextricably linked with the ICE raids that have been sowing terror in the daily lives of Californians in Los Angeles.  While these harms would be beyond the scope of this lawsuit *if they involved ICE officers alone*, the Department of Defense chose to deploy the National Guard to support ICE raids, rather than just protecting federal property.  ECF 8-3 at 4-5 [A189-90].  Consequently,

---

[19] Cal. Governor's Off., *Trump's Unlawful CalGuard Power Grab Results in 57% Decrease in Fentanyl Pounds Seized* (July 31, 2025), https://www.gov.ca.gov/2025/07/31/trumps-unlawful-calguard-power-grab-results-in-57-decrease-in-fentanyl-pounds-seized/.

[20] Shawn Hubler, *Trump's National Guard Troops Are Questioning Their Mission In L.A.*, N.Y. Times (July 16, 2025), https://www.nytimes.com/2025/07/16/us/trump-national-guard-california.html.

many Californians now consider the National Guard to be indistinguishable from ICE.[21]

Members of the California Legislature have heard countless examples from constituents who are desperate for help and have come to see both ICE and the National Guard as the cause of their desperation. The Legislature detailed many of these communications in its Amicus Brief in Support of En Banc Review, filed in this Court on July 19, 2025. Dkt. 50. To cite just one example, on July 7, federal officers and approximately 90 members of the California National Guard stormed through MacArthur Park on foot, horseback, and in armored military vehicles. The park was mostly empty at the time and there were no reported arrests.[22] Many of the Legislature's constituents have therefore concluded that the National Guard has entered their communities, not to keep the peace or enforce the law, but to target them and to intentionally stoke fear.

---

[21] It is exceedingly difficult to distinguish the National Guard from ICE officers in the field. When the Los Angeles Field Office Director for ICE's Enforcement and Removal Operations was recently asked to identify which agents in a photo were from the National Guard rather than from ICE, he was unable to do so. ECF 127-2 at 19 [Santacruz Dep. Tr. 86:11-18].

[22] *Troops And Federal Agents Briefly Descend On L.A.'s Macarthur Park In Largely Immigrant Neighborhood*, Associated Press (via NBC News) (July 8, 2025), https://www.nbcnews.com/news/us-news/troops-federal-agents-briefly-descend-ls-macarthur-park-largely-immigr-rcna217405.

Members of the California Legislature must now seek to heal and secure their communities, faced with the reality that their constituents may never trust the National Guard again. The full implications are impossible to predict, but it has become clear that this federal deployment has made wildfire season more dangerous, allowed more fentanyl to flow into the State, undermined California's ability to recruit and retain members of its National Guard, inflicted lasting psychological harm on Californians, and fractured the trust essential to civic life.

## CONCLUSION

The District Court's temporary restraining order should be affirmed.

Dated: September 9, 2025    Respectfully submitted,

OLSON REMCHO, LLP


By: *s/ Margaret R. Prinzing*
    Margaret R. Prinzing

By: *s/ Robin B. Johansen*
    Robin B. Johansen

Attorneys for *Amicus Curiae* Legislature of the State of California

33

## **CERTIFICATE OF COMPLIANCE**

This Unopposed Amicus Curiae Brief Of The Legislature Of The State Of California In Support Of Plaintiffs-Appellees complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionately-spaced typeface using Microsoft Word, in 14-point font, Times New Roman.

This Amicus Curiae Brief also complies with the 7,000-word limit for Amicus Curiae Briefs contained in the Court's local rules because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,956 words.

Dated:  September 9, 2025

By:  *s/ Margaret R. Prinzing*
Margaret R. Prinzing

(2,107,159)