No. 25-3727

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

—————————

GAVIN NEWSOM, *et al.*,
*Plaintiffs-Appellees*,

V.

DONALD TRUMP, *et al.*,
*Defendants-Appellees*

—————————

On Appeal from the United States District Court for the
Northern District of California
No. 3:25-cv-04870
The Honorable Charles R. Breyer

—————————

**BRIEF OF *AMICI CURIAE***
**AMERICAN CIVIL LIBERTIES UNION,**
**ACLU OF SOUTHERN CALIFORNIA, ACLU OF NORTHERN**
**CALIFORNIA, ACLU OF SAN DIEGO AND IMPERIAL COUNTIES,**
**THE KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA**
**UNIVERSITY, AND THE RUTHERFORD INSTITUTE IN SUPPORT OF**
**PLAINTIFFS-APPELLEES**

Hina Shamsi
Charlie Hogle*
Sean M. Lau*
AMERICAN CIVIL LIBERTIES
  UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
*Admission pending

Peter Eliasberg
Victor Leung
Adrienna Wong
ACLU FOUNDATION OF
  SOUTHERN CALIFORNIA
1313 West Eighth Street
Los Angeles, CA 90017
(213) 977-5200

*(Additional Counsel Listed on Next Page)*

Shilpi Agarwal
Chessie Thacher
Neil Sawhney
ACLU FOUNDATION OF
  NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
(415) 621-2493

Julia A. Gomez
ACLU FOUNDATION OF SAN
  DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
(619) 398-4199

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amici curiae* the American Civil Liberties Union, the American Civil Liberties Union of Southern California, the American Civil Liberties Union of Northern California, the American Civil Liberties Union of San Diego and Imperial Counties, the Knight First Amendment Institute at Columbia University, and the Rutherford Institute state that they do not have a parent corporation and that no publicly held corporation owns 10% or more of their stock.

Date: September 9, 2025

Shilpi Agarwal
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NOTHERN
CALIFORNIA

*Counsel for Amici Curiae*

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ iii

TABLE OF AUTHORITIES ........................................................................ v

INTERESTS OF *AMICI CURIAE* ............................................................. ix

INTRODUCTION ................................................................................... 1

ARGUMENT .......................................................................................... 4

    I.    American history, tradition, and law strictly limit the President's
        authority to deploy the military against civilians. .......................... 4

    II.   The President's decision to deploy the military in response to
        overwhelmingly lawful political protests puts First Amendment rights
        at high risk. ................................................................................. 10

    III.  The Court should reconsider the level of deference it accorded the
        President's decision to federalize and deploy the California National
        Guard. ........................................................................................ 15

CONCLUSION ...................................................................................... 25

CERTIFICATE OF COMPLIANCE ........................................................... 27

# TABLE OF AUTHORITIES

**Cases**

*ACLU of Nevada v. City of Las Vegas*,
466 F.3d 784 (9th Cir. 2006) ..............................................................11

*Baker v. Carr*,
369 U.S. 186 (1962)..........................................................................18

*Bissonette v. Haig*,
776 F.2d 1384 (8th Cir. 1985) ..............................................................9

*Boos v. Barry*,
485 U.S. 312 (1988)..........................................................................15

*Carroll v. President & Comm'rs of Princess Anne*,
393 U.S. 175 (1968)..........................................................................12

*Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley*,
454 U.S. 290 (1981)..........................................................................13

*Collins v. Jordan*,
110 F.3d 1363 (9th Cir. 1996) ........................................ 12, 15, 21, 23

*Doe #1 v. Trump*,
957 F.3d 1050 (9th Cir. 2020) ............................................................19

*Doe v. Mckesson*,
71 F.4th 278 (5th Cir. 2023) ..............................................................20

*Edwards v. South Carolina*,
372 U.S. 229 (1963)..........................................................................15

*Healy v. James*,
408 U.S. 169 (1972)..........................................................................12

*Index Newspapers LLC v. U.S. Marshals Serv.*,
977 F.3d 817 (9th Cir. 2020) ..............................................................12

*Laird v. Tatum*,
408 U.S. 1 (1972)................................................................................5

*Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist. No1*
  584 F. Supp. 328 (E.D. Ark. 1984) ....................................................................10

*Long Beach Area Peace Network v. City of Long Beach*,
  574 F.3d 1011 (9th Cir. 2009) ..............................................................14

*Los Angeles Press Club v. Noem*,
  No. 25-cv-5563 (C.D. Cal. June 18, 2025) .........................................23

*Luther v. Borden*,
  48 U.S. 1 (1849) .............................................................. 16, 18, 19

*Martin v. Mott*,
  25 U.S. 19 (1827) ................................................................. 16, 17

*NAACP v. Button*,
  371 U.S. 415 (1963) ...............................................................20

*NAACP v. Claiborne Hardware Co.*,
  458 U.S. 886 (1982) ............................................ 11, 12, 15, 20

*Newsom v. Trump*,
  141 F.4th 1032 (9th Cir. 2025) .......................................... *passim*

*Perpich v. Dep't of Defense*,
  496 U.S. 334 (1990)................................................................1, 5

*Reed v. Town of Gilbert, Ariz.*,
  576 U.S. 155 (2015)..................................................................11

*Reid v. Covert*,
  354 U.S. 1 (1957)........................................................................5

*Roth v. United States*,
  354 U.S. 476 (1957)..................................................................13

*Santopietro v. Howell*,
  73 F.4th 1016 (9th Cir. 2023) ..................................................12

*Seattle Affiliate of Oct. 22nd Coal. to Stop Police Brutality, Repression &*
  *Criminalization of a Generation v. City of Seattle*,
  550 F.3d 788 (9th Cir. 2008) ...................................................14

*Snyder v. Phelps*,
562 U.S. 443 (2011) ...................................................................... 11, 14

*Terminiello v. City of Chicago*,
337 U.S. 1 (1949) ....................................................................... 14

*Texas v. Johnson*,
491 U.S. 397 (1989) .................................................................... 14

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
393 U.S. 503 (1969) .................................................................... 14

*Vasquez Perdomo v. Noem*,
No. 24-4312, 2025 WL 2181709 (9th Cir. Aug. 1, 2025) .................................. 23

**Statutes**

10 U.S.C. § 12406 ........................................................................ *passim*

10 U.S.C. §§ 251–255 ..................................................................... 9

18 U.S.C. § 1385 ......................................................................... 8

**Other Authorities**

Anser Hassen, *Pres. Trump Threatens to Send Troops to Oakland*, ABC7 News
(Aug. 12, 2025) ......................................................................... 4

Charlie Savage, *Ex-Officials Urge Curbing Presidential Power to Deploy Troops
on U.S. Soil*, N.Y. Times (Apr. 8, 2024) ................................................. 21

Earl Warren, *The Bill of Rights and the Military*, 37 N.Y.U. L. Rev. 181 (1962) .... 5

George Washington, Address from George Washington to Officers of the Army
(Mar. 15, 1783) ......................................................................... 7

Jackie Gardina, *Toward Military Rule? A Critique of Executive Discretion to Use
the Military in Domestic Emergencies*, 91 Marq. L. Rev. 1027 (2008) ................. 6

James Madison, Address to the Constitutional Convention (1787), *reprinted in* 1
Records of the Federal Convention of 1787 (Max Farrand ed., 1911) .................. 7

John Adams, Adams' Argument for the Defense (1770), *reprinted in* 3 Legal
Papers of John Adams 242 (L. Kinvin Wroth & Hiller B. Zobel eds., 1965) ....... 6

*President Trump Holds Cabinet Meeting*, C-SPAN (Aug. 26, 2025) ......................4

*READ: President Trump's Call with US Governors over Protests*, CNN
(June 1, 2020)...............................................................................22

Robert F. Williams, *George Washington and the Foundations of Civilian Control
of the Military*, Mil. Rev. (July–Aug. 2025) ...........................................7

Samuel Adams, Boston Gazette (Oct. 17, 1768) ......................................6

Sara DiNatale, *Trump Adds San Francisco to List of Cities Where He Wants to
Send Troops*, San Francisco Chronicle (Aug. 22, 2025) ..........................4

Sonja Sharp, *Trump Deployment of Military Troops to Los Angeles Was Illegal,
Judge Rules in Blistering Opinion*, L.A. Times (Sept. 2, 2025)..........................4

The Federalist No. 8 (Alexander Hamilton) ...............................................8

Veronica Stracqualursi, *Trump Suggests Using Military Against "Enemy from
Within" on Election D*ay, CNN Politics (Oct. 14, 2024).................................21

William Baude & Michael Stokes Paulsen, *The Sweep and Force of Section Three*,
172 U. Pa. L. Rev. 605 (2024) ..............................................................19

William Blackstone, 1 Commentaries on the Laws of England 413 (1765) ............5

William Paterson, 1 Records of the Federal Convention of 1787
(Max Farrand ed., 1911) ....................................................................8

Zachary Cohen, *Top US General Rejected Trump Suggestions Military Should
'Crack Skulls' During Protests Last Year, New Book Claims*, CNN Politics
(June 24, 2021)...............................................................................22

## INTERESTS OF *AMICI CURIAE*[1]

The American Civil Liberties Union ("ACLU") is a nationwide, non-partisan, nonprofit organization with more than six million members, supporters, and activists. Since its founding in 1920, the ACLU has been dedicated to the principles of liberty and equality embodied in the Constitution and our nation's civil rights laws. The American Civil Liberties Unions of Southern California, Northern California, and San Diego and Imperial Counties are state affiliates of the national ACLU (collectively referred to here as "the ACLU"). The ACLU has frequently appeared before this Court, both as direct counsel and as *amicus curiae*, in numerous First Amendment and other cases involving executive powers, civil liberties, and civil rights.

The Knight First Amendment Institute at Columbia University is a non-partisan, not-for-profit organization that works to defend the freedoms of speech and the press through strategic litigation, research, and public education. The Knight Institute's aim is to promote a system of free expression that is open and inclusive, that broadens and elevates public discourse, and that fosters creativity,

---

[1] Pursuant to Federal Rule of Appellate Procedure Rule 29(a), *amici* certify that all parties have consented to its timely filing. *Amici* also certify that no person or entity, other than *amici*, their members, or their counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part.

accountability, and effective self-government. Protecting the right to peacefully protest is of special concern to the Knight Institute.

The Rutherford Institute is a nonprofit civil liberties organization headquartered in Charlottesville, Virginia. Founded in 1982 by its President, John W. Whitehead, the Institute provides legal assistance at no charge to individuals whose constitutional rights have been threatened or violated and educates the public about constitutional and human rights issues affecting their freedoms. The Rutherford Institute works tirelessly to resist tyranny and threats to freedom by seeking to ensure that the government abides by the rule of law and is held accountable when it infringes on the rights guaranteed by the Constitution and laws of the United States.

# INTRODUCTION

President Trump's decision to deploy military troops in response to protests in Los Angeles would have shocked this country's Founders. As *amici* explain, the Founders held a deep-rooted fear—grounded in history and experience—of the military's use as a tool of oppression and as a means of suppressing political opponents, which would pose "an intolerable threat to individual liberty." *See Perpich v. Dep't of Defense,* 496 U.S. 334, 340 (1990) (describing the 1787 Constitutional Convention as manifesting a "widespread fear" of military encroachment on civil liberties). Reflecting these profound concerns, all three branches of government have viewed use of the military to police the American people as a last resort, appropriate only in the rarest and most urgent emergencies. That is why Congress, the courts, and the executive branch have repeatedly recognized strict limits on the President's authority to deploy military troops in our streets.

Yet on the night of June 7, 2025, the President took the unprecedented step of invoking a rarely-used statute, 10 U.S.C. § 12406, to forcibly federalize members of the California National Guard and deploy them, along with active-duty Marines, in response to protests against the President's immigration raids in and around Los Angeles. Those protests organically developed on June 6 and 7 because Angelenos were outraged when armed federal agents brutally arrested a local union leader and

grabbed city residents from workplaces and homes, subjecting them to unjust detentions under deplorable conditions. Although the President has focused on sporadic instances of unlawful conduct (which local law enforcement officials stated they could address), the vast majority of city residents were exercising their core First Amendment rights to protest and petition the government for change. Indeed, it was the federal government's initial response to Angelenos' protests that proved both unlawful and inflammatory—with federal agents using tear gas, pepper balls, flash-bang grenades, and other excessive force against groups that included reporters, legal observers, children, elders, clergy, and elected officials. As protests continued in response to this escalation, the President swiftly used them as a pretext, issuing a presidential memorandum and invoking Section 12406 to deploy military troops. *See* Presidential Memorandum, Department of Defense Security for the Protection of Department of Homeland Security Functions (June 7, 2025) (the "June 7 Presidential Memorandum"), ER-126.

The June 7 Presidential Memorandum demonstrates a blatant disregard for established First Amendment doctrine, which emphasizes that political protest— including civil disturbance and disruption—is a fundamental right and serves a core function in our democracy. Protest is to be expected, courts recognize, when the government takes controversial action. And the possibility or occurrence of some unlawful conduct does not turn a protest into a "rebellion" or emergency justifying

the rare and extreme measure of calling out the military against civilians. On the contrary, it is the President's unnecessary and broad military deployment memorandum, which shows a clear intent to suppress his political opponents' speech, that should be seen as constitutionally suspect.

Considering the case in an emergency posture and in an exigent context, this Court issued a swift decision. The Court rejected the executive's most extreme assertions, rightly refusing to accept the President's claim of unreviewable authority to interpret Section 12406 and deploy troops based on his say-so alone. *See Newsom v. Trump*, 141 F.4th 1032, 1039–41 (9th Cir. 2025). But the Court decided that, in adjudicating whether the President had met the statute's conditions, it owed his determinations "especially" high deference in light of two Supreme Court cases from the 1800s. *Id*. at 1047. Those cases, however, addressed justiciability concerns raised in contexts different from the one now before this Court.

*Amici* respectfully request that the Court reconsider the high level of deference it initially accorded the President. It should do so informed by American history, tradition, and laws, which strictly limit the President's authority to deploy the military to police civilians. And it should do so because of the high risk that the First Amendment rights of California's residents—and of the residents of multiple other cities around the country—will be violated if the President maintains troops in California and follows through on his threats to deploy them elsewhere. *See, e.g.*,

Anser Hassen, *Pres. Trump Threatens to Send Troops to Oakland*, ABC7 News (Aug. 12, 2025), https://perma.cc/VG8A-HAZY; Sara DiNatale, *Trump Adds San Francisco to List of Cities Where He Wants to Send Troops*, San Francisco Chronicle (Aug. 22, 2025), https://perma.cc/6Z8A-R2QH; *President Trump Holds Cabinet Meeting* at 3:12:29–40, C-SPAN (Aug. 26, 2025), https://bit.ly/4mIDTME ("I [have] the right to do anything I want to do. I'm the President of the United States. If I think our country is in danger, and it is in danger in these cities, I can do it."); Sonja Sharp, *Trump Deployment of Military Troops to Los Angeles Was Illegal, Judge Rules in Blistering Opinion*, L.A. Times (Sept. 2, 2025), https://perma.cc/9KYW-B45D ("We're going to look at New York," "we're going to do the same thing in Chicago," and "[h]opefully, L.A. is watching."). Whether seen through the distorting lens of extreme deference or not, the President's determination that the Los Angeles protests satisfied the predicates of Section 12406 is baseless.

## ARGUMENT

**I.** **American history, tradition, and law strictly limit the President's authority to deploy the military against civilians.**

The President asserts unilateral and unreviewable authority to federalize the National Guard and deploy it against American civilians on American soil. His claims are extreme, unprecedented, and incompatible with the history, traditions, and laws of the United States.

The "strong resistance of Americans to any military intrusion into civilian affairs" has "deep roots in our history." *Laird v. Tatum*, 408 U.S. 1, 15 (1972). The Founders "envisioned the army as a necessary institution, but one dangerous to liberty if not confined within its essential bounds." *Reid v. Covert*, 354 U.S. 1, 23–24 (1957). This mistrust of a federal military force was based in part on the Founders' knowledge of the past: they "knew that ancient republics had been overthrown by their military leaders" and "were familiar with the history of Seventeenth Century England, where Charles I tried to govern through the army and without Parliament." *Id.* at 24. Indeed, since the era of Oliver Cromwell's autocratic use of the military in the 1600s, *see id.* at 25–26, Anglo-American political thought has warned of the "military tyranny that ensued" from "the executive power . . . being able to oppress," William Blackstone, 1 Commentaries on the Laws of England 413 (1765).

Personal experience, too, convinced the Founders that an executive's use of a national military force to regulate the people "posed an intolerable threat to individual liberty and to the sovereignty of the separate States." *Perpich*, 496 U.S. at 340. The colonies "had long been subjected to the intemperance of military power." Earl Warren, *The Bill of Rights and the Military*, 37 N.Y.U. L. Rev. 181, 183 (1962). "Within their own lives," the Founders "had seen royal governors sometimes resort to military rule," including by deploying British troops to Boston "to support unpopular royal governors and to intimidate the local populace." *Reid*, 354 U.S. at

27; John Adams, Adams' Argument for the Defense (1770), *reprinted in* 3 Legal Papers of John Adams 242, 266 (L. Kinvin Wroth & Hiller B. Zobel eds., 1965) (stating, after the 1770 Boston Massacre in which British troops killed five American protestors, that "soldiers quartered in a populous town . . . will always occasion two mobs, where they prevent one").

In short, the Founders' political views and actions were shaped by their knowledge that a ruler's control of a standing army posed an ongoing threat to individual civil liberties. *See, e.g.*, Jackie Gardina, *Toward Military Rule? A Critique of Executive Discretion to Use the Military in Domestic Emergencies*, 91 Marq. L. Rev. 1027, 1035 (2008); *see also* Samuel Adams, Boston Gazette (Oct. 17, 1768), https://perma.cc/T46W-CQMS (opposing British Quartering Acts requiring housing of soldiers with civilians because of concern that soldiers "may even *make laws for themselves,* and enforce them by the *power of the sword!* Such instances are not uncommon in history, and they always will happen when troops are put under the direction of an *ambitious* or a *covetous* governor!") (emphasis in original).

Indeed, as a general in the Revolutionary War, George Washington famously established a foundational principle for the Continental Army—against military interference with civilian institutions or civil law. During the Newburgh Affair of 1783, when soldiers were prepared to take action against the Continental Congress because of undelivered backpay, General Washington delivered an impassioned

speech instructing American military leaders, "as you respect the rights of humanity, & as you regard the Military & national character of America, to express your utmost horror & detestation of the Man who wishes, under any specious pretences, to overturn the liberties of our Country, & who wickedly attempts to open the flood Gates of Civil discord, & deluge our rising Empire in Blood." George Washington, Address from George Washington to Officers of the Army (Mar. 15, 1783), https://perma.cc/W4B2-HU6F. Later, when General Washington could have aggrandized the powers Congress gave him during the Revolutionary War and taken control of a new nation, he instead chose to resign his military commission, establishing a resonant example of American leadership that refused "to seek, seize, or otherwise hold power outside of legitimate means." Robert F. Williams, *George Washington and the Foundations of Civilian Control of the Military*, Mil. Rev., July–Aug. 2025, at 84.

Against this backdrop, it is little wonder that Federalists and anti-Federalists, fiercely debating the nascent Constitution, agreed on the perils of using a national military force to regulate the domestic civilian population. *See, e.g.*, James Madison, Address to the Constitutional Convention (1787), *reprinted in* 1 Records of the Federal Convention of 1787, at 465 (Max Farrand ed., 1911) ("A standing military force, with an overgrown Executive will not long be safe companions to liberty . . . . Throughout all Europe, the armies kept up under the pretext of defending, have

enslaved the people."); The Federalist No. 8 (Alexander Hamilton) (in a military state, civilians "are unavoidably subjected to frequent infringements on their rights, which serve to weaken their sense of those rights"); William Paterson, 1 Records of the Federal Convention of 1787, at 350 (Max Farrand ed., 1911) ("[Y]ou can no more execute civil Regulations by Military Force than you can unite opposite Elements, than you can mingle Fire with Water[.]"). As other *amici* explain, the Founders reserved police powers to the State in part for these reasons. *See* Br. of Bipartisan Former Governors as *Amici Curiae* in Support of Hearing En Banc, C.A. Dkt. 49 at 7–9; Unopposed Br. *Amicus Curiae* of the Legislature of the State of California in Support of Rehearing En Banc, C.A. Dkt. 50 at 1–3.

The Founders' apprehension of a national army deployed within the United States against the civilian population continues to shape the law of the modern era. Today, the Posse Comitatus Act embodies the nation's profound resistance to federal use of troops to carry out ordinary police functions, criminalizing the use of the federal troops and federalized National Guard "to execute the laws" except when "expressly authorized by the Constitution or Act of Congress." 18 U.S.C. § 1385. The logic of this prohibition is straightforward: "military enforcement of the civil law leaves the protection of vital Fourth and Fifth Amendment rights in the hands of persons who are not trained to uphold these rights. It may also chill the exercise of fundamental rights, such as the rights to speak freely and to vote, and create the

8

atmosphere of fear and hostility which exists in territories occupied by enemy forces." *Bissonette v. Haig*, 776 F.2d 1384, 1387 (8th Cir. 1985) (footnote omitted).

Consistent with our tradition and values, Congress has granted the President the power to deploy federal military troops on American soil to execute the law or quell violence only in extreme and rare emergencies. The Insurrection Act, 10 U.S.C. §§ 251–255, is the prime example. In relevant part, the Insurrection Act authorizes the President to use federal troops "to enforce the laws of the United States," or to suppress exceptional instances of "insurrection, domestic violence, unlawful combination or conspiracy," when "the ordinary course of judicial proceedings or ordinary civilian forces cannot." As the Justice Department's Office of Legal Counsel ("OLC") has long recognized, the portions of the Insurrection Act authorizing the President to deploy troops domestically without the consent of a state "have always been interpreted as requiring, as a prerequisite to action by the President," at least one thing to be true: "that state authorities are either directly involved, by acting or failing to act, in denials of federal rights of a dimension requiring federal military action, or are so helpless in the face of private violence that the private activity has taken on the character of state action." OLC, *Use of Marshals, Troops, and Other Federal Personnel for Law Enforcement in Mississippi* (1964), 1 Op. Att'y Gen. 493, 497 (2013), https://perma.cc/QT82-YYG4. What is more, OLC has taken the position that the existence of these prerequisites is a proper

9

subject of judicial review. OLC, *Authority of President to Keep Troops in Little Rock* 24 (1958), https://perma.cc/B87D-NGDX.

Thus, adhering to history, tradition, and law, President Dwight D. Eisenhower invoked the Insurrection Act in 1957, deploying federal troops and federalizing the Arkansas National Guard to enforce the Supreme Court's *Brown v. Board of Education* decision and guard the Little Rock Nine against a racist and violent mob. President Eisenhower acted only after then-Arkansas Governor Orval Faubus had deployed the state National Guard to support segregationists in defiance of the Supreme Court's decision. *See* Exec. Order No. 10,730 (Sept. 24, 1957), 3 C.F.R. § 389 (1954-1958); *Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist. No. 1*, 584 F. Supp. 328, 331–32 (E.D. Ark. 1984) (recounting history). President Trump's invocation of Section 12406 to federalize the California National Guard over the governor's objection in response to a largely peaceful protest is neither lawful nor in keeping with this nation's history and traditions.

## II. The President's decision to deploy the military in response to overwhelmingly lawful political protests puts First Amendment rights at high risk.

The President may not, consistent with First Amendment principles, use the military to quell political protests as President Trump sought to do in California—and seeks to do elsewhere. *See* June 7 Presidential Memorandum (determining, without any geographic limitation or specific findings of fact, that "protests *or* acts

of violence" inhibiting execution of laws "constitute a form of rebellion" against federal authority and authorizing activation of state National Guard troops where protests "are occurring or are likely to occur") (emphasis added). This is so even when protests produce a measure of unlawful conduct, including vandalism or clashes with law enforcement. If the President could unilaterally deploy the military against any assembly of Americans who opposed his policies, so long as some quantum of them engaged—or *might* engage—in sporadic instances of property destruction or other unprotected acts, then the constitutional right to protest would be transformed beyond recognition. Put differently, if Section 12406 meant what the President says it means, *see* Br. for Appellants, C.A. Dkt. 56 at 21–35, it would collide inexorably with the liberties protected by the First Amendment.

Blackletter First Amendment doctrine establishes that in the context of protest, government officials' role is to facilitate protected activity; any government infringement on the right to protest must meet constitutional scrutiny. *See Snyder v. Phelps*, 562 U.S. 443, 451–58 (2011); *ACLU of Nevada v. City of Las Vegas*, 466 F.3d 784, 792 (9th Cir. 2006). Targeting a protest based on the message it expresses is "presumptively unconstitutional." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). And, in any event, when the government responds to unlawful conduct associated with protest, it "may not employ means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *NAACP v.*

11

*Claiborne Hardware Co.*, 458 U.S. 886, 920 (1982) (quoting *Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 183–184 (1968)). Thus, in addressing the unprotected conduct of *some* protesters, the government may not suppress the lawful, protected conduct of *other* protesters, even if they are part of the same general demonstration or share the same viewpoint. *See id.* at 908, 916–19; *see also Santopietro v. Howell*, 73 F.4th 1016, 1025 (9th Cir. 2023) (emphasizing that "[a]ssociation for the purpose of engaging in protected activity is itself protected by the First Amendment" and that "'guilt by association alone . . . is an impermissible basis upon which to deny First Amendment rights'") (quoting *Healy v. James*, 408 U.S. 169, 186 (1972)).

Restrictions on First Amendment activities in public fora are "subject to a particularly high degree of scrutiny," and "enjoining or preventing First Amendment activities before demonstrators have acted illegally or before the demonstration *poses a clear and present danger* is presumptively a First Amendment violation." *Collins v. Jordan*, 110 F.3d 1363, 1371 (9th Cir. 1996) (citations omitted and emphasis added). Because the Constitution reserves police powers to states, it is the role of local law enforcement to facilitate constitutionally compliant policing of protests that rejects sweeping "prophylactic measures" when free speech is at stake. *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 834 (9th Cir. 2020); *see also id.* at 831 ("Federal Defendants did not claim the authority to issue general

dispersal orders on Portland's streets and sidewalks, [and] local law enforcement retains that authority pursuant to the general police power.").

On its face, President Trump's June 7 Memorandum shows no acknowledgment or understanding of—or intent to comply with—established First Amendment law. And it ignores that, unlike local or even state law enforcement, military troops "do not receive extensive training on how to operate safely and effectively in the context of domestic law enforcement," let alone in the context of policing protests in compliance with First Amendment doctrine. Br. of *Amici Curiae* Former U.S. Army & Navy Secretaries & Retired Four-Star Admirals & Generals, C.A. Dkt 47.1 at 12–14.

Even—and especially—when the President disregarded the First Amendment principles at stake in activating and deploying troops under Section 12406 in response to protest, this Court must not. The First Amendment was designed "to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States*, 354 U.S. 476, 484 (1957). Political protest plays an essential role in the American system of self-governance. "[T]he practice of persons sharing common views banding together to achieve a common end is deeply embedded in the American political process." *Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley*, 454 U.S. 290, 294 (1981). Indeed, "the right to speak freely," including the right to protest, is "one of

the chief distinctions that sets us apart from totalitarian regimes." *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949) (cleaned up). For, as this Court previously concluded, "robust political discourse within a traditional public forum is the lifeblood of a democracy." *Seattle Affiliate of Oct. 22nd Coal. to Stop Police Brutality, Repression & Criminalization of a Generation v. City of Seattle*, 550 F.3d 788, 797 (9th Cir. 2008); *see also Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1021 (9th Cir. 2009) ("Political speech is . . . critical to the functioning of our democratic system.").

Protest serves its core democratic function particularly "when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Terminiello*, 337 U.S. at 4. Disruptive political speech is part of the American way of life. It "may cause trouble," but "our Constitution says we must take this risk, and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 508–09 (1969) (cleaned up). Accordingly, the Supreme Court has repeatedly held that some forms of activity that might otherwise be subject to civil or criminal liability are, in the context of protest, forms of expression protected by the First Amendment. *See, e.g.*, *Snyder*, 562 U.S. at 451; *Texas v. Johnson*, 491 U.S. 397, 411

(1989); *Boos v. Barry*, 485 U.S. 312, 318 (1988); *Claiborne Hardware*, 458 U.S. at 908; *Edwards v. South Carolina*, 372 U.S. 229, 235 (1963).

Protests "can be expected when the government acts in highly controversial ways." *Collins*, 110 F.3d at 1372. "The more controversial the occurrence, the more likely people are to demonstrate." *Id.* Of course, the First Amendment's protection of protest does not extend to violence. *Claiborne Hardware*, 458 U.S. at 916. Yet neither the risk nor the fact of some unlawful, unprotected conduct is enough to transform a protest into an emergency justifying the extreme measure of deploying the military to police civilians. On the contrary, as this Court has made clear, "[t]he generally accepted way of dealing with unlawful conduct that may be intertwined with First Amendment activity is to punish it after it occurs, rather than to prevent the First Amendment activity from occurring in order to obviate the possible unlawful conduct." *Collins*, 110 F.3d at 1371–72. The President's assertion of unfettered discretion to activate the California National Guard against his political opponents is utterly incompatible with this bedrock constitutional jurisprudence.

**III.    The Court should reconsider the level of deference it accorded the President's decision to federalize and deploy the California National Guard.**

American law, history, and tradition limit the President's authority to deploy the military against civilians within the United States to a narrow range of extreme factual circumstances. No president has previously invoked Section 12406 in the

context and under the set of facts now before this Court, let alone with such apparent disregard for Americans' First Amendment rights. It is emphatically the role of the Court to interpret and apply Section 12406's terms to determine whether the President's invocation of the statute exceeded the authority delegated to him by Congress, and in doing so, *amici* respectfully urge the Court to reconsider the level of deference it accorded to the President in its emergency stay decision.

The Court correctly determined that this case does not present a political question. *Newsom*, 141 F.4th at 1046. It was also right that the President lacks the unreviewable discretion to determine whether the predicates of Section 12406 are satisfied. *Id.* at 1047. But it went awry in concluding that precedent—principally *Martin v. Mott*, 25 U.S. 19 (1827) and *Luther v. Borden*, 48 U.S. 1 (1849)—requires the judiciary to grant tremendous deference to the President's conclusion that the facts on the ground satisfied Section 12406's conditions. *Newsom*, 141 F.4th at 1047, 1049–51 (applying "especially deferential" standard, President's determination requires "significant deference," although at preliminary litigation stage, "we need not further specify the precise standard that governs our review"). Both *Martin* and *Luther* are precursors of the modern political-question doctrine, and in both, the Supreme Court relied on justiciability concerns not present here.

The question in *Martin* was one of military discipline. The case arose when the President invoked the Militia Act of 1795, calling the militia into federal service.

16

*Martin*, 25 U.S. at 28. A militia officer refused to report for federal duty and was court martialed. *Id.* Challenging his punishment, the officer contended that he was under no obligation to answer the President's call because no exigency justified the President's invocation of the Militia Act. *Id.* at 30.

The Supreme Court refused to entertain the officer's argument, rooting its decision in the military chain of command. As the Court explained, "[i]f a superior officer has a right to contest the orders of the President upon his own doubts as to the exigency having arisen, it must be equally the right of every inferior officer and soldier." *Id.* at 30. The result would be a breakdown of military effectiveness: the court reasoned that the United States would be unable to defend itself if "subordinate officers or soldiers" were continually "pausing to consider whether they ought to obey" their commander's orders. *Id.* What was more, said the Court, if a member of the military could *challenge* the factual bases for the President's orders under the Militia Act in federal litigation, then any member of the military who immediately *obeyed* the same orders could be subject to "ruinous litigation." *Id.* at 30–31. "Such a course would be subversive of all discipline and expose the best disposed officers to the chances of ruinous litigation." *Id.* at 31.

The Supreme Court's consequentialist reasoning—the heart of its holding in *Martin*—is wholly inapplicable to the current case. California's challenge does not require this Court to elevate a subordinate military officer's judgment over the

17

President's; nor does it otherwise interpose the federal judiciary in the military chain of command. The *Martin* Court's overriding interests—in preserving military discipline and preventing troops from being held civilly liable for obedience to their commanding officers—are not implicated here. Rather, California's lawsuit asks this Court to consider whether the President satisfied basic statutory prerequisites when he took the extreme and unprecedented step of deploying military troops—over the objection of the state's governor—to police citizens of Los Angeles, the "vast majority" of whom engaged in lawful protest. Answering Br. of Plaintiffs-Appellees, C.A. Dkt. 63 at 7.

*Luther* is all the more inapt. The question in that case was whether the longstanding "charter" government of Rhode Island was legitimately in power on a certain date. *Luther*, 48 U.S. at 38. The Supreme Court held that the answer could be supplied only by the political branches, not the judiciary. *Id.* at 39. Specifically, the Court held that "it rests with Congress to decide what government is the established one in a State," *id.* at 42, and that Congress had, in the Militia Act of 1795, provided a limited delegation of its decision-making authority to the President, *id.* at 43.

That holding in *Luther*, which presaged today's political-question doctrine, was decisive. *See Baker v. Carr*, 369 U.S. 186, 211, 218 (1962) (identifying *Luther* as one of the "representative cases" whose "analytical threads . . . make up the

political question doctrine"). As the Court explained, the President had "recognized" the head of Rhode Island's charter government "as the executive power of the State." *Luther*, 48 U.S. at 44. Having concluded that the power to determine the legitimacy of state governments belonged to the political branches, the Court considered itself bound by the President's recognition. *Id.*; *see also* William Baude & Michael Stokes Paulsen*, The Sweep and Force of Section Three*, 172 U. Pa. L. Rev. 605, 707 (2024) (explaining *Luther* "held that the question of which government constituted the lawful government of the state was a political question committed to the judgment of Congress and the President and that the judiciary lacked authority to interfere with the political branches' actions (and inactions), which had tacitly supported the charter government"). Critically, the President's decision to recognize Rhode Island's charter government as legitimate was the sole issue in *Luther*; the President neither called out the militia nor concluded that it was appropriate to do so under the Militia Act. *See Luther*, 48 U.S. at 44.

In sum, *Martin* and *Luther* do not compel this Court's prior conclusion that "review of the President's determinations in *this* context is especially deferential." *Newsom*, 141 F.4th at 1047 (emphasis added). To the contrary, "the President's determination that a statutory precondition exists" for the invocation of Section 12406 "is subject to review like certain other factual findings that are preconditions for executive action under a statute." *Id.* (citing *Doe #1 v. Trump*, 957

F.3d 1050, 1066–67 (9th Cir. 2020)). Indeed, robust review of the executive's factfinding is particularly appropriate here, because the President has deployed military troops in a manner that suppresses core First Amendment activity—namely, protests against unpopular, unprecedented, and unlawful federal conduct.

The President's actions—to quell widespread political protests in response to a handful of instances of unlawful conduct—offend the bedrock principle that "precision of regulation" is demanded when unprotected conduct occurs in the context of constitutionally protected activity. *Doe v. Mckesson*, 71 F.4th 278, 289–90 (5th Cir. 2023) (quoting *NAACP v. Button*, 371 U.S. 415, 438 (1963)). Moreover, the First Amendment limits the government's ability to hold protest leaders and peaceful demonstrators accountable for violence committed by other participants. *Claiborne Hardware*, 458 U.S. at 933–34 (1982) ("A massive and prolonged effort to change the social, political, and economic structure of a local environment cannot be characterized as a violent conspiracy simply by reference to the ephemeral consequences of relatively few violent acts."). For this reason, "[b]road prophylactic rules in the area of free expression"—which the President's deployment of military troops amounts to here—"are suspect." *Button*, 371 U.S. at 438.

Viewed without the distorting effect of extreme deference, the President's determination that the LA protests satisfied the predicates of Section 12406 is baseless. The protests neither constituted a "rebellion or danger of a rebellion" nor

rendered the President "unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(2), (3). On the contrary, they were overwhelmingly lawful, and civilian law enforcement authorities stood ready to "arrest those who actually engage[d] in" any instances of violence or property damage—a constitutionally permissible response to unprotected protest activity. *Collins*, 110 F.3d at 1372; *see also* Answering Br. of Plaintiffs-Appellees, C.A. Dkt. 63 at 7 (describing largely peaceful nature of protests as well as state and local officials' and law enforcement responses).

The President has made no secret of his intent to deploy military troops against his political opponents and civilians. His campaign speeches were full of threatening statements, such as "the bigger problem are the people from within," and "it should be very easily handled by, if necessary, by National Guard, or if really necessary, by the military. . . ." Veronica Stracqualursi, *Trump Suggests Using Military Against "Enemy from Within" on Election Day*, CNN Politics (Oct. 14, 2024), https://perma.cc/BZ3R-ZN8T; *see also* Charlie Savage, *Ex-Officials Urge Curbing Presidential Power to Deploy Troops on U.S. Soil*, N.Y. Times (Apr. 8, 2024), https://perma.cc/GAQ2-UMYC (reporting Trump campaign rally statements that New York City and Chicago are "crime dens" and that although as president, "you're supposed to not be involved in that, you just have to be asked by the governor or the mayor to come in—the next time, I'm not waiting").

In his first administration, the President reiterated those threats and he has escalated them recently, asserting authorities and claims that would have shocked the Founders. He, for example, reportedly made demands to the then Joint Chiefs of Staff Chairman to "beat the fuck out" of civil rights protesters and "crack their skulls." Zachary Cohen, *Top US General Rejected Trump Suggestions Military Should 'Crack Skulls' During Protests Last Year, New Book Claims*, CNN Politics (June 24, 2021), https://perma.cc/C5HG-GJ36.

And in discussing his military parade earlier this summer, the President stated: "For those people that want to protest, they're going to be met with very big force . . . . I haven't even heard about a protest, but you know, this is people that hate our country, but they will be met with very heavy force." Erica L. Green & Maggie Haberman, *Trump Threatens Any Protestors at Military Parade With 'Very Big Force,'"* N.Y. Times (June 10, 2025), https://www.nytimes.com/2025/06/10/us/politics/trump-military-parade-protests.html; *see also READ: President Trump's Call with US Governors over Protests*, CNN (June 1, 2020), https://perma.cc/VR4P-T6DP (instructing governors to "[u]se our National Guard, you're much better off with too many than too few" and "[y]ou have to dominate. If you don't dominate, you're wasting your time").

Now, the President's threats are only escalating. *See* Donald J. Trump (@realDonaldTrump), Truth Social (Sept. 6, 2025 at 11:38 AM ET),

http://bit.ly/4mc0Mal (depicting an AI-generated image of the President against a backdrop of the Chicago skyline, military helicopters, flames, and the phrase "Chipocalypse Now," stating "I love the smell of deportations in the morning" and "Chicago about to find out why it's called the Department of War. . .").

In Los Angeles, the President seized on a flimsy pretext to make good on his threats: he first ordered federal law enforcement agencies to conduct extraordinarily intrusive, violent, and discriminatory immigration raids throughout the city. Armed federal agents wearing paramilitary gear began "Operation At Large" in Southern California, snatching people from churches, carwashes, and ordinary places of business, and spreading fear and horror through families and communities. *See Vasquez Perdomo v. Noem*, No. 24-4312, 2025 WL 2181709, at *1, 3 (9th Cir. Aug. 1, 2025) (describing start of raids on June 6 and federal agents' actions).

When, as might be "expected," *Collins*, 110 F.3d at 1372, the people of Los Angeles protested against their neighbors' being snatched from workplaces and homes on June 6 and 7, the President deployed federal agents who used unlawful and violent measures against them. *See* Complaint, *Los Angeles Press Club v. Noem*, No. 25-cv-5563 (C.D. Cal. June 18, 2025), Dkt. No. 1, ¶¶ 21–47 (describing development of organic, grassroots protests against federal raids, unjust detentions, and detention conditions; and federal law enforcement agencies' response to protests on June 6 and 7, including with "pepper balls and tear gas into a crowd of protestors,

23

legal observers, and reporters who had gathered for a press conference and demonstration," a brutal arrest of "a union leader protesting," "volleys of tear gas and flash-bang grenades at groups of demonstrators that included children and elders, clergy, and elected officials").

On the evening of June 7, the President pitted military troops against the people of Los Angeles, over the strenuous objections of local and state law enforcement authorities. That deployment chilled protesters' speech, as the district court has since found. *See* Op. Granting Injunctive Relief, D.Ct. Dkt. 176 at 11 (presence of U.S. Army Task Force, which includes federalized National Guard troops, "deterred engagement by the public, especially by those who might have attempted to hinder or protest an arrest by ICE agents").

In sum, through his novel invocation of Section 12406, the President contravened this nation's foundational aversion to using soldiers to regulate civilians. He flouted the executive branch's longstanding, narrow interpretation of the President's authority to deploy the military domestically without the consent of state authorities. And he ignored centuries of law confirming that political protest is both a core First Amendment right and an essential component of the American political process, even when it creates a civil disturbance, and even though otherwise lawful protest is sometimes accompanied by unprotected acts of violence or vandalism. Against this backdrop, it is painfully evident that the President is not due

24

a high level of deference. It is also very clear that the President's invocation of Section 12406 was not "conceived in good faith" and exceeded the "permitted range of honest judgment." *Newsom*, 141 F.4th at 1050–51 (citation omitted). The Court should not—indeed, must not—close its eyes to that reality.

## CONCLUSION

*Amici* respectfully urge the Court to apply a less deferential standard of review to the President's invocation of Section 12406 in light of American history, tradition, and laws, as well as the First Amendment rights at stake here. They support California's request that the Court should then either affirm the district court's temporary restraining order or vacate it, along with the Court's published stay order, and remand for further proceedings.

Dated: September 9, 2025

Respectfully submitted,

/s/ *Hina Shamsi*

Hina Shamsi
Charlie Hogle*
Sean M. Lau*
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
hshamsi@aclu.org
charlie.hogle@aclu.org
slau@aclu.org
*Admission pending*

/s/ *Shilpi Agarwal*

Shilpi Agarwal
Chessie Thacher
Neil Sawhney
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION OF
    NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
(415) 621-2493
sagarwal@aclunc.org
cthacher@aclunc.org
nsawhney@aclunc.org

/s/ *Peter Eliasberg*

Peter Eliasberg
Victor Leung
Adrienna Wong
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION OF
    SOUTHERN CALIFORNIA
1313 West Eighth Street
Los Angeles, CA 90017
(213) 977-5200
peliasberg@aclusocal.org
vleung@aclusocal.org
awong@aclusocal.org

/s/ *Julia A. Gomez*

Julia A. Gomez
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION OF SAN
    DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
(619) 398-4199
jagomez@aclu-sdic.org

*Counsel for Amici Curiae*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | No. 25-3737

I am the attorney or self-represented party.

**This brief contains** | 6,296 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    ☐ it is a joint brief submitted by separately represented parties.
    ☐ a party or parties are filing a single brief in response to multiple briefs.
    ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [    ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Shilpi Agarwal | **Date** | 9/9/25

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**           *Rev. 12/01/22*