No. 25-3727

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

GAVIN NEWSOM, in his official
capacity as Governor of the State of
California; STATE OF CALIFORNIA,

*Plaintiff-Appellee,*

*v.*

DONALD TRUMP, in his official
capacity as President of the United
States; PETE HEGSETH, in his official
capacity as Secretary of the Department
of Defense; DEPARTMENT OF
DEFENSE,

*Defendant-Appellant.*

On Appeal from the United States
District Court for the District of
California
No. 3:25-cv-04870-CRB
Hon. Charles R. Breyer

---

**BRIEF OF *AMICUS CURIAE* THE CITY OF LOS ANGELES, THE
COUNTY OF LOS ANGELES, THE CITY OF BALTIMORE, THE CITY
OF BELL GARDENS, THE CITY OF BOSTON, THE CITY OF
CHICAGO, THE CITY OF MONTEREY PARK, THE CITY OF NEW
YORK, THE CITY OF SANTA ANA, THE CITY OF SANTA MONICA,
THE CITY OF SANTA PAULA, THE CITY OF LONG BEACH, AND
THE CITY OF WEST HOLLYWOOD IN SUPPORT OF PLAINTIFF-
APPELLEES**

---

HYDEE FELDSTEIN SOTO
  *City Attorney*
VALERIE L. FLORES
MICHAEL J. DUNDAS
Office of the Los Angeles City Attorney
200 N. Main Street
Los Angeles, CA 90012
Mike.Dundas@lacity.org
*Counsel for Amicus Curiae*
  *City of Los Angeles*

EBONY M. THOMPSON
  *City Solicitor*
Baltimore City Department of Law
100 N. Holliday Street
Baltimore, Maryland 21202
*Counsel for Amicus Curiae the Mayor*
*and City Council of Baltimore*

STEPHANIE VASQUEZ
  *City Attorney*
Bell Gardens City Attorney's Office
7100 Garfield Avenue
Bell Gardens, CA 90201
*Counsel for Amicus Curiae*
  *City of Bell Gardens*

ADAM CEDERBAUM
  *Corporation Counsel*
City of Boston Law Department
One City Hall Square, Room 615
Boston, MA 02201
*Counsel for Amicus Curiae*
  *City of Boston*

MARY B. RICHARDSON-LOWRY
  *Corporation Counsel*
City of Chicago Department of Law
121 North LaSalle Street, Suite 600
Chicago, Illinois 60602
*Counsel for Amicus Curiae*
  *City of Chicago*

Dawn A. McIntosh
  *City Attorney*
Office of the City Attorney
411 W. Ocean Blvd., 9th Floor
Long Beach, CA 90802
*Counsel for Amicus Curiae*
  *City of Long Beach*

JUDY W. WHITEHURST
  *Chief Deputy*
LILIANA CAMPOS
BRIGIT GREESON ALVAREZ
648 Kenneth Hahn Hall of
Administration
500 West Temple Street Los Angeles,
California 90012-2713
*Counsel for Amicus Curiae*
  *County of Los Angeles*

Karl H. Berger
  *City Attorney*
Monterey Park City Attorney's Office
320 West Newmark Ave.
*Counsel for Amicus Curiae*
  *City of Monterey Park*

MURIEL GOODE-TRUFANT
  *Corporation Counsel*
100 Church Street
New York, NY 10007
*Counsel for Amicus Curiae*
  *City of New York*

SONIA R. CARVALHO
  *City Attorney*
City of Santa Ana
20 Civic Center Plaza M-29
Santa Ana, CA 92702
*Counsel for Amicus Curiae*
  *City of Santa Ana*

Heidi von Tongeln
SANTA MONICA CITY
ATTORNEY'S OFFICE
1685 Main Street, 3rd Floor
Santa Monica, CA 90401
*Counsel for Amicus Curiae*
  *City of Santa Monica*

MONICA D. CASTILLO
  *City Attorney*
City of Santa Paula
300 S. Grand Ave., 25th Floor
Los Angeles, CA 90071
*Counsel for Amicus Curiae*
  *City of Santa Paula*

Lauren Langer
  *City Attorney*
City of West Hollywood
8300 Santa Monica Boulevard
West Hollywood, California 90069
*Counsel for Amicus Curiae*
  *City of West Hollywood*

Norman L. Eisen
Stephen A. Jonas
Joshua G. Kolb
Diamond Brown
**DEMOCRACY DEFENDERS FUND**
600 Pennsylvania Avenue SE
Suite 15180
Washington, DC 20003
Telephone: (202) 594-9958
Norman@statedemocracydefenders.org
Steve@statedemocracydefenders.org
Joshua@statedemocracydefenders.org
Diamond@statedemocracydefenders.org
*Attorneys for Amicus Curiae*
  *City of Los Angeles*

# TABLE OF CONTENTS

IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT 1

ARGUMENT .......................................................................................8

I.   The Federal Government Lacks the Statutory Authority to Deploy the National Guard in Los Angeles .............................................8

   a.   The federal courts may determine whether Section 12406's factual predicates are satisfied.........................................................8

   b.   *Martin v Mott* does not mandate deference in the present matter, nor does it preclude judicial review................................................10

   c.   None of Section 12406's factual predicates are satisfied ...........................16

II.   The Deployment of the Military Has Impeded the City's Ability to Carry out its Traditional Police Powers .............................................21

   a.   The City—not the military—holds the lawful expertise and authority over domestic law enforcement ...............................................21

CONCLUSION .......................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Dep't of Homeland Security v. MacLean*, 574 U.S. 383 (2015) ...................................... 9

*Duncan v. Walker*, 533 U.S. (2001) ................................................................................. 20

*Gustafson v. Alloyd Co.,* 513 U.S. (1995) ........................................................................ 19

*Hamdi v. Rumsfeld*, 542 U.S. (2004) ............................................................................... 17

*Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. (1981)) ............................ 12

*Knight v. Comm'r*, 552 U.S. (2008) ................................................................................. 18

*Laird v. Tatum*, 408 U.S. 1 (1972) ..................................................................................... 8

*Ludecke v. Watkins*, 335 U.S. 160 (1948) .......................................................................... 8

*Martin v. Mott*, 25 U.S., 19 (U.S.) .................................................................... 6, 9, 13, 15

*Newsom v. Trump*, 3:25-cv-04870, (N.D. Cal. Sept. 2, 2025) ......................... 4, 11, 13

*NFIB v. Sebelius*, 567 US, (2012) ..................................................................................... 21

*Russello v. United States*, 464 U. S. (1983) ........................................................................ 9

Sterling v. Constantin, 287 U.S. 378 (1932) ..................................................................... 14

*Trump v. J.G.G.*, 145 S. Ct. (2025) .................................................................................... 7

*TRW Inc. v. Andrews*, 534 U.S. (2001) ............................................................................ 19

*W.M.M. v Trump*, No. 25-10534 (5th Cir. 2025). .......................................................... 8, 10

*Yates v. United States*, 574 U.S. (2015) ............................................................................ 19

## STATUTES

10 U.S.C. 12406 .................................................................................................... passim

18 U.S.C. § 1385 ................................................................................................................ 23

## OTHER AUTHORITIES

Alien Enemies Act ............................................................................................................... 8

Exec. Order No. 14339 ....................................................................................................... 3

Federalist No. 28 ............................................................................................................... 17

Federalist No. 39 ............................................................................................................... 20

Federalist No. 45 ............................................................................................................... 21

Friden, Liz & Heinrich, Jacqui, *National Guard mobilizing in 19 states amid immigration, crime crackdown*,

    FOX NEWS, updated Aug. 23, 2025 ........................................................ 14

LAPD, *Strategic Plan 2023 & Beyond* ........................................................ 22

Miller, Heather *No Kings Day attendance: Over 5 million turned out across US, organizers say*,

    LiveNOW FOX, (June 15, 2025) ........................................................ 22

Nevitt, Mark *The Military, the Mexican Border, and Posse Comitatus*, Just Security (Nov. 6,

    2018) ........................................................ 23

*Rebellion*, Black's Law Dictionary (1891) ........................................................ 15

*Rebellion*, Black's Law Dictionary (2024) ........................................................ 15

SLAUGHTER, P. THOMAS, THE WHISKEY REBELLION:

    FRONTIER EPILOGUE TO THE AMERICAN REVOLUTION (1986). ........................................................ 17

SZATMARY, P. DAVID, SHAY'S REBELLION: THE MAKING OF AN AGRARIAN INSURRECTION (1980)

    ........................................................ 17

*The Amy Warwick*, 67 U.S. 635 (1862). ........................................................ 18

Treisman, Rachel *How Chicago, Baltimore and New Orleans are Reacting to Trump's National Guard threats*, NPR, Sep. 5, 2025 ........................................................ 14

Vladeck, Steve, *Five Questions About Domestic Use of the Military*, One First (Apr. 14, 2025) 23

## CONSTITUTIONAL PROVISIONS

Cal. Const., art. XI ........................................................ 12

U.S. Const. Art. I, § 9 ........................................................ 17

**INTRODUCTION AND STATEMENT OF INTEREST OF *AMICI CURIAE***

The United States (the "Government") is systematically and unlawfully deploying federalized forces of the National Guard to conduct both immigration operations and domestic law enforcement on American streets.[1] Although Los Angeles was the first staging ground for this unprecedented assault on fundamental American values in violation of federal law, it did not stop there. Washington D.C., although separately situated and raising different legal issues, was next and in recent days, the President has repeatedly stated that he is going to send troops to Chicago, Baltimore, Boston, New York, and other cities around the country. He has threatened to do so without citing any reason necessitating that extraordinary action. And now, the President has ordered the Secretary of Defense to establish the readiness of the National Guard in all 50 States to serve as "standing National Guard quick reaction force" for civilian law enforcement needs. Exec. Order No. 14339 (Aug. 25, 2025).

The President's rhetoric — flimsy and pretextual justifications to deploy the force of the federal government on the streets of American cities — is a replay of what is occurring in Los Angeles. In considering this appeal, this Court cannot ignore the broader context in which the Los Angeles deployment is presented. If allowed to remain unchecked, there will be no limit on the use of the National Guard,

---

[1] No party or party's counsel authored this brief in whole or in part; no party or party's counsel contributed money to fund preparation or submission of this brief; and all of the parties consented to the filing of this brief.

which will, in due time, become the President's personal police force. *Newsom v. Trump*, 3:25-cv-04870, (N.D. Cal. Sept. 2, 2025) ECF No. 176 ("President Trump and Secretary Hegseth have stated their intention to call National Guard troops into federal service in other cities across the country…thus creating a national police force with the President as its chief.").

Pursuant to Rule 29 of the Federal Rules of Appellate Procedure, the City of Los Angeles, the County of Los Angeles, the City of Baltimore, the City of Bell Gardens, the City of Boston, the City of Chicago, the City of Monterey Park, the City of New York, the City of Santa Ana, the City of Santa Monica, the City of Santa Paula, the City of Long Beach, and the City of West Hollywood (collectively, "Amici") respectfully submit this brief *amicus curiae* brief in support of Plaintiffs-Appellees.

Amici have all either seen troops deployed to their jurisdiction or have been threatened with such military activity, and all Amici have a critical interest in protecting the safety of their residents along with their constitutional rights to peacefully assemble and exercise their First Amendment rights. The deployment of National Guard personnel, armed with live ammunition and skilled in warfare against external enemies, on domestic soil for domestic law enforcement without the training, perspective, and expertise of local police departments traditionally charged

with the protecting civilian population, inflames tensions with the public and infringes upon and directly harms Amici's interests.

Home to nearly four million people, the City of Los Angeles ("City") exercises the powers of the State — those reserved by the Tenth Amendment — to preserve peace, order, and liberty. The Government's overwhelming and unauthorized military presence in the City undermines those principles, sows chaos, and deprives the City of its prerogative to protect its residents. In its opening brief, the Government attempts to justify the federalization as needed to quell "lawless mob violence." But the cited protests in Los Angeles, a city that covers 469 square miles, occurred over a few days in June; within one square mile of the downtown area; and mostly involved, with a few exceptions, a few dozen primarily peaceful protestors at any given time.

Admittedly, some violence and property damage occurred during the protests. Such criminal conduct is incidental to many large protest gatherings in the United States. But the Government's response to this geographically contained and limited series of incidents was to activate or deploy, without the request or even consent of the local and state authorities, 4,000 federalized National Guard along with 700 United States Marines. To give the scale of this deployment some context, the number of troops deployed by the Government exceeds the size of all but five police departments in the country.

There was no "lawless mob violence" directed at the Government and there certainly was no invasion or rebellion. The criminal conduct that occurred those first few days was separate from the outpouring of peaceful protest activity. The isolated violence was quickly arrested by the LAPD and the County Sheriff, both of which are composed of highly trained and professional officers familiar with long established protocols for crowd control and for summoning mutual aid and assistance from other law enforcement agencies when the need arises, while simultaneously ensuring non-violent residents are able to freely exercise their right to speech and protest.

The Government deployed the National Guard on the streets of Los Angeles without lawful statutory authority. The conditions precedent required to invoke 10 U.S.C. 12406 ("Section 12406"), the statute upon which the Government relied, never existed. This Court has the authority to review the President's actions, and the Supreme Court's decision in *Martin v. Mott*, 25 U.S., 19 (U.S.) does not mandate otherwise.

The aggravation of the protest and violence and the chilling of the First Amendment activities that the unlawful military presence wrought in Los Angeles illustrates the immediate and concrete harms that follow when the Government unlawfully displaces local authority. By exceeding its legal and statutory authority, the Government has inflicted irreparable harm on the Amici the City of Los Angeles,

the County of Los Angeles, and their constituents. At this moment, the Government threatens to inflict similar damage upon cities throughout the country, including other Amici. To prevent any further unlawful interference with the State of California's management of the National Guard and the City's core responsibilities, the Court must affirm the district court's granting of a temporary restraining order, or, in the alternative, remand the matter back to the district court for further proceedings while vacating this Court's published stay order.

## ARGUMENT

I. **The Federal Government Lacks the Statutory Authority to Deploy the National Guard in Los Angeles**

a. **The federal courts may determine whether Section 12406's factual predicates are satisfied**

The Government grounds its purported authority to deploy the National Guard in a single statute, Section 12406. Resolving the scope of the executive branch's statutory authority falls squarely within the providence of the judicial branch. The Supreme Court recently reiterated, in the context of the Alien Enemies Act, that courts may engage in "'judicial review' as to 'questions of interpretation of and constitutionality' of the Act." *Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (2025) (*per curiam*) (quoting *Ludecke v. Watkins*, 335 U.S. 160, 163 (1948)). That judicial review extended to examining whether the factual predicates of the statute's

authorities were satisfied—in that case, "whether he or she 'is in fact an alien enemy fourteen years of age or older.'" *Id. See also Laird v. Tatum*, 408 U.S. 1, 15–16 (1972) ("[W]hen presented with claims of judicially cognizable injury resulting from military intrusion into the civilian sector, federal courts are fully empowered to consider claims of those asserting such injury; there is nothing in our Nation's history or in this Court's decided cases, including our holding today, that can properly be seen as giving any indication that actual or threatened injury by reason of unlawful activities of the military would go unnoticed or unremedied."). Most recently, the Fifth Circuit engaged in a thorough review of the threshold questions of applicability of the Alien Enemies Act to the Administration's March 2025 Presidential Proclamation. The court found the matter to be justiciable and struck down the Administration's actions as inconsistent with the requirements of the Act. *W.M.M. v Trump*, No. 25-10534 at 17, 48 (5th Cir. 2025).

The Government's opening brief suggests that the President's invocation of 10 U.S.C. § 12406 is not subject to judicial review because the statute "commits the decision to the discretion of the president." But this misreads the text of the statute. The government notes that Section 12406 authorizes the President to activate the National Guard "in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws." The statute thus commits to the President the decision about *how many* Guardsmen to activate. The statute pointedly

does not include a similar grant of discretion regarding the threshold question whether there is, in fact, an invasion, rebellion, or inability to execute the law in the first place. The fact that Congress included the express grant of discretion elsewhere in the same statutory provision confirms that it did not intend to do so with respect to whether the statutory predicates are satisfied. *See Dep't of Homeland Security v. MacLean*, 574 U.S. 383 (2015) ("The interpretive canon that Congress acts intentionally when it omits language included elsewhere applies with particular force [because]…Congress used 'law' and 'law, rule, or regulation' in close proximity—indeed, in the same sentence."); *Russello v. United States*, 464 U. S. 16, 23 (1983) ("Where Congress includes particular language in one section of statute but omits it in another section of (the) same act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (citation, alternation, and quotation marks omitted).

Accordingly, this court should similarly interpret Section 12406's scope and determine whether its factual predicates are satisfied.

### b. *Martin v Mott* does not mandate deference in the present matter, nor does it preclude judicial review

The Government's contention—that its invocation of Section 12406 is insulated from any judicial review and subject to deference under *Martin v. Mott*—

is fundamentally flawed and incorrect. The Government provides several justifications for this position, none of which survive scrutiny.

*Martin* concerned the president's authority under the Militia Act to call state militias into federal service to fight in the War of 1812, an exercise of the president's authority as commander in chief that implicated the core of his foreign affairs powers that are not implicated by the Government's present attempt to use the military to address purely domestic, ordinary criminal conduct. As the Fifth Circuit explained last week in *W.M.M.*, the *Martin* Court was "discussing a situation in which the country had been physically invaded by the British Army in what at times is called the Second War of Independence, the loss of which could have ended independence." *W.M.M.*, No. 25-10534 at 14 .

Although this Court has indicated that *Martin's* binding precedent ties its hands with respect to judicial review, we respectfully contend that this reading overstates the case's meaning and ignores later precedent as noted in Section 1.a. above. Amici concur with the argument of Plaintiffs-Appellees that *Martin* focuses on justiciability and *not* presidential discretion and that *Martin's* holding on justiciability has been narrowed by subsequent decisional law, so we do not repeat those arguments here. Answering Br. 31-35. Even if this court were to decide that *Martin* required some deference in the factual review, such deference does not similarly apply in matters related to the domestic preconditions in § 12406.

In acting on the TRO, this Court held: "We see no reason that Congress would have intended for the President to receive significant deference when he invokes the first precondition in § 12406, but not when he invokes the other two." *Newsom v. Trump*, 141 F.4th 1032, 1050 (9th Cir. 2025). But the deference afforded the President under *Martin* was focused on situations that implicate the foreign policy and military command interests, not to the "rebellion" or "execute the laws" provisions. The fact that Congress enacted those provisions in adjacent sections of the United States Code does not indicate that the deference due under one section bleeds over into an adjoining provision. And, contrary to the Court's suggestion, Congress had good reason not to bestow the President with the same significant deference he is due in foreign affairs when he deploys the military for domestic law enforcement. For in such unbridled discretion lies the path to tyranny.

Indeed, the President's discretionary power is at its height in matters of foreign policy, as in *Martin*, although, as shown in the recent Alien Enemies Act decisions, even at its zenith, such power is not unassailable. The President's powers are more limited in matters of domestic law enforcement, particularly where the ostensible limitation on enforcing federal law is from isolated incidents of violence incidental to lawful First Amendment protest activity, not a foreign invasion.

The Constitution codifies the primacy of the states in matters of local law enforcement, and in all areas where powers have not been expressly delegated to the

United States. U.S. Const. amend. X. The Government's argument that its actions do not invade "areas reserved to the States by the Tenth Amendment simply because it exercises its authority ... in a manner that displaces the States' exercise of their police powers" is inapposite. Opening Br. 40 (quoting *Hodel v. Virginia Surface Min. & Reclamation Ass'n*, *Inc.*, 452 U.S. 264, 291 (1981)) (internal quotations omitted). The Court need not go so far as to find that National Guard deployment constitutes a violation of Tenth Amendment,[2] but in areas traditionally reserved to the States and delegated to local governments in state constitutions, *see e.g.* Cal. Const., art. XI, §§ 5, 7, the Tenth Amendment does necessitate the eschewing of judicial deference in favor of a reasoned review of the Government's actions.

The language in *Martin* indicates that the Court's decision squarely addressed only the question of the President's vertical authority within Article II, specifically his supremacy over all other officials in the chain of command; rather than powers with respect to the states, and whether the courts may review his determination about the exigency in question.

The Supreme Court never explicitly holds that the President's actions under the 1795 Act are subject to great deference. Rather, the Court presented the fundamental "question" it was resolving as follows: "Is the President the sole and

---

[2] The "regulation and punishment of intrastate violence" is, nevertheless, "the province of the States," *United States v. Morrison*, 529 U.S. 598, 618 (2000).

exclusive judge whether the exigency has arisen, or is it to be considered as an open question, upon which *every officer* to whom the orders of the President are addressed, may decide for himself, and equally open to be contested by *every militia-man* who shall refuse to obey the orders of the President?" *Martin*, 25 U.S. 29-30 (emphasis added). The Court then answers that question in the next sentence, stating, "We are all of opinion that the authority to decide whether the exigency has arisen, belongs exclusively to the President, and that his decision is conclusive upon all other *persons*." *Martin,* 25 U.S. 30 (emphasis added). The reference to "all other persons" — after specifically cabining the question to "officer[s]" and "militiam[e]n" — indicates a vertical focus on individuals within the President's chain of command, not a separate and co-equal branch of government or independent sovereign states.

Moreover, the Government's reliance on the "rebellion" provision in the present matter fails even the highly deferential review under *Martin* and its progeny, were that review to apply to that provision. As this Court acknowledges: "*Martin* does not compel us to accept the federal government's position that the President could federalize the National Guard based on no evidence whatsoever, and that courts would be unable to review a decision that was obviously absurd or made in bad faith." *Newsom,* 141 F.4th at 1050. The Government proffered "no evidence

whatsoever" that there was a "rebellion" in Los Angeles, and Amici submit that the Government's claim that it did so was "obviously absurd" and "made in bad faith."

Consider the Supreme Court's statements on executive power in *Sterling v. Constantin*: "It does not follow from the fact that the executive has this range of discretion, deemed to be a necessary incident of his power to suppress disorder, that every sort of action the Governor may take, no matter how unjustified by the exigency or subversive of private right and the jurisdiction of the courts, otherwise available, is conclusively supported by mere executive fiat. The contrary is well established. What are the allowable limits of military discretion, and whether or not they have been overstepped in a particular case, are judicial questions." 287 U.S. 378, 400-401 (1932).

The deployment of the National Guard must be understood within its proper context. The Government intends to deploy federal forces to cities throughout the nation for purely domestic law enforcement purposes. The President has stated he is going to send federal forces to Chicago and Baltimore imminently (referring to Chicago, President Trump has said "We're going in — I didn't say when, we're going in"), and there are reported plans to send troops to other cities throughout the nation. *See* Rachel Treisman, *How Chicago, Baltimore and New Orleans are Reacting to Trump's National Guard threats*, NPR, Sep. 5, 2025, https://www.npr.org/2025/09/05/nx-s1-5530051/trump-national-guard-chicago-

baltimore-new-orleans; Jacqui Heinrich & Liz Friden, *National Guard mobilizing in 19 states amid immigration, crime crackdown*, FOX NEWS, updated Aug. 23, 2025, https://www.foxnews.com/politics/national-guard-mobilizing-19-states-immigration-crime-crackdown. These pronouncements came *in advance* of any rebellion or supposed disruption of the Government's ability to execute the law, including immigration enforcement. The President and the Government have amply demonstrated their willingness to abuse the power of domestic deployment of federal troops — and have already done so in Los Angeles.

Because the President does not receive deference under *Martin* with respect to his reliance on the "rebellion" and "execute the laws" provisions, the Court can and must review whether that statutory predicate is satisfied. As explained below, the statutory preconditions, quite simply, cannot be met.

### c. None of Section 12406's factual predicates are satisfied

#### i. There is no rebellion or danger of rebellion in Los Angeles

Section 12406(2) authorizes the president to activate the National Guard when "there is a rebellion or danger of a rebellion against the authority of the Government of the United States." A "rebellion" is "[o]pen, organized, and armed resistance to an established government." *Rebellion*, Black's Law Dictionary (2024). *See also Rebellion*, Black's Law Dictionary (1891) ("Deliberate, organized resistance, by

force and arms, to the laws and operations of the government, committed by a subject.").

The protests and disorder in Los Angeles in June did not constitute such a rebellion. Large public demonstrations naturally attract random bad actors. It is inevitable that even the most peaceful planned events can bring out those who would seek to commit violence. For example, during the celebration of the 2024 Los Angeles Dodgers World Series Championship, in which more than 200,000 joyous fans packed into the same one square mile where the protests that are the subject of this litigation are occurring, some scattered violent and hostile crowds burned a city bus, looted stores, and threw dangerous objects at LAPD. That is to be expected within such large gatherings, and, as indicated below, the local police forces are equipped to handle such exigencies. It would be untenable to suggest that those actions of a few among so many amounted to a "rebellion." The discrete incidents that occurred within the largely peaceful protests in June fall within the same category.

Moreover, the effectiveness of the LAPD response to the present matter, using ordinary law enforcement personnel and techniques, confirm that the violence was ordinary criminal conduct, not a rebellion. Both the Constitution and early American history confirm the understanding that the word "rebellion" refers only to violent, organized attempts to overthrow or wholly defy the authority of the government.

Such an interpretation is not without precedent. The Suspension Clause of the Constitution authorizes the temporary suspension of habeas corpus only in "Cases of Rebellion or Invasion," U.S. Const. Art. I, § 9, cl. 2, which has never been understood to encompass ordinary criminal conduct. *See, e.g.*, *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004) ("Only in the rarest of circumstances has Congress seen fit to suspend the writ." (citing Act of Mar. 3, 1863, ch. 81, § 1, 12 Stat. 755; Act of Apr. 20, 1871, ch. 22, § 4, 17 Stat. 14, which suspended the writ during the Civil War)).

Similarly, Alexander Hamilton explained the need for a federal military because "there might sometimes be a necessity … *to maintain the just authority of the laws against those violent invasions* of them which amount to insurrections and rebellions." The Federalist No. 28 (Alexander Hamilton) (emphasis added). American history confirms this limited conception of "rebellion" as well. The two widely recognized "rebellions" in the Founding Era illustrate that only attempts to wholly reject governmental authority qualify. In Shay's Rebellion in 1786 and 1787, rebels shut down the court system in Western Massachusetts, attempted to seize the federal armory in Springfield, and explicitly stated that their goal was to overthrow the government of Massachusetts. *See* David P. Szatmary, Shay's Rebellion: The Making of an Agrarian Insurrection (1980). The Whiskey Rebellion involved insurrectionists setting up extralegal courts and the federal excise tax going

18

wholly uncollected in numerous states throughout 1791 and most of 1792. *See* THOMAS P. SLAUGHTER, THE WHISKEY REBELLION: FRONTIER EPILOGUE TO THE AMERICAN REVOLUTION (1986). The Supreme Court later characterized the Southern States in "rebellion" during the Civil War because they "occup[ied] and h[e]ld in a hostile manner a certain portion of territory; ha[d] declared their independence; ha[d] cast off their allegiance; ha[d] organized armies; ha[d] commenced hostilities against their former sovereign" and "claim[ed] to be in arms to establish their liberty and independence, in order to become a sovereign State." *The Amy Warwick*, 67 U.S. 635, 666–67 (1862).

There was no such rebellion in Los Angeles, nor is there now.

### ii. The President is able to execute the laws of the United States with regular forces

Section 12406(3) authorizes the President to activate the National Guard when "the President is unable with the regular forces to execute the laws of the United States." This Court already correctly rejected the contention that "any minimal interference with the execution of laws is, by itself, enough to justify invoking § 12406(3)." Congress could have written a statute that authorized the President to activate the National Guard if "the execution of the laws of the United States is impeded" or "impaired." Congress did not write that statute, instead choosing to limit the President's authority to situations in which he is categorically "unable" to execute the laws. *See, e.g.*, *Knight v. Comm'r,* 552 U.S. 181, 188 (2008) ("If

Congress had intended the Court of Appeals' reading, it easily could have replaced 'would' in the statute with 'could,' and presumably would have. The fact that it did not adopt this readily available and apparent alternative strongly supports rejecting the Court of Appeals' reading.").

Provisions adjoining Section 12406(3) confirm its meaning. Section 12406(1)'s coverage of "invasion by a foreign nation" and Section 12406(2)'s coverage of "rebellion" demonstrate that the statute is limited to extreme circumstances that threaten the fundamental authority and basic functioning of the government. *Yates v. United States*, 574 U.S. 528, 543 (2015) (the Court "rel[ies] on the principle of *noscitur a sociis*—a word is known by the company it keeps—to 'avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress.'" (quoting *Gustafson v. Alloyd Co.,* 513 U.S. 561, 575 (1995)). The government's interpretation of Section 12406(3) would also render Sections 12406(1) and 12406(2) superfluous. If any kind of lawbreaking were sufficient to trigger the President's authority to activate the National Guard under Section 12406(3), then the preceding sections would serve no independent purpose because both an invasion and rebellion invariably involve lawbreaking. The Court should avoid interpreting the statute to make two of its three provisions surplusage. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is 'a cardinal principle of statutory construction' that 'a

statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)).

No facts alleged indicate that "regular forces" (i.e. ICE, CBP, DHS, FBI, DEA, ATF, etc.) could not execute federal immigration law, as demonstrated by the Governments ongoing immigration raids throughout the relevant period. Moreover, even if the protests hampered ICE attempts to apprehend or arrest some persons, that would not rise to the level of "regular forces" being "unable to execute" federal law. If the law were otherwise, any single, isolated impediment at all to federal law enforcement would trigger the President's powers to federalize the state National Guard.

## II. The Deployment of the Military Has Impeded the City's Ability to Carry out its Traditional Police Powers

### a. The City—not the military—holds the lawful expertise and authority over domestic law enforcement

Our federalist system has always reserved the policing of the streets, protests, and daily life to those who know their communities best: local governments, not the federal government, and, certainly, not the United States Military. *See* Federalist No. 39 at 245 ("[T]he local or municipal authorities form distinct and independent portions of the supremacy, no more subject, within their respective spheres, to the general authority, than the general authority is subject to them, within its own sphere."). The Tenth Amendment confirms this axiom, enshrining the sovereign

prerogatives of state and local governments to retain their authority to "perform many of the vital functions of modern government—punishing street crime, running public schools, and zoning property for development, to name but a few." *NFIB v. Sebelius*, 567 U.S. 519, 535–36 (2012) .

Federalism "ensure[s] that powers which 'in the ordinary course of affairs, concern the lives, liberties, and properties of the people' [are] held by governments more local and more accountable than a distant federal bureaucracy." *Id.* at 536 (quoting The Federalist No. 45, at 293). That principle is not an abstraction, it is lived and practiced everyday in Los Angeles.

The mission of the LAPD is to safeguard the lives and property of the people it serves, to reduce the incidence and fear of crime, and to enhance public safety while working with the diverse communities of Los Angeles to improve their quality of life. The LAPD seeks to work in partnership with the people and organizations within its communities to solve local problems that affect public safety. The LAPD has great familiarity in handling large-scale pre-planned demonstrations, protests, and events, which occur regularly and with great frequency City-wide. The history of peaceful protests and demonstrations in the City has allowed the LAPD to form strong relationships with frequent protest organizers in order to facilitate peaceful demonstrations. Indeed, in June, while the Government was claiming that Los Angeles was unable to quell demonstrations on its streets, the City successfully

policed the mass No Kings' Day Protests of June 14th, in which over 200,000 people poured onto the streets without incident to protest this Government's actions. Heather Miller, *No Kings Day attendance: Over 5 million turned out across US, organizers say*, LiveNOW FOX, (June 15, 2025), https://www.livenowfox.com/news/no-kings-day-attendance.

For example, the LAPD also has experience in dealing with spontaneous, unpermitted protests, such as the large mass protests that occurred in Los Angeles and other major cities around the country in May and June, 2020, following the death of George Floyd. Many lessons were learned during those demonstrations and civil unrest, and the LAPD has since further trained its personnel on updated crowd management and crowd control techniques in order to facilitate peaceful protests and attempt to de-escalate tense and even violent and hostile situations, where those who would seek to cause havoc hide under a cloak provided by so many peacefully exercising their First Amendment rights. The LAPD's policies, like those of all Amici's police departments, are rooted in a commitment to constitutional policing and a recognition that the City's communities are safer when officers maintain a relationship of trust, respect, and cooperation with the City's residents.

To that end, the LAPD devotes significant resources to prepare officers to respond effectively to protests that have escalated to violence. In the last few years alone, the LAPD has launched and implemented an initiative to protect Los Angeles

by conducting quarterly and yearly exercises to practice managing large-scale First Amendment assemblies. LAPD, *Strategic Plan 2023 & Beyond*, 12–13, https://t.ly/TAECl. That initiative also includes engaging the public to inform them of best practices, and to solicit feedback to "better suit the community's stated needs." *Id.* at 12. These measures, among many others, ensure not only that the LAPD is prepared to manage large assemblies, but also that the community feels comfortable placing its trust in the LAPD. As indicated below, the federal Government's intrusion into policing only made the situation worse.

The military, in contrast, is trained in combat and warfare. Mark Nevitt, *The Military, the Mexican Border, and Posse Comitatus*, Just Security (Nov. 6, 2018), https://www.justsecurity.org/61364/update-military-mexican-border-posse-comitatus/. And the "domestic use of the military can . . . be corrosive—to the morale of the troops involved, all of a sudden, in policing their own; to the relationship between local/state governments and the federal government; and to the broader relationship between the military and civil society." Steve Vladeck, *Five Questions About Domestic Use of the Military*, One First (Apr. 14, 2025), https://www.stevevladeck.com/p/142-five-questions-about-domestic. That is why Congress has prohibited the use of the military "as a posse comitatus or otherwise to execute the laws" except in extraordinary circumstances. 18 U.S.C. § 1385.

The deployment that occurred in the City has proven to be reckless, unnecessary, and lawless and the consequences of this federal militarization were immediate, predictable, and long-lasting: peaceful assemblies transformed into tinderboxes; tensions soared; violence escalated. By inserting combat-trained soldiers into that setting, the federal Government accomplished nothing but sowing distrust, amplifying disorder, and trampling the very constitutional freedoms it is sworn to protect.

The City's long-established prerogatives in law enforcement were bulldozed by a federal action untethered from law or history. That incursion not only disfigured federalism; it inflicted irreparable harm on the City's residents, whose streets were turned into staging grounds for a political stunt masquerading as law enforcement.

## CONCLUSION

The Government's extraordinary abuse of power, in response to First Amendment demonstrations and protests that the City of Los Angeles and other Amici cities in the Central District of California are amply equipped to handle, should not be permitted to stand. The President's federalization of the National Guard not only is a legally unfounded action but it has caused, is causing, and will cause injury to Amici. Every day that military troops in combat gear, carrying assault rifles and trained to kill in war rather than apprehending criminals, is a day that sows fear and mistrust in the population. For the reasons stated herein, the Amici cities

urge this Court to affirm the District Court's ruling and allow the District Court's order to go into effect.

DATED: September 9, 2025               Respectfully submitted,

*/s/.*    *Michael J. Dundas*       .

HYDEE FELDSTEIN SOTO
  *City Attorney*
VALERIE L. FLORES
MICHAEL J. DUNDAS
Office of the Los Angeles City Attorney
200 N. Main Street
Los Angeles, CA 90012
*Counsel for Amicus Curiae*
  *City of Los Angeles*

EBONY M. THOMPSON
  *City Solicitor*
Baltimore City Department of Law
100 N. Holliday Street
Baltimore, Maryland 21202
*Counsel for Amicus Curiae the Mayor and*
  *City Council of Baltimore*

STEPHANIE VASQUEZ
  *City Attorney*
Bell Gardens City Attorney's Office
7100 Garfield Avenue
Bell Gardens, CA 90201
*Counsel for Amicus Curiae City of Bell*
*Gardens*

ADAM CEDERBAUM
  *Corporation Counsel*
City of Boston Law Department
One City Hall Square, Room 615
Boston, MA 02201
*Counsel for Amicus Curiae City of Boston*

MARY B. RICHARDSON-LOWRY
  *Corporation Counsel*
City of Chicago Department of Law
121 North LaSalle Street, Suite 600
Chicago, Illinois 60602

*Counsel for Amicus Curiae City of Chicago*

JUDY W. WHITEHURST
  *Chief Deputy*
LILIANA CAMPOS
BRIGIT GREESON ALVAREZ
648 Kenneth Hahn Hall of Administration
500 West Temple Street Los Angeles,
California 90012-2713
*Counsel for Amicus Curiae County of Los
Angeles*

Karl H. Berger
  *City Attorney*
Monterey Park City Attorney's Office
320 West Newmark Ave.
*Counsel for Amicus Curiae City of Monterey
Park*

MURIEL GOODE-TRUFANT
  *Corporation Counsel*
100 Church Street
New York, NY 10007
*Counsel for Amicus Curiae City of New
York*

SONIA R. CARVALHO
  *City Attorney*
City of Santa Ana
20 Civic Center Plaza M-29
Santa Ana, CA 92702
*Counsel for Amicus Curiae City of Santa
Ana*

Heidi von Tongeln
SANTA MONICA CITY ATTORNEY'S
OFFICE
1685 Main Street, 3rd Floor
Santa Monica, CA 90401
*Counsel for Amicus Curiae City of Santa
Monica*

MONICA D. CASTILLO
  *City Attorney*
City of Santa Paula
300 S. Grand Ave., 25th Floor

Los Angeles, CA 90071
*Counsel for Amicus Curiae City of Santa Paula*

Lauren Langer
  *City Attorney*
City of West Hollywood
8300 Santa Monica Boulevard
West Hollywood, California 90069
*Counsel for Amicus Curiae City of West Hollywood*

Dawn A. McIntosh
  *City Attorney*
Office of the City Attorney
411 W. Ocean Blvd., 9th Floor
Long Beach, CA 90802
*Counsel for Amicus Curiae City of Long Beach*

Norman L. Eisen
Stephen A. Jonas
Joshua G. Kolb
Diamond Brown
**DEMOCRACY DEFENDERS FUND**
600 Pennsylvania Avenue SE
Suite 15180
Washington, DC 20003
Tel: (202) 594-9958
*Attorneys for Amicus Curiae City of Los Angeles*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**   No. 25-3727

I am the attorney or self-represented party.

**This brief contains**   5,186   **words,** including ⬚ words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

⬚ it is a joint brief submitted by separately represented parties.
⬚ a party or parties are filing a single brief in response to multiple briefs.
⬚ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated ⬚ .

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**   /s/ Michael J. Dundas   **Date**   09/09/2025

*(use "*s/[typed name]*" to sign electronically-filed documents)*

Feedback or questions about this form? Email us at forms@ca9.uscourts.gov

**Form 8**                                                                 *Rev. 12/01/22*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 9, 2025, an electronic copy of the foregoing brief amicus curiae was filed with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit using the CM/ECF filing system and that service upon counsel for the parties will be accomplished using the CM/ECF system.


/s/    *Michael J. Dundas*

Michael J. Dundas