NO. 25-3727

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

GAVIN NEWSOM, in his official capacity as
Governor of the State of California, et al.,

*Plaintiffs–Appellees,*

v.

DONALD J. TRUMP, in his official capacity
as President of the United States, et al.,

*Defendants–Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
No. 3:25-cv-04870-CRB
The Honorable Charles R. Breyer

**BRIEF FOR THE STATES OF WASHINGTON, DELAWARE, ARIZONA, COLORADO, CONNECTICUT, HAWAI'I, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, NEW YORK, NORTH CAROLINA, OREGON, RHODE ISLAND, VERMONT, WISCONSIN, DISTRICT OF COLUMBIA, AND THE OFFICE OF THE GOVERNOR OF KANSAS AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS-APPELLEES' ANSWERING BRIEF**

KATHLEEN JENNINGS
Attorney General of Delaware

IAN R. LISTON
Director of Impact Litigation
ROSE E. GIBSON

NICHOLAS W. BROWN
Attorney General of Washington

PATRICIO MARQUEZ
EMILY NELSON
ANDREW HUGHES
ALEXIA DIORIO

Assistant Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
Ian.Liston@deaware.gov

Assistant Attorneys General
Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744
Patricio.Marquez@atg.wa.gov
Emily.Nelson@atg.wa.gov
Andrew.Hughes@atg.wa.gov
Alexia.Diorio@atg.wa.gov

*(Additional Amici on Signature Page)*

## **TABLE OF CONTENTS**

I.     INTRODUCTION .................................................................................1

II.    IDENTITY AND INTERESTS OF AMICI ......................................2

III.   ARGUMENT .....................................................................................6

    A.  The National Guard Is the Organized Militia of the States and Is Under Governor Command and Control Except When Properly Called into Federal Service ........................................................6

    B.  Fear of a Standing Army and Tyranny by the Federal Government Compelled the Framers to Embed State Control of the Militias in the Constitutional Framework .........................................................8

        1.  Our Founders Sought to Prohibit Military Rule After Centuries of Abuse in England ................................................................9

        2.  The Constitution Enshrines a Deliberate Balance of State and Federal Military Control ....................................................11

        3.  Throughout Our History, Presidents Have Carefully Avoided Domestic Deployment of the Militias Unless Absolutely Necessary ..............................................................................14

    C.  The National Guard Plays a Vital and Irreplaceable Role in Ensuring the Security and Disaster Preparedness of the States .............................22

IV.   CONCLUSION...............................................................................30

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Biden*,
  70 F.4th 817 (5th Cir. 2023) ............................................................. 6, 13

*Ass'n of Civilian Technicians, Inc. v. United States*,
  603 F.3d 989 (D.C. Cir. 2010) ..........................................................6, 7

*Bissonette v. Haig*,
  776 F.2d 1384 (8th Cir. 1985) ..............................................................8

*Duncan v. Kahanamoku*,
  327 U.S. 304 (1946) ...................................................................... 9, 10

*Houston v. Moore*,
  18 U.S. 1 (1820) ..................................................................................13

*Laird v. Tatum*,
  408 U.S. 1 (1972) ..................................................................................8

*Lipscomb v. Fed. Labor Rels. Auth.*,
  333 F.3d 611 (5th Cir. 2003) ................................................................7

*N.A.A.C.P. v. Claiborne Hardware Co.*,
  458 U.S. 886 (1982) ..............................................................................5

*Newsom v. Trump*,
  No. 3:25-cv-04870-CRB, 2025 WL 2501619 (N.D. Cal. Sep. 2, 2025)......... 3, 12

*Perpich v. Dep't of Def.*,
  496 U.S. 335 (1990) ........................................................................ 7, 18

*Reid v. Covert*,
  354 U.S. 1 (1957) ..................................................................................9

## State Constitutional Provisions

Del. Const. art. III, § 8 ............................................................................7

Kan. Const. art. 8, § 4 .............................................................................7

Mich. Const. art. V, § 12.................................................................................7

N.M. Const. art. V, § 4...................................................................................7

N.Y. Const. art. IV, § 3.................................................................................7

Wash. Const. art. III, § 8...............................................................................7

### Federal Constitutional Provisions

U.S. Const. art. I, § 8......................................................................... 6, 11, 12

U.S. Const. art. II, § 2 ....................................................................... 11, 12

Articles of Confederation of 1781, art. VI, para. 4.................................10

### State Statutes

20 Del. Laws § 171 .......................................................................................7

Md. Code Ann., State Gov't § 3-303 ............................................................7

Mich. Comp. Laws § 32.551(1) ....................................................................7

N.M. Stat. Ann. § 20-2-3 ..............................................................................7

N.Y. Military Law § 3....................................................................................7

Wash. Rev. Code § 38.08.020........................................................................7

Wash. Rev. Code § 38.08.040........................................................................7

### Federal Statutes

10 U.S.C. § 10101..........................................................................................7

10 U.S.C. § 12401..........................................................................................7

10 U.S.C. § 12406.................................................................................. 3, 18

18 U.S.C. § 1385..........................................................................................17

32 U.S.C. § 106 ................................................................................23

32 U.S.C. § 107 ................................................................................23

32  U.S.C. § 328 ..................................................................................7

32  U.S.C. § 502(f) ..............................................................................7

An Act Making Appropriations for the Support of the Army for the Fiscal
  Year Ending June Thirtieth, Eighteen Hundred and Seventy-Nine, and for
  Other Purposes,
  ch. 263, § 15, 20 Stat. 145, 152 (1878) ................................................17

An Act to Provide for the Suppression of Rebellion against and Resistance to
  the Laws of the United States,
  ch. 25, 12 Stat. 281 (1861). .............................................................15

The Calling Forth Act of 1792,
  ch. 28, 1 Stat. 264, § 1 (1792) ..........................................................13

The Dick Act,
  ch. 196, 32 Stat. 775, § 4 (1903) .......................................................18

The Fugitive Slave Act of 1850,
  9 Stat. 462 (1850) .........................................................................16

The Insurrection Act of 1807,
  2 Stat. 443 (1807) .........................................................................14

The Militia Act of 1792,
  1 Stat. 271 (1792) .........................................................................13

Pub. L. No. 60-145, § 3, 35 Stat. 400 (1908)............................................19

Pub. L. No. 84-1028, 70A Stat. 199 (1956).............................................19

## Executive Orders

Exec. Order No. 11519,
  35 Fed. Reg. 5003 (March 23, 1970) ....................................................20

Ulysses S. Grant, Proclamation (May 3, 1871),
   https://millercenter.org/the-presidency/presidential-speeches/may-3-1871-
   message-regarding-fourteenth-amendment ..........................................................16

## Other Authorities

1 W. & M., sess. 2, ch. 2 (1688) ...............................................................................9

1908 Cong. Rec. 6942,
   https://www.congress.gov/bound-congressional-
   record/1908/05/25/42/house-section/article/6893-
   6949?q=%7B%22search%22%3A%221908+Cong.+Rec.+
   6942%22%7D&s=1&r=1 ...................................................................................19

3 J. Elliot, *The Debates in the Several State Conventions on the Adoption of
   the Federal Constitution* 387 (1836) ..................................................................12

6 Stat. Realm, at 142 (1819, *reprinted* 1963),
   https://babel.hathitrust.org/cgi/pt?id=pst.000017915557&seq=1 .........................9

Air Force Master Sgt. Erich B. Smith, *Haw. Army Nat'l Guard Supports Maui
   Wildfire Response*, Nat'l Guard (Aug. 28, 2023),
   https://www.nationalguard.mil/News/Article-View/Article/3507502/hawaii-
   army-national-guard-supports-maui-wildfire-response/ ......................................25

Alexander Barnes, *On the Border: The Nat'l Guard mobilizes for war in
   1916*, U.S. Army (Feb. 26, 2016),
   https://www.army.mil/article/162413/
   on_the_border_the_national_guard_mobilizes_for_war_in_1916 ......................20

Anshu Siripurapu, Noah Berman, and Diana Roy, *What does the U.S. Nat'l
   Guard Do?*, Council on Foreign Relations (last updated Sept. 3, 2025),
   https://www.cfr.org/backgrounder/what-does-us-national-guard-
   do#:~:text=The%
   20National%20Guard%20can%20also,normally%20funded%20by%20the
   %20state.............................................................................................................27

Army Nat'l Guard, *GUARD FAQS, What is the Nat'l Guard?*,
   https://nationalguard.com/guard-faqs...................................................................8

Army Sgt. 1st Class Jim Greenhill, *12,000 Nat'l Guard Members Helping 11 States Recover from Hurricane Sandy* (Oct. 30, 2012), https://www.nationalguard.mil/News/Article/574966/12000-national-guard-members-helping-11-states-recover-from-hurricane-sandy/.................................28

Brad Brooks, *Trump wants to 'liberate' Los Angeles, residents say 'no thanks,'* Reuters (June 11, 2025), https://www.reuters.com/world/us/trump-wants-liberate-los-angeles-residents-say-no-thanks-2025-06-11/....................................................................4

C. Todd Lopez, *New York Guard's Joint Task Force Empire Shield: Guarding NYC transit hubs since 9/11*, Army New Service (Sept. 9, 2016), https://www.nationalguard.mil/News/Article-View/Article/939398/newyork-guards-joint-task-force-empire-shield-guarding-nyc-transit-hubs-since-9/ ....................................28

Cal. State Budget Office, *2023-24 STATE BUDGET – GG1*, 8940 Mil. Dep't, https://ebudget.ca.gov/2023-24/pdf/Enacted/GovernorsBudget/8000/8940.pdf.................................................................................23

Capt. Emerson Marcus, *Nev. Guard set to support Clark County first responders during Formula 1 Las Vegas Grand Prix*, Nev. Nat'l Guard (Nov. 20, 2024), https://nv.ng.mil/News/Article-Display/Article/3973518/nevada-guard-set-to-support-clark-county-first-responders-during-formula-1-las/. .......................29

Charles Emery Stevens, *Anthony Burns: A History*, Boston John P. Jewett and Co. (1856), https://archive.org/details/anthonyburnshiststev/page/n5/mode/2up...................16

*Civilian in Peace, Soldier in War . . . I am the Guard: A History of the Army Nat'l Guard, 1636-2000*, https://www.nationalguard.mil/portals/31/Documents/About/Publications/Documents/I%20am%20the%20Guard.pdf.................................................................................................13

Colo. Nat'l Guard Pub. Affairs, *Colo. Nat'l Guard supports Hurricane Milton relief efforts*, Colo. Nat'l Guard (Oct. 9, 2024), https://co.ng.mil/News/Archives/Article/3930948/colorado-national-guard-supports-hurricane-milton-relief-efforts/............................................27

Commonwealth of Mass. Military Div., *Budget Summary FY2025 Enacted*, Commonwealth of Mass., https://budget.digital.mass.gov/summary/fy25/enacted/public-safety/military-division/ ...................................................................24

D.C. Nat'l Guard, *Nat'l Guard support to the District of Columbia and the 60th Presidential Inauguration* (Jan. 13, 2025), https://dc.ng.mil/Public-Affairs/News-Release/Article/4028262/national-guard-support-to-the-district-of-columbia-and-the-60th-presidential-in/ ...........29

Defense Manpower Data Ctr., *Number of Military and DoD Appropriated Fund (APF) Civilian Personnel* (June 30, 2025), https://dwp.dmdc.osd.mil/dwp/app/dod-data-reports/workforce-reports ............24

Dep't of Mil. and Veterans Affairs, *More than 800 Mich. Nat'l Guard Soldiers and Airmen Mobilized to Support Mich. Communities Impacted by Northern Mich. Ice Storm* (April 4, 2025), https://www.michigan.gov/dmva/newsroom/press-releases/2025/04/04/mobilized-to-support-michigan-communities-impacted-by-northern-michigan-ice-storm ..........................................................26

Emergency Mgmt. Assistance Compact (EMAC), *What is EMAC?*, https://www.emacweb.org/index.php/learn-about-emac/what-is-emac..............26

Engr. Sub. S.B. 5187, 68th Leg., Reg. Sess., 2023 Wash. Sess. Laws, ch. 475, § 148. ................................................................................................23

Frederick Wiener, *The Militia Clause of the Constitution*, 54 Harv. L. Rev. 181 (Dec. 1940) .....................................................................................18

G. Norman Lieber, *Use of the Army in Aid of the Civil Power*, at 8 (1898), https://archive.org/details/useofarmyinaidof00liebrich/page/n3/mode/2up. .......17

*Governor Newsom deploys California Nat'l Guard to Los Angeles fires: 'Looting will not be tolerated,'* Governor Gavin Newsom (Jan. 9, 2025), https://www.gov.ca.gov/2025/01/09/governor-newsom-deploys-california-national-guard-to-los-angeles-fires-looting-will-not-be-tolerated/ .....................25

H.R. Rep. No. 1094, 57th Cong., 1st Sess., at 22-23 (1902)...................................18

Homer Bigart, *Military in Post Offices, Begins Handling the Mail*, New York Times (March 24, 1970), https://www.nytimes.com/1970/03/24/archives/military-in-post-offices-begins-handling-the-mail-military-in-post.html....................................................21

Jason Dearen, Jaimie Ding, and Jake Offenhartz, *Immigration protests intensify in Los Angeles after Trump deploys hundreds of National Guard* troops, ABC7 (June 8, 2025), https://abc7ny.com/post/la-ice-raid-protests-california-national-guard-members-begin-arriving-los-angeles-authorities-clash-protesters/16696165/.......4

Joseph Nunn & Elizabeth Goitein, *Guide to Invocations of the Insurrection Act*, Brennan Center for Justice (Apr. 25, 2022), https://www.brennancenter.org/our-work/research-reports/guide-invocations-insurrection-act ......................................................... 15, 16

Joseph Siemandel, *Year in Review: 2024 was a busy year for Washington Military Department*, Defense Visual Info. Distrib. Serv. (DVIDS) (Jan. 7, 2025), https://www.dvidshub.net/news/488741/year-review-2024-busy-year-washington-military-department ..........................................................25

KING 5 NEWS, *Breaking News: Wildfire evacuations underway near Cle Elum* (June 10, 2025), https://www.king5.com/video/news/local/wildfire/breaking-wildfire-evacuations-underway-near-cle-elum/281-366f3bc2-c237-4c7a-9e40-1276e33b3755. ..........................................................29

Lindsey Smith, *How much rain has Wichita seen so far in June? See latest totals after flooding*, The Wichita Eagle (June 13, 2025), https://www.kansas.com/news/weather-news/article308476580.html ...............30

Lt. Col. Bradford Leighton, *Ill. Nat'l Guard helps civilian agencies fight flooding*, Nat'l Guard (June 3, 2019), https://www.nationalguard.mil/News/Article-View/Article/1863818/ill-national-guard-helps-civilian-agencies-fight-flooding/ .......................................25

Maj. J. Scott Detweiler, *Vermont Nat'l Guards Supports Cyclone Beryl Response*, DVIDS (July 11, 2024), https://www.dvidshub.net/news/475930/vermont-national-guards-supports-cyclone-beryl-response..........................................................25

Md. Nat'l Guard, *Md. Nat'l Guard activated to support winter storm response across the state* (Jan. 8, 2025), https://news.maryland.gov/ng/2025/01/08/maryland-national-guard-activated-to-support-winter-storm-response-across-the-state/ ............................ 26

Memorandum from Deputy Assistant Att'y Gen. Mary C. Lawton to Assistant Att'y Gen. Antonin Scalia, *Laws Relating to Civil Disturbances* (Jan. 6, 1975), https://www.justice.gov/d9/pages/attachments/2022/09/02/la_19750 106_law_relating_to_civil_disturbances_0.pdf ................................................... 15

Nat'l Ctrs. for Env't Information, *Storm Events Database*, NOAA, https://www.ncdc.noaa.gov/stormevents/eventdetails.jsp?id=416939 ............... 28

NOAA, *NOAA predicts above-normal 2025 Atlantic hurricane* season (May 22, 2025), https://www.noaa.gov/news-release/noaa-predicts-above-normal-2025-atlantic-hurricane-season ...................................................................................... 30

Office of the Judge Advocate General, *Federal Aid in Domestic Disturbances 1903-1922*, S. Doc. No. 263, at 10, 67th Cong., 2d Sess. (1922), https://babel.hathitrust.org/cgi/pt?id=pst.000057379777&seq=7 ........................ 11

Robert W. Coakley, *The Role of Fed. Mil. Forces in Domestic Disorders, 1789-1878*, at 176, Ctr. of Mil. History United States Army Washington D.C. (1988), https://www.google.com/books/edition/The_Role_of _Federal_Military_Forces_in_D/Ydx1_LFkbjcC?hl=en&gbpv=1&pg=PA3 &printsec=frontcover. ....................................................................................... 16

State of Conn., *Governor Lamont Announces Conn. Nat'l Guard Sending Additional Soldiers and Aircraft to N.C. for Further Hurricane Helene Disaster Assistance* (Oct. 3, 2024), https://portal.ct.gov/governor/news/press-releases/2024/10-2024/governor-lamont-announces-connecticut-national-guard-sending-additional-soldiers-to-north-carolina?language=en_US ........................................................................ 27

State of Del., *Governor Carney to Activate Del. Nat'l Guard to Assist with Florida's Hurricane Response*, Office of the Governor (Oct. 8, 2024), https://news.delaware.gov/2024/10/08/governor-carney-to-activate-delaware-national-guard-to-assist-with-floridas-hurricane-response/. ............... 27

State of N.Y., *Governor Hochul Announces 65 New York Nat'l Guard Soldiers and Airmen Are Deploying to Assist in Florida in Responding to the Impact of Hurricane Milton*, New York's Governor's Office (Oct. 9, 2024), https://www.governor.ny.gov/news/governor-hochul-announces-65-new-york-national-guard-soldiers-and-airmen-are-deploying-assist ........................... 27

State of Vt., FY2025 Governor's Recommended Budget: Rollup Report, https://perma.cc/LNY6-E2EJ. ............................................................................. 23

Today in History – March 5, *The Boston Massacre: A History with Documents*, Library of Congress, https://www.loc.gov/item/today-in-history/march-05/ ........................................ 10

Wash. Mil. Dep't, *Annual Report 2024/2025*, https://d34w7g4gy10iej. cloudfront.net/pubs/pdf_72587.pdf. ............................. 28

Wikipedia, *Militia Act of 1903*, https://en.wikipedia.org/wiki/Militia_Act_of_1903 ............................................. 18

# I.    INTRODUCTION

President Trump's federalization and deployment of California's National Guard, without the consent of California's Governor and in violation of the statute on which the President relies, is unlawful, unconstitutional, and undemocratic. It is also wholly inconsistent with one of our Nation's founding principles that freedom depends on subordinating the military to civilian authority. By calling forth troops when there is no invasion to repel, no rebellion to suppress, and when state and local law enforcement are fully able to execute the laws, the President flouts the vision of our Founders, undermines the rule of law, and sets a chilling precedent that puts the constitutional rights of Americans everywhere at risk.

The temporary restraining order entered below—treated as "effectively a preliminary injunction" when stayed by this Court pending appeal, Dkt. No. 32.1 at 12—was necessary to vindicate state sovereignty and protect the States' National Guards, which, as the district court found, play a vital role in ensuring the security of States and preparing for and responding to emergencies. States rely on the National Guard to protect their residents and save lives. National Guard troops fight fires, respond to hurricanes, protect residents from flooding, and provide much-needed security at major events. By undermining States' authority, unlawfully deploying National Guard troops, and leaving the door wide open to deploy the Guards of every State, the President has made us less safe. This Court should affirm

the injunction, returning California to the *status quo ante*—with the National Guard commanded and controlled by the Governor—and preventing Defendants from proceeding further down the unlawful and perilous path they are on.

## II. IDENTITY AND INTERESTS OF AMICI

The States of Washington, Delaware, Arizona, Colorado, Connecticut, Hawai'i, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New York, North Carolina, Oregon, Rhode Island, Vermont, Wisconsin, District of Columbia, and the Office of the Governor of Kansas ("Amici States" or "States") respectfully submit this brief in support of California's Answering Brief. The Amici States' interests in preventing the President's unlawful deployment of the National Guard are numerous.

*First*, the Amici States are implicated by the unlimited scope of the June 7, 2025, presidential memorandum titled "Department of Defense Security for the Protection of Department of Homeland Security Functions" (Trump Memo). This memo, which federalizes the National Guard in support of "ICE" and other unspecified "Federal functions," does not restrict its application to Los Angeles, California, or any specific geographic region. Instead, it is an unlimited claim of presidential authority to deploy any State's National Guard for a period of 60 days

or "at the discretion of the Secretary of Defense."[1] Today it is California, but tomorrow it could be another State—as both the President and Secretary Hegseth have repeatedly threatened.

This broad invocation implicates the Amici States' interest in ensuring that the deployment of their National Guard units is governed by the rule of law and the facts on the ground, and not the whims of the President or his appointees. Indeed, the Trump Memo and subsequent orders from the Department of Defense (DOD Orders) were issued purportedly pursuant to 10 U.S.C. § 12406. However, the circumstances where Congress authorized invocation of § 12406 were not and are not present in California, and the President failed to issue the orders through the Governor of California as required by statute. Allowing the President and the Secretary of Defense to ignore the plain-text requirements of the statute they invoked undermines the rule of law.

*Second*, the States have an interest in ensuring their National Guard units are available and able to perform the essential services they provide the States. As discussed below, National Guard personnel provide critical services across the country including responding to wildfires, floods, and hurricanes; responding to

---

[1] In August, Secretary Hegseth issued orders extending the deployment of certain California National Guard troops for 90 days, through November 6, 2025. *Newsom v. Trump*, No. 3:25-cv-04870-CRB, 2025 WL 2501619, at *9 (N.D. Cal. Sep. 2, 2025).

chemical, biological, radiological, and nuclear incidents; conducting counter-drug operations; and providing cybersecurity and election support. Nationally, there are over 419,000 National Guard members engaged in these essential services, making significant contributions to public safety. Allowing an unlawful federalization of the National Guard pulls service members away from responding to emergencies and performing vital services for which they are specially trained, and which Amici States cannot replace.

*Third*, the States have an interest in protecting public safety and combating violence. Defendants' actions exacerbate these challenges in the name of addressing them. In Los Angeles, the President's deployment dramatically worsened the situation on the ground.[2] And in Amici States, the unjustified deployment of military personnel to California stokes fear that the same will happen throughout the nation.

---

[2] Jason Dearen, Jaimie Ding, & Jake Offenhartz, *Immigration protests intensify in Los Angeles after Trump deploys hundreds of National Guard* troops, ABC7 (June 8, 2025), https://abc7ny.com/post/la-ice-raid-protests-california-national-guard-members-begin-arriving-los-angeles-authorities-clash-protesters/16696165/ ("Tensions in Los Angeles escalated Sunday as thousands of protesters took to the streets in response to President Donald Trump's extraordinary deployment of the National Guard[.]"); Brad Brooks, *Trump wants to 'liberate' Los Angeles, residents say 'no thanks,'* Reuters (June 11, 2025), https://www.reuters.com/world/us/trump-wants-liberate-los-angeles-residents-say-no-thanks-2025-06-11/ ("Trump's use of the military was inflaming the protests against recent immigration raids in Los Angeles . . . . 'It's instigating the protesters and making things worse.'").

As a result, local law enforcement may be required to respond to incidents of violence that may otherwise never have occurred.

*Fourth*, the States have an interest in maintaining and promoting a free and open society in which lawful dissent is not chilled by the presence of military forces deployed domestically against protestors in our cities and towns. Of course, under the First Amendment, the States' residents may use public spaces to exercise their views lawfully and peacefully—and any violation of the law can and should be addressed by civil law enforcement instead of the military. The President's unlawful deployment of military to California without factual justification or legal authority is already having, and will likely continue to have, a chilling impact on constitutionally protected activity. *See N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 908 (1982) ("The right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected."). Each State has an interest in protecting the constitutional rights of their citizens to freedom of expression and assembly—rights that are threatened by the unjustified use of domestic military force, whether in California or in any State.

## III.   ARGUMENT

**A.   The National Guard Is the Organized Militia of the States and Is Under Governor Command and Control Except When Properly Called into Federal Service**

The States' primacy over the National Guard predates our Nation. As the modern-day successor to the colonial-era state militias, the National Guard is explicitly governed by the United States Constitution. *Ass'n of Civilian Technicians, Inc. v. United States*, 603 F.3d 989, 992 (D.C. Cir. 2010). Article I, Section 8 gives Congress the power "[t]o provide for calling forth the militia" only where necessary "to execute the laws of the union, suppress insurrections and repel invasions[.]" U.S. Const. art. I, § 8, cl. 15. It gives Congress the power "[t]o provide for organizing, arming, and disciplining, the militia, and for governing such part of them as may be employed in the service of the United States, *reserving to the states* respectively, the appointment of the officers, and the authority of training the militia according to the discipline prescribed by Congress[.]" U.S. Const. art. I, § 8, cl. 16 (emphasis added). These two clauses, known as the Militia Clauses, "reflect a delicate compromise that gives the States power over their respective militias" subject to the congressionally granted delegation of authority to the President "to call those militias into national service when necessary." *Abbott v. Biden*, 70 F.4th 817, 821 (5th Cir. 2023).

The statutory scheme governing the National Guard reflects this compromise. As the Fifth Circuit explained, "the National Guard includes two 'overlapping but distinct organizations'—the National Guards of the various States and the National Guard of the United States." *Id.* at 822 (quoting *Perpich v. Dep't of Def.*, 496 U.S. 335, 345 (1990)). "All who enlist in a State's National Guard must simultaneously enlist in the National Guard of the United States, which is a reserve component[] of the armed forces." *Id.* (internal quotations and citations omitted); 10 U.S.C. § 10101. However, "[m]embers of the Army National Guard of the United States and . . . Air National Guard of the United States are not in active Federal service except when ordered thereto under law." 10 U.S.C. § 12401. Otherwise, the States—and their Governors as Commanders-in-Chief—retain control over the National Guard. 32 U.S.C. §§ 328, 502(f); *see also, e.g.*, Wash. Const. art. III, § 8; Wash. Rev. Code §§ 38.08.020, .040; Del. Const. art. III, § 8; 20 Del. Laws § 171; Kan. Const. art. 8, § 4; Md. Code Ann., State Gov't § 3-303; Mich. Const. art. V, § 12; Mich. Comp. Laws § 32.551(1); N.Y. Const. art. IV, § 3; N.Y. Military Law § 3.

In sum, the National Guard is "'a "hybrid" entity that carefully combines both federal and state characteristics.'" *Ass'n of Civilian Technicians*, 603 F.3d at 992 (quoting *Lipscomb v. Fed. Labor Rels. Auth.*, 333 F.3d 611, 614 (5th Cir. 2003)).

But there is no question that "Guard Soldiers' primary area of operation is [in] their home state."[3]

**B.     Fear of a Standing Army and Tyranny by the Federal Government Compelled the Framers to Embed State Control of the Militias in the Constitutional Framework**

The National Guard's long tradition of civilian and state control traces its origins through the prehistory of our country, is enshrined in our Founding documents, and has continued unabated until the present day.

"Civilian rule is basic to our system of government." *Bissonette v. Haig*, 776 F.2d 1384, 1387 (8th Cir. 1985), *on reh'g*, 800 F.2d 812 (8th Cir. 1986), *aff'd*, 485 U.S. 264 (1988). Civilian authority is necessary to uphold our cherished liberties, because the "use of military forces to seize civilians can expose civilian government to the threat of military rule and the suspension of constitutional liberties." *Id*. Military force may also threaten "vital Fourth and Fifth Amendment rights," "chill the exercise" of the rights to "speak freely and to vote," and can "create the atmosphere of fear and hostility which exists in territories occupied by enemy forces." *Id.* Accordingly, "a traditional and strong resistance of Americans to any military intrusion into civilian affairs . . . has deep roots in our history." *Laird v. Tatum*, 408 U.S. 1, 15 (1972). President Trump's unconstitutional effort to use the

---

[3] Army Nat'l Guard, *GUARD FAQS, What is the Nat'l Guard?*, https://nationalguard.com/guard-faqs.

National Guard to intrude into state civilian rule threatens this longstanding tradition and the critical freedoms it protects.

### 1. Our Founders Sought to Prohibit Military Rule After Centuries of Abuse in England

In creating our country, one of the Founders' "well-established purpose[s]" was to keep the military strictly subordinate to civil authority. *Reid v. Covert*, 354 U.S. 1, 30 (1957). This purpose stemmed from centuries of British citizens taking "political action against aggressive military rule," namely by kings abusing their power. *Duncan v. Kahanamoku*, 327 U.S. 304, 320 (1946). These abuses ultimately led Parliament to pass the English Bill of Rights, which forbade the King from maintaining a standing army without Parliament's consent.[4]

Against these guarantees of freedom from domestic use of troops, which British subjects had enjoyed for generations, King George III's deployment of British soldiers in the colonies galvanized a revolution. Starting in 1768, King George III quartered British troops in Boston "to support unpopular royal governors and to intimidate the local populace." *Reid*, 354 U.S. at 27. The colonists'

---

[4] 1 W. & M., sess. 2, ch. 2 (1688), *reprinted in* 6 Stat. Realm, at 142 (1819, *reprinted* 1963), https://babel.hathitrust.org/cgi/pt?id=pst.000017915557&seq=1.

worst fears were realized when Redcoats, deployed to enforce the Crown's tax acts, murdered five protestors in the Boston Massacre and sparked our Revolution.[5]

As the Nation took its first steps toward self-government, the Founders maintained their commitment to civilian control, even as they faced down the Revolutionary War. In drafting the Articles of Confederation in 1777, the Continental Congress placed primary reliance on state militias (what would become the National Guards) to provide internal security in emergencies, while eschewing the role of federal troops. The Articles ensured that "every state shall always keep up a well regulated and disciplined militia" but prohibited a standing army.[6] They further provided that each State's militia was limited to those needed for the "defense" of the State, and the civilian Congress had exclusive control over the size and activities of federal armed forces.

Under the Articles, "[t]he executive and military officials who . . . found it necessary to utilize the armed forces to keep order in a young and turbulent nation, did not lose sight . . . that existing civilian government . . . were not to be interfered with by the exercise of military power." *Kahanamoku*, 327 U.S. at 320. For example, in 1786, when 1,500 farmers and unpaid former Continental Army soldiers armed

---

[5] *See* Today in History – March 5, *The Boston Massacre: A History with Documents*, Library of Congress, https://www.loc.gov/item/today-in-history/march-05/ (last visited 6/14/2025).

[6] Articles of Confederation of 1781, art. VI, para. 4.

themselves to attack courts and a federal armory in Massachusetts in what became known as Shays' Rebellion, Massachusetts' governor deployed the militia to assist with civil law enforcement. But even then, the governor directed the militia that they were "to consider [themselves] in all [their] military offensive operations constantly as under the direction of the civil officer, saving where any armed force shall appear and oppose [their] marching to execute these orders." [7]

## 2. The Constitution Enshrines a Deliberate Balance of State and Federal Military Control

When the Framers of the Constitution met to craft a new framework for self-government in 1787, the document they created reflected their deep concerns about military subversion of civilian rule. Yet, then-recent history, including Shays' Rebellion and looming threats from European powers, led the Framers to acknowledge that some permanent national military might be necessary to supplement the traditional role of state militias. The result was a compromise: the Framers cautiously embraced a standing army but put it under the command of a civilian President as Commander-in-Chief, and gave Congress, not the President, authority to raise, support, and regulate the armed forces. U.S. Const. art. II, § 2, cl. 1; art. I, § 8, cls. 12-14. At the same time, the Framers preserved a primary role

---

[7] Office of the Judge Advocate General, *Federal Aid in Domestic Disturbances 1903-1922*, S. Doc. No. 263, at 10, 67th Cong., 2d Sess. (1922), https://babel.hathitrust.org/cgi/pt?id=pst.000057379777&seq=7.

for "the Militia of the several States." *Id.*, art. II, § 2. Under the Constitution, Congress was given the power

> To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions; [and]

> To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress . . . .

*Id.*, art. I, § 8, cls. 15-16. Meanwhile the President was assigned the role of "Commander in Chief of . . . the Militia of the several States, *when called into the actual Service of the United States*[.]" *Id.*, art. II, § 2 (emphasis added).

Thus, Congress was given certain powers over state militias, including the power to call them forth into national service—but only in the limited circumstances of invasion, insurrection, or breakdown in federal law. *See Newsom*, 2025 WL 2501619, at *11 (explaining that Constitutional delegates intended "that Congress's power to call forth the militia to execute the laws would be exercised only if 'found absolutely necessary'") (citation omitted). And when, but only when, the militias were called forth pursuant to Congress' command, the President exercised authority over them as Commander-in-Chief. Otherwise, state militias remained entirely within the States' control. Or, as Justice Story put it: "It is almost too plain for argument, that the power here given to Congress over the militia; is of a limited

12

nature, and confined to the objects specified in these clauses; and that in all other respects, and for all other purposes, the militia are subject to the control and government of the State authorities." *Houston v. Moore*, 18 U.S. 1, 50 (1820) (Story, J., concurring); *see also Abbott*, 70 F.4th at 829 ("The States . . . retain exclusive power to appoint officers, train militiamen, and govern the non-federalized militia; the States also share concurrent authority with Congress to provide for organizing, arming, and disciplining the militia—so long as the States' rules aren't inconsistent with Congress's.").[8]

Following its directive to "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions," the Second Congress passed the Calling Forth Act in 1792. 1 Stat. 264, § 1 (1792). The Act authorized the President to call forth state militias "whenever the United States shall be invaded, or be in imminent danger of invasion from any foreign nation or Indian tribe . . . to repel such invasion." *Id*. In the event of "insurrection in any state," the Act gave the President power to federalize state militias to suppress the insurrection,

---

[8] The Second Congress passed the Milita Act of 1792, which organized the militia. 1 Stat. 271 (1792). Congress passed the Act to stave off efforts by President Washington and War Secretary Knox "to bring State forces under increased federal control." *Civilian in Peace, Soldier in War . . . I am the Guard: A History of the Army Nat'l Guard, 1636-2000*, at 67, https://www.nationalguard.mil/portals/31/Documents/About/Publications/Documents/I%20am%20the%20Guard.pdf (last visited Sept. 9, 2025). The Militia Act "represented the triumph of the Republicans over the Federalists in militia affairs by reserving to the States near complete control over their soldiers." *Id.* at 68.

but only "on application of the legislature" of the State facing the insurrection, "or of the executive (when the legislature cannot be convened)." *Id.*, § 2. The Act also included a provision authorizing the President to call forth the militia without a request from a State if "the laws of the United States shall be opposed, or the execution thereof obstructed . . . by combinations too powerful to be suppressed by the ordinary course of judicial proceedings, or by the powers vested in the [federal] marshals." *Id.*

In 1807, Congress passed another law that largely tracked the 1795 Calling Forth Act and also permitted the President to deploy regular military forces in the same circumstances under which militias could be deployed. 2 Stat. 443 (1807). This statute is commonly known as the Insurrection Act.

And with this, the delicate balance of state and federal authority was set. And this balance has remained essentially the same ever since, with the President's authority to call out state militias for domestic law enforcement carefully conscribed.

### 3. Throughout Our History, Presidents Have Carefully Avoided Domestic Deployment of the Militias Unless Absolutely Necessary

Since 1792, when Congress first gave the President the authority to call forth the militia in limited circumstances, the President has only ever used it as "a last resort," when a State requested help to quell an insurrection, when necessary to enforce a federal court order, or when state and local law enforcement are unable to

enforce the law.[9] All told, between 1792 and June 5, 2025, Presidents relied on the Calling Forth and Insurrection Acts approximately thirty times to engage National Guards in domestic law enforcement.[10] Presidents have called the National Guard forth to respond to armed uprisings like the Whiskey Rebellion in 1794, Fries's Rebellion in 1799, and the Brooks-Baxter War in 1874; deadly riots that overwhelmed local law enforcement like the Colfax Massacre in 1873, the Seattle Riot of 1886, and the Los Angeles Riots in 1992; the Civil War[11] and post-war reign of terror by the Ku Klux Klan; crippling labor strife like the Pullman Strike of 1894, the Colorado Coalfield War of 1914, and the Battle of Blair Mountain in 1921; and

---

[9] Memorandum from Deputy Assistant Att'y Gen. Mary C. Lawton to Assistant Att'y Gen. Antonin Scalia, *Laws Relating to Civil Disturbances* (Jan. 6, 1975), https://www.justice.gov/d9/pages/attachments/2022/09/02/la_19750 106_law_relating_to_civil_disturbances_0.pdf.

[10] *See generally* Joseph Nunn & Elizabeth Goitein, *Guide to Invocations of the Insurrection Act*, Brennan Center for Justice (Apr. 25, 2022), https://www .brennancenter.org/our-work/research-reports/guide-invocations-insurrection-act.

[11] During the Civil War, Congress amended the Insurrection Act to give President Lincoln flexibility to fight the Civil War and invade States of the fraying union. The Lincoln Law amended the Calling Forth Act to permit the President to deploy state militias or regular armed forces whenever "by reason of unlawful obstructions, combinations, or assemblages of persons, or rebellion against the authority of the Government of the United States, it shall become impracticable, in the judgment of the President . . . to enforce, by the ordinary course of judicial proceedings, the laws of the United States within any State." An Act to Provide for the Suppression of Rebellion against and Resistance to the Laws of the United States, ch. 25, 12 Stat. 281 (1861).

States' refusals to comply with desegregation orders and protect civil rights protestors in Little Rock in 1957, Ole Miss in 1962, and Selma in 1965.[12]

Meanwhile, Congress has periodically adjusted the guardrails to ensure the President has power to respond to genuine emergencies, while preserving the supremacy of local civilian control and protecting the delicate state–federal balance enshrined in the Constitution. During Reconstruction, President Grant called forth the armed forces on multiple occasions to support fragile Reconstruction governments and address the threats posed by the Ku Klux Klan and other revanchist terrorist groups.[13] In this unique epoch of American history, extensive military involvement was indispensable in fighting a Civil War, reconstructing a shattered nation, and protecting the rights of newly freed slaves. As President Grant explained

---

[12] Nunn & Goiten, *supra* note 10. Prior to the Civil War, federal troops were occasionally deployed without invocation of the Calling Forth or Insurrection Acts, such as when violence erupted between pro- and anti-slavery elements in the new Kansas Territory in the 1850s. Robert W. Coakley, *The Role of Fed. Mil. Forces in Domestic Disorders, 1789-1878*, at 176, Ctr. of Mil. History United States Army Washington D.C. (1988), https://www.google.com/books/edition/The_Role_of_Federal_Military_Forces_in_D/Ydx1_LFkbjcC?hl=en&gbpv=1&pg=PA3&printsec=frontcover. Additionally, in one of the more shameful chapters of our history, an 1850 amendment to the Fugitive Slave Act permitted the use of posse comitatus to capture runaway slaves, which sometimes led to militia troops being pressed into service. 9 Stat. 462 (1850) (repealed 1864); *see also* Charles Emery Stevens, *Anthony Burns: A History*, Boston John P. Jewett and Co. (1856), https://archive.org/details/anthonyburnshiststev/page/n5/mode/2up. As detailed below, in 1878, Congress passed the Posse Comitatus Act, forbidding exactly this.

[13] Nunn & Goiten, *supra* note 10, at 15; *see also* Ulysses S. Grant, Proclamation (May 3, 1871), https://millercenter.org/the-presidency/presidential-speeches/may-3-1871-message-regarding-fourteenth-amendment.

it, "I have not employed troops on slight occasions, nor in any case where it has not been necessary to the enforcement of the laws of the United States."[14]

In 1876, however, Republican Rutherford B. Hayes lost the popular vote, but won the electoral vote after promising to withdraw federal troops from the former Confederacy. Shortly thereafter, Congress passed the Posse Comitatus Act to severely restrict any further use of the armed forces for domestic law enforcement.[15] As presently codified, the Act provides:

> Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both.

18 U.S.C. § 1385. After the experience of Reconstruction, the Posse Comitatus Act firmly reestablished the antebellum balance. It sharply limited military involvement in civilian affairs, while preserving some flexibility for the President to use the armed forces in extraordinary circumstances.

Congress next spoke in 1903. Following the Spanish-American War, Congress passed the Militia Act of 1903—known as the Dick Act—to improve the

---

[14] Ulysses S. Grant to the House of Representatives (Jan. 22, 1877), *quoted in* G. Norman Lieber, *Use of the Army in Aid of the Civil Power*, at 8 (1898), https://archive.org/details/useofarmyinaidof00liebrich/page/n3/mode/2up.

[15] An Act Making Appropriations for the Support of the Army for the Fiscal Year Ending June Thirtieth, Eighteen Hundred and Seventy-Nine, and for Other Purposes, ch. 263, § 15, 20 Stat. 145, 152 (1878).

readiness and training of the state militias.[16] Acting pursuant to the Militia Clauses, the Dick Act created the modern National Guard and set forth the circumstances under which they could be federalized. *See Perpich*, 496 U.S. at 342. As Representative Charles Dick, then-Chairman of the Committee on Militia explained, the National Guard was "never designed to be a militia of the United States" and the President could not call up the National Guard at "his arbitrary pleasure" but only in specific enumerated circumstances.[17] Representative Dick noted, "[i]t was the hereditary fear of standing armies, as a menace to liberty in time of peace, which lead the framers of the Constitution to provide that the militia should always remain a militia of the States."[18]

Consistent with this unbroken tradition of restricting the President's authority to call up the National Guard, Section 4 of the Dick Act included a provision that would later be codified as 10 U.S.C. § 12406. As initially passed, it provided:

> That whenever the United States is invaded, or in danger of invasion from any foreign nation, or of rebellion against the authority of the Government of the United States, or the President is unable, with the other forces at his command, to execute the laws of the Union in any part thereof, it shall be lawful for the President to call forth, for a period

---

[16] The Dick Act, ch. 196, 32 Stat. 775, § 4 (1903); *see also* Wikipedia, *Militia Act of 1903* (last edited June 9, 2025, 11:55 a.m.), https://en.wikipedia.org/wiki/Militia_Act_of_1903.

[17] Frederick Wiener, *The Militia Clause of the Constitution*, 54 Harv. L. Rev. 181, n.74 (Dec. 1940) (citing H.R. Rep. No. 1094, 57th Cong., 1st Sess., at 22-23 (1902)).

[18] *Id.*

> not exceeding nine months, such number of the militia of the State or of the States or Territories or of the District of Columbia as he may deem necessary to repel such invasion, suppress such rebellion, or to enable him to execute such laws, and to issue his orders for that purpose to such officers of the militia as he may think proper.

Notably—and perhaps in response to the experience of the Civil War during which some pro-slavery Union States declined to send forth their militias[19]—this early version of what would become Section 12406 did not include any role for the governor of the State whose National Guard was being federalized. But just five years later, before Section 4 was ever invoked, Congress amended the statute to add the requirement that when the President has need to nationalize the Guard in the face of invasion, rebellion, or inability to enforce the laws, he must "issue his orders for that purpose, through the governor of the respective State or Territory, or through the commanding general of the militia of the District of Columbia, from which State, Territory, or District such troops may be called."[20]

In 1956, when the Dick Act was recodified into the current Title 10, the statute was amended into its current form.[21] Section 12406 now provides:

---

[19] *See* 1908 Cong. Rec. 6942 (Statement of Rep. Parker of New Jersey), https://www.congress.gov/bound-congressional-record/1908/05/25/42/house-section/article/6893-6949?q=%7B%22search%22%3A%221908+Cong.+Rec.+6942%22%7D&s=1&r=1.

[20] Pub. L. No. 60-145, § 3, 35 Stat. 400 (1908). The statute has been amended since and in 1956 was adopted in essentially its current form. Pub. L. No. 84-1028, 70A Stat. 199 (1956).

[21] Pub. L. No. 84-1028, 70A Stat. 199 (1956).

Whenever-

(1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation;

(2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or

(3) the President is unable with the regular forces to execute the laws of the United States;

the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws. Orders for these purposes shall be issued through the governors of the States or, in the case of the District of Columbia, through the commanding general of the National Guard of the District of Columbia.

In the hundred-plus years since the Dick Act, Section 12406 and its predecessors have only been invoked twice. In 1916, after Pancho Villa attacked the United States in an ongoing border dispute, U.S. Army forces chased him deep into Mexico. With the Army drawn away, other Mexican forces attacked undefended towns in Texas, leading President Wilson to call up National Guard units to defend the United States against any further border incursions.[22]

Section 12406 was next invoked 54 years later, when President Nixon called upon the Guard to deliver the mail in New York during a Postal Service Strike. Exec. Order No. 11519, 35 Fed. Reg. 5003 (March 23, 1970). The strike had stopped the

---

[22] Alexander Barnes, *On the Border: The Nat'l Guard mobilizes for war in 1916*, U.S. Army (Feb. 26, 2016), https://www.army.mil/article/162413/on_the_border_the_national_guard_mobilizes_for_war_in_1916

delivery of mail entirely in New York. As President Nixon explained, federal law "require[d] that the business of the Post Office Department, including the expeditious processing and delivery of the mail, be regularly carried on." *Id.* Because he was "unable solely with the regular forces" to carry out these laws, President Nixon declared a national emergency, *see* Proclamation 3972, and federalized nearly 12,000 National Guardsmen.[23] *See also* Order Granting Pls.' Appl. for TRO, Add. to Appellants' Emergency Mot. Under Cir. R. 27-3 for Stay Pending Appeal at A283-84 (June 12, 2025), Dkt. No.10.

In the 55 years since, Section 12406 has lain dormant.

As this history makes clear, President Trump's invocation of Section 12406 to deploy armed National Guard soldiers and entangle them in protests that local law enforcement is able to manage, and over the objection of California's Governor, no less, is utterly unprecedented in our history. It runs contrary to our nation's unbroken tradition of restraint in using the armed forces to conduct law enforcement. It undermines the historical and constitutionally enshrined balance between state and local authority. And worst of all, it threatens the civil liberties of all Americans. While our leaders have long recognized that the armed forces, including the National

---

[23] Homer Bigart, *Military in Post Offices, Begins Handling the Mail*, New York Times (March 24, 1970), https://www.nytimes.com/1970/03/24/archives/military-in-post-offices-begins-handling-the-mail-military-in-post.html (digitized version).

21

Guard, might sometimes be necessary to respond to emergencies, this has always and only been used as a last resort, and always with an eye toward respecting the primacy of civil law enforcement and State control of the militias.

And imagine if it were otherwise. Under Appellants' theory, a president could make unfounded claims of widespread voter fraud during the midterms and then send federalized National Guard troops to seize voting machines based on his determination that state election officers are unable to enforce federal election law. Or a president could determine that States were doing a bad job of enforcing federal gun control laws and send the Guard to prevent "rebellion" or "danger of a rebellion" by going house-to-house to inspect Americans' weapons and seize any that were arguably restricted. This cannot be, and the Court should make clear that by invoking Section 12406 here, President Trump undermines one of our Nation's founding principles: that freedom depends on the subordination of the military to civilian authority.

## C.     The National Guard Plays a Vital and Irreplaceable Role in Ensuring the Security and Disaster Preparedness of the States

While the National Guard may be called into federal service in the emergency situations described above, its daily, indispensable role is in service of the States. This includes responding to natural disasters and other (sometimes life-threatening) emergencies that imperil the States' residents, and ensuring public safety at large

and high-profile events. The States invest millions of dollars every year to fund this critical work.

Although the National Guard is primarily funded through federal appropriations, *see* 32 U.S.C. §§ 106-07, it also receives funding from the States. For example, California's enacted budget for fiscal year 2024 allocated more than $293 million for its National Guard; of this amount, more than $148 million— approximately 51% of the budget—came from California's General Fund.[24] In Washington, the adopted budget for 2023-2025 allocated over $151 million in state appropriations to the Military Department, including more than $59 million for the disaster response account[25]; in federal fiscal year 2024, Washington spent about $6.3 million on National Guard facilities, construction, and projects, and the State also appropriates almost $1 million per year combined to the Guard for wildland fire training, administrative costs, and death benefits for families of Guard members who die in service. Vermont's fiscal year 2025 budget allocated almost $7 million to its Military Department, most of which flows to various National Guard functions.[26]

---

[24] Cal. State Budget Office, *2023-24 STATE BUDGET – GG1*, 8940 Mil. Dep't, https://ebudget.ca.gov/2023-24/pdf/Enacted/GovernorsBudget/8000/8940.pdf (last visited June 11, 2025).

[25] Engr. Sub. S.B. 5187, 68th Leg., Reg. Sess., 2023 Wash. Sess. Laws, ch. 475, § 148.

[26] State of Vt., FY2025 Governor's Recommended Budget: Rollup Report, https://perma.cc/LNY6-E2EJ.

And in Massachusetts, the enacted budget for the fiscal year 2025 included state spending for (among other things) the office of the adjutant general, certain National Guard aviation facilities, and Guard missions and division operations.[27]

The National Guard has thousands of members assigned for duty in each State. In June 2025, for example, Washington had 5,563 members of the Army National Guard and 1,978 members of the Air National Guard assigned for duty in the State.[28] Illinois had 9,790 members of the Army National Guard and 2,704 members of the Air National Guard assigned for duty.[29] New York had 11,599 and 5,805, respectively.[30] For Kansas, the numbers were 4,633 Army National Guard and 2,061 Air National Guard; for Vermont, 1,685 and 1,018.[31]

These Guard troops are an indispensable resource for their states. Through its response to natural disasters in Amici States, the National Guard saves lives. The National Guard responded to major wildfires in Washington in 2024 and California

---

[27] Commonwealth of Mass. Mil. Div., *Budget Summary FY2025 Enacted*, Commonwealth of Mass., https://budget.digital.mass.gov/summary/fy25/enacted/public-safety/military-division/ (last visited Sept. 2, 2025).

[28] Defense Manpower Data Ctr., *Number of Military and DoD Appropriated Fund (APF) Civilian Personnel* (June 30, 2025), https://dwp.dmdc.osd.mil/dwp/app/dod-data-reports/workforce-reports (June 2025 Spreadsheet under *Military and Civilian Personnel by Service/Agency by State/Country*).

[29] *Id.*

[30] *Id.*

[31] *Id.*

24

in 2025.[32] Members of the Vermont Army National Guard collaborated with search and rescue teams to evacuate nineteen people from Hurricane Beryl in one night in 2024.[33] In 2023, the Hawaiʻi National Guard responded to devastating wildfires on Maui, including the wildfire-initiated urban conflagration that consumed the historic town of Lahaina, by maintaining order, fighting the fires, and searching for victims.[34] In 2019, 200 members of the Illinois National Guard responded to major river floods by placing sandbags and monitoring levees.[35] In January and April of this year,

---

[32] Joseph Siemandel, *Year in Review: 2024 was a busy year for Washington Military Department*, Defense Visual Info. Distrib. Serv. (DVIDS) (Jan. 7, 2025), https://www.dvidshub.net/news/488741/year-review-2024-busy-year-washington-military-department.; *Governor Newsom deploys California Nat'l Guard to Los Angeles fires: 'Looting will not be tolerated,'* Governor Gavin Newsom (Jan. 9, 2025), https://www.gov.ca.gov/2025/01/09/governor-newsom-deploys-california-national-guard-to-los-angeles-fires-looting-will-not-be-tolerated/.

[33] Maj. J. Scott Detweiler, *Vermont Nat'l Guards Supports Cyclone Beryl Response*, DVIDS (July 11, 2024), https://www.dvidshub.net/news/475930/vermont-national-guards-supports-cyclone-beryl-response.

[34] Air Force Master Sgt. Erich Smith, *Haw. Army Nat'l Guard Supports Maui Wildfire Response*, Nat'l Guard (Aug. 28, 2023), https://www.nationalguard.mil/News/Article-View/Article/3507502/hawaii-army-national-guard-supports-maui-wildfire-response/. As an insular State located more than 2,000 miles away from the mainland, Hawaiʻi cannot readily expect to receive prompt material assistance from elsewhere when responding to emergencies.

[35] Lt. Col. Bradford Leighton, *Ill. Nat'l Guard helps civilian agencies fight flooding*, Nat'l Guard (June 3, 2019), https://www.nationalguard.mil/News/Article-View/Article/1863818/ill-national-guard-helps-civilian-agencies-fight-flooding/.

Maryland and Michigan activated their respective National Guards to respond to severe winter storms.[36]

States also send members of their National Guard to assist other States facing major natural disasters. All fifty States, plus the District of Columbia, Puerto Rico, Guam, U.S. Virgin Islands, and the Northern Mariana Islands, have enacted legislation to become members of the Emergency Management Assistance Compact ("EMAC").[37] EMAC is a formal compact that facilitates States' sharing of personnel and resources when a governor in one State declares an emergency.[38] National Guard members are deployed to respond to disasters in other States through EMAC.[39] For example, in 2024, many States sent personnel and resources to Florida to help respond to Hurricane Milton. New York sent sixty-five members of its National

---

[36] Md. Nat'l Guard, *Md. Nat'l Guard activated to support winter storm response across the state* (Jan. 8, 2025), https://news.maryland.gov/ng/2025/01/08/maryland-national-guard-activated-to-support-winter-storm-response-across-the-state/; Dep't of Mil. and Veterans Affairs, *More than 800 Mich. Nat'l Guard Soldiers and Airmen Mobilized to Support Mich. Communities Impacted by Northern Mich. Ice Storm* (April 4, 2025), https://www.michigan.gov/dmva/newsroom/press-releases/2025/04/04/mobilized-to-support-michigan-communities-impacted-by-northern-michigan-ice-storm.

[37] Emergency Mgmt. Assistance Compact (EMAC), *What is EMAC?*, https://www.emacweb.org/index.php/learn-about-emac/what-is-emac (last visited June 11, 2025).

[38] *Id.*

[39] *Id.*

Guard.[40] Colorado sent a helicopter and crew.[41] Delaware sent 100 members of its Guard.[42] Connecticut deployed members of its Guard in the wake of Hurricane Helene in 2024.[43] In 2022 alone, over 100,000 members of the National Guard were deployed to fight wildfires in nineteen States.[44] And in 2012, in the aftermath of Hurricane Sandy, 12,000 National Guard members—including 2,000 deployed by New Jersey—assisted eleven States, working with search and rescue teams, staffing evacuation shelters, clearing routes, and delivering essential equipment and

---

[40] State of N.Y., *Governor Hochul Announces 65 New York Nat'l Guard Soldiers and Airmen Are Deploying to Assist in Florida in Responding to the Impact of Hurricane Milton*, New York's Governor's Office (Oct. 9, 2024), https://www.governor.ny.gov/news/governor-hochul-announces-65-new-york-national-guard-soldiers-and-airmen-are-deploying-assist.

[41] Colo. Nat'l Guard Pub. Affairs, *Colo. Nat'l Guard supports Hurricane Milton relief efforts*, Colo. Nat'l Guard (Oct. 9, 2024), https://co.ng.mil/News/Archives/Article/3930948/colorado-national-guard-supports-hurricane-milton-relief-efforts/.

[42] State of Del., *Governor Carney to Activate Del. Nat'l Guard to Assist with Florida's Hurricane Response*, Office of the Governor (Oct. 8, 2024), https://news.delaware.gov/2024/10/08/governor-carney-to-activate-delaware-national-guard-to-assist-with-floridas-hurricane-response/.

[43] State of Conn., *Governor Lamont Announces Conn. Nat'l Guard Sending Additional Soldiers and Aircraft to N.C. for Further Hurricane Helene Disaster Assistance* (Oct. 3, 2024), https://portal.ct.gov/governor/news/press-releases/2024/10-2024/governor-lamont-announces-connecticut-national-guard-sending-additional-soldiers-to-north-carolina?language=en_US.

[44] Anshu Siripurapu, Noah Berman, and Diana Roy, *What does the U.S. Nat'l Guard Do?*, Council on Foreign Relations (last updated Sept. 3, 2025), https://www.cfr.org/backgrounder/what-does-us-national-guard-do#:~:text=The%20National%20Guard%20can%20also,normally%20funded%20by%20the%20state.

27

supplies.[45] As the Amici States—and the nation as a whole—face increasingly catastrophic wildfires, hurricanes, and other natural disasters, a robust, responsive National Guard is essential to protect people and property.

In addition to natural disasters, States' National Guard forces play an important role in counterdrug and counterterrorism activities. In 2024, the Washington National Guard Counterdrug Program helped coordinate twelve multi-jurisdictional law enforcement task forces, partnering with state, local, and tribal agencies. Together, "they seized more than 4.6 million lethal doses of fentanyl and other narcotics, denying drug trafficking organizations (DTOs) approximately $71 million in revenue."[46] The New York National Guard contributes members to the Joint Task Force Empire Shield, which conducts land and waterborne Homeland Security Operations in the New York City metropolitan area to deter and prevent terrorist acts.[47]

---

[45] Army Sgt. 1st Class Jim Greenhill, *12,000 Nat'l Guard Members Helping 11 States Recover from Hurricane Sandy* (Oct. 30, 2012), https://www.nationalguard.mil/News/Article/574966/12000-national-guard-members-helping-11-states-recover-from-hurricane-sandy/; Nat'l Ctrs. for Env't Information, *Storm Events Database*, NOAA, https://www.ncdc.noaa.gov/stormevents/eventdetails.jsp?id=416939 (last visited September 2, 2025).

[46] Wash. Mil. Dep't, *Annual Report 2024/2025*, https://d34w7g4gy10iej.cloudfront.net/pubs/pdf_72587.pdf.

[47] C. Todd Lopez, *New York Guard's Joint Task Force Empire Shield: Guarding NYC transit hubs since 9/11*, Army New Service (Sept. 9, 2016), https://www.nationalguard.mil/News/Article-View/Article/939398/newyork-guards-joint-task-force-empire-shield-guarding-nyc-transit-hubs-since-9/.

28

Additionally, States sometimes activate members of the National Guard to provide security support at major events. For example, in 2024, members of Nevada's Guard assisted local law enforcement in providing security at the Formula 1 Las Vegas Grand Prix, which drew several hundred thousand attendees to the city.[48] Members of about forty States provided security for President Trump's 2025 Inauguration, in a tradition dating back to the first inauguration of President George Washington.[49]

All of this work is vital. And all of it requires significant advance training, planning, and preparation. Amici States cannot simply replace the National Guard's work if its members are suddenly whisked from their state missions and pressed into service as domestic law enforcement. This is particularly so given the timing of the Trump Memo: wildfire season has started in the western States[50]; so has hurricane

---

[48] Capt. Emerson Marcus, *Nev. Guard set to support Clark County first responders during Formula 1 Las Vegas Grand Prix*, Nev. Nat'l Guard (Nov. 20, 2024), https://nv.ng.mil/News/Article-Display/Article/3973518/nevada-guard-set-to-support-clark-county-first-responders-during-formula-1-las/.

[49] D.C. Nat'l Guard, *Nat'l Guard support to the District of Columbia and the 60th Presidential Inauguration* (Jan. 13, 2025), https://dc.ng.mil/Public-Affairs/News-Release/Article/4028262/national-guard-support-to-the-district-of-columbia-and-the-60th-presidential-in/.

[50] KING 5 NEWS, *Breaking News: Wildfire evacuations underway near Cle Elum* (June 10, 2025), https://www.king5.com/video/news/local/wildfire/breaking-wildfire-evacuations-underway-near-cle-elum/281-366f3bc2-c237-4c7a-9e40-1276e33b3755.

season on the East Coast[51]; and in between, States are facing imminent risks of flooding,[52] and other emergencies. For that reason, unlawful activation of the National Guard risks significant harm to people and property as the Guard diverts resources from its core state mission.

The Court should not bless that harm, nor the damage the Trump Memo and DOD Orders work on state sovereignty and the constitutional requirement that the military remain separate from civilian law enforcement. The rule of law must hold. Defendants' unlawful, unconstitutional, and undemocratic orders were properly enjoined.

## IV.   CONCLUSION

This Court should affirm the District Court.

DATED this 9th day of September 2025.

Respectfully submitted,

KATHLEEN JENNINGS
Attorney General of Delaware

NICHOLAS W. BROWN
Attorney General of Washington

IAN R. LISTON
Director of Impact Litigation
ROSE E. GIBSON
Assistant Attorney General

*s/ Patricio Marquez*
PATRICIO MARQUEZ
EMILY NELSON
ANDREW HUGHES

---

[51] NOAA, *NOAA predicts above-normal 2025 Atlantic hurricane* season (May 22, 2025), https://www.noaa.gov/news-release/noaa-predicts-above-normal-2025-atlantic-hurricane-season.

[52] Lindsey Smith, *How much rain has Wichita seen so far in June? See latest totals after flooding*, The Wichita Eagle (June 13, 2025), https://www.kansas.com/news/weather-news/article308476580.html.

30

Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
Ian.Liston@delaware.gov

ALEXIA DIORIO
Assistant Attorneys General
Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744
Patricio.Marquez@atg.wa.gov
Emily.Nelson@atg.wa.gov
Andrew.Hughes@atg.wa.gov
Alexia.Diorio@atg.wa.gov

KRISTIN K. MAYES
Attorney General of Arizona
2005 N. Central Ave.
Phoenix, AZ 85004

PHILIP J. WEISER
Attorney General, State of Colorado
Office of the Attorney General
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203

WILLIAM TONG
Attorney General
State of Connecticut
165 Capitol Avenue
Hartford, CT 06106

ANNE E. LOPEZ
Attorney General
State of Hawai'i
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
Attorney General of Illinois
115 S. LaSalle St.
Chicago, IL 60603

JUSTIN WHITTEN
Attorney for Governor Kelly
Office of the Governor of Kansas
300 SW 10th Ave., Suite 541-E
Topeka, KS 66612

AARON M. FREY
Attorney General of Maine
6 State House Station
Augusta, ME 04333-0006

ANTHONY G. BROWN
Attorney General State of Maryland
200 Saint Paul Place
Baltimore, MD 21202

ANDREA JOY CAMPBELL
Attorney General
Commonwealth of Massachusetts
One Ashburton Place
Boston, MA 02108

DANA NESSEL
Michigan Attorney General
P.O. Box 30212
Lansing, MI 48909

31

KEITH ELLISON
Attorney General
State of Minnesota
102 State Capitol
75 Rev. Dr. Martin Luther King Jr.
Blvd.
St. Paul, MN 55155

AARON D. FORD
Attorney General
of Nevada
100 North Carson Street
Carson City, NV 89701

MATTHEW J. PLATKIN
Attorney General of New Jersey
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625

LETITIA JAMES
Attorney General
State of New York
28 Liberty Street
New York, NY 10005

JEFF JACKSON
North Carolina Attorney General
114 W. Edenton Street
Raleigh, NC  27603

DAN RAYFIELD
Attorney General of Oregon
1162 Court Street NE
Salem, OR 97301

PETER F. NERONHA
Attorney General
State of Rhode Island
150 South Main Street
Providence, RI 02903

CHARITY R. CLARK
Vermont Attorney General
109 State Street
Montpelier, VT 05609

JOSHUA L. KAUL
Attorney General of Wisconsin
17 W. Main Street
Madison, WI 53703

BRIAN L. SCHWALB
Attorney General
District of Columbia
400 6th Street NW
Washington, DC 20001

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5), because it contains 6,996 words, less than half of the length allowed by Circuit Rule 32-1(a) for principal briefs. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared in Times New Roman 14-point font, a proportionally spaced typeface.

DATED this 9th day of September 2025.

*s/ Patricio Marquez*
PATRICIO MARQUEZ

## CERTIFICATE OF SERVICE

I certify that on September 9, 2025, I electronically filed the foregoing document with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit by using the Court's e-filer portal (ACMS), which will send notification of such filing to all counsel/parties of record.

DATED this 9th day of September 2025.

*s/ Patricio Marquez*
Patricio Marquez