No. 25–3727

# In the United States Court of Appeals for the Ninth Circuit

GAVIN NEWSOM, *et al.*,

*Plaintiffs-Appellees,*

*v.*

DONALD J. TRUMP, *et al.*,

*Defendants-Appellants.*

On Appeal from the United States District Court, for the
Northern District of California, Case No. 25-cv-04870-CRB
Hon. Charles R. Breyer, Judge

## BRIEF OF *AMICI CURIAE* LOCAL GOVERNMENTS AND LOCAL GOVERNMENT LEADERS IN SUPPORT OF APPELLEES' ANSWERING BRIEF AND AFFIRMANCE

S.F. CITY ATTORNEY'S OFFICE
DAVID CHIU, SBN 189542
YVONNE R. MERÉ, SBN 175394
MOLLIE M. LEE, SBN 251404
SARA J. EISENBERG, SBN 269303
NANCY E. HARRIS, SBN 197042
KARUN A. TILAK, SBN 323939
1390 Market Street, 7th Floor
San Francisco, CA 94102-5402
Telephone: (415) 355-3308

*Attorneys for Amicus Curiae City
and County of San Francisco*

PUBLIC RIGHTS PROJECT
JENNY MA
JONATHAN MILLER
490 43rd Street, #115
Oakland, CA 94609
Telephone: (510) 738-6788

*Attorneys for Amici Curiae
Listed in Appendix A*

[Counsel continued on next page]

KEKER, VAN NEST & PETERS LLP
CODY S. HARRIS, #255302
SOPHIE HOOD, #295881
ANJALI SRINIVASAN, #304413
IAN KANIG, #295623
CARA R. MEYER, #348877
633 Battery Street
San Francisco, CA 94111-1809
Telephone: (415) 391-5400

*Attorneys for Amici Curiae County of Santa Clara, City of Alameda, and City of Albuquerque*

# <u>TABLE OF CONTENTS</u>

**Page**

STATEMENT OF INTEREST ...................................................................1

SUMMARY OF ARGUMENT ...............................................................3

ARGUMENT .........................................................................................6

I.   UNLAWFULLY DEPLOYING MILITARY FORCES IRREPARABLY HARMS FEDERALISM, INDIVIDUAL RIGHTS, AND THE PUBLIC WELFARE. ......................................6

    A.   State and local governments possess sovereign police power that the federal government cannot infringe. ..............6

    B.   The unlawful federalization and deployment of the National Guard to manage local public protests and unrest irreparably harms state and local sovereignty..........11

    C.   The unlawful deployment of the National Guard also threatens irreparable harm to individual rights....................17

II.  THE PUBLIC INTEREST IS BEST SERVED BY ALLOWING EXPERIENCED AND TRAINED LOCAL LAW ENFORCEMENT TO MANAGE PROTESTS. .....................23

    A.   Local law enforcement is far better equipped than federalized military forces to ensure public safety while simultaneously safeguarding individual rights. ..........23

    B.   Deploying military forces without coordinating with local law enforcement decreases policing efficiency and increases the risk of violence and accidents....................29

CONCLUSION........................................................................................32

STATEMENT OF RELATED CASES .................................................49

CERTIFICATE OF COMPLIANCE FOR BRIEF ................................50

CERTIFICATE OF SERVICE...............................................................51

i

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Bissonette v. Haig,*
    776 F.2d 1384 (8th Cir. 1985) ................................................................. 22

*Black Lives Matter Seattle-King Cnty. v. City of Seattle,*
    466 F. Supp. 3d 1206 (W.D. Wash. 2020) ........................................... 21

*Bond v. United States,*
    572 U.S. 844 (2014) ..................................................................... 13, 14

*Boumediene v. Bush,*
    553 U.S. 723 (2008) ..................................................................... 10, 14

*City & Cnty. of San Francisco v. Trump,*
    2025 WL 1282637 (N.D. Cal. May 3, 2025) ..................................... 9, 16

*City & Cnty. of San Francisco v. Trump,*
    897 F.3d 1225 (9th Cir. 2018) ................................................................. 9

*Doe #1 v. Trump,*
    957 F.3d 1050 (9th Cir. 2020) ............................................................... 14

*Gregory v. Ashcroft,*
    501 U.S. 452 (1991) ............................................................... 6, 14, 17

*Grider v. Abramson,*
    180 F.3d 739 (6th Cir. 1999) ................................................................. 24

*Helvering v. Gerhardt,*
    304 U.S. 405 (1938) ................................................................................. 7

*Home Bldg. & Loan Ass'n v. Blaisdell,*
    290 U.S. 398 (1934) ............................................................................... 11

*Index Newspapers LLC v. United States Marshals Serv.,*
    977 F.3d 817 (9th Cir. 2020) ................................................................. 19

ii

*Jones v. Parmley,*
    465 F.3d 46 (2d Cir. 2006) .................................................... 21

*Laird v. Tatum,*
    408 U.S. 1 (1972) ........................................................... 11, 19

*Lane Cnty. v. Oregon,*
    7 Wall. 71 (1869) ................................................................ 7

*League of Wilderness Defs./Blue Mountains Biodiversity*
    *Project v. Connaughton,*
    752 F.3d 755 (9th Cir. 2014) ................................................. 5

*Libertarian Party of L.A. Cnty. v. Bowen,*
    709 F.3d 867 (9th Cir. 2013) ............................................... 19

*Marbury v. Madison,*
    1 Cranch 137 (1803) ......................................................... 10

*Martin v. Mott,*
    25 U.S. 19 (1827) ............................................................. 13

*Murphy v. Nat'l Collegiate Athletic Assn.,*
    584 U.S. 453 (2018) .................................................... 6, 7, 10

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
    567 U.S. 519 (2012) .......................................................... 10

*New York Times Co. v. Sullivan,*
    376 U.S. 254 (1964) .......................................................... 18

*New York v. United States,*
    505 U.S. 144 (1992) .................................................... 16, 17

*Newsom v. Trump,*
    No. 3:25-cv-04870-CRB (N.D. Cal. Sept. 2, 2025) ..................... 1

*Patterson v. Kentucky,*
    97 U.S. 501 (1878) ............................................................. 8

*Perpich v. Dep't of Def.,*
    496 U.S. 334 (1990) .......................................................... 12

*Printz v. United States*,
521 U.S. 898 (1997) ................................................................ *passim*

*Snyder v. Phelps*,
562 U.S. 443 (2011) .......................................................... 18

*Tafflin v. Levitt*,
493 U.S. 455 (1990) ............................................................ 7

*Texas v. White*,
7 Wall. 700 (1869) ............................................................. 7

*United States v. Lopez*,
514 U.S. 549 (1995) ........................................................ 8, 10

*United States v. Morrison*,
529 U.S. 598 (2000) .................................................... 8, 10, 11

*United States v. Nixon*,
418 U.S. 683 (1974) ........................................................ 10

*Washington v. Trump*,
847 F.3d 1151 (9th Cir. 2017) ........................................ 18

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) ........................................................ 13

*Whitney v. California*,
274 U.S. 357 (1927) ........................................................ 18

*Younger v. Harris*,
401 U.S. 37 (1971) ........................................................ 7, 9

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ........................................................ 10

**Federal Statutes**

Militia Act of 1903 ................................................... 12, 13, 14, 15

**State Statutes**

Cal. Gov't Code § 7072................................................................29

**State and Municipal Policies and Regulations**

*Body Worn Cameras*, City and County of San Francisco,
California Police Dep't General Order 10.11.....................................28

*Community Engagement Division (CED)*, City and County of
San Francisco, California Police Dep't..............................................27

*Community Police Review Agency*, City of Oakland,
California..........................................................................................27

*Crowd Control*, City and County of San Francisco, California
Police Dep't General Order 8.03................................................24, 25

*Crowd Management*, Minneapolis, Minnesota Police Dep't
Policy and Procedure Manual § 7–805.............................................26

*Demonstrations and Assemblies*, City of Madison, Wisconsin
Police Dep't......................................................................................26

*First Amendment Assemblies*, County of Alameda, California
Police Dep't Policy Manual § 467 ....................................................26

*Guidelines for First Amendment Activities*, City and County
of San Francisco, California Police Dep't General Order
8.10 ..................................................................................................25

*Mutual Aid*, State of California Governor's Off. of Emergency
Servs. ...............................................................................................30

*Pittsburgh Bureau of Police Roadway Safety Guidelines*, City
of Pittsburgh, Pennsylvania .............................................................27

*Response to First Amendment Assemblies and
Demonstrations and Unplanned Incidents*, City of
Albuquerque, New Mexico Police Dep't ...........................................26

*Response to Resistance (Section 200.520)*, County of Dane, Wisconsin Sheriff's Office Policy and Procedure Manual .................. 26

*Use of Force Policy and Proper Control of a Person*, City and County of San Francisco, California Police Dep't General Order 5.01 ...................................................................................... 24, 25

*Use of Tear Gas, Rubber Bullets, "Flash-bang" Devices and Other Less Lethal Methods of Crowd Control*, Pittsburgh, Pennsylvania Bureau of Police's Response to Mayor's Community Task Force Recommendations ........................................ 26

## Federal Constitutional Provisions

U.S. Const. amend. I ................................................................... *passim*

U.S. Const. amend. IV ................................................................. 22

U.S. Const. amend. V ................................................................... 22

U.S. Const. amend. X .................................................................. 6, 9

U.S. Const. art. I, § 8, cl. 15 ....................................................... 12

U.S. Const. art. I, § 8, cl. 16 ....................................................... 12

U.S. Const. art. IV, § 4 .................................................................. 6

## State Constitutional Provisions

Cal. Const. art. XI, §§ 5, 7 .......................................................... 8

Ill. Const. art. VII, § 6 ................................................................ 8

N.M. Const. art. X, § 6 ................................................................. 8

## Law Review Articles

Bernays Wiener, The Militia Clause of the Constitution, 54 Harv. L. Rev. 181 (1940) ...................................................... 18

Hirsch, The Militia Clauses of the Constitution and the National Guard, 56 U. Cin. L. Rev. 919 (1988) ................................. 14

**Press Releases, News Articles, and Other Authorities**

Bellow, *Golden Gate Bridge protest was organized by teens seeking change*, KRON4 (Jun. 7, 2020) ................................. 28

City of New Haven*, Statement by Mayor Elicker on Yale University Students Protests and Successful De-escalation by the New Haven Police Department* (Apr. 23, 2024) ........................ 27

*Demonstrations and Political Violence in America: New Data for Summer 2020*, ACLED (Sept. 3, 2020) ......................... 23

The Federalist No. 28 (A. Hamilton) ........................................ 17

The Federalist No. 39 (J. Madison) ...................................... 7, 9

The Federalist No. 45 (J. Madison) ........................................ 16

The Federalist No. 51 (J. Madison) ........................................ 17

Goitein, *What to Know About the Los Angeles Military Deployment*, Brennan Center for Justice (June 20, 2025) ........... 21, 23

Habeshian, *National Guard can temporarily detain LA protestors: DHS*, Axios (Jul. 11, 2025) ......................... 22, 23

Harrison-Caldwell, *Trump says he'll send troops to 'clean up' San Francisco*, The San Francisco Standard (Aug. 22, 2025) ................................................................. 2

*LAPD Chief Jim McDonnell Responds to Possible Deployment of Marines to Los Angeles*, LAPD News Release (June 9, 2025) ........................................... 31

Letter from Mayor Bowser to President Trump (June 4, 2020) ............................................................. 31

Letter from Sen. Alex Padilla (Jul. 31, 2025) ........................... 20

Marcus, *Trump mobilizing up to 1,700 National Guard troops in 19 states to widen crime and immigration crackdown*, The Independent (Aug. 25, 2025) ...................... 2

Mastrangelo, *Press groups warn federal agents may have violated journalists' First Amendment rights in LA*, The Hill (Jun. 10, 2025) .................................................... 19, 20

*Mayor Lucas Announces Significant KCPD Accountability Measures, Pardons Roderick Reed*, Kansas City, Missouri (June 4, 2020) .................................................................. 27

National Guard, *Federalizations of the Guard for Domestic Missions through 2025* (June 9, 2025) ................................ 15

*National guard start carrying firearms in DC as Trump says Chicago may be next*, Associated Press (Aug. 25, 2025)...................... 2

Office of the Governor of the State of California, *What military experts are saying: Veterans unite against militarization of California* (Jun. 11, 2025)......................... 32

Roth, *Activists marching against climate change cross Golden Gate Bridge*, Fox KTVU (Jun. 14, 2021) ................................ 28

Rogers, *Trump Takes Control of D.C. Police, Citing 'Bloodthirsty Criminals.' But Crime Is Down*, N.Y. Times (Aug. 11, 2025) ...................................................................... 2

*Sheriff's Office Sends Mutual Aid to Los Angeles*, Santa Barbara Cnty., California Sheriff's Office (Jun. 10, 2025)................. 31

*Troops and federal agents briefly descend on L.A.'s MacArthur Park in largely immigrant neighborhood*, Associated Press (Jul. 8, 2025) ............................................. 20

*Troops in Los Angeles can detain but not arrest individuals, military official says*, Reuters (June 11, 2025) .................................. 26

*Trump Hints He Could Send National Guard to Oakland*, KTVU (Aug. 12, 2025)............................................................. 2

## Federal Regulations and Policies

The White House, *Additional Measures to Address the Crime Emergency in the District of Columbia* (Aug. 25, 2025) ...................... 2

## Federal Legislative Materials

143 Cong. Rec. H6767 (daily ed. Sept. 4, 1997)...................................... 32

## STATEMENT OF INTEREST

*Amici curiae* are local governments and officials from across the Nation.[1] Their municipalities and counties differ in size, demographics, and policy priorities, but share a fundamental interest in keeping their constituents and communities safe, including during public protests. Through decades of experience, *amici* have developed policies and practices that balance those public safety needs with the constitutional rights of their residents. In doing so, *amici* maintain law and order while safeguarding our history and tradition of free speech and due process.

By deploying the California National Guard and the U.S. Marines to respond to protests in Los Angeles, appellants have usurped the constitutional role of California law enforcement, with no end in sight.[2] Worse still, this drastic and provocative executive action has quickly spiraled into further actual and threatened military deployments across the country. Appellants have now seized control of Washington, D.C.'s

---

[1] No party or party's counsel authored this brief in whole or in part. No party or party's counsel contributed money intended to fund preparation or submission of this brief. A list of all *amici* is provided at Appendix A.

[2] Appellants have extended the Los Angeles deployment until at least November 6, 2025. *Newsom v. Trump*, No. 3:25-cv-04870-CRB, Dkt. No. 176 at 15 (N.D. Cal. Sept. 2, 2025).

police force and deployed armed National Guard troops on its streets, purportedly because of local crime.[3]  Plans are underway to deploy the National Guard to police nineteen more States,[4] with a new Executive Order instructing the U.S. Department of Defense to prepare for deployments to the remainder of the States.[5]  And the President has made clear that military troops will then be deployed to more of the nation's cities—calling out San Francisco, Chicago, Oakland, and Baltimore—to "clean [them] up" because he considers them "very bad."[6]  This is horrifying, but unsurprising.  As *amici* previously warned, the President's memorandum to the Department of Defense authorizing

---

[3] Katie Rogers, *Trump Takes Control of D.C. Police, Citing 'Bloodthirsty Criminals.' But Crime Is Down.*, N.Y. Times (Aug. 11, 2025), available at:  tinyurl.com/yfhhay73;  Associated Press, *National guard start carrying firearms in DC as Trump says Chicago may be next* (Aug. 25, 2025), available at: tinyurl.com/b8snhmn6.

[4] Josh Marcus, *Trump mobilizing up to 1,700 National Guard troops in 19 states to widen crime and immigration crackdown*, The Independent (Aug. 25, 2025), available at: tinyurl.com/yc5favhw.

[5] The White House, *Additional Measures to Address the Crime Emergency in the District of Columbia* (Aug. 25, 2025) § 2(d)(2), available at: tinyurl.com/mrk5d7kh (authorizing further deployments to all States).

[6] Max Harrison-Caldwell, *Trump says he'll send troops to 'clean up' San Francisco*, The San Francisco Standard (Aug. 22, 2025), available at: tinyurl.com/5vj4hjdh; *Trump Hints He Could Send National Guard to Oakland*, KTVU (Aug. 12, 2025), available at: tinyurl.com/5b7zznxw.

military deployment to Los Angeles was unlimited in geographical scope. Dkt. No. 20.1 at 1–2.

*Amici* remain gravely concerned that any protest within their borders—or nothing more than the President's unchecked desire—will result in the unnecessary and harmful deployment of the military. *Amici* respectfully call upon the Judiciary to fulfill its constitutional obligation to stand between the American public and a federal police state.

To protect their compelling local governmental interests, the fundamental individual rights of the residents of their communities, and the broader public interest in peace and tranquility, *amici* respectfully submit this brief in support of appellees' answering brief. All parties have consented to the filing of this brief. *See* Fed. R. Civ. P. 29(a)(2).

## SUMMARY OF ARGUMENT

State and local sovereignty is fundamental to our federalist constitutional order. There is perhaps no more important manifestation of that state and local sovereignty than state and local governments' exclusive and plenary police power to ensure the safety of their communities through local law enforcement. By deploying military forces to police local protests and support immigration and other federal

law enforcement operations in Los Angeles, over the objection of state and local authorities, appellants are undermining this constitutional tenet and tearing at fundamental norms against military policing.

Military policing shatters our Nation's bedrock history and tradition of preserving state and local control over the police power. Federalizing and domestically deploying the National Guard is an absolute last resort, reserved for those exceedingly rare, if not largely unprecedented, cases of foreign invasion, violent rebellion, or calamitous natural disaster, in which state and local resources are completely overwhelmed. Indeed, the Framers of the U.S. Constitution were insistent that local matters are best addressed at the local level. Ever since, the Judiciary has repeatedly rebuffed attempts by the federal government—whether Congress or the Executive, or both—to exceed its enumerated powers and seize control of state and local police power.

*Amici* seek to emphasize to this Court that military policing dramatically increases the risk of irreparable injury to their constitutional sovereignty, the fundamental constitutional rights of their residents, and the public's general welfare. The forced presence of military troops on our streets inflames tensions, decreases the efficacy of

local law enforcement, interrupts chains of command, and creates risks of tragic miscalculations, accidents, and increased violence. Those risks are particularly acute where, as here, military troops are deployed on city streets without coordination with state and local law enforcement. State and local law enforcement who are familiar with their own communities are far better positioned than military forces to maintain law and order during a protest while safeguarding the fundamental rights of residents.

Accordingly, this Court should affirm the district court's order enjoining appellants from federalizing the National Guard and deploying them to Los Angeles in bad faith, without authorization or invitation from state or local authorities, and without a sufficient factual basis. That injunction reflects a sober and balanced understanding of federal law and our Nation's history and traditions, which enshrine the sovereign interest of state and local governments and the fundamental constitutional rights of their residents. ER-18-38 (Order Granting TRO).

In considering whether preliminary injunctive relief is proper, this Court should scrutinize the impact that the absence of an injunction would have on the public interest, most primarily non-parties like *amici*. *See League of Wilderness Defs./Blue Mountains Biodiversity Project v.*

*Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014) ("The public interest inquiry primarily addresses impact on non-parties rather than parties."). The public interest that *amici* and their residents share in preventing military policing of their communities weighs decisively in favor of the district court's injunction. The alternative is opening the gateway to the militarized policing of local communities that has never before existed in this country.

## ARGUMENT

### I. Unlawfully deploying military forces irreparably harms federalism, individual rights, and the public welfare.

#### A. State and local governments possess sovereign police power that the federal government cannot infringe.

The U.S. Constitution establishes a system of "dual sovereignty" between the States and the federal government. *Murphy v. Nat'l Collegiate Athletic Assn.*, 584 U.S. 453, 470 (2018); *Printz v. United States*, 521 U.S. 898, 918–19 (1997); *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991). This federalist structure is expressly enshrined in the Tenth Amendment: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. It is also built into the Guarantee Clause, which "guarantee[s] to every State in this Union

6

a Republican Form of Government[.]" U.S. Const. art. IV, § 4. In doing so, the U.S. Constitution "presupposes the continued existence of the states and . . . those means and instrumentalities which are the creation of their sovereign and reserved rights. . . ." *Printz*, 521 U.S. at 919 (quoting *Helvering v. Gerhardt*, 304 U.S. 405, 414–415 (1938)).

As a result, "under our federal system, the States possess sovereignty concurrent with that of the Federal Government, subject only to limitations imposed by the Supremacy Clause." *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990). It is fundamental to the republic that the States possess this "residuary and inviolable sovereignty" over all other subjects beyond the "certain enumerated objects" of the federal government. *Murphy*, 584 U.S. at 471 (quoting The Federalist No. 39, at 245 (J. Madison)). There "can there be no loss of separate and independent autonomy to the States" because that sovereignty is "as much within the design and care of the Constitution as the preservation of the Union and the maintenance of the National government." *Texas v. White*, 7 Wall. 700, 725 (1869) (quoting *Lane Cnty. v. Oregon*, 7 Wall. 71, 76 (1869)). Thus, "Our Federalism," "born in the early struggling days of our Union

of States, occupies a highly important place in our Nation's history and its future." *Younger v. Harris*, 401 U.S. 37, 44 (1971).

There is "no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime . . . ." *United States v. Morrison*, 529 U.S. 598, 618 (2000); *accord United States v. Lopez*, 514 U.S. 549, 566 (1995) ("The Constitution . . . withhold[s] from Congress a plenary police power[.]"); *see also id.* at 584–585 (Thomas, J., concurring) ("[W]e *always* have rejected readings of . . . the scope of federal power that would permit Congress to exercise a police power.") (emphasis in original).

This core constitutional principle has permeated and animated precedent since the Nation's founding. *Patterson v. Kentucky*, 97 U.S. 501, 504 (1878). "The regulation and punishment of intrastate violence . . . has *always* been the province of the States." *Morrison*, 529 U.S. at 618. And beyond the States' interest in safeguarding their residents' rights and liberties, the States have no more important interest than maintaining local law and order. *Printz*, 521 U.S. at 928.

The States' police power manifests in significant part through county and municipal governments, which are the primary providers of

quotidian law enforcement and public safety. *E.g.,* Cal. Const., art. XI, §§ 5, 7; Ill. Const., art. VII, § 6; N.M. Const., art. 10, § 6. "As Madison expressed it: '[T]he local or municipal authorities form distinct and independent portions of the supremacy, no more subject, within their respective spheres, to the general authority than the general authority is subject to them, within its own sphere." *Printz*, 521 U.S. at 920–91 (quoting The Federalist No. 39, at 245). Local governments thus share the core constitutional interest in the police power with the States under the Tenth Amendment. "This is not a new principle: localities' right to sovereignty and self-determination forms the bedrock of our republic. It is essential to federalism." *City & Cnty. of San Francisco v. Trump*, 2025 WL 1282637, at *22 (N.D. Cal. May 3, 2025) (citing *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1234–36 (9th Cir. 2018)).

Throughout American history, the Judiciary has carefully guarded this balance of power between the federal and state governments. "[T]he National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States." *Younger*, 401 U.S. at 44. Whenever the federal government has failed in

9

that endeavor and has exceeded its power by co-opting or commandeering the police power, the U.S. Supreme Court has enjoined that federal action. *E.g., Murphy*, 584 U.S. at 471 (preventing the federal government from commandeering state officials under the Commerce Clause and Necessary and Proper Clause); *Morrison*, 529 U.S. at 617–18 (preventing the federal government from exceeding its police powers under the Commerce Clause); *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 578 (2012) (same for the Spending Clause); *Printz*, 521 U.S. at 928 (same for Necessary and Proper Clause).

These judicial guardrails exist even when the Executive Branch acts pursuant to congressional authorization. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 650 (1952) (Jackson, J., concurring). "To hold that the political branches have the power to switch the Constitution on or off at will . . . would permit a striking anomaly in our tripartite system of government, leading to a regime in which Congress and the President, not this Court, say 'what the law is.'" *Boumediene v. Bush*, 553 U.S. 723, 765 (2008) (quoting *Marbury v. Madison*, 1 Cranch 137, 177 (1803)); *accord United States v. Nixon*, 418 U.S. 683, 703–05 (1974).

The fundamental constitutional principle at work here is that the exercise of federal power may not "obliterate the distinction between what is national and what is local and create a completely centralized government." *Lopez*, 514 U.S. at 556–57. And it is axiomatic that, within the framework of this federalist division of government, "[t]he regulation and punishment of intrastate violence . . . has always been the province of the States." *Morrison*, 529 U.S. at 618. No exigency alters federalism's balance. After all, "[t]he Constitution was adopted in a period of grave emergency," and the balance it strikes between State and federal power is "not altered by emergency." *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 425–26 (1934).

**B. The unlawful federalization and deployment of the National Guard to manage local public protests and unrest irreparably harms state and local sovereignty.**

A bedrock embodiment of state and local sovereignty over the police power is the steadfast refusal to use military power for domestic policing. "That tradition has deep roots in our history" and "reflect[s] a traditional and strong resistance of Americans to any military intrusion into civilian affairs." *Laird v. Tatum*, 408 U.S. 1, 15–16 (1972). Appellants' federalization and deployment of the California National Guard in

response to a local protest shatters this tradition. In doing so, appellants irreparably harm the sovereignty of the State of California and City and County of Los Angeles, and threaten to metastasize that harm to other localities nationwide. A president who can simply proclaim that "[w]e have . . . cities that are very bad"[7] and, on that basis, deploy federal troops to American cities subverts the Constitution and the federal structure. It is now clear that Los Angeles was a test case and is only the beginning.

The U.S. Constitution vests authority in Congress to federalize the State Militias under three enumerated and exceptional conditions: "to execute the Laws of the Union, suppress Insurrections and repel Invasions." U.S. Const., art. I, § 8, cl. 15. Control of Militias is otherwise expressly reserved to the States. *Id.* § 8, cl. 16. This "compromise in the text of the Constitution" balanced "a widespread fear that a national standing Army posed an intolerable threat to individual liberty and to the sovereignty of the Separate States" with "the danger of relying on inadequately trained soldiers as the primary means of providing for the common defense." *Perpich v. Dep't of Def.*, 496 U.S. 334, 340 (1990).

---

[7] KTVU, *supra* note 6; The San Francisco Standard, *supra* note 6.

Section 12406 of the Militia Act of 1903 (the "Dick Act of 1903"), which created the modern National Guard, authorizes the President to federalize the National Guard in the same three enumerated and exceptional circumstances laid out in the Militia Clauses. *See Perpich*, 496 U.S. at 342 ("It is undisputed that Congress was acting pursuant to the Militia Clauses of the Constitution in passing the Dick Act."). The Judiciary has always understood—even under earlier, broader, and now-defunct predecessor statutes to the Dick Act of 1903—that "[t]he power thus confided by Congress to the President" is of "no ordinary magnitude" and thus, "in its terms, a limited power[.]" *Martin v. Mott*, 25 U.S. 19, 29 (1827) (discussing the Calling Forth Act of 1795, 1 Stat. 424, 424 (1795)).

Appellants' federalization of the California National Guard—and assertion that their action is unreviewable by the federal courts—seeks to crush the constitutional compromise built into the Militia Clauses. Appellants appear to contend that so long as they can identify behavior during a protest that arguably impedes the work of some federal officer, the President is authorized to federalize and deploy the National Guard. But Congress does not "hide elephants in mouseholes" when granting authority to the President. *Whitman v. Am. Trucking Ass'ns*, 531 U.S.

13

457, 468 (2001). A "statute . . . must be read consistent with principles of federalism inherent in our constitutional structure." *Bond v. United States*, 572 U.S. 844, 856 (2014). It is thus "incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides'" the "usual constitutional balance of federal and state powers." *Gregory*, 501 U.S. at 460. In doing so, the Supreme Court "insist[s] on a clear indication that Congress meant to reach purely local crimes, before interpreting [a] statute's expansive language in a way that intrudes on the police power of the States." *Bond*, 572 U.S. at 861.

The constitutional compromise between the federal government and the States contained in the Militia Clauses would be rendered utterly "meaningless if the federal government could declare, whenever it wanted, that the conditions of clause fifteen were met, and the states could not question that determination." Alan Hirsch, The Militia Clauses of the Constitution and the National Guard, 56 U. Cin. L. Rev. 919, 955 (1988). "The test for determining the scope of this [federal and presidential power] must not be subject to manipulation by those whose power it is designed to restrain." *See Boumediene*, 553 U.S. at 797–98. Thus, this Court—not the Executive Branch—decides whether the

14

alleged factual predicates underlying a presidential proclamation are sufficient to invoke the asserted exercise of presidential power. *See, e.g.*, *Doe #1 v. Trump*, 957 F.3d 1050, 1066–67 (9th Cir. 2020).

Here, appellants had no colorable basis for invoking Section 12406 to federalize the National Guard, either to manage local public protest or as pretext for participating in federal law enforcement operations in California. For the reasons set forth in appellees' answering brief, this Court should reject appellants' novel and dangerous interpretation and application of Section 12406. In doing so, this Court would protect the sovereignty of state and local governments under the constitutional compromise struck in the Militia Clauses at the founding. Indeed, despite the country's long and important history of public protests, a President has never before federalized and domestically deployed the National Guard in response to public protests under the Militia Act of 1903.[8] A President has also never taken such disproportionate action

---

[8] National Guard, *Federalizations of the Guard for Domestic Missions through 2025*, available at: tinyurl.com/w5wv8pv9 (listing the thirteen occasions when the National Guard has been domestically deployed). On one occasion, the National Guard was deployed to deliver mail during a federal postal strike, but that did not concern local policing and arguably there was a complete inability to execute federal law in that instance.

over a state's objection, except to enforce a court order from the Supreme Court to protect the fundamental rights of citizens in those localities. *Id.*

*Amici* urge this Court to consider the distinct and irreparable injury that local governments suffer when the President and Department of Defense unlawfully deploy military forces to quell local protests. The Framers sought to ensure that "powers which 'in the ordinary course of affairs, concern the lives, liberties, and properties of the people' were held by governments more local and more accountable than a distant federal bureaucracy." *See Sebelius*, 567 U.S. at 536 (quoting The Federalist No. 45, at 293 (J. Madison)). The unlawful federalization and deployment of the National Guard to manage local protests usurps State and local government's constitutional interest to provide for the general welfare of their residents in the exercise of their exclusive police power. *See City & Cnty. of San Francisco*, 2025 WL 1282637, at *22 (citing *City & Cnty. of San Francisco*, 897 F.3d at 1234–36). In doing so, appellants are undermining "localities' right to sovereignty and self-determination [that] forms the bedrock of our republic." *Id.* And this federal intrusion "diminish[es] the accountability" of federal officials by "put[ting] [state and local governments] in the position of taking the blame for its

burdensomeness and for its defects." *Printz*, 521 U.S. at 929–30. This infringement on State and local sovereignty weighs strongly against the public interest.

### C. The unlawful deployment of the National Guard also threatens irreparable harm to individual rights.

"State sovereignty," however, "is not just an end in itself[.]" *New York v. United States*, 505 U.S. 144, 181 (1992). "The Constitution divides authority between federal and state governments for the protection of individuals." *Id.* (citing *Coleman v. Thompson*, 501 U.S. 722, 759, (1991) (Blackmun, J., dissenting)). Both sets of sovereigns— the federal government and the several States—protect the People from encroachments by the other. *Printz*, 521 U.S. at 928 (citing The Federalist No. 51, at 323 (J. Madison)). Just like the separation of powers among the federal branches of government "prevent[s] the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Gregory*, 501 U.S. at 458; *see also* The Federalist No. 28, at 180–81 (A. Hamilton). "Hence a double security arises to the rights of the people." The Federalist No. 51, at 323.

17

By unlawfully deploying the National Guard against protestors in Los Angeles, appellants are undermining not only the federalist balance of power, but they also threaten to violate the fundamental rights of individuals within those communities.  By deploying military troops on city streets to police protests, appellants chill First Amendment rights to free speech, free association, assembly, and to petition the government. It also causes constitutional violations that flow from the use of military personnel who are untrained to deescalate conflict and police civilians, including the Fourth Amendment's right to be free from unreasonable searches and seizures.  "[T]he deprivation of [these] constitutional rights unquestionably constitutes irreparable injury." *Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017).  This is precisely why some Framers expressed concerns that the federal power to call forth State Militias "to execute the Laws of the Union" would be "subversive of civil liberties" should it be unlawfully abused.  Frederick Bernays Wiener, The Militia Clause of the Constitution, 54 Harv. L. Rev. 181, 185 (1940).

Demonstrations, protests, and political speech on matters of public concern—like those that occurred in response to the U.S. Immigration and Customs Enforcement actions in Los Angeles—are "the essence of

self-government" and "occup[y] the highest rung of the hierarchy of First Amendment values[.]" *Snyder v. Phelps*, 562 U.S. 443, 452 (2011). This reflects a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open[.]" *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). The Framers "eschewed silence coerced by law—the argument of force in its worst form." *Whitney v. California*, 274 U.S. 357, 375 (1927) (Brandeis, J., concurring).

The U.S. Supreme Court has long recognized that "constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights." *Laird*, 408 U.S. at 11 (collecting cases); *Libertarian Party of L.A. Cnty. v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013) ("[A]s the Supreme Court has recognized, a chilling of the exercise of First Amendment rights is, itself, a constitutionally sufficient injury."). Thus, First Amendment violations can flow from mere military surveillance that unlawfully targets individuals, *see id.* at 15–16, activities which are far less intrusive than the unlawful deployment of armed military troops on city streets that preclude the exercise of the

right to public protest, *see Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 826 (9th Cir. 2020).

This chilling of First Amendment expression is already occurring in Los Angeles. During initial protests, federal officers "indiscriminately used force or deployed munitions such as tear gas and pepper balls that caused significant injuries to journalists."[9] Federal law enforcement flew military-grade predator drones over Los Angeles to surveil protestors, perhaps using facial-recognition technology, which U.S. Senator Alex Padilla noted would "chill free speech rights."[10] Appellants then ordered the federalized and armed National Guard troops and Marines to encircle a public park with dozens of Humvees and other military vehicles while ICE agents conducted a performative sweep of the park interior on horseback—the sole purpose of which was "designed to sow fear."[11] As one resident who witnessed the scene described, "It's terror and, you

---

[9] *Press groups warn federal agents may have violated journalists' First Amendment rights in LA*, The Hill, Jun. 10, 2025, available at: tinyurl.com/4cxk6dah.

[10] Ltr. from Sen. Padilla, Jul. 31, 2025, available at: tinyurl.com/5aptfkve.

[11] *Troops and federal agents briefly descend on L.A's MacArthur Park in largely immigrant neighborhood*, Associated Press, Jul. 8, 2025, available at: tinyurl.com/yc7xe3av.

know, it's ripping the heart and soul out of Los Angeles . . . I am still in shock, disbelief, and so angry and terrified and heartbroken."[12] The President has now implemented these tactics in Washington, D.C. and threatened that these tactics will be used in *amici's* jurisdictions soon.[13] That is why the Brennan Center for Justice has described the unlimited geographical scope of the President's June 7 memorandum as a "grave threat to the First Amendment right to engage in peaceful protest."[14]

Appellants have pointed to unlawful protest activity as a reason to override constitutional and federalist principles and to turn federal and military officers into a local police force. But even when "some demonstrators [] allegedly violated the law, transforming the peaceful demonstration into a potentially disruptive one, the Supreme Court has expressly held that 'the right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected.'" *Jones v. Parmley*, 465 F.3d 46, 57 (2d Cir. 2006) (cleaned up) (quoting

---

[12] *Id.*

[13] The San Francisco Standard, *supra* note 6; KTVU, *supra* note 6.

[14] Goitein, Brennan Center for Justice, *What to Know About the Los Angeles Military Deployment*, available at: tinyurl.com/yy5ffu7m.

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 908 (1982)). This remains true even when violence breaks out. *See Black Lives Matter Seattle-King Cnty. v. City of Seattle*, 466 F. Supp. 3d 1206, 1213 (W.D. Wash. 2020) (citing *Collins v. Jordan*, 110 F.3d 1363, 1372 (9th Cir. 1996)). Such conduct remains a quintessential concern for local law enforcement, who are specifically trained and equipped to address it and have a long history of doing so in their own communities.

The domestic deployment of military troops also threatens citizens' Fourth and Fifth Amendment rights. "[M]ilitary enforcement of the civil law leaves the protection of vital Fourth and Fifth Amendment rights in the hands of persons who are not trained to uphold these rights." *Bissonette v. Haig*, 776 F.2d 1384, 1387 (8th Cir. 1985), *on reh'g*, 800 F.2d 812 (8th Cir. 1986), *aff'd*, 485 U.S. 264 (1988). There is no place for such federal military policing under the Constitution. For that reason, searches and seizures of civilians by military troops who are acting without lawful authority inherently violate the Fourth Amendment. *Id.* at 1389. This reflects "the embodiment of a long tradition of suspicion and hostility towards the use of military force for domestic purposes." *Id.*

And when civilians are detained by military troops and not accorded due process, this violates their Fifth Amendment rights, too. *Id.* at 1391–92.

Notwithstanding that proscription on military searches and seizures, the Department of Homeland Security has claimed that the National Guard is authorized to detain protestors in Los Angeles.[15] Indeed, a senior federal military official overseeing the National Guard acknowledged having done so, before trying to retract that admission.[16]

These actual and incipient violations of fundamental constitutional rights of individuals also weigh heavily against the public interest.

## II. The public interest is best served by allowing experienced and trained local law enforcement to manage protests.

### A. Local law enforcement is far better equipped than federalized military forces to ensure public safety while simultaneously safeguarding individual rights.

The lawful alternative to appellants' federalization and deployment of the National Guard is to let local law enforcement manage protests, using the expertise they use every day and have used throughout the Nation's history. There is no question they are best equipped to do so.

---

[15] Habeshian, S., *National Guard can temporarily detain LA protestors: DHS*, Axios (Jul. 11, 2025), available at: tinyurl.com/nhy2n8fn.

[16] *Id.*

The vast majority of protests and demonstrations across the United States are peaceful.[17] In most circumstances, local police officers and sheriff's deputies are necessary only to control traffic and support paramedics if someone suffers a health event. But if public demonstrations do threaten public safety, local law enforcement are better trained and equipped than military forces to handle such incidents. Unlike the military, which secures combat and natural disaster zones, local law enforcement agencies have extensive experience managing protests and demonstrations and deep knowledge of their communities. To that effect, *amici* have well-established procedures and training that balance both concerns for public safety and individual rights, managing crowds to protect persons and property while safeguarding their residents' fundamental constitutional rights. *See Grider v. Abramson*, 180 F.3d 739, 751-53 (6th Cir. 1999) (local governments have "significant public interests in fostering the privileges of free expression and assembly of all participants" and in "the

---

[17] *See, e.g., Demonstrations and Political Violence in America: New Data for Summer 2020*, ACLED (Sept. 3, 2020), available at: tinyurl.com/ymzvjdxd (finding that 93% of national demonstrations connected to the BLM movement—in 2,400 locations—were peaceful).

preservation of community peace" at a public demonstration).

For example, the San Francisco Police Department ("SFPD") has instituted policies and procedures to address First Amendment activity, crowd control, and use of force that account for the constitutional rights of protesters.[18] The policies direct that law enforcement "balance the group's First Amendment rights of free speech and assembly while preventing and reasonably enforcing observed violations of the law." *Id.* at 2. San Francisco's local government has directed its police officers to not attempt to limit the size or location of "any demonstration, march, protest, or picket" unless there are articulable facts or circumstances causing reasonable concern for public safety, public health, or the safe movement of persons." *Id.* In such an unlikely event, SFPD policies further detail procedures for safely dispersing a dangerous crowd while minimizing the likelihood and magnitude of force used. SFPD General Order 8.03 at 1–2. Similarly detailed protections for protestors are enforced in the police policies of *amici* cities and counties Oakland,[19]

---

[18] SFPD General Order 8.03, available at: tinyurl.com/39cta65c; SFPD General Order 5.01, available at: tinyurl.com/ncwkusdn; SFPD General Order 8.10 (Oct. 1, 2008), available at: tinyurl.com/3e433v4x.

[19] *OPD Crowd Control and Crowd Management Policy*, Oakland Police

Alameda,[20] Minneapolis,[21] Albuquerque,[22] Pittsburgh,[23] Madison,[24] New Haven,[25] and Dane.[26]  The National Guard have no such training.[27]

Local law enforcement also know their communities best.  They understand neighborhoods' nuances, are familiar with local infrastructure, and have established relationships with community organizations and leaders.  Law enforcement agencies like SFPD devote

---

Dep't, available at: tinyurl.com/rwfwjr54.

[20] *First Amendment Assemblies*, Alameda Police Dep't Policy Manual § 467, available at: tinyurl.com/bdd527x4.

[21] *Crowd Management*, Minneapolis Police Dep't Policy and Procedure Manual § 7–805, available at: tinyurl.com/5n7j6ysy.

[22] Response to First Amendment Assemblies and Demonstrations and Unplanned Incidents, Albuquerque Police Dep't, available at: tinyurl.com/3p8cff7n.

[23] *Use of Tear Gas, Rubber Bullets, "Flash-bang" Devices and Other Less Lethal Methods of Crowd Control*, Pittsburgh Bureau of Police's Response to Mayor's Community Task Force Recommendations, available at: tinyurl.com/4tcwjpyc.

[24] *Demonstrations and Assemblies*, City of Madison Police Dep't, available at: tinyurl.com/2ckczn6a.

[25] *Crowd Control and Management (General Order 6.11)*, City of New Haven, available at: tinyurl.com/56bsj6zn.

[26] *Response to Resistance (Section 200.520),* Dane County Sheriff's Office Policy and Procedure Manual, available at: tinyurl.com/4a6nxmk7.

[27] The National Guard deployed in Los Angeles are not trained to conduct law enforcement operations like arrests or search and seizure. *See Troops in Los Angeles can detain but not arrest individuals, military official says*, REUTERS (June 11, 2025), perma.cc/FG93-WXAN.

significant time to community engagement with the aim of building the public's trust.[28] As a result, local law enforcement understand which tactics might escalate a situation in a particular community and what might be more useful in calming that same community. These tactics are not window-dressing; they succeed in deescalating serious conflicts.[29] Military troops with no local orientation lack these critical insights. Indeed, their deployment itself inflames protesters. *See* ER-8-9 (Order Granting TRO).

At an operational level, local law enforcement also have a deep understanding—developed over decades of experience—of where protest activity is likely to endanger public safety. For example, in San Francisco, the Golden Gate Bridge and the Bay Bridge are often targets

---

[28] *Community Engagement Division (CED)*, SFPD, available at: tinyurl.com/3udxvkfd; *see also Community Police Review Agency,* City of Oakland, available at: tinyurl.com/yvppt243; *Mayor Lucas Announces Significant KCPD Accountability Measures, Pardons Roderick Reed* (June 4, 2020), Kansas City, available at: tinyurl.com/mr44dku5.

[29] *Pittsburgh Bureau of Police Roadway Safety Guidelines* (July 26, 2018), available at: https://tinyurl.com/mr3xb4du; *see also City of New Haven, Statement by Mayor Elicker on Yale University Students Protests and Successful De-escalation by the New Haven Police Department* (Apr. 23, 2024), available at: tinyurl.com/6cen9s3n (describing New Haven police "successfully working with student organizers to de-escalate the situation and ensuring a peaceful and orderly reopening of . . . streets").

for protest activity.[30] Bridge protests can pose unique dangers unless properly managed. Given its experience, SFPD is able to respond to these protests and coordinate with well-known state partners like the Golden Gate Bridge Highway & Transportation District and the California Highway Patrol. The military lacks this local knowledge.

Local law enforcement also utilize specialized equipment, including body-worn cameras, to document their interactions with the public. This technology fosters trust between the public and the police that enables better policing outcomes in the present and in the future.[31] Similarly, under California law, whenever local law enforcement agencies deploy military-style equipment (*e.g.,* using drones for aerial surveillance to assist with crowd control), they must report on those uses to their local governing body and the public. Cal. Gov't Code § 7072. This requirement is grounded in the Legislature's finding that military-style intervention

---

[30] *E.g.,* Noelle Bellow, *Golden Gate Bridge protest was organized by teens seeking change*, KRON4 (Jun. 7, 2020), available at: tinyurl.com/39bvptrs; Rob Roth, *Activists marching against climate change cross Golden Gate Bridge*, Fox KTVU (Jun. 14, 2021), available at: tinyurl.com/yda77bk6.

[31] *Body Worn Cameras*, SFPD General Order 10.11, (Oct. 7, 2020), available at: tinyurl.com/43xx8r4d.

in local communities "impacts the public's safety and welfare," and therefore "[t]he public has a right to know about" and weigh in on any "use of military equipment by state or local government officials." By contrast, the practices of federalized military troops lack transparency and are not accountable to the local community, including in their use of force against protestors or other individuals.

Taken together, these policies and procedures demonstrate that local law enforcement are better positioned to manage local protests—even those that result in unrest—protecting people, property, and rights.

**B.  Deploying military forces without coordinating with local law enforcement decreases policing efficiency and increases the risk of violence and accidents.**

Finally, appellants' unlawful federalization and deployment of the National Guard to Los Angeles without consent or coordination with the State of California or local authorities has undermined well-established state and local coordination systems that protect *amici*'s communities.

Local governments like *amici* have established policies and procedures for coordinating responses to significant emergencies and civil unrest when local resources prove to be insufficient. They allow local governments to request additional state and local resources in a practiced

manner that will avoid interagency conflicts, deescalate tensions and prevent widespread disorder.

For example, in San Francisco, in the event of an emergency requiring additional state and/or local resources, the City activates its Emergency Operations Center to coordinate planning, information-sharing, and responses between all city departments and partner agencies. These channels of coordination extend further between local jurisdictions and states. For instance, the State of California has had a law enforcement "mutual aid system" in place since 1961. Under this mutual aid system, if a locality lacks the resources to respond to an emergency, it can call on neighboring law enforcement agencies for assistance. Depending on the severity of the emergency, regional resources and even statewide resources can be brought to bear in a coordinated manner to address the problem.[32] Indeed, that happened here.[33] Centralized information-sharing and coordination of responses

---

[32] *Mutual Aid*, State of California Governor's Off. of Emergency Servs., available at: tinyurl.com/359x65ec.

[33] *Sheriff's Office Sends Mutual Aid to Los Angeles*, Santa Barbara Cnty. Sheriff's Office (Jun. 10, 2025), available at: tinyurl.com/yjhsa2a8.

within these groups avoids putting the public or other first responders at risk due to erroneous information and potential conflicting responses.

Deploying military troops outside of these established processes heightens the likelihood of coordination failures and introduces more complexity and risk for local law enforcement and the public.[34] Most critically, confusion in the chain of command and training can incite violence, panic, and injury. For instance, in 2020 when President Trump deployed federal law enforcement to Washington D.C.'s Lafayette Park in response to protests following the death of George Floyd, the Mayor of Washington D.C. noted the "dangerous confusion" caused by the deployment of unidentified federal officials who "operat[e] outside of established chains of command" and use military-style tactics, including the use of "helicopters . . . to frighten and disperse peaceful protestors."[35]

Further, in the fog of an uncoordinated military deployment, the risk of "friendly-fire" accidents that could harm members of the public, local law enforcement, and/or federal forces is dramatically increased.[36]

---

[34] LAPD News Release (June 9, 2025), available at: https://t.ly/_U7vP.

[35] Letter from Mayor Bowser to President Trump (June 4, 2020), available at: tinyurl.com/mr96589n.

[36] Office of the Governor of the State of California, *What military experts*

Such harm is far from speculative. In reviewing the tragic case of an 18-year-old civilian who was killed by a U.S. Marine deployed at the border, Congress heard firsthand how domestic military deployments can have "deadly consequences" for civilians.[37] There is no reason to tolerate such risks when local law enforcement stand ready to do what they are trained to do, what they have done throughout our Nation's history, and what the constitution empowers them to do, free from federal interference.

## CONCLUSION

This Court should affirm the district court's order in full.

Dated: September 9, 2025      Respectfully submitted,

DAVID CHIU
City Attorney
YVONNE R. MERÉ
Chief Deputy City Attorney
MOLLIE M. LEE
Chief of Strategic Advocacy
SARA J. EISENBERG
Chief of Complex and Affirmative
Litigation
NANCY E. HARRIS
KARUN A. TILAK

---

*are saying: Veterans unite against militarization of California* (Jun. 11, 2025), available at: tinyurl.com/5n7586yv.

[37] 143 Cong. Rec. H6767 (daily ed. Sept. 4, 1997) (motion to instruct conferees on H.R. 1119), available at: tinyurl.com/bdzfjw2t.

Deputy City Attorneys

By: */s/Yvonne R. Meré*
YVONNE R. MERÉ
Chief Deputy City Attorney

*Attorneys for Amicus Curiae*
*City and County of San Francisco*

Dated: September 9, 2025     PUBLIC RIGHTS PROJECT

*/s/Jonathan Miller*
JENNY MA
JONATHAN MILLER
490 43rd Street, #115
Oakland, CA 94609
Telephone: (510) 738-6788

*Attorneys for Amici Curiae*
*Listed in Appendix A*

Dated: September 9, 2025     KEKER, VAN NEST & PETERS LLP

*/s/Anjali Srinivasan*
CODY S. HARRIS
ANJALI SRINIVASAN
SOPHIE HOOD
IAN KANIG
CARA R. MEYER

*Attorneys for Amici Curiae County of*
*Santa Clara, City of Alameda,* and
*City of Albuquerque*

## ADDITIONAL COUNSEL

Dated:  September 9, 2025

*/s/Yibin Shen*
YIBIN SHEN
City Attorney
2263 Santa Clara Avenue, Room 280
Alameda, CA 94501
*Attorney for the City of Alameda, California*

Dated:  September 9, 2025

*/s/Lauren Keefe*
LAUREN KEEFE
City Attorney of Albuquerque
One Civic Plaza, 4th Floor
Albuquerque, NM 87102
*Attorney for the City of Albuquerque, New Mexico*

Dated:  September 9, 2025

*/s/Cheran Ivery*
CHERAN IVERY
City Attorney
301 King Street, Suite 1300
Alexandria, VA 22314
*Attorney for the City of Alexandria, Virginia*

Dated:  September 9, 2025

*/s/Rosalyn Guy-McCorkle*
ROSALYN GUY-MCCORKLE
Allegheny County Solicitor
445 Fort Pitt Boulevard, Suite 300
Pittsburgh, PA 15219
*Attorney for County of Allegheny, Pennsylvania*

Dated: September 9, 2025   */s/ Robert Fabela*
           ROBERT FABELA
           City Attorney
           200 South Anaheim Boulevard, Suite 356
           Anaheim, CA 92805
           *Attorney for City of Anaheim*

Dated: September 9, 2025   */s/ Atleen Kaur*
           ATLEEN KAUR
           City Attorney
           Guy C. Larcom City Hall
           301 East Huron, 3rd Floor
           Ann Arbor, MI 48104
           *Attorney for the City of Ann Arbor, Michigan*

Dated: September 9, 2025   */s/ Farimah Faiz Brown*
           FARIMAH FAIZ BROWN
           City Attorney
           2180 Milvia Street, 4th Floor
           Berkeley, CA 94704
           *Attorney for the City of Berkeley, California*

Dated: September 9, 2025   */s/ Jessica C. Brown*
           JESSICA C. BROWN
           City Attorney
           Office of City Attorney & Corporation Counsel
           149 Church Street
           Burlington, VT 05401
           *Attorney for the City of Burlington, Vermont*

Dated: September 9, 2025        */s/ Megan Bayer*
MEGAN BAYER
City Solicitor
795 Massachusetts Avenue
Cambridge, MA 02139
*Attorney for the City of Cambridge, Massachusetts*

Dated: September 9, 2025        */s/ Carlos Pabellon*
CARLOS PABELLON
Corporation Counsel
DAVID R. GAULT
Deputy Corporation Counsel
Room 419, City-County Building
210 Martin Luther King, Jr.,
Boulevard
Madison, WI 53703
*Attorneys for County of Dane, Wisconsin*

Dated: September 9, 2025        */s/ Miko Brown*
MIKO BROWN
City Attorney
1437 Bannock Street, Room 353
Denver, CO 80202
*Attorney for the City and County of Denver, Colorado*

Dated: September 9, 2025        */s/ Leesa Manion*
LEESA MANION
Prosecuting Attorney
Chinook Building
401 5th Avenue, Suite 800
Seattle, WA 98104
*Prosecuting Attorney for Martin Luther King, Jr. County*

Dated: September 9, 2025      */s/Michael Haas*
MICHAEL HAAS
City Attorney
210 Martin Luther King Jr. Blvd.,
Room 401
Madison, WI 53703
*Attorney for the City of Madison,*
*Wisconsin*

Dated: September 9, 2025      */s/Kristyn Anderson*
KRISTYN ANDERSON
City Attorney
350 South Fifth Street
Minneapolis, MN 55415
*Attorney for the City of Minneapolis,*
*Minnesota*

Dated: September 9, 2025      */s/John P. Markovs*
JOHN P. MARKOVS
Montgomery County Attorney
101 Monroe Street, 3rd Floor
Rockville, MD 20850
*Attorney for Montgomery County,*
*Maryland*

Dated: September 9, 2025      */s/Patricia King*
PATRICIA KING
Corporation Counsel
165 Church Street
New Haven, CT 06510
*Attorney for the City of New Haven,*
*Connecticut*

Dated: September 9, 2025      */s/Laura Conover*
LAURA CONOVER
County Attorney
Pima County Attorney's Office
32 North Stone Avenue
Tucson, AZ 85745
*Attorney for Pima County, Arizona*

Dated: September 9, 2025      */s/Krysia Kubiak*
KRYSIA KUBIAK
City Solicitor and Chief Legal Officer
414 Grant Street
Pittsburgh, PA 15219
*Attorney for the City of Pittsburgh, Pennsylvania*

Dated: September 9, 2025      */s/Robert Taylor*
ROBERT TAYLOR
City Attorney
1221 SW Fourth Avenue, Room 430
Portland, OR 97204
*Attorney for the City of Portland, Oregon*

Dated: September 9, 2025      */s/Patrick Beath*
PATRICK BEATH
Corporation Counsel
30 Church Street, Room 400A
Rochester, New York 14614
*Attorney for the City of Rochester, New York*

Dated: September 9, 2025

/s/ Susana Alcala Wood
SUSANA ALCALA WOOD
City Attorney
915 I Street, Fourth Floor
Sacramento, CA 95814
*Attorney for City of Sacramento, California*

Dated: September 9, 2025

/s/Lyndsey M. Olson
LYNDSEY M. OLSON
City Attorney
400 City Hall & Court House
15 West Kellogg Boulevard
St. Paul, MN 55102
*Attorney for the City of St. Paul, Minnesota*

Dated: September 9, 2025

/s/Heather Ferbert
HEATHER FERBERT
San Diego City Attorney
1200 Third Avenue, Suite 1100
San Diego, CA 92101
*Attorney for the City of San Diego, California*

Dated: September 9, 2025

/s/Nora Frimann
NORA FRIMANN
City Attorney
200 East Santa Clara Street, 16th Floor
San José, CA 95113
*Attorney for the City of San José, California*

Dated:  September 9, 2025            /s/ Tony Lopresti
                                     TONY LOPRESTI
                                     County Counsel
                                     70 West Hedding Street East Wing,
                                     9th Floor
                                     San José, CA 95110
                                     *Attorney for County of Santa Clara,
                                     California*

## APPENDIX A – List of *Amici Curiae*

## Local Governments

City of Alameda, California

City of Albuquerque, New Mexico

City of Alexandria, Virginia

Allegheny County, Pennsylvania

City of Anaheim, California

City of Ann Arbor, Michigan

City of Berkeley, California

City of Burlington, Vermont

City of Cambridge, Massachusetts

Dane County, Wisconsin

City and County of Denver, Colorado

City of Evanston, Illinois

City of Madison, Wisconsin

Martin Luther King, Jr. County, Washington

City of Minneapolis, Minnesota

Montgomery County, Maryland

City of Newark, New Jersey

City of New Haven, Connecticut

Pima County, Arizona

City of Pittsburgh, Pennsylvania

City of Portland, Oregon

City of Rochester, New York

City of Sacramento, California

City of St. Paul, Minnesota

City of San Diego, California

City and County of San Francisco, California

City of San José, California

County of Santa Clara, California

**Local Government Leaders**

Luis Alejo
*Supervisor, County of Monterey, California*

Valarie Bachelor
*School Board Director, City of Oakland, California*

Jorge Baron
*Councilmember, King County, Washington*

Ravi Bhalla
*Mayor, City of Hoboken, New Jersey*

Xouhoa Bowen
*Vice Mayor, City of San Leandro, California*

Andy Brown
*Judge, Travis County, Texas*

Jesse Brown
*Councilmember, City of Indianapolis, Indiana*

Chelsea Byers
*Mayor, City of West Hollywood, California*

Barb Byrum
*Clerk, Ingham County, Michigan*

Chris Canales
*Councilmember, City of El Paso, Texas*

Michael Chameides
*Supervisor, County of Columbia, New York*

John Clark
*Mayor, Town of Ridgway, Colorado*

Laura Conover
*County Attorney, County of Pima, Arizona*

Christine Corrado
*Councilmember, Township of Brighton, New York*

Olgy Diaz
*Councilmember, City of Tacoma, Washington*

Roger Dickinson
*Councilmember, City of Sacramento, California*

Justin Douglas
*Commissioner, Dauphin County, Pennsylvania*

Diane Ellis-Marseglia
*Commissioner, Bucks County, Pennsylvania*

Marilyn Ezzy Ashcraft
*Mayor, City of Alameda, California*

Ramin Fatehi
*Commonwealth's Attorney, City of Norfolk, Virginia*

Bryan "Bubba" Fish
Councilmember, City of Culver, California

Vanessa Fuentes
*Mayor Pro Tem, City of Austin, Texas*

Brenda Gadd
*Councilmember, Metropolitan Nashville & Davidson County, Tennessee*

Adrian Garcia
*Commissioner, County of Harris, Texas*

Heidi Garrido
*Councilmember, City of Hopkins, Minnesota*

Delia Garza
*County Counsel, Travis County, Texas*

José Garza
*District Attorney, Travis County, Texas*

Megan Green
*President of Board of Alderman, St. Louis County, Missouri*

Jonathan Guzmán
*School Committee Vice-Chair, City of Lawrence, Massachusetts*

Beau Harbin
*Legislator, County of Cortland, New York*

Robert J. Harvie
*Commissioner, Bucks County, Pennsylvania*

Jani Hitchen
*Councilmember, County of Pierce County, Washington*

Stephanie Howse-Jones
*Councilmember, City of Cleveland, Ohio*

Susan Hughes-Smith
*Legislator, County of Monroe, New York*

Christopher Jaramillo
*Norristown Area School District Board President, County of Montgomery, Pennsylvania*

Lisa Kaplan
*Councilmember, City of Sacramento, California*

Lisa Lawitzke
*Clerk, Township of Bellevue, Michigan*

Jessie Lopez
*Councilmember, City of Santa Ana, California*

Christian Menefee
*County Attorney, Harris County, Texas*

William Moehle
*Supervisor, Town of Brighton, New York*

Steve Mulroy
*District Attorney, County of Shelby, Tennessee*

Arnetta Murray
*Councilmember, City of Iowa Colony, Texas*

Linda Mussmann
*Supervisor, City of Hudson, New York*

Jonathan Nieuwsma
*Councilmember, City of Evanston, Illinois*

Isabel Piedmont-Smith
*Councilmember, City of Bloomington, Illinois*

Jacqueline "Jack" Porter
*Commissioner, City of Tallahassee, Florida*

Delishia Porterfield
*Councilmember, Metropolitan Nashville & Davidson County, Tennessee*

Satya Rhodes-Conway
*Mayor, City of Madison, Wisconsin*

Ryan Richardson
*City Attorney, City of Oakland, California*

Amanda Rodriguez
*Councilmember, City of San Marcos, Texas*

Rossana Rodríguez Sánchez
*Alderperson, City of Chicago, Illinois*

Miguel Sanchez
*Councilmember, City of Providence, Rhode Island*

Dawn Marie Sass
*Clerk/Deputy Treasurer, City of Exeter, Wisconsin*

Seema Singh
*Councilmember, City of Knoxville, Tennessee*

David Stout
*Commissioner, City of El Paso, Texas*

Lena Tam
*Supervisor, County of Alameda, California*

Terry Vo
*Metro Councilmember, Metropolitan Nashville & Davidson County, Tennessee*

Braxton White
*Commissioner, County of Clarion, Pennsylvania*

Robin Wilt
*Councilmember, Township of Brighton, New York*

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form17instructions.pdf

**9th Cir. Case Number(s)** 25-3727

The undersigned attorney or self-represented party states the following:

☐  I am unaware of any related cases currently pending in this court.

☐  I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

☒  I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

*Newsom, et al. v. Trump, et al.*, Case No. 25-5553 – Appeal of a permanent injunction issued in 3:25-cv-04870-CRB, the same district court case giving rise to the instant appeal of a preliminary injunction order.

Dated:  September 9, 2025        KEKER, VAN NEST & PETERS LLP

*/s/Anjali Srinivasan*
CODY S. HARRIS
ANJALI SRINIVASAN
SOPHIE HOOD
IAN KANIG
CARA R. MEYER

*Attorneys for Amici Curiae County of Santa Clara, City of Alameda, and City of Albuquerque*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 25-3727

I am the attorney or self-represented party.

This brief contains _6,429_ words, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

☐ complies with the word limit of Cir. R. 32-1.

☐ is a cross-appeal brief and complies with the word limit of Cir. R. 28.1-1.

☒ is an amicus brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

☐ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

☐ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

    ☐ it is a joint brief submitted by separately represented parties;

    ☐ a party or parties are filing a single brief in response to multiple briefs; or

    ☐ a party or parties are filing a single brief in response to a longer joint brief.

☐ complies with the length limit designated by court order dated _____.

☐ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

Signature /s/ Anjali Srinivasan        Date September 9, 2025
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

## CERTIFICATE OF SERVICE

I, NATALIE YOUNG, hereby certify that I electronically filed the following document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on September 9, 2025.

**BRIEF OF *AMICI CURIAE* LOCAL GOVERNMENTS AND LOCAL GOVERNMENT LEADERS IN SUPPORT OF APPELLEES' ANSWERING BRIEF AND AFFIRMANCE**

I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the appellate CM/ECF system.

Executed September 9, 2025, at San Francisco, California.


_____
NATALIE YOUNG