No. 25-3727

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

GAVIN NEWSOM, *ET AL.*,
*Plaintiffs-Appellees,*

*v.*

DONALD J. TRUMP, *ET AL.*,
*Defendants-Appellants.*

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA DISTRICT COURT NO. 3:25-CV-04870*

## BRIEF OF *AMICUS CURIAE* NATIONAL SECURITY LEADERS FOR AMERICA

BENJAMIN J. HOGAN
CLARK D. SEAMAN
Bryan Cave Leighton Paisner LLP
1700 Lincoln Street, Suite 4100
Denver, CO 80203

JEAN-CLAUDE ANDRÉ
Bryan Cave Leighton Paisner LLP
120 Broadway, Suite 300
Santa Monica, CA 90401
jc.andre@bclplaw.com
Tel. (310) 576-2148

DANIEL J. SCHWARTZ
MARK S. SRERE
Bryan Cave Leighton Paisner LLP
1155 F St NW
Washington, DC 20004

EMMA G. MCENERY
Bryan Cave Leighton Paisner LLP
One Metropolitan Square
211 N Broadway #3600
St. Louis, MO 63102

Attorneys for NATIONAL SECURITY LEADERS FOR AMERICA

# TABLE OF CONTENTS

**DESCRIPTION**                                                  **PAGE**

INTEREST OF *AMICUS CURIAE* .............................................................1

INTRODUCTION .......................................................................................2

ARGUMENT ...............................................................................................4

I.      The National Guard's Development as a Community-Based Force in the Absence of a Standing Army ...................5

II.     Historical National Guard Deployments Show that President Trump's Federalization of the California Guard Is a Dangerous Outlier .................................................8

         A.     The Civil Rights Era and Deployments of the National Guard Without Governors' Consent Only to Protect Important Constitutional Rights Amid State Defiance ......................................................9

         B.     The Modern Era: Most Recent Decisions to Federalize the National Guard Have Been Made at the Request of or in Cooperation with State Governors ...................................................................15

III.    The Federalization of the National Guard Contravenes the Applicable Statute and Is Contrary to the Best Interests of the National Guard, the State of California, and the Nation .................................................18

         A.     President Trump Improperly Federalized the National Guard Under 10 U.S.C. § 12406 Because He Was Not *Unable* to Execute the Laws of the United States ...........................................................19

i

# TABLE OF CONTENTS (continued)

**DESCRIPTION**                                             **PAGE**

B.    Strict Compliance with Subsection 12406(3)'s Language Is Especially Important Because of the Negative Impact of President Trump's Deployment on the National Guard, California, and the Nation ............................................................ 28

      1.   President Trump's Deployment Diverted the National Guard from Its Core Duties without Proper Training or Instruction ............. 29

      2.   President Trump's Deployment Undermined Public Trust in the Federal Government and its Military ............................. 35

CONCLUSION ......................................................... 37

DECLARATION OF J. THOMAS KING, JR., FORMER NATIONAL GUARD BRIGADIER GENERAL, IN SUPPORT OF BRIEF OF *AMICUS CURIAE* NATIONAL SECURITY LEADERS FOR AMERICA

# TABLE OF AUTHORITIES

**DESCRIPTION**                                                               **PAGE(S)**

**Cases**

*Doe #1 v. Trump,*
   957 F.3d 1050 (9th Cir. 2020) ....................................................... 27

*Martin v. Mott,*
   25 U.S. (12 Wheat.) 19 (1827) ...................................................... 26

*United States v. Williams,*
   553 U.S. 285 (2008) ........................................................................ 25

**Statutes**

35 Stat. 399 (1908) ............................................................................... 24

108 Stat. 2663 (1994) ........................................................................... 24

10 U.S.C. § 251 ............................................................................... 14, 21

10 U.S.C. § 252 ............................................................................... 14, 23

10 U.S.C. § 253 ..................................................................................... 14

10 U.S.C. § 254 ..................................................................................... 14

10 U.S.C. § 255 ..................................................................................... 14

10 U.S.C. § 12406 ................................................................................... 3

10 U.S.C. § 12406(2) ....................................................................... 18, 25

10 U.S.C. § 12406(3) ................................................... 5, 18, 20, 24, 25

18 U.S.C. § 1385 ................................................................................... 31

Calling Forth Act of 1792, ch. 28, 1 Stat. 264 ....................... 20, 21, 22, 24

Militia Act of 1795, ch. 36, § 2, 1 Stat. 424 ............................................ 22

## TABLE OF AUTHORITIES (continued)

**DESCRIPTION** **PAGE(S)**

Insurrection Act of 1807, ch. 39, 2 Stat. 443 .................................... 14, 22

Suppression of the Rebellion Act of 1861, ch. 25, § 1, 12 Stat. 281........ 23

Militia Act of 1903, ch. 196, § 4, 32 Stat. 775 ....................................... 23

U.S. Const. art. I, § 8, cl. 15 ......................................................... 3, 6, 19

U.S. Const. art. II, § 2 ...................................................................... 3, 6

**Other Authorities**

David E. Engdahl, *Soldiers, Riots, and Revolution: The Law
and History of Military Troops in Civil Disorders*,
57 Iowa L. Rev. 1 (1971).................................................................. 22

Exec. Order No. 11053, Providing Assistance for the Removal of
Unlawful Obstructions of Justice in the State of Mississippi,
27 Fed. Reg. 9693 (Sept. 30, 1962)................................................. 11

Edison Forman & Rebecca Lullo, *Understanding Domestic
National Guard Missions*, Protect Democracy
(Aug. 5, 2024)................................................................. 7, 29, 33, 35

*Hurricane Katrina: The Role of the Governors in Managing the
Catastrophe*, Hearing Before the S. Comm. on Homeland
Security & Governmental Affairs, 109th Cong. 27 (2006) ........... 17

Anshu Siripurapu & Noah Berman, *What Does the U.S.
National Guard Do?*, Council on Foreign Relations
(June 10, 2025) ....................................................... 7, 10, 13, 17, 29

**Internet Sources**

Am. RadioWorks, *The Road from Selma*, Am. Pub. Media (2018),
https://americanradioworks.publicradio.org/features/prestapes/
c3.html .......................................................................................... 12

## TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                              **PAGE(S)**

Cal Guard, *California Army National Guard*, Cal. Military Dep't,
 https://calguard.ca.gov/army/ ..........................................................7

Elizabeth Castillo, *Six things: The role of California's National Guard
 in protests*, Cal Matters (June 2, 2020),
 https://calmatters.org/justice/2020/06/california-national-guard-
 role-protests-explained/.................................................................7

*Chronology of the Integration of the University of Mississippi*,
 John F. Kennedy Presidential Libr. & Museum,
 https://microsites.jfklibrary.org/olemiss/chronology/....................11

*Civil Disturbance Operations in National Guard History*, NGB Pub.
 Affairs (Nov. 2020),
 https://www.nationalguard.mil/Portals/31/Resources/Fact%20Shee
 ts/Civil%20Disturbance%20Operations%20Fact%20Sheet%20(Nov
 %202020).pdf ....................................................................... 8, 10, 17

Robert W. Coakley, *The Role of Federal Military Forces in Domestic
 Disorders 1789-1878* (1988),
 https://tinyurl.com/566cb2cm..........................................................6

*De-escalation Policies and Training*, Council on Crim. Just. (Mar. 2021),
 https://assets.foleon.com/eu-central-1/de-uploads-7e3kk3/41697/de-
 escalation_training.9f4b662e97c2.pdf ...........................................31

Elizabeth Goitein, *What to Know About the Los Angeles Military
 Deployment*, Brennan Ctr. for Just. (June 20, 2025),
 https://www.brennancenter.org/our-work/research-reports/what-
 know-about-los-angeles-military-deployment ...............................30

*Governor Barnett's Declaration to the People of Mississippi,*
 John F. Kennedy Presidential Libr. & Museum,
 https://microsites.jfklibrary.org/olemiss/controversy/
 doc2.html .......................................................................................11

## TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                                    **PAGE(S)**

Shawn Hubler, *Trump's National Guard Troops Are Questioning Their Mission in L.A.*, N.Y. Times (July 16, 2025), https://www.nytimes.com/2025/07/16/us/trump-national-guard-california.html ................................................................. 18, 34, 37

Kiki Intarasuwan & Caitlin Yilek, *Former defense secretary's concern about National Guard in L.A. is "loss of life like we saw in 1970"*, CBS News (June 11, 2025), https://www.cbsnews.com/news/chuck-hagel-defense-secretary-national-guard-la-reaction/ ........................................................ 32

Lyndon B. Johnson, *Proclamation 3645—Providing Federal Assistance in the State of Alabama*, The American Presidency Project (Mar. 20, 1965), https://www.presidency.ucsb.edu/documents/proclamation-3645-providing-federal-assistance-the-state-alabama ........................... 13

Lyndon B. Johnson & Richard J. Daley, *Conversation of Apr. 6, 1968*, in Lyndon B. Johnson and Civil Rights, vol. 2, ed. Kent B. Germany (Univ. of Va. Press 2014), Presidential Recordings Digital Edition, http://prde.upress.virginia.edu/conversations/4005994 ............... 16

*LBJ sends federal troops to Alabama to protect a civil rights march*, HISTORY (Nov. 24, 2009), https://www.history.com/this-day-in-history/march-20/lbj-sends-federal-troops-to-alabama ................. 12

Gen. Joseph Lengyel et al., *Statement of Principles on Domestic Deployment of the National Guard*, Count Every Hero, https://counteveryhero.org/wp-content/uploads/2024/07/CEH-Deployment-Principles.pdf ..................... 28, 29, 30, 32, 34, 35

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                                    **PAGE(S)**

Capt. Wayde Minami, *Baltimore Riot Was Maryland Air Guard's Largest Mobilization*, 175th Wing Pub. Affs. (Feb. 22, 2010), https://www.175wg.ang.af.mil/News/Features/Display/Article/448514/baltimore-riot-was-maryland-air-guards-largest-mobilization/ ................................................................................ 16

National Guard Bureau, *How We Began*, The National Guard, https://www.nationalguard.mil/About-the-Guard/How-We-Began/ ................................................................................ 5

*National Guard firefighters finally back to work — but Trump's militarization of LA has pulled cops from the street and teachers out of classrooms*, Governor of California (July 1, 2025), https://www.gov.ca.gov/2025/07/01/national-guard-firefighters-finally-back-to-work-but-trumps-militarization-of-la-has-pulled-cops-from-the-street-and-teachers-out-of-classrooms/ .................. 33

Nat'l Archives, *Executive Order 10730: Desegregation of Central High School (1957)*, https://www.archives.gov/milestone-documents/executive-order-10730 ........................................................................... 10

Joseph Nunn, *The Posse Comitatus Act Explained*, Brennan Ctr. for Just. (Oct. 14, 2021), https://www.brennancenter.org/our-work/research-reports/posse-comitatus-act-explained ............................................... 13

Fintan O'Toole, *A Show of Force*, N.Y. Rev. of Books (July 24, 2025) https://www.nybooks.com/articles/2025/07/24/a-show-of-force-fintan-otoole/ ................................................................... 35

Policing and Social Justice HistoryLab, *Detroit Under Fire: Police Violence, Crime Politics, and the Struggle for Racial Justice in the Civil Rights Era*, Univ. of Mich. Dep't of Hist. (2021), https://policing.umhistorylabs.lsa.umich.edu/s/detroitunderfire/page/home ........................................................................... 15

**TABLE OF AUTHORITIES (continued)**

DESCRIPTION                                                           PAGE(S)

Dave Roos, *7 Times Presidents Have Activated US Troops on American
     Soil* History (June 11, 2025),
          https://www.history.com/articles/national-guard-federal-troops-
          deployments............................................................. 8, 12, 15, 16, 17

*Tactical De-escalation Techniques Resource Guide,* Los Angeles Police
     Department (May 2018),
          https://lapdonlinestrgeacc.blob.core.usgovcloudapi.net/lapdonline
          media/2021/10/De-escalation-Resource-Guide-for-
          Instructors_May-2018.pdf.............................................................31

*Troops in Los Angeles can detain but not arrest individuals, military
     official says*, Reuters (June 11, 2025),
          https://www.reuters.com/world/us/troops-los-angeles-can-
          temporarily-detain-individuals-no-arrest-authorities-
          2025-06-11/ ....................................................................................32

*University of Alabama desegregated*, HISTORY (Feb. 9, 2010),
          https://www.history.com/this-day-in-history/june-11/university-of-
          alabama-desegregated ...........................................................11, 12

No. 25-3727

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

GAVIN NEWSOM, *ET AL.*,
*Plaintiffs-Appellees*,

*v.*

DONALD J. TRUMP, *ET AL.*,
*Defendants-Appellants*.

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA DISTRICT COURT NO. 3:25-CV-04870*

## BRIEF OF *AMICUS CURIAE* NATIONAL SECURITY LEADERS FOR AMERICA

## INTEREST OF *AMICUS CURIAE*

*Amicus curiae* National Security Leaders for America ("NSL4A")[1]

is a volunteer organization with over 1,300 bipartisan members,

including retired generals, admirals, and other command service officers,

---

[1]     No counsel for a party authored this brief in whole or in part, and no one other than *amicus curiae*, its members, or its counsel made a monetary contribution intended to fund this brief's preparation or submission. Both parties have consented to this filing.

1

ambassadors, diplomats, and former federal government employees who served in Senior Executive Service positions in areas relating to United States national security, intelligence, public service, and diplomacy. NSL4A's mission is to preserve democratic norms, protect constitutional freedoms, and ensure that both civilian and military service remain non-politicized and operating in the best interest of American democracy and nonpartisanship.

Among NSL4A's members are persons who have served in command positions in National Guard units around the country. This experience gives NSL4A particular expertise to assist the Court to understand the laws and regulations controlling the very limited circumstances under which the President may federalize National Guard units away from their state governors and deploy them for federal use.

## INTRODUCTION

The National Guard has served a unique function in United States history. First formed in each of the original colonies, the Militia (as it was then known) served under the command of colonial governors. During the Revolutionary War, while much of the colonial Militia fought under

General George Washington, that required specific action of the Continental Congress and colonial governor agreement.

The Framers of the Constitution understood the reluctance of the new country's citizens to accept a national, federal army—partly due to the British occupation army's excesses. As a motions panel of this Court recognized in its June 19, 2025, published order, while Article II of the Constitution makes the President commander in chief of the armed forces, including the Militia "when called into the actual Service of the United States" (U.S. Const. art. II, § 2), Congress has the responsibility of determining under what circumstances the Militia may be "call[ed] forth … to execute the Laws of the Union." U.S. Const. art. I, § 8, cl. 15.

Because of the severe impact uninvited federalization of the National Guard has on states' welfare and governors' responsibilities, Congress strictly controlled the President's ability to federalize the National Guard without the relevant governor's invitation or consent. Under 10 U.S.C. § 12406, there are three such circumstances: "whenever (1) the United States … is invaded or is in danger of invasion by a foreign nation; (2) there is a rebellion or danger of a rebellion against the

authority of the Government of the United States; or (3) the President is unable with the regular forces to execute the laws of the United States."

Noticeably, only the third provision is conditional. The President may uninvitedly federalize the National Guard if there is an "invasion" or a "rebellion" without demonstrating he is unable to confront the situation without employing the National Guard. Only in the case of the need to execute federal laws is the President required to show he is unable to do so with "regular forces." Unlike an invasion or a rebellion, the execution of the laws is either uniquely within the responsibility of a governor, or a responsibility shared by the governor and the President. When the President seeks to federalize the National Guard against that governor's wishes, particularly given the negative impact doing so has on the National Guard's readiness, the President should be required to establish that section 12406's conditions have been met.

## ARGUMENT

On June 7, 2025, President Trump, against California Governor Gavin Newsom's wishes, federalized 4,000 California National Guard troops and deployed them with 700 active-duty Marines to Los Angeles. The deployment responded to persons protesting aggressive federal

enforcement actions to detain purported immigrants. The district court issued a temporary restraining order in favor of the Governor and the State of California, but a motions panel of this Court granted a stay pending appeal. The motions panel's order concluded that it was likely the President lawfully exercised his statutory authority under subsection 12406(3). But that order and President Trump's activation of the National Guard against the wishes of California's Governor broke from the plain language and purpose of the statute itself, the National Guard's purpose and mission, and the history of the Guard's domestic deployment by Presidents. They also jeopardize the Guard's ability to carry out important state goals and undermine public trust in the National Guard.

## I. The National Guard's Development as a Community-Based Force in the Absence of a Standing Army

The National Guard's origins trace back to the Colonial period when militia units were formed to defend against Native American tribes and provide security for early settlements.[2] This first organization of militia

---

[2]     National Guard Bureau, *How We Began*, The National Guard, https://www.nationalguard.mil/About-the-Guard/How-We-Began/ (last visited July 27, 2025).

regiments in North America ultimately gave birth to what is now known as the National Guard.

In the American Revolution's wake, the Constitution's Framers strongly opposed the notion of a standing army or a President-controlled militia. Indeed, this opposition was prevalent during the Constitutional Convention in Philadelphia.[3] As a result, despite the President's Article II authority to act as commander in chief of the Army and the Navy, he commands the Militia only "when called into the actual Service of the United States." U.S. Const. art. II, § 2. It initially was up to Congress to provide the circumstances under which the Militia could be "call[ed] forth" to execute federal laws. U.S. Const. art. I, § 8, cl. 15.

Today, National Guard units continue to operate primarily as state militias, while increasingly operating with U.S. military components

---

[3]    Robert W. Coakley, *The Role of Federal Military Forces in Domestic Disorders 1789-1878*, at 12 (1988), https://tinyurl.com/566cb2cm (last visited July 18, 2025).

overseas.[4] Guard members are not full-time soldiers. They are community members leading civilian lives until called upon to serve.[5]

As a "community-based land force,"[6] the National Guard's primary purpose is to serve American communities domestically.[7] The California National Guard's recent missions include providing aid during the notoriously devastating California wildfire season, emergency response services, drug interdiction, and other important community services.[8] The history of and purposes for the National Guard demonstrate that it has always been comprised of state and local militias dedicated to serving the American people and their communities in times of crisis—not as instruments for advancing partisan agendas. In fact, remaining

---

[4] Edison Forman & Rebecca Lullo, *Understanding Domestic National Guard Missions*, Protect Democracy (Aug. 5, 2024); Anshu Siripurapu & Noah Berman, *What Does the U.S. National Guard Do?*, Council on Foreign Relations (June 10, 2025).

[5] Elizabeth Castillo, *Six Things: The role of California's National Guard in protests*, Cal Matters (June 3, 2020), https://calmatters.org/justice/2020/06/california-national-guard-role-protests-explained/.

[6] Cal Guard, *California Army National Guard*, Cal. Military Dep't, https://calguard.ca.gov/army/ (last visited July 12, 2025).

[7] Forman & Lullo, *supra* note 4.

[8] Castillo, *supra* note 5.

7

nonpartisan is crucial to National Guard members' ability to serve their communities and retain public trust.

## II. Historical National Guard Deployments Show that President Trump's Federalization of the California Guard Is a Dangerous Outlier

Historically, given that the National Guard is intended to remain under state control, Presidents have federalized the National Guard sparingly and only under extraordinary circumstances. Presidents activated the National Guard during the Civil Rights Era to protect constitutional rights and the lives of citizens against governors' wishes only after state and local governments themselves openly refused to do so in defiance of federal law. In those circumstances, there was no question that the federal laws against racial discrimination could not be enforced relying solely on the "regular forces."[9]

---

[9] *Civil Disturbance Operations in National Guard History*, NGB Pub. Affairs (Nov. 2020), https://www.nationalguard.mil/Portals/31/Resources/Fact%20Sheets/Civil%20Disturbance%20Operations%20Fact%20Sheet%20(Nov%202020).pdf; *see also* Dave Roos, *7 Times Presidents Have Activated US Troops on American Soil*, HISTORY (June 11, 2025), https://www.history.com/articles/national-guard-federal-troops-deployments.

A.    **The Civil Rights Era and Deployments of the National Guard Without Governors' Consent Only to Protect Important Constitutional Rights Amid State Defiance**

Following the end of Jim Crow laws and racial segregation, presidents called upon the National Guard to defend the constitutional rights of citizens against state governments unwilling to recognize those rights. Crucially, though state National Guards were federalized during this period without the consent or, indeed, over the objection of state governors, such decisions occurred with great caution and only where state governors were actively impeding the exercise of citizens' constitutional rights in violation of federal law.

The first example of this occurred in 1957, when the then-governor of Arkansas, Orval Faubus, activated the Arkansas National Guard in defiance of a federal court order to prevent nine black students—the "Little Rock Nine"—from entering Central High. After discussions with President Dwight D. Eisenhower, Governor Faubus agreed to respect the desegregation order and promised to use the Arkansas National Guard to protect the Little Rock Nine. But Governor Faubus instead withdrew the Guardsmen, and an angry mob prevented the court-ordered integration. Given Governor Faubus's  defiance of federal law, Arkansas

Congressman Brooks Hays and Little Rock Mayor Woodrow Mann asked the President for help.[10] With Executive Order 10730, President Eisenhower placed the Arkansas National Guard under federal control and sent 1,000 U.S. Army paratroopers to assist in restoring order to Little Rock.[11]

The National Guard was federalized several more times during the Civil Rights Era to enforce the expansion of civil rights and ensure public order—again, critically, in light of the indisputable fact that federal court orders could not be enforced with "regular forces."[12] For example, in 1962, President John F. Kennedy called upon Mississippi National Guardsmen to assist after the University of Mississippi refused to desegregate and enroll James Meredith, also in violation of a court order.[13] Notably, before federalizing the Mississippi Guard, President Kennedy requested—but did not receive—adequate assurances from Governor Ross Barnett that

---

[10]     Nat'l Archives, *Executive Order 10730: Desegregation of Central High School (1957)*, https://www.archives.gov/milestone-documents/executive-order-10730 (last visited Sept. 5, 2025).

[11]     *Id.*

[12]     NGB Pub. Affairs, *supra* note 9.

[13]     Siripurapu & Berman, *supra* note 4.

10

the court order would be followed.[14] Governor Barnett instead publicly announced via television and radio that he would "do everything in [his] power to prevent integration in [Mississippi] schools."[15] In light of Governor Barnett's refusal to deploy "regular forces" to enforce the law, President Kennedy issued Executive Order 11053, federalizing the Mississippi Guard to allow desegregation to continue unimpeded.[16]

One year later, in June 1963, President Kennedy federalized the Alabama National Guard to help integrate the University of Alabama against the wishes of Governor George Wallace, who, as in Arkansas and Mississippi, actively opposed integration.[17] Later that year, in September 1963, following Governor Wallace's continued resistance of court-ordered

---

[14]   *Chronology of the Integration of the University of Mississippi*, John F. Kennedy Presidential Libr. & Museum, https://microsites. jfklibrary.org/olemiss/chronology/ (last visited Sept. 5, 2025).

[15]   *Governor Barnett's Declaration to the People of Mississippi*, John F. Kennedy Presidential Libr. & Museum, https://microsites. jfklibrary.org/olemiss/controversy/doc2.html (last visited Sept. 5, 2025).

[16]   Exec. Order No. 11053, Providing Assistance for the Removal of Unlawful Obstructions of Justice in the State of Mississippi, 27 Fed. Reg. 9693 (Sept. 30, 1962).

[17]   *University of Alabama desegregated*, HISTORY (Feb. 9, 2010), https://www.history.com/this-day-in-history/june-11/university-of-alabama-desegregated.

11

desegregation, President Kennedy federalized the Alabama National Guard a second time to assist Alabama public schools' integration.[18]

Finally, in March 1965, President Lyndon B. Johnson federalized the Alabama National Guard after Alabama State Troopers attacked civil rights activists during a three-day march from Selma to Montgomery.[19] As with the previous Civil Rights Era federalizations, President Johnson's decision came only after a federal court ordered that the protestors be allowed to proceed protected by regular forces, and Governor Wallace refused to provide that protection.[20] The President's actions ensured the safety of demonstrators, who completed the march three weeks later.[21] Before federalizing the National Guard, President Johnson urged Governor Wallace to call the National Guard himself.[22]

---

[18]    *Id.*

[19]    Roos, *supra* note 9.

[20]    *LBJ sends federal troops to Alabama to protect a civil rights march*, HISTORY (Nov. 24, 2009), https://www.history.com/this-day-in-history/march-20/lbj-sends-federal-troops-to-alabama.

[21]    *Id.*

[22]    Am. RadioWorks, *The Road from Selma*, Am. Pub. Media (2018), https://americanradioworks.publicradio.org/features/prestapes/c3.html (in a transcript of a call between President Johnson and Governor Wallace, President Johnson states, "I think it'd be better if you called up the Guard, in the service of the state … rather than our doing it").

Instead, Governor Wallace "advised [him] that the state [was] unable and refuse[d] to provide for the safety and welfare" of the activists, contrary to the federal court order.[23] In other words, federalizing and deploying the National Guard was necessary because federal law could not be executed using the "regular forces."

"Presidents rarely federalize a state or territory's guard without the consent of the governor."[24] Following President Johnson's 1965 decision to federalize the National Guard to protect civil rights activists from state-sanctioned violence, no president had again federalized the National Guard against a state's wishes until President Trump's actions at issue in this case.[25] Each of these prior instances of federalization lacking a governor's approval share certain common features. Unlike the circumstance now before the Court, the actions taken then were to protect important individual constitutional rights where the presidents

---

[23]     Lyndon B. Johnson, *Proclamation 3645—Providing Federal Assistance in the State of Alabama*, The American Presidency Project (Mar. 20, 1965), https://www.presidency.ucsb.edu/documents/ proclamation-3645-providing-federal-assistance-the-state-alabama.

[24]     Siripurapu & Berman, supra note 4.

[25]     Joseph Nunn, *The Posse Comitatus Act Explained*, Brennan Ctr. for Just. (Oct. 14, 2021), https://www.brennancenter.org/our-work/ research-reports/posse-comitatus-act-explained.

first attempted to gain the cooperation of state governors, federalizing the National Guard only as a last resort. Additionally, it was clear that federal law could not be executed using "regular forces" because the governors involved openly refused to protect those rights and opposed enforcement of federal court orders.[26] These rare features of past federalizations of the National Guard despite state opposition are entirely absent in this case, setting a dangerous precedent for more common and authoritarian presidential control over state National Guard forces than the Framers contemplated or the law permits.

Section 12406 requires that presidential control over the National Guard, in the absence of the responsible governor's consent, be both rare and in strict conformity with the law, as the Framers intended. This federalization and deployment does not meet those standards.

---

[26] Additionally, in each of these instances, presidents invoked the Insurrection Act of 1807 to federalize the National Guard, which does not require state consent or cooperation. 10 U.S.C. §§ 251-55. In contrast, President Trump invoked 10 U.S.C. § 12406, which requires the governor's participation even in the absence of the governor's concurrence. *See id.* ("Orders for these purposes shall be issued through the governors of the States.").

### B. The Modern Era: Most Recent Decisions to Federalize the National Guard Have Been Made at the Request of or in Cooperation with State Governors

From 1967 to 1992, the National Guard was federalized to quell violent, widespread riots throughout U.S. cities. Crucially, these actions were at the request of or in cooperation with the respective state governors.

In 1967, when Detroit experienced rampant rioting and violence sparked by racial tensions, police brutality, and unemployment, Michigan Governor George Romney and Detroit Mayor Jerome Cavanagh formally requested federal assistance, acknowledging their inability to restore order. In response, President Johnson federalized the Michigan National Guard to help quell the chaos that resulted in 43 dead, 342 wounded, and more than 1,400 buildings destroyed.[27] Even after the state request, President Johnson's actions were taken "with the greatest regret."[28]

---

[27] Roos, *supra* note 9.

[28] Policing and Social Justice HistoryLab, *Detroit Under Fire: Police Violence, Crime Politics, and the Struggle for Racial Justice in the Civil Rights Era*, Univ. of Mich. Dep't of Hist. (2021), https://policing.umhistorylabs.lsa.umich.edu/s/detroitunderfire/page/home.

After Dr. Martin Luther King, Jr.'s assassination in 1968, President Johnson federalized National Guard troops in Washington, D.C., where the President has unique, direct control over the Guard, and in Baltimore and Chicago at the request of the Maryland governor[29] and the mayor of Chicago.[30]

In 1992, California Governor Pete Wilson requested President George H.W. Bush federalize the National Guard in the face of riots in black neighborhoods in Los Angeles after four LAPD officers who nearly beat unarmed Rodney King to death were acquitted of their criminal charges. Not only was this federalization in response to a state request, but also the circumstances were dramatically more severe than those surrounding the current deployment. Then, "[t]housands of people poured into the streets—smashing windows, looting stores, and tossing Molotov cocktails."[31] President Bush mobilized California National

---

[29] Capt. Wayde Minami, *Baltimore Riot Was Maryland Air Guard's Largest Mobilization*, 175th Wing Pub. Affs. (Feb. 22, 2010), https://www.175wg.ang.af.mil/News/Features/Display/Article/448514/baltimore-riot-was-maryland-air-guards-largest-mobilization/.

[30] Lyndon B. Johnson & Richard J. Daley, *Conversation of Apr. 6, 1968*, in Lyndon B. Johnson and Civil Rights, vol. 2, ed. Kent B. Germany (Univ. of Va. Press 2014), Presidential Recordings Digital Edition, http://prde.upress.virginia.edu/conversations/4005994.

[31] Roos, *supra* note 9.

Guard troops after Governor Wilson and the Los Angeles mayor requested assistance.[32] Ultimately, more than 60 people died during the riots, and property damage totaled over $1 billion.[33]

In contrast, in 2006, President George W. Bush ended plans to federalize the National Guard in Louisiana to assist following Hurricane Katrina when the then-governor of Louisiana opposed it.[34]

Viewing the California National Guard's recent deployment in this historical context reveals that President Trump's decision to federalize the National Guard is a marked departure from past efforts to limit uninvited federalization to only those circumstances permitted under the law. Unlike deployments during the Civil Rights Era that saw local and state governments deny basic constitutional rights to their citizens in violation of federal law, or the more recent federalizations used to quell widespread, violent riots in cooperation with state governments when state resources were overwhelmed (as determined by state leadership),

---

[32] *Id.*; *see also* Siripurapu & Berman, *supra* note 4; NGB Pub. Affairs, *supra* note 9.

[33] Roos, *supra* note 9.

[34] *Hurricane Katrina: The Role of the Governors in Managing the Catastrophe*, Hearing Before the S. Comm. on Homeland Security & Governmental Affairs, 109th Cong. 27–30 (2006) (testimony of Kathleen Blanco).

17

President Trump's deployment exceeded his authority to take control of the Guard away from Governor Newsom in violation of 10 U.S.C. § 12406 and the Constitution. To quote an anonymous National Guard member who experienced the deployment in Los Angeles firsthand, "[t]his is not what the military of our country was designed to do, at all."[35]

## III. The Federalization of the National Guard Contravenes the Applicable Statute and Is Contrary to the Best Interests of the National Guard, the State of California, and the Nation

The motions panel's order concluded that it was likely that President Trump lawfully exercised his statutory authority under 10 U.S.C. § 12406(3), which permits the President to call into federal service the National Guard of any state whenever "unable with the regular forces to execute the laws of the United States."[36] As explained below, there was

---

[35] Shawn Hubler, *Trump's National Guard Troops Are Questioning Their Mission in L.A.*, N.Y. Times (July 16, 2025), https://www.nytimes.com/2025/07/16/us/trump-national-guard-california.html.

[36] Finding subsection 12406(3) likely satisfied, the motions panel declined to consider subsection 12406(2), which also permits federalization of the National Guard where "there is a rebellion or danger of a rebellion against the authority of the Government of the United States." 10 U.S.C. § 12406(2). Subsection 12406(3) is also the focus of defendants' opening merits brief. This brief thus similarly focuses on subsection 12406(3). In any case, there is also no evidence here of a rebellion against the authority of the United States, or an invasion, or the danger of one.

and is no showing that the President satisfied this prerequisite. That failure undercuts both the purpose of the National Guard and the sovereignty of the State of California to use its critical resources as needed. It also harms the Nation by using the Guard as a tool for partisan political theater.

### A. President Trump Improperly Federalized the National Guard Under 10 U.S.C. § 12406 Because He Was Not *Unable* to Execute the Laws of the United States

The power to call forth militias to "execute the Laws of the Union, suppress Insurrections and repel Invasions" belongs, first and foremost, to Congress.[37] Only in rare and specific circumstances has Congress authorized the Executive to call state militias into federal service without the governor's invitation or consent. The authorizing statute itself is plainly limited to extraordinary circumstances, such as "invasion," "rebellion," and the inability to execute the laws using "regular forces." 10 U.S.C. § 12406. The statute's plain text, coupled with its legislative history and Congress's limited delegation of its authority to the Executive, requires a narrow statutory application.

---

[37]    *See* U.S. Const. art. I, § 8, cl. 15.

19

To call the National Guard into federal service under 10 U.S.C. § 12406(3), the President must demonstrate that he is "*unable* with the regular forces to execute the laws of the United States."[38] The inability to execute federal law using regular forces is the prerequisite. Facing mere opposition from the public or other difficulties, however extreme, is not enough; the statute makes clear that an *inability* is what is required. The intent of the Framers, the distribution of powers between Congress and the President, and the history of the presidential use of this extraordinary power, make clear that this section should be strictly construed to ensure compliance with the statute's plain text, purpose, and separation of powers. History, again, is instructive.

On the heels of the American Revolution, Congress passed the Militia Act of 1792, a predecessor to 10 U.S.C. § 12406.[39] Under Section I of the Militia Act, the Second Congress delegated to the President the power to "call forth such number of the militia of the state or states" "in case of an insurrection in any state … [*but only*] on application of the

---

[38]   10 U.S.C. § 12406(3) (emphasis added).
[39]   Calling Forth Act of 1792, ch. 28, § 1, 1 Stat. 264, 264; *cf.* 10 U.S.C. § 12406.

20

legislature of such state, or of the executive."[40] This language remains today, as codified in 10 U.S.C. § 251.[41] Section II of the Militia Act also permitted the President to call forth the militia without the request of the state "whenever the laws of the United States shall *be opposed* or the execution thereof *obstructed*."[42] But that authority could only be exercised after a court first recognized that conditions for exercising that power had been met. Additionally, the President had to issue a proclamation ordering insurgents to disperse prior to mobilization.[43]

Significantly, the Militia Act of 1792, in cases of insurrection and obstruction of federal law, did not allow the President to act alone. Both sections of the Militia Act required action either from the state legislature or the federal judiciary. These limitations reflect Congress's intent—from its earliest days—to limit the President's authority to call

---

[40]    Calling Forth Act of 1792 § 1, 1 Stat. at 264.

[41]    *Id.*; *see also* 10 U.S.C. § 251 ("Whenever there is an insurrection in any State against its government, the President may, upon the request of its legislature or of its governor if the legislature cannot be convened, call into Federal service such of the militia of the other States").

[42]    Calling Forth Act of 1792 § 2, 1 Stat. at 264 (emphasis added).

[43]    Calling Forth Act of 1792 § 3, 1 Stat. at 264.

forth state militias. Indeed, the very notion of granting this authority to the Executive branch *at all* was contested from its inception.[44]

Changes to Section II of the 1792 Militia Act over the next two hundred years demonstrate Congress's consistent narrowing of the authority delegated to the Executive.[45] Illustrative of this point, Congress passed the Militia Act of 1861 on the eve of the Civil War, amending Section II to limit the circumstances under which the President could mobilize the militia to enforce federal law. No longer was it enough for the President to show that the laws of the United States were "*opposed, or the execution thereof obstructed*"; the President's ability to call forth

---

[44]    David E. Engdahl, *Soldiers, Riots, and Revolution: The Law and History of Military Troops in Civil Disorders*, 57 Iowa L. Rev. 1, 60 (1971) ("From the record of the House debate, it appears that the representatives were not troubled over the use of the militia in circumstances so grave as invasion or outright insurrection; but they were deeply concerned over the prospect of troops being used in common civilian situations 'to execute the laws of the Union.'").

[45]    It is worth noting that the Militia Act of 1792 had a three-year expiration date, upon which time the Militia Act of 1795 was enacted, permanently replacing the former but maintaining the "opposed" and "obstructed" language seen in Section II. *See* Militia Act of 1795, ch. 36, § 2, 1 Stat. 424, 424. Additionally, Congress enacted the Insurrection Act of 1807 not to amend the 1795 Act, but rather to supplement it by allowing the President to call forth, "in all cases of insurrection, or obstruction to the laws," and in addition to state militias, "such part of the land or naval force of the United States." *See* Insurrection Act of 1807, ch. 39, 2 Stat. 443, 443.

the militia or the federal armed forces became conditional on the President's incapability to enforce federal law otherwise. Thus, the President could activate the militia only on the condition that "it shall become *impracticable, in the judgment of the President* of the United States, to enforce … the laws of the United States[.]"[46]

This trend of narrowing the Executive's authority to call forth militias continued into the 20th century with the passage of the Militia Act of 1903.[47] There, Congress removed the qualification of relying on the President's "judgment" by eliminating previous language—"in the judgment of the President"[48]—and substituting an absolute standard that the President be "unable" to execute the laws using regular forces.[49] Congress has since retained this much narrower language through subsequent revisions, confirming its intent that the President be held to

---

[46]    Suppression of the Rebellion Act of 1861, ch. 25, § 1, 12 Stat. 281, 281 (emphasis added) (current version codified at 10 U.S.C. § 252).

[47]    The Militia Act of 1903, ch. 196, § 4, 32 Stat. 775, 776.

[48]    *Id.* (when "the President is unable, with the other forces at his command, to execute the laws of the Union in any part thereof, it shall be lawful for the President to call forth … the militia").

[49]    *Id.*

an extremely high standard when justifying a decision to federalize the National Guard.[50]

Contrary to the plain text and the history of this limited delegation, defendants argue "[the statute] is better read to authorize the President to call up the National Guard when he is unable to ensure to his satisfaction the faithful execution of federal laws."[51] That is plainly not what the statute says. And such a tortured reading also conflicts with separation of powers and the Congressional trend of limiting the Executive's authority to deploy the military domestically, a direct reflection of such separation.[52] Requiring a showing of an inability to execute federal law—rather than the President's "own satisfaction" of the enforcement of such laws—to invoke the authority granted in subsection (3) is also consistent with the remainder of the statute. Subsections (1) and (2), for example, require the extreme circumstances of "invasion" or "rebellion" before the President can federalize the National Guard. Allowing the President to circumvent those preconditions whenever he is

---

[50]    *See* 35 Stat. 399, 400 (1908); 108 Stat. 2663, 2994 (1994).

[51]    C.A. Dkt. 56.1 at 24.

[52]    Calling Forth Act of 1792 § 1, 1 Stat. at 264; *cf.* 10 U.S.C. § 12406(3).

24

"unable to his own satisfaction" to enforce federal immigration policies defeats the purpose.[53] It is also contrary to the legislative history of 10 U.S.C. § 12406, which specifically removed the concept of the "President's judgment" as a basis to federalize the Guard without the governor's consent or invitation. It is clear from that evolution of the law that what is important is not the President's "judgment" or "satisfaction" as to whether the federal laws may be executed with "regular forces," but the Court's determination of the actual facts.

The district court correctly held that § 12406(3) requires something beyond a showing that the President faces obstacles or frustration in executing the laws.[54] Indeed, the statute's plain text, its elimination of deference to the President's judgment, and the legislative history all call for a showing that the President is wholly unable to execute federal law. By defendants' own admission, they were able to execute the laws without activating the National Guard: "ICE succeeded in arresting 44

---

[53] *See United States v. Williams*, 553 U.S. 285, 294 (2008) ("[A] word is given more precise content by the neighboring words with which it is associated.").

[54] *See* ER-25. The district court also correctly rejected defendants' dubious argument that the protests in Los Angeles constituted a "rebellion" for the purposes of satisfying subsection 12406(2). ER-24.

people and detaining others on June 6 and had been able to carry out some enforcement actions since then."[55] There is no evidence that the President had been unable to enforce the laws of the United States in the normal course.

In this regard, the motion panel's reliance on *Martin v. Mott*, 25 U.S. (12 Wheat.) 19 (1827), is misplaced. In that case, Mr. Mott refused to serve during the War of 1812. The Supreme Court there deferred to the President's judgment that there was an "invasion" under the Militia Act of 1795 and concluded that his "decision [that there was an invasion justifying federalizing the militia] is conclusive upon all other persons." *Id.* at 30 and cited by motions panel at 20. Based on this decision, the motions panel determined it must defer to and not question the President's determination that he could not execute the laws of the United States in Los Angeles with "regular forces."

But much has changed since 1827. As shown above, the Militia Act of 1903 specifically removed reliance on the President's judgment in determining whether section 12406's requirements had been met.

---

[55]     C.A. Dkt. 56.1 at 13.

Instead, it clearly permitted the court to make this determination. *See Doe #1 v. Trump*, 957 F.3d 1050, 1066-67 (9th Cir. 2020).

*Martin* is not controlling for two other reasons. Section 12406's first two prongs, invasion and rebellion, are potential circumstances aligned more closely with the President's Article II powers to safeguard and defend the country. The third prong, inability to execute federal law, is much more aligned with domestic police powers, inherently shared by the President and the governors of the states. Unlike invasion and rebellion, there is no basis for deferring to the President's judgment or whim in enforcing the domestic police powers of the nation over the interests of the governors.

In addition, the law enforcement prong is conditional. The invasion and rebellion prongs do not require the President to show that those conditions cannot be met with "regular forces" before calling up the National Guard. The third prong does: the President must determine and be prepared to prove that the federal government cannot execute the laws of the United States "with the regular forces," i.e., relying on the regular police forces available locally. Governor Newsom contends the National Guard is not necessary to execute the laws of the United States. The

27

motions panel incorrectly found, on a preliminary basis, that the President was not required to establish to the contrary. That conclusion is not supported by the law on its face or its legislative history.

**B.** **Strict Compliance with Subsection 12406(3)'s Language Is Especially Important Because of the Negative Impact of President Trump's Deployment on the National Guard, California, and the Nation**

President Trump's unlawful deployment of the National Guard in Los Angeles misuses limited state resources as a means of achieving partisan political ends. This has real consequences. By abusing this power, the President has harmed the state of California and all of its citizens by redirecting critical resources away from other needs and undermining the public trust in the National Guard, hindering its ability to effectively serve local communities.

Domestic deployment of the National Guard requires judicious consideration of "what is best for the nation, the states, and the Guard."[56] Not only did President Trump's deployment of National Guard troops in Los Angeles plainly violate the authorizing statute, it entirely failed to

---

[56] Gen. Joseph Lengyel et al., *Statement of Principles on Domestic Deployment of the National Guard*, Count Every Hero, https://counteveryhero.org/wp-content/uploads/2024/07/CEH-Deployment-Principles.pdf (last visited July 12, 2025).

account for these factors. Instead, the deployment used the National Guard as a counterdemonstration to achieve partisan ends, not enforce laws. That misuse undermines the role of the National Guard, deters recruitment, and ultimately weakens a vital component of our national defense, leaving the country less prepared to respond to both domestic crises and foreign threats.

> ### 1. President Trump's Deployment Diverted the National Guard from Its Core Duties without Proper Training or Instruction

In deciding the propriety of deploying the National Guard domestically, both the Executive and courts reviewing the Executive's actions should consider the National Guard's preparedness for the particular mission, as well as its ability to maintain readiness in case of emerging crises.[57] As Brigadier General J. Thomas King Jr., U.S. Army (Ret'd) notes in his attached declaration, collaboration with governors, who possess critical insight into the preparedness and readiness of units, is a crucial part of this analysis.[58]

---

[57]    *See* Forman & Lullo, *supra* note 4; *see also* Siripurapu & Berman, *supra* note 4; Gen. Joseph Lengyel et al., *supra* note 56.

[58]    King Decl. ¶ 22.

29

**Preparedness.** President Trump deployed the National Guard in Los Angeles without ample instructions, training, or preparation. Elements of preparedness, in addition to sufficient training, include having the appropriate equipment and resources, and a clear objective, timeline, chain of command, and instructions for use of force,[59] all of which were lacking here.

Per President Trump's June 7 deployment memorandum, "the deployed military personnel may perform those military protective activities that the Secretary of Defense determines are reasonably necessary to ensure the protection and safety of Federal personnel and property."[60] The memorandum does nothing to clarify what is meant by "reasonably necessary" to protect ICE enforcement officers, and neither President Trump nor his administration has publicly specified the full range of actions or amount of force that deployed Guardsmen are authorized to take in service of that stated purpose.[61] The lines are, at

---

[59] Gen. Joseph Lengyel et al., *supra* note 56.

[60] ER-45–46.

[61] *Id.*; *see also* Elizabeth Goitein, *What to Know About the Los Angeles Military Deployment*, Brennan Ctr. for Just. (June 20, 2025), https://www.brennancenter.org/our-work/research-reports/what-know-about-los-angeles-military-deployment.

best, blurred between what constitutes protection and law enforcement functions, especially when the underlying functions of ICE are to implement enforcement measures.[62]

Compounding confusion of the President's vague directive, the National Guard does not receive extensive training on protective and enforcement activities in the face of civil unrest. According to the Council on Criminal Justice, de-escalation training is one of the most effective methods of quelling civil unrest, which is something the LAPD is specifically trained to do.[63] The military, on the other hand, does not focus on de-escalation training. In fact, according to reports, the National

---

[62] Should such protection measures bleed into law enforcement measures, they would violate the Posse Comitatus Act. *See* 18 U.S.C. § 1385.

[63] *De-escalation Policies and Training*, Council on Crim. Just. (Mar. 2021), https://assets.foleon.com/eu-central-1/de-uploads-7e3kk3/ 41697/de-escalation_training.9f4b662e97c2.pdf; *see also Tactical De-escalation Techniques Resource Guide*, Los Angeles Police Department (May 2018), https://lapdonlinestrgeacc.blob.core.usgovcloudapi.net/ lapdonlinemedia/2021/10/De-escalation-Resource-Guide-for-Instructors_May-2018.pdf.

Guard received only two days of training on how to handle civil disturbances before being deployed.[64]

In the absence of clearly defined instructions and specialized training, deploying the National Guard into a politically charged and potentially volatile situation—like the one in Los Angeles—poses serious risks to both members of the National Guard and the public. As former Defense Secretary Chuck Hagel warned, such deployments can lead to tragic outcomes, recalling the 1970 Kent State shootings where improperly trained National Guard troops opened fire on unarmed students, leaving four dead in Ohio.[65]

**Readiness.** President Trump's deployment also detracted from the National Guard's readiness, diverting it from its primary mission.[66] "Our

---

[64] *Troops in Los Angeles can detain but not arrest individuals, military official says*, Reuters (June 11, 2025), https://www.reuters.com/world/us/troops-los-angeles-can-temporarily-detain-individuals-no-arrest-authorities-2025-06-11/.

[65] Kiki Intarasuwan & Caitlin Yilek, *Former defense secretary's concern about the National Guard in L.A. is "loss of life like we saw in 1970"*, CBS News (June 11, 2025), https://www.cbsnews.com/news/chuck-hagel-defense-secretary-national-guard-la-reaction/.

[66] Gen. Joseph Lengyel et al., *supra* note 56.

leaders should treat the Guard as a last resort and a resource with limits on its capacity."[67]

Perhaps the best example of this is the California National Guard's Task Force Rattlesnake team. The Rattlesnake team "is a specialized crew of over 300 Cal Guard members who partner with CAL FIRE to prevent and fight wildfires."[68] Thanks to President Trump's deployment of the National Guard, the Rattlesnake team was cut to just 40 percent capacity "while fires flared up across the state."[69] Moreover, 32 percent of the members of the National Guard's drug interdiction task force, who have seized nearly 31,000 pounds of fentanyl and more than 50 million pills containing fentanyl since 2021, were unnecessarily pulled from their core duties.[70]

In addition to depleting resources, inappropriate deployments can negatively affect recruitment and retention for the National Guard and

---

[67] Forman & Lullo, *supra* note 4.

[68] *National Guard firefighters finally back to work — but Trump's militarization of LA has pulled cops from the street and teachers out of classrooms*, Governor of California (July 1, 2025), https://www.gov.ca.gov/2025/07/01/national-guard-firefighters-finally-back-to-work-but-trumps-militarization-of-la-has-pulled-cops-from-the-street-and-teachers-out-of-classrooms/.

[69] *Id.*

[70] *Id.*

the military. "Most Guard members have families and civilian lives that they must put on hold when deployed."[71] Unlike active-duty personnel, Guard members must navigate the complexities of two careers. The longer and more disruptive a deployment, the greater the risk to their civilian livelihoods and family stability.[72] As such, excessive and unnecessary deployments like President Trump's "seriously impair retention and exacerbate recruitment shortfalls within the National Guard,"[73] further detracting from its readiness. According to reports, of the 72 California National Guard members whose enlistment was set to expire during their deployment in Los Angeles, at least 55 have indicated they will not re-enlist, and another two have since quit."[74] These harms to recruitment and retention will negatively impact the National Guard's ability to respond to domestic and international emergencies for the foreseeable future.

---

[71]    Gen. Joseph Lengyel et al., *supra* note 56.

[72]    King Decl. ¶ 13.

[73]    Gen. Joseph Lengyel et al., *supra* note 56.

[74]    Hubler, *supra* note 35.

### 2. President Trump's Deployment Undermined Public Trust in the Federal Government and its Military

Beyond preparedness and readiness, decisionmakers must also consider whether deployment will negatively impact public trust in the National Guard.[75] This is especially relevant when considering deployments on U.S. soil, where such decisions "should *never* be made to further a political agenda."[76] Because the National Guard is an apolitical institution, "[i]f some Americans come to associate the Guard with a political faction they oppose, it could weaken the Guard's ability to respond to emergencies affecting those communities."[77]

---

[75]     Gen. Joseph Lengyel et al., *supra* note 56.

[76]     Forman & Lullo, *supra* note 4.

[77]     *Id.*; *see also* Fintan O'Toole, *A Show of Force*, N.Y. Rev. of Books (July 24, 2025), https://www.nybooks.com/articles/2025/07/24/a-show-of-force-fintan-otoole/ ("Politicizing the military means dismantling its self-image as an institution that transcends partisan divisions, is broadly representative of the US population, and owes its primary loyalty not to the president but to the Constitution…. Trump's deployment of troops in Los Angeles … had no military purpose. It can best be thought of as a counterdemonstration."); Gen. Joseph Lengyel et al., *supra* note 56 ("Americans trust that when you call out the National Guard, you call out America and that when the National Guard arrives, their situation will improve. No deployment of the National Guard should break that trust. Indeed, were that trust to erode, it would dramatically weaken the ability of the Guard to respond to domestic emergencies.").

Using the Guard to "protect" immigration enforcement officers inextricably entangles it with the act of immigration enforcement, a heavily politicized and debated subject, particularly in Los Angeles. Indeed, Governor Newsom and Los Angeles Mayor Karen Bass both publicly condemned the deployment, calling it an overreach of federal authority and a politically motivated move designed to escalate tensions rather than restore order.[78]

The deployment has also had a polarizing effect within the National Guard and the communities it was ostensibly sent to protect. Unorthodox deployments, especially those perceived as politically motivated or lacking clear operational necessity, can erode trust in leadership and diminish the sense of purpose and pride that sustains Guard service.[79] Indeed, one Latino member offered to be arrested after telling

---

[78]  Governor Gavin Newsom, X (June 8, 2025) ("I have formally requested the Trump Administration rescind their unlawful deployment of troops in Los Angeles county and return them to my command. We didn't have a problem until Trump got involved. This is a serious breach of state sovereignty—inflaming tensions while pulling resources from where they're actually needed. Rescind the order. Return control to California."); Mayor Karen Bass, X (July 21, 2025) ("Today I'm standing with our Veterans to send a clear message: we condemn the unnecessary, unjustified, and unconstitutional deployment of Marines and the National Guard to the streets of L.A.").

[79]  King Decl. ¶ 17.

commanding officers that he strongly opposed being deployed to an immigration raid in Ventura County.[80] And rather than being welcomed as a stabilizing force, Guard members have been met with anger and antipathy, particularly in immigrant neighborhoods. This broad opposition to the deployment undermines public trust and again deters recruitment and re-enlistment,[81] ultimately weakening a vital component of our national defense and leaving states and the country less prepared to respond to threats. These consequences will be felt not just for the duration of the deployment, but for years to come.

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court.

DATED: September 9, 2025              Respectfully submitted,

                                     BRYAN CAVE LEIGHTON PAISNER LLP

                                     */s/ Jean-Claude André*

                                     JEAN-CLAUDE ANDRÉ
                                     Attorneys for NATIONAL SECURITY
                                     LEADERS FOR AMERICA

---

[80]   Hubler, *supra* note 35.
[81]   *Id*.

37

**DECLARATION OF J. THOMAS KING, JR., FORMER NATIONAL GUARD BRIGADIER GENERAL, IN SUPPORT OF BRIEF OF *AMICUS CURIAE* NATIONAL SECURITY LEADERS FOR AMERICA**

**DECLARATION OF J. THOMAS KING, Jr.,**
**FORMER NATIONAL GUARD BRIGADIER GENERAL, IN**
**SUPPORT OF BRIEF OF *AMICUS CURIAE***
**NATIONAL SECURITY LEADERS FOR AMERICA**

I, J. Thomas King, Jr., hereby certify and declare as follows:

1.      I am a retired Circuit Judge for the Tenth Judicial Circuit in the State of Alabama and a former Brigadier General for the National Guard. As a former Brigadier General, I have extensive experience in the oversight, mobilization, and deployment of Guard personnel. My career has included direct responsibility for maintaining unit readiness, with a particular emphasis on retention and recruitment, morale, and operational capability in both domestic and overseas contexts. I submit this declaration in support of Brief of *Amicus Curiae* National Security Leaders for America, based on my professional expertise and firsthand knowledge of National Guard operations.

2.      I began my military career in August 1971, as a Distinguished Military Graduate of my ROTC Class at the University of Alabama. My military career spanned 32 years in the United States Army and the Alabama National Guard, including active-duty service

in the Republic of South Vietnam, where I was awarded the Bronze Star Medal, Vietnam Service Medal, and Vietnam Commendation Medal.

3.     Between 1989 and 2003, I held various command positions in the National Guard, including Battalion Commander, Group Commander, and Deputy Commanding General, overseeing the training, mobilization, and deployment of thousands of soldiers to operations such as Desert Shield-Desert Storm, Southern Command's retrograde from the Panama Canal Zone, and support missions in Croatia and Hungary during the First Russian-Chechen War.

4.     My final military role was to serve as Deputy Commanding General of a command comprised of approximately 3,800 personnel. Specifically, I was tasked with training logistical commands across Alabama without disclosing the ultimate deployment order by The Commander-in-Chief to initiate Operation Iraqi Freedom that resulted in the removal of Saddam Hussein. Upon my military retirement in 2003, I was awarded the Legion of Merit in recognition of my exemplary service.

5.     In addition to my military service, I have maintained a long-standing legal career that culminated in my appointment and subsequent elections as Circuit Judge for the Tenth Judicial Circuit Court in Jefferson County, Alabama. I held this position between April 2001 and January 2015.

6.     Throughout my legal career, I have demonstrated a steadfast commitment to the rule of law, public service, and the fair administration of justice. In the course of my military and legal careers, I developed particularized expertise on the practicality and legality of federal mobilization of National Guard units. I make this statement on the basis of that experience and expertise.

7.     The recent deployment of National Guard troops in Los Angeles constitutes a highly irregular and unorthodox activation. This type of deployment deviates significantly from standard protocols and has the potential to cause substantial and lasting harm to the operational readiness of affected units.

### Impact on Unit Readiness

8.     Readiness is a foundational element of National Guard effectiveness. It is cultivated through consistent training, stable leadership, and uninterrupted support systems.

9.     Unscheduled or politically motivated deployments disrupt these systems, leading to degradation in preparedness, cohesion, and mission capability.

10.     In extreme cases, such disruptions may render units incapable of performing their assigned wartime missions or impair their ability to respond to critical state-level emergencies such as wildfires, hurricanes, tornadoes, earthquakes, and floods.

### Family and Employer Support

11.     The National Guard relies heavily on the support of families and civilian employers to sustain its dual-role personnel.

12.     Guard members balance military obligations with civilian employment and family responsibilities. Extended or unpredictable activations place undue strain on these relationships, often resulting in financial hardship, emotional stress, and diminished support for future service.

13.     Unlike active-duty personnel, who serve full-time, Guard members must balance the complexities of two careers. The longer and more disruptive a deployment, the greater the risk to their civilian livelihoods and family stability.

## Community Relations and Personal Impact

14.     Deploying Guard members within their own communities for politically sensitive or controversial missions can have adverse effects on their personal relationships.

15.     Guard members may face scrutiny, tension, or alienation from neighbors, friends, and relatives, which in turn affects morale, unit cohesion, recruitment, and retention.

## Morale and Esprit de Corps

16.     The morale of both individual service members and their units is closely tied to the nature of the mission, the duration of deployment, and the living and working conditions experienced during activation.

17.     Unorthodox deployments, especially those perceived as politically motivated or lacking clear operational necessity, can erode

trust in leadership and diminish the sense of purpose and pride that sustains Guard service.

## Command and Training Challenges

18. National Guard commanders face the ongoing challenge of maintaining unit strength, training standards, and esprit de corps in preparation for mobilization and overseas deployment.

19. Unlike active-duty commanders, who have daily access to their units, Guard commanders typically have only one weekend per month and fifteen (15) days of Annual Training to conduct training.

20. Any interruption to this limited schedule—especially one involving extended activation—requires significantly more time and effort to restore readiness and operational capability. It also frustrates training to be prepared for other mission-critical operations.

## Governance and Command Structure

21. The Governor of each state exercises command and control over the Army and Air National Guard within that state.

22. Historically, the President consults with the Governor prior to mobilizing Guard units, not merely as a courtesy, but because the

Governor possesses critical insight into the readiness of units for both federal and state missions.

23.    This collaboration ensures that federal mobilizations do not compromise the Guard's ability to respond to imminent state-level emergencies. Bypassing this consultation requirement undermines the dual-purpose nature of the Guard and risks misusing or politicizing its deployment.

## Comparison with Army Reserve

24.    The United States Army Reserve reports directly to the President and is not subject to dual command.

25.    As such, Reserve units are more readily deployable for federal missions, including those involving immigration enforcement or other politically sensitive operations.

26.    The National Guard, by contrast, must balance federal and state responsibilities, making its deployment far more complex and requiring careful coordination between state and federal leadership.

## Political Context and Concerns

27.    It is my professional opinion that the President's decision to mobilize and deploy the California National Guard without prior

consultation with the Governor was undertaken as a demonstrative response intended to suppress public protest and advance controversial, partisan objectives.

28.   This action appears to have been designed as a test case to establish a precedent for similar deployments in other states governed by political opponents.

29.   Such politicization of the National Guard undermines its integrity, erodes public trust, and jeopardizes its ability to effectively fulfill both federal and state missions.


I declare under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct.

Executed on this 3rd day of September, 2025, at 7:14 PM EDT, Daniel Island, SC

J. Thomas King, Jr.
Former National Guard Brigadier General

## CERTIFICATE OF COMPLIANCE

I certify that:

1.      This brief complies with the length limits permitted by Fed. R. App. P. 29(a)(5) and Ninth Circuit Rule 32-1(a) because the brief contains 6,976 words, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word 2016.

DATED: September 9, 2025          */s/ Jean-Claude André*

JEAN-CLAUDE ANDRÉ
Attorneys for NATIONAL SECURITY
LEADERS FOR AMERICA