No. 25-3727

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————————

GAVIN NEWSOM, in his official capacity as
Governor of the State of California;
STATE OF CALIFORNIA,

*Plaintiffs/Appellees,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States;
PETE HEGSETH, in his official capacity as Secretary of Defense;
DEPARTMENT OF DEFENSE,

*Defendants/Appellants.*

———————————————

On Appeal from the United States District Court
for the Northern District of California

———————————————

**Brief for Neal Goldfarb as *Amicus Curiae***
**in Support of the  Plaintiffs/Appellees**
(Regarding the meaning of *rebellion* and
*rebellion against the Government of the United States*)

———————————————

Neal Goldfarb
P.O. Box 488
Dillsburg, PA 17019
(202) 262-7886
goldfarbneal@gmail.com
Attorney for *Amicus Curiae*

# Contents

Table of Authorities .................................................................................ii

Interest of Amicus Curiae ........................................................................1

Statement ...................................................................................................2

    The dictionary definitions at issue ......................................................2

    The definitions and the evidence: The district court's decision............4

    The issues that remain to be resolved..................................................4

Introduction and Summary of Argument ...............................................5

Argument ...................................................................................................

    I.  The Administration has not shown that the violence in Los Angeles
        amounted to a rebellion. ................................................................7

        A. *Black's Law Dictionary* (12th ed., sense 2), *An American Dictionary of the
           English Language* (sense 2), and *Webster's International Dictionary of the
           English Language* (sense 2) ...................................................7

        B. *Black's Law Dictionary* (12th ed., sense 3)...................................11

        C. *An American Dictionary of the English Language* (sense 2), and
           *Webster's International Dictionary of the English Language* (sense 2) .................13

    II. Even assuming the opposition to the federal activity at issue constituted to a
       rebellion, the Administration hasn't shown that it amounted to a rebellion
       against "the authority of the Government of the United States" ....................13

        A. The protests were a response to the Administration's execution of its
           "Mass Deportation Operation" in Los Angeles, which has been prelim-
           inarily held to have violated the Fourth and Fifth Amendments................14

        B. The constitutional violations committed in the course of the Mass
           Deportation Operation did not represent an exercise of the authority
           of the United States government............................................17

        C. In light of the foregoing, the President Trump was neither authorized
           nor empowered to invoke § 12406 ........................................21

    Conclusion .................................................................................22

# Table of Authorities

## Cases

*Almeida–Sanchez v. United States*, 413 U.S. 266 (1973).................................20

*Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*,
   403 U.S. 388 (1971) ..................................................................................20

*Deal v. United States*, 508 U.S. 129 (1993).................................................8

*In re Establishment Inspection of Hern Iron Works, Inc.*, 881 F.2d 722
   (9th Cir. 1989) ........................................................................................18

*Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949) ....... 19, 20

*Littlejohn v. City of New York*, 795 F.3d 297 (2d Cir. 2015) ........................21

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) .........................................19

*Trump v. CASA, Inc.*, — U.S. — 145 S. Ct. 2540 (2025) ...........................19

*Tucker v. Alexandroff*, 183 U.S. 424 (1902) ...............................................19

*United States v. Yakima Tribal Court*, 806 F.2d 853 (9th Cir. 1986).............20

*Noem v. Vasquez Perdomo*, 606 U.S. —, 2025 WL 2585637 (Sept. 8, 2025)
   (No. 25A-169)..........................................................................................16

*Vasquez Perdomo v. Noem*, — F.4th —, 2025 WL 2181709 (9th Cir. Aug. 1, 2025),
   *stay granted*, 606 U.S. —, 2025 WL 2585637 (Sept. 8, 2025) (No. 25A-169)..........15

*Vasquez Perdomo v. Noem*, — F. Supp. 3d —, 2025 WL 1915694 (C.D. Cal.
   2025), *stay denied in relevant part*, — F.4th —, 2025 WL 2181709 (9th Cir.
   Aug. 1, 2025), *stay granted*, 606 U.S. —, 2025 WL 2585637 (Sept. 8, 2025)
   (No. 25A-169)..........................................................................................15

*Ex parte Young,* 209 U.S. 123 (1908).........................................................20

## Constitution and Statutes

U.S. Const. Art. II, § 3 ..............................................................................20

U.S. Const. Fourth Amendment .......................................................7, 14, 15, 20

U.S. Const. Fifth Amendment .............................................................7, 14, 20

10 U.S.C. § 12406...............................................................................*passim*

18 U.S.C. § 242 ......................................................................................20

Militia Act of 1903, Pub. L. No. 57-33, Ch. 196, § 4, 32 Stat. 775,
   776 (1903)..............................................................................................12

## Dictionaries

*An American Dictionary of the English Language* (1900)............................................*passim*

*Black's Law Dictionary* (1st ed. 1891) ................................................................3, 12, 17

*Black's Law Dictionary* (5th ed. 1979)........................................................................17

*Black's Law Dictionary* (12th ed. 2024)...............................................................*passim*

*The Cyclopedic Dictionary of Law* (1901) ....................................................................3

*The New Grove Dictionary of Jazz* (1988 & 1994) ......................................................10

*New Oxford American Dictionary* (3d ed. 2010) .........................................................10

*Oxford English Dictionary* (3d ed. 2002)....................................................................10

1 *A Standard Dictionary of the English Language* (Funk &
    Wagnalls 1908)........................................................................................................17

*Webster's International Dictionary of the English Language* (1903) ...............................*passim*

1 *Webster's New International Dictionary* (1911)..........................................................17

*Webster's Third New International Dictionary* (1961)....................................................10

2 *World Book Encyclopedia Dictionary* (1964) .............................................................10

## Other Authorities

3 William Blackstone, *Commentaries on the Laws of England* (1768).............................12

*Commentaries on the Laws of England*, Wikipedia (last visited Sept. 8, 2025) ................ 12

Neal Goldfarb, *Meaning in the Framework of Corpus Linguistics*, 2017 BYU L. REV.
    1359 (2018)..........................................................................................................1, 2

Neal Goldfarb, *The Use of Corpus Linguistics in Legal Interpretation*, 7 ANN. REV.
    LING. 473 (2021) .................................................................................................1, 2

Neal Goldfarb, *Corpus Linguistics in Legal Interpretation: What Do Judges and
    Lawyers Need to Know?* (2025), https://tinyurl.com/CLinLegalInterp .................1, 2

Neal Goldfarb, *Dictionaries, Context, and Legal Interpretation*, delivered at the
    25th Biennial Conference of the Dictionary Society of North America
    (May 30, 2025) (abstract available at https://tinyurl.com/DSNA-NG)...................2

Peter Helman, *Bebopped and Rebopped: The Births of Bebop and Invisible Man*,
    New York City in the '40s, https://tinyurl.com/bebopped ....................................12

Rosamund Moon, *The Analysis of Meaning*, in LOOKING UP: AN ACCOUNT
    OF THE COBUILD PROJECT IN LEXICAL COMPUTING (John M. Sinclair ed.,
    1987) ........................................................................................................................8

Wilfrid Prest, WILLIAM BLACKSTONE: LAW AND LETTERS IN THE EIGHTEENTH CENTURY (2008)..................................................................................12

Antonin Scalia & Brian A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS (2012) ...................................................................1, 5

John Simpson, *The production and use of occurrence examples*, in A PRACTICAL GUIDE TO LEXICOGRAPHY 260, 268–69 (Piet van Sterkenburg ed., 2003)...............9

## Interest of *Amicus Curiae*[1]

*Amicus* Neal Goldfarb is an attorney who has an interest in linguistics and lexicography, and in applying insights and methodologies from those fields to legal interpretation. He has read widely in the primary literature in linguistics and lexicography, and has written about ways in which that literature can be brought to bear on issues of textual interpretation.[2]

In this brief, *amicus* addresses two issues, the first of which is the dispute between the parties as to which of two dictionary definitions of "rebellion" is the one that is "contextually appropriate" to the issue before the Court, Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 70 (2012), and therefore should be regarded

---

1.  Counsel for all parties have consented to the filing of this brief.

This brief was not authored in whole or in part by any party or any party's counsel. No money intended to fund the preparation or submission of this brief was contributed by any party or any party's counsel, or by anyone else other than *amicus* and his counsel.

This brief follows two typographic conventions generally followed in linguistics: (1) *Italics* are used to signal that the italicized word or phrase is being used to refer to itself as an expression, as in "The word *language* has eight letters." (2) Single quotes are used around statements of the meaning of an expression, as in "*bad* means 'not good'."

2.  *E.g.*, Neal Goldfarb, *Meaning in the Framework of Corpus Linguistics*, 2017 BYU L. REV. 1359 (2018); Neal Goldfarb, *The Use of Corpus Linguistics in Legal Interpretation*, 7 ANN. REV. LING. 473 (2021); Neal Goldfarb, *Corpus Linguistics in Legal Interpretation: What Do Judges and Lawyers Need to Know?* (2025), https://tinyurl.com/CLinLegalInterp.

as reflecting the relevant term's ordinary meaning. He has written about the method-ological question of how to determine which sense of a word counts as the contextually appropriate one,[3] and he recently gave a talk on that topic at the biennial conference of the Dictionary Society of North America.[4]

The brief also deals with the meaning of "rebellion *against the authority* of the Gov-ernment of the United States" (emphasis added). That discussion builds on prior work (cited *supra*, in note 2) in which *amicus* has written about the need to focus on the entire phrase that is at issue in a case, rather than on just the single word that the phrase is built around. In addition, while *amicus* relies in part on a relevant dictionary definition, he also draws on his experience with corpus linguistics, in that he provides multiple examples from the caselaw of *authority* being used in ways that reflect the meaning that he believes is relevant in the context of this case.

## Statement

**The dictionary definitions at issue.** The first part of this brief will deal with the dictionary definitions that were cited to the court below by the parties, and cited by that

---

3. *E.g.*, *Corpus Linguistics in Legal Interpretation: What Do Judges and Lawyers Need to Know?*, *supra* note 2, at 13–14, 24–26, 34–39.

4. Neal Goldfarb, *Dictionaries, Context, and Legal Interpretation*, delivered at the 25th Biennial Conference of the Dictionary Society of North America (May 30, 2025) (ab-stract available at https://tinyurl.com/DSNA-NG).

court in its decision. As background for that discussion, those definitions are set out below:

> *Black's Law Dictionary* (12th ed. 2024): "1. Open, organized, and armed resistance to an established government or ruler; esp., an organized attempt to change the government or leader of a country, usu. through violence. Cf. *civil war* under war (1). 2. Open resistance or opposition to an authority or tradition. 3. *Hist.* Disobedience of a legal command or summons."

> *Black's Law Dictionary* (1st ed. 1891): "Deliberate, organized resistance, by force and arms, to the laws or operations of the government, committed by a subject."

> *An American Dictionary of the English Language* (1900)[5]: "1. An open and avowed renunciation of the authority of the government to which one owes allegiance; or the taking of arms traitorously to resist the authority of lawful government; revolt.
> "2. Open resistance to lawful authority."

> *The Cyclopedic Dictionary of Law* (1901): "The taking up of arms traitorously against the government; the forcible opposition and resistance to the laws and process lawfully installed. If the rebellion amounts to treason, it is punished by the laws of the United States with death. If it be a mere resistance of process, it is generally punished by fine and imprisonment."

> *Webster's International Dictionary of the English Language* (1903): "1. The act of rebelling; open and avowed renunciation of the authority of the government to which one owes obedience, and resistance to its officers

---

5. The definition's discussion of the difference between *rebellion* on the one hand and *insurrection* and *mutiny* on the other has been omitted.

and laws, either by levying war, or by aiding others to so; an organized
uprising of subjects for the purpose of coercing or overthrowing their
lawful rule or government by force; revolt; insurrection.

   "2. Open resistance to, or defiance of, lawful authority."

**The definitions and the evidence: The district court's decision.** The district
court concluded that "[w]here dictionaries list multiple definitions of 'rebellion,' the first
definition is the one demanded by context here[,]" and characterized those definitions as
"political in nature" (ER 20), which *amicus* takes to mean that rebellions within the scope
of those definitions are characteristically directed against a government. In addition, the
court described the turn-of-the-century definitions (i.e., all but the one from the current
edition of *Black*'s) as characterized rebellions as being "armed," "organized," and "open
and avowed." (*Id.*, relying on definitions quoted at ER 19-20.)

   The court found that there was no evidence that the episodes of violence that are
at issue met those criteria. (*Id.* at 21–22.) That finding, if affirmed, would suffice to
establish that the events in Los Angeles did not come within the scope of the first listed
sense in the 12th edition of *Black's*, the definition in the 1st edition of *Black's* in its
entirety, or the first sense in *An American Dictionary of the English Language*.

   **Issues that remain to be resolved.** The affirmance of the findings referred to in
the previous paragraph would not fully resolve this appeal, because several issues would
remain to be dealt with.

First, there would remain the question whether the district court was correct in concluding that the definitions of *rebellion* relied on by the Administration (the second and third senses in *Black's* 12th edition, the second sense in *An American Dictionary of the English Language*, and the second sense in *Webster's* (1903)) were not relevant in interpreting § 12406. *Amicus* will argue that the answer to that question is Yes.

Second, assuming for the moment that the activities in Los Angeles that prompted the president's federalization of the California National Guard district court amounted to a rebellion, there would remain the question whether it amounted to a rebellion "against *the authority* of the Government of the United States," § 12406 (emphasis added) or created a danger of such a rebellion. *Amicus* will argue that the answer to that question is No.

### Introduction and Summary of Argument

In the first part of this brief, *amicus* presents a lexicographically-informed argument that the definitions of *rebellion* on which the Administration relies are irrelevant (or, in Scalia & Garner's terms, are not contextually appropriate[6]) with respect to 10 U.S.C. § 12406. This argument is based primarily on three facts.

---

6. Reading Law: The Interpretation of Legal Texts 70.

The first is that dictionary definitions often provide examples showing the use of the different senses of the word being defined), in order to give users an idea of the kinds of contexts in which each of the various senses of the word is conveyed. The second fact is that none of the definitions on which the Administration relies provides any such examples. And the third fact is that, several general-purpose dictionaries not cited by the Administration include definitions of *rebellion* that are similar to those relied on by the Administration, and that do provide examples.

Given the similarity in wording between the two sets of definitions, it is reasonable to regard all of these definitions as relating to the same sense of *rebellion* as the definitions preferred by the Administration. And that being the case, it would be reasonable to expect the examples from the general-purpose dictionaries to apply equally to the definitions that the Administration relies on. But it is immediately apparent upon reading those examples that they are not at all illustrative of the Administration's preferred definitions.

In the second part of this brief, *amicus* argues that even if one assumes that the Administration's definitions are contextually appropriate here, and that the events that prompted President Trump's invocation of § 12406 therefore constituted a rebellion, they did not constitute a rebellion against *the authority* of the United States government.

6

In the governmental context, authority doesn't consist simply of power, but combines power with the legitimacy that comes from being (shall we say) authorized by a higher authority; for example, the federal government's authority derives from the Constitution. But assuming that the events in Los Angeles constituted a rebellion, they were not a rebellion against the government's authority in that sense. Rather, they constituted opposition and resistance to "enforcement" actions that involved violations of the Fourth and Fifth Amendments. And those actions were beyond the authority of the agents who took them and of the federal government more broadly.

## Argument

### I. The district court was correct in concluding that the definitions of *rebellion* preferred by the Administration are irrelevant.

As previously noted, the district court concluded that the definitions of *rebellion* relied on by the Administration are irrelevant in the context of § 12406. In the discussion below, *amicus* closely examines the definitions that were cited by the parties, and shows that the district court's conclusion was correct.

### A. *Black's Law Dictionary* (12th ed., sense 2) *An American Dictionary of the English Language* (sense 2), and *Webster's International Dictionary of the English Language* (1903, sense 2)

These definitions, which the Administration relies on, are as follows:

*Black's*:  "Open resistance or opposition to an authority or tradition."

*American*:  "Open resistance to lawful authority."

7

*Webster's* (1903): "Open resistance to, or defiance of, lawful authority."

In relying on these definitions, the Administration tacitly assumes that as used in each of them, "authority" and "lawful authority" were intended to encompass the kind of authority referred to in § 12406, namely, governmental authority. Or, to use the district court's terminology (ER 20), the Administration assumes that this definition was intended to cover rebellions that are "political" in their nature. This amounts to an assumption that when rebellion is used in the sense defined by these definitions, it denotes a rebellion against such governmental authority.

But that assumption is inconsistent with the fact that, as stated by Justice Scalia, it is a "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used." *Deal v. United States*, 508 U.S. 129, 132 (1993). Lexicographers recognize this, as well as the fact that each sense of the word is typically associated with contexts specific to that sense.[7] They try to give users an idea of those context type(s), and providing that information is perhaps the most important function of the examples that of the word in use that are often provided (with another one being to help clarify the meaning of the sense in question):

---

7. *See, e.g.*, Rosamund Moon, *The Analysis of Meaning*, in LOOKING UP: AN ACCOUNT OF THE COBUILD PROJECT IN LEXICAL COMPUTING 86, 87 (John M. Sinclair ed., 1987).

> Sometimes—even for experienced dictionary editors— it can be difficult to disambiguate or prise apart two similar definitions in a dictionary. But by contrasting the illustrative quotations supplied for each meaning[,] the reader is often able to determine immediately the context in which the term may be used, and then to appreciate the definition more accurately.

John Simpson, *The production and use of occurrence examples*, in *A Practical Guide to Lexicography* 260, 268–69 (Piet van Sterkenburg, ed. 2003).

But none of these definitions relied on by the Administration provides any examples, so they furnish no guidance in determining the conditions in which one can say that there exists a rebellion in the sense advocated by the Administration. As a result, these definitions are apt to be misunderstood and therefore misapplied.

One way to deal with that problem would be to simply exclude the definitions from consideration, but *amicus* recognizes that the Court might be reluctant to do so. Fortunately, there is a less drastic alternative that that *amicus* believes can at least mitigate this problem. It consists of consulting dictionaries that (a) include a definition of *rebellion* that is worded similarly those above, and (b) do provide examples. Given those definitions' similarity in wording to those that are in dispute, it's reasonable to view them all as relating to the same sense of *rebellion*. And that being the case, the examples provided by those dictionaries are likely to be helpful in interpreting the one in *Black's*.

*Amicus* has pursued that alternative, and the results that it yielded are shown below (with the examples in italics):

*New Oxford American Dictionary* 1454 (3d ed. 2010): "the action or process of resisting authority, control, or convention. *an act of teenage rebellion*"

*Webster's Third New International Dictionary* 1892 (1961): "open opposition to a person or thing in a position of authority or dominance. *continuing the [rebellion[8]] started by the beboppers[9][;] a moral [rebellion] against the oppression of everyday pettiness and misery*"

*Oxford English Dictionary* (3d ed. 2002) (online only, www.OED.com; paywalled): "Open or determined defiance of or resistance to any authority, controlling power, or convention; an instance of this. *An outsiderly Old Etonian whose rebellion against the ethics of his upbringing has driven him mad*[;] *Freud's rebellion was directed against those in authority who did not acknowledge him.*"

2 *World Book Encyclopedia Dictionary* 1622 (1964): "resistance against any power or restriction[;] *sullen rebellion against fate.*"

These definitions describe what *amicus* will refer to as the "target" of rebellion in terms strikingly similar to those in the definitions at issue (which are repeated below, with emphasis added).

---

8. *Rebellion* appears in brackets in these examples because in the printed volume, the word being defined is replaced in the examples by a "swung dash" ("∼") as a space-saving measure. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, *supra*, at 17a.

9. The word *beboppers* was used to refer to musicians who played the style of jazz known as "bebop," which caused controversy when it first started being played. See, e.g., THE NEW GROVE DICTIONARY OF JAZZ 137 (1988 & 1994). Regarding the controversy, see, *e.g.*, Peter Helman, *Bebopped and Rebopped: The Births of Bebop and Invisible Man*, NEW YORK CITY IN THE '40S, https://tinyurl.com/bebopped.

> *Black's* (12th ed.): "Open resistance or opposition to an *authority or tradition.*"

> *American*: "Open resistance to *lawful authority.*"

> *Webster's International* (1903): "Open resistance to, or defiance of, *lawful authority.*"

The similarities among all these definitions provide reason to think that the definitions above, on this page and the one before, relate to the same sense of *rebellion*. And that, in turn, would lead one to expect the examples above would be appropriate as illustrations of *Black's* sense no. 2 in action.

But that expectation would not be borne out. No rational person would regard the uses of *rebellion* in the examples on pages 7–8 as denoting anything that could possibly be within the scope of § 12406. And beyond that, none of the examples can be understood as referring to opposition or resistance to a government or ruler, to conduct involving violence, or even (in some of the examples) to physical conduct of any kind.

This being the case, and in the absence of any evidence of *rebellion* having been used in one of the quoted senses in a factually relevant context, the senses discussed in this section are in almost certainly irrelevant to the issue before the Court.

## B. *Black's* (12th ed., Sense 3)

This definition reads, in its entirety, as follows: "*Hist.* Disobedience of a legal command or summons[.]" In the context of § 12406 it is irrelevant, but in order to

11

recognize its irrelevance one has to the know the significance of the notation "*Hist.*" That information can be found in the "Guide to the Dictionary" in Black's 12th edition, a link to which (in Westlaw) appears at the top of the definition, and which is presumably part of the frontmatter in the printed volume. As the Guide explains, "Hist." is one of four "usage tags" that are used in the 12th edition's definitions, and it means "historical; *no longer current in the law*" (emphasis added).

A word search of the PDF version of *Black's* first edition reveals that unlike the 12th edition, it did not use "hist." as a tag to indicate that a particular sense did not reflect the contemporary use of the word. Instead, it identified such senses by attributing them to "old English law," and such an attribution was included in the first edition's entry for sense of *rebellion* relied on by the Administration. *Black's Law Dictionary* 999 (1st ed. 1891). The definition was also supported by a citation "3 Bl. Comm. 444" (referring to Blackstone's *Commentaries*), the first edition of which was published in 1768,[10] predating the Militia Act of 1903[11] (the precursor of § 12406) by 135 years. In short, this sense of *rebellion* is a relic of 18th-century history, and is of no help in deciding the present issue.

---

10. *Commentaries on the Laws of England*, Wikipedia (last visited Sept. 8, 2025) (citing Wilfrid Prest, WILLIAM BLACKSTONE: LAW AND LETTERS IN THE EIGHTEENTH CENTURY (2008).

11. Pub. L. No. 57-33, Ch. 196, § 4, 32 Stat. 775, 776 (1903).

C. *An American Dictionary of the English Language* (sense 2), and *Webster's International Dictionary of the English Language* (1903, sense 2)

*American*:   "Open resistance to lawful authority."

*Webster's*:   "Open resistance to, or defiance of, lawful authority."

These definitions are discussed in section II.C., below, which deals with the significance of the fact that the power conferred on the president by § 12406 is conditioned on the occurrence (or existence of a danger) of a rebellion against "*the authority of the government of the United States*" (emphasis added).

## II. Even assuming the opposition to the federal activity at issue constituted a rebellion, the Administration hasn't shown that it amounted to a rebellion against "the authority of the Government of the United States."

Up to this point, *amicus* has argued that the Administration has failed to show that the circumstances that led President Trump to federalize the California National Guard constituted a rebellion. But even if that conclusion is rejected, there would remain the question of what the participants in the rebellion were rebelling *against*—i.e., whether they were rebelling against "the authority of the Government of the United States," as specified by 10 U.S.C. § 12406, or instead against something else.

Answering that question requires (1) identifying the federal activities against which the rebellion was directed and (2) determining whether those activities were with-

in the authority of the Government of the United States. But the Administration hasn't addressed those issues, contenting itself with a single conclusory sentence from the presidential memorandum invoking § 12406: "'To the extent that protests or acts of violence directly inhibit the execution of the laws, they constitute a form of rebellion against the authority of the Government of the United States.'" Admin. Br. 26 (quoting Donald J. Trump, *Presidential Actions: Department of Defense Security for the Protection of Department of Homeland Security Functions* (June 7, 2025) ("Trump Memorandum") (Excerpts of Record ["ER"] 45–46)).

As explained below, that does not provide an adequate justification for the president's invocation of § 12406 and federalization of the California National Guard.

**A. The protests were a response to the Administration's execution of its "Mass Deportation Operation" in Los Angeles, which has been preliminarily held to have violated the Fourth and Fifth Amendments.**

**1.** The president's memorandum federalizing the California National Guard was by its own terms issued in response to "violence and disorder" that occurred in Los Angeles on June 6, 2025 in the course of protests against immigration raids conducted by officers of Immigration and Customs Enforcement (ICE) (ER 45)—raids that "federal officials have described as [part of] 'the largest Mass Deportation Operation…in His-

tory[,]'" *Vasquez Perdomo v. Noem*, — F. Supp. 3d —, 2025 WL 1915694 at *1 (C.D. Cal. 2025).

In class action litigation challenging the Mass Deportation Operation's action in Southern California, *Vasquez Perdomo v. Noem*, No. 25-cv-05605 (C.D. Cal. filed June 20, 2025), the district court held, *inter alia*, that (1) members of one subclass of plaintiffs were likely to succeed on their claim that their rights under the Fourth Amendment had been or would be violated, on the ground that they had been or would be "subjected to detentive stop by federal agents…without a pre-stop, individualized assessment concerning whether the person [is subject to such detention]," and (2) members of another subclass were likely to succeed on their claim that their Fourth Amendment rights had been violated because they had been or would be "arrested…by federal agents without a warrant and without a pre-arrest individualized assessment of probable cause that [they] pose[] a flight risk." 2025 WL 1915964 at *7 n.6 (July 11, 2025). Upon an interlocutory appeal to this Court, those determinations were not disturbed. — F.4th —, 2025 WL 2181709 (9th Cir. Aug. 1, 2025), *stay granted*, 606 U.S. — (Sept. 8, 2025).[12]

The decisions in *Vasquez Perdomo* provide reason for this Court to conclude that the Mass Deportation Operation's actions in Los Angeles, against which the alleged rebel-

---

12. Although this Court did stay the TRO with respect to the "except as permitted by law" clause, 2025 WL 2181709, that issue is irrelevant to *amicus*'s argument here.

lion at issue here was directed, was based at least in part on violations of the Constitution. While the district court's decision was based on its conclusion that the plaintiffs were likely to succeed on their Constitutional claims rather than a final decision on the merits, its ruling, is entitled to substantial weight here, as is its affirmance by this Court, and the decisions should arguably be treated as conclusive on that point. This appeal concerns the same kind of interim relief as was at issue in *Vasquez–Perdomo*, so the likelihood-of-success standard that applied there also applies here. And that, in turn, is important because (as discussed in the next section) violations of the Constitution are by definition outside the authority of the government of the United States.

**2.** As this brief was being finalized, the Supreme Court issued a single-paragraph order granting without explanation the Administration's application to stay the district court's TRO. *Noem v. Vasquez–Perdomo*, 606 U.S. —, 2025 WL 2585637 (Sept. 8, 2025) (No. 25A169). Justices Sotomayor, Kagan, and Jackson dissented.

Because the Supreme Court's decision to grant a stay was unexplained, no conclusions can be drawn about its views about any issues relevant to this brief. As Justice Sotomayor noted in her dissent, "Neither the District Court nor the parties will know whether the majority believed the key issue was standing, the merits, or the scope of

relief, any one of which could have been the basis for the majority's order."[13] Dissenting Op. at 21. Of those issues, standing and the scope of relief are irrelevant to the arguments *amicus* has presented. So to the extent that the Supreme Court's stay is based on its conclusions as to those issues, it does not limit this Court's authority to consider *amicus*'s argument and, if it accepts the argument, to rely on it in deciding this appeal.

**B. The constitutional violations committed in the course of the Mass Deportation Operation were not exercises of the authority of the United States government.**

As used in the context of governmental law, *authority* is most appropriately understood to mean "[l]egal power; a right to command or to act; the right and power of public officers to require obedience to their orders lawfully issued in the scope of their public duties." *Black's Law Dictionary* (1st ed. 1891 & 5th ed. 1979); *accord* 1 *Webster's New International Dictionary* 155 (1911) ("Legal or rightful power; a right to command or to act; power exercised by a person in virtue of his office or trust; dominion; jurisdiction; authorization; as, the authority of a prince over subjects, and of parents over children; the *authorization* of a court.") (emphasis in the original); 1 *A Standard Dictionary of the English Language* 142 (Funk & Wagnalls 1908) ("The right to command and enforce

---

13. Justice Kavanaugh wrote a concurrence in which he concluded that the Administration was likely to prevail as to both standing and the merits, but none of the other Justices joined in his opinion.

obedience; the right to act by virtue of office, station, or relation; as the *authority* of the parent over the child; the *authority* of an officer") (emphasis in the original).

Authority in this sense doesn't equate simply to raw power, but rather consists of power that is legitimized by permission from a higher source of authority (or, to put it differently, authorization). Thus, federal government's authority derives from the Constitution, which simultaneously imposes limits on the kinds of actions that the government is permitted to take. But those limitations aren't self-executing; they don't disable the government from acting unconstitutionally. If the government nevertheless does so, enforcement of the limits depends on the courts.

But even then, there remains a tension between power and authority, which can be seen in operation of the collateral-bar rule. Under that rule, an injunction that prohibits conduct protected by the Constitution (and therefore exceeds the court's authority) is nevertheless within the court's power in that it binds the enjoined party unless and until it is stayed or reversed on appeal. *E.g.*, *In re Establishment Inspection of Hern Iron Works, Inc.*, 881 F.2d 722, 725–26 (9th Cir. 1989).

Further evidence of the difference between authority and power can be seen in judicial statements in which that difference is highlighted, either explicitly or implicitly:

> Under our well-established precedent, the equitable relief available in the federal courts is that 'traditionally accorded by courts of equity' at the time of our founding. Nothing like a universal injunction was available at the

founding, or for that matter, for more than a century thereafter. Thus, under the Judiciary Act, *federal courts lack authority to issue them.*

    *Trump v. CASA, Inc.*, — U.S. —145 S. Ct. 2540, 2560 (2025) (emphasis added; citation and quotation marks omitted).

The treaties of the United States with Russia and with most of the nations of the world must be considered as defining and limiting *the authority of the government of the United States* to take active steps for the arrest and surrender of deserting seamen.

    *Tucker v. Alexandroff*, 183 U.S. 424, 466 (1902) (emphasis added).

In its practical operation,…the ordinance goes beyond mere content discrimination, to actual viewpoint discrimination…. [The City of] St. Paul has no such authority to license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules.

    *R.A.V. v. City of St. Paul*, 505 U.S. 377, 392 (1992).

In each of the foregoing cases, the governmental action in question—extending a deadline, granting an injunction, arresting deserting seamen, enacting an ordinance—had the effect of changing the legal status quo, and was therefore an exercise of *power*, but was beyond the governmental entity's *authority.*

When the reference in § 12406 to the authority of the federal government is seen in this light, it becomes clear that the constitutional violations committed in the course of the Mass Deportation Operation did not represent exercises of that authority. As the Supreme Court has said, conduct by federal official that is unconstitutional is "beyond the officer's powers and is, therefore, *not the conduct of the sovereign*"). *Larson v. Domestic &*

*Foreign Commerce Corp.*, 337 U.S. 682, 690 (1949) (emphasis added).[14] *See also, e.g.*, *United States v. Yakima Tribal Court*, 806 F.2d 853, 859 (9th Cir. 1986) ("[I]f a federal official …commits an unconstitutional act, he cannot be acting on behalf of the government because his actions go beyond the scope of his authority and are *ultra vires*.") (citing *Larson, supra*).

This conclusion would hold even if it turns out that the ICE agents carrying out the Mass Deportation Operation were instructed or (purportedly) authorized to disregard the Fourth and Fifth Amendments in doing so—no matter who those instructions or purported authorizations came from. The Supreme Court has said that "no Act of Congress can authorize a violation of the Constitution[,]" *Almeida-Sanchez v. United States*, 413 U.S. 266, 272 (1973), and it follows *a fortiori* that no such authorization can be given by the president, who lacks the power to make law and is obligated to "take Care that the Laws be faithfully executed," U.S. Const. Art. II, § 3, or by officials at even the highest level of the executive agencies under his control.[15]

---

14. Indeed, this is what accounts for the fact that this action is not barred by sovereign immunity. *See Ex parte Young,* 209 U.S. 123, 159–60 (1908).

15. Although the federal agents carrying out the Mass Deportation Operation had no authority to violate the constitution, they acted under *color* of authority and are therefore subject to suit under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and potentially to criminal prosecution under 18 U.S.C. § 242. And supervisory officials who "created a policy or custom under which unconstitutional

**C. In light of the foregoing, President Trump was neither authorized nor empowered to invoke § 12406.**

As *amicus* has shown, the opposition and resistance in Los Angeles was directed at actions outside the federal government's authority, so even if the opposition and resistance constituted a rebellion, it was not a rebellion against the *authority* of the government of the United States. So even if one assumes that the protests at issue here constituted a rebellion against *something*, they did not constitute a rebellion *against the authority* of the Government of the United States, and therefore did not provide a valid basis for the invocation of 10 U.S.C. § 12406.

The conclusion that there was no rebellion against the authority of the United States government also has independent significance (in two respects) as to the dictionary entries that defined *rebellion* as "resistance to lawful authority," *An American Dictionary of the English Language* (sense 2), and "resistance to, or defiance of, lawful authority," *Webster's International Dictionary of the English Language* (1903, sense 2). The fact that the protests and violence were directed at actions that were beyond the federal government's authority suggests that they did not constitute resistance or defiance to *lawful* authority.

---

practices occurred" might well face similar exposure. *See, e.g.*, *Littlejohn v. City of New York*, 795 F.3d 297, 314 (2d Cir. 2015).

And if that was the case, it would not matter for purposes of this case that the actions might have qualified as a rebellion more generally.

## Conclusion

For the reasons stated above, the Court should hold that during the relevant time period, no rebellion against the authority of the Government of the United States took place, and therefore that the presidential directive at issue here cannot be justified on the basis that such a rebellion was occurring or had occurred.

Respectfully Submitted,

*/s/ Neal Goldfarb*
Neal Goldfarb
P.O. Box 488
Dillsburg, PA 17019
(202) 262-7886
goldfarbneal@gmail.com
September  9, 2025                 Attorney for *Amicus Curiae*

# UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** _____ No. 25-3727 _____

I am the attorney or self-represented party.

**This brief contains** _____ 5,292 _____ **words,** including _____ 0 _____ words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[x] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _____ /s/ Neal Goldfarb _____ **Date** __ September 9, 2025 __
*(use "s/[typed name]" to sign electronically-filed documents)*

## Certificate of Service

I HEREBY CERTIFY that on this 9th day of September, 2025, the foregoing Amicus Brief of Neal Goldfarb was filed with Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the CM/ECF system, that counsel for all parties are registered with the CM/ECF system, and that service upon counsel for the parties will be accomplished via the CM/ECF system.

*/s/ Neal Goldfarb*
Neal Goldfarb
Attorney for *Amicus Curiae*