No. 25-3727

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————

GAVIN NEWSOM, *in his official capacity as Governor of the State of California*; STATE OF CALIFORNIA,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, *in his official capacity as President of the United States*; PETER HEGSETH, *in his official capacity as Secretary of the Department of Defense*; UNITED STATES DEPARTMENT OF DEFENSE,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the Northern District of California

———————————

## REPLY BRIEF FOR APPELLANTS

———————————

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
ANNA O. MOHAN
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7517*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-2689*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................1

ARGUMENT .......................................................................................................3

I.    The President Lawfully Federalized the National Guard .......................................3

    A.    The President Reasonably Judged that Section 12406's Conditions Are Satisfied and that Decision Is Conclusive ...............................3

    B.    The President Acted Lawfully in the Process Used to Call Up the National Guard.......................................................................17

II.    Plaintiffs Did Not Establish the Equitable Factors for Injunctive Relief ......... 23

III.    This Court Should Decide the Merits and Leave in Place the Stay Panel Opinion ................................................................................. 25

CONCLUSION ................................................................................. 28

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                                                                    **Page(s)**

*American Sch. of Magnetic Healing v. McAnnulty*,
   187 U.S. 94 (1902) .................................................................. 22-23

*Baker v. Carr*,
   369 U.S. 186 (1962) ......................................................................... 13

*Biden v. Nebraska*,
   600 U.S. 477, 511, 517 (2023) ........................................................ 7

*Bufkin v. Collins*,
   604 U.S. 369 (2025)....................................................................... 10

*Corner Post, Inc. v. Board of Governors of the Fed. Rsrv. Sys.*,
   603 U.S. 799 (2024)....................................................................... 23

*Dalton v. Specter*,
   511 U.S. 462 (1994) ....................................................................... 17

*Department of the Navy v. Egan*,
   484 U.S. 518 (1988)......................................................................... 7

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992)....................................................................... 16

*Gilligan v. Morgan*,
   413 U.S. 1 (1973)........................................................................... 14

*Herb Reed Enters., LLC v. Florida Ent. Mgmt., Inc.*,
   736 F.3d 1239 (9th Cir. 2013) ...................................................... 25

*Jones v. United States*,
   527 U.S. 373, 389 (1999) .............................................................. 20

*Luther v. Borden*,
   48 U.S. (7 How.) 1 (1849) ............................................................ 13

*Loper Bright Enterprises v. Raimondo*,
   603 U.S. 369 (2024)................................................................. 16, 17

*Martin v. Mott*,
   25 U.S. (12 Wheat.) 19 (1827) ........................... 2, 3, 6, 11, 12, 19

*Monsanto Co. v. Geertson Seed Farms,*
   561 U.S. 139 (2010) ...............................................................................23

*Moyer v. Peabody,*
   212 U.S. 78 (1909) .................................................................................13

*Murthy v. Missouri,*
   603 U.S. 43 (2024) .................................................................................25

*Newsom v. Trump,*
   141 F.4th 1032 (9th Cir. 2025) ................................... 2, 6, 12, 13, 14, 15, 17,
                                  18, 19, 22, 23, 23, 24, 25

*NRC v. Texas,*
   605 U.S. 665 (2025) ...............................................................................16

*Pacific Radiation Oncology, LLC v. Queen's Med. Ctr.,*
   810 F.3d 631 (9th Cir. 2015) .................................................................26

*Roman v. Wolf,*
   977 F.3d 935 (9th Cir. 2020) .................................................................25

*Seila Law LLC v. CFPB,*
   591 U.S. 197 (2020) ......................................................................... 7, 14

*Sterling v. Constantin,*
   287 U.S. 378 (1932) .....................................................................13, 14, 15

*United States v. Texas,*
   599 U.S. 670 (2023)................................................................................ 23

*U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship,*
   513 U.S. 18 (1994)................................................................................. 26

*West Virginia v. EPA,*
   597 U.S. 697 (2022) ............................................................................... 7

*Winter v. Natural Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ................................................................................. 23

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952)............................................................................... 15

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
   566 U.S. 189 (2012) ................................................................................. 13

**U.S. Constitution:**

Art. I, § 8, cl. 15 ..................................................................................... 7

Art. II, § 3 ............................................................................................. 10

**Statutes:**

Act of May 27, 1908, ch. 204, § 3, 35 Stat. 399 .......................... 20, 21

Act of Aug. 10, 1956, ch. 1041, § 3500, 70A Stat. 1 ...................... 20

Administrative Procedure Act,
   5 U.S.C. § 701 *et seq.* .......................................................... 16
   5 U.S.C. § 706 ...................................................................... 16

Insurrection Act,
   10 U.S.C. § 251 ..................................................................... 19
   10 U.S.C. § 252-254 ............................................................. 19

10 U.S.C. § 3500 Historical and Revision Notes (1988) ................. 21

10 U.S.C. § 12406 ........................................................... 3, 11, 17

10 U.S.C. § 12406(2) ............................................................. 8

10 U.S.C. § 12406(2)-(3) ........................................................ 1

10 U.S.C. § 12406(3) ............................................................. 3

**Congressional Materials:**

42 Cong. Rec. 6870 (1908) .............................................. 21, 22

46 Cong. Rec. 3638 (1911) .................................................. 22

**Executive Branch Materials:**

Exec. Order No. 11519,
   35 Fed. Reg. 5003 (Mar. 24, 1970) ..................................... 6

iv

*Final Report of the Attorney General's Committee on Administrative Procedure* (1941) .............23

**Other Authorities:**

Josh DuBose, *'That Can Kill You': L.A. Police Attacked with Fireworks, Rocks, Molotov Cocktails*, KTLA (June 8, 2025, at 22:49 PT), https://ktla.com/news/local-news/that-can-kill-you-l-a-police-attacked-with-fireworks-rocks-molotov-cocktails/ ............................................................................................4

Jennifer K. Elsea, Cong. Rsch. Serv., R42659, *The Posse Comitatus Act and Related Matters: The Use of the Military to Execute Civilian Law* (2018) ....................................................................................10

Charles Fairman, *Martial Rule, in the Light of* Sterling v. Constantin 19 Corn. L.Q. 20, 33 (1933) ................................................15

Michele McPhee, *LAPD Chief Jim McDonnell Says, 'Violence I Have Seen Is Disgusting,' Recounting Attacks on Cops*, L.A. Magazine (June 8, 2025), https://perma.cc/9848-BJES ...............5

Stay Motion Addendum, *Newsom v. Trump* No. 25-5553 (9th Cir. Sept. 3, 2025) ....................................26, 27

# INTRODUCTION

The President called up the National Guard in the face of violence specifically targeted at federal officials, including officials attempting to enforce our immigration laws. That mob violence seriously injured federal officers, caused extensive damage to federal property, and forced the closure of federal buildings. State and local police were unable or unwilling to effectively quell the violence, and federal agents on site were unable to do so without assistance. In these circumstances, the President properly judged that "the President is unable with the regular forces to execute the laws of the United States," and that there was "a rebellion or danger of a rebellion against the authority of the Government of the United States," warranting federalization of California National Guard members. 10 U.S.C. § 12406(2)-(3). The district court erred in enjoining the Guard deployment and directing the President to relinquish command to the California Governor.

In defending the district court's injunction, plaintiffs maintain that the criteria for federalization were not satisfied. But under plaintiffs' interpretation of Section 12406(3), the President would be unable to call up the Guard to respond to violent attacks actively impeding federal law enforcement, unless he first evaluates every other potential resource at his disposal and can present evidence to satisfy a court that those other resources are unavailable. That implausible position finds no support in the text and makes little sense in the context of a statute that empowers the President to act quickly to address exigent threats. For similar reasons, plaintiffs fail in their efforts to

restrict the term "rebellion," as used in Section 12406(2), to a narrow interpretation that excludes the violent opposition to federal law enforcement that occurred here. Even setting all that aside, longstanding Supreme Court precedent makes clear that neither plaintiffs nor the district court can second-guess the President's judgment about the existence of conditions that justify federalization of the National Guard under Section 12406. *See Martin v. Mott*, 25 U.S. (12 Wheat.) 19 (1827).

Plaintiffs also erroneously contend that Section 12406's instruction to issue a federalization order "through" a governor required the President to consult with the California Governor prior to issuing his order. That language is more naturally read as a ministerial requirement that ensures orderly transfer of authority over the Guard members from state to federal commanders. And although plaintiffs disclaim any suggestion that Section 12406 authorizes a gubernatorial veto, they fail to explain what would happen if following the consultation, the Governor refused to transmit the President's order. It is implausible to think that Congress intended to sow that sort of confusion in a statute that necessarily demands "prompt and unhesitating obedience" to the President's orders. *Newsom v. Trump*, 141 F.4th 1032, 1053 (9th Cir. 2025) (per curiam) (quoting *Martin*, 25 U.S. (12 Wheat.) at 30). Regardless, as this Court's stay panel recognized, any technical flaw in transmitting the President's order would not justify the extraordinary injunction issued by the district court.

Finally, the remaining equitable factors overwhelmingly favor the federal government. As the stay panel explained, the federal government has an uncontested

2

interest in the protection of federal personnel and property and that interest was seriously threatened by violence in Los Angeles. Plaintiffs' focus on hypothetical and speculative concerns about the diversion of state resources and inflaming tensions do not demonstrate that they will suffer irreparable harm in the absence of an injunction. There similarly is no reason to remand to the district court, where the lawfulness of the federalization order depends only on the facts that existed before that order was issued, and conditions on the ground amply justify the continued deployment of the Guard, in any event.

## ARGUMENT

## I. The President Lawfully Federalized the National Guard

### A. The President Reasonably Judged that Section 12406's Conditions Are Satisfied and that Decision Is Conclusive

The President federalized the National Guard to protect federal personnel and property from mob violence specifically aimed at impeding lawful federal enforcement efforts. In doing so, the President exercised authority that Congress vested in him under 10 U.S.C. § 12406, and his judgment was "conclusive upon all other persons," including the district court. *Martin v. Mott*, 25 U.S. (12 Wheat.) 19, 30 (1827).

**1.** The President lawfully invoked Section 12406(3), which authorizes the President to call forth the National Guard when he is "unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(3). In his order

3

federalizing the Guard, the President described the "[n]umerous incidents of violence and disorder" occurring in Los Angeles and explained that those incidents were deliberately targeted at "Immigration and Customs Enforcement (ICE) and other United States Government personnel . . . performing Federal functions and supporting the faithful execution of Federal immigration laws." ER-50.

Those judgments are amply supported by the record. Declarations described protesters "throwing rocks and other objects," including Molotov cocktails, at federal personnel. ER-80-81; *see* ER-57-61. News articles reported on mobs blocking traffic, launching fireworks and other projectiles at police vehicles, *see* ER-203-204, "block[ing] entrances and exits to" federal buildings, and "attempt[ing] to physically stop ICE vehicles," ER-136; *see also* ER-118-119. Articles similarly described how the violence continued despite the dispersal orders issued by local law enforcement, ER-203; *see* ER-59-60, and how local law enforcement struggled to respond to ICE's requests for assistance, *see* ER-205 (noting that "ICE requested assistance from [the Los Angeles Police Department (LAPD)] multiple times over the course of Friday night" but that it "took LAPD 55 minutes to respond"); *see also* ER-58-59. As LAPD Chief Jim McDonnell explained, the local police were "overwhelmed"; "things ha[d] gotten out of control," and "somebody could [have] easily be[en] killed."[1]

---

[1] Josh DuBose, *'That Can Kill You': L.A. Police Attacked with Fireworks, Rocks, Molotov Cocktails*, KTLA (June 8, 2025, at 22:49 PT), https://ktla.com/news/local-news/that-can-kill-you-l-a-police-attacked-with-fireworks-rocks-molotov-cocktails/;

*Continued on next page.*

4

Plaintiffs do not dispute that protesters attacked federal personnel and property or that the attacks were specifically aimed at impeding the enforcement of federal immigration law. Nor do plaintiffs defend the district court's suggestion that the President can invoke Section 12406(3) to federalize National Guard members only where he is completely incapable of enforcing federal law. *See* Answering Br. 27; *see also* ER-25-26. Instead, plaintiffs contend that the President failed to satisfy Section 12406(3) because he did not "exhaust" other federal, state, or local law enforcement resources "before federalizing the Guard." Answering Br. 22.

Nothing in the text of Section 12406(3) supports imposing such an exhaustion requirement, nor would it make sense in this context. Plaintiffs argue that Section 12406 is meant to encompass only "unusual" and "extreme" "exigenc[ies]." Answering Br. 23 (quotation omitted). But they contend that before the President could federalize the National Guard in response to such an emergency, he first had to exhaust every other resource potentially at his disposal, including at least: officers from "state and local law enforcement agencies"; "officers from one or more of the federal government's many law enforcement arms"; "federal marshals"; "Marines"; ICE officers from nearby regions; Federal Bureau of Investigation officers; and Federal Protective Service officers, Answering Br. 23-25 (quotation omitted). And worse still, plaintiffs argue that the President must present evidence to explain to

Michele McPhee, *LAPD Chief Jim McDonnell Says, 'Violence I Have Seen Is Disgusting,' Recounting Attacks on Cops*, L.A. Mag. (June 8, 2025), https://perma.cc/9848-BJES.

courts why it would have been infeasible to use these other resources. *See* Answering Br. 27-28. Plaintiffs offer no reason to conclude that Congress would have imposed those extraordinary requirements via a statute that empowers the President to address "sudden emergencies" and where the evidence they seek "might reveal important secrets of state, which the public interest, and even safety, might imperiously demand to be kept in concealment." *Martin*, 25 U.S. (12 Wheat.) at 30-31. Nor did President Nixon appear to understand the statute to impose such a requirement when he invoked the predecessor to Section 12406 to federalize the National Guard in response to the Postal Strike of 1970. *See* Exec. Order No. 11519, 35 Fed. Reg. 5003 (Mar. 24, 1970) (containing no evidence showing that other forces were unavailable). It is thus far more plausible to conclude, as the stay panel did, that the President lawfully invokes Section 12406(3) where, as here, mob violence is specifically directed at federal personnel and property in an effort to hinder the enforcement of federal laws. *See Newsom v. Trump*, 141 F.4th 1032, 1052 (9th Cir. 2025) (per curiam).

Plaintiffs half-heartedly assert that the federal government's reading of Section 12406(3) licenses violations of the Appropriations Clause, upsets the federal-state balance of power and the separation of powers, and undermines norms against military intrusion into civilian affairs. *See* Answering Br. 26. Every domestic deployment of the federalized National Guard would theoretically present those same concerns. But the text of the Constitution makes clear that Congress may "provide

for calling forth the Militia." U.S. Const. art. I, § 8, cl. 15. Section 12406(3) rests on that express grant of authority, and the President lawfully invoked it.

Nor does the major-questions doctrine apply here. *Contra* Answering Br. 26-27. The major-questions doctrine addresses the "particular and recurring problem" of "*agencies* asserting highly consequential power beyond what Congress could reasonably be understood to have granted." *West Virginia v. EPA*, 597 U.S. 697, 724 (2022) (emphasis added). Those concerns dissipate when, as here, Congress delegates authority directly to the President— "the most democratic and politically accountable official in Government," *Seila Law LLC v. CFPB*, 591 U.S. 197, 224 (2020). The major-questions doctrine also applies only where there is an apparent "'mismatch[]'" between the breadth of the asserted power and the "narrow[ness]" of the statute in which the agency claims to have discovered it. *Biden v. Nebraska*, 600 U.S. 477, 511, 517 (2023) (Barrett, J., concurring). No such mismatch exists here. Section 12406 addresses invasions, rebellions, and impediments to the execution of federal law and authorizes the President (the most important person in government—and uniquely situated to react quickly) to respond to those emergencies. The more natural presumption in this context is just the opposite: that Congress intends broad language conferring emergency powers to be construed broadly, not narrowly. *See, e.g.,* *Department of the Navy v. Egan*, 484 U.S. 518, 530 (1988) ("[U]nless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs.").

7

**2.** The President's action was independently warranted under Section 12406(2), which authorizes him to call the National Guard into federal service whenever "there is a rebellion or danger of a rebellion against the authority of the Government of the United States." 10 U.S.C. § 12406(2). The federal government explained why that condition was satisfied in Los Angeles. *See* Opening Br. 28-29. In the days leading up to the President's federalization order, violent rioters assaulted federal officials with potentially deadly weapons like mortar-style fireworks, Molotov cocktails, concrete chunks, and bricks, and they attempted to breach federal buildings with make-shift battering rams—all in an effort to oppose and hamper lawful immigration enforcement efforts. The President concluded that "[t]o the extent [these] protests or acts of violence directly inhibit the execution of the laws, they constitute a form of rebellion against the authority of the Government of the United States." ER-50.

In urging the Court to second-guess that conclusion, plaintiffs do not defend the district court's assertion that a rebellion must be "against the government as a whole." ER-21. With good reason: that requirement would exclude historical incidents, such as the Whiskey Rebellion, where violent protests were aimed at opposing a single federal law or issue, not the government as a whole. *See* Answering Br. 21 (acknowledging that the Whiskey Rebellion satisfies Section 12406's definition of "rebellion").

Plaintiffs maintain that a rebellion under Section 12406(2) requires "'violent,' 'armed,' 'organized,' 'open and avowed' resistance to the lawful authority of the

government." Answering Br. 17 (quoting ER-19-21). Even under this framework, the federal government has explained why those features were present here. *See* Opening Br. 28-29. Plaintiffs' suggestion that there was no evidence of organization ignores the declaration from a federal official that described demonstrators organizing themselves through social media, "posting the locations of federal law enforcement employees conducting immigration enforcement operations," as well as "images[] and family information of federal law enforcement employees." ER-64. And the mere fact that some protesters were peaceful does not minimize the undisputedly violent actions of others. Plaintiffs also assert that Congress "plainly had in mind rebellions that are 'political in nature.'" Answering Br. 19 (quoting ER-20). But again, plaintiffs fail to explain why that purported requirement would not be satisfied when plaintiffs concede that the protests here were "against federal immigration policies." Answering Br. 18.

In any event, there is no basis for concluding that Congress intended to adopt a narrow definition of "rebellion" requiring circumstances akin to the Civil War. As the federal government has explained, dictionaries from the relevant time period, including those cited by the district court and plaintiffs, define "rebellion" in a manner that encompasses deliberate resistance to the government's laws and authority. *See* Opening Br. 26-27. That broader conception of "rebellion" better reflects the historical context in which Section 12406 was enacted and the instances in which Presidents have federalized National Guard members since Section 12406 was

9

enacted. *See* Jennifer K. Elsea, Cong. Rsch. Serv., R42659, *The Posse Comitatus Act and Related Matters: The Use of the Military to Execute Civilian Law* 9-12, 35-38 (2018).

Construing Section 12406(2) to apply to violent mob attacks targeted at federal personnel as they attempt to enforce federal laws will not make it "trivially easy" for presidents to federalize the National Guard. *Contra* Answering Br. 19. Presidents have a duty to take care that the laws, including Section 12406, are faithfully executed, *see* U.S. Const. art. II, § 3, and like any other "public officer," they are "presumed to act in obedience to his duty," *Martin*, 25 U.S. (12 Wheat.) at 33. Nor does the federal government's reading of Section 12406(2) create impermissible superfluity. *Contra* Answering Br. 19-20. Some on-the-ground conditions very well might constitute a rebellion and render the President unable to enforce the federal laws. "[S]ometimes the better overall reading of the statute contains some redundancy." *Bufkin v. Collins*, 604 U.S. 369, 387 (2025) (quotation omitted). After all, the Whiskey Rebellion, which plaintiffs describe as the "perfect illustration" of a circumstance where Section 12406's conditions are satisfied, Answering Br. 21, undoubtedly rose to the level of a "rebellion" and also rendered the President "unable" to enforce the federal excise tax on whiskey.[2]

---

[2] Plaintiffs assert that the mobilization "intrudes on Congress's Article I prerogatives and on the State's sovereign interest in deploying its Guard," Answering Br. 21, but that assumes that the federalization here was unlawful, which is wrong for the reasons explained, *see supra* pp. 3-11.

10

Finally, the federal government explained why, at a minimum, the conditions in Los Angeles amounted to a "dangerous risk of rebellion," which is an independent basis upon which to conclude that Section 12406(2)'s conditions are satisfied. *See* Opening Br. 29-30. Plaintiffs do not even attempt to respond to this argument.

**3.** In any event, this Court need not reach questions about the propriety of the President's judgment because Congress vested the decision whether to call up the National Guard in the President, not the courts. *See* Opening Br. 30-35. In *Martin*, the Supreme Court held that "the authority to decide whether [an] exigency ha[d] arisen[]" under a 1795 law authorizing the federalization of the militia "belong[ed] exclusively to the President." 25 U.S. (12 Wheat.) at 30. Once the President judged that such an exigency existed, his judgment was "conclusive upon all other persons." *Id.* That holding governs here and precludes plaintiffs' and the district court's efforts to second-guess the President's decision.

Plaintiffs attempt to distinguish Section 12406, contending that it vests discretion in the President only as to the numbers of militia members to call into service. *See* Answering Br. 36-37. Section 12406, however, uses the same structure as, and language virtually identical to, the 1795 militia law at issue in *Martin*: It begins with a clause stating that "whenever" a particular type of exigency arises and concludes with a clause authorizing the "President" to "call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to" address that exigency. *Compare* 10 U.S.C. § 12406, *with Martin*,

11

25 U.S. (12 Wheat.) at 31 (quoting text of 1795 law). That language, the Supreme Court made clear, "necessarily constitute[s]" the President as "the judge of the existence of the exigency in the first instance." *Martin*, 25 U.S. (12 Wheat.) at 31. Plaintiffs identify no distinction in Section 12406's text that would warrant a different reading.

For the same reason, it does not matter that Congress, in the course of amending Section 12406, added and then omitted the phrase, "in the judgment of the President." *Contra* Answering Br. 30. Whatever changes Congress made along the way, the version of Section 12406 that governs uses, in all material respects, the same language and structure as the 1795 law that the Court analyzed in *Martin*. As the stay panel put it, "if Congress had disagreed with the *Martin* Court's interpretation of the 1795 Act, it could have amended the statute to provide for greater judicial review of the existence of a predicate condition," but it did not do so. *Newsom*, 141 F.4th at 1048. If anything, Congress's modification of other aspects of the statutory delegation of the calling forth power underscores that Congress could have but chose not to alter *Martin*'s bottom-line conclusion.

Plaintiffs fare no better in attempting to distinguish *Martin* on its facts. *See* Answering Br. 37-38. *Martin* arose out of a militia member's challenge to President Madison's decision to call up the militia in response to the British invasion during the War of 1812. But the stay panel correctly recognized that *Martin*'s holding is not limited to situations where a militiaman questions orders during a foreign invasion.

12

To the contrary, the Supreme Court relied heavily on *Martin* in *Luther v. Borden*, 48 U.S. (7 How.) 1 (1849)—a case involving a "purely domestic dispute" between two factions each purporting to constitute the legitimate government of Rhode Island. *Newsom*, 141 F.4th at 1050 (citing *Luther*, 48 U.S. (7 How.) at 44-45). And in *Luther*, the Court reiterated that courts could not second-guess President Tyler's decision to call out the militia to support one side in the Rhode Island dispute. 48 U.S. (7 How.) at 44-45.

Nor has *Martin*'s reasoning been undermined by modern precedent. *Contra* Answering Br. 31-32, 35-36, 37-40. The Supreme Court has on multiple occasions cited with approval *Martin*'s holding that the militia law afforded the President "conclusive" authority to determine whether the conditions exist that justify calling forth the militia. *See Luther*, 48 U.S. (7 How.) at 45; *Sterling v. Constantin*, 287 U.S. 378, 399 (1932); *see also Moyer v. Peabody*, 212 U.S. 78, 83 (1909) (citing *Luther*). More recent justiciability cases similarly recognize that statutes can confer unreviewable discretion on the President, especially in emergency contexts where courts have neither technical competence nor official responsibility. *See Baker v. Carr*, 369 U.S. 186, 213 (1962) (citing *Martin* for the proposition that an emergency demands "[a] prompt and unhesitating obedience" (quotation omitted)); *see also Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 205-06, 206 n.1 (2012) (Sotomayor, J., concurring in part and concurring in the judgment) (citing *Martin* for the proposition that "courts are

13

particularly ill suited to intervening in exigent disputes necessitating unusual need for 'attributing finality to the action of the political departments'").

The Court has also reaffirmed *Martin*'s acknowledgement that Congress and periodic elections can serve as checks to guard against Executive abuses of power where judicial review is unavailable. *See Gilligan v. Morgan*, 413 U.S. 1, 10 (1973) ("The ultimate responsibility for . . . decisions" as to the composition, training, equipping, and control of a military force "is appropriately vested in branches of the government which are periodically subject to electoral accountability."); *cf. Seila Law*, 591 U.S. at 224 ("[T]he Framers made the President the most democratic and politically accountable official in Government."). Regardless, the stay panel correctly recognized that even when a Supreme Court precedent "appears to rest on reasons rejected in some other line of decisions," the lower courts must "follow the case which directly controls, leaving to [the] [Supreme] Court the prerogative of overruling its own decisions." *Newsom*, 141 F.4th at 1050 (quotation omitted).

Plaintiffs also misread *Sterling*, 287 U.S. 378. As explained (Opening Br. 33-34), that case involved a challenge to orders the Governor of Texas issued to the Texas National Guard after concluding that oil and gas producers were "in a state of insurrection." *Sterling*, 287 U.S. at 387-88 (quotation omitted). Plaintiffs incorrectly assert that the Court's "ultimate conclusion" was that "no exigency . . . justified the Governor['s] actions." Answering Br. 34 (alterations in original) (quoting *Sterling*, 287 U.S. at 404). To the contrary, the Court made clear that the Governor was

14

"appropriately vested with the discretion to determine whether an exigency requiring military aid . . . has arisen" and that "[h]is decision to that effect [wa]s conclusive." *Sterling*, 287 U.S. at 399. The Court accordingly did not second-guess the Governor's assessment about the existence of an insurrection that justified the deployment of the militia. *See id.* at 401, 404. Instead, the Court evaluated only the measures taken by the militia once deployed. *See id.* at 404 (assuming "that the Governor was entitled to declare a state of insurrection and to bring military force to the aid of civil authority" but emphasizing that "the proper use of that power in this instance was to maintain the federal court in the exercise of its jurisdiction, and not to attempt to override it"). As the commentary plaintiffs cite explains, under *Sterling*, "courts must give conclusive value" to "the proclamation of a state of insurrection," but "not [to] the orders issued" in response to the proclamation. Charles Fairman, *Martial Rule, in the Light of Sterling v. Constantin*, 19 Corn. L.Q. 20, 33 (1933); *cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587-89 (1952) (reviewing President's action in response to Korean War, not existence of war).

Even if some judicial review of the President's decision were permitted, however, that review would be highly deferential. The stay panel recognized that courts must, at a minimum, "give a great level of deference to the President's determination that [one of Section 12406's] predicate condition[s] exists." *Newsom*, 141 F.4th at 1048; *see also id.* at 1047 (observing that review of the President's decision in this context is "especially deferential"). And even the district court recognized that

15

"courts cannot second-guess a President's factual determinations" underlying a call-up order under Section 12406.  ER-17 (emphasis omitted).

Those conclusions follow from general principles governing judicial review of presidential action.  Plaintiffs challenging federal agency action ordinarily rely on the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.*, but the President is not an agency subject to the APA.  *See Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992).  Plaintiffs' only path to judicial review of the President's federalization order, therefore, is a non-statutory ultra vires claim—a type of claim the Supreme Court recently described as a "Hail Mary pass" that "rarely succeeds."  *NRC v. Texas*, 605 U.S. 665, 681-82 (2025) (quotation omitted).  To prevail on an ultra vires claim, plaintiffs must show that the President "has taken action entirely in excess of [his] delegated powers and contrary to a specific prohibition"; it is not sufficient that the President "has arguably reached a conclusion which does not comport with the law."  *Id.* at 681 (emphasis and quotation omitted).

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), provides no support for plaintiffs' extraordinary suggestion that the President is entitled to no deference in his judgments under Section 12406.  *See* Answering Br. 28-30.  *Loper Bright* addressed the framework for judicial review of agency action under the APA, with the Supreme Court holding that when a reviewing court "decide[s] all relevant questions of law" and "interpret[s] … statutory provisions," 5 U.S.C. 706, the reviewing court does so *de novo*.  *See Loper Bright*, 603 U.S. at 391-95.  But as explained, the APA does not afford a

16

cause of action to challenge actions by the President; those challenges—to the extent they are cognizable—must instead satisfy the demanding standards for raising an ultra vires claim. *See supra* p. 16.

Even with the APA cases to which *Loper Bright* is applicable, the Court confirmed that the "best reading of a statute" sometimes is "that it delegates discretionary authority to" the Executive Branch. *Loper Bright*, 603 U.S. at 395. In such cases, the judicial duty "to independently interpret the statute" is "fulfill[ed] . . . by recognizing" the "delegation[]." *Id.*; *see also Dalton v. Specter*, 511 U.S. 462, 477 (1994) ("Where a statute . . . commits decisionmaking to the discretion of the President," the best reading of the statute is that "judicial review of the President's decision is not available"). Here, the Supreme Court already has determined that the best reading of a similarly worded and structured statute is that it vests exclusive discretion in the President to make these judgments. This Court thus fulfills its duty by "recognizing" that delegation.

## B.   The President Acted Lawfully in the Process Used to Call Up the National Guard

The President also complied with Section 12406's procedural requirement that his orders "be issued through the governors of the States." 10 U.S.C. § 12406. As the stay panel explained, the federalization order was issued "in the Governor's name," "through an agent of the Governor"—namely, the California Adjutant General, who is the commander of all state military forces. *Newsom*, 141 F.4th at 1052. It is

17

undisputed that the California Adjutant General informed the Governor of the order and then transferred operational command of the relevant National Guard units to the federal commander.  *See* ER-149-150, ER-223.[3]

Plaintiffs contend that the President was required to personally notify the Governor of the order, "afford[ing] the Governor a chance to discuss the order with the President."  Answering Br. 41; *see also* Answering Br. 43.  But as plaintiffs acknowledge, the text does not "refer[] to 'consultation'" with State governors.  Answering Br. 44 n.15; *see Newsom*, 141 F.4th at 1053 ("[T]he decision to activate the National Guard under [Section] 12406 is textually committed to the President alone.").  And plaintiffs provide no support for their assertion that an official who issues an order "through" another individual necessarily affords that individual an opportunity to discuss the order.  No one would suggest that a military commander who issues an order "through" a subordinate must give the subordinate an opportunity to consult and discuss the merits of the order.  The more natural reading of the "through the governors" language is, as the stay panel recognized, that it "delineates the procedural mechanisms through which the President's orders are issued," *Newsom*, 141 F.4th, at 1053, imposing a ministerial requirement to ensure orderly transfer of command of the relevant Guard members.

---

[3] Plaintiffs' observation that the Adjutant General cannot "issue orders *that the Governor has not approved*," Answering Br. 45, only underscores that the Governor was aware of and authorized the transmission of the President's orders to the Guard units.

18

This straightforward understanding does not render the "through the governors" language meaningless. Rather, it reflects the dual control of the Guard, guaranteeing that the state commander in chief has notice of the federalization order and eliminating any command confusion that might result if the orders were not transmitted through the state chain of command. That a different statute, the Insurrection Act, lacks similar language says nothing about what Congress intended in Section 12406. *Contra* Answering Br. 41. The provisions of the Insurrection Act deal with specific situations where the State's governor or legislature has requested the assistance of federalized troops, *see* 10 U.S.C. § 251, or where the President, following a proclamation to disperse, must issue his orders directly to National Guard members, *id.* §§ 252-254.

Plaintiffs' construction, in contrast, would effectively authorize the Governor to pocket veto the President's order, contrary to Section 12406's text and in contradistinction to other statutes that expressly require gubernatorial consent. *See* Opening Br. 37-38. Plaintiffs disclaim any attempt to authorize such a veto, suggesting that Section 12406 is silent as to what happens if a Governor refuses to transmit the President's orders. *See* Answering Br. 45-46. But it makes no sense to conclude that Congress intended to create that kind of confusion in a statute that demands "prompt and unhesitating obedience" to the President's orders. *Newsom*, 141 F.4th at 1053 (quoting *Martin*, 25 U.S. (12 Wheat.) at 30). At minimum, Congress could not have intended to obliquely bury a potential governor's veto in a statute that

places the National Guard under the President's control. Such a reading would defy the dual structure of the National Guard, which may operate under the command of a governor in a Title 32 status or under the command of the President in a Title 10 status, as is the case here.

The relevant statutory history confirms that Congress intended the "through the governors" language to impose only a ministerial requirement, and not, as plaintiffs suggest, to promote state sovereignty, *see* Answering Br. 43-44. When that language was first added to the statute in 1908, the text referred to the President issuing orders "through the governor of the respective State or Territory." Act of May 27, 1908, ch. 204, § 3, 35 Stat. 399, 400. In later versions of the statute, Congress further specified that orders should be issued "through the governors of the States, the Territories, Puerto Rico, the Canal Zone, or the District of Columbia." *See, e.g.,* Act of Aug. 10, 1956, ch. 1041, § 3500, 70A Stat. 1, 199 . It is implausible to think that the reference to orders issued through these territorial governors was meant to give those subordinate federal officers any consultative role in the federalization process. Because territorial governors were grouped alongside State governors in the text, it follows that Congress similarly did not intend State governors to have a special substantive role in the President's decision-making process. *See Jones v. United States*, 527 U.S. 373, 389 (1999) ("Statutory language must be read in context and a phrase gathers meaning from the words around it." (quotation omitted)).

20

The 1908 version of the law also contained a final clause that authorized the President to issue his orders "to such officers of the militia as he may think proper." Act of May 27, 1908, ch. 204, § 3, 35 Stat. at 400.[4]  Thus, as originally enacted, the statute made clear that the President issues his orders through the governors to officers of the militia, and it is the President himself—not the governors—who decides which officers are proper to receive the orders.  Put differently, the President determines not only whether to federalize the Guard but also which officers and units to federalize, and the Governor "shall" transmit those orders through the chain of command.  The final clause was removed in 1956, apparently because it was viewed as surplusage.  *See* 10 U.S.C. § 3500 Historical and Revision Notes (1988).

The stray comments plaintiffs pluck from the legislative history do not support a different interpretation.  *Contra* Answering Br. 42.  During floor debates on the 1908 law, one opponent of the bill suggested that the revisions might enable governors who "did not desire to have the militia called out" to frustrate the President's authority.  42 Cong. Rec. 6870, 6942 (1908).  But the legislator made that statement in the course of discussing whether the revised law would inadvertently limit the

---

[4] The text in full read: "[I]t shall be lawful for the President to call forth such number of the militia of the State or of the States or Territories or of the District of Columbia as he may deem necessary to repel such invasion, suppress such rebellion, or to enable him to execute such laws, and to issue his orders for that purpose, through the governor of the respective State or Territory, or through the commanding general of the militia of the District of Columbia, from which State, Territory, or District such troops may be called, to such officers of the militia as he may think proper."

21

President's authority as compared to the prior law, under which at least theoretically all able-bodied men of a certain age were required to register with state authorities for militia service and could be called upon directly by the President (without going through any state chain of command). *See id.* The bill's sponsor, moreover, emphasized that the bill did "not change in any material respect . . . the existing law," except for "two or three particulars," *id.* at 6940, none of which had anything to do with affording governors a substantive role in the federalization process, *see id.* at 6940-41. Plaintiffs also cite a 1911 comment from the Army Chief of Staff, but that comment simply reiterates the same comparison with the prior version of the law. *See* 46 Cong. Rec. 3638, 3701 (1911). To the extent the comment is relevant, it only underscores the "confusion" that would result if plaintiffs' reading of the statute were correct. *Id.*

Finally, the stay panel explained why even if the President failed to comply with Section 12406's procedural requirement, "the proper remedy would be injunctive relief tailored to [d]efendants' failure to issue the order through the Governor[, ]not an injunction prohibiting the President from exercising his lawful authority to call up the National Guard." *Newsom*, 141 F.4th at 1054. Plaintiffs again attempt to draw support from APA actions, but the APA does not apply to the President, as explained. *See supra* p. 16. And contrary to plaintiffs' suggestion (Answering Br. 47-48), the traditional remedy in non-statutory suits for non-monetary relief is an injunction or a declaratory judgment, not vacatur. *See, e.g., American Sch. of Magnetic*

22

*Healing v. McAnnulty*, 187 U.S. 94 (1902); *see also Final Report of the Attorney General's Committee on Administrative Procedure* 81 (1941) (noting that "the injunction is the remedy normally used" in nonstatutory suits "for the protection of the individual against illegal official action").[5]  Indeed, that is precisely what plaintiffs requested in their complaint.  *See* ER-232.  It is settled that injunctive relief must be tailored to the alleged violation.  *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008).  At most, then, a procedural violation of Section 12406 would warrant an injunction directing the Department of Defense "to send the relevant memoranda directly to the Governor."  *Newsom*, 141 F.4th at 1054.

## II.  Plaintiffs Did Not Establish the Equitable Factors for Injunctive Relief

The district court's order should be vacated for the independent reason that plaintiffs did not show that the remaining factors warrant the "extraordinary relief of an injunction."  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010).

Plaintiffs acknowledge that the federal government has an interest "in protecting federal agents and property."  Answering Br. 51 (quoting ER-37).  And they concede that at least "some individuals used the protests [in Los Angeles] as an excuse for violence and destruction."  *Id.* (quoting ER-21).  Plaintiffs nonetheless

---

[5] Even the APA does not authorize a departure from these traditional remedies. *See United States v. Texas*, 599 U.S. 670, 693-703 (2023) (Gorsuch, J., joined by Thomas and Barrett, JJ., concurring in the judgment); *but cf. Corner Post, Inc. v. Board of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 826-43 (2024) (Kavanaugh, J., concurring) (expressing a contrary view).

23

contend that the federal government has "overstated the risk level faced by federal officers in Los Angeles." *Id.* But as the stay panel explained:

> The undisputed facts demonstrate that before the deployment of the National Guard, protesters "pinned down" several federal officers and threw "concrete chunks, bottles of liquid, and other objects" at the officers. Protesters also damaged federal buildings and caused the closure of at least one federal building. And a federal van was attacked by protesters who smashed in the van's windows.

*Newsom*, 141 F.4th at 1054. That some individuals protested peacefully does not diminish the threat posed by the violent mobs attacking federal officers. Plaintiffs also focus incorrectly on the federal government's purported failure to show that other resources were unavailable to protect federal personnel and property. *See* Answering Br. 51. That argument, like plaintiffs' argument that the deployment upsets the federal-state balance, "is, in essence, a merits argument," *Newsom*, 141 F.4th at 1055, that is wrong for the reasons explained. *See supra* pp. 3-8.

The stay panel also correctly concluded that the federal government's interest in preventing these threats to federal personnel and property outweighed plaintiffs' "speculative" fears about the diversion of the Guard members from state functions and the potential for worsening tensions in Los Angeles. *Newsom*, 141 F.4th at 1055. Of course, the President's decision to call National Guard members into federal service rendered those members temporarily unavailable to serve in state roles. *See* Answering Br. 48-49. But that is the necessary result of the dual system of control created by the Constitution and Congress. *See* Opening Br. 5-6. As to inflamed

24

tensions, the stay panel appropriately observed that the record contained no evidence to suggest that "future protests w[ould] grow due to the deployment of the National Guard." *Newsom*, 141 F.4th at 1055. In those circumstances, plaintiffs "cannot rely on the predictable effect of Government action on the decisions of third parties; rather, they can only speculate about the decisions of third parties." *Id.* (quoting *Murthy v. Missouri*, 603 U.S. 43, 72 (2024)) (cleaned up). And such speculation does not establish that it is "likely," as opposed to merely "possib[le]," that plaintiffs will suffer irreparable harm absent interim relief. *Herb Reed Enters., LLC v. Florida Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013).

## III. This Court Should Decide the Merits and Leave in Place the Stay Panel Opinion

As plaintiffs acknowledge, this case is not moot because 300 National Guard members remain deployed in Los Angeles. *See* Answering Br. 53. There is thus no reason for this Court to decline to address the merits of the appeal. Even if circumstances on the ground had changed significantly, *but see infra* pp. 26-27, that would not affect this Court's assessment of the legality of the President's initial federalization order, which was based on the conditions in Los Angeles on June 6 and 7. That sets this case apart from *Roman v. Wolf*, 977 F.3d 935 (9th Cir. 2020) (per curiam), where the question whether the government's conduct was unlawful arguably depended on the government's response to rapidly evolving COVID-19 conditions. Plaintiffs may feel that there are now issues more important than the lawfulness of the

25

original federalization order, *see* Answering Br. 54-55, but if they wish to adjudicate those issues, they must do so via an amended complaint or a new lawsuit. *See Pacific Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 633 (9th Cir. 2015) ("When a plaintiff seeks injunctive relief based on claims not pled in the complaint, the court does not have the authority to issue an injunction."). There also would be no reason to vacate the stay decision even if the Court chose to follow plaintiffs' novel approach. Vacatur of an opinion generally is inappropriate where "the losing party has voluntarily forfeited his legal remedy," and here, this Court's remand would be at the plaintiffs' behest, not demanded by the "vagaries of circumstance." *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 25 (1994).

In any event, the circumstances on the ground still amply support the continued need for the National Guard in Los Angeles. At trial on the plaintiffs' Posse Comitatus Act claim, witnesses testified that National Guard members continue to respond to requests for assistance, Stay Motion Addendum A216-217, *Newsom v. Trump*, No. 25-5553 (9th Cir. Sept. 3, 2025), and that National Guard members have been critical in addressing threats to federal personnel as they conduct immigration enforcement. A government witness explained that prior to the Guard's federalization, he received reports of officer assaults multiple times a day. *Id.* at A297. Those officer assaults hampered ICE's ability to perform its federal functions, as officers had to pivot to address the violence. *Id.* During one incident, a mob outnumbered officers taking an individual into custody, helped that individual to

26

escape, and forced the officers to flee as it became too dangerous. *Id.* at A297-298. During another, 1,500 protesters became violent and assaulted federal officers outside a three-building federal complex. *Id.* at A299. During a third incident, a crowd started forming around an operation and quickly became violent: Officers were "assaulted by members of the public with projectiles" and "rocks," and "there was an individual" present who "had a weapon that appeared to look like he was shooting in the direction of" federal officers. *Id.* at A303-304.

After the National Guard deployment, these incidents decreased. Stay Motion Addendum A300, *Newsom*, No. 25-5553. The numbers of officer assaults "reduce[d] drastically." *Id.* at A297. And the presence of the Guard has deterred potential bad actors and has helped assure federal officers that they will not be assaulted. *See id.* at A300-301.

27

## CONCLUSION

For the foregoing reasons, the district court's temporary restraining order should be vacated.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE

  *s/ Anna O. Mohan*
ANNA O. MOHAN
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7517*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-2689*
  *Sharon.swingle@usdoj.gov*

September 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,878 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Anna O. Mohan*
Anna O. Mohan