No. 25-3727

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————

GAVIN NEWSOM, *et al.*,
*Plaintiffs-Appellees*,

V.

DONALD J. TRUMP, *et al.*,
*Defendants-Appellants*.

———————————

**On Appeal from the United States District Court
for the Northern District of California**
No. 3:25-cv-04870
The Honorable Charles R. Breyer

———————————

## MOTION TO VACATE STAY OR, IN THE ALTERNATIVE, FOR
## INJUNCTION PENDING APPEAL

———————————

ROB BONTA
  *Attorney General of California*
SAMUEL T. HARBOURT
  *Solicitor General*
HELEN H. HONG
  *Principal Deputy*
  *Solicitor General*
THOMAS S. PATTERSON
MICHAEL L. NEWMAN
  *Senior Assistant*
  *Attorneys General*
ANYA BINSACCA
MARISSA MALOUFF
JAMES E. STANLEY
  *Supervising Deputy*
  *Attorneys General*

October 7, 2025

CHRISTOPHER D. HU*
  *Deputy Solicitor General*
BRENDAN M. HAMME
BARBARA HORNE-PETERSDORF
MEGHAN H. STRONG
JANE REILLEY
  *Deputy Attorneys General*
HALEY AMSTER
  *Associate Deputy*
  *Solicitor General*

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3917
Christopher.Hu@doj.ca.gov
*Attorneys for Plaintiffs-Appellees*

# TABLE OF CONTENTS

**Page**

Introduction ................................................................. 1

Statement .................................................................... 4

Argument .................................................................... 9

    I.    The Court should vacate the stay pending appeal .................... 9

    II.   Alternatively, the Court should issue an injunction pending appeal to block defendants' prolonged, unlawful federalization of California's National Guard ........................ 16

Conclusion ................................................................. 22

# TABLE OF AUTHORITIES

**Page**

CASES

*Feldman v. Arizona Sec'y of State's Off.*
    843 F.3d 366 (9th Cir. 2016) (en banc) ...................................... 16

*In re World Trade Ctr. Disaster Site Litig.*
    503 F.3d 167 (2d Cir. 2007) ........................................................ 10

*Laird v. Tatum*
    408 U.S. 1 (1972) ......................................................................... 15

*Log Cabin Republicans v. United States*
    2011 U.S. App. LEXIS 16310 (9th Cir. July 22, 2011) ............. 10

*Maryland v. King*
    567 U.S. 1301 (2012) ................................................................... 20

*Mi Familia Vota v. Fontes*
    111 F.4th 976 (9th Cir. 2024) ..................................................... 10

*NetChoice, LLC v. Fitch*
    145 S. Ct. 2658 (2025) ................................................................. 10

*Nken v. Holder*
    556 U.S. 418 (2009) ..................................................................... 10

*Southeast Alaska Conservation Council v. U.S. Army Corps of
    Engineers*
    472 F.3d 1097 (9th Cir. 2006) ....................................................... 9

*Trump v. Int'l Refugee Assistance Project*
    582 U.S. 571 (2017) ..................................................................... 15

*Winter v. Natural Res. Def. Council, Inc.*
    555 U.S. 7 (2008) ......................................................................... 16

ii

## TABLE OF AUTHORITIES
### (continued)

**Page**

STATUTES

10 U.S.C. § 12406 ........................................................................*passim*

COURT RULES

9th Cir. R. 27-10 ................................................................................. 10

OTHER AUTHORITIES

Exec. Order 14339, 90 Fed. Reg. 42121 (Aug. 25, 2025) ............................. 21

Harter, *National Guard Troops Deployed to L.A. Were Sent to Riverside County Marijuana Farm Raid*, L.A. Times (June 24, 2025), https://tinyurl.com/7r9xtb7c ............................................................ 6

*Speech: Donald Trump Addresses Military Leadership in Quantico, Virginia*, Vimeo (Sept. 30, 2025), https://vimeo.com/1123254617?fl=pl&fe=sh ........................................... 21

iii

## INTRODUCTION

Earlier this year, the Court recognized the need for judicial review to serve as a check on abuses by the President and Secretary of Defense when exercising their limited authority to federalize members of the National Guard.  Stay Order 21.  As the Court explained, "the Constitution authorizes Congress, not the President, to determine when (and how) the militia can be called into actual service of the United States."  *Id.* at 20.  The Court also recognized that sovereign States have "significant interests . . . implicated" when the President federalizes their Guard troops.  *Id.* at 39.  Although the Court provisionally determined that defendants "had a colorable basis for" federalizing California's Guard under 10 U.S.C. § 12406(3) in response to certain forms of disorder on June 6-7 in Los Angeles, *id.* at 33, the Court "emphasize[d] . . . that [its] decision addresse[d] only the facts before [it]" in early June, *id.* at 40.  On that limited basis, and on the basis of representations by defendants that they needed the Guard to protect personnel and property in Los Angeles, *see id.* at 38-39, the Court agreed to stay an injunction issued by the district court requiring the return of the Guard to state control.

Since that time, the relevant circumstances have changed in fundamental ways.  Not long after the Court entered its stay order, defendants began deploying members of the Guard to areas far from Los Angeles on missions that had nothing to do with the original basis for federalizing the Guard.  Defendants also issued an

order extending the federalization from its initial 60-day period to 150 days, even while acknowledging that there was little (if any) remaining security risk to federal personnel in Los Angeles. And in recent weeks, defendants have greatly expanded their efforts to deploy the military on the streets of communities across the Nation. Most relevant here, defendants sent about 200 members of California's National Guard—nearly all of the remaining federalized troops—out of California entirely, to Portland, after a separate district court enjoined the federalization of the Oregon National Guard. A-404-405 (*Oregon v. Trump*, No. 25-cv-1756 (D. Or. Oct. 4, 2025), Dkt. 56-1).[1] Defendants also told California they plan to issue yet another order extending the federalization of California's Guard—this time, to January 31.

The ever-expanding mission of California's federalized Guard bears no resemblance to what this Court provisionally upheld in June. And it is causing irreparable harm to California, our Nation's democratic traditions, and the rule of law. The most straightforward way for the Court to address these circumstances would be to vacate the stay entered on June 19. The effect would be to restore the district court's temporary restraining order, thereby requiring the return of the 300 members of the Guard to state control. This Court has authority to vacate a stay when changed circumstances undermine the basis for it. That is the case here: Because most of the Guard is no longer in Los Angeles and the episodes of

---

[1] All references to "A-##" are to the addendum submitted with this motion.

2

disorder from early June have long since subsided, defendants could not plausibly show that they would suffer the forms of irreparable harm identified in this Court's prior stay order. *See* Stay Order 38-39. And whatever the public interest may have been on June 19, *see id.* at 39, it would be ill-served by maintaining a stay that has the practical effect of facilitating defendants' efforts to deploy the military on the streets of an increasing number of communities across our Nation. The Oregon district court has temporarily blocked defendants from circumventing its initial order by substituting members of the California National Guard for the Oregon National Guard. *See* A-414-415 (*Oregon*, No. 25-cv-1756 (D. Or. Oct. 5, 2025), Dkt. 68). But defendants are likely to attempt their novel experiment in cross-state deployments again in the near future. Indeed, defendants have already sent some members of California's National Guard to Illinois. A-454.[2]

Alternatively, the Court should issue an injunction to block defendants' unlawful orders extending the federalization of California's Guard through November 2025 and potentially even January of next year. The Court has broad equitable authority to grant relief of that nature. Although such a request would ordinarily be made in the district court in the first instance, the district court has

---

[2] At A-454, plaintiffs have included a new supplemental declaration from Paul S. Eck, Deputy General Counsel of the California Military Department. All other documents in the addendum were filed in district court, either in this case or in *Oregon v. Trump*, No. 25-cv-1756 (D. Or.).

concluded that it lacks jurisdiction over requests for renewed injunctive relief while the appeal before this Court remains pending.  And defendants can no longer show any "colorable basis" under Section 12406 for federalizing members of California's Guard.  Stay Order 33.  If there were any remaining need for the troops in Los Angeles, defendants would not have sent most of them to Portland.  Similarly, if there were any remaining need in Los Angeles, members of the Guard would have been assisting on more than "zero" ICE field operations in the city as of the time that trial was held in this case several weeks ago.  A-201.  For those reasons, and because the remaining equitable factors strongly support relief, the Court should grant this motion and restore the Guard to state control.[3]

## STATEMENT

The legal and procedural background are well known to the Court.  *See, e.g.*, Answering Br. 3-13, 16-48.  This Statement focuses on certain factual and procedural developments most relevant to the relief requested in this Motion.

1.  In June 2025, the State of California and Governor Newsom filed a lawsuit challenging the President's federalization of 4,000 members of California's National Guard and moved for a temporary restraining order.  ER-212-233.  The district court granted interim relief, enjoining defendants "from deploying

---

[3] Counsel for defendants have represented that they oppose the motion.

members of the California National Guard" and directing defendants "to return control of the California National Guard to Governor Newsom."  ER-37-38.

This Court granted a stay pending appeal, applying a "highly deferential standard of review."  Stay Order 33.  The Court concluded that defendants had "presented facts" establishing a "colorable basis for invoking" Section 12406(3). *Id.* at 33-34.  In the Court's view, defendants had established that protests and other unlawful conduct in early June had "significantly impeded the ability of federal officers to execute the laws," *id.*, including at an ICE building "in downtown Los Angeles," *id.* at 11; in front of federal property "in Paramount, California," *id.*; and at federal buildings near the "Federal Courthouse" in "downtown Los Angeles," *id.* at 13.  While the Court credited the "declarations submitted by Defendants" about the interference with federal officers' ability to execute the laws in Los Angeles, *id.* at 33-34, it also emphasized that the President lacks authority to "federalize the National Guard based on no evidence whatsoever," and rejected the argument that "courts would be unable to review a decision that was obviously absurd or made in bad faith."  *Id.* at 30-31.  Courts may "review the President's determination to ensure that it reflects a colorable assessment of the facts and law within a 'range of honest judgment.'"  *Id.* at 31.

2.  Between June and August 2025, defendants deployed members of the Guard on missions that had very little—if anything—to do with the circumstances

5

and security risks discussed in this Court's stay order. For example, federalized Guard units were "sent more than 100 miles away" from Los Angeles to assist the DEA in enforcement actions "on suspected illegal marijuana farms." Harter, *National Guard Troops Deployed to L.A. Were Sent to Riverside County Marijuana Farm Raid*, L.A. Times (June 24, 2025), https://tinyurl.com/7r9xtb7c; *see also* A-83-84. And as part of "Operation Excalibur," defendants deployed 80 troops in Humvees and tactical vehicles to Los Angeles' MacArthur Park for a "show of presence"—that is, to "demonstrat[e] federal reach" in a "high-visibility urban environment." A-38, 40, 41. Defendants also substantially reduced the number of federalized troops based on their view that "the lawlessness in Los Angeles is subsiding." A-214.

On August 5, however, defendants issued a new order that deployed 300 federalized members of California's Guard for a period of 90 days, through November 5. The order states that the "mobilization is in response to direction from the President . . . to provide forces to protect federal functions, personnel, and property." A-2. But it provides no other justification for continued federalization. *See id.*; *see also* A-359 (defendants agreeing that August order does not "cite new grounds or interject new considerations" to support continued federalization).

In response, plaintiffs asked the district court to preliminarily enjoin the new federalization order. D.Ct. Dkt. 183. Plaintiffs explained that there was no

6

colorable basis under Section 12406 to support it. Rather than addressing the motion on the merits, however, the district court concluded that it lacks jurisdiction to rule on the motion while the appeal before this Court remains pending. A-369-372. The district court also observed that plaintiffs could "move for an injunction before the Ninth Circuit" and pledged to "lift its stay and proceed expeditiously" if this Court offered direction that the district court could hear the preliminary injunction motion in the first instance. A-372.

3. On September 28, 2025, Secretary Hegseth issued a memorandum authorizing the deployment and federalization of 200 members of Oregon's National Guard. A-375 (*Oregon*, No. 25-cv-1756 (D. Or. Oct. 4, 2025), Dkt. 56). The State of Oregon and City of Portland filed a lawsuit in the District of Oregon challenging the federalization order, and sought a temporary restraining order.

On Saturday, October 4, the district court granted the requested relief, enjoining defendants "from implementing Defendants' September 28, 2025, Memorandum ordering the federalization and deployment of Oregon National Guard service members to Portland." A-404. The court explained that "it had been months since there was any sustained level of violent or disruptive protest activity in Portland," and that there was substantial evidence that federal law enforcement "*were able* to execute the laws of the United States" in Portland. A-391, 393. The district court also rejected defendants' argument that "occurrences

7

of violence elsewhere" could support federalization in Portland. A-393.
"[V]iolence in a different state . . . do[es] not provide a colorable basis to invoke
Section 12406(3)." *Id.* "To accept Defendants' arguments would be to render
meaningless the extraordinary requirements of 10 U.S.C. § 12406 by allowing the
President to federalize one State's National Guard based on events in a different
state or mere speculation about future events." A-393-394; *see* A-394 ("In other
words, violence *elsewhere* cannot support troop deployments *here*[.]").

Hours later, the U.S. Army Northern Command communicated to the
California Military Department Leadership that they planned to send 200
federalized California National Guard personnel to Portland. A-409 (*Oregon*, No.
25-cv-1756 (D. Or. Oct. 5, 2025), Dkt. 60). By 6:30 a.m. the next day,
approximately 100 of those Guardsmen departed Los Angeles for Portland and
additional transport was scheduled for later in the day. *Id.* The California Military
Department later learned that all 300 federalized California National Guard
personnel would be deployed to Portland and that an order extending their
federalization through January 31, 2026, would soon be issued. *Id.*[4]

---

[4] Defendants appear to have changed their minds about sending all 300
troops to Portland—at least for now. *See* A-420 (*Oregon*, No. 25-cv-1756 (D. Or.
Oct. 5, 2025)). The 200 troops most recently deployed to Portland remain there.
A-454. An additional 15 members of the California National Guard were sent to
Portland several days earlier to train members of Oregon's National Guard for their
Portland deployment. *Id.* That means 85 members of the Guard remain in Los

(continued…)

Through an amended complaint, the State of California joined Oregon's lawsuit, challenging the order deploying California's Guard to Portland. Together, the two States requested a temporary restraining order to prevent the active deployment of federalized members of California's National Guard in the State of Oregon. Shortly before the hearing on the temporary restraining order, Secretary Hegseth issued a memorandum mobilizing up to 400 members of the Texas National Guard to "perform federal protection missions where needed, including in the cities of Portland and Chicago." A-413 (*Oregon*, No. 25-cv-1756 (D. Or. Oct. 5, 2025), Dkt. 65-1). In response to that order and the motion filed by Oregon and California, the district court entered an order temporarily enjoining defendants "from deploying federalized members of the National Guard in Oregon." A-414. In granting that relief, Judge Immergut stated that "I see [defendants' actions] as direct contravention of . . . the order that this Court [previously] issued." A-434.

## ARGUMENT

### I. THE COURT SHOULD VACATE THE STAY PENDING APPEAL

To justify vacating a stay, a party must "demonstrate that facts have changed sufficiently since" the issuance of the stay, and that circumstances no longer satisfy the standard for a stay. *Southeast Alaska Conservation Council v. U.S. Army*

---

Angeles. *Id.* And California has learned that 14 members of the Guard were recently sent from Portland to Illinois to train members of the National Guard deployed in that State. *Id.*

*Corps of Engineers*, 472 F.3d 1097, 1101 (9th Cir. 2006); *see also Log Cabin Republicans v. United States*, 2011 U.S. App. LEXIS 16310, at *4 (9th Cir. July 22, 2011) (applying standard to vacate stay pending appeal in light of changed circumstances); *In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007) (same). Under that standard, a stay is warranted—and can only remain in place—when the applicant has established that it "will be irreparably injured." *Nken v. Holder*, 556 U.S. 418, 426 (2009); *see also NetChoice, LLC v. Fitch*, 145 S. Ct. 2658, 2658 (2025) (Kavanaugh, J. concurring) (despite concluding that a challenged law was likely unconstitutional, concurring in denial of application for a stay because applicant had "not sufficiently demonstrated that the balance of harms and equities favors it at this time").[5]

The relevant circumstances have changed in significant ways such that defendants can no longer make any convincing claim of the sort of harms or equities that would justify a continued stay. When this Court issued a stay in June 2025, it relied on disturbances and isolated instances of violence involving federal facilities and personnel in Los Angeles that had occurred before the deployment of the National Guard. *See* Stay Order 38. After reviewing several of those incidents,

---

[5] The Court also has authority to reconsider its June 19 stay order in light of "[c]hanges in . . . factual circumstances." 9th Cir. R. 27-10; *see Mi Familia Vota v. Fontes*, 111 F.4th 976, 980 (9th Cir. 2024) (vacating motions panel's order staying district court injunction pending appeal).

this Court concluded that "the federal government's interest in preventing incidents like these is significant." *Id.* at 39. While the Court also acknowledged the State's "significant interests" in the "constitutional balance of power between federal and state government," it credited defendants' arguments that "[b]oth irreparable harm and the public interest weigh in favor of Defendants, who have an uncontested interest in the protection of federal agents and property." *Id.* at 38, 39.

Whatever interest the federal government could profess in "the protection of federal agents and property" in Los Angeles at that time, the situation in Los Angeles and defendants' recent actions have undercut any claim to such an interest now. For one, since the Court issued the stay order, the instances of civil unrest that gave rise to the deployment have subsided. "[T]here have only been a few immigration-related protests around the City [of Los Angeles] with often just a few dozen protestors at a time," A-351; the LAPD "has had to deploy far fewer resources in response to immigration-related protest activity, including in and around federal property," A-353; the California Highway Patrol has not seen any large-scale, protest-related activities in the area since June 19—over 100 days ago—and they are unaware of any requests from another law enforcement agency for protest-related assistance, A-346. As early as mid-July, moreover, a Pentagon spokesperson conceded that "the lawlessness in Los Angeles is subsiding." A-214.

11

Consistent with those substantially changed circumstances on the ground, defendants have deployed the federalized National Guard for only routine law enforcement operations—operations where defendants' own risk assessments concluded that the security risk to federal personnel is "low"—*not* to respond to any extraordinary threats or other circumstances significantly limiting the ability of civilian agents to execute federal law. *E.g.*, A-36, A-88-89. For example, over 300 troops and approximately 50 military vehicles were deployed to accompany law enforcement officers on a raid at a cannabis farm in Mecca, over 140 miles from downtown Los Angeles. A-83-84. Defendants also sent troops to a July 10 operation in Carpinteria, California, despite no evidence that the absence of Guard forces "would result in loss of life or significant property damage to federal personnel." A-89; *see also* A-108-110 (discussing Operation Excalibur).

In recognition of that reality, defendants began to release members of the National Guard from federalized service—with no harm or elevated risk to federal personnel or property. On July 1, defendants released 150 National Guard members, A-236; on July 15 they released an additional 2,000 troops, A-240; and by August 5, defendants maintained a federalized force comprising only 300 members of the National Guard, A-2-3; *see also infra* pp. 17-18 (describing current conditions in Los Angeles in greater detail).

12

Defendants' recent actions reveal that they do not view even those 300 Guard members to be necessary to protect federal personnel and property in Los Angeles. In response to an order in a separate case temporarily enjoining defendants from federalizing 200 members of the Oregon National Guard, defendants in the early morning hours of October 5 transported 100 members of California's Guard from Los Angeles to Portland.  A-409.  By the same evening, approximately 200 troops had moved to Portland.  A-424.  And defendants told California military leaders that they planned to send "all 300 federalized" troops to Portland as well.  A-409; *see also* A-454 (some 200 California Guard troops remain in Portland).

Transporting the entirety of the federalized guard, some 800 miles away, cannot be reconciled with defendants' assertions about the harm they would suffer without federalized troops on the ground in the Los Angeles area.  In prior proceedings, defendants represented to this Court that federal employees would be exposed "to violence at the hands of rioting mobs in Los Angeles," C.A. Dkt. 5.1 at 20; others would be "violently pummeled with stones," *id.*; and "extensive damage" would be inflicted on federal property, *id.*  "The federal government," they stated, would suffer "significant harms" if they could not "prevent[] these extraordinary acts of violence causing both personal injury and property damage." *Id*.  Even if those representations were accurate in mid-June, defendants' own actions reveal that they cannot credibly be asserted now.

Meanwhile, the ongoing stay irreparably harms California, the public, and the rule of law. As the State has previously explained, *see* C.A. Dkt. 16.1 at 21-25, C.A. Dkt. 48.1 at 16-18, it suffers a sovereign harm when the federal government federalizes its National Guard, and it plainly suffers harm when its troops are diverted from critical work for the State. *See, e.g.*, ER-75; SER-17-19. And whatever the public interest may have been when this Court first entered the stay, it would be ill-served by maintaining a stay that only emboldened defendants and enabled their efforts to circumvent another federal court's injunction. A-421 (Immergut, J.) ("Aren't defendants simply circumventing my order?").

The public interest would also be ill-served by exposing California and its federalized Guard members to the risk that they will be re-deployed to yet another State, such as Illinois or one of the many other American communities that the President has mentioned as possible targets. *See, e.g.*, A-413. That risk is far from hypothetical, and it could materialize at moment's notice—just as it did when defendants transported hundreds of troops from California to Oregon mere hours after the district court enjoined the Oregon Guard's deployment. Indeed, defendants have already deployed members of both the California and Texas National Guard to Illinois. *Supra* pp. 8-9 & n.4; A-454. And defendants have taken the position that they have authority to send California's Guard anywhere in the country, even though the ongoing federalization and deployment has zero

14

connection to the original mission in Los Angeles. *See, e.g.*, A-422 (counsel for defendants arguing that "[Section 12406] doesn't limit itself to [the] Guard in the state where—where a problem is").

Vacating the stay, in contrast, would restore the district court's temporary restraining order, thereby "return[ing] control of the California National Guard to Governor Newsom." ER-37-38. That would validate the public's "significant interest[]" in the proper "constitutional balance of power between federal and state government." Stay Order 39. And it would safeguard our Nation's longstanding tradition against "military intrusion into civilian affairs." *Laird v. Tatum*, 408 U.S. 1, 15 (1972); *see also* Br. of Former U.S. Army & Navy Secretaries & Retired Four-Star Admirals & Generals, D.Ct. Dkt. 124-1 at 11 (describing the "bedrock principle of American democracy" that "our military is apolitical").

At a minimum, the Court should vacate its prior stay order in part. *Cf. Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017) ("This Court may, in its discretion, tailor a stay so that it operates with respect to only 'some portion of the proceeding.'"). The principal concern expressed by the Court in the June order was the security risk at the time to federal property in Los Angeles. *See, e.g.*, Stay Order 33-34. For the reasons discussed above, there is no longer any basis in fact for that concern. If the Court disagrees, however, it could lift its stay of the district court's temporary restraining order, except to the extent that federalized members

15

of California's National Guard are needed for and engaged in the protection of federal property in the Los Angeles area. Defendants could then seek to make a "good faith," "honest judgment," Stay Order 31 (emphases omitted), about the number of troops needed for that purpose, if any.

## II. ALTERNATIVELY, THE COURT SHOULD ISSUE AN INJUNCTION PENDING APPEAL TO BLOCK DEFENDANTS' PROLONGED, UNLAWFUL FEDERALIZATION OF CALIFORNIA'S NATIONAL GUARD

If the Court declines to vacate its prior stay order, it should grant an injunction blocking defendants' unlawful efforts to prolong the federalization of California's National Guard.[6] The Court has broad authority to issue injunctions while an appeal is pending. *See, e.g.*, *Feldman v. Arizona Sec'y of State's Off.*, 843 F.3d 366, 367 (9th Cir. 2016) (en banc). "The standard for evaluating an injunction pending appeal is similar to that employed by district courts in deciding whether to grant a preliminary injunction." *Id.*; *see generally Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Here, that standard is satisfied:

---

[6] Specifically, the Court should order defendants to return the remaining 300 federalized members of the California National Guard to state control. At a minimum, for similar reasons to those discussed above, *supra* pp. 15-16, the Court should enjoin defendants from deploying members of the Guard for any activities beyond the protection of federal property in the Los Angeles area.

Defendants' order renewing the federalization for 90 additional days has no basis in Section 12406. And the remaining equitable factors strongly support relief.[7]

1. In early August, defendants issued an order federalizing hundreds of California's National Guard forces beyond the initial 60-day deployment. *Supra* p. 6. And if recent information provided by defendants to California is accurate, 300 members of the Guard are now set to remain under federal control until January 31, 2026, nearly eight months after the events in early June that originally prompted the federalization. *Supra* p. 8. Those actions violate Section 12406, which requires a showing of "invasion" or "rebellion," or that the President is "unable with the regular forces to execute the laws of the United States." As this Court previously recognized, "any minimal interference with the execution of laws" is not "enough to justify invoking § 12406(3)." Stay Order 33. Section 12406(3) also requires the President to identify an "unusual," "extreme" exigency similar in kind to "invasions" or "rebellions." *Id.*

Nothing of the sort has transpired in Los Angeles in recent months. *See supra* p. 11. Protest activity since early June has fallen significantly and recent activity

---

[7] Although a request for injunctive relief is typically addressed in the first instance at the district-court level, the district court here concluded that it lacks jurisdiction to resolve requests for injunctive relief while this appeal remains pending. *Supra* pp. 6-7. In the district court's view, the proper avenue is filing a motion for injunctive relief before this Court. *See* A-372.

has been limited and almost entirely lawful.[8]  Defendants have admitted that the circumstances on the ground in Los Angeles have substantially changed since early June.[9]  And on a number of missions where the Guard was deployed in June and July, military leaders determined that there would be a "low" risk to federal personnel in the absence of the Guard's participation.  *E.g.*, A-36, 88-89.  For instance, during "Operation Excalibur" in Los Angeles' MacArthur Park, *see supra* p. 6, Guard troops were deployed for a mere "show of presence" where there was no indication of any "threat to federal functions."  A-40, 42-43.

If there were any doubt about the continued need for the Guard in Los Angeles, defendants resolved it over the weekend by sending hundreds of the remaining federalized units out of Los Angeles—and out of California entirely—to serve some 800 miles away in Portland, Oregon.  *Supra* pp. 8-9.  There is no "colorable basis" for federalizing the Guard to protect federal law enforcement or property in California, Stay Order 33, when defendants have sent most of those troops to Oregon and expressed their intent to send them all there.  *See* A-409, 454;

---

[8] A-351 ("there have been only a few immigration-related protests around the City [of Los Angeles] with often just a few dozen protestors at a time."); A-346 (CHP not aware of any large-scale, protest-related activities in the Los Angeles area since June 19, 2025 or any requests for assistance, and have made no arrests resulting from such activities after June 19).

[9] On July 15, a spokesperson for the Department of Defense stated that "lawlessness in Los Angeles is subsiding," A-214, and as of August, the National Guard was assisting on "zero" ICE field operations, A-201.

*supra* p. 8 & n.2. Even under the "highly deferential standard of review" applied by this Court, which allows for actions "within a 'range of honest judgment," Stay Order 31, 33, defendants' efforts to extend the federalization of California's National Guard falls far short. *See id.* at 30-31 (executive actions that are "obviously absurd or made in bad faith" are impermissible).

Elsewhere, defendants have argued that plaintiffs cannot challenge the August federalization order because, in defendants' view, it simply represents a continuation of the original June 7 federalization. *See* A-358-359. But defendants have cited no authority for treating the June 7 federalization as a blank check—that is, an authorization of all future deployments indefinitely, no matter what factual circumstances develop and how much they diverge from the original circumstances that justified federalization. And the fact that defendants attempt to rely on a months-old justification, rather than the current situation on the ground in Los Angeles, merely underscores their inability to satisfy the predicate requirements under Section 12406 with respect to orders extending the federalization. *Cf.* A-393 (Immergut, J.) ("To accept Defendants' arguments would be to render meaningless the extraordinary requirements of 10 U.S.C. § 12406[.]").

2. The equitable factors also strongly favor injunctive relief. Defendants can no longer credibly claim that federalizing California's National Guard is necessary to avert "extraordinary acts of violence causing both personal injury and property

19

damage" in Los Angeles.  C.A. Dkt. 5.1 at 20.  If there were any doubt on that

point, their stated intention of sending all of the remaining federalized California

National Guard members to Oregon—and the reality that 215 members of the

Guard were in fact deployed to Oregon—reveals that defendants have no pressing

need for troops in Los Angeles.  *See supra* p. 8 & n.4, p. 13; A-409, A-454.

At the same time, the continuing and unwarranted federalization of the State's

Guard harms California's sovereign interests, intrudes on the State's traditional law

enforcement functions, and diverts members of the Guard from performing critical

work for the State.  *See supra* pp. 14-15; *cf. Maryland v. King*, 567 U.S. 1301,

1303 (2012) (Roberts, C.J., in chambers) (noting "ongoing and concrete harm to

[State's] law enforcement and public safety interests").  Although the number of

troops that remain federalized has fallen from the 4,000 that were initially called

up, hundreds still are unavailable for "important state services."  ER-35.  And there

is nothing under defendants' understanding of the relevant legal principles that

would guard against a sudden upsurge in the "number of National Guard

members" that would be "appropriate to deploy" in California and beyond.  C.A.

Dkt. 5.1 at 15.  After all, in defendants' view, such decisions are not subject to

"judicial second-guessing" and are "entrusted to the political branches" alone.  *Id.*

Defendants' recent actions only exacerbate the harms suffered by the State.

At the moment, approximately 200 members of California's Guard are hundreds of

miles away, in another State, hindering their capacity to respond to emergencies within California. *Supra* p. 8 n.4; A-409, 454. Others were routed to Illinois earlier today. A-454. And there is no reason to think that defendants' recent actions will abate any time soon. Defendants take the remarkable position that federalized troops may be "relocat[ed]" anywhere because, in their view, the federalization orders are "not limited in any way to the state" where the troops were initially federalized. A-421. The President has also made no secret of his desire to continue using the Nation's "cities as training grounds for our . . . National Guard."[10] The August order extending federalization thus threatens to allow California's Guard—federalized in response to specific circumstances in Los Angeles four months ago—to be dispersed across the country as part of the President's unprecedented experiment in militarized law enforcement.[11]

None of this serves any interest previously recognized as valid by this Court. The public interest strongly supports relief that would prevent the President from

---

[10] *See Speech: Donald Trump Addresses Military Leadership in Quantico, Virginia*, Vimeo, at 42:45-43:01 (Sept. 30, 2025), https://vimeo.com/1123254617?fl=pl&fe=sh.

[11] *See, e.g.*, *Illinois v. Trump*, No. 25-cv-12174 (N.D. Ill. Oct. 6, 2025), Dkt. 1 (challenging President's federalization and deployment of troops to Chicago); *see also* Exec. Order 14339, 90 Fed. Reg. 42121-42122 (Aug. 25, 2025) (directing the Secretary of Defense to establish a "standing National Guard quick reaction force" for "rapid nationwide deployment").

abusing the limited authority conferred on him by Congress under Section 12406 to address "unusual and extreme exigencies."  Stay Order 33.

## CONCLUSION

The Court should vacate the June 19 order entering a stay of the district court's temporary restraining order, or, in the alternative, grant the motion for an injunction pending appeal.

Dated:  October 7, 2025                    Respectfully submitted,

                                           *s/Christopher D. Hu*
                                           _____

                                           ROB BONTA
                                             *Attorney General of California*
                                           SAMUEL T. HARBOURT
                                             *Solicitor General*
                                           HELEN H. HONG
                                             *Principal Deputy Solicitor General*
                                           THOMAS S. PATTERSON
                                           MICHAEL L. NEWMAN
                                             *Senior Assistant Attorneys General*
                                           CHRISTOPHER D. HU
                                             *Deputy Solicitor General*
                                           ANYA BINSACCA
                                           MARISSA MALOUFF
                                           JAMES E. STANLEY
                                             *Supervising Deputy Attorneys General*
                                           BRENDAN M. HAMME
                                           BARBARA HORNE-PETERSDORF
                                           MEGHAN STRONG
                                           JANE REILLEY
                                             *Deputy Attorneys General*
                                           HALEY AMSTER
                                             *Associate Deputy Solicitor General*

22

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) and Local Rules 27-1(d) and 32-3 because it contains 5,172 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word in Times New Roman 14-point font.

**ADDENDUM**

# TABLE OF CONTENTS

Exhibit to Declaration of Meghan H. Strong,
D.Ct. Dkt. 140-2 (August 6, 2025) ............................................................ A-1

Transcript of Bench Trial Proceedings (August 11, 2025) ................................... A-4

Exhibits (1-18) to Declaration of Brendan Hamme in Support of
Plaintiffs' Motion for Preliminary Injunction, D.Ct. Dkt. 183-2
(September 2, 2025) ................................................................................ A-212

Declaration of Sean Duryee, D.Ct. Dkt. 183-4
(September 2, 2025) ................................................................................ A-343

Declaration of German Hurtado, D.Ct. Dkt. 183-5
(September 2, 2025) ................................................................................ A-348

Defendants' Response Brief Regarding Jurisdiction, D.Ct. Dkt. 190
(September 5, 2025) ................................................................................ A-355

Order Re: Jurisdiction Over Plaintiffs' Motion for Preliminary
Injunction, D.Ct. Dkt. 192 (September 9, 2025) ..................................... A-369

Opinion and Order Granting Motion for Temporary Restraining Order,
*Oregon v. Trump*, No. 25-cv-1756, Dkt. 56 (October 4, 2025) ............. A-373

Declaration of Paul S. Eck, *Oregon v. Trump*, No. 25-cv-1756,
Dkt. 60 (October 5, 2025) ....................................................................... A-406

Declaration of Brian Marshall in Support of Plaintiffs' Motion
for a Second Temporary Restraining Order, *Oregon v. Trump*,
No. 25-cv-1756, Dkt. 65 (October 5, 2025) ............................................ A-410

Second Temporary Restraining Order, *Oregon v. Trump*,
No. 25-cv-1756, Dkt. 68 (October 5, 2025) ............................................ A-414

Temporary Restraining Order Transcript of Proceedings,
*Oregon v. Trump*, No. 25-cv-1756 (October 5, 2025) .......................... A-416

Supplemental Declaration of Paul S. Eck (October 7, 2025) ........................... A-454

# EXHIBIT 31

**To Declaration of Meghan H. Strong in Support of Plaintiff's Supplemental Reply Brief in Support of Motion for Preliminary Injunction**

**DA ACTIVATION ORDER 004-25 12406 (052035ZAug25)**

1. REFERENCES:
A. FORSCOM-43354 - 12406
B. UNITED STATES CODE (USC) 12406, AUTHORITY TO CALL THE NATIONAL GUARD INTO FEDERAL SERVICE.
C. PRESIDENTIAL MEMORANDUM, DATED 7 JUNE 2025, SUBJECT: DEPARTMENT OF DEFENSE SECURITY FOR THE PROTECTION OF THE DEPARTMENT OF HOMELAND SECURITY FUNCTIONS.
D. SECRETARY OF DEFENSE MEMORANDUM FOR ADJUTANT GENERAL OF THE CALIFORNIA NATIONAL GUARD, DATED 7 JUNE 2025, SUBJECT: CALLING MEMBERS OF THE CALIFORNIA NATIONAL GUARD INTO FEDERAL SERVICE.

2. THE SECRETARY OF DEFENSE, PURSUANT TO TITLE 10, US CODE, SECTION 12406, AUTHORIZES THE MOBILIZATION OF UNITS AND MEMBERS OF THE NATIONAL GUARD. THIS MOBILIZATION IS IN RESPONSE TO DIRECTION FROM THE PRESIDENT OF THE UNITED STATES STATES (REF C) TO PROVIDE FORCES TO PROTECT FEDERAL FUNCTIONS, PERSONNEL, AND PROPERTY.

3. THIS MESSAGE IMPLEMENTS SECDEF'S ORDER TO CALL UNITS AND MEMBERS OF THE ARMY NATIONAL GUARD INTO FEDERAL SERVICE. THE NATIONAL GUARD UNIT(S) LISTED IN PARA 5 BELOW ARE CALLED INTO FEDERAL SERVICE UNDER PRESIDENTIAL RESERVE CALLUP (TITLE 10, USC 12406). THIS DA ACTIVATION ORDER ALSO WILL BE TRANSMITTED TO THE ADJUTANT GENERAL (TAG) CONCERNED FOR FURTHER TRANSMISSION TO THE GOVERNOR.
A. UNIT PERSONNEL ARE INVOLUNTARILY CALLED INTO FEDERAL SERVICE IN THEIR CURRENT GRADES AND POSITIONS FOR AN INITIAL PERIOD AS SPECIFIED BELOW ABSENT AUTHORIZED EXTENSIONS OR REORDERS TO ACTIVE DUTY. UNIT ACTIVATION ORDERS ARE APPLICABLE TO ALL ASSIGNED MEMBERS, UNLESS THE SECRETARY OF THE ARMY GRANTS A SPECIFIC EXEMPTION. DIRECTOR, ARNG WILL DETERMINE THE BEST METHOD TO FILL UNIT MANNING SHORTFALLS.
B. PURSUANT TO SECRETARY OF DEFENSE DIRECTIVE AND SECRETARY OF THE ARMY YOU ARE RELIEVED FROM YOUR PRESENT STATUS AND ARE ORDERED TO REPORT FOR A PERIOD OF ACTIVE DUTY.
C. PROCEED FROM YOUR PRESENT LOCATION IN SUFFICIENT TIME TO REPORT BY THE DATE SPECIFIED. MEMBERS OF ACTIVATED UNITS WILL COMPLY WITH GUIDANCE ISSUED BY CDRUSNORTHCOM, OR SUCH COMMANDERS AS HE DESIGNATES.
D. UNLESS SPECIFICALLY STATED, THIS ORDER DOES NOT AUTHORIZE THE MOBILIZATION OF PROMOTABLE COLONELS OR GENERAL OFFICERS.
E. DIRECTOR, ARMY NATIONAL GUARD WILL ENSURE THAT EVERY SOLDIER IN ANY UNIT IDENTIFIED ON THIS ORDER THAT IS ACTIVATED AND SENT TO A REQUESTED STAGING OR DUTY STATION WILL BE CAPABLE OF PERFORMING THEIR ASSIGNED DUTIES. FOR PURPOSES OF THIS ACTIVATION, UNIT AND INDIVIDUAL INVOLUNTARY DUTY WILL BE CAPTURED AND FACTORED INTO FUTURE SOURCING DECISIONS WHEN THE UNIT IS BEING CONSIDERED FOR FOLLOW ON INVOLUNTARY ACTIVATION. SOLDIERS ACTIVATED UNDER 10 USC 12406 ARE NOT IN DWELL.

4. ACTIVATED UNIT(S) WILL REPORT TO HOME STATION AND MOVE TO DESIGNATED STAGING LOCATIONS IAW TIME LINES ESTABLISHED BY THE FORCE REQUESTOR AND US FORCES COMMAND. UNIT STRENGTH WILL NOT EXCEED THE AUTHORIZED LEVEL STATED IN PARAGRAPH 5.

5. THE FOLLOWING UNIT(S) IS/ARE HEREBY CALLED INTO FEDERAL SERVICE UNDER THE PROVISIONS OF 10 USC 12406 EFFECTIVE:

A. MOBILIZATION DATE 08 AUG 25 AND MOBSAD 08 AUG 25

| UIC | DESCRIPTION | COMPO | PAX | TOUR LENGTH | HOME STA | MOB STA |
|---|---|---|---|---|---|---|
| WPB9Y1 | 0040 MP CO FWD 1 | 2 | 158 | 90 | LOS ALAMITOS CA | HOME STATION MOB |
| WPV1TA | 0579 EN BN HHC FWD 1 | 2 | 142 | 90 | SANTA ROSA G1 CA | HOME STATION MOB |

6. THE UNIT(S) LISTED IN PARAGRAPH 5 WILL BE NOTIFIED OF THE ACTIVATION EFFECTIVE DATE WITHIN 24 HOURS OF RELEASE OF THIS MESSAGE. THE ACTIVATION PERIOD MAY BE ADJUSTED DEPENDING ON MISSION REQUIREMENTS. COMMANDERS WILL INFORM SOLDIERS TO PLAN ACCORDINGLY.

7. ACOMS WILL APPLY THE PROVISION OF AMOPES, FORMDEPS, AND AR 600-8-101 FOR PERSONNEL PROCESSING.

8. THIS ORDER IS THE DA MOVEMENT DIRECTIVE. PROVISIONS OF AR 55-113 AND AR 55-355 APPLY. SUPPORT INSTALLATIONS ARE DIRECTED TO PROCESS REQUESTS FROM SUBJECT RC UNITS PENDING RECEIPT OF HARD COPY ORDERS TO ACTIVE DUTY.

9. OMA FUND CITATIONS FOR MOBILIZED UNITS: ALL ARMY PERSONNEL, EXCEPT SOCOM ASSETS, ORDERED TO DEPLOY WILL REVIEW PROVIDED FUND CITES ON PUBLISHED ORDERS AND IF NECESSARY CONTACT THE RESPECTIVE RESOURCE MANAGEMENT OFFICE FOR FUND CITES.
A. ALL UNITS, EXCEPT SOCOM UNITS, CONTACT THE SERVICING / INSTALLATION RESOURCE MANAGEMENT OFFICE AT THE DESIGNATED MOB STATION FOR TRAVEL AND TRANSPORTATION FUND CITES.
B. TRAVEL ADVANCED ACCOUNTING CITATIONS MUST CITE A SPECIFIC FISCAL STATION NUMBER (FSN). RESERVE COMPONENT PERSONNEL WILL ACTIVATE AND DEACTIVATE IN ACCORDANCE WITH THE CHAIN OF COMMANDS DIRECTIVE.

10. UNITS WILL NOT DEACTIVATE WITHOUT PRIOR APPROVAL OF HQDA. INDIVIDUAL MEMBERS OF THE UNIT WILL DEMOBILIZE WITH THE UNIT UNLESS PROVISIONS OF AR 600-8-24 OR AR 635-200 APPLY.

11. PUBLIC AFFAIRS GUIDANCE. UNITS WILL COMPLY WITH PAO GUIDANCE

12. POC IS MOB SHIFT LEADER - MOB SHIFT LEADER CPT JESSE MEINKE, DAMO-ODM,(703)697-4116 EMAIL TO jesse.d.meinke.mil@mail.smil.mil

A-003

**Volume 1**

**Pages 1 - 207**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

GAVIN NEWSOM, in his official )
capacity as Governor of the State of )
California; STATE OF  CALIFORNIA, )
                                     )
          Plaintiffs,                )
                                     )
  VS.                                )  **NO. 3:25-CV-04870 CRB**
                                     )
DONALD TRUMP, in his official        )
capacity as President of the United  )
States; PETE HEGSETH, in his official )
capacity as Secretary of the         )
Department of Defense; UNITED STATES )
DEPARTMENT OF DEFENSE,               )
                                     )
          Defendants.                )
_____)

San Francisco, California
Monday, August 11, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

                    CALIFORNIA DEPARTMENT OF JUSTICE
                    OFFICE OF THE ATTORNEY GENERAL
                    455 Golden Gate Avenue, Room 11000
                    San Francisco, California 94102
               BY:  **JANE E. REILLEY**
                    **LORRAINE A. LOPEZ**
                    **MEGHAN STRONG**
                    **KENDAL MICKLETHWAITE**
                    **DEPUTY ATTORNEYS GENERAL**

          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

```
 1   APPEARANCES:  (CONTINUED)

 2   For Plaintiffs:
                         CALIFORNIA DEPARTMENT OF JUSTICE
 3                       OFFICE OF THE ATTORNEY GENERAL
                         455 Golden Gate Avenue, Room 11000
 4                       San Francisco, California 94102
                    BY:  ANYA M. BINSACCA
 5                       MARISSA MALOUFF
                         SUPERVISING DEPUTY ATTORNEYS GENERAL
 6

 7   For Defendants:
                         UNITED STATES DEPARTMENT OF JUSTICE
 8                       Civil Division, Federal Programs Branch
                         1100 L Street, NW
 9                       Washington, D.C. 20005
                    BY:  GARRY D. HARTLIEB, TRIAL ATTORNEY
10                       JODY D. LOWENSTEIN, TRIAL ATTORNEY
                         JEAN LIN, SPECIAL LITIGATION COUNSEL
11                       BENJAMIN S. KURLAND, TRIAL ATTORNEY
                         ANDREW BERNIE, TRIAL ATTORNEY
12                       ABIGAIL STOUT, TRIAL ATTORNEY

13
                         UNITED STATES DEPARTMENT OF JUSTICE
14                       Civil Division
                         950 Pennsylvania Avenue NW
15                       Washington, D.C. 20530
                    BY:  ERIC J. HAMILTON
16                       JOHN BAILEY
                         DEPUTY ASSISTANT ATTORNEYS GENERAL
17

18   Also Present:
                         Kimberly Knight, Paralegal
19                       Noel Garcia, Legal Analyst
                         Major General Scott Sherman
20

21

22

23

24

25
```

## I N D E X

Monday, August 11, 2025 - Volume 1

| | PAGE | VOL. |
|---|---|---|
| Plaintiffs Rest | 202 | 1 |

| PLAINTIFFS' WITNESSES | PAGE | VOL. |
|---|---|---|
| HARRINGTON, WILLIAM | | |
| (SWORN) | 14 | 1 |
| Direct Examination by Ms. Reilley | 14 | 1 |
| Cross-Examination by Mr. Lowenstein | 43 | 1 |
| Redirect Examination by Ms. Reilley | 47 | 1 |
| | | |
| SHERMAN, SCOTT MARSHALL | | |
| (SWORN) | 49 | 1 |
| Direct Examination by Ms. Reilley | 50 | 1 |
| Cross-Examination by Ms. Lin | 112 | 1 |
| Redirect Examination by Ms. Reilley | 143 | 1 |
| | | |
| SANTACRUZ, ERNESTO | | |
| (SWORN) | 147 | 1 |
| Direct Examination by Ms. Lopez | 147 | 1 |
| Cross-Examination by Mr. Hartlieb | 179 | 1 |

## E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 5 | | 58 | 1 |
| 10 | | 24 | 1 |
| 12 | | 66 | 1 |
| 15 | | 53 | 1 |
| 28 | | 36 | 1 |
| 31 | | 85 | 1 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 38 | | 73 | 1 |
| 41 | | 81 | 1 |
| 53 | | 71 | 1 |
| 54 | | 72 | 1 |
| 64 | | 77 | 1 |
| 66 | | 78 | 1 |
| 68 | | 79 | 1 |
| 69 | | 83 | 1 |
| 75 | | 91 | 1 |
| 76 | | 92 | 1 |
| 79 | | 86 | 1 |
| 80 | | 86 | 1 |
| 83 | | 93 | 1 |
| 86 | | 94 | 1 |
| 87 | | 95 | 1 |
| 92 | | 96 | 1 |
| 94 | | 96 | 1 |
| 95 | | 97 | 1 |
| 96 | | 98 | 1 |
| 114 | 110 | 111 | 1 |

PROCEEDINGS

| | |
|---|---|
| 1 | <u>Monday - August 12, 2025</u>                    <u>10:00 a.m.</u> |
| 2 | P R O C E E D I N G S |
| 3 | ---o0o--- |
| 4 | THE COURTROOM DEPUTY:  Calling Civil Action C 25-4870, |
| 5 | Newsom vs. Trump. |
| 6 | Counsel, please state your appearances for the record. |
| 7 | MS. STRONG:  Good morning, Your Honor.  Meghan Strong |
| 8 | of the California Department of Justice for plaintiffs.  With |
| 9 | me at counsel table are Jane Reilley, Lorraine Lopez, Kendall |
| 10 | Micklethwaite, Anya Binsacca, and Marissa Malouff. |
| 11 | THE COURT:  Good morning. |
| 12 | MR. HAMILTON:  Good morning, Your Honor. |
| 13 | Eric Hamilton for the defendants.  With me at counsel table is |
| 14 | John Bailey, Garry Hartlieb, Jean Lin, Jody Lowenstein, |
| 15 | Ben Kurland, Andrew Bernie, Abby Stout. |
| 16 | THE COURT:  Good morning. |
| 17 | MR. HAMILTON:  Thank you. |
| 18 | THE COURT:  Well, let me thank the parties, first of |
| 19 | all, for complying with the many orders that we've issued in |
| 20 | the last two or three weeks concerning preparation, discovery, |
| 21 | and so forth.  It's extremely helpful to have an order to |
| 22 | things, especially in cases that are high-profile cases and |
| 23 | where there are deadlines to be met, and the parties did meet |
| 24 | the deadlines and I'm grateful for that. |
| 25 | So I thought I would make a brief statement as to what I |

PROCEEDINGS

1   understand - when I say "I," I mean the Court -- understand

2   this process to be, where we are as of today.

3       The trial that is going to commence this morning is about

4   a single factual issue to which a number of legal challenges

5   have been asserted.

6       First, the factual issue.  The factual issue is as

7   follows:  Did the military, in this case the Marines and the

8   federalized National Guard, violate the Posse Comitatus Act?

9   Now, that act, which is a statute, which means it's a law,

10  reads as follows, and it's rather brief.  It's 18 U.S.C.,

11  Section 1385, and it's entitled "Use of Army, Navy, Marine

12  Corps, Air Force, and Space Force as Posse Comitatus."  It

13  reads [as read]:

14          "Whoever, except in cases and under

15      circumstances expressly authorized by the

16      Constitution or Act of Congress, willfully uses any

17      part of the Army, the Navy, the Marine Corps, the

18      Air Force, or the Space Force as a posse comitatus or

19      otherwise to execute the laws shall be fined under

20      this title or imprisoned . . . ."

21      And it goes on to discuss the penalty.

22      Now, the first question, obviously, is it doesn't say

23  "National Guard"; however, I think it's recognized by the

24  parties that with the federalization of the National Guard,

25  they then would be included within this prohibition, which is

PROCEEDINGS

 1   listed as -- which is contained in the Posse Comitatus Act.

 2        So it means, in the Court's view, in other words, the

 3   military, as defined, cannot be used to enforce domestic laws

 4   unless expressly authorized by the Constitution or act of

 5   Congress.  The factual question which the Court must address is

 6   whether the military was used to enforce domestic law and, if

 7   so, whether there continues to be a threat that it would be

 8   done again.  Evidence will be presented on this issue today and

 9   tomorrow.

10        On Wednesday, the Court will hear argument on the major

11   legal issues that have -- that the federal government has

12   raised in connection with the implementation of this statute,

13   and the major issues are as follows:

14        One, the Posse Comitatus Act provides no civil cause of

15   action for relief.  The Posse Comitatus Act is a criminal

16   statute and, therefore, to bring it in a civil context is not

17   permitted under the law.  That's number one.

18        Number two, California, the State of California, cannot

19   bring a claim that the military was acting *ultra vires* under

20   these circumstances.

21        Number three, California lacks standing to bring the

22   claim.

23        And, number four, that there is another statute, which is

24   12406, under which the National Guard was federalized, and that

25   statute constitutes federal authorization for exempting this

**PROCEEDINGS**

1    conduct under the Posse Comitatus Act because, remember, when I

2    read the Posse Comitatus Act, it's not a blanket, it's not a

3    blanket statute.  It says "unless expressly authorized by act

4    of Congress or by the Constitution."  And the federal

5    government takes the position that 14604 -- I'm sorry --

6    12406 -- I'm getting my numbers transposed.  That's a little

7    dangerous when I do that -- it's 12406, expressly constitutes

8    that exception to the Posse Comitatus Act.

9        We'll have that discussion, and I promise you we'll have

10   it, on Wednesday after the evidentiary issues have been -- have

11   been presented to the Court.

12       So I also want to point out, to anybody who's interested,

13   is that the parties have written extensively on this subject.

14   This is not the first time these issues have been raised in

15   this Court, and both sides have addressed it.  I will give you

16   another opportunity to address those issues, but I want you to

17   be assured that I actually have considered it, I have read your

18   briefs, and I understand -- at least I believe I understand

19   what the issues are.

20       So thank you.  That is my opening.  I gave the opening

21   statement here today.  So I think that we should move right

22   into the evidentiary portions because we have a number of

23   witnesses.  I want to make sure that they're heard and go

24   through it and there's ample time for cross-examination of the

25   witnesses.

PROCEEDINGS

1      So I turn to the State of California.  They are the

2  plaintiff in this case.

3      And you may call your first witness.

4          MS. STRONG:  Thank you, Your Honor.

5      Before we call our first witness, I just have one

6  housekeeping item and one exhibit-related item I want to bring

7  the Court's attention to.

8          THE COURT:  Okay.

9          MS. STRONG:  So, first, the parties have already

10  discussed and agreed that the witnesses shall be sequestered

11  during respective testimony, except that I understand that

12  defendants are designating a party representative.  I believe

13  they designated Major General Sherman as their party

14  representative.

15          THE COURT:  Okay.  And he may attend.

16          MS. STRONG:  In addition, Your Honor, as you may have

17  seen if you've had the chance review --

18          THE COURT:  Let me clarify the sequestration.

19      What we've done is we've put the witnesses in a secure

20  location, in a courtroom actually, but they're there.  They're

21  not here to hear the evidence, but they have -- they are with

22  each other.  It's unrealistic to assume that they would never

23  talk to each other.  It may be a good idea that they do talk to

24  each other.  I don't know.  But they're sequestered in that

25  sense.

PROCEEDINGS

1          MS. STRONG:  Yes, Your Honor.

2          THE COURT:  They're not sequestered one from the

3     other.

4          MS. STRONG:  Yes, Your Honor, that's my understanding,

5     and they don't have access to the audio feed or otherwise

6     ability to --

7          THE COURT:  I believe that's correct.

8          MS. STRONG:  -- hear the testimony.

9          THE COURT:  I believe that's correct.

10         MS. STRONG:  So the second item, Your Honor, is on our

11    exhibit list, you may have seen the parties have stipulated to

12    the admissibility and to admit the vast majority of the

13    exhibits on the exhibit list; and in order to streamline trial

14    today and enable free use of these exhibits during the exams,

15    we'd like to go ahead and admit all of the stipulated exhibits

16    now.

17         THE COURT:  So admitted.

18         MS. STRONG:  Thank you.  Would Your Honor like me to

19    individually address each exhibit or can we reference them?

20         THE COURT:  No.  I would like you not to have to

21    address it.

22         MS. STRONG:  Thank you, Your Honor.  That's my

23    preference as well.

24       In that case, that's all from me.  I'm going to turn it

25    over to my colleague to call our first witness.

**PROCEEDINGS**

1   THE COURT:  Okay.  Is there anything from the federal

2   government that you want to address?  Good morning.

3          MS. LIN:  Good morning, Your Honor.

4          THE COURT:  And you have to give me your name again,

5   please.

6          MS. LIN:  Jean Lin on behalf of the Department of

7   Justice.

8          THE COURT:  Thank you.

9          MS. LIN:  So one housekeeping that the defendants have

10  is that we have a pending motion to seal two types of

11  information, and one is a small redaction -- redaction to

12  certain exhibits that the parties either have stipulated to or

13  not; and then the -- and the other is we have one document that

14  we wanted to seal in entirety, and we have that motion pending.

15  And if Your Honor would like to hear arguments about the

16  sealing motion because it would affect portions that are

17  redacted as well as one document that we're withholding, we're

18  hoping to withhold in full.

19          THE COURT:  Well, I don't want to hear it now unless

20  it's necessary for me to hear it now in light of the order of

21  evidence.

22       But, I mean, the problem, quite practically speaking, is

23  clearing the courtroom, having the hearing.  I mean, if it's

24  under seal, it's under seal.  But is it necessary for me to

25  adjudicate that now?

PROCEEDINGS

1      MS. LIN:  So for defendants, we don't intend to talk

2  about any portions of the exhibits that have been redacted or

3  withheld in full.  That's one.

4      And when we filed the motion yesterday, the defendants --

5  the plaintiffs represented that they do not oppose --

6      THE COURT:  Well, let me --

7      MS. LIN:  -- the motion.

8      THE COURT:  -- see what the plaintiff says.

9      MS. STRONG:  We don't take a position on the sealing

10  itself, Your Honor.  We'll defer to the Court on that.

11      We do intend to use the exhibits that are redacted.

12  However, we think that the easiest way to address this is for

13  us to simply put the redacted versions up.  If we display

14  anything on the public screen, we'll use the redacted versions.

15  Your Honor and the witness will, of course, have the

16  under-seal, unredacted issues, but we think that would

17  reasonably address this issue during the trial.

18      THE COURT:  Okay.  Let's do it that way, and let's

19  proceed.

20      Thank you.

21      MS. STRONG:  Thank you, Your Honor.

22      MS. LIN:  Okay.  Thank you, Your Honor.

23      THE COURT:  Thank you very much.

24      Okay.  Good morning.

25      MS. REILLEY:  Good morning, Your Honor.  Deputy

**PROCEEDINGS**

1    Attorney General Jane Reilley for the plaintiffs.

2        Plaintiffs call Deputy Chief of Staff William Harrington

3    as their first witness.

4            **THE COURT:**  Thank you.  Now, is the witness in the --

5            **MS. REILLEY:**  I believe he's one of the witnesses

6    who's been sequestered.

7            **THE COURT:**  Okay.  Well, maybe the marshals can...

8            **MS. REILLEY:**  And his name is William Harrington.

9            **THE COURT:**  Thank you.

10                   (Pause in proceedings.)

11           **THE COURT:**  By the way, I might as well address, while

12   we're waiting, the -- as the parties know, the sound is being

13   broadcast.  So there is a link.  The link is a public link,

14   anyone can access it, and so they will hear, if they're

15   interested, these proceedings.

16       In terms of the video, I issued an order, I think on

17   Saturday, granting the federal government -- I've got to talk

18   about federal government and state government -- the federal

19   government's request, and therefore, there is no video of these

20   proceedings.

21       However, the Court is a public court.  It's open.  People

22   come in.  They can look at the witnesses as the witnesses

23   testify.  Okay?  So we just understand that.

24       And I've now filled the necessary time because the witness

25   is here.

HARRINGTON - DIRECT / REILLEY

```
1    (Witness enters the courtroom and steps forward to be sworn.)
2         THE COURT:  Would you come forward, please.
3         THE COURTROOM DEPUTY:  Good morning.  Step up.  Watch
4    your step.
5         Please raise your right hand.
6                     WILLIAM  HARRINGTON,
7    called as a witness for the Plaintiffs, having been duly sworn,
8    testified as follows:
9         THE WITNESS:  Yes, ma'am.
10         THE COURTROOM DEPUTY:  Thank you.  You may be seated.
11        Please state your full name for the record and spell your
12    last name.
13         THE WITNESS:  William Harrington, H-a-r-r-i-n-g-t-o-n.
14         THE COURTROOM DEPUTY:  Thank you.
15         THE COURT:  You may proceed.
16         MS. REILLEY:  Thank you, Your Honor.
17                     DIRECT EXAMINATION
18   BY MS. REILLEY:
19   Q.   Good morning, Mr. Harrington.
20   A.   Good morning, ma'am.
21   Q.   It's nice to see you again.
22        Do you recall that I deposed you in this matter
23   approximately two weeks ago?
24   A.   I do remember.
25   Q.   All right.  And --
```

HARRINGTON - DIRECT / REILLEY

```
1           THE COURT:  And could you go a bit closer to the
2    microphone and keep your voice up?
3           THE WITNESS:  Yes, sir.
4           THE COURT:  Thank you.
5    BY MS. REILLEY:
6    Q.   Mr. Harrington, you are a civilian who's employed by the
7    U.S. Army; is that right?
8    A.   Yes, ma'am.
9    Q.   Would you please state your rank and current assignment
10   with the Army?
11   A.   GS-13, Deputy Chief of Staff, Task Force 51.
12   Q.   What is Task Force 51?
13   A.   Task Force 51 is U.S. Army North's deployable contingency
14   command post.
15   Q.   Task Force 51 was involved in the deployment of
16   federalized California National Guard soldiers and Marines to
17   Los Angeles that began in June of this year; is that correct?
18   A.   Yes, ma'am.
19   Q.   And specifically Task Force 51 had operational control
20   over all of the federalized California National Guard soldiers
21   who were deployed to Los Angeles?
22   A.   Yes, ma'am.
23   Q.   That was approximately 4,000 soldiers in total; correct?
24   A.   Yes, ma'am.
25   Q.   Task Force 51 also had tactical control over all of the
```

HARRINGTON - DIRECT / REILLEY

1  Marines who were deployed to Los Angeles?

2  A.   Yes, ma'am.

3  Q.   And that was approximately 700 Marines in total?

4  A.   Correct.

5  Q.   If today I use the phrase "Task Force 51 troops," do you

6  understand that I'm referring to all of the federalized

7  California National Guard soldiers and all of the Marines who

8  are under Task Force 51's command during the deployment to

9  Los Angeles?

10  A.   Yes, ma'am.

11  Q.   And the U.S. Department of Defense oversees the entire

12  Army, including Task Force 51; is that right?

13  A.   Correct.

14  Q.   During the deployment to Los Angeles, Task Force 51 worked

15  with and provided assistance to members of the Department of

16  Homeland Security?

17  A.   Yes, ma'am.

18  Q.   And the Department of Homeland Security has several

19  divisions, including Immigration and Customs Enforcement,

20  Enforcement and Removal Operations, Customs and Border

21  Protection, and Homeland Security Investigations?

22  A.   Yes, ma'am.

23  Q.   But the Department of Homeland Security is not part of the

24  military; right?

25  A.   No, ma'am.

HARRINGTON - DIRECT / REILLEY

1  Q.   The Department of Homeland Security is a federal law
2  enforcement agency?
3  A.   Correct.
4  Q.   And the Department of Defense, which includes Task
5  Force 51 and is made up of military, is separate from the
6  Department of Homeland Security, which is made up of federal
7  law enforcement agents; is that right?
8  A.   Yes, ma'am.
9  Q.   How long have you served as the deputy chief of staff for
10 Task Force 51?
11 A.   For about two and a half years.
12 Q.   In that role, you're responsible for managing the staff of
13 Task Force 51; is that correct?
14 A.   Correct.
15 Q.   You also carry out any tasks that are assigned to you by
16 the chief of staff for Task Force 51?
17 A.   Yes, ma'am.
18 Q.   Previously you were an instructor for the U.S. Army
19 Northern Command's Defense Support for Civil Authorities
20 course?
21 A.   It wasn't U.S. Army.  North Com is a joint headquarters,
22 so it's not underneath the Department of the Army.
23 Q.   All right.  But it was underneath the Department of
24 Defense; is that correct?
25 A.   Yes, ma'am.

**HARRINGTON - DIRECT / REILLEY**

1  Q.   And that course applied to all of the military branches,

2  not just the Army?

3  A.   Yes, ma'am.

4  Q.   All right.  And the course was entitled "Defense Support

5  to Civil Authorities"; is that right?

6  A.   Yes, ma'am, the Phase 2 course.

7  Q.   The Phase 2 course?

8  A.   Yes.

9  Q.   All right.  And you were the instructor of that Phase 2

10  course for two years?

11  A.   Yes, ma'am.

12  Q.   And that course covers how the Department of Defense

13  provides security to federal law enforcement agencies when the

14  need arises; is that right?

15  A.   Well, there is a legal brief and part of that legal brief

16  includes Posse Comitatus.

17  Q.   All right.  And in June you deployed to Los Angeles with

18  Task Force 51; is that correct?

19  A.   Yes, ma'am.

20  Q.   One of your responsibilities during that deployment was to

21  write a nightly report for the commanding general of Task

22  Force 51?

23  A.   Yes, ma'am.

24  Q.   At the beginning of the deployment, Major General Scott

25  Sherman was the commanding general of Task Force 51 with

HARRINGTON - DIRECT / REILLEY

1    respect to that deployment; is that correct?

2    A.   Yes, ma'am.

3    Q.   And Major General Scott Sherman was in command until

4    July 10th?

5    A.   Yes, ma'am.

6    Q.   And from July 10th onward, is it correct that Major

7    General Neve Nell was the commanding general?

8    A.   Yes, ma'am.

9    Q.   In your nightly reports to the commanding general, you

10   included information about the daily activities of Task

11   Force 51; correct?

12   A.   Yes.

13   Q.   And that included information about Task Force 51's

14   activities in response to requests for assistance from the

15   Department of Homeland Security?

16   A.   Yes, ma'am.

17   Q.   And the information you included in your nightly reports

18   came from information uploaded to a centralized network by each

19   of Task Force 51 units; is that right?

20   A.   Yes, ma'am.

21   Q.   And you also received real-time reports from the units via

22   email, phone calls, and Microsoft Team messages?

23   A.   Correct.

24   Q.   But you never personally were present during any of

25   Task Force 51's field operations during the deployment; is that

HARRINGTON - DIRECT / REILLEY

1   right?

2   A.   Correct.

3   Q.   So the information you included in your nightly reports

4   was received secondhand from the units?

5   A.   I don't know if it was secondhand.  It was direct

6   reporting from the units; but, yes.

7   Q.   Okay.  So but all the -- you didn't personally witness any

8   of the actions that you included in your report; is that right?

9   A.   Correct.

10  Q.   All right.  You first received orders in connection with

11  Task Force 51's deployment to Los Angeles on June 7th; is that

12  correct?

13  A.   Yes, ma'am.

14  Q.   And on that day you received a phone call ordering you to

15  come to Army North headquarters for a briefing?

16  A.   Yes, ma'am.

17  Q.   You attended that June 7th briefing; correct?

18  A.   I did.

19  Q.   And the commanding general of Army North was also present

20  at that briefing?

21  A.   Yes, ma'am.

22  Q.   The chief of staff for Army North was also present?

23  A.   Yes, ma'am.

24  Q.   So was the G3?

25  A.   Yes, ma'am.

HARRINGTON - DIRECT / REILLEY

1    Q.    And the G3 is the operations officer; correct?

2    A.    Correct, ma'am.

3    Q.    And the Task Force 51 lawyer was present at the briefing?

4    A.    I don't remember.

5    Q.    All right.  What about the staff judge advocate?  Was that

6    individual present at the briefing?

7    A.    I think they're the same person, ma'am.  I don't -- I

8    don't remember if she was there or not.

9    Q.    All right.  At the June 7th briefing, you were told that

10   Task Force 51 would be deployed to Los Angeles; is that right?

11   A.    Yes, ma'am.

12   Q.    And you were told that Task Force 51 would serve as the

13   command and control headquarters for the deployment?

14   A.    Yes, ma'am.

15   Q.    And at the time you attended that briefing, you already

16   knew what the Posse Comitatus Act was; correct?

17   A.    Correct, ma'am.

18   Q.    And your knowledge of the Posse Comitatus Act comes from

19   trainings that you've received during your time at the

20   Department of Defense; is that right?

21   A.    Yes, ma'am.

22   Q.    And it also comes from your time as an instructor of the

23   Defense Support to Civil Authorities Phase 2 course?

24   A.    Correct, ma'am.

25   Q.    I believe you mentioned earlier that course included a

HARRINGTON - DIRECT / REILLEY

1    legal brief that addressed the Posse Comitatus Act?

2    A.    Yes, ma'am.

3    Q.    And you during your time as instructor, you received that

4    legal briefing 28 times?

5    A.    About 28 times.  I've sat through it about that number.

6    Q.    Okay.  So during the June 7th briefing, you raised the

7    issue of the Posse Comitatus Act; correct?

8    A.    I did, ma'am.

9    Q.    Specifically you said that any -- if any National Guard

10   troops were federalized as part of the deployment, they would

11   lose the ability to conduct law enforcement activities because

12   of the Posse Comitatus Act; correct?

13   A.    Correct, ma'am.

14   Q.    And when you said that, the commanding general of

15   U.S. Army North specifically said that federalized National

16   Guard troops involved in the mission would not be performing

17   law enforcement functions; is that right?

18   A.    Correct, ma'am.

19   Q.    And everyone in the briefing agreed that as soon as

20   California National Guard troops were called into federal

21   service, they would be subject to the Posse Comitatus Act; is

22   that right?

23   A.    Yes, ma'am.

24   Q.    And because of the Posse Comitatus Act, those federalized

25   National Guard troops would not be able to engage in law

HARRINGTON - DIRECT / REILLEY

1    enforcement activities?

2            MR. LOWENSTEIN:  Objection, Your Honor.  This is

3    improper opinion testimony under 701.

4            THE COURT:  Overruled.

5    BY MS. REILLEY:

6    Q.   You may answer the question.

7    A.   Can you repeat the question, please.

8    Q.   Certainly.  And this goes back to the --

9            THE COURT:  You're asking him what his understanding

10   is, what his state of mind is, as distinct from a legal

11   opinion; but his legal opinion may very well govern his state

12   of mind.  But he can testify as to what his beliefs were, what

13   he thought of the law, and so forth.

14           MS. REILLEY:  Thank you, Your Honor.

15   BY MS. REILLEY:

16   Q.   Mr. Harrington, the question was:  Because of the Posse

17   Comitatus Act, it's your understanding that those federalized

18   troops would not be allowed to engage in civilian law

19   enforcement activities --

20   A.   Correct.

21   Q.   -- during their deployment?

22        Thank you.

23        And during the June 7th briefing, you were reassured that

24   federalized National Guard troops would not engage in any

25   actions that would violate the Posse Comitatus Act during the

HARRINGTON - DIRECT / REILLEY

1  deployment; right?

2  **A.**   Correct, ma'am.

3  **Q.**   And you're not aware of anyone within the U.S. Northern

4  chain of command who ever believed that the federalized

5  National Guard troops in Los Angeles were not subject to the

6  Posse Comitatus Act; is that right?

7  **A.**   Okay.  There was like a double negative in there, so

8  I think you're saying that everyone knew that Posse Comitatus

9  applied; is that correct?

10          **THE COURT:**  To your knowledge.

11          **THE WITNESS:**  Yes, sir.  Yes, ma'am.

12  **BY MS. REILLEY:**

13  **Q.**   You never heard anyone express an opinion that they

14  thought Posse Comitatus did not apply; is that correct?

15  **A.**   Correct.

16  **Q.**   All right.  Thank you.

17      Task Force 51 troops received training on which specific

18  activities they are not allowed to engage in because of Posse

19  Comitatus; is that correct?

20  **A.**   Yes, ma'am.

21  **Q.**   And this training included a slideshow presentation?

22  **A.**   Yes, ma'am.

23      (Trial Exhibit 10 received in evidence.)

24  **BY MS. REILLEY:**

25  **Q.**   Mr. Harrington, in front of you there's a binder.  I'll

HARRINGTON - DIRECT / REILLEY

1    ask you to turn to Tab 10 of that binder.  This is a document

2    that's been previously admitted as Exhibit 10.

3         Mr. Harrington, do you recognize this document?

4    A.   I do.

5    Q.   This is a copy of the slide deck that was used during the

6    training that Task Force 51 troops received during the

7    deployment to Los Angeles; is that correct?

8    A.   Yes, ma'am.

9    Q.   Do you know who created this slide deck?

10   A.   I do not.

11   Q.   And you did not attend any of the training sessions where

12   these slides were presented to the Task Force 51 troops; is

13   that correct?

14   A.   That's correct.

15   Q.   You're not aware of any transcripts or recordings that

16   show what was said during the training sessions?

17   A.   Correct.

18   Q.   So apart from what's included in these slides, you do not

19   know what information, if any, was provided to the troops

20   during the training sessions?

21   A.   Correct.

22   Q.   If you could please turn to what's been marked as

23   page DEFS00001100, and we'll publish that page to the screen in

24   front of you.

25   A.   Okay.  I'm on the page, ma'am.

HARRINGTON - DIRECT / REILLEY

1  Q.  All right.  And do you recognize this training slide?

2  A.  Yes, ma'am.

3  Q.  At the top of the page, it says "PCA," and that refers to

4  the Posse Comitatus Act; correct?

5  A.  Yes, ma'am.

6  Q.  And the slide goes on to read [as read]:

7          "PCA prohibits active direct pursuit, arrest,

8      apprehension, search and seizure, security patrols,

9      traffic control, crowd control, riot control,

10     evidence collection, and interrogation."

11  A.  Yes, ma'am.

12          THE COURT:  One moment, please.

13      Lashanda, it's not on the screen.

14      Is it on the screen?  Is the audience able to see it?  No.

15          THE COURTROOM DEPUTY:  Noel has it.  The tech person

16  will need to display it.

17          THE COURT:  The tech.  Okay.  Can you explain to --

18          THE COURTROOM DEPUTY:  We tested on Thursday, so he

19  just needs to publish.

20          THE COURT:  Okay.  Let's wait just a minute because

21  you're going through these, and I think it's useful for

22  everybody to be able to see the exhibit.

23          MS. REILLEY:  Thank you, Your Honor.

24          THE COURT:  So let's wait till your tech person...

25              (Pause in proceedings.)

HARRINGTON - DIRECT / REILLEY

```
 1              THE COURT:  It's very important to have a tech person
 2       under the age of 50.
 3                        (Pause in proceedings.)
 4              THE COURT:  All right.  I now see it on the screen.
 5       BY MS. REILLEY:
 6       Q.   Mr. Harrington, do you see that?
 7              THE COURT:  Can you see it as well?
 8              THE WITNESS:  Yes, sir.
 9              THE COURT:  Okay.  Thank you.
10       BY MS. REILLEY:
11       Q.   All right.  And the page that's shown on the screen in
12       front of you, that is the same document we were just
13       discussing; is that correct?
14       A.   Yes, ma'am.
15       Q.   Thank you.
16            While he was the commander of Task Force 51 with respect
17       to the deployment to Los Angeles, Major General Sherman made it
18       very clear that the troops were not to impede vehicle or
19       pedestrian traffic; is that right?
20       A.   Yes, ma'am.
21       Q.   And that's because impeding vehicle or pedestrian traffic
22       is a law enforcement function?
23       A.   Yes, ma'am.
24       Q.   And the troops were told that they were not allowed to
25       block public roads under the Posse Comitatus Act?
```

HARRINGTON - DIRECT / REILLEY

1  A.   Yes, ma'am.

2  Q.   Task Force 51 troops were trained that they could detain

3  civilians, though; is that correct?

4  A.   Yes, ma'am.

5  Q.   But there's no scenario that you can conceive of where a

6  Task Force 51 soldier would be able to detain a civilian who is

7  not committing any criminal act without violating Posse

8  Comitatus; is that right?

9  A.   No, ma'am.  I do not agree with that statement.

10  Q.   All right.  You gave a deposition in this matter two weeks

11  ago.  Do you recall that testimony from earlier?

12  A.   Yes, ma'am.

13  Q.   All right.  If you could, please, turn to Volume 4 of the

14  binder.  If you could please turn to Tab 98.

15       Do you recognize this as the transcript of the deposition

16  that you gave in this matter?

17  A.   (Witness examines document.)  Yes, ma'am.

18  Q.   When you were deposed in this matter, you gave testimony

19  under oath; correct?

20  A.   Yes, ma'am.

21  Q.   And as part of that oath, you swore to tell the truth as

22  completely and accurately as you could; right?

23  A.   Yes, ma'am.

24  Q.   And after the deposition, you had a chance to review your

25  transcript and make any changes to it?

HARRINGTON - DIRECT / REILLEY

```
 1   A.   Yes, ma'am.

 2   Q.   Then you signed the transcript under oath; is that

 3   correct?

 4   A.   Yes, ma'am.

 5   Q.   Could you please turn to page 177 of your deposition.  Let

 6   me know when you're at that page.

 7   A.   (Witness examines document.)  Okay.  I'm there, ma'am.

 8        MS. REILLEY:  May I have one moment, Your Honor.

 9        THE COURT:  Yes.

10             (Pause in proceedings.)

11   BY MS. REILLEY:

12   Q.   All right.  And do you recall at your deposition when I

13   asked you [as read]:

14        "Can you conceive of any scenario where a

15        Task Force 51 soldier would be able to temporarily

16        detain a civilian who is not committing any criminal

17        act without violating Posse Comitatus?"

18        THE COURT:  Well, are you referring to a particular

19   page?  Are you referring to a particular page?

20        MS. REILLEY:  Yes, Your Honor.  We are pulling that

21   cite.

22        THE COURT:  Okay.  Let's wait a moment and see if we

23   can find the page.

24        If not, you can return to this; but I think in fairness to

25   the witness, the witness should be able to look at --
```

HARRINGTON - DIRECT / REILLEY

```
 1                MS. REILLEY:  Yes, Your Honor, and I apologize for the
 2       delay.
 3                THE COURT:  That's all right.
 4                MS. REILLEY:  We're pulling the cite now.
 5       BY MS. REILLEY:
 6       Q.   Oh, if I could please have you turn to page 179, I
 7       apologize, of your deposition transcript, and if I could direct
 8       your attention to line 18.
 9            Do you see where I asked you [as read]:
10                "Can you conceive --
11            And this is, again, based on your training and experience
12       as a deputy chief of staff.
13            [As read]:
14                "Can you conceive of any scenario where a
15            Task Force 51 soldier would be able to temporarily
16            detain a civilian who is not committing any criminal
17            act without violating Posse Comitatus?"
18            Do you see where I asked you that question?
19       A.   Yes, ma'am.
20       Q.   If you could please turn to the following page, page 180,
21       of your deposition.
22            Do you see at line 6 where you responded [as read]:
23                "No, ma'am"?
24       A.   (Witness examines document.)  Yes, ma'am.
25       Q.   And you did not change that testimony when you reviewed
```

HARRINGTON - DIRECT / REILLEY

1    and signed your transcript; correct?

2    A.    Yes, ma'am.

3    Q.    During the deployment to Los Angeles, Task Force 51

4    responded to requests for assistance from federal law

5    enforcement agencies; is that right?

6    A.    Correct.

7    Q.    And that included requests for assistance from the

8    Department of Homeland Security and its subdivisions?

9    A.    Yes, ma'am.

10   Q.    During the deployment, Task Force 51 received a total of

11   64 requests for assistance from federal law enforcement

12   agencies; is that right?

13   A.    Yes, ma'am.

14   Q.    Some of those requests for assistance involved

15   Task Force 51 guarding federal buildings?

16   A.    Protecting federal buildings, yes, ma'am.

17   Q.    And many of the other requests for assistance asked for

18   Task Force 51 troops to provide force protection to federal law

19   enforcement agents while they were conducting search warrant

20   operations?

21   A.    While they were providing -- while they were executing

22   federal functions, yes, ma'am.

23   Q.    All right.  And those federal functions were search

24   warrant operations?

25   A.    Those are some of the federal functions.

**HARRINGTON - DIRECT / REILLEY**

1   Q.   All right.   And Task Force 51 approved and responded to

2   the majority of the 64 requests for assistance it received;

3   correct?

4   A.   Yes, ma'am.

5   Q.   And whenever they responded to a request for assistance

6   during the deployment, Task Force 51 troops carried weapons

7   with live ammunition in their magazines?

8   A.   Yes, ma'am.

9   Q.   One of the requests for assistance asked for Task Force 51

10  troops to be involved in a law enforcement operation near

11  Mecca, California; is that correct?

12  A.   Yes, ma'am.

13  Q.   That law enforcement operation took place in mid-June?

14  A.   Yes, ma'am.

15  Q.   And that law enforcement operation involved a marijuana

16  farm; is that correct?

17  A.   Yes, ma'am.

18  Q.   Task Force 51 approved and responded to the request for

19  assistance related to the Mecca operation; is that right?

20  A.   Yes, ma'am.

21  Q.   Approximately 300 Task Force 51 troops participated in

22  that operation?

23  A.   Correct, ma'am.

24  Q.   And approximately 20 of Task Force 51's military vehicles

25  were also involved in the Mecca operation; correct?

HARRINGTON - DIRECT / REILLEY

```
 1   A.   I don't know the number of vehicles, but probably a little
 2   more than that to carry 300 troops.
 3   Q.   All right.  So probably 20 or more vehicles; correct?
 4   A.   Yes, ma'am.
 5   Q.   And those military vehicles were Humvees?
 6   A.   Well, they were Humvees; LMTVs, which are large cargo
 7   vehicles; and probably JLTVs, which is -- you know, it's --
 8   it's an updated version.  It's kind of like a Humvee but it's
 9   slightly larger.
10   Q.   If you know, could you please state the full term of the
11   acronyms you just gave in your prior response?
12   A.   Oh.  Let's see.  LMTV is a light medium transportation
13   vehicle.  You know, it's a cargo vehicle.  It can also carry
14   soldiers.
15        JLTV, I think it stands for joint land tactical vehicle.
16   Some- -- you know, something to that effect.  It's -- it
17   carries a handful of soldiers in it.
18   Q.   During the Mecca operation, federal agents did not require
19   any force protection from the Task Force 51 troops; is that
20   right?
21   A.   Correct, ma'am.
22   Q.   And there was also a request for assistance for
23   Task Force 51 troops to be involved in a law enforcement
24   operation in Camarillo, California; is that right?
25   A.   Yes, ma'am.
```

HARRINGTON - DIRECT / REILLEY

1  Q.  That law enforcement operation also involved a marijuana

2  farm?

3  A.  Yes, ma'am.

4  Q.  And Task Force 51 approved and responded to that request

5  for assistance; correct?

6  A.  Well, I think it was in the approval process and then the

7  requesting federal agency canceled the request.

8  Q.  All right.  Was there ever an occasion where Task Force 51

9  troops participated in a law enforcement operation in

10  Camarillo?

11  A.  Yes, ma'am.

12  Q.  All right.  That was not in response to a standalone

13  request for assistance?  That's your testimony?

14  A.  Correct.

15  Q.  All right.  Was that -- were the Task Force 51 troops'

16  involvement in that operation as a mobile response force?

17  A.  Yes, ma'am.

18  Q.  All right.  And there were approximately 80 Task Force 51

19  soldiers who were on site in Camarillo during that operation;

20  correct?

21  A.  Yes, ma'am.

22  Q.  And Task Force 51 military vehicles were also involved in

23  the Camarillo operation?

24  A.  Yes, ma'am.

25  Q.  Those military vehicles were Humvees and transportation

HARRINGTON - DIRECT / REILLEY

1  vehicles?

2  A.   Yes, ma'am.

3  Q.   There's also a request for assistance that asked

4  Task Force 51 troops to be involved in a law enforcement

5  operation in Los Angeles' MacArthur Park on July 7th; is that

6  correct?

7  A.   Yes, ma'am.

8  Q.   And Task Force 51 approved and responded to that request

9  for assistance?

10  A.   Well, we -- Task Force 51 did not approve that one.  That

11  one went up to a higher level authority for approval.

12  Q.   Did the Secretary of Defense ultimately approve the

13  MacArthur Park operation?

14  A.   I believe so, ma'am.

15  Q.   So Task Force 51 troops did participate in the

16  MacArthur Park operation?

17  A.   Yes, ma'am.

18  Q.   Thank you.

19       And there were approximately 80 Task Force 51 troops who

20  participated in the MacArthur Park operation; correct?

21  A.   Yes, ma'am.

22  Q.   And military vehicles from Task Force 51 were involved in

23  that operation as well?

24  A.   Yes, ma'am.

25  Q.   And those were Humvees and tactical vehicles?

HARRINGTON - DIRECT / REILLEY

1   A.   Yes, ma'am.

2        (Trial Exhibit 28 received in evidence.)

3   BY MS. REILLEY:

4   Q.   All right.  If you could please turn to Tab 28 of Volume 1

5   of the binder in front of you.  This has been previously

6   admitted as Exhibit 28.

7   A.   (Witness examines document.)

8   Q.   And, Mr. Harrington --

9        THE COURT:  Let's see if we can get it up on the

10  screen.

11       MS. REILLEY:  We were going to -- Your Honor, we were

12  going to publish two pages of the document.

13       THE COURT:  Okay.  So identify those, and they can --

14  they can go on the screen.

15       MS. REILLEY:  Thank you, Your Honor.

16  BY MS. REILLEY:

17  Q.   So the first page we were going to publish is 2875.

18       Mr. Harrington, first I want to ask you about all of the

19  documents that -- pages that are included within Exhibit 28,

20  and that's labeled 2872 through 2893.  Do you recognize those

21  documents?

22  A.   Yes, ma'am.

23  Q.   These are Task Force 51 documents related to the July 7th

24  MacArthur Park operation; correct?

25  A.   Yes, ma'am.

HARRINGTON - DIRECT / REILLEY

1   Q.   All right.  If I could please have you turn to page 2875,

2   and this has also been published on the screen in front of you.

3       And, Mr. Harrington, this page is entitled "Operation

4   Excalibur Executive Summary."  Does Operation Excalibur refer

5   to the MacArthur Park operation?

6   A.   It does, ma'am.

7   Q.   Could you please read aloud the paragraph that's written

8   under the header "Mission"?  And if it's helpful, we've zoomed

9   in on that portion on the screen in front of you.

10   A.   Okay.  It says [as read]:

11         "On Order 118 CAF Squadron provides static

12       interagency site protection, mounted mobile security,

13       and joint force land component command reserve

14       support to Customs and Border Patrol and supporting

15       federal agencies whose intent at MacArthur Park is to

16       demonstrate, through a show of presence, the capacity

17       and freedom of maneuver of federal law enforcement

18       within the Los Angeles joint operations area."

19   Q.   That is your understanding of the mission of the

20   MacArthur Park operation; correct?

21   A.   Well, I don't know what the lead federal agencies' intent

22   was.  That's what -- this is what our slide says; but, yes,

23   ma'am.

24   Q.   And you don't have any reason to dispute the description

25   you just read; correct?

HARRINGTON - DIRECT / REILLEY

1    A.   No, ma'am.

2    Q.   If you could please read aloud the section that's written

3    under the header "Purpose," and we will zoom in on that section

4    on the screen in front of you.

5    A.   Okay.

6         [As read]:

7              "The purpose of this operation is to enable and

8         protect the execution of joint federal law

9         enforcement missions in a high-visibility urban

10        environment while preserving public safety and

11        demonstrating federal reach and presence."

12   Q.   That is your understanding of the purpose of the

13   MacArthur Park operation; correct?

14   A.   Yes, ma'am.

15   Q.   If you could please turn to page 2892 of the document?

16   And we will publish that page to the screen now.

17        Mr. Harrington, that page is entitled "Operation Excalibur

18   Executive Summary Risk Assessment."  Do you see that's written?

19   A.   Yes, ma'am.

20   Q.   And you recognize this page; correct?

21   A.   Yes, ma'am.

22   Q.   Do you see where -- near the bottom of the page, where it

23   says "Risk of inaction low"?

24   A.   Yes, ma'am.

25   Q.   Could you please read aloud the four lines immediately

HARRINGTON - DIRECT / REILLEY

```
 1   below the statement "Risk of inaction low"?
 2   A.   [As read]:
 3            "Current intelligence does not indicate a
 4        high-value target or threat to federal functions at
 5        this location.  No indication that failure to act
 6        would result in loss of life or significant property
 7        damage.  Expected law enforcement action is limited
 8        in scale, with few detainees anticipated and no
 9        high-risk warrants involved.  Operation not informed
10        by time-sensitive intelligence or part of an
11        integrated targeting cycle."
12   Q.   You watched the MacArthur Park operation live on
13   television; is that right?
14   A.   Yes, ma'am.
15   Q.   And other members of Task Force 51 watched the broadcast
16   with you?
17   A.   Yes, ma'am.
18   Q.   When you watched the broadcast, you saw that the federal
19   agents in the park walked through the park uninhibited;
20   correct?
21   A.   Yes, ma'am.
22   Q.   And it wasn't necessary for Task Force 51 troops to
23   provide any force protection during the MacArthur Park
24   operation; is that right?
25   A.   Correct, ma'am.
```

HARRINGTON - DIRECT / REILLEY

1  Q.   And federal law enforcement agents ultimately didn't end

2  up making any arrests during the MacArthur Park operation; is

3  that right?

4  A.   Correct, ma'am.

5  Q.   Mr. Harrington, do you currently have any involvement with

6  the Los Angeles deployment?

7  A.   What do you mean?  I don't understand the question.

8  Q.   As of the time I took your deposition, you were still

9  deployed to Los Angeles; correct?

10 A.   Yes, ma'am.

11 Q.   Are you still deployed to Los Angeles?

12 A.   No, ma'am.

13 Q.   When did your involvement with the deployment in

14 Los Angeles end?

15 A.   Friday the 8th of August.

16 Q.   How did you learn that your involvement in the deployment

17 was ending on August 8th?

18 A.   I was told that I was coming here.

19 Q.   After the trial in this matter concludes, are you going to

20 return to Los Angeles?

21 A.   No, ma'am.

22 Q.   Will you be going back to Fort Sam Houston?

23 A.   I will.

24 Q.   All right.  Do you have any knowledge of what the

25 remaining federalized National Guard soldiers in Los Angeles

**HARRINGTON - DIRECT / REILLEY**

 1   are doing?

 2   A.   Yes, ma'am.

 3   Q.   What is your understanding of what those federalized

 4   troops are doing?

 5   A.   They're supporting the requests for assistance from the

 6   lead federal agency.

 7   Q.   So federalized National Guard soldiers are continuing to

 8   assist federal law enforcement agents in Southern California;

 9   is that correct?

10   A.   Well, they're -- they are still supporting requests for

11   assistance, yes, ma'am.

12   Q.   At the time that your involvement in the deployment ended

13   on August 8th, how many requests for assistance was

14   Task Force 51 continuing to respond to?

15   A.   Four, ma'am.

16   Q.   Are you aware that this morning Secretary of Defense

17   Hegseth announced the deployment of National Guard troops in

18   Washington, D.C.?

19        MR. LOWENSTEIN:  Objection.  Scope.  Relevance.

20        THE COURT:  Well, the relevance, I would assume, is

21   the likelihood -- is whether or not it's likely that this

22   deployment or kind of deployment will occur in the future.  I

23   mean, that's one of the tests for injunctive relief; right?

24   Right?

25        MR. LOWENSTEIN:  That's correct.

HARRINGTON - DIRECT / REILLEY

1      **THE COURT:** Right. So it's relevant to -- present

2  conduct may be relevant on that issue. The extent to which

3  it's relevant, how it's the same, how it's different, those are

4  all factors to be considered obviously, but I think it's

5  relevant. So on that basis, the objection is overruled.

6      **MS. REILLEY:** Thank you, Your Honor.

7  **BY MS. REILLEY:**

8  **Q.** And, Mr. Harrington, did -- you testified that you are

9  aware of that announcement that was made this morning?

10 **A.** No, I was not aware.

11 **Q.** All right. Secretary Hegseth said in his announcement

12 that the D.C. National Guard will, quote, "stand with their law

13 enforcement partners," closed quote, and that, quote, "we did

14 the same thing in Los Angeles," closed quote. Did you hear

15 that statement?

16 **A.** No, ma'am.

17     **MR. LOWENSTEIN:** Objection. Foundation. He wasn't

18 aware of this.

19     **THE COURT:** Well, the question is did he -- I assume

20 if he's unaware of it, he didn't hear it. I mean, that

21 generally is the case.

22     Did he say he didn't hear the announcement? Somebody may

23 have said something to him and so forth. So I'll allow the

24 question is he aware of it; however, the fact that the

25 statement is made or what was contained in the statement is not

HARRINGTON - CROSS / LOWENSTEIN

1    evidence in and of itself by virtue of the question that's

2    asked.

3        So to the extent it may assume facts not in evidence, it

4    would be granted, but I don't have the statement in front of me

5    to know whether it's attributed to the Secretary or not.  Okay?

6    Satisfied?

7            MR. LOWENSTEIN:  Yes.  Thank you.

8            THE COURT:  Great.

9        Go ahead.

10   BY MS. REILLEY:

11   Q.   Mr. Harrington, you said that you were not aware of that

12   statement that Secretary Hegseth made this morning?

13   A.   Correct, ma'am.

14   Q.   Do you have any involvement with the deployment of

15   National Guard troops in the D.C. area?

16   A.   No, ma'am.

17           MS. REILLEY:  At this time, plaintiffs have no further

18   questions for Mr. Harrington.

19           THE COURT:  Any cross?

20           MR. LOWENSTEIN:  Yes, Your Honor.

21           THE COURT:  Okay.

22                       CROSS-EXAMINATION

23   BY MR. LOWENSTEIN:

24   Q.   Jody Lowenstein for defendants.

25        Good morning, Mr. Harrington.

HARRINGTON - CROSS / LOWENSTEIN

1    A.    Good morning, sir.

2    Q.    I just have a few questions for you.

3          You're testifying here today based on your personal

4    knowledge; correct?

5    A.    Yes, sir.

6    Q.    You've testified a bit about your background earlier.  Do

7    you recall that?

8    A.    Yes, sir.

9    Q.    Are you a lawyer?

10   A.    No, sir.

11   Q.    Do you have a law degree?

12   A.    No, sir.

13   Q.    Your understanding of the Posse Comitatus Act is not

14   informed by any specialized legal training; is that right?

15   A.    Correct, sir.

16   Q.    Do you recall testifying just a moment ago about

17   Task Force 51's involvement in the Mecca operation?

18   A.    Yes, sir.

19   Q.    And you testified in response to counsel's question that

20   they were involved in that operation.  Do you recall that?

21   A.    Yes, sir.

22   Q.    Can you explain what you mean by "they were involved in

23   that operation"?

24   A.    Well, they were asked to provide force protection for the

25   agents while they were performing their federal functions.  The

HARRINGTON - CROSS / LOWENSTEIN

1    soldiers actually did not engage in any activity other than

2    they were located near the facility, several hundred yards

3    away.  There was actually a canal between where the soldiers

4    were and the facility that the agents were performing their law

5    enforcement functions.

6        Soldiers had no interactions with any civilians.  They

7    were -- they were near the facility, did not go in the

8    facility, did not interact with any civilians.  So they were

9    there to -- you know, prepared to provide force protection but

10   did not actually get employed to do that.

11   Q.   In your view, did Task -- any Task Force 51 troops perform

12   law enforcement functions at the Mecca operation?

13   A.   No, sir.

14   Q.   Do you recall receiving questions regarding an operation

15   in Camarillo?

16   A.   Yes, sir.

17   Q.   And in response to counsel's questions, you testified that

18   Task Force 51 troops were involved in and participated in that

19   operation.  Do you recall testifying to that?

20   A.   Yes, sir.

21   Q.   Can you explain what you mean when you testified that

22   Task Force 51 was involved in and participated in the Camarillo

23   operation?

24   A.   Yes, sir.  So the federal agents, CBP, and I think there

25   was ICE and ERO as well, were already executing their law

HARRINGTON - CROSS / LOWENSTEIN

1  enforcement functions at the facility in Camarillo. And as I

2  stated before, they had canceled the request for assistance to

3  Task Force 51, which was RFA Number 48. They canceled it.

4      And as they were executing the operation, crowds formed on

5  the roads near the facility, so we received a request for a

6  mobile response force to provide force protection of those

7  agents.

8  Q.  Do you recall or do you know what kind of conduct those

9  crowds were engaging in at the Camarillo operation?

10 A.  Yes, sir. They were -- they were throwing rocks at the

11 agents. They were throwing rocks at the vehicles. They had

12 damaged the vehicles. They had built -- they had taken

13 sections of garden hose and run nails through the hoses as

14 spike strips, and they were popping the tires of the federal

15 law enforcement vehicles. So they were -- it was an unruly

16 crowd.

17 Q.  Did Task Force -- any Task Force 51 troops engage in any

18 law enforcement functions during the Camarillo operation?

19 A.  No, sir.

20 Q.  Do you recall receiving questions regarding the

21 MacArthur Park operation?

22 A.  Yes, sir.

23 Q.  In response to counsel's questions, do you recall

24 testifying that Task Force 51 participated in that operation?

25 A.  Yes, sir.

HARRINGTON - REDIRECT / REILLEY

1    Q.   Can you please explain what you meant by Task Force 51

2    participated in the MacArthur Park operation?

3    A.   So we had approximately 80 soldiers, I think it was 19

4    vehicles, and they were there to provide force protection of

5    the federal agents who were -- they had established four

6    separate traffic control points around the park and two

7    separate blocking positions.  Our soldiers were near those

8    positions to provide force protection of the agents.

9         And, again, they were not employed, did not interact with

10   the civilians at any of those locations, and the operation took

11   about 20 minutes total.  It actually took more time to drive

12   there than it took the agents to walk through the park.  And

13   then our soldiers returned back to joint force training base

14   Los Alamitos around noon that day.

15   Q.   Did Task Force 51 -- did any Task Force 51 troops engage

16   in any law enforcement functions during the MacArthur Park

17   operation?

18   A.   No, sir.

19        MR. LOWENSTEIN:  No further questions, Your Honor, for

20   the witness.

21        THE COURT:  Okay.  Redirect or recross?

22        MS. REILLEY:  Thank you, Your Honor.

23                    REDIRECT EXAMINATION

24   BY MS. REILLEY:

25   Q.   Mr. Harrington, Mr. Lowenstein just asked you a moment ago

HARRINGTON - REDIRECT / REILLEY

1  about your knowledge of the activities that troops participated

2  in during the Mecca operation.  Do you recall that testimony?

3  A.  Yes, ma'am.

4  Q.  You were not present at the Mecca operation; correct?

5  A.  Correct.

6  Q.  So any information that you have about activities

7  performed during that operation came from the units who were

8  present; is that right?

9  A.  Yes, ma'am.

10  Q.  All right.  And as to the Camarillo operation, you also

11  were not present for that operation; correct?

12  A.  Correct.

13  Q.  So any information that you have about the activities that

14  were engaged in at that operation you received from the troops;

15  correct?

16  A.  Not all of it, ma'am.  Some of it, received from reports

17  from the unit.  The rest of the information, we watched it live

18  on TV in the Operations Center.

19  Q.  All right.  And as to MacArthur Park, the only information

20  that you have about what actually happened on the ground during

21  MacArthur Park came from watching the news broadcasts and

22  hearing from the troops who were present; correct?

23  A.  No, ma'am.  There was -- we had the Deputy Secretary of

24  DHS in our Operations Center who had a feed to -- so an

25  aircraft that also showed footage of the operation.

PROCEEDINGS

| | |
|---|---|
| 1 | Q.   Was that a DHS aircraft? |
| 2 | A.   Yes, ma'am. |
| 3 | MS. REILLEY:  All right.  No further questions. |
| 4 | THE COURT:  Anything further? |
| 5 | MR. LOWENSTEIN:  Nothing further, Your Honor. |
| 6 | THE COURT:  Thank you.  You're excused.  Thank you for |
| 7 | coming. |
| 8 | (Witness excused.) |
| 9 | THE COURT:  Call your next witness. |
| 10 | MS. REILLEY:  Thank you, Your Honor. |
| 11 | Plaintiffs call Major General Scott Sherman. |
| 12 | THE COURT:  Okay. |
| 13 | (Witness enters the courtroom and steps forward to be sworn.) |
| 14 | THE COURTROOM DEPUTY:  Good morning. |
| 15 | THE WITNESS:  Good morning. |
| 16 | SCOTT MARSHALL SHERMAN, |
| 17 | called as a witness for the Plaintiffs, having been duly sworn, |
| 18 | testified as follows: |
| 19 | THE WITNESS:  I do. |
| 20 | THE COURTROOM DEPUTY:  Thank you.  You may be seated. |
| 21 | Please state your full name for the record and spell your |
| 22 | last name. |
| 23 | THE WITNESS:  Sure.  Scott Marshall Sherman, last |
| 24 | spelling, S-h-e-r-m-a-n. |
| 25 | THE COURTROOM DEPUTY:  Thank you. |

SHERMAN - DIRECT / REILLEY

1          ### DIRECT EXAMINATION

2     BY MS. REILLEY:

3     Q.   Good morning, Major General Sherman.

4     A.   Good morning.

5     Q.   Do you recall giving a deposition in this matter last

6     Wednesday?

7     A.   I do.

8     Q.   And you remember me from that deposition, don't you?

9     A.   I do.

10    Q.   Nice to see you again.

11    A.   Nice to see you.

12    Q.   Would you please state your rank and current assignment

13    with the U.S. Army?

14    A.   Sure.  I'm a major general in the United States Army.  I

15    am the deputy commanding general support for U.S. Army North,

16    and I'm also the commander of Task Force 51, which is the

17    contingency command post for U.S. Army North.

18    Q.   You've held these positions for approximately two years;

19    is that correct?

20    A.   That's correct.  Since September of 2023.

21    Q.   For how many years have you been a soldier in the

22    U.S. Army?

23    A.   I've been a soldier for 33 years.

24    Q.   In June of this year, you deployed to Los Angeles with

25    Task Force 51; correct?

SHERMAN - DIRECT / REILLEY

1   A.   Correct.

2   Q.   And from June 9th until June 10th, you served as the

3   commanding general of Task Force 51 with respect to that

4   deployment; is that right?

5   A.   That is correct.

6   Q.   And today if I use the phrase "Task Force 51 troops," do

7   you understand that I'm referring to the federalized California

8   National Guard soldiers and Marines who were under

9   Task Force 51's control and command during that deployment?

10  A.   I do.

11  Q.   As commanding general, is it true that one of your

12  responsibilities during the deployment was to ensure

13  Task Force 51 troops were properly trained?

14  A.   That is correct.

15  Q.   And another of your responsibilities was to ensure

16  Task Force 51 troops were prepared for their operations?

17  A.   Correct.

18  Q.   You were also responsible for ensuring Task Force 51

19  troops followed the law; is that right?

20  A.   Correct.

21  Q.   You never personally accompanied any Task Force 51 troops

22  during any field operations; is that right?

23  A.   That's correct.  Only at -- only at the positions where we

24  were doing protection of federal property.

25  Q.   All right.  So in any operations that took place off of

SHERMAN - DIRECT / REILLEY

1  federal property, you did not personally attend; is that fair?

2  A.   That's correct.

3  Q.   All right.  You would receive briefings on the field

4  operations after they took place, though; is that right?

5  A.   Before and after, yes, that's correct.

6  Q.   All right.  So your knowledge of what took place during

7  Task Force 51's field operations was received from the

8  briefings you received before and after the fact; correct?

9  A.   Correct, and reports from commanders.

10 Q.   All right.  Prior to deploying to Los Angeles in June, you

11 were aware of the Posse Comitatus Act; correct?

12 A.   Correct.

13 Q.   And your knowledge of the Posse Comitatus Act is based on

14 trainings and legal guidance you've received throughout your

15 33 years as a soldier?

16 A.   That is correct.

17 Q.   And as commanding general, it's important that you have a

18 clear understanding of the Posse Comitatus Act so you can

19 ensure that your troops are complying with it; is that right?

20 A.   That is correct.

21 Q.   Based on your training and experience, it's your

22 understanding that Task Force 51 troops who are deployed to

23 Los Angeles are subject to the Posse Comitatus Act; right?

24 A.   That is correct.

25 Q.   And based on your training and experience, it's your

SHERMAN - DIRECT / REILLEY

1   understanding that because Task Force 51 troops are subject to

2   the Posse Comitatus Act, they cannot engage in civil law

3   enforcement activities; correct?

4   A.    That is correct.

5         (Trial Exhibit 15 received in evidence.)

6   BY MS. REILLEY:

7   Q.    If you could please turn to Tab 15 of the binder that's in

8   front of you.

9   A.    (Witness examines document.)

10  Q.    And we are going to publish page 2532 of this document to

11  the -- to the screen.

12        THE COURT:  All right.

13  BY MS. REILLEY:

14  Q.    Major General Sherman, do you recognize the document at

15  Tab 15?  And this has been previously admitted as Exhibit 15.

16  A.    I do recognize it.

17  Q.    And this is a memorandum from Undersecretary of Defense

18  Elbridge Colby to Secretary of Defense Hegseth; is that right?

19  A.    That is correct.

20  Q.    And this memorandum includes the Undersecretary of

21  Defense's assessment of what Task Force 51 soldiers and Marines

22  could legally do during the deployment to Los Angeles?

23  A.    That was in line with the Posse Comitatus Act, that is

24  correct.

25  Q.    And you reviewed this memorandum during the deployment in

SHERMAN - DIRECT / REILLEY

```
 1    or around mid-June?

 2    A.    That is correct.

 3    Q.    And if you could please turn to page 2532, and this will

 4    be published to the screen.

 5    A.    (Witness examines document.)  I'm there.  I'm sorry.

 6    Q.    It's all right.  We're just getting it queued up on the --

 7    A.    Okay.

 8    Q.    -- on the screen.

 9                      (Pause in proceedings.)

10         THE COURT:  With technology, one has to have a great

11    deal of hope.  You see, we hope it will arrive in due course,

12    but...

13         MS. REILLEY:  Yes, Your Honor.

14                      (Pause in proceedings.)

15    BY MS. REILLEY:

16    Q.    Major General Sherman --

17         THE COURT:  Let's just wait a second and see.  He

18    seems to be on to something here.  We can also use the Elmo.

19                      (Pause in proceedings.)

20         MS. REILLEY:  Your Honor, I understand from our team

21    that there's an HDMI disconnect with the --

22         THE COURT:  Well, what about the Elmo?  Will that

23    work?

24         THE COURTROOM DEPUTY:  Do you have a hard copy that

25    you can show?
```

SHERMAN - DIRECT / REILLEY

```
 1              THE COURT:  Or we could take a recess if that's --
 2              MS. REILLEY:  If we could take a brief recess to
 3    attempt to address --
 4              THE COURT:  Yeah, okay.  We'll be in recess for
 5    ten minutes.
 6              MS. REILLEY:  Thank you, Your Honor.
 7              THE COURT:  Okay.  Thank you.
 8                     (Recess taken at 11:03 a.m.)
 9                 (Proceedings resumed at 11:17 a.m.)
10              THE COURT:  The record will show all parties are
11    present.
12         My understanding is the federal government is able to show
13    these exhibits; is that correct?
14              MS. LIN:  Yes, Your Honor.
15              THE COURT:  So I want to thank the federal government
16    for accommodating the state government.  It's a wonderful
17    example of federal-state cooperation.
18                          (Laughter.)
19              THE COURT:  Thank you so much, and we'll proceed.
20              MS. REILLEY:  Thank you, Your Honor.
21    BY MS. REILLEY:
22    Q.   And we will publish at this time page 2532 of Exhibit 15.
23         Major General Sherman, do you see the header in this
24    document that reads "Detention/Arrest Authority"?
25    A.   I do.
```

SHERMAN - DIRECT / REILLEY

1  Q.  Can you please read aloud the paragraph immediately below
2  that header?
3  A.  [As read]:
4           "CUI" -- which is just unclassified material
5        but -- "DHS has requested service members' direct
6        assistance in detaining and/or arresting individuals
7        observed to be committing a crime.  Use of military
8        personnel in a Title X duty status to enforce the
9        law, such in the arrest or detention of civilians for
10        violations of the federal criminal code, would be a
11        violation of the Posse Comitatus Act, 18 U.S. Code
12        paragraph 1385, which prohibits the use of military
13        for domestic law enforcement purposes."
14  Q.  You agreed with this portion of the Undersecretary's
15  memorandum when you read it in June; correct?
16  A.  I agree with part of it.  It's not the full document but,
17  yes.
18  Q.  All right.  But as to the portion you just read, you agree
19  with that; correct?
20  A.  I would.
21  Q.  At the outset of the deployment, did you ever hear from
22  any source that there was a rebellion in Los Angeles?
23  A.  No, not a rebellion, but there were there people that were
24  preventing federal officials and federal law enforcement from
25  doing their job and also threatening federal buildings, that is

SHERMAN - DIRECT / REILLEY

```
 1    correct.
 2    Q.   But no one that you spoke with from the Department of
 3    Defense ever used the term "rebellion"; correct?
 4    A.   That is correct.
 5    Q.   All right.  And even though the Posse Comitatus Act
 6    applies to Task Force 51 troops, you also believe that there is
 7    an exception to the Posse Comitatus Act that also applies to
 8    the troops; correct?
 9    A.   Through my training -- I'm not a lawyer, but through my
10    training I've gotten that there are constitutional exceptions.
11    Q.   And specifically with respect to this deployment, it's
12    your understanding that Task Force 51 troops are allowed to
13    protect federal property and personnel as they do their federal
14    law enforcement functions; is that correct?
15    A.   That is correct, in accordance with the second paragraph
16    here, under detention and arrest authority.
17    Q.   All right.  And you learned about this exception by
18    reading the operations order that was issued by the U.S. Army
19    Northern Command at the outset of the deployment; is that
20    right?
21    A.   And also the training that we received on the standing
22    rules on the use of force, which were provided by our legal
23    personnel.
24            MS. REILLEY:  All right.  If you could please turn to
25    Tab 5 of the binder in front of you.  This has been previously
```

SHERMAN - DIRECT / REILLEY

1    introduced as Exhibit 5.

2         (Trial Exhibit 5 received in evidence.)

3         **THE WITNESS:**   (Witness examines document.)

4    BY MS. REILLEY:

5    **Q.**   You recognize this document; correct?

6    **A.**   Yes.  This is General Order Number 1 signed by Lieutenant

7    General Allan Pepin, the commander of U.S. Army North.

8    **Q.**   And it's your understanding that this order set forth the

9    exception to the Posse Comitatus Act that applied to the Task

10   Force 51 troops?

11   **A.**   I don't know that to be fact.  I'd have to read it.

12   **Q.**   If you could please read it.

13   **A.**   Can you help me -- where it is?  This is a three-page

14   document.

15   **Q.**   You testified at your deposition that this general order

16   was the document that, in your view, set forth the exception to

17   the Posse Comitatus Act; correct?

18   **A.**   Well, this order is established.  Any General Order 1 is

19   your baseline personnel conduct that's expected of any

20   personnel, any DOD personnel that are under the command.

21   **Q.**   So it is your testimony that this General Order Number 1

22   does not set forth the exception to the Posse Comitatus Act

23   that applied to the troops in Los Angeles?

24   **A.**   This is more about Code of Conduct, personal Code of

25   Conduct, what they're allowed to do.  It talks about what we

SHERMAN - DIRECT / REILLEY

1  expected of them as far as what their -- what we expect of

2  soldiers to do, how they should be treating everybody, how they

3  should be treating anybody that they encounter.  And it talks

4  right here in 5(b) about follow and adhere to the standing

5  rules in the use of force.

6  Q.  Was there a different order that was issued with respect

7  to the Los Angeles deployment that you believe set forth the

8  exception to the Posse Comitatus Act that applied to the

9  troops?

10  A.  It was strictly briefed to them when they got the standing

11  rules on the use of force that is in line with the memorandum

12  that the Secretary signed to his guidance to the commander of

13  U.S. Northern Command that our mission was to protect federal

14  facilities, allowing federal personnel that were there and

15  federal law enforcement to do their job; and then outside

16  federal facilities, to support federal law enforcement strictly

17  to protect them to allow them to do their federal law

18  enforcement job.

19  Q.  And that exception that you just testified about, that was

20  written in Secretary Hegseth's memorandum at the outset of the

21  deployment?

22  A.  It's not written directly, but it is the guidance that we

23  were given.  It was -- it was discussed with the soldiers in

24  the standing rules and the use of force of why the Secretary's

25  memo and why their guidance is that they're allowed to protect

**SHERMAN - DIRECT / REILLEY**

1    federal facilities and then also protect federal law

2    enforcement as they do their federal law enforcement duties.

3    **Q.**    So you never saw the exception to the Posse Comitatus Act

4    that you just testified about written down in any of the

5    materials in this deployment; is that your testimony?

6    **A.**    It was written down in the standing rules on the use of

7    force brief that was given by our legal personnel that was

8    given to every soldier and Marine that went on the mission.

9    **Q.**    All right.  So other than those training slides, that was

10   the only place where this exception was written; correct?

11   **A.**    That is correct.

12   **Q.**    All right.  And under that exception, Task Force 51 troops

13   were trained that they could set security perimeters; is that

14   correct?

15   **A.**    They could set security perimeters around the federal

16   facility on the federal property if there was a crowd

17   demonstrating that was threatening the facility.  They could

18   get -- even with the federal law enforcement that was there in

19   the facility to protect the facility.

20        And then, the federal law enforcement, as they were doing

21   the federal law enforcement job, if they encountered any kind

22   of crowds or any kind of -- anyone or even a vehicle that was

23   presenting any kind of threat to them, they could get in front

24   of those personnel to protect them.

25   **Q.**    So it's your testimony that Task Force 51 troops were

SHERMAN - DIRECT / REILLEY

```
 1    trained they could set security perimeters on federal property
 2    if there was a threat; correct?
 3    A.    Correct, and they could guard the property like they did
 4    all the time they were there.
 5    Q.    Was there any standardized definition of threat that was
 6    used by Task Force 51?
 7    A.    No.  It made a decision on the ground by both the -- if
 8    you're talking about facilities that were guarded by the
 9    Marines on the ground or by the commanders or their platoon
10    leaders even that were there on the ground, witnessing what was
11    happening in front of them.
12    Q.    So if the commander on the ground felt threatened, they
13    could order Task Force 51 troops to set a perimeter on federal
14    property; correct?
15    A.    That is correct, if they felt that they were threatened.
16    Q.    And directing your attention to field operations that took
17    place off federal property, Task Force 51 troops were trained
18    that they could set security perimeters off of federal
19    property; correct?
20    A.    Only to protect federal law enforcement, allowing them to
21    do their federal law enforcement job.
22    Q.    So, again, Task Force 51 troops could set security
23    perimeters off federal property as long as the commander on the
24    ground felt threatened; right?
25    A.    As long as there was a group there that was some kind of
```

SHERMAN - DIRECT / REILLEY

1    event happening that they felt there was a threat to the

2    federal law enforcement or a threat to the soldiers that were

3    there, correct.

4    Q.   But Task Force 51 didn't have any standardized definition

5    of what constituted a threat for purposes of forming a security

6    perimeter off of federal property; right?

7    A.   No.  That's within commander's guidance within -- they're

8    allowed to make a decision on the ground, because every

9    situation is different, that they're allowed to take in what's

10   happening, understand what's happening; if they feel it's a

11   threat to either the soldiers or to federal law enforcement,

12   then they could.

13   Q.   So even if the crowd wasn't making physical threats

14   towards anyone, a commander on the ground could still order

15   troops to form a security perimeter if that commander felt the

16   crowd was a threat; is that right?

17   A.   It was also a feeling.  If the federal law enforcement was

18   not allowed to do their job, if he had -- if he or she had that

19   feeling on the ground that they were being not able to do their

20   job because a crowd was reacting with them or that they felt

21   unsafe, then they could.

22   Q.   All right.  So even if no one in the crowd was committing

23   any criminal act, Task Force 51 commanders could order their

24   troops to set a security perimeter; correct?

25   A.   In line with the explicit guidance they were given, that

SHERMAN - DIRECT / REILLEY

```
 1    if they felt there was any kind of threat or was not allowing
 2    federal law enforcement to do their job, in that particular
 3    incident, whatever it was, then they could.
 4    Q.   That's a "yes" to my question, Major General Sherman?
 5    A.   Yes.
 6    Q.   Thank you.
 7         Task Force 51 troops have set security perimeters around
 8    federal buildings during the deployment; correct?
 9    A.   That is correct.
10    Q.   And Task Force 51 troops also set security perimeters
11    during field operations that took place off the federal
12    property; correct?
13    A.   Yes.
14    Q.   Including at private residences?
15    A.   Only of -- one time that I know of right offhand, that's
16    correct.
17    Q.   And Task Force 51 troops were also trained that they were
18    not allowed to set traffic blockades unless there was a hostile
19    vehicle coming towards a federal law enforcement agent;
20    correct?
21    A.   That is correct.  It needed to be something hostile that
22    was threatening federal law enforcement.
23    Q.   And that's because setting up a traffic control point is
24    considered a law enforcement function; right?
25    A.   That is correct.
```

SHERMAN - DIRECT / REILLEY

1 Q.   Task Force 51 troops were trained that they could

2 temporarily detain civilians; correct?

3 A.   They could if they deemed that that -- it was a threat --

4 that person was a threat to either the soldiers or to the

5 federal law enforcement.

6 Q.   And on June 12th of 2025, a Task Force 51 Marine did

7 detain a civilian; correct?

8 A.   That is correct.

9 Q.   That took place at the Wilshire federal building?

10 A.   That is correct.

11 Q.   And the civilian in question was a veteran who was going

12 to the VA; right?

13 A.   That is correct.

14 Q.   And the Marines told the veteran to stop, but he didn't

15 because he was wearing headphones; right?

16 A.   That is correct.

17 Q.   And at some point you learned that the Marines told the

18 veteran to leave the property and come back in the correct way,

19 and it was only after the civilian came back in the correct way

20 that he was detained; right?

21 A.   The only --

22       MS. LIN:   Objection.   Foundation.

23       THE COURT:   Overruled.

24 BY MS. REILLEY:

25 Q.   You may answer the question.

SHERMAN - DIRECT / REILLEY

1  A.    The only time I've seen that, and I don't know it to be

2  correct, is an email that you showed me during my deposition.

3  Q.    All right.  So -- and that email came from a Department of

4  Homeland Security area commander; correct?

5  A.    I believe it came from, yes, Federal Protective Service,

6  some individual.

7  Q.    So prior to when I showed you that email at deposition,

8  you never were informed about the civilian coming back in the

9  correct way before he was detained; is that correct?

10  A.    That person -- that is not correct.  That person did not

11  come in the correct way even when they came in.  Even if that

12  person did cross the yellow line, which is what -- or cross

13  underneath the tape barrier, which is what that email said,

14  even when that person came to the right location to be entered

15  into the facility, that person did not stop, did not provide

16  identification, did not identify themselves and why their

17  business was supposed to be on the federal -- or why they were

18  there on the Wilshire building.

19  Q.    Would you please turn to Tab 12 of the binder in front of

20  you.  This is a document that's been produced by the federal

21  government as DEFS00001212 through '14.

22        Major General Sherman, is this the email that you were

23  just testifying about?

24  A.    I believe it is.

25  Q.    All right.  And we're going to publish page 1213 at this

SHERMAN - DIRECT / REILLEY

```
 1    time.
 2              MS. LIN:  Objection.  This is not in evidence and this
 3    is a hearsay, out-of-court statement --
 4              THE COURT:  Okay.
 5              MS. LIN:  -- that's being offered for the truth of the
 6    matter asserted, and we move to exclude this piece of evidence.
 7              THE COURT:  I think the question -- I think the
 8    question is whether he heard about this.
 9              MS. REILLEY:  Correct, Your Honor.
10              THE COURT:  So it goes to his state of mind.  It's not
11    being introduced for the truth of the matter.  It's being
12    introduced for other than the truth of the matter, so it's not
13    hearsay.
14              MS. REILLEY:  Correct, Your Honor.
15         So at this time, we will publish page 1213, and we will
16    move Tab 12 into evidence as Exhibit 12.
17              THE COURT:  Okay.  But not being introduced for the
18    truth of the matter.
19              MS. REILLEY:  Correct.
20              THE COURT:  Admitted.
21         (Trial Exhibit 12 received in evidence.)
22    BY MS. REILLEY:
23    Q.   All right.  Major General Sherman, do you see the document
24    that's labeled 1213 on the screen in front of you?
25    A.   I do.
```

SHERMAN - DIRECT / REILLEY

```
 1   Q.   Do you see where it reads [as read]:
 2             "Summary:  FPS advise the subject will be
 3        released and not cited per guidance from on-duty
 4        AUSA.  The subject is a veteran and came under yellow
 5        tape to come into the VA.  After the USMC told him to
 6        leave, he did so and came back in the correct way.
 7        The USMC detained him for repeat offense.  The
 8        individual has departed property and will return
 9        another day"?
10        Do you see where that's written?
11   A.   I do.
12   Q.   Is this the email that I showed you at your deposition
13   that you were just testifying about?
14   A.   It is.
15   Q.   All right.  And "FPS" stands for Federal Protective
16   Service; is that right?
17   A.   That is correct.
18   Q.   USMC is the United States Marine Corps?
19   A.   It is.
20   Q.   And that refers to members of the U.S. Marine Corps who
21   were under Task Force 51's control during the deployment;
22   correct?
23   A.   That's correct.
24   Q.   All right.  And you did not learn any of the information
25   that's contained in this email while you were the commanding
```

SHERMAN - DIRECT / REILLEY

```
 1   general of Task Force 51; correct?

 2   A.   I did not.

 3   Q.   And if you ever heard from any source that the veteran who

 4   was detained was detained after he came back onto federal

 5   property the correct way, you would have asked the battalion

 6   commander to investigate that detention; correct?

 7   A.   Yes.  If he came in the wrong -- if he did not come in the

 8   right way, if he did not stop and have himself identified, that

 9   is correct.

10   Q.   All right.  And because you did not hear this information,

11   you did not order any investigation of the detention; correct?

12   A.   That is correct.

13   Q.   And while he was detained by the Marines, the civilian's

14   hands were restrained in flex cuffs; correct?

15   A.   That is correct.  For his safety and for the Marines'

16   safety, that is correct.

17   Q.   And the Marines detained the veteran for approximately

18   25 minutes?

19   A.   That is correct.  While they were waiting for law

20   enforcement to come and take control of him, that is correct.

21   Q.   And the Marine who detained the veteran never determined

22   that the veteran was threatening federal agents or any other

23   person; correct?

24   A.   No, because the questioning that needed to happen then

25   would have to be done by law enforcement.  That's a law
```

SHERMAN - DIRECT / REILLEY

1  enforcement action.  So they flex cuffed that person just for

2  his safety and for their safety, sat him down on a picnic

3  table, covered, and waited for federal law enforcement to come

4  and take control of him.

5  Q.  But prior to the detention actually taking place, the

6  Marines who were at the federal Wilshire building never saw the

7  veteran partake in any action they considered to be a threat;

8  correct?

9  A.  Well, they didn't know because he came through the stop.

10  He did not stop.  He had his headphones on, got told quite a

11  few times -- I don't know the number, at least two -- to stop,

12  "You need to stop."  He did not.  He went right through,

13  barreled right through the checkpoint, and then that's when

14  they stopped him.

15  Q.  And other than not stopping because he was wearing his

16  headphones, there is no other conduct that that veteran was

17  engaging in that was cited for the -- as a reason for the

18  detention; correct?

19  A.  That's correct.

20  Q.  During the deployment to Los Angeles, federal law

21  enforcement agencies would submit requests for assistance to

22  Task Force 51; right?

23  A.  That is correct.

24  Q.  And as commanding general, you had primary responsibility

25  for approving those requests for assistance?

**SHERMAN - DIRECT / REILLEY**

1  A.   I did once they were -- they went through the staffing

2  process and were legally reviewed, that's correct.

3  Q.   And as part of the staffing process's review, there was a

4  legal review performed; correct?

5  A.   That is correct.

6  Q.   All right.  And whenever they responded to requests for

7  assistance, Task Force 51 troops were armed with weapons that

8  had live ammunition in the magazine; right?

9  A.   In the magazine but not in the chamber.

10 Q.   Based on their training, the average Task Force 51

11 soldier/Marine could load an active round into a chamber in a

12 matter of about two seconds?

13 A.   That is what I said in my deposition, correct.

14 Q.   And that's correct?

15 A.   That is.

16 Q.   And Task Force 51 troops were also armed with batons

17 whenever they went out into the field; correct?

18 A.   That was part of what they were also with.  That was part

19 of the civil disturbance operations kit.

20 Q.   All right.  And Task Force 51 wore face shields whenever

21 they went out in the field; right?

22 A.   That is correct.

23 Q.   They also had body armor?

24 A.   That is correct.

25 Q.   They wore helmets?

SHERMAN - DIRECT / REILLEY

1    A.    They did.

2    Q.    Task Force 51 troops accompanied federal law enforcement

3    agents on warrant service operations; right?

4    A.    They did.

5    Q.    And they also accompanied Immigrations and Customs

6    Enforcement agents as those agents made arrests?

7    A.    They did.

8          (Trial Exhibit 53 received in evidence.)

9    BY MS. REILLEY:

10   Q.    If you could please turn to Tab 53, and this is included

11   in Volume 2 of the evidence binder.  And this has been

12   previously admitted as Exhibit 53, and we'll publish it to the

13   screen now.

14         THE COURT:   Okay.

15   BY MS. REILLEY:

16   Q.    And, Major General Sherman, you've seen these photographs

17   before; correct?

18   A.    I have during the deposition.

19   Q.    And you don't know when these photographs were taken?

20   A.    I do not.

21   Q.    Directing your attention to the left-hand photograph, the

22   individual shown in that photograph who's wearing a camouflage

23   uniform, that's a Task Force 51 soldier; right?

24   A.    It is.

25   Q.    And you don't know what the soldier in this photograph is

SHERMAN - DIRECT / REILLEY

1    doing?

2    **A.**    I do not.

3    **Q.**    Looking now at the right-hand photograph, you are not able

4    to tell if the two individuals wearing camouflage uniforms in

5    that photograph are Task Force 51 soldiers; right?

6    **A.**    I cannot.

7         (Trial Exhibit 54 received in evidence.)

8    **BY MS. REILLEY:**

9    **Q.**    If you can please turn to Tab 54, and this has been

10   previously admitted as Exhibit 54, and we'll publish it to your

11   screen now.

12        You've seen this photograph before; correct?

13   **A.**    I have.

14   **Q.**    And the individual who's shown on the right-hand side of

15   the photograph who's wearing a camouflage uniform, that's a

16   Task Force 51 soldier; right?

17   **A.**    Well, I can't tell from that, but I can tell from the

18   vehicle, when it says "79th IBTC 143rd MP."

19   **Q.**    All right.  So the Humvee shown on the right side of the

20   vehicle is a Task Force 51 vehicle; correct?

21   **A.**    It could be, depending on when the date of this picture

22   was.

23   **Q.**    Do you see the date on this photograph is June 10th, 2025?

24   **A.**    Yes.  So with that, it would be.

25   **Q.**    All right.  And you don't know where this photograph was

**SHERMAN - DIRECT / REILLEY**

1    taken; right?

2    **A.**    I do not.

3    **Q.**    And you can't explain what the soldier in this photograph

4    is doing; yes?

5    **A.**    I cannot.

6        (Trial Exhibit 38 received in evidence.)

7    **BY MS. REILLEY:**

8    **Q.**    All right.  If you could please turn to Tab 38 of your

9    binder, and we'll publish this.  This is an exhibit that's been

10   previously admitted as Exhibit 38.

11       Major General Sherman, you recognize this document;

12   correct?

13   **A.**    Only -- yes.  You showed me in the deposition.

14   **Q.**    Prior to your deposition when I showed you this document,

15   you never saw it while you were the commanding general of

16   Task Force 51?

17   **A.**    No.  This is at a platoon level.  I never saw it.

18   **Q.**    And this was drafted by a second lieutenant of the Third

19   Platoon, Company Bravo, First Battalion, 160th Infantry?

20   That's correct?

21   **A.**    That is correct.

22   **Q.**    This document is dated June 13th, 2025?

23   **A.**    Yes.  I'm sorry.  Yes.

24   **Q.**    And at that time, the Third Platoon, Company Bravo, First

25   Battalion, 160th Infantry was under Task Force 51's command;

SHERMAN - DIRECT / REILLEY

1  correct?

2  A.  It was.

3  Q.  And under "Patrol Narrative," do you see where it reads,

4  quote [as read]:

5        "On 13 June 2025, at approximately 0500,

6     soldiers from COB 1160N attended an FBI briefing

7     IVO" -- there's an address that's been redacted --

8     "in the city of Carson, California, to execute the

9     arrest of" --

10    And there's an individual's name who's been redacted.

11    Do you see where that's written?

12 A.  I do.

13 Q.  And you were aware that Task Force 51 troops were involved

14 in this operation on or around June 13th; correct?

15 A.  I can't recall the exact operation, no.

16 Q.  All right.  Did you -- do you recall testifying at your

17 deposition that you vaguely recalled this operation?

18 A.  Yeah.  I vaguely recall.  I don't know the exact

19 specifics.

20 Q.  You were not personally present during this operation;

21 right?

22 A.  I was not.

23 Q.  You did not receive any briefing on this operation after

24 it took place; correct?

25 A.  I did not.

SHERMAN - DIRECT / REILLEY

1  Q.  So you don't have any information about what actually

2  happened during this operation other than what's written in

3  this report; right?

4  A.  Correct.

5  Q.  Directing you to the bottom of the page, where it says

6  "Patrol Narrative," do you see that box?

7  A.  I do.

8  Q.  Could you please read aloud the three paragraphs written

9  in that box.

10  A.  The three paragraphs here?

11  Q.  Yes.

12  A.  [As read]:

13        "On 13 June '25 at approximately 0500, soldiers

14      from Bravo Company, 1" -- "First Battalion 160th

15      Infantry attended an FBI briefing in the vicinity of

16      this address, 21356 Avalon Boulevard, in the city of

17      Carson, California, to execute an arrest of an

18      individual."

19      Can I ask a question real quick?  You want me to read here

20  the stuff that's been redacted?

21  Q.  No.  Please read the version off the screen, if you would.

22  A.  Yeah, okay.

23  Q.  Thank you.

24        MS. LIN:  Your Honor, one moment.  The screen document

25  is the unredacted.

SHERMAN - DIRECT / REILLEY

```
 1              THE COURT:  Sorry?
 2              MS. LIN:  If you could please read off the redacted
 3   version.
 4              MS. REILLEY:  The version on the screen is redacted.
 5              MS. LIN:  Okay.  Just to make sure.  Thank you.
 6              THE COURT:  Yes.  So you should read it off the screen
 7   rather than that.
 8              THE WITNESS:  Yes, Your Honor.
 9          [As read]:
10              "Videos of this person surfaced on 7 June 2025
11          when it was reported he was throwing rocks and
12          injuring federal officers on the 6400 block of
13          Alondra Boulevard in the city of Paramount.  Soldiers
14          arrived at the briefing site today and learned the
15          objective would be at" -- that's PII -- "in the city
16          of Long Beach.  They were tasked to cordon the
17          southbound lanes of Long Beach Boulevard from
18          East Ellis Street and East 55th Street.  One van with
19          12 packs was set up to block on the south side of the
20          objective along with" -- or -- "along Long Beach
21          Boulevard, and one van with 12 packs was set up to
22          block on the north side of the objective.
23              "When National Guard, DEA, and FBI elements
24          arrived at the objective, blockades were established,
25          and each blockade was accompanied by a marked
```

77

SHERMAN - DIRECT / REILLEY

```
 1          Los Angeles Sheriff's vehicle.  Both blockades were
 2          also accompanied by DEA SWAT and armed with less than
 3          lethal munitions such as pepper ball guns.
 4              "National Guard soldiers established their
 5          blocking positions at approximately 0600, and the
 6          DEA" -- and that's 0600 hours -- "and the DEA and FBI
 7          began their operation at the target residence.  PII
 8          was not located, but his brother was detained.  It is
 9          known" -- "It is unknown if his brother was arrested.
10          The motorcycle that this person was riding during the
11          assault on the federal officers was recovered and
12          stored for evidence."
13     BY MS. REILLEY:
14     Q.   And you do not know or have any information as to whether
15     Task Force 51 soldiers prevented any civilians from using the
16     public road as part of this operation; right?
17     A.   I do not.
18              MS. REILLEY:  Thank you.
19          (Trial Exhibit 64 received in evidence.)
20     BY MS. REILLEY:
21     Q.   If you could please turn to Tab 64 of the binder.  And
22     this has been previously admitted as Exhibit 64, and we'll
23     publish that exhibit to the screen.
24          And, Major General Sherman, you recognize this document as
25     a printout from the DVIDS website; correct?
```

SHERMAN - DIRECT / REILLEY

1   A.   I do.

2   Q.   And "DVIDS" stands for Defense Visual Information

3   Distribution Service?

4   A.   That is correct.

5   Q.   And this is a website run by the Department of Defense?

6   A.   That is correct.

7   Q.   The photograph shown here was taken by Sergeant Chase

8   Murray; correct?

9   A.   That is correct.

10  Q.   And Sergeant Murray was a part of Task Force 51 when this

11  photograph was taken?

12  A.   He was a member of the public affairs section, that is

13  correct.

14  Q.   Attached to Task Force 51?

15  A.   That is correct.

16  Q.   And the four individuals standing behind the yellow

17  caution tape in this photograph are all Task Force 51 soldiers;

18  right?

19  A.   It appears so, yes.

20  Q.   And you don't know what the soldiers in this photograph

21  are doing; correct?

22  A.   I do not.

23       (Trial Exhibit 66 received in evidence.)

24  BY MS. REILLEY:

25  Q.   If you could please turn to Tab 66 of the binder, which

**SHERMAN - DIRECT / REILLEY**

1    has been previously admitted as Exhibit 66, and we'll publish

2    this document to the screen.

3    **A.**    (Witness examines document.)

4    **Q.**    Showing you another photograph that was taken by

5    Sergeant Murray that was published on the DVIDS website, the

6    five individuals in the foreground of this photograph who are

7    wearing camouflage uniforms and holding shields are also

8    Task Force 51 soldiers; correct?

9    **A.**    They are.

10   **Q.**    And you can't explain what those soldiers in this

11   photograph are doing; right?

12   **A.**    I cannot.

13        (Trial Exhibit 68 received in evidence.)

14   **BY MS. REILLEY:**

15   **Q.**    If you could please turn to Tab 68, which has been

16   previously admitted as Exhibit 68, and we'll publish that to

17   the screen.

18        This is another photograph taken by Sergeant Murray that

19   was published on the DVIDS website.

20        And the four individuals in this photograph who are

21   holding shields are also Task Force 51 soldiers; correct?

22   **A.**    The four holding the shields are Task Force 51 soldiers.

23   **Q.**    And you don't know what the soldiers in this photograph

24   are doing; correct?

25   **A.**    I do not.

SHERMAN - DIRECT / REILLEY

1  Q.   And you don't know where this photograph was taken; right?

2  A.   I do not, except the buildings look similar to the last

3  photograph you showed me.

4  Q.   All right.  And while you were the commanding general of

5  Task Force 51, you approved two requests for assistance that

6  involved search warrant operations at cannabis farms; correct?

7  A.   Correct.

8  Q.   The first was an operation in Mecca, California?

9  A.   Correct.

10 Q.   And Mecca is a long way from the center of Los Angeles;

11 right?

12 A.   It is.

13 Q.   You didn't have any specific knowledge of any particular

14 threat related to the Mecca operation; correct?

15 A.   No, we did not.

16 Q.   And you didn't have any specific information that there

17 were going to be riots during the Mecca operation; right?

18 A.   We did not.

19 Q.   There were approximately 300 Task Force 51 soldiers who

20 participated in the Mecca operation; correct?

21 A.   That is correct.

22 Q.   And there were only about 200 federal law enforcement

23 agents involved in that operation; right?

24 A.   That is correct.

25 Q.   So during the Mecca operation, Task Force 51 troops

SHERMAN - DIRECT / REILLEY

```
 1   outnumbered federal law enforcement agents by over a hundred?
 2   A.    That is correct.
 3   Q.    The Mecca operation involved approximately 50 military
 4   vehicles?
 5   A.    That is correct.
 6   Q.    And those military vehicles included Humvees?
 7   A.    They did.
 8   Q.    And 5-ton trucks?
 9   A.    They did.
10   Q.    During the Mecca operation, neither the Task Force 51
11   troops nor the federal law enforcement agents faced any
12   resistance; right?
13   A.    I do not know about the federal law enforcement.  I know
14   that our soldiers did not face any resistance on the outside.
15   Q.    And no Task Force 51 soldier was required to provide force
16   protection to any federal agent during the Mecca operation;
17   correct?
18   A.    No.  Not inside the perimeter, that is correct.
19         (Trial Exhibit 41 received in evidence.)
20   BY MS. REILLEY:
21   Q.    All right.  If you could please turn to Tab 41 of your
22   binder.  This has been previously admitted as Exhibit 41, and
23   we'll publish this document to the screen.
24         You recognize this document; correct?
25   A.    I do.
```

SHERMAN - DIRECT / REILLEY

```
 1   Q.   This is a storyboard of the Mecca operation that was made
 2   by the 143rd Military Police Battalion?
 3   A.   That is correct.
 4   Q.   And the 143rd Police Battalion was part of Task Force 51
 5   at the time of the Mecca operation; correct?
 6   A.   That is correct.
 7   Q.   Could you please read aloud the paragraph under the header
 8   "End State," which is in the bottom left corner of the
 9   document?
10   A.   [As read]:
11            "Joint federal and military companies,
12        headquarters and headquarters company, 143rd MP
13        Battalion, 40th Military Police Company,
14        330th Military Police Company, and 670th Military
15        Police Company established outer cordons and secured
16        designated sites, enabling safe entry for DEA
17        personnel.
18            "Actions resulted in the seizure of narcotics,
19        approximately 87 suspected human trafficking victims,
20        and disruption of illegal marijuana cultivation" -- I
21        can't read that last one -- "tied to organized
22        criminal activity."
23   Q.   And you saw this slide shortly after the Mecca operation
24   took place; correct?
25   A.   I did.
```

SHERMAN - DIRECT / REILLEY

```
 1          (Trial Exhibit 69 received in evidence.)
 2     BY MS. REILLEY:
 3     Q.   If you could please turn to Tab 69 of your binder.  This
 4     has been previously admitted as Exhibit 69, and we'll publish
 5     that document to the screen.
 6          You recognize this photograph that was published on the
 7     DVIDS website?
 8     A.   I do.
 9     Q.   This photograph is also taken by Sergeant Murray?
10     A.   That is correct.
11     Q.   And this photograph shows Task Force 51 troops during the
12     Mecca operation; correct?
13     A.   I believe so, correct.  Yes.
14     Q.   And if you look at the description under the photograph,
15     do you see where it reads [as read]:
16              "Soldiers from the 143rd Military Police
17          Company, 49th Military Police Brigade, California
18          National Guard, serving under Title X status,
19          established a security perimeter in Mecca,
20          California, June 18th, 2025"?
21     A.   Correct.
22     Q.   All right.  And the second request for assistance that you
23     approved while you were the commanding general of Task Force 51
24     that involved a search warrant at a cannabis farm was an
25     operation in Carpinteria, California?
```

**SHERMAN - DIRECT / REILLEY**

1   A.   Correct.

2   Q.   And is it correct that you approved the Carpinteria

3   operation while you were still commanding general; but by the

4   time the operation actually took place, you were no longer in

5   command?

6   A.   That is correct.

7   Q.   During the Carpinteria operation, Task Force 51 troops

8   were tasked with protecting federal agents who had set up

9   traffic control blocks?

10  A.   They had set up traffic control points east and west on --

11  for Carpinteria; that is correct.

12  Q.   All right.  And Task Force 51 troops were given that

13  assignment because without the troops, the federal agencies

14  involved in the operation would have had to station more of

15  their personnel at the traffic control points; right?

16  A.   Correct.

17  Q.   And if the federal agencies had had to station more of

18  their personnel at the traffic control points, the operation

19  would have taken longer; correct?

20  A.   That's what they told me, that's correct.

21  Q.   And the Carpinteria operation involved approximately 100

22  to 120 Task Force 51 troops?

23  A.   I believe that's correct.

24  Q.   And there were approximately 20 to 25 Task Force 51

25  military vehicles involved in that operation as well?

SHERMAN - DIRECT / REILLEY

```
 1    A.    Correct.

 2    Q.    And those military vehicles were Humvees and 5-ton trucks?

 3    A.    Correct.

 4          (Trial Exhibit 31 received in evidence.)

 5    BY MS. REILLEY:

 6    Q.    Could you please turn to Tab 31 of your binder.  This has

 7    been previously admitted as Exhibit 31, and we're going to show

 8    a page of that document that's labeled 3519 on the screen.

 9              THE COURT:  What page?

10              MS. REILLEY:  We'll be publishing 3519.

11              THE COURT:  Thank you.

12    BY MS. REILLEY:

13    Q.    Major General Sherman, you recognize this document;

14    correct?

15    A.    I do.

16    Q.    This is a brief that battalion staff prepared in advance

17    of the Carpinteria operation?

18    A.    That is correct.

19    Q.    And directing you to page 3519, which is shown on the

20    screen in front of you, do you see where it reads "Risk of

21    inaction low"?

22    A.    Yes.

23    Q.    Could you please read the section that immediately follows

24    that statement "Risk of inaction low"?

25    A.    [As read]:
```

SHERMAN - DIRECT / REILLEY

1          "The Assessment:  No indication that failure to

2       act would result in loss of life or significant

3       property damage to federal personnel at both traffic

4       control points given the volume of HSI" -- so

5       Homeland Security Investigations -- "personnel on

6       scene."

7       (Trial Exhibit 79 received in evidence.)

8   BY MS. REILLEY:

9   Q.   Could you please turn to Tab 79 of your binder.  This has

10  been previously admitted as Exhibit 79.

11      Major General Sherman, you recognize this photograph;

12  correct?

13  A.   You showed it to me at my deposition, yes.

14  Q.   And this is a photograph that was taken by Monica

15  Solorzano, who's the vice mayor of Carpinteria, during the

16  Carpinteria operation.  And you recall during your deposition

17  that I asked you to label this photograph?

18  A.   Yes.

19  Q.   And at your deposition you labeled the individual who was

20  wearing sunglasses and a mask as a federal agent?

21  A.   That is correct.

22  Q.   And you also labeled the individuals who were wearing

23  camouflage uniforms and hats as Task Force 51 soldiers?

24  A.   They all appear to be, yes.

25      (Trial Exhibit 80 received in evidence.)

SHERMAN - DIRECT / REILLEY

1      **MS. REILLEY:** All right. At this time, I'm going to

2  show you a video that's been previously admitted as Exhibit 80.

3      And for the record, this is a video that was taken by

4  Vice Mayor Solorzano during the Carpinteria operation.

5      **THE COURTROOM DEPUTY:** One moment, Judge.

6                    (Pause in proceedings.)

7              (Video was played but not reported.)

8      **MS. REILLEY:** Your Honor, were you able to see the

9  entire video, or did that start partway through?

10     **THE COURT:** Do you want to reshow it?

11     **MS. REILLEY:** Could we? Thank you. I just want to

12  make sure we see the entire video.

13             (Video was played but not reported.)

14  **BY MS. REILLEY:**

15  **Q.** Major General Sherman, you've seen this video before;

16  right?

17  **A.** I have.

18  **Q.** And the two individuals who are wearing camouflage

19  uniforms in that video are Task Force 51 soldiers; correct?

20  **A.** They are.

21  **Q.** In fact, all the individuals who are wearing camouflage

22  uniforms in that video are Task Force 51 soldiers; correct?

23  **A.** Yes.

24  **Q.** And you don't have any information indicating that the

25  woman in this video who is holding the megaphone threatened

**SHERMAN - DIRECT / REILLEY**

```
 1    anyone, including any federal agents; right?
 2    A.    No, I don't have the context of this.
 3    Q.    Thank you.
 4          If you could please turn to Tab 70 --
 5              THE COURT:  Wait.  Before we do that, could you go
 6    back on this for a minute?
 7              MS. REILLEY:  Yes.
 8              THE COURT:  Okay.  Maybe show it again.  I want to ask
 9    the general a question.
10                 (Video was played but not reported.)
11              THE COURT:  Freeze it there.  Freeze it there.  Stop
12    it.
13          Okay.  So I see three law en- -- what I'll call law
14    enforcement people; that is, people either in military gear or
15    in other gear.  And my question is:  The military people, the
16    people in camouflage, they are part of Task Force 51; is that
17    correct?
18              THE WITNESS:  That's correct, Your Honor.
19              THE COURT:  Okay.  There's a third person there.  And
20    do you have any information as to who that person -- what force
21    that person belongs to?
22              THE WITNESS:  I can't tell off the video.  I can't --
23    I'm not close enough to see the badge.  They do have "Police"
24    on there, and there's usually "Federal Police" on their
25    uniform.  It says that too, Your Honor, but I can't tell.  But
```

SHERMAN - DIRECT / REILLEY

```
 1   there is a "Police" -- it says "Police" on the left-hand side
 2   there.
 3           THE COURT:  Okay.  So you don't know whether that's
 4   federal or state?
 5           THE WITNESS:  It would be federal, Your Honor.
 6           THE COURT:  It would be federal?
 7           THE WITNESS:  Yes.
 8           THE COURT:  Okay.  My question is:  I assume the Task
 9   Force camouflage-dressed officers have identification on them;
10   is that correct?
11           THE WITNESS:  That is correct.
12           THE COURT:  So it's Army regulation that they have
13   their name above their lapel or at some place prominently
14   displayed on their uniform?
15           THE WITNESS:  It is correct -- that's correct,
16   Your Honor.  It is blocked here by the body armor that they're
17   wearing.  You can see the rank.  Like this is a sergeant right
18   here who's got the glasses, facing right here.  She's -- you
19   can tell that it's an Army patch she has on, but her name --
20   her name is covered by the body armor.
21           THE COURT:  Okay.  So she is -- for intents and
22   purposes, she's anonymous in terms of whether an individual who
23   is not part of the operation can identify that particular
24   person; is that correct?
25           THE WITNESS:  That's correct, Your Honor.  They can
```

SHERMAN - DIRECT / REILLEY

 1    tell what unit she's in by the unit patch.

 2          THE COURT:  Her rank?

 3          THE WITNESS:  And her rank, yes, sergeant E5.

 4          THE COURT:  Right.  Now, the person who you believe to

 5    be a federal law enforcement officer but not sure what branch

 6    they belong to or what department they belong to, that person

 7    is wearing a mask; is that correct?

 8          THE WITNESS:  That is correct.

 9          THE COURT:  Okay.  So nobody could -- it would be

10    difficult to identify who that person is by virtue of the fact

11    that the person is wearing a mask.  Is that person identified

12    in any other way?

13          That is to say, if somebody was standing there, would they

14    be able, after the fact, to say, "Officer X," identifying

15    Officer X, who's masked, can make that identification?

16          THE WITNESS:  Your Honor, they could tell that it's

17    police.  And now that I look at it, it says "HSI" under the

18    "Police."  They can tell.

19          THE COURT:  HSI?

20          THE WITNESS:  Yes.  It says it.  That's a "Police" --

21    that the body vest that he's wearing, which is body armor, says

22    "Police" and it says "HSI" under it.

23          THE COURT:  And HSI is?

24          THE WITNESS:  I think Homeland Security Investigations

25    I believe, Your Honor.

SHERMAN - DIRECT / REILLEY

1          THE COURT:  Okay.  All right.  Thank you so much.

2          THE WITNESS:  Yes, Your Honor.

3    BY MS. REILLEY:

4    Q.   Major General Sherman, you stated a moment ago that even

5    though you can't see the soldier's name, you would be able to

6    tell she was a sergeant; is that right?

7    A.   That is correct.

8    Q.   And you would know that from the chevrons on her hat?

9    A.   Both on her hat and right there right above her body

10   armor, right there it says -- it shows her rank too.  Same

11   thing.

12   Q.   But if you were not familiar with military insignia, you

13   would not know that those two chevrons denoted a sergeant;

14   correct?

15   A.   Those three.  There are actually three, but that's

16   correct.

17        (Trial Exhibit 75 received in evidence.)

18   BY MS. REILLEY:

19   Q.   If you could please turn to Tab 75 of your binder.  This

20   has been previously admitted as Exhibit 75, and we will publish

21   this to the screen now.

22        This is another photograph that was published on the DVIDS

23   website, again taken by Sergeant Murray.  You recognize this

24   photograph; correct?

25   A.   I do.

SHERMAN - DIRECT / REILLEY

1    Q.   At least some of the individuals in this photograph who

2    are wearing camouflage are Task Force 51 troops; correct?

3    A.   Yes, with a lot of federal agents in there -- mixed in

4    there too.

5    Q.   And below the picture, do you see where it reads [as

6    read]:

7             "Soldiers assigned to the 870th Military Police

8         Company, 185th Military Police Battalion,

9         49th Military Police Brigade, California National

10        Guard, serving under Title X status, provide a

11        security perimeter for federal personnel conducting

12        law enforcement activities in Carpinteria,

13        California, July 10th, 2025"?

14   A.   I do.

15        (Trial Exhibit 76 received in evidence.)

16   BY MS. REILLEY:

17   Q.   If you could please turn to Tab 76 of your binder.  This

18   has been previously admitted as Exhibit 76, and it's being

19   published to the screen now.

20        Showing you another photograph that was published on the

21   DVIDS website, taken by Sergeant Murray during the Carpinteria

22   operation, you recognize this photograph; correct?

23   A.   I do.

24   Q.   At least some of the individuals in this photograph who

25   are wearing camouflage are Task Force 51 troops?

SHERMAN - DIRECT / REILLEY

1   A.   Yes.

2   Q.   And beneath this photograph is the same description as the

3   previous photograph; correct?

4   A.   That is correct.

5   Q.   While you were commanding general, there was also an

6   occasion where a mobile response force of Task Force 51 troops

7   assisted in a federal law enforcement operation at a cannabis

8   farm in Camarillo, California; correct?

9   A.   That was after I left, correct.

10  Q.   Okay.  But you do have knowledge of Task Force 51's

11  involvement in that operation?

12  A.   I have knowledge from what I read from General Nell's

13  report and talking to General Nell, but that would be it.

14  Q.   So you don't have any knowledge about what specifically

15  took place during the Camarillo operation; correct?

16  A.   I do have knowledge that about 48 hours ahead of time

17  before the operation, they canceled -- the CVP canceled the

18  request for assistance.  So there would not be any soldiers on

19  that mission with federal law enforcement.

20  Q.   All right.  So that's -- to my question, that's a "yes"?

21  You don't -- because you were no longer commanding general, you

22  don't know specifically what took place during the Camarillo

23  operation; right?

24  A.   I don't.  I was actually flying at the time this happened.

25         (Trial Exhibit 83 received in evidence.)

SHERMAN - DIRECT / REILLEY

1  BY MS. REILLEY:

2  Q.   Okay.  If you could please turn to Tab 83 of your binder.

3  And this has been previously admitted as Exhibit 83, and we'll

4  publish that to the screen now.

5       And for the record, this is a photograph of the Camarillo

6  operation that was taken by Genevieve Flores-Haro of the

7  Mixteco/Indigena Community Organizing Project.

8       Major General Sherman, you've seen this photograph before;

9  correct?

10 A.   I have.

11 Q.   And the eight individuals in this photograph who are

12 wearing face shields are Task Force 51 soldiers; right?

13 A.   The ones that are wearing clear face shields -- I don't

14 know that federal agent that's there in the middle, if that's a

15 face shield.  I can't tell.  But it appears, yes, the ones that

16 are wearing clear face shields are soldiers, members of,

17 I believe, Task Force 51.  I can't see the patches, but I

18 assume so.

19 Q.   And you don't know what the soldiers in this photograph

20 are doing; correct?

21 A.   I do not.

22      (Trial Exhibit 86 received in evidence.)

23 BY MS. REILLEY:

24 Q.   If you could please turn to Tab 86 of your binder, and

25 we'll publish this.  This is Exhibit 86, another photograph

SHERMAN - DIRECT / REILLEY

1    taken by Ms. Flores-Haro during the Camarillo operation.

2        You've seen this photograph before; correct?

3    A.    I have.

4    Q.    And the four individuals in this photograph who are

5    wearing clear face shields and shin guards are Task Force 51

6    soldiers; correct?

7    A.    Yes.   I can't see the patches, but this is gear that they

8    were issued, yes.

9    Q.    And you can't explain what the soldiers are doing in this

10   paragraph; correct?

11   A.    I cannot.

12       (Trial Exhibit 87 received in evidence.)

13   BY MS. REILLEY:

14   Q.    If you could please turn to Tab 87, which we will publish

15   now.   This is another photograph taken by Ms. Flores-Haro

16   during the Camarillo operation.

17       You've seen this photograph before; correct?

18   A.    Yes, I have.

19   Q.    And the five individuals in this photograph who are

20   wearing face shields -- clear face shields and shin guards are

21   Task Force 51 soldiers; right?

22   A.    They are Task Force 51 soldiers behind the federal agent

23   there, that's correct.

24   Q.    And you can't explain what the soldiers in this photo are

25   doing; correct?

SHERMAN - DIRECT / REILLEY

```
 1   A.    I cannot.
 2         (Trial Exhibit 92 received in evidence.)
 3   BY MS. REILLEY:
 4   Q.    If you could please turn to Tab ninety- -- turn to Tab 92,
 5   which is Exhibit 92.  We'll publish this now.
 6         You've seen this photograph before; correct?
 7   A.    I have.
 8   Q.    And the three individuals in this photograph who are
 9   wearing face shields and shin guards are Task Force 51
10   soldiers; correct?
11   A.    I see -- well, there's two that are cut off that have,
12   appears to be, face shields and then two more of that face
13   shields; and then the other ones are not 51, Task Force 51,
14   that's correct.
15   Q.    So the two individuals on the left-hand side of the
16   photograph who are wearing shin guards and holding batons,
17   those are Task Force 51 soldiers; right?
18   A.    They appear so, yes.
19   Q.    And you can't explain what the soldiers in this photograph
20   are doing; right?
21   A.    I cannot.
22         (Trial Exhibit 94 received in evidence.)
23   BY MS. REILLEY:
24   Q.    If you could please turn to Tab 94.  This is Exhibit 94,
25   another photograph taken by Ms. Flores-Haro during the
```

SHERMAN - DIRECT / REILLEY

1    Camarillo operation.

2        You've seen this photograph before; correct?

3    A.    I have.

4    Q.    And we're zooming in on the photograph now.

5        The individuals in this photograph who are standing next

6    to the field and holding shields are Task Force 51 soldiers;

7    right?

8    A.    They are.

9    Q.    And you don't know what the soldiers in this photograph

10   are doing; correct?

11   A.    I do not.

12       (Trial Exhibit 95 received in evidence.)

13           MS. REILLEY:    At this time, I'm going to show you a

14   video that's been admitted as Exhibit 95.   This was also taken

15   by Ms. Flores-Haro during the Camarillo operation.

16           (Video was played but not reported.)

17   BY MS. REILLEY:

18   Q.    You've seen that video before; correct?

19   A.    I have.

20   Q.    And the individuals in this video who are wearing the

21   clear face shields and holding shields are Task Force 51

22   soldiers; right?

23   A.    That is correct.

24   Q.    And you don't know what the soldiers in this video are

25   doing?

SHERMAN - DIRECT / REILLEY

1  A.  No.  I could make -- I wasn't there, so I'm not going to

2  make a decision but -- or make a statement on that.  No, I do

3  not.  I don't have context.

4       (Trial Exhibit 96 received in evidence.)

5            MS. REILLEY:  All right.  Now I'm going to show you a

6  video that's been admitted as Exhibit 96.  Again, this was

7  taken by Ms. Flores-Haro during the Camarillo operation.

8            (Video was played but not reported.)

9  BY MS. REILLEY:

10  Q.  You've seen this video before; correct?

11  A.  I have.

12  Q.  And the individuals in this video who are wearing

13  camouflage uniforce -- uniforms and gas masks are Task Force 51

14  troops?

15  A.  Not necessarily.

16  Q.  When the video panned to the right and it showed

17  individuals in camouflage uniforms who are wearing gas masks

18  and clear face shields, those are Task Force 51 soldiers;

19  correct?

20  A.  Yes, but there are also federal agents wearing gas masks

21  on that one too.

22  Q.  But the federal agents are wearing solid green, not

23  camouflage; correct?

24  A.  I believe so.  I'd have to take a better look.  I don't --

25  I don't know.

SHERMAN - DIRECT / REILLEY

1  Q.   We could replay the video if you'd like.

2  A.   Sure.

3            (Video was played but not reported.)

4  BY MS. REILLEY:

5  Q.   Having seen the video for a second time, it's correct that

6  the individuals wearing camouflage are Task Force 51 soldiers;

7  correct?

8  A.   Correct.  Behind the federal agents, that's correct.

9  Q.   And you can't explain what these soldiers in this video

10  are doing; correct?

11  A.   Well, with the crowd there, it appears like they're doing

12  a traffic control point, holding people back, but I don't have

13  any other information.

14  Q.   And you were not present for this operation; correct?

15  A.   I was not.

16  Q.   And you were not commanding general at the time this

17  operation took place; correct?

18  A.   Which operation is this one?

19  Q.   Camarillo.

20  A.   Oh, no, I was not.

21  Q.   All right.  Task Force 51 soldiers also participated in a

22  law enforcement operation at MacArthur Park on July 7th, 2025;

23  correct?

24  A.   Correct.

25  Q.   And the original request for assistance that related to

**SHERMAN - DIRECT / REILLEY**

1  the MacArthur Park operation called for the operation to take

2  place on Father's Day?

3  **A.**   That is correct.

4  **Q.**   And it also called for Task Force 51 military vehicles to

5  be on the section of Wilshire Boulevard that runs through

6  MacArthur Park; correct?

7  **A.**   It did.  It had them going through the middle, yes.

8  **Q.**   You objected to that original request for assistance

9  related to the MacArthur Park operation; correct?

10  **A.**   That is correct.

11  **Q.**   And Chief Gregory Bovino of the Department of Homeland

12  Security criticized you for objecting to that request; correct?

13  **A.**   He did.  He did.

14  **Q.**   And specifically Chief Bovino questioned your loyalty to

15  the country for objecting to that original MacArthur Park

16  operation?

17  **A.**   He did.

18       **MS. LIN:**  Objection.  Relevance.

19       **THE COURT:**  Sorry?  The objection.

20       **MS. LIN:**  Objecting to relevance of this line of

21  questioning of the conversations that counsel is --

22       **THE COURT:**  Why is it irrelevant?  I mean, if somebody

23  is making decisions and then people who are part of the

24  decision-making process turn to the person who makes a decision

25  based upon his judgment and calls him disloyal, why is that

SHERMAN - DIRECT / REILLEY

```
 1    irrelevant?

 2            MS. LIN:  The only question before the Court today is

 3    the scope of the Posse Comitatus Act.

 4            THE COURT:  Yes.  We're talking about -- it's in an

 5    operation; isn't it?  Isn't this related to the MacArthur Park?

 6            MS. LIN:  Yes, yes, it is, but the discussion about

 7    loyalty or disloyal, that's not part of --

 8            THE COURT:  But wasn't that -- I'm sorry.  Was that

 9    not part of the discussion?  Are you saying that wasn't part of

10    the discussion, Counsel?

11            MS. LIN:  It was, but --

12            THE COURT:  Well, so if it's part of the discussion,

13    why isn't it then related to the decision that was made in that

14    context?  Why isn't it?

15        I'm actually asking you these questions because you're the

16    one objecting, so you have to explain it to me.

17            MS. LIN:  Yes, Your Honor.  The scope --

18            THE COURT:  Why don't you come up to the microphone so

19    I can hear you.

20            MS. LIN:  The scope of the issue before the Court is

21    simply about whether there have been violations of the Posse

22    Comitatus Act.  What a law enforcement agency's view about the

23    military's loyalty or disloyalty is not relevant, in our view,

24    to that narrow question of whether a violation --

25            THE COURT:  But why isn't it relevant?
```

SHERMAN - DIRECT / REILLEY

```
 1              MS. LIN:  -- of law has occurred.

 2              THE COURT:  If, in fact, a person is making a

 3    decision, who's a military officer, who's had 33 years of

 4    experience and I assume -- we haven't gone through the

 5    decorations, but I assume there was least one decoration over

 6    your career -- is told by civilian authorities that he is

 7    disloyal to the United States of America, why isn't that

 8    relevant to whatever decisions are made in connection with this

 9    officer, the general?

10        I'm just trying to understand your objection.  You say

11    it's not -- it's not relevant because of what?

12              MS. LIN:  Because that question of loyalty does not

13    directly go to the issue of whether violations of the Posse

14    Comitatus Act has occurred and is --

15              THE COURT:  Well, maybe it goes to his state of mind.

16    Maybe it goes to the fact he's now being -- he's exercising his

17    military judgment in connection with the Posse Comitatus Act;

18    and in doing so, in doing so, he is told that he is disloyal to

19    the United States of America.

20        Why is it any different from turning, as an example, to an

21    attorney who makes an argument and then you say to the arguer,

22    "You can't make that argument.  You're disloyal"?  Why isn't it

23    relevant?

24              MS. LIN:  Your Honor has ruled.

25              THE COURT:  Okay.
```

SHERMAN - DIRECT / REILLEY

```
 1            MS. LIN:  My objection remains the same.

 2            THE COURT:  Thank you.  Overruled.

 3        Okay.  Go ahead.

 4   BY MS. REILLEY:

 5   Q.   Major General Sherman, your answer to my last question

 6   was, yes, Chief Bovino did question your loyalty to the

 7   United States of America; correct?

 8   A.   Yes.

 9   Q.   You did not ultimately approve the MacArthur Park

10   operation that took place on July 7th; right?

11   A.   That's correct.

12   Q.   That request for assistance was actually approved by the

13   Secretary of Defense?

14   A.   It was not approved by the Secretary of Defense.  Or I

15   don't really understand your question.

16   Q.   So my question relates to the operation that, in fact,

17   took place on July 7th.

18   A.   Oh, okay, yes.

19   Q.   Was -- that operation was pursuant to a request for

20   assistance; correct?

21   A.   It was.  It was the third time we have -- we had planned

22   MacArthur Park.  Because of the high risk, it went to the

23   commander of U.S. Northern Command for his approval; and from

24   there, it did go to the Secretary of Defense for the approval.

25   Q.   And when you say "high risk," you are referring to the
```

SHERMAN - DIRECT / REILLEY

```
 1   high risk it posed to your Task Force 51 troops; correct?
 2   A.   It could be Task Force 51 troops.  It could also be
 3   federal law enforcement.  It was both a risk just to the
 4   operation.
 5   Q.   And there were approximately 120 to 150 Task Force 51
 6   soldiers involved in the MacArthur Park operation?
 7   A.   I believe that's too high.  I believe it's more like 90
 8   that were there on the site.  We had some Mobile Response Force
 9   people that were outside if they needed to respond, but I think
10   there was about 90 on the ground right there.
11   Q.   Do you recall at your deposition when you testified that
12   there were approximately 120 to 150 Task Force 51 soldiers?
13   A.   I think if you're including the MRP, that's probably -- or
14   the Mobile Response Force, that's a correct number.
15   Q.   And the Mobile Response Force was stationed near
16   MacArthur Park during the operation; correct?
17   A.   They were at -- we had them at Roybal, at Wilshire, and
18   Los Angeles Air Force base.
19   Q.   All right.  And there were approximately 40 Task Force 51
20   military vehicles that were involved in the MacArthur Park
21   operation?
22   A.   I believe that's correct, yes.
23   Q.   And those military vehicles included Humvees; right?
24   A.   They did.
25   Q.   It also included transport vehicles?
```

SHERMAN - DIRECT / REILLEY

```
 1   A.   It did.  It had LMTVs and I also believe there were some

 2   JLTVs involved in that too.

 3   Q.   It included 5-ton trucks as well; right?

 4   A.   Yes.  Those are the LMTVs, that's correct.

 5   Q.   If you could please turn to Tab 28 of your binder.  This

 6   has been previously admitted as Exhibit 28.  And of this

 7   document, we are going to publish page 2892.

 8        Major General Sherman, you recognize this document;

 9   correct?

10   A.   I do.  I don't know the date of which when this was

11   published, but, yes, I do.

12   Q.   And this relates to the MacArthur Park operation; correct?

13   A.   I assume so, yes.

14   Q.   Operation Excalibur --

15   A.   Yes.

16   Q.   -- refers to MacArthur Park?

17   A.   Yes, you're right.  That's correct.

18   Q.   And this relates to the July 7th operation; correct?

19   A.   If these are a full slide set, I could tell you by looking

20   at one.

21        (Witness examines document.)  Yes, that's correct.

22   Q.   If you could please turn to page 2892.

23        Do you see where it reads "Risk of inaction low"?

24   A.   Yes.

25   Q.   And can you please read aloud the section that immediately
```

SHERMAN - DIRECT / REILLEY

```
 1   follows that header?
 2   A.   Yes.  [As read]:
 3            "So risk of inaction low assessment.  Current
 4        intelligence does not indicate a high-volume or
 5        high-value target to federal function at this
 6        location.  No indication that failure to act would
 7        result in loss of life or significant property
 8        damage.  Expected law enforcement action is limited
 9        in scale, with few detainees anticipated and no
10        high-risk warrants involved.  Operation not informed
11        by time-sensitive intelligence or part of an
12        integrated targeting cycle."
13   Q.   And the MacArthur Park operation took place on July 7th,
14   which was a Monday morning; correct?
15   A.   Correct.
16   Q.   And given that it took place on a Monday morning, that
17   summary you just read is an accurate assessment of the risk
18   presented by the MacArthur Park operation; correct?
19   A.   That is correct.  It was changed because of the -- of an
20   operation that did take place on Monday, the 7th, after the
21   Fourth of July holiday.
22   Q.   All right.  So even if Task Force 51 troops had not been
23   involved in the MacArthur Park operation on July 7th, the risk
24   to the federal law enforcement officers would have been low;
25   correct?
```

SHERMAN - DIRECT / REILLEY

```
 1   A.    That was our assessment.
 2   Q.    Do you have any current involvement with the Los Angeles
 3   deployment?
 4   A.    I do not.
 5   Q.    In fact, you have not had any involvement with the
 6   deployment since July 10th; correct?
 7   A.    That is correct.
 8   Q.    You are aware, though, that there are 300 federalized
 9   California National Guard soldiers who are still deployed;
10   right?
11   A.    I am.
12   Q.    And 300 soldiers is a full battalion?
13   A.    No, it's not.  It's like three-quarters of a battalion.
14   Q.    All right.
15   A.    It depends on the type of battalion that you're talking
16   about.  If this is an MP battalion, it's about three-quarters
17   of it.
18   Q.    And to your knowledge, those 300 federalized California
19   National Guard troops are still providing assistance to federal
20   law enforcement agencies; correct?
21   A.    They are conducting four requests for assistance as of
22   last night.
23   Q.    And what are those four requests for assistance?  What
24   operations are you assisting?
25   A.    They have personnel at the Roybal building in case it
```

**SHERMAN - DIRECT / REILLEY**

```
 1    needs defended, they have personnel at the Paramount facility

 2    in case that needs defended, and then two Mobile Response

 3    Forces.

 4    Q.   And the Mobile Response Forces can be called upon to

 5    engage in field operations; correct?

 6    A.   Yes, they could.

 7    Q.   Are you aware that this morning, Secretary of Defense

 8    Hegseth announced the deployment of National Guard troops in

 9    Washington, D.C.?

10    A.   I read it on the news.

11    Q.   Did you watch any news coverage of Secretary Hegseth's

12    announcement?

13    A.   I did not.

14    Q.   Are you aware that Secretary Hegseth said in his

15    announcement that the D.C. National Guard will, quote, "stand

16    with their enforcement partners," closed quote, and that,

17    quote, "We did the same thing in Los Angeles"?

18    A.   I do not -- I did not read that.  That's what he said.  I

19    did not see that.

20         MS. REILLEY:  At this time, Your Honor, we would like

21    to play that footage given that this is the party opponent

22    representative and the Secretary's statement is a party

23    opponent statement.

24         THE COURT:  Okay.  You may proceed.

25         MS. REILLEY:  Thank you, Your Honor.
```

SHERMAN - DIRECT / REILLEY

```
 1              MS. LIN:  Your Honor, objection from us.  This is not
 2    on the exhibit list.  This is not --
 3              THE COURT:  You actually have to -- it's important we
 4    have a record, so that's why you should come forward.
 5         And also --
 6              MS. LIN:  Apologies, Your Honor.
 7              THE COURT:  -- I must tell you -- don't apologize.
 8    It's perfectly all right.
 9              MS. LIN:  I thought --
10              THE COURT:  I have a hard time hearing you when you're
11    at counsel table.  So I do want to hear what you have to say.
12              MS. LIN:  Okay.  That this particular, I believe it
13    was characterized as a press statement or video, is not part of
14    the exhibits list.  It's not part of the evidence of this case.
15    We were not informed that they were going to use this, even as
16    of this morning.
17              THE COURT:  Okay.  So how could it have been part of
18    the exhibit list when it occurred today?
19              MS. LIN:  We were not informed this morning either.
20              THE COURT:  Okay.  Well, now you're informed, and it
21    comes in subject to a motion to strike.
22              MS. LIN:  And, Your Honor, is it being offered for the
23    truth of the matter?
24              THE COURT:  It's being offered as a statement by a
25    party opponent.  The Secretary of Defense is a party opponent,
```

SHERMAN - DIRECT / REILLEY

```
 1   isn't he?
 2          MS. LIN:  Yes.  Understood.
 3          THE COURT:  Okay.  Thank you.
 4      It may be played --
 5          THE COURTROOM DEPUTY:  The exhibit number?
 6          THE COURT:  -- subject to a motion to strike.
 7          MS. REILLEY:  This will be the next exhibit in order,
 8   which I believe is 114.  Thank you.
 9      (Trial Exhibit 114 marked for identification.)
10                  (Pause in proceedings.)
11          THE COURT:  Do we have an estimate as to how long this
12   is going to take?
13          MS. REILLEY:  Your Honor, I was going to propose we
14   could try to download it if we took a recess.
15          THE COURT:  Yes, let's do that.
16      Well, do you have any other questions other than this?
17          MS. REILLEY:  No.  This will be my last one.
18          THE COURT:  Okay.  So let's do this:  Let's take our
19   noon recess, and we will resume at 1 o'clock sharp, and you may
20   play this at 1 o'clock sharp.
21          MS. REILLEY:  Thank you, Your Honor.
22          THE COURT:  And you may step down.  Thank you,
23   General.
24          THE WITNESS:  Thank you, Your Honor.
25          THE COURT:  Okay.  We're in recess till 1:00.
```

SHERMAN - DIRECT / REILLEY

```
 1              (Luncheon recess taken at 12:27 p.m.)

 2   Afternoon Session                          1:02 p.m.

 3         THE COURT:  Let the record show all parties are

 4   present.  The witness has returned to the witness stand.

 5       You may proceed.

 6         MS. REILLEY:  Thank you, Your Honor.

 7       (Trial Exhibit 114 received in evidence.)

 8         MS. REILLEY:  At this time, we are going to play

 9   what's been admitted as Exhibit 114, which is the Secretary of

10   Defense Hegseth's statement from this morning.

11         THE COURT:  Okay.  You may proceed.

12              (Video was played but not reported.)

13   BY MS. REILLEY:

14   Q.   Major General Sherman, you have not seen that video clip

15   before just now; correct?

16   A.   That's correct.

17   Q.   And you were not aware that Secretary of Defense Hegseth

18   made those statements before just now?

19   A.   That's correct.

20         MS. REILLEY:  At this time, the plaintiffs have no

21   further questions for Major General Sherman.

22         THE COURT:  Thank you.

23       Any examination?

24                   (Pause in proceedings.)

25         THE COURT:  Why don't you come over here.
```

SHERMAN - CROSS / LIN

```
 1            MS. LIN:  Oh.

 2            THE COURT:  It will be easier.

 3                    CROSS-EXAMINATION

 4   BY MS. LIN:

 5   Q.   Good afternoon, General Sherman.

 6   A.   Good afternoon.

 7   Q.   Earlier today you were asked to look at several

 8   photographs that were published by DVIDS.  Do you recall that?

 9   A.   I do.

10            MS. LIN:  So if we could have maybe the same

11   photograph -- at least one of the photographs, 64, that was

12   discussed this morning, Exhibit 64.

13   BY MS. LIN:

14   Q.   And then there were others as well that you were asked

15   questions about.  And just for the record, if I got them

16   correctly, the DVIDS photos included Exhibit 66, 68, 75, and

17   76, and these were represented as being taken by Sergeant Chase

18   Murray?

19            MS. REILLEY:  Objection.  Leading.

20            THE COURT:  Overruled.

21            MS. LIN:  I'm sorry.  I didn't hear, Your Honor.

22            THE COURT:  I said overruled.

23   BY MS. LIN:

24   Q.   And just to get an understanding of these photos, I think

25   you testified that you were not there and you did not know what
```

SHERMAN - CROSS / LIN

1   the circumstances were when the photos were taken?

2   A.   Correct.

3   Q.   Okay.  As the commander of Task Force 51, do you have an

4   understanding of what Sergeant Chase Murray's responsibility

5   was in taking these photographs?

6   A.   Sure.  So Sergeant Chase Murray was attached to

7   Task Force 51 in our public affairs section.  By him taking

8   photos and for him posting on DVIDS, his whole purpose was to

9   show the Army, the military side of the operation.  He was a

10  member of Task Force 51, so he was able to be inside the actual

11  interior lines, if you will, taking pictures.  And his focus

12  was really taking pictures of soldiers or Marines, highlighting

13  what DOD was doing for the operation.

14  Q.   So was there any guidance to photographers, such as

15  Sergeant Chase Murray, about whether they were to also include

16  federal law enforcement personnel if they were there?

17  A.   It was much -- it was because federal personnel were

18  starting to get doxed.  They were starting to have real issues

19  there.  His guidance, given by our head public affairs officer,

20  is to avoid as much as possible taking any pictures of federal

21  law enforcement that were any kind of facial recognition or

22  names could be used in those -- those federal law enforcement

23  being doxed.

24  Q.   And so do you believe that the photos that were -- that

25  you were asked questions about from DVIDS fall within that

SHERMAN - CROSS / LIN

```
 1    general guidance that was given to photographers attached to
 2    Task Force 51?
 3    A.   They were.
 4         MS. REILLEY:  Objection.  Calls for speculation.
 5         THE COURT:  I'll allow it.
 6         THE WITNESS:  There are some photos in here, not all,
 7    but there are some where he's gotten into position where he
 8    makes sure that he hasn't taken pictures of federal law
 9    enforcement; he's taken pictures of DOD personnel.
10    BY MS. LIN:
11    Q.   And if I could focus your attention on the first
12    photograph that I mentioned, Exhibit 64.
13    A.   Correct.
14    Q.   I think you were asked questions about this particular
15    photograph.
16         Do you see there's a yellow caution tape in front of
17    the -- I think you said the Task Force -- Task Force 51
18    soldiers?
19    A.   That's correct.
20    Q.   Is this yellow caution tape the type of equipment standard
21    issued for Task Force 51 troops?
22    A.   No.  Only federal law enforcement had that type of tape.
23    Q.   What other equipment were the Task Force 51 troops issued
24    for part of -- for this federal protection mission?
25    A.   So they had -- they had -- so for the civil disturbance,
```

SHERMAN - CROSS / LIN

```
 1   beyond their typical uniform, which was just a standard
 2   uniform, was boots, camouflage uniform.  They did have on their
 3   armored vests -- they're what we call IOTV, but they're vests
 4   that carried their armor plates -- and their ballistic helmet.
 5   And then part of it was their civil disturbance kit, which
 6   included kneepads, a body shield, a face shield, and a baton.
 7   And then they also had their personal weapon that was slung
 8   across their back.
 9   Q.   To your knowledge, was any Task Force 51 soldiers used the
10   issued batons during the federal protection mission?
11   A.   I do not know of any instance where they actually used it
12   to hit anybody.  That never happened.
13   Q.   And does your knowledge extend beyond -- I think you
14   discussed earlier you left California on July 10th.
15   A.   Correct.
16   Q.   Do you have knowledge, after you left on July 10th, as to
17   what -- whether that was -- whether any soldiers used a
18   baton --
19   A.   No.  I was --
20   Q.   -- during their mission?
21   A.   I was still on the distribution for the nightly reports,
22   and I did not see any reports where batons were ever used.
23   Q.   When you mentioned that you were on the distribution, this
24   is the distribution from, I believe you testified,
25   General Nell?
```

SHERMAN - CROSS / LIN

```
 1   A.   Correct.  General Nell would send her usual -- same thing
 2   I did, send a nightly report to General Pepin and to
 3   General Guillot, the commander of U.S. Northern Command.
 4   Q.   And when you talk about the civil disturbance equipment,
 5   did it include non-lethal munition?
 6   A.   It did not include non-lethal munitions.  We considered
 7   that a law enforcement action, so only civilian law enforcement
 8   had any of that equipment.
 9   Q.   And you mentioned that you were asked questions about the
10   personal weapons.  Can you let us know whether any soldiers,
11   pursuant to Task Force 51's federal protection mission, used
12   their personal weapons?
13   A.   They did not.  No -- no rounds were ever -- well, a term
14   we use -- "lock and loaded," which was putting a round into the
15   chamber.  They did have -- they did have magazines that were
16   loaded, but they never -- nobody ever chambered a round, never
17   were in a position that they thought that their life was in
18   jeopardy that they needed to do that.
19   Q.   And why is it that they were able to carry lethal weapons
20   but not non-lethal munitions?
21   A.   So strictly for self-defense.  If they thought their life
22   was in peril, that was the only time they were allowed to use
23   their personal weapon, is strictly for self-defense or defense
24   of another soldier or any lethal protection or any -- if they
25   saw some lethal force put against a federal law enforcement.
```

SHERMAN - CROSS / LIN

1   Q.   Thank you.

2        And if I can direct your attention to the discussion

3   earlier about Exhibit 38 that was -- you were asked questions

4   about it.

5   A.   Yes.

6   Q.   Do you have it in front of you on the screen?

7   A.   I don't see it on the screen, but I have it in front of

8   me.

9   Q.   I believe you were asked questions -- or I'm sorry.

10       I believe you were asked to read the last paragraph of the

11  "Patrol Narrative" section?

12  A.   I was.

13  Q.   Can I direct your attention to the third paragraph that

14  began with "National Guard soldiers establish their blocking

15  positions at approximately 0600," and the sentence continued?

16  A.   Yes.

17  Q.   Were National Guard soldiers attached to Task Force 51

18  permitted to establish blocking positions as part of the

19  federal protection mission?

20  A.   No.  It had to be -- because we considered that a law

21  enforcement action.  They could establish a blocking position

22  perimeter, if you will, if there was -- any time that they

23  thought law enforcement -- there was -- either preventing them

24  from doing their job or some kind of -- they saw as an imminent

25  threat of anything on that.  But in this --

SHERMAN - CROSS / LIN

```
 1   Q.   So --

 2   A.   Oh, I'm sorry.

 3   Q.   So the reference here about National Guard soldiers

 4   establishing their blocking positions, is that contrary to what

 5   they were trained to do?  Or I guess I'm trying to get an

 6   understanding of --

 7   A.   Well, so --

 8   Q.   -- why is it they established --

 9        MS. REILLEY:  Objection.

10        THE COURT:  Well, wait, wait, wait.

11     What is your question?  You started asking two questions

12   at the same time.

13        MS. LIN:  Okay.  My apologies, Your Honor.

14   BY MS. LIN:

15   Q.   So I'm asking whether you can explain to me if what you're

16   saying is that they are not permitted to establish blocking

17   positions, but the paragraph here is talking about National

18   Guard soldiers establishing their blocking positions.

19        MS. REILLEY:  Objection.  Calls for speculation.

20        THE COURT:  I'll allow it.

21        THE WITNESS:  So on the previous paragraph, where it

22   talks about -- where it started with "National Guard, DEA, and

23   FBI arrived at the objective.  Blockades were established and

24   each blockade was accompanied by a marked Los Angeles Sheriff's

25   vehicle."
```

**SHERMAN - CROSS / LIN**

1    The sheriffs were used in this operation because this

2    person had already been -- saw that they had -- had caused

3    significant -- they'd hurt a federal agent.  So, actually, this

4    was a time when Los Angeles Sheriff's Department was allowed;

5    they were actually part of this operation.  So not only were

6    they there on the checkpoint -- they call it blockade in this

7    case.  I don't like his wording here, but this is a very young,

8    22-year-old officer here.

9    But both blockades were also accompanied by DEA SWAT, so

10   Drug Enforcement Agency SWAT teams that were also at those

11   blockades, which are traffic control points, with less than

12   lethal munitions.  So it was law enforcement in the lead, with

13   our soldiers behind them.

14   **BY MS. LIN:**

15   **Q.**   So pursuant to the federal protection mission, are the

16   soldiers permitted to be establishing blocking positions if the

17   law enforcement personnel were the lead at that operation?

18   **A.**   They're allowed to be behind the federal law enforcement

19   or, in this case, L.A. County Sheriff were the ones

20   establishing the traffic control point, the blocking position,

21   and our soldiers were behind them strictly to protect them if

22   there was any threat.

23   **Q.**   So I think you testified that you were not at this

24   operation.  So I guess my question to you then is:  What are

25   the soldiers trained to do with respect to blocking positions

SHERMAN - CROSS / LIN

1  as part of the federal protection mission?

2  **A.**    So this is my number one priority -- or my number two

3  priority.  My number one priority was always the welfare and

4  safety of soldiers and Marines, but Number 2 was to ensure that

5  they followed the standing rules on the use of force exactly as

6  was written.

7       And for these operations, when battalion commanders and

8  their staffs would brief me on the operations, that was the

9  first question I asked:  What's your mission?  What are you

10  allowed to do?  What are you not allowed to do?  And what are

11  you doing?

12       It's standard, but it's something -- especially when

13  you're talking something as early as the first week of this

14  operation, the 13th, it was making sure they fully understood

15  because these are soldiers that had done previous riot

16  operations in a Title 32 state active duty status, which is

17  different, I wanted to make sure they fully understood under

18  Title X what they were allowed to do.

19       And then part of this was they weren't allowed to do any

20  law enforcement actions.  Law enforcement had to do it

21  themselves.  This is, we were strictly there to protect federal

22  law enforcement, allowing them to do their law enforcement job.

23  **Q.**    Okay.  And so, to your knowledge, no Task Force 51

24  soldiers acting pursuant to the federal protection mission

25  established blocking positions that were just by themselves,

SHERMAN - CROSS / LIN

```
 1    not connected with law enforcement personnel on the scene?
 2    A.    That's correct.  The only time they got out in front and
 3    established a blocking position is if there was some kind of
 4    risk posed to the federal law enforcement, not allowing them to
 5    do their job.
 6    Q.    And I think you mentioned earlier about the risk posed and
 7    the feeling of the commander, if I'm remembering your testimony
 8    correctly.  I think you mentioned that if the commander felt
 9    threatened.
10         Can you explain a little bit more when you are describing
11    if a commander felt threatened?  What is that -- what does that
12    entail, as far as you know, as the commander --
13    A.    Well, we use a --
14    Q.    -- of Task Force 51?
15    A.    Sure.  We use a thing in the military called mission
16    command.  That means the commander knows what their left and
17    right boundaries are.  They understand the mission.  They
18    understand the reason they were there:  either they were at a
19    facility to protect a federal facility or they were out on a
20    mission to protect federal law enforcement, allowing them to do
21    their job.
22         They have the ability on the ground to make decisions,
23    depending on how they sense how things are going.  And that's a
24    sense if they're feeling a threat, do they feel like the crowd
25    is hostile, do they feel like the law enforcement is prevented
```

122

SHERMAN - CROSS / LIN

```
 1   from doing their job, or that it could be a dangerous enough --
 2   something could be happening that they could actually hurt or
 3   endanger the law enforcement, then they had the ability to
 4   react.
 5   Q.   Okay.  So this is, from your description, you're
 6   talking -- am I correct to say that you're talking about they
 7   can conduct a risk assessment on the ground?
 8            MS. REILLEY:  Objection.  Leading.
 9            THE COURT:  Sustained.
10            MS. LIN:  Let me ask the question differently.
11   BY MS. LIN:
12   Q.   So when you say they felt threatened, I think you gave me
13   some explanation as to what that meant.  My question is:  Did
14   that -- what did it entail if you have to identify them?
15   A.   It was them on the ground, gauging from their own sense,
16   doing assessment, if you will, of how they felt the crowd was
17   reacting.  If they thought it was endangering the federal
18   agents, one, or preventing them from doing their job, then they
19   could act.
20   Q.   And did it actually -- did it have to be an actual threat
21   or was it -- that's my question.  Did it have to be an actual
22   threat?
23   A.   No.  It could be -- there could be a crowd that's pushing
24   up against the federal law enforcement, not allowing them to do
25   their job.  It's a preventive measure too.
```

SHERMAN - CROSS / LIN

1    Q.   Preventive measure?

2    A.   Sure.

3    Q.   So when you say "preventive measure," does that mean that

4    if there were no crowd, would it still be permissible?

5    A.   No.

6    Q.   -- as a preventive measure?

7    A.   So if there was no crowd, they wouldn't be going forward.

8    They'd be -- still the federal law enforcement have their

9    traffic control point.  There would be no reason.  They'd just

10   be standing behind them.  Very similar to some of the pictures

11   we saw.

12   Q.   I see.  So they would still be permitted to be standing

13   next to or behind -- I'm sorry -- standing behind law

14   enforcement?

15   A.   Correct.  Somewhere within a -- you know, a distance where

16   they could react quickly if the situation -- if something

17   happened and they deemed it necessary, they needed to react.

18        THE COURT:  I'm sorry.  I want to make sure I

19   understand that.

20        If there's no threat and there was never an expectation of

21   a threat, is it your testimony you could still have military

22   out on the operation?  If there was no threat.

23        THE WITNESS:  Well, the only -- Your Honor, the threat

24   we had, so that -- like those threat assessments that were put

25   up there as --

SHERMAN - CROSS / LIN

```
 1              THE COURT:  So let's say you got a threat assessment
 2     which said it was low or non-existent.
 3              THE WITNESS:  Sure.
 4              THE COURT:  Can you send out military?
 5              THE WITNESS:  Absolutely, Your Honor, because that's
 6     just an assessment of what we thought would happen on the
 7     ground, but it could -- it could get much worse.
 8              THE COURT:  So it's your testimony that whenever there
 9     is local law enforcement carrying out an operation, and even if
10     there is no threat, you can send the military out?
11              THE WITNESS:  Yes, sir, that's correct.  With this
12     mission, with the federal law enforcement -- because it was
13     just an assessment that they didn't think anything would
14     happen; but if something did happen, take, for instance, they
15     had a low -- a low assessment, there was one time we didn't --
16     we didn't have any force there, we actually had to respond.
17     They had a low threat assessment.  There was -- they didn't
18     think anything was going to happen, but they started to -- they
19     went to a house to -- to act on a warrant, and there was
20     actually a construction site across the street and that crowd,
21     actually the people from the construction site, came down and
22     started harassing the federal law enforcement officers.
23              THE COURT:  So that's a case in which a threat
24     developed.
25              THE WITNESS:  Yes, sir.
```

SHERMAN - CROSS / LIN

1    THE COURT:  Okay.  But my question is a different

2  question.  My -- and maybe it was anticipated that that's a

3  possibility, but if it's not -- if it's not seen as a situation

4  in which there is a threat, then is it your testimony you can

5  still deploy the military because there may be a threat in

6  carrying out the operation?

7    THE WITNESS:  That's correct, Your Honor.

8    THE COURT:  So, in other words, if you have -- let's

9  say you are executing the laws of the immigration -- the

10  immigration laws, which are, in certain circumstances,

11  unpopular, in certain contexts, unpopular --

12    THE WITNESS:  Right.

13    THE COURT:  -- but you have no evidence that there's a

14  threat or that people would constitute a threat.  Is it your

15  testimony you can send out the military on that operation?

16    THE WITNESS:  Yes, and we did, Your Honor.

17    THE COURT:  Okay.  Now, let's say you had cases

18  involving low compliance with the tax laws and you have a

19  person who is a tax protestor but there's no evidence that that

20  person constitutes a dangerous situation -- constitutes a

21  dangerous situation.  Send out military in that?

22    THE WITNESS:  Well, we never had a situation like

23  that, Your Honor.  We never supported the IRS on any type of

24  operation as far as going and anybody who was evading taxes.

25    THE COURT:  But it's a federal law.  I'm just trying

SHERMAN - CROSS / LIN

```
 1   to figure out, if you are enforcing -- if there is a federal
 2   law, such as the tax law or the immigration law or the drug
 3   laws, which are co-terminus federal and state, if you're
 4   enforcing these laws and there's some indication that the law
 5   is unpopular among the public or among the group that is the
 6   subject of the enforcement, is it your view you can send out
 7   the military in the -- that you can send out the military to
 8   support the operation?
 9           THE WITNESS:  Your Honor, if it was -- if it was in
10   line with the direction that we've gotten with both
11   the President's memo and the Secretary's memo and it was
12   supporting federal agencies or federal law enforcement beyond
13   DHS, that was performing functions and it was legally reviewed
14   and they deemed it a valid mission, we could do that.
15           THE COURT:  Well, I'm actually not asking you whether
16   the lawyers looked at it.
17           THE WITNESS:  Right.
18           THE COURT:  But maybe they would.  I assume that.
19       But I'm trying to figure out really what boundaries there
20   are established by the Posse Comitatus Act.
21       And I looked through the file, and I saw a very helpful
22   slide presentation of:  You can't do this.  You can't do that.
23   You can't do a third thing.  You can't do a fourth thing.
24   So -- and there are a number of things you can't do.
25       And essentially I'm trying to figure out whether you can
```

SHERMAN - CROSS / LIN

1    do any of those things when what the -- what the law

2    enforcement -- not the military -- the law enforcement is

3    trying to enforce an unpopular law.  Can you then, because it's

4    an unpopular law, use the Posse Comitatus -- I mean, use

5    federal forces?

6          THE WITNESS:  Well, I'm not a lawyer.

7          THE COURT:  Well, your judgment.  You're the one who's

8    telling me --

9          THE WITNESS:  Well, in my judgment, if it's -- if it's

10   in line and it also fits, according to the brief that you saw,

11   our standing rules on the use of force brief, which actually

12   had constitutional exceptions in there that's showing that

13   we're protecting federal property and enforcing federal law or

14   allowing personnel to enforce law, then we deemed it that it

15   was legally appropriate.

16         THE COURT:  Do you draw any distinction between

17   enforcing federal law and protecting federal property?

18         THE WITNESS:  No.  The -- well, so federal property

19   was -- part of that, Your Honor, was to protect federal

20   property from defacement, from being damaged, and to allow the

21   federal employees that were there, allow them to do their job.

22         THE COURT:  Well, but my question is a little

23   different.  I understand -- at the Roybal building, I

24   understand.  You know, I understand what -- this building.  I

25   understand federal property.

SHERMAN - CROSS / LIN

```
 1          THE WITNESS:  Right.
 2          THE COURT:  And I understand that there is -- there
 3   may be a particular role in protecting federal property, but
 4   I'm not talking about federal property.  I'm now talking about
 5   federal law, which, in some cases, obviously, involve federal
 6   property, but I'm talking about those cases in which it's not
 7   involved, MacArthur Park or some marijuana farm somewhere.
 8   Though there may be federal laws that are implicated, there's
 9   not federal property.
10          So if there are federal laws that are implicated and those
11   laws are unpopular laws and there is no threat, known threat,
12   to the military that there's going to be force used in
13   connection with the implementation of the law, is it your view
14   that you can send out the military?
15          THE WITNESS:  Yes, Your Honor, we could because it was
16   our view, because it was just an assessment that we had of the
17   situation on the ground, it could turn out to be differently,
18   happen very different.
19          THE COURT:  And that's true, isn't it, always the
20   case?  In other words, it's always the case you have an
21   assessment, a preincident assessment, and then you have the
22   reality of what happened.
23          Now, it doesn't -- the reality doesn't tell us what the
24   alternatives are, and I appreciate that.  But assessments that
25   are preincident or predeployment are done in advance, aren't
```

SHERMAN - CROSS / LIN

1   they?

2           THE WITNESS:  They are, Your Honor.

3           THE COURT:  They may turn out to be inaccurate in the

4   sense that actually circumstances develop different from what

5   the assessment would have been.

6           THE WITNESS:  Absolutely, Your Honor.  Could I further

7   explain on that?

8           THE COURT:  You sure can.  You go right ahead.

9           THE WITNESS:  So in the military --

10          THE COURT:  I don't want to cut you off.

11          THE WITNESS:  In the military, we develop plans.  We

12  tell very comprehensive plans.  You can see inside these books.

13  These are -- these -- all of these detailed plans, these were

14  all done by military planners because it's kind of the detail

15  planning that we need because we're very much -- we're very

16  much an NFL team, if you will.  We make sure that we plan in

17  detail both offense and defense, that we fully understand the

18  situation on the ground and that we're able to react.

19      In this case, we know that a plan only is good enough

20  until you actually -- it actually commences because we always

21  say the opposition has a vote.  Some things happen; and while I

22  wasn't there, we saw that at Camarillo.  We had had an

23  operation planned in RFA and two days before it happened, the

24  Border Patrol or CBP had canceled that RFA because the

25  assessment was that there wasn't going to be military needed at

SHERMAN - CROSS / LIN

```
 1    that location.
 2         Well, after the -- after the operation that happened at
 3    Carpinteria and all that being on the -- on the news and with
 4    the helicopters there, that's when a lot of people showed up.
 5    And then there was one instance where they actually -- well, at
 6    that instance at Camarillo, they actually had more illegal
 7    aliens than they originally thought was going to be there.  It
 8    was actually 300, which overwhelmed them right then.  And then
 9    they started having large crowds come to their traffic control
10    points; and right from there, that's when they -- yeah, they
11    had large crowds that came to their traffic control points.
12    And then from there, they knew they had a situation that they
13    needed extra help, and that's when they called Task Force 51 to
14    bring personnel in from our Mobile Response Force to help them
15    with the situation on the ground.  Because they knew they had a
16    very -- they had a crowd that was very upset, somewhat hostile,
17    and they needed help because they got overwhelmed.
18              THE COURT:  But they were called in when there was a
19    demonstrable threat.
20              THE WITNESS:  Correct.
21              THE COURT:  Okay.
22              THE WITNESS:  That's correct, Your Honor.
23              THE COURT:  Thank you.
24              THE WITNESS:  Yes.
25              THE COURT:  Thank you very much.
```

SHERMAN - CROSS / LIN

BY MS. LIN:

Q.   General Sherman, I think the judge posed the question about if a law is unpopular, how does that factor into your decision as the commander of Task Force 51.

My question to you is:  Who makes the law enforcement determination as to whether the law is unpopular or whether that law enforcement operation is a valid law enforcement operation?

A.   So that's happened at the IEC.  We don't have any part in that part of it.  The actual law enforcement operation, that was decided at the interagency coordination cell, along with the Attorney General that's there for that district, along with the FBI, along with all the federal agencies, they go through the process.

With our mission that we were given, we were there to go on the federal -- on their law enforcement missions to protect them when and if needed.

Q.   So you're not concerned, as part of your federal protection mission, as to whether the law is popular or unpopular?  That's not part of your consideration; is that correct?

A.   It was not.

        MS. REILLEY:  Objection.  Leading.

        THE COURT:  Sorry?

        MS. REILLEY:  I objected to the question as leading.

SHERMAN - CROSS / LIN

1          **THE COURT:**  I'll allow it.

2       Go ahead.

3          **THE WITNESS:**  No, that wasn't with our mission.  That

4    wasn't a part of -- we certainly don't do federal law

5    enforcement functions.  It's not our -- it is not our place to

6    make any determination.  That's federal law enforcement.  On

7    whether a law is popular or unpopular, they're enforcing

8    federal law.  It was our mission in this case to go along with

9    them, to partner with them, to be there to protect them if they

10   did encounter any hostile crowds or actions.

11   **BY MS. LIN:**

12   **Q.**  And the judge asked you earlier about the list of

13   activities, and you also -- in response, you mentioned the

14   standard -- standing rules for the use of force, and I believe

15   counsel also asked you about that.

16       Can I have you look at that exhibit, which has already

17   been admitted into evidence and is Exhibit Number 10?

18          **THE COURT:**  And the page is?

19   **BY MS. LIN:**

20   **Q.**  And the page number on that, if I could direct your

21   attention to page 1101; or to be more accurate, DEFS 00001101.

22       Do you see the section that's entitled "Constitutional

23   Exceptions"?

24   **A.**  I do.

25   **Q.**  Do you see if one of these items listed here -- and

SHERMAN - CROSS / LIN

1   there's one, two, three, four, five -- whether that describes

2   what you believe to be your current federal protection mission?

3   A.   Well, number two is from the protection of federal

4   property functions and personnel.

5   Q.   So in carrying out this -- in trying to protect federal

6   property functions and personnel, is it your view that you are

7   conducting law enforcement activities?

8   A.   No, not conducting law enforcement; protecting federal

9   property, functions, and personnel, allowing them to -- federal

10  personnel to do their job.

11  Q.   So just so I'm understanding your answer correctly, when

12  you're protecting federal personnel, does that involve the

13  federal personnel being on law enforcement missions that's

14  not -- that's at large?

15  A.   No.   They could be -- actually be federal personnel not on

16  mission.   That would be at the federal property, doing their

17  job.   But certainly, yes, if they were doing their federal law

18  enforcement job, it's protecting them, allowing them to do

19  their function, to do their federal law enforcement job, and to

20  protect them.

21  Q.   And so the judge asked you questions about the threat

22  assessment.   I think you gave one example or two examples.   One

23  was a search warrant and the other one was the Camarillo.

24       Is this the type of anticipated threat or actual threat

25  that is part of your consideration as whether to grant a

SHERMAN - CROSS / LIN

```
 1   request for assistance?  Or is it --
 2   A.   No.  No.  So I --
 3           THE COURT:  I'm sorry.  I don't understand the
 4   question.
 5           MS. LIN:  Let me rephrase it.  That was --
 6           THE COURT:  Is the existence of a search warrant part
 7   of the witness's consideration?  Is that your question?
 8           MS. LIN:  No, I'm sorry.  Your Honor, let me strike my
 9   question.
10           THE COURT:  Okay.
11           MS. LIN:  I'll ask a better question.
12   BY MS. LIN:
13   Q.   So we were talking earlier about the example of a search
14   warrant being carried out and also the Camarillo situation.
15       In both instances, I gather from your testimony was that
16   you didn't anticipate that there was going to be any threat,
17   but threat developed during the operation.  Am I correct?
18   A.   That's correct.
19   Q.   And so I think the judge's question to you was if there
20   were no such -- if you had no knowledge whether any threat was
21   going to occur, how does that factor into your decision whether
22   to grant the request for assistance?
23   A.   It really didn't.  It -- it came to -- it was really
24   determined that threat assessment that we did, those were
25   actually our staff that did that, that was what we thought was
```

SHERMAN - CROSS / LIN

```
 1    going to happen at the operation.
 2         It -- it played into -- especially with high risk, if
 3    that's where we -- that's where it needed to go up higher than
 4    me.  I approved everything moderate and below.  But anything of
 5    high risk or extremely high risk, it went to a higher commander
 6    just because we thought it was either a very risky operation to
 7    either federal law enforcement and/or our soldiers in this
 8    case, if it was an operation outside the federal facilities.
 9         But those -- that assessment was strictly our own.  It
10    played into just our risk we thought the operation was.  What
11    didn't play in, if we were going to protect them for an
12    operation.  They had the request.  They believed -- federal law
13    enforcement believed they wanted to have law enforcement -- or
14    they wanted to have military there to protect them in case.  It
15    was their belief that something could happen there.  So it
16    was -- and the operation totally abided by the law, as we saw
17    it, and that it was legal, then we went ahead and -- went ahead
18    and approved the operation.
19         THE COURT:  Well, General, let's take your example.
20    You said that there was a risk assessment which showed that it
21    was low, and that it didn't -- that the information that you
22    had, which was developed internally or developed by your forces
23    or the people who advise you --
24         THE WITNESS:  Correct.
25         THE COURT:  -- your staff, they said there's a low
```

SHERMAN - CROSS / LIN

```
 1    risk of force or violence.  That's what you're told.  And
 2    I think you gave two examples of it, or maybe one.  It escapes
 3    me at the present time.  Forgive me.  But that you were told by
 4    somebody that the forces should be employed, notwithstanding
 5    the risk assessment that you were given.  As I understand,
 6    that's your testimony.
 7               THE WITNESS:  Yeah.  As part of the risk --
 8               THE COURT:  Okay.
 9               THE WITNESS:  -- the request for assistance, the law
10    enforcement still would like military.
11               THE COURT:  And who told you -- who told you, in those
12    cases?  Who said to you, "General, I know you're the commander
13    of Task" -- what is it? -- "Task Force 51.  I know you're the
14    commander and I know you've received an assessment of no
15    danger, but I'm advising you that I want you, nevertheless, to
16    employ troops"?  Who told you that?
17               THE WITNESS:  Nobody talked to me directly if you say
18    it that way, for most operations, Your Honor, because it was a
19    request that they sent up.  They had gone through the
20    interagency coordination cell, through our personnel there and
21    had come to Task Force 51.  The law enforcement was asking for
22    military support.
23               THE COURT:  I understand, but the Task -- you say the
24    law enforcement.  The law enforcement is local; is that right?
25    When I say "local" --
```

SHERMAN - CROSS / LIN

```
 1          THE WITNESS:  No.
 2          THE COURT:  Pardon me.  The law enforcement is
 3    non-military that you're referring to?
 4          THE WITNESS:  Correct.  That's correct.
 5          THE COURT:  So non-military -- non-military people
 6    told you that they wanted your -- the military force to be
 7    present, notwithstanding the information you got from the
 8    military people?
 9          THE WITNESS:  Correct.  That -- well, they were
10    requesting.  They didn't tell me.  They requested.  They were
11    asking for military support.  Even if our assessment was low,
12    they had a belief or even if -- even if they thought it was
13    low, it was -- it was a safety measure for them to ensure that
14    if something did happen at that location, they had protection.
15          THE COURT:  And, General, wouldn't that always be the
16    case?  Whenever -- if it's even a low risk, if the civilian --
17    what I'm calling the civilian as distinct from the military --
18          THE WITNESS:  Yes, sir.
19          THE COURT:  -- the civilian may tell you, "You know,
20    we want military just in case" --
21          THE WITNESS:  Absolutely.
22          THE COURT:  -- "something happens."
23          THE WITNESS:  Absolutely, Your Honor.  They always
24    wanted military there, and we had plenty of capacity to do
25    that.
```

SHERMAN - CROSS / LIN

```
 1              THE COURT:  All right.  Okay.  I think that answers
 2    the question.  Thank you, General.
 3              THE WITNESS:  Yes, Your Honor.  Thank you.
 4              THE COURT:  Anything further?
 5              MS. LIN:  Yes, Your Honor.
 6              THE COURT:  Go ahead.
 7              MS. LIN:  Just a couple more points in relation to
 8    what was discussed earlier.
 9    BY MS. LIN:
10    Q.   I think if I could turn your attention to Exhibit 41 that
11    you were asked questions about.
12         Do you have it?
13    A.   I do.
14    Q.   I believe you were asked to read the last paragraph
15    earlier by counsel, and in this paragraph it mentions
16    establishing outer cordon.  Do you see that?
17    A.   I do.
18    Q.   Were Task Force 51 troops permitted to establish outer
19    cordon?
20    A.   Well, so you see there where the "End State.  Joint
21    federal and military companies," why -- I think it's poorly
22    written, poorly worded.  But joint federal and military
23    companies, when they say "federal," they meant joint federal
24    law enforcement and military companies.
25         In this case, military police companies established the
```

SHERMAN - CROSS / LIN

1   outer cordons, secured designated sites, enabling safe entry

2   for DEA personnel.

3   Q.   And you do not recall this particular operation or did

4   you?

5   A.   Oh, no, I know this operation.  This is the -- this is the

6   Mecca operation, yes.

7   Q.   So to be clear, what were the soldiers trained to do with

8   respect to the ability to establish outer cordons?

9   A.   So they were there -- so I think -- so there was a large

10  irrigation ditch, canal, outside this grow operation.  So they

11  were actually outside, lined up along the road there, and they

12  got out of their vehicle to watch the operation that was

13  happening inside the -- inside the grow area that was there.

14       There was only one place that they had a traffic control

15  point, and that was actually a bridge that crossed from the

16  canal over into the grow area.  We had soldiers there, but it

17  was run by federal law enforcement.  I don't know if it was DEA

18  or not.  But federal law enforcement ran that traffic control

19  point.

20       There was a news crew there.  There wasn't any -- they

21  didn't -- they didn't encounter any resistance at all or

22  anything.  It was one news crew because they had seen all the

23  vehicles coming down the road because they had come in from

24  March Air Reserve Base.  So it was about an hour and a half

25  drive, so there was plenty of people to see them and call.

SHERMAN - CROSS / LIN

```
 1    Q.    I see.  But as far as you know, do you whether law
 2    enforcement -- sorry -- whether Task Force 51 troops conducted
 3    any law enforcement activities?
 4    A.    They did not.  They didn't -- they just stayed on the
 5    outside.  They were not needed.  They were there to first
 6    protect the traffic control point; but if they did encounter --
 7    federal law enforcement encountered resistance inside of this
 8    large grow operation, their job was to go in to help them,
 9    protect them, break contact, if you will, if they were
10    receiving any kind of fire, and break contact and get them out
11    safely.
12    Q.    So, in your view, their activities were consistent with
13    what they were charged to do, which is the federal protection
14    mission?
15    A.    That's correct, yeah.  They were there to -- they were
16    there strictly to protect federal law enforcement as they did
17    their law enforcement jobs.
18    Q.    And just one last question also about the photographs that
19    we were talking about earlier.  If I can refer you to
20    Exhibit 69.  This is another picture that you were asked
21    questions about.
22    A.    Yes.
23    Q.    And just -- and this is another photograph I believe --
24    A.    I don't think it's up on the screen yet, but...
25    Q.    Oh.
```

SHERMAN - CROSS / LIN

1   A.    Yes.

2   Q.    So you were asked to -- or you were read to -- the caption

3   was read to you, and the second sentence of this caption

4   references establishing a security perimeter in Mecca,

5   California?

6   A.    Correct.

7   Q.    Is this reference to a security perimeter in Mecca,

8   California, consistent with the federal protection mission that

9   the Task Force 51 troops were charged with carrying out?

10  A.    No.  Is it a perimeter?  It's a perimeter because they

11  have their vehicles lined up right there because they're

12  actually down -- they're lined up on a road that actually --

13  you see right there in front of them is actually a canal.  You

14  can see that little part, which that means nobody could get

15  across -- anybody coming out of the grow operation couldn't get

16  across that canal unless they were swimming.

17      But they were there, lined up, just watching what was

18  going on inside the actual grow operation itself.  They had the

19  vehicles lined up.  If they did need to drive in from there, it

20  was just a lot of vehicles.  I think over 40 -- 40, 50

21  vehicles.  It was -- you know, precisely it was 314 soldiers.

22  So it was a lot of vehicles, a lot of soldiers there that were

23  lined up on both sides of the traffic control point there.

24  They were outside their vehicles, on alert.

25      There's another photo in here where you see them talking

SHERMAN - CROSS / LIN

 1    on -- there's some leaders talking on a radio.  So they were

 2    all in contact finding -- you know, just keeping up-to-date

 3    what was happening inside the grow operation.

 4        You're talking about, as I understand it, it was -- it was

 5    a land that was about 800 acres.  It was a very large

 6    operation.  And, you know, they heard everything going on the

 7    radios.  There was contact.  All the company commanders and

 8    above did have radios, so they could hear what law enforcement

 9    was talking about.

10        But -- and we did have intelligence -- I wouldn't call it

11    intelligence.  They just had -- law enforcement told us that

12    they had -- they thought that there were people inside this

13    operation, human smuggling, enslavement, if you will.  They

14    found I believe it was about 87 Chinese nationals that were

15    handcuffed inside -- inside buildings that were there not on

16    their own free will.

17  **Q.**   Okay.  So, to your knowledge, though, looking at this

18    photograph, it does not -- does it indicate to you whether this

19    is consistent with the federal protection mission?

20  **A.**   Yeah, with what this operation was because there was just

21    one small little area they could actually get across the canal

22    into the grow operation.  Yes, this was consistent.

23        Were they doing a cordon here?  No.  They were lined up,

24    ready to go if they needed to get called in.  They just

25    happened to be lined up that way.

SHERMAN - REDIRECT / REILLEY

```
 1          MS. LIN:  I have no further questions, Your Honor, but
 2   we do have General Sherman as our case-in-chief tomorrow.
 3          THE COURT:  Yes.  However, I assume the testimony he
 4   will give tomorrow will not be cumulative to what he gave
 5   today.
 6          MS. LIN:  We'll certainly attempt to do that other
 7   than to bring in the topic or the background.
 8          THE COURT:  I'll aid you in that endeavor, I promise.
 9          MS. LIN:  We appreciate that, Your Honor.
10          THE COURT:  Okay.  All right.
11      You may cross.
12          MS. REILLEY:  Thank you, Your Honor.
13                    REDIRECT EXAMINATION
14   BY MS. REILLEY:
15   Q.   Major General Sherman, you were not present when
16   Sergeant Murray took any of the photographs that were published
17   to the DVIDS website; correct?
18   A.   I was not.
19   Q.   All right.  And so you don't have any information about
20   where Sergeant Murray was standing relative to the troops when
21   he took those photographs?
22   A.   No, I wouldn't say that.  Did I know his directions that
23   he was given by the public affairs officer of Task Force 51 to
24   make sure that he got soldiers -- or he got pictures of
25   soldiers?  I know that for a fact because I was -- I was, like,
```

SHERMAN - REDIRECT / REILLEY

1  "Where are the pictures of soldiers?  We need pictures of them

2  doing their duty."

3  **Q.**   So you know what the instructions he was given were, but

4  you don't know physically where he was standing when he took

5  the photographs; correct?

6  **A.**   No, I don't.  I could make an assumption, but I don't

7  know.

8  **Q.**   You testified a moment ago that Task Force 51 troops never

9  used their batons to hit during the deployment, but you were

10  not present during any of the field operations; correct?

11  **A.**   That's correct.

12  **Q.**   And you do not know if batons were used for any other

13  purpose, such as to block pedestrian foot traffic; correct?

14  **A.**   There was no report ever brought up to me on that.

15  **Q.**   All right.  Again, you weren't present on those

16  operations, so unless a report was brought to you, you would

17  not have heard about it; correct?

18  **A.**   Correct.

19  **Q.**   You testified a moment ago about Exhibit 38, which was the

20  briefing from the Long Beach operation, and you testified that

21  law enforcement was in the lead on that operation.  Do you

22  recall that testimony?

23  **A.**   I do.

24  **Q.**   You were not present at that operation; correct?

25  **A.**   I was not.

**SHERMAN - REDIRECT / REILLEY**

1   Q.   And you testified earlier today that you did not receive

2   any briefing after that operation; correct?

3   A.   I did not.

4   Q.   So you do not know for a fact that the troops did actually

5   stay behind federal law enforcement agents during that

6   operation; correct?

7   A.   That is correct.

8   Q.   And you also don't know for a fact that the individual who

9   drafted that report is 23 years of age; correct?

10  A.   He's a young second lieutenant, so he could be -- I don't

11  know his exact age, but he's young.  I remember him.  He's a

12  very young officer.

13  Q.   And you testified with Ms. Lin a moment ago that there are

14  constitutional exceptions to the Posse Comitatus Act; is that

15  your understanding?

16  A.   That's what we've been trained, yes, with the standard

17  rules on the use of force briefing, correct.

18  Q.   And, again, you're not a lawyer; correct?

19  A.   That is correct, I'm not a lawyer.

20  Q.   So you could not point me to the portion of the

21  Constitution that sets forth the exception you've been

22  testifying about today; correct?

23  A.   I cannot.

24  Q.   And you testified about the training slides that

25  Task Force 51 reviewed.  That was Exhibit 10.  Those slides

SHERMAN - REDIRECT / REILLEY

1  were drafted by the staff judge advocate for Task Force 51;

2  correct?

3  **A.**   For, I believe, Army North.  Army North did the slides.

4  **Q.**   And that individual who drafted the slides, the staff

5  judge advocate is a lawyer; correct?

6  **A.**   Correct.

7          **MS. REILLEY:**  Plaintiffs do not have any further

8  questions at this time.

9          **THE COURT:**  Thank you.

10     Anything further?

11         **MS. LIN:**  No, Your Honor.

12         **THE COURT:**  Okay.  Thank you very much, General, and

13  you're excused from this portion, but you may remain in the

14  courtroom.

15         **THE WITNESS:**  Thank you, Your Honor.

16                    (Witness excused.)

17         **THE COURT:**  All right.  Call your next witness.

18         **MS. LOPEZ:**  Good afternoon, Your Honor.  Lorraine

19  Lopez, Deputy Attorney General, for the plaintiffs.

20     We would like to call Ernesto Santacruz Jr. as our next

21  witness.

22         **THE COURT:**  Okay.  And let's see.  Yes, please would

23  you bring him in?

24                    (Pause in proceedings.)

25         **THE COURT:**  And is this your third and final witness,

SANTACRUZ - DIRECT / LOPEZ

1    or do you have four?

2            **MS. LOPEZ:**  Yes, Your Honor.

3            **THE COURT:**  Okay.  Thank you.

4                    (Pause in proceedings.)

5     (Witness enters the courtroom and steps forward to be sworn.)

6                    <u>**ERNESTO SANTACRUZ**</u>,

7    called as a witness for the Plaintiffs, having been duly sworn,

8    testified as follows:

9            **THE WITNESS:**  Yes.

10           **THE COURTROOM DEPUTY:**  Thank you.  You may be seated.

11      Please state your full name for the record and spell your

12   last name.

13           **THE WITNESS:**  Ernesto Santacruz.  Last name

14   S-a-n-t-a-c-r-u-z.

15           **MS. LOPEZ:**  Thank you.

16                    <u>**DIRECT EXAMINATION**</u>

17   **BY MS. LOPEZ:**

18   **Q.**   And nice to see you again, Mr. Santacruz.

19      You are currently employed by U.S. Immigration and

20   Customs Enforcement; correct?

21   **A.**   That is correct.

22   **Q.**   And you are employed in Enforcement and Removal Operations

23   specifically; correct?

24   **A.**   Yes, that is correct.

25   **Q.**   And that is sometimes referred to as ERO; correct?

SANTACRUZ - DIRECT / LOPEZ

```
 1    A.    That is correct.

 2    Q.    And ICE is a U.S. federal law enforcement agency; correct?

 3    A.    That is correct.

 4    Q.    And it is overseen by the Department of Homeland Security?

 5    A.    That is correct.

 6    Q.    You previously provided two separate declarations in

 7    support of the defendants' case; correct?

 8    A.    I provided three.  You're talking about for this specific

 9    case?

10    Q.    For this specific case.

11    A.    I believe it was three.

12    Q.    And when you say "three," do you mean your two

13    declarations and a deposition?

14    A.    I provided the initial declaration and I believe it was

15    two supplementals.

16    Q.    Okay.  And you also had a deposition in this case;

17    correct?

18    A.    That is correct.

19    Q.    Okay.  And that occurred on July 24th, 2025?

20    A.    I don't recall exactly the date.  I'm sorry.

21    Q.    It's okay.  However, since then, you have had an

22    opportunity to review your testimony; correct?

23    A.    Yes, I have.

24    Q.    Okay.  And, to your knowledge, no changes have been made

25    to the substance of your testimony; correct?
```

149

SANTACRUZ - DIRECT / LOPEZ

```
 1   A.    I think there were just a few minor changes that were made
 2   on there, if I remember correctly.
 3   Q.    Thank you.
 4         And you are currently the field office director for
 5   Enforcement and Removal Operations in Los Angeles; correct?
 6   A.    That is correct.
 7   Q.    And you've been in this position since April 6, 2025?
 8   A.    That is correct.
 9   Q.    You've held several other positions at ICE and its
10   predecessor, Immigration and Naturalization Services, since
11   2002; correct?
12   A.    Yes, that is correct.
13   Q.    Okay.  And you were previously the deputy field office
14   director for Enforcement and Removal Operations in L.A.?
15   A.    Yes.
16   Q.    You were the assistant or acting assistant field office
17   director for Enforcement and Removal Operations?
18   A.    Yes.
19   Q.    You were also a supervisory detention and deportation
20   officer?
21   A.    Yes.
22   Q.    And you were also a deportation officer in Los Angeles?
23   A.    Yes.
24   Q.    And you were an immigration enforcement agency [sic] also
25   in Los Angeles?
```

SANTACRUZ - DIRECT / LOPEZ

1   **A.**   Can you repeat that?  I'm sorry.

2   **Q.**   You were also an immigration enforcement agent in

3   Los Angeles?

4   **A.**   Yes.

5   **Q.**   And you were a detention enforcement officer for INS?

6   **A.**   Yes.

7   **Q.**   So overall, you've had approximately how many years of

8   experience?

9   **A.**   With?

10  **Q.**   With ICE.

11  **A.**   This current agency?

12  **Q.**   Yes.

13  **A.**   With this current agency, along with legacy Immigration

14  and Naturalization Service, slightly over 23 years.

15  **Q.**   And you have served in the military; correct?

16  **A.**   That is correct.

17  **Q.**   And you served in the U.S. Army?

18  **A.**   That is correct.

19  **Q.**   How long did you serve for?

20  **A.**   Three years.

21  **Q.**   And what was the highest rank you held?

22  **A.**   E4, specialist.

23  **Q.**   All right.  Enforcement and Removal Operations is a unit

24  of U.S. Immigration and Customs Enforcement; correct?

25  **A.**   Correct.

SANTACRUZ - DIRECT / LOPEZ

1   Q.   And you are familiar with Homeland Security

2   Investigations, also referred to as HSI; correct?

3   A.   That is correct.

4   Q.   Okay.  Are they also a unit of Immigration and Customs

5   Enforcement?

6   A.   Yes.

7   Q.   Homeland Security Investigations also engages in

8   immigration-related law enforcement?

9   A.   Yes.

10  Q.   Los Angeles Enforcement and Removal Operations is

11  responsible for immigration enforcement within a specific

12  region; correct?

13  A.   That is correct.

14  Q.   And that is referred to as Enforcement and Removal

15  Operations area of responsibility; correct?

16  A.   Can you repeat that one more time, please.

17  Q.   This is referred to as Enforcement and Removal Operations

18  area of responsibility?

19  A.   Area of responsibility is just an area that a specific

20  field office covers.  Enforcement and Removal Operations is an

21  agency that deals with enforcing the immigration laws within

22  the interior of the United States.

23  Q.   So the area of responsibility for your office encompasses

24  the Central District of California; correct?

25  A.   Yes, that is correct.

SANTACRUZ - DIRECT / LOPEZ

```
 1   Q.   And that is an area of 36,000 square miles?

 2   A.   Approximately, yes.

 3   Q.   And it includes seven counties; correct?

 4   A.   That is correct.

 5   Q.   It includes San Luis Obispo County?

 6   A.   Yes.

 7   Q.   Ventura County?

 8   A.   Yes.

 9   Q.   Santa Barbara County?

10   A.   Yes.

11   Q.   San Bernardino County?

12   A.   Yes.

13   Q.   Riverside County?

14   A.   Yes.

15   Q.   Los Angeles County?

16   A.   Yes.

17   Q.   And Orange County; correct?

18   A.   Correct.

19   Q.   Okay.  You also oversee suboffices in San Bernardino,

20   Camarillo, and Santa Ana; correct?

21   A.   Correct.

22   Q.   And you oversee just over 500 personnel?

23   A.   No.  It's approximately --

24   Q.   Oh, sorry.  Just under 500 personnel?

25   A.   Yes.
```

SANTACRUZ - DIRECT / LOPEZ

1   Q.   And you oversee two detention centers as well?

2   A.   Correct.

3   Q.   And both of those are in Adelanto?

4   A.   That is correct.

5   Q.   As part of your responsibilities as Los Angeles field

6   office director, you oversee all Enforcement and Removal

7   Operations immigration enforcement actions that take place in

8   the area of responsibility; correct?

9   A.   In the Central District, yes, that is correct.

10  Q.   And your office is in Los Angeles?

11  A.   Yes.

12  Q.   As the field office director, you are kept informed of all

13  Enforcement and Removal Operations immigration enforcement

14  operations taking place in the area of responsibility; correct?

15  A.   Correct.

16  Q.   And that includes being informed of joint operations with

17  other federal law enforcement agencies even if Enforcement and

18  Removal Operations isn't the lead agency; correct?

19  A.   I have some knowledge to it, yes.

20  Q.   You were first told on the morning of June 8th, 2025, that

21  the federalized National Guard and Marines would be deployed to

22  Los Angeles; correct?

23  A.   That is correct.

24  Q.   Okay.  And you were first informed by Homeland Security

25  Investigations' counterpart, named John Pasciucco, over

SANTACRUZ - DIRECT / LOPEZ

```
 1    telephone; correct?
 2    A.    That is correct.
 3    Q.    You understood that the deployed troops were there to
 4    protect federal property or to protect federal officers in the
 5    event something went wrong; correct?
 6    A.    That is correct.
 7    Q.    The information that you received is that the federalized
 8    National Guard and Marines were in Los Angeles to protect
 9    federal property and to protect personnel and that was it;
10    correct?
11    A.    Initially it was just the National Guard when I was
12    informed.
13    Q.    And the Department of Defense did not explain what
14    "protect" means?
15    A.    Protect?
16    Q.    Yes.
17    A.    They did not specify as far as what protection.  I know
18    that they mentioned that they were there to protect federal
19    property and federal personnel.
20    Q.    And you were not told what the Department of Defense can
21    and cannot do to protect Enforcement and Removal Operations
22    officers; correct?
23    A.    Not to my knowledge.
24    Q.    And you do not know what the federalized troops did to
25    protect federal officers related to that request; correct?
```

SANTACRUZ - DIRECT / LOPEZ

 1    **A.**   That is correct.

 2    **Q.**   And you did not witness what the federalized troops

 3    actually did to protect federal officers; correct?

 4    **A.**   Not personally.  I wasn't on the ground to oversee that.

 5    **Q.**   ICE Enforcement and Removal Operations request assistance

 6    from the federalized National Guard through a request for

 7    assistance, known as an RFA; correct?

 8    **A.**   Correct.

 9    **Q.**   There is required information you must include in these

10    requests; correct?

11    **A.**   That is correct.

12    **Q.**   You had to include the purpose and the need for the

13    protection -- I'm sorry -- for the request?

14    **A.**   Correct.

15    **Q.**   And those requests are submitted to a Department of

16    Defense liaison?

17    **A.**   That is correct.

18    **Q.**   If a request was denied, are you provided with an

19    explanation?

20    **A.**   I have never received any denials from any requests that I

21    personally made.

22    **Q.**   And you personally only submitted two requests for

23    assistance; correct?

24    **A.**   I provided, yes, that is correct, two and then just

25    follow-ups.

SANTACRUZ - DIRECT / LOPEZ

1  Q.   Okay.  And you would be made aware of any request for

2  assistance originating from Enforcement and Removal Operations

3  even if you were not the person submitting the request for

4  assistance; correct?

5  A.   Correct.

6  Q.   And you do not know how many requests for assistance were

7  submitted by Enforcement and Removal Operations; correct?

8  A.   I do not have the number of that.

9  Q.   You do not know how many requests for assistance by

10 Enforcement and Removal Operations were granted in total;

11 correct?

12 A.   My understanding is the requests that we made -- I'm not

13 sure exactly how many were -- were all granted.  I've never

14 received any information of any being denied.

15 Q.   Okay.  But you don't know the exact number; correct?

16 A.   I do not.

17 Q.   As the field officer -- sorry -- field director for ICE

18 Enforcement and Removal Operations for this region, you oversee

19 the personnel making the request for assistance; correct?

20 A.   Correct.

21 Q.   And you also oversee the planning and operations for

22 immigration operations conducted by your office; correct?

23 A.   Regarding for ERO?  Correct.

24 Q.   Yes.

25      On or about June 8th, 2025, you submitted a request for

**SANTACRUZ - DIRECT / LOPEZ**

```
 1   assistance to the Department of Defense; correct?
 2   A.   I don't recall exactly what the date was, but I do recall
 3   making requests.
 4   Q.   Would it refresh your recollection if you took a look at
 5   your deposition transcript?
 6   A.   Yes.
 7   Q.   Okay.  So I'm going to -- there is a binder and it's the
 8   third one at the bottom there.
 9   A.   This one?
10   Q.   Yes.  And that is Volume 7 -- I'm sorry -- Volume 5,
11   Exhibit 99.  So turn -- once you're ready, let me know.
12   A.   Can you repeat what --
13   Q.   Sure.  So you're going to turn to Tab 99.
14          THE COURT:  What page?
15          MS. LOPEZ:  The very first page, Your Honor, of
16   Tab 99.
17   BY MS. LOPEZ:
18   Q.   All right.  So, again, you took this deposition on
19   July 24th.  And when you took the deposition, you took an oath;
20   correct?
21   A.   Yes.
22   Q.   And you took an oath to tell the truth; correct?
23   A.   Correct.
24   Q.   And since taking your deposition, you reviewed the
25   transcript; correct?
```

SANTACRUZ - DIRECT / LOPEZ

```
 1   A.   Correct.
 2   Q.   And you signed it to show you approved of what was in it;
 3   correct?
 4   A.   Say that one more time.
 5   Q.   You -- I'm sorry.
 6        You reviewed the transcript and signed it to show that you
 7   approved of what was in it; correct?
 8   A.   Correct.
 9   Q.   All right.  Okay.  So now if you can turn -- apologies.
10        Okay.  If you can turn to page 27.  All right.  And
11   starting at line 3, I ask [as read]:
12            "You are" --
13        Sorry.  You say [as read]:
14        "ANSWER:  You are asking specifically for me on what I
15        requested?
16        "QUESTION:  Correct, yes.  What kind of assistance would
17        ICE be requesting?  What would be that process?"
18        So the question is [as read]:
19        "QUESTION:  Correct, yes.  What kind of assistance would
20        ICE be requesting?  What would be that process?"
21            THE COURT:  What is your question?
22            MS. LOPEZ:  I'm sorry, Your Honor.  I think I have the
23   wrong page on here.
24        Actually, strike that, Your Honor.  That is the wrong
25   citation and wrong page.
```

SANTACRUZ - DIRECT / LOPEZ

```
 1          Actually, turn to page 149.
 2                THE COURT:  149?
 3                MS. LOPEZ:  Yes.
 4                THE COURT:  Okay.
 5                MS. LOPEZ:  Apologies for that.
 6     BY MS. LOPEZ:
 7     Q.   Are you on page 149?
 8     A.   I'm getting there.
 9     Q.   Okay.  Let me know when you get there.
10     A.   (Witness examines document.)  Okay.
11     Q.   Okay.  So if we go to line 7, the question reads [as
12     read]:
13          "QUESTION:  Now, as far as the request that you do
14          remember making, you said it was early on.  How early on
15          was it?"
16          And the answer is [as read]:
17          "ANSWER:  Shortly after June 8.  If not on June 8, shortly
18          after that."
19          Is what I read accurate?
20     A.   That is correct.
21     Q.   Okay.  Does that refresh your recollection?
22     A.   Yes.
23     Q.   Okay.  So the request for federalized National Guard
24     personnel to protect federal officers conduct -- is for
25     protecting federal officers conducting at-large operations;
```

SANTACRUZ - DIRECT / LOPEZ

1    correct?

2    **A.**    Correct.

3    **Q.**    And "at-large operations" means Enforcement and Removal

4    Operations everyday routine arrests in the field; correct?

5    **A.**    Correct.

6    **Q.**    This includes immigration raids and arrests of individuals

7    who are not the targets but are apprehended during an

8    operation; correct?

9    **A.**    Well, we don't do immigration raids.  We do at-large

10   operations.

11   **Q.**    Does at-large operations sometimes include joint

12   operations with other federal law enforcement agencies?

13   **A.**    Yes.

14          THE COURT:  What do you mean "at-large operations"?

15          THE WITNESS:  Your Honor, at-large operations means

16   that we are conducting and going after criminal aliens or any

17   individual that has violated immigration law out into the

18   field.

19          THE COURT:  So the distinction you draw between an

20   immigration raid, which you say you don't do, and an at-large

21   operation, which you say you do --

22          THE WITNESS:  Right.

23          THE COURT:  -- is what exactly?

24          THE WITNESS:  So a raid would be, in my opinion,

25   somewhere where you would go and just start raiding a certain

SANTACRUZ - DIRECT / LOPEZ

1    location versus you're going after different individuals that

2    you are having some known or idea or intelligence that they are

3    in the country illegal or maybe a certain target.  So it's

4    targeted operations where we go after a specific individual.

5           THE COURT:  So the defining line between the two types

6    of operations are, in an immigration raid, you don't have

7    information that any individuals who would be subject to that

8    operation are illegal or undocumented aliens, whereas an

9    at-large operation, you have received information of some kind

10   that individuals are undocumented?  Is that the -- I'm just

11   trying to figure out the distinction because you said you don't

12   do one; you do another.  So I want to make sure I understand

13   what it is that defines the difference between the two.

14          THE WITNESS:  No, I understand, Your Honor.

15      So at-large operations, whether it be targeted enforcement

16   operations, is someone that we do have information on that's

17   either in the country illegally or has a final order of

18   deportation or is in some type of process that an immigration

19   judge has already deemed them unfit to be in the country.

20          THE COURT:  Specific information.

21          THE WITNESS:  Specific information.

22      As far as raids, we don't conduct raids.  What raids, in

23   my opinion, would be something along the lines if we were just

24   to go to a specific area and just raid a -- let's say, for

25   example, like a worksite enforcement ERO.

SANTACRUZ - DIRECT / LOPEZ

```
 1            THE COURT:  Pardon me?
 2            THE WITNESS:  A worksite enforcement, for example,
 3    would not be a -- something that ERO does, Enforcement and
 4    Removal Operations, because we typically just deal with
 5    targeted or at-large operations, is what we've known it to be.
 6            THE COURT:  Okay.  Thank you.
 7    BY MS. LOPEZ:
 8    Q.   So just to be clear, ERO does not conduct raids; correct?
 9    A.   That is correct.
10    Q.   Who does conduct those?
11    A.   I don't know anyone who actually conducts raids.
12    Q.   And going back to your June 8th request, was that request
13    accepted?
14    A.   The one that I personally made, yes.
15    Q.   And the same day that the request you made on June 8th was
16    approved, was there a meeting?
17    A.   Just so -- to clarify, I'm not exactly sure if it happened
18    on June 8th or shortly after June 8th, but the ones that I did
19    make shortly after were approved.  And I didn't get the last
20    part of the question.  I'm sorry.
21    Q.   Was there a meeting after the one that you believe to have
22    been requested on June 8th?  There was a meeting; correct?
23            MR. HARTLIEB:  Objection.  Vague as to whether there
24    was a meeting.
25            THE COURT:  I'm sorry.  You say the term "meeting" is
```

SANTACRUZ - DIRECT / LOPEZ

1  vague?

2        MR. HARTLIEB:  Yes, Your Honor.

3        THE COURT:  Okay.  So can you clarify -- fine.

4     Can you clarify what you mean by "meeting" in the

5  question?  Just be more specific.

6        MS. LOPEZ:  Yes.

7  BY MS. LOPEZ:

8  Q.   There was a follow-up meeting about the request; correct?

9  A.   I don't believe there was a follow-up meeting right there

10 and then.  I'm sure there may have been a follow-up meeting the

11 very next day.  I can't -- I would defer to DOD if they had any

12 internal meetings on that.

13 Q.   So let's go back to your deposition transcript then.  So

14 if you can go to page 26, and let me know when you get there.

15 A.   (Witness examines document.)  Okay.

16 Q.   All right.  And I'm going to bring your attention to

17 line 7.  The question posed was [as read]:

18       "QUESTION:  When did you find out the purpose of the

19       deployment to Los Angeles?"

20       And on line --

21       MR. HARTLIEB:  Your Honor, if I may just interject.

22 I'm not sure that we are working on the same deposition

23 transcript.  My line 7 on page 26 does not contain that

24 language.

25       THE COURT:  Mine does.  Well, let's clarify.  I mean,

SANTACRUZ - DIRECT / LOPEZ

```
 1    counsel is entitled to --

 2            MS. LOPEZ:  Yes, Your Honor.

 3            THE COURT:  -- to have the correct version.  Is there

 4    another version of the deposition?

 5            MS. LOPEZ:  So there was a corrected version,

 6    Your Honor, and it is labeled --

 7            THE COURT:  Okay.  Let's just take a moment.

 8    Everybody get on the same page.  And if you'd like, Counsel,

 9    you can just stand right next to her and look at it.  That's

10    fine.

11        So it's Exhibit -- Exhibit 99?

12            MS. LOPEZ:  Exhibit 99.

13            THE COURT:  Page 26, line 7.

14            THE WITNESS:  Your Honor?  Can I get some water,

15    Your Honor?

16            THE COURT:  Pardon me?

17            THE WITNESS:  Can I get some water?

18            THE COURT:  Oh, absolutely.  Help yourself.

19            THE WITNESS:  Thank you.

20            THE COURT:  It's Hetch Hetchy.  It's very good water

21    we have in San Francisco.

22            MR. HARTLIEB:  Thank you, Your Honor.

23            THE COURT:  It's designer water.

24            MR. HARTLIEB:  Thank you for the indulgence.  I'm on

25    track.
```

SANTACRUZ - DIRECT / LOPEZ

```
 1          THE COURT:  Okay.  Question, line 7 [as read]:
 2       "QUESTION:  When did you find out the purpose of
 3       deployment to Los Angeles?"
 4       You were about to give the answer.
 5          MS. LOPEZ:  Yes.
 6  BY MS. LOPEZ:
 7  Q.   And the answer was [as read]:
 8       "ANSWER:  I think after the morning, they showed up.  In a
 9       meeting, we were told that they were going to be here to
10       protect and assist Federal Protective Service and the
11       security of federal property."
12       What I read, is that accurate?
13  A.   Yes.
14  Q.   Okay.  Thank you.
15       So at that meeting, you were told the purpose of the
16  deployment; correct?
17  A.   Correct.
18  Q.   But you were not given full information as to the
19  activities that the National -- the federalized National Guard
20  could engage in to fulfill the request; correct?
21  A.   For what specific reason?
22  Q.   For -- you were not given information as to the activities
23  that the federalized National Guard could engage in to fulfill
24  your request?
25  A.   My personal request for at-large operations?
```

SANTACRUZ - DIRECT / LOPEZ

1  Q.   Correct.

2  A.   Yes.  They were told that they were there to provide

3  protection for the federal officers that were conducting

4  at-large operations.

5  Q.   But you were not provided any other information aside from

6  that; correct?

7  A.   That is correct.

8  Q.   Okay.  And troops accompanied your ERO officers on the

9  majority of operations; correct?

10  A.   That is correct.

11  Q.   Roughly about 75 percent; correct?

12  A.   That was an approximate estimate that I gave during my

13  deposition, yes.

14  Q.   Thank you.

15      This was the case up until about four weeks ago; correct?

16  A.   In terms of what?

17  Q.   In terms of having federalized National Guard troops

18  accompany your ERO officers?

19  A.   Approximately, yes.

20  Q.   Okay.  And at that time, their participation started to

21  decrease in Enforcement and Removal Operations, at-large

22  operations; correct?

23  A.   Regarding the National Guard of --

24  Q.   The federalized National Guard.

25  A.   Yes.

SANTACRUZ - DIRECT / LOPEZ

1   **Q.**   So your request for assistance, did that cover all

2   Enforcement and Removal Operations, at-large operations, from

3   the date you made the request up until the time their

4   participation started to decrease?

5   **A.**   No.

6   **Q.**   What time period did the request for assistance cover?

7   **A.**   I'm not sure exactly what period it covered.  There was a

8   period there where I took leave; and upon my return from leave,

9   it had already scaled down.

10   **Q.**   To your knowledge, was your personal request for

11   assistance still ongoing before you went on leave?

12   **A.**   Yes, I believe so.

13   **Q.**   And requests for assistance are typically made in advance

14   of each non-at-large Enforcement and Removal Operations

15   operation; correct?

16   **A.**   So just to clarify, any request that I made was for an

17   ongoing period.  Any other requests that needed to be made,

18   please keep in mind that there's other federal law enforcement

19   agencies that made their own requests, and I would defer to

20   those specific agencies.

21   **Q.**   And just for continuing questions, I will only be asking

22   you about Enforcement and Removal Operations --

23   **A.**   Okay.  Understood.

24   **Q.**   -- requests.  Okay?

25   So going back to your request for assistance for at-large

SANTACRUZ - DIRECT / LOPEZ

1   operations, you do not know what the federalized National Guard

2   did during those operations to provide protection; correct?

3   A.   I don't have that firsthand knowledge as I was not on the

4   ground during those daily at-large operations.

5   Q.   And you do not know what activities the federalized

6   National Guard engaged in on the ground to protect Enforcement

7   and Removal Operations agents; correct?

8   A.   I do not know specifically how they did it.

9   Q.   Okay.  And you also made a request for assistance for the

10  Adelanto facility; correct?

11  A.   That is correct.

12  Q.   Okay.  And this request was in response to reports of

13  potential protests at the Adelanto facility; correct?

14  A.   That is correct.

15  Q.   And that request was approved as well?

16  A.   Yes, it was.

17  Q.   And the protesters didn't yield as expected at the

18  Adelanto facility; correct?

19  A.   We did have protesters, but not to the scale where we

20  anticipated.

21  Q.   And you don't know what the federalized National Guard

22  troops actually did in response to that request; correct?

23  A.   I do not know what they actually did there.  I would defer

24  to DOD or FPS, who oversees that portion of protecting federal

25  properties.

SANTACRUZ - DIRECT / LOPEZ

1  Q.   And you're going to have an opportunity to add anything

2  else you'd like during direct, but for my questions, a lot of

3  this is going to be "yes" or "no."  Okay?

4  A.   Okay.

5  Q.   You have not received any information regarding Department

6  of Defense staff intervening and protecting Enforcement and

7  Removal Operations agents during any request for assistance;

8  correct?

9  A.   Intervening?

10  Q.   Yes.

11  A.   Is that how I understood it?

12      Okay.  I have no reports or any knowledge to that.

13  Q.   The federalized troops provide a safety blanket for

14  Enforcement and Removal Operations officers conducting

15  operations; correct?

16  A.   Correct.

17  Q.   And the federalized National Guard troops served as a

18  quick reaction force during immigration enforcement operations;

19  correct?

20  A.   Correct.

21  Q.   Prior to the federalized National Guard deployment, a

22  quick reaction force to provide protections for Enforcement and

23  Removal Operations agents was staffed with your own personnel;

24  correct?

25  A.   It depends on what type of operation we were conducting.

SANTACRUZ - DIRECT / LOPEZ

1   Q.   And it also depended on whether you had the capacity;

2   correct?

3   A.   Correct, depending on the specific operation that we were

4   conducting.

5   Q.   In that case, a quick reaction force could be anybody;

6   correct?

7   A.   It can be anybody, yes.

8   Q.   And you do not know what the quick reaction force engages

9   in because you were not on the ground during enforcement

10  operations during the National Guard deployment; correct?

11  A.   Specifically to National Guard?

12  Q.   Yes.

13  A.   They were there to protect federal officers and federal

14  property.

15  Q.   But you do not know the specifics of what they were doing

16  during those deployments; correct?

17  A.   No.  As I mentioned before, I was not on the ground.

18  Q.   Having the federalized National Guard serve in this role

19  was helpful to Enforcement and Removal Operations; correct?

20  A.   Correct.

21  Q.   And it helped to ensure that Enforcement and Removal

22  Operations were not impeded by the public or protests; correct?

23  A.   Correct.

24  Q.   And it helped your Enforcement and Removal Operations

25  officers to be able to conduct -- or make arrests without

SANTACRUZ - DIRECT / LOPEZ

1  having the public or anyone else hinder or impede or assault

2  them during at-large operations; correct?

3  A.    That is correct.

4  Q.    Okay.  And having their presence out there in the event of

5  something happening, allowing your officers to safely conduct

6  their work without having to worry about protesters, violent

7  protesters, that might impede their ability to effect an arrest

8  while conducting at-large operations; correct?

9  A.    That is correct.

10 Q.    Having the federalized National Guard present during

11 operations at large was a huge deterrent to the public;

12 correct?

13 A.    Yes.

14 Q.    The mere presence of the federalized National Guard could

15 be a deterrent to members of the public considering hindering

16 an arrest; correct?

17 A.    Correct.

18 Q.    At this time, I would like to reintroduce what has been

19 previously admitted and marked as Exhibit 53.  So if you can go

20 to Volume 3 of the binders.

21         THE COURT:  53?

22         MS. LOPEZ:  Yes, Your Honor.

23                 (Pause in proceedings.)

24         MS. LOPEZ:  And we will be displaying that document

25 shortly.

SANTACRUZ - DIRECT / LOPEZ

1  BY MS. LOPEZ:

2  Q.  So you're going to go to Tab 53.

3  A.  (Witness examines document.)

4  Q.  Okay.  And you see the photo on the page there?

5  A.  Yes.

6  Q.  You've seen this photograph before; correct?

7  A.  Yes.

8  Q.  In the photo on the right side of the two individuals in

9  camouflage, they look like they're protecting the officers

10  conducting the arrest; correct?

11  A.  Based on this photo that I have in front of me, it looks

12  like they're standing and looking at something that is out of

13  my view, to the right side.

14  Q.  But they do look like they're protecting the officers

15  conducting the arrest; right?

16  A.  I would say so, yes.

17  Q.  And based on what you see, the way these two individuals

18  were standing in front of that officer, that would be

19  considered a contingent perimeter; correct?

20  A.  A contingent perimeter?  It's hard to say what it is just

21  based on this photo.  I have a very narrow scope of what I have

22  in front of me.  It's hard to see what's to the left or to the

23  right.  If they're just -- if there's no one on the right side

24  of them in front of them, then they would just be kind of just

25  posting versus if there was a group of folks that were looking,

SANTACRUZ - DIRECT / LOPEZ

```
 1   then at that point then it would be some type of protection
 2   from those folks from intervening or any potential bad actors.
 3   Q.   So, again, we did discuss this at your deposition, so
 4   let's go back to Exhibit 99.
 5   A.   Tab 99?
 6   Q.   Tab 99, yes.
 7             THE COURT:  Page?
 8             MS. LOPEZ:  Page 73.  Thank you, Your Honor.
 9             THE COURT:  73?
10             MS. LOPEZ:  Page 73.
11   BY MS. LOPEZ:
12   Q.   Let me know when you get there.
13   A.   Is that in the other book?
14   Q.   Yes.  That's in Volume 5.
15   A.   What page again?  I'm sorry.
16   Q.   Page 73.
17   A.   (Witness examines document.)  Okay.
18   Q.   All right.  So I'm going to take you down to line --
19             THE COURT:  I think this testimony is consistent with
20   what he said on the stand, isn't it?
21             MS. LOPEZ:  It is somewhat consistent, Your Honor.
22             THE COURT:  I don't think it's inconsistent.
23   Okay.  Move on.
24             MS. LOPEZ:  We'll move on then, Your Honor.
25   Thank you.
```

SANTACRUZ - DIRECT / LOPEZ

1   BY MS. LOPEZ:

2   Q.   And as you just mentioned, if there was a threat on the

3   other side of the camouflaged individuals, you would expect

4   these camouflaged individuals to protect the ICE officers;

5   correct?

6   A.   That is correct.

7   Q.   And you have not received any reports from your

8   Enforcement and Removal Operations officers about instances

9   where the federalized National Guard intervened to protect

10  them; correct?

11  A.   No, I did not.

12  Q.   Enforcement and Removal Operations agents wear uniforms;

13  correct?

14  A.   Repeat that one more time.  I'm sorry.

15  Q.   Enforcement and Removal Operations agents wear uniforms;

16  correct?

17  A.   Not necessarily.

18  Q.   What do you mean by "not necessarily"?

19  A.   So the only uniforms that we do have involve our special

20  response team.  All of our other agents -- excuse me -- are

21  plainclothes, plainclothes agents.

22  Q.   And the special response team, these agents wear

23  camouflage uniforms?

24  A.   That is correct.

25  Q.   And the special response team for Enforcement and Removal

**SANTACRUZ - DIRECT / LOPEZ**

1  Operations are not the only law enforcement agency with a

2  camouflage uniform; correct?

3  **A.**   That is correct.

4  **Q.**   Other federal law enforcement agencies also have

5  camouflage uniforms; correct?

6  **A.**   Correct.

7  **Q.**   And these camouflage uniforms are similar to the

8  camouflage for military uniforms; correct?

9  **A.**   Correct.

10  **Q.**   Enforcement and Removal Operations special response team

11  wears a brownish-greenish camouflage uniform; correct?

12  **A.**   Correct.

13  **Q.**   And the military wears a green or a multicamouflage

14  uniform; correct?

15  **A.**   Correct.

16  **Q.**   And you have knowledge of the different types of uniforms

17  as well because of your previous military service; correct?

18  **A.**   Correct.

19  **Q.**   So you know what identifying features to look for on a

20  military uniform; correct?

21  **A.**   Correct.

22  **Q.**   For example, you know how to look for patches; correct?

23  **A.**   Correct.

24  **Q.**   And someone without knowledge of the different types of

25  military and law enforcement uniforms wouldn't be able to

SANTACRUZ - DIRECT / LOPEZ

 1    differentiate between the two; correct?

 2    A.   I could only speculate, but I know what I know as far as

 3    how to be able to identify that.

 4    Q.   How -- or even for someone like you, who has experience,

 5    it's not easy to tell who is military and who isn't without

 6    being up close and personal to see patches; correct?

 7    A.   That is correct.

 8    Q.   So at this time, I'd like to reintroduce Exhibit 54, which

 9    has previously been admitted as Exhibit 54.  So you're going to

10    go back to Volume 3.

11    A.   (Witness examines document.)

12    Q.   Ready?

13    A.   Yes.

14    Q.   Tab 54.

15         Okay.  And for the record, again, this is a photo from the

16    U.S. Immigration and Custom Enforcement's X account dated

17    June 10th, 2025, at 11:56 a.m.

18         You've seen this photo before; correct?

19    A.   That is correct.

20    Q.   And from this photo, given that they have similar

21    uniforms, you cannot tell who is military and who is federal

22    law enforcement; correct?

23    A.   Well, I can tell that this person right in front of us --

24    or in front of the picture is DEA.  It's hard to make out the

25    person in the back, who that actually is.

SANTACRUZ - DIRECT / LOPEZ

1  Q.  And the person in the back, just for the record, is

2  wearing camouflage; correct?

3  A.  Based on this, in the book picture, yes.

4  Q.  And based on that camouflage uniform and in that photo,

5  you cannot tell if that is military or federal law enforcement;

6  correct?

7  A.  I cannot.

8  Q.  Okay.

9      All right.  So we're going to stick with Volume 3, and if

10 you can go to Tab 92.  And this has been previously admitted as

11 Exhibit 92, and this is a photo from Camarillo.

12 A.  Okay.

13 Q.  You've seen this photo before as well; correct?

14 A.  That is correct.

15 Q.  Okay.  And from this photo, you cannot tell who is

16 military and who is federal law enforcement; correct?

17 A.  I can tell who's federal law enforcement on one specific

18 person.

19 Q.  And which person is that?

20 A.  The person in the center of this photograph.

21 Q.  How about the individuals in the back?

22 A.  It's hard to tell.  I think I mentioned this before.  The

23 picture is kind of grainy, and the distance is kind of pushed

24 back, so it's hard to tell who that actually is.

25 Q.  And you can't identify any of the patches on those

SANTACRUZ - DIRECT / LOPEZ

1    uniforms; correct?

2    **A.**    I can identify the individual in the front just based on

3    my experience and knowledge that -- who that agency is.

4    **Q.**    But for the individuals in the back, you can't identify

5    any of the patches; correct?

6    **A.**    I can't make them out, no.

7    **Q.**    Okay.  And based on this photo, the individuals in the

8    camouflage in the back, they are forming a perimeter; correct?

9    **A.**    It looks like they're standing in a line behind this

10   federal officer, and it looks like a loose perimeter, in my

11   perception, based on my experience.

12   **Q.**    Thank you.

13       And you heard about the cannabis farm raids in Camarillo

14   and Carpinteria; correct?

15   **A.**    Correct.

16   **Q.**    And Enforcement and Removal Operations was not the lead

17   agency on that operation; correct?

18   **A.**    That is correct.

19   **Q.**    And Enforcement and Removal Operations, although not the

20   lead agency, was one of several federal agencies participating

21   in the operation; correct?

22   **A.**    That is correct.

23   **Q.**    Okay.  And in your 23 years of experience with ICE, has

24   the military ever accompanied ICE in a security function on

25   non-border immigration enforcement operations?

SANTACRUZ - CROSS / HARTLIEB

 1    **A.**    Not that I can recall.

 2              **MS. LOPEZ:**  At this time, I have no more questions,

 3    Your Honor.

 4              **THE COURT:**  Cross or whatever.

 5                        **CROSS-EXAMINATION**

 6    BY MR. HARTLIEB:

 7    **Q.**   Good afternoon.  Garry Hartlieb for the defendants.  And

 8    good afternoon to you, Mr. Santacruz.

 9         I would like to follow up on certain topics that you

10    discussed with opposing counsel just now.

11         And before we delve into some of those specifics, I'd like

12    to better understand the scope of responsibilities that you

13    held as field office director.

14         Can you describe what you did and how you kept yourself

15    informed of ERO's personnel and their activities?

16    **A.**   During this specific time?

17    **Q.**   In general, as field office director, how do you supervise

18    490 personnel?

19    **A.**   Well, our chain of command structure encompasses me as the

20    field office director.  I have two deputy field office

21    directors that work right below me.  I also have a chief of

22    staff and approximately 12 assistant field office directors.

23    Those assistant field office directors have various

24    responsibilities or portfolios that cover every facet that ERO,

25    Enforcement and Removal Operations, enforces.

SANTACRUZ - CROSS / HARTLIEB

1    I also have approximately -- each of those assistant field

2    office directors have about six or seven first-line supervisors

3    who then oversee the various programs within ERO that cover the

4    seven counties within the Central District of California.

5        On top of the two detention populations or detention

6    centers that I have regarding detainees, we have two different

7    portfolios that two deputy field office directors oversee,

8    which is -- one portfolio is the enforcement portfolio, and the

9    other portfolio is the detention portfolio.

10   Q.   How do you stay apprised of all of the activities

11   encompassed by those portfolios?

12   A.   Well, we do have countless meetings.  We have daily

13   meetings with my core management staff.  We do have weekly

14   meetings.  Then we do have -- every month we do have an

15   assistant field office director meeting where everyone comes

16   together and discuss the various topics.

17       We do have ad hoc meetings where any information or

18   pertinent information that needs to be relayed that comes from

19   the very top or any pivot changes or mission changes, we have

20   discussions, whether it be MS Teams, whether it be phone calls,

21   or whether it be in-person meetings.

22   Q.   You mentioned pertinent information.  What is the type of

23   pertinent information that comes up to your attention?

24   A.   There's various types of information that we receive.

25   Anything from a use-of-force incident, anything from an officer

SANTACRUZ - CROSS / HARTLIEB

1    assault incident, employees getting injured, detainees being

2    injured, the health and welfare of detainees that may go to the

3    hospital.  Any -- any type of serious misconduct, various

4    information that we receive, to include any pivot changes or

5    mission changes that may come from our headquarters' component.

6    Q.   Do you receive that information only in meetings or also

7    in written reports?

8    A.   Written reports.  We do have situational reports that we

9    do have.  We also have significant incident reports any time,

10   for example, there is an officer assault, any use-of-force

11   incidents, any time a detainee or a law enforcement officer has

12   to go to the hospital for whatever reason, but there's various

13   reports and different type of formats that we receive those in.

14   Q.   Did anything about your responsibilities in day-to-day

15   work change after the National Guard was federalized?

16   A.   Yes.

17   Q.   How did it change?

18   A.   It changed more now that we have -- the DOD representative

19   now is something that we had to encompass in terms of making

20   sure that everyone was on the same page, whether it be just

21   coordinating or having discussions regarding the day-to-day

22   activities.

23   Q.   You mentioned the DOD representative.  Did you work with

24   that representative in a particular place?

25   A.   Yes.

SANTACRUZ - CROSS / HARTLIEB

1    Q.   What was that place?

2    A.   It was at the Federal Command Center, the Incident Command

3    Center.  It has a lot of terms; right?  Incident Command

4    Center, Federal Command Center, and then the Interagency

5    Command Center, but that's where all the different federal

6    heads sat, to include DOD representatives.

7    Q.   What is your understanding of what the function of the

8    Interagency Command Center was?

9    A.   Well, it's basically a funnel point with all the federal

10   partners that are working together on Immigration Title 8

11   at-large operations.  That's where all the information and

12   that's where all the federal heads sit to discuss any ongoing

13   or any potential operations that come up.  And it's -- all the

14   information gets relayed from each component, and from there it

15   gets filtered out to each headquarters component from that

16   point.

17   Q.   How specifically did you work with Task Force 51

18   representatives in the Interagency Command Center?

19   A.   Well, as I mentioned previously, I have worked closely

20   with them in the sense of me, personally, I had to make a

21   couple of requests for assistance, and that was for protection

22   of federal property or federal personnel.

23   Q.   How would you submit those requests for assistance?

24   A.   The ones that I personally made were in person.  Since

25   they're in the same room as we were in the command center, I

SANTACRUZ - CROSS / HARTLIEB

1    would have a conversation with the DOD representative and

2    pretty much provide the specifics on what we needed.

3    **Q.**    What type of information would you provide when making

4    requests for assistance?

5    **A.**    So it was basically the who, where, what, and why type of

6    situation.  They needed to know what the -- what type of assets

7    were going to be required, what location, when, why.  And we

8    would provide that information, and then they ran it up their

9    chain of command.

10   **Q.**    When you made a request for assistance, did you ever

11   request the specific function that members of Task Force 51

12   were to perform?

13   **A.**    No.  It was a general request.  It was a request -- for

14   example, when I made the request to provide additional support

15   at the Adelanto facility, we requested personnel to go out

16   there to assist in the protection of that federal property.

17   **Q.**    Now, you said that you didn't make a specific request

18   about the function that Task Force 51 members were to perform.

19   Was there a reason that you didn't specify what those members

20   should be doing?

21   **A.**    Well, from the very beginning, their purpose there was to

22   protect federal property and federal personnel.  As far as the

23   policies and procedures regarding that, I would defer to DOD as

24   I am not sure how or what instructions they would be receiving

25   from their chain of command.

SANTACRUZ - CROSS / HARTLIEB

1  Q.   Did you ever request that Task Force 51 or the National

2  Guard help assist in the performance of ERO's law enforcement

3  functions?

4  A.   No.

5  Q.   Why not?

6  A.   Like I mentioned before, DOD is only there to protect

7  federal personnel or protect federal property.

8  Q.   How did you learn that DOD was only protecting personnel

9  or property?

10 A.   Early on, that was the discussion that we had in our

11 meeting, is that they were here to protect federal property and

12 federal personnel.

13 Q.   And who is the "we" in that last sentence?

14 A.   Everyone in that Interagency Command Center.

15 Q.   And who was it that communicated that DOD's role would be

16 restricted to protecting federal personnel and property?

17 A.   I can't remember exactly who that was.  I mean, there were

18 various DOD representatives.  It's a -- initially it was a

19 24-hour operation where there was different folks there.

20 Q.   But it was -- is it fair to say that it was a DOD employee

21 that communicated the restriction that DOD was there --

22 A.   That's correct.

23 Q.   -- to protect?

24      Okay.  What would happen after you submitted a request for

25 assistance?

SANTACRUZ - CROSS / HARTLIEB

```
 1   A.   I could only assume that they -- the DOD would send it up
 2   their chain of command.
 3   Q.   Do you have any visibility into how DOD evaluated your
 4   request?
 5   A.   I do not.
 6   Q.   I want to talk about a couple of the specific requests
 7   that were discussed that you made.  How many requests did you
 8   personally make to Task Force 51?
 9   A.   I believe I made two requests that also required follow-up
10   requests.
11   Q.   What was the first request that you made?
12   A.   I believe the first one that I made was for additional
13   personnel to be assigned to at-large teams that were conducting
14   field operations for protection of federal officers due to the
15   increase in, spike of officer assaults.
16   Q.   And what was the second request?
17   A.   The second request was when we received information that
18   they were -- there was going to be a potential large protest at
19   one of our detention facilities, at the Adelanto detention
20   facility.  We requested additional DOD personnel to assist and
21   protect the federal property.
22   Q.   With respect to at-large operations, did you ever request
23   that DOD execute arrests on behalf ERO?
24   A.   No, I did not.
25   Q.   With respect to at-large missions, did you ever request
```

SANTACRUZ - CROSS / HARTLIEB

```
 1    that DOD assist with detentions?

 2    A.   No, I did not.

 3    Q.   With respect to at-large missions, did you ever request

 4    that DOD execute search warrants?

 5    A.   No, I did not.

 6    Q.   Do you have a general understanding of what Task Force was

 7    doing to assist on at-large operations?

 8    A.   I was not there, present on the ground.  As a field office

 9    director, I was in the command center.  So I have no knowledge

10    of how each team operated independently within those specific

11    DOD teams that were assigned to them.

12    Q.   Well, let me ask it this way:  Do you know if DHS and

13    Task Force 51 were performing the same functions with respect

14    to your requests for assistance?

15    A.   They were not performing the same functions.

16    Q.   How were they different?

17    A.   Well, the federal officers that have Title 8 authority

18    have arrest powers to arrest individuals that are here,

19    you know, breaking the immigration laws or having some type of

20    immigration order.  DOD is only here to protect federal

21    property and only to protect federal personnel.

22    Q.   In terms of these at-large operations, would DHS and

23    Task Force 51 personnel ride in the same vehicles?

24    A.   No, they do not.

25    Q.   Do you recall prior questioning by plaintiffs' counsel
```

SANTACRUZ - CROSS / HARTLIEB

1   about deterrence?

2   **A.**   Can you repeat that one more time?  I'm sorry.

3   **Q.**   Do you recall a question about the presence of the

4   National Guard having a deterrent effect?

5   **A.**   Yes.

6   **Q.**   When you made the statement that having the National Guard

7   provided a deterrent effect, who was being deterred?

8   **A.**   I would say any potential bad actors out there that

9   previously, prior to them showing up, ended up becoming violent

10  in the sense where they started assaulting federal officers by,

11  you know, throwing projectiles to our folks that were there to

12  protect the buildings.

13  **Q.**   When you submitted your requests for assistance, did you

14  ever have an intent that Task Force 51 would deter lawful

15  actors and citizens and members of the public from lawful

16  activity?

17  **A.**   What I was looking for was for -- to protect our -- my

18  officers that were out conducting operations, because due to

19  the increase of vehicle -- officer assaults that we were -- the

20  frequency was so high at that time, and we needed to protect

21  our workforce to continue to do their, you know, ERO mission.

22  So my whole purpose was to protect -- provide protection for

23  the folks that are conducting that work.

24  **Q.**   You mentioned officer assaults.  How frequently would you

25  receive reports of officer assaults on at-large missions in

SANTACRUZ - CROSS / HARTLIEB

1    early June 2025, prior to the federalization of the National

2    Guard?

3    **A.**    Daily, multiple times a day, we would receive officer

4    assault reports.

5    **Q.**    Did the frequency with which you received those reports of

6    officer assaults change after Task Force 51 began providing

7    protection on at-large missions?

8    **A.**    We still had officer assault situations, but they did

9    reduce drastically after DOD were assigned to our teams.

10   **Q.**    Now, in lieu of these officer assaults in early June 2025,

11   did you believe ERO was able to carry out its federal functions

12   at an acceptable level?

13   **A.**    They were carrying out their functions, but I would not

14   say that it was at an acceptable level due to the increase of

15   violence towards our federal workforce.  We had to pretty much

16   pivot to combat that.

17   **Q.**    Can you give an example of how an at-large operation was

18   interrupted by officer assaults?

19   **A.**    So one that comes off the top of mind is we do have

20   federal partners that work together, ERO and federal partners,

21   whether it be FBI, DEA, Marshals, any of the other federal

22   partners that have Title 8 authority.

23       We did have an individual that was taken into custody, and

24   the moment the handcuffs were put on him and he was being

25   walked to the vehicle, members of the public, they pretty much

SANTACRUZ - CROSS / HARTLIEB

1    got outnumbered to the point where they ended up pulling the

2    individual from the officers' grasp and they got overran.  They

3    became too dangerous, to where the public ended up helping the

4    individual escape in handcuffs.

5         And the officers, due to the safety factor, had to vacate

6    the scene because there was just an overwhelming presence of

7    folks that were impeding not only their exit to leave in

8    vehicles, but also affecting their ability to make arrests.

9    Q.   Was that interference a factor in your decision to submit

10   a request for assistance?

11   A.   That was one of many instances that, yeah, a decision is

12   that we needed to do something to help our workforce conduct

13   its operations.

14   Q.   Are you aware of any interference with your federal

15   functions at federal property or federal buildings?

16   A.   Yes.

17   Q.   Please describe what comes to mind.

18   A.   Well, early on, prior to DOD or after?

19   Q.   Prior to the deployment of Task Force 51.

20   A.   So prior to their arrival on June 6, for example, after

21   that worksite enforcement that HSI, Homeland Security

22   Investigations, conducted on June 6, that evening, later on at

23   the Roybal Federal Complex, which also encompasses MDCLA,

24   Metropolitan Detention Center there in Los Angeles, with the

25   Federal Bureau of Prisons and the Federal Building, 300 North

SANTACRUZ - CROSS / HARTLIEB

1    Los Angeles, it's a three-building complex there where we had

2    approximately 1500 protesters that late afternoon, and it

3    became violent and they became -- they started assaulting the

4    Federal Protective Service there.

5        That impeded our ability to be able to go in and out of

6    that federal complex.  And keep in mind it's not just ICE, ERO

7    that's in that.  You're talking about a federal building that

8    has over 29 tenants there that could not safely vacate that

9    premises on a Friday.

10   Q.   So prior to the federalization of the National Guard, did

11   you ever develop plans on how to address your concerns of

12   officer safety?

13   A.   In regards to?

14   Q.   In general, did you ever take any action to try to address

15   concerns about officer assaults or officer safety with respect

16   to at-large missions before the National Guard was federalized?

17   A.   So, yes.  So we had to pivot and we had to pretty much

18   condense teams to have a larger footprint, but that impacted

19   obviously our ability to conduct our missions.

20   Q.   How did it impact your ability to conduct missions?

21   A.   Well, because we had to condense teams, collapse teams

22   into other teams to have a larger footprint due to the spike of

23   assaults on federal officers.

24       So that meant that if we had a certain amount of locations

25   that we were conducting at-large operations, that it had to be

SANTACRUZ - CROSS / HARTLIEB

1    minimized or scaled down just so we wouldn't sacrifice officer

2    safety.

3    Q.    After the National Guard was federalized in California,

4    did you pursue other plans to address your concerns of officer

5    safety?

6    A.    Other plans?  So, I mean, yeah, when they got federalized,

7    that's when I made that request.  In a sense, we had that

8    additional resources.  I requested to have the National Guard

9    assigned to our at-large teams to help out as a QRF, as a Quick

10   Reaction Force, in the event of any potential assaults on

11   federal officers.

12   Q.    So now thinking of after the National Guard has been

13   federalized and at-large missions, are you aware of any safety

14   threats to DHS personnel after that time period?

15   A.    After that time period, it minimized it just because we

16   knew -- or the officers also knew that they had a force

17   multiplier out there; and just having their mere -- their mere

18   presence out there, it was definitely a deterring factor for

19   any potential bad actors that maybe in the past did act in a

20   violent way but would definitely think twice having that

21   additional support.

22         But not only that, it also was a huge relief for our

23   workforce, knowing that they're not going to get blindsided if

24   they are effecting an arrest and have someone, you know,

25   necessarily intervene or try to assault them or impede their

SANTACRUZ - CROSS / HARTLIEB

```
 1    ability to take someone into custody.
 2    Q.    I want to focus your attention specifically on the
 3    Camarillo operation.  Are you familiar with that operation?
 4    A.    Yes, I am.
 5    Q.    Do you have a belief about whether there were any safety
 6    threats to officers on that operation?
 7    A.    There actually some safety threats that I obviously --
 8    a lot of that was televised live.  Even though I was not on the
 9    ground personally, but I did see some threats towards federal
10    officers.
11    Q.    What did you see?
12              MS. LOPEZ:  Objection.  Speculation.
13              THE COURT:  Let's take a break now.  My court reporter
14    has asked for it.  So we will resume at 3:15.  Resume at ten
15    after 3:00.
16                   (Recess taken at 2:53 p.m.)
17                   (Proceedings resumed at 3:10 p.m.)
18              THE COURT:  Let the record show all parties are
19    present.
20         You may continue.
21              MR. HARTLIEB:  Thank you, Your Honor.  Again, Garry
22    Hartlieb on behalf of the Department of Justice, United States
23    Department of Justice.
24    BY MR. HARTLIEB:
25    Q.    So, Mr. Santacruz, before we took a break, we were
```

SANTACRUZ - CROSS / HARTLIEB

1    beginning to talk about Camarillo.  Are you familiar with the

2    DHS operation in Camarillo, California?

3    **A.**   Yes.

4    **Q.**   Were you personally present at that operation?

5    **A.**   I was not.

6    **Q.**   How did you learn about the Camarillo operation?

7    **A.**   We had discussions about it.

8    **Q.**   Were those discussions before or afterwards?

9    **A.**   Before.

10   **Q.**   Did you receive any reports afterwards that described the

11   Camarillo operation?

12   **A.**   Yes.

13   **Q.**   Was there any other way in which you learned about the

14   Camarillo operation outside of your conversations and your

15   reports?

16   **A.**   No.  It would be just basically after-action reports that

17   were generated after the fact.  We also did discuss it in

18   meetings as well after.

19   **Q.**   Did you watch anything about the operation on the

20   television?

21   **A.**   Yes.

22   **Q.**   So that would be an additional way in which you --

23   **A.**   An additional way, yes.

24   **Q.**   -- you learned about it?

25        Do you have a belief about whether there were any safety

SANTACRUZ - CROSS / HARTLIEB

```
 1    threats to officers of DHS and ERO at that operation?
 2    A.    There was.
 3          MS. LOPEZ:  Objection.  Speculation.
 4          THE COURT:  Overruled.
 5          MR. HARTLIEB:  So I'll reask that question.
 6    BY MR. HARTLIEB:
 7    Q.    Do you have a belief about whether there were any safety
 8    threats to officers at that operation?
 9    A.    There was.
10    Q.    And to confirm, was ERO present at the Camarillo
11    operation?
12    A.    So we did have ERO presence there.
13    Q.    What was the nature of the safety threats that were
14    present at that operation?
15    A.    So once the crowd started forming around the area of the
16    operation, we had members of the public who were there and
17    became violent.  We had a lot of officers that were out there,
18    especially transportation vans, that were assaulted by members
19    of the public with projectiles, rocks, to include vans that
20    actually carried detainees; and they were smashing the windows,
21    throwing rocks at the security element that was there, to
22    include -- we did witness, because we were watching it live
23    from the command center, that was what was happening on the
24    ground, where individuals were pretty much conducting deadly
25    force situations on our federal officers.
```

SANTACRUZ - CROSS / HARTLIEB

1   Q.   What do you mean by conducting deadly force situations on

2   your officers?

3   A.   So there was an individual there that actually had a

4   weapon that appeared to look like he was shooting in the

5   direction of our officers.

6   Q.   How would gunshots during an operation impact your

7   officers' ability to carry out their federal functions?

8   A.   Well, you're talking about deadly force at that point;

9   right?  That's the worst possible threat that you can think of

10  as a law enforcement officer, is being shot by someone.  So it

11  weighs heavily on the security of officer safety and the

12  security of the operation.

13  Q.   Notwithstanding the existence of these safety threats at

14  Camarillo, are you aware of the National Guard ever taking any

15  law enforcement activities in response?

16  A.   I was not there on the ground to know exactly what the

17  National Guard did.  I would defer to the DOD.  I know that

18  they were there simply to -- they were assigned as a QRF, Quick

19  Reaction Force, for that specific deployment, but I would defer

20  to HSI.

21  Q.   Now, you said that they were assigned as a QRF.  Does that

22  mean that they were assigned as security and intended to be at

23  the operation in advance?

24  A.   All I know is that they were assigned to play the role of

25  a QRF.  I would -- like I said, I would defer to DOD and HSI.

SANTACRUZ - CROSS / HARTLIEB

```
 1   I was not part of those discussions, as far as specific roles,
 2   other than the QRF.
 3   Q.   Is the assignment of a QRF different from general
 4   provision of protection on the at-large missions?
 5   A.   So almost the same concept in the sense that if something
 6   were to go in the wrong way, assaults on our officers or
 7   whatnot, but their role was there to protect federal officers.
 8   Q.   Staying on the topic of Camarillo, you were asked some
 9   questions about whether certain photographs looked like they
10   depicted a perimeter.  Do you recall that?
11   A.   Yes.
12   Q.   When you answered those questions generally, was that
13   based on your personal knowledge and opinion or something else?
14   A.   My personal knowledge and opinion.
15   Q.   Do you know how Task Force 51 understands or defines the
16   term "perimeter"?
17   A.   I do not.  I don't know their policies and procedures.  I
18   would defer to the DOD.
19   Q.   With respect to the photographs at Camarillo that you were
20   shown, do you know what was happening outside of the frames of
21   any of the photographs that you looked at?
22   A.   I do not.  I've been -- I was shown various photos
23   regarding that -- that operation, and it was hard to -- I only
24   had a snapshot of what was in front of me, so it's hard to tell
25   without seeing the whole scope or the layout of what was
```

SANTACRUZ - CROSS / HARTLIEB

1   actually going on.

2   Q.   With respect to those pictures that appeared to show

3   certain people in uniform in a line, do you know what any of

4   those uniformed personnel were doing?

5   A.   I was shown various pictures.  To be specific as far as

6   what they were doing, it's hard to tell.  If they were standing

7   in a line, that could have been a loose perimeter.  But without

8   seeing the whole scope and seeing what's in front or behind

9   them, what's taking place, what does the perimeter consist of,

10  it's hard to tell.

11  Q.   Do you know why Task Force 51 members of the National

12  Guard were present at Camarillo?

13  A.   Well, like I said, I was not there on the ground to know

14  why or how they ended up at -- if they were there, but I know

15  that they were a Quick Reaction Force and called upon if

16  needed.

17  Q.   Do you recall a question earlier about the percent of

18  at-large operations for ERO that had Task Force 51 support?

19  A.   Yes.

20  Q.   So when you testified that the National Guard assisted on

21  75 percent of at-large operations, was that opinion based on

22  specific facts and data, or how did you come up with it?

23  A.   It was a -- because if I remember that question, I said

24  I'd be widely guessing, you know, what that percentage was.

25  And I believe they -- plaintiffs' counsel said, "Would

SANTACRUZ - CROSS / HARTLIEB

```
 1   75 percent sound accurate?"  And based on everything in my
 2   experience and the amount of folks that were assigned to some
 3   of the at-large teams, which wasn't all of them, 75 percent
 4   seemed about accurate.
 5   Q.   Has that number changed since you testified that the
 6   National Guard was assisting on 75 percent of ERO's at-large
 7   operations?
 8   A.   Yes, it has.
 9   Q.   What is that number today?
10   A.   It's zero.
11   Q.   When did that number change?
12   A.   That number had to have -- it's hard to say when that
13   number changed.  I know -- like I mentioned earlier, I was on
14   annual leave, and that number had to change somewhere between
15   that time frame where I was on annual leave.
16   Q.   When were you on annual leave?
17   A.   I took annual leave from June 28th until July 7th.  So
18   when I returned, that number had already decreased.
19   Q.   So by July 7th, the 75 percent number was already
20   decreasing?
21   A.   Yes.
22   Q.   Now, I asked you questions earlier about the specifics of
23   your requests for support on the front end.  What I want to ask
24   about now is, thinking to all of the at-large operations where
25   ERO received Task Force 51 support, did you ever receive
```

SANTACRUZ - CROSS / HARTLIEB

1  after-action reports of what actually happened on those

2  at-large missions?

3  A.   Not for every at-large mission.  Keep in mind that we have

4  quite a few at-large missions going on at the same time,

5  multiple teams out there.  Each team has multiple locations

6  that they were targeting.  The only thing that I would get

7  were, like, anything that needed to be reported up.

8  Q.   And can you clarify what types of things would need to be

9  reported up?

10 A.   So, for example, and I think I mentioned this earlier, on

11 daily reports that show up would be the amount of teams that

12 are currently out in the field, how many arrests were

13 conducted, what federal agencies assisted or were involved, to

14 include DOD and the number of personnel for each specific team.

15 Q.   Of those reports that you reviewed, did you ever come to

16 know that Task Force 51 was carrying out any of ERO's law

17 enforcement operations?

18 A.   They were not carrying out our operations.  They were just

19 assigned.

20 Q.   Based on those reports that you reviewed, did you ever see

21 any indication that Task Force 51 members committed arrests?

22 A.   No, they did not.

23 Q.   Based on those reports that you reviewed, did you ever see

24 that Task Force 51 members had committed any searches or

25 seizures?

SANTACRUZ - CROSS / HARTLIEB

1    A.    No, I did not.

2    Q.    Mr. Santacruz, you are testifying here today based on your

3    personal knowledge and the information that you've learned in

4    connection with your role; correct?

5    A.    That is correct.

6    Q.    Are you presently employed by the military?

7    A.    No, I'm not.

8    Q.    Do you have any awareness of what the military's

9    restrictions are on Task Force 51 members who assist DHS

10   operations?

11   A.    I don't know the specifics of those, what their orders

12   are.  I know that they're just here to protect federal property

13   and to protect federal personnel.

14   Q.    So do you have any specific knowledge of what instructions

15   Task Force 51 members may have received about what they can and

16   cannot do?

17   A.    No, I have no knowledge of what their chain of command

18   instructed them to do.

19   Q.    Do you have any knowledge of what the Posse Comitatus Act

20   allows or prohibits?

21   A.    I do not.

22   Q.    Do you know what DOD has instructed military members with

23   respect to the Posse Comitatus Act?

24   A.    I do not.

25   Q.    Thinking of your entire involvement now with

SANTACRUZ - CROSS / HARTLIEB

 1   Task Force 51, who had the authority to decide what activities

 2   DOD would permit its forces to conduct on a prospective

 3   operation?

 4   **A.**   I can't speak for DOD as far as what they were told.  Like

 5   I stated before, the only information that we received, federal

 6   partners, they're there to protect federal personnel and

 7   federal property.

 8   **Q.**   Thinking to your entire involvement with Task Force 51,

 9   did DHS or DOD control the activities of what DOD forces

10   actually did in assistance of at-large operations?

11   **A.**   No.

12   **Q.**   Let me rephrase the question.  Which entity -- between DHS

13   and DOD or some other entity, which entity controlled the

14   activities of Task Force 51?

15   **A.**   Well, the only ones -- I could speak for ERO.  I'm the

16   only one and some of my folks that may have made requests for

17   the assistance of the at-large teams, for them to go out as a

18   QRF, to include the federal property.  So that was the only

19   general ask that we made.

20        Now, as far as how their chain of command relayed that

21   information to its soldiers, I would not have any knowledge of

22   that.

23   **Q.**   So I wanted to clarify that a little bit.

24        ERO did or did not control the activities of

25   Task Force 51?

PROCEEDINGS

```
 1   A.   Well, to a certain point we only controlled the ask that
 2   we -- the general ask to have them come out with our specific
 3   teams and to protect federal property, the only instances that
 4   I -- the only one that I made, which was at the Adelanto
 5   facility.  Beyond that, how they do it and how they were
 6   directed to do it is not within my scope.
 7   Q.   Whose scope would it be within?
 8   A.   That would be under DOD.
 9        MR. HARTLIEB:  No further questions.  Thank you,
10   Mr. Santacruz.
11        THE COURT:  Anything further?
12        MS. LOPEZ:  Nothing further, Your Honor.
13        THE COURT:  Okay.  Thank you.  You're excused.
14        THE WITNESS:  Thank you very much.
15                     (Witness excused.)
16        THE COURT:  Okay.  Anything further from the
17   plaintiff?
18        MS. STRONG:  Nothing further, Your Honor.
19        THE COURT:  Plaintiff rests?
20        MS. STRONG:  Yes, Your Honor, the plaintiff rests.
21        THE COURT:  Okay.  So we will proceed tomorrow
22   morning.  You have one witness; is that right, who's already
23   testified in this matter?
24        MR. HAMILTON:  Yes, Your Honor.
25        THE COURT:  Okay.  Do you have an estimate as to how
```

**PROCEEDINGS**

```
 1   long now, in light of the testimony that he's given and which

 2   won't be repeated, his testimony will be?

 3          MS. LIN:  Your Honor, we are hoping to be very

 4   efficient and two to two and a half hours at the maximum.

 5          THE COURT:  How long?

 6          MS. LIN:  Two to two and a half hours maximum, but we

 7   are going to go through and make sure that we avoid duplicates.

 8   So after tonight, maybe the estimate will change.

 9          THE COURT:  Okay.  All right.  Well, that would be

10   useful.

11       So what I want to do is, at the conclusion of your

12   witness's testimony, and assuming you rest at that point, then

13   go into an argument as to the evidentiary aspects of the case.

14   I want to do that tomorrow, reserving till Wednesday morning

15   the legal issues that you've asserted.  Okay?

16          MS. LIN:  Understood, Your Honor, but can we clarify

17   with plaintiffs that the two witnesses that have already

18   testified today, whether they could be released.  That would be

19   Mr. Santacruz and Mr. Harrington.

20          THE COURT:  Well, that's up to them.  They can -- you

21   can have a discussion as to that.  I mean, I -- it may be --

22   they may or may not want to have an issue as to rebuttal.  I

23   have no idea.  They haven't heard -- they haven't heard the

24   testimony -- the new testimony of the general.  So you can have

25   a discussion.  It's whatever you agree to is fine with me, if
```

PROCEEDINGS

```
 1    you can agree.
 2        And then I will just see you tomorrow morning.  We'll
 3    start -- let's see.  Let's start at 9:30.  Yes.
 4            MS. STRONG:  Your Honor, I just want to clarify --
 5            THE COURT:  Sure.
 6            MS. STRONG:  -- to make sure we understand what
 7    Your Honor is expecting for tomorrow afternoon versus
 8    Wednesday.
 9        So is it Your Honor's expectation that the parties give
10    closing arguments on the evidence presented so far tomorrow
11    afternoon and that then we would then present arguments on the
12    four legal issues you discussed this morning on Wednesday, or
13    is it the reverse?
14            THE COURT:  Exactly.
15            MS. STRONG:  Okay.
16            THE COURT:  That's exactly my --
17            MS. STRONG:  Thank you.
18            THE COURT:  The only thing is when you say "tomorrow
19    afternoon," we don't know how long the general's testimony is
20    going to be; and once its concluded, I want to move right into
21    the argument.  So that means tonight you should prepare
22    whatever you want to say about the evidentiary features of the
23    case.
24            MS. LIN:  So, Your Honor, the reason I mentioned
25    Mr. Harrington and Mr. Santacruz is that if there's expectation
```

**PROCEEDINGS**

1   that would go longer, so the timing would be affected by that.

2   That's my only point.

3         **THE COURT:** Well, obviously, if they testify, if

4   they're called back for some rebuttal, if they are, then that

5   changes the timetable.

6      But, I mean, actually, this is all sort of simple, isn't

7   it? There's nothing complicated about what I've said, is it?

8         **MS. LIN:** No.

9         **MS. STRONG:** No, Your Honor.

10        **THE COURT:** Great.

11        **MS. STRONG:** I just wanted to clarify: Evidentiary

12   argument first; legal argument to follow. That's how you

13   prefer our process.

14        **THE COURT:** Exactly.

15        **MS. STRONG:** Thank you, Your Honor.

16        **THE COURT:** Okay. Anybody here didn't get that?

17        **MS. LIN:** We got it, Your Honor, but we'd also like to

18   be heard just a few more minutes today if that's possible.

19        **THE COURT:** Oh, sure. I've got time. Everybody's got

20   time. Sure.

21      Okay. Well, anyway, that's where we are right now; and

22   then if somebody wants to say something, please do.

23        **MR. HAMILTON:** Thanks, Your Honor.

24      I'm mindful of the fact that the Court --

25        **THE COURT:** You have to identify yourself for the

PROCEEDINGS

```
 1    record.
 2           MR. HAMILTON:  I'm sorry, Your Honor.  Eric Hamilton
 3    for defendants.
 4           THE COURT:  Sure.
 5           MR. HAMILTON:  -- mindful of the fact that the Court
 6    has set aside time on Wednesday for legal arguments.  For the
 7    record, we just want to move for judgment as a matter of law
 8    under Rule 52(c) now that plaintiffs have closed their case
 9    based on the fact that plaintiffs have failed to prove a
10    violation of the Posse Comitatus Act, as well as for all of the
11    threshold defects that we argued in our opposition to the
12    original motion for a preliminary injunction, as well as the
13    supplemental opposition brief that we filed.
14           THE COURT:  Great.  I'll take that under submission.
15           MS. STRONG:  I'm happy to respond to it, Your Honor,
16    but I don't need to if you don't feel the need for a response.
17           THE COURT:  Well, I think the federal government is
18    right to raise it, and -- but I'm not going to decide it until
19    we move ahead and see where we are, though it has to be decided
20    on the record that's been adduced so far.  In other words, the
21    plaintiff put in their case, so it either succeeds or fails on
22    that motion as of the conclusion of their case.  And anything
23    you do after doesn't affect that particular motion; right?
24           MR. HAMILTON:  Yes.  Yes, Your Honor.
25           THE COURT:  That also is not complicated.  Okay.
```

**PROCEEDINGS**

1    There we go.

2        Anything else?

3            **MS. STRONG:**  Not from me, Your Honor.

4            **THE COURT:**  So we're hopeful that the IT will all work

5    tomorrow.

6            **MS. STRONG:**  I think --

7            **THE COURT:**  Hopeful.  That's sort of an aspirational

8    view.

9            **MS. STRONG:**  I think we owe thanks to your IT

10   Department for that, Your Honor.  So thank you for that.

11           **THE COURT:**  Oh, our IT Department is crack.  Crack.

12       Okay.  Great.  See you all tomorrow.  Thank you so much.

13               (Proceedings adjourned at 3:31 p.m.)

14                       ---oOo---

15

16

17

18

19

20

21

22

23

24

25

1

2                  **CERTIFICATE OF REPORTER**

3       I certify that the foregoing is a correct transcript

4 from the record of proceedings in the above-entitled matter.

5

6 DATE:  Monday, August 11, 2025

7

8

9

10

11         _____

12         Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

13        CSR No. 7445, Official United States Reporter

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 1

**To Declaration of Brendan Hamme in Support of Plaintiff's
Motion for Preliminary Injunction**

(242 of 483), Page 242 of 483

8/27/25, 1:21 PM    Case 3:25-cv-04870-... Pete Hegseth orders the removal of 2,000 National Guard troops from Los Angeles    Case: 25-3727, 10/07/2025, DktEntry: 126.1, Page 242 of 483 2 of 131

U.S. NEWS

# Pete Hegseth orders the removal of 2,000 National Guard troops from Los Angeles

The troops were deployed after protests over immigration raids last month. California opposed the deployment, calling it a military overreach by the Trump administration.



Get more news **LIVE** on NBC NEWS NOW. ❯

July 15, 2025, 4:03 PM PDT / Updated July 15, 2025, 6:00 PM PDT

**By Tim Stelloh**

Secretary of Defense Pete Hegseth ordered the removal of 2,000 National Guard troops who were mobilized in response to protests in Los Angeles last month over immigration raids, a Pentagon official said Tuesday.

"Thanks to our troops who stepped up to answer the call, the lawlessness in Los Angeles is subsiding," chief Pentagon spokesman Sean Parnell said in a statement.



ADVERTISING

The deployment of 4,000 National Guard troops came after a series of raids by immigration authorities in Los Angeles prompted sometimes-violent protests in parts of the city that were quelled with arrests and the use of "less lethal" weapons.

The Trump administration's decision to deploy the troops drew fierce criticism from California Gov. Gavin Newsom, who called it an "assault" on Democracy and invoked "authoritarian regimes" who "begin by targeting people who are least able to defend themselves."



— California National Guard stand on the steps of the Federal Building in Los Angeles on June 10, 2025.
Patrick T. Fallon / AFP - Getty Images file

Los Angeles Mayor Mayor Bass has also been vocal about her opposition to the deployment of National Guard troops, calling it an unnecessary overreach.

In a statement Tuesday, she said the troops' removal "happened because the people of Los Angeles stood united and stood strong. We organized peaceful protests, we came together at rallies, we took the Trump administration to court — all of this led to today's retreat."

The state sued over the mobilization, which state Attorney General Rob Bonta said was unlawful and infringed on the governor's role as commander-in-chief.

An appeals panel ruled against the state's challenge, writing in a decision last month that President Donald Trump "exercised his statutory authority" when he activated the troops.

The deployment marked the first time a president had federalized National Guard troops without a governor's permission since 1965.

(245 of 483), Page 245 of 483

8/27/25, 1:21 PM        Case 3:25-cv-04870   Pete Hegseth orders the removal of 2,000 National Guard troops from Los Angeles   126.1, Page 245 of 483   131

Half of the troops will remain in the area, for now, along with the roughly 700 Marines who Hegseth deployed.

The troops are authorized to detain people who pose a threat to federal personnel or property, but only until police can arrest them. Military officials are not allowed to carry out arrests themselves.

---

    Tim Stelloh

Tim Stelloh is a breaking news reporter for NBC News Digital.

---

        Reuters contributed.

---

# EXHIBIT 2

# CAPITAL & MAIN

**FEATURED VIDEO**

# Federal Officers Continue Arresting Anti-ICE Protesters During 24/7 Demonstrations

As Los Angeles protesters continue to organize against ICE operations, they said they are met with aggression from both DHS and L.A. police.

Published on August 13, 2325
By **Maison Tran**

   

SIGN UP F
OUR NEWSL

ENTER YOUR EM

SUBSCRIB

**CAPITAL & I**

**Federal officials** have arrested more than a dozen protesters outside an immigration detention center in downtown L.A., including several who have staged a nearly monthlong wave of round-the-clock demonstrations since early July.

The demonstration is part of Occupy ICE, a nationwide series of protests against U.S. Immigration and Customs Enforcement and President Donald Trump's immigration policies. Protesters have gathered and camped in front of the Metropolitan Detention Center in Los Angeles, where people detained in federal immigration raids are held.

The Federal Protective Service, which is part of the Departm

Join Our Community of Fact-Based News Readers

Sign up for our newsletter for exclusive investigative series, live events, and special stories.

Subscribe Now

No thanks, I don't want to join

# CAPITAL & MAIN

Protesters said they are being targeted for arrest because they are exercising their free speech rights in that location. They said the arrests are unwarranted because they have done nothing illegal.

"We're here to make sure that this is being seen. We don't want this happening in the cover of darkness," said Sully, a protest organizer who asked to be identified only by her first name because she feared retaliation from law enforcement.

Protesters who have been present at the demonstration since it began told Capital & Main that more than a dozen people have been arrested and later released since people started camping out in front of the detention center.

The ACLU Foundation of Southern California filed a lawsuit on June 18 in the U.S. District Court for the Central District of California accusing DHS officers of using excessive force and violating people's First Amendment rights during previous months' protests, seeking to stop what it alleged are federal officers' aggressive crowd control tactics. The lawsuit is pending.

"They're not restoring order. They're creating chaos and inflicting violence," said Peter Eliasberg, an attorney and chief counsel for the ACLU Foundation of Southern California.

Los Angeles police officers, meanwhile, have shot pepper balls at protesters and cited a city ordinance that bans unhoused people from many parts of the city in order to sweep ICE protester camps outside the detention center, L.A. TACO reported. The Los Angeles Police Department did not respond to multiple requests for comment.

ICE operations continued despite a ruling by the 9th U.S. Circuit Court of Appeals upholding a temporary restraining order against ICE patrols. Protesters said they don't plan on stopping, either.

---

*Copyright 2025 Capital & Main*

**RELATED TOPICS:** #DEPARTMENT OF HOMELAND SECURITY  #DEPORTATION
#IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE)  #LOS ANGELES

## Top Stories

   

### Join Our Community of Fact-Based News Readers

Sign up for our newsletter for exclusive investigative series, live events, and special stories.

LATEST NEWS    SECTIONS    VIDEOS

# CAPITAL & MAIN

EXPOSÉS 2025



**LATEST NEWS** / August 6, 2025
**ICE Is Pressuring People in Custody to Self-Deport. Many Are Giving Up.**



**WORKED OVER** / August 25, 2025
**Forest Service Cuts Leave Firefighters Mowing Lawns While Morale Craters**



**WORKED OVER** / August 25, 2025
**Trump's Policies Are Adding Up to a Hostile Work Environment**



**THE SLICK** / August 19, 2025
**There's a 'Lake' of Oil Under L to-Close Refinery. Who's Goin Up?**

| | | | |
|---|---|---|---|
| About Capital & Main | Awards | Videos | Careers |
| Our Staff | Columns | Donate | Subscribe |
| Board of Directors | Special Series | Exposés Gala 2025 | Contact Us |
| Advisory Board | | | |

Donor Transparency Policy | Donor Disclosure | Editorial Independence Policy

Copyright © CAPITAL & MAIN 2025 | Fact-based reporting, not opinion.

**CAPITAL &**

## Join Our Community of Fact-Based News Readers

Sign up for our newsletter for exclusive investigative series, live events, and special stories.

# EXHIBIT 3

(251 of 483) Page 251 of 483

8/27/25, 1:27 PM    Case 3:25-cv-04870-CRB    At least 70 people faced criminal charges after LA protests over ICE raids    Document 126-1    Filed 10/07/2025    Page 251 of 483    Page 1 of 131



NEWS

# At least 71 people faced criminal charges after LA protests over ICE raids

*One woman died in custody after pleading not guilty to 14 counts enhanced by prior convictions.*

by **Elizabeth Chou**
08/18/2025 1:48 pm



A woman outside LA City Hall holds a sign reading "Families Belong Together" at a protest Sunday, June 8 against federal immigration law enforcement raids across the region. Photo by Martín Macías, Jr. Credit: Martín Macías, Jr. / LA Public Press

8/27/25, 1:27 PM    Case 3:25-cv-04870-CRB    At least 71 people face criminal charges after LA protests over ICE raids...    Document 126-1    10/07/2025    Page 252 of 483

The Los Angeles County District Attorneys Office and the Los Angeles City Attorney's Office charged at least 71 people with crimes allegedly committed during recent protests against federal immigration enforcement.

*LA Public Press* analyzed 52 cases corresponding to charges against 62 people. All but one person pleaded not guilty at the start of their cases. Many could see their lives upended because of the charges.

The cases stem from downtown Los Angeles protests almost all in June, with one case in July, where 75 people are accused of throwing rocks, fireworks, beer cans and water bottles at officers, driving motorcycles into police lines, and spray-painting "Fuck ICE" on a building. Others face allegations of looting stores during the demonstrations. Charges range from failing to disperse to assault on police officers.

Three people were charged with animal cruelty, all related to alleged scuffles with horses, including those ridden by Los Angeles Sheriff's Department deputies and other law enforcement.

At least fifty people, including two juveniles, have been charged with felonies by District Attorney Nathan Hochman's office and at least 21 with misdemeanors by Los Angeles City Attorney Hydee Feldstein-Soto's Office. *LA Public Press* could not analyze the cases involving juveniles, because juvenile court records are sealed. Feldstein-Soto's Office only provided information on the cases of 14 of the 21 people. Of the 62 adults whose cases *LA Public Press* analyzed, 61 pleaded not guilty at the start of their case. Five of those people later pleaded no contest to some or all of their charges, which means they did not admit guilt but also did not contest the charges. Six people are now participating in some type of diversion program.

Defense attorneys and public defenders representing the dozens of defendants charged say they are working to challenge the allegations by presenting additional evidence and context. Attorneys say that even being charged with a crime can be devastating and life-altering–and they're concerned that people involved in recent protests against ICE raids face particular challenges navigating the legal system.

One woman among those charged died in custody while detained at the Clara Shortridge Foltz Criminal Justice Center, shortly after she attended a hearing on June 17 during which she pleaded not guilty to 14 charges, 10 of which carried enhancements under California's Three Strikes Law for prior felony convictions. During that hearing, she was remanded to custody and had bail set at $1.33 million. Los Angeles County Sheriff's Department Lieutenant Daniel Vizcarra told *LA Public Press* that she was found hanging in a cell lockup, later that day. The coroner pronounced her dead just before 4 a.m. the next morning, on June 18, 2025.

Many defendants remain jailed for weeks or months, unable to work or care for families. Those who can afford bail bonds often face crushing debt.

"The process is the punishment," said Elizabeth Howell-Egan of the National Lawyers Guild.

The organization's legal observer program deploys volunteer lawyers in neon green hats to document what happens during demonstrations to help people defend themselves against charges. The guild has also been helping people navigate the system and deal with the aftermath of arrests and criminal charges.

Federal raids prompted hundreds of people to protest in defense of neighbors, family and friends against federal immigration officials – who were often masked and unidentified – detaining and arresting immigrants and U.S. citizens at Home Depots and businesses, and taking people from bus benches and parking lots.

For many defendants, this may be their first encounter with many of the "well-known harms of the carceral state that are in play," Howell-Egan said.

"A big thing is remembering that just because someone was charged with something doesn't mean they actually did it or are guilty," Howell-Egan said.

However, prosecutors' allegations against people can be circulated publicly by the mainstream media, and are often repeated "at face value," Howell-Egan said. In reality, prosecutors must prove beyond a reasonable doubt that defendants committed the alleged crimes.

The experience can be "traumatic," Howell-Egan said, particularly for people simultaneously dealing with what she called the "double trauma" of confronting the state as it detains and deports their family members and neighbors.

The LA DA's office declined to comment, citing pending litigation. Spokesperson Greg Risling added that the pretrial conditions are set by a judge.

"To clarify and generally speaking, a judge sets pretrial conditions based on the evidence in each case," he said. "Our office may file motions regarding bail, detention and other matters, but ultimately the decision is left to the judge."

The City Attorney's Office did not respond to requests for information and comment about the cases it filed.

## High bail amounts keep many defendants in custody

Judges may keep some defendants in custody over concerns they might be a "flight risk or a danger to society," according to LA County Assistant Public Defender Haydeh Takasugi.

Without such concerns, Takasugi says her office believes it is unjust for defendants to remain in custody before trial, "when we all know that the charges that are brought against them are simply that – charges, and there hasn't been a determination whether or not they're guilty of anything."

Takasugi said their office believes that keeping people in custody, sometimes for weeks to months, "doesn't serve the community in any way." It prevents their clients, many of whom are "indigent," from being able to continue to live their lives outside as they wait for their cases to move through the system, she said.

Takasugi says her office questions the value of money bail in ensuring defendants return for hearings.

High bail amounts can compromise the fairness of the legal process. Takasugi says defendants should base their decisions on the merits of their case and potential penalties, not on their understandable wish to avoid jail time while awaiting trial.

Alex Trantham, second vice president of the public defender's union, says immigrants and those with undocumented family members face additional challenges. ICE agents have been known to target court houses, typically considered a sanctuary against immigration enforcement, to make arrests. At the time of the interview at the end of July, Trantham and others had said that had not occurred with one of their clients.

But those fears were realized last Wednesday, when men identifying themselves as federal immigration officials were filmed outside the Clara Shortridge Foltz courthouse in downtown LA taking away a client of the Alternate Defender's Office.

Trantham said that people have a better chance of convincing a judge that they can be released if their family members show up to their court hearings to vouch for them. But that can be difficult with clients whose family members may be undocumented, she said

"Right now, a lot of people who went to the protest, they have family or friends that might be undocumented who are terrified right now to leave their house because of what's happening with these ICE raids," Trantham said. "So when a family member then picks up a case, it can be hard to have family support in court because they're terrified of being in court and appearing for them because they don't know if ICE is going to be there."

Many cases also carry sentencing enhancements that increase potential penalties. Trantham says in her experience these enhancements, which often cite prior felony convictions as grounds for increased sentences, have become more common since District Attorney Nathan Hochman took office. The DA's office did not respond to a request for comment on the issue.

8/27/25, 1:27 PM    Case 3:25-cv-04870-CRB    At least 100 people face criminal charges after LA protests over raids 5    Document 100-7    Filed 09/02/25    Page 115 of 131

Based on an analysis by *LA Public Press*, the District Attorney tried to increase penalties in the cases of 13 people, including Three Strikes enhancements for prior convictions, and special allegations of alleged great bodily injury and deadly weapon use.

The District Attorney applied 47 enhancements to the charges of 13 people. Twenty of the enhancements, or just over 40%, applied to the defendant who died in custody. That person had pleaded not guilty to the charges against her during a June 17, 2025 hearing.

The remaining 27 enhancements were applied to 12 other defendants. Some have now had their charges, along with the enhancements dismissed. For example, one person had two weapon-related enhancements dismissed —one through a plea deal, the other after pleading no contest to a firearm possession charge.

"It makes our job a lot harder if the charges are more serious because we're fighting these more serious cases that the judges are just assuming are serious based on the charges, as opposed to if they were charged more appropriately for the conduct that was committed, then it might be easier to keep them out and maintaining their, you know, jobs, school, family life," Trantham said.

Enhanced charges can influence defendants' decisions. Takasugi says judges should consider people with criminal histories within the context of the immigration protests.

Judges need to get a more "nuanced" understanding of defendants' situations, she said, considering the federal immigration enforcement taking place in Los Angeles that prompted people "to express their frustration with a system that they cannot change."

"I hope that people will understand the situation in which the individual found themselves, and the context of the protest and how they feel about what is happening to their communities," she said.

© 2025 Foundation for Los Angeles Journalism

All Rights Reserved

# EXHIBIT 4

(257 of 483), Page 257 of 483 Case: 25-3727, 10/07/2025, DktEntry: 126.1, Page 257 of 483

8/27/25, 1:28 PM    Case 3:25-cv-04870    Federal Agents March Through L.A. Park, Spurring Local Outrage - The New York Times    17 of 31

# Federal Agents March Through L.A. Park, Spurring Local Outrage

Federal officials said it was an immigration enforcement operation, though it was unclear if anyone had been arrested. "It's the way a city looks before a coup," Mayor Karen Bass said as she condemned the action.

 **Listen to this article · 7:19 min**   Learn more

**By Jill Cowan and Mimi Dwyer**

Reporting from Los Angeles

July 7, 2025

It had been a quiet morning in MacArthur Park, a hub in one of Los Angeles's most immigrant-heavy neighborhoods. Children at a summer camp were playing outside, but the park was otherwise largely empty.

Then, dozens of armed federal agents began marching over soccer fields and grass berms, based on footage of the incident. Military-style vehicles blocked the street and a federal helicopter flew overhead.

They wore fatigues, masks and helmets and marched in lines. Some were on horseback. Camera crews followed alongside them.

Los Angeles leaders have grown weary after thousands of National Guard troops and Marines arrived nearly a month ago and immigration raids have become a regular, visible occurrence. But they took particular umbrage at Monday's extraordinary show of force in MacArthur Park and issued a swift and furious rebuke.

(258 of 483), Page 258 of 483

8/27/25, 1:28 PM Case 3:25-cv-04870 Federal Agents March Through LA Park, Spurring Local Outrage - The New York Times 31

"What I saw in the park today looked like a city under siege, under armed occupation," Mayor Karen Bass said in a news conference on Monday afternoon, adding that she had traveled regularly into conflict zones as a member of Congress. "It's the way a city looks before a coup."



Los Angeles Mayor Karen Bass visited MacArthur Park while federal agents were still there on Monday. "What I saw in the park today looked like a city under siege, under armed occupation," she said later. Damian Dovarganes/Associated Press

Dozens of federal agents were observed in the park, many arriving in armored military vehicles. They were joined by 80 California National Guard troops under the command of President Trump, according to the office of Gov. Gavin Newsom, who criticized the effort and has tried to stop the federalization of Guard members through a lawsuit.

Tricia McLaughlin, a spokeswoman for the Department of Homeland Security, did not respond to specific questions about the purpose of the operation at MacArthur Park or whether anyone had been detained.

"The operation is ongoing," she wrote in an email. "So that should be a message in of itself."

Asked to clarify that message, she responded that it was an immigration enforcement operation and that such efforts "are not in one single location."

Mr. Trump called up National Guard troops on June 7 to quell protests at federal buildings and at immigration raids. All told, he mobilized about 4,000 Guard members and 700 Marines to the region. It has been more than three weeks since the last major demonstration in downtown Los Angeles.

Mr. Newsom and local leaders had expected the troops to return to their regular duties once the protests had died down. But the president has released only 150 Guard troops for firefighting efforts, and Gregory Bovino, a Customs and Border Protection chief in Southern California, indicated Monday that the Trump administration intended to make itself seen across the city.

"Better get used to us now, cause this is going to be normal very soon," Mr. Bovino told a Fox News reporter. "We will go anywhere, anytime we want in Los Angeles."

To many local leaders, the Monday march through MacArthur Park seemed designed to intimidate immigrants and residents, rather than to carry out targeted enforcement. Marqueece Harris-Dawson, the president of the Los Angeles City Council, derided the display as a stunt made for TikTok.

"If you want to film in L.A., you should apply for a film permit like everybody else," he said during an afternoon news conference. "Stop trying to scare the bejesus out of everybody who lives in this great city and disrupt our economy."

Ms. Bass had planned to appear with Mr. Newsom on Monday to talk about the region's recovery six months after the Palisades and Eaton fires devastated the region.

Instead, she told reporters, she heard about the federal action at MacArthur Park and headed there. She met with children who had quickly been ushered inside a recreational facility when the federal personnel arrived. One 8-year-old boy, she

said, told her unprompted that he was afraid of immigration agents.

City leaders and community groups have long tried to address homelessness and drug use in the park about 10 blocks west of downtown Los Angeles. Workers with a St. John's Community Health street medicine clinic that was serving homeless people at the park said that agents had pointed guns at them and instructed them to stop their work and leave on Monday.

Ms. Bass said that once she arrived, she had demanded to speak to the person in charge of the operation at the park. She was handed a phone, through which, she said, Mr. Bovino told her that he would be "getting them out of the park," apparently referring to federal agents.

The agents left the park a short time later, she said.



Federal agents arrived in armored vehicles and stood with guns at MacArthur Park in what the Department of Homeland Security described as an immigration enforcement operation.  Damian Dovarganes/Associated Press

Ever since Mr. Trump deployed National Guard troops to Los Angeles last month, state and local leaders have engaged in legal and rhetorical battles with the Trump administration.

Federal officials have accused local leaders of fostering lawlessness and allowing criminals to roam free. Mr. Bovino persisted on Monday, saying on X: "We may well go back to MacArthur Park or other places in and around Los Angeles. Illegal aliens had the opportunity to self deport, now we'll help things along a bit."

The post was punctuated with two American flag emojis.

Local officials have accused the federal government of ripping apart families and terrorizing communities by conducting seemingly random workplace and street raids with masked agents in plainclothes, many of whom don't identify themselves.

The raids have had a chilling effect on the Los Angeles area, where roughly half the population is Latino and an estimated 10 percent is undocumented. Small businesses have struggled as undocumented customers and workers have holed up at home. Public spaces like MacArthur Park have been desolate on days when they would typically be bustling with vendors and celebrating families.

Fernando Rodriguez, who runs a small convenience store on South Alvarado Street near the park, said he had seen about 15 large vehicles pull up on Monday morning, including armored vehicles.

"It was like they were going to war," he said. He and everyone else on the block rushed to close their stores and went home, returning only once the park had cleared, he said.

Mr. Rodriguez said that everyone in the community was afraid of being picked up by immigration agents, including those who have legal status. He said that agents did not seem to care whether people had immigration papers if they were Latino.

Business at his convenience store has been very slow for about a month, since enforcement raids intensified in the community, he said. He said that he worried about his two children, ages 6 and 7, who were with him in the shop.

(262 of 483), Page 262 of 483 Case: 25-3727, 10/07/2025, DktEntry: 126.1, Page 262 of 483

8/27/25, 1:28 PM     Case 3:25-cv-04870—Federal Agents March Through LA Park, Spurring Local Outrage - The New York Times 22 of 31

"The kids turn on the TV, there's news about raids," he said. "That's already traumatic. Psychologically, they make you sick because all you're doing is thinking about what time they'll arrive."

Monday's episode felt like an escalation: National Guard soldiers and Marines had mostly been seen guarding federal buildings or accompanying immigration agents on smaller operations. And Ms. Bass said she didn't know how long to expect the raids to continue.

"Frankly," she said, "we are managing by rumor."

Laurel Rosenhall contributed reporting from Sacramento.

**Jill Cowan** is a Times reporter based in Los Angeles, covering the forces shaping life in Southern California and throughout the state.

---

A version of this article appears in print on , Section A, Page 15 of the New York edition with the headline: Outrage as Federal Agents Sweep Through Los Angeles Park

# EXHIBIT 5

An official website of the United States government    Here's how you know

HOME > NEWSROOM > PRESS RELEASES

 ☰  U.S. NORTHERN COMMAND                    Q

Skip to main content (Press Enter).

**PRESS RELEASE** | July 1, 2025

# Task Force 51 releases 150 members of the California National Guard

At the recommendation of Gen. Gregory M. Guillot, Commander, U.S. Northern Command, and approved by the Secretary of Defense, Task Force 51 will release approximately 150 members of the California National Guard from the Federal Protection mission today. USNORTHCOM and Task Force 51 are still appropriately sourced to conduct our Federal Protection Mission. For more information on the disposition of the released soldiers, please contact the California National Guard.  Task Force 51 is  U.S. Army North's Contingency Command Post under the command of Maj. Gen. Scott M. Sherman. The mission of TF 51 is protecting federal personnel conducting federal functions, as well as federal property.

**--30--**

For additional information, please contact U.S. Northern Command Public Affairs:
Email: n-ncpa.omb@mail.mil
Phone: (719) 554-6889
After duty hours: (719) 217-3716

**Follow U.S. Northern Command:**
Facebook: facebook.com/USNORTHCOM
X (formerly Twitter): x.com/USNorthernCmd
Instagram: instagram.com/usnortherncmd

---


SHARE


PRINT

🏷 federal protection mission   🏷 USNORTHCOM

Skip to main content (Press Enter).

# EXHIBIT 6

  24/7 Live                                                                    87°

POLITICS

# 2,000 National Guard troops to be withdrawn from Los Angeles, Pentagon confirms

 By **Marc Cota-Robles**
Tuesday, July 15, 2025

Este artículo se ofrece en **Español** →



The Pentagon confirmed that 2,000 National Guard members are being withdrawn from their mission in Los Angeles.

LOS ANGELES (KABC) -- The military presence in the Los Angeles area is being reduced by almost half. The Pentagon Tuesday confirmed that 2,000 National Guard members are being withdrawn from their mission in the city.

Roughly 4,000 National Guard soldiers and 700 Marines have been in the city since early June. They were deployed with the mission to protect federal buildings and personnel following protests of U.S. Immigration and Customs Enforcement operations in L.A.

"Thanks to our troops who stepped up to answer the call, the lawlessness in Los Angeles is subsiding. As such, the Secretary has ordered the release of 2,000 California National Guardsmen (79th IBCT) from the federal protection mission," Chief Pentagon Spokesman Sean Parnell said in a statement provided to ABC News.

Some of the Guard members deployed to L.A. received specific training to provide perimeter security during ICE operations and were not carrying out law enforcement duties. They were, however, authorized to temporarily detain individuals if needed and then quickly turn them over to law enforcement personnel.

L.A. Mayor Karen Bass called the troops' withdrawal an important victory.



"This happened because the people of Los Angeles stood united and stood strong. We organized peaceful protests, we came together at rallies, we took the Trump administration to court - all of this led to today's retreat," she said in a statement, adding that "We will not stop making our voices heard until this ends, not just here in LA, but throughout our country."

Both city and state leaders pushed back against the deployments, accusing the Trump administration of overstepping its authority.

That led to a legal showdown between California and the federal government, which is still playing out in the courts.

Last month, an appeals court temporarily sided with Trump by deciding troops can remain in L.A. while the case is under review.

"For more than a month, the National Guard has been pulled away from their families, communities and civilian work to serve as political pawns for the President in Los Angeles," Gov. Gavin Newsom's office said in a statement to Eyewitness News. "While nearly 2,000 of them are starting to demobilize, the remaining guardsmembers continue without a mission, without direction and without any hopes of returning to help their communities.

"We call on Trump and the Department of Defense to end this theater and send everyone home now."

The federal troops' domestic deployment raised multiple legal questions, including whether the administration would seek to employ emergency powers under the Insurrection Act to empower those forces to conduct law enforcement on U.S. soil, which they are not permitted to do except in rare circumstances. The Marines, however, are primarily assigned to protecting federal buildings.

**READ MORE: [Military requesting to pull 200 troops back from LA protest duty and return them to wildfire unit](#)**

Previously, the top military commander in charge of the troops deployed to L.A. asked Defense Secretary Pete Hegseth if 200 of those forces could be returned to wildfire fighting duty.

Some politicians sounded the alarm, saying National Guard troops who would normally be working on state fire prevention and drug enforcement were deployed to L.A.



Read More

(0:00)                                                                          02:00

California has just entered peak wildfire season, and Newsom warned that the Guard was understaffed due to the L.A. protest deployment.

The top military commander of those troops, U.S. Northern Command head Gen. Gregory Guillot, submitted a request to Hegseth to return 200 of the National Guard troops back to Joint Task Force Rattlesnake, which is the California National Guard's wildfire unit, the officials said.

*The Associated Press contributed to this report.*

**Report a correction or typo**

Copyright © 2025 KABC Television, LLC. All rights reserved.

**Related Topics**

POLITICS    LOS ANGELES    LOS ANGELES COUNTY    CALIFORNIA NATIONAL GUARD    NATIONAL GUARD

MARINES    MILITARY    GAVIN NEWSOM    ICE    IMMIGRATION    PROTEST    MIGRANTS



**Emma & Mia Are Retiring — Their Handmade Jewelry Is 80% Off**

Sponsored / Sedona Daily Post

`Read More`

**Anyone Considering Investing In Gold Should See This**

Sponsored / Goldco

`Learn More`

**California: Gov Will Cover Your Cost To Install Solar If You Live In These Zip Codes**

Sponsored / SunValue

`Learn More`

**Warren Buffett, Elon Musk and other moguls all use the 5-hour rule. Here's what I learned from...**

Sponsored / Blinkist Magazine

**The best walking shoes are suitable for men to wear all day.**

Sponsored / Walkergrey

`Shop Now`

**My Men's Handbag Boutique is Closing - Clearance Sale is Live**

Sponsored / James Andrews

**Cesar Millan Reveals What Honey Does to Your Aging Dog**

Sponsored / Experts In Pet Health

**Seniors Born 1941-1979 Receive 55 Benefits This Month if They Ask**

Sponsored / WalletJump

`Learn More`

**Topics**

Home

Weather

Traffic

U.S. & World

Politics

Consumer

**Regions**

Los Angeles

Orange County

Inland Empire

Ventura County

California

**More**

Live Video

Apps

ABC7 En Español

Investigations

Shop

**Company**

Submit News Tips

TV Listings

About ABC7

Meet the News Team

Jobs/Internships

ABC7 Merchandise

 

Privacy Policy    Do Not Sell or Share My Personal Information    Children's Privacy Policy    Your US State Privacy Rights    Terms of Use    Interest-Based Ads

Public Inspection File    FCC Applications    Copyright © 2025 KABC Television, LLC. All Rights Reserved.

# EXHIBIT 7

# Hegseth directs 700 Marines to be pulled from Los Angeles

The 700 Marines deployed to Los Angeles last month amid protests over increased immigration enforcement are being pulled from the city, the Pentagon confirmed Monday.

"With stability returning to Los Angeles, [Defense Secretary Pete Hegseth] has directed the redeployment of the 700 Marines whose presence sent a clear message: lawlessness will not be tolerated," chief Pentagon spokesperson Sean Parnell said in a statement to The Hill's sister outlet NewsNation.

Parnell claimed the Marines' "unmistakable presence" in the city was "instrumental in restoring order and upholding the rule of law," even as few of the service members remained in public view following the initial show of force in June.

The Trump administration continues to scale back its military deployment in Los Angeles after President Trump ordered some 4,100 California National Guard troops and later the 700 Marines to the city to quell protests of raids by Immigration and Customs Enforcement (ICE) agents.

The move was heavily criticized by California state officials for bypassing the consent of Gov. Gavin Newsom (D), who accused Trump of inflaming tensions with deployments he said were unnecessary.

After protests largely died down across the city, service members found themselves with little to do, and last week Hegseth ordered half of some 4,000 remaining guard members to return home. That leaves 2,000 in Los Angeles to continue with their role of protecting ICE agents as they conduct raids.

Another 150 guard members had earlier been allowed to leave the city to help fight wildfires in California.

**Sign up for the Morning Report**
The latest in politics and policy. Direct to your inbox.

| |
|---|
| * |

By signing up, I agree to the Terms of Use, have reviewed the Privacy Policy, and to receive personalized offers and communications via email, on-site notifications, and targeted advertising using my email address from The Hill, Nexstar Media Inc., and its affiliates

Newsom has continued to push for all deployed service members to leave the city, saying Trump has used them as "political pawns."

"Thousands of members are still federalized in Los Angeles for no reason and unable to carry out their critical duties across the state," he said in a statement posted to the social platform X on July 15. "End this theater and send everyone home."

Parnell did not say when the Marines would depart the city, but a Defense official told The Washington Post they are set to return to the Twentynine Palms base in the coming days.

In a video posted to X on Monday, Los Angeles Mayor Karen Bass (D) celebrated the Marines' departure, calling their initial deployment "unnecessary."

"The Marines will be able to go back to their families and will be leaving Los Angeles," she said. "I'd like to say that they heard from the people of Los Angeles: This was an unnecessary deployment."

A-246

# EXHIBIT 8



U.S. Department of Homeland Security

# Secretary Noem Makes History in First 200 Days in Office

**Release Date:** August 14, 2025

*From securing 16 international agreements to revolutionizing safe travel and securing the U.S. southern border to historic levels, Secretary Noem has been working around the clock to make America safe*

WASHINGTON – In her first 200 days on the job, U.S. Department of Homeland Security (DHS) Secretary Kristi Noem is hard at work delivering on President Trump's promise of making America safe again. Under Secretary Noem's leadership, DHS has secured the border, arrested and removed thousands of criminal aliens, safeguarded U.S. cyber infrastructure, protected America's leaders, deterred terrorism, achieved historic international agreements and kept Americans safe.

Below are just some of Secretary Noem's accomplishments from her 200 Days:

## Secured the Southern Border to Historic Levels

- Daily Southwest Border encounters have **plunged by 93%** since President Trump took office.
- Under President Trump and Secretary Noem's leadership, Immigration and Customs Enforcement (ICE) Homeland Security Investigations (HSI) **has located over 13,000 unaccompanied children.**
- Migrants are **turning BACK** before they even reach our border—migration through Panama's Darien Gap is down 99.98%.
- President Trump and Secretary Noem—with **$46.5 billion** from the Big Beautiful Bill Act—are **finishing the border wall**. DHS already has more than 85 miles either planned or under construction with funding from the prior year, in addition to hundreds of miles that are now planned to be funded by the bill. President Trump's Big Beautiful Bill also includes over **$5 billion for new technology and border surveillance.**
- In June, Customs and Border Protection (CBP) had **the lowest number of nationwide encounters in CBP history at 24,628.**
- The number of nationwide apprehensions in July was **also a historic low of just 6,177.**
  - Notably, on July 20 Border Patrol recorded only 116 apprehensions nationwide—the lowest single-day total in agency history.
- **In May, June and July, U.S. Border Patrol reported zero parole releases**—reinforcing the Administration's commitment to ending catch-and-release policies.
- The **Coast Guard has surged assets** to increase operational presence in key areas and protect America's maritime borders, territorial integrity, and sovereignty-- **including TRIPLING its forces operating on the southern border** and coordinating surface and air presence with partners to detect, deter, and interdict alien and drug smuggling ventures.

## Removed the Worst of the Worst Illegal Aliens

- The Trump Administration empowered our brave men and women in law enforcement to enforce the law and do their jobs.
- DHS returned to using the term "illegal alien" which is the statutory language. President Trump will not allow political correctness to hinder law enforcement.
- The Trump administration arrested **more than 352,000 illegal aliens and removed more than 324,000.**
- **70% of ICE arrests are criminal illegal aliens with criminal charges or convictions in the U.S.**
- DHS has partnered with the State of Florida on **Alligator Alcatraz,** and the State of Indiana on the **Speedway Slammer to expand detention space.** These partnerships give the Trump administration the capability to lock up some of the worst scumbags who entered the country illegally under the previous administration. These new facilities expand facility and bed space by the thousands.
- President Trump and Secretary Noem empowered state and local law enforcement to get these criminal illegal aliens off our streets. **DHS has secured nearly 900 agreements with state and local partnerships under 287(g).**
  - Operation Tidal Wave, the first 287(g) enforcement operation coordinated with state and federal law enforcement partners, resulted in over 800 arrests.
- At the direction of President Trump, CBP and ICE began **widescale immigration enforcement operations in sanctuary city Los Angeles and southern California.** In total, since June 6, DHS arrested 4,481 illegal aliens in the Los Angeles area.
- In July, federal law enforcement officers executed criminal warrant operations at marijuana grow sites in Carpinteria and Camarillo. At least 14 migrant children have been **rescued** from potential exploitation, forced labor and human trafficking. Federal officers **also arrested at least 361 illegal aliens** from both sites in Carpinteria and Camarillo.

(278 of 483), Page 278 of 483 Case: 25-3727, 10/07/2025, DktEntry: 126.1, Page 278 of 483

8/27/25, 1:28 PM Case 3:25-cv-04870-CI Secretary Document Makes History 11 First 2000 Days of Office | Homeland Security 39 of 131

- After weeks of delays by activist judges, the Department of Homeland Security **finally deported eight barbaric, violent criminal illegal aliens to South Sudan**.
- **DHS launched Defend the Homeland; a historic nationwide campaign aimed at recruiting Americans to join ICE** and help President Trump and Secretary Noem remove criminal illegal aliens. Since the campaign took off, ICE has received **more than 100,000 applications.**

## Delivering Justice for Victims of Illegal Immigration

- President Trump and Secretary Noem reopened the **Victims of Immigration Crime Engagement (VOICE)** office, which was shuttered by the Biden Administration. President Trump and Secretary Noem are standing up for the victims of illegal alien crime and ensuring they have access to much needed resources and support they deserve.

## Incentivizing Historic Self-Deportations

- **1.6 million** illegal immigrants have left the United States population. This means safer streets, taxpayer savings, pressure off of schools and hospital services, and better job opportunities for Americans.
- President Trump **ended the CBP One app** that allowed more than one million aliens to illegally enter the U.S. The Trump Administration replaced this disastrous program with the **CBP Home app, which has a new self-deportation reporting feature** for aliens illegally in the country.
- President Trump launched Project Homecoming through a presidential EO. **The United States is also offering any illegal alien who uses the CBP Home App a stipend of $1,000 dollars**, paid after their return to their home country has been confirmed through the app.
- In addition to offering CBP Home, DHS announced **illegal aliens who self-deport through the app will receive forgiveness of any civil fines or penalties for failing to depart the United States.** DHS also made CBP Home more user friendly by eliminating certain steps and making it easier than ever for illegal aliens to self-deport.
- DHS and DOJ are enforcing our immigration laws and fining illegal aliens who do not depart when they are supposed to. **So far, nearly 10,000 fine notices have been issued by ICE.**

## Restoring Integrity to America's Legal Immigration System

- President Trump ended the broad abuse of humanitarian parole and returned the program to a case-by-case basis. As part of this effort, Secretary Noem **terminated the Cuba, Haiti, Nicaragua, and Venezuela parole programs**.
  - Under the Biden Administration, this CHNV political scheme allowed hundreds of thousands of unvetted aliens to circumvent the traditional parole process. **Known terrorists, gang members, convicted murderers,** have all entered this country "legally" under this program.
- Following victory at the U.S. Supreme Court, **DHS began sending termination notices in June,** informing the illegal aliens both their parole is terminated, and their parole-based employment authorization is revoked – effective immediately.
- DHS has returned the **Temporary Protected Status** immigration program to its original status: temporary. TPS was never intended to be a de facto asylum program.
  - No longer will this program be abused and exploited by illegal aliens. Secretary Noem ended the TPS designations of the previous administration for Venezuela, Haiti, Nicaragua, Honduras, Nepali Cameroon, and Afghanistan.
- DHS and USCIS initiated an overhaul of the Systematic Alien Verification for Entitlements (SAVE) database to eliminate transaction fees for participating state, local, territorial, and tribal government users, streamline mass alien status checks, and integrate criminal records, immigration timelines, and addresses into results. This will help prevent aliens from exploiting taxpayer-funded public benefits or voting illegally.
- Secretary Noem began terminating Harvard University's Student and Exchange Visitor Program (SEVP) certification—**meaning Harvard would no longer enroll foreign students and existing foreign students must transfer or lose their legal status**—for fostering violence, antisemitism, and coordinating with the Chinese Communist Party.
- It is a privilege, not a right, for universities to enroll foreign students and benefit from higher tuition to help pad their multibillion-dollar endowments. Harvard University repeatedly abused this privilege and even stonewalled DHS's request for information.

## Secured Historic Partnerships with Other Nations to Make America Safer

- In 200 days, **Secretary Noem has signed 16 agreements with other countries that advance President Trump's agenda of making America safe. These agreements include:**
  - Security Alliance for Fugitive Enforcement (SAFE) Memorandum of Cooperation with El Salvador to ensure fugitives are not inadvertently released back into Salvadoran communities.

- Biometric Data Sharing Partnership (BDSP) Letter of Intent with Colombia to provide a real-time exchange and query of biometric and biographic information against U.S. data holdings.
- Electronic Nationality Verification (ENV) Letter of Intent with Colombia to enable a streamlined process for obtaining travel documents.
- Reaffirmation of the Air Cargo Data Sharing Memorandum of Understanding with Mexico to share air cargo data between CBP and the Mexican National Customs Agency and Mexican Customs Agency.
- Global Entry Joint Letter of Intent with El Salvador to facilitate entry of a foreign country's citizens into the U.S. for tourism and eligible business purposes.
- Repatriation Assistance Pilot Program Memorandum of Understanding extension with Panama to provide an additional $7.2M in support for removals of illegal migrants, especially facilitating support to Panama in managing reverse flows.
- Global Entry Joint Letter of Intent with Costa Rica facilitate entry of a foreign country's citizens into the U.S. for tourism and eligible business purposes.
- Biometric Data Sharing Partnership (BDSP) Letter of Intent with Honduras to provide a real-time exchange and query of biometric and biographic information against U.S. data holdings.
- Joint Security Program (JSP) Memorandum of Understanding with Guatemala to formalize the Joint Security Program in Guatemala which started in February 2024. CBP through the Joint Security Program has worked alongside Guatemalan partners at La Aurora International Airport to strengthen the security of the global travel network by preventing high-risk travelers from boarding U.S.-bound and foreign-to-foreign flights with thorough targeting, threat assessments, and face-to-face interviews.
- 2026 FIFA World Cup Letter of Intent with Qatar to share lessons learned from prior World Cup between the U.S. government and Qatari government.
- Biometric Data Sharing Partnership (BDSP) Memorandum of Cooperation with Belize to provide a real-time exchange and query of biometric and biographic information against U.S. data holdings.
- Electronic Nationality Verification (ENV) Letter of Intent with Argentina to enable a streamlined process for obtaining travel documents to support repatriation of Argentine nationals from the United States.
- Security Alliance for Fugitive Enforcement (SAFE) Memorandum of Cooperation with Argentina to facilitate the sharing of criminal history information so that fugitives are not inadvertently released back into Argentine communities.
- Visa Waiver Program (VWP) Statement of Intent for Cooperation with Argentina.
- Biometric Identification Transnational Migration Alert Program (BITMAP) Letter of Intent with Chile to Provides temporary legal coverage for the Government of Chile to continue the pilot program with BITMAP enrollments by Ministry of Public Security entities (PDI and Carabineros) as well as expand the program for Ministry of Justice (Prison system). An implementing arrangement is still being negotiated and will need to be signed before April 2026.
- Joint Arrangement to Facilitate the Exchange of Liaison Personnel with Ecuador to enable the assignment of an Ecuadorian National Police liaison at the CBP National Targeting Center in Virginia.

## Initiating a Golden Age in American Air Travel

- Secretary Noem **terminated the politically motivated Quiet Skies Program**, which since its existence has failed to stop a single terrorist attack while costing US taxpayers $200 million a year. The program, under the guise of "national security," was used to target political opponents and benefit political allies.
- **TSA ended the "shoes-off" travel policy**, allowing passengers traveling through domestic airports to keep their shoes on while passing through security screening at TSA checkpoints—while maintaining the same high standard of security. This change will drastically decrease passenger wait times at our TSA checkpoints, leading to a more pleasant and efficient passenger experience.
- **TSA launched specialized security lanes at select airports for military service members and for traveling families.** These initiatives are part of DHS's overall goal to enhance hospitality and security for the American traveler.
- **The Trump administration fully implemented REAL ID enforcement measures nationwide**—a law signed 20 years ago. REAL ID helps ensure that travelers are who they say they are and prevents fraud by criminals, terrorists, and illegal aliens. Most travelers have not even noticed a difference because **nearly 94% of travelers are already REAL ID compliant.**
- Secretary Noem took action to end collective bargaining for the Transportation Security Administration's (TSA) Transportation Security Officers, which constrained TSA's chief mission to safeguard our transportation systems.
  - Prior to Secretary Noem's ending of collective bargaining: 86% of airports had MORE TSOs performing full-time union work than performing security screening.

## Fixing Disaster Relief for the 21st Century

- The Federal Emergency Management Agency is now shifting from bloated, DC-centric dead weight to a **lean, deployable disaster force that empowers state actors to provide relief for their citizens**. The old processes are being replaced because they failed Americans in real emergencies for decades.

(280 of 483), Page 280 of 483 Case: 25-3727, 10/07/2025, DktEntry: 126.1, Page 280 of 483

8/27/25, 1:28 PM    Case 3:25-cv-04870-CRB    Secretary Noem Makes History in First 200 Days of Office | Homeland Security    Document 75-4    Page 40 of 131

- President Trump has established the FEMA Review Council to provide recommendations on how to best conduct disaster relief at the federal level.
  - Under Secretary Noem's leadership, the FEMA Review Council is developing a comprehensive plan for necessary change.
- DHS has empowered state and local governments to lead disaster relief efforts without interference from the federal government.
- DHS has provided FEMA the ability to provide upfront disaster funds to both Texas and New Mexico for disaster recovery efforts speeding up the state's abilities to address debris removal, evacuation and congregate sheltering services, and provide lifesaving and life-sustaining supplies and commodities to the impacted communities.
- DHS accelerated debris removal efforts in California. The majority of properties have now been cleared of debris. **Nearly 92% of debris removal is fully complete while 98% of properties have been cleared.**
- At Secretary Noem's direction, **FEMA has conducted a critical evaluation of all grant programs** and recipients to root out waste, fraud, and abuse and deliver accountability for the American taxpayer.
- Under Secretary Noem's leadership, recipients of FEMA grants will no longer be permitted to use federal funds to house illegal immigrants at luxury hotels, fund climate change pet projects, or empower radical organizations with unseemly ties that don't serve the interest of the American people.

## Provided Rapid and Effective Support to Flood Victims in Texas

- Within moments of the flooding in Texas, DHS assets, including the U.S. Coast Guard (USCG), CBP Border Search, CBP BORSTAR, and FEMA personnel surged into unprecedented action alongside Texas first responders for search and rescue operations.
- The Coast Guard's Rescue Swimmer, Petty Officer Scott Ruskan, in coordination with the air crew from Coast Guard Air Station Corpus Christie saved nearly 200 lives in response to the Texas Floods. Over the past 200 days, the Coast Guard had a total of 8,492 search and rescues, saved or assisted 12,801 lives and saved over $375M in property.
- **FEMA deployed 311 staffers delivering critical intelligence, aerial imagery, and shelter for 171 survivors.**
- Combined state and federal rescue efforts **evacuated and rescued over 1,500 people.**
  - Deployed over 300 Coast Guardsmen.
  - Surged four Coast Guard cutters to support response and recovery operations.
  - Surged response boats from six Coast Guard stations: Washington, Curtis Bay, Annapolis, St. Inigoes, Oxford, and Crisfield.

## Getting the Cybersecurity and Infrastructure Agency Back on Mission

- Under the Biden Administration, the Cybersecurity and Infrastructure Agency (CISA) censored free speech and targeted Americans.
- Under President Trump and Secretary Noem's direction, DHS closed CISA's politically weaponized offices and fired those responsible for abusing their power.
- CISA is now back on-mission: Protecting Americans and critical infrastructure from cyberthreats.
- CISA personnel are deployed across 10 regions in support of all 56 states/territories and is actively working with local, federal, and international partners to identify emerging threats and issue alerts, advisories or provide guidance to mitigate these threats. It has issued 6 major advisories since April that enable operational collaboration.
- CISA works to support cyber defenders with the tools they need to secure their cyber systems. This summer it released the Eviction Strategies Tool (https://www.cisa.gov/eviction-strategies-tool) , a no-cost resource designed to support cyber defenders, and Thorium (https://www.cisa.gov/resources-tools/resources/thorium) , an automated, scalable malware and forensic analysis platform.
- On Aug 1, CISA and FEMA announced the availability (https://www.cisa.gov/news-events/news/dhs-launches-over-100-million-funding-strengthen-communities-cyber-defenses) of over $100 million in cybersecurity grant funding to strengthen state, local and tribal government community cybersecurity.
- Under Secretary Noem's leadership, **CISA has issued more than 700 pre-ransomware notifications,** cataloged 131 known exploited vulnerabilities and partnered with 57 new software companies bringing the number of companies who have pledged to build more secure software to 319.

## Championed Strategic Advancements in Law Enforcement Training to Enhance Border Security and Immigration Enforcement

- **Secured historic funding for law enforcement training**. The One Big Beautiful Bill Act is providing the Federal Law Enforcement Training Centers (FLETC) with **$750 million**, more than doubling its annual resources, to enhance the training and readiness of U.S. Border Patrol (USBP), U.S. Customs and Border Protection (CBP), and U.S. Immigration and Customs Enforcement (ICE) personnel.
- **Expanded nationwide law enforcement collaboration** by facilitating ICE's 287(g) Training Program. To date, 12,024 officers across 39 states have registered and 8,192 have completed the training, strengthening partnerships between federal and local law enforcement agencies.

- **Trained** nearly 2,000 newly hired USBP, CBP, and ICE officers and agents since January 20, 2025, ensuring operational readiness and rapid deployment of a trained workforce to critical national security missions.
- **Achieved record-breaking training—the highest attendance levels since 2007—by supporting over 1,000 USBP trainees daily at FLETC in Artesia, New Mexico,** and demonstrating a commitment to scaling operations to meet growing security demands.

## Revitalizing the U.S. Coast Guard

- When President Trump came back into office, the Coast Guard faced its greatest readiness crisis since World War II because the Biden Administration left it underfunded and neglected. President Trump's order to surge Coast Guard assets to our maritime border changed the game.
- Under President Trump and Secretary Noem's leadership, the Coast Guard is being revitalized to meet the various security challenges of the 21st century and keep America's maritime borders secure for decades to come.
- In the first seven months of the Trump Administration, the Coast Guard **seized more than double the cocaine and other illegal drugs than during the entirety of 2024.** The Coast Service removed 289,467 lbs. of cocaine, 31,942 lbs. of marijuana, 5,952 lbs. of other illicit drugs, and detained 261 drug traffickers.
- The Coast Guard enhanced its immigration enforcement mission executing asset deployments and tripled its operationally deployed units along the southern border and maritime approaches. This resulted in following Illegal Alien Statistics.
  - Interdicted 1140
  - Transferred 717
  - Repatriated 423
  - Deterred 126
- For the first time in years, the Coast Guard expects to exceed its recruiting goals. As of August 12, 2025, the Coast Guard recruited over 5,220 new members into the active-duty enlisted workforce.
- In FY 2025, the Coast Guard expects to access nearly 700 more active-duty enlisted members than the previous year.
- For the first time in 25 years, the Coast Guard, under Secretary Noem's leadership has the ability to expand the Nation's high latitude operations and presence in the Arctic.
- Through the acquisition of additional polar icebreakers and fast response cutters (FRC) such as the recently commissioned CGC Storis and FRC Cunningham, the Nation has ensured access to protect U.S. sovereignty and national security. Nearly $8 billion will be dedicated to this mission.
- Under President Trump and Secretary Noem, the Coast Guard is launching "Force Design 2028," a revolutionary new blueprint that will make the Coast Guard more agile, more capable, and more responsive than ever before.
- Force Design 2028 is the Coast Guard's roadmap to become a more agile, capable, and responsive fighting force to best serve the American people. With unprecedented support and momentum from the President, Secretary of Homeland Security, and Congress, we are seizing the opportunity now to renew the Coast Guard for the future.
  - It will drive much needed changes to transform the Service's: (1) Organization; (2) Contracting and Acquisition; (3) Technology; and (4) People.

## Standing up for the American taxpayer

- The United States Coast Guard (USCG) eliminated an ineffective information technology (IT) program, saving nearly $33 million, and is now focusing resources where they're most needed to protect our homeland.
- USCG partially terminated a wasteful Offshore Patrol Cutter (OPC) contract with Eastern Shipbuilding Group (ESG), which has been slow to deliver four OPCs, harming U.S. defense capabilities.
- The Trump Administration stopped aliens on the Terror Watchlist from receiving Medicaid benefits.
- Secretary Noem cancelled CISA's expensive headquarters project, saving taxpayers over half a billion dollars.
- The Coast Guard partially terminated a wasteful Offshore Patrol Cutter (OPC) contract with Eastern Shipbuilding Group (ESG), which has been slow to deliver four OPCs, harming U.S. defense capabilities.
- The Coast Guard made a fiscally responsible move that saves taxpayers $260 million, through the cancellation of the planned eleventh National Security Cutter (NSC-11) acquisition. This decision, driven by budgetary realities, is projected to yield substantial cost savings and allows for potential reallocation of resources to other Coast Guard priorities.
- To stop policies that were magnets for illegal immigration, DHS froze funding to non-governmental organizations that facilitate illegal immigration and announced a partnership with the U.S. Department of Housing and Urban Development to ensure taxpayer dollars do not go to housing illegal aliens.

### #

(282 of 483), Page 282 of 483

8/27/25, 1:28 PM                    Case 3:25-cv-04870-C   Secretary Noem Makes History id First 200 Days / Office of Homeland Security   of 131

## Topics

HOMELAND SECURITY ENTERPRISE (/TOPICS/HOMELAND-SECURITY-ENTERPRISE)        SECRETARY OF HOMELAND SECURITY (/TOPICS/SECRETARY-HOMELAND-SECURITY)

## Keywords

HOMELAND SECURITY (/KEYWORDS/HOMELAND-SECURITY)        SECRETARY KRISTI NOEM (/KEYWORDS/SECRETARY-KRISTI-NOEM)

AIRPORT SECURITY (/KEYWORDS/AIRPORT-SECURITY)        ALIEN (/KEYWORDS/ALIEN)        BORDER SECURITY (/KEYWORDS/BORDER-SECURITY)

CRITICAL INFRASTRUCTURE (/KEYWORDS/CRITICAL-INFRASTRUCTURE)        CUSTOMS AND BORDER PROTECTION (CBP) (/KEYWORDS/CUSTOMS-AND-BORDER-PROTECTION-CBP)

CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY (CISA) (/KEYWORDS/CYBERSECURITY-AND-INFRASTRUCTURE-SECURITY-AGENCY-CISA)

DEPORTATION (/KEYWORDS/DEPORTATION)        DISASTER RELIEF (/KEYWORDS/DISASTER-RELIEF)

ENFORCEMENT AND REMOVAL OPERATIONS (ERO) (/KEYWORDS/ENFORCEMENT-AND-REMOVAL-OPERATIONS-ERO)

FEDERAL EMERGENCY MANAGEMENT AGENCY (FEMA) (/KEYWORDS/FEDERAL-EMERGENCY-MANAGEMENT-AGENCY-FEMA)

FEDERAL LAW ENFORCEMENT TRAINING CENTERS (FLETC) (/KEYWORDS/FEDERAL-LAW-ENFORCEMENT-TRAINING-CENTERS-FLETC)        ILLEGAL (/KEYWORDS/ILLEGAL)

IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE) (/KEYWORDS/IMMIGRATION-AND-CUSTOMS-ENFORCEMENT-ICE)

IMMIGRATION ENFORCEMENT (/KEYWORDS/IMMIGRATION-ENFORCEMENT)        INTERNATIONAL PARTNERSHIP (/KEYWORDS/INTERNATIONAL-PARTNERSHIP)

LAW ENFORCEMENT PARTNERSHIP (/KEYWORDS/LAW-ENFORCEMENT-PARTNERSHIP)        LAW ENFORCEMENT TRAINING (/KEYWORDS/LAW-ENFORCEMENT-TRAINING)

MAKING AMERICA SAFE AGAIN (/KEYWORDS/MAKING-AMERICA-SAFE-AGAIN)        PARTNERSHIP (/KEYWORDS/PARTNERSHIP)

PRESIDENT TRUMP (/KEYWORDS/PRESIDENT-TRUMP)        REMOVAL (/KEYWORDS/REMOVAL)

TRANSPORTATION SECURITY ADMINISTRATION (TSA) (/KEYWORDS/TRANSPORTATION-SECURITY-ADMINISTRATION-TSA)        TRAVEL (/KEYWORDS/TRAVEL)

U.S. COAST GUARD (USCG) (/KEYWORDS/US-COAST-GUARD-USCG)        VICTIMS OF CRIME (/KEYWORDS/VICTIMS-CRIME)

VICTIMS OF IMMIGRATION CRIME ENGAGEMENT (VOICE) (/KEYWORDS/VICTIMS-IMMIGRATION-CRIME-ENGAGEMENT-VOICE)

HOMELAND SECURITY INVESTIGATIONS (HSI) (/KEYWORDS/HOMELAND-SECURITY-INVESTIGATIONS-HSI)

Last Updated: 08/18/2025

# EXHIBIT 9


**Homeland Security**

U.S. Department of Homeland Security

# Despite Riots and Assaults, ICE and Border Patrol Arrest Worst of the Worst Criminal Illegal Aliens Including Rapists, Gang Members, Murderers, and Pedophiles in Los Angeles

**Release Date:** August 27, 2025

*DHS law enforcement has arrested more than 5,000 illegal aliens since operations began in June in the sanctuary city*

WASHINGTON – The U.S. Department of Homeland Security (DHS) today released the following update regarding targeted immigration enforcement operations in Los Angeles, California that resulted in the arrests of criminal illegal aliens including rapists, gang members, murderers, and child sex offenders.

On August 26, Secretary Kristi Noem announced (/news/2025/08/26/secretary-noem-announces-dhs-arrest-5000th-illegal-alien-los-angeles-operations) **U.S. Border Patrol and Immigration and Customs Enforcement (ICE) have made more than 5,000 arrests in Los Angeles, California since June.**

While violent rioters threatened law enforcement officers and attempted to obstruct them from enforcing the law (/news/2025/06/07/dhs-releases-statement-violent-rioters-assaulting-ice-officers-los-angeles-ca-and) , DHS law enforcement continued to deliver on President Donald Trump's promise to remove the worst of the worst criminal illegal aliens from American communities.

*"DHS law enforcement has made over 5,000 arrests in Los Angeles. That's more than 5,000 criminal illegal aliens, gang members, child predators, and murderers taken off our streets. Precious lives saved,"* said **Secretary Noem**. *"Families protected. American taxpayers spared the cost of their crimes AND the burden of their benefits. Thank you to our brave law enforcement officers. Make no mistake: if you are here illegally, we will find you, arrest you, and send you back. This is just the beginning."*

Below are just a handful of examples of the criminals DHS law enforcement arrested from Los Angeles streets since targeted operations began in June:



Diego Fernandez-Martinez, a criminal illegal alien from Mexico and confirmed member of the deadly Surenos gang with convictions for **carjacking, vehicle theft, possession of drug paraphernalia, possession of a controlled substance for sales, robbery, and prisoner in possession of a weapon.**



Juan Carlos Marin-Hipolito, a criminal illegal alien from Mexico convicted of **murder** and sentenced to 50 years to life in prison.



Jaime Sarinana-Rodriguez, a criminal illegal alien from Mexico and **registered sex offender** convicted of **continuous sexual abuse of a child** and sentenced to 16 years in prison.



Yohannes Zerai, a criminal illegal alien from Eritrea and **registered sex offender**, convicted of **robbery, battery with serious bodily injury, assault to commit rape, sexual penetration with a foreign object with force, assault with a deadly weapon not firearm, petty theft with priors, and failure to register as a sex offender.**



Justin Chung, a criminal illegal alien from South Korea, who was convicted of **murder and shooting at an inhabited dwelling** and was sentenced to 75 years prison.



Quoc Dung Pham, a criminal illegal alien from Vietnam and **registered sex offender**, convicted of **kidnapping, rape with force, sodomy in concert with force, oral copulation in concert with force, robbery, assault with committing of rape, and possession of a controlled substance** and sentenced to 64 years prison.



Bo Quoc Pham, a criminal illegal alien from Vietnam and **registered sex offender**, convicted of **rape with force, arm/weapon sex offense, rape in concert with force or violence, oral copulation** and sentenced to 118 years prison. Arrested with his brother, Quoc Dung Pham, who has the same criminal convictions.

A-257



Hong Jing, a criminal illegal alien from China, convicted of **driving under the influence of alcohol, aiding, abetting and engaging in sex trafficking of an individual, and racketeering.**



Martina Zacarias, a criminal illegal alien from Mexico and **convicted sex offender**, convicted of **lewd or lascivious acts with a child under 14** and sentenced to eight years in prison.



Edgar Isaac Lopez, a criminal illegal alien from Mexico, convicted of **voluntary manslaughter, child cruelty resulting in injury/death, assault by prisoner, unlawful display of fake or fraudulent ID card/permit, and trespassing/injure property.**



Joel Benjamin Reyes, a criminal illegal alien from El Salvador and **registered sex offender**, convicted of **rape in the first degree by forcible compulsion, incest engaged in sexual conduct with related person** and sentenced to five years.



Omar Guzman-Rodriguez, a criminal illegal alien from Mexico and **registered sex offender**, convicted of **burglary, possession of check/money order to defraud, personate to record document, making fictitious checks, petty theft with a prior conviction, taking vehicle without owner consent/vehicle theft and tow owner moving a vehicle without authorization, vehicle theft and possession of stolen vehicle, and lewd acts with a child under 14.**

# # #

## Topics

HOMELAND SECURITY ENTERPRISE (/TOPICS/HOMELAND-SECURITY-ENTERPRISE)

IMMIGRATION AND CUSTOMS ENFORCEMENT (/TOPICS/IMMIGRATION-AND-CUSTOMS-ENFORCEMENT)

## Keywords

IMMIGRATION (/KEYWORDS/IMMIGRATION)    IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE) (/KEYWORDS/IMMIGRATION-AND-CUSTOMS-ENFORCEMENT-ICE)

ALIEN (/KEYWORDS/ALIEN)    CRIME (/KEYWORDS/CRIME)    CUSTOMS AND BORDER PROTECTION (CBP) (/KEYWORDS/CUSTOMS-AND-BORDER-PROTECTION-CBP)

ILLEGAL (/KEYWORDS/ILLEGAL)    IMMIGRATION ENFORCEMENT (/KEYWORDS/IMMIGRATION-ENFORCEMENT)    LAW ENFORCEMENT (/KEYWORDS/LAW-ENFORCEMENT)

MAKING AMERICA SAFE AGAIN (/KEYWORDS/MAKING-AMERICA-SAFE-AGAIN)    PUBLIC SAFETY (/KEYWORDS/PUBLIC-SAFETY)

SECRETARY KRISTI NOEM (/KEYWORDS/SECRETARY-KRISTI-NOEM)    U. S. BORDER PATROL (/KEYWORDS/U-S-BORDER-PATROL)

Last Updated: 08/28/2025

# EXHIBIT 10

California Secretary of State
## Shirley N. Weber, Ph.D.

Home    Elections and Voter Information    Upcoming Elections
## Statewide Special Election

**Choose Language**

English ∨

# 2025 Statewide Special Election

- The last day to register to vote for the November 4, 2025, Statewide Special Election is October 20, 2025.
- All California active registered voters will receive a vote-by-mail ballot for the November 4, 2025, Statewide Special Election.
- Your county elections office will begin mailing ballots by October 6, 2025.
- Ballot drop-off locations open on October 7, 2025.
- Vote-by-mail ballots can be returned by mail, at a drop-off location, or your county elections office.
- Vote centers open for early in-person voting in all Voter's Choice Act counties beginning on October 25, 2025.
- Vote-by-mail ballots must be postmarked on or before Election Day and received by November 12, 2025.



# Election Information

**Legislation Calling for the Statewide Special Election (PDF)**

**Key Dates and Deadlines**

**Complete Statewide Special Election Calendar (PDF)**

**Ballot Arguments**

# Voting Resources

**Register to Vote**

**My Voter Status**

**Voting in California**

**Where's My Ballot?**

**Vote By Mail**

**Military & Overseas Voters**

**Poll Worker Information**

**Election Video Resources**

**Election Security**

**County Elections Offices**

**Frequently Asked Questions**

# EXHIBIT 11

**Trending:**  Burning Man  |  AI's job market effect  |  Plan to split California  |  Newsom trolls Trump  |  Joel Engardio recall  |  S.F. swimmer dies  |  T

POLITICS

# Trump adds San Francisco to list of cities where he wants to send troops

By **Sara DiNatale**, Staff Writer
Updated Aug 22, 2025 1:34 p.m.

    



President Donald Trump floated sending troops into San Francisco during a news conference in the Oval Office on Friday.
Jacquelyn Martin/Associated Press

e-Edition          Account

0:00                                                                    2:47

Everlit

President Donald Trump said Friday from the Oval Office that Democrats "destroyed" San Francisco, adding that it was among the American cities he would "clean up" using federal troops.

It's the latest attack the president has made on Democratic-led cities he has characterized as crime-ridden and poorly run. The president already ordered roughly 2,000 National Guard troops to Washington, D.C., all on loan from at least six Republican-led states.

Chicago, the president said, could be next to get the takeover treatment. New York City was also possible, he said. Then Trump took shots at San Francisco.

ADVERTISEMENT
Article continues below this ad

A-265

"Look at what the Democrats have done to San Francisco," Trump told reporters. "They've destroyed it. We could clean that up, too. We'll clean that one up, too."

The slam to San Francisco comes after Trump earlier this month named Oakland and other Black-led cities as troubled areas where he'd consider sending federal troops to police.

"President Trump's characterization of Oakland is downright wrong," Oakland Mayor Barbara Lee said at an Aug. 14 news conference held in response to the remarks. "We're not going to back down."

Trump said Friday that Democrats who'd "lost control of their cities" have called asking for the administration's help, but he declined to name any.

"We're going to make our cities very, very safe. Chicago is a mess," Trump said. "We'll straighten that one out, probably next. That will be our next one after this, and it won't even be tough."

ADVERTISEMENT
Article continues below this ad

Crime nationwide has been down in the first half of the year, according to a report by the Council on Criminal Justice. And leaders in cities such as Washington, Oakland and now San Francisco, in response to Trump's rhetoric, have also pointed to stats showing drops in violent crime.

San Francisco Mayor Daniel Lurie has avoided talking about Trump since taking office in January. That strategy continued Friday, even as the president took direct jabs at the city.

"My administration has made safe and clean streets our top priority, and the results are clear: Crime is at its lowest point in decades, visitors are coming back, and San Francisco is on the rise," Lurie said in a statement. "And we're going to keep working every day to build on that progress."

In June, Trump deployed more than 4,000 National Guard troops to Los Angeles as protests broke out into response to immigration raids in Southern California. At that time, Lurie said his priority was "keeping San Franciscans safe" and ensuring that the city would protect free speech during any of its own protests.

Trump's orders to send troops to Los Angeles is still the focus of an ongoing legal challenge, arguing the president wrongly deployed the California guard.

Aug 22, 2025 | Updated Aug 22, 2025 1:34 p.m.

 **Sara DiNatale**
STAFF WRITER

 

Sara DiNatale covers politics and the impacts of the Trump administration's policies on the Bay Area. She joined the Chronicle in 2025, after a decade reporting across the southern United States.

She was the recipient of a 2024 George Polk Award for her investigation on the Texas residential solar industry as an energy reporter at the San Antonio Express-News. Her investigation led Texas to adopt new state laws to regulate bad actors and scammers. She spent several years covering business, retail, the economy and labor at the Tampa Bay Times and Mississippi Today. Her reporting has been recognized by a series of state-level and national awards, including top honors from the Headliner Foundation, Best of the West and Bill Minor Prize for Investigative Reporting. She's a graduate of the University at Buffalo and a native of Western New York.

**More For You**



POLITICS

## As Newsom touts AI's promise, he's using it to post Trump memes

California Gov. Gavin Newsom has endorsed a targeted approach to AI regulation, but his most public use of it has been posting images mocking President Trump.

CRIME

## Judge quashes San Mateo County sheriff's attempt to halt key hearing

POLITICS

## California says immigration agents continue to profile Latinos

CALIFORNIA WILDFIRES

## Napa Valley wineries at risk as Pickett Fire spreads near Calistoga

RESTAURANTS

## Cockroaches shut down two San Francisco restaurants this week

Let's Play



# EXHIBIT 12

# POLITICO

## Clean Energy + Clean Cars = Healthier Air

When we cut pollution, we cut medical costs.

**LEARN MORE →**

Paid for by the American Lung Association

## Trump says he may send National Guard to Chicago, New York

The president said he is looking to continue sending troops to major cities after deployments in D.C. and Los Angeles.



President Donald Trump speaks in the Oval Office of the White House on Aug. 22. | Jacquelyn Martin/AP

By **AARON PELLISH**
08/22/2025 02:39 PM EDT
Updated: 08/22/2025 04:47 PM EDT

   

CHICAGO — President Donald Trump said he is looking to send in the National Guard to Chicago or New York, seeking to extend the deployment of guardsmen elsewhere after amassing troops in Washington.

Trump told reporters Friday he's considering deploying guardsmen to Chicago after ordering troops into the nation's capital and to Los Angeles earlier this year — a move the Trump administration is now being forced to defend in court.

Advertisement

"We're going to make our cities very, very safe. Chicago is a mess," Trump said. "We'll straighten that one out probably next. That will be our next one after this, and it won't even be tough."

Trump later mentioned New York along with Chicago as cities he'd like the National Guard to "help."

The president praised the hundreds of guardsmen currently deployed in Washington and noted he's willing to "bring in the regular military" to help support his campaign to reduce crime in the city.

"I really am honored that the National Guard has done such an incredible job working with the police, and we haven't had to bring in the regular military, which we're willing to do," he said. "After we do this, we'll go to another location, and we'll make it safe also."

Washington's status as a federal territory gives Trump broader authority to deploy the National Guard through the nation's capital, along with his attempt to take over the city's police force. National Guard units outside of D.C. are generally under the command of states' governors, although Trump federalized the California guard to send troops to Los Angeles earlier this year.

But federal law prohibits the use of military personnel for civilian law enforcement except when authorized by the Constitution or another federal law.

Trump's order to send hundreds of troops to Los Angeles is currently the subject of a legal challenge arguing Trump wrongfully federalized and deployed California guardsmen to quell protests.

Chicago Mayor Brandon Johnson said the city hasn't received formal notification of new deployments of federal law enforcement to the city and called the tactic "uncoordinated, uncalled for, and unsound."

"Unlawfully deploying the National Guard to Chicago has the potential to inflame tensions between residents and law enforcement when we know that trust between police and residents is foundational to building safer communities," Johnson said in a statement.

Illinois Gov. JB Pritzker responded to Trump's comments in a social media post, where he labeled "an authoritarian power grab of major cities" as something that "people are not begging for."

New York Gov. Kathy Hochul said in a statement that an attempt by Trump to "invoke military power" by sending the National Guard to New York "undermines the significant work being done at the state level" to reduce crime.

**FILED UNDER:** NATIONAL GUARD, NEW YORK CITY, CHICAGO, DONALD TRUMP, LOS ANGELES

---

## West Wing Playbook: Remaking Government



Your guide to Donald Trump's unprecedented overhaul of the federal government.

**EMAIL**

Your Email

**EMPLOYER**

Employer

\* All fields must be completed to subscribe

SIGN UP

By signing up, you acknowledge and agree to our Privacy Policy and Terms of Service . You may unsubscribe at any time by following the directions at the bottom of the email or by contacting us here . This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

---

SPONSORED CONTENT



**Kate Middleton Sad News Regarding Prince George**
TipHero



**Donald Trump's Golf Footage Sparks Curiosity About His Legs**
TMSPN



**Barack Obama Admits to "Deep Deficit" in Marriage with Michelle**
TipHero

(303 of 483), Page 303 of 483

8/27/25, 1:30 PM    Case 3:25-cv-04870-CRB    Trump says he'll send National Guard to Chicago, New York    Document 126-1    Filed 08/27/25    Page 303 of 483    Page 303 of 131





**Top Cardiologist Begs: Quit Eating Blueberries Before This Happens**

thehealthyfat.com

**Experts Recommend These Two 0% Intro APR Cards Until Nearly 2027**

With no annual fee and no interest until Nearly 2027, these cards are helping...

CompareCredit™

**Every American Should Be Using This Retirement Loophole In 2025**

If You're Not Using This IRS Loophole, You Should Be

Goldco

About Us

Advertising

Breaking News Alerts

Careers

Credit Card Payments

Digital Edition

FAQ

Feedback

Headlines

Photos

Press

Print Subscriptions

Request A Correction

Write For Us

RSS

Site Map

Terms of Service

Privacy Policy

Do Not Sell or Share My Personal Information and Opt Out of Targeted Advertising

© 2025 POLITICO LLC

# EXHIBIT 13

POLITICS • 6 MIN READ

# Trump aims high in bid to impose ultimate power

AUG 26, 2025

Analysis by  Stephen Collinson

President Donald Trump during a cabinet meeting at the White House in Washington, DC, on ...



In the gospel according to Donald Trump — his book "The Art of the Deal" — the future president laid out his business and life philosophy.

"I aim very high, and then I just keep pushing and pushing and pushing to get what I'm after," Trump wrote. "Sometimes I settle for less than I sought, but in most cases I still end up with what I want."

Once, Trump used this technique to haggle with contractors, to intimidate rival real estate sharks and in endless lawsuits to pursue his business interests.

Twenty-eight years later, he hasn't changed. His pushing and pushing and pushing just takes place on a grander and more consequential stage.

## How Trump beat a presidential curse

The president's relentless attempts to create leverage and wield decisive and uninhibited power on multiple fronts have dominated a summer in which he's been more unrestrained than ever.

August has often been a cruel month for presidents. In 2014, in an odd echo of today, fighting raged in Gaza and Ukraine, intruding on President Barack Obama's vacation and raising questions about his leadership. Chroniclers of the Biden years date the start of the eclipse of the 46th president's administration to August 26, 2021, when a suicide bomber killed 13 Americans at Kabul International Airport.



A member of the National Guard carries a firearm while patrolling the National Mall in Washington, DC, on Tuesday. *(Jose Luis Gonzalez/Reuters)*

Trump motored through this August determined to beat the curse, always testing the boundaries of what is appropriate legal or constitutional conduct in a president.

His pushing culminated this week with threats to **federalize National Guard troops** and send them to Chicago — even when Democratic leaders of the city and the state of Illinois **told him to stay away**.

Emergency conditions prescribed by the US Code that include rebellions, which might make this a clear legal act, do not exist in the city — despite Trump's claims Tuesday that it's in "big trouble" and is a "disaster" because of crime.

But that's not stopping the president, who is also threatening to send federal forces to other cities controlled by Democrats.

"I (have) the right to do anything that I want to do. I'm the president of the United States. If I think our country's in danger — and it is in danger in these cities — I can do it," Trump said during a Cabinet meeting Tuesday.

This is consistent with the president's long-held view that there are few constraints on a president and that his authority is almost absolute.

Illinois Gov. JB Pritzker, a possible 2028 presidential candidate, however, seemed on solid ground when he wrote on X. "No, Donald, you can't do whatever you want."

Time will tell.

## Trump's bid to fire Fed member is one of his biggest power plays yet

Trump is pushing his authority on another front, announcing this week he had **fired Federal Reserve official Lisa Cook**. The Department of Justice is investigating Cook over alleged mortgage transgressions. She has denied wrongdoing and plans to fight her dismissal in the courts.

It's not clear whether Trump has the power to fire Cook. But he's trying it anyway — aiming high and seeing if he can get what he wants.

 **CNN** Politics                                    Subscribe   **Sign in**



Lisa Cook testifies during a Senate Banking nominations hearing on June 21, 2023, in Washington, DC. *(Drew Angerer/Getty Images/File)*

"Under the law the president clearly does have the legal authority to fire a member of the Federal Reserve for cause. I think what is a closer question though is whether, the president has at this point what amounts to cause," Tom Dupree, a former deputy assistant attorney general told CNN.

Trump rarely hides his motives. He said Tuesday that if he could dispense with Cook, he was more likely to get a favorable decision on one of his obsessions — **big interest rate cuts**.

"We'll have a majority very shortly, so that'll be great," Trump said. "Once we have a majority, housing is going to swing and it's going to be great. People are paying too high an interest rate."



CNN One Thing
Why Trump's Attempt to Reshape the Fed Could B...

SHARE   SUBSCRIBE   DESCRIPTION

Trump shrugged his shoulders on Tuesday when asked by a reporter about the possibility that Cook could prevail in court. "You always have legal fights. Look, I had a legal fight that went on for years with crooked people, with very horrible people," the president said.

Even if Cook's fate remains in limbo because of the court fight, the president can achieve some of his goals. By attacking one Fed board member, he's imposing indirect pressure on his premier target, **Federal Reserve Chair Jerome Powell**. And he can make life unpleasant for Cook, whom he regards as an adversary who has crossed him.

## How Trump exploits legal delays to chase political goals

Trump is no stranger to using the time it takes for cases to work through the courts to advance his political goals.

For example, by the time dismissed bureaucrats working for USAID were able to **legally challenge him**, Trump had eviscerated their agency.

And as he fought four criminal indictments as a presidential candidate, he filed countless and often frivolous procedural motions to slow court action and run out the accountability clock over his attempt to steal the 2020 election.

A-281

Now that he's back in power, his administration is using the legal system to settle scores.

Several of Trump's political enemies have found themselves under investigation over mortgage filings, including **California Sen. Adam Schiff** and **New York Attorney General Letitia James**, who won a civil fraud judgment against Trump, his adult sons and the Trump organization. Neither has been charged, and both deny wrongdoing.



FBI members walk outside the home of the former White House national security adviser John Bolton in Bethesda, Maryland on August 22. *(Tasos Katopodis/Reuters)*

Last week, FBI agents arrived at the home of **John Bolton**, a first-term Trump national security adviser who frequently criticizes the president on television. A search warrant would have been approved by a judge on the grounds that there was probable cause that a crime had been committed.

But it did seem rather a coincidence that yet another Trump adversary was under investigation.

"What the president is trying to do here is very systemic and systematic," Schiff told NBC's "Meet the Press" regarding the search of Bolton's home. "Anyone who stands up to the president, anyone who criticizes the president, anyone who says anything adverse to the president's interests, gets the full weight of the federal government brought down on them."

But who is to stop Trump?

The courts have curtailed some of his policies, although the increasing ranks of judges appointed by the president — and a conservative Supreme Court majority that sometimes **rules in his favor** — are helping his bid to expand presidential power. And the high court fueled Trump's vision of impunity by ruling in a case related to one of his criminal indictments that **presidents have substantial immunity** for official acts.

Congress ought to be another brake. But Republican majorities in the House and Senate are supine to Trump, willingly ceding power to the executive. And the ultimate constitutional curb on his behavior — impeachment — was carried out twice by Democratic House majorities but was thwarted when Republicans in the Senate refused to convict him of high crimes and misdemeanors.

And forget anyone in Trump's handpicked second-term team of uber-loyalists imposing restraint. In a more-than-three-hour Cabinet meeting Tuesday, his subordinates took turns to layer extravagant praise on the president.

Trump's sense of his own omnipotence, impunity, vengeance and ambition grows by the day.

A-283

"Any person who defies him is viewed not as an intellectual adversary but as a vicious opponent," Ty Cobb, who served for a time as a White House lawyer in Trump's first term, told CNN's Erin Burnett. "Anything that he can do to wreak vengeance, obviously, makes him very happy, just like expanding his power, makes him very happy."

Cobb added, "I think this is something that Americans need to look at seriously because this cannot be what people in the country voted for in terms of honor, virtue and the rule of law."

But nothing will stop Trump aiming very high — and pushing and pushing and pushing.



## Up next


Trump readies crushing autumn power plays as Democrats search for direction
7 MIN READ


Trump's new 'dictator' comment betrays his trick for expanding his power
4 MIN READ


This one word captures the most important division among Democrats
11 MIN READ


Tracking Trump's retaliation
16 MIN READ

## Most read

**1**    A grieving family cares for a tiny baby girl, delivered after her 17-year-old mother was shot in a road rage incident

**2**    11-year-old fatally shot after 'ding dong ditching' in Houston, police say

**3**  Trump raises fresh questions about Covid-19 vaccines that he says have 'ripped apart' CDC

Search CNN...

Subscribe

Sign in

Live TV

Listen

Watch

US

World

Politics

Business

Markets

Health

CNN Underscored

Entertainment

Tech

Style

Travel

Sports

Science

Climate

Weather

Ukraine-Russia War

Israel-Hamas War

Watch

Listen

Games

Labor Day Sales

About CNN

Politics

**FOLLOW CNN POLITICS**



Terms of Use    Privacy Policy    Do Not Sell Or Share My Personal Information    Ad Choices    Accessibility & CC    About

Subscribe    Newsletters    Transcripts    Help Center

© 2025 Cable News Network. A Warner Bros. Discovery Company. All Rights Reserved.

CNN Sans ™ & © 2016 Cable News Network.

# EXHIBIT 14





**AUGUST 2025**

# The Effects of Recent Federal Immigration Enforcement on California's Private Sector Employment

## SUMMARY

The UC Merced Community and Labor Center analyzed Current Population Survey data for the periods before and following escalations in federal immigration enforcement actions in California. The center examined changes in the number of workers in California and the rest of the US, for the weeks of May 11, June 8 and July 6, 2025, and found that persons reporting private sector work in California decreased by 4.9%—with citizens forming a greater share of the decrease. The state's downturn in work is comparable with the Great Recession and the COVID-19 pandemic, and has profound implications for policymaking.

## KEY FINDINGS

Findings indicate federal immigration enforcement actions have had a disruptive effect on California's economy. Fewer Californians reported private sector work during the week of escalated enforcement actions on June 8 than on the preceding reference week of May 11, 2025—and even fewer reported work the week of July 6. The May-July decline was greater for citizens (414,832) than noncitizens (327,659), though rates of decline were highest among noncitizens. In contrast, in the rest of the US, the number of citizen workers slightly increased while non-citizen workers remained almost the same.

## BACKGROUND

The second Trump presidential administration has been marked by escalated immigration enforcement actions, with profound implications for civil rights and the American economy. In September 2024, while on the campaign trail, Trump claimed that if elected "We're going to have the largest deportation [initiative] in the history of our country" (Alvarez 2024). On January 7, 2025—one day after Trump's election was certified by the US Congress—the US Customs and Border Patrol initiated "Operation Return to Sender," arresting seventy-eight people at worksite raids in Kern County, of which only one had a criminal record (Olmos and Fry 2025).

Operation Return to Sender drew a complaint from the ACLU (with the United Farm Workers of America as a plaintiff) requesting a court order to prevent unconstitutional targeting of farmworkers and day laborers on the basis of race (ACLU Southern California 2025a). Nonetheless, by April 30, President Trump was on track to deport half a million persons in 2025—merely half of the Trump administration's stated goal, and substantially fewer than the 685,000 that President Biden had deported in the final year of his presidency (Chishti and Bush-Joseph 2025).

In response to pressure to increase immigrant deportations, on June 6, 2025, the federal administration escalated enforcement by ordering US Immigration and Customs Enforcement (ICE) officers to carry out indiscriminate workplace raids and arrests in Los Angeles (Hesson and Cooke 2025). The raids were immediately met by largely peaceful protests, though subsequently on June 7 President Trump ordered the deployment of 2,000 National Guard troops to quell the protests (Hernandez and Futterman 2025). As a result of the enforcement actions, many noncitizens avoided work, school, and other public spaces, leading to declines in consumption, business, work and employment (Wick 2025). By July 11, a federal judge granted a temporary restraining order (TRO) against the federal government's use of racial profiling or "roving patrols" to target immigrants (Fry and Olmos 2025). Yet, after agents used a rental truck for an immigration raid in Los Angeles, questions remain about compliance with the order (Solis et al. 2025).

This brief offers an examination of the effects of ongoing immigration enforcement actions on the economy, in June and July 2025 in California—the state with the nation's largest immigrant population and one which has been the site of major public displays of immigration enforcement. Because the federal administration's efforts to enact the nation's largest-ever deportation campaign has been met with questions about its impact on the economy, we examine the impact that recent enforcement efforts appear to have had in California. We ask, "Since escalated federal enforcement actions began on June 6, 2025, how has employment changed among citizen and noncitizen workers in California and the rest of the US?"

## DATA AND METHODS

This brief utilizes the US Census Bureau-Current Population Survey (CPS) Basic Monthly survey. The CPS Basic Monthly is a representative survey with responses from roughly 40,000 American households, of which roughly one of thirteen are from California (United States Census Bureau 2024). The American Community Survey is the largest survey on American social and economic life but is not available until more than a year after data is gathered, while the CPS Basic Monthly is the largest dataset that provides insight into the rapidly changing dynamics of work and employment among Californians, both US citizens and noncitizens.

We utilized the CPS Basic Monthly for May, June and July 2025. The CPS Basic Monthly is collected the week of the month on which the 19th falls and asks about the week of the 12th. In May 2025, the reference week was the week of May 11; in June, it was the week of June 8 (when escalated, immigration enforcement actions had just begun in Los Angeles), and in July it was the week starting July 6 (just before the announcement of the TRO on July 11).

Our analysis included those currently employed (PREMPNOT=1), who reported working one or more hours at one or more jobs (PEHRACTT>0). Since citizenship is generally a requirement for public sector employment, we expect the economic impact of immigration enforcement on noncitizen employment to be greatest in the private sector. In turn, our analysis of "workers" focused on private sector employment—including employment in the private, for-profit sector (PEIO1COW=4) and the private, non-profit sector (PEIO1COW=5)

A-291

**Table 1. Number of private sector workers, California and rest of the US**

|  | May | June | July | May-July Change | % Change |
|---|---|---|---|---|---|
| California | 15,220,150 | 14,755,180 | 14,477,658 | -742,492 | -4.9% |
| Rest of the US | 116,356,877 | 116,919,828 | 117,032,005 | 675,128 | 0.6% |

Source: UC Merced Community and Labor Center analysis of US Census Bureau
Current Population Survey Basic Monthly data, May-July 2025

**Table 2. Mean hours worked, California and rest of the US**

|  | May | June | July | May-July Change | % Change |
|---|---|---|---|---|---|
| California | 37.6 | 37.5 | 37.9 | 0.3 | 0.7% |
| Rest of the US | 38.2 | 38.1 | 38.0 | -0.3 | -0.7% |

Source: UC Merced Community and Labor Center analysis of US Census Bureau
Current Population Survey Basic Monthly data, May-July 2025

**Table 3. Number of private sector workers, by citizenship, California and rest of the US**

|  |  | May | June | July | May-July Change | % Change |
|---|---|---|---|---|---|---|
| California | Noncitizen | 2,668,903 | 2,475,475 | 2,341,244 | -327,659 | -12.3% |
|  | Citizen | 12,551,246 | 12,279,705 | 12,136,414 | -414,832 | -3.3% |
| Rest of the US | Noncitizen | 11,409,035 | 11,414,396 | 11,383,642 | -25,393 | -0.2% |
|  | Citizen | 104,947,842 | 105,505,433 | 105,648,363 | 700,522 | 0.7% |

Source: UC Merced Community and Labor Center analysis of US Census Bureau
Current Population Survey Basic Monthly data, May-July 2025

**Table 4. Number of private sector workers, by citizenship and sex, California and rest of the US**

|  |  |  | May | June | July | May-July Change | % Change |
|---|---|---|---|---|---|---|---|
| California | Noncitizen | Male | 1,720,419 | 1,608,809 | 1,494,235 | -226,184 | -13.1% |
|  |  | Female | 948,485 | 866,666 | 847,009 | -101,476 | -10.7% |
|  | Citizen | Male | 6,853,068 | 6,726,568 | 6,593,193 | -259,875 | -3.8% |
|  |  | Female | 5,698,178 | 5,553,137 | 5,543,221 | -154,957 | -2.7% |
| Rest of the US | Noncitizen | Male | 6,995,017 | 7,004,121 | 7,114,831 | 119,814 | 1.7% |
|  |  | Female | 4,414,018 | 4,410,275 | 4,268,811 | -145,207 | -3.3% |
|  | Citizen | Male | 55,988,063 | 56,528,751 | 56,520,355 | 532,292 | 1.0% |
|  |  | Female | 48,959,778 | 48,976,682 | 49,128,008 | 168,230 | 0.3% |

Source: UC Merced Community and Labor Center analysis of US Census Bureau
Current Population Survey Basic Monthly data, May-July 2025

—as well as self-employed workers, not incorporated (PEIO1COW=7), such as those not formally registering a business as a separate legal entity from their own labor. We analyzed these trends among workers in California (GESTFIPS=6), for citizens and noncitizens (PRCITSHP=5), and by sex (PESEX). We weighted data with the CPS' final weight (PWSSWGT/10,000).

## FINDINGS

*California's Declining Workers.* The US (outside of California) had an estimated 116,356,877 private sector workers the week of May 11, 2025, which slightly increased by 675,128 (or 0.6%) to 117,032,005 by the week of July 6 (see Table 1). In contrast, the number Californians reporting work declined over the same period. The week of May 11, California had 15,220,150 workers, but that figure declined by 464,970 (or -3.1%) the week of June 8 and by 742,492 (or -4.9%) by the week of July 6 (see Table 1).

*Californians' Hours Worked.* The average number of hours worked in the private sector remained nearly identical during the same period, however. In California, workers averaged 37.6 hours of work per week in May and 37.9 hours per week in July, an increase of 0.7% (see Table 2). In the rest of the US, workers averaged 38.2 hours of work per week in May and 38.0 hours per week in July, a decline of -0.7% (see Table 2).

*California's Declining Citizen and Noncitizen Workers.* California's decline in the number of private sector workers was greatest among noncitizens, although the number of citizens declined as well. California had an estimated 2,668,903 noncitizen workers in May, but only 2,341,244 by July, a decline of 327,659 workers (or -12.3%) (see Table 3).

Californian citizens reporting work declined from an estimated 12,551,246 to 12,136,414, a loss of 414,832 (or -3.3%), over the same period (see Table 3). As a whole, the estimated number of workers in the rest of the US outside of California changed very little; US noncitizen workers decreased by 25,393 (or 0.2%), while the number of US citizen workers changed from 104,947,842 to 105,648,363, an increase of 700,522 persons working (or 0.7%) (see Table 3).

*California's Declining Male and Female Workers.* California also saw declines in the number of male and female workers reporting private sector work, though the decline was slightly more pronounced among males. Between May and July 2025, California had more than one in eight fewer noncitizen males reporting work; noncitizen males working declined from 1,720,419 in May to 1,494,235 in July—a loss of 226,184, or -13.1% (see Table 4). Over the same period, the state had over one in ten fewer noncitizen females working, a decline from 948,485 to 847,009—a loss of -101,476, or -10.7% (see Table 4). In contrast, in the rest of the US, noncitizen male workers (1.7%) and male citizen workers (1.0%) experienced increases. Citizen female workers (0.3%) remained virtually consistent from the prior period, while noncitizen female workers (-3.3%) saw declines (see Table 4).

*California's Declining Latino, White, Black and Asian Workers.* Private sector work in California significantly decreased among the four major racial/ethnic groups. Between May and July 2025, the number of Californian Latinos reporting work decreased from 6,511,032 to 5,991,211, a change of -519,821, or -8.0% (see Figure 4). The number of whites in California reporting work decreased from 4,912,455 in May, to

4

**Figure 1. Change in number of private sector workers, California and rest of the US**



Source: UC Merced Community and Labor Center analysis of US Census Bureau
Current Population Survey Basic Monthly data, May-July 2025

**Figure 2. Change in number of private sector workers, by citizenship,
California and rest of the US**



Source: UC Merced Community and Labor Center analysis of US Census Bureau
Current Population Survey Basic Monthly data, May-July 2025

**Figure 3. Change in number of private sector workers, by citizenship and sex, California and rest of the US**



Source: UC Merced Community and Labor Center analysis of US Census Bureau Current Population Survey Basic Monthly data, May-July 2025

**Figure 4. Change in number of private sector workers, by race, California only**



Source: UC Merced Community and Labor Center analysis of US Census Bureau Current Population Survey Basic Monthly data, May-July 2025

4,745,657 in July, a change of -166,798, or -3.4% (See Figure 4). Californian Asian workers decreased from 2,809,986 in May, to 2,664,565 in July, a change of -145,421, or -5.2% (See Figure 4). Californian Black workers also decreased from 675,256 in May to 637,736 in July, a change of -37,520, or -5.6% (see Figure 4).

## CONCLUSION

Our analysis of CPS data suggests that following the escalated immigration enforcement of the week of June 8, private sector work among Californians as a whole initially decreased by 3.1%, and then further declined to 4.9% (compared with the week of May 11) by the week of July 6. While citizens accounted for the greatest decline in private sector work, noncitizens had a higher rate of decline. In contrast, in the rest of the US, the number of citizen workers increased slightly. In sum, the federal administration's escalating immigration enforcement actions seem to have profoundly negative consequences for California's economy.

Taking into account the seasonality of hiring, only two historical cases can compare with the loss of work that has just occurred in California from May to July 2025: the Great Recession and the COVID-19 pandemic. Since 1983, when the CPS began to collect data on private sector and self-employed, not incorporated workers, only during the COVID-19 pandemic did the US experience a greater month-to-month decline in private sector work (a decline of 3.4% from February

to March 2020, and a decline of 19.7% from March to April 2020).[1]

The second comparable historical case is that of the Great Recession, when the state's decline in private sector work was 2.9% in the first year of the downturn (December 2007 to December 2008), while the US' decline was 3.2% in the first year.

To put this in context, the recent escalation in immigration enforcement had a more immediate impact on California's economy than the Great Recession did for the US. The recent decline of 4.9% of fewer persons reporting private sector work occurred in *two months* compared to the US' 3.2% decline in private sector work during the Great Recession's first *year*.

We have reason to suspect that immigration enforcement will further escalate in California and the rest of the US. First, California only experienced 8,460 ICE arrests from the beginning of Trump's second inauguration to June 26 (Jarvie and LeMee 2025). From the beginning of escalated federal actions in Los Angeles on June 6 to June 22, however, the US Department of Homeland Security reported 2,792 detentions of immigrants in Los Angeles alone (Wilner and Uranga 2025).

Some recent developments suggest that we might expect a reduction in the types of federal immigration enforcement actions associated with declines in Californians reporting private sector work. For example, a recent court order has prohibited ICE from

---

[1] Analysis (not shown) finds that in January 1996 the US had private sector decline in work of 3.6%, and in January 1991 it was 3.3%. These were the only other months with figures above 3%. However, they are statistically not different from the figures in this

report given the typical margin of error of US (.1%) and California (.6%) CPS estimates in this range. In addition, the January 1991 and 1996 figures are not seasonally-adjusted. The month of January typically sheds the most jobs in any given year.

the tactics of racial profiling and denying access to counsel in immigration raids that were seen in Los Angeles the week of June 8 (ACLU Southern California 2025b). Nonetheless, Congress recently allocated an unprecedented $160 billion for immigration enforcement and deportation (PBS News Hour 2025). Meanwhile, neither federal legislators nor the Supreme Court have challenged the presidential administration's efforts to advance mass, indiscriminate immigration enforcement actions. As a result, efforts to protect or enhance immigrant workers' rights may require policy innovation on behalf of states, municipalities and employers.

Given that the Great Recession and COVID-19 pandemic are the most comparable examples of massive loss of work, state policymakers should consider how the current moment may require significant action on behalf of the state. In the cases of the Great Recession and the COVID-19 pandemic, lawmakers invested massive amounts of public resources for one-time stimulus or disaster relief spending. Similarly, policymakers might examine how to simultaneously protect those workers who must shelter in place during heightened immigration enforcement while infusing massive amounts of cash into the economy.

Los Angeles Mayor Karen Bass has recently announced a privately-funded plan to support undocumented immigrants affected by federal actions; similarly, state lawmakers might consider extending access (on a much wider scale) to the economic safety net to those affected by the recent federal actions. The state might, for example, create a state-funded unemployment benefit system for undocumented workers.

The recent workplace raids in California reveal how the state currently lacks an adequate economic safety net system for undocumented immigrant workers, and the downstream effects of escalated immigration enforcement on citizens' employment. Given the historic magnitude of the effects of recent federal actions on California's private sector employment, state lawmakers should begin planning and developing a major economic stimulus and disaster package—for all workers.

# REFERENCES

ACLU Southern California. 2025a. "United Farm Workers and Bakersfield Residents Sue Border Patrol for Unlawful Practices." Press Release. February 26, 2025. Accessed on July 13, 2025 from: https://www.aclusocal.org/en/press-releases/united-farm-workers-and-bakersfield-residents-sue-border-patrol-unlawful-practices

ACLU Southern California. 2025b. "Court Prohibits Federal Government from Racial Profiling, Denying Access to Counsel in Immigration Raids." Press Release. July 11, 2025. Accessed on July 13, 2025 from: https://www.aclusocal.org/en/press-releases/breaking-court-prohibits-federal-government-racial-profiling-denying-access-counsel

Alvarez, Alayna. 2024. "Trump pledges "largest deportation" in U.S. history, starting in Ohio and Colorado." Axios. September 13, 2024. Accessed on July 13, 2025 from: https://www.axios.com/2024/09/13/trump-deportation-immigrants-springfield-ohio-aurora-colorado

Chishti, Muzaffar and Kathleen Bush-Joseph. 2025. "In First 100 Days, Trump 2.0 Has Dramatically Reshaped the U.S. Immigration System, but Is Not Meeting Mass Deportation Aims." Policy Beat. Migration Policy Institute. Accessed on July 13, 2025 from: https://www.migrationpolicy.org/article/trump-2-immigration-first-100-days?eType=EmailBlastContent&eId=51cf34f0-7709-4662-a56e-c02c07c00fc0

Fry, Wendy and Sergio Olmos. 2025. "Trump administration asks Supreme Court to lift temporary ban on roving immigration stops in L.A." CalMatters. August 7, 2025. Accessed on August 11, 2025 from: https://calmatters.org/justice/2025/08/trump-appeals-ban-on-la-immigration-raids/

Goldberg, Noah. 2025. "L.A. will provide cash assistance to immigrants affected by raids." Los Angeles Times July 11, 2025. Accessed on July 13, 2025 from: https://www.latimes.com/california/story/2025-07-11/l-a-will-provide-cash-assistance-to-immigrants

Hernandez, Joe and Steve Futterman. 2025. "Protesters clash with law enforcement in Los Angeles as Trump sends National Guard." National Public Radio. June 8, 2025. Accessed on July 13, 2025 from: https://www.npr.org/2025/06/08/nx-s1-5426679/national-guard-california-immigration-protests

Hesson, Ted and Kristina Cooke. 2025. "ICE's tactics draw criticism as it triples daily arrest targets." Reuters June 10, 2025. Accessed on July 13, 2025 from: calmatters.org/economy/2025/04/b

Jarvie, Jenny and Gabrielle LaMarr LeMee. 2025. "Texas, Florida hit with far more ICE arrests than California. But that's not the whole story." Los Angeles Times August 10, 2025. Accessed on August 11, 2025 from: https://www.latimes.com/california/story/2025-08-10/california-was-center-stage-in-ice-raids-but-texas-and-florida-each-saw-more-immigration-arrests

Olmos, Sergio and Wendy Fry. 2025. "Border Patrol said it targeted known criminals in Kern County. But it had no record on 77 of 78 arrestees." CalMatters. June 27, 2025. Accessed on July 13, 2025 from: https://calmatters.org/economy/2025/04/border-patrol-records-kern-county/

PBS News Hour. 2025. "GOP gives ICE massive budget increase to expand Trump's deportation effort." July 8, 2025. Accessed on July 13, 2025 from: https://www.pbs.org/newshour/show/gop-gives-ice-massive-budget-increase-to-expand-trumps-deportation-effort

Solis, Nathan, Rachel Uranga, Brittny Mejia and David Zahniser. 2025. "Federal agents use Penske rental truck as 'Trojan Horse' to raid Los Angeles Home Depot." Los Angeles Times August 6, 2025. Accessed on August 11, 2025 from: https://www.latimes.com/california/story/2025-08-06/more-raids-home-depot-in-macarthur-park-raided

United States Census Bureau. 2024. "Methodology." June 4, 2024. Accessed on July 13, 2025 from: https://www.census.gov/programs-surveys/cps/technical-documentation/methodology.html

Wick, Julia. 2025. "'It reminded me of COVID': Mayor Bass decries economic effect of immigration raids on L.A." Los Angeles Times June 16, 2025. Accessed on July 13, 2025 from: https://www.latimes.com/california/story/2025-06-16/mayor-bass-decries-economic-impact-of-immigration-raids-on-l-a

Wilner, Michael and Rachel Uranga. 2025. "Federal arrests in L.A. approach 2,800 since raids began, DHS says." Los Angeles Times July 8, 2025. Accessed on July 13, 2025 from: https://www.latimes.com/politics/story/2025-07-08/federal-arrests-in-la-are-accelerating-homeland-security

**Research brief prepared by** Edward Orozco Flores, Quy Lam, Keila Luna and Todd Sorensen.

**Acknowledgements to** Ana Padilla for her comments on an earlier draft.

**MISSION STATEMENT**

The UC Merced Community and Labor Center conducts research and education on issues of community, labor and the environment, in the San Joaquin Valley and beyond.

# EXHIBIT 15

# Trump suggests using military against 'enemy from within' on Election Day

≡   **CNN** Politics                                          Subscribe   **Sign in**

🕐 3 min read · Updated 3:17 PM EDT, Mon October 14, 2024

**Trump suggests military action against 'enemy from within' during Fox News interview**

02:27

**(CNN)** — Former President Donald Trump suggested using the military to handle what he called "the enemy from within" on Election Day, saying that he isn't worried about chaos from his supporters or foreign actors, but instead from "radical left lunatics."

"I think the bigger problem are the people from within. We have some very bad people. We have some sick people. Radical left lunatics," Trump said told Fox News' Maria Bartiromo in an interview on "Sunday Morning Futures."

"I think it should be very easily handled by, if necessary, by National Guard, or if really necessary, by the military, because they can't let that happen," he added.

The former president, whose supporters stormed the US Capitol on January 6, 2021, in an attempt to thwart Congress' certification of his 2020 election loss, downplayed any threat from his voters.

"No, I don't think — not from the side that votes for Trump," the former president said when Bartiromo asked whether he was expecting chaos on Election Day. When she alluded to the Justice Department arresting and charging an Afghan national for allegedly plotting a terrorist attack in the US on Election Day and cited the threat of "outside agitators" and undocumented immigrants, Trump pivoted to talking about political opponents on the left.

"I think the bigger problem is the enemy from within, not even the people that have come in and destroying our country, by the way, totally destroying our country, the towns, the villages, they're being inundated," he said, referring to immigrants whom Trump has repeatedly attacked with dehumanizing rhetoric.

Vice President Kamala Harris' campaign seized on Trump's comments, arguing that they should "alarm every American."

"Trump is suggesting that his fellow Americans are worse 'enemies' than foreign adversaries, and he is saying he would use the military against them," Ian Sams, a senior spokesperson and adviser for the campaign, said in a statement Sunday. "Taken with his vow to be a dictator on 'day one,' calls for the 'termination' of the Constitution, and plans to surround himself with sycophants who will give him unchecked, unprecedented power if he returns to office, this should alarm every American who cares about their freedom and security."

The former president has in the years since the January 6 insurrection denied any wrongdoing and looked to cast blame for the riot on others, including Democrats, in a barrage of false claims even as he faces federal and state charges for interfering in the 2020 election in Washington, DC, and Georgia, respectively. He has pleaded not guilty in those cases.

Trump has also been laying groundwork to question the integrity of the 2024 election. He's threatened, if he wins the White House again, prosecution and "long-term prison sentences" for election officials and political operatives, who he suggested could cheat. And he has routinely suggested he would weaponize the justice system to go after his political opponents if voters return him to the White House.

*CNN's Jack Forrest, Sam Fossum, Marshall Cohen, Daniel Dale and Kate Sullivan contributed to this report.*

## Up next

The thing Trump's generals feared about him could now be arriving

5 minute read



Tracking Trump's retaliation

16 minute read



This one word captures the most important division among Democrats

11 minute read



Trump readies crushing autumn power plays as Democrats search for direction

7 minute read



# Most read

**1**    A grieving family cares for a tiny baby girl, delivered after her 17-year-old mother was shot in a road rage incident

**2**    11-year-old fatally shot after 'ding dong ditching' in Houston, police say

**3**    Trump raises fresh questions about Covid-19 vaccines that he says have 'ripped apart' CDC

## ▍ MORE FROM CNN



A grieving family cares for a tiny baby girl, delivered after her 17-year-old mother was ...



11-year-old fatally shot after 'ding dong ditching' in Houston, police say



Trump raises fresh questions about Covid-19 vaccines that he says have

A-305

that he says have
'ripped apart' CDC

## ▌ NEWS & BUZZ



A grieving family
cares for a tiny
baby girl, delivered
after her 17-year-
old mother was ...



11-year-old fatally
shot after 'ding
dong ditching' in
Houston, police say



Trump raises fresh
questions about
Covid-19 vaccines
that he says have
'ripped apart' CDC

Search CNN...

Subscribe

Sign in

Live TV

Listen

Watch

US

World

Politics

Business

Markets

Health

CNN Underscored

Entertainment

Tech

Style

Travel

Sports

Science

Climate

Weather

Ukraine-Russia War

Israel-Hamas War

Watch

Listen

Games

Labor Day Sales

About CNN

Politics

FOLLOW CNN POLITICS

   

Terms of Use    Privacy Policy    Do Not Sell Or Share My Personal Information    Ad Choices    Accessibility & CC    About

Subscribe    Newsletters    Transcripts    Help Center

A-307

© 2025 Cable News Network. A Warner Bros. Discovery Company. All Rights Reserved.

CNN Sans™ & © 2016 Cable News Network.

# EXHIBIT 16

★ INDEPENDENT     Support Now     ☰ Menu

NEWS   SPORTS   VOICES   CULTURE   LIFESTYLE   TRAVEL   CLIMATE   PREMIUM

News > World > Americas > US politics

# Trump says he plans to sue California over redistricting - but Texas is apparently OK

The president intends to challenge California's redistricting plan which state officials created in response to the Texas map-grab that Trump encouraged

**NOW STREAMING. ALWAYS FEARLESS.**     TRY 7 DAYS FREE

Josh Marcus in San Francisco • Monday 25 August 2025 21:30 BST • 2 Comments



Trump claims people are saying maybe the US would like a dictator

## Your support helps us to tell the story

Read more ∨

**SUPPORT NOW**

Read more ∨

President Donald Trump has threatened to sue the state of California over the redistricting plan it adopted last week, which Democratic lawmakers there said was a response to a similar plan in Texas, that the president called on his Republican allies to initiate.

"Well think I'm going to be filing a lawsuit pretty soon," Trump told reporters in the Oval Office on Monday. "And I think we're going to be very successful in it."

The president added the suit would come from the Department of Justice.

"BRING IT," California Governor Gavin Newsom, a frequent legal and political adversary of the president, wrote on X following the announcement.

A White House official declined to answer further questions about the nature of the lawsuit and directed inquiries to the Department of Justice.



The president encouraged Texas to redraw congressional maps because he was 'entitled' to more seats but plans to sue California over legislation it passed in response to Texas' plan *(AP)*

**RECOMMENDED**

> Trump says he and Secretary Hegseth want to take 'Department of Defense' back 80 years

> 'Fire with fire': The doomsday political scenarios after Texas and California launch their warheads over redistricting

> Gavin Newsom signs bill to redraw California districts in response to Texas effort to add five GOP seats

*The Independent* has contacted the Department of Justice for comment.

It is unclear under what basis the Trump administration plans to use to challenge the California map plan.

The California legislation asks voters to approve a new series of congressional maps in a November special election that could add as many as five Democratic seats to Congress.

Newsom described the bill as a way to counteract an effort to carve as many as five new GOP congressional seats in Texas which also passed last week.

"We're neutralizing what occurred and we're giving the American people a fair chance," Newsom said on Thursday. "Because when all things are equal and we're all playing by the same set of rules, there's no question the Republican party will be the minority party in the House of Representatives."



California is calling on voters to approve new congressional maps in November special election, a response to a Texas redistricting plan that could add five

The Texas plan, which does not require voter approval, came after Trump encouraged Republicans in the Lone Star state this summer to find him more seats, arguing he was "entitled" to them after his success in the 2024 election.

"Texas will be the biggest one," Trump said at the time. "And that'll be five."

Texas's effort has set off a national redistricting war, bucking the usual trend of drawing new maps once per decade after the Census.

**RECOMMENDED**

Stephen King shares theory about how Donald Trump will be remembered in history

Trump responds to speculation about his health

My Men's Handbag Boutique is Closing - Clearance Sale is Live
Sponsored | James Andrews

California: Gov Will Cover Your Cost To Install Solar If You Live In These Zip Codes
Sponsored | SunValue

Powered by Taboola

At least half a dozen states are threatening to redraw their maps, in an effort to wrest control of the House of Representatives, where Republicans hold a seven seat advantage, while four seats remain vacant.

Republicans ultimately have the potential to add more seats than Democrats, given it controls more state legislatures.

More about: Donald Trump   California   Texas   Gavin Newsom   House of Representatives   Trump

 **Join our commenting forum**
Join thought-provoking conversations, follow other Independent readers and see their replies

☐ 2 | Comments ⬇

Promoted stories                                                U.S. Privacy

### Wall Street Passed—Now This Crypto Bet Has Political Muscle Behind It
This isn't a single-thread gamble. The plan is built on two profit engines.

Sponsored | BULLSEYEALERTS                                      Read More

### Cesar Millan Reveals What Honey Does to Your Aging Dog
Is honey safe for senior dogs? Find out what pet experts think.

Sponsored | EXPERTS IN PET HEALTH                                Learn More

### San Francisco: Gov Will Give You Back Up To $30,000 Credit If You Install Solar In These Zips
If you pay more than $99/month for power and own a home, you better read this.

Sponsored | ENERGY BILL CRUNCHER                                 Click Here

### Heart Surgeon Begs Americans: Stop Drinking This Plant Based Milk
Think plant milk is safe? This doctor's discovery will change your mind.

Sponsored | WELL BEING FOR ALL                                   Learn More

### Top Urologist: Most Muscle Loss in Older Men Starts With This One Mistake

Sponsored | PRIMENUTRITIONSECRETS                                

### Think Neuropathy Is From Vitamin B Deficiency? Think Again
When The Burning, Tingling & Numbness Won't Stop
Sponsored | HEALTH INSIGHT JOURNAL

### New HELOC Program Lets You Keep Your Same Mortgage Rate While Getting Cash Fast
Borrow without affecting your current mortgage interest rate.
Sponsored | LENDGO                                               Click Here

### Costco Shoppers Say This Fat-Burning Patch Triggers Weight Loss "Unlike Any Other"
Shocking results without diets or lifestyle changes

Sponsored | HEALTH ADVICE TODAY

US POLITICS
Donald Trump set to make key change to future US elections

Newsom's trolling of Trump continues with post taking aim at president's health

## Simple Nail Fungus Treatment Shocks Experts from California - It's a Shoe!

Millions are affected – but hardly anyone knows the solution. Learn more now and act quickly.

Sponsored | BAREFOOT VITALITY

Learn More

## I went from Ozempic to Mounjaro with this unexpected side effect

The first time around, 59-year-old James Brown lost a stone and a half when he took medication that aids weight loss. This time, he tried what has been declared the 'king kong' of diet jabs and the results have been startlingly different...

Sponsored | PROMOTED BY INDEPENDENT PREMIUM

## Fed Just Quietly Took Control of Your Money

Sponsored | PRIORITY GOLD

Read More

## Maximize travel rewards and make every trip feel VIP

Make traveling feel more affordable and rewarding. See how a travel card could help you earn miles, enjoy perks and make every trip memorable.

Sponsored | INTUIT CREDIT KARMA

Learn More

**US POLITICS**

Cause of death revealed for US attorney who stepped down the day Trump was sworn in

Trump says he's awarding Rudy Giuliani the Presidential Medal of Freedom

## Warren Buffett, Elon Musk and other moguls all use the 5-hour rule. Here's what I learned from...

Thousands swear by the learning routing of the 5-Hour Rule. I gave it a go to see what all the fuss is about.

Sponsored | BLINKIST MAGAZINE

**NEWS**

Woody Allen praises Donald Trump's acting skills and would like to direct him again



**GET IN TOUCH**

Contact us

 

**OUR PRODUCTS**

Register

Newsletters

Donate

Today's Edition

Install our app

Archive

**OTHER PUBLICATIONS**

International editions

Independent en Español

Independent Arabia

Independent Turkish

Independent Persian

Independent Urdu

The Standard

**LEGAL**

Code of conduct and complaints

Contributors

Cookie policy

Donations Terms & Conditions

Privacy policy

Do Not Sell or Share My Information

User policies

Modern Slavery Statement

**EXTRAS**

Puzzles

All topics

Betting offers

Latest deals

Competitions and offers

Independent Advertising

Independent Ignite

Syndication

Working at The Independent



# Trump says he plans to sue California over redistricting - but Texas is apparently OK

## The president intends to challenge California's redistricting plan which state officials created in response to the Texas map-grab that Trump encouraged

**Your support helps us to tell the story**
Support Now



From reproductive rights to climate change to Big Tech, The Independent is on the ground when the story is developing. Whether it's investigating the financials of Elon Musk's pro-Trump PAC or producing our latest documentary, 'The A Word', which shines a light on the American women fighting for reproductive rights, we know how important it is to parse out the facts from the messaging.

At such a critical moment in US history, we need reporters on the ground. Your donation allows us to keep sending journalists to speak to both sides of the story.

The Independent is trusted by Americans across the entire political spectrum. And unlike many other quality news outlets, we choose not to lock Americans out of our reporting and analysis with paywalls. We believe quality journalism should be available to everyone, paid for by those who can afford it.
**Your support makes all the difference.**

President Donald Trump has threatened to sue the state of California over the redistricting plan it adopted last week, which Democratic lawmakers there said was a response to a similar plan in Texas, that the president called on his Republican allies to initiate.

"Well think I'm going to be filing a lawsuit pretty soon," Trump told reporters in the Oval Office on Monday. "And I think we're going to be very successful in it."

The president added the suit would come from the Department of Justice.

"BRING IT," California Governor Gavin Newsom, a frequent legal and political adversary of the president, wrote on X following the announcement.

A White House official declined to answer further questions about the nature of the lawsuit and directed inquiries to the Department of Justice.



*The president encouraged Texas to redraw congressional maps because he was 'entitled' to more seats but plans to sue California over legislation it passed in response to Texas' plan (AP)*

*The Independent* has contacted the Department of Justice for comment.

It is unclear under what basis the Trump administration plans to use to challenge the California map plan.

The California legislation asks voters to approve a new series of congressional maps in a November special election that could add as many as five Democratic seats to Congress.

**A-320**

Newsom described the bill as a way to counteract an effort to carve as many as five new GOP congressional seats in Texas which also passed last week.

"We're neutralizing what occurred and we're giving the American people a fair chance," Newsom said on Thursday. "Because when all things are equal and we're all playing by the same set of rules, there's no question the Republican party will be the minority party in the House of Representatives."



*California is calling on voters to approve new congressional maps in November special election, a response to a Texas redistricting plan that could add five GOP seats to Congress (Getty Images)*

The Texas plan, which does not require voter approval, came after Trump encouraged Republicans in the Lone Star state this summer to find him more seats, arguing he was "entitled" to them after his success in the 2024 election.

"Texas will be the biggest one," Trump said at the time. "And that'll be five."

Texas's effort has set off a national redistricting war, bucking the usual trend of drawing new maps once per decade after the Census.

At least half a dozen states are threatening to redraw their maps, in an effort to wrest control of the House of Representatives, where Republicans hold a seven seat advantage, while four seats remain vacant.

Republicans ultimately have the potential to add more seats than Democrats, given it controls more state legislatures.

# EXHIBIT 17

☰                           Los Angeles Times

CALIFORNIA

# Veterans' advocates warn of low morale amid L.A. deployment: 'This is not what we signed up for'

U.S. Marines watch from inside the Federal Building in downtown Los Angeles while demonstrators participate in the Interfaith Prayer Walk for Family Unity in downtown Los Angeles this month.  (Genaro Molina/Los Angeles Times)

 

**By Hailey Branson-Potts and Phi Do**

June 24, 2025 3 AM PT

Ever since President Trump seized control of the California National Guard and deployed thousands of troops to Los Angeles, calls from distressed service members and their families have been pouring in to the GI Rights Hotline.

Some National Guard troops and their loved ones have called to say they were agonizing over the legality of the deployment, which is being litigated in federal court, according to Steve Woolford, a resource counselor for the hotline, which provides confidential counseling for service members.

Others phoned in to say the Guard should play no part in federal immigration raids and that they worried about immigrant family members who might get swept up.

"They don't want to deport their uncle or their wife or their brother-in-law," Woolford said. "Some of the language people have used is: 'I joined to defend my country, and that's really important to me — but No. 1 is family, and this is actually a threat to my family.'"

Although active-duty soldiers are largely restricted from publicly commenting on their orders, veterans' advocates who are in direct contact with troops and their families say they are deeply concerned about the morale of the roughly 4,100 National Guard members and 700 U.S. Marines deployed to Los Angeles amid protests against immigration raids.

In interviews with The Times, spokespeople for six veterans' advocacy organizations said many troops were troubled by the assignment, which they viewed as overtly political and as pitting them against fellow Americans.

Advocates also said they worry about the domestic deployment's potential effects on military retention and recruitment, which recently rebounded after several years in which various branches failed to meet recruiting goals.

A-324

"What we're hearing from our families is: 'This is not what we signed up for,' " said Brandi Jones, organizing director for the Secure Families Initiative, a nonprofit that advocates for military spouses, children and veterans. "Our families are very concerned about morale."



Horse riders make their way past U.S. Marines near the Paramount Home Depot during the Human Rights Unity Ride on Sunday. (Carlin Stiehl/Los Angeles Times)

Janessa Goldbeck, a U.S. Marine Corps veteran and chief executive of the nonprofit Vet Voice Foundation, said that, among the former Marine Corps colleagues she has spoken to in recent weeks, "There's been a universal expression of, 'This is an unnecessary deployment given the operational situation.'"

"The fact that the LAPD and local elected officials repeatedly said deploying the National Guard and active -duty Marines would be escalatory or inflammatory and the

president of the United States chose to ignore that and deploy them anyway puts the young men and women in uniform in an unnecessarily political position," she said.

She added that the "young men and women who raised their right hand to serve their country" did "not sign up to police their own neighbors."

Trump has repeatedly said Los Angeles would be "burning to the ground" if he had not sent troops to help quell the protests.

"We saved Los Angeles by having the military go in," Trump told reporters last week. "And the second night was much better. The third night was nothing much. And the fourth night, nobody bothered even coming."

The troops in Los Angeles do not have the authority to arrest protesters and were deployed only to defend federal functions, property and personnel, according to the military's U.S. Northern Command.

Task Force 51, the military's designation of the Los Angeles forces, said in an email Saturday that "while we cannot speak for the individual experience of each service member, the general assessment of morale by leadership is positive."

The personnel's "quality of life," the statement continued, is "addressed through the continued improvement of living facilities, balanced work-rest cycles, and access to chaplains, licensed clinical social workers, and behavioral health experts."



U.S. Marines guard the Federal Building at the corner of Veteran Avenue and Wilshire Boulevard in Los Angeles. (Genaro Molina/Los Angeles Times)

It is unclear whether the National Guard troops, federalized under Title 10 of the United States Code, had been paid as of this weekend. Task Force 51 told The Times on Saturday that the soldiers who received 60-day activation orders on June 7 "will start receiving pay by end of the month" and that "those that have financial concerns have access to resources such as Army Emergency Relief," a nonprofit charitable organization.

U.S. Rep. Derek Tran (D-Orange), an Army veteran and member of the House Armed Services Committee, said he has asked Defense Secretary Pete Hegseth "for his plan to manage the logistics of this military activation, but he has failed to provide me with any clear answers."

Tran said in a statement to The Times that "the pattern of disrespect this Administration has shown our Veterans and active-duty military personnel is disgraceful, and I absolutely think it will negatively impact our ability to attract and retain the troops that keep America's military capacity the envy of the world."

Diana Crofts-Pelayo, a spokeswoman for Gov. Gavin Newsom, said in an email that the governor is "worried how this mission will impact the physical and emotional well-being of the soldiers deployed unnecessarily to Los Angeles."

On June 9, Newsom [posted photos on X](posted-photos-on-x) depicting National Guard soldiers crowded together, sleeping on concrete floors and what appeared to be a loading dock. Newsom wrote that the president sent troops "without fuel, food, water or a place to sleep."

Task Force 51 told The Times that the soldiers in the photos "were not actively on mission, so they were taking time to rest." At the time, the statement continued, "it was deemed too dangerous for them to travel to better accommodations."

Since then, according to Task Force 51, the military has contracted "for sleeping tents, latrines, showers, hand-washing stations, hot meals for breakfast, dinner and a late-night meal, and full laundry service."

"Most of the contracts have been fulfilled at this time," the military said.

Abigail Jackson, a White House spokeswoman, said in a statement to The Times that Newsom "should apologize for using out-of-context photos of National Guardsmen to try and make a political argument."

"Under President Trump's leadership military morale is sky high because our troops know they finally have a patriotic Commander-In-Chief who will always have their backs," Jackson wrote.

Troops have been posted outside federal buildings in an increasingly quiet downtown Civic Center — a few square blocks within the 500-square-mile city.

Their interactions with the public are far different from those earlier this year, when Newsom deployed the National Guard to L.A. County to help with wildfire recovery efforts after the Eaton and Palisades fires.

At burn zone check points, National Guard members were often spotted chatting with locals, some of whom brought food and water and thanked them for keeping looters away.

But downtown, soldiers have stood stone-faced behind riot shields as furious protesters have flipped them off, sworn at them and questioned their integrity.



Members of the California National Guard stand by as thousands participate in the "No Kings" protest demonstration in downtown Los Angeles on June 14. (Genaro Molina/Los Angeles Times)

During the boisterous "No Kings" protests on June 14, a woman held up a mirror to troops outside the downtown Federal Building with the words: "This is not your job. It's YOUR LEGACY." On a quiet Wednesday morning, a UCLA professor, standing solo outside the Federal Building, held up a sign to half a dozen Guard members reading: "It's Called the Constitution You F—ers."

James M. Branum, an attorney who works with the Military Law Task Force of the National Lawyers Guild, said that, in recent weeks, the task force has received two to three times more than the usual volume of referrals and direct calls. The upward trend began after Trump came into office, with people calling about the war in Gaza and increased military deployment to the U.S. southern border — but calls spiked after troops were sent to Los Angeles, he said.

"A lot of these folks joined because they want to fight who they see as the terrorists," Branum said. "They want to fight enemies of the United States … they never envisioned they would be deployed to the streets of the United States."

In his June 7 memo federalizing the National Guard, Trump called for their deployment in places where protests against federal immigration enforcement were occurring or "are likely to occur." The memo does not specify Los Angeles or California.

California officials have sued the president over the deployment, arguing in a federal complaint that the Trump administration's directives are "phrased in an ambiguous manner and suggest potential misuse of the federalized National Guard."

"Guardsmen across the country are on high alert, [thinking] that they could be pulled into this," said Goldbeck, with the Vet Voice Foundation.

Jones, with the Secure Families Initiative, said military families "are very nervous in this moment."

"They are so unprepared for what's happening, and they're very afraid to speak publicly," she said.

Jones said she had been communicating with the wife of one National Guard member who said she had recently suffered a stroke. The woman said her husband had been on Family and Medical Leave Act leave from his civilian job to care for her. The woman said his leave was not recognized by the military for the domestic assignment. He was deployed to Los Angeles, and she has been struggling to find a caregiver, Jones said.

Jones said her own husband, an active-duty Marine, deployed to Iraq in 2004 with the 2nd Battalion, 7th Marine Regiment based at Twentynine Palms — the same infantry unit now mustered in Los Angeles.

The unit was hard hit in Afghanistan in 2008, with at least 20 Marines killed and its high rate of suicide after that year's deployment highly publicized.

Jones said she was stunned to learn the battalion — nicknamed the War Dogs — was being deployed to Los Angeles.

"I said, 'Wait, it's 2/7 they're sending in? The War Dogs? Releasing them on Los Angeles?' It was nuts for me," Jones said. "To hear that unit affiliated with this — for my family that's been serving for two decades, it brings up a lot."

The Los Angeles deployment comes at a time of year when the California National Guard is often engaged in wildfire suppression operations — a coincidence that has raised concerns among some officials.

On June 18, Capt. Rasheedah Bilal was activated by the California National Guard and assigned to Sacramento, where she is backfilling in an operational role for Joint Task Force Rattlesnake, a National Guard firefighting unit that is now understaffed because roughly half its members are deployed to Los Angeles.

"That's a large amount to pull off that mission ... so you have to activate additional Guardsmen to cover on those missions," said Bilal, speaking in her capacity as executive director of the nonprofit National Guard Assn. of California.

National Guard members are primarily part-time soldiers, who hold civilian jobs or attend college until called into active duty. In California — a state prone to wildfires, earthquakes and floods — they get called into duty a lot, she said.

Many of the National Guard soldiers in downtown Los Angeles are the same ones who just finished a 120-day activation for wildfire recovery, she said.

"You have the state response to fire and then federal activation? It becomes a strain," Bilal said.

"They haven't complained," she added. "Soldiers vote with their feet. We're mostly quiet professionals and take a lot of pride in our job. [But] you can only squeeze so much of a lemon before it is dry. You can only pound on the California Guardsmen without it affecting things like retention and recruiting."

## More to Read

**From the L.A. Olympics to Oakland, California braces for Trump National Guard deployments**

Aug. 13, 2025



**More than 1,000 National Guard troops leaving L.A. Newsom says Trump's 'political theater backfired'**

July 31, 2025



**National Guard came to L.A. to fight unrest. Troops ended up fighting boredom**

July 17, 2025





**Hailey Branson-Potts**

Hailey Branson-Potts is a Metro reporter who joined the Los Angeles Times in 2011. She reports on a wide range of issues and people, with a special focus on communities along the coast. She grew up in the small town of Perry, Okla., and graduated from the University of Oklahoma.



**Phi Do**

Phi Do is a data journalist for the Los Angeles Times. Before joining The Times in 2018, she helped develop databases for Voice of OC and wrote for the Santa Barbara Independent and the Hollywood Reporter. She graduated from UC Santa Barbara where she created a new data journalism section at the student newspaper, the Daily Nexus. Tips can be sent to Signal: (213) 267-3953.

Copyright © 2025, Los Angeles Times | Terms of Service | Privacy Policy | CA Notice of Collection | Do Not Sell or Share My Personal Information

# EXHIBIT 18

(364 of 483), Page 364 of 483
Case 3:25-cv-04870-CRB    Document 183-2    Filed 09/02/25    Page 124 of 131
Case: 25-3727, 10/07/2025, DktEntry: 126.1, Page 364 of 483

# Trump's National Guard Troops Are Questioning Their Mission in L.A.

Thousands of National Guard members have served in the L.A. region since last month. Six soldiers spoke in interviews about low morale over the deployment.

▶ **Listen to this article · 11:09 min**  Learn more

 **By Shawn Hubler**

July 16, 2025

When the California National Guard rolled into Los Angeles to respond to devastating wildfires in January, Southern Californians largely hailed the troops as heroes. Celebrities thanked them for their service in Pacific Palisades. Suburban homeowners competed to chat them up at traffic checkpoints in Altadena.

Seven months later, much of that good will is gone.

Protesters jeer the troops as they guard federal office buildings. Commuters curse the behemoth convoys clogging freeways. Family members grill members with questions about whether they really have to obey federal orders.

The level of public and private scorn appears to have taken a toll on the National Guard deployment to Los Angeles that President Trump announced last month, citing protests over immigration raids. Interviews with nearly two dozen people — including soldiers and officers as well as officials and civilians who have worked closely with the troops — show that many members of the Guard are questioning the mission. The deployment's initial orders to quell scattered protests have given way to legally disputed assignments backing up federal immigration agents.

↬

"They gave Disneyland tickets to the people who worked in the wildfires," one soldier said. "Nobody's handing out Disneyland tickets now."

Six members of the Guard — including infantrymen, officers and two officials in leadership roles — spoke of low morale and deep concern that the deployment may hurt recruitment for the state-based military force for years to come. Those who were interviewed spoke on the condition of anonymity, because military orders bar Guard personnel from publicly discussing the federal deployment and they feared retribution for talking to the media.

All but one of the six expressed reservations about the deployment. Several said they had raised objections themselves or knew someone who objected, either because they did not want to be involved in immigration crackdowns or felt the Trump administration had put them on the streets for what they described as a "fake mission."

The New York Times reached out to a broad pool of soldiers seeking interviews about the deployment. While a small sample, the six soldiers' comments aligned with other signs of poor morale.

At least 105 members of the deployment sought counseling from behavioral health officers, and at least one company commander and one battalion commander who objected to the mission were reassigned to work unrelated to the mobilization, the Guard officers said. Some troops became so disgruntled that there were several reports of soldiers defecating in Humvees and showers at the Southern California base where the troops are stationed, prompting tightened bathroom security.

The California National Guard had 72 soldiers whose enlistment was set to expire during the deployment. Of those 72, at least two have now left the Guard and 55 others have indicated that they will not extend their service, according to the office of Gov. Gavin Newsom, who is fighting Mr. Trump's deployment in court. That number, if troops act on it, would amount to a 21 percent retention rate, far lower than the Guard's typical 60 percent rate, officials said.



President Trump deployed National Guard troops to Southern California starting on June 7. Alex Welsh for The New York Times

"The moral injuries of this operation, I think, will be enduring," one of the two Guard officials said. "This is not what the military of our country was designed to do, at all."

> **Sign up for the Race/Related Newsletter** Join a deep and provocative exploration of race, identity and society with New York Times journalists. Get it sent to your inbox.

The six soldiers are a fraction of the thousands of troops who have been deployed to Los Angeles. Many members of the Guard have had no trouble taking part in the operation and have voiced no personal conflicts or concerns. It's not uncommon for soldiers in Guard deployments to complain about their assignments, question the

reasons they were called up or seek counseling during deployments. Earlier this year, after National Guard soldiers were called in to keep order in the New York State prison system after corrections officers went on strike, some troops described feeling unprepared and took issue with not being provided pepper spray or other means of protecting themselves.

Officials with the military's Northern Command, which is overseeing the president's military response in California, said the deployment was more organized than the interviewed soldiers suggested. The officials declined to comment on the morale of the troops, their behavioral health, the reassignments or the deployment's impact on re-enlistment.

Mr. Trump began deploying thousands of troops on June 7 to Southern California, making the case that the state's Democratic leaders were failing to protect federal agents and property after immigration raids sparked protests. The president commandeered a total of 4,100 California National Guard members who ordinarily are controlled by Mr. Newsom, and dispatched an additional 700 Marines.

Since then, the military presence in California has been a flashpoint of debate, as armed soldiers have faced down protesters outside federal buildings and accompanied federal agents conducting raids in the Los Angeles region. Several operations have drawn intense backlash, including a show of force in MacArthur Park and an immigration raid on a cannabis farm in Ventura County where a fleeing farmworker fell from a greenhouse and later died.

The deployment has started scaling back. On July 1, the president agreed to release about 150 Guard troops in a specialized wildfire fighting unit, and on Tuesday, the Pentagon announced that 1,990 members of the Guard's 79th Infantry Brigade Combat Team will begin demobilization. It was unclear if the president would end the mission after 60 days, as his order initially suggested. The other half of the deployment — 1,892 members of the 49th Military Police Brigade — remains.

The six soldiers said that even though they are receiving higher pay and more benefits on a federal mission than they would under a state activation, they are eager to go home. The National Guard is ordinarily a part-time commitment, and

many members have been on almost continuous duty since Mr. Newsom summoned them after the fires to assist local authorities.

The new mission has put them at odds with communities and families, several soldiers said. Mr. Trump's immigration crackdown has spread fear and panic in Hispanic immigrant communities in the Los Angeles region. A majority of the California National Guard's 18,000 members are based in Southern California, and roughly 40 percent of them are of Hispanic heritage.



A California National Guard soldier guards a federal building in downtown Los Angeles.  Philip Cheung for The New York Times

Not all the Latino soldiers who spoke with The Times objected to the mission. One Hispanic commander from the Central Valley said that his grandparents came to the United States legally and that he felt no conflict. He noted, however, that National Guard soldiers must obey orders either way.

Other Latino soldiers have raised formal and informal objections.

In one incident that several soldiers said occurred early in the deployment, 60 troops were awaiting transport to planned immigration raids in Ventura County when a Latino soldier approached officers in charge of the mission. He told them that he strongly objected, and he offered to be arrested rather than take part in the operation. Eventually, they said, he was reassigned to administrative tasks. Officials at the military's Northern Command declined to comment about the incident.

Missions have come under intense scrutiny for potential constitutional violations. California authorities have challenged the legality of the deployment, citing a 19th-century law, the Posse Comitatus Act, which generally makes it illegal to use federal troops for law enforcement on domestic soil unless there is an insurrection.

Trump administration officials and Justice Department lawyers have argued that troops are "not engaged in law enforcement" but are merely protecting federal agents. Civil liberties groups have disputed that portrayal, pointing to the temporary detention of one man by Marines early in the deployment.

A federal judge has set a trial for August to determine whether the use of the National Guard and Marines has violated federal law.

Most troops have been stationed at the Joint Forces Training Base in Los Alamitos, a federally-owned facility operated by the California National Guard near Long Beach. The soldiers said breakfasts are hearty — eggs, hash browns, sausage, pancakes — and accommodations are comfortable. Despite efforts to keep them busy, however, they reported long stretches of downtime and frustration with missions that leaked or were canceled by the time lumbering convoys reached their destinations.

MacArthur Park was all but empty on July 7 when federal agents arrived to show that they could "go anywhere, anytime we want in Los Angeles," as one immigration official told Fox News. About 80 National Guard members who arrived for backup mostly stayed in their trucks.



A mix of U.S. Marines and National Guard soldiers guard a federal building in the Westwood neighborhood of Los Angeles last month. Philip Cheung for The New York Times

On the base, soldiers said, they received riot training, reviewed battlefield maneuvers and drilled to leap from their cots and gear up at a moment's notice. But mostly, they said, they lounged in warehouse-sized tents, listening to music

and playing games on their cell phones. Only about 400 of the 3,882 deployed Guard members had actually been sent on assignments away from the base, Guard figures showed.

A spokeswoman for the Northern Command's U.S. Army North component said that the routine for service members "varies on a day-to-day basis." Many assignments on the base involve "practicing de-escalation and crowd control techniques and fulfilling annual training requirements, all while maintaining cycles of rest and recuperation," she added.

In Los Alamitos, a coastal suburb of about 12,000 people, the troops have crowded into a two-square-mile facility that is shared with other government agencies, which have balked at the encroachment. In emails obtained through a public records request, workers in a joint program to eradicate the Mediterranean fruit fly complained that troops shaving and brushing their teeth are crowding the bathrooms and that scientists are unsettled by nearby trucks full of explosives.

Soldiers meander down new walkways between a huge tent city and new semi-permanent buildings. "I've lived here 33 years and this is the first I've seen anything like this," the mayor of Los Alamitos, Shelley Hasselbrink, said. "We call it the circus — they look like big circus tents."

Two Democratic officials who were granted brief access to the base — Josh Fryday, a Navy veteran who leads community engagement for the governor's office, and Representative Derek Tran, an Army veteran who represents Los Alamitos — said the massive military presence, which has been projected to cost $134 million, seemed excessive and extreme.

"If they can do this here," Mr. Fryday said, "they can do it in any community."

**Shawn Hubler** is The Times's Los Angeles bureau chief, reporting on the news, trends and personalities of Southern California.

A version of this article appears in print on , Section A, Page 17 of the New York edition with the headline: Some National Guard Troops Deployed by Trump Question Mission

(372 of 483), Page 372 of 483
Case: 25-3727, 10/07/2025, DktEntry: 126.1, Page 372 of 483
Case 3:25-cv-04870-CRB   Document 183-4   Filed 09/02/25   Page 1 of 5

**ROB BONTA**
Attorney General of California
MICHAEL L. NEWMAN
THOMAS S. PATTERSON
Senior Assistant Attorneys General
ANYA M. BINSACCA
MARISSA MALOUFF
JAMES E. STANLEY
Supervising Deputy Attorneys General
NICHOLAS ESPÍRITU
LUKE FREEDMAN
BARBARA HORNE-PETERSDORF
LORRAINE LOPEZ
KENDAL MICKLETHWAITE
JANE REILLEY
MEGAN RICHARDS
MEGHAN H. STRONG
BRENDAN HAMME
Deputy Attorneys General
 300 S. Spring St.
 Los Angeles, CA 90013
 Telephone: (213) 269-6598
 E-mail: Brendan.Hamme@doj.ca.gov
*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| **GAVIN NEWSOM, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF CALIFORNIA; STATE OF CALIFORNIA,**<br><br>                    Plaintiffs,<br><br>              v.<br><br>**DONALD TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; PETE HEGSETH, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF DEFENSE; U.S. DEPARTMENT OF DEFENSE,**<br><br>                    Defendants. | Case No: 3:25-cv-04870-CRB<br><br>**DECLARATION OF SEAN DURYEE** |

1

# DECLARATION OF SEAN DURYEE

I, Sean Duryee, declare as follows:

1. I am over the age of 18 years and a U.S. citizen. I know the following facts based on my own personal knowledge and on my review of information and records gathered by California Highway Patrol (CHP) staff in the ordinary course of business. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am employed by the CHP as a law enforcement officer. I graduated from the CHP Academy in October of 1998 and have been continuously employed since that time as a member of the CHP. I have worked in three different field divisions including the Valley, Northern and Golden Gate Divisions. I have held the rank of officer, sergeant, lieutenant, captain, assistant chief, chief, assistant commissioner, and deputy commissioner. I currently serve as the Commissioner of the CHP.

3. As the Commissioner, I have command and responsibility of the CHP, the largest state law enforcement agency in the United States. I have held this position for 2 years and 6 months. I have served as a police officer in California for more than 26 years. I have extensive experience and training in mitigating civil unrest. I have held positions on Special Response Teams (SRT) as a supervisor, platoon leader, and commander. Throughout my career, I have deployed numerous times to civil unrest or violent protests.

4. During the June 2025 civil unrest in Los Angeles, I communicated regularly and coordinated with the Chief of the Los Angeles Police Department (LAPD) and the Sheriff of the Los Angeles Sheriff's Department (LASD) to ensure adequate law enforcement resources were deployed to restore order, enforce the law, and protect protestors' First Amendment rights. I was personally present at the protests in Los Angeles from the night of Sunday, June 8, 2025, to Wednesday, June 11, 2025. The protests in Los Angeles were not unlike other protests I have

2

1   experienced in California. Local and State law enforcement resources were

2   sufficient to restore order, enforce the law, protect life and property, and allow

3   Californians to exercise their Constitutional right to protest.

4        5.   My prior June 19, 2025 declaration submitted to the Court in this matter

5   describes the extensive response of CHP and local law enforcement agencies to the

6   June 2025 Los Angeles-area protests, including their work to protect federal

7   property and personnel. In particular, that declaration explains that over four

8   thousand officers from LAPD, LASD, CHP, and neighboring local law

9   enforcement agencies responded to protest-related incidents from June 6 to June 19,

10   2025, many of which were mobilized pursuant to California's Law Enforcement

11   Mutual Aid System.

12        6.   CHP resources dedicated to the June 2025 Los Angeles-area protests

13   included Special Response Teams drawn from five different CHP Divisions around

14   the state. The Special Response Teams are specially equipped and trained in crowd

15   control techniques and have been responsible for CHP's response to unlawful

16   protests. In addition to the annual training on managing civil disturbances that all

17   CHP officers receive, all Special Response Team members are required to complete

18   an initial Commission on Peace Officer Standards and Training certified 24-hour

19   course. Each Division's Special Response Team also completes quarterly training

20   on relevant topics. Further, Special Response Team members annually complete an

21   additional 12-hour recertification course, which includes practical scenarios based

22   on current events. Additionally, the Special Response Teams have Logistics Units

23   that are responsible for booking arrestees, furnishing necessary supplies, and

24   transport of arrestees. During the Los Angeles Protest Incidents, these Special

25   Response Teams have been used as a rapid reaction force mobilizing quickly to hot

26   spots as needed.

27        7.   In addition to these Special Response Teams, CHP deployed numerous

28   other specialized units to Los Angeles to help manage these incidents. These

(375 of 483), Page 375 of 483
Case 3:25-cv-04870-CRB    Document 183-4    Filed 09/02/25    Page 4 of 5
Case: 25-3727, 10/07/2025, DktEntry: 126.1, Page 375 of 483

1    include commercial enforcement units providing logistics and supplies; canine

2    units; air operations units, including airplanes and helicopters, that monitor and

3    track crowd movements, and have the capability to track particular vehicles

4    believed to have been involved in criminal activity; mounted units on horseback

5    specially trained in crowd control techniques; and a detective unit that specializes in

6    the investigation of felonious criminal activity, including identification and

7    investigation of individuals who assault law enforcement officers.

8        8.    CHP uniformed officers also provided security and traffic control on

9    major freeways in the Los Angeles area. In particular, our officers were focused on

10   preventing freeway incursions by protestors and other pedestrians. CHP also

11   maintained a Mobile Field Force ready to respond to incidents on freeways in and

12   around Los Angeles.

13       9.    I am not aware of any large-scale, protest-related activities in the Los

14   Angeles area since June 19, 2025, and therefore there have been no arrests resulting

15   from such activities occurring after June 19. Additionally, I am unaware of any

16   requests for assistance or mutual aid requests from local law enforcement agencies

17   related to large-scale protest activities in the Los Angeles area during this time and

18   I have not issued any protest-related targeted deployments of personnel in the Los

19   Angeles area since June 19, 2025.

20       10.   Since June 19, 2025, I have not received reports or notification of any

21   significant protest-related violence or property destruction in or around Los

22   Angeles. Based on my regular communication with the leadership of local law

23   enforcement agencies, as well as my field executives in Southern California, if

24   there were other such incidents I would expect to be aware of them.

25       11.   CHP stands ready to respond to any future significant protest activities

26   anywhere in California, including in the Los Angeles area, with all the resources

27   previously described above.

28

4

Declaration of Sean Duryee
A-346

1      I declare under penalty of perjury under the laws of the United States that the

2    foregoing is true and correct.

3      Executed on August 28, 2025, in Sacramento, California.

4

5      _____

6                        Sean Duryee, Commissioner,
                          California Highway Patrol

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **ROB BONTA**
     Attorney General of California
2    MICHAEL L. NEWMAN
     THOMAS S. PATTERSON
3    Senior Assistant Attorneys General
     ANYA M. BINSACCA
4    MARISSA MALOUFF
     JAMES E. STANLEY
5    Supervising Deputy Attorneys General
     NICHOLAS ESPIRITU
6    LUKE FREEDMAN
     BARBARA HORNE-PETERSDORF
7    LORRAINE LOPEZ
     KENDAL MICKLETHWAITE
8    JANE REILLEY
     MEGAN RICHARDS
9    MEGHAN H. STRONG
     BRENDAN HAMME
10   Deputy Attorneys General
      300 S. Spring St.
11    Los Angeles, CA 90013
      Telephone: (213) 269-6598
12    E-mail: Brendan.Hamme@doj.ca.gov
     *Attorneys for Plaintiffs*

13

14              IN THE UNITED STATES DISTRICT COURT

15            FOR THE NORTHERN DISTRICT OF CALIFORNIA

16

17   **GAVIN NEWSOM, IN HIS OFFICIAL**         Case No: 3:25-cv-04870-CRB
     **CAPACITY AS GOVERNOR OF THE**
18   **STATE OF CALIFORNIA; STATE OF**
     **CALIFORNIA,**

19                              Plaintiffs,
                                                **DECLARATION OF GERMAN**
20          v.                                  **HURTADO**

21   **DONALD TRUMP, IN HIS OFFICIAL**
22   **CAPACITY AS PRESIDENT OF THE**
     **UNITED STATES; PETE HEGSETH, IN**
23   **HIS OFFICIAL CAPACITY AS SECRETARY**
     **OF THE DEPARTMENT OF DEFENSE;**
24   **U.S. DEPARTMENT OF DEFENSE,**

25
                                Defendants.
26

27

28

55271542.1                          1

# DECLARATION OF GERMAN HURTADO

I, German Hurtado, declare as follows under 28 U.S.C. § 1746:

1.  I am over the age of 18 years and a U.S. citizen. I have personal knowledge of all facts stated except for those facts specifically stated to be based on information and belief. If called as a witness, I could and would testify competently to the matters set forth below.

2.  I have been employed with the Los Angeles Police Department ("LAPD" or "Department") since July 6, 1998. I am the Commanding Officer of the Central Bureau and hold the rank of Deputy Chief. The Central Bureau covers a population of roughly 842,700 people, encompasses 65 square miles, and includes Downtown Los Angeles, Boyle Heights, Echo Park, Eagle Rock, Highland Park, Los Feliz, and MacArthur Park. The bureau borders Burbank, Glendale, Pasadena, South Pasadena, Alhambra, East Los Angeles, Vernon, and Huntington Park.

3.  As a Deputy Chief, I am aware of and familiar with LAPD's various policies and practices, including those regarding First Amendment protests, unlawful assemblies, and crowd control. I also serve as the Department Immigration Affairs Liaison ("DIAL"). In my capacity as the DIAL, I am responsible for the oversight of LAPD's practices and policies regarding criminal immigration enforcement, joint operations and task forces with federal law enforcement agencies such as U.S. Immigration and Customs Enforcement ("ICE"), the transfer of arrestees to other agencies, and the sharing of criminal investigative and custodial information with other entities and the public. I am also familiar with local, state, and federal law involving the detention, arrest, transfer, and sharing of information with other law enforcement entities.

4.  Before my service with the Department, I served as a sergeant in the United States Marine Corps. During that service, my assignments included Special Operations Training Group, and 1st Marine Division, Combat Engineer Battalion.

(379 of 483), Page 379 of 483
Case: 25-3727, 10/07/2025, DktEntry: 126.1, Page 379 of 483
Case 3:25-cv-04870-CRB    Document 183-5    Filed 09/02/25    Page 3 of 7

**LAPD's Public Safety Mission and Training in First Amendment Activities**

5. The mission of the LAPD is to safeguard the lives and property of the people it serves, to reduce the incidence and fear of crime, and to enhance public safety while working with the diverse communities of Los Angeles to improve their quality of life. The Department seeks to work in partnership with the people and organizations within the City to solve local problems that affect public safety.

6. In light of its status as the police department of the second largest city in the nation, LAPD has great familiarity in handling large-scale pre-planned demonstrations, protests, and events, which occur regularly and with great frequency city-wide. The history of peaceful protests and demonstrations in Los Angeles has allowed the Department to form relationships with frequent protest organizers in order to facilitate peaceful demonstrations.

7. The Department also has experience in dealing with spontaneous protests, such as the mass George Floyd protests that occurred in the City of Los Angeles ("City") and other major cities around the country in May and June, 2020. The Department learned many lessons during the ten days of those demonstrations and civil unrest, and has since trained its personnel on updated crowd management and crowd control techniques in order to facilitate peaceful protests and attempt to de-escalate tense, hostile and potentially violent situations.

8. The LAPD is a highly trained and professional department, accustomed to protests, adept at crowd control, and well versed in managing public safety, with long established protocols for requesting and receiving mutual aid and assistance from, and providing mutual aid and assistance to, other law enforcement agencies when the need arises. The LAPD regularly trains its officers to handle situations that require balancing individual rights of speech, expression, and assembly with the need to protect public safety, residents, and property.

9. In the last few years alone, the LAPD launched and implemented an initiative to protect Los Angeles by conducting quarterly and yearly exercises to

Declaration of German Hurtado (3:25-cv-04870-CRB)
**A-350**

1    practice managing large-scale First Amendment assemblies. That initiative also

2    includes engaging the public to help inform best practices, and to solicit feedback to

3    better suit the community's stated needs.  These measures, among many others,

4    ensure not only that the LAPD can manage large assemblies, but also that the

5    community feels comfortable placing its trust in the LAPD.

6    **Details of Recent Protest Activity**

7        10.    On June 6, federal agents began a series of immigration enforcement

8    actions both in the City and around the County of Los Angeles. As a result of these

9    actions, a series of protests occurred, primarily focused on an area of approximately

10    10 blocks (less than a square mile) in Downtown Los Angeles. Los Angeles is a

11    charter city that covers 469 square miles and is home to nearly four million people.

12        11.    Since the national "No Kings" day protests on June 14, 2025, there

13    have only been a few immigration-related protests around the City with often just a

14    few dozen protestors at a time.  These recent protest activities often originate in

15    response to the ongoing federal immigration operations.  The Department is well

16    equipped to handle these protests and did so without mutual aid, the National

17    Guard, or even the Department's own specialized crime suppression units.

18        12.    Sending in the National Guard to provide support in local crowd

19    control and protest situations is a decision the LAPD usually makes as a local law

20    enforcement agency with incident command, our local law enforcement partners,

21    and our state counterparts. Over the 27 years I have been with the Department,

22    there have been just a few times where LAPD has requested that the State of

23    California provide support from the National Guard under the Governor's control to

24    perform discrete and limited tasks, for the limited purpose of freeing up local law

25    enforcement personnel and resources to perform core policing and public safety

26    functions.

27        13.    Most recently, during the George Floyd demonstrations in May-June

28    2020, LAPD coordinated with the State of California to deploy the National Guard

1    to perform discrete tasks – such as securing critical infrastructure and protecting

2    other fixed posts – which allowed LAPD to free up its officers and deploy them to

3    facilitate demonstrations and undertake crowd control functions. To the best of my

4    personal knowledge, and on information and belief, there has been no situation in

5    the last 35 years where the National Guard or any other military unit has been

6    deployed without a request from or advance notice to the LAPD.

7        14.    Even when the National Guard is there in a cooperative function with

8    LAPD, their presence can present challenges. For example, during the May-June

9    2020 demonstrations, the LAPD documented some of the difficulties in maintaining

10   clear communications and unified command with the National Guard, including

11   that their members were not familiar with the rules of engagement, the laws of

12   arrest, or rules and policy regarding the use of force in policing and domestic law

13   enforcement.

14       15.    To minimize these challenges, it is important for local law

15   enforcement to coordinate in advance any deployment by the National Guard, and

16   to have the discretion to determine where, when, and in what capacity they should

17   be deployed. When the National Guard remains under the Governor's control, well

18   established lines of coordination with the Governor's Office facilitate

19   communications, constitutional policing, and a unified command. These, in turn,

20   reduce the likelihood of escalation, better protect lives and property, and provide a

21   framework for the arrest and prosecution of criminals and restoration of public

22   safety and order.

23       16.    LAPD has seen firsthand that deploying the National Guard in

24   coordination with the Governor's Office can be advantageous. For example, during

25   the Palisades Fire recovery, approximately 155 National Guard personnel were

26   deployed daily alongside the LAPD officers, Los Angeles Sheriff's Department

27   deputies, and California Highway Patrol officers, working in concert to combat the

28   devastating consequences of the worst natural disaster in Southern California's

1  history, the January 2025 wildfires. The National Guard staffed the Traffic Control

2  Points leading into the area, had a liaison assigned to the incident for seamless

3  communication, and followed the unified command for coordination.

4       17.    Outside of the obvious differences in mission and overall purpose of

5  the local law enforcement and our nation's military, the LAPD relentlessly trains its

6  personnel on the tenets of constitutional policing, use of force, and crowd

7  management and control, as well as historical perspective of the local communities

8  and police relations. To ensure the adherence to Department policies, as well as

9  state and federal laws, the LAPD officers' response to protests and demonstrations

10  are guided by, among other documents and training, six directives on less-lethal use

11  of force and options, two training bulletins covering crowd control and crowd

12  management, as well as two tactical concepts documents. The LAPD personnel is

13  versed on all of the aspects of the Incident Command System, a standardized

14  approach that provides a common framework for command, control, and

15  communication while managing emergency response, and regularly practices it

16  with our local law enforcement and fire partners.

17       18.    In the month of June, 2025, the Department: deployed a total of 10,196

18  personnel (counted in days of deployment, not individual officers); spent an

19  estimated $27.8 million in total cost; and arrested or cited 556 people.

20       19.    Since July 1, the Department has had to deploy far fewer resources in

21  response to immigration-related protest activity, including in and around federal

22  property, as large-scale protests have subsided.

23  >>>

24  >>>

25  >>>

26  >>>

27  >>>

28

55271542.1                  6

1    20.    I declare under penalty of perjury under the laws of the United States

2    that the foregoing is true and correct.

3

4    Executed on August 29, 2025, at Los Angeles, California.

5

6

7    _____

8    Deputy Chief German Hurtado

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

55271542.1                                        7

1   BRETT A. SHUMATE
    Assistant Attorney General
2   ERIC J. HAMILTON (CA Bar No. 296283)
    Deputy Assistant Attorney General
3   ALEXANDER K. HAAS (CA Bar No. 220932)
    Branch Director
4   JEAN LIN (NY Bar No. 4074530)
    Special Litigation Counsel
5   CHRISTOPHER EDELMAN (DC Bar No. 1033486)
    Senior Counsel
6   GARRY D. HARTLIEB (IL Bar No. 6322571)
7   BENJAMIN S. KURLAND (DC Bar No. 1617521)
    Trial Attorneys
8   U.S. Department of Justice
    Civil Division, Federal Programs Branch
9   1100 L Street, NW
    Washington, DC 20005
10  Telephone: (202) 598-7755
    ben.kurland@usdoj.gov
11  *Attorneys for Defendants*

12                 **UNITED STATES DISTRICT COURT**
13          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
                    **SAN FRANCISCO DIVISION**

14  

15  GAVIN NEWSOM, in his official capacity as        Case No. 3:25-cv-04870-CRB
    Governor of the State of California, et al.,

16                                                    **DEFENDANTS' RESPONSE BRIEF**
                    *Plaintiffs*,                     **REGARDING JURISDICTION**

17  

18          v.

19  DONALD J. TRUMP, in his official capacity as
    President of the United States of America, et al.,

20  

21                  *Defendants*.

22  

23  

24  

25  

26  

27  

28

1          On September 2, 2025, Plaintiffs moved for a preliminary injunction to: (1) enjoin the

2   continued service of approximately 300 members of the California National Guard; and (2) return

3   control of the California National Guard to Governor Newsom.  ECF No. 183 (Mot.) at 19.  This

4   Court has directed Defendants to address whether it has jurisdiction over this latest motion "even

5   though the Ninth Circuit has before it Defendants' appeal of this Court's June 12, 2025 order."

6   ECF No. 188 at 1.  It does not.  The pending appeal divests the Court of jurisdiction over this

7   motion because the motion seeks relief identical to the order on appeal to the Ninth Circuit, and

8   presents overlapping (if not identical) issues and arguments.

9          **1.** "The filing of a notice of appeal is an event of jurisdictional significance—it confers

10  jurisdiction on the court of appeals and divests the district court of its control over those aspects

11  of the case involved in the appeal."  *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58

12  (1982).  That principle divests the Court of jurisdiction over the pending motion.  For starters,

13  Plaintiffs' current motion seeks relief squarely on the grounds that the continuation of the

14  federalization and deployment is unauthorized by Section 12406.  Mot. at 1.  The relief Plaintiffs

15  seek is also functionally identical to the since-stayed relief currently on appeal.  *Compare* Mot. at

16  19 (seeking injunction enjoining continued deployment "and returning control of the California

17  National Guard to Governor Newsom"), *with* ECF No. 64 at 35 (Court's June 12 Order enjoining

18  Defendants "from deploying members of the California National Guard in Los Angeles" and

19  directing them "to return control of the California National Guard to Governor Newsom").  This

20  is in stark contrast with Plaintiffs' Posse Comitatus Act claim, which the Court's June 12 Order

21  did not address; and this Court's September 2 permanent injunction on that claim is nothing like

22  the relief previously granted by this Court and pending in the Ninth Circuit.  ECF Nos. 176, 182.[1]

23  Here, Plaintiffs seek in substance the *same injunction* that the Ninth Circuit is currently reviewing.

24         **2.** That is clearer still when one looks to the asserted grounds for Plaintiffs' current motion.

25  That motion seeks relief based on issues and arguments that necessarily overlap substantially

26  (indeed, virtually entirely) with the issues and arguments currently before the Ninth Circuit.  In

27

28  _____

[1] Defendants have sought a stay pending appeal of that injunction and partial judgment from the
Ninth Circuit, which has granted an administrative stay.  *See* No. 25-5553, ECF No. 7.1.

the pending appeal, the Ninth Circuit will decide whether Plaintiffs are likely to succeed in their challenge to the federalization and deployment of the California National Guard.  In doing so, the Ninth Circuit will first have to decide whether the President's determination under 10 U.S.C. § 12406 is subject to judicial review (as Plaintiffs contend), or whether (as Defendants contend) that determination is "conclusive upon all other persons," including the district court.  *Martin v. Mott*, 25 U.S. (12 Wheat.) 19, 30 (1827).  If the Ninth Circuit concludes that the determination is reviewable, it will then need to decide the standard of judicial review.  At the motion to stay stage, the panel "disagree[d] with Defendants' contention that § 12406 completely precludes judicial review of the President's determination," *Newsom v. Trump*, 141 F.4th 1032, 1047 (9th Cir. 2025), and concluded that "courts may at least review the President's determination to ensure that it reflects a colorable assessment of the facts and law within a range of honest judgment," while declining to "further specify the precise standard that governs [the court's] review," *id.* at 1051 (quotation marks omitted).  Notably, Plaintiffs' Ninth Circuit brief asks the merits panel to reconsider that highly deferential standard of review.  *See* No. 25-3727, ECF No. 63.1 at 14.

If the Ninth Circuit determines that the President's determination is reviewable, the merits panel will then determine, applying the appropriate standard of review, whether Plaintiffs are likely to succeed in their challenge to the President's determination that "there is a rebellion or danger of a rebellion against the authority of the Government of the United States," 10 U.S.C. § 12406(2), or "the President is unable with the regular forces to execute the laws of the United States," *id.* § 12406(3).  The stay panel held that Defendants are likely to prevail with respect to the President's determination under Section 12406(3), and thus did "not reach the other condition invoked by the President, § 12406(2), concerning 'rebellion.'"  *Id.* at 1051.  The Ninth Circuit will then decide whether Plaintiffs will suffer irreparable harm, and whether the balance of the equities and public interest weigh in favor of this Court's previous grant of injunctive relief.  *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).

**3.** Given this posture, it is clear that Plaintiffs seek functionally the same preliminary injunction, on basically the same theories.  And it is likewise clear that this Court could not

1   adjudicate the motion without encroaching on the aspects of the case currently before the Ninth

2   Circuit.

3        To decide Plaintiffs' instant motion, this Court would need to determine (as the Ninth

4   Circuit soon will) whether the federalization and deployment determination is reviewable, and if

5   so, the applicable standard of review.  The Court would also need to interpret two statutory

6   provisions that are also at issue in Plaintiffs' current motion: "a rebellion or danger of a rebellion

7   against the authority of the Government of the United States," 10 U.S.C. § 12406(2), and "unable

8   with the regular forces to execute the laws of the United States," *id.* § 12406(3).  Indeed, Plaintiffs'

9   motion contains substantial arguments about how the Court should interpret the language in these

10  two provisions, contending "that a 'rebellion' must be violent, armed, organized, and in open

11  defiance of the government as a whole, not merely isolated incidents of disruption," and that "the

12  extreme conditions necessary to trigger the other two subsections—foreign invasion or rebellion—

13  strongly suggest a similarly high bar as to an inability to execute the laws." Mot. at 9–10.  These

14  legal questions are squarely before the Ninth Circuit, as is the related issue of the level of deference

15  accorded to the President in making those determinations (assuming they are reviewable).  The

16  fact that Plaintiffs have interposed an objection to the duration of the order—based on the elapsing

17  of just 60 days—is not enough to allow this Court to issue a duplicative preliminary injunction

18  while the first one is pending, especially since the durational objection implicates many of the

19  same issues about the reviewability of the President's determinations, and the standard of review

20  if the determinations are reviewable.  Indeed, if anything, the durational objection is even more

21  committed to the President's discretion, because once the Guard is properly federalized, the

22  President (or his delegee) decides that they will be deployed "in such numbers as he considers

23  necessary to … execute those laws" that the regular forces are unable to execute.

24       **4.** Against all of this, Plaintiffs contend that this Court has jurisdiction over their current

25  motion because they are challenging a new decision, which was necessarily not before the Court

26  when it issued the June 12 Order. Mot. at 8.  This fails on multiple levels.  For one, a challenge to

27  the continuation of the mission is still a challenge to the Presidential Memorandum federalizing

28  the Guard; that Memorandum directed that "the duration of duty shall be for 60 days or at the

Defendants' Response Brief Regarding Jurisdiction
3:25-cv-04870-CRB

1    discretion of the Secretary of Defense." ECF No. 8-1 at 44. On July 30, Secretary Hegseth decided

2    to "[r]elease approximately 1,350 California National Guard personnel from Federal service" and

3    that "[a]pproximately 260 California National Guardsmen w[ould] remain in Federal service for

4    an additional 90 days, concluding on November 4, 2025." Decl. of Benjamin S. Kurland (Kurland

5    Decl.), Ex. A. Those decisions were communicated later in writing to the Commander for U.S.

6    Northern Command and California's adjutant general. Kurland Decl., Exs. A, B. And they were

7    communicated to servicemembers in the August 5 order that Plaintiffs cite. Secretary Hegseth's

8    decision thus released servicemembers and *maintained the status quo* for approximately 260

9    National Guardsmen in Southern California. As Plaintiffs acknowledge, Mot. at 6, the August 5

10    order did not cite new grounds or interject new considerations that are independent of the issues

11    currently pending before the Ninth Circuit. *See* ECF No. 140-2. On the contrary, it cited for

12    authority the June 7 Presidential Memorandum that this Court has ruled upon and that is the subject

13    of the pending appeal.

14    **4.** More fundamentally, Plaintiffs' jurisdictional theory appears to be that this Court can

15    consider their current motion because this motion challenges whether one of the grounds for

16    federalization existed when Secretary Hegseth decided to release some Guardsmen and continue

17    service for others—while the June 12 Order on appeal considered whether one of those grounds

18    existed on June 7 (when the Presidential Memorandum was issued). *See* Mot. at 1 (characterizing

19    this as a "distinct question"). This slices things too thinly and, as discussed above, this minor

20    tweak to Plaintiffs' legal theory does not give the Court jurisdiction to grant functionally the same

21    injunction based on virtually identical grounds. Indeed, given the short period of time between

22    the two (about 60 days), the Court could not meaningfully address the decision to continue the

23    Guard's presence without some assessment of the conditions that led to the Guard's federalization

24    in the first place. Plaintiffs' motion proves the point. They describe the protests as "mostly

25    peaceful" and stress the supposed sufficiency of state and local protection, all to support the

26    proposition that the President's federalization of the Guard was improper. Mot. at 2. And insofar

27    as conditions in Los Angeles have improved somewhat, that is undoubtedly at least in part because

28    the Guard's presence has *deterred* further attacks. But in any event, the dispositive point is that

1   Plaintiffs seek functionally the same injunction and this Court cannot entertain this current motion

2   without necessarily adjudicating numerous aspects of the case that are currently before the Ninth

3   Circuit.[2]  The Court lacks jurisdiction to do so.

4        **5.** Finally, to the extent this Court would have jurisdiction to consider the current motion—

5   on the theory that Secretary Hegseth's decision to release some servicemembers and continue

6   service for others is a new action that does not flow from the challenged Presidential Memorandum

7   and is allegedly unlawful on distinct grounds—Plaintiffs cannot challenge the August 5 order

8   without amending their complaint.  "When a plaintiff seeks injunctive relief based on claims not

9   pled in the complaint, the court does not have the authority to issue an injunction."  *Pac. Radiation*

10  *Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 633 (9th Cir. 2015).  The test "requires a

11  sufficient nexus between the claims raised in a motion for injunctive relief and the claims set forth

12  in the underlying complaint itself."  *Id.* at 636.  The complaint filed on June 9, of course, makes

13  no mention of Secretary Hegseth's July decision.  *See Indep. Petroleum Ass'n of Am. v. Babbitt*,

14  235 F.3d 588, 597 (D.C. Cir. 2001).  It does not identify that decision as an agency action subject

15  to review under the Administrative Procedure Act or one susceptible to review through any other

16  cause of action.  Plaintiffs must amend their complaint before the Court could possibly entertain

17  their motion.

18

19  Dated: September 5, 2025                          Respectfully submitted,

20

21                                                   BRETT A. SHUMATE
                                                     Assistant Attorney General
22                                                   Civil Division

23                                                   ERIC J. HAMILTON
                                                     Deputy Assistant Attorney General

24   _____

25  [2] This conclusion does not deny Plaintiffs an opportunity to challenge Secretary Hegseth's decision
    to release some Guardsmen and continue the service of others.  Plaintiffs have already obtained
26  from this Court the interim injunction that they seek, and their answering brief on appeal of course
    asks the Ninth Circuit to affirm this Court's June 12 order.  If Plaintiffs think there are distinct
27  grounds for a new injunction, they could also seek an indicative ruling from this Court.  *See* Fed.
    R. Civ. P. 62.1.  The dispositive point is that these aspects of the case are now before the Ninth
28  Circuit, not this Court.

Defendants' Response Brief Regarding Jurisdiction
3:25-cv-04870-CRB

A-360

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Federal Programs Branch
(CA Bar No. 296283)

ALEXANDER K. HAAS
(CA Bar No. 220932)
Director, Federal Programs Branch

JEAN LIN
(NY Bar No. 4074530)
Special Litigation Counsel
Federal Programs Branch

_____

BENJAMIN S. KURLAND
(DC Bar No. 1617521)
CHRISTOPHER EDELMAN
(DC Bar No. 1033486)
Senior Counsel
GARRY D. HARTLIEB
(IL Bar No. 6322571)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Telephone: (202) 598-7755
ben.kurland@usdoj.gov

*Attorneys for Defendants*

Defendants' Response Brief Regarding Jurisdiction
3:25-cv-04870-CRB

6

A-361

1  BRETT A. SHUMATE
   Assistant Attorney General
2  ERIC J. HAMILTON (CA Bar No. 296283)
   Deputy Assistant Attorney General
3  ALEXANDER K. HAAS (CA Bar No. 220932)
   Branch Director
4  JEAN LIN (NY Bar No. 4074530)
   Special Litigation Counsel
5  CHRISTOPHER EDELMAN (DC Bar No. 1033486)
   Senior Counsel
6  GARRY D. HARTLIEB (IL Bar No. 6322571)
7  BENJAMIN S. KURLAND (DC Bar No. 1617521)
   Trial Attorneys
8  U.S. Department of Justice
   Civil Division, Federal Programs Branch
9  1100 L Street, NW
   Washington, DC 20005
10 Telephone: (202) 598-7755
   ben.kurland@usdoj.gov
11 *Attorneys for Defendants*

12

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

13

14

| | |
|---|---|
| GAVIN NEWSOM, in his official capacity as Governor of the State of California, et al., | Case No. 3:25-cv-04870-CRB |
| *Plaintiffs*, | **DECLARATION OF BENJAMIN S. KURLAND IN SUPPORT OF DEFENDANTS' RESPONSE BRIEF REGARDING JURISDICTION** |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States of America, et al., | |
| *Defendants*. | |

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration of Benjamin S. Kurland in support of Defendants' Response Brief Regarding Jurisdiction
3:25-cv-04870-CRB

I, Benjamin S. Kurland, declare, pursuant to 28 U.S.C. § 1746 and Local Rule 7-5, as follows:

1.     I am a member in good standing of the Bar of the District of Columbia.  I am a Trial Attorney in the United States Department of Justice, Civil Division, Federal Programs Branch, and an attorney of record for Defendants in this action.  I am authorized to practice in this Court under Local Rule 11-2.  I make this declaration in support of Defendants' Response Brief Regarding Jurisdiction.

2.     I am over the age of 18.  The facts set forth in this declaration are within my personal knowledge or based upon documents and information I have received in the course of this litigation.

3.     On September 2, 2025, Plaintiffs moved for a preliminary injunction to: (1) enjoin the continued service of approximately 300 members of the California National Guard; and (2) return control of the California National Guard to Governor Newsom.  *See* ECF No. 183.

4.     On September 3, 2025, the Court ordered Defendants to file a response limited to the question of this Court's jurisdiction over Plaintiffs motion no later than noon on Friday, September 5, 2025.  ECF No. 188 at 1.

5.     Defendants are filing a responsive brief to the Court's order in conjunction with this filing.

6.     Attached herein as Exhibit A is a true and accurate copy of a memorandum signed by Secretary of Defense Pete Hegseth on August 15, 2025, entitled Force Structure for the Presidentially Directed Mission to Protect Federal Law Enforcement Personnel and Functions in California.

7.     Attached herein as Exhibit B is a true and accurate copy of letter signed by Secretary Pete Hegseth on August 15, 2025, addressed to Major General Matthew P. Beevers, Adjutant General of the California Military Department.

1        8.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

2    is true and correct.

3    Dated: September 5, 2025                   Respectfully submitted,

4

5                                         Benjamin S. Kurland

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration of Benjamin S. Kurland in support of Defendants' Response Brief Regarding Jurisdiction
3:25-cv-04870-CRB

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A



**SECRETARY OF DEFENSE**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

AUG 1 5 2025

MEMORANDUM FOR COMMANDER, U.S. NORTHERN COMMAND

SUBJECT:  Force Structure Decisions for the Presidentially Directed Mission to Protect Federal
Law Enforcement Personnel and Functions in California

At the direction of the President, I called California National Guard units into Federal
service under 10 U.S.C. § 12406 to temporarily protect U.S. Immigration and Customs
Enforcement and other U.S. Government personnel who are performing Federal functions,
including the enforcement of Federal law, and to protect Federal property, at locations where
protests against these functions are occurring or are likely to occur based on current threat
assessments and planned operations.

On July 30, 2025, at your recommendation and that of the Chairman of the Joint Chiefs
of Staff, General John D. Caine, I have decided to undertake the following actions:

- Release approximately 1,350 California National Guard personnel from Federal
  service.

- Approximately 260 California National Guardsmen will remain in Federal service for
  an additional 90 days, concluding on November 4, 2025.

These actions are to be effective immediately.  Those Service members still deployed to
Los Angeles and the surrounding counties will be expected to continue performing the Federal
protective mission.

I appreciate the hard work of our Service members in the protection of our Nation and of
the rule of law.

cc:
CJCS
USD(P)
USD(P&R)
Chief, NGB

THANKS GAVIN!

OSD008249-25/CMD010596-25

A-366

**EXHIBIT B**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Declaration of Benjamin S. Kurland in support of Defendants' Response Brief Regarding Jurisdiction
3:25-cv-04870-CRB



**SECRETARY OF DEFENSE**
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

AUG 1 5 2025

Major General Matthew P. Beevers, USA
The Adjutant General of the California Military Department
Sacramento, CA  95827

Dear General Beavers:

I am writing to notify you that on July 30, 2025, the Secretary of Defense directed that approximately 1,350 of the remaining 1,638 California National Guard (CA NG) personnel now executing the Federal protective mission in Los Angeles be released from Federal service. Approximately 300 remaining CA NG personnel will remain in Federal service and continue to execute the Federal protective mission through November 4, 2025.

We appreciate your cooperation on this matter as we both seek to reduce the violence against Federal personnel in Los Angeles and the surrounding counties.

Sincerely,

cc:
The Honorable Gavin Newsom
    Governor of California

Thanks!

A-368

(398 of 483), Page 398 of 483
Case: 25-3727, 10/07/2025, DktEntry: 126.1, Page 398 of 483
Case 3:25-cv-04870-CRB    Document 192    Filed 09/09/25    Page 1 of 4

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GAVIN NEWSOM, et al., | Case No. 25-cv-04870-CRB |
| Plaintiffs, | |
| v. | **ORDER RE: JURISDICTION OVER PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| DONALD J. TRUMP, et al., | |
| Defendants. | |

Plaintiffs brought this action against Defendants to challenge Defendants' federalization of the California National Guard in response to immigration-related protests in Los Angeles and to challenge Defendants' use of the National Guard and the U.S. Marines in Los Angeles. Plaintiffs now seek a preliminary injunction blocking Secretary Hegseth's August 5, 2025 order extending the federalization of approximately 300 California National Guard members until November 4, 2025. The complicated and fragmented procedural posture of this action leaves the Court skeptical of its jurisdiction to consider Plaintiffs' motion, so the Court hereby **STAYS** all proceedings related to Plaintiffs' motion for a preliminary injunction until further order.

## I.    PROCEDURAL HISTORY

On June 10, 2025, Plaintiffs sought a temporary restraining order to prevent Defendants from federalizing the California National Guard and from using them for civilian law enforcement in violation of the Posse Comitatus Act. TRO Mot. (dkt. 9). On June 12 the Court granted Plaintiffs' motion on the grounds that Defendants' calling of the California National Guard into federal service violated 10 U.S.C. § 12406 and the Tenth Amendment to the U.S. Constitution. See TRO (dkt. 64). Specifically, the Court enjoined

1    Defendants from deploying the California National Guard in Los Angeles and ordered

2    Defendants to return control of the California National Guard to Governor Newsom.  Id. at

3    35–36.  The Court did not reach Plaintiffs' Posse Comitatus Act arguments, however, as

4    the Court's statutory and constitutional determinations about the federalization of the

5    National Guard provided the relief that Plaintiffs had requested.  Id. at 26–29.

6         Defendants appealed the Court's entry of a temporary restraining order, splitting the

7    case into two parts.  See Newsom v. Trump, 141 F.4th 1032, 1039 (9th Cir. 2025) (per

8    curiam).  Part of the case (President Trump's federalization of the National Guard under

9    § 12406 and the Tenth Amendment) went to the Ninth Circuit on appeal, while part of the

10    case (Plaintiffs' allegations of Posse Comitatus Act violations) remained with this Court.

11    From there, the Ninth Circuit administratively stayed the temporary restraining order and

12    then, on expedited briefing and argument, issued an order staying the temporary restraining

13    order pending appeal.  Id. at 1039–40.  The Ninth Circuit concluded that it was likely that

14    President Trump lawfully federalized the California National Guard under § 12406(3).  Id.

15         But the Ninth Circuit did not have before it Plaintiffs' Posse Comitatus Act claims.

16    Id. at 1055.  This Court held a trial on the merits of those claims from August 11 to August

17    13.  See Dkts. 155–57.  On September 2 this Court issued its findings of fact and

18    conclusions of law, in which it explained that Defendants had violated the Posse Comitatus

19    Act and enjoined them from continuing to do so.  See FOFCOL (dkt. 176).  The Court

20    stayed the injunction, id. at 52, and Defendants timely appealed, see NOA (dkt. 187).

21         On September 2 Plaintiffs moved for a preliminary injunction to block an August 5,

22    2025 order from Secretary Hegseth instructing that 300 members of the California

23    National Guard would remain in federal service until November 4, 2025.  MPI (dkt. 183).

24    Plaintiffs contend that Defendants failed to satisfy the statutory requirements of 10 U.S.C.

25    § 12406 for this August 5 federalization order.  Id. at 9–13.  Though Plaintiffs argued that

26    this Court had jurisdiction to consider their motion, id. at 8, the Court ordered the parties to

27    submit expedited briefs addressing whether jurisdiction over this issue is currently vested

28    in this Court or with the Ninth Circuit.  Briefing Order (dkt. 188).  Plaintiffs maintain that

United States District Court
Northern District of California

2

1    jurisdiction is proper in this Court, MPI at 8; Reply (dkt. 191), while Defendants argue that

2    the Ninth Circuit has exclusive jurisdiction over this issue, Opp. (dkt. 190).

3    **II.    DISCUSSION**

4         An appeal divests a trial court "of its control over those aspects of the case involved

5    in the appeal." Coinbase, Inc. v. Bielski, 599 U.S. 736, 740 (2023) (citation omitted).

6    Plaintiffs correctly point out that, in the typical case, a district court "retains jurisdiction to

7    address aspects of the case that are not the subject of the appeal." United States v. Pitner,

8    307 F.3d 1178, 1183 n.5 (9th Cir. 2002).  And there is ample authority explaining that

9    district courts can proceed with a case while an appeal of a preliminary injunction is

10   pending.  See Mayweathers v. Newland, 258 F.3d 930, 935–36 (9th Cir. 2001); Adams v.

11   City of Chicago, 135 F.3d 1150, 1153 (7th Cir. 1998).  Thus, for example, this Court

12   properly moved forward on Plaintiffs' Posse Comitatus Act claims, even while the

13   temporary restraining order remained on appeal before the Ninth Circuit.

14        This is not the typical case.  Plaintiffs do not identify any case where a district court

15   was found to retain jurisdiction after an appellate court stayed an injunction, as the Ninth

16   Circuit did here.  See Plotkin v. Pac. Tel. & Tel. Co., 688 F.2d 1291, 1293 (9th Cir. 1982)

17   (holding that, as a matter of course, "an appeal from an interlocutory order does not stay

18   the proceedings").  Such a stay warrants additional caution beyond the usual effort to avoid

19   conflicting claims of jurisdiction from the district and appellate courts.  Further, Plaintiffs'

20   cases mostly involve appeals from denials of a preliminary injunction, not grants of one.

21   Adams, 135 F.3d at 1153–54; Plotkin, 688 F.2d at 1293; Free Speech v. FEC, 720 F.3d

22   788, 791 (10th Cir. 2013); Mt. Graham Red Squirrel v. Yeutter, 930 F.2d 703, 704 (9th

23   Cir. 1991).  But see Mayweathers, 258 F.3d at 933–34 (district court could issue second

24   injunction after first injunction, which was time-limited under the PLRA, expired while on

25   appeal).  These cases provide boilerplate statements regarding when an appeal does or does

26   not divest a trial court of jurisdiction, yet they are of little help in this uniquely complex

27   procedural situation where the Court of Appeals has spoken (but not with finality) and has

28   stayed the district court with respect to part of (but not the whole) action.

*United States District Court*
*Northern District of California*

3

United States District Court
Northern District of California

1    Plaintiffs assert that the issue pending before the Ninth Circuit is distinct from the

2    issue that they seek to litigate through their new motion. To be sure, the Ninth Circuit has

3    before it the issue of whether Defendants lawfully federalized the California National

4    Guard on June 7, while Plaintiffs now challenge Secretary Hegseth's August 5 order

5    extending their federalization through November. But that slices the issues too finely. Cf.

6    Coinbase, 599 U.S. at 741 (holding that the arbitrability of a dispute implicates "the entire

7    case"). The Ninth Circuit is still considering the merits of Plaintiffs' arguments as to the

8    temporary restraining order, and those merits are inextricably tied up with the merits of

9    Plaintiffs' new motion. Though the Ninth Circuit offered an initial interpretation of 10

10   U.S.C. § 12406 in its stay order, the court suggested that more specific guidance would be

11   forthcoming. See Newsom, 141 F.4th at 1051 ("At this preliminary stage of the litigation,

12   we need not further specify the precise standard that governs our review." (emphasis

13   added)). For this Court to proceed with Plaintiffs' preliminary injunction motion would

14   risk "attempt[ing] to assert jurisdiction over a case simultaneously" with the Ninth Circuit.

15   See Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58 (1982).

16   Moreover, Plaintiffs are not without a forum in which they can seek relief. Courts

17   of Appeal have authority to issue injunctions, see Fed. R. Civ. P. 62(g)(2), so Plaintiffs can

18   move for an injunction before the Ninth Circuit, see Fed. R. App. P. 27; see also Ninth Cir.

19   R. 27-3 (emergency motions). Certainly if the Ninth Circuit determines that Plaintiffs'

20   motion should be heard in the district court in the first instance, this Court will lift its stay

21   and proceed expeditiously. Until the Ninth Circuit makes that plain, though, this Court

22   will not infringe on the Ninth Circuit's appellate jurisdiction over the proper application of

23   § 12406 to Defendants' federalization orders.

24   For the foregoing reasons, the Court **STAYS** all proceedings related to Plaintiffs'

25   motion for a preliminary injunction until further order.

26   **IT IS SO ORDERED.**

27   Dated: September 9, 2025



CHARLES R. BREYER
United States District Judge

28

4

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **STATE OF OREGON** and the **CITY OF PORTLAND**, | Case No. 3:25-cv-1756-IM |
| Plaintiffs, | **OPINION AND ORDER GRANTING MOTION FOR TEMPORARY RESTRAINING ORDER** |
| v. | |
| **DONALD TRUMP**, in his official capacity as President of the United States; **PETE HEGSETH**, in his official capacity as Secretary of Defense; **U.S. DEPARTMENT OF DEFENSE**; **KRISTI NOEM**, in her official capacity as Secretary of Homeland Security; and **U.S. DEPARTMENT OF HOMELAND SECURITY**, | |
| Defendants. | |

Dan Rayfield, Oregon Attorney General; Benjamin Gutman, Oregon Solicitor General; Dustin Buehler, Special Counsel; Scott Kennedy, Brian Simmonds Marshall, Thomas Castelli, Ian Van Loh, and Rachel Sowray, Senior Assistant Attorneys General; and Alexander C. Jones and Derek Olson, Assistant Attorneys General, OREGON DEPARTMENT OF JUSTICE, 100 SW Market Street, Portland, OR 97201. Attorneys for Plaintiff State of Oregon.

Robert Taylor, Portland City Attorney; Caroline Turco, Senior Deputy City Attorney; and Naomi Sheffield, Chief Deputy City Attorney, OFFICE OF THE PORTLAND CITY ATTORNEY, 1221 SW Fourth Avenue, Room 430, Portland, OR 97204. Attorneys for Plaintiff City of Portland.

Brett A. Shumate, Assistant Attorney General; Eric J. Hamilton, Deputy Assistant Attorney General; Alexander K. Haas, Branch Director, Federal Programs Branch; Jean Lin, Special Litigation Counsel, Federal Programs Branch; Christopher D. Edelman, Senior Counsel; and Benjamin S. Kurland, Trial Attorney, U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION, FEDERAL PROGRAMS BRANCH, 1100 L Street, NW, Washington, DC 20005. Attorneys for Defendants.

**IMMERGUT, District Judge.**

This case involves the intersection of three of the most fundamental principles in our constitutional democracy. The first concerns the relationship between the federal government and the states. The second concerns the relationship between the United States armed forces and domestic law enforcement. The third concerns the proper role of the judicial branch in ensuring that the executive branch complies with the laws and limitations imposed by the legislative branch. Whether we choose to follow what the Constitution mandates with respect to these three relationships goes to the heart of what it means to live under the rule of law in the United States.

On June 7, 2025, President Donald J. Trump issued a Memorandum broadly authorizing the federalization of National Guard service members under 10 U.S.C. § 12406, without specifying a designated location or duration. This Memorandum authorized federalized troops to temporarily protect U.S. Immigration and Customs Enforcement ("ICE") and other federal employees "who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where protests against these functions are occurring or are likely to occur based on current threat assessments and planned operations." Declaration of Major General Timothy L. Rieger ("Rieger Decl."), Ex. D, ECF 37 at 20.

In the wake of this June 7, 2025 Memorandum, protests ensued at the ICE facility in Portland. From June 11th to June 25th, these protests included violent behavior and required an increased law enforcement presence by both the Portland Police Bureau ("PPB") and federal law enforcement agencies. After June 25, 2025, however, the protests were generally peaceful in nature with only sporadic incidents of violence and disruptive behavior. By late September, these protests typically involved twenty or fewer people.

On September 27, 2025, President Trump posted a message on his Truth Social account stating that he was directing Pete Hegseth, the Secretary of War, to provide troops to protect "War ravaged Portland" from "Antifa, and other domestic terrorists" and authorizing "Full Force, if necessary." Declaration of Assistant Attorney General Brian Marshall ("Marshall Decl."), Ex. 12, ECF 9-12 at 2. In response, on September 28th, Secretary Hegseth issued a memorandum authorizing the deployment and federalization of 200 of Oregon National Guard service members, over the objection of Oregon's Governor, Tina Kotek.

That same day, the State of Oregon and the City of Portland (collectively, "Plaintiffs") brought this lawsuit against President Trump, Secretary Hegseth, the Secretary of Homeland Security Kristi Noem, and the U.S. Departments of Defense and Homeland Security (collectively, "Defendants"). Plaintiffs allege that Defendants' actions are *ultra vires*[1] and therefore unlawful because they violate 10 U.S.C. § 12406, the Posse Comitatus Act, and 10 U.S.C. § 175 by federalizing Oregon's National Guard. Plaintiffs also allege that Defendants' conduct violates the Tenth Amendment and the separation of powers doctrine by infringing on Oregon's state sovereignty and police powers. Finally, Plaintiffs assert that Secretary Hegseth's Memorandum violates the Administrative Procedure Act ("APA") because it is not in accordance with the law, is in excess of statutory jurisdiction, authority, or limitations, and is arbitrary and capricious.

Plaintiffs move for a temporary restraining order ("TRO") and stay of Defendants' September 28, 2025, Memorandum ordering the federalization and deployment of Oregon

---

[1] *Ultra vires* actions allow courts to adjudicate "constitutional challenges to presidential acts" and "actions by subordinate Executive Branch officials that extend beyond delegated statutory authority." *Murphy Co. v. Biden*, 65 F.4th 1122, 1128–29 (9th Cir. 2023) (first citing *Franklin v. Massachusetts*, 505 U.S. 788, 790–91 (1992); then citing *Larson v. Domestic & Foreign Com. Corp.* 337 U.S. 682, 689–90 (1949)).

National Guard service members to Portland. Defendants respond that this Court may not second guess the President's determination that conditions in Portland warranted a federal military response. Defendants also contend that their conduct did not violate the U.S. Constitution or any statutory provision or exceed their statutory authority.

This Court has considered the briefing and declarations submitted in this case, the submission of *amici*, and the presentation of the parties at the hearing on Plaintiffs' TRO on October 3, 2025. For the foregoing reasons, this Court finds that Plaintiffs have met their burden at this stage of the litigation and GRANTS Plaintiffs' motion for a temporary restraining order.

## STANDARDS

In deciding whether to grant a motion for a TRO, courts look to substantially the same factors that apply to a court's decision on whether to issue a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). "A plaintiff seeking a preliminary injunction must establish [1] that it is likely to succeed on the merits, [2] that it is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in its favor, and [4] that an injunction is in the public interest." *Bennett v. Isagenix Int'l LLC*, 118 F.4th 1120, 1122–23 (9th Cir. 2024) (brackets omitted) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "The first factor— likelihood of success on the merits—is 'the most important.'" *Apache Stronghold v. United States*, 101 F.4th 1036, 1049 (9th Cir. 2024) (quoting *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc)). "When the government is a party, the last two factors (equities and public interest) merge." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 668 (9th Cir. 2021). In addition, "[d]ue to the urgency of obtaining a preliminary injunction at a point when there has been limited factual development, the rules of evidence do not apply strictly to preliminary

injunction proceedings." *Herb Reed Enters., LLC v. Fla. Entmt. Mgmt., Inc*., 736 F.3d 1239,

1250 n.5 (9th Cir. 2013); *see also Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009).

## BACKGROUND

### A.  The National Guard

Members of the National Guard must be "activated" to serve on a mission. Declaration of

Lieutenant General Jeffrey S. Buchanan, (Retired) ("Buchanan Decl.") ECF 9-1 ¶ 11. First, they

may serve in "State Active Duty" in the state where they are commissioned when the governor of

the state or commonwealth activates their unit, and they are under the command of the governor.

*Id.* ¶ 12. Second, they may be activated under Title 32 of the United States Code, where the

governor asks the federal government to bring troops into active duty for a particular mission,

and they are under the command of the governor, but the costs are borne by the federal

government. *Id.* ¶ 13; *see also* 32 U.S.C. § 502(f)(2)(A). Finally, they may be activated under

Title 10 of the United States Code, where they are considered federal military and under the

command of the U.S. President, *i.e.*, the "federalized" National Guard. Buchanan Decl. ¶ 14; *see*

*also* 10 U.S.C. § 12406. This is the activation that occurred here.

State Active Duty National Guard troops and those activated under Title 32 may engage

in domestic law enforcement functions, subject to restrictions under state law. Buchanan Decl.

¶ 25. Federalized National Guard troops activated under Title 10 may not engage in domestic law

enforcement activities, with some exceptions. *Id.* Members of the National Guard generally do

not receive training to perform local law enforcement tasks, such as learning de-escalation

techniques, the use of non-lethal force, or how to properly conduct criminal investigations. *Id.* ¶¶

34–46.

## B. Law Enforcement Resources in Portland

Plaintiffs present several witness declarations from local law enforcement officials detailing local and state law enforcement resources that stand ready to address unlawful conduct at protests in Portland. The primary local law enforcement agency in Portland is the Portland Police Bureau. PPB employs approximately 812 officers. Declaration of PPB Assistant Chief of Operations Craig Dobson ("Dobson Decl."), ECF 7 ¶ 7. All PPB officers are trained in crowd management and First Amendment law. *Id.* ¶ 8. Crowd Management Incident Commanders receive an additional 40 hours of crowd management training. *Id.* ¶ 11. PPB also has a Rapid Response Team of 50 officers that is specially trained in crowd management, intervention (removing someone from a protest), and "direct crowd control through approved maneuvers and tactics." *Id.* ¶ 13. The Rapid Response Team receives an initial 40 hours of crowd control training and then 10 hours of crowd control training per month, meeting the standards of the National Tactical Officers Association. *Id.* The Rapid Response Team works under a Crowd Management Incident Commander. *Id.* PPB also has specially trained Dialogue Officers who work with protest organizers, *id.* ¶ 12, and Mobile Field Forces, who can move from one precinct to another as the situation demands, *id.* ¶ 15.

Crowd Management Incident Commanders work outside of their everyday PPB roles and are activated in that role based on PPB's risk assessment of an event. *Id.* ¶ 11. These commanders are activated for large events, such as the April 2025 "No Kings" protest that drew approximately 40,000–50,000 participants. *Id.* ¶ 14. PPB also uses traffic control officers and can coordinate with other local and state resources and existing federal partners as needed. *Id.* ¶¶ 14, 17. PPB has mutual aid agreements with the Multnomah County Sheriff, the City of Gresham, the Port of Portland, Clark County, Washington, and the Oregon State Police. *Id.* ¶ 17. PPB also can call in off-duty officers if PPB anticipates risks will stretch the capacity of PPB's on-duty

PAGE 6 – OPINION AND ORDER

workforce. *Id.* ¶ 16. If additional resources beyond all of these are critically needed, PPB may request that Oregon's Governor provide National Guard resources for a locally declared emergency. *Id.* ¶ 18.

The Multnomah County District Attorney took office in January 2025 with a strong commitment to prosecuting political violence and public criminal activity. Declaration of Multnomah County District Attorney Nathan Vasquez ("Vasquez Decl."), ECF 42 ¶ 5. The District Attorney's Office has a Strategic Prosecution Unit that works closely with the Crowd Management Incident Commander. *Id.* ¶ 6. Strategic Prosecution Unit District Attorneys are on call 24 hours per day. *Id.* ¶ 6. They meet weekly with PPB to assess public safety needs. *Id.* ¶ 8. When there is a demonstration that is anticipated to require a law enforcement presence, a DDA is assigned and a supervisory DDA participates in pre-event planning to try to prevent violent gatherings. *Id.* ¶¶ 6–7.

The Oregon State Police is a partner with PPB. It responds to requests from local law enforcement for assistance. Declaration of Oregon State Police Criminal Investigations Captain Cameron Bailey ("Bailey Decl."), ECF 8 ¶ 11. Although Portland has not requested the Oregon State Police's help with the current protests, the State Police stands ready to assist PPB should it so request. *Id.* ¶ 13. The Oregon State Police has approximately 700–800 sworn officers at any given time. *Id.* ¶ 5. The State Police trains every trooper on use of force, de-escalation, and crowd management. *Id.* ¶¶ 7, 9.

Existing federal law enforcement resources also protect federal facilities in Portland. *See, e.g.*, Dobson Decl. ¶ 25; Declaration of Deputy Director of the Federal Protective Service Robert Cantu ("Cantu Decl."), ECF 40 ¶¶ 17, 37 (describing federal law enforcement activities in Portland); Declaration of Seattle Enforcement and Removal Operations Field Officer Director

PAGE 7 – OPINION AND ORDER

Cammilla Wamsley ("Wamsley Decl."), ECF 38 ¶ 15 (describing federal law enforcement resources assisting in Portland). The federal government also has deployed additional federal law enforcement officers to Portland from around the country in response to protests when necessary. Cantu Decl., ECF 40 ¶ 18; Wamsley Decl., ECF 38 ¶ 20.

## C. Protests in Portland

ICE has a facility located at 4310 S. Macadam Avenue in Southwest Portland. Dobson Decl., ECF 7 ¶ 19. This facility encompasses approximately one block of the City of Portland. *See* Marshall Decl., Ex. 21, ECF 9-21 at 2. Following federal officials' arrests of asylum seekers in Portland's Immigration Court in June 2025, protests broke out around the ICE facility. These protests were small, generally involving fewer than 100 people, *see* Dobson Decl., ECF 7 ¶ 20, but were concentrated at the ICE facility and disruptive to the facility. The ICE facility is within PPB's Central Precinct. *Id.* ¶ 21. Unless a Crowd Management Incident Commander is activated, protests at the ICE facility are monitored by Central Precinct. *Id.*

Assistant Chief Dobson activated a Crowd Management Incident Commander for the ICE facility protests from June 11–25, 2025, who in turn activated a PPB Rapid Response Team, mostly in a monitoring capacity. *Id.* ¶ 22. The protests were mostly peaceful, but there were some individuals who engaged in unlawful conduct requiring PPB intervention. *Id.* PPB made 25 arrests from June 11–19, 2025. *Id.* After June 25, PPB transitioned monitoring over to Central Precinct because PPB determined that the protests were low risk. *Id.* ¶ 23. Since July 18, 2025, PPB has "carried out routine monitoring of the ICE-Facility protests without serious incident," and "the risks posed by nightly ICE-Facility protests have not merited anything more than standard, periodic monitoring like any other neighborhood in the City." *Id.* ¶ 24.

Defendants proffer three declarations in support of their opposition to the TRO from individuals who do not appear to be based in Oregon. These declarations detail some specific

PAGE 8 – OPINION AND ORDER

instances of violence and other unlawful conduct involving the ICE facility and protests from this same period. On June 8, 2025, protestors attempted to block the vehicle entrance. Wamsley Decl., ECF 38 ¶ 17. On June 11, protestors lit fires to barricade a vehicle gate. *Id.* ¶ 11. Four offenders were arrested and are being prosecuted for arson, assaulting a federal officer, and depredation of federal property. *Id.* On June 14, protestors threw rocks and sticks and M80 fireworks at Federal Protective Services ("FPS") officers. Cantu Decl., ECF 40 ¶ 8. The Border Patrol Tactical Unit and the ICE Special Response Team responded, and the violent protest was under control within approximately two hours of its start. *Id.* A few FPS officers suffered minor injuries, and three protestors were arrested by federal officers and charged with assault on a federal officer. *Id.*

On June 24, 2025, one protestor was detained for assaulting a federal officer with a machete and knife—the officer deployed his taser and recovered the protestor's weapons without getting injured. *Id.* ¶ 10. Another protester shot officers with a paintball gun, and a third shined a laser in an officer's eyes. *Id.* All three were arrested by federal law enforcement and charged with assault on a federal officer. *Id.* Another protester attempted to set a U.S. flag on fire in the driveway. Wamsley Decl., ECF 38 ¶ 11. On June 29, a protestor tampered with the card reader at the ICE facility and resisted arrest. Cantu Decl., ECF 40 ¶ 9. Ultimately, three card readers were damaged in June 2025, as well as damage to gates and windows. Wamsley Decl., ECF 38 ¶ 12. With the card readers broken, personnel must call someone ahead of time to let them in, causing delays and inconvenience. *Id.* The ICE facility in Portland shut down from June 13, 2025, until July 7, 2025, due to the property damage from protesters. *Id.* ¶ 13. As a result of the closure, most Portland ICE officers had to work out of separate temporary space. *Id.*

PAGE 9 – OPINION AND ORDER

On August 20, 2025, PPB activated a Crowd Management Incident Commander from 4:00 p.m. to 7:30 p.m., having assessed potential risk of increased protest activity that did not end up occurring. Supplemental Declaration of Craig Dobson ("Dobson Supp. Decl."), ECF 21 ¶ 3. Otherwise, from July 18th to September 27th, Central Precinct police officers handled the ICE protests with routine monitoring. Dobson Decl., ECF 7 ¶¶ 24, 25. The protests generally were limited to fewer than 30 people and were "largely sedate." *Id.* ¶ 25. If the protests were to increase or threaten public safety, PPB could call on additional available resources. *Id.* ¶ 26. But the protests have been such a minor issue, that the normal nightlife in downtown Portland has required more police resources than the ICE facility. *Id.*

Federal law enforcement encountered some instances of unlawful conduct in the two months leading up to the federal deployment. On August 9, 2025, protesters attempted to block an ICE vehicle and federal officers had to use pepper spray so the vehicle could depart. Cantu Decl., ECF 40 ¶ 12. On September 1, protestors assembled a "guillotine," and two protestors had riot shields. Wamsley Decl., ECF 38 ¶ 16. That night, PPB checked in twice with FPS Supervisor Will Turner and was told despite FPS being "down ten tactical officers" who were sent to other parts of the country, he was "not concerned" about the protestors. Declaration of Central Precinct Commander Brian Hughes ("Hughes Decl."), Ex. 1, ECF 46-1 at 2. At one point, however, federal officers had to come out and deploy tear gas to clear the area for a vehicle to exit. *Id.* According to PPB dispatch logs, on that occasion Federal officers arrested "a few" people. Hughes Decl., Ex. 2, ECF 46-2 at 2.

On September 9, 2025, four protestors shined high-powered flashlights in the eyes of drivers leaving the ICE facility. Wamsley Decl., ECF 38 ¶ 18. ICE received additional reports of drivers leaving the building that week having flashlights shone in their eyes. *Id.* PPB, however,

PAGE 10 – OPINION AND ORDER

did not receive any requests for assistance from federal officers during the next 17 days of September. Additionally, PPB's independent monitoring of the protests and regular communications with FPS during this time show protests generally averaging less than 20 persons, with a few nights having around 50 persons. *See generally* Hughes Decl., Ex. 3, ECF 46-3 to Ex. 16, ECF 46-16. Sometimes the protests had "higher energy," and sometimes they had skirmishes between protestors, but they rarely had any issues with federal officers or federal property. *Id.*

On September 18, 2025, the protests increased in size to around 150 people, but there were no issues with federal property or personnel and FPS did not request assistance. *Id.*, Ex. 17, ECF 46-17 at 2. On September 19, federal law enforcement employed munitions to break up a crowd and reported to PPB assaults on protestors and one journalist by a known "agitator." *Id.*, Ex. 18, ECF 46-18 at 2 to Ex. 19, ECF 46-19 at 2. There was no reported activity, however, against federal property or personnel.

From Monday, September 22, 2025, through Friday, September 26, 2025, in the days immediately preceding the President's federalization directive, the protests involved around 20 or fewer people. *Id.*, Ex. 22, ECF 46-22 to Ex. 26, ECF 46-26. PPB reported no incidents of disruptions outside the ICE facility except for a few individuals shining flashlights into drivers' eyes. *Id.*, Ex. 25, ECF 46-25 at 2.

In support of their opposition to the TRO, Defendants include in their supporting declarations that federal law enforcement officers are concerned that protests "risk escalation at any moment," Cantu Decl., ECF 40 ¶ 14, and that ICE employees are being "doxed" and having their personal information posted online. Wamsley Decl., ECF 38 ¶ 12. Several Portland ICE officers have had flyers with their names, photographs, and home addresses posted publicly. *Id.*

¶ 18. And on September 12, 2025, a photograph of an unmarked ICE vehicle in Portland was posted online with its make, model, license plate, and location after it left the ICE facility. *Id.* ¶ 18.

Defendants also express concern about danger in Portland because of incidents that have occurred elsewhere in the country. *Id.* ¶ 21. Most concerning is the sniper shooting in Dallas, Texas, targeting an ICE van, and the protest that followed in Chicago when a protestor was found with a firearm. *Id.* ¶¶ 21–22.

### D. Defendants' Actions Relating to Federalization of National Guard

On June 6 and 7, 2025, violent protests broke out in Los Angeles at ICE facilities and elsewhere. *See Newsom v. Trump* (*Newsom I*), 786 F. Supp. 3d 1235, 1242–43 (N.D. Cal. 2025), *stayed pending appeal*, 141 F.4th 1032 (9th Cir. 2025). On June 7, 2025, President Trump issued a Memorandum to the Secretary of Defense, the Attorney General, and the Secretary of Homeland Security, broadly authorizing the federalization of National Guard service members under 10 U.S.C. § 12406. Rieger Decl., Ex. D, ECF 37 at 20–21. The June 7, 2025 Presidential Memo recited that "incidents of violence and disorder have recently occurred and threaten to continue in response to the enforcement of Federal law by [ICE] and other United States Government personnel who are performing Federal functions and supporting the faithful execution of Federal immigration laws." Rieger Decl., Ex. D, ECF 37 at 20. The June 7, 2025 Presidential Memo also stated that the protests "threaten the security" of ICE detention centers and other federal property. *Id.* The June 7, 2025 Presidential Memo concluded that "[t]o the extent that protests or acts of violence directly inhibit the execution of the laws, they constitute a form of rebellion against the authority of the Government of the United States." *Id.*

The June 7, 2025 Presidential Memo authorized the federalized troops to "temporarily protect ICE and other United States Government personnel who are performing Federal

functions, including the enforcement of Federal law, and to protect Federal property, at locations where protests against these functions are occurring or are likely to occur based on *current threat assessments* and planned operations." *Id.* (emphasis added). The number of National Guard troops was to be no fewer than 2,000 and the duration of the deployment under the June 7, 2025 Presidential Memo was 60 days or at the discretion of the Defense Secretary. The June 7, 2025 Presidential Memo did not refer to any specific location.

In response to the June 7, 2025 Presidential Memorandum, that same night Secretary Hegseth issued his own memorandum federalizing 2,000 California National Guard members. *Newsom I*, 786 F. Supp. 3d at 1244. Two days later he federalized another 2,000 California National Guard members and deployed the National Guard along with approximately 700 active duty Marines. *Id.* at 1244–45. The first of these troops arrived to Los Angeles on June 8, 2025. *Id.* at 1245. Governor Gavin Newsom and the State of California sued President Trump and other defendants, obtaining a TRO under § 12406, which was stayed by the Ninth Circuit. *See Newsom v. Trump* (*Newsom II*), 141 F.4th 1032 (9th Cir. 2025).

On September 19, 2025, President Trump explained that the administration was going to "get rid of" the "problems" in cities, including Chicago, Memphis, and Portland. Marshall Decl., ECF 9 ¶ 25. He described that in Portland people were "out of control" and "crazy." *Id.*

On September 25, 2025, the President again described Portland, exclaiming that "nobody's ever seen anything like it" with activity happening "every night," with people that "just burn the place down." Marshall Decl., ECF 9 ¶ 26. President Trump commented on "professional agitators" in Portland who are "paid a lot of money by rich people," "anarchists," and "crazy people" who try to "burn down buildings, including federal buildings," with Portland

PAGE 13 – OPINION AND ORDER

having activity "every night . . . for years." *Id.* He promised to do a "pretty big number" on the "people in Portland that are doing that." *Id.*

On September 27, 2025, President Trump posted a message on Truth Social, stating:

> At the request of Secretary of Homeland Security, Kristi Noem, I am directing Secretary of War, Pete Hegseth, to provide all necessary Troops to protect War ravaged Portland, and any of our ICE Facilities under siege from attack by Antifa, and other domestic terrorists. I am also authorizing Full Force, if necessary. Thank you for your attention to this matter!

*See* Marshall Decl., Ex. 12, ECF 9-12 at 2. Later that day, Major General Timothy L. Rieger, Acting Vice Chief of the National Guard Bureau, asked Governor Kotek, via Oregon National Guard Adjutant General Alan R. Gronewald, to immediately mobilize 200 National Guard members "to protect federal personnel, functions, and property in Oregon." Rieger Decl., Ex. B, ECF 37 at 14. Major General Rieger threatened federalization of the Oregon National Guard if Governor Kotek refused. Rieger Decl., Ex. B, ECF 37 at 14.

Governor Kotek spoke with President Trump and explained that there was no insurrection or threat to public safety in Oregon. *See* Marshall Decl., Ex. 14, ECF 9-14 at 2–3. She declined to voluntarily activate Oregon's National Guard. *Id.* Oregon's Attorney General emphasized that local law enforcement has "the capacity to manage public safety without federal interference" and that sending "200 National Guard troops to guard a single building is not normal." *Id.*; *see also id.*, Ex. 15, ECF 9-15 at 2–3.

On September 28, 2025, Secretary Hegseth issued his memorandum, authorizing the federalization of 200 Oregon National guard members. Rieger Decl., Ex. C, ECF 37 at 16. He cited and attached the June 7, 2025 Presidential Memo. *Id.* at 17–18. He explained that his memorandum "further implements the President's direction" from the June 7, 2025 Presidential Memo. *Id.* He then directed the federalization and deployment of 200 Oregon National Guard

PAGE 14 – OPINION AND ORDER

service members for 60 days. *Id.* Those members will be "under the command and control of the Commander, U.S. Northern Command." *Id.* Plaintiffs filed this lawsuit later that day, and their motion for a TRO on September 29, 2025.

On October 1, 2025, President Trump posted on Truth Social:

> As I determined on September 27th, when I activated and called into service the National Guard in Oregon, conditions continue to deteriorate into lawless mayhem. Our GREAT Federal Law Enforcement Officers have not been able to enforce the Laws in Oregon. ANTIFA and the Radical Left Anarchists have been viciously attacking our Federal Law Enforcement Officers, men and women who are simply doing their job, protecting Federal Property, and enforcing Federal Immigration Laws and the Rule of Law. We will never allow MOBS to take over our streets, burn our Cities, or destroy America. The National Guard is now in place, and has been dedicated to restoring LAW AND ORDER, and ending the Chaos, Death, and Destruction! We are a Nation of LAW, and we will PREVAIL. Thank you for your attention to this matter!

Donald J. Trump (@realDonaldTrump), Truth Social (Oct. 1, 2025 at 10:36 AM), https://truthsocial.com/@realDonaldTrump/posts/115300118756896774 (emphasis in original); *see also* Rieger Decl., ECF 37 ¶ 12 (stating that the President "further explained" his September 27, 2025, decision to federalize troops in his October 1 Truth Social post). According to Defendants, "National Guard personnel activated would be limited in their functions to protecting federal property, personnel, and functions." Rieger Decl., ECF 37 ¶ 24.; *see also* Cantu Decl., ECF 40 ¶ 22 (same).

## DISCUSSION

Plaintiffs bring claims alleging that Defendants' actions violate (1) the statutory authority granted the President in 10 U.S.C. § 12406, (2) Oregon's sovereign rights as protected in the Tenth Amendment, (3) the Posse Comitatus Act, (4) the Administrative Procedures Act, and (5) the separation of powers, as well as the Militia and Take Care Clauses of the U.S.

PAGE 15 – OPINION AND ORDER

Constitution. Plaintiffs argue that they are likely to succeed on all of their claims, that they will suffer irreparable harm absent injunctive relief, and that the balance of equities and public interest tip in their favor. Defendants respond that President Trump determined that the situation in Portland met the statutory criteria under Section 12406, and under the deference this Court must give that determination, Plaintiffs' fail to show a likelihood of success on that claim. And absent a showing that Defendants' conduct violated Section 12406, Defendants argue that Plaintiffs cannot show that they are likely to succeed on their remaining claims.

For the reasons discussed below, this Court finds that Plaintiffs are likely to succeed on their claim that the President's federalization of the Oregon National Guard exceeded his statutory authority under 10 U.S.C. § 12406 and was *ultra vires*. In addition, because Section 12406 defines the scope of Congress's constitutional delegation to the President to federalize the National Guard, Plaintiffs are likely to succeed on their claim that the President exceeded his constitutional authority and violated the Tenth Amendment. Because this Court finds that Plaintiffs are likely to succeed on these two claims, this Court declines to reach Plaintiffs' arguments regarding their likelihood of success on their remaining claims. Plaintiffs also have adequately shown irreparable harm and that the balance of equities and public interest weigh in their favor. This Court therefore grants Plaintiffs' motion for a temporary restraining order.

## A.  Likelihood of Success on the Merits

### 1.  Section 12406 Claim

#### a.  Statutory Framework

Under the Militia Clause of U.S. Constitution, Congress has the power "[t]o provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections, and repel Invasions." U.S. Const. art. I, § 8, cl. 15. Congress first delegated authority to the President to call forth the militia in extraordinary, limited circumstances in the Militia Act of 1792. *See* Ch.

28, § 1, 1 Stat. 264–65. Congress affirmed this power in the Militia Act of 1795, which "was a precursor to the Militia Act of 1903." *Newsom II*, 141 F.4th at 1047. The Militia Act of 1903 created the modern framework of the National Guard, *see* Ch. 196, § 25, 32 Stat. 775 (1903), and this statute was the "precursor to [10 U.S.C.] § 12406." *Newsom II*, 141 F.4th at 1047.

Under 10 U.S.C. § 12406, the President may federalize National Guard service members if:

> (1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation;
>
> (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or
>
> (3) the President is unable with the regular forces to execute the laws of the United States.

After making this determination, the President may federalize National Guard troops "in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws. Orders for these purposes shall be issued through the governors of the States or, in the case of the District of Columbia, through the commanding general of the National Guard of the District of Columbia." *Id.*

In *Newsom II*, the Ninth Circuit held that 10 U.S.C. § 12406 does not "preclude[] judicial review of the President's determination that a statutory precondition exists." 141 F.4th at 1047.[2] However, a reviewing court must give "a great level of deference to the President's determination that a predicate condition exists." *Id.* at 1048. A court "review[s] the President's determination to ensure that it reflects a colorable assessment of the facts and law within a 'range

---

[2] Defendants argue that the President's determination under 10 U.S.C. § 12406 is unreviewable, but they acknowledge that the Ninth Circuit has held that this determination is reviewable. Resp., ECF 35 at 18–19.

PAGE 17 – OPINION AND ORDER

of honest judgment.'" *Id.* at 1051 (quoting *Sterling v. Constantin*, 278 U.S. 378, 399 (1932)). At the same time, the Executive's "exercise of his authority to maintain peace" must be "*conceived in good faith*, in the face of the emergency and directly related to the quelling of the disorder or the prevention of its continuance." *Id.* (emphasis in original) (quoting *Sterling*, 278 U.S. at 399–400).

### b.  Whether the President is Unable with the Regular Forces to Execute the Laws of the United States

Defendants first argue that the President "had a colorable basis for invoking § 12406(3)," *id.* at 1052, because he was "unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(3); *see* Resp., ECF 35 at 20–22. Although Section 12406(3) "does not have as a prerequisite that the President be completely precluded from executing the relevant laws of the United States," "minimal interference with the execution of laws is, by itself," insufficient "to justify invoking § 12406(3)." *Newsom* II, 141 F.4th at 1051.

As a threshold matter, this Court must determine to what extent the President can rely on violence that occurred months prior to his September 27, 2025 federalization directive and that had subsided by September. Under *Newsom II*, and as a matter of logic, this Court assesses whether the President invoked Section 12406(3) based on "a colorable assessment of the facts" as they existed *at the time* he federalized the National Guard. *Newsom II*, 141 F.4th at 1051. In *Newsom II*, the Ninth Circuit evaluated the "protesters' interference with the ability of federal officers to execute the laws, *leading up to* the President's federalization of the National Guard on June 7." *Id.* at 1052 (emphasis added). And the Ninth Circuit specifically cited events from "the day before" the June 7, 2025 federalization order to conclude that "the President had a colorable basis for invoking § 12406(3)." *Id.* Likewise, this Court will focus on "the ability of federal

PAGE 18 – OPINION AND ORDER

officers to execute the laws[] leading up to the President's federalization of the National Guard"
on September 28, 2025. *Id.*

In this case, and unlike in *Newsom II*, Plaintiffs provide substantial evidence that the
protests at the Portland ICE facility were not significantly violent or disruptive in the days—or
even weeks—leading up to the President's directive on September 27, 2025. The record evidence
establishes that while disruption outside the Portland ICE facility peaked in June of 2025, federal
and local law enforcement officers were able to "quell[] . . . the disorder." *Newsom II*, 141 F.4th
at 1051 (quoting *Sterling*, 278 U.S. at 399–400). As of September 27, 2025, it had been months
since there was any sustained level of violent or disruptive protest activity in Portland. During
this time frame, there were sporadic events requiring either PPB monitoring or federal law
enforcement intervention, but overall, the protests were small and uneventful.

Defendants' declarants describe only four incidents of protesters clashing with federal
officers in the month of September preceding the federalization order—on September 1st, 9th,
12th, and without further specification, the second week of September. Wamsley Decl., ECF 38
¶¶ 16, 18; Cantu Decl., ECF 40 ¶ 15. The first involved protesters setting up a makeshift
guillotine to intimidate federal officials; the second involved four people shining overpowered
flashlights in the eyes of drivers; the third involved someone posting a photograph of an
unmarked ICE vehicle online; and the last involved additional drivers having flashlights shone in
their eyes. Cantu Decl., ECF 40 ¶ 15; Wamsley Decl., ECF 38 ¶¶ 16–18. These incidents are
inexcusable, but they are nowhere near the type of incidents that cannot be handled by regular
law enforcement forces. They also occurred at least two weeks before President Trump issued
his directive. More broadly, these incidents are categorically different from the violent incidents
as described in *Newsom II* that took place in Los Angeles when the President federalized the

PAGE 19 – OPINION AND ORDER

California National Guard on June 7, 2025. *See* 141 F.4th at 1052 ("[P]rotesters threw objects at ICE vehicles trying to complete a law enforcement operation, 'pinned down' several FPS officers defending federal property by throwing 'concrete chunks, bottles of liquid, and other objects,' and used 'large rolling commercial dumpsters as a battering ram' in an attempt to breach the parking garage of a federal building.").

Plaintiffs provide all the PPB call logs in the month of September, which show that PPB worked in close coordination with FPS supervisors and regularly checked the status of the ICE facility. As detailed above, they also show that the protest activity in September generally did not involve violence against federal property or personnel. At the hearing, Defendants highlighted a September 19 entry relating to FPS reporting an assault by a known agitator against other protestors and a journalist. Hughes Decl., Ex. 19, ECF 46-19. This isolated assault, which did not target federal personnel, and which occurred a week before the federalization order, along with the other isolated September incidents, do not approach the level of disruption to federal functions in Los Angeles that *Newsom II* described as occurring "the day before" President Trump's June 7, 2025 federalization of the California National Guard. 141 F.4th at 1052. Neither outside the Portland ICE facility nor elsewhere in the City of Portland was there unlawful activity akin to what was occurring in Los Angeles leading up to June 7, 2025. *See id.* at 1041 (describing the riotous activity).

Defendants also argue that strained FPS resources suffice to show that the President had a colorable basis to invoke Section 12406(3). Resp., ECF 35 at 20–21. But they demonstrate just the opposite, that federal law enforcement officers, unaided by any military forces, were capable of not only "quelling" the violence in June but also "preventi[ng]" it through September. *Newsom II*, 141 F.4th at 1051 (quoting *Sterling*, 287 at 399–400). The Deputy Director of the

Federal Protective Service Region that encompasses Oregon noted that to date, FPS has deployed 115 officers from other FPS Regions to Portland. Cantu Decl., ECF 40 ¶ 18. This deployment of additional federal law enforcement officers reduced the level of disorder between June and September to the point that in the immediate days leading up to the federalization order, around twenty or fewer protesters gathered outside the ICE Facility and "FPS indicated no issues or criminal reports." Hughes Decl., Ex. 22, ECF 46-22 to Ex. 26, ECF 46-26. On September 26, the eve of the President's directive, law enforcement "observed approximately 8–15 people at any given time out front of ICE. Mostly sitting in lawn chairs and walking around. Energy was low, minimal activity." Hughes Decl., Ex. 26, ECF 46-26. It is clear that "the regular forces," i.e. FPS and additional federal law enforcement, *were able* to execute the laws of the United States.

Defendants' argument that this diversion of federal law enforcement officers from out-of-state demonstrates that "the regular forces" were unable to execute the laws is not persuasive. Defendants' proposed test for Section 12406(3) would allow the President to call in the National Guard whenever one law enforcement office receives support from another office, which is a routine aspect of law enforcement activity. If the President could equate diversion of federal resources with his inability to execute federal law, then the President could send military troops virtually anywhere at any time.

In support of their opposition, Defendants also rely on occurrences of violence elsewhere in the country and the risk that peaceful protests in Portland might escalate into violence "at any moment." Resp., ECF 35 at 13. But violence in a different state and the mere potential for future escalation do not provide a colorable basis to invoke Section 12406(3). To accept Defendants' arguments would be to render meaningless the extraordinary requirements of 10 U.S.C. § 12406 by allowing the President to federalize one state's National Guard based on events in a different

PAGE 21 – OPINION AND ORDER

state or mere speculation about future events. In other words, violence *elsewhere* cannot support

troop deployments *here*, and concern about hypothetical *future* conduct does not demonstrate a

*present* inability to execute the laws using nonmilitary federal law enforcement.

Finally, the President's own statements regarding the deployment of federalized National

Guardsmen further support that his determination was not "*conceived in good faith*" or "in the

face of the emergency and directly related to the quelling of the disorder or the prevention of its

continuance." *Newsom II*, 141 F.4th at 1051 (emphasis in original) (quoting *Sterling*, 287 U.S. at

399–400). Despite the "minimal activity" outside the Portland ICE facility in the days preceding

September 27, 2025, Hughes Decl., Ex. 22, ECF 46-22 to Ex. 26, ECF 46-26, President Trump

directed Secretary Hegseth "to provide all necessary Troops to protect War ravaged Portland,

and any of our ICE Facilities under siege from attack by Antifa, and other domestic terrorists."

Marshall Decl., Ex. 12, ECF 9-12. Two days before that directive, the President claimed that

Portland has "professional agitators" who are "paid a lot of money by rich people," "anarchists,"

and "crazy people" who try to "burn down buildings, including federal buildings." *See* Marshall

Decl., ECF 9 ¶ 26. Whatever the factual basis the President may have for these allegations,

nothing in the record suggests that anything of this sort was occurring "every night" outside the

Portland ICE building or in the City of Portland in the days or weeks leading up to his September

27 directive. *Id.*

In sum, the President is certainly entitled "a great level of deference," *Newsom II*, 141

F.4th at 1048, in his determination that he "is unable with the regular forces to execute the laws

of the United States." 10 U.S.C. § 12406(3). But "a great level of deference" is not equivalent to

ignoring the facts on the ground. As the Ninth Circuit articulated, courts must "review the

President's determination to ensure that it reflects a colorable assessment of the facts and law

PAGE 22 – OPINION AND ORDER

within a 'range of honest judgment.'" *Id.* at 1051 (quoting *Sterling*, 278 U.S. at 399). Here, this Court concludes that the President did not have a "colorable basis" to invoke § 12406(3) to federalize the National Guard because the situation on the ground belied an inability of federal law enforcement officers to execute federal law. *Id.* at 1051–52. The President's determination was simply untethered to the facts.

### c.   Whether there is a Rebellion or Danger of Rebellion

Defendants also argue that the September 28, 2025 federalization order is authorized under subsection two, which permits federalization of the National Guard in response to "a rebellion or danger of a rebellion against the authority of the Government of the United States." 10 U.S.C. § 12406(2). In the June 7, 2025 Presidential Memo, President Trump stated that, "[t]o the extent that protests or acts of violence directly inhibit the execution of the laws, they constitute a form of rebellion." Rieger Decl., Ex. D, ECF 37 at 20.

The parties disagree about the meaning of the word rebellion in the statute. "Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents and authorities that inform the analysis." *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006). Additionally, courts must interpret words in statutes "consistent with their 'ordinary meaning . . . at the time Congress enacted the statute.'" *Wisc. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)).

The Ninth Circuit did not reach the government's rebellion arguments in *Newsom II*. *See* 141 F.4th at 1051. In *Newsom I*, however, the district court performed a detailed statutory interpretation of § 12406(2) that this Court finds instructive. 786 F. Supp. 3d at 1251. There, the court surveyed four dictionaries from the late 1800s and early 1900s—when Congress passed the first predecessor statute to § 12406, the Militia Act of 1903. *See id.* at 1252. From that survey,

PAGE 23 – OPINION AND ORDER

the court identified several shared characteristics of a rebellion, as Congress would have

understood the term in 1903:

> First, a rebellion must not only be violent but also be armed. Second, a rebellion must be organized. Third, a rebellion must be open and avowed. Fourth, a rebellion must be against the government as a whole—often with an aim of overthrowing the government—rather than in opposition to a single law or issue."

*Id.* at 1253 (emphasis omitted).

The court also considered three of the same definitions that the parties here proffer from

the current edition of *Black's Law Dictionary*:

> 1. Open, organized, and armed resistance to an established government or ruler; esp., an organized attempt to change the government or leader of a country, [usually] through violence.
>
> 2. Open resistance or opposition to an authority or tradition.
>
> 3. Hist. Disobedience of a legal command or summons.

*Id.* at 1252 (quoting *Rebellion*, *Black's Law Dictionary* (12th ed. 2024)).

Plaintiffs advocate for the first definition, whereas Defendants advocate for the second

and third definitions. *See* Resp., ECF 35 at 22–23. As a threshold matter, the second and third

definitions that Defendants proffer fail to meet any of the shared characteristics of early 1900s

definitions of "rebellion"—that the rebellion be (1) violent and armed; (2) organized; (3) open

and avowed; and "against the government as a whole—often with an aim of overthrowing the

government." *See Newsom I*, 786 F. Supp. 3d at 1253.

Even overlooking that problem, however, Defendants' definition of rebellion also

contravenes the greater statutory context of § 12406. *See Dolan*, 546 U.S. at 486. In *Newsom II*,

the Ninth Circuit defined the statutory phrase "unable with the regular forces to execute the laws

of the United States" in subsection (3) by reference to "[t]he statutory context." *See* 141 F.4th

at 1051. To do so, it compared the phrase to subsections (1) and (2). *Id.* "Subsections one and

two of the statute describe unusual and extreme exigencies—invasions and rebellions—that

threaten the normal operations of civil government." *Id.* Defendants' broad proffered definitions

of rebellion fall far short of an unusual and extreme exigency.

 Therefore, this Court reaches the same conclusion as the district court in *Newsom I* that

the following "key characteristics" provide the boundaries for what constitutes a "rebellion":

> First, a rebellion must not only be violent but also be armed.
> Second, a rebellion must be organized. Third, a rebellion must be
> open and avowed. Fourth, a rebellion must be against the
> government as a whole—often with an aim of overthrowing the
> government—rather than in opposition to a single law or issue.

*Newsom I*, 786 F. Supp. 3d at 1253 (emphasis omitted). Here, the protests in Portland were not

"a rebellion" and did not pose a "danger of a rebellion," especially in the days leading up to the

federalization. As discussed above, Defendants presented evidence of sporadic violence against

federal officers and property damage to a federal building. Defendants have not, however,

proffered any evidence demonstrating that those episodes of violence were part of an organized

attempt to overthrow the government as a whole, and therefore, Defendants have failed to show

that the President had a colorable basis to conclude that Section 12406(2) was satisfied.

 Defendants nevertheless argue that the President was authorized under Section 12406(2)

to quell "violent resistance to lawful enforcement of federal immigration law occurring in

Portland." Resp., ECF 35 at 22. Indeed, the President also stated that "protests or acts of violence

[that] directly inhibit execution of the laws[] constitute a form of rebellion." Rieger Decl., Ex. D,

ECF 37 at 20. These conceptions of rebellion improperly conflate the statutory preconditions in

Sections 12406(2) and (3). As discussed above, subsection (3) only authorizes the President to

federalize the National Guard if he is "unable with the regular forces to execute the laws of the

United States." If subsection (2) ("rebellion") was satisfied whenever "protests or acts of

violence directly inhibit execution of the laws," subsection (3) (requiring inability to enforce

PAGE 25 – OPINION AND ORDER

federal law) would be superfluous. "If we were to adopt the federal government's reading of subsection [two], it would swallow subsection[ ] [three]." *See Newsom II*, 141 F.4th at 1051; *see also Fischer v. United States*, 603 U.S. 480, 490 (2024) ("Congress would not go to the trouble of spelling out [a list of terms] if a neighboring term swallowed it up . . . .").

### 1. Tenth Amendment

Defendants' *ultra vires* federalization of Oregon's National Guard troops also violates the Tenth Amendment. "No matter the context, the President's authority to act necessarily 'stem[s] either from an act of Congress or from the Constitution itself.'" *Trump v. United States*, 603 U.S. 593, 607 (2024) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)). The Tenth Amendment reserves to the States all rights and powers "not delegated to the United States by the Constitution." U.S. Const. amend. X. In turn, action that "exceeds the National Government's enumerated powers undermines the sovereign interests of the States." *Bond v. United States*, 564 U.S. 211, 225 (2011).

The Constitution grants Congress the power to "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions." U.S. Const. art. I, § 8, cl. 15. "Congress has delegated portions of that power to the President" in 10 U.S.C. § 12406. *Newsom II*, 141 F.4th at 1055; *see Youngstown*, 343 U.S. at 636–38 (Jackson, J., concurring). Here, because the President is acting outside that delegation, he is "'tak[ing] measures incompatible with the expressed . . . will of Congress' reflected in that statute." *Newsom II*, 141 F.4th at 1045–46 (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring)). "But the Constitution authorizes Congress, not the President, to determine when (and how) the militia can be called into actual service of the United States." *Newsom II*, 141 F.4th at 1045. Therefore, the President lacks constitutional authority to federalize the National

PAGE 26 – OPINION AND ORDER

Guard once he exceeds the constitutional authority that Congress granted him, such as in Section 12406.[3]

Because the President is federalizing the Oregon National Guard absent constitutional authority, his actions undermine the sovereign interest of Oregon as protected by the Tenth Amendment. Oregon has a Tenth Amendment power to control its National Guard to the extent it is not cabined by the Militia Clause. And as discussed above, Defendants have acted outside the scope of this constitutional authority conferred by Congress. Put another way, Defendants "interfere[d] with the constitutional balance of power between the federal and state governments" by federalizing state National Guardsmen for federal service when no statutory or constitutional authority permitted their federalization. Brief for the State of California and Governor Newsom as Amici Curiae, ECF 41-1 at 9.

## B. Irreparable Harm

Having demonstrated a likelihood of success on the merits, Plaintiffs must also show that "irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original). Irreparable harm is that "for which there is no adequate legal remedy." *See Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). If a plaintiff is likely to succeed on a constitutional claim, "that showing will almost always demonstrate [the plaintiff] is suffering irreparable harm as well." *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023).

---

[3] In arguing that Defendants did not violate the Posse Comitatus Act, Defendants assert that under the Take Care Clause, "the President has inherent Article II authority to use troops for the protection of federal property and federal function." Resp., ECF 35 at 25. But the President's inherent authority under the Take Care Clause does not support the conclusion that he has inherent authority to federalize the state National Guard to accomplish this purpose. *See Newsom II*, 141 F.4th at 1045 ("[T]he Constitution authorizes Congress, not the President, to determine when (and how) the militia can be called into actual service of the United States.").

PAGE 27 – OPINION AND ORDER

First, Oregon has demonstrated a likelihood that it will suffer a constitutional injury due to Defendants' violation of the state's Tenth Amendment right to control its National Guard. This encroachment on Oregon's police power leaves an indelible mark on Oregon's "sovereignty under the Constitution," *see Shelby County v. Holder*, 570 U.S. 529, 544 (2013), which cannot be remedied by a "legal remedy, such as an award of damages." *Ariz. Dream Act Coal.*, 757 F.3d at 1068. Because Oregon is likely to succeed on its Tenth Amendment claim, it will also likely suffer irreparable harm in the absence of a temporary restraining order.

Second, Plaintiffs claim "ongoing and concrete" harms to their "law enforcement and public safety interests" due to the diversion of state resources. Motion, ECF 6 at 38 (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012)). Federalizing Oregon National Guard members diverts them from their state responsibilities, which impairs the State's ability to call on the Guard to respond to emergencies. *See id.* Further, state and local law enforcement will need to expend additional resources to quell increased civil unrest that is likely to result from the Guard's mobilization. Dobson Decl., ECF 7 ¶ 30 ("Scaling resources to address protests based on the federal deployment may mean that PPB is less able to respond to regular public safety calls for service.").

Defendants respond that the deployment, federalizing only 200 of a total 6,500 Oregon National Guard members, does not substantially impair Oregon's use of the overall force. Resp., ECF 35 at 35–37. However, the 200 members constitute 60% of Oregon National Guardsmen "who are trained to quickly respond to emergencies, including national disasters." Declaration of Brigadier General Alan R. Gronewold, ECF 34 ¶ 3.

Defendants also argue that these harms from diversion are "so conclusory" as to render them "utterly meaningless." Resp., ECF at 37. But the increased need for state and local law

PAGE 28 – OPINION AND ORDER

enforcement reflects reality. On the night the September 28, 2025, National Guard federalization order was announced, the size of the protests increased substantially, ballooning to around 200 people, with a second protest at a different location including "a few hundred." Schoening Decl., Ex. B, ECF 12-1 at 1. Moreover, this Court notes that in Los Angeles, the National Guard mobilizations inflamed protests, spawned unrest at new locations, and required additional resources from the California Highway Patrol. Brief for the State of California and Governor Newsom as Amici Curiae, ECF 41-1 at 11. Likewise, the deployment of federal law enforcement officers to Portland in 2020 "reignited" protests and riots that had "largely self-extinguished." Declaration of Caroline Turco, ECF 13 ¶ 3.

## C. Balancing the Equities and Public Interest

Lastly, the balance of the equities and the public interest, *see E. Bay Sanctuary Covenant*, 993 F.3d at 668, also weigh in favor of granting Plaintiffs' TRO. The public has a profound interest in "prevent[ing] irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *Doe #1 v. Trump*, 957 F.3d 1050, 1068 (9th Cir. 2020) (quoting *Golden Gate Rest. Ass'n v. City & County of San Francisco*, 512 F.3d 1112, 1116 (9th Cir. 2008)). Put simply, the issues at stake in this case are important, and the consequences of this Court's decision are far-reaching. As soon as the federalized National Guard deploys to Portland, the state of Oregon will suffer an injury to its sovereignty. Conversely, if the TRO issues, federal law enforcement may continue "to protect federal personnel, functions, and property in Oregon." ECF 1-1 at 2. In addition, both state and federal law enforcement officers may continue to arrest protestors who violate the law. The impact on Defendants, if any, is therefore *de minimis*.[4]

---

[4] Defendants claim that they have a "significant" and "uncontested interest in the protection of federal agents and property and the faithful execution of the law." *Newsom II*, 141

PAGE 29 – OPINION AND ORDER

Furthermore, this country has a longstanding and foundational tradition of resistance to government overreach, especially in the form of military intrusion into civil affairs. "That tradition has deep roots in our history and found early expression, for example, in . . . the constitutional provisions for civilian control of the military." *Laird v. Tatum*, 408 U.S. 1, 15 (1972); *see also* James Madison, Address to the Constitutional Convention (1787), reprinted in 1 Records of the Federal Convention of 1787, at 465 (Max Farrand ed., 1911) ("A standing military force, with an overgrown Executive will not long be safe companions to liberty. The means of defence [against] foreign danger, have been always the instruments of tyranny at home."). This historical tradition boils down to a simple proposition: this is a nation of Constitutional law, not martial law. Defendants have made a range of arguments that, if accepted, risk blurring the line between civil and military federal power—to the detriment of this nation.

---

F.4th at 1054–55. But the record demonstrates that the threats to that interest in Portland do not warrant the extraordinary measure of bringing in the military. Rather, based on the current record, it is clear that any threats to federal agents and property are readily remedied—as they have been—by federal civilian law enforcement, with the support of State and local law enforcement. Therefore, this interest cannot overcome the countervailing balance of equities and public interest that weigh in favor of Plaintiffs.

PAGE 30 – OPINION AND ORDER

**CONCLUSION**

For the above reasons, this Court GRANTS Plaintiffs' Motion for Temporary Restraining Order, ECF 6, and temporarily enjoins Defendants' September 28, 2025, Memorandum ordering the federalization and deployment of Oregon National Guard service members to Portland. The TRO expires in fourteen days on October 18, 2025, and the parties are ORDERED to comply with the attached TRO. The Defendants' request to stay or administratively stay the Temporary Restraining Order, *see* Defendants' Opposition to Plaintiffs' Motion for Temporary Restraining Order, ECF 35 at 41, is DENIED.

**IT IS SO ORDERED**

DATED this 4th day of October, 2025 at 3:40 p.m. pacific daylight time.


/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **STATE OF OREGON** and the **CITY OF PORTLAND**, | Case No. 3:25-cv-1756-IM |
| Plaintiffs, | **TEMPORARY RESTRAINING ORDER** |
| v. | |
| **DONALD TRUMP**, in his official capacity as President of the United States; **PETE HEGSETH**, in his official capacity as Secretary of Defense; **U.S. DEPARTMENT OF DEFENSE**; **KRISTI NOEM**, in her official capacity as Secretary of Homeland Security; and **U.S. DEPARTMENT OF HOMELAND SECURITY**, | |
| Defendants. | |

The Court GRANTS Plaintiffs' Motion for Temporary Restraining Order, ECF 6, and ORDERS as follows:

1.     Defendants are temporarily enjoined from implementing Defendants' September 28, 2025, Memorandum ordering the federalization and deployment of Oregon National Guard service members to Portland.

2.     This Temporary Restraining Order expires by its own terms on October 18, 2025, at 11:59 p.m.

PAGE 1 – TEMPORARY RESTRAINING ORDER

3.      Plaintiffs are ORDERED to post a nominal bond of $100 within 48 hours. The bond shall be filed in the Clerk's Office and be deposited into the registry of the Court.

4.      Defendants' Request to Stay or Administratively Stay the Temporary Restraining Order, *see* Defendants' Opposition to Plaintiffs' Motion for Temporary Restraining Order, ECF 35 at 41, is DENIED.

5.      The Court Clerk will contact the parties to schedule a telephone hearing on October 17, 2025, to address whether this Temporary Restraining Order should be extended for another 14 days.

6.      Any motion for a Preliminary Injunction shall be filed no later than October 17, 2025; Defendants' opposition shall be due no later than October 23, 2025, and Plaintiffs' reply shall be due on October 27, 2025.

7.      A combined hearing on the preliminary injunction motion and a trial on the merits under Rule 65(a)(2) is set for October 29, 2025, before the Honorable Judge Karin J. Immergut, in Courtroom 13A, beginning at 9:00 a.m.

**IT IS SO ORDERED**

DATED this 4th day of October, 2025 at 3:40 p.m. pacific daylight time.

/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge

PAGE 2 – TEMPORARY RESTRAINING ORDER

**ROB BONTA**
Attorney General of California
Michael L. Newman
Thomas S. Patterson
Senior Assistant Attorneys General
Anya M. Binsacca
Marissa Malouff
James E. Stanley
Supervising Deputy Attorneys General
Jesse Basbaum
Jane Reilley
Meghan H. Strong
Barbara Horne-Petersdorf
Deputy Attorneys General
  300 Spring Street
  Los Angeles, CA 90013
  Telephone: (213) 269-6667
  E-mail: Barbara.HornePetersdorf@doj.ca.gov
*Counsel for the State of California*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| STATE OF OREGON, the CITY OF PORTLAND, and the STATE OF CALIFORNIA, | Case No. 3:25-cv-01756-IM |
| Plaintiffs, | DECLARATION OF PAUL S. ECK |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States; PETE HEGSETH, in his official capacity as Secretary of Defense; U.S. DEPARTMENT OF DEFENSE; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; and U.S. DEPARTMENT OF HOMELAND SECURITY, | |
| Defendants. | |

## DECLARATION OF PAUL S. ECK

1.        I am a resident of the State of California. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2.        I am a Deputy General Counsel in the California Military Department (CMD). I have served in this role since August 2018. As Deputy General Counsel for the California Military Department, I lead a blended team of California and National Guard attorneys. I provide direct legal support to the Executive Staff and other senior leaders on complex matters at the intersection of military operations, state governance, and national security. I am regularly consulted on the operational needs, objectives, movements, and orders impacting the CMD.

Professional Background

3.        I began my service career as a Sergeant in the United States Marine Corps. I served in the United States Marine Corps. from 1980 to 1984 before being honorably discharged.

4.        I completed college and law school following my service in the United States Marine Corps. and worked in private practice from 1991 to 2012.

5.        From 2008 to 2012, I also worked for the San Diego Sheriff's Department as a Search and Rescue Reserve. In this capacity I provided communications and logistical support to the San Diego Sheriff's Department during search and rescue operations for missing and lost persons, evidence recovery, emergency and disaster operations, and mutual aid events among other duties.

6.        From 2010 to 2022, I served as a Colonel (CA) and Judge Advocate in the California Military Department, advising a wide array of units including the 40th Infantry Division, 3-140th Aviation Regiment, 49th Military Police Brigade, and Joint Forces Headquarters. In this capacity, I advised on both administrative law and critical operational legal support.

7.        From 2012 to 2014, I worked as an attorney III for the California Department of Forestry and Fire Protection (Cal Fire).

1

DECLARATION OF PAUL S. ECK

A-407

8.      From 2014 to 2018, I served as a Peace Officer with Cal Fire, ultimately rising to Chief of Investigations. In this role, I led critical investigative and law enforcement operations supporting both Cal Fire and the Office of the State Fire Marshal. I concurrently served as Bomb Squad Commander and Terrorism Liaison Officer.

9.      I am certified by Peace Officer's Standards and Training (POST) at the Basic, Intermediate, Supervisor, and Instructor levels and also hold specialized credentials, including a Post-Blast Explosives Investigator Certificate from the FBI and the FBI Certified Explosives Investigator designation.

10.     I have been a National Guard Bureau Intelligence Oversight Monitor for the State of California since I joined the California Military Department in 2018, maintaining annual certifications and ensuring strict compliance with intelligence oversight standards.

11.     I have also been a Domestic Operational Law Legal Advisor since 2018, activated to support major domestic missions such as the Oroville Dam crisis and the Camp Fire response. I am trained in State Disaster Management, Advanced Incident Command System (ICS) Command, Military Resources in Emergency Management, United States Special Operations Command Operations Security, and Army Counterintelligence.

Background on the Federalization of California National Guard Personnel

12.     I am aware of and have reviewed the Memorandum issued by President    Trump on June 7, 2025 (Trump Memo) calling into federal service members and units of the National Guard.

13.     I am also aware and have reviewed the June 7, 2025, Memorandum from Secretary of Defense Peter Hegseth to the Adjutant General of California, ordering 2,000 California National Guard members into federal service for 60 days (DOD June 7 Order).

14.     I am also aware and have reviewed the June 9, 2025, Memorandum from Secretary Hegseth federalizing an additional 2,000 California National Guard members into federal service for 60 days (DOD June 9 Order).

15.     Pursuant to the DOD June 7 Order and DOD June 9 Order, approximately 4,000 California National Guard members were federalized and deployed to the Greater Los Angeles area.

2

DECLARATION OF PAUL S. ECK

16.     On or about August 5, 2025, Secretary of Defense Peter Hegseth issued an order calling into federal service 300 California National Guard for an additional 90 days, and they have been stationed in Southern California until today, as described below.  The remaining California National Guard personnel were returned to state command.

Deployment of California National Guard Personnel to Oregon and Extension of Federalization

17.     On the evening of Saturday, October 4, 2025, after the United States District Court for the District of Oregon issued a temporary restraining order blocking the attempted federalization of Oregon National Guard personnel to deploy to Portland, Oregon, the U.S. Army Northern Command communicated to the California Military Department Executive Leadership that they intended to send 200 of the federalized California National Guard personnel in Los Angeles to Portland.

18.     As of 6:30 a.m. on Sunday, October 5, 2025, one transport carrying approximately 100 federalized California National Guard personnel had already departed from Los Angeles to Portland, with additional transport scheduled for later in the day.  Additionally, California Military Department Executive Leadership learned that all 300 federalized California National Guard personnel will be deployed to Portland.

19.     Also on Sunday, October 5, 2025, the U.S. Army Northern Command advised the California Military Department that order calling into federal service the 300 federalized California National Guard personnel for an additional period through January 31, 2026, would be issued.

20.     I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on October 5, 2025, at Rancho Cordova, CA.

Digitally signed by PAUL S.
ECK  Deputy General Counsel
Date: 2025.10.05 15:03:50
-07'00'

Paul S. Eck

3

DECLARATION OF PAUL S. ECK

A-409

DAN RAYFIELD
Attorney General
BENJAMIN GUTMAN
Solicitor General
DUSTIN BUEHLER
Special Counsel
SCOTT KENNEDY #T25070201, D.C. Bar #1658085
BRIAN SIMMONDS MARSHALL #196129
THOMAS CASTELLI #226448
IAN VAN LOH #225163
RACHEL SOWRAY #095159
Senior Assistant Attorneys General
ALEXANDER C. JONES #213898
DEREK OLSON #225504
Assistant Attorneys General
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email: Scott.Kennedy@doj.oregon.gov

*Counsel for the State of Oregon*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| STATE OF OREGON, et al., | Case No. 3:25-cv-01756-IM |
| Plaintiffs, | DECLARATION OF BRIAN MARSHALL IN SUPPORT OF PLAINTIFFS' MOTION FOR A SECOND TEMPORARY RESTRAINING ORDER |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States, et al., | |
| Defendants. | |

I, Brian Marshall, declare under penalty of perjury as follows:

1.      I am employed as an Assistant Attorney General with the Oregon Department of Justice. I represent the State of Oregon in this case.

Page 1 -    DECLARATION OF BRIAN MARSHALL IN SUPPORT OF PLAINTIFFS' MOTION FOR A SECOND TEMPORARY RESTRAINING ORDER

2.      Attached hereto as Exhibit 1 is a true and correct copy of an undated PDF with file name "SecWar Memo to TX_05OCT25_Signed", issued by Defense Secretary Pete Hegseth, entitled "Memorandum for the Adjutant General, Texas National Guard Through: The Governor of Texas."

**I declare under penalty of perjury that the foregoing is true and correct.**

EXECUTED on Portland, Oregon on October __5th__, 2025.

_____*s/ Brian Marshall*_____
BRIAN MARSHALL

Page 2 -     DECLARATION OF BRIAN MARSHALL IN SUPPORT OF PLAINTIFFS' MOTION
             FOR A SECOND TEMPORARY RESTRAINING ORDER

# EXHIBIT 1



**SECRETARY OF WAR**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

MEMORANDUM FOR THE ADJUTANT GENERAL, TEXAS NATIONAL GUARD
THROUGH: THE GOVERNOR OF TEXAS

SUBJECT: Calling Members of the Texas National Guard into Federal Service

On June 7, 2025, the President of the United States called forth at least 2,000 National Guard personnel into Federal service pursuant to section 12406 of title 10, U.S. Code, to protect U.S. Immigration and Customs Enforcement and other U.S. Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where violent demonstrations against these functions are occurring or are likely to occur based on current threat assessments and planned operations. On October 4, 2025, the President determined that violent incidents, as well as the credible threat of continued violence, are impeding the execution of the laws of the United States in Illinois, Oregon, and other locations throughout the United States.

The President has authorized me to coordinate with you on the mobilization of up to 400 members of the Texas National Guard under section 12406 of title 10, U.S. Code. The orders will be effective immediately for an initial period of 60 days, and be subject to extension, to perform federal protection missions where needed, including in the cities of Portland and Chicago. The Chief of the National Guard Bureau will immediately coordinate the details of the mobilization with you, in coordination with the Chairman of the Joint Chiefs of Staff and Commander, U.S. Northern Command. The mobilized Service members will be under the command and control of the Commander, U.S. Northern Command.

cc:
Chairman of the Joint Chiefs of Staff
Chief, National Guard Bureau
Commander, U.S. Northern Command
Under Secretary of Defense for Policy
Under Secretary of Defense for Personnel and Readiness

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **STATE OF OREGON**; the **CITY OF PORTLAND**; and **STATE OF CALIFORNIA**, | Case No. 3:25-cv-1756-IM |
| Plaintiffs, | **SECOND TEMPORARY RESTRAINING ORDER** |
| v. | |
| **DONALD TRUMP**, in his official capacity as President of the United States; **PETE HEGSETH**, in his official capacity as Secretary of Defense; **U.S. DEPARTMENT OF DEFENSE**; **KRISTI NOEM**, in her official capacity as Secretary of Homeland Security; and **U.S. DEPARTMENT OF HOMELAND SECURITY**, | |
| Defendants. | |

Based on this Court's prior Opinion and Order Granting Plaintiffs' First Motion for Temporary Restraining Order, ECF 56; the hearing on Plaintiffs' Second Motion for Temporary Restraining Order; and the newly submitted declarations, ECF 60, 63, 65, this Court GRANTS Plaintiffs' Second Motion for Temporary Restraining Order, ECF 59, and ORDERS as follows:

1.   Defendants are temporarily enjoined from deploying federalized members of the National Guard in Oregon.

2.      This Second Temporary Restraining Order expires by its own terms in fourteen days on October 19, 2025.

3.      Plaintiffs are ORDERED to post a nominal bond of $100 within 48 hours. The bond shall be filed in the Clerk's Office and be deposited into the registry of the Court.

4.      Defendants' Request to Stay or Administratively Stay this Second Temporary Restraining Order, which was raised in the hearing on Plaintiffs' Second Motion for Temporary Restraining Order, is DENIED.

5.      The Court Clerk will contact the parties to schedule a telephone hearing on October 17, 2025, to address whether this Second Temporary Restraining Order should be extended for another 14 days.

6.      Any motion for a Preliminary Injunction shall be filed no later than October 17, 2025; Defendants' opposition shall be due no later than October 23, 2025, and Plaintiffs' reply shall be due on October 27, 2025.

7.      A combined hearing on the preliminary injunction motion and a trial on the merits under Rule 65(a)(2) is set for October 29, 2025, before the Honorable Judge Karin J. Immergut, in Courtroom 13A, beginning at 9:00 a.m.

**IT IS SO ORDERED**

DATED this 5th day of October.


/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge

1        IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF OREGON

3               PORTLAND DIVISION

4

5    STATE OF OREGON, the CITY OF     )
     PORTLAND, and the STATE OF       )
6    CALIFORNIA                       )
                                      )
7                    Plaintiffs,      )   Case No. 3:25-cv-01756-IM
                                      )
8                 v.                  )
                                      )   October 5, 2025
9    DONALD TRUMP, in his official    )
     capacity as President of the     )
10   United States; PETE HEGSETH,     )
     in his official capacity as      )
11   Secretary of Defense; U.S.       )
     DEPARTMENT OF DEFENSE;           )
12   KRISTI NOEM, in her official     )
     capacity as Secretary of         )
13   Homeland Security; and U.S.      )
     DEPARTMENT OF HOMELAND           )
14   SECURITY,                        )
                                      )
15                   Defendants.      )
     _____)

16

17

18

19          TEMPORARY RESTRAINING ORDER

20          TRANSCRIPT OF PROCEEDINGS

21   BEFORE THE HONORABLE KARIN J. IMMERGUT

22       UNITED STATES DISTRICT COURT JUDGE

23

24

25

```
 1                        TELEPHONIC APPEARANCES

 2    FOR PLAINTIFF STATE OF OREGON:

 3    Mr. Scott P. Kennedy
      Oregon Department of Justice
 4    100 S.W. Market Street
      Portland, OR 97201
 5

 6    FOR PLAINTIFF CITY OF PORTLAND:

 7    Ms. Caroline Turco
      Portland City Attorney's Office
 8    1221 S.W. Fourth Avenue, Room 430
      Portland, OR 97204
 9

10    FOR THE DEFENDANTS:

11    Mr. Eric Hamilton
      Department of Justice - Civil Division
12    950 Pennsylvania Avenue NW
      Washington, DC 20530
13

14    Ms. Jean Lin
      Department of Justice - Civil Division
15    1100 L St NW
      Washington, DC 20005
16

17    FOR THE STATE OF CALIFORNIA:

18    Jane Reilley
      Deputy Attorneys General
19    455 Golden Gate Avenue
      San Francisco, CA 94102
20

21    COURT REPORTER:

22    Jill L. Jessup, CSR, RMR, RDR, CRR
      United States District Courthouse
23    1000 S.W. Third Ave.
      Room 301
24    Portland, OR 97204

25
```

```
 1                    TRANSCRIPT OF PROCEEDINGS
 2                        (October 5, 2025)
 3   (Telephonic hearing:)
 4            THE COURT:  Hello, this is Judge Immergut.
 5       All right.  We're on the record in State of Oregon,
 6   City of Portland, and State of California v.
 7   President Trump, Secretary of Defense Pete Hegseth,
 8   U.S. Department of Defense Kristi Noem, and U.S. Department
 9   of Homeland Security -- excuse me -- Defendant Pete Hegseth
10   and the Department of Defense and Kristi Noem and the U.S.
11   Department of Homeland Security.
12       This case is 25-cv-01756.  An amended complaint was
13   filed this afternoon, and plaintiffs brought an emergency
14   TRO in this case to -- this is the second motion for a
15   temporary restraining order, which is ECF Document 59, and
16   it seeks to temporarily enjoin defendants from deploying the
17   California National Guard to Oregon.
18       Let me have counsel state appearances for the record.
19       Why don't I call your name, and then you just confirm
20   that you're here.  And let me say a couple of things before
21   I do that.
22       Just my apologies.  We had some technical difficulties
23   having the public be able to hear this hearing, and that is
24   what caused the delay, because we are -- a lot of people are
25   remote so that we could do it in a very expeditious manner.
```

1        So let me start with the lawyers that I understand to

2   be here.

3        Do we have Scott Kennedy for the State of Oregon?

4             MR. KENNEDY:  Yes.  Good evening, Your Honor.

5             THE COURT:  And then Caroline Turco for the City

6   of Portland?

7             MS. TURCO:  Yes, Your Honor.  I'm here.

8             THE COURT:  And do we have Jane Reilley for the

9   State of California?

10             MS. REILLEY:  Yes.  Good evening, Your Honor.

11             THE COURT:  And, Mr. Kennedy, are you arguing for

12   plaintiffs today, and Ms. Turco as well, or what's the plan?

13             MR. KENNEDY:  I'll be arguing specifically for the

14   State of Oregon, Your Honor.

15        Ms. Turco may have information, if relevant to

16   Your Honor's questions about the situation in Portland, and

17   then Ms. Reilley will be representing the State of

18   California and will have additional commentary for them,

19   Your Honor.

20             THE COURT:  All right.  Thank you.

21        And do we have Eric Hamilton for the defendants?

22             MR. HAMILTON:  Yes, Your Honor.  Good evening.

23             THE COURT:  Okay.  Good evening.

24        And do we have Jane -- excuse me -- Jean Lin also for

25   the defendants?

1             MS. LIN:  Yes.  Here, Your Honor.

2             THE COURT:  Okay.  So it is -- since our -- the

3    TRO I issued yesterday, it's my understanding that two

4    things have happened.  One, that the President has sought to

5    and actually brought National Guard to Oregon from

6    California, and also now I just received another declaration

7    from Mr. Marshall that attaches a memorandum from

8    Secretary Hegseth to the Adjutant General of the Texas

9    National Guard to the Governor of Texas.  That also states

10   that the President has determined that violent incidents, as

11   well as a credible threat of continued violence, are

12   impeding the execution of the laws of the United States in

13   Illinois, Oregon, and other locations throughout the

14   United States.

15        So that's some new information, certainly.

16        I do have some questions for the lawyers, but I do want

17   to give Mr. Hamilton a chance to respond to plaintiffs'

18   emergency motion, TRO.

19        Anything you would like to say?

20             MR. HAMILTON:  Yes.  Thank you, Your Honor.

21        I'll start by addressing the relocation of California

22   guardsmen.  My understanding is that 200 members of the

23   California National Guard have been or are presently being

24   relocated to Portland and that 100 guardsmen, who were

25   federalized in California, are staying in Los Angeles.

1     The relocation of the guardsmen is consistent with the

2    Presidential memorandum that the President signed on

3    June 7th federalizing members of the California National

4    Guard.

5     Nothing in the June 7th --

6        THE COURT:  Mr. Hamilton, let me ask you how could

7    bringing in federalized National Guard in California not be

8    in direct contravention of the TRO I issued yesterday?

9        MR. HAMILTON:  The TRO issued yesterday,

10    paragraph 1 of it, enjoined implementation of

11    Secretary Hegseth's order to the Oregon National Guard, and

12    this is --

13        THE COURT:  Mr. Hamilton, you're an officer of the

14    court.  Aren't defendants simply circumventing my order,

15    which relies on the conditions in Portland?  And nothing has

16    changed.  There's nothing in my order that has changed.

17        MR. HAMILTON:  No, Your Honor.

18        THE COURT:  So why -- why is this appropriate?

19        MR. HAMILTON:  Well, the reason is that the

20    California National Guard were federalized under a different

21    Presidential memorandum.  The June 7th Presidential

22    memorandum.  That is not limited in any way to the state of

23    California.

24     And, in fact, that Presidential memorandum authorized

25    Secretary Hegseth to carry out the mission and deploy

1  military personnel, may perform the military protective

2  activities that the Secretary of Defense determines are

3  reasonably necessary to ensure the protection and safety of

4  federal personnel and property.

5      I would add that §12406 even acknowledges that -- it

6  says that any state may be -- may be called upon to respond

7  to wherever the -- you know, the situation is that -- that

8  guardsmen are being deployed.  It doesn't limit itself to

9  the Guard in the state where -- where a problem is.

10     I'd also add that --

11         THE COURT:  Mr. Hamilton -- Mr. Hamilton, you are

12  missing the point.  Because here it's the conditions on the

13  ground in Oregon that were the basis for my finding on a

14  TRO -- standard for a TRO that there was not a legal basis

15  to bring federalized National Guard into Oregon.

16     Bringing them from -- is there any legal authority for

17  federalizing National Guard for one purpose -- that is, to

18  help California -- and then divert them to another purpose

19  in a different state where the state -- where there is no

20  showing that that is military help that is necessary to

21  assist law enforcement or to protect law enforcement or the

22  one federal building here for ICE?

23         MR. HAMILTON:  Well --

24         THE COURT:  Is there any legal authority for what

25  you're doing?

1      MR. HAMILTON:  §12406 has not been utilized any

2  time in history; so there are not many previous precedence

3  from the use of this authority, but --

4      THE COURT:  Tell me.  Why do you think it has not

5  been utilized?

6      MR. HAMILTON:  I can't -- I can't speak to that.

7   The -- I guess, I can speak to the fact that the

8  President determined in June that the California National

9  Guard needed to be federalized to respond to arrest and

10  danger to federal law enforcement and property, and that --

11      THE COURT:  Mr. Hamilton -- Mr. Hamilton, so,

12  again, if it were the case that you could federalize

13  National Guard in one place and simply send them to a place

14  where the President doesn't have authority to federalize the

15  National Guard, then what would the purpose of §12406 be?

16   You have to have a colorable claim that Oregon

17  conditions require it, but you don't.  We've already gone

18  over that.

19   So why is this appropriate?

20      MR. HAMILTON:  Well, again, no additional

21  California guardsmen were federalized.  They were, instead,

22  relocated from California to the state of Oregon, and --

23      THE COURT:  So are they federalized?  Or they're

24  not?

25      MR. HAMILTON:  They are federalized, but new

1   guardsmen were not federalized.  200 already federalized

2   California guardsmen were relocated to the state of Oregon.

3        THE COURT:  Let me ask you, Mr. Hamilton.  You're

4   an officer of the court.  Do you believe that this is an

5   appropriate way to deal with my order or an order that a

6   judge issues that you disagree with or is the appropriate

7   mechanism to appeal, as you've done?

8        MR. HAMILTON:  Well, I -- I'm not a policymaker,

9   but my -- my --

10        THE COURT:  You're a lawyer.

11        MR. HAMILTON:  Right.  And paragraph 1 of the

12   temporary restraining order was limited to implementing

13   the -- Secretary Hegseth's memo that federalized members of

14   the Oregon National Guard, and the California guardsmen are

15   already federalized and were relocated to the state of

16   Oregon within the scope of the June 7th Presidential

17   memorandum, which does not have a geographic limit.

18     Also --

19        THE COURT:  Anything else you want to argue?

20        MR. HAMILTON:  Yes, Your Honor.

21     We submit that each of the plaintiffs lacks standing

22   and also cannot make a showing of irreparable harm.  Oregon

23   and Portland do not have a cognizable injury in fact in --

24   in challenging the locate -- relocation of out-of-state

25   guardsmen to the state of Oregon.

1     Out-of-state guard are providing protection for federal

2  property and personnel, like, say, the work that Federal

3  Protective Service would do.  They are working at a location

4  where the Federal Government already has a police force.

5  Oregon and Portland would also lack third-party standing in

6  our outside civilian interests of §12406 as to the State of

7  California.

8     Oregon and Portland don't have any statutory right or

9  interest based on the federalization of out-of-state

10  guardsmen.  Only California could possibly sue to challenge

11  the federalization of guardsmen under §12406, but California

12  cannot establish standing or an irreparable harm here

13  because they have no redressable injury in fact.

14     They noted the 200 guardsmen who are being relocated

15  from California to Oregon are already properly federalized

16  and a temporary restraining order as to their movement from

17  California to Oregon would just result in service members

18  returning to California but staying in a federalized state.

19  That does not redress any injury that California could

20  claim.

21     And, finally, Your Honor, I would note that, if the

22  Court enters a second temporary restraining order, we are

23  moving for a stay pending appeal authorized by the

24  Solicitor General, an administrative stay of any temporary

25  restraining order.  We would respectfully ask the Court to

1   note this motion in any order it issues and rule on the

2   motion as it did with the first temporary restraining order.

3              THE COURT:  Mr. Hamilton, do you want to respond?

4              MR. HAMILTON:  I -- I beg your pardon, Your Honor?

5              THE COURT:  Would you like to respond?

6              MR. HAMILTON:  I --

7              THE COURT:  I'm sorry, Mr. Hamilton.  I'm sorry.

8         Mr. Kennedy.  I'm sorry.

9              MR. KENNEDY:  Yes.  Thank you, Your Honor.

10        You know, I would just like to make a few points

11   because I think our key points and arguments have all been

12   raised in the briefing.  I think Your Honor understands the

13   issues that we're concerned about very, very well, but I

14   just want to note and highlight the information we received

15   about the apparent deployment or transfer of -- or impending

16   transfer of Texas National Guard members.

17        The memorandum that we filed on the docket just shortly

18   before this hearing was one that we received -- at least I

19   received at, I think, 6:36 p.m. tonight, just minutes before

20   our 7:00 p.m. hearing.

21        So we apologize for that late filing, but we filed it

22   as soon as we could.

23        I just want to highlight an additional concern, I

24   think, that that memorandum raises, which is that it feels a

25   little bit like we're playing a game of rhetorical

1    whac-a-mole here because, of course, what Your Honor ruled

2    yesterday was the plaintiffs made very, very clear, in the

3    way that you just articulated in your questioning, that

4    there was no lawful basis, based on the facts existing in

5    Portland and Oregon, to federalize under §12406.  That

6    appears to have triggered the response late in the night,

7    just hours after the Court's order, by federal defendants to

8    then turn to the California National Guard apparently based

9    on a very technical and extremely narrow reading of

10   Your Honor's order.

11        We then filed a motion for temporary restraining order

12   asking for that action to be enjoined and then --

13   thereafter, and it's hard to know if it was

14   cause-and-effect; but, thereafter, we received the

15   memorandum from Secretary Hegseth apparently federalizing

16   the members of the Texas National Guard with the same

17   design.

18        So I do think that we actually are in a position now we

19   need to somewhat broaden the relief that was requested in

20   our motion for temporary restraining order to prevent this

21   gamesmanship from persisting, and I think now we do need to

22   broaden the relief that's requested to encompass the

23   National Guard of any state or the District of Columbia.

24        So I think I would like to make clear that that's the

25   broader request that we have to make here is that it's --

1  it's something that's necessitated, again, by developments

2  in just the moments before this hearing, but I wanted to

3  raise that point first.

4         THE COURT:  All right.  Can I ask you just a

5  couple of questions with regard to the California component?

6  If the defendants have sought a stay of -- I denied the --

7  at least I denied the stay, but they brought it up to the

8  Ninth Circuit.  So if the Ninth Circuit were to stay the TRO

9  I issued yesterday in the exclusively Oregon case, which

10  pertains to the Oregon National Guard, what is the

11  consequence if I grant this TRO?

12         MR. KENNEDY:  Your Honor, just to clarify the

13  question.  Specifically, if the Ninth Circuit that's

14  currently reviewing the motion to stay the effect of your

15  October 4th order, if they were to stay that order, what

16  would be the effect on the second TRO that we have requested

17  this afternoon?

18         THE COURT:  Correct.  I suppose, if it's the

19  broader TRO, then it might have no effect, it seems; but if

20  it's the California National Guard, then if the Ninth

21  Circuit stays the Oregon one, then is there an effect on

22  the -- a new TRO that relates to the California federalized

23  troops?

24         MR. KENNEDY:  Two points, Your Honor.  I want to

25  give my colleague, Ms. Reilley, from the State of

1   California, an opportunity to address that, but one issue

2   that I think I highlight is that -- there's an independent

3   issue from the issues Your Honor addressed in yesterday's

4   order, which is that the California National Guard very

5   clearly in the record from the *Newsom v. Trump* litigation

6   was federalized for a specific purpose that relates to the

7   conduct that was occurring in L.A. back in June.

8        That issue has, of course, been addressed by courts in

9   California, but I think that's an important distinction

10  between what happened in yesterday's order from Your Honor

11  and a separate issue with respect to the federalization and

12  deployment of the California National Guard.  So I would

13  like to give my colleague, Ms. Reilley, an opportunity to

14  address that further, with your indulgence.

15             THE COURT:  Yes, that would be fine.

16        And, Ms. Turco, I'll give you an opportunity if you

17  want to add anything as well.

18        So let me hear from Ms. Reilley if you would like to

19  add something.

20             MS. REILLEY:  Thank you, Your Honor.  Just from

21  the point of the effect of the -- a potential stay in the

22  Ninth Circuit of your order from yesterday on an order you

23  may issue in response to this new motion, we don't see that

24  that would create any jurisdictional conflict.

25        This TRO request, as you know, was made pursuant to a

1   new amended complaint that was filed this afternoon with

2   respect to facts that were not available at the time that

3   you made your previous ruling.  And for authority in support

4   of that position, we would direct you to *Adams*, which is

5   135 F.3d at 1154 and also the *Mayweathers v. Newland* case,

6   258 F.3d 930, and that stands for the proposition that the

7   district court had jurisdiction to enter a second

8   preliminary injunction while appeal of the first preliminary

9   injunction was still pending.

10      So it is our position at least that any order that you

11  issue in response to this new TRO request would not be

12  adversely affected by a stay of the prior TRO order if that

13  addresses Your Honor's question.

14          THE COURT:  Okay.  And let me ask you just from --

15  I think Mr. Hamilton was making a couple of arguments.  One,

16  there's no standing.  I think that also applies to Oregon.

17  So I'll go back to them in a minute.

18      But, also, what is the irreparable harm for California?

19          MS. REILLEY:  Yes, Your Honor.  There are two

20  distinct sources of irreparable harm for California.  The

21  first is the injury to our sovereign rights and police

22  powers.

23      Essentially, what we're seeing here is California

24  soldiers being unwilling participants in an unlawful

25  federalization mission, and that does harm not only to our

1    sovereign rights as the standard commander in chief of these

2    forces but also does damage to the morale and reputation of

3    our National Guard troops.

4        It also undermines the State's police powers because

5    our troops are being commandeered to partake in federal --

6    excuse -- civilian law enforcement activities in

7    contravention of the Posse Comitatus Act and other federal

8    law without our consent.

9        And, second, there is an injury to California in the

10   form of an inability to respond to emergencies and natural

11   disasters.  Of course, these troops would still be

12   federalized even if they were still in California, but at

13   least in that situation they would still be geographically

14   located within the state.

15       So to the extent there were a natural disaster or an

16   emergency, those troops could be defederalized and deployed

17   under state control to respond to that emergency in short

18   order.

19       If they're in a different state, such as Oregon or even

20   farther beyond Oregon, in a feature factual scenario, that's

21   just one more logistical hurdle to get the troops back into

22   the state and under state control to the extent it's

23   necessary to respond to an emergency.

24       So those are the two sources of irreparable harm that

25   we're alleging here.

1          THE COURT:  Okay.  And, Ms. Turco -- actually, let

2   me go back to Mr. Hamilton.

3       In terms of the standing issue, did you want to respond

4   to that?

5       Not Mr. Hamilton.  I'm sorry.

6       Mr. Kennedy?

7          MR. KENNEDY:  Yes.  Your Honor, this is

8   Mr. Kennedy for the State of Oregon.

9       I'll add that the irreparable harms for the State of

10  Oregon includes issues we've already discussed at the

11  hearing we had this last Friday.

12      As the Court recognized at that hearing, and I'll just

13  quote a passage from the transcript, "The people of Oregon

14  have a sovereign interest in making a determination of what

15  the needs of the State are, including whether they can

16  handle their own law enforcement issues," end quote.

17      I think that interest is irreparably violated as soon

18  as the President's deployment of any state's National Guard

19  occurs in Oregon.

20      And here, just one more quote from that hearing, "The

21  people of Oregon have a sovereign interest in making the

22  determination of what the needs of the state are," end

23  quote, "including whether they can handle their own law

24  enforcement issues," end quote.

25      And here I think Oregon does have, as we discussed in

1  the papers, an interest in securing observance of the terms

2  under which it participates in the federal system.  That's a

3  broader point, but I think it encompasses everything that I

4  just described.

5      There's also an argument intendant of what I just

6  described about the expenditure of additional resources.

7      This is another issue that we highlighted in our

8  original TRO motion and, again, in our papers today, but the

9  state and local law enforcement in the state of Oregon and

10  in the city of Portland will need to expend additional

11  resources to quell increased -- any increased protest

12  activity, any additional issues that arise or are likely to

13  result, we think, from the guard's mobilization in Oregon.

14      Again, this is an issue we discussed in the original

15  motion for TRO.  We think that category of irreparable harm

16  still absolutely applies here.

17          THE COURT:  Okay.  So anything further from

18  plaintiffs?

19      All right.

20          MS. REILLEY:  Nothing further from California,

21  Your Honor.

22          THE COURT:  Okay.  Thank you.

23      Did somebody want to saying something?  I'm sorry.

24          MR. KENNEDY:  Nothing else for the State of Oregon

25  at the moment, Your Honor.

1          THE COURT:  And, Ms. Turco?

2          MS. TURNER:  The City has nothing to add to the

3   argument already made, Your Honor.  Thank you.

4          THE COURT:  Okay.  All right.  Again, I'm handling

5   this on an emergency basis with limited briefing because it

6   is on the temporary restraining order portions on -- the

7   second motion for a temporary restraining order.

8       No new information has been provided about any issues

9   in Portland; so for all of the reasons stated in my prior

10   opinion or this Court's prior opinion and order granting

11   plaintiffs' first motion for a TRO, I grant plaintiffs'

12   second motion for a TRO, which is ECF 59, and the question

13   is the scope of it.

14       It -- originally, I was viewing this just as a TRO to

15   enjoin defendants from deploying members of the California

16   National Guard to Oregon, but it seems to me that, based on

17   the conduct of the defendants and the now seeking National

18   Guard from Texas to go to Oregon -- again, I see those as

19   direct contravention of this -- the order that this Court

20   issued yesterday -- so I am going to grant that -- the

21   alternative TRO that was requested, which is -- well, let me

22   ask plaintiffs for a minute.

23       Is there any issue -- I prefer not to modify my

24   original TRO, but is there -- I am certainly troubled by now

25   hearing that both California and Texas National Guard are

 1  being sent to Oregon, which does appear to be in direct

 2  contravention of my order.  It appears to violate both

 3  §12406 and the Tenth Amendment, but I have some concern

 4  about the breadth of the alternative order and modifying my

 5  order of yesterday.

 6      Can you speak to that, Mr. Hamilton?

 7          MR. HAMILTON:  The question is as to modification

 8  of the now appealed TRO as opposed to a new TRO?

 9          THE COURT:  Yes.  So you're asking your TRO to

10  prohibit the relocation or deployment of any National Guard

11  under defendants' command.  That is Title 10 status within

12  the state of Oregon.  Is that too broad?

13          MR. HAMILTON:  So I represent defendants.

14          THE COURT:  Oh, I'm sorry.  I'm sorry.  I keep

15  saying "Mr. Hamilton."  I mean "Mr. Kennedy."

16          MR. KENNEDY:  Yes, Your Honor.  Thank you.

17      I'll describe my thoughts about this.  I'll invite

18  Ms. Reilley to add any others that she has for California,

19  but what we requested last -- well, I'll back up and make

20  two points, Your Honor.

21      I think, first, that it would be appropriate for the

22  Court here to issue a second temporary restraining order, a

23  second order with broader scope than last night's.

24      I think it would be appropriate for the Court to

25  incorporate, by reference, the reasoning that was

1   articulated in yesterday's order, as you did in today's

2   argument, because of the sufficiency of that reasoning,

3   specifically the reasoning that the prerequisites in §12406

4   were not satisfied, the reasons why they were not satisfied,

5   based on the facts in Portland, Oregon.  All that reasoning

6   still applies in full force.

7        The only issue that I think was perhaps exploited by

8   defendants in this situation is the fact that the original

9   TRO was specific to the National Guard of Oregon.

10       What we requested in our motion today and in the papers

11  was for the Court to stay the active deployment of

12  federalized members of the National Guard of California in

13  the state of Oregon.  I think now we would need to broaden

14  that, in light of what has happened in the most recent

15  memorandum from the Secretary of Defense, to stay the active

16  deployment of federalized members of the National Guard of

17  any state or the District of Columbia in the state of

18  Oregon.

19       I think that's the issue that we have before us.  It's

20  still the same issue because we're still talking about

21  10 U.S.C. §12406 in both the most recent Secretary of

22  Defense memorandum and the one we were dealing with from

23  last weekend.  The basis is still 10 U.S.C. §12406, and

24  those prerequisites Your Honor has already found have not

25  been satisfied.

1    So you're just applying that reasoning to these new

2  developments and issuing a second TRO to address this new

3  conduct.

4           THE COURT:  Okay.  So that's what I'll do -- is

5  not a modification of the October 5, 2025, TRO.  It is a new

6  TRO that prohibits the relocation, federalization, or

7  deployment of any National Guard under defendants' command

8  that is Title 10 status within the state of Oregon.

9    And is that sufficient, Mr. Kennedy?

10           MR. KENNEDY:  I believe it is, from the State of

11  Oregon's perspective.

12    I would invite Ms. Reilley from California to offer any

13  other comment or Ms. Turco from the City of Portland.

14           THE COURT:  Ms. Reilley?

15           MS. REILLEY:  Yes, Your Honor.  We would agree

16  that that would be the appropriate scope for a second TRO.

17           THE COURT:  Ms. Turco?

18           MS. TURCO:  Yes, Your Honor.  The scope is

19  appropriate and having a second TRO as well would be

20  appropriate.

21           THE COURT:  So that will be my order.

22    I am basing that on all of the reasons that were in my

23  prior opinion and order granting plaintiffs' first motion

24  for a TRO, and I -- the same reasoning applies, that the

25  deployment of the federalized military is ultra vires and

1    contrary to law because it violates 10 U.S.C. §12406 because

2    that has to be based on conditions of Oregon at the time the

3    orders are issued and the record that I have demonstrated

4    that it is not appropriate to bring military in to Oregon at

5    the federalized military at this time.

6         I also find that it's likely that defendants, through

7    this process, violate the Tenth Amendment, and for the same

8    reasons as stated in yesterday's opinion, plaintiffs have

9    demonstrated a likelihood of irreparable harm and that the

10   balance of equities and public interest weigh in their

11   favor.

12        And I accept also the irreparable harm that the State

13   of California has expressed at this hearing, and I adopt

14   that as a rationale as well to find irreparable harm with

15   regard to California providing National Guard to Oregon

16   under the circumstances of this case.

17        So that is my order.  I'll follow it up with a written

18   TRO.  Because of the emergency basis, it is not my plan to

19   issue an opinion because I'm relying on all of the reasoning

20   previously expressed in my opinion.

21        Mr. Kennedy, is there anything I need to clarify or --

22   I'll issue a written TRO order, though, which will be the

23   second TRO, but is there anything I need to clarify or any

24   additional findings that you think I need to make for the

25   record?

1    MR. KENNEDY:  Your Honor, Mr. Kennedy here.
2  Nothing else occurs to me at the moment.

3    THE COURT:  Ms. Turco?

4    MS. TURCO:  Nothing from the City, Your Honor.

5    THE COURT:  Ms. Reilley?

6    MS. REILLEY:  Your Honor, I believe the only
7  remaining factor would be the length of the second TRO or
8  the duration in time that it would lapse.  I know the prior
9  order was 14 days.

10    Does the Court intend to adopt that same duration or it
11  would have a different duration?

12    THE COURT:  It would expire on its own terms in 14
13  days.  I'm sorry.  I should have said that.

14    Thank you.

15    MS. REILLEY:  Thank you, Your Honor.

16    Nothing further from California.

17    THE COURT:  Okay.  All right.

18    Any clarification, Mr. Hamilton?

19    MR. HAMILTON:  Yes, Your Honor.  I would just
20  re-note my motion for a stay pending appeal authorized by
21  the Solicitor General and for an administrative stay; and,
22  again, we would ask the Court to rule on that motion and
23  note the Court's ruling in the order that is entered on the
24  docket.

25    THE COURT:  All right.  I'm denying both a motion

1    for a stay and a motion for administrative stay.

2            MR. HAMILTON:  Thank you, Your Honor.

3            THE COURT:  And as I -- I should have said this at

4    the beginning of the hearing; but, of course, our record --

5    you cannot record this hearing.  If you did record it, you

6    need to delete it.  That's a violation of my court orders,

7    and you can be held in contempt.

8        So, with that, we'll be in recess.

9        Thank you.

10            (Hearing concluded at 8:20 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E
 2          State of Oregon, et al. v. Donald Trump, et al.
 3                       3:25-cv-01756-IM
 4                   Temporary Restraining Order
 5                       October 5, 2025
 6          I certify, by signing below, that the foregoing is a
 7   true and correct transcript, to the best of my ability, of
 8   the telephonic proceedings heard via conference call, taken
 9   by stenographic means.  Due to the telephonic connection,
10   parties appearing via speakerphone or cell phone or wearing
11   masks due to coronavirus, speakers overlapping when
12   speaking, speakers not identifying themselves before they
13   speak, fast speakers, the speaker's failure to enunciate,
14   and/or other technical difficulties that occur during
15   telephonic proceedings, this certification is limited by the
16   above-mentioned reasons and any technological difficulties
17   of such proceedings occurring over the speakerphone at the
18   United States District Court of Oregon in the above-entitled
19   cause.
20          A transcript without an original signature, conformed
21   signature, or digitally signed signature is not certified.
22
23   /s/Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
24   _____
     Official Court Reporter      Signature Date: 10/5/2025
25   Oregon CSR No. 98-0346  CSR Expiration Date:  9/30/2026
```

**MR. HAMILTON:** [19] 4/22 5/20 6/9 6/17 6/19 7/23 8/1 8/6 8/20 8/25 9/8 9/11 9/20 11/4 11/6 20/7 20/13 24/19 25/2
**MR. KENNEDY:** [10] 4/4 4/13 11/9 13/12 13/24 17/7 18/24 20/16 22/10 24/1
**MS. LIN:** [1] 5/1
**MS. REILLEY:** [7] 4/10 14/20 15/19 18/20 22/15 24/6 24/15
**MS. TURCO:** [3] 4/7 22/18 24/4
**MS. TURNER:** [1] 19/2
**THE COURT:** [42]

**/**

**/s/Jill** [1] 26/23

**0**

**01756** [3] 1/6 3/12 26/3
**0346** [1] 26/25

**1**

**1** [2] 6/10 9/11
**10** [6] 20/11 21/21 21/23 22/8 23/1 26/24
**10 U.S.C** [1] 21/21
**10/5/2025** [1] 26/24
**100** [2] 2/4 5/24
**1000** [1] 2/23
**1100** [1] 2/15
**1154** [1] 15/5
**1221** [1] 2/8
**12406** [11] 7/5 8/1 8/15 10/6 10/11 12/5 20/3 21/3 21/21 21/23 23/1
**135** [1] 15/5
**135 F.3d** [1] 15/5
**14** [2] 24/9 24/12

**2**

**200** [3] 5/22 9/1 10/14
**20005** [1] 2/15
**2025** [5] 1/8 3/2 22/5 26/5 26/24
**2026** [1] 26/25
**20530** [1] 2/12
**25** [1] 3/12
**25-cv-01756** [1] 3/12
**258** [1] 15/6

**3**

**30** [1] 26/25
**301** [1] 2/23
**3:25** [2] 1/6 26/3
**3:25-cv-01756-IM** [2] 1/6 26/3

**4**

**430** [1] 2/8
**455** [1] 2/19
**4th** [1] 13/15

**5**

**5** [5] 1/8 3/2 22/5 26/5 26/24
**59** [2] 3/15 19/12

**6**

**6:36** [1] 11/19

**7**

**7:00** [1] 11/20
**7:00 p.m** [1] 11/20
**7th** [4] 6/3 6/5 6/21 9/16

**8**

**8:20** [1] 25/10

**9**

**9** [1] 26/25
**9/30/2026** [1] 26/25
**930** [1] 15/6
**94102** [1] 2/19
**950** [1] 2/12
**97201** [1] 2/4

**97204** [2] 2/8 2/24
**98** [1] 26/25
**98-0346** [1] 26/25

**A**

**ability** [1] 26/7
**able** [1] 3/23
**about** [8] 4/16 11/13 11/15 18/6 19/8 20/4 20/17 21/20
**above** [2] 26/16 26/18
**above-entitled** [1] 26/18
**above-mentioned** [1] 26/16
**absolutely** [1] 18/16
**accept** [1] 23/12
**acknowledges** [1] 7/5
**Act** [1] 16/7
**action** [1] 12/12
**active** [2] 21/11 21/15
**activities** [2] 7/2 16/6
**activity** [1] 18/12
**actually** [3] 5/5 12/18 17/1
**Adams** [1] 15/4
**add** [7] 7/5 7/10 14/17 14/19 17/9 19/2 20/18
**additional** [7] 4/18 8/20 11/23 18/6 18/10 18/12 23/24
**address** [3] 14/1 14/14 22/2
**addressed** [2] 14/3 14/8
**addresses** [1] 15/13
**addressing** [1] 5/21
**Adjutant** [1] 5/8
**administrative** [3] 10/24 24/21 25/1
**adopt** [2] 23/13 24/10
**adversely** [1] 15/12
**affected** [1] 15/12
**after** [1] 12/7
**afternoon** [3] 3/13 13/17 15/1

A-442

## A

**again [8]** 8/12 8/20 13/1 18/8 18/14 19/4 19/18 24/22

**agree [1]** 22/15

**al [2]** 26/2 26/2

**all [12]** 3/5 4/20 11/11 13/4 18/19 19/4 19/9 21/5 22/22 23/19 24/17 24/25

**alleging [1]** 16/25

**already [8]** 8/17 9/1 9/15 10/4 10/15 17/10 19/3 21/24

**also [15]** 4/24 5/6 5/9 7/10 9/18 9/22 10/5 15/5 15/16 15/18 16/2 16/4 18/5 23/6 23/12

**alternative [2]** 19/21 20/4

**am [3]** 19/20 19/24 22/22

**amended [2]** 3/12 15/1

**Amendment [2]** 20/3 23/7

**Angeles [1]** 5/25

**another [3]** 5/6 7/18 18/7

**any [25]** 6/22 7/6 7/16 7/24 8/1 10/8 10/19 10/24 11/1 12/23 14/24 15/10 17/18 18/11 18/12 19/8 19/23 20/10 20/18 21/17 22/7 22/12 23/23 24/18 26/16

**anything [6]** 5/19 9/19 14/17 18/17 23/21 23/23

**apologies [1]** 3/22

**apologize [1]** 11/21

**apparent [1]** 11/15

**apparently [2]** 12/8 12/15

**appeal [4]** 9/7 10/23 15/8 24/20

**appealed [1]** 20/8

**appear [1]** 20/1

**appearances [2]** 2/1 3/18

**appearing [1]** 26/10

**appears [2]** 12/6 20/2

## B

**applies [4]** 15/16 18/16 21/6 22/24

**applying [1]** 22/1

**appropriate [10]** 6/18 8/19 9/5 9/6 20/21 20/24 22/16 22/19 22/20 23/4

**are [27]**

**Aren't [1]** 6/14

**argue [1]** 9/19

**arguing [2]** 4/11 4/13

**argument [3]** 18/5 19/3 21/2

**arguments [2]** 11/11 15/15

**arise [1]** 18/12

**arrest [1]** 8/9

**articulated [2]** 12/3 21/1

**as [30]**

**ask [7]** 6/6 9/3 10/25 13/4 15/14 19/22 24/22

**asking [2]** 12/12 20/9

**assist [1]** 7/21

**attaches [1]** 5/7

**Attorney's [1]** 2/7

**Attorneys [1]** 2/18

**authority [5]** 7/16 7/24 8/3 8/14 15/3

**authorized [3]** 6/24 10/23 24/20

**available [1]** 15/2

**Ave [1]** 2/23

**Avenue [3]** 2/8 2/12 2/19

## B

**back [5]** 14/7 15/17 16/21 17/2 20/19

**balance [1]** 23/10

**based [6]** 10/9 12/4 12/8 19/16 21/5 23/2

**basing [1]** 22/22

**basis [6]** 7/13 7/14 12/4 19/5 21/23 23/18

**be [27]**

**because [13]** 3/24 7/12

## C

**been [7]** 5/23 8/1 8/5 11/11 14/8 19/8 21/25

**before [7]** 1/21 3/20 11/18 11/19 13/2 21/19 26/12

**beg [1]** 11/4

**beginning [1]** 25/4

**being [6]** 5/23 7/8 10/14 15/24 16/5 20/1

**believe [3]** 9/4 22/10 24/6

**below [1]** 26/6

**best [1]** 26/7

**between [1]** 14/10

**beyond [1]** 16/20

**bit [1]** 11/25

**both [4]** 19/25 20/2 21/21 24/25

**breadth [1]** 20/4

**briefing [2]** 11/12 19/5

**bring [2]** 7/15 23/4

**bringing [2]** 6/7 7/16

**broad [1]** 20/12

**broaden [3]** 12/19 12/22 21/13

**broader [4]** 12/25 13/19 18/3 20/23

**brought [3]** 3/13 5/5 13/7

**building [1]** 7/22

## C

**C [2]** 25/11 26/1

**CA [1]** 2/19

**CALIFORNIA [49]**

**call [2]** 3/19 26/8

**called [1]** 7/6

**can [6]** 8/7 13/4 17/15 17/23 20/6 25/7

**can't [2]** 8/6 8/6

**cannot [3]** 9/22 10/12 25/5

**capacity [3]** 1/9 1/10 1/12

## C

**Caroline [2]** 2/7 4/5
**carry [1]** 6/25
**case [7]** 1/6 3/12 3/14 8/12 13/9 15/5 23/16
**category [1]** 18/15
**cause [2]** 12/14 26/19
**caused [1]** 3/24
**cell [1]** 26/10
**certainly [2]** 5/15 19/24
**certification [1]** 26/15
**certified [1]** 26/21
**certify [1]** 26/6
**challenge [1]** 10/10
**challenging [1]** 9/24
**chance [1]** 5/17
**changed [2]** 6/16 6/16
**chief [1]** 16/1
**Circuit [5]** 13/8 13/8 13/13 13/21 14/22
**circumstances [1]** 23/16
**circumventing [1]** 6/14
**city [9]** 1/4 2/6 2/7 3/6 4/5 18/10 19/2 22/13 24/4
**Civil [2]** 2/11 2/14
**civilian [2]** 10/6 16/6
**claim [2]** 8/16 10/20
**clarification [1]** 24/18
**clarify [3]** 13/12 23/21 23/23
**clear [2]** 12/2 12/24
**clearly [1]** 14/5
**cognizable [1]** 9/23
**colleague [2]** 13/25 14/13
**colorable [1]** 8/16
**Columbia [2]** 12/23 21/17
**Comitatus [1]** 16/7
**command [2]** 20/11 22/7
**commandeered [1]** 16/5
**commander [1]** 16/1
**comment [1]** 22/13
**commentary [1]** 4/18
**complaint [2]** 3/12 15/1

**component [1]** 13/5
**concern [2]** 11/23 20/3
**concerned [1]** 11/13
**concluded [1]** 25/10
**conditions [4]** 6/15 7/12 8/17 23/2
**conduct [3]** 14/7 19/17 22/3
**conference [1]** 26/8
**confirm [1]** 3/19
**conflict [1]** 14/24
**conformed [1]** 26/20
**connection [1]** 26/9
**consent [1]** 16/8
**consequence [1]** 13/11
**consistent [1]** 6/1
**contempt [1]** 25/7
**continued [1]** 5/11
**contrary [1]** 23/1
**contravention [4]** 6/8 16/7 19/19 20/2
**control [2]** 16/17 16/22
**coronavirus [1]** 26/11
**correct [2]** 13/18 26/7
**could [7]** 3/25 6/6 8/12 10/10 10/19 11/22 16/16
**counsel [1]** 3/18
**couple [3]** 3/20 13/5 15/15
**course [4]** 12/1 14/8 16/11 25/4
**court [18]** 1/1 1/22 2/21 6/14 9/4 10/22 10/25 15/7 17/12 19/19 20/22 20/24 21/11 24/10 24/22 25/6 26/18 26/24
**Court's [3]** 12/7 19/10 24/23
**Courthouse [1]** 2/22
**courts [1]** 14/8
**CRC [1]** 26/23
**create [1]** 14/24
**credible [1]** 5/11
**CRR [2]** 2/22 26/23

**CSR [4]** 2/22 26/23 26/25 26/25
**currently [1]** 13/14
**cv [3]** 1/6 3/12 26/3

## D

**damage [1]** 16/2
**danger [1]** 8/10
**Date [2]** 26/24 26/25
**days [2]** 24/9 24/13
**DC [2]** 2/12 2/15
**deal [1]** 9/5
**dealing [1]** 21/22
**declaration [1]** 5/6
**defederalized [1]** 16/16
**Defendant [1]** 3/9
**defendants [13]** 1/14 2/10 3/16 4/21 4/25 6/14 12/7 13/6 19/15 19/17 20/13 21/8 23/6
**defendants' [2]** 20/11 22/7
**Defense [8]** 1/10 1/11 3/7 3/8 3/10 7/2 21/15 21/22
**delay [1]** 3/24
**delete [1]** 25/6
**demonstrated [2]** 23/3 23/9
**denied [2]** 13/6 13/7
**denied the [1]** 13/6
**denying [1]** 24/25
**DEPARTMENT [9]** 1/11 1/13 2/3 2/11 2/14 3/8 3/8 3/10 3/11
**deploy [1]** 6/25
**deployed [2]** 7/8 16/16
**deploying [2]** 3/16 19/15
**deployment [8]** 11/15 14/12 17/18 20/10 21/11 21/16 22/7 22/25
**Deputy [1]** 2/18
**describe [1]** 20/17
**described [2]** 18/4 18/6
**design [1]** 12/17

# D

**determination [2]** 17/14 17/22
**determined [2]** 5/10 8/8
**determines [1]** 7/2
**developments [2]** 13/1 22/2
**did [5]** 11/2 17/3 18/23 21/1 25/5
**different [4]** 6/20 7/19 16/19 24/11
**difficulties [3]** 3/22 26/14 26/16
**digitally [1]** 26/21
**direct [4]** 6/8 15/4 19/19 20/1
**disagree [1]** 9/6
**disaster [1]** 16/15
**disasters [1]** 16/11
**discussed [3]** 17/10 17/25 18/14
**distinct [1]** 15/20
**distinction [1]** 14/9
**district [8]** 1/1 1/2 1/22 2/22 12/23 15/7 21/17 26/18
**divert [1]** 7/18
**DIVISION [3]** 1/3 2/11 2/14
**do [16]** 3/21 3/25 4/3 4/8 4/21 4/24 5/16 5/16 8/4 9/4 9/23 10/3 11/3 12/18 12/21 22/4
**docket [2]** 11/17 24/24
**Document [1]** 3/15
**does [7]** 9/17 10/19 15/25 16/2 17/25 20/1 24/10
**doesn't [2]** 7/8 8/14
**doing [1]** 7/25
**don't [4]** 3/19 8/17 10/8 14/23
**DONALD [2]** 1/8 26/2
**done [1]** 9/7
**due [2]** 26/9 26/11

**duration [3]** 24/8 24/10 24/11
**during [1]** 26/14

# E

**E [2]** 26/1 26/1
**each [1]** 9/21
**ECF [2]** 3/15 19/12
**ECF 59 [1]** 19/12
**ECF Document [1]** 3/15
**effect [6]** 12/14 13/14 13/16 13/19 13/21 14/21
**else [3]** 9/19 18/24 24/2
**emergencies [1]** 16/10
**emergency [7]** 3/13 5/18 16/16 16/17 16/23 19/5 23/18
**encompass [1]** 12/22
**encompasses [1]** 18/3
**end [3]** 17/16 17/22 17/24
**enforcement [7]** 7/21 7/21 8/10 16/6 17/16 17/24 18/9
**enjoin [2]** 3/16 19/15
**enjoined [2]** 6/10 12/12
**ensure [1]** 7/3
**enter [1]** 15/7
**entered [1]** 24/23
**enters [1]** 10/22
**entitled [1]** 26/18
**enunciate [1]** 26/13
**equities [1]** 23/10
**Eric [2]** 2/11 4/21
**Essentially [1]** 15/23
**establish [1]** 10/12
**et [2]** 26/2 26/2
**even [3]** 7/5 16/12 16/19
**evening [4]** 4/4 4/10 4/22 4/23
**everything [1]** 18/3
**exclusively [1]** 13/9
**excuse [3]** 3/9 4/24 16/6
**execution [1]** 5/12
**existing [1]** 12/4

**expeditious [1]** 3/25
**expend [1]** 18/10
**expenditure [1]** 18/6
**Expiration [1]** 26/25
**expire [1]** 24/12
**exploited [1]** 21/7
**expressed [2]** 23/13 23/20
**extent [2]** 16/15 16/22
**extremely [1]** 12/9

# F

**F [1]** 26/1
**F.3d [2]** 15/5 15/6
**fact [5]** 6/24 8/7 9/23 10/13 21/8
**factor [1]** 24/7
**facts [3]** 12/4 15/2 21/5
**factual [1]** 16/20
**failure [1]** 26/13
**farther [1]** 16/20
**fast [1]** 26/13
**favor [1]** 23/11
**feature [1]** 16/20
**federal [10]** 7/4 7/22 8/10 10/1 10/2 10/4 12/7 16/5 16/7 18/2
**federalization [5]** 10/9 10/11 14/11 15/25 22/6
**federalize [3]** 8/12 8/14 12/5
**federalized [21]** 5/25 6/7 6/20 7/15 8/9 8/21 8/23 8/25 9/1 9/1 9/13 9/15 10/15 10/18 13/22 14/6 16/12 21/12 21/16 22/25 23/5
**federalizing [3]** 6/3 7/17 12/15
**feels [1]** 11/24
**few [1]** 11/10
**filed [5]** 3/13 11/17 11/21 12/11 15/1
**filing [1]** 11/21

## F

**finally [1]** 10/21
**find [2]** 23/6 23/14
**finding [1]** 7/13
**findings [1]** 23/24
**fine [1]** 14/15
**first [7]** 11/2 13/3 15/8
 15/21 19/11 20/21 22/23
**follow [1]** 23/17
**force [2]** 10/4 21/6
**forces [1]** 16/2
**foregoing [1]** 26/6
**form [1]** 16/10
**found [1]** 21/24
**Fourth [1]** 2/8
**Francisco [1]** 2/19
**Friday [1]** 17/11
**full [1]** 21/6
**further [4]** 14/14 18/17
 18/20 24/16

## G

**game [1]** 11/25
**gamesmanship [1]** 12/21
**Gate [1]** 2/19
**General [4]** 2/18 5/8
 10/24 24/21
**geographic [1]** 9/17
**geographically [1]** 16/13
**get [1]** 16/21
**give [4]** 5/17 13/25 14/13
 14/16
**go [3]** 15/17 17/2 19/18
**going [1]** 19/20
**Golden [1]** 2/19
**gone [1]** 8/17
**Good [4]** 4/4 4/10 4/22
 4/23
**Government [1]** 10/4
**Governor [1]** 5/9
**grant [3]** 13/11 19/11
 19/20
**granting [2]** 19/10 22/23
**ground [1]** 7/13

**guard [35]**
**guard's [1]** 18/13
**guardsmen [12]** 5/22
 5/24 6/1 7/8 8/21 9/1 9/2
 9/14 9/25 10/10 10/11
 10/14
**guess [1]** 8/7

## H

**had [3]** 3/22 15/7 17/11
**Hamilton [18]** 2/11 4/21
 5/17 6/6 6/13 7/11 7/11
 8/11 8/11 9/3 11/3 11/7
 15/15 17/2 17/5 20/6
 20/15 24/18
**handle [2]** 17/16 17/23
**handling [1]** 19/4
**happened [3]** 5/4 14/10
 21/14
**hard [1]** 12/13
**harm [10]** 9/22 10/12
 15/18 15/20 15/25 16/24
 18/15 23/9 23/12 23/14
**harms [1]** 17/9
**has [15]** 5/4 5/10 6/15
 6/16 8/1 8/4 10/4 14/8
 19/2 19/8 20/18 21/14
 21/24 23/2 23/13
**have [34]**
**having [2]** 3/23 22/19
**hear [2]** 3/23 14/18
**heard [1]** 26/8
**hearing [13]** 3/3 3/23
 11/18 11/20 13/2 17/11
 17/12 17/20 19/25 23/13
 25/4 25/5 25/10
**HEGSETH [6]** 1/9 3/7 3/9
 5/8 6/25 12/15
**Hegseth's [2]** 6/11 9/13
**held [1]** 25/7
**Hello [1]** 3/4
**help [2]** 7/18 7/20
**her [1]** 1/11
**here [16]** 3/20 4/2 4/7 5/1

 7/12 7/22 10/12 12/1
 12/25 15/23 16/25 17/20
 17/25 18/16 20/22 24/1
**highlight [3]** 11/14 11/23
 14/2
**highlighted [1]** 18/7
**his [2]** 1/8 1/10
**history [1]** 8/2
**Homeland [4]** 1/12 1/13
 3/9 3/11
**Honor [36]**
**Honor's [3]** 4/16 12/10
 15/13
**HONORABLE [1]** 1/21
**hours [1]** 12/7
**how [1]** 6/6
**hurdle [1]** 16/21

## I

**I [84]**
**I'd [1]** 7/10
**I'll [12]** 4/13 5/21 14/16
 15/17 17/9 17/12 20/17
 20/17 20/19 22/4 23/17
 23/22
**I'm [13]** 4/7 9/8 11/7 11/7
 11/8 17/5 18/23 19/4
 20/14 20/14 23/19 24/13
 24/25
**ICE [1]** 7/22
**identifying [1]** 26/12
**Illinois [1]** 5/13
**IM [2]** 1/6 26/3
**IMMERGUT [2]** 1/21 3/4
**impeding [1]** 5/12
**impending [1]** 11/15
**implementation [1]** 6/10
**implementing [1]** 9/12
**important [1]** 14/9
**inability [1]** 16/10
**incidents [1]** 5/10
**includes [1]** 17/10
**including [2]** 17/15 17/23
**incorporate [1]** 20/25

**I**

**increased [2]** 18/11 18/11
**independent [1]** 14/2
**indulgence [1]** 14/14
**information [4]** 4/15 5/15 11/14 19/8
**injunction [2]** 15/8 15/9
**injury [5]** 9/23 10/13 10/19 15/21 16/9
**instead [1]** 8/21
**intend [1]** 24/10
**intendant [1]** 18/5
**interest [6]** 10/9 17/14 17/17 17/21 18/1 23/10
**interests [1]** 10/6
**invite [2]** 20/17 22/12
**irreparable [10]** 9/22 10/12 15/18 15/20 16/24 17/9 18/15 23/9 23/12 23/14
**irreparably [1]** 17/17
**is [66]**
**issue [16]** 14/1 14/3 14/8 14/11 14/23 15/11 17/3 18/7 18/14 19/23 20/22 21/7 21/19 21/20 23/19 23/22
**issued [6]** 5/3 6/8 6/9 13/9 19/20 23/3
**issues [9]** 9/6 11/1 11/13 14/3 17/10 17/16 17/24 18/12 19/8
**issuing [1]** 22/2
**it [39]**
**it's [10]** 5/3 7/12 12/13 12/25 13/1 13/18 13/20 16/22 21/19 23/6
**its [1]** 24/12
**itself [1]** 7/8

**J**

**J [1]** 1/21
**Jane [3]** 2/18 4/8 4/24

**Jean [2]** 2/14 4/24
**Jessup [2]** 2/22 26/23
**Jill [2]** 2/22 26/23
**judge [3]** 1/22 3/4 9/6
**Judge Immergut [1]** 3/4
**June [6]** 6/3 6/5 6/21 8/8 9/16 14/7
**June 7th [3]** 6/3 6/21 9/16
**jurisdiction [1]** 15/7
**jurisdictional [1]** 14/24
**just [24]** 3/19 3/22 5/6 10/17 11/10 11/14 11/17 11/19 11/23 12/3 12/7 13/2 13/4 13/12 14/20 15/14 16/21 17/12 17/20 18/4 18/5 19/14 22/1 24/19
**Justice [3]** 2/3 2/11 2/14

**K**

**KARIN [1]** 1/21
**keep [1]** 20/14
**Kennedy [10]** 2/3 4/3 4/11 11/8 17/6 17/8 20/15 22/9 23/21 24/1
**key [1]** 11/11
**know [5]** 7/7 11/10 12/13 14/25 24/8
**KRISTI [3]** 1/11 3/8 3/10
**KRISTI NOEM [1]** 1/11

**L**

**L [3]** 2/15 2/22 26/23
**L.A [1]** 14/7
**lack [1]** 10/5
**lacks [1]** 9/21
**lapse [1]** 24/8
**last [4]** 17/11 20/19 20/23 21/23
**late [2]** 11/21 12/6
**law [9]** 7/21 7/21 8/10 16/6 16/8 17/16 17/23 18/9 23/1
**lawful [1]** 12/4

**laws [1]** 5/12
**lawyer [1]** 9/10
**lawyers [2]** 4/1 5/16
**least [4]** 11/18 13/7 15/10 16/13
**legal [3]** 7/14 7/16 7/24
**length [1]** 24/7
**let [9]** 3/18 3/20 4/1 6/6 9/3 14/18 15/14 17/1 19/21
**light [1]** 21/14
**like [8]** 5/19 10/2 11/5 11/10 11/25 12/24 14/13 14/18
**likelihood [1]** 23/9
**likely [2]** 18/12 23/6
**limit [2]** 7/8 9/17
**limited [4]** 6/22 9/12 19/5 26/15
**Lin [2]** 2/14 4/24
**litigation [1]** 14/5
**little [1]** 11/25
**local [1]** 18/9
**locate [1]** 9/24
**located [1]** 16/14
**location [1]** 10/3
**locations [1]** 5/13
**logistical [1]** 16/21
**Los [1]** 5/25
**lot [1]** 3/24

**M**

**made [4]** 12/2 14/25 15/3 19/3
**make [6]** 9/22 11/10 12/24 12/25 20/19 23/24
**making [3]** 15/15 17/14 17/21
**manner [1]** 3/25
**many [1]** 8/2
**Market [1]** 2/4
**Marshall [1]** 5/7
**masks [1]** 26/11
**may [5]** 4/15 7/1 7/6 7/6

**M**

**may... [1]** 14/23
**Mayweathers [1]** 15/5
**me [14]** 3/9 3/18 3/20 4/1 4/24 6/6 8/4 9/3 14/18 15/14 17/2 19/16 19/21 24/2
**mean [1]** 20/15
**means [1]** 26/9
**mechanism [1]** 9/7
**members [9]** 5/22 6/3 9/13 10/17 11/16 12/16 19/15 21/12 21/16
**memo [1]** 9/13
**memorandum [11]** 5/7 6/2 6/21 6/22 6/24 9/17 11/17 11/24 12/15 21/15 21/22
**mentioned [1]** 26/16
**might [1]** 13/19
**military [6]** 7/1 7/1 7/20 22/25 23/4 23/5
**minute [2]** 15/17 19/22
**minutes [1]** 11/19
**missing [1]** 7/12
**mission [2]** 6/25 15/25
**mobilization [1]** 18/13
**modification [2]** 20/7 22/5
**modify [1]** 19/23
**modifying [1]** 20/4
**mole [1]** 12/1
**moment [2]** 18/25 24/2
**moments [1]** 13/2
**morale [1]** 16/2
**more [2]** 16/21 17/20
**most [2]** 21/14 21/21
**motion [19]** 3/14 5/18 11/1 11/2 12/11 12/20 13/14 14/23 18/8 18/15 19/7 19/11 19/12 21/10 22/23 24/20 24/22 24/25 25/1
**movement [1]** 10/16

**moving [1]** 10/23
**Mr [6]** 2/3 2/11 5/7 6/13 17/5 17/6
**Mr. [21]** 4/11 5/17 6/6 7/11 7/11 8/11 8/11 9/3 11/3 11/7 11/8 15/15 17/2 17/8 20/6 20/15 20/15 22/9 23/21 24/1 24/18
**Mr. Hamilton [14]** 5/17 6/6 7/11 7/11 8/11 8/11 9/3 11/3 11/7 15/15 17/2 20/6 20/15 24/18
**Mr. Kennedy [7]** 4/11 11/8 17/8 20/15 22/9 23/21 24/1
**Ms [5]** 2/7 2/14 14/16 22/12 22/13
**Ms. [13]** 4/12 4/15 4/17 13/25 14/13 14/18 17/1 19/1 20/18 22/14 22/17 24/3 24/5
**Ms. Reilley [7]** 4/17 13/25 14/13 14/18 20/18 22/14 24/5
**Ms. Turco [6]** 4/12 4/15 17/1 19/1 22/17 24/3
**my [24]** 3/22 5/3 5/22 6/14 6/16 7/13 9/5 9/9 9/9 13/25 14/13 19/9 19/23 20/2 20/4 20/17 22/21 22/22 23/17 23/18 23/20 24/20 25/6 26/7

**N**

**name [1]** 3/19
**narrow [1]** 12/9
**National [33]**
**natural [2]** 16/10 16/15
**necessary [3]** 7/3 7/20 16/23
**necessitated [1]** 13/1
**need [8]** 12/19 12/21 18/10 21/13 23/21 23/23 23/24 25/6

**needed [1]** 8/9
**needs [2]** 17/15 17/22
**new [11]** 5/15 8/25 13/22 14/23 15/1 15/11 19/8 20/8 22/1 22/2 22/5
**Newland [1]** 15/5
**Newsom [1]** 14/5
**night [1]** 12/6
**night's [1]** 20/23
**Ninth [5]** 13/8 13/8 13/13 13/20 14/22
**no [10]** 1/6 6/17 7/19 8/20 10/13 12/4 13/19 15/16 19/8 26/25
**NOEM [3]** 1/11 3/8 3/10
**not [25]** 6/7 6/22 7/14 8/1 8/2 8/4 8/24 9/1 9/8 9/17 9/23 10/19 15/2 15/11 15/25 17/5 19/23 21/4 21/4 21/24 22/5 23/4 23/18 26/12 26/21
**note [5]** 10/21 11/1 11/14 24/20 24/23
**noted [1]** 10/14
**nothing [9]** 6/5 6/15 6/16 18/20 18/24 19/2 24/2 24/4 24/16
**now [7]** 5/6 12/18 12/21 19/17 19/24 20/8 21/13
**NW [2]** 2/12 2/15

**O**

**observance [1]** 18/1
**occur [1]** 26/14
**occurring [2]** 14/7 26/17
**occurs [2]** 17/19 24/2
**October [5]** 1/8 3/2 13/15 22/5 26/5
**October 4th [1]** 13/15
**offer [1]** 22/12
**Office [1]** 2/7
**officer [2]** 6/13 9/4
**official [4]** 1/8 1/10 1/11 26/24

## O

**Oh [1]** 20/14
**Okay [9]** 4/23 5/2 15/14 17/1 18/17 18/22 19/4 22/4 24/17
**one [11]** 5/4 7/17 7/22 8/13 11/18 13/21 14/1 15/15 16/21 17/20 21/22
**only [4]** 10/10 15/25 21/7 24/6
**opinion [6]** 19/10 19/10 22/23 23/8 23/19 23/20
**opportunity [3]** 14/1 14/13 14/16
**opposed [1]** 20/8
**order [43]**
**orders [2]** 23/3 25/6
**OREGON [55]**
**Oregon's [1]** 22/11
**original [5]** 18/8 18/14 19/24 21/8 26/20
**originally [1]** 19/14
**other [4]** 5/13 16/7 22/13 26/14
**others [1]** 20/18
**our [15]** 5/2 10/6 11/11 11/20 12/20 15/10 15/21 15/25 16/3 16/5 16/8 18/7 18/8 21/10 25/4
**out [4]** 6/25 9/24 10/1 10/9
**outside [1]** 10/6
**over [2]** 8/18 26/17
**overlapping [1]** 26/11
**own [3]** 17/16 17/23 24/12

## P

**P [1]** 2/3
**p.m [3]** 11/19 11/20 25/10
**papers [3]** 18/1 18/8 21/10
**paragraph [2]** 6/10 9/11
**paragraph 1 [2]** 6/10

**pardon [1]** 11/4
**partake [1]** 16/5
**participants [1]** 15/24
**participates [1]** 18/2
**parties [1]** 26/10
**party [1]** 10/5
**passage [1]** 17/13
**pending [3]** 10/23 15/9 24/20
**Pennsylvania [1]** 2/12
**people [3]** 3/24 17/13 17/21
**perform [1]** 7/1
**perhaps [1]** 21/7
**persisting [1]** 12/21
**personnel [3]** 7/1 7/4 10/2
**perspective [1]** 22/11
**pertains [1]** 13/10
**PETE [3]** 1/9 3/7 3/9
**phone [1]** 26/10
**place [2]** 8/13 8/13
**PLAINTIFF [2]** 2/2 2/6
**plaintiffs [8]** 1/6 3/13 4/12 9/21 12/2 18/18 19/22 23/8
**plaintiffs' [4]** 5/17 19/11 19/11 22/23
**plan [2]** 4/12 23/18
**playing [1]** 11/25
**point [4]** 7/12 13/3 14/21 18/3
**points [4]** 11/10 11/11 13/24 20/20
**police [3]** 10/4 15/21 16/4
**policymaker [1]** 9/8
**portions [1]** 19/6
**PORTLAND [20]** 1/3 1/5 2/4 2/6 2/7 2/8 2/24 3/6 4/6 4/16 5/24 6/15 9/23 10/5 10/8 12/5 18/10 19/9 21/5 22/13
**position [3]** 12/18 15/4

9/11

15/10

**Posse [1]** 16/7
**possibly [1]** 10/10
**potential [1]** 14/21
**powers [2]** 15/22 16/4
**precedence [1]** 8/2
**prefer [1]** 19/23
**preliminary [2]** 15/8 15/8
**prerequisites [2]** 21/3 21/24
**presently [1]** 5/23
**President [7]** 1/9 3/7 5/4 5/10 6/2 8/8 8/14
**President Trump [1]** 3/7
**President's [1]** 17/18
**Presidential [5]** 6/2 6/21 6/21 6/24 9/16
**prevent [1]** 12/20
**previous [2]** 8/2 15/3
**previously [1]** 23/20
**prior [5]** 15/12 19/9 19/10 22/23 24/8
**problem [1]** 7/9
**proceedings [5]** 1/20 3/1 26/8 26/15 26/17
**process [1]** 23/7
**prohibit [1]** 20/10
**prohibits [1]** 22/6
**properly [1]** 10/15
**property [3]** 7/4 8/10 10/2
**proposition [1]** 15/6
**protect [1]** 7/21
**protection [2]** 7/3 10/1
**protective [2]** 7/1 10/3
**protest [1]** 18/11
**provided [1]** 19/8
**providing [2]** 10/1 23/15
**public [2]** 3/23 23/10
**purpose [4]** 7/17 7/18 8/15 14/6
**pursuant [1]** 14/25

## Q

question [4]  13/13 15/13 19/12 20/7
questioning [1]  12/3
questions [3]  4/16 5/16 13/5
quote [5]  17/13 17/16 17/20 17/23 17/24

## R

R [1]  26/1
raise [1]  13/3
raised [1]  11/12
raises [1]  11/24
rationale [1]  23/14
RDR [2]  2/22 26/23
re [1]  24/20
re-note [1]  24/20
reading [1]  12/9
reason [1]  6/19
reasonably [1]  7/3
reasoning [7]  20/25 21/2 21/3 21/5 22/1 22/24 23/19
reasons [5]  19/9 21/4 22/22 23/8 26/16
received [5]  5/6 11/14 11/18 11/19 12/14
recent [2]  21/14 21/21
recess [1]  25/8
recognized [1]  17/12
record [8]  3/5 3/18 14/5 23/3 23/25 25/4 25/5 25/5
redress [1]  10/19
redressable [1]  10/13
reference [1]  20/25
regard [2]  13/5 23/15
Reilley [10]  2/18 4/8 4/17 13/25 14/13 14/18 20/18 22/12 22/14 24/5
relates [2]  13/22 14/6
relevant [1]  4/15
relief [2]  12/19 12/22
relies [1]  6/15

relocated [1]  9/24 8/22
relocation [5]  9/2 9/15 10/14
relocation [5]  5/21 6/1 9/24 20/10 22/6
relying [1]  23/19
remaining [1]  24/7
remote [1]  3/25
REPORTER [2]  2/21 26/24
represent [1]  20/13
representing [1]  4/17
reputation [1]  16/2
request [3]  12/25 14/25 15/11
requested [6]  12/19 12/22 13/16 19/21 20/19 21/10
require [1]  8/17
resources [2]  18/6 18/11
respect [2]  14/11 15/2
respectfully [1]  10/25
respond [9]  5/17 7/6 8/9 11/3 11/5 16/10 16/17 16/23 17/3
response [3]  12/6 14/23 15/11
restraining [13]  1/19 3/15 9/12 10/16 10/22 10/25 11/2 12/11 12/20 19/6 19/7 20/22 26/4
result [2]  10/17 18/13
returning [1]  10/18
reviewing [1]  13/14
rhetorical [1]  11/25
right [9]  3/5 4/20 9/11 10/8 13/4 18/19 19/4 24/17 24/25
rights [2]  15/21 16/1
RMR [2]  2/22 26/23
Room [2]  2/8 2/23
rule [2]  11/1 24/22
ruled [1]  12/1
ruling [2]  15/3 24/23

## S

s [1]  26/23
S.W [3]  2/4 2/8 2/23
safety [1]  7/3
said [2]  24/13 25/3
same [5]  12/16 21/20 22/24 23/7 24/10
San [1]  2/19
satisfied [3]  21/4 21/4 21/25
say [3]  3/20 5/19 10/2
saying [2]  18/23 20/15
says [1]  7/6
scenario [1]  16/20
scope [5]  9/16 19/13 20/23 22/16 22/18
Scott [2]  2/3 4/3
second [14]  3/14 10/22 13/16 15/7 16/9 19/7 19/12 20/22 20/23 22/2 22/16 22/19 23/23 24/7
Secretary [11]  1/10 1/12 3/7 5/8 6/11 6/25 7/2 9/13 12/15 21/15 21/21
Secretary Hegseth [1]  5/8
Secretary Hegseth's [1]  6/11
securing [1]  18/1
Security [4]  1/12 1/13 3/9 3/11
see [2]  14/23 19/18
seeing [1]  15/23
seeking [1]  19/17
seeks [1]  3/16
seems [2]  13/19 19/16
send [1]  8/13
sent [1]  20/1
separate [1]  14/11
service [2]  10/3 10/17
she [1]  20/18
short [1]  16/17
shortly [1]  11/17
should [2]  24/13 25/3

**S**

**showing [2]** 7/20 9/22
**signature [4]** 26/20 26/21 26/21 26/24
**signed [2]** 6/2 26/21
**signing [1]** 26/6
**simply [2]** 6/14 8/13
**since [1]** 5/2
**situation [4]** 4/16 7/7 16/13 21/8
**so [29]**
**soldiers [1]** 15/24
**Solicitor [2]** 10/24 24/21
**Solicitor General [1]** 10/24
**some [4]** 3/22 5/15 5/16 20/3
**somebody [1]** 18/23
**something [3]** 13/1 14/19 18/23
**somewhat [1]** 12/19
**soon [2]** 11/22 17/17
**sorry [8]** 11/7 11/7 11/8 17/5 18/23 20/14 20/14 24/13
**sought [2]** 5/4 13/6
**sources [2]** 15/20 16/24
**sovereign [4]** 15/21 16/1 17/14 17/21
**speak [4]** 8/6 8/7 20/6 26/13
**speaker's [1]** 26/13
**speakerphone [2]** 26/10 26/17
**speakers [3]** 26/11 26/12 26/13
**speaking [1]** 26/12
**specific [2]** 14/6 21/9
**specifically [3]** 4/13 13/13 21/3
**St [1]** 2/15
**standard [2]** 7/14 16/1
**standing [5]** 9/21 10/5 10/12 15/16 17/3

**stands [1]** 15/6
**start [2]** 4/1 5/21
**state [47]**
**state's [2]** 16/4 17/18
**stated [2]** 19/9 23/8
**states [8]** 1/1 1/9 1/22 2/22 5/9 5/12 5/14 26/18
**status [2]** 20/11 22/8
**statutory [1]** 10/8
**stay [15]** 10/23 10/24 13/6 13/7 13/8 13/14 13/15 14/21 15/12 21/11 21/15 24/20 24/21 25/1 25/1
**staying [2]** 5/25 10/18
**stays [1]** 13/21
**stenographic [1]** 26/9
**still [9]** 15/9 16/11 16/12 16/13 18/16 21/6 21/20 21/20 21/23
**Street [1]** 2/4
**submit [1]** 9/21
**such [2]** 16/19 26/17
**sue [1]** 10/10
**sufficiency [1]** 21/2
**sufficient [1]** 22/9
**support [1]** 15/3
**suppose [1]** 13/18
**system [1]** 18/2

**T**

**T [2]** 26/1 26/1
**taken [1]** 26/8
**talking [1]** 21/20
**technical [3]** 3/22 12/9 26/14
**technological [1]** 26/16
**telephonic [5]** 1/25 3/3 26/8 26/9 26/15
**Tell [1]** 8/4
**temporarily [1]** 3/16
**temporary [13]** 1/19 3/15 9/12 10/16 10/22 10/24 11/2 12/11 12/20 19/6

19/7 20/22 26/4
**Tenth [2]** 20/3 23/7
**terms [3]** 17/3 18/1 24/12
**Texas [6]** 5/8 5/9 11/16 12/16 19/18 19/25
**than [1]** 20/23
**Thank [11]** 4/20 5/20 11/9 14/20 18/22 19/3 20/16 24/14 24/15 25/2 25/9
**that [147]**
**that's [11]** 5/15 12/22 12/24 13/1 13/13 14/9 16/20 18/2 21/19 22/4 25/6
**their [4]** 10/16 17/16 17/23 23/10
**them [5]** 4/18 7/16 7/18 8/13 15/17
**themselves [1]** 26/12
**then [11]** 3/19 4/5 4/17 7/18 8/15 12/8 12/11 12/12 13/19 13/20 13/21
**there [14]** 7/14 7/16 7/19 7/24 8/2 12/4 13/21 15/19 16/9 16/15 19/23 19/24 23/21 23/23
**there's [4]** 6/16 14/2 15/16 18/5
**thereafter [2]** 12/13 12/14
**these [3]** 16/1 16/11 22/1
**they [14]** 8/21 8/23 8/25 10/3 10/13 10/14 13/7 13/15 16/12 16/13 17/15 17/23 21/4 26/12
**they're [2]** 8/23 16/19
**things [2]** 3/20 5/4
**think [23]** 8/4 11/11 11/12 11/19 11/24 12/18 12/21 12/24 14/2 14/9 15/15 15/16 17/17 17/25 18/3 18/13 18/15 20/21 20/24 21/7 21/13 21/19 23/24

## T

**third [2]** 2/23 10/5
**third-party [1]** 10/5
**this [40]**
**those [4]** 16/16 16/24 19/18 21/24
**though [1]** 23/22
**thoughts [1]** 20/17
**threat [1]** 5/11
**through [1]** 23/6
**throughout [1]** 5/13
**time [5]** 8/2 15/2 23/2 23/5 24/8
**Title [2]** 20/11 22/8
**today [3]** 4/12 18/8 21/10
**today's [1]** 21/1
**tonight [1]** 11/19
**too [1]** 20/12
**transcript [5]** 1/20 2/25 17/13 26/7 26/20
**transfer [2]** 11/15 11/16
**triggered [1]** 12/6
**TRO [36]**
**troops [6]** 13/23 16/3 16/5 16/11 16/16 16/21
**troubled [1]** 19/24
**true [1]** 26/7
**TRUMP [4]** 1/8 3/7 14/5 26/2
**Turco [10]** 2/7 4/5 4/12 4/15 14/16 17/1 19/1 22/13 22/17 24/3
**turn [1]** 12/8
**two [5]** 5/3 13/24 15/19 16/24 20/20

## U

**U.S [4]** 1/10 1/12 3/8 3/10
**U.S. [1]** 3/8
**U.S. Department [1]** 3/8
**U.S.C [3]** 21/21 21/23 23/1
**ultra [1]** 22/25
**under [9]** 6/20 10/11 12/5 16/7 16/22 18/2 20/1 22/7 23/16
**undermines [1]** 16/4
**understand [1]** 4/1
**understanding [2]** 5/3 5/22
**understands [1]** 11/12
**UNITED [7]** 1/1 1/9 1/22 2/22 5/12 5/14 26/18
**United States [1]** 5/14
**unlawful [1]** 15/24
**unwilling [1]** 15/24
**up [3]** 13/7 20/19 23/17
**upon [1]** 7/6
**us [1]** 21/19
**use [1]** 8/3
**utilized [2]** 8/1 8/5

## V

**v [5]** 1/7 3/6 14/5 15/5 26/2
**very [7]** 3/25 11/13 11/13 12/2 12/2 12/9 14/4
**via [2]** 26/8 26/10
**viewing [1]** 19/14
**violate [2]** 20/2 23/7
**violated [1]** 17/17
**violates [1]** 23/1
**violation [1]** 25/6
**violence [1]** 5/11
**violent [1]** 5/10
**vires [1]** 22/25

## W

**want [9]** 5/16 9/19 11/3 11/14 11/23 13/24 14/17 17/3 18/23
**wanted [1]** 13/2
**was [21]** 3/12 7/14 9/12 11/18 12/2 12/4 12/13 12/19 14/6 14/7 14/25 15/1 15/9 15/15 19/14 19/21 20/25 21/7 21/9 21/11 24/9
**Washington [2]** 2/12
**way [3]** 6/22 9/5 12/3
**we [38]**
**we'll [1]** 25/8
**we're [6]** 3/5 11/13 11/25 15/23 16/25 21/20
**we've [2]** 8/17 17/10
**wearing [1]** 26/10
**weekend [1]** 21/23
**weigh [1]** 23/10
**well [12]** 4/12 5/11 6/19 7/23 8/20 9/8 11/13 14/17 19/21 20/19 22/19 23/14
**were [18]** 5/24 6/20 7/13 8/12 8/21 8/21 9/1 9/2 9/15 13/8 13/15 15/2 16/12 16/15 21/4 21/4 21/22 22/22
**whac [1]** 12/1
**what [16]** 3/24 7/24 8/15 12/1 13/10 13/15 14/10 15/18 15/23 17/14 17/22 18/5 20/19 21/10 21/14 22/4
**what's [1]** 4/12
**when [1]** 26/11
**where [6]** 7/9 7/9 7/19 7/19 8/14 10/4
**wherever [1]** 7/7
**whether [2]** 17/15 17/23
**which [12]** 3/15 6/15 9/17 11/24 13/9 14/4 15/4 18/2 19/12 19/21 20/1 23/22
**while [1]** 15/8
**who [2]** 5/24 10/14
**why [6]** 3/19 6/18 6/18 8/4 8/19 21/4
**will [5]** 4/17 4/18 18/10 22/21 23/22
**within [4]** 9/16 16/14 20/11 22/8
**without [2]** 16/8 26/20
**work [1]** 10/2
**working [1]** 10/3

# W

**would [33]**

**written [2]**  23/17 23/22

# Y

**Yes [16]**  4/4 4/7 4/10 4/22
 5/1 5/20 9/20 11/9 14/15
 15/19 17/7 20/9 20/16
 22/15 22/18 24/19

**yesterday [8]**  5/3 6/8 6/9
 12/2 13/9 14/22 19/20
 20/5

**yesterday's [4]**  14/3
 14/10 21/1 23/8

**you [47]**

**you're [7]**  3/20 6/13 7/25
 9/3 9/10 20/9 22/1

**you've [1]**  9/7

**your [47]**

**Your Honor [30]**

**Your Honor's [2]**  4/16
 12/10

## SUPPLEMENTAL DECLARATION OF PAUL S. ECK

1.    I am a resident of the State of California. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2.    I am a Deputy General Counsel in the California Military Department (CMD). I have served in this role since August 2018. As Deputy General Counsel for the California Military Department, I lead a blended team of California and National Guard attorneys. I provide direct legal support to the Executive Staff and other senior leaders on complex matters at the intersection of military operations, state governance, and national security. I am regularly consulted on the operational needs, objectives, movements, and orders impacting the CMD.

3.    I submit this declaration to supplement the declaration that I executed on October 5, 2025.

4.    On the evening of October 5, 2025, the United States District Court for the District of Oregon issued a second temporary restraining order blocking the deployment of California National Guard personnel to Portland, Oregon.

5.    As of today, 200 federalized California National Guard personnel are still in Oregon.

6.    As of today, 85 federalized California National Guard personnel remain in the Greater Los Angeles area.

7.    An additional 15 of the federalized California National Guard personnel had been sent to Oregon to train the Oregon Guard.

8.    Earlier this week, U.S. NORTHCOMM advised that those additional 15 personnel would be sent to Illinois to train the Illinois Guard.

9.    As of today, 14 federalized California National Guard personnel assigned to train other federalized personnel in Oregon, have departed to Chicago, Illinois.

10.    I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on October 7, 2025, at Rancho Cordova, CA.

Paul S. Eck Deputy General Counsel    Digitally signed by Paul S. Eck Deputy General Counsel Date: 2025.10.07 12:12:22 -07'00'

Paul S. Eck