No. 25-3727

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

————————————

GAVIN NEWSOM, *in his official capacity as Governor of the State of California*; STATE OF CALIFORNIA,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, *in his official capacity as President of the United States*; PETER HEGSETH, *in his official capacity as Secretary of the Department of Defense*; UNITED STATES DEPARTMENT OF DEFENSE,

Defendants-Appellants.

————————————

On Appeal from the United States District Court
for the Northern District of California

————————————

## OPPOSITION TO APPELLEES' MOTION TO VACATE STAY OR, IN THE ALTERNATIVE, FOR INJUNCTION PENDING APPEAL

————————————

BRETT A. SHUMATE
  *Assistant Attorney General*
ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
J. KAIN DAY
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7517*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-2689*

# TABLE OF CONTENTS

**Page**

INTRODUCTION.................................................................................................1

STATEMENT.......................................................................................................3

ARGUMENT.......................................................................................................9

I.     Plaintiffs Must Make a Strong Showing to Justify Vacatur or an
Injunction Pending Appeal...................................................................10

II.    Under Any Standard, Plaintiffs Have Not Demonstrated that Vacatur or
an Injunction Are Justified....................................................................16

CONCLUSION..................................................................................................23

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                   **Page(s)**

*Doe v. Snyder,*
28 F.4th 103 (9th Cir. 2022) ........................................................ 10, 11

*Feldman v. Arizona Sec'y of State's Off.,*
843 F.3d 366 (9th Cir. 2016) ............................................................... 10

*Garcia v. Google, Inc.,*
786 F.3d 733 (9th Cir. 2015) ............................................................... 11

*Luther v. Borden,*
48 U.S. (7 How.) 1 (1849) .................................................................. 13

*Martin v, Mott,*
25 U.S. (12 Wheat.) 19 (1827) ........................................................... 13

*Mi Familia Vota v. Fontes,*
111 F.4th 976 (9th Cir. 2024) ............................................................. 12

*Newsom v. Trump,*
141 F.4th 1032 (9th Cir. 2025) ................................... 1, 2, 4, 5, 11, 13, 18, 19

*Newsom v. Trump,*
--- F. Supp. 3d ---, 2025 WL 2501619 (N.D. Cal. 2025) ............................ 20

*Pacific Radiation Oncology, LLC v. Queen's Med. Ctr.,*
810 F.3d 631 (9th Cir. 2015) ............................................................... 16

*Sharp v. Weston,*
233 F.3d 1166 (9th Cir. 2000) ............................................................. 10

*Southeast Alaska Conservation Council v. U.S. Army Corps of Eng'rs,*
472 F.3d 1097 (9th Cir. 2006) ............................................................. 12

*Winter v. NRDC,*
555 U.S. 5 (2008) .............................................................................. 15

**Statutes:**

3 U.S.C. § 301 ................................................................................ 14

10 U.S.C. § 12406 .............................................. 2, 3, 4, 8, 13, 14, 18

**Rules:**

9th Circuit Rule 27-10(a)(2) .................................................... 1, 15

**Other Authorities:**

Dep't of Homeland Security, *DHS Issues Statement on Targeted Attack on Dallas ICE Facility* (Sept. 24, 2025), https://www.dhs.gov/news/2025/09/24/dhs-issues-statement-targeted-attack-dallas-ice-facility ..................................................... 6

U.S. Dep't of Homeland Sec. (July 11, 2025), https://www.dhs.gov/news/2025/07/11/ice-and-cbp-law-enforcement-dodge-literal-bullets-rioters-while-rescuing-least-10 ............................... 20

## INTRODUCTION

A panel of this Court has already decided the appropriate status quo while this appeal remains pending: the California National Guard can continue operating in federal status, despite the district court's injunction to the contrary. *See Newsom v. Trump*, 141 F.4th 1032 (9th Cir. 2025) (per curiam). As the panel explained, review of the President's decision to federalize the Guard is "especially deferential," *id.* at 1047, and on this record, the President "likely acted within his authority" when he federalized and deployed the California Guard, *id.* at 1052. Indeed, the President called up the California National Guard for the "protection of federal agents and property," and irreparable injury would befall defendants if the Guard were returned to plaintiffs' control.

Now, on the eve of oral argument, plaintiffs ask this Court to undo that status quo. Plaintiffs seek either vacatur of the panel's stay order or a new injunction pending appeal. Mot.1-2. Plaintiffs' motion is not based on any alleged error in the stay panel's reasoning or any facts that call into question that decision. Nor could it be. The time for reconsideration of the panel's stay order has long since passed. *See* 9th Cir. R. 27-10(a)(2). Plaintiffs thus effectively make a new request for equitable relief on appeal.

The standard for granting that relief should be exceedingly high. Plaintiffs seek what would effectively be a mandatory injunction altering the status quo, notwithstanding the President's broad discretion in determining the number of

Guardsmen "he considers necessary" to enforce the laws, 10 U.S.C. § 12406. What is more, as the stay panel explained, the President's Section 12406 decisions in federalizing and deploying Guardsmen are entitled to "a great level of deference." *Newsom*, 141 F.4th at 1048. An injunction countermanding those military directives should be rare and disfavored. And in all events, plaintiffs ask the Court to impose injunctive relief on defendants, so they should at least be required to make the showing necessary to support that relief, rather than shifting the burden onto defendants to re-justify the already-issued stay.

Against this backdrop, plaintiffs have not justified vacatur of the panel's stay or an injunction pending appeal. Indeed, they do not come close to showing that either of these extraordinary remedies is warranted. Their motion is primarily based on the *dramatic reduction* in forces, both in the number of Guardsmen in the Los Angeles area and in the frequency of their presence during U.S. Immigration and Customs Enforcement (ICE) operations. These developments do not entitle plaintiffs to relief, and in fact, the developments dramatically undercut plaintiffs' claimed irreparable harm, which this Court already held was insufficient when it granted a stay. Plaintiffs also complain at length about the redeployment of Guardsmen previously in California to Portland and the Chicago area, but that is obviously not a basis for the relief plaintiffs seek, and this Court should also not prejudge those disputes, which are the subject of separate litigation.

2

Removing the federalized members of the California National Guard from the field would only lead to the same irreparable injury the stay panel outlined previously. Those Guardsman continue to protect federal personnel and property, performing an important mission to ensure the enforcement of federal law. The Court should leave the prior stay in place, allowing the Guard to continue their mission, and decide the pending appeal.

## STATEMENT

**a.** On June 6, 2025, a violent mob, protesting the enforcement of federal immigration law, pinned down federal personnel outside a federal building in Los Angeles. The mob attacked the officers with concrete chunks, chairs, and other objects and used dumpsters as battering rams to breach the perimeter of the building. The next day, the violence intensified and spread. Large crowds assaulted a group of federal officers for seven hours, launching commercial-grade fireworks and rocks at the officers, trapping one officer in her vehicle while violently pummeling it with stones, shattering the wrist of another officer, and damaging federal buildings. The violence continued in the days that followed: more officers were injured, and federal buildings were seriously damaged.

In response to these attacks, which local law enforcement were unable to address effectively, the President activated the National Guard to protect federal personnel and property. SA6; *see* SA1-4. Under 10 U.S.C. § 12406, the President is authorized to call up members of the National Guard into federal service when "there

3

is a rebellion or danger of a rebellion against the authority of the Government of the United States" or "the President is unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(2)-(3). Both conditions applied here: the violent actions by large numbers of protestors, directed at enforcement of federal immigration laws, constitute a rebellion against federal authority and have impeded the ability of ICE and other federal officials to enforce federal law.

**b.** Almost immediately after the President federalized the California Guard, plaintiffs sued alleging that, among other things, defendants' actions exceeded the President's authority under 10 U.S.C. § 12406. The district court agreed and entered a putative temporary restraining order with no durational limit, directing defendants to relinquish control over the California National Guard. Defendants appealed and requested an emergency stay pending appeal. This Court administratively stayed the injunction before it was scheduled to go into effect.

In a published opinion issued after oral argument, a unanimous panel of this Court stayed the district court's injunction pending appeal. *Newsom v. Trump*, 141 F.4th 1032, 1040-41 (9th Cir. 2025) (per curiam). After finding that it possessed appellate jurisdiction, the panel concluded that each of the stay factors favored defendants. On the merits, the panel held that defendants had "made the required strong showing that they are likely to succeed." *Id.* This Court applied a "highly deferential" standard when reviewing the President's federalization decision, and it found that standard to be met. *Id.* at 1051, 1052. On the remaining stay factors, the

4

panel concluded that "[b]oth irreparable harm and the public interest weigh in favor of [d]efendants." *Id.* at 1054.

After the panel's stay decision, National Guard members and Marines began "providing protection to Federal installations, personnel, and functions consistent with the President's June 7 memorandum." SA18; *see* A-47-49, 124. The Guard members and Marines "established outside perimeters, observation posts, and perimeter patrols" for federal buildings, SA18, and generally, the National Guard was deployed only to "protect federal law enforcement, allowing them to do their law enforcement job." A-123; *see also* A-130, 136.

As a result of these efforts, and no doubt in part because of the deterrent effect provided by the Guard's presence, the conditions in Los Angeles have improved somewhat. Protests are now less frequent, less violent, and generally pose a less significant risk to federal personnel and property compared to before the Guard was deployed. SA18. But that risk has not disappeared entirely. Even now, protesters are assaulting officers, damaging property, and operating a coordinated effort to prevent enforcement of the immigration laws. SA18-20. For example, Federal Protective Services (FPS) officers have been threatened and assaulted as recently as a week ago. SA18-19. In one instance, a protester shined a potentially blinding laser at an officer's eyes, resulting in a serious injury that has prevented the officer from working. SA18-19.

Accordingly, the President's federalization of the California National Guard has adapted to the ongoing situation in Los Angeles. By August 1, less than two months following the initial deployment, all of the Marines had left Los Angeles and only about 300 Guard members remained assigned to the federal protection mission. *See* SA18, 20. On July 30, Secretary of War Peter Hegseth released "approximately 1,350 California National Guard personnel from Federal service," leaving around "260 California National Guardsmen" in federal service "for an additional 90 days." A-366.

The Guard's footprint in the Los Angeles area has since been reduced still further. Of the 4,119 Guardsmen initially federalized, around 300 remain federalized, and approximately 100 Guardsman remain on the ground in Los Angeles today. SA18, 20. This reduction in force reflects defendants' judgment that fewer National Guardsmen are required in California compared to in June. SA18-20. And the federalized Guardsmen continue to play an important role protecting federal personnel and property. SA18-20; *see also* SA8-9.

**c.** The same anti-immigration-enforcement sentiment giving rise to the violence in California has since spread to other cities. Just a few weeks ago, a man opened fire on an ICE field office in Dallas, killing two detainees and injuring another. Dep't of Homeland Security, *DHS Issues Statement on Targeted Attack on Dallas ICE Facility* (Sept. 24, 2025), https://www.dhs.gov/news/2025/09/24/dhs-issues-statement-targeted-attack-dallas-ice-facility. The shooter's shell casings bore anti-ICE

6

messages. *Id.* And this was not an isolated incident. Two cities in particular—Portland, Oregon, and Chicago, Illinois—have seen a sharp increase in violent protests.

In Portland, ICE and FPS have come "under coordinated assault by violent groups intent on obstructing lawful federal enforcement actions." *See generally* SA10-16, 24-41. Outside of ICE's facility in downtown Portland, protestors have attacked federal officers with rocks, bricks, pepper spray, and incendiary devices. *See* SA11-13, 27-28. Protestors have attempted to impede government vehicles as they enter or exit the facility, throwing objects at the vehicles, blocking and surrounding them, and shouting threats at the occupants. SA12, 29-30, 34. Individuals working inside the facility have been followed home after work, and other federal personnel were doxed. SA12, 29-30. Protestors attempted on several occasions to burn down the facility and painted death threats on the facility's walls. SA28-29, 32. Requests for assistance from local police resulted in no concrete actions or were ignored. SA13-14, 39-40. As a result, DHS was forced to close the facility for three weeks and to reassign additional federal officers to support the protection of the facility and its occupants, significantly impeding DHS's ability to perform its regular law enforcement functions. SA29-31, 39-40.

The situation in the Chicago area is similar. *See generally* SA42-74. Outside of an ICE facility in Broadview, organized agitators—several of whom were later found with handguns—have attacked and seriously injured federal officers with fireworks,

7

rocks, bottles, and tear gas. SA54-72. Rioters have repeatedly followed, surrounded, and rammed government vehicles. *Cf.* SA49-51. Rioters have also blocked and swarmed government vehicles as they enter and exit ICE facilities, slashing their tires and trapping federal personnel inside. SA54. ICE officers have been followed home from work and aggressively confronted. SA51. Other federal personnel have been subjected to death threats on social media. *E.g.*, SA48. Requests for assistance from local police resulted in no concrete actions or were ignored. SA52-53. As a result, DHS and other agencies have been forced to reassign large numbers of additional federal officers to support the protection of the ICE facility and its occupants, significantly impeding their ability to perform their own regular law enforcement functions. SA62-63.

Based on this escalating violence, DHS requested assistance from the Department of War to safeguard federal personnel, facilities, and operations in both Portland and the Chicago area. The President, in turn, determined that Section 12406's conditions were satisfied and called forth members of the National Guard to protect federal personnel and property in those regions.

**d.** Implementing the President's military directives, commanders in the field have reassigned certain members of the already-federalized California National Guard to missions in Portland and Chicago. SA7-9. A small group of California National Guardsmen, 15 in total, have been tasked with training the newly federalized Guardsmen. SA7-8. Those individuals had "recent experience in Los Angeles on de-

8

escalation" and could "facilitate proper, experience-based [] training and readiness" for the Oregon and Illinois Guards. SA7-8. Another group of 200 California Guardsmen have been deployed to Oregon to protect federal personnel and property.[1] SA8.

This reallocation of forces comes at a cost. With fewer Guardsman in California, federal personnel and property will be more susceptible to surges in protest violence. *See* SA7-8. And as the recent history in Los Angeles confirms, protests are a volatile affair. Conditions on the ground may change in an instant, and with comparably fewer forces, the federalized California National Guard would be at a disadvantage when responding to a swell in violence aimed at thwarting the enforcement of the laws. But as a matter of military judgment, a commander has decided that resources are best allocated by deploying a limited number of California Guardsmen to Oregon and Illinois. *See* SA7-8.

## ARGUMENT

Four months ago, the district court entered an unprecedented injunction, countermanding the President's decision to federalize and deploy the California National Guard without any limitations in time or scope. A panel of this Court has already stayed that order, establishing the "status quo" while the parties litigate the

---

[1] Injunctions limit the activities of the certain federalized Guardsmen in Portland and Chicago, but defendants are challenging those injunctions on appeal. *See Oregon v. Trump*, No. 25-6268 (9th Cir.); *Illinois v. Trump*, No. 25-2798 (7th Cir.).

lawfulness of the President's decision.  Since then, the parties have filed their merits briefing, and the Court set oral argument for less than a week from today.

Now, on the eve of argument, plaintiffs seek either vacatur of the panel's stay order or a new injunction pending appeal.  Mot.1-2.  They ask this Court to repeat the district court's mistake by ordering the President to relinquish control of the federalized members of California's National Guard or, at minimum, to restrict deployment to the Los Angeles area.  The Court should deny that request and resolve this case on the merits.

## I.  Plaintiffs Must Make a Strong Showing to Justify Vacatur or an Injunction Pending Appeal

Plaintiffs bear the burden of establishing their entitlement to vacatur of the panel's stay or an injunction pending appeal.  *Sharp v. Weston*, 233 F.3d 1166, 1170 (9th Cir. 2000) (vacatur); *Feldman v. Arizona Sec'y of State's Off.*, 843 F.3d 366, 367 (9th Cir. 2016) (en banc) (injunction).  For several reasons, that burden should be especially high in this case.

**a.**  To start, plaintiffs' requested relief resembles a mandatory injunction. Mandatory injunctions go "beyond simply maintaining the status quo," ordering a party "to take action pending the determination of the case on its merits."  *Doe v. Snyder*, 28 F.4th 103, 111 (9th Cir. 2022).  Injunctions of this sort are "particularly disfavored," so a party seeking a mandatory injunction must "establish that the law and facts *clearly favor* [his] position, not simply that [he] is likely to succeed on the

10

merits." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc) (emphasis in original). And a mandatory injunction can issue only when there is a risk of "extreme or very serious damage" without relief. *Doe*, 28 F.4th at 111. Minimal harms will not suffice.

A panel of this Court has already decided the appropriate status quo while this appeal remains pending. The President "likely acted within his authority in federalizing the National Guard," and returning the Guard to plaintiffs' control would result in irreparable harm—both against federal personnel and against federal property. *Newsom*, 141 F.4th at 1051. So the panel concluded that a stay is warranted, and the National Guard should remain federalized and subject to the President's control. While the district court entered an injunction, that injunction has never gone into effect and the status quo for the past four months has been that the federalized Guard has been in place in California (albeit now in dramatically reduced numbers), where they have protected federal officials and property, allowing for enforcement of federal law.

Plaintiffs seek to upset that status quo. They ask for an order "requiring the return of the 300 members of the Guard to state control" or, at minimum, an injunction limiting the President's ability to deploy those Guardsmen. Mot.1, 16 n.6. This is true both for plaintiffs' vacatur request (Mot.1), and plaintiffs' request for a new injunction pending appeal (Mot.16 n.6).

11

Plaintiffs' framing of this as a request for vacatur (or partial vacatur) of the panel's stay does nothing to alter the implications of plaintiffs' motion. *See* Mot.1. Certainly, this Court may vacate its prior orders when the "facts have changed sufficiently" to justify such relief, but that says nothing about the relevant status quo. *See Southeast Alaska Conservation Council v. U.S. Army Corps of Eng'rs*, 472 F.3d 1097, 1101 (9th Cir. 2006). It is well established that "a merits panel does not lightly overturn a decision made by a motions panel during the course of the same appeal." *E.g.*, *Mi Familia Vota v. Fontes*, 111 F.4th 976, 981 n.1 (9th Cir. 2024). This amounts to a recognition that stay panel decisions set the status quo on appeal. In fact, the standard for reconsidering a panel decision closely tracks the standard for mandatory injunctive relief: the stay decision must be "clearly erroneous and its enforcement" must "work a manifest injustice," or there must be as showing that "*compels* [the Court] to reconsider" the prior stay decision. *Id.* (emphasis added and quotation marks omitted). Put simply, plaintiffs must make an exceedingly strong showing to justify the relief they seek on appeal.

**b.** Next, plaintiffs' burden is necessarily high for an additional reason: they take issue with the President's decision about the number of California Guardsmen needed to respond to ongoing violence in Los Angeles and other cities. Mot.11-13, 17. Indeed, they fault the President for *reducing* the number of Guardsmen deployed in Los Angeles, arguing that fact supports both vacatur and an injunction that would eliminate the federalized Guard's presence entirely. But plaintiffs, and the courts,

have no basis for second-guessing the President on this score. And that should make this Court especially hesitant in granting the relief plaintiffs seek.

Congress has vested the decision whether to call up the National Guard in the President, not the courts. *Martin v. Mott*, 25 U.S. (12 Wheat.) 19 (1827). The President's federalization decisions are, therefore, "conclusive upon all other persons," *id.* at 30, including the courts, *Luther v. Borden*, 48 U.S. (7 How.) 1, 43 (1849). As explained more fully in defendants' briefing, these principles prohibit judicial review of the President's federalization decisions.

But even if the President's initial federalization decision is reviewable on a highly deferential basis, as the stay panel concluded, there is no basis for judicial review of the "number[]" of forces the President "considers necessary" to enforce the laws. *Cf. Newsom*, 141 F.4th at 1046-51. Section 12406 provides "three predicate conditions for the President's decision to call forth the National Guard," and the stay panel reasoned that "the text of the statute does not make the President the sole judge of whether one or more of the statutory preconditions exist." *Id.* at 1047. But the statutory text is unambiguously clear when it comes to the "members and units of the National Guard" needed to enforce the laws. The President is permitted to call forth whatever number of Guardsmen "he considers necessary" to "execute those laws" that the regular forces are unable to execute. 10 U.S.C. § 12406(3). This language commits to the President's discretion any determination about the number of forces needed to enforce the laws under 10 U.S.C. § 12406(3), and plaintiffs cannot use the

number of federalized Guardsmen to second guess the President's federalization decision—even assuming that latter decision is reviewable. Nor can they question Secretary Hegseth's exercise of that unreviewable discretion, which was delegated to him pursuant to well established law. *See* 3 U.S.C. § 301.

Similarly, there is no basis for plaintiffs to challenge defendants' decision to extend federalization of a limited number of California Guardsmen. The statute imposes no time limit on federalization, and the decision about the troops considered "necessary" to enforce the laws subsumes any decision about how long those troops must be deployed in the field. *See* 10 U.S.C. § 12406. It would be extraordinary to infer from congressional silence some limit on the President's authority as Commander in Chief over federalized Guardsmen to determine when to release them from federal service. Thus, any decision about the length of federal service is committed to the President's discretion, and the President has delegated that unreviewable authority to Secretary Hegseth. And in any event, this "extension" actually returned most of the previously federalized Guardsmen to state control, while maintaining the status quo for a small fraction of them.

Moreover, it is hard to imagine a decision more properly reserved for the President as Commander in Chief than allocations of troops in the field. Decisions of this sort must be made in real time, taking account of the developing situation on the ground. Allowing courts to second-guess those determinations based on week-to-week fluctuations on the ground would inject the judiciary into the military chain of

command, risk countermanding the President's orders to officers in the field, and in this case, threaten the lives of federal personnel and significant damage to federal property.

**c.** In all events, plaintiffs ought to be required at least to make the affirmative showing necessary to justify a preliminary injunction—rather than shifting the burden back onto defendants to re-justify the already-granted stay. *Contra* Mot.10. Plaintiffs have long missed their window to seek reconsideration of the stay decision. *See* 9th Cir. R. 27-10(a)(2) (14-day window). And it would make no sense for appellants to re-establish their right to a stay, or any other injunctive relief on appeal, every time a movant purports to identify a change in relevant circumstances. Doing so would allow parties to circumvent the Court's usual process—which involves proceeding to a decision on the merits after resolving any initial motions for interlocutory relief.

In this specific case, plaintiffs' motion principally seeks the reinstitution of injunctive relief the district court granted. It only makes sense for plaintiffs to be obligated to make the showings necessary for such injunctive relief in the first place. That is, plaintiffs must show they are likely to succeed on the merits and that the equitable injunction factors tilt in their favor. *See Winter v. NRDC*, 555 U.S. 5, 20 (2008). The Court should not impose new injunctive requirements on defendants without assuring itself that plaintiffs have set forth a basis for such relief.

And to the extent plaintiffs claim their request seeks *new* injunctive relief on appeal, challenging the continued federalization and deployment of the California

15

Guard, plaintiffs have not amended their complaint to seek such relief. As a result, this Court lacks jurisdiction to address any request for new injunctive relief on appeal. *Pacific Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 633 (9th Cir. 2015) ("When a plaintiff seeks injunctive relief based on claims not pled in the complaint, the court does not have the authority to issue an injunction.").

## II. Under Any Standard, Plaintiffs Have Not Demonstrated that Vacatur or an Injunction Are Justified.

Against this backdrop, it is clear that plaintiffs' motion must be denied.

**a.** For starters, although plaintiffs contend that "[t]he ever-expanding mission of California's federalized Guard bears no resemblance to what this Court provisionally upheld in June," Mot.2, nothing about the Guard's operations in California represents an expansion from what this Court considered when it granted a stay. Plaintiffs note that the Secretary has since extended the deployment, but this was expressly authorized by the Presidential Memorandum this Court held was likely lawful. *See* SA3-4. And as noted above, Secretary Hegseth's extension *released* the vast majority of remaining Guardsmen from federal service while continuing the status quo for a much smaller number of personnel (approximately 300 Guardsmen). Since that continuation of the status quo, the number of Guardsmen in California has been dramatically reduced still further. Of the 4,119 Guardsmen initially federalized, around 300 remain federalized, and approximately 100 Guardsman remain on the ground in Los Angeles today. SA6.

16

**b.** Paradoxically then, plaintiffs' principal argument is that they are entitled to an injunction or vacatur of this Court's prior stay *because* the Guard's numbers in Los Angeles have been dramatically reduced and most Guardsmen have been returned to state control. *See* Mot.2 ("[M]ost of the Guard is no longer in Los Angeles[.]"); Mot.3 ("If there were any remaining need for the troops in Los Angeles, defendants would not have sent most of them to Portland."); Mot. 6 ("Defendants also substantially reduced the number of federalized troops."); Mot.12 ("[B]y August 5, defendants maintained a federalized force comprising only 300 members of the National Guard."). They also repeatedly contend that they are entitled to relief because, they assert, the Guard is not actually doing very much. Mot.18 ("[A]s of August, the National Guard was assisting on 'zero' ICE field operations[.]"); Mot.4 ("[I]f there were any remaining need in Los Angeles, members of the Guard would have been assisting on more than 'zero' ICE field operations in the city as of the time that trial was held in this case several weeks ago[.]").

It is remarkable that plaintiffs think these subsequent developments *support* their request for vacatur or an injunction. In fact, they show the opposite: that defendants have dramatically scaled down the Guard's presence, returned most Guardsmen to state control, and limited the remaining Guardsmen's activities underscores that defendants are acting reasonably, limiting the federalization, deployment, and use of the Guard to the minimal extent necessary to protect federal officials and property, and allow for enforcement of federal law. It would be perverse

17

to use this dramatic drawdown and the Executive's restraint on the Guard's use as a *basis* for injunctive relief or vacatur.

**c.** These recent developments also dramatically undercut plaintiffs' contentions of irreparable harm. In contesting defendants' motion to stay the district court's injunction, plaintiffs contended that "the federalization of the National Guard 'impairs the Guard's ability to perform critical functions for the State,' including support for fighting forest fires and combatting drug trafficking." *Newsom*, 141 F.4th at 1055. This Court was not impressed with that contention then. *Id.* And it is even weaker now that the number of federalized Guardsmen in the Los Angeles area has been reduced by roughly 98 percent. Plaintiffs also previously contended that "permitting the use of the National Guard here would upset the constitutional balance of power between federal and state government" and expressed "concern about what they describe as 'defendants' nearly limitless conception of Section 12406.'" *Id.* at 1055. Again, those arguments did not sway this Court in June, and they are even weaker now that almost all previously federalized Guardsmen have been returned to state control (and indeed, were returned to state control months ago). Finally, plaintiffs contended that "the 'continued presence of National Guard members' in Los Angeles 'risks worsening, not improving, tensions on the ground.'" *Id.* at 1055. This form of a rioters' veto argument was not a legitimate basis for seeking an injunction in the first place. In any event, plaintiffs now tell us that this concern on their part was misplaced. *See* Mot.11 (contending, inter alia, that "there have only

18

been a few immigration-related protests around the City of Los Angeles with often just a few dozen protestors at a time" and "the LAPD has had to deploy far fewer resources in response to immigration-related protest activity, including in and around federal property" (cleaned up)).

**d.** Plaintiffs also repeatedly note that violence in Los Angeles has subsided somewhat since June. Mot.11. But initially, as noted above, defendants have *responded* to that improvement in conditions by dramatically reducing the Guard's numbers and activities.

It is also unsurprising that the Guard's introduction following multiple days of violent mobs attacking federal officials and property has yielded benefits to public safety. Insofar as conditions in Los Angeles have improved, that is undoubtedly at least in part *because* the Guard's presence has deterred further attacks. As a witness explained at trial on plaintiffs' PCA claim, the National Guard operated as "a huge deterrent" in Los Angeles "allowing [ICE] officers to safely conduct their work without having to worry about protesters, violent protesters, that might impede" those officers' law enforcement efforts. A-174; SA7-9.

As this Court noted, the impetus behind the violent protests in June was not the presence of the Guard and Marines (which had not yet been deployed), but opposition on the part of protestors to ICE's enforcement of federal immigration law. *Newsom*, 141 F.4th at 1041. That enforcement continues, as does opposition to that enforcement—and that opposition has turned violent in Portland and Chicago, just as

19

it previously turned violent in Los Angeles. *See supra* pp. 6-9. There is no good reason to grant plaintiffs the extraordinary relief they seek now, at a time when the Guard's deployment has helped improve conditions and when officials have accordingly reduced the California force.

In any event, the Guard has provided critical protection to law enforcement officers under attack and facing threats. In Camarillo, about 50 miles from downtown Los Angeles and weeks after the initial riots, officers enforcing immigration laws encountered 500 rioters and came under gunfire. "ICE and CBP Law Enforcement Dodge Literal Bullets from Rioters," U.S. Dep't of Homeland Sec. (July 11, 2025), https://www.dhs.gov/news/2025/07/11/ice-and-cbp-law-enforcement-dodge-literal-bullets-rioters-while-rescuing-least-10. The crowd even laid down a makeshift spike strip to counter DHS vehicles. *Newsom v. Trump*, --- F. Supp. 3d ---, 2025 WL 2501619, at *8 (N.D. Cal. 2025). Guardsmen were deployed and provided protection. *Id.* And as noted above, violence and threats have been a major problem in other jurisdictions. Defendants have responded to somewhat improved conditions in Los Angeles since the Guard was deployed by reducing the Guard's numbers by approximately 98 percent, removing all the Marines, and returning almost all previously federalized Guardsmen to state service. This Court should not credit plaintiffs' breezy contention that the threat has completely abated such that the Guard should be removed entirely, contrary to the defendants' judgment as to their

20

continued need. And this Court certainly should not grant plaintiffs' extraordinary requested relief at this juncture, on the eve of oral argument.

**e.** The Court should reject out of hand plaintiffs' argument that the redeployment of federalized troops to Portland and the Chicago area justifies vacatur of the Court's prior stay decision or an injunction returning the few remaining federalized Guardsmen to state service. Mot.3, 13-15. 18. Those redeployments are amply justified by the facts on the ground in the Chicago area and Portland. *See supra* pp. 6-9. But in any event, there is no reason for the Court to consider those issues here. As plaintiffs admit, they have already challenged the Portland deployment in a separate suit. Mot.9. And a challenge to the Chicago area deployment is already pending before the Seventh Circuit. In each of these cases, the relevant courts stand poised to assess the facts on the ground, including those facts that justify reallocation of the federalized California Guard troops. There is no reason for this Court, in resolving a motion to vacate, to wade into those issues prematurely.

Consideration of these redeployments would be particularly unwarranted as part of this appeal because those redeployments do not injure plaintiffs—and if anything, *undermine* plaintiffs' irreparable harm arguments. No additional members of the California Guard have been federalized as part of those redeployments. And insofar as plaintiffs' alleged grievances concern the federalized Guard's presence and activities in California, the redeployments arguably *partially redress* plaintiffs' claimed injury by redeploying portions of the federalized Guard out of the State.

21

Finally on this point, plaintiffs are wrong to contend that redeployment of some federalized California Guardsmen to other locations shows that the Guard is no longer needed in California at all. Mot.13. Again, plaintiffs are effectively arguing that a reduction of the Guard's footprint in California is a basis for the extraordinary remedy of vacatur or a new injunction, which is backward. *See supra* pp. 17-19. In any event, plaintiffs are incorrect on the facts. The Department of War made the redeployment decisions in an exercise of military judgment based on its assessment of optimal allocation of scarce resources—specifically, that its resources are best allocated by deploying a limited number of California Guardsmen to Oregon and Illinois (even though taking this step would place it a disadvantage in California). *See supra* pp. 8-9.

**f.** Finally, plaintiffs suggest the National Guard is performing "law enforcement activities" in California, but that issue is not presently before this Court. It amounts to a claim that defendants are violating the Posse Comitatus Act, which bars willful use of the military to enforce the laws—at least absent a statutory exception. That issue is pending in another appeal before this Court. *See Newsom v. Trump*, No. 25-5553 (9th Cir.).

## CONCLUSION

The Court should deny Plaintiffs' motion.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE

  *s/ J. Kain Day*
J. KAIN DAY
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7517*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-2689*
  *Sharon.swingle@usdoj.gov*

October 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) and Local Rules 27-1(d) and 32-3 because it contains 5,395 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ J. Kain Day*
J. Kain Day

# SUPPLEMENTAL ADDENDUM

## TABLE OF CONTENTS

Exhibit 2 to Defendants' Opposition to Plaintiffs' Motion for a Temporary
　　　Restraining Order, Dkt. 22-2 (June 11, 2025) .................................................... SA1

Declaration of Major General Niave F. Knell (Oct. 15, 2025) .................................... SA5

Declaration of Deputy Director Robert Cantu (Oct. 16, 2025) ................................. SA10

Declaration of Deputy Regional Director Roger Scharmen (Oct. 16, 2025) ........... SA17

Declaration of Acting Field Office Director Andre Quinones (Oct. 16, 2025) ...... SA21

# EXHIBIT 2



**SECRETARY OF DEFENSE**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

JUN 0 7 2025

MEMORANDUM FOR ADJUTANT GENERAL OF THE CALIFORNIA NATIONAL GUARD
THROUGH: THE GOVERNOR OF CALIFORNIA

SUBJECT: Calling Members of the California National Guard into Federal Service

    The President of the United States has called forth at least 2000 National Guard personnel into Federal service pursuant to section 12406 of title 10, U.S. Code, to temporarily protect U.S. Immigration and Customs Enforcement and other U.S. Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where protests against these functions are occurring or are likely to occur based on current threat assessments and planned operations. The President signed a copy of the attached memorandum today to effectuate the calling forth of these Service members.

    This memorandum implements the President's direction. Two thousand members of the California National Guard will be called into Federal service effective immediately for a period of 60 days. The Chief of the National Guard Bureau will immediately coordinate the details of the mobilization with the Adjutant General of the California National Guard, in coordination with the Chairman of the Joint Chiefs of Staff and Commander, U.S. Northern Command. The mobilized Service members will be under the command and control of the Commander, U.S. Northern Command.

Attachment:
As stated

cc:
Chairman of the Joint Chiefs of Staff
Chief, National Guard Bureau
Commander, U.S. Northern Command
Under Secretary of Defense for Policy

**SA2**

June 7, 2025


MEMORANDUM FOR THE SECRETARY OF DEFENSE
                THE ATTORNEY GENERAL
                THE SECRETARY OF HOMELAND SECURITY

SUBJECT:          Department of Defense Security for the Protection
                  of Department of Homeland Security Functions


Numerous incidents of violence and disorder have recently
occurred and threaten to continue in response to the enforcement
of Federal law by U.S. Immigration and Customs Enforcement (ICE)
and other United States Government personnel who are performing
Federal functions and supporting the faithful execution of
Federal immigration laws.  In addition, violent protests
threaten the security of and significant damage to Federal
immigration detention facilities and other Federal property.  To
the extent that protests or acts of violence directly inhibit
the execution of the laws, they constitute a form of rebellion
against the authority of the Government of the United States.

In light of these incidents and credible threats of continued
violence, by the authority vested in me as President by the
Constitution and the laws of the United States of America, I
hereby call into Federal service members and units of the
National Guard under 10 U.S.C. 12406 to temporarily protect ICE
and other United States Government personnel who are performing
Federal functions, including the enforcement of Federal law, and
to protect Federal property, at locations where protests against
these functions are occurring or are likely to occur based on
current threat assessments and planned operations.  Further, I
direct and delegate actions as necessary for the Secretary of
Defense to coordinate with the Governors of the States and the
National Guard Bureau in identifying and ordering into Federal
service the appropriate members and units of the National Guard
under this authority.  The members and units of the National
Guard called into Federal service shall be at least 2,000
National Guard personnel and the duration of duty shall be for
60 days or at the discretion of the Secretary of Defense.  In
addition, the Secretary of Defense may employ any other members

**SA3**

2

of the regular Armed Forces as necessary to augment and support
the protection of Federal functions and property in any number
determined appropriate in his discretion.

To carry out this mission, the deployed military personnel may
perform those military protective activities that the Secretary
of Defense determines are reasonably necessary to ensure the
protection and safety of Federal personnel and property  The
Secretary of Defense shall consult with the Attorney General and
the Secretary of Homeland Security prior to withdrawing any
personnel from any location to which they are sent.  The
Secretaries of Defense and Homeland Security may delegate to
subordinate officials of their respective Departments any of the
authorities conferred upon them by this memorandum.


                         DONALD J. TRUMP

**IN THE UNITED STATES COURT OF APPEAL
FOR THE NINTH CIRCUIT**

GAVIN NEWSOM, et al.,        )
                                )

    *Plaintiffs-Appellees,*    )
                                )    No. 25-3727

    v.                        )
                                )

DONALD J. TRUMP, *in his official capacity*    )
*as President of the United States,* et al.,    )
                                )

    *Defendants-Appellants.*    )

_____

<u>DECLARATION OF MAJOR GENERAL NIAVE F. KNELL</u>

I, Major General Niave Knell, hereby state and declare as follows:

1.      I am currently the Deputy Commanding General for Operations for the United States Army North Command (ARNORTH), which is the Army Service Component Command (ASCC) of the United States Northern Command (USNORTHCOM). I have held this position since August 24, 2024. I have served as a commissioned Army Officer for more than 33 years. My current responsibilities include overseeing the daily operations of ARNORTH, as well as the training, discipline, and readiness of the units under ARNORTH's command. This declaration is based on my personal knowledge, as well as information made available to me during the routine execution of my official duties.

2.      USNORTHCOM is one of the Department of War's (DoW) eleven unified combatant commands. Its mission includes providing command and control of DoW homeland defense efforts and coordinating defense support of civil authorities. ARNORTH supports USNORTHCOM in its mission as the ASCC and Joint Forces Land Component Command for USNORTHCOM.

3.      When federalized, members of a state's National Guard serve pursuant to Title 10 of the United States Code under the command of the President and the Secretary of War. Relevant to this case, Commander USNORTHCOM has delegated operational control of members of the California, Illinois, Oregon, and Texas National Guards who are in a Title 10 status to ARNORTH.

4.      Since June 7, 2025, members of the California National Guard have been federalized due to the "[n]umerous incidents of violence and disorder…in response to the enforcement of Federal law by U.S. Immigration and Customs Enforcement (ICE) and other United States Government personnel who are performing Federal functions and supporting the faithful execution of Federal Immigration laws." *See* June 7 Memorandum, *Department of Defense (DoD) Security for Protection of Homeland Security (DHS) Functions* (June 7, 2025).

5.      As recently as June 17, 2025, approximately 4,119 California National Guard members were mobilized in a Title 10 status, and those Guardsmen, as well as 821 active-duty United States Marines, were conducting operations in support of the Federal Protection Mission in the State of California. After the subsequent decrease in federal protection mission requirements in the State of California, the Secretary of War directed the immediate drawdown of forces in Los Angeles on or about July 30, 2025 to approximately 300.

6.      On or about September 26, 2025, the Department of Homeland Security (DHS) submitted a request for assistance to DoW "to safeguard federal personnel, facilities, and operations in the State of Oregon" because facilities and personnel supporting Immigration and Customs Enforcement (ICE) operations were "under coordinated assault by violent groups intent on obstructing lawful federal enforcement actions." *See* September 26 Memorandum, *Request for*

*Assistance from the Department of War for Federal Facility Protection Support to the*
*Department of Homeland Security (State of Oregon).*

7.     On or about October 3, 2025, DHS submitted a second request for assistance to DoW "to safeguard federal personnel, facilities, and operations in the State of Illinois" because ICE facilities and personnel were "under coordinated assault by violent groups intent on obstructing lawful federal enforcement actions." *See* October 3 Memorandum, *Updated Request for Assistance from the Department of War for Federal Facility Protection Support to the Department of Homeland Security (State of Illinois).*

8.     On or about September 28 and October 4, 2025, the Secretary of War, under the direction of the President, federalized members of the Oregon and Illinois National Guards in response to DHS' requests for assistance in their respective states. Before undertaking any federal protection mission, federalized members of the Oregon and Illinois Army National Guards were required to undergo Civil Disturbance Operations (CDO) training to be qualified to perform mission tasks. CDO training is to ensure that the federalized members are proficient in applied techniques in federal protection settings that will ensure the safety of the National Guard members as well as the protestors. This training includes de-escalation, display of presence, how to safely move back protestors who fail to abide by law enforcement lawful orders to vacate Federal properties to ensure the safety of the Federal properties, as well as of individual National Guard members, DoW members, Federal law enforcement officers, and protestors.

9.     Since members of the federalized California Army National Guard have recent experience with CDO tasks, I considered that ordering fifteen federalized members of the California Army National Guard to Oregon on or about October 7, 2025, to provide CDO training based on their recent experiences in Los Angeles on de-escalation, and feedback to the

3

**SA7**

federalized members of the Oregon Army National Guard, would facilitate proper, experience-based CDO training and readiness for the Oregon mission.

10.     Fourteen of the fifteen federalized members of the California Army National Guard who were ordered to and did train the Oregon Army National Guard in Portland were subsequently ordered to Illinois to provide CDO training to the federalized members of the Illinois Army National Guard. The final California Army National Guard member of the fifteen remained in Portland as an advisor. CDO training for the federalized members of the Illinois Army National Guard is expected to conclude on or about October 17, 2025.

11.     Given our finite resources, I assessed and accepted the risk of using these fifteen federalized members of the California Army National Guard outside of California to provide efficient and experience-based CDO training to federalized members of the Oregon and Illinois Army National Guards. That decision does not negate or diminish the mission requirements for federalized members of the California Army National Guard in California. Instead, I determined that these fifteen federalized members of the California Army National Guard should be deployed to train efficiently federalized members of other state National Guards on federal protection missions outside of California.

12.     On or about October 4, 2025, ARNORTH was directed to move approximately 200 federalized members of the California Army National Guard from Los Angeles, California to Portland, Oregon to protect federal facilities, functions, and personnel at or near Portland, Oregon.

13.     Since the movement of some federalized members of the California Army National Guard from Los Angeles, California, to Portland, Oregon, the remaining federalized members of the California Army National Guard have continued to provide mission-critical protection

4

SA8

support to federal partners in Los Angeles and continue to be staged at various locations throughout Los Angeles to provide rapid response protection support to federal facilities, functions, and personnel.

14.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

KNELL.NIAVE.FRA
NCES.1010491840

Digitally signed by
KNELL.NIAVE.FRANCES.10104
91840
Date: 2025.10.15 15:39:51 -05'00'

MAJOR GENERAL NIAVE F. KNELL
DEPUTY COMMANDING GENERAL
U.S. Army North, U.S. Army Northern Command

No. 25-3727

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————

GAVIN NEWSOM, *in his official capacity as Governor of the State of California*; STATE OF
CALIFORNIA,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, *in his official capacity as President of the United States*; PETER
HEGSETH, *in his official capacity as Secretary of the Department of Defense*; UNITED
STATES DEPARTMENT OF DEFENSE,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the Northern District of California

———————————

**DECLARATION OF ROBERT CANTU**

I, Robert Cantu, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. This declaration is based on my personal knowledge and information made
available to me in the course of my official duties.

2. I am the Deputy Director of the Federal Protective Service (FPS), Region 10,
which encompasses Alaska, Washington State, Idaho, and Oregon. I have served
in that position since September 9, 2023. FPS is the law enforcement agency
within the U.S. Department of Homeland Security (DHS) that protects the federal
government facilities and persons therein in accordance with 40 U.S.C. § 1315.

3. FPS is a small agency with a total of 776 law enforcement officers. Of that
number, only 497 are Inspectors, whose primary mission is to patrol and respond to

SA10

law enforcement incidents at the federal buildings in their area of responsibility. While FPS can surge its Inspectors to respond to emergency situations, it is not resourced to provide a large-scale response to ongoing civil unrest or sustained attacks on federal facilities or federal employees working in those facilities.

4.  Since June 2025, there have been ongoing protests of the Administration's immigration policies with many occurring at federal facilities in major urban centers, such as Los Angeles, San Francisco, Chicago, Dallas, Seattle, Denver, New York, Boston, Portland and Washington DC. Many of these protests, at times, have turned violent, requiring FPS to use crowd control tactics to prevent the destruction of federal facilities or serious injury to federal employees and the public.

5.  FPS has had to deploy many of its officers to those cities to increase its presence at the facilities where the protests are occurring. Even when the protests are peaceful, FPS needs to have an increased presence so that it can adequately respond to outbreaks of violence if they occur. This has resulted in a reduction in the number of FPS Inspectors available in other areas of the country where FPS services are needed. Indeed, all federal buildings continue to experience incidents requiring an FPS law enforcement response, and the continued deployment of FPS officers in response to the immigration protests stretches an already thin force beyond what is safe and effective. While FPS officers are expected to respond to emergencies after hours and on weekends and holidays, they are not expected to work 12-hour shifts, seven days a week, which has become the norm.

6.  In Portland, Oregon, there have been regular protests since June 2025 at the Immigration and Customs Enforcement (ICE) building, also known as the Lindquist Federal Building, located at 4310 South Macadam Avenue. While many of the protests have been peaceful, there have been numerous occasions where groups of protestors have become extremely violent, threatening the building and federal law enforcement officers.

7. One of the most significant incidents occurred on June 14, 2025, when at approximately 4:30 p.m., protesters (including one who was carrying a firearm) began to advance up the driveway towards the main gate of the facility. They were throwing rocks and sticks at the guard shack and launching M80 fireworks at FPS officers. A mortar was thrown at the front entrance of the building, causing minor injuries to an officer. Two separate fires broke out in front of the building which had to be extinguished by FPS officers. FPS officers had to barricade themselves

inside the building and protesters placed chains on the exterior doors. At approximately 5:59 p.m., protesters attempted to breach the front door and broke the front door glass. FPS officers were forced to deploy their long guns but did not use them. The protestors continued to throw mortars at the building. At approximately 6:12 p.m., the Border Patrol Tactical Unit (BORTAC) responded to the facility with an up-armored tactical vehicle. By approximately 6:24 p.m., FPS officers were able to leave the building and, along with ICE Special Response Team (SRT) and BORTAC, were able to push the protesters past the driveway and sidewalk, into the middle of the street. A number of FPS officers suffered minor injuries from rocks and fireworks. Three individuals were arrested and charged with Assault on a Federal Officer (18 U.S.C. § 111).

8. Since the June 14th incident, protesters have continued to accost both the building and federal officials as the officers execute their duties. For example, on June 29, 2025, at approximately 3:27 a.m., a protester tampered with an access card reader providing entry to the Lindquist Building. When FPS officers took the individual into custody after a foot pursuit, he resisted arrest by biting and kicking the officers.

9. Even more concerning is when protesters threaten officers with dangerous weapons. For example, on June 24, 2025, at approximately 11:09 p.m., after officers gave a warning to clear the driveway of the facility, one protestor shot officers with a paintball gun and another shined a laser in an officer's eyes, after the officers warned the individuals to clear the facility's driveway. That same night, a third protester was detained for assaulting an officer with a machete and knife. The officer deployed his taser and was able to recover the machete and knife before he was injured. All three protesters were arrested and charged with Assault on a Federal Officer (18 U.S.C. § 111).

10. FPS and ICE officers have also been the targets of doxing[1], and at the end of each shift, it is not uncommon for officers, who have been deployed to Portland from other locations to fill operational needs, to be tailed and followed back to their hotels. Those officers have reported that groups have protested at the hotels where they were staying, both on the Oregon and Washington State sides of the Portland metropolitan area.

---

[1] Doxing occurs when an individual's personally identifiable information is gathered and publicly released for malicious purposes, such as public humiliation, stalking, identity theft, or targeting for harassment or physical violence.

11. It is extremely common for protesters to attempt to impede government vehicles as they enter or exit the facility. Once the vehicles stop, the protesters surround the vehicle, shouting threats at the occupants. For example, on August 9, 2025, at approximately 1:00 a.m., a group of protesters became aggressive when an ICE vehicle was departing the facility and began striking the vehicle with their fists. FPS had to deploy pepperballs to push the protesters back away from the vehicle.

12. In addition, on September 29, 2025, at approximately 6:52 p.m., an FPS officer had to deploy his pepper spray fogger against a protester who refused to comply with multiple orders to depart federal property. The protester was part of a larger group standing in front of and to the right of the driveway. At approximately 10:26 p.m., FPS issued a warning for protesters to clear the driveway. At approximately 10:31 p.m., two FPS officers deployed their pepper spray foggers at protesters who were shining high-powered strobe lights in the faces of the FPS officers attempting to push the crowd back from the driveway. One of the FPS officers who had the strobe light directed at him experienced pain in his eyes and head and spotting of his vision.

13. The above examples are part of a larger coordinated effort to obstruct lawful federal enforcement actions based at the Lindquist Building. The facility is subject to nightly protests, which risk escalation at any moment. In addition, there are concerns that the protesters may be protecting domestic terrorist organizations that are seeking to prevent the deportation of criminal aliens within the State of Oregon. Because of these concerns and the volatility of the situation in Portland, FPS has been forced to drastically alter its operations in a manner which is currently unsustainable.

14. Normally, FPS would be able to rely on the Portland Police Bureau (PPB) to assist with large scale law enforcement operations related to federal facilities in Portland. FPS has been informed by PPB, however, that they will only respond to "life/safety" situations, but not anything immigration related. For example, on September 9, 2025, at approximately 12:21 a.m., a female counter-protester was surrounded by a group of twelve to thirteen individuals. The began to physically harasser her by taking her water bottles and shining a high-powered flashlight in her eyes. At approximately 1:08 a.m., FPS requested assistance from PPB. PPB dispatch responded that two units would respond but an estimated time of arrival (ETA) could not be provided. At approximately, 1:15 a.m., FPS called PPB

dispatch back to request an ETA. At approximately 1:27 a.m., a PPB Sergeant called in requesting a description of the situation and the counter-protester being harassed. At approximately 1:33 a.m., a PPB patrol car drove by the area but did not leave their vehicle or engage with the situation. At approximately 1:44 a.m., FPS called PPB dispatch again, emphasizing that the situation was not an immigration issue or related to federal property but rather a civilian in distress and that the counter-protester was surrounded and in danger. At approximately 1:46 a.m., FPS contacted PPB once again and PPB stated that they did not perceive the counter-protester to be in distress or at risk of bodily harm and would not intervene. The counter-protester continued to be harassed, spit on and threatened with physical harm. The counter-protester was permitted to come onto federal property for her safety. At approximately 2:27 a.m., FPS officers pushed the protestors off of federal property back away from the counter-protestor so that she could leave the federal property safely. The counter-protester fled the area southbound on Macadam Street with a group of protesters attempting to follow her. FPS believed that the counter-protester had enough of a head start to escape the area safely. At no point did PPB respond or assist FPS with the incident.

15. This situation has resulted in FPS having to rely almost exclusively on ICE SRT for assistance in preventing the violent protesters from attacking immigration officers and the ICE facility where they work. While having ICE SRT as an available resource is invaluable to FPS, their primary mission is to handle high-risk immigration enforcement operations. As such, their continued assistance to FPS will become a drain on those resources and is not a practical ongoing solution.

16. FPS officers have a broad range of responsibilities within their respective areas of responsibility. Not only do they respond to law enforcement calls, but they also conduct routine security inspections of the facilities and contract security guards working in the buildings. They are also responsible for conducting facility security assessments (FSAs), during which they identify security vulnerabilities for a building and make recommendations to the building's Facility Security Committee (FSC) how best to mitigate those risks. FPS is resourced to patrol and respond to law enforcement calls during the workday when the facilities it protects are open to employees and/or the public. While FPS officers will occasionally respond to emergencies after hours and on weekends and holidays, they do not typically have to do that repeatedly over an extended period.

17. The sustained violence associated with the protests in Portland has required FPS Region 10 to deploy officers from the other FPS Regions. As of October 2, 2025, 115 FPS officers have had to deploy to Portland to maintain a 24/7 operational tempo. Removing these officers from their normal duty stations means that the buildings they are assigned to must rely on other FPS officers or the local police force to respond to law enforcement incidents. Moreover, the security related functions that the assigned officers normally perform end up being delayed.

18. FPS's efforts to contain the violence associated with the protests in Portland have placed an unreasonable strain on the FPS law enforcement community as well as on FPS's limited resources. As of October 2, 2025, FPS has expended over two million dollars in overtime pay and expenses in response to the violent protests in Portland since June 5, 2025. Because those expenses were not anticipated, they were not factored into FPS's FY25 budget. FPS expects the costs to continue at the same rate or higher in FY26.

19. I understand that for these reasons DHS has requested, and the Department of War has agreed, to deploy members of the National Guard to assist FPS in the State of Oregon. Given FPS's urgent need for additional support in Portland, that assistance is vital. Because the National Guard has the personnel, resources and training to provide non-law enforcement support in an effective and efficient manner, they are the ideal partner for FPS to work with in protecting federal facilities, and FPS welcomes their assistance.

20. Having National Guard support will enable FPS to reduce the number of FPS Inspectors deployed to Portland and return them to their primary mission at their normal duty locations. The presence of the National Guard in Portland will also enable FPS to surge its forces to other cities as necessary to deal with ongoing and anticipated threats. Most importantly, it will enable FPS to perform its mission without having to request support from PPB.

21. It is my understanding that the National Guard members working with FPS will not engage in any law enforcement operations but will only provide FPS with direct support related to federal facility protection, access control and crowd control measures. The National Guard members supporting FPS will be instructed to call an FPS officer anytime a law enforcement response at a federal facility is necessary and to wait for the FPS officer to respond, to the extent practicable. FPS is very familiar with this type of arrangement, as it is similar to the relationship that FPS has with the contract security guards who do not have any law

enforcement authority but provide facility protection, access control and crowd control measures at the approximately 8,000 federal facilities that FPS protects daily.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on October 16, 2025, at Portland, OR

ROBERTO R CANTU

Digitally signed by ROBERTO R CANTU
Date: 2025.10.16 18:20:28 -07'00'

ROBERT CANTU

**SA16**

No. 25-3727

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

———————————

GAVIN NEWSOM, *in his official capacity as Governor of the State of California*; STATE OF CALIFORNIA,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, *in his official capacity as President of the United States*; PETER HEGSETH, *in his official capacity as Secretary of the Department of Defense*; UNITED STATES DEPARTMENT OF DEFENSE,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the Northern District of California

———————————

**<u>DECLARATION OF ROGER SCHARMEN</u>**

I, Roger Scharmen pursuant to 28 U.S.C. § 1746, hereby declare as follows:

This declaration is based on my personal knowledge and information made available to me in the course of my official duties.

1.      I serve as the Deputy Regional Director for Region 9 of the Federal Protective Service (FPS). My primary place of duty is San Francisco, CA, but I continue to work in Los Angeles periodically.

1

**SA17**

1    2. The FPS remains the lead law enforcement agency protecting federal

2 facilities, property, and people therein in Los Angeles in accordance with its statutory

3 authority provided in 40 U.S.C. § 1315.

4    3. Beginning in June 2025, the National Guard has provided assistance to FPS

5 in a support role at the Federal buildings in Los Angeles located at 255 E. Temple St.

6 (Roybal Building), 300 N Los Angeles St. (Los Angeles Federal Building), and 11000

7 Wilshire Blvd. (Wilshire Federal Building). Those National Guard troops have been

8 providing protection to the federal buildings, the personnel working there, and by

9 extension, the functions ongoing at those buildings, consistent with the President's June

10 7 memorandum. For example, the National Guard has established outside perimeters,

11 observation posts, and perimeter patrols for these federal buildings.

12    4. In early June, FPS reported protests in front of the Roybal and Los Angeles

13 Buildings that would sometimes number in the thousands, including a protest on June 8

14 in front of the Roybal Building that included 3700 protesters. As has been documented

15 elsewhere in this litigation, there were numerous acts of violence directed at federal law

16 enforcement officers and the facilities.

17    5. The presence of the National Guard in Los Angeles significantly reduced

18 the size, frequency, and violence of the protests at Federal Buildings, while not

19 preventing any First Amendment protected activities. Beginning in mid-June and

20 continuing to the present, protests have continued, albeit in reduced numbers. The

21 number of protesters is typically below 100 protesters, but protests that are attended by

22 up to 500 people still occur. Typically, protests occur each day between Thursday

23 through Sunday of each week.

24    6. While the smaller protests are for the most part peaceful, threatening and

25 harassing incidents still occur. A recent example occurred on October 9, 2025, when a

26 verbal threat was made towards an FPS Inspector at approximately 12:20 a.m. It was

27 reported that a Hispanic male, a known gang member, had come onto federal property

28 and stated to the FPS Inspector "watch out" and that the officer should "leave and gangs

run this." The individual then left the property and entered a van. He exited the van and said to the officer "you think I am playing?" A female exited the van and pulled the male individual back into the van.

7.     Another incident occurred on October 10, 2025, at approximately 8:58 p.m., when an immigration protestor assaulted an FPS Inspector and an FPS Protective Service Officer (PSO) by shining a high-powered laser in the officer's eyes, causing eye damage. The PSO cannot work due to his injury.

8.     Having the National Guard available to assist FPS is key to maintaining officer safety and continuing our property protection operations. Although violence and threats directed at federal officials and property has been reduced since June, it is clear that this is due at least in part to the Guard's presence, which serves as both a deterrent and as support for overburdened FPS officers.  There is no question that, from the perspective of the FPS officers responsible for protecting the federal facilities, the National Guard's presence has prevented violence from reoccurring on a frequent basis. and has been critical to maintaining the safety of all law enforcement officers involved.

9.     Notwithstanding the two recent incidents, having the National Guard present at the federal facilities that FPS protects has not only helped keep most protests from becoming violent, but it also has allowed FPS to reduce its staffing levels. It is not uncommon for the National Guard to provide a force equal to or greater than what FPS is able to provide at a particular facility. For example, during a peaceful protest that occurred on September 16, 2025, FPS only needed to have 39 of its officers on site because the National Guard provided 40 of its members.

10.     Most importantly, having the National Guard on site allows FPS officers perform law enforcement operations that it would otherwise have to forego.  For example, when attempting to conduct an arrest during a crowded protest, teamwork is essential for officer safety.  Having the National Guard available to remain on the property allows the FPS arrest teams officers to leave federal property to effectuate arrests of protesters who are suspected of committing crimes directed at federal property

3

1  or persons at or near the property.  The National Guard members will form a line on the

2  border of federal property while FPS officers are engaged in detaining the subjects. This

3  creates a vital safety barrier for federal property and the FPS Officers.

4       11.     FPS is a small agency with a total of 776 law enforcement officers.  Of that

5  number, only 497 are Inspectors, whose primary mission is to patrol and respond to law

6  enforcement incidents at the federal buildings in their area of responsibility.  While FPS

7  can surge its Inspectors to respond to emergency situations, it is not resourced to provide

8  a large-scale response to ongoing civil unrest or sustained attacks on federal facilities or

9  federal employees working in those facilities.  Given that so many FPS officers have

10  been deployed to Portland, OR, to help protect the Portland ICE facility, FPS continues

11  to be spread extremely thin operationally.

12       12.     If the National Guard were no longer available to assist FPS, there is a

13  concern that if the protests grow in size and become violent again, FPS would not have

14  the resources on hand to respond fully.  This would increase the threat to law

15  enforcement, the public and the federal facilities.

16       13.     I declare under penalty of perjury that the foregoing is true and correct to

17  the best of my knowledge and belief.

18

19       Executed on October 16, 2025, at Los Angeles, California.

20

21       _____

22       Roger Scharmen

23

24

25

26

27

28

4

**SA20**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| GAVIN NEWSOM, *in his official capacity as the Governor of the State of California*; STATE OF CALIFORNIA, | No. 25-3727 |
| | **DECLARATION OF ANDRE QUINONES** |
| Plaintiffs-Appellees, | |
| v. | |
| DONALD J. TRUMP, *in his official capacity as President of the United States*; PETER HEGSETH, *in his official capacity as Secretary of the Department of Defense*; U.S. DEPARTMENT OF DEFENSE, | |
| Defendants-Appellants. | |

## <u>DECLARATION OF ANDRE QUINONES</u>

I, Andre Quinones, hereby declare:

1.  I am employed by the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) as the Acting Field Office Director (FOD) of the Los Angeles Field Office (ERO Los Angeles). I have held this position since September 22, 2025.

2.  The purpose of this declaration is to describe the current conditions in Portland, Oregon, and Chicago, Illinois. My knowledge of these conditions is based on the declarations described below.

3.  ICE filed a declaration in *Oregon v. Trump*, No. 25-cv-1756 (D. Or. filed

Sept. 28, 2025), appeal filed, No. 25-6268 (9th Cir. Oct. 4, 2025), describing the violent protests and threats to the ICE facility in Portland, Oregon, and to ICE personnel working in that building. Attached as Exhibit 1 is a copy of that filed declaration.

4.      ICE filed a declaration in *Illinois v. Trump*, No. 25-cv-12174 (N.D. Ill. filed Oct. 6, 2025), appeal filed, No. 25-2798 (7th Cir. Oct. 9, 2025), describing the violent protests and threats to ICE facilities and personnel in the Chicago area. Attached as Exhibit 2 is a copy of that filed declaration.

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed on this 16th day of October 2025.

ANDRE G QUINONES  Digitally signed by ANDRE G QUINONES
Date: 2025.10.16 13:01:17 -07'00'

Andre Quinones
Acting Field Office Director
DHS ICE ERO Los Angeles

2

**SA22**

# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
(Portland Division)**

STATE OF OREGON and the CITY OF
PORTLAND,

    *Plaintiffs*

    *v.*

DONALD TRUMP, in his official capacity as
President of the United States; PETE
HEGSETH, in his official capacity as
Secretary of Defense; U.S. DEPARTMENT
OF DEFENSE; KRISTI NOEM, in her
official capacity as Secretary of Homeland
Security; and U.S. DEPARTMENT OF
HOMELAND SECURITY,

    *Defendants*

Case No. 3:25-cv-01756

Declaration of Field Office Director
Cammilla Wamsley

**DECLARATION OF CAMMILLA WAMSLEY**

I, Cammilla Wamsley, hereby declare as follows:

1.  I am employed by the United States Department of Homeland Security (DHS), U.S.

    Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations

    (ERO) as the Field Office Director (FOD) of ERO's Seattle Field Office, which includes

    the ERO Portland sub-office. I have held this position since July 27, 2025.

2.  As the FOD for ERO Seattle, I direct and oversee ICE's enforcement of federal

    immigration laws in the states of Oregon, Washington, and Alaska.

3.  The Seattle Field Office has approximately 115 officers covering three states across three

    time zones. In Oregon, ERO has three offices, including the Portland sub-office, with

    approximately 30 officers who are responsible for enforcing federal immigration law in a

**SA24**

population of over four million people. Due to Oregon's sanctuary laws and policies, the

Seattle Field Office does not receive any cooperation from state and local law

enforcement agencies in Oregon enforcing federal immigration laws. *See, e.g.*, O.R.S. §

181A.820-829 and Portland Police Bureau Policy # PPB-0810.10, Bureau Contact with

Members of Immigrant Communities and Individuals with Diplomatic Immunity.[1]

4.  This declaration is submitted in support of Defendants' Opposition to Plaintiffs' Motion

for Temporary Restraining Order (TRO) and sets out the current conditions on the ground

in the Portland Area of Responsibility (AOR) with respect to immigration enforcement

operations and the security of ICE personnel and property. I have reviewed Plaintiffs'

application for a TRO and supporting exhibits.

5.  The statements contained in this declaration are based upon my personal knowledge and

information made available to me in the course of my official duties.

**<u>Background</u>**

6.  ICE is the largest investigative branch of DHS and is charged with enforcement of more

than 400 federal statutes. The agency was created after the September 11, 2001, terrorist

attacks, by combining components of the former Immigration and Naturalization Service

and the former U.S. Customs Service, among other agencies, to more effectively enforce

federal immigration and customs laws and to protect the United States against terrorist

attacks. The mission of ICE is to protect the United States from the cross-border crime

and illegal immigration that threaten national security and public safety. To carry out that

mission, ICE focuses on enforcing immigration laws, preventing terrorism, and

---

1.  Available at: https://www.portland.gov/policies/police-directives/arrest-detentions-court-0800/081010-bureau-contact-members-immigrant (last visited on Sept. 30, 2025).

combating transnational criminal threats. ICE consists of three core operational directorates: (1) ERO, which includes 25 field offices led by FODs; (2) Homeland Security Investigations (HSI), which includes 30 field offices led by Special Agents-in-Charge; and (3) the Office of the Principal Legal Advisor, which includes 25 field locations led by Chief Counsel.

7.  ERO deportation officers are immigration officers under 8 U.S.C. § 1357 and have been delegated limited customs officer authority under 19 U.S.C. § 1589a. It is the mission of ERO to identify, arrest, and remove aliens who present a danger to national security or are a risk to public safety, as well as those who enter the United States illegally—including those who cross the border illegally, which is a federal misdemeanor, 8 U.S.C. § 1325, and those who illegally reenter after having been removed, which is a federal felony, 8 U.S.C. § 1326—or otherwise undermine the integrity of our immigration laws and our border control efforts.

8.  The majority of ERO's immigration enforcement operations take place in the interior of the country. ERO manages all logistical aspects of the removal process by identifying, apprehending, and, when appropriate, detaining removable aliens during the course of immigration proceedings and pending physical removal from the United States. This includes locating and taking into custody fugitive aliens and at large criminal aliens, as well as identifying aliens in federal, state, and local prisons and jails and working with those authorities to transfer them to ICE custody without releasing them into the community. When aliens are ordered removed, ERO is responsible for safely repatriating them, or otherwise overseeing their departure from the United States.

**Current Protests in Portland and Impact on ICE Operations**

9.   ERO Portland Office is located at 4310 South Macadam Avenue in downtown Portland,

Oregon.  Violent opportunists and protesters have targeted this site and the employees

who work there since early June 2025.

10.  Protesters at the ERO Portland Office have assaulted federal law enforcement officers

with rocks, bricks, pepper spray and incendiary devices; some attacks have been serious

enough for FPS to refer for prosecution on ICE's behalf. In just one example, on July 4,

2025, ICE officers observed several individuals defacing ICE property with graffiti. As

an officer pursued one individual, that individual ran towards the officer and kicked him

in the leg, causing the officer to trip. Another individual threw an incendiary device

towards the officers, which then detonated near the officers. The U.S. Attorney's Office

for the District of Oregon deemed these actions severe enough to seek the prosecution of

four involved individuals. *See e.g.*, U.S. Attorney's Office District of Oregon Press

Release, "Four Defendants Charged with Assaulting Federal Law Enforcement Officers,

Other Offenses During Protests Near Local ICE Office (July 8, 2025)[2] (reporting that the

U.S. Attorney's Office charged 22 defendants between June 13, 2025, and July 8, 2025,

with offenses committed at the Portland ERO building including assaulting federal

officers, arson, possession of a destructive device, and depredation of government

property). Indeed, some of these could have resulted in serious, and perhaps permanent

damage to officers. For example, in June 2025, a man geared with a gas mask and vest

was arrested for pointing a powerful laser at federal officers outside an ICE facility in

---

[2] Available at: https://www.justice.gov/usao-or/pr/four-defendants-charged-assaulting-federal-law-enforcement-officers-other-offenses#:~:text=Since%20June%2013%2C%202025%2C%20the,and%20depredation%20of%20government%20property (last visited Oct. 1, 2025).

**SA27**

Portland. *See* KGW8 News Report, "Man arrested outside Portland ICE facility, accused of pointing laser at federal officers" (June 19, 2025) (anti-ICE protester arrested outside the ERO Portland Office after attempting to shine a laser pointer in the eyes of officers in June 2025).[3]

11. Protesters have repeatedly tried to burn down the Portland ERO Office, risking the safety of the public at large and lives of both ICE personnel and any detainees who might have been held in the facility, in addition to property damage. For example, on June 11, 2025, federal officers observed a man ignite a flare and set fire to a range of materials that protesters compiled to barricade against a vehicle gate. Other individuals then added items to the pile of materials, growing the flames further. The Federal Bureau of Investigations, Federal Protection Service (FPS), and the Bureau of Alcohol, Tobacco, Firearms, and Explosives investigated this incident, and the U.S. Attorney's Office for the District of Oregon is prosecuting these acts of violent destruction. *See* U.S. Attorney's Office, District of Oregon Press Release, "Four Defendants Charged with Various Offenses Including Arson, Assaulting a Federal Officer, and Depredation of Federal Property During Protests Near Local ICE Office;"[4] Portland Police Bureau Press Release, "Protestors Place Flammable Material, Lit Flare Against ICE Building, Officers Arrest 3."[5] On June 24, 2025, protesters attempted to set a U.S. flag on fire in the driveway of the ERO Portland building, and later a protester attempted to light an incendiary device next to the building's guard shack. When FPS officers engaged with the protester, she

---

[3] Available at: https://www.kgw.com/article/news/local/protests/portland-ice-facility-protest-arrests/283-ee652223-8d7a-40f6-a2ec-0cc373caaad2 (last visited Oct. 1, 2025).
[4] Available at: https://www.justice.gov/usao-or/pr/four-defendants-charged-various-offenses-including-arson-assaulting-federal-officer-and (last visited on Oct. 1, 2025).
[5] Available at: https://www.portland.gov/police/news/2025/6/12/protesters-place-flammable-material-lit-flare-against-ice-building-officers (last visited on Oct. 1, 2025).

threatened them with knives. *See* U.S. Attorney's Office, District of Oregon Press

Release, "Three Defendants Charged with Assaulting Federal Law Enforcement Officers,

Other Offenses During Protests Near Local ICE Office."[6]

12. Protesters have also damaged property, including but not limited to, breaking the

windows of the office building and damaging the external security cameras with spray

paint and other tools. In one instance, protesters used physical force to push the stainless-

steel grid out of alignment from the building's vehicle entrance/exit gates (see photograph

below). The damaged gates compromised security because the gates required manual

locking with a chain and padlock each time a vehicle entry or exit was necessary. On

June 29, 2025, a card reader that permits foot and vehicle entry to the building was

rendered inoperable. *See* U.S. Attorney's Office, District of Oregon, Press Release, "Four

Defendants Charged with Various Offenses Including Arson, Assaulting a Federal Officer,

and Depredation of Federal Property During Protests Near Local ICE Office."[7]

Ultimately, three card readers were broken in June 2025. Replacement of such technology

is expensive, and ERO is waiting for a secure box to house the card reader to be

manufactured. It is expected to arrive in mid-October. In the meantime, entering and

leaving the building are both more difficult, and the building and personnel are less safe.

With the card readers broken, personnel must call someone in the building ahead of time

to let them in and then wait. During this time, protesters take their photos, potentially to

use to publicly dox officers and their family members. Doxing of ICE employees occurs

when the employee's personally identifiable information is gathered and publicly released

---

[6] Available at: https://www.justice.gov/usao-or/pr/three-defendants-charged-assaulting-federal-law-enforcement-officers-other-offenses (last visited on Oct. 1, 2025).
[7] Available at:  https://www.justice.gov/usao-or/pr/four-defendants-charged-various-offenses-including-arson-assaulting-federal-officer-and (last visited Oct. 1, 2025.).

for malicious purposes, such as public humiliation, stalking, identity theft, or targeting for harassment or physical violence. As a result, many personnel wear masks. These masks do not prevent protesters from following officers when they depart the facility, however. I am aware of multiple instances where ICE employees have had their identity and other personal information disseminated online for the sole purpose of doxing, harassing, and intimidating ICE employees and their families, including posting their home address. Specifically, on August 28, 2025, three individuals followed an ICE agent home while livestreaming their predatory pursuit of the agent, providing directions to the agent's home, and encouraging viewers to share the livestream and visit the agent at his home address. The U.S. Attorney's Office for the Central District of California has indicted all three individuals. *See* U.S. Attorney's Office, Central District of California Press Release "Federal Grand Jury Charges Three Women with Following ICE Agent Home from Work and Livestreaming His Home Address on Instagram" (Sept. 26, 2025) (where the Southern California defendants publicly disclosed on Instagram the victim's home address and told viewers, "Come on down.").[8]

---

[8] Available at: https://www.justice.gov/usao-cdca/pr/federal-grand-jury-charges-three-women-following-ice-agent-home-work-and-livestreaming (last visited on Oct. 1, 2025).

Declaration of Field Office Director Cammilla Wamsley

7

**SA30**



13. As a result of the destruction caused by protesters, the ERO Portland Office was required to close for three weeks, from June 13, 2025, until July 7, 2025, forcing most Portland ICE officers to work out of an alternative temporary space. This significantly impeded operations. For example, non-detained aliens who had appointments at the ERO Portland facility had to be rescheduled for alternative locations and/or times, and when the facilities' windows were broken by vandals and/or violent protesters, ERO Portland officers had to process arrested illegal aliens at facilities in Washington State. While the facility is again currently operational, the windows on the building must remain boarded to prevent further damage to property or attempts at incursion and to provide security to those federal employees working inside.

14. The local HSI office advised they received a tip that someone planned to detonate an incendiary explosive device at the building on September 19, 2025. Although this attack did not take place, preparing for the possibility necessitated an increase in security inspections and otherwise diverted important agency resources.

15. HSI detailed three Special Response Team (SRT) certified Special Agents to ERO's SRT efforts in Portland in September 2025, and intends to continue to support as directed. HSI SRT Special Agents are trained, among other things, to engage with the public, serve high-risk warrants under hazardous conditions, arrest dangerous criminals, and assist other law enforcement agencies during critical incidents. Detailing HSI SRT Special Agents to Portland for these purposes diminishes HSI's operational capabilities nationwide due to personnel limitations.

16. Protesters at the ERO Portland Office building have spray painted direct threats against ICE officers on the building, as shown in the photograph below. On September 1, 2025, protesters even assembled a guillotine outside, presumably to intimidate personnel, while two protesters wielded riot shields. *See* Fox News Channel "Anti-ICE Portland rioters with guillotine clash with police in war-like scenes) (Sept. 2, 2025).[9]

---

[9] Available at: https://www.foxnews.com/us/anti-ice-portland-rioters-guillotine-clash-police-burn-flag-war-like-scenes (last visited Oct. 1, 2025).





17. Protesters at the Portland ERO Office building have also repeatedly attempted to impede law enforcement operations by blockading the vehicle entrance. On June 8, 2025, it was reported that protesters placed wood, rocks, and a traffic barrier, and again, on June 11, 2025, protesters set aflame stacked materials alongside the building and placed a pole against the main lobby entrance. Obstructions such as these, if continued, could have a serious effect on ICE's ability to carry out legitimate law enforcement activities and, in addition, are safety hazards if there was an immediate emergency to exit the building. *See, e.g.*, The Oregonian/Oregon Live "Portland police clear blockade of ICE office; chief says it was for safety not immigration enforcement" (June 10, 2025) (protesters barricaded vehicle entrance);[10] Portland Police Bureau News Release, "Protestors Place Flammable Material, Lit Flare Against ICE Building, Officer Arrest 3" (June 12, 2025) (protesters attempted to start a fire at the ERO Portland Office building after placing a pole against the door the facility).[11] It is my understanding the protesters have also poured a substance believed to be motor oil in the vehicle entrance. Motor oil is highly flammable and could be used to burn down the building or cause injury to the personnel using the vehicle entrance.

18. Protesters have attempted to identify both private and government vehicles used by ICE employees in Portland. In September 2025, ICE officers reported vehicles following them after leaving the Portland ERO Office. On September 9, 2025, multiple individuals were observed on four occasions shining high powered flashlights at vehicles departing the building in an apparent attempt to blind the drivers. In the second week of September

---

[10]  Available at: https://www.oregonlive.com/crime/2025/06/portland-police-clear-blockade-of-ice-office-chief-says-it-was-for-safety-not-immigration-enforcement.html (last visited on Oct. 1, 2025).
[11] Available at: https://www.portland.gov/police/news/2025/6/12/protesters-place-flammable-material-lit-flare-against-ice-building-officers (last visited on Oct. 1, 2025).

2025, ICE personnel received multiple reports of drivers leaving the Portland building being temporarily blinded or disoriented after individuals shone high-powered lights at their vehicles. On September 12, 2025, protesters posted a photograph of an unmarked government vehicle used by ICE officers taken at the vehicle entrance of the ERO Portland Office to social media with a post that identified the vehicle by make, model and license plate number. The post alarmingly provided the address of the vehicle's location *after* it left the building and was parked at a separate location. It is further my understanding that, over the past several months, ICE officers in the Seattle AOR, particularly those employed in the Portland ERO Office, have been under surveillance and subjected to written, verbal, and physical threats due to their employment with ICE. Several Portland ICE officers have had their names, photographs and even home addresses posted publicly in multiple locations throughout their residential neighborhoods and the Portland metro area, along with threatening messages. Multiple Portland ICE officers have had unknown individuals appear at their residences in vehicles and on foot, peering into their private homes and recording the officers entering and leaving. A sample of one recent flyer containing violent threats and a Portland ICE officer's personal information, including residential address (redacted for safety reasons), can be seen below. ICE has seen a dramatic increase in assault against ICE personnel as these doxxing websites have revealed their identity and their families' identity to the public, exposing personnel and their families to known and suspected violent individuals. *See* DHS Press Release "Anarchists and Rioters in Portland Illegally Dox ICE Officers and Federal Law Enforcement" (July 11, 2025). [12]

---

[12] Available at: https://www.dhs.gov/news/2025/07/11/anarchists-and-rioters-portland-illegally-dox-ice-officers-and-federal-law (last visited Oct. 1, 2025).



19. In addition, multiple social media users have threatened to murder Portland ICE officers, as depicted in the screenshot below (flyers depicting officers' images and personal addresses have been removed for officer safety) (captured on Sept. 9, 2025).



20. In response to these threats and violence by criminal agitators in Portland, ICE has

diverted its personnel and resources to assist the Federal Protection Service (FPS) in the

protection of the ERO Portland building, the people who work there, aliens, and the

public. As discussed above, this includes deploying ICE officers and agents from around

the country, including SRT personnel, to assist FPS in Portland beginning on or about

June 9, 2025. This diversion of personnel and resources to assist FPS erodes ICE's ability to enforce federal immigration laws in the State of Oregon and across the country.

21. National Guardsmen are especially needed now in Portland given the recent deadly acts of violence targeting ICE, its employees, and its detainees around the country in recent weeks. Notably, on September 24, 2025, in Dallas, Texas, a sniper fired shots indiscriminately at an ICE van and building wounding and killing detainees in custody. Shell casings found near the body of the shooter contained anti-ICE messages.



*See* DHS Press Release: "DHS Issues Statement on Targeted Attack on Dallas ICE Facility."[13]

22. Days later, crowds of protesters outside an ICE facility in Chicago chanted, "Arrest ICE, shoot ICE." One protester was found with firearm after arrest. *See* DHS Press Release:

---

[13] Available at: https://www.dhs.gov/news/2025/09/24/dhs-issues-statement-targeted-attack-dallas-ice-facility (last visited on Oct. 1, 2025).

Declaration of Field Office Director Cammilla Wamsley

15

**SA38**

"Days After the Dallas Terrorist Attack on ICE, Rioters Gather Outside an ICE

Broadview, IL Facility and Chant "Arrest ICE, Shoot ICE," (noting that there has been a

1000% increase in assaults against ICE officers). [14]

23. As threats and violence against ICE becomes the norm – even in portions of the country

that are typically more friendly to ICE – it increases the likelihood that other rogue actors

will endanger the lives of ICE personnel and detainees. Cities like Portland, where

intimidation and violence are already daily tools, are ripe for violence.

24. Deployment of National Guardsmen to assist FPS will help protect ICE personnel and

ICE facility and allow ICE and its employees to enforce federal immigration laws in the

State of Oregon.

**Insufficient Response of Portland Officials**

25. Portland authorities have expressed concern about offering any assistant to ICE that could

be viewed as supporting ICE's immigration law enforcement efforts.  Indeed, in June

2025, PPB Police Chief Bob Day spoke publicly about avoiding any actions that might

show 'perceived or actual support' for immigration agents after Portland officers cleared

a blockade of the ICE driveway to let an empty transport van pass.

26. Instead of helping ICE and FPS protect the ERO Portland building, and personnel from

arsonists, vandals, and stalkers, the City of Portland issued a Notice of Zoning Violation

on September 18, 2025, to the building for boarding up the windows without a Design

Review Approval. The notice requires removal of all the wood coverings on the windows

and doors within 30 days. Should these wood coverings be removed, violent protesters

---

[14]  Available at: https://www.dhs.gov/news/2025/09/26/days-after-dallas-terrorist-attack-ice-rioters-gather-outside-ice-broadview-il (last visited on Oct. 1, 2025).

will be able to damage the windows again, forcing another closure of the building to the public.

**National Guard Assistance Will Allow ICE To Enforce Federal Laws in Portland**

27. It is my understanding that, at this time, approximately 200 National Guardsmen will be deployed to the Portland area providing protection of federal personnel, property, and functions.

28. I expect the National Guard will protect federal immigration officials from interference in their lawful enforcement efforts and their presence at federal facilities in the Portland area.

29. The presence of the National Guard will enable ICE to continue to carry out its congressionally mandated duties in the Portland area. It is the additional manpower and resources provided by these guards – indeed, their mere presence – that will provide safety to local federal facilities and ensure the safety of those enforcing federal laws in Portland.

**Impact of Plaintiffs' Requested Relief**

30. If the Court grants Plaintiffs' temporary restraining order, ICE employees, detainees, the federal facilities, and the general public in the vicinity of the federal buildings will continue to be at serious risk of harm and ICE will have to continue to divert its limited personnel and resources to support FPS instead of enforcing federal laws in the State of Oregon.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and

correct to the best of my knowledge and belief.

October 2, 2025


CAMMILLA H WAMSLEY
Digitally signed by CAMMILLA H WAMSLEY
Date: 2025.10.02 10:34:56 -07'00'

Cammilla Wamsley
Field Office Director
Seattle Field Office
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

SA41

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| STATE OF ILLINOIS, *et. al.*, <br><br> *Plaintiff*, <br><br> v. <br><br> DONALD TRUMP, *et.al.*, <br><br> *Defendants*. | No. 25-cv-12174 |

**DECLARATION OF FIELD OFFICE DIRECTOR RUSSELL HOTT**

I, Russell Hott, hereby declare as follows:

1. I am employed by the United States Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) as the Field Office Director (FOD) of the ERO Chicago Field Office. This includes oversight of ICE's Broadview Processing Center (BSSA), in Broadview, Illinois. I have held this position since August 2025.

2. Beginning in the fall of 2024, I served as the Acting Executive Associate Director (EAD) for ERO. In that role, I oversaw the operations of more than 7,600 ERO employees in field offices, at headquarters, and overseas. ERO manages and oversees all aspects of the removal process within ICE, including domestic transportation, detention, alternatives to detention programs, bond management, supervised release, and removal to more than 170 countries around the world. I previously served as Deputy EAD from January 2024. I began my service with the U.S. Government as a detention enforcement officer with the former Immigration and Naturalization Service in New York, New York. I have held the

following positions with ICE: Assistant Director for Enforcement and Custody

Management, Field Operations, and Enforcement Divisions, FOD for the Washington

Field Office, Deputy FOD for the Boston and Washington Field Offices, Chief of Staff

for the ICE Deputy Director, acting Deputy Assistant Director for Domestic Operations –

Western Operations, and Unit Chief in the Removal Division. As the FOD for ERO

Chicago, I direct and oversee ICE's enforcement of federal immigration laws in the states

of Illinois, Indiana, Wisconsin, Kansas, Kentucky, and Missouri.

3. The Chicago Field Office has approximately 180 officers covering six states across two

time zones. In and around the City of Chicago, ERO has approximately 65 officers,

including 31 at BSSA.

4. This declaration is submitted in support of Defendants' Opposition to Plaintiffs' Motion

for Temporary Restraining Order (TRO). I have reviewed Plaintiffs' application for a

TRO and supporting exhibits.

5. The statements contained in this declaration are based upon my personal knowledge and

information made available to me in the course of my official duties.

**Background**

6. ICE is the largest investigative branch of DHS and is charged with enforcement of more

than 400 federal statutes. The agency was created after the September 11, 2001, terrorist

attacks, by combining components of the former Immigration and Naturalization Service

and the former U.S. Customs Service, among other agencies, to more effectively enforce

federal immigration and customs laws and to protect the United States against terrorist

attacks. The mission of ICE is to protect the United States from the cross-border crime

and illegal immigration that threaten national security and public safety. To carry out that

**SA44**

mission, ICE focuses on enforcing immigration laws, preventing terrorism, and combating transnational criminal threats. ICE consists of three core operational directorates: (1) ERO, which includes 25 field offices led by FODs; (2) Homeland Security Investigations (HSI), which includes 30 field offices led by Special Agents-in-Charge; and (3) the Office of the Principal Legal Advisor, which includes 25 field locations led by Chief Counsel.

7. ERO deportation officers are immigration officers under 8 U.S.C. § 1357 and customs officers under 19 U.S.C. § 1589a. It is the mission of ERO to identify, arrest, and remove aliens who present a danger to national security or are a risk to public safety, as well as those who enter the United States illegally—including those who cross the border illegally, which is a federal misdemeanor, 8 U.S.C. § 1325, and those who illegally reenter after having been removed, which is a federal felony, 8 U.S.C. § 1326—or otherwise undermine the integrity of our immigration laws and our border control efforts.

8. The majority of ERO's immigration enforcement operations take place in the interior of the country. ERO manages all logistical aspects of the removal process by identifying, apprehending, and, when appropriate, detaining removable aliens during the course of immigration proceedings and pending physical removal from the United States. This includes locating and taking into custody fugitive aliens and at large criminal aliens, as well as identifying aliens in federal, state, and local prisons and jails and working with those authorities to transfer them to ICE custody without releasing them into the community. When aliens are ordered removed, ERO is responsible for safely repatriating them, or otherwise overseeing their departure from the United States.

**Chicago's Restrictions on State and Local Cooperation with Federal Officials**

**(Chicago Code ch. 2-173)**

9. In 2012, the Chicago City Council passed the "Welcoming City Ordinance," Chicago

   Code ch. 2-173, which sought to "clarify the communications and enforcement

   relationship between the City and the federal government," in addition to "establish[ing]

   the City's procedures concerning immigration status and enforcement of federal civil

   immigration laws." Chicago Code § 2-173-005.[1]

10. This Ordinance explicitly and intentionally limits local cooperation with federal

    immigration enforcement in numerous ways. It provides that no agent or agency shall

    "detain, or continue to detain a person based upon an immigration detainer" or "an

    administrative warrant, including, but not limited to, those entered into the Federal

    Bureau of Investigation's National Crime Information Center database, or successor or

    similar database maintained by the United States." Sections 2-173-020(a)(1). Moreover,

    no agent shall permit ICE agents "access, including by telephone, to a person being

    detained by, or in the custody of, the agency or agent," or "use of agency facilities for

    investigative interviews or other investigative purpose." *Id.* § 2-173-020(a)(2). Nor shall

    agents "expend their time responding to ICE inquiries or communicating with ICE

    regarding a person's custody status, release date, or contact information." *Id.* § 2-173-

    020(a)(3).

---

[1] Available at:
https://www.chicago.gov/content/dam/city/depts/mayor/Office%20of%20New%20Americans/PDFs/WelcomeCityOrdinance.pdf  (last visited on Oct. 7, 2025).

11. It is my understanding Chicago Mayor Brandon Johnson signed an executive order on October 6, 2025, prohibiting federal agents from using certain city-owned spaces for immigration enforcement activities.[2]

**Increased Violence and Insufficient Response**

12. Officers continue to face threats throughout the Chicago Field Office Area of Responsibility (AOR). For example, on June 16, 2025, a deportation officer was physically attacked by a rioter outside of the immigration court located at 55 E. Monroe, while the officer was conducting a civil immigration enforcement action.

13. On or around June 4, 2025, a huge crowd formed outside of a facility in the South Loop of Chicago run by ICE's contractor BI Incorporated for the Intensive Supervision Appearance Program (ISAP)[3], after some aliens on the ISAP were arrested following a routine check-in. Protesters and local officials clashed with ICE agents during these arrests, and at one point, a Chicago alderperson sat on the ground, blocking an ICE van. Also, on or about June 17, 2025, protestors outside of the Immigration Court at 55 E. Monroe in Chicago blocked an ICE van, and at least one protestor pulled down the mask of an officer.

---

[2] Available at: https://www.chicago.gov/city/en/depts/mayor/press_room/press_releases/2025/october/city-property-executive-order.html (last visited Oct. 7, 2025) and https://www.nbcchicago.com/news/local/chicago-politics/chicago-mayor-signing-order-to-stop-federal-agents-from-using-certain-city-owned-spaces/3834094/ (last visited on Oct. 7, 2025).
[3] ICE's Alternatives to Detention (ATD) program exists to ensure compliance with release conditions and provides important case management services for non-detained aliens. ATD consists of the Intensive Supervision Appearance Program (ISAP). The ATD-ISAP program utilizes case management and technology tools to support aliens' compliance with release conditions while on ICE's non-detained docket. *See* https://www.ice.gov/features/atd (last visited Oct. 8, 2025).

Declaration of Field Office Director Russell Hott
5

**SA47**

14. A rally was advertised for June 10, 2025, to get "ICE out of Chicago!" One image in support of the rally depicted damaged police vehicles on a highway covered in objects (i.e., scooters, traffic cones, debris). [4]

15. Between approximately February 2025 and July 2025, an individual named Michael Stover posted threats against ICE agents and officers on social media platforms and called for violence against them, including according to the criminal complaint filed against him, calling for others to kill officials "on sight." Additional posts included comments like, "**Abolition is not enough, the goons themselves must be exterminated to the absolute last one. Masks off, photographs taken, then shoot em.**" Stover also stockpiled weapons and ammunition. After being monitored and investigated for months, in September 2025, he was arrested pursuant to a warrant and charged in the District Court for the Northern District of Illinois with threatening to kill federal immigration officers. Those charges remain pending.[5]

16. On or about August 20, 2025, HSI Springfield, Illinois received information indicating that an individual had posted a video to social media stating that all ICE agents are pedophiles and should be killed. This same individual encouraged people to dox ICE agents and go after their families. HSI Springfield initiated an investigation and made an arrest. This case remains open and ongoing.

17. On or about August 24, 2025, ERO officers and other federal law enforcement officers, were conducting an enforcement operation on the Westside of Chicago. While these officers were arresting occupants of a residence on that street, two subjects verbally

---

[4] Available at:
https://www.reddit.com/r/50501Chicago/comments/1l7c6hb/pop_up_protest_at_chicago_immigration_court/?rdt=52315 (last visited on Oct. 8, 2025).
[5] Downers Grove man charged with making threats against ICE agents, political figures (last visited Oct. 8, 2025).

threatened and physically assaulted law enforcement officers, including threatening one officer, reaching for another officer's firearm, and grabbing yet another officer's magazine from his chest and throwing it to the ground. Two of these officers were ICE officers; one was a Customs and Border Protection (CBP) officer. All three officers were wearing vests with "POLICE" on the front.

18.  On September 15, 2025, two illegal aliens escaped from ICE custody in West Chicago while being arrested and restrained. There were 12 illegal aliens who were initially detained for questioning, but protesters on-scene, including a local Illinois state senator, interfered and disrupted the arrests. Most of ERO Officers who were present to conduct arrests were instead forced to control the crowd of rioters, which allowed two of the illegal aliens to escape, both of whom remain at-large. ERO Chicago believes the members of the crowd aided the illegal aliens' escape and provided shelter from law enforcement.

19. On September 22, 2025, several unidentified subjects followed ERO Chicago vehicles transporting detainees from an ICE detention center to the flight line in Gary, Indiana.  The airport security notified ERO and the Gary Police Department of rioters attempting to climb fences onto the tarmac and attempting entry at other parts of the airport where the detainees were located. Gary Police Department responded to this call, and the rioters were dispersed.

20. On October 4, 2025, a CBP government-owned vehicle driven by and carrying federal law enforcement personnel was intentionally boxed in on a public road by approximately 10 civilian vehicles. A black GMC Envoy driven by Anthony Ruiz and a silver Nissan Rogue driven by Marimar Martinez attacked the officers by ramming their vehicles into

the government vehicle on both the passenger and driver's side.[6] Agents exited their vehicle to disperse civilians for safety and to prevent further assault. Martinez then drove her vehicle directly at a Border Patrol Agent. Faced with an imminent threat of death or great bodily harm given the high potential of being run over, the agent discharged his service-issued firearm at the Nissan Rogue striking Martinez, who fled the scene to a nearby business where she was subsequently transported to a local hospital. A handgun was later found within Martinez's purse. Both Ruiz and Martinez were criminally charged under 18 U.S.C. § 111(a) and (b) by the U.S. Attorney's Office for the Northern District of Illinois. Approximately 200 rioters converged near the scene of the shooting at three separate locations. Over the next four hours, rioters threw objects at agents, including glass bottles and traffic cones, and forcefully pushed the agents. The Chicago Police Department initially refused to assist, but over one hour later, they provided perimeter security.

21. Given the lack of an immediate Chicago Police Department response, ERO re-directed its Quick Response Force (QRF) Team to assist the besieged CBP officers. While enroute to the scene, the ERO QRF vehicle was also attacked when it was rammed by another vehicle, causing substantial damage.

22. Later in the day on October 4, 2025, ICE officers operating a government-owned vehicle were surrounded by rioters who slashed the tires of the van. The ICE officers called for emergency assistance, but no units were immediately available because of the ongoing active scenes from two vehicular rammings earlier in the day.[7] The scene quickly became

---

[6] Available at: https://www.dhs.gov/news/2025/10/04/update-dhs-deploys-special-operations-after-multiple-violent-attacks-federal-law (last visited on Oct. 7, 2025).
[7] Available at: https://www.youtube.com/watch?v=IVgTnMfn4ak (last visited on Oct. 7, 2025).

hostile and unsafe. The ICE officers abandoned the vehicle for their own personal safety. Upon returning to the vehicle, all the windows had been smashed and additional destruction of the vehicle had occurred. Chicago Police Department impounded the vehicle, and ICE was required to pay to retrieve the vehicle.

23. Over the summer, one ERO officer was followed to his home, where he was confronted aggressively. The officer was forced to call 911 out of concern for his safety. Roughly ten days later, the same officer's garage was broken into, and his government-owned vehicle was broken into and damaged. The perpetrator was even able to break into the safe in the car and stole the officer's service weapon.

24. Multiple federal employees have been doxed, their families threatened, and their personal property damaged. It is my understanding various criminal enterprises have placed bounties on the murder and kidnapping of immigration officers. For example, on or around October 6, 2025, federal agents in Chicago arrested Juan Espinoza Martinez, an alleged Latin Kings gang leader for placing bounties on a senior immigration officer's life. Martinez reportedly advertised online an offer of $2,000 upon the kidnapping of an officer and $10,000 for the officer's murder with a photo of the targeted officer.[8] *See* U.S. Attorney's Office, Northern District of Illinois Press Release, "Alleged Member of Chicago Street Gang Charged with Soliciting the Murder of Senior Law Enforcement Official Involved in "Operation Midway Blitz," (Oct. 6, 2025).

25. It is my understanding certain criminal enterprises have set forth clear intentions to undermine immigration authorities and have escalated their tactics against federal law

---

[8] Available at: https://www.justice.gov/usao-ndil/pr/alleged-member-chicago-street-gang-charged-soliciting-murder-senior-law-enforcement (last visited on Oct. 7, 2025).

Declaration of Field Office Director Russell Hott

9

**SA51**

enforcement, such as using late model SUVs (due to the heavier chassis) to ram and disable law enforcement vehicles during immigration enforcement activities.

26. As threats, violence, and obstruction of operations increased, ERO Chicago was required to respond to increased threats and assaults on its employees and offices. ERO Chicago has leveraged the depth and breadth of its law enforcement authorities in response to acts of violence or aggression impacting its mission. This has included the criminal arrests of violent rioters for trespass and assault and referrals for federal prosecution. CBP was also deployed to Broadview to assist ERO due to increased violence.

27. As the public is increasingly aware of the Chicago Police Department's lack of response, this has emboldened bad actors to increase the violence and targeting of ICE officials, knowing there are no consequences from local police departments.

28. On October 4, 2025, ICE agents called Chicago Police Department to request assistance when officers were boxed in and surrounded following a vehicular ramming incident. An internal dispatch (pictured below) revealed that the Chief of Patrol ordered Chicago police officers not to respond.[9]

---

[9] Available at: https://www.foxnews.com/us/chicago-police-sources-blast-departments-response-after-officers-were-told-not-help-fed-agents-cover-a (last visited Oct. 7, 2025).



29. On September 13, 2025, ICE officers made three separate phone calls to police for assistance when rioters threw rocks near the facility's gates and damaged twelve vehicles resulting in slashed tires and flour poured into a vehicle's gas tank. Broadview Police Department informed officers that it would get back to them but never responded.

**ICE Broadview Processing Center**

30. Only a few miles outside of Chicago, the ICE Broadview Processing Center (BSSA) is beset by increasingly aggressive protesters and violent rioters. BSSA, located at 1930 Beach Street, in Broadview, Illinois, is an ICE-owned property used to intake and process individuals arrested by ICE and CBP for appropriate administrative or criminal action. Since the first week of September 2025, violent opportunists, rioters, and protesters have targeted BSSA and its employees. Because this facility is the only one in the area that serves as an intake and initial processing facility for ICE, protests at this location

**SA53**

interfere with immigration operations throughout the region, including ICE's targeted operations against criminal aliens.

31. Though issues began in early September, riots at the BSSA escalated from September 12 to the present. Rioters, among other things, blocked all means of ingress and egress at BSSA and physically assaulted personnel – law enforcement and non-law enforcement alike – who were attempting to go to and leave work.[10] Employees, who parked in an open lot, had to call the office when they arrived, so four officers could come out and escort them into the building. These "security details" retraced their steps when the employees departed. Vandalism of cars in the lots became common. Both government and personally owned vehicles were targeted. As a result, ICE employees would park further from BSSA, and ERO would have to send a van, which would be attacked by rioters, to retrieve them. Moving cars were also vandalized. In an attack that was repeated more than a dozen times, one rioter would jump on the hood of a car, and another would stand immediately behind the car. While the driver stopped the car in the face of these obstacles, others would run up to the car and slash the tires. My own tires were slashed in this fashion.

---

[10] Photos below available at: https://blockclubchicago.org/2025/09/19/ice-tear-gasses-detains-protesters-outside-broadview-facility/ (last visited October 7, 2025) and https://southsideweekly.com/we-want-them-back-protest-and-state-violence-at-broadview-ice-facility/ (last visited October 7, 2025).

Declaration of Field Office Director Russell Hott





32. Not only ICE personnel were impacted. These violent individuals accosted employees of
nearby businesses, mistaking them for ICE employees. At least one of these employees
also had their personally owned vehicle vandalized.

33. Property damage was significant, with graffiti (largely spray paint and permanent marker)
on the building, concrete surfaces, signs, and the flagpole. The vandalism has included, in
multiple locations: "F*CK ICE." BSSA's external plumbing systems were destroyed by
the violent agitators when they broke off plumbing and downspouts. It has not yet been
repaired, exposing the building to damage during inclement weather.

SA55



Declaration of Field Office Director Russell Hott
14



34. As threats, violence, and obstruction of operations increased, ERO Chicago was required

to respond to increased threats and assaults on its officers and offices at BSSA by shifting

its limited personnel and resources from the enforcement of federal immigration law to

protecting its own employees and facilities. Because the facility is ICE-owned, it is not

protected by the Federal Protective Service (FPS). ERO has been forced to shift resources

from within its own organization. For example, five ERO SRT teams were flown into

Chicago from various cities, including El Paso, New York, and Phoenix, to assist with 24-hour security at BSSA. These ERO SRT teams are typically comprised of 16 officers. In addition, ERO has solicited help from Bureau of Prisons (BOP), Federal Bureau of Investigations (FBI), Bureau of Alcohol, Tobacco, and Firearms (ATF), Drug Enforcement Administration (DEA), and CBP. The only time that FPS appeared at BSSA was after a fence was installed around the property, to deter violence and protect employees and property, and the crowd moved to the other side of the building near a GSA parking lot.

35. Most troubling has been the sharp increase in physical assaults on personnel, including employees who are not law enforcement officers. On several occasions, officers have been hit and punched by rioters at BSSA. As the size of the crowds at BSSA have grown from a mere handful of people in early September to more than 300 immediately before the fence was erected on the night of September 22-23, 2025, the assaults became more significant and the clashes more violent.

36. Starting in early September, rioters shot fireworks at officers stationed outside BSSA.[11] This has the potential to cause burns, blindness, and more significant injury, depending on the distance at which the firework explodes.

---

[11] Photos available at: https://blockclubchicago.org/2025/09/19/ice-tear-gasses-detains-protesters-outside-broadview-facility/ (last visited October 7, 2025) and https://news2share.com/anti-ice-protesters-arrested-tents-dismantled/ (last visited October 7, 2025).





37. The weekends of September 12-14 and 19-21 were particularly violent. Rioters threw

bottles and rocks at officers, and even canisters of 2-chlorobenzylidene malononitrile

(also known as CS gas), which they brought to throw at federal officers at BSSA. CS is a

form of tear gas generally used for riot control.[12] Under Illinois Criminal Code of 2012, no person shall knowingly manufacture, possess, deliver, sell, purchase, carry, use, or employ in any manner any tear gas weapon or chemical weapon or device, unless issued a permit for commercial use from the Illinois Department of Professional Regulation.



38. At the same time, rioters would attempt to pull off officers' masks. When ERO fired its own CS canisters into the violent crowd, rioters would throw them back. When in scuffles, rioters would attempt (and sometimes succeed) to pull gear, such as gas masks or CS canisters, off officers' uniforms.

39. Because the larger and more aggressive crowds of protesters have made safe access to BSSA increasingly difficult, ERO Chicago has used $100,000 worth of less lethal munitions and chemicals for crowd control in two weeks spanning from September 6,

---

[12] Photo available at: https://www.usatoday.com/picture-gallery/news/nation/2025/10/03/chicago-protests-federal-ice-immigration-raids-photos/86503237007/ (last visited October 7, 2025).

2025, to September 20, 2025. ICE has never needed to use such munitions at this location previously.

40. Over the weekend of September 19-21, 2025, ERO discovered a round, green ball with a wick. Its purpose was unclear, but in an abundance of caution, ERO contacted the Bureau of Alcohol, Tobacco, Firearms, and Explosives, which labeled it an Improvised Explosive Device and removed it from the scene.[13]

41. It is clear that rioters have sought to permanently maim ERO personnel. When standing close to officers, rioters have used "Aztec Death Whistles," which sound like a human screaming and are generally 100-110 decibels in volume. They have also used bullhorns. At close quarters, either could cause long-term or even permanent hearing loss. Rioters have also shone strobe lights and lasers in offers' faces, risking their sight. Several rioters have been armed with loaded weapons, and they have been charged in federal court with assaulting or forcibly resisting federal agents. *See* U.S. Attorney's Office, Northern District of Illinois Press Release| Five Individuals Charged in Federal Court in Chicago with Assaulting or Resisting Federal Agents Engaged in Immigration Enforcement Operations | United States Department of Justice (Sept. 29, 2025).[14]

42. It is clear that these rioters are organized. They appear to gather offsite and then are brought onsite in vans. After several hours, the vans return with new rioters and take the people who have been outside for several hours away with them. When they arrive, rioters are armed with shields, gas masks, protective padding, and other tools that indicate that rioters are prepared or expecting to physically engage with federal personnel.

---

[13] Available at: https://x.com/DHSgov/status/1972297960319832252 (posted Sep. 28, 2025) (last visited Oct. 7, 2025).
[14] Available at: https://www.justice.gov/usao-ndil/pr/five-individuals-charged-federal-court-chicago-assaulting-or-resisting-federal-agents (last visited Oct. 7, 2025).

Declaration of Field Office Director Russell Hott

43. The agitators have been successful in their attempts to harm officers. More than thirty ERO officers have been injured during the assaults on federal law enforcement, including a torn ACL, a beard being ripped from an officer's face, multiple lacerations, cuts, and bruises, multiple hospitalizations, and a hyper-extended knee from an officer being tackled by a rioter at the legs.

44. Personnel have not been harmed or threatened only at BSSA. More than twenty officers have been doxed with their home addresses posted on social media, their families threatened, and their personal property damaged. Cartels and the Latin Kings gang have placed $10,000 bounties on the murder of any immigration officer.

45. As BSSA's staff became overwhelmed by this concentrated attack, ERO Chicago took additional steps to directly respond to the above-referenced violence. On or about September 8, 2025, ERO Chicago mandated 12-hour duty shifts for its SRT officers. SRT officers and agents are uniquely trained to serve in high-risk situations, such as serving warrants under hazardous conditions, arresting dangerous criminals, and assisting other law enforcement agencies during critical incidents. The addition of SRT officers to control the security risks at BSSA aimed to ensure that the most highly trained officers were safeguarding BSSA, officers, agents, and bystanders from unnecessary and unlawful violence. Among other things, SRT members created paths for ERO vehicles to enter and exit and pushed the crowds away from the building as the rioters threatened violence. The addition of SRT members to secure BSSA and the ongoing 12-hour shifts has diverted important limited resources away from federal law enforcement operations outside of BSSA. And despite the presence of SRT members and ICE's significant expenditure of resources, rioters continue to exhibit violent and obstructive behavior.

SA62

46. On at least twenty-five occasions, ERO Chicago solicited assistance from Homeland Security Investigations, another component within ICE, to add agents from its SRTs, to address the escalating violence.

47. Of ERO's 31 BSSA officers, approximately 21 have been diverted to secure the outside perimeter of the facility. This diversion of resources has caused the processing of aliens to slow down at BSSA, created a strain on BSSA employee work hours, and has caused another ICE facility to facilitate in the processing of aliens. Beginning on or around September 7, 2025, BSSA officers were mandated to increase their workload from an eight-hour five-day per week schedule to a twelve-hour six-day per week schedule. Because of this diversion away from officers' regular duties of transporting and booking, on or around September 14, 2025, the BSSA facility sent an entire plane of approximately 131 unprocessed aliens to the El Paso facility for processing, which then had the domino effect of straining El Paso's resources.

**Impediment to ICE Operations Nationwide**

48. Over the past few months, there has been a marked increase in aggressive and hostile actors obstructing the lawful execution of ICE's federal law enforcement mission nationwide. ICE officers have been harassed, attacked, and brutalized; their family members have been doxed and threatened; and Government property has been vandalized and destroyed.

49. This summer, ICE came under attack in Los Angeles, California, where despite assertions to the contrary, local law enforcement was unable to adequately provide security to officers and the public.[15] *See* Associated Press Report, "Protests Intensify in Los Angeles

---

[15] Available at: https://apnews.com/article/immigration-protests-raids-los-angeles-78eaba714dbdd322715bf7650fb543d7 (last visited on Oct. 7, 2025).

Declaration of Field Office Director Russell Hott

21

**SA63**

After Trump Deploys Hundreds of National Guard Troops," (June 8, 2025). On June 6, 2025, rioters turned to violence and began throwing objects at ICE vehicles. Later in the day, Mayor Karen Bass posted on X inflammatory comments that escalated the violent activities. Rioters began throwing concrete chunks, bottles of liquid, and other objects at Federal Protective Service (FPS) officers as well as attempting to use large rolling commercial dumpsters as a battering ram to breach the parking garage gate and damage the federal building. On June 9, 2025, the federal building had to be shut down due to ongoing violence. On June 14, 2025, the Los Angeles Police Department declared an unlawful assembly outside 300 North Los Angeles Federal Building and Edward R. Roybal Federal Building and U.S. Courthouse after violent opportunists in the crowd of over 1,000 people began assaulting law enforcement officers with rocks, bricks, bottles, fireworks, and other objects. *See* "Officers Deploy Tear Gas, Rubber Bullets to Clear Protestors in Downtown Los Angeles."[16] Protestors blocked the parking garage exits on Alameda Street, preventing ICE transport vehicles from exiting with approximately 130 immigration detainees. As the protests grew, ICE was forced to abandon its use of the U.S. Marshals' transport bus. Only through the actions of the National Guard was ICE able to move the detainees.

50. Moreover, in June 2025, two men were federally charged after throwing Molotov cocktails during immigration enforcement protests in downtown Los Angeles. One of the men was accused of throwing a flaming Molotov cocktail at Los Angeles County Sherriff's deputies who were conducting crowd control. Police arrested the other man who allegedly threw a Molotov cocktail at law enforcement officers when officers

---

[16] Available at: https://ktla.com/news/local-news/no-kings-protestors-ordered-to-disperse-tear-gassed-in-downtown-los-angeles/ (last visited on Oct. 7, 2025).

**SA64**

approached him.[17] *See* NBC4 Los Angeles News Report, "2 LA County Men Charged in Molotov Cocktail Attacks in Downtown LA and Paramount," (June 11, 2025).

51. In fact, the 300 North Los Angeles Street Federal Building in downtown Los Angeles, California, was closed for over a week due to rioters assaulting federal, state, and local law enforcement officers with rocks, fireworks, and other objects. Rioters and protestors also damaged federal property by spray painting death threats to federal law enforcement officers.[18]

---

[17] Available at: https://www.nbclosangeles.com/news/local/molotov-cocktail-attacks-la-paramount-protests/3721306/ (last visited on Oct. 7, 2025).
[18] Additional photos and videos for those assaults and threatening graffiti can be found here: https://www.dhs.gov/news/2025/06/10/dhs-sets-record-straight-la-riots-condemns-violence-against-law-enforcement (last visited Oct. 7, 2025).







52. Similar violent and hostile activity targeting ICE operations is spreading across the Nation. Rioters at the ERO Portland Office have assaulted federal law enforcement officers with rocks, bricks, pepper spray, and incendiary devices; some attacks have been serious enough for FPS to refer for prosecution. In just one example, on July 4, 2025, ICE officers observed several individuals defacing ICE property with graffiti. As an officer pursued one individual, that individual ran towards the officer and kicked him in the leg, causing the officer to trip. Another individual threw an incendiary device towards the officers, which then detonated near the officers. These actions were severe enough for the U.S. Attorney's Office for the District of Oregon to seek the prosecution of four involved individuals. *See e.g.*, U.S. Attorney's Office District of Oregon Press Release, "Four Defendants Charged with Assaulting Federal Law Enforcement Officers, Other Offenses During Protests Near Local ICE Office (July 8, 2025) (reporting that the U.S. Attorney's Office charged 22 defendants between June 13, 2025, and July 8, 2025, with offenses

committed at the Portland ERO building including assaulting federal officers, arson, possession of a destructive device, and depredation of government property).[19]

53. For more than 100 nights, the ICE facility in Portland, Oregon has effectively been under siege by violent rioters who not only clash with federal law enforcement but create an unsafe environment for Portland residents who live near the facility. These "protests" involve bottle rockets being fired at the ICE building, rocks thrown through windows, lasers targeting ICE officers' eyes, and barricades blocking ICE vehicles in and out of the facility. *See* Greg Wehner, Portland Police Chief Touts 'Crowd Support' Approach as ICE Facility Faces Ongoing Violence, *Fox News* (Oct. 5, 2025, 8:28 p.m. EDT).[20]

54. Upon information and belief, there are reports from nearby residents who have barely slept as the area has become a "war zone" and is "terrifying" as the encampment of protesters "blast loud music, engage in anti-government chants over loudspeakers and megaphones, and …. Violently clash with law enforcement officers." Joseph Treviño, Inside the Antifa Siege on 'War Zone' Portland — and the Resistance to the National Guard Cleaning It Up, *New York Post* (Oct. 1, 2025, 6:02 p.m. ET).[21] In the same vein, rioters have repeatedly tried to burn down the Portland ERO Office, risking the safety of the public at large and lives of both ICE personnel and any detainees who might have been held in the facility, in addition to property damage. For example, on June 11, 2025, federal officers observed a man ignite a flare and set fire to a range of materials that

---

[19] Available at: https://www.justice.gov/usao-or/pr/four-defendants-charged-assaulting-federal-law-enforcement-officers-other-offenses#:%7E:text=Since%20June%2013%2C%202025%2C%20the,and%20depredation%20of%20government%20property (last visited on Oct. 7, 2025).

[20] Available at: https://www.foxnews.com/us/portland-police-chief-touts-crowd-support-approach-ice-facility-faces-ongoing-violence (last visited on Oct. 7, 2025).

[21] Available at: https://nypost.com/2025/10/01/us-news/inside-the-antifa-siege-on-war-zone-portland-and-the-resistance-to-the-national-guard-cleaning-it-up/ (last visited Oct. 7, 2025).

rioters compiled to barricade against a vehicle gate. Other individuals then added items to

the pile of materials, growing the flames further. The Federal Bureau of Investigations,

FPS, and the Bureau of Alcohol, Tobacco, Firearms, and Explosives investigated this

incident, and the U.S. Attorney's Office for the District of Oregon is prosecuting these

acts of violent destruction. *See* U.S. Attorney's Office, District of Oregon Press Release,

"Four Defendants Charged with Various Offenses Including Arson, Assaulting a Federal

Officer, and Depredation of Federal Property During Protests Near Local ICE Office."[22]

55. Rioters have even gone to such extreme lengths to display their violent proclivities

towards ICE officers by assembling and displaying a guillotine outside of the ERO

Portland Office. *See* Greg Norman, Anti-ICE Portland Rioters Bring Guillotine, Clash

with Police, Burn Flag in 'War-Like' Scenes, *Fox News* (Sept. 2, 2025, 10:53 a.m.

EDT).[23]

---

[22] Available at: https://www.justice.gov/usao-or/pr/four-defendants-charged-various-offenses-including-arson-assaulting-federal-officer-and. (last visited Oct. 7, 2025). *See also* Protesters Place Flammable Material, Lit Flare Against ICE Building, Officers Arrest 3, *Portland Police Bureau* (June 12, 2025, 12:45 a.m. PDT), available at: https://www.portland.gov/police/news/2025/6/12/protesters-place-flammable-material-lit-flare-against-ice-building-officers (last visited on Oct. 7, 2025) and *FOX 12 Oregon* (July 1, 2025, 6:33 p.m. EDT), available at: https://www.kptv.com/2025/07/01/man-facing-federal-charges-starting-fire-portland-ice-facility (last visited Oct. 7, 2025).

[23] Available at: https://www.foxnews.com/us/anti-ice-portland-rioters-guillotine-clash-police-burn-flag-war-like-scenes (last visited Oct. 7, 2025).



Anti-ICE protesters are seen rolling out a guillotine on Monday, Sept. 1, 2025, in front of the ICE field office in Portland, Ore. (X/@KatieDaviscourt)

56. These threats have gone even further. Upon information and belief, over the past several

months, ICE officers in the Seattle Field Office Area of Responsibility (AOR),

particularly those employed in the Portland ERO Office, have been under surveillance

and subjected to written, verbal, and physical threats due to their employment with ICE.

Several Portland ICE officers have had their names, photographs and even home

addresses posted publicly in multiple locations throughout their residential

neighborhoods and the Portland metro area, along with threatening messages. Multiple

Portland ICE officers have had unknown individuals appear at their residences in vehicles

and on foot, peering into their private homes and recording the officers entering and

leaving. A sample of one recent flyer containing violent threats and a Portland ICE

officer's personal information, including residential address (redacted for safety reasons),

can be seen in the DHS Press Release referenced below. ICE has seen a dramatic increase

in assault against ICE personnel as these doxxing websites have revealed their identity

and their families' identity to the public, exposing personnel and their families to known

SA71

and suspected violent individuals. *See* DHS Press Release "Anarchists and Rioters in Portland Illegally Dox ICE Officers and Federal Law Enforcement" (July 11, 2025).[24]

57. In addition, multiple social media users have threatened to murder Portland ICE officers, as depicted in the screenshot below (captured on Sept. 9, 2025).



58. These threats against the lives of ICE officers, when considered in the shadow of the recent shooting upon the ICE facility in Dallas, killing two people, cannot be discounted. They are real.

---

[24] Available at: https://www.dhs.gov/news/2025/07/11/anarchists-and-rioters-portland-illegally-dox-ice-officers-and-federal-law (last visited Oct. 7, 2025).

59. On September 24, 2025, Joshua Jahn carried out a shooting at an ICE facility near Interstate 35E in Dallas, Texas, firing from a rooftop into the sally port.[25] Three detainees in a van were shot; one died at the scene, and another succumbed to injuries six days later.[26] Investigators found anti-ICE notes and a marked round of ammunition, concluding the attack was a premeditated terrorist act targeting ICE agents.[27]

60. On July 4, 2025, a group attacked an ICE facility in Alvarado, Texas, vandalizing property and setting off fireworks.[28] During the incident, a gunman fired on responding police, injuring an officer, who was struck in the neck.[29] Additionally, a month earlier, a man was arrested at a Dallas ICE facility for making a bomb threat.[30]

### National Guard Assistance Will Allow ICE To Enforce Federal Laws in Chicago

61. It is my understanding that, at this time, National Guardsmen are deployed to the Chicago area providing protection of federal personnel, property, and functions. I expect the National Guard will substantially aid in the protection of federal immigration officials from interference in their lawful enforcement efforts and their presence at federal facilities in the Chicago area.

---

[25] Available at: https://www.nbcnews.com/news/us-news/live-blog/dallas-ice-facility-shooting-rcna233385 (last visited Oct. 7, 2025); https://www.dhs.gov/news/2025/09/24/dhs-issues-statement-targeted-attack-dallas-ice-facility (last visited Oct. 7, 2025).

[26] Available at https://www.nbcnews.com/news/us-news/live-blog/dallas-ice-facility-shooting-rcna233385 (last visited Oct. 7, 2025); *see also* https://www.kxii.com/2025/09/30/family-says-mexican-man-shot-dallas-ice-facility-has-died-becoming-attacks-second-victim/ (last visited Oct. 7, 2025).

[27] Available at: https://www.azfamily.com/2025/09/24/fbi-says-ammunition-found-dallas-detention-center-contained-anti-ice-messaging/ (last visited Oct. 7, 2025); *see also* https://www.npr.org/2025/09/25/nx-s1-5553470/latest-updates-dallas-ice-shooting (last visited Oct. 7, 2025); https://abcnews.go.com/US/dallas-ice-sniper-suspect/story?id=125909069 (last visited Oct. 7, 2025).

[28] Available at: https://www.keranews.org/news/2025-07-11/prairieland-detention-center-alvarado-u-s-immigration-and-customs-enforcement-shooting-alvarado-police-officer-questions (last visited Oct. 7, 2025).

[29] Available at: https://www.fox4news.com/news/benjamin-song-suspect-immigration-center-attack-previously-sued-over-drag-show-counter-protest (last visited Oct. 7, 2025).

[30] Available at: https://www.aljazeera.com/news/2025/9/25/who-is-joshua-jahn-what-we-know-about-the-dallas-ice-facility-shooting (last visited Oct. 7, 2025).

62. The presence of the National Guard will enable ICE to carry out its congressionally mandated duties in the Chicago area. The National Guard's additional personnel and resources– indeed, their mere presence – will provide the necessary security to local federal facilities and ensure the safety of those federal employees enforcing and executing federal laws in Chicago.

**Impact of Plaintiffs' Requested Relief**

63. If the Court grants Plaintiffs' temporary restraining order, ICE employees, detainees, the federal facilities, and the general public in the vicinity of the federal buildings and near federal enforcement actions will continue to be at serious risk of harm and aggressive actors, who the city of Chicago is unable to control, and these aggressive actors will continue to obstruct lawful federal enforcement actions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

October 8, 2025

_____
Russell Hott
Field Office Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security